**Original**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Gainesville

AUG 2 3 2002

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

UNITED STATES OF AMERICA )
)
v. )    CRIMINAL ACTION
)    NO.
WILLIAM M. LeCROY, JR. )    2:02cr38
_____ )

### WILLIAM M. LeCROY, JR.'S PROFFER IN SUPPORT OF PETIT JURY CHALLENGE AND MOTION TO STAY PROCEEDINGS AND MOTION TO DISMISS INDICTMENT BASED ON GRAND JURY CHALLENGE

COMES NOW the Defendant, WILLIAM M. LeCROY, JR., and provides the following offer of evidence in support of his Motion to Stay the Proceedings based on the composition of the jury pool from which the petit jury is selected, and his Motion to Dismiss the Indictment based on the selection process for the Grand Jury which returned his indictment. To put the proffered facts in perspective, Mr. LeCroy will first review the relevant standards governing these type of challenges, and will reply to the Government's Consolidated Response. After setting out the proper legal framework, Defendant will then show that he has made out a prima facie case of jury discrimination, and that the Court should conduct an evidentiary hearing on the Motion.

### I. **THE LEGAL FRAMEWORK**

The Government obviously agrees that the Sixth Amendment to the United States Constitution guarantees Mr. LeCroy the right to

*35*

a jury selected from a group representing a fair cross-section of the community. <u>United States v. Tuttle</u>, 729 F.2d 1325, 1327 (11th Cir. 1884); <u>Duren v. Missouri</u>, 439 U.S. 357 (1979); <u>Taylor v. Louisiana</u>, 419 U.S. 522 (1975) Govt. Br. at pg. 2. The Government correctly cites the elements the Supreme Court established in <u>Duren</u> for demonstrating a prima facie violation of the fair cross-section requirement:

> (1) That the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to a systematic exclusion of the group in the jury selection process.

439 U.S. at 364; <u>United States v. Terry</u>, 60 F.3d 1541, 1544 (11th Cir. 1995).

Although the government has cited the law correctly, it has made several errors in how these legal principles are applied

A. <u>The Distinct Group Element</u>.

The first element to be shown in a jury discrimination case is that the allegedly excluded group is "distinctive". Mr. LeCroy has alleged under-representation of two such groups, African-Americans and persons of Hispanic origin. The government concedes that African-Americans constitute a cognizable group of human beings. Amazingly, the government contends that:

2

> ...the same cannot be said for "persons of Hispanic origin." To the extent that the defendant tries to define a cognizable class as "all persons of Hispanic origin," his definition is over-inclusive. Therefore, with regard to "persons of Hispanic origin", defendant has failed to identify a "cognizable class" of individuals who are systematically excluded from jury service.

Govt. Br. at 3-4.

In making this claim, the government is swimming against the long stream of Supreme Court history, numerous lower court cases, and perhaps most importantly, the fact that most modern federal prosecutors readily concede that a Hispanic person is a member of a distinct and cognizable class.

**1)** The Government sets out the showing that must be made to characterize a cognizable class: (1) the group is defined and limited by some factor (i.e., the group has a definite composition such as race and sex); (2) the group shows a common thread or basic similarities in attitude, ideals, or experiences; and (3) the group shows a community of interest such that the group's interest cannot be represented adequately if a group is excluded from the jury selection process. <u>Willis v. Zant</u>, 720 F.2d 1212, 1216-17 (11th Cir. 1984), citing <u>Duren</u>, 439 U.S. at 364; <u>Ford v. Seabold</u>, 841 F.2d 677, 681-83 (6th Cir. 1988). However, citing <u>Hernandez v.</u>

Texas, 347 U.S. 475, 478 (1954), the Government amazingly contends that whether Hispanics are each a sufficiently distinct and cognizable class of persons for a fair cross-section analysis is a question of fact.  It is worthwhile reviewing this 1954 case.

The petitioner there was required in the district court to establish that persons of Mexican descent constituted a separate class in Jackson County, Texas, distinct from Whites, as part of his challenge to the exclusion of persons of Mexican descent in the selection of grand and petit jurors.  That petitioner provided proof similar to the showings made in constitutional challenges raised by Negroes in the first half of the Twentieth Century.  He demonstrated that residents of the community distinguished between "white" and "Mexican."  Historically, children of Mexican descent were required to attend a segregated school for the first four grades.  At least one restaurant in town prominently displayed a sign announcing "No Mexicans Served."  The courthouse had two men's toilets, one unmarked and the other one marked "Colored Men" and "Hombres Aqui" ("Men Here").  The Supreme Court found that evidence established the existence of a class.  Hernandez, 347 U.S. 479, 74 S.Ct. 671.

Other cases arising out of the State of Texas also involved this issue. Twenty-five years ago, the Supreme Court recognized that the petitioner's equal protection claim based on the

4

discrimination against Mexican-Americans and the selection of the grand jury that indicted him was premised upon the under-representation of Mexican-Americans in the jury pool. Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272 (1977). On other occasions, the Supreme Court has repeatedly found that Mexican-Americans are a clearly identifiable class. In White v. Regester, 412 U.S. 755, 767, 93 S.Ct. 2332, 2340, 37 L.Ed.2d 314 (1973), the Supreme Court noted that the district court, consistent with Hernandez v. Texas, considered Mexican-Americans in the Bexar County of Texas to be an identifiable class for Fourteenth Amendment purposes. By 1977, the Supreme Court appeared to take it as a given in Castaneda v. Partida that Mexican-Americans are a clearly identifiable class that can raise a claim based on discrimination.

The Supreme Court has in these cases already recognized that persons of Mexican descent are an identifiable class if they reside in various parts of Texas. If the government is seriously pressing its current claim that Hispanics are not a cognizable group within the Northern District of Georgia, it is obviously ignoring the historical record of disparate treatment of Mexican-Americans, African-Americans, and women.

2) Above and beyond the simple fact that the Supreme Court long ago recognized that which the government now wants to ignore, it is important to look at more recent developments in the lower

5

courts.    Numerous other federal and state courts across the country have recognized Hispanic and Latino people as a cognizable class under the Sixth Amendment. E.g., <u>United States v. Weaver</u>, 267 F.3d 231 (3rd Cir. 2001);<u>United States v. Alvarado</u>, 891 F.2d 439 (2nd Cir. 1989), vacated on other grounds, 497 U.S. 543, 110 S.Ct. 2995, 111 L.Ed.2d 439 (1990); <u>United States v. Sanchez-Lopez</u>, 879 F.2d 541 (9th Cir. 1989); <u>People v. Trevino</u>, 39 Cal. 3d 667, 217, Cal. Rptr. 652, 704 Pac. 2d 719 (1985); <u>Mejia v. State</u>, 328 Md. 522, 616 A. 2d 356 (1992).    In addition to the Supreme Court, the following courts have recognized Mexican-Americans, Hispanics and Latinos as a cognizable group for equal protection grounds: <u>United States v. Lara</u>, 181 F.3d 183, 192 (1st Cir. 1999); <u>United States v. Rioux</u>, 97 F.3d 648, 654 (2nd Cir. 1996); <u>United States v. Cecil</u>, 836 F.2d 1431 (4th Cir. 1988); <u>United States v. Garcia</u>, 991 F.2d 489 (8th Cir. 1993); <u>United States v. Nelson</u>, 137 F.3d 1094 (9th Cir. 1998); <u>United States v. Chanthadara</u>, 230 F.3d 1297 (10th Cir. 2000); <u>United States v. Johnson</u>, 21 F.Supp.2d 329, 334 (S.D.N.Y. 1998); <u>United States v. Coronell-Leon</u>, 973 F.Supp. 1094, 1099 (D. Neb. 1997); <u>United States v. Haworth</u>, 948 F.Supp. 981, 985 (D.N.M. 1996); <u>State v. Atwood</u>, 832 Pac.2d 593, 638-39 (Az. 1992); <u>People v. Avala</u>, 1 Pac.3d 3 (Cal. 2000); <u>State v. Gibbs</u>, 758 A.2d 327, 335 (Conn. 2000); <u>State v. Paz</u>, 798 Pac.2d 1 (Id. 1990), overruled on other grounds; <u>State v. Card</u>, 825 Pac.2d 1081 (Id. 1991);

6

Commonwealth v. Prater, 725 NE.2d 233, 239 (Ma. 2000); State v. Robles, 535 NW.2d 729, 732 (ND. 1995); Aldrich v. State, 938 SW.2d 558, 560 (Tx. 1996); State v. Young, 853 Pac.2d 327 (Ut. 1993); State v. Gurerra-Reyna, 549 NW.2d 779, 781 (Wis. 1996).

**3)** Besides the Supreme Court, in addition to the other courts arrayed above, the government's argument also lies square in the face of what other U.S. Attorney's offices have conceded in other cases. For example, in the relatively recent federal death penalty case of United States v. Chanthadara, supra, "The government concedes, as it did in [United States v. ]Shinault, [147 F.3d 1266 (10th Cir. 1988)] that the first requirement is met-blacks and Hispanics each are distinctive groups in the community." 230 F.3d at 1256. Accord, United States v. Gault, 141 F.3d 1399 (10th Cir. 1998)("...the government concedes that Hispanics, Native Americans and African Americans are distinct groups within the community...").

If the Government seriously disputes that Hispanics and Latinos are a distinct or cognizable group under the Fifth and Sixth Amendments of the United States Constitution, Mr. LeCroy submits that such evidence must be presented at an evidentiary hearing. As will be set out later in this Proffer, the affidavit of Stephanie Bohon, attached hereto, summarizes the nature of the evidence the Defendant is prepared to present to established that

7

Hispanics and Latinos are a distinct and cognizable group and must be proportionately represented in the selection of the grand and petit jury pools to assure the Defendant is provided his constitutionally guaranteed fair cross-section of the community in these pools.

> B. <u>Methods for showing under representation of African-Americans and Hispanics</u>.

Besides its error on whether Hispanics are a cognizable group, the government has also made several errors concerning the legal principles applicable to methods used to show under-representation of certain groups. The government incorrectly contends that the comparison group consists only of eligible voters. Furthermore, the government has ignored Eleventh Circuit law on how the statistical concept of "absolute disparity" is not the only method for proving under-representation.

**1)** At several points, the government argues that Defendant cannot show under-representation because Mr. LeCroy has not compared the jury lists with the lists of eligible voters. Govt. Br. at 4,5. The government makes the additional claim that, unlike other distinct groups, there seems to be a presumption that "Hispanics in the general population []are ineligible for jury

service due to lack of citizenship". Govt. Br. At 8. On each point, the government is incorrect.

The government is correct about how the Jury Selection and Service Act of 1968 envisions voter registration lists as the starting point of the process that ultimately leads to grand and petit juries. However, the government assiduously ignores the fact that Congress specifically realized that using only lists of registered voters might be insufficient sometimes. "The plan shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title." 28 U.S.C. §1863(b)(2). In other words, it is not correct to say that the starting point for statistical comparisons always begins with a list of registered voters.

This same point is made by a case cited in the government's Brief. In United States v. Tuttle, 729 F.2d 1325 (11th cir. 1984), the Eleventh Circuit clearly noted that the proper point of comparison is between people who are on the venire, and "...the under-represented group's proportion of the general or age-eligible population...". Id., at 1327. This Court already seems to recognize this very point. The JS-12's attached to Defendant's initial Motion show how the Clerk's office makes its periodic statistical comparisons between qualified jurors and the "percent this class is found in general population". The Clerk does not

compare the qualified jurors with the list of voters, but instead compares jurors with the population a whole.

There is a very good reason why the courts look to the general population as a whole as the comparison point.  In <u>United States v. Perez-Hernandez</u>, 672 F.2d 1380 (11th Cir. 1982), the Court confronted a case involving a challenge to the way the grand jury foreperson was selected.  Along the way, the Court looked at the question of why it is the entire population as a whole which is the comparison point in jury selection cases.

> The purpose of a jury is to guard against the exercise of arbitrary power-to make available the common sense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps over conditioned or biased response of a judge.  This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinct groups are excluded from the pool.  Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage, but is also critical to public confidence in the fairness of the criminal justice system. Moreover, when any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is

10

> unknown and perhaps unknowable. We
> conclude, therefore, that the
> purpose of the fair cross section
> protection is to provide a criminal
> defendant with grand and petit
> juries which are a microcosm of the
> community.

Id., at 1385 (citations and quotation marks omitted).

The Supreme Court has made the same point that it is the entire community, and not merely lists of registered voters, which forms the base line for comparisons in these cases. In Duren the Supreme Court found the defendant's reliance on the 1970 census data to establish the percentage of the under-represented group in the community acceptable, despite the lower court's criticism that defendant should have used the voter registration lists as the "eligible" population for jury service. Duren v. Missouri, 439 U.S. 366, 365 fn. 22, 99 S.Ct. 664, 669 (1979). Similarly, in Castaneda, the community population was based on the 1960 census, over the objection of the dissenters who urged that ineligible persons be winnowed out of the base line group. Castaneda v. Partida, 430 U.S. 482, compare 496 with 504, 97 S.Ct. 1272, compare 1281 with 1284 (1977).

It is clear that in fair cross section cases such as the present one, the community as a whole is the proper comparison point. However, the government has made an additional claim: that there seems to be a presumption that Hispanics are not citizens,

and thus not eligible to vote.  The government provides no legal or factual citation to support this claim, which should be rejected out of hand.

2)    The government has made a second legal error in its discussion of how to prove whether a distinct group is under-represented in a jury selection system.  The government seems to argue that only the "absolute disparity" method is acceptable.  Instead, as shown below and in the attached affidavits, the "comparative disparity" method is the only one that makes any statistical sense for deciding if Hispanics are under-represented in jury pools in this District.

Absolute disparity measures the difference between the percentage of members of the cognizable group in the relevant population and the percentage of group member on the jury wheel.  In contrast, comparative disparity measures the diminished likelihood that members of an unrepresented group, when compared to the population as a whole, will be called for jury service.

The Government contends that the case law in the Eleventh Circuit requires that a defendant must establish an absolute disparity of greater than 10% to make a prima facie case of under-representation.  Govt. Br. at 6.  This characterization of the status of Eleventh Circuit case law is inaccurate.  The Eleventh Circuit has long recognized that it has not determined whether

12

absolute disparity would be the appropriate measure if the definitive group at issue made up less than 10% of the population. United States v. Maskeny, 609 F.2d 183, 190 (5th Cir. 1980). The Eleventh Circuit has suggested it might consider some measure other than absolute disparity, but it has never been confronted with such a case. See United States v. Grisham, 63 F.3d 1074, 1078-79 (11th Cir. 1995); United States v. Rodriquez, 776 F.2d 1509, 1511, n. 4 (11th Cir. 1985); United States v. Butler, 615 F.2d 685, 686 (5th Cir. 1980)(per curium)(denying petitions for rehearing and rehearing en banc).

In a case that sent back to a District Court a jury selection challenge, the old Fifth Circuit discussed this issue at length.

> The import ascribed by a court to a deviation from proportional representation will necessarily depend upon whether the deviation is viewed in absolute or comparative terms. Where, for example, negroes comprise twenty percent of the presumptively eligibles, their appearance on 10 percent of the venire can be viewed as a 10 percent deviation under the absolute view, or a 50 percent deviation under a comparative view. While there is authority for the latter measure, the preferable view is that an absolute measure should be employed because the comparative measure may distort the significance of a deviation.... [describing case where a group making up 4.4% of a population which had only 2% of its

members on jury pool was a 50% comparative deviation, but only a 2% absolute deviation].<u>Conversely, an intractable use of the absolute measure may, in certain circumstances also produce distorted results. For example, if a district with 10% Non-white population has .5% Non-whites in the wheel, the 9.5% disparity may not evoke disapproval under an absolute measure, but may require it under a comparative measure. Hence, flexible use of the two measures is advisable, with the selection of either to be guided by both a desire to avoid distorted results and a need to adequately protect the interests of those challenging the selection system.</u>

<u>Foster v. Sparks</u>, 506 F.2d 805, 834-35(5th Cir. 1975).

And will be discussed later, numerous modern courts have confronted statistical showings using both the absolute and the comparative disparity methods. The government is simply wrong when it contends that Defendant can only make out a prima facie case by showing a ten percent absolute disparity between a distinct group in the population and the percentage of that group in the venire.

C. <u>The systematic exclusion element</u>

The government's argument on the third element is a simple one, yet it is incorrect. According to the government, there is no problem here because this District has a jury selection plan that fits within the parameters of the Jury Selection and Service Act,

14

and therefore any under-representation cannot be caused by the system itself. Govt. Br. at 11.

This argument by the government is simply a re-hash of its earlier, and incorrect, claims that use of voter lists solves all problems. Such an argument ignores what is demonstrated in the attached affidavits: statistical proof of gross under-representation of Hispanics in the Gainesville Division within the Northern District. If the system is not at fault, how does the government explain that the JS-12 for the Gainesville Division shows that out of a sample of 325 jurors only two are Hispanic, yet even the Census Bureau shows that Hispanics are at least 6% of the population in this Division![1]

The bottom line is that the under-representation demonstrated in the attached Affidavits is caused completely by the system itself, a system which relies only on voter registration lists for its source of potential jurors.

## II. PROFFER

As shown above, many courts and federal prosecutors concede that African-Americans and Hispanics are a cognizable group in jury selection cases. To show under-representation of these groups, it is proper to look at how the percentage of these groups

---

[1] As is shown in the attached affidavits, there is a huge problem with relying solely on the Census Bureau data, in that these numbers contain a massive undercount of Hispanics.

in the general population compares with the percentage of these groups in jury venire. It is appropriate to use both absolute and comparative disparities in making these comparisons. As shown below, those comparisons here demonstrate that this Court should conduct an evidentiary hearing, in that Defendant has made out a prima facie case.

A. <u>Hispanics and African-Americans are each a cognizable group</u>

Attached as Exhibit "A" is the Affidavit of Stephanie Bohon. Paragraph 4 of her Affidavit contains the basis for her conclusion that Hispanics are a distinct and cognizable class. As described previously, this unremarkable conclusion has been accepted for many years by the Supreme Court, lower courts, and numerous federal prosecutors. The first element is clearly established.

B. <u>Hispanics and African-Americans are under-represented in both the District as a whole and in the Gainesville Division</u>

Defendant appended to his previous Motion the relevant JS-12's for all Divisions of this Court. Furthermore, attached to this Proffer is the Affidavit of Jeffrey O'Neal Martin. As shown in his Affidavit, Mr. Martin has been previously accepted as an expert

witness in other courts on the procedures used to produce jury pools.

According to Mr. Martin, there are numerous problems with the jury selection system used in the Northern District of Georgia. By using only the lists of voters, huge swaths of the population in the Northern District are never considered for jury duty. Affidavit of Jeffrey Martin, para.7. Voter registration lists historically undercount the African-American community. Id., para. 14. Including "inactive" voters causes huge statistical problems, in that the data for this group is "questionable". Id., para. 6.

Above and beyond these problems with the system as it is set up, Mr. Martin has also identified how the system causes significant under-representation of Hispanics and African-Americans. Mr. Martin describes how professional statisticians "do not usually use absolute disparity as a statistical measure." Id., para. 10. He describes how for groups whose percentage of the population approaches over even slightly exceeds ten percent, comparative disparity is "a more appropriate measure to use...". Id. As shown in paragraph 11 of his Affidavit, Mr. Martin has established that the comparative disparity for Hispanics in the Gainesville division is an amazing 90.75%, and over 84% in the entire District!

Mr. Martin also notes that the comparative disparity figures for African-Americans are not as dramatic. Nevertheless, this groups seems to also be consistently under-represented in the entire District, and in each Division. What is significant to Mr. Martin is that Whites seem to be always over-represented! Such over-representation can only come at the expense of excluded minority groups. Mr. Martin describes the odds or the statistical chance of Whites always being over-represented in each of the four Divisions simultaneously as 6.25%. In other words, there is a huge problem when a statistician would expect to find White over-representation only 6 out of every 100 times the jury pool is comprised, yet it happens year after year in the Northern District.

Mr. Martin also describes the problems with using absolute disparity figures. For Hispanics especially, Martin describes how they likely comprise a significantly larger portion of the general population than the numbers turned up by the Census Bureau. If these larger numbers of Hispanics are accurate, there is likely to be a ten percent absolute disparity between the measly 0.62% of jurors in the Gainesville Division being Hispanic and the population as a whole.

As noted previously, the Eleventh Circuit has expressly held open the notion that comparative disparity may be the appropriate measuring stick in certain jury challenges. Other courts have

looked at this question as well. Defendant concedes that none of these courts has held for a Defendant in these cases, but is worthwhile comparing the figures in these cases with the numbers found by Mr. Martin here. For example, in <u>United States v. Chanthadara</u>, <u>supra</u>, the court rejected comparative disparities of 40.89% and 58.39% for African-Americans and Hispanics. In <u>United States v. Shinault</u>, 147 F.3d 1266 (10th Cir. 1998) that court found no under-representation when the comparative disparities were 59.84%, 50.09% and 48.63%. <u>United States v. Clifford</u>, 640 F.2d 150, 155 (8th Cir. 1981) rejected a claim of under-representation when the comparative disparity was 46%. The comparative disparity was 58.3% for Hispanics in <u>United States v. Sanchez</u>, 156 F.3d 875, 879, n.4 (8th Cir. 1998). The highest single comparative disparity figure found by Defendant is the 72.98% Hispanic under-representation discussed in <u>United States v. Weaver</u>, 267 F.3d 231, 242 (3rd Cir. 2001). However, in rejecting those numbers that court derided the "questionable probative value" of the method used to compile the figures in question.

However, in comparing the numbers from these cases with what is going on in the Northern District and in the Gainesville Division, it is clear that Defendant has made out a prima facie case of under-representation of Hispanics. There is an almost complete exclusion of Hispanics from jury pools in the Gainesville

19

Division, a 90.75% comparative disparity. A slightly smaller comparative disparity is found in the District as a whole, 84.07%. None of the reported cases has rejected numbers this high.

CONCLUSION

There are serious problems with the jury selection method used in this District. Defendant has made out a prima facie case of under-representation which is caused by this flawed system. The Court should conduct an evidentiary hearing on Defendant's Motion.

Dated: This 22nd day of August, 2002.

Respectfully submitted,

PAUL KISH
STATE BAR NO: 424277

STEPHANIE A. KEARNS
STATE BAR NO. 409950

BRIAN MENDELSOHN
STATE BAR NO. 502031

Federal Defender Program, Inc.
Suite 200, The Equitable Building
100 Peachtree Street
Atlanta, Georgia  30303
404/688-7530
and

DANIEL A. SUMMER
STATE BAR NO. 691759

COUNSEL FOR DEFENDANT WILLIAM EMMETT LECROY, JR.

20