AFFIDAVIT

STATE OF GEORGIA
COUNTY OF FULTON

Before the undersigned officer duly authorized to administer oaths comes Jeffrey O'Neal Martin who swears and affirms the following under oath:

(1)

My name is Jeffrey O'Neal Martin, I graduated from public school in Dekalb County Georgia, hold a Bachelor's degree in Mathematics and Economics from Vanderbilt University and a Master's degree in Economics from the University of Chicago. I am employed as a consultant on jury pool analysis, a consultant on actuarial issues and as a consultant to political campaigns on issues related to voting data and projections. My academic research and current work involves the use of computers and statistical procedures to analyze data including census data and voter registration data. I have been qualified as an expert witness on the procedures used to produce jury pools in Hall, Fulton, Dekalb, Morgan, Dougherty and Bacon counties in Georgia.

(2)

I have been asked by counsel for William LeCroy, Jr. to review various documents and sources of information concerning the construction of the jury wheel in the United States District Court for the Northern District of Georgia. In particular, I was directed to focus on the Gainesville Division of the Northern District.

Counsel for Mr. LeCroy have asked that I render an opinion as to whether the jury wheels in the Northern District of Georgia, and within the Gainesville Division of that District, result in the exclusion of cognizable classes of people. I reviewed the "Amended Plan of the United States District Court for the Northern District of Georgia, All Divisions, For the Random Selection of Grand and Petit Jurors", dated June 1, 2002 (the Plan). I also looked at the most recent "JS-12's", also called the "Report on Operation of the Jury Selection Plan", for the Northern District of Georgia. These JS-12's were dated December 21, 2001. I reviewed the JS-12's for each of the four Divisions within the Northern District, the Gainesville Division, the Rome Division, the Newnan Division and the Atlanta Division. I have also looked at numbers from the 2000 decennial census.

(3)

I interviewed Lucy Moses of the Jury Division about the construction of the jury wheel and the "Amended Plan for the United States District Court for the Northern District of Georgia for the Random Selection of Grand and Petit Jurors" dated June 1st 2002.

(4)

Saralyn Skinner of the Officer of Secretary of State supplied information on the voter files in Georgia. The Georgia Secretary of State website also supplied information.

(5)

The only data source for petit jurors and grand jurors is the voter registration file. The petit jury wheel is randomly drawn from the list of all voters on the voter registration file from the counties in each Division.  Grand jurors are drawn on a District wide basis from all of the Division petit jury wheels.  Even though the voter file contains racial and gender information for each voter, a sample is taken of the jury wheel to show whether the jury wheel is representative.

(6)

My review of information relating to the operation of the Jury Selection Plan in the Northern District of Georgia shows that there are significant problems with using only registered voters as the source from which jurors are selected.  The jury wheels as constructed exclude eligible non-voters.  The jury wheels are demographically different from the population as a whole in the Northern District, and different from the population in the Gainesville Division.  By using only voters as the source from which jurors are selected, there is a significant problem in that this group includes "inactive" voters, the data for which is questionable.

(7)

To show that a jury selection plan is systematically excluding certain persons one can compare the group from which jurors are selected with what the population as a whole looks like.  As

described above, the Plan in the Northern District uses the list of registered voters as the starting point. According to the Secretary of State's information, there were 2,279,018 voters in the Northern District as of August 1, 2002. However, the 2000 census shows that the Northern District had at least 3,701,374 persons over the age of 18. This very basic and simple comparison shows that by using only the list of registered voters, the Plan systematically excludes a significant percentage of persons in the Northern District simply because those persons do not register to vote. My experience with other jury selection methods at the county level shows that many counties have rectified this problem by supplementing the voter list with driver's license data and personal identification cards, along with other sources of data.

(8)

There are various methods for analyzing the statistics when determining if a jury selection plan is excluding certain classes of persons. One statistical method uses a calculation called "absolute disparity". Absolute disparity is calculated as the percentage of a group on a jury wheel less the percentage of that same group in the population. For example, if the census shows that 30% of the people eligible for jury service in a certain area are African-American, and the jury selection plan reveals that 25% of the jurors are African-American, there is a negative absolute disparity of 5%. In this example, African-Americans are under represented on the jury wheel by an absolute amount of 5%. I know

that many courts use a 10% absolute disparity as a cut off point for jury selection challenges.

(9)

One major problem with using absolute disparity as the statistical method for looking at the numbers in a jury selection case is that this method is misleading for any distinct and cognizable group that is less than 10% of the population. For example, if 8% of a District is Hispanic/Latino, and the jury selection Plan purposely excludes all members of this class, the absolute disparity would only be 8% (0 minus 8 equals -8), which is less than the 10% absolute disparity used by many courts.

(10)

Statisticians do not usually use absolute disparity as a statistical measure. A more appropriate measure to use, particularly for groups comprising less than 10% of a given population, is the statistical method known as "comparative disparity". To get the comparative disparity, the absolute disparity is divided by the population percentage of the group in question. In the example set out in paragraph 9 above, the absolute disparity of 8% would be divided by the 8% of Hispanics/ Latinos in the population, yielding a 100% comparative disparity. Comparative disparity measures the rate at which a group is represented. In the example above, 100% of the Hispanic/Latinos are excluded by the Plan. If the jury selection Plan resulted in 4% of the jury pool being Hispanic/Latino, there would be a 4%

absolute disparity, which when divided by the expected 8% would yield 50% comparative disparity.  In other words, in this example the jury plan would result in only 50% of the expected Hispanic/Latino members you would find if the plan properly mirrored the population in general.

(11)

Using the JS-12's and the 2000 Census, I have created a table showing the absolute and comparative disparities for Whites, African-Americans and Hispanic/Latinos in the Gainesville Division. I have also set out these same figures for the entire Northern District of Georgia.

| | Gainesville Division | Gainesville Division | Gainesville Division | All Division Northern District | All Division Northern District | All Division Northern District |
|---|---|---|---|---|---|---|
| | Whites | African American | Hispanic or Latino | Whites | African American | Hispanic or Latino |
| 2000 Census (Age 18 and Over) | 90.67% | 4.21% | 6.70% | 69.35% | 23.41% | 6.34% |
| Sample of Qualified Jury Wheel | 95.08% | 3.38% | 0.62% | 80.46% | 17.22% | 1.01% |
| Absolute Disparity | +4.41% | -0.83% | -6.08% | +11.11% | -6.19% | -5.33% |
| Comparative Disparity | +4.86% | -19.71% | -90.75% | +16.02% | -26.44% | -84.07% |

(12)

Voter registration lists typically have a different demographic make up from the population because of differential rates of registration by different racial and ethnic groups.  The sample of qualified jurors from the wheel over represents Whites

with an absolute disparity of 4.41% in the Gainesville Division and with an absolute disparity of 11.11% in the entire Northern District. Whites are also over represented in each of the four Divisions. The chances of all four Divisions being over represented by Whites randomly in the population is 6.25%. In other words, if the jury selection system was randomly drawn from the population, it would rarely cause over representation of Whites in all four Divisions simultaneously. A statistician analyzing the numbers for all four Divisions would find that Whites would be over represented in all four Divisions only 6.25 times out of 100. This over representation of Whites is a direct result of using only voter lists as the source from which potential jurors are chosen.

(13)

As shown in the Table above, the absolute disparity of Hispanic/Latino jurors does not exceed 10%. However, these numbers are suspect because of the undercount of Hispanic/Latinos already documented by the Census Bureau. There is evidence that the census figures for Hispanic or Latino persons reflect a disproportionate undercount. In the 1990 census, the Census Bureau's adjusted numbers reflect an undercount of the total population by 2.2% while an undercount of Hispanic or Latino persons by 7.1%. The relative increase in the correct number of Hispanic and Latino persons exacerbates the under representation of Hispanic or Latino Jurors on the jury wheel. It is my belief that this undercount of Hispanic/Latinos shows that the absolute disparity numbers on the

JS-12's are not correct, and that it is likely that the absolute disparity exceeds 10%.

(13)

Putting aside the problems with the absolute disparity numbers, there is the additional problem of using this method for small groups. As I described previously, there could never be a 10% disparity for this group, if it comprises less than 10% of the population in general.  If the 2000 Census figures are to be believed, 6.34% of the entire Northern District is Hispanic/Latino, while 6.7% of the Gainesville Division is comprised of this class. As shown by the JS-12 for the Gainesville Division a mere 0.62% of the qualified jurors were Hispanic/Latino, virtually a complete exclusion of this class from juries in this Division. Despite this almost complete elimination of this class, the absolute disparity does not exceed 10%.  This is why the comparative disparity method makes more sense in this context.

(14)

In addition to the problems with the Plan set out above, there are additional difficulties with a system that relies exclusively on voter registration lists as the source for potential jurors. The voter file administered by the Secretary of State of Georgia includes both "active" and "inactive" voters.  Inactive voters are voters that have not contacted voter registration recently.  Voters become inactive because they are no longer residents, are deceased, have trouble receiving mail, or for other reasons do not respond.

Inactive voters are disproportionately African American. As of June 2002, 25.20% of African American voters are inactive while 20.77% of White registered voters are inactive. Therefore the racial skew in the voter file compared to the population is exacerbated when only active voters are taken into account.

(15)

The voter file used to construct the jury wheels includes data on the race and gender of the voter. Instead of sampling the data, a complete demographic summary of the data could be constructed. It would be helpful to analyze this complete information rather than the sample.

(16)

The exclusive use of voter lists as the source for jury wheels in the Northern District of Georgia causes the jury wheels to not be representative of the population. Based on 1) the undercount in the Census, and 2) the problems of using inactive voters as part of the class, there is reason to believe that the absolute disparity of both African-Americans and Hispanic/Latinos is over 10% in either the Gainesville Division, or in the Northern District as a whole. Furthermore, using absolute disparity as the standard makes no statistical sense in cases where the group in question is less than, or only slightly larger than, 10% of a given population. In my professional opinion, this review demonstrates that the jury selection Plan in the Northern District of Georgia: 1) systematically excludes virtually all members of the

Hispanic/Latino class, 2) significantly under represents African-Americans, and 3) consistently over represents Whites.

IN WITNESS WHEREOF, I have set my signature to this affidavit on this 22 day of August , 2002.

Jeffrey O'NEAL MARTIN

Sworn before me this 22 day of August , 2002

NOTARY PUBLIC

MY COMMISSION EXPIRES APRIL 24, 2004

My Commission expires _____

**Jeffrey O. Martin**
**458 North Highland Avenue**
**Atlanta, Georgia  30307**

**Telephone:  (404) 521-1882**
**E-mail:  chief18@mindspring.com**

---

## EXPERIENCE

**1997 - Present**

**Consultant on Jury Pools and Statistical Issues**
- Expert witness in capital cases on jury procedures and statistics.
- Qualified as an expert in Fulton, DeKalb, Hall, Morgan, Dougherty and Bacon counties in Georgia.
- "Jury Challenges" presentation to the Multi-County Public Defender Office Capital Defense Training Seminar February 2002.
- Affidavits and testimony on statistical issues.

**1983 - Present**

**Political Consultant**
- Consultant to municipal, county and state political campaigns.

**1981 – 2001**

**Actuarial Consultant**
**Towers Perrin, Atlanta Office (1995-2001 and 1981-1986)**
**Towers Perrin, Chicago Office (1986-1992)**
**William M. Mercer, Atlanta Office (1992-1995)**
**Chicago Consulting Actuaries, Chicago Office (1992)**
- Pension and employee benefits consulting on strategy, compliance, and administration for large corporations (some specific projects include:  IRC section 415 analysis, work-force modeling and strategy, employee benefits calculation software, models and forecasts of employee benefits and compensation under statutory limits, actuarial and retiree medical valuations)

**1988 - 1992**

**Research and Teaching Assistant, University of Chicago**
- Developed and taught the statistical lab portion of "The Economics and Demography of Marketing", Graduate School of Business 1990-1992
- Taught portions of "The Ethics, Technology, and Economics of American Slavery", Graduate School of Business 1989-1990
- Undergraduate tutoring in Economics 1988-1989

## EDUCATION

**Master of Arts, Economics, University of Chicago, 1988**

**Bachelor of Arts Cum Laude, Economics and Mathematics, Vanderbilt University, Nashville, 1981**
- Mitchell Scholarship
- Travel Scholarship (University of Leeds, U.K. 1979-1980)
- Classes at Fisk University, Nashville

**Public Schools in the City of Atlanta, Fulton County and DeKalb County**