IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| | : | NO. 2:02-CR-038-RWS |
| v. | : | |
| | : | |
| | : | |
| WILLIAM EMMETT LECROY, JR. | : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
TO VACATE, SET ASIDE, OR CORRECT SENTENCE
BY A PERSON IN FEDERAL CUSTODY PURSUANT TO 28 U.S.C. § 2255**

Comes now the United States of America, by and through counsel, David E. Nahmias, United States Attorney, and William L. McKinnon, Jr., Assistant United States Attorney, for the Northern District of Georgia, and submits its opening response to defendant's Motion to Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody Pursuant to 28 U.S.C. § 2255 (hereinafter Section 2255 motion). [Doc. 493]. The government respectfully reserves the right to supplement its response.

I.   Statement of the Case

On May 15, 2002, a federal grand jury for the Northern District of Georgia returned an indictment charging defendant with taking a motor vehicle from the person and presence of Joann Lee Tiesler by force and violence resulting in her death in violation of 18 U.S.C. § 2119(3). (Doc. 1). On August 13, 2002, the grand jury returned a superseding indictment which added death-

eligibility special findings.  (Doc. 32).  On December 20, 2002, the government served on defendant notice of its intent to seek the death penalty.  (Doc. 88).

Following the resolution of numerous pre-trial motions, the trial commenced on February 17, 2004.  (Doc. 375).  On March 1, 2004, the jury found defendant guilty. (Doc. 398).  The penalty phase of the trial commenced on March 3, 2004.  (Doc. 404).  On March 10, 2004, the jury returned its verdict sentencing defendant to death.  (Doc. 413).  Defendant filed a motion for a new trial on March 17, 2004. (Doc. 420).  The court denied defendant's motion for new trial on October 12, 2004.  (Doc. 445).

Defendant filed notice of appeal on October 25, 2004. (Doc. 448).  On March 2, 2006, the Eleventh Circuit affirmed defendant's conviction and sentence.  *United States v. LeCroy*, 441 F.3d 914 (11th Cir. 2006).  Defendant petitioned the United States Supreme Court for a writ of certiorari on November 6, 2006.  The Court denied the writ on April 23, 2007.  Defendant's Section 2255 motion was timely filed on April 22, 2008.  (Doc. 493).

II.  <u>Statement of the Facts Establishing that Defendant was the Perpetrator of the Murder of Joann Tiesler</u>.

The government submits that the evidence of defendant's guilt was overwhelming.  Therefore, defendant can not demonstrate prejudice requiring the setting aside of his conviction for any alleged performance deficiencies of his trial counsel that impacted

only the determination that defendant was the perpetrator of the offense.

On August 21, 2001, defendant was released from custody after serving over ten years in federal and state prisons following convictions for aggravated assault, burglary, child molestation, statutory rape, and unlawful possession of a sawed-off shotgun. (Doc. 429-924-27, 931-32).  Upon his release, defendant began serving a three year term of supervised release, and he moved into the home of his mother and step-father, Donna and Sam Houston, on Cherry Log Mountain in Gilmer County, Georgia, a community of log cabins used mainly as weekend and summer homes.  (Doc. 429-839-40, 842, 846, 925-26).

As a condition of his supervised release, defendant was ordered to undergo a psychosexual evaluation due to his prior convictions for statutory rape and aggravated child molestation. (Doc. 429-930-33).  However, defendant resisted registering as a convicted sex offender, and he walked out of the psychosexual evaluation he had been ordered to attend.  (Doc. 429-937-38, 987, 1000).  Defendant's probation officer warned defendant that he would have to undergo the evaluation or risk being sent back to prison.  (Doc. 429-954).  Defendant indicated he would submit to the evaluation.

At the same time, defendant made plans to abscond from federal supervision.  (Doc. 429-954, 956).  On the back of the letter

3

scheduling his original psychosexual evaluation, defendant wrote a list of items under the heading "need to acquire" which included binoculars, boots, gloves, rifles, guns, ammunition, and food and water for a minimum of three days. (Doc. 429-865-66; Gov. Ex. 67). Defendant proceeded to acquire some of these items by breaking into unoccupied cabins on Cherry Log Mountain near the Houstons' home. At one cabin he stole a shotgun and numerous shells. (Doc. 429-1046). At another cabin he stole medical supplies, such as peroxide and antibiotic cream. (Doc. 430-1087). Defendant also needed a vehicle to carry the items from his "need to acquire" list and other survival supplies because his only means of transportation was a used motorcycle that recently had broken down and been repaired. (Doc. 429-853, 855, 888, 951). Defendant's options for obtaining a vehicle nearby were limited to stealing one from a few year-round residents of Cherry Log, one of whom was Joann Tiesler. Ms. Tiesler was a 30 year-old nurse practitioner who lived alone in a log cabin on the mountain within walking distance of the Houstons.[1] (Doc. 428-628-30; Doc. 429-842-44,850-52).

On Sunday, October 7, 2001, while Ms. Tiesler was away from home on a shopping trip, defendant broke into her residence armed

---

[1] The day after defendant came to live on Cherry Log Mountain, the Houstons took him for a walk and showed him the homes where the full-time residents lived, including Ms. Tiesler's residence. (Doc. 429-850-52).

with a loaded shotgun, a Gerber folding knife, and plastic cable ties he had purchased three weeks earlier at Wal-Mart. (Doc. 428-721, 727, 738, 740-41, 747-48, 750; Doc. 429-904; Doc. 430-1193-95). Defendant entered the cabin through Ms. Tiesler's bedroom window on the back side of her home which was accessible only by climbing onto an elevated deck. (Doc. 428-716-19). Defendant closed the bedroom window, draped the drawstring of the open blinds back over the window locking mechanism so that it looked undisturbed, and waited for Ms. Tiesler to return home. (Doc. 428-647, 716).

Ms. Tiesler arrived home around 6:00 p.m. (Doc. 428-643-44, 665-69). Defendant violently attacked her as she was unloading her Ford Explorer, carrying some clothes she had purchased into her residence. (Doc. 428-647, 657, 721, 774). During the assault, defendant struck Ms. Tiesler in the back of her head with the shotgun and discharged it in the hallway outside her bedroom. (Doc. 428-738-41; Doc. 430-1321). Defendant tied Ms. Tiesler's ankles together and bound her hands behind her back with the plastic cable ties. (Doc. 428-721). Injuries to Ms. Tiesler's wrists indicate that she struggled to free herself from the plastic cable ties. (Doc. 430-1323). Defendant used the electrical cord of a carbon monoxide detection device in Ms. Tiesler's home to strangle her, leaving a bruise that encircled Ms. Tiesler's neck, but it did not cause her death. (Doc. 428-637, 721-22; Doc. 430-1316-18).

Defendant stripped Ms. Tiesler's pants down to her ankles, forced her to kneel at the foot of her bed, and raped her from behind. (Doc. 428-715, 721, 732-33; Doc. 430-1324). DNA testing of vaginal swabs from Ms. Tiesler's body revealed the presence of defendant's sperm. (Doc. 431-1391-92, 1408). Defendant also anally sodomized Ms. Tiesler so severely that it caused contusions around the circumference of her rectum. (Doc. 430-1325-26). After inflicting these injuries, defendant pulled Ms. Tiesler's head back, put his knife to her neck, and slit her throat, creating a gaping wound from which she bled to death. (Doc. 428-722, 732-33; Doc. 430-1311, 1314-16). Defendant used such extreme force that he completely severed Ms. Tiesler's external jugular vein, right internal jugular vein and right carotid artery, penetrating to her cervical vertebrae. (Doc. 430-1315). While Ms. Tiesler was face down in her own blood, defendant plunged his knife into her back five times and then wiped the blade off on her shirt. (Doc. 428-725-28, 749-50; Doc. 430-1318-21). Defendant left Ms. Tiesler lying exposed on her bed to be discovered the next day by a co-worker and real estate agent after she failed to show up for work. (Doc. 428-683, 687, 690).

The only items defendant took from Ms. Tiesler's home were both sets of keys to her Ford Explorer and perhaps some cash from her purse. (Doc. 428-639-42, 743). Defendant left all of her other keys and the contents of her purse strewn on the kitchen

counter.   (Doc. 428-743).   The interior of Ms. Tiesler's home was otherwise undisturbed but for the shotgun blast in the hallway wall and the bloody bed where her body was found.   (Doc. 428-689, 712-16).   Defendant loaded his acquired items in Ms. Tiesler's Ford Explorer and left for Canada.   (Doc. 428-656-58, 745-47).   Before midnight, defendant reached Berea, Kentucky, where he purchased candy, sunglasses, and a sleeping bag at a WalMart.   (Doc. 430-1196).

Defendant was apprehended on Tuesday, October 9th, at the United States-Canadian border driving Ms. Tiesler's vehicle.   (Doc. 430-1157-60).   Inside the vehicle, law enforcement agents found the Gerber folding knife defendant used to kill Ms. Tiesler.   (Doc. 428-747-49).   DNA testing of the knife revealed the presence of Ms. Tiesler's blood.   (Doc. 431-1408-09).   Agents also found a bundle of plastic cable ties like those defendant used to tie-up Ms. Tiesler, two unspent shotgun shells, other ammunition, binoculars, gloves, boots, food and water, among other items from the "need to acquire" list defendant had compiled.   (Doc. 428-750, 753-54, 756, 775).   In addition, agents found inside the vehicle two notes defendant had written on the back of a torn map.   (Doc. 428-751). One note stated, "Please call the police and report this vehicle as stolen.   Thanks, The Thief."   Just below that another note stated, "Please, please, please forgive me Joanne ... you were an angel and I killed you.   Now I have to live with that and I can never go

home.  I am a vagabond and doomed to hell...”[2]  (Gov. Ex. 41A; Doc. 428-752).

This was not the first time defendant had written about killing someone and stealing their vehicle.  Following defendant's arrest on burglary charges in 1991, law enforcement officers found inside his vehicle a written plan to "armed rob cars and kill people driving so the car can be used 2 or 3 days."  (Doc. 430-1233, 1243-46).  On the same piece of paper defendant also wrote: "Kill J? No! Maybe later for car."  (Doc. 430-1246).  Defendant's written plan included burglarizing homes to steal food, guns and ammunition.  (Doc. 430-1246).  On a separate piece of paper found in his car in 1991, defendant compiled a hit list and a plan in the event he was "being chased" which included robbing or stealing cars, switching cars every other day, and burglarizing houses to get food and drink.  (Doc. 430-1247).  In addition to carrying out the hit list, defendant had written plans to "rape, rob, and pillage" and to be "ruthless and famous."  (Doc. 430-1247).

Defendant was incarcerated from 1991 until August 2001 when he came to live in Cherry Log with his mother and step-father.  (Doc. 429-846, 931-32).   The Houstons were the first to identify defendant as a suspect in Joann Tiesler's death.  (Doc. 429-871-72, 900).   The Houstons were away from home the weekend defendant killed Ms. Tiesler and took her vehicle.  (Doc. 429-860).   It was

---

[2] Ellipses in original.

the first weekend defendant had been left alone since his release from custody. (Doc. 429-858, 860-61). The Houstons learned of Ms. Tiesler's death from a neighbor upon returning home Monday evening, October 8th. (Doc. 429-860-64). Sam Houston, a retired law enforcement officer, immediately suspected defendant was involved in Ms. Tiesler's death in part because he had seen the "need to acquire" list in defendant's bedroom some time prior to Ms. Tiesler's murder. (Doc. 429-864-67).

After learning of Ms. Tiesler's death, the Houstons immediately went to their home and found that defendant and most of his clothes were gone, but his motorcycle was parked in front of their cabin. (Doc. 429-867-70). The Houstons found in the trash at their home an empty box of 16-gauge shotgun shells and portions of two black plastic cable ties similar to those defendant used to tie-up Ms. Tiesler. (Doc. 429-868-69, 875). Mrs. Houston also found a crumpled ball of paper on defendant's bed. (Doc. 429-872). It was a note in defendant's handwriting addressed to himself and purportedly from the Houstons. The note read: "Bill Jr. We'll be back Monday evening... Let us know how your new Jeep is to your liking! Priscilla's # is on the 'fridge.' Love, Mom & Sam." (Gov. Ex. 65; Doc. 429-873). The Houstons could not explain why defendant wrote the note, and they did not understand his reference to having a new Jeep. (Doc. 429-874). The Houstons owned a Jeep Cherokee that was parked at their residence the weekend Ms. Tiesler

was murdered, but Mr. Houston had taken all the keys to the Jeep Cherokee with him that weekend because he did not want defendant to drive the vehicle.  (Doc. 429-874).


III.  <u>Statement Regarding Need for Evidentiary Hearing</u>

An evidentiary hearing is not necessary to resolve most of the issues raised in defendant's Section 2255 motion.  Rule 8(a) of the Rules Governing Proceedings under Title 28, U.S.C., Section 2255, provides that the district court shall, upon a review of the files, records, and supporting evidence, determine whether an evidentiary hearing is required and/or dispose of defendant's motion as justice dictates.  It is well settled that the district court need not hold an evidentiary hearing for every allegation raised in a Section 2255 motion.  "A federal habeas corpus defendant is entitled to an evidentiary hearing if he alleges facts which, if proven, would entitle him to relief."  *Hutch v. Dugger*, 874 F.2d 1483, 1485 (11th Cir. 1989), citing *Townsend v. Sain*, 372 U.S. 293, 312 (1963)).

The court should resolve most of the issues raised by defendant against him without the necessity of the introduction of facts from outside the record.  Accordingly, because the file and other records of the court are adequate for the court to rule on many of the issues raised in defendant's motion, an evidentiary hearing on those issues is not necessary.  The court should limit the scope of an evidentiary hearing to the following issues: whether trial counsel were ineffective in the presentation of mental health evidence during the sentencing phase of the trial and

whether government attorneys violated the court's "firewall" order regarding the disclosure of certain reports related to defendant's mental health issues.  In addition, defendant makes an unspecific allegation that the government's jury expert had improper contact with members of the jury venire during jury selection.  The court should require defendant to proffer what contact he alleges the jury selection expert had with members of the jury venire.  If defendant makes such a proffer, then the government would ask for an evidentiary hearing on that issue so that the government may rebut any allegation that its expert had any improper contact with the jury.

IV.   <u>The Law on the Ineffective Assistance of Counsel</u>.

Defendant contends for a number of reasons that his Sixth Amendment right to the effective assistance of counsel was violated based upon the representation of his trial attorneys.  The following section will summarize the law the government relies upon in addressing defendant's ineffective assistance claims.

It is uncontradicted that a defendant has a constitutional right to effective assistance of counsel at all stages of his criminal proceedings.  *See Wilson v. United States*, 962 F.2d 996, 997 (11th Cir. 1992); *Middleton v. Dugger*, 849 F.2d 491, 493 (11th Cir. 1988).  In *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the Supreme Court set forth the test under which the Court reviews a claim of ineffective assistance.  This standard applies equally to both the guilt and sentencing phases of the trial.  *King v.*

*Strickland*, 748 F.2d 1462, 1463 (11th Cir. 1984).  To prevail on a claim of ineffective assistance of counsel, defendant bears the burden of establishing by a preponderance of the evidence that (1) his attorney's performance was deficient; and (2) he was prejudiced by the inadequate performance.  *Mills v. Singletary*, 63 F.3d 999, 1020 (11th Cir. 1995).  The inquiry is two-pronged: defendant must show *both* ineffective assistance (the performance prong) and resulting prejudice (the prejudice prong).  *See Smith v. Wainwright*, 741 F.2d 1248, 1254 (11th Cir. 1984) (emphasis added). Hence, if the court finds that defendant has failed to satisfy one prong of the *Strickland* test, it need not consider the other prong. *Strickland*, 466 U.S. at 690.

To satisfy the performance prong, the defendant must prove that his counsel's representation was unreasonable under prevailing professional norms . *Strickland* , 466 U.S. at 690.  The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error in light of all the circumstances.  *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).  A petitioner must overcome a strong presumption of competence, and the court must give significant deference to the attorney's decisions.  *Hagins v. United States*, 267 F.3d 1202, 1204-05 (11th Cir. 2001). "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

Therefore, a habeas petitioner must prove that the approach taken by trial counsel would not have been used by "professionally competent counsel." *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) (noting that counsel's conduct is unreasonable only if the petitioner shows "that no competent counsel would have made such a choice").

In *Chandler*, the defendant contended that his attorneys were ineffective during the sentencing phase of his federal death penalty trial for failing to present character evidence in mitigation of punishment.  218 F.3d at 1315.  With regard to trial counsel's performance, the court held that "the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.' (footnote omitted)."  218 F.3d at 1313, citing, *Burger v. Kemp*, 483 U.S. 776 (1987).  The court held that in judging the performance of trial counsel the court must indulge in the strong presumption that counsel's performance was reasonable, and in cases such as the instant case, where the court is reviewing the performance of trial counsel that are experienced, the presumption in favor of the reasonableness is even stronger. 218 F.3d 1316.  The reviewing court should not conduct its inquiry through the distortion of hindsight, but must review the reasonableness of counsel's performance in the light of circumstances facing counsel at the time of the trial.  218 F.3d at 1316.

To satisfy the prejudice prong, the defendant "must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694. The Supreme Court held that the prejudice prong of *Strickland* requires more than a mere showing that the outcome of the proceeding would have been different but for counsel's errors. *Lockhart v. Fretwell*, 506 U.S. 364, 369-370 (1993).  The analysis must include whether the outcome was fundamentally unfair or unreliable.  (*Id*.).  Unlike the performance prong of the *Strickland* test, which is analyzed at the time of the proceeding, the prejudice prong of the *Strickland* test is examined under the law at the time that the ineffectiveness claim is evaluated.  *Id*. at 372.

V.    Government's Response to Defendant's Specific Allegations of Ineffective Assistance of Counsel.

    A.    THE RECORD ESTABLISHES THAT TRIAL COUNSEL DID NOT FAIL TO INVESTIGATE ADEQUATELY THE STATE OF DEFENDANT'S MENTAL HEALTH AT THE TIME OF THE OFFENSE.[3]

---

[3]Defendant also alleges in Section A that his trial counsel were ineffective for not presenting a mental health case at sentencing.  The government believes this issue is related to the issue raised in Section B regarding whether defendant's trial counsel were ineffective for failing to proffer the testimony of their mental health experts to the court and seek a ruling on the scope of the government's rebuttal expert testimony before deciding whether to have their experts give opinion testimony. Therefore, the government will address those issues jointly in Section B below.

In Section A defendant makes a number of claims regarding his trial counsel's unprofessional errors in the investigation of defendant's mental health at the time of the offense. However, the record establishes that defense counsel did adequately investigate defendant's mental health issues and that defendant was not prejudiced by any failures to investigate. Therefore, the court should deny defendant's failure to conduct an adequate investigation claim without an evidentiary hearing.

> 1. Failure to Submit to an Evaluation by a Government Expert.

Defendant contends that his trial counsel provided ineffective assistance of counsel for their failure to agree to allow a government expert to evaluate defendant pursuant to Rule 12.2 of the Federal Rules of Criminal Procedure. Defendant contends that he was prejudiced thereby, because based upon counsel's decision not to allow defendant to be evaluated by a government expert, the court ruled that defendant could not present compelling expert opinion testimony regarding the relationship between defendant's mental state and the commission of the murder of Joann Tiesler. However, defendant made a strategic decision to refuse to allow a government expert to evaluate him. In addition, defendant cannot show that he was prejudiced thereby because the court ruled during trial that defendant could present the opinion testimony of his expert witnesses despite defendant's failure to submit to a

15

government evaluation.

Federal Rule of Criminal Procedure 12.2 requires a defendant to give notice before trial if he "intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on ... the issue of punishment in a capital case ...." Fed. R. Crim. P. 12.2(b)(2). If a defendant provides such notice, "the court may, upon the government's motion, order the defendant to be examined under procedures ordered by the court." Fed. R. Crim. P. 12.2(c)(1)(B). To protect a defendant's Fifth Amendment privilege against self-incrimination and avoid litigation over whether the government has improperly made derivative use of information obtained during a court-ordered examination, the Rule provides that:

> The results and reports of any examination conducted solely under Rule 12.2(c)(1) after notice under Rule 12.2(b)(2) must be sealed and must not be disclosed to any attorney for the government or the defendant unless the defendant is found guilty of one or more capital crimes and the defendant confirms an intent to offer during sentencing proceedings expert evidence on mental condition.

Fed. R. Crim. P. 12.2(c)(2). The Rule goes on to provide in pertinent part that "[i]f the defendant ... does not submit to an examination when ordered under Rule 12.2(c), the court may exclude any expert evidence from the defendant on the issue of the defendant's mental disease, mental defect, or any other mental condition bearing on ... the issue of punishment in a capital case." Fed. R. Crim. P. 12.2(d). *See also* 2002 Advisory Committee

16

Notes ("The selection of an appropriate remedy for the failure of a defendant to provide notice or submit to an examination under subdivisions (b) and (c) is entrusted to the discretion of the court.").

It is important to review the procedural history of defendant's proposed expert mental health evidence in order to place this issue in proper context. On October 20, 2003, defendant gave notice of his "intent to introduce expert evidence relating to a mental disease or defect or any mental condition of the defendant bearing on the issue of punishment." (Doc. 183). Defendant did not specify the mental condition, disease or defect about which he intended to present evidence or identify his expert(s); rather, his one sentence notice simply tracked the language of the statute. Accordingly, the government moved the district court pursuant to Rule 12.2(c)(1)(B) for an order requiring defendant to submit to a mental examination. (Doc. 189). In response, defendant initially stated that the expert evidence he planned to introduce "could conceivably" not be based on an examination of him. (Doc. 195-2). The magistrate judge nevertheless ordered that defendant be examined. (Doc. 210). In a motion to reconsider, defendant finally confirmed that the expert evidence he planned to present would "not be based on an evaluation of [him]." (Doc. 219-3). The magistrate judge denied the motion to reconsider, (Doc. 234), and defendant appealed the order to the court. (Doc. 245).

17

During subsequent proceedings, the defense disclosed that it intended to call Dr. David Lisak as a teaching expert to educate the jury about sexual abuse of boys and the ramifications that such abuse can have on grown men.  The defense proposed to connect this evidence to the defendant by presenting fact testimony from mental health witnesses who had treated him while he was incarcerated. (Doc. 453-4).  The court nevertheless affirmed the magistrate judge's order requiring defendant to be examined, although it limited the scope of the examination.  (Doc. 306; Doc. 453-30). The court explained that "the Government should be given the opportunity to respond to that connection [to defendant]; and the most obvious way to do that is to have someone examine the defendant to determine if the connection is appropriate."  (Doc. 453-3).   Defendant subsequently invoked his Fifth and Sixth Amendment rights and refused to submit to the court-ordered evaluation.  (Doc. 454-7).

At that point, the court was authorized to exclude defendant's expert altogether.  *See* Rule 12.2(d).  However, the court instead reserved ruling on whether defendant could call Dr. Lisak.  (Doc. 454-8).  The court permitted the government to retain an expert to prepare a report regarding defendant's mental condition based solely on certain records she had been provided.  The court required the government's expert's report to be filed under seal and remain under seal until the close of the guilt-innocence phase

18

of the trial.   (Doc. 346).   At that time, the report would be released to the defense to assist them in deciding whether to call Dr. Lisak as a witness.  (Doc. 346; Doc. 431-1570-74; Doc. 455-15-16).   The report would simultaneously be released to fire-walled Assistant United States Attorneys but not to the government's trial attorneys.  (*Id.*).  If the defense elected to still call Dr. Lisak, the court would then hold a hearing on the admissibility of Dr. Lisak's proposed testimony.   (Doc. 431-1571-72; Doc. 455-11-12). If the court decided to admit his testimony, it would finally take up the issue of whether the government's expert would be allowed to testify in rebuttal and, if so, the scope of her testimony.   (Doc. Doc. 431-1571-73; Doc. 455-17).

At trial, after the jury began their deliberations on guilt-innocence, defense counsel reviewed the government expert's report and elected not to call Dr. Lisak as a witness.  (Doc. 432-1646). Defendant did call two other psychologists, however, during the sentencing phase.  Prior to their testimony, the court amended its ruling regarding the ability of the witnesses to testify to "psychological testing, results, diagnoses, [and] opinions, . . ." (Doc. 435-2248).   The court ruled that such testimony would be allowed despite the fact that defendant had not been evaluated by a government expert because after reviewing the government expert's report, the court was satisfied that the government would have an adequate opportunity to rebut the expert testimony presented by the

defense.  (Doc. 435-2249).  The court then allowed defense counsel to choose how they wished to proceed on behalf of defendant. (*Id.*).  Defense counsel decided to limit the testimony of their mental health witnesses to factual testimony and not open the door for the government's expert to testify on rebuttal.  (*Id.*).

Defendant's claim on this issue fails to satisfy either the performance prong or the prejudice prong of the *Strickland* test. The decision not to have defendant evaluated by a government expert was a reasonable one under the circumstances.  Despite significant contact with psychologists during defendant's ten years of incarceration, there is no evidence that any professional had diagnosed defendant with a mental disease or defect that would explain his violent attack on Joann Tiesler.  Defense counsel reasonably assumed that a government expert would conclude that defendant's mental state did not provide any explanation for his crime, and that defendant was better served presenting the fact testimony of the witnesses who did testify.  This was not a choice that no reasonably competent lawyer would make, therefore, defendant cannot show that his trial counsel were ineffective for making this tactical decision about how best to present mitigating evidence on defendant's behalf.

Nor can defendant show that he was prejudiced.  Defendant contends in paragraphs 12 and 13 of his motion that his trial counsel's decision not to call Dr. Lisak and not to question Drs.

Ganahl and Carlson and Jan Vogelsang about their opinions about defendant's mental state and the connection between defendant's prior sexual abuse and the commission of the murder of Joann Tiesler was based on their failure to allow him to be evaluated by a government expert.  However, the record clearly rebuts that factual assertion.  As established above, once the court reviewed the government's expert's report, the court ruled that defendant could ask his expert witnesses about "psychological testing, results, diagnoses, [and] opinions," despite the fact that defendant had not been evaluated by a government expert.  The trial record establishes that defendant was not foreclosed from presenting any evidence related to his mental state because of the failure to submit to a government psychological evaluation. Therefore, defendant could not have been prejudiced by the failure to do so.

This issue may be resolved based upon the record without an evidentiary hearing and provides no basis for Section 2255 relief.

>>>>>>> 2.    Failure to Identify Female Babysitter Who Allegedly Molested Defendant.

In paragraph 12 defendant contends that his trial counsel was ineffective for failing to identify the female babysitter who allegedly molested defendant.  However, defendant cannot establish that his trial attorneys were ineffective for not identifying the babysitter because there are no additional witnesses who could

reasonably do so.    Defendant only identified the babysitter as "Tinker Bell."  Apparently, defendant could not provide any further description of the babysitter to his attorneys. Defendant's parents and step-father did not know any of defendant's babysitters by the name "Tinker Bell."  Defendant does not proffer any other witnesses who could identify "Tinker Bell."   Based upon the description given, there is simply no additional investigation that trial counsel could have done to identify "Tinker Bell."   Trial counsel did not act in an unprofessional manner for failing to do so.

Nor can defendant demonstrate that he was prejudiced by trial counsel's failure to identify "Tinker Bell."  First, presumably if habeas counsel had identified "Tinder Bell," habeas counsel would have asserted that fact in support of defendant's Section 2255 motion.  Habeas counsel did not do so, therefore, it appears likely that "Tinker Bell" is not identified at this time and defendant could not be prejudiced by the failure to find a witness who is not now available.

Secondly, if habeas counsel had identified "Tinker Bell" and she had confessed to the molestation, then presumably defendant would have stated that fact in his motion.  Defendant does not do so.  Even if "Tinker Bell" was identified, it is not reasonable to believe that the babysitter would have confessed that she molested defendant as a child.  Such a confession would have subjected her to criminal prosecution for doing so.   Therefore, it is highly

unlikely that had the babysitter been identified she would have corroborated defendant's allegation.

Finally, Dr. Ganahl and Dr. Carlson testified that defendant claimed that he was molested as a child. (Doc. 235-2255, 2260-61, 2326-28). In addition, Dr. Carlson testified that because of the molestation, defendant described himself as "being a loner, prone to violence, hiding his feelings, avoiding attachments, and being irresponsible." (Doc. 235-2327-28). Therefore, defendant simply cannot demonstrate that the outcome of the trial would have been different had his trial counsel conducted a more thorough investigation and located "Tinker Bell."

Therefore, the record clearly rebuts defendant's assertion that his trial counsel were ineffective for not conducting a more thorough investigation to locate "Tinker Bell.". Nor does defendant establish that the outcome of the sentencing phase would have been different if "Tinker Bell" had been found. For these reasons, defendant can not satisfy either prong of the *Strickland* test on this issue. The government submits that this issue may be resolved based upon the existing record without an evidentiary hearing and provides no basis for Section 2255 relief.

3.   Conclusion

The record clearly demonstrates that trial counsel conducted a reasonable investigation into defendant's mental health and

mental state at the time of the offense.  Counsel obtained the opinion of Dr. Lisak regarding the relationship between childhood sexual abuse and adult behavior.  Defense counsel obtained the opinion of Jan Voglesang regarding the relationship between defendant's upbringing and mental state and the offense.  Counsel received reports in discovery that identified Drs. Ganahl and Carlson as potential witnesses who could testify about defendant's mental health and mental state while he was in prison. Defense counsel clearly interviewed and prepared Drs. Ganahl and Carlson to give testimony about defendant's mental state and mental health. The Eleventh Circuit in *Chandler* held that "[u]nder *Strickland*, counsel's conducting or not conducting an investigation need only be reasonable to fall within the wide range of competent assistance. [*Strickland*] 104 S.Ct. at 2066 (stating that counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary")" 218 F.3d at 1317.  The record clearly establishes that trial counsel conducted a reasonable investigation regarding defendant's mental health, defendant's mental health history, and mitigating mental health evidence that could be presented at sentencing on defendant's behalf.

Therefore, the court should deny defendant's claim that his trial attorneys failed to adequately investigate defendant's mental health issues without conducting an evidentiary hearing.

24

B.    THE COURT SHOULD CONDUCT AN EVIDENTIARY HEARING ON DEFENDANT'S CLAIMS THAT HIS TRIAL COUNSEL'S FAILURE TO PRESENT MITIGATING MENTAL HEALTH EVIDENCE DENIED HIM THE EFFECTIVE ASSISTANCE OF COUNSEL.

In Section A defendant contends, in part, that he was denied the effective assistance of counsel because his trial counsel failed to present mitigating mental health opinion testimony at his sentencing hearing because they unreasonably feared that by doing so they would open the door to rebuttal testimony from the government's expert witness.  In Section B defendant contends that he was denied the effective assistance of counsel because his trial counsel failed to proffer this evidence to the court and ask the court to rule on the scope of the government's rebuttal evidence in light of the proffer so that counsel would make an informed decision about whether they should present the opinions of their experts.

Based upon the trial record, the government is prepared to argue that defense counsel made a reasonable decision not to call Dr. Lisak and not to question Drs. Ganahl and Carlson and Ms. Vogelsang so as to elicit opinion testimony from them, therefore, defendant cannot satisfy the performance prong of *Strickland*. However, the witnesses did not testify to their expert opinions or to any psychological testing that was conducted on defendant previously, and the government's expert did not testify on

25

rebuttal.  Therefore, the record is not complete and the court cannot fully determine whether defendant has satisfied either the performance prong or the prejudice prong.  Therefore, the court should conduct an evidentiary hearing on the issue of whether trial counsel was ineffective for not presenting the opinion testimony of Dr. Lisak, Ms. Vogelsang, Dr. Ganahl, and Dr. Carlson and the results of any psychological testing that they did.[4]

C.   THE GOVERNMENT REQUESTS AN EVIDENTIARY HEARING ON DEFENDANT'S CLAIM THAT THE GOVERNMENT TRIAL ATTORNEYS IN THIS CASE VIOLATED THE COURT'S "FIREWALL" ORDER.

As the court is aware, the court ordered that certain confidential psychiatric records from mental health evaluations conducted while defendant was incarcerated, the report prepared by Dr. Lisak regarding the effect of childhood sexual abuse on adults, and the report prepared by the government's expert rebuttal witness would be disclosed to the government's "firewall" counsel but not to the trial AUSAs.  Defendant contends that the trial AUSAs and the "firewall" AUSAs breached the court's order when the "firewall" AUSA disclosed to the trial AUSAs Dr. Lisak's name and/or the government expert's report.  Defendant contends that the disclosure

---

[4]The issue of whether defense counsel was ineffective for failing to proffer this evidence and seek a ruling would be mooted by the court's consideration of whether defense counsel was ineffective for failing to present the same evidence to the jury.

of Dr. Lisak's name alone would inform the trial AUSAs of the defendant's intention to present mitigating evidence about defendant's childhood sexual abuse.  Defendant also contends that the breach of the "firewall" order is established by the fact that an AUSA disclosed to a seminar that the government used a jury selection expert at trial because the government anticipated that defendant would present child sexual abuse evidence in mitigation of punishment.  However, the government denies that there was any violation of the court's order.

As a factual matter, defendant is simply wrong in alleging that the trial AUSAs improperly discovered the fact that defendant would rely on evidence that he was sexually abused as a child. Defense counsel acknowledged that defendant's allegation that he was the victim of childhood sexual abuse was documented in records provided to defense counsel by the government in discovery.  (Doc. 435-2169-75, 2248).  The records revealed that defendant disclosed to Dr. Ganahl and Dr. Carlson at separate times that he was sexually abused as a child.  (Doc. 235-2255, 2260-61, 2326-28). Therefore, it is clear that the government's trial attorney's did not improperly discover the fact that defendant would present child sexual abuse as mitigating evidence.

The record is also clear that defendant cannot establish prejudice based on this allegation because Drs. Ganahl and Carlson testified that defendant claimed that he was the victim of

27

childhood sexual abuse. (*Id.*).

Nevertheless, so that there will be no factual issue about whether government attorneys violated the court's "firewall" order, the government requests an evidentiary hearing on this issue.

    D.    THE RECORD ESTABLISHES THAT DEFENDANT'S TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO CONDUCT AN ADEQUATE MITIGATION INVESTIGATION.

    1.    Inmate Character Witnesses

Defendant contends that his trial counsel were ineffective for failing to properly prepare inmate character witnesses for cross-examination about defendant's previous convictions and the instant case.  However, the record does not support defendant's contention.

Inmate witnesses, Shanna Nicole Smith, James Garth Morse, Jason Ronald Medlock, Herbert Keller, John Thomas Swatz, Lemuel Bleu, William Galloway, Clyde Denbo, Kurt Latimer, all testified that they knew defendant in prison and that based upon their interactions with him in prison, they did not believe that defendant was a violent person.  (Doc. 234-2011, 2015, 2039-40 2100, 2103-05, 2127-31, 2138-39, 2149-50, 2156-58, 2182-84). Through these witnesses trial counsel repeatedly brought out instances of defendant's good character, his attendance at religious services, defendant's attempts to improve his life while in prison, and defendant's leadership of self-improvement activities among the inmates that he came in contact with.  (*Id.*).

A review of the testimony of these witnesses demonstrates that they were interviewed prior to trial and that trial counsel was fully prepared to present their testimony effectively.

With regard to defendant's argument about cross-examination, Smith and Morse were not cross-examined. (Doc. 234-2023, 2040). Keller was only questioned about his prior conviction for murder. (Doc. 234-2124). The other inmates were questioned about their knowledge of the instant offense and whether the details of the murder of Joann Tiesler affected their opinions of defendant's character. (Doc. 234-2107-2110, 2131-2133, 2139-2142, 2150-2153, 2158-2161, 2187-88). The inmates generally responded that their opinions of defendant's character were based on their personal interactions with him and that their opinions of his character would not be affected by the details of the instant offense. (*Id.*). No one changed his or her testimony about defendant's character. (*Id.*). No one testified that he or she believed that defendant should receive the death penalty for killing Joann Tiesler in the manner that he did. (*Id.*). There is simply no support in the record for the allegation made in defendant's motion that trial counsel were ineffective in the manner in which they prepared these witnesses to testify on cross-examination.

Moreover, defendant cannot establish that the outcome of the trial would have been different had trial counsel prepared the witnesses differently. Defendant does not proffer what the

witnesses would have said differently with better preparation.

Therefore, the record clearly rebuts defendant's assertion that his trial counsel were ineffective for not properly preparing the inmate witnesses for cross-examination.  Nor does defendant establish that the outcome of the sentencing phase would have been different if the witnesses had been better prepared for cross-examination.  For these reasons, defendant can not satisfy either prong of the *Strickland* test on this issue.  The government submits that this issue may be resolved based upon the existing record without an evidentiary hearing and provides no basis for Section 2255 relief.

2.    Jan Vogelsang's expert opinion testimony.

Defendant contends that trial counsel were ineffective for not presenting Jan Vogelsang's expert testimony regarding her explanation for how the problems she identified in defendant's upbringing would offer insight into why defendant would have committed the murder of Joann Tiesler.  As the government stated in Section B above, the court should conduct an evidentiary hearing on this issue as it is related to the issue regarding the failure to present the opinion testimony of Dr. Lisak, Dr. Ganahl and Dr. Carlson.

3.    Additional mitigating evidence.

Defendant also argues that trial counsel could have discovered additional compelling mitigating evidence had counsel conducted a

30

more thorough mitigation investigation.   However, the record establishes that defendant's trial attorneys conducted a reasonable mitigation investigation and that the outcome of the trial would not have been different had defense counsel done more to discover mitigating evidence.

Defendant's contention that in hindsight a more thorough mitigation investigation should have been conducted is exactly what the Eleventh Circuit found objectionable in *Chandler* where the Court stated that

> In reviewing counsel's performance, a court must avoid using "the distorting effects of hindsight" and must evaluate the reasonableness of counsel's performance "from counsel's perspective at the time." *Strickland*, 104 S.Ct. at 2065. "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." FN20 *Id.;* see *Waters*, 46 F.3d at 1514 (en banc) ("The widespread use of the tactic of attacking trial counsel by showing what 'might have been' proves that nothing is clearer than hindsight-except perhaps the rule that we will not judge trial counsel's performance through hindsight.").

218 F.3d at 1316-17.

> The Court gave the following example of what it meant:

> For example, "[i]t is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating [ ] evidence, had they been called or ... had they been asked the right questions." *Waters*, 46 F.3d at 1514 (*en banc*). But "[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *Id.* (noting that such witnesses show nothing more than that, "with the luxury of time and the opportunity to focus resources on specific parts of a made record,

> post-conviction counsel will inevitably identify shortcomings"). And, basing the inquiry on whether an investigation (if one had been undertaken) would have uncovered mitigating evidence (or witnesses) is an example of judging counsel's acts from the benefit of hindsight. The proper inquiry was articulated in *Rogers v. Zant*: "Once we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced." 13 F.3d 384, 388 (11th Cir.1994).

218 F.3d at 1317 n.20.

In the instant case, trial counsel presented the testimony of family members and friends who knew defendant before he went to prison and inmates who knew defendant while he was in prison. They all testified favorably for defendant in terms of his character and good conduct. Trial counsel also called psychologists who saw defendant while he was in prison who testified about defendant's self-reporting of childhood sexual abuse and suicide attempts. Trial counsel called Jan Vogelsang who testified to her biopsychosocial assessment of defendant's family history. At trial, three full days were taken up with the presentation of defendant's mitigation evidence during the sentencing hearing. Clearly, the court must conclude that based on this record, it was reasonable for trial counsel to decline to investigate defendant's background and personal history further.

As the Eleventh Circuit held in *Chandler*, the issue is not whether additional mitigation evidence is available. The issue is whether trial counsel conducted a reasonable mitigation investigation. The record establishes that counsel did, in fact,

32

conduct a reasonable mitigation investigation, therefore, defendant cannot satisfy the *Strickland* performance prong on this issue.

Nor can defendant satisfy the prejudice prong. In *Lawhorn v. Allen*, 519 F.3d 1272, 1296 (11th Cir. 2008), the Eleventh Circuit noted that "[w]e are aware that "some [death penalty] cases almost certainly cannot be won by defendants" because "sometimes the best lawyering, not just reasonable lawyering, cannot convince the sentencer to overlook the facts of a brutal murder-or, even a less brutal murder[-]for which there is strong evidence of guilt in fact." *Clisby v. State of Alabama*, 26 F.3d 1054, 1057 (11th Cir. 1994)." The instant case is just such a case. Defendant attacked Joann Tiesler in her own home. Defendant struck her in the back of the head with a shotgun. Defendant bound her, raped her, and brutally sodomized her. Then, using a knife, defendant slit Joann Tiesler's throat with such savagery that he nearly decapitated her. Finally, defendant stabbed Joann Tiesler in the back multiple times. The last minutes of Joann Tiesler's life were filled with terror, pain, apprehension, horror, and fear caused by defendant. Defendant served 10 years in federal and states prisons, yet committed this offense within four months of his release. This is a case where the best lawyering and the most thorough and comprehensive mitigation investigation could not overcome the horrendous facts that the jury heard. Defense counsel investigated and presented more than a reasonably competent mitigation case, but

33

they could overcome the facts of Joann Tiesler's death or the fact that defendant committed this horrific crime four months after being released from prison. Defendant cannot demonstrate that a more thorough mitigation investigation would have resulted in a different sentencing verdict. Defendant cannot satisfy the *Strickland* prejudice prong.

The court should deny defendant Section 2255 relief on this issue without holding an evidentiary hearing.

> E.   THE COURT CORRECTLY INSTRUCTED THE JURY ON THE NON-STATUTORY AGGRAVATING FACTOR OF FUTURE DANGEROUSNESS, THEREFORE, DEFENDANT CANNOT SHOW PREJUDICE FROM HIS ATTORNEYS' FAILURE TO OBJECT TO THE FUTURE DANGEROUSNESS CHARGE.

Defendant next contends that his sentence should be reversed because his trial counsel were ineffective for failing to object to the court's instruction on the non-statutory aggravating factor of future dangerousness. Specifically, defendant asserts that the instruction was erroneous because the court instructed the jury that it could consider the non-statutory aggravating factor of future dangerousness if the jury found that defendant posed an escape "risk," as opposed to a finding that there was a "likelihood" that defendant would escape.

Because the court's instruction on future dangerousness was both legally correct and supported by ample evidence, defendant cannot show that his trial counsel committed an unprofessional

34

error for failing to object to the charge on the issue now raised. Even if the court finds that the instruction was not a correct statement of the law, defendant's sentence should not be set aside because the court should find that the error was harmless beyond a reasonable doubt or the court may reweigh the aggravating and mitigating factors without this aggravating factor and still find that the aggravating factors outweighed the mitigating factors to a sufficient degree so as to warrant the imposition of a death sentence.

The government concedes that trial counsel did not raise the objection to the future dangerous charge that is now raised on collateral attack.   Prior to the start of the penalty phase, defense counsel stated their belief that the initial draft of the court's proposed jury instruction on future dangerousness was incorrect because it allowed the jury to consider his danger to the general public.  (Doc. 433-1670).  The court stated that it needed to think about the issue further before deciding on the final charge.  (Doc. 433-1672).  Prior to closing arguments, the court provided both parties with significantly revised jury instructions for them to review.   (Doc. 436-2623-24).   Those instructions included the charge on future dangerousness which defendant now challenges.   The defense stated a number of objections to the revised proposed instructions but did not object to any portion of the future dangerousness charge.   (Doc. 436-2638-56; Doc. 437-

35

2760).

District courts have "broad discretion in formulating a jury charge so long as the charge as a whole accurately reflects the law and the facts." *United States v. Turner*, 871 F.2d 1574, 1578 (11th Cir. 1993).  Accordingly, a conviction will not normally be reversed on the basis of a jury charge unless "the issues of law were presented inaccurately, or the charge improperly guided the jury in a substantial way as to violate due process."  *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000) (*quoting United States v. Arias*, 984 F.2d 1139, 1143 (11th Cir. 1993)).  The Eleventh Circuit reviews jury instructions *de novo.  Prather*, 205 F.3d at 1270.

Here, the court's instruction on future dangerousness was consistent with the limited legal authority on the subject.  The court first recited the aggravating factor as alleged by the government in its death penalty notice.  (Doc. 437-2733-2738). This factor was approved by the Supreme Court in *Jurek v. Texas*, 428 U.S. 262, 269 (1976).  Then, as required by *Simmons v. South Carolina*, 512 U.S. 154, 156 (1994), the court informed the jury that if they did not sentence the defendant to death he would spend the rest of his life in federal prison.  (Doc. 437-2738).  A number of district courts have interpreted *Simmons* as limiting the type of evidence the jury may consider in evaluating the future dangerousness of a defendant who will never be released from

prison.  *See, e.g., Gilbert*, 120 F.Supp.2d at 154; *United States v. Cooper*, 91 F.Supp.2d 90, 111 (D.D.C. 2000); *United States v. Peoples*, 74 F.Supp.2d 930, 932 (W.D. Mo. 1999)("dangerousness should not be measured in the same manner as if a defendant were to be 'uncaged'; life in prison without parole, a firmly fixed federal requirement, must mean that the focus of dangerousness analysis is on prison conditions.").  In accordance with these non-binding decisions, and at defendant's request, the court instructed the jury that it could only consider the future danger defendant might present to other inmates and prison officials.  (Doc. 437-2739).

However, here, unlike in *Gilbert*, *Cooper* or *Peoples*, the government also alleged that defendant posed a future danger to others because he was an escape risk.  Obviously, if defendant were to escape from prison, he would no longer pose a threat to other inmates and prison officials.  Rather, the general public, and particularly people he had made specific threats against in the past, could be in danger.  Accordingly, the court instructed the jury that if they found beyond a reasonable doubt that defendant posed a risk of escape, they could consider the danger he would pose to the general public.  (Doc. 437-2739).

Defendant claims that the charge was flawed because it did not require the jury to determine that there was a <u>likelihood</u> that defendant would escape before allowing the jury to decide whether defendant would be a danger if he was out in the general public.

While it is true that the court did not require the jury to determine the exact probability that defendant would escape, such a finding was not necessary. *See Jurek*, 428 U.S. at 269 (upholding Texas statute which merely required the state to prove a probability of future dangerousness, not a specific probability). Moreover, the court instructed jurors <u>twice</u> that before considering the danger posed to the general public by defendant, they had to first find <u>beyond a reasonable doubt</u> that he actually posed an escape risk. (Doc. 437-2738, 2739). This sufficiently eliminated any concern that the jury's consideration of defendant's threat to society would be based on sheer speculation.

Even if the court finds that the jury considered this aggravating factor under erroneous instructions, and reverses this aggravating factor, the court would not be required to reverse defendant's death sentence. In *Clemons v. Mississippi*, 494 U.S. 738 (1990), the Supreme Court held that the United States Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating factor. In that instance, the habeas court must either reweigh the balance of aggravating and mitigating factors or conduct harmless error analysis. (*Id.*). In the instant case, both the reweighing of aggravating and mitigating factors and harmless error analysis establish that the death sentence would have been imposed despite any error in the

38

instruction given at trial.

The jury found that the evidence established the existence of all aggravating factors beyond a reasonable doubt, including the related aggravating factor that defendant was a future danger to those with whom he would come in contact in prison. If the court reweighs the aggravating and mitigating factors without consideration of defendant's dangerousness to the public at large, then the court must conclude that the aggravating factors outweigh the mitigating factors to a sufficient degree to warrant the imposition of a sentence of death.

In addition, had the jury been instructed that it must find that there was a likelihood that defendant would escape before considering whether defendant posed a danger to the public outside the prison setting, there is no reasonable probability that the outcome of the sentencing phase would have been different. The evidence established that the risk defendant could escape from prison was a real one. The government presented evidence that while defendant was awaiting trial in this case, he attempted to escape from the custody of a local jail where he was being housed by the U.S. Marshal Service. (Doc. 433-1892). Defendant managed to escape from a solitary confinement cell by knocking a hole in the concrete wall of the isolation cell large enough to crawl through. (Gov. Ex. 163; Doc. 433-1897-1903). Defendant wrote a note on the cell wall taunting his jailers about his planned

39

escape.[5]  Defendant's escape attempt was thwarted when a jailer discovered the hole in the wall while responding to a report that an inmate had been observed in the mechanical chase area outside the isolation cell.  (Doc. 433-1898).  On more than one occasion during his incarceration at the local jail, defendant broke out of another holding area by climbing into the ceiling where he gained access to the cell of a female inmate and had sex with her.  (Doc. 433-1893-96).  The government also presented evidence that while defendant was initially detained in Minnesota after trying unsuccessfully to flee to Canada, jailers discovered two metal hooks in defendant's cell which he had removed from a shower curtain.  (Doc. 434-1954-55).  All this evidence showed that defendant posed a substantial escape risk, therefore, had the court given the instruction now proposed by defendant, the jury would still have found that defendant posed a danger to persons in the community at large.

For the foregoing reasons, defendant can not satisfy either prong of the *Strickland* test on this issue.  The government submits that this issue may be resolved based upon the existing record without an evidentiary hearing and provides no basis for Section 2255 relief.

---

[5]The note stated:  "[Dear Captain Brewer, The blinds worked] so well... Have a great day explaining to the Marshals about me...  Thanks for the food, smokes and women, LeCroy.  P.S. Had a great time here, but sorry I won't miss you." (Gov. Ex. 164; Doc. 433-1900-06).

F.    DEFENDANT WAS NOT DENIED THE EFFECTIVE
ASSISTANCE OF COUNSEL BASED ON COUNSEL'S
FAILURE TO MAKE A SUFFICIENT PRIMA FACIE CASE
ON DEFENDANT'S CHALLENGE TO THE JURY ARRAY.

Prior to trial, defendant filed a challenge to the jury pool arguing that the jury pool did not represent a fair cross section of the community with regard to Hispanics and Latinos.  Defendant now asserts that his trial counsel were ineffective for failing to support his fair cross section claim with the figures for the percentage of members of the Hispanic or Latino population who were registered to vote, and thus eligible for jury service.  Defendant argues that had his trial counsel presented the proper figures to the court prior to trial, defendant would have made out a *prima facie* case of the systematic discrimination of Hispanics or Latinos from the qualified jury wheel, and defendant would have been entitled to an evidentiary hearing on his fair cross section claim. However, defendant cannot show prejudice based on his trial attorneys' performance because even if trial counsel had presented the figures defendant now presents, defendant would still not have been entitled to an evidentiary hearing on his fair cross section claim.

The Sixth Amendment guarantees a criminal defendant the right to a jury selected from a group representing a fair cross-section of the community.  *Duren v. Missouri*, 439 U.S. 357 (1979); *United States v. Tuttle*, 729 F.2d 1325, 1327 (11th Cir. 1984).  The Supreme Court in *Duren* set forth the elements a defendant must

41

establish to demonstrate a *prima facie* violation of the fair cross-section requirement:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.

439 U.S. at 364; *United States v. Terry*, 60 F.3d 1541, 1544 (11th Cir. 1995). "The burden of proving a fair-cross-section violation falls on the defendant." *Berryhill v. Zant*, 858 F.2d 633, 638 (11th Cir. 1988). If the defendant fails to establish even one element of the *prima facie* case, then the Sixth Amendment challenge fails. *United States v. Pepe*, 747 F.2d 632, 649 (11th Cir. 1984).

The Jury Selection and Service Act specifically addresses when a defendant is entitled to an evidentiary hearing on a motion challenging compliance with the grand or petit jury selection procedures set forth therein. 28 U.S.C. § 1867(d). Section 1867(d) authorizes the presentation of evidence by the moving party *only* where the motion contains a sworn statement of facts which, if true, would constitute a "substantial failure to comply" with the provisions of the Act. (*Id.*). Thus, a defendant who fails to make such a *prima facie* showing has no right to an evidentiary hearing. *See, e.g., United States v. LaChance*, 788 F.2d 856, 869 (2d Cir. 1986) (affirming denial of evidentiary hearing based on defendant's failure to assert facts which constituted a substantial violation

of the Act's fair cross-section requirement); *United States v. Miller*, 771 F.2d 1219, 1228-29 (9th Cir. 1985)(same).  As the Second Circuit observed in *LaChance*, "[Defendant is] not entitled to a hearing to explain why he did not make out a prima facie case."  788 F.2d at 869.  Similarly, a defendant's failure to allege facts sufficient to satisfy the *Duren* test forecloses his right to an evidentiary hearing on his Sixth Amendment challenge to the grand and petit jury selection process.  *LaChance*, 788 F.2d at 869; *Miller*, 771 F.2d at 1228-29.

Assuming *arguendo* that the facts set forth in defendant's Section 2255 motion could be established at an evidentiary hearing, defendant cannot demonstrate that he suffered prejudice from his trial attorneys performance on this issue, because had defendant submitted the facts he now relies upon defendant still would not have met the *Duren* three-part test.  First, defendant cannot show that the category of Latinos or Hispanics is a sufficiently distinct group in the community to satisfy *Duren*.  In *Willis v. Zant*, 720 F.2d 1212 (11th Cir. 1983), the Eleventh Circuit set forth the following standard for showing that a group is distinct or cognizable:

> To show that a group is distinct or cognizable under the sixth amendment, a defendant must show: (1) that the group is defined and limited by some factor i.e., that the group has a definite composition such as by race or sex; (2) that a common thread or basic similarity in attitude, ideas, or experience runs through the group; and (3) that there is a community of interest among members of the group such that the group's interests

cannot be adequately represented if the group is excluded from the jury selection process.

720 F.2d at 1216.

The Eleventh Circuit recently affirmed a decision by the Florida Supreme Court that held that a death penalty habeas petitioner had not established that Latinos and Hispanics constituted a cognizable group. *Valle v. Secretary for Department of Corrections*, 459 F.3d 1206 (11th Cir. 2006). In *Valle*, the Eleventh Circuit held that

> Here, the Florida Supreme Court's conclusion that "[t]he term 'Latin American' encompasses people from too many different countries and different cultural backgrounds and attitudes to constitute a single cognizable class for equal protection analysis" is not contrary to or an unreasonable application of *Castaneda* or *Duren*. See *Valle II*, 474 So.2d at 800; see also *United States v. Rodriguez*, 588 F.2d 1003, 1007 (5th Cir. 1979) (stating that appellant's mere assertion that his statistics indicated that the number of Latin registered voters had more than doubled since the master jury wheel was last filled indicated purposeful discrimination was insufficient to show that "persons of such diverse national origins as Cubans, Mexicans, and Puerto Ricans possess such similar interests that they constitute a cognizable group ...." (quotation omitted)). Therefore, Valle is not entitled to habeas relief on this ground.

459 F.3d at 1216-17.

Presumably, defendant's statistics include all residents who were from countries in the western hemisphere south of the United States and in the Carribean. Like the defendants in *Valle* and *Rodriguez,* defendant makes no showing that Mexican-Americans, Cuban-Americans, Argentinian-Americans, Honduran-Americans, etc. possess such similar interests that they should be treated as a cognizable

44

group.   There is simply no evidence available to defendant that would sufficiently show that Hispanics or Latinos from countries throughout Central and South America share a common thread in attitude, ideas, and experience such that a community of interests is shared by them.   Defendant cannot satisfy the first part of the *Duren* test.

Nor can defendant satisfy the second part of the test.   The Eleventh Circuit has consistently found that a *prima facie* case of under-representation cannot be made where the absolute disparity between the percentage of the distinct group on the wheel and the percentage in the voter eligible population is less than 10%.   *See United States v. Grisham*, 63 F.3d 1074, 1078-79 (11th Cir. 1995)("If the absolute disparity between these two percentages is 10 percent or less, the second element is not satisfied."); *United States v. Rodriguez*, 776 F.2d 1509, 1511 (11th Cir. 1985) ("Although precise mathematical standards are not possible, this circuit has consistently found that a *prima facie* case of under-representation has not been made where the absolute disparity between these percentages does not exceed ten percent.").   Absolute disparity is calculated by subtracting the percentage of a group in the jury wheel from the percentage of the eligible voters from that same group in the general population.   *Grisham*, 63 F.3d at 1079. In the instant case, defendant alleges that the 2000 Census figures show that between 2.23% and 2.19% of the voter eligible population

45

of the Northern District of Georgia were listed as Hispanic or Latino. Defendant also alleges that the 2000 Census figures show that between 1.89% and 1.68% of the voter eligible population of the Gainesville Division of the Northern District of Georgia were listed as Hispanic or Latino. Obviously, where the percentage of the voter eligible population does not exceed 10%, it is not possible for a defendant to demonstrate that there is an absolute disparity of more than 10% between the voter eligible population of Hispanics and Latinos and the percentage of Hispanics and Latinos in the qualified jury wheel. Therefore, regardless of which geographic region is applicable, defendant cannot show that there is an absolute disparity of more than 10% between voter eligible Hispanic and Latino persons in the Northern District of Georgia or the Gainesville Division as opposed to the percentage of Hispanics and Latinos on the jury qualified wheel. Defendant's claim, therefore, fails the second test.

However, defendant asks the court to analyze the figures using the comparative disparity test even though the Eleventh Circuit has explicitly rejected comparative disparity analysis, stating, "We consider deviation from proportional representation in absolute rather than comparative terms for sixth amendment no fair-cross section purposes, because the relative measure may distort the significance of the deviation." *United States v. Pepe,* 747 F.2d at 649 n.18. Several other circuits have likewise rejected

comparative disparity analysis because it produces distorted results with smaller population groups. *See, e.g., United States v. Royal*, 174 F.3d 1, 7-8 (1st Cir. 1999)("For fifteen years, this Circuit has rejected comparative disparity analysis and applied absolute disparity analysis in cases similar to the case at hand, and we have recently reaffirmed this position."); *Thomas v. Borg*, 159 F.3d 1147, 1150 (9th Cir. 1998)("[T]he comparative disparity test is strongly disfavored in the Ninth Circuit on the ground that it exaggerates the effect of any deviation."); *United States v. Rioux*, 97 F.3d 648, 655 (2d Cir. 1996)("This Court has earlier considered and rejected the comparative disparity test."); *United States v. Clifford*, 640 F.2d 150, 155-56 (8th Cir. 1981)("This court has not seen fit to adopt the comparative disparity concept as a better means of calculating underrepresentation."); *Smith v. Yeager*, 465 F.2d 272, 279 n.18 (3d Cir. 1972)("[T]he comparative approach reaches absurd results in [a case in which] ... the [black] population at the time was 4.4% of the total, and [black] jury participation ranged as low as 2% of the jury list.").

Nevertheless, defendant presumably would argue that absolute disparity analysis is inappropriate where the distinct group constitutes less than 10% of the population. Although the Eleventh Circuit has not yet addressed this specific issue, several other circuits have applied the absolute disparity test even when the population of the distinctive group in question was less than 10%.

47

*See Royal*, 174 F.3d at 10; *Rioux*, 97 F.3d at 655, 657-58; *United States v. Suttiswad*, 696 F.2d 645, 648-49 (9th Cir. 1982); *United States v. Whitley*, 491 F.2d 1248, 1249 (8th Cir. 1973).

Finally, defendant argues that using comparative disparity analysis, the comparative disparity in the district would be between 54.62% and 53.82%, and for the Gainesville Division the difference would be between 67.37% and 63.32%. Assuming these figures to be accurate, courts have found these percentages to be within the range of acceptable percentages in examining similar claims. *See, e.g., United States v. Chanthadara*, 230 F.3d 1237, 1257 (10th Cir. 2000) (finding that where African-Americans accounted for 7.9% of population, and Hispanics, 2.74%, comparative disparities of 40.89% and 58.39%, respectively, did not establish prima facie violation under the Sixth Amendment); *United States v. Shinault*, 147 F.3d 1266, 1273 (10th Cir. 1998) (upholding jury selection procedure that resulted in comparative disparities of 59.84%, 50.09%, and 48.63%, with group populations comprising 1.27%, 5.11%, and 2.92% of the total community, respectively); *United States v. Clifford*, 640 F.2d 150, 155 (8th Cir. 1981) (finding that 46% comparative disparity was insufficient under-representation to make out fair cross-section claim under the Sixth Amendment, where group comprised 15.6% of the population); *United States v. Yazzie*, 660 F.2d 422, 427 (10th Cir. 1981) (holding that comparative disparity of 46.3% did not violate either

Sixth Amendment or the Equal Protection Clause); *cf. United States v. Weaver*, 267 F.3d 231, 243 (3d Cir. 2001) (finding that comparative disparities of 40.01% and 72.98% were of questionable probative value, where group populations comprised only 1.84% and .97% of the population, respectively). *But see United States v. Rogers*, 73 F.3d 774, 776 (8th Cir. 1996) (treating .579% actual and 30.96% comparative disparity as sufficient).

In order to carry his burden on the second prong of the *Duren* test, defendant must convince this court to disregard controlling circuit precedent and reject the absolute disparity method of measuring under-representation of Hispanic and Latino persons on the jury qualified wheel. Even if the court were to do so and employ the comparative disparity method of measurement, defendant cannot demonstrate that the under-representation of Hispanics and Latinos on the jury qualified wheel rises to the level of a constitutional violation under the Sixth Amendment.

Finally, defendant also fails to satisfy the third part of the *Duren* test. Defendant alleges that the under-representation of Hispanics and Latinos on the jury qualified wheel is due to the reliance of voter registration lists as the source for the wheel and on other factors such as the failure to follow up when Hispanic and Latino potential jurors failed to respond to the jury qualification questionnaires. Assuming *arguendo* that these facts are true, these factors do not provide a sufficient basis upon

which a finding of systematic exclusion of a cognizable group has occurred.  *See United States v. Pion*, 25 F.3d 18, 23 (1st Cir. 1994); *United States v. Garcia*, 991 F.2d 489, 492 (8th Cir. 1993) (numerical under-representation not a proxy for systematic exclusion); *cf. Barber v. Ponte*, 772 F.2d 982, 997 (1st Cir. 1985) (en banc) ("courts have tended to allow a fair degree of leeway in designating jurors so long as the state or community does not actively prevent people from serving or actively discriminate, and so long as the system is reasonably open to all") (emphasis in original).  Defendant merely alleges that there is under-representation because of the process by which jurors are added to the wheel.  However, that is an insufficient basis upon which the court may find that defendant has made out a *prima facie* case of systematic under-representation.

For the foregoing reasons, defendant fails to establish that had his trial counsel presented the data that defendant now presents in his Section 2255 motion, defendant would have made out a *prima facie* case that would entitled him to a hearing on his under-representation claim.  Because the record demonstrates that defendant cannot show that he was prejudiced by his trial counsel's alleged ineffectiveness for presenting the wrong figures to the court, the court must deny defendant Section 2255 relief on this issue without holding an evidentiary hearing.

G.    DEFENDANT WAS NOT DENIED THE EFFECTIVE
ASSISTANCE OF COUNSEL BASED ON COUNSEL'S
FAILURE TO ARGUE THAT THE RETENTION BY LAW
ENFORCEMENT OF DOCUMENTS SEIZED FROM HIS CAR
DURING THE 1991 SEARCH VIOLATED HIS FOURTH
AMENDMENT RIGHTS.

Defendant alleges that his trial attorneys were ineffective for not arguing that his Fourth Amendment rights were violated when after defendant's state prosecution was concluded a law enforcement officer retained the documents that were seized at the time that defendant's vehicle was searched in 1991.  However, there is no precedent in Fourth Amendment jurisprudence that supports an argument that the retention of evidence after a seizure has occurred violates the Fourth Amendment and makes the evidence subject to suppression in a later prosecution.  Therefore, defendant's trial attorneys were not ineffective for failing to raise an issue for which there is no legal support.  Moreover, defendant cannot demonstrate prejudice in either the guilt/innocence or penalty phase of the trial because of the erroneous admission of the writings seized from defendant's vehicle.

Defendant's Fourth Amendment theory is a novel one that has no support in the case law.  To the knowledge of counsel for the government, no reported case has held that lawfully seized property that is retained by law enforcement is subject to suppression because the retention of the property violated the Fourth

51

Amendment.[6]  Federal law and Georgia law authorize a defendant to seek the return of seized property by making a motion in the court where the criminal case was prosecuted, even after the criminal case has been disposed of.  *See United states v. Martinez*, 241 F.3d 1329 (11th Cir. 2001), Fed. R. Crim. Pro. Rule 41(g), *Baez v. State*, 231 Ga.App. 375, 500 S.E.2d 339 (Ga.App. 1998), O.C.G.A. 17-5-54.  However, the state and federal case law, the state statute and Federal Rule of Criminal Procedure 41(g) do not state that the retention of the property would violate the Fourth Amendment. (*Id.*).

In order to satisfy the performance prong of *Strickland*, defendant must show that no competent attorney would fail to do what trial counsel allegedly failed to do in the instant case, that is, argue for suppression of evidence that has been retained by law enforcement.  Defendant cannot make that showing given that no attorney appears to have even raised the issue previously. Therefore, defendant fails to satisfy the *Strickland* performance prong on this issue.  *See Pitts v. Cook*, 923 F.2d 1568, 1574 (11th Cir. 1991) ("While the ability to think creatively can be a great asset to trial lawyers, lawyers rarely, if ever, are required to be

---

[6]Counsel is aware of two district court cases that addressed this issue in the context of Section 1983 civil litigation and held that retention of seized property may violate the Fourth Amendment.  *See Fox v. Van Oosterum*, 987 F.Supp. 597, 608 (W.D.Mich.1997); *Roderick v. City of Gulfport, Miss.*, 144 F.Supp.2d 622, 629 (S.D.Miss. 2000).

innovative to perform within the wide range of conduct that encompasses the reasonably effective representation mandated by the Constitution."). *See also Black v. United States*, 373 F.3d 1140, 1145 (11th Cir. 2004) (trial counsel did not render ineffective assistance of counsel for failure to raise "unsettled" question of law).

Nor can defendant demonstrate prejudice on this issue because if defendant had properly raised the issue previously, his motion to suppress the writings would have still been denied. If the court were to conclude that the retention of the defendant's writings constituted a seizure that violated the Fourth Amendment, the court must also conclude that because of defendant's failure to seek the return of his property for more than ten years defendant abandoned any expectation of privacy that he had in the property and defendant lacks standing to litigate the alleged Fourth Amendment violation.

With regard to determining abandonment, the Eleventh Circuit holds that:

> 'the critical inquiry is "whether the person prejudiced by the search ... voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." ' " Id. (emphasis in original) (quoting *United States v. McKennon*, 814 F.2d 1539, 1545 (11th Cir. 1987) (citation omitted)).

*United States v. Ledher-Rivas*, 955 F.2d 1510, 1521 (11th Cir. 1992).

In *Ledher-Rivas*, the defendant left a briefcase with an acquaintance for more than a year. The acquaintance turned the briefcase over to law enforcement and it was searched. The Eleventh Circuit affirmed the district court's finding that the defendant abandoned the briefcase. (*Id.*). In the instant case, the property seized from defendant's vehicle stayed in the possession of law enforcement for more than 10 years. Although defendant could have sought return of the property under Georgia law, defendant never did so. Therefore, assuming *arguendo* that the retention of the writings violated the Fourth Amendment, after 10 years defendant no longer had an expectation of privacy in the property, and therefore, lack standing to seek suppression of the writings in the instant prosecution. Had trial counsel raised this issue, defendant's motion to suppress the writings would have been denied, therefore, defendant cannot show that he was prejudiced by the failure of his trial attorneys to make the argument previously.

The court should deny defendant Section 2255 relief on this issue without holding an evidentiary hearing.

H. DEFENDANT WAS NOT DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL BASED ON COUNSEL'S FAILURE TO REQUEST A JURY INSTRUCTION THAT THE JURY MUST FIND BEYOND A REASONABLE DOUBT THAT THE STATUTORY FACTORS MUST OUTWEIGH THE MITIGATING FACTORS.

Defendant argues that his trial counsel was ineffective for failing to request an instruction that the jury must find beyond a

54

reasonable doubt that the aggravating factors outweigh the mitigating factors. However, there is no requirement that the jury make such a finding, therefore, defendant did not suffer prejudice for failing to request the instruction.

The Federal Death Penalty Act (FDPA) requires the sentencing jury to find that the aggravating factors have been proven beyond a reasonable doubt. 18 U.S.C. § 3593(e). If such a finding is made, then the jury has found that a defendant is death eligible and the maximum penalty at that stage is death. (*Id.*). Then the jury weighs the aggravating factors against the mitigating factors (the weighing process) to determine if the aggravating factors sufficiently outweigh the mitigating factors to warrant the imposition of a death sentence. (*Id.*). Under the FDPA, once the jury has fulfilled its responsibility and found the defendant death eligible, the maximum penalty can go no higher, and since the maximum penalty cannot then be raised any higher, *Ring v. Arizona,* 536 U.S. 584 (2002) and *Apprendi v. New Jersey,* 530 U.S. 466 (2000) do not apply.

In raising this issue, defendant raises a facial challenge to the constitutionality of the FDPA. However, a facial challenge to a federal statute is difficult to mount. *United States v. Salerno*, 481 U.S. 739, 745 (1987). To succeed on a facial challenge to the FDPA, defendant must establish that no set of circumstances exists under which the FDPA would be valid. (*Id.*). Defendant's

contention fails to meet this exacting burden.

In *Ring* and its progeny, the Supreme Court held that capital defendants are entitled "to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 589.  Accordingly, "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact-no matter how the State labels it-must be found by a jury beyond a reasonable doubt."  536 U.S. at 602 (citing *Apprendi*, 530 U.S. at 482-83). In *Ring*, the trial court made the determination about the existence of aggravating and mitigating factors after the jury fount the defendant guilty of first degree murder.  The Supreme Court found that this procedure was unconstitutional because the enumerated aggravating factors operated "as the functional equivalent of an element of a greater offense" and the "Sixth Amendment requires that they be found by a jury."  536 U.S. at 609; *Apprendi*, 530 U.S. at 494, n. 19.

Defendant's reliance on *Ring* is misplaced because the weighing process in his case did not operate as the functional equivalent of an element of a greater offense and increase the punishment to which he would be subjected.  Rather the weighing process served the purpose of aiding the jury in selecting the appropriate sentence, after it had already determined that the maximum sentence was death.  *United States v. Higgs*, 353 F.3d 281, 298-99 (4th Cir. 2003); *United States v. Lentz*, 225 F.Supp.2d 672, 681-82 (E.D.Va.

2002).  Contrary to defendant's argument, the weighing process did not operate to increase the potential punishment defendant might have received.  The jury could only get to the weighing process after it found defendant to be eligible for the death penalty by finding that one or more of the statutory aggravating factors had been proven beyond a reasonable doubt.  Therefore, the weighing process did not come into play until after the jury had already found that defendant was statutorily eligible for the death penalty.  At the time that the jury engaged in the weighing process, the maximum penalty the defendant could have received was death.

Therefore, defendant's argument that the jury's weighing of the aggravating factors and the mitigating factors was an "element" that increased defendant's maximum sentence is incorrect.  Every court to have considered this issue has rejected defendant's contention.  *See United States v. Diaz*, 2007 WL 656831 (N.D.Cal. 2007); *United States v. Talik*, 2007 WL 4570704 (N.D.W.Va. 2007); *United States v. Gooch*, 2006 WL 3780781 (D.D.C. 2006); *United States v. Natson*, 444 F.Supp.2d 1296, 1304 (M.D.Ga. 2006).

Once the jury reached the point of weighing aggravating and mitigating factors, it had already found defendant death penalty eligible and established the statutory maximum sentence.  Therefore, there was no requirement that the jury find beyond a reasonable doubt that the aggravating factors must outweigh the

mitigating factors.  Had defendant requested such an instruction, the court would not have given it, therefore, defendant has failed to show that he was prejudiced by his trial attorneys failure to request such an instruction.  The court should deny defendant Section 2255 relief on this issue without holding an evidentiary hearing.

> I/J. DEFENDANT'S DEATH SENTENCE IS NOT UNCONSTITUTIONAL BASED ON THE FAILURE OF THE FDPA TO REQUIRE THAT THE STATUTORY AND NON-STATUTORY AGGRAVATING FACTORS BE LISTED IN THE INDICTMENT.

In Sections I and J defendant alleges that his death sentence violates his constitutional rights because the FDPA does not require that the statutory and non-statutory aggravating factors be alleged in the indictment.  In both sections defendant concedes that these issues were raised on direct appeal and decided against him.[7]  *See United States v. LeCroy*, 441 F.3d 914, 920 (11th Cir. 2006).  *See also United States v. Brown*, 441 F.3d 1330, 1367 (11th Cir. 2006).

Therefore, these issues provide no basis for Section 2255 relief, and must be denied without an evidentiary hearing.

> K.   THE COURT SHOULD DEFER TAKING EVIDENCE AND

---

[7]Defendant acknowledges that he has raised these issues in this proceeding simply to preserve them for further review because the Supreme Court has not ruled on the issues.

> RULING ON THE ISSUE OF WHETHER EXECUTION PURSUANT TO THE CURRENT BUREAU OF PRISONS AND DEPARTMENT OF JUSTICE PROTOCOLS FOR CARRYING OUT A DEATH SENTENCE VIOLATE THE EIGHTH AMENDMENT.

Defendant contends that the current protocols employed by the Bureau of Prisons and the Department of Justice to execute citizens sentenced to death violate the Eighth Amendment. Defendant seeks an evidentiary hearing on this issue.

The government submits that this issue is not ripe for consideration at this time. The court must resolve the other issues raised in this Section 2255 motion. That process will take several months. Then there is certain to be an appeal of the court's ruling. The appellate process, including a petition for certiorari to the Supreme Court, will take more than a year to resolve. The execution of defendant's sentence is stayed pending the resolution of defendant's Section 2255 motion.

Counsel for the government is aware that presently there is litigation pending in the United States District Court for the District of Columbia on this issue. The inmates who are have brought that lawsuit are all awaiting execution by the Bureau of Prisons. All of these inmates have already had the denial of their Section 2255 motions affirmed on appeal. Therefore, the issue of whether the current protocol for the execution of federal prisoners who have been sentenced to death violates the Eighth Amendment will be resolved during the time that this court and the Eleventh

59

Circuit address the other issues raised in defendant's motion.  If the issue is resolved in favor of the government, then this issue will be moot as to this defendant.  If the issue is resolved in favor of the inmates, then it is likely that the protocol will be changed while the execution of defendant's sentence is stayed and the issue of the current protocol would be moot.

Therefore, the government submits that without prejudicing defendant's right to litigate this issue at a later time, the court should defer hearing evidence and ruling on this issue at this time.

L.   TRIAL  COUNSEL  DID  NOT  RENDER  INEFFECTIVE ASSISTANCE  OF  COUNSEL  IN  CLOSING  ARGUMENT DURING THE PENALTY PHASE.

Defendant  contends  that  his  trial  attorneys  rendered ineffective  assistance  of  counsel  in  closing  argument  because counsel did not organize or present the mitigation evidence that was admitted at trial in an effective manner.  However, the record demonstrates that counsel's closing argument was not deficient and that any omissions from the argument did not affect the outcome of the trial.

Deficient performance in closing argument may be the basis of a finding that trial counsel rendered ineffective assistance of counsel.  *See Lawhorn v. Allen*, 519 F.3d 1272 (11th Cir. 2008) (death sentence vacated where trial counsel chose not to give a

closing argument during the penalty phase). In *Lawhorn*, the Eleventh Circuit explained that through closing argument during the penalty phase, "counsel has one "last clear chance" or final opportunity to marshal all of the mitigating evidence before the jury and explain or minimize the prosecution's evidence." 519 F.3d at 1296, citing *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555 (1975). The court also stated that "[d]eficient performance is demonstrated by an attorney's failure to use the closing argument to focus the jury's attention on his client's character or any mitigating factors of the offender's circumstances, and by his failure to ask the jury to spare his client's life." 519 F.3d at 1295, citing *Dobbs v. Turpin*, 142 F.3d 1383, 1389 (11th Cir. 1998).

Closing arguments during the penalty phase will be found to be deficient where the argument "would have been likely misunderstood by the jurors as meaning that their judgment call on the appropriateness of a death sentence did not really matter." *Mann v. Dugger*, 844 F.2d 1446, 1457 (11th Cir. 1988). And where the argument failed to focus the sentencing jury's attention on "the character and record of the individualized offender and the circumstances of the particular offense...." *Penry v. Lynaugh*, 492 U.S. 302, 316 (1989), citing *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).

In the instant case, trial counsel divided up the closing

argument during the penalty phase.  Mr. Mendelsohn gave the first half.  He told the jury that the decision to impose the death penalty was uniquely in each juror's hands because the decision to sentence defendant to death must be unanimous, and that if only one juror believed that a life sentence was appropriate, then the sentence would be life imprisonment.  (Doc. 237-2687).  He also told the jury that their decision was final because the judge could not overturn it.  (*Id.*).  Mr. Mendelsohn then attacked the aggravating circumstances. (Doc. 237-2688-96).  He concluded his argument by telling the jury that defendant would spend the rest of his life in prison and that defendant would think about the victim impact testimony of the victim's family and friends every day for the rest of his life. (Doc. 237-2296-98).  Finally, Mr. Mendelsohn asked the jury to grant mercy.  (Doc. 237-2298).

Ms. Kearns then addressed the jury about the mitigating factors.  She first defined the mitigating factors as mercy and explained that the jurors must look at defendant as a human being. (Doc. 237-2702-04).  Ms. Kearns argued that the evidence of defendant's conduct immediately after the murder established that defendant was immediately remorseful for killing Joann Tiesler, and that life imprisonment for a defendant who feels remorseful for his crime would be just punishment.  (Doc. 237-2705-08).  Ms. Kearns also argued that defendant's writings and defendant's contacts with

psychologists while he was in prison before the murder demonstrate that he felt bad about and was remorseful for his other actions that hurt people. (Doc. 237-2708-11). Secondly, Ms. Kearns argued that life imprisonment was an appropriate punishment because a death sentence would make victims of defendant's family who still supported him. (Doc. 237-2711-14). Finally, Ms. Kearns argued that defendant's childhood and family history, history of childhood sexual abuse, and the lack of evidence of violence while he was incarcerated demonstrated that defendant has basic moral fiber. (Doc. 237-2715-16). Ms. Kearns concluded her argument by suggesting that based on the way Joann Tiesler lived her life, she would consider defendant worthy of mercy. (Doc. 237-2717).

Defendant contends that trial counsel could have given a closing argument that better focused the jury's attention on the mitigating factors. However, as noted previously, in reviewing the performance of trial counsel in a death penalty case, the task of the court is not to look in hindsight at what counsel could have done, but to evaluate what counsel did do. It is from this perspective that the court determines whether the closing argument was within the sphere of what a reasonably competent trial attorney would do. In the instant case, trial counsel told the jury that the decision to execute defendant was an individual one that would not be overturned by the judge, asked the jury to show mercy on defendant, argued that defendant was remorseful for his crime,

63

argued that life imprisonment for a remorseful defendant was sufficient punishment, discussed defendant's lack of violence in prison, discussed defendant's upbringing, childhood sexual abuse, parent's divorce and the impact that those issues had on his behavior, and concluded by arguing to the jury that the victim would show mercy on defendant. None of the deficiencies that the Eleventh Circuit has noted in the closing arguments in other death cases were present in the instant case. The court should find that the closing argument that defense counsel gave was well within the sphere of what the court would expect from a reasonably competent given the facts of the case. Defendant cannot satisfy the performance prong of *Strickland* on this issue.

Nor can defendant satisfy the prejudice prong. In *Lawhorn*, the court noted that "[w]e are aware that "some [death penalty] cases almost certainly cannot be won by defendants" because "sometimes the best lawyering, not just reasonable lawyering, cannot convince the sentencer to overlook the facts of a brutal murder-or, even a less brutal murder[-]for which there is strong evidence of guilt in fact." Clisby v. State of Alabama, 26 F.3d 1054, 1057 (11th Cir. 1994)." 519 F.3d at 1296. The instant case is just such a case. Defendant attacked Joann Tiesler in her own home. Defendant struck her in the back of the head with a shotgun. Defendant bound her, raped her, and brutally sodomized her. Then, using a knife, defendant slit Joann Tiesler's throat with such

64

savagery that he nearly decapitated her.  Finally, defendant stabbed Joann Tiesler in the back multiple times.  The last minutes of Joann Tiesler's life were filled with terror, pain, apprehension, horror, and fear caused by defendant.  Defendant served 10 years in federal and states prisons, yet committed this offense within four months of his release.  This is such a case where the best lawyering and the most brilliant closing argument could not overcome the horrendous facts that the jury heard. Defense counsel gave more than a reasonably competent closing argument, but they could not make the facts of Joann Tiesler's death go away.  Defendant cannot demonstrate that a better closing argument would have resulted in a different sentencing verdict. Defendant cannot satisfy the *Strickland* prejudice prong.

The court should deny defendant Section 2255 relief on this issue without conducting an evidentiary hearing.


    M.    DEFENDANT'S ALLEGATION THAT THE GOVERNMENT
          WITHHELD EXCULPATORY AND/OR MITIGATING
          EVIDENCE IS NOT SPECIFIC AND SHOULD BE DENIED
          WITHOUT AN EVIDENTIARY HEARING.

Defendant alleges that the government withheld exculpatory and/or mitigating evidence.  However, defendant gives no specifics as to what evidence he alleges was withheld by the government.  The government denies that there was a discovery or *Brady* violation in the instant case.  Unless defendant makes a more specific allegation or proffers what evidence he believes the government has

withheld, the government cannot substantively respond. Without supplementation by defendant, this issue provides no basis for Section 2255 relief and should be denied without an evidentiary hearing.

> N.   DEFENDANT'S DOES NOT ESTABLISH THAT HIS CONSTITUTIONAL RIGHTS WERE VIOLATED BECAUSE THE GOVERNMENT HIRED A JURY SELECTION EXPERT TO ASSIST WITH JURY SELECTION.

Defendant alleges that the jury selection expert employed by the government had improper contact with potential jurors, family members, witnesses and the defense team, and that this contact violated defendant's constitutional rights. Because defendant alleges nothing more than this bare allegation, the government cannot respond substantively at this stage of the proceedings.

The court should require defendant to supplement this issue with a proffer stating with specificity with whom the jury expert had contact, the relationship of that person to the defendant or the defense team, the nature of the contact, and how the contact violated defendant's rights. If defendant does not supplement this issue with such a proffer, then the court should deny defendant Section 2255 relief on this issue without an evidentiary hearing.

> O.   DEFENDANT'S ALLEGATION THAT HIS APPELLATE COUNSEL COULD HAVE RAISED ADDITIONAL ISSUES ON DIRECT APPEAL, BUT DID NOT, IS NOT SPECIFIC AND SHOULD BE DENIED WITHOUT AN EVIDENTIARY HEARING.

Defendant alleges that his appellate attorneys provided ineffective assistance of appellate counsel because they should have raised additional issues on direct appeal, but did not. However, defendant does not specify what issues should have been raised that were not, therefore, there is nothing for the government to respond to at this time.  If defendant does not supplement this issue with specific issues that were not raised on direct appeal, but should have been, then the court should deny defendant Section 2255 relief on this issue without holding an evidentiary hearing.

VI.  Conclusion.

The government submits that the court should conduct an evidentiary hearing only on the issues regarding whether trial counsel were ineffective in the presentation of mental health evidence during the sentencing phase of the trial and whether government attorneys violated the court's "firewall" order regarding the disclosure of certain reports related to defendant's mental health issues.  In addition, if defendant makes a sufficient proffer with regard to what improper contact he alleges the jury

selection expert had with members of the jury venire, then the court should conduct an evidentiary hearing on that issue, as well. As to the remaining issues raised in defendant's Section 2255 motion, the government submits that the record is sufficient for the court to make a just determination of those issues without considering evidence from outside the record.  As to those issues, the government submits that the court should deny defendant Section 2255 relief.

Respectfully submitted,

DAVID E. NAHMIAS
UNITED STATES ATTORNEY

/s/
WILLIAM L. McKINNON, JR.
ASSISTANT UNITED STATES ATTORNEY
600 Richard B. Russell Federal Bldg.
75 Spring Street, S. W.
Atlanta, Georgia  30303
404/581-6046
404/581-6181 (Fax)
Georgia Bar No. 495812

68

CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by electronically filing with the Clerk of Court using the CM/ECF system which will automatically send notification via email said copy to:

    Sandra Michaels
    Jack Martin

This 9th day of January, 2009.

                              /s/                          
                              WILLIAM L. MCKINNON, JR.
                              ASSISTANT UNITED STATES ATTORNEY