UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CASE NO. |
| | ) | 2:02-CR-038-RWS-SSC-1 |
| WILLIAM EMMETT LECROY, JR. | ) | |
| | ) | |
| Defendant. | ) | |

**TRAVERSE TO GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A
PERSON IN FEDERAL CUSTODY PURSUANT TO 28 U.S.C. §2255**

As permitted by Rule 5(d) of the Rules Governing Section 2255 cases, the Defendant LeCroy (herein also referred to as the "Defendant" or "Mr. LeCroy") hereby files this Traverse to respond to certain assertions made by the Government in the Government's Response to Defendant's Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody Pursuant to 28 U.S.C. §2255 (the "Government's Response")(Doc. 508) and to clarify the claims set out by the Defendant in his Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody Pursuant to 28 U.S.C. §2255 (the "Motion to Vacate")(Doc. 493), which appear in some respects to have been misinterpreted or misapprehended by the Government.

## I.    Grounds A and B Regarding Ineffective Assistance of Counsel with Respect to Mental Health Evidence at Sentencing

The Government misinterprets or misunderstands Defendant's claim. With one important exception, the Defendant does not claim that his trial counsel did not investigate mental health evidence which would have been compelling mitigating evidence as to sentence. Quite to the contrary, trial counsel located mental health experts who had observed, diagnosed and treated the Defendant prior to the events in this case and reached various conclusions regarding the Defendant's mental status, including the likelihood of childhood abuse and its effect upon the Defendant. Trial counsel had also arranged for the Defendant to be evaluated by a respected forensic psychiatrist, Dr. Michael C. Hilton, M.D., who was prepared to offer expert testimony that the Defendant's prior sexual abuse as a child, along with other factors, offered an explanation as to how he could come to commit the crime for which he was convicted. Trial counsel had also contacted Dr. David Lisak, Ph.D., a national expert on the adult effects of childhood abuse, who could provide important expert information regarding the effect on adults of childhood sexual abuse.

Where trial counsel failed in their representation is when they decided not to present this evidence, the only evidence that was available to the defense to offer some explanation for the horrendous attack for which the Defendant had been convicted, because the Defendant would have been required to submit to an

independent expert evaluation by a Government selected expert. Trial counsel made this momentous decision without knowing fully what type of evidence the Government would offer in response, because they refused to allow the Defendant to be evaluated. In short, trial counsel unreasonably abandoned a mental health defense for fear of what might be offered in response, but without full knowledge of what the response would have been.

A tactical or strategic decision not to offer evidence, the only compelling evidence that was available to the defense to explain the attack on Ms. Teisler, can be reasonable only if made with full knowledge of the consequences of that strategic choice. If counsel had permitted their client to be evaluated by the Government and that evaluation had been found to be so devastating that presenting the mental health evidence would do more harm than good, that decision might withstand attack as ineffective assistance of counsel as one possible reasonable strategic choice made by counsel, although the Defendant does not concede that such a decision would be reasonable because it still left the Defendant essentially defenseless at sentencing. But here, the claimed strategic or tactical decision was made without knowledge of what the Government might offer in response, that is without knowledge of the full consequences of the decision not to present mental health evidence.

It is this type of decision made without full knowledge of the consequences of the decision and the ramifications of the choices made which cannot be defended or excused as a simple strategic choice. A strategic choice is virtually unchallengeable only when it is made with full knowledge of the options available and the consequences of the choice. Such an uninformed strategic decision to which the Court should not give deference is often the result of a failure to investigate. Here the strategic choice not to present evidence was made without knowing (i.e. "investigating") what the Government response would be. Strickland v. Washington, 466 U.S. 668, 690-691 (1984)("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment support the limitations on investigation."); Baxter v. Thomas, 45 F.3d 1501, 1514 (1995)("[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.") (citing and quoting Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991));

In one other important respect counsel's actions were unreasonable. The Defendant had reported years prior to the events in this case that he had been abused by a teenage babysitter when he was only a child. He remembered the

4

babysitter's name only as "Tinkerbell." Because of the lapse of years and the fact that the Defendant's family was transient, regularly moving from apartment to apartment, trial counsel were unable to identify or locate Tinkerbell. The inability to locate the babysitter who had sexually abused the Defendant many years earlier was not a sufficient reason to abandon a mental health defense based upon childhood sexual abuse. After all, as the Government itself points out in the Government's Response, it would be unlikely even if the person could be located that she would confess to the abuse. (Government's Response, pp. 22-23).

Instead, trial counsel should have had the Defendant evaluated by a specialist in childhood abuse to determine whether the Defendant's explanation of the events and the symptoms described were consistent with childhood abuse as corroborating evidence that such abuse had actually occurred. The need for such corroboration was especially important in light of the opinions advanced by the Government's "firewall" expert, Dr. Julie C. Medlin, based upon her review of the Defendant's psychiatric records but without personally evaluating the Defendant, that it was "unclear if Mr. LeCroy was sexually abused by a female baby sitter as alleged, and if so, to what extent", that there were "potential motivations for (Mr. LeCroy) to fabricate such a history", and that "[r]esearch suggests that a significant percentage of sex offenders fabricated a history of childhood sexual abuse, presumably to explain and justify their sexual offending."

Trial counsel had available to them such an expert in Dr. Lisak, who if trial counsel had allowed him to evaluate the Defendant personally could have refuted Ms. Medlin's suspicions and corroborated the fact that Mr. LeCroy had in fact been sexually abused as a child. In particular, Dr. Lisak could have determined whether the Defendant's description of the inner psychological turmoil resulting from the abuse claimed by the Defendant was consistent with childhood abuse, making it extremely unlikely that the Defendant had fabricated this story. Dr. Lisak has now had the opportunity to evaluate the Defendant personally and is prepared to testify as a leading expert in the area that there is no way that the Defendant could have described the inner psychological turmoil that he has experienced and that has shaped every sexual relationship he has ever had, as he did to Dr. Lisak, unless he had been the victim of childhood sexual abuse. Dr. Lisak would testify that there are probably only six experts in his field who would be able to describe the inner psychology of somebody who has been sexually abused as a child by a woman the way that Defendant described the inner psychology he has experienced without having actually experienced sexual abuse. In short, trial counsel had available to them in Dr. Lisak a resource to confirm that Mr. LeCroy was the victim of childhood sexual abuse, even though they could not now locate the abuser, and that this childhood sexual abuse played a part in the attack on Ms.

6

Tiesler, offering an explanation, not an excuse for that attack, which would have been powerful evidence to justify a sentence other than death.

In sum, with one important exception, the Defendant is not claiming that his trial counsel did not investigate mental health issues in his case. Quite to the contrary, they obtained the documentary evidence of mental health problems reported and observed years prior to the offense for which the Defendant was convicted and were prepared to present mental health experts who could testify about what they had learned about Mr. LeCroy and their diagnoses regarding the impact of childhood abuse of Mr. LeCroy. Counsel for the Defendant also contacted a respected local forensic psychiatrist who was prepared to give a detailed explanation of the Defendant's mental state at the time of the events which would have substantially mitigated against imposition of the death penalty. Counsel for the Defendant had also contacted a leading expert in the field of childhood abuse, Dr. Lisak, and had obtained his general opinions regarding the effects of childhood abuse on an adult.

Where the defense failed in their representation was when they chose not to present the evidence that was already available to them, primarily for fear of an unknown Government evaluation, and also, in part, because they had not located "Tinkerbell", but without employing Dr. Lisak to confirm from his personal evaluation of the Defendant that the Defendant's account of sexual abuse was true,

7

which would have also refuted the suspicions of fabrication by Dr. Medlin. Without knowing what the possible Government evaluation might be, and without knowledge of how Dr. Lisak could confirm the truth of the sexual abuse of the Defendant, trial counsel chose to advise the Defendant not to submit to an independent evaluation by a Government mental health expert knowing that this would foreclose their ability to present <u>any</u> of the mental health evidence that was available to them. They even failed to proffer the "teaching expert" testimony of Dr. Lisak so that they would know whether the Court would rule that this testimony would trigger the Government's right to an independent evaluation.

Trial counsel's actions were unreasonable and indefensible as merely strategic decisions, because trial counsel did not know fully the consequences and ramifications of their decision. If they had simply allowed Mr. LeCroy to have been evaluated by a Government psychiatrist, they would then know what the ramifications of a choice not to present the mental health evidence would have been. If they had had the Defendant evaluated by Dr. Lisak, they would have also had powerful evidence supporting the truth of the Defendant's account of childhood sexual abuse which would have refuted Dr. Medlin's speculations. They may have still decided that the impact of an unfavorable Government evaluation or of Dr. Medlin's testimony would make it unwise to present mental health evidence. This may or may not have been a reasonable decision, given that mental health

evidence was essentially the only compelling mitigation case available to the defense. <u>Cave v. Singletary</u>, 971 F.2d 1513, 1518 (11th Cir. 1992)("Further, we wish to emphasize the district court's observation that the mere incantation of the word 'strategy' does not insulate attorney behavior from review. The attorney's choice of tactic must be reasonable under the circumstances."). But, we need not answer that question, because trial counsel made the choice not to present mental health evidence, the only compelling mitigation evidence available to the defense, without knowing what the risks were. This is unreasonable representation.

The Government concedes that evidence should be received with regard to Ground B of the Motion to Vacate, but contests that evidence should be received regarding Ground A of the Motion to Vacate. This distinction may reflect the Government's misapprehension of the precise claim that the Defendant is presenting, but there is no practical difference, because the evidence that the defense would present as to Ground A is essentially the same as to Ground B, namely "the opinion testimony of Dr. Lisak, Ms. Vogelsang, Dr. Ganahl and Dr. Carlson and the results of any psychological testing that they did" (Government Response, p. 26), plus the testimony of Dr. Hilton, which was available to the defense but never presented, as well as the testimony of trial counsel regarding the reasons for the decisions they made and the information upon which they made these decisions.

9

Given the Government's concession that an evidentiary hearing is required, the Defendant respectfully requests that the Court set down such a hearing at which the defense can present the relevant expert testimony that was available to the defense at trial, but was never presented, because of the unreasonable choices made by trial counsel without full knowledge of the impact of those choices, as well as the testimony of trial counsel. This evidence is also necessary for the Court to determine the prejudice the Defendant suffered from the failure of his counsel to present the mental health evidence that could have been presented on his behalf. In judging prejudice, the Court should keep in mind the observation of Justice O'Connor in <u>California v. Brown</u>, 479 U.S. 538, 545 (1987), that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, <u>or to emotional or mental problems</u>, may be less culpable than those who have no such excuse." (Emphasis added). After the Court has conducted that hearing, the parties can brief the relevant legal issues based upon a complete record.

## II.    Potential Violation of the Court's Firewall Order

In Ground C of the Motion to Vacate, the Defendant alleges concerns raised by comments made by one of the prosecution trial counsel at a post-trial seminar indicating that the Court's "firewall" orders may have been breached in this case. The Government denies this allegation but nevertheless requests an evidentiary hearing on this issue "so that there will be no factual issue about whether the Government attorneys violated the Court's "firewall" order." (Government's Response, p. 28). The Defendant agrees that it would be wise to explore this issue at an evidentiary hearing, or by way of depositions, and concurs in the Government's request for an evidentiary hearing on the issue raised in Ground C.

## III.    Ineffective Assistance of Counsel With Regard to Inadequate Mitigation Investigation and Presentation at Trial

Ground D of the Motion to Vacate alleges ineffective assistance of counsel due to the failure of trial counsel adequately to investigate mitigation evidence and its failure to present effectively its mitigation case. Although the Government attempts to break down this ground for relief into separate claims, the Defendant's claim for relief is based on the cumulative effect of trial counsel's failures in their mitigation investigation and the presentation of a mitigation case.

As to the prison "character" witnesses presented by the defense, the Government ignores the fact that the record shows that the character witnesses were not properly prepared to respond to the likely questions regarding how the

11

crimes for which the Defendant had been previously convicted, including the murder/rape for which he was convicted in this case, might impact their character testimony. To the contrary, the record supports the implication that the witnesses were not prepared for this line of cross-examination.

Moreover, the Government is wrong when it claims that when challenged with the facts of the Defendant's conviction, none of these witnesses "changed his or her testimony about Defendant's character." (Government's Response, p. 29). For example, inmate Clyde Denbo, when confronted with the Defendant's prior conviction for statutory rape and aggravated child molestation testified that these facts "lowered his expectations of the guy because he is capable of doing what is right." (Trial Testimony (hereinafter "TT")-2160-2161). Had counsel properly prepared these witnesses, counsel would have helped these witnesses shape a more effective answer to the likely cross-examination or, if they had known that these facts would have actually changed the witness' character assessment, they could have made an informed decision not to call the witness. A witness who retracts his character assessment on the stand and in effect becomes a bad character witness is obviously worse than not calling the witness at all.

With respect to the limitations that the defense imposed on the testimony of social worker Jan Vogelsang, including the fact that she was unable to express her opinions regarding how childhood abuse could have offered insight into how the

Defendant could have committed the crime for which he was convicted and why her investigation and testimony did not include any information about the Defendant for over a decade prior to the offense, the Government has conceded that testimony from her should be received by the Court in deciding whether these restrictions on Ms. Vogelsang which resulted from counsel's actions was reasonable and, if not, the extent of the prejudice the Defendant suffered from the actions of counsel.

Finally, with respect to Ground D, the Court cannot assess the extent to which the Defendant suffered from the failure of the defense to discover and/or present compelling evidence that was available to explain the Defendant's mental status and the effects on him of childhood abuse, both sexual and emotional abuse, without hearing the additional evidence that present counsel has discovered or that trial counsel unreasonably decided not to present. Accordingly, the defense requests the opportunity to present evidence on this claim, including the testimony of trial counsel, Ms. Vogelsang, and family and other witnesses who were not called but who could have testified about bizarre sexual activities that were allowed or occurred involving the Defendant as a child, or who were called but not examined as to what they knew about such activities, so that the Court will have a complete record upon which to judge the effectiveness of trial counsel. These witnesses include William LeCroy, Sr., Donna Houston, Tonya LeCroy, Chad

13

LeCroy, Keisha LeCroy, Linda Cook, Curtis Cook, Kristie Grasis, Julie Cook, Rita McLeod, Russell Kelly, Sr., Russell Kelly, Jr., Richard Kelly, Larry LeCroy, Charlotte LeCroy, Luther LeCroy, Charles Bradley, Barbara Bradley, Shannon Bradley, Andy Bradley, Christy Bradley, James Thomas LeCroy, and neighbors from apartment complexes where Mr. LeCroy lived.

**IV.    Failure to Object to the Court's Future Dangerousness Charge**

Ground E of the Motion to Vacate claims that the Defendant suffered from ineffective assistance of counsel when his trial counsel failed to object to the Court's instruction that the jury in deciding his sentence could consider whether the Defendant was a potential danger to the general public, even though he would be incarcerated for life, if they found that he was an escape "risk." This issue was raised during the trial but no timely objection was made by trial counsel to the Court's final instruction. See, e.g., Kimmelman v. Morrison, 477 U.S. 365 (1986)(Counsel ineffective for failing to file a timely motion to suppress). As a consequence, the Court of Appeals for the Eleventh Circuit failed to consider this claim on any other standard than a plain error standard. United States v. LeCroy, 441 F.3d 914, 930-931 (11th Cir. 2006).

The Government concedes, as it must, that no proper objection was raised at trial. (Government's Response, p. 35). The Government, nevertheless, argues that no relief is required because, according to the Government, the charge given by the

Court was "consistent with the limited legal authority on the subject." (Government Response, p. 36). However, none of the cases cited by the Government deal with the specific problem here, which is that the instruction allowed the jury to consider the aggravating factor of future dangerousness to the public based simply upon an escape "risk", without any guidance as to the degree of evidence that the jury should have in determining the substantiality of such a "risk," that is whether escape is merely possible, even if that possibility is fanciful, or whether there must be a reasonable likelihood of an escape. Although the Court instructed the jury that it must find beyond a reasonable doubt that the Defendant posed a "risk" of escape, the word "risk" is so elastic and ill-defined, that it would include the mere possibility of an escape, as opposed to what the defense counsel requested, but did not adequately perfect, that the jury find beyond a reasonable doubt that there was a "likelihood" of escape.

With regard to the Government's prejudice argument, the Government fails to mention the importance that the Government attached to its escape "risk" evidence, which was the lion's share of the aggravating evidence presented by the Government in aggravation of sentence and an important argument fervently made by the Government in its closing. (Government's Response, pp. 39-40)(TT-2677-2680, 2718-2719, 2726).

Nevertheless, given that this is purely a record issue not requiring the receipt of any additional evidence, the Court can decide this issue based upon the record and the briefs of counsel, unless the Government contends that trial counsel had a strategic reason for not perfecting the arguments they had previously made. If so, then their testimony is required. Once an evidentiary hearing has been completed, this issue can be briefed by the parties along with all other issues upon which evidence has been received, in the final briefing to the Court with regard to Defendant's Motion to Vacate.

## V.    <u>Ineffective Assistance of Counsel in Raising a Jury Challenge Claim Regarding the Underrepresentation of the Hispanic/Latino Community</u>

In Ground F of the Motion to Vacate, the Defendant raises a claim based upon the ineffectiveness of his trial counsel in not offering citizenship figures in presenting his claims regarding the underrepresentation of the Hispanic/Latino community in the Northern District of Georgia and the Gainesville Division. In the Government's Response, the Government incorrectly describes this claim as being the failure to present the figures as to those "registered to vote" (Government's Response, p. 41), which is not the claim raised by the Defendant.

The Government argues that even if the figures offered by the defense in Ground F are correct, the Defendant was nevertheless not entitled to an evidentiary hearing, because even based upon the Defendant's own proffered statistics he cannot state a <u>prima</u> <u>facie</u> case under either the Sixth Amendment fair cross-section

clause or the Jury Selection Service Act of the 1968, 28 U.S.C. §1861 et. seq., upon which relief would have been granted. (Government's Response, pp. 43-50). The Government is wrong both in its factual and legal assertions.

First of all, the Government claims that the Defendant cannot make a valid claim that the Hispanic/Latino community in the Northern District of Georgia and/or the Gainesville Division is a "cognizable class", for both Sixth Amendment and Jury Act purposes. (Government's Response, pp. 44-45). What the Government fails to mention is that because trial counsel never presented citizenship figures the Defendant has never been given an opportunity to make that case. After all, Willis v. Zant, 720 F.2d 1212, 1216 (11th Cir. 1983), cited in the Government's Response ( p. 43), itself asserts that this issue is a fact specific issue upon which the Defendant is entitled to an evidentiary hearing. ("Whether or not a class of persons is a sufficiently distinct and cognizable class for Sixth Amendment cross-section analysis is a question of fact."). Valle v. Secretary for the Department of Corrections, 459 F.3d 1206, 1215-1217 (11th Cir. 2006), relied upon by the Government, involved the Eleventh Circuit's application of the deferential standard for federal review of a state conviction under 28 U.S.C. §2254(d), a much narrower standard than that applicable here. The Court simply held that the Florida Supreme Court's determination that the habeas petitioner there had not made a sufficient showing that "Latin Americans" are a cognizable group in the

jurisdiction where he was convicted, was not an unreasonable application of binding Supreme Court authority, not that this conclusion was correct. This deferential holding in a habeas corpus proceeding reviewing a state conviction does not mean that if offered the opportunity here the Defendant's trial counsel here could not have shown that the Hispanic/Latino community, as defined by the United States Census, is a distinctive cognizable class in the Northern District of Georgia and the Gainesville Division, based upon common language, religion, culture, experiences, self-definition, etc. After all, Hispanics/Latino-Americans have repeatedly been found to be a sufficiently "distinctive group" in the community for equal protection and fair cross-section purposes. E.g., Castenada v. Partida, 430 U.S. 482, 495, 97 S.Ct. 1272, 1280 (1997)("In this case, it is no longer open to dispute that Mexican-Americans are a clearly identifiable class."); Hernandez v. Texas, 347 U.S. 475, 478, 74 S.Ct. 667, 670 (1954); United States v. Torres-Hernandez, 447 F.3d 699, 703, fn. 6 (9th Cir. 2006); United States v. Lara, 181 F.3d 183, 192, fn. 1 (1st Cir. 1999); United States v. Rioux, 97 F.3d 648, 654 (2nd Cir. 1996); United States v. Garcia, 991 F.2d 489, 491 (8th Cir. 1993). Indeed, the Georgia Supreme Court has recognized the distinctiveness for constitutional purposes of the Hispanic community in Hall County, a major county in the Gainesville Division, based upon such factors as common language, religion, work ethic, and family traditions. Smith v. State, 275 Ga. 715, 718 (2002).

Moreover, the Florida Supreme Court's conclusion that "[t]he term 'Latin American' encompasses too many countries and different cultural backgrounds and attitudes to constitute a single cognizable class for equal protection analysis" proves a little too much. The United States Supreme Court has held that the African-American community is per se a cognizable class. Rose v. Mitchell, 443 U.S. 545, 565 (1979). Is that holding now subject to reconsideration because the African-American community traces its origin to numerous countries, tribes, languages, religions and cultural heritages in the African continent?[1] Clearly, not. But that is the upshot of the Government's contention.

In short, the Defendant was entitled to make his case that the Hispanic/Latino community in the Northern District of Georgia and especially the Gainesville Division is in fact a cognizable group, but was never allowed the opportunity to do so, because trial counsel never presented the correct statistical figures, based upon citizenship, which they should have presented. This was ineffective assistance of counsel.

The Government's second argument is that somehow it is binding Eleventh Circuit law that unless you can show an absolute disparity of less than 10%, there is no way to make a claim, either under the Sixth Amendment or the Jury Act,

---

[1] Is Michelle Obama a member of the African-American cognizable class because she is a descendent of African slaves, while her husband is not because his father's ancestors were never slaves in America?

which requires relief, even if the cognizable group at issue is less than 10% of the jury eligible population. This is again flat wrong. Neither the Eleventh Circuit nor the former Fifth Circuit has ever held that a minus 10% absolute disparity threshold can still be employed for a cognizable group of less than 10%, because, after all, such a rule would allow the complete exclusion of a cognizable group that composed less than 10% of the relevant jurisdiction. See, United States v. Maskeny, 609 F.2d 183, 1906 (5th Cir. 1980)(The Court specifically declined to rule on the issue.); United States v. Butler, 615 F.2d 685, 686 (5th Cir. 1980); United States v. Rodriguez, 776 F.2d 1509, 1511, fn. 4 (11th Cir. 1985). In this situation, other statistics should be looked at, and the statistic most commonly considered is the "comparative disparity" figure, which has been presented by the Defendant in his Motion to Vacate. See, generally, Appendix to Foster v. Sparks, 506 F.2d 805, 834-835 (5th Cir. 1975).

Moreover, the United States Supreme Court has clearly stated that there is no one statistic that is the end all and be all for determining jury representation questions and that a flexible employment of various statistical tests is appropriate. Alexander v. Louisiana, 405 U.S. 625, 630 (1972)("This Court has never announced mathematical standards for the demonstration of "systematic' exclusion but has, rather, emphasized that a factual inquiry is necessary in each case that takes into account all possible explanatory factors."). While recognizing that in

20

some circumstances it can lead to a potentially exaggerated figure, the comparative disparity is a widely used statistic to examine jury representation issues and in many respects is preferable to the absolute disparity figure, which has its own distorting effects. See, Foster v. Sparks, at 835 ("Hence, flexible use of the two measures (absolute disparity and comparative disparity) is advisable, with the selection of either to be guided by a desire to avoid distorted results and a need to adequately protect the interests of those challenging the system."); Kairys, Kadane & Lehoczky, "Jury Representativeness: A Mandate for Multiple Source Lists," 65 Cal.L.Rev. 776, 793-799 (1977).

Here, the comparative disparity figures presented by the Defendant in the Motion to Vacate are large and troublesome. At the time of the Defendant's trial approximately half of the Hispanic/Latino community was not represented in the jury wheels in the Northern District of Georgia and approximately two thirds of the Hispanic/Latino community was not represented in the Gainesville Division. As the Government concedes, the Eleventh Circuit has never specifically ruled upon these types of disparities and the Defendant now merely requests the opportunity to present expert testimony regarding the figures asserted in his Motion to Vacate and an explanation of why those figures are compelling. See, United States v. Rogers, 73 F.3d 774, 776 (8th Cir. 1996) (Finding a 30.96 comparative disparity sufficient for a prima facie case.).

21

Finally, with regard to the systematic factors which may be resulting in significant underrepresentation of the Hispanic/Latino community, the Defendant's investigation at this point indicates that this underrepresentation is probably resulting from the use of the voter registration list as the sole source of names for potential jurors, and the failure to supplement that list with other sources more representative of the community, such as the driver's license and personal identification card lists, as required by 18 U.S.C. §1863(b)(2) of the Jury Act. An additional problem is the failure of the Clerk's Office to employ effective follow up procedures for juror questionnaires that are either found to be undeliverable or are not returned. After all, the Hispanic/Latino community tends to be more transient (renters as opposed to homeowners) and follow up procedures such as a request for forwarding addresses and sending out requests for juror questionnaires by certified mail can substantially decrease the underrepresentation problem so that the jury wheels can adequately represent the entire community, the mandate of the Sixth Amendment and the Jury Act.

All the defense asks for at this point is the opportunity to present evidence on this issue from the responsible individuals in the clerk's office and from a statistical and jury selection expert, as well as the documentary evidence necessary to support his claim, as contemplated by 18 U.S.C. § 1867. The legal consequences of that evidence can be briefed by the parties in the final briefing.

## VI.   The Ineffective Assistance of Counsel for Failing to Raise the Retention of Documents Issue

The Eleventh Circuit failed to address the Defendant's claims regarding the retention of documents found in the Defendant's car as the result of a 1991 law enforcement search because it was not fairly raised on appeal. United States v. LeCroy, 441 F.3d at 925, fn. 8. These documents were important evidence in the Government's case in chief, as well as evidence that supported the Government's claim that a death sentence was necessary in this case based upon the Defendant's claimed history as a serial predator and escape risk. (See, Government's Response, p. 8).

The Government concedes that it has been unable to find any specific case on point, although it admits that it was aware of two §1983 district court cases which held that the retention of seized documents may violate the Fourth Amendment. (Government's Response, pp. 51-52, and fn. 6); Fox v. Van Oosterum, 987 F.Supp. 597, 608 (W.D.Mich.1997); Roderick v. City of Gulfport, Miss., 144 F.Supp. 622, 629 (S.D.Miss. 2000).

Again, this is a purely legal issue not requiring the receipt of any evidence, which can be briefed in more detail by the parties in final briefing once the evidentiary hearing is concluded.

**VII.** **The Failure of Trial Counsel to Raise and Perfect the Failure to Require that the Jury in its Final Balancing Find that the Aggravating Circumstances Outweigh Mitigating Circumstances Beyond a Reasonable Doubt**

Section H of the Motion to Vacate raises another legal issue which does not require receipt of evidence and can be briefed in more detail by the parties in final briefing after the conclusion of the evidentiary hearing. Section H raises an issue which has never been addressed by the United States Supreme Court, but which has confounded the lower courts. That issue is whether under the authority of Ring v. Arizona, 536 U.S. 584 (2002) and Apprendi v. New Jersey, 530 U.S. 466 (2000), the final judgment of 18 U.S.C. §3593(e) that the aggravating factors found by the jury "sufficiently outweigh" any mitigating factors so as "to justify a sentence of death" is a "finding of fact" which must be made by the jury "beyond a reasonable doubt" before a death sentence can be legally imposed. If so, trial and appellate counsel were ineffective in not raising this issue at trial, by requesting an instruction that the jury must make the final balancing decision of 18 U.S.C. §3593(c) by proof beyond a reasonable doubt, by failing to perfect at trial the failure of the court to give such an instruction, and by neglecting to raise this issue on appeal. Although this is a record issue not requiring the receipt of evidence and the issue can be briefed fully in the final briefing to the Court after an evidentiary hearing, the Defendant will take this opportunity to expand on his allegations set out in the Motion to Vacate with the following preliminary legal analysis.

Under the Federal Death Penalty Act, 18 U.S.C. §3591 et. seq. (the "FDPA"), the sentencing jury must make four distinct findings before sentencing a defendant to death: (1) It must consider and find unanimously that the Government has proved beyond a reasonable doubt one of the four intent factors set out in § 3591(a)(2), § 3593(e)(1); (2) It must consider and find unanimously that the Government has proved beyond a reasonable doubt at least one of the statutory aggravating factors set out in § 3592(c), § 3593(e)(2); (3) It must consider and find whether the Government has proved beyond a reasonable doubt any other non-statutory aggravating factors for which notice has been given under §3593(a), and each individual juror must consider and find whether the defendant has proved any mitigating factors by a preponderance of the evidence, § 3593(c); (4) It must consider and find unanimously whether the aggravators so found "sufficiently outweigh" any mitigators so found "to justify a sentence of death." §3593(e).

Thus, by the FDPA's own terms, a defendant is not exposed to the maximum penalty of death under the statute unless and until the jury has considered evidence of and made findings for or against all proffered non-statutory aggravators. Only after those findings are made can the aggravators be weighed against the mitigators, as required in step (4). Nor is this simply a procedural hoop that the jury must jump through before imposing death. Absent the finding of one or more non-statutory aggravators, at least some defendants will never in fact be exposed to

a death sentence under the FDPA, because in some cases the "at least one [statutory] aggravator," § 3593(e)(2), that must be found in the preliminary step (2) will not "sufficiently outweigh" mitigating factors found.  Indeed, the statute explicitly contemplates that the § 3592(e)(2) finding does not, by itself, automatically "expose" the defendant to death, because even where that finding is made and no off-setting mitigators are found, the jury must still consider "whether the aggravating factor or factors alone are sufficient to justify a sentence of death." § 3593(e).  Accordingly, where the § 3592(e)(2) factor is *not* "alone . . . sufficient to justify a sentence of death," it is only the prior finding of the additional aggravators – including non-statutory aggravators – that "exposes 'the defendant to a greater punishment than that authorized by the jury's guilty verdict.'" Ring v. Arizona, 536 U.S. 584, 612 (2002)(Kennedy, J., concurring) (quoting, Apprendi v. New Jersey, 530 U.S. 466, 494 (2000)).

Cunningham v. California, 549 U.S. 270 (2007), supports the conclusion that the finding of non-statutory aggravators and the ultimate weighing process required under the FDPA must be treated, for Ring/Apprendi purposes, like the statutory aggravators in Ring itself, because the statutory scheme invalidated in Cunningham operates in a manner that is indistinguishable from the § 3593(e) fact-finding and weighing procedures. Under the California Determinate Sentencing Law (the "DSL"), in which the judge is required to select among a lower, middle

or upper term of years, "[s]election of the upper term is justified only if, after a consideration of all the relevant facts, the circumstances in aggravation outweigh the circumstances in mitigation."  Cunningham, 549 S.Ct. at 279 n. 9 (quoting California DSL Rule 4.420(b)).  The position of a defendant to be sentenced under the California DSL in regard to the upper sentence is thus precisely analogous to the position of a federal capital defendant against whom "at least one [statutory] aggravator" has been found, but for whom that statutory aggravator is not "alone . . sufficient to justify a sentence of death" under § 3593(e).  In the case of both defendants, the sentencing fact-finder must first find additional aggravating and mitigating circumstances, if any, and then weigh them against each other, before the higher sentence (death or, in Cunningham, the upper term of years) may be imposed.

Just as the Court in Cunningham found that the California judge's findings of aggravating facts under the DSL violated Apprendi, the finding of non-statutory aggravating facts by the FDPA sentencing jury and its weighing of these facts must receive parallel treatment, under Ring and its progeny, including Cunningham, including a requirement of proof beyond a reasonable doubt. Indeed, the violation of the Apprendi principle is if anything even clearer under the FDPA, since the additional aggravating factors available for the judge to consider under the California DSL include any "facts which justify the imposition of the upper prison

term" that the judge may discern in the evidence before him. Cunningham, 549 U.S. at 862 (quoting California DSL Rule Rule 4.405(d); emphasis omitted). The finding of non-statutory aggravators under the FDPA, by contrast, is a far more structured process, because the Government must allege specific aggravating factors in advance of the sentencing trial. In terms of the actual fact-finding process and the use to which they are ultimately put, the role of non-statutory aggravators is indistinguishable (with the sole exception of § 3593(e)(2)) from the role played by statutory aggravators.

Thus, in Apprendi, Ring and Cunningham the Supreme Court held that a legislature's choice to make a particular finding the predicate of an increased maximum sentence triggers the requirement of proof beyond a reasonable doubt as a matter of federal constitutional law, regardless of how the statutory scheme itself characterizes that finding. If so, it would seem that a finding that aggravating factors outweigh mitigating factors—a determination not itself mandated by the Constitution, but required under many state death penalty statutes as well as in federal prosecutions under the FDPA before a death sentence may be imposed—is that type of finding (i.e., one "necessary to impose the maximum [punishment]," Harris v. United States, 536 U.S. 545, 566 (2002)), and thus subject to the constitutional requirement of proof beyond a reasonable doubt.

28

After Ring, courts around the country were sharply divided over this issue. Taking one side in this dispute are Missouri, Colorado and Nevada. All have squarely held that where state law requires a finding that aggravating factors outweigh mitigating factors before the sentencer may proceed to consider whether to impose death, the "gateway" function played by such a finding triggers the requirements of Apprendi and Ring. Whitfield v. State, 107 S.W.2d 253, 259 (Mo. 2003); Woldt v. People, 64 P.3d 256, 265 (Colo. 2003); Johnson v. State, 59 P.3d 450, 460 (Nev. 2002). At least one academic commentator has agreed with these state courts that a jury's assessment of whether aggravation outweighs mitigation, if such a finding is a prerequisite to a death sentence, should be treated as a factual finding governed by Apprendi and Ring.    See, B. Stevenson, The Ultimate Authority on the Ultimate Punishment: The Requisite Role of the Jury in Capital Sentencing, 54 ALA.L.REV. 1091 n. 214 (2003); see also, Id. at 1126-1127 (pointing out that "[a]ll of the features of the aggravation finding that the Ring Court regarded as significant [in concluding that it triggered the protections of the Sixth Amendment] are equally true of the two other components of [Arizona's] tripartite sentencing determination," including a weighing of the relative substance of aggravating and mitigating circumstances).

Other courts, state and federal, have reached the opposite conclusion— typically by focusing on the perceived "nature" of the determination, rather than its

29

"function" as a necessary step in the sentencing process before death may be imposed. <u>See</u>, <u>e.g.</u>, <u>United States v. Sampson</u>, 486 F.3d 13, 31-32 (1st Cir. 2007)(weighing determination is not a finding of fact); <u>United States v. Barrett</u>, 469 F.3d 1079, 1107 (10th Cir. 2007). Courts in Indiana, Alabama and California, for example, have reasoned that a finding that aggravation outweighs mitigation "is not a factual determination [but a] moral or legal judgment", resting on "a theoretically limitless set of facts" and therefore "not susceptible to any quantum of proof." <u>Ex Parte Waldrop</u>,859 So.2d 1181, 1189 (Ala. 2002); <u>Ritchie v. State</u>, 809 N.E.2d 258, 264-268 (Ind. 2004)(citing and quoting <u>Waldrop</u>); <u>People v. Demetrulias</u>, 137 P.3d 229, 256-57 (Cal. 2006)(such an assessment is "inherently normative, not factual, and, hence, not susceptible to a burden of proof quantification")(citation and internal quotation marks omitted); <u>People v. Bell</u>, 151 P.3d 292 (Cal. 2007)(same).

Other states—<u>e.g.</u>, Oklahoma, New Mexico, Delaware and Maryland— understand the Sixth Amendment right to jury trial announced in <u>Ring</u> to be limited by the Eighth Amendment concept of "death-eligibility." According to this view, because a capital defendant is "death-eligible" once the jury has found beyond a reasonable doubt the existence of one statutory aggravating factor, other necessary determinations that may precede the ultimate sentencing decision—even if they are necessary prerequisites under state law—need not be found beyond a reasonable

doubt. See, e.g., Torres v. State, 58 P.3d 214, 216 (Okla.Crim.App. 2002)(it is the finding of a statutory aggravating circumstance that "authorizes" jurors to impose death); Mitchell v. State, 136 P.3d 671, 704 (Okla.Crim.App. 2006)(citing Torres); Ortiz v. State, 869 A.2d 285, 305 (Del. 2005)(although a defendant may not be sentenced to death "without [a] finding that the aggravating factors outweigh the mitigating factors, it is not that determination that increases the maximum punishment. Rather the maximum punishment is increased by the [jury's unanimous] finding [beyond a reasonable doubt] of the statutory aggravator")(alterations in original)(quoting Brice v. State, 815 A.2d 314, 322 (Del. 2003); State v. Fry, 126 P.3d 516, 531-36 (N.M. 2005).

Evans v. State, 886 A.2d 562 (Md. 2005), usefully illustrates this conflict among the State high courts, as the justices in Evans divided 4-3 over whether Ring requires that a jury finding that aggravation outweighs mitigation be made beyond a reasonable doubt. The Evans majority invoked its earlier decision in Oken v. State, 835 A.2d 1105, 1151-52 (Md. 2003), which took the position that Ring's Sixth Amendment protections apply only until the Eighth Amendment "eligibility" threshold is crossed. Evans, 886 A.2d at 577 (citing Oken). The Evans dissenters, by contrast, focused on the fact that under the Maryland statute "the increase in punishment from life imprisonment to the death penalty is contingent on the factual finding that the aggravators outweigh the mitigators." As a

consequence, that finding exposes the defendant "to an increased potential range of punishment beyond that for a conviction for first degree murder" and is covered by Ring. Indeed, the Evans dissenters were so strongly convinced that their view of how Ring applies in this context is correct that they have continued to assert it in subsequent cases, notwithstanding Evans. See, Abeokuto v. State, 893 A.2d 1018, 1067 (Md. 2006)(Raker, J., joined by Bell, C.J., and Greene, J. dissenting).

Defendant LeCroy believes that the Supreme Courts of Missouri, Nevada and Colorado and the dissenters in Evans have the better argument. If the statutory framework for imposition of a death sentence conditions the jury's power to recommend a death sentence on a prerequisite finding that aggravation outweighs mitigation, that finding operates to increase the potential maximum sentence, regardless of whether one labels that determination a "finding of fact" or a "normative judgment." Cf., Booker v. United States, 543 U.S. 220, 232 (2005)(Sixth Amendment protections apply to "any particular fact that the law makes essential to [the defendant's] punishment."). §3593(e) of the FDPA makes the jury's determination that aggravating factors outweigh mitigating factors "essential to" imposing a death sentence under FDPA. Ring's emphasis on function, rather than form, leads to the conclusion that this finding was required to be made by the jury "beyond a reasonable doubt" before a death sentence is legally available. Cf., Blakely v. Washington, 542 U.S. 296, 303-04 (2004)("the relevant

'statutory maximum' [for purposes of <u>Ring</u>] is not the maximum sentence a [jury] may impose after finding additional facts, but the maximum [it] may impose *without* any additional findings."); <u>Saltazahn v. Pennsylvania</u>, 537 U.S. 101, 111 (2003)("Put simply, if the existence of any fact (other than conviction) increases the maximum punishment that may be imposed on a defendant that fact—no matter how the State labels it—constitutes an element and must be found by a jury beyond a reasonable doubt.")

The Government has cited to the Court several district court cases, decided both before and after the decision of the Supreme Court in <u>Cunningham</u>, to the effect that the reasonable doubt standard does not apply to the weighing process under the FDPA and that non-statutory aggravating factors need not be charged in the indictment. (Government's Response, p. 57). There are also circuit court cases outside the Eleventh Circuit, not cited by the Government, which reach the same conclusion. <u>E.g.</u>, <u>United States v. Sampson</u>, 468 F.3d 13, 31-32 (1st Cir. 2007); <u>United States v. Barrett</u>, 469 F.3 1079, 1107 (10th Cir. 2002). None of the decisions are binding precedent on this Court.

Some of these decisions argue that the failure of the FDPA to provide for a burden of proof regarding the weighing process, when burdens of proof (beyond a reasonable doubt and by a preponderance of the evidence) are specifically provided for with regard to aggravating and mitigating circumstances, should be interpreted

as reflecting an intention by Congress not to require proof beyond a reasonable doubt at the weighing stage. Otherwise, it would have specifically provided for a burden of proof for the weighing process. E.g., United States v. Sampson, 486 F.3d at 31. While there might be some statutory interpretation basis for such an inference, it does not end the matter and it certainly does not decide the constitutional question.

We do not contend that Congress specifically provided for a burden of proof of beyond a reasonable doubt at the weighing stage. Instead, we contend that since Congress created a requirement of weighing before a death sentence can be imposed, under the authority of Apprendi, Ring and Cunningham, the Sixth Amendment requires that this finding necessary for a death sentence can only be made based upon proof beyond a reasonable doubt. After all, the California DSL did not provide for a burden of proof.  However, since it did require weighing before an aggravating offense could be imposed, the Supreme Court held in Cunningham that that weighing process must be found by the jury beyond a reasonable doubt.

Another argument made by the cases holding that the Constitution does not require proof beyond a reasonable doubt in the final weighing process between life and death is that the final weighing process of the FDPA is not a "finding of fact" but instead a "highly subjective" moral judgment, not suitable to a reasonable

doubt type of standard. E.g., United States v. Barrett, 496 F.3d 1079, 1107 (10th Cir. 2007). But we do not contend that the Sixth Amendment requires the weighing of aggravating and mitigating circumstances before imposing a death sentence. Many states, such as Georgia, do not provide for any weighing process at all. See, O.C.G.A. §17-10-31. But again, this misses the point. While Congress was not constitutionally required to provide for a weighing of aggravating and mitigating circumstances as a prerequisite to the imposition of a death sentence, it nevertheless decided to do so and having done so this determination became subject to the Sixth Amendment analysis of the Apprendi/Ring/Cunningham line of cases, which clearly provide that a factual determination, such as the weighing required by the DSL for a longer prison sentence in California and the weighing required for a death sentence under the FDPA, must be found by the jury and, if so, beyond a reasonable doubt.

Although ultimately ruling contrary to the defendant's position because of District Judge Clay Land's view of how the Eleventh Circuit "might" interpret the case law, the opinion of Judge Land in United States v. Natson, 444 F.Supp.2d 1296, 1303-1304 (M.D.Ga.)[2] sets forth the inevitable consequences of the logic of

---

[2]The defendant in Natson avoided a death sentence so there was no occasion for the Eleventh Circuit to consider the issue raised and discussed by Judge Land in his opinion.

the Apprendi/Ring/Cunningham decisions of the Supreme Court. As Judge Land

explained in Natson,

> "Mindful of the Supreme Court's admonition to avoid the
> labeling trap, the Court must focus not on whether
> something is labeled a 'sentencing factor' but on whether
> the effect of this final phase balancing is to subject a
> defendant to a more severe sentence that he would
> otherwise be exposed to if this balancing were not
> performed. See 530 U.S. at 494, 120 S.Ct. 2348
> (explaining that the dispositive question 'is not one of
> form, but of effect'). In other words, can a defendant be
> given a death sentence absent a jury's determination that
> the aggravating factors outweigh the mitigating ones?
> The undisputed answer is no. A jury must find that the
> aggravating/mitigating scale tips in favor of death for the
> ultimate penalty to be imposed. That finding is absolutely
> necessary to expose the defendant to death. If the jury
> finds a death penalty eligible offense, plus the requisite
> intent, plus an aggravating factor, that moves the
> defendant closer to the death penalty. However, the death
> penalty cannot be imposed unless and until the jury
> makes the final finding that the aggravating factors
> outweigh the mitigating factors." Id. at 1303-1304
> (Emphasis added).

Because, as Judge Land explained in Natson, the "undisputed answer" is that

a death sentence cannot be imposed under the FDPA "unless and until the jury

makes the final finding that the aggravating factors outweigh the mitigating

factors", that finding is subject to the constitutional restraints of the

Apprendi/Ring/Cunningham line of cases, which means that it must be made

beyond a reasonable doubt. Moreover, since the non-statutory aggravating factors

play a role in this process and must also be found beyond a reasonable doubt, then

36

they must also be alleged in the indictment, the same way that statutory aggravating circumstances must also be alleged in the indictment. United States v. Jones, 526 U.S. 227, 243, n. 6 (1999); United States v. Allen, 406 F.3d 940 (8th Cir. 2005)(en banc); United States v. Quinones, 313 F.2d 49 (2nd Cir. 2002); United States v. LeCroy, 441 F.3d 914 (11th Cir. 2006); United States v. Robinson, 367 F.3d 278 (5th Cir. 2004); United States v. Barnette, 390 F.3d 775 (4th Cir. 2004). The same logic would apply to the weighing process.[3]

The failure of trial counsel to raise these issues both at trial and on appeal was constitutionally ineffective assistance of counsel to the substantial prejudice of the Defendant. As a consequence, the Defendant's death sentence should be vacated.

---

[3]The fact that the grand jury would not necessarily know of all mitigating factors is of no moment. Indictments are returned based on probable cause and grand jurors seldom, if ever, are aware of the defense position or evidence at the time that the indictment is returned. In order to return a death penalty eligible indictment, the grand jury would only need to determine, based on the evidence before it, that there was probable cause to believe that the aggravating factors outweighed mitigating factors so that there would be probable cause to justify a death sentence or in the absence of mitigating factors that there is probable cause to find that the aggravating factors alone are sufficient to justify a death sentence.

**VIII.** **The FDPA is Unconstitutional Because it Does not Require that Aggravating Factors Necessary for the Imposition of the Death Penalty be Alleged in the Indictment**

Ground I of the Motion to Vacate raises a question which was decided against the Defendant by the Eleventh Circuit in United States v. LeCroy, 441 F.3d at 920-921, but has never been specifically addressed by the United States Supreme Court. Unless the Eleventh Circuit changes its mind, this Court is bound by the Eleventh Circuit's decision in this case. The Defendant has raised this issue simply for the purpose of perfecting it should this issue be later addressed by the United States Supreme Court or should the Supreme Court take this issue on a petition for writ of certiorari if the Defendant's convictions and sentence are not otherwise set aside.

**IX.** **The FDPA is Unconstitutional Because it Does Not Require that Non-Statutory Aggravating Factors be Alleged in the Indictment**

As with Ground I, the Defendant's claim in Ground J was decided against the Defendant in United States v. LeCroy, 441 F.3d at 922-923. The claim is raised again here merely for the purpose of perfecting that claim should the United States Supreme Court decide this issue differently or should it be necessary to seek review on this claim by a petition for writ of certiorari in the United States Supreme Court in this case, should relief not otherwise be granted.

## X.    The Constitutionality of the Justice Department Protocols for Lethal Injection

Defendant's claim asserted in Ground K of the Motion to Vacate deals with the constitutionality of the lethal injection procedures currently being used by the Department of Justice. The Defendant agrees with the Government that it is premature to hear evidence on this claim. It may not even be necessary to address this claim should relief be granted on other grounds. Moreover, as the Government asserts, there is litigation pending in the United States District Court for the District of Columbia on this very issue which will likely wind its way up to the United States Supreme Court. Defendant asserts this claim now in order to make clear that it has been timely raised, and quite frankly hopes that the Court never has to address this particular issue.

## XI.    Ineffectiveness of Trial Counsel at Closing Argument

The claim raised in Ground L of the Motion to Vacate is a record issue not requiring the receipt of evidence which can be addressed in final briefing by the parties after the receipt of evidence at an evidentiary hearing.

## XII.   Failure to Disclose Exculpatory Evidence

Due to the lack of access to the prosecution and law enforcement files, the defense cannot further specify what might be undisclosed exculpatory evidence. Counsel for the Defendant intends to make a demand on new counsel for the Government to review the Government files, including investigatory files, for

39

information potentially exculpatory ether as to guilt or sentence under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and will further amend his Motion to Vacate with particular allegations based upon the Government's response.

## XIII. <u>The Undisclosed Jury Selection Expert</u>

As to Ground N of the Motion to Vacate regarding the undisclosed jury selection expert, the Defendant requests the right to take discovery regarding this expert and to present evidence to the Court regarding the activities of this expert. The Defendant would ask that the Court require the Government to identify the expert so that the expert's deposition can be taken. The Defendant further requests the opportunity to take the depositions of trial counsel for the Government as to the activities of this expert and why the fact that the expert was being employed was not revealed to the defense.

## XIV. <u>Ineffectiveness on Appeal</u>

Ground O of the Motion to Vacate is again a record issue, based on the appellate briefs and other filings, which does not require the receipt of evidence. Ground O incorporates issues previously addressed in the Motion to Vacate and herein, including but not limited to claims regarding the retention of documents seized from the Defendant and the failure of the indictment to include allegations regarding non-statutory aggravators and the final weighing for imposition of the death penalty, as well as the failure of the Court to require the jury to make the

final weighing decision under 18 U.S.C. §3593(e) based upon proof beyond a reasonable doubt. This claim can be addressed by the parties in final briefing after the Court has held an evidentiary hearing.

This 11th day of February, 2009.

Respectfully submitted,

s/JOHN R. MARTIN
John R. Martin
Georgia Bar No. 473325

44 Broad Street, N.W.
Suite 202 The Grant Building
Atlanta, Georgia  30303
404.522.0400
jack@martinbroslaw.com

s/SANDRA MICHAELS
Sandra Michaels
Georgia Bar No. 504014

44 Broad Street, N.W.
Suite 202 The Grant Building
Atlanta, Georgia  30303
404.522.0400
slmichaels@mindspring.com          Counsel for William LeCroy

41

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 11, 2009, I electronically filed the foregoing **TRAVERSE TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY PURSUANT TO 28 U.S.C. §2255** with the Clerk of Court using the CM/ECF system which will send notification of such filing to William McKinnon, Assistant United States Attorney.

s/John R. Martin
JOHN R. MARTIN