UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 2:02-CR-38-RWS |
| | ) | |
| V. | ) | ATLANTA, GEORGIA |
| | ) | |
| WILLIAM EMMETT LECROY, JR. | ) | JANUARY 11, 2010 |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

VOLUME I
TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:                WILLIAM L. MCKINNON, ESQ.
                                   SHANYA DINGLE, ESQ.
                                   MARY JANE STEWART, ESQ.
                                   ASSISTANT U.S. ATTORNEYS

FOR THE DEFENDANT:                 JOHN R. MARTIN, ESQ.
                                   SANDRA L. MICHAELS, ESQ.
                                   DEFENSE ATTORNEYS

COURT REPORTER:                    SHARON D. UPCHURCH
                                   2114 U. S. COURTHOUSE
                                   ATLANTA, GEORGIA 30303-3361
                                   (404) 215-1354

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
PRODUCED BY COMPUTER.

2

INDEX TO EXAMINATION

WITNESS:                                                        PAGE


PAUL KISH:
DIRECT EXAMINATION                                               10
CROSS-EXAMINATION                                               28
REDIRECT EXAMINATION                                           80

STEPHANIE KEARNS:
DIRECT EXAMINATION                                              84
CROSS-EXAMINATION                                              101
REDIRECT EXAMINATION                                          138
RECROSS-EXAMINATION                                           149

BRIAN MENDELSOHN:
DIRECT EXAMINATION                                            152

3

P R O C E E D I N G S

(JANUARY 11, 2010; IN OPEN COURT)

THE DEPUTY CLERK:  THE COURT CALLS THE CASE OF THE UNITED STATES VERSUS WILLIAM EMMETT LECROY, JR., CRIMINAL ACTION NUMBER 2:02-CR-38.

THE COURT:  GOOD MORNING.  LET ME FIRST BEFORE WE PROCEED MAKE SURE THAT TECHNICALLY WE ARE OPERATING ADEQUATELY.

MR. LECROY, CAN YOU HEAR ME THERE?

THE DEFENDANT:  YES, SIR.

THE COURT:  OKAY.  VERY WELL.  IF AT ANY POINT THERE'S DIFFICULTY IN THE COMMUNICATION, JUST MAKE IT KNOWN.  OBVIOUSLY, WE CAN SEE YOU WHERE YOU ARE; SO EVEN IF WE DON'T HEAR YOU, IF YOU RAISE YOUR HAND OR SOMETHING, LET US KNOW THAT WE'RE NOT COMMUNICATING, WE CAN THEN STOP AND ADDRESS THAT AND MAKE SURE THAT WE ARE HAVING OPEN COMMUNICATION HERE.

WE ARE, OBVIOUSLY, HERE FOR PURPOSES OF AN EVIDENTIARY HEARING ON THE MOTION THAT IS PENDING IN THIS ACTION.  BEFORE WE GET STARTED, LET ME HEAR FROM COUNSEL IN TERMS OF YOUR PROPOSAL OF HOW WE PROCEED, WHAT EVIDENCE THE DEFENSE WISHES TO PRODUCE TODAY, NOT SO MUCH IN TERMS OF AN OPENING STATEMENT BUT JUST AN OVERALL OUTLINE OF HOW YOU WOULD LIKE TO PROCEED AND GO FORWARD.

MR. MARTIN:  THANK YOU, YOUR HONOR.  ONE THING I DID WANT TO MENTION TO THE COURT AND I MENTIONED THIS TO MR. GOSS LAST WEEK IS MR. LECROY HAS A BACK PROBLEM.  HE'S TAKING

MEDICATION FOR IT.  SO IF MAYBE FROM TIME TO TIME HE MIGHT STAND UP OR MOVE AROUND A LITTLE BIT TO STRETCH HIS BACK, THAT MEANS NOTHING OF DISRESPECT TO THE COURT OR ANYBODY ELSE OR LIKE HE'S NOT PAYING ATTENTION TO ANYTHING THAT'S GOING ON. IT'S JUST BECAUSE OF THAT BACK CONDITION.  I WANTED TO LET THE COURT KNOW THAT.

THE COURT:  THAT'S FINE.

MR. MARTIN:  WHAT I WAS GOING TO PROPOSE TO THE COURT THIS MORNING, YOUR HONOR, IS THIS SCHEDULE:  WE HAVE THREE OF THE TRIAL ATTORNEYS HERE THIS MORNING TO TESTIFY; MR. KISH, MS. KEARNS AND MR. MENDELSOHN.  WE WILL PROBABLY CALL THEM IN THAT ORDER.  MR. SUMMER HAD A COURT APPEARANCE THIS MORNING BUT HE WOULD PROBABLY BE AVAILABLE THIS AFTERNOON.  WE MAY OR MAY NOT CALL HIM, DEPENDING ON HOW IT GOES THIS MORNING.

THEN JEFFREY MARTIN WHO IS THE JURY EXPERT WOULD TESTIFY THIS AFTERNOON AND PRESENT TO THE COURT THOSE STATISTICS AND HIS TESTIMONY IN THAT REGARD.  THAT'S WHAT WE HAVE SCHEDULED FOR TODAY.

TOMORROW WE HAVE SCHEDULED DR. HILTON.  HIS SCHEDULE IS AVAILABLE FOR TOMORROW MORNING.  AND WE WOULD ALSO CALL DR. CARLSON WHO WE'RE IN THE PROCESS OF GETTING HERE FROM TEXAS, AND PERHAPS DR. GANAHL WHO IS LOCAL.  THOSE WOULD BE THREE MENTAL-HEALTH-TYPE WITNESSES.

THAT WOULD BE AT THIS POINT WHAT WE INTEND TO DO THESE TWO DAYS.  WE WOULD THEN PICK UP DR. LISAK, WHO COULDN'T

MAKE IT THIS WEEK, ON FEBRUARY 8.  MR. MCKINNON MENTIONED THAT HE WOULD PROBABLY CALL DR. MEDLIN IN RESPONSE, AND THEN WE MIGHT CALL DR. LISAK IN RESPONSE TO DR. MEDLIN IN THAT REGARD. SO THAT'S THE GENERAL FORMAT.  WE'VE GOT, OF COURSE, A NUMBER OF DOCUMENTS WE WOULD BE PRESENTING AND OFFERING IN EVIDENCE AS WE GO FORWARD.

THE COURT:  ALL RIGHT.

MR. MARTIN:  JUST ONE SECOND.

(DISCUSSION OFF THE RECORD.)

MR. MARTIN:  WE MENTIONED TO MR. GOSS THIS MORNING THE PROBLEM WITH DR. CARLSON'S TRAVEL.  I DON'T KNOW IF HE'S MENTIONED THAT TO YOU YET.  WE'RE WORKING ON SEEING IF WE CAN GET THAT HANDLED.  MY UNDERSTANDING IS THAT IN THE 2255 OF A DEATH PENALTY CASE, THAT WOULD BE AN EXPENSE OF AN EXPERT THAT CAN BE AUTHORIZED BY THE COURT, JUST HER TRAVEL.  SHE'S NOT ASKING FOR ANY FUNDS FOR HER EXPERTISE.

THE COURT:  OKAY.  ON THE GOVERNMENT SIDE IN TERMS OF BEYOND THE WITNESSES THAT HAVE BEEN MENTIONED OR THE WITNESS THAT HAS BEEN MENTIONED THAT YOU WOULD EXPECT TO PRODUCE ON THE 8TH, ARE THERE ANY OTHER WITNESSES YOU'RE ANTICIPATING?

MR. MCKINNON:  POSSIBLY, YOUR HONOR.  FIRST OF ALL, LET ME INTRODUCE SHANYA DINGLE.  I DON'T KNOW IF THE COURT HAS HAD A CHANCE TO MEET MS. DINGLE.  SHE'S AN A.U.S.A. IN THE OFFICE, AND SHE'S ASSISTING ME AND MS. STEWART.  SHE'LL BE PRIMARILY RESPONSIBLE FOR THE JURY ISSUE.

6

THE COURT:  ALL RIGHT.

MR. MCKINNON:  AND WE DO HAVE THREE WITNESSES ON THAT ISSUE PERHAPS.

(DISCUSSION OFF THE RECORD.)

MR. MCKINNON:  WE HAVE TWO WITNESSES ON THE JURY POOL ISSUE THAT WE WOULD CALL, I GUESS, TOMORROW AFTER THE DEFENSE HAS PUT UP THEIR WITNESSES.

THERE'S BEEN DISCUSSION ABOUT CALLING EITHER A.U.S.A. JOE PLUMMER AND FORMER A.U.S.A.'S RUSSELL VINEYARD AND JOSEPH BURBY PERHAPS ON THE BREACH OF THE FIREWALL ISSUE.  IT KIND OF DEPENDS ON WHAT EVIDENCE IS PRESENTED BY THE DEFENSE ON THAT ISSUE TODAY.  AND THEN IT WAS THE GOVERNMENT'S BELIEF THAT DR. MEDLIN WOULD BE A REBUTTAL WITNESS TO DR. LISAK; SO IT DIDN'T MAKE SENSE TO US, EVEN THOUGH SHE WAS AVAILABLE THIS WEEK, TO CALL HER WHEN WE COULDN'T CALL HER IN REBUTTAL TO DR. LISAK.  SO SHE'S AVAILABLE THE WEEK OF THE 8TH, ALTHOUGH PERHAPS AT SOME POINT WE MAYBE COULD TALK ABOUT SCHEDULING BECAUSE THE 8TH MAY NOT BE AS READILY AVAILABLE TO MS. DINGLE AND MYSELF BECAUSE OF OTHER COMMITMENTS AS WE THOUGHT INITIALLY.  WE CAN WORK AROUND IT; BUT IF THERE'S ANOTHER DAY AROUND THAT TIME THAT WE COULD DO IT, THEN THAT WOULD BE MAYBE BETTER FOR US.

THE COURT:  I DEFINITELY THINK THAT DR. MEDLIN, IT MAKES SENSE, I WOULD RATHER NOT TRY TO HEAR HER TODAY AND THEN PLUG IT INTO DR. LISAK.  I THINK IT MAKES SENSE TO JUST WAIT

AND DO HER AFTER DR. LISAK.

MR. MCKINNON: AND THERE'S ONE OTHER ISSUE. I'VE ASKED FOR A COPY OF DR. LISAK'S REPORT. MY UNDERSTANDING FROM THE PLEADINGS IS THAT HE'S NOW DONE AN EVALUATION OF MR. LECROY. THAT'S NOT BEEN PROVIDED TO THE GOVERNMENT; AND I THINK UNDER THE RULES, THE DEFENSE IS REQUIRED TO PRODUCE THAT. AND I WOULD -- I DON'T KNOW THAT IT'S GOING TO BE AN ISSUE TODAY OR TOMORROW, BUT I CERTAINLY WOULD ASK THAT IT BE PROVIDED TO THE GOVERNMENT.

MR. MARTIN HAS PROVIDED ME WITH A COPY OF THE EVALUATION THAT DR. HILTON DID, SO I'VE GOT THAT AND I'M PREPARED TO CROSS-EXAMINE HIM TOMORROW. BUT WE WOULD LIKE TO GET THAT REPORT AT SOME POINT SO THAT WE CAN PREPARE. BASED ON WHAT'S IN THAT REPORT, THE GOVERNMENT WOULD RESERVE THE RIGHT TO LOOK INTO WHETHER WE NEED TO CALL ANY ADDITIONAL WITNESSES ONCE WE SEE THE REPORT. THAT WOULD BE, AGAIN, IN THE SECOND OR THE SECOND TIME WE GET TOGETHER IN FEBRUARY SOMETIME.

THE COURT: RIGHT, OKAY. ANY OBJECTION FROM THE DEFENSE TO PROVIDING DR. LISAK'S REPORT TO THE GOVERNMENT?

MR. MARTIN: WELL, FIRST OF ALL, WE DON'T HAVE A REPORT. I'VE NEVER ASKED HIM TO ACTUALLY WRITE OUT THE REPORT. I'M NOT SURE IN THE CONTEXT OF A 2255 WHETHER THERE IS A REQUIREMENT UNDER RULE 16 THAT THERE BE A REPORT. BUT I WILL WORK WITH MR. MCKINNON. I'LL BE FAIR WITH HIM, LET HIM HAVE SOME UNDERSTANDING OF WHERE HE'S COMING FROM SO IT WILL MAKE

8

THINGS GO SMOOTHLY.  WE'LL GET SOME SORT OF REPORT.

THE COURT:  THAT WOULD BE HELPFUL, BECAUSE I THINK IF NOT, THEN DR. LISAK TESTIFIES, THEY'RE GOING TO REQUEST AN OPPORTUNITY AND, OBVIOUSLY, THE COURT WOULD AFFORD THEM AN OPPORTUNITY FOR A FAIR CROSS-EXAMINATION.  SO IF YOU'LL WORK WITH HIM ON THAT, THAT WOULD BE HELPFUL.

MS. MICHAELS?

MS. MICHAELS:  YES, THANK YOU, JUDGE.

ON THE ISSUE OF THE WITNESS FROM TEXAS, WHAT WE DID WAS MAKE ARRANGEMENTS WITH THE FEDERAL TRAVEL AGENCY TO HOLD THE TICKET; AND THEY'RE JUST WAITING FOR THE COURT'S GO-AHEAD --

THE COURT:  AUTHORIZATION.

MS. MICHAELS:  -- TO RELEASE THE TICKET.  AT SOME POINT DURING THE BREAK MID MORNING, I WOULD RESPECTFULLY REQUEST A BREAK SO I COULD GO LET DR. CARLSON KNOW SHE CAN COME.

THE COURT:  VERY WELL.

ALL RIGHT.  THAT SCHEDULE IS FINE WITH ME.  WE'LL PROCEED WITH IT; AND HOPEFULLY, WE CAN STAY WITH THE TIME FRAME THAT'S BEEN MENTIONED.  THAT WILL CERTAINLY BE OUR GOAL.

THE ATTORNEYS WHO WILL BE TESTIFYING TODAY, IS IT CONTEMPLATED THAT YOU WILL GO AHEAD AND DO THE EXAMINATION OF THEM TODAY AS TO ALL AREAS OF ALLEGED INEFFECTIVENESS OR --

MR. MARTIN:  YES, SIR.

9

THE COURT:  OKAY.  DO YOU WANT TO MAKE ANY TYPE OF OPENING STATEMENT BEFORE YOU PROCEED WITH THEM?

MR. MARTIN:  YOUR HONOR, I DON'T BELIEVE SO.  I THINK WE CAN JUST GO FORWARD.  I THINK THE COURT KNOWS FROM OUR PLEADINGS THE GENERAL AREAS THAT WE'RE INTERESTED IN, AND I JUST SAY LET'S JUST GET STARTED.

THE COURT:  I'M READY.

MR. MCKINNON:  I DO WANT TO ADDRESS THE REPORT ISSUE WITH DR. LISAK.

THE COURT:  OKAY.  COME ON UP.

MR. MCKINNON:  UNDER THE RULES FOR PROCEEDING IN A SECTION 2255, THERE'S A SPECIFIC DISCOVERY RULE THAT SAYS A JUDGE MAY FOR GOOD CAUSE AUTHORIZE A PARTY TO CONDUCT DISCOVERY UNDER THE FEDERAL RULES OF CRIMINAL PROCEDURE.  I WOULD ASK THAT THE COURT INVOKE OR I WOULD INVOKE RULE 16(B) AND THE REQUIREMENT THAT AN EXPERT, IF AN EXPERT WITNESS IS GOING TO TESTIFY, THAT A REPORT IN COMPLIANCE WITH RULE 16 BE PREPARED BY DR. LISAK THAT WOULD BE A FULL AND COMPREHENSIVE REPORT OF ANY EVALUATION THAT HE DID OF THE DEFENDANT.

MY UNDERSTANDING FROM, I THINK, THE TRAVERSE THAT WAS FILED BY THE DEFENDANT IS THAT DR. LISAK HAS DONE AN EVALUATION OF MR. LECROY.  SO I WOULD ASK, SO WE CAN KIND OF GET THIS RESOLVED TODAY, THAT IF DR. LISAK HAS NOT PREPARED A REPORT THAT WOULD COMPLY WITH RULE 16, THAT THE COURT IN ITS DISCRETION, AS I READ RULE 6 OF THE RULES GOVERNING SECTION

10

2255 PROCEEDINGS, IN MY BOOK IT'S ON PAGE 260 IF THE COURT IS LOOKING FOR IT, THAT THE COURT DIRECT THE DEFENSE TO DIRECT DR. LISAK TO PREPARE A REPORT THAT WOULD COMPLY WITH RULE 16.

MR. MARTIN:  WE HAVE NO OBJECTION, YOUR HONOR.  WE'LL DO THAT.

THE COURT:  VERY WELL.  ALL RIGHT.  THE COURT WILL SO DIRECT.

YOU MAY CALL YOUR FIRST WITNESS.

MR. MCKINNON:  YOUR HONOR, I MADE COPIES OF ALL THE EXHIBITS WE THINK WE MIGHT INTRODUCE.

THE COURT:  WONDERFUL.

MR. MCKINNON:  I WOULD JUST ASK TO HAND THAT UP TO THE COURT.

THE COURT:  ALL RIGHT.

MR. MARTIN?

MR. MARTIN:  WE HAVE COPIES, TOO; BUT WE'LL PROVIDE THOSE TO YOU PIECE BY PIECE.

WE WOULD CALL PAUL KISH, AND WE WOULD INVOKE THE RULE.

(THE WITNESS WAS SWORN.)

THE DEPUTY CLERK:  STATE YOUR FULL NAME.

THE WITNESS:  MY NAME IS PAUL KISH.

PAUL KISH,

HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

11

BY MR. MARTIN:

Q.   MR. KISH, WHAT IS YOUR PROFESSION?

A.   I'M A LAWYER.

Q.   AND TELL THE COURT BRIEFLY YOUR EDUCATIONAL BACKGROUND.

A.   I GOT MY LAW DEGREE AT THE UNIVERSITY OF GEORGIA IN 1982, MY UNDERGRADUATE DEGREE IN 1978 AT HILLSDALE COLLEGE (INAUDIBLE).

THE COURT:  PULL THAT MICROPHONE A LITTLE CLOSER TO YOU.

THE WITNESS:  SORRY.  AND MY UNDERGRADUATE DEGREE IN 1978 AT HILLSDALE COLLEGE IN HILLSDALE, MICHIGAN.

BY MR. MARTIN:

Q.   AND TELL US A LITTLE BIT ABOUT YOUR PROFESSIONAL LIFE. WHAT'S YOUR HISTORY AS A LAWYER?

A.   I STARTED PRACTICING LAW IN 1982.  I CLERKED FOR A COUPLE OF FEDERAL JUDGES.  I WAS AN ASSOCIATE AT THE FORMER POWELL GOLDSTEIN FIRM, AND THEN I WAS AT THE FEDERAL DEFENDER PROGRAM FROM 1985 THROUGH 2006.  AND SINCE THAT TIME I'VE HAD MY OWN LAW FIRM ALONG WITH A LAW PARTNER.

Q.   OKAY.  AND AS A MEMBER OF THE FEDERAL DEFENDER PROGRAM AND IN PRIVATE PRACTICE, TELL US A LITTLE BIT ABOUT THE NATURE OF YOUR PRACTICE.

A.   I HAVE ALWAYS DONE CRIMINAL DEFENSE WORK.

Q.   PRIMARILY IN THE FEDERAL COURTS?

A.   YES.

12

Q.   IN 2000 -- OR GOING UP TO THE TIME OF THE TRIAL IN 2004, WERE YOU INVOLVED IN THE REPRESENTATION OF WILLIAM LECROY, JR.?

A.   I WAS.

Q.   AND WAS THAT AS A MEMBER OF THE FEDERAL DEFENDER PROGRAM?

A.   YES.

Q.   IN THAT REGARD, WHO WERE THE TRIAL -- EXCUSE ME.  WHO WERE THE LAWYERS THAT WERE PART OF THAT TEAM?

A.   THERE WERE FOUR LAWYERS ON THE TEAM.  THERE WAS MYSELF; STEPHANIE KEARNS, THE EXECUTIVE DIRECTOR; BRIAN MENDELSOHN; AND THEN DAN SUMMER, A PRIVATE PRACTITIONER IN GAINESVILLE, GEORGIA.

Q.   NOW, WERE THERE ANY INVESTIGATORS THAT WERE ASSIGNED TO THE CASE?

A.   YES, AT LEAST TWO.  SUSAN MILLER WAS ONE OF THE INVESTIGATORS AS WELL WAS MICHAEL HUTCHESON.

Q.   NOW, HAD YOU PERSONALLY HAD A PRIOR EXPERIENCE DEFENDING A DEATH PENALTY CASE?

A.   NOT AT TRIAL.

Q.   NOW, WHEN IT CAME UP TO TIME OF TRIAL, HAD Y'ALL DIVIDED UP THE ROLES OF THE DIFFERENT LAWYERS FOR THE PRESENTATION OF THE DEFENSE OF MR. LECROY?

A.   YES.

Q.   TELL US ABOUT THAT.

A.   WE BASICALLY DIVIDED THE CASE, WHICH IS A COMMON THING TO DO, BETWEEN THE GUILT/INNOCENCE PHASE AND THE PENALTY PHASE.

13

MYSELF AND DAN SUMMER AGREED TO HANDLE THE GUILT/INNOCENCE PART OF THE CASE, AND THEN STEPHANIE AND BRIAN WERE RESPONSIBLE FOR THE PENALTY PORTION OF THE TRIAL.

Q.   WAS THERE ANY PARTICULAR ISSUE THAT YOU WERE REALLY FOCUSING ON IN YOUR REPRESENTATION OF MR. LECROY?

A.   I LOOKED AT AND FOCUSED OFTEN AND QUITE A BIT OF MY WORK ON WHAT SOME PEOPLE CALL THE JURISDICTIONAL QUESTION AS TO WHETHER OR NOT WHAT MR. LECROY WAS CHARGED WITH WAS ACTUALLY A FEDERAL CRIME, AND IF SO, WHETHER THE GOVERNMENT COULD BEAR ITS BURDEN OF PROOF THAT THE JURISDICTION FOR THIS MATTER WAS PROPERLY IN THE FEDERAL COURTS.

Q.   WAS THAT AN ISSUE YOU RAISED AT TRIAL?

A.   YES.

Q.   WAS THAT AN ISSUE THAT YOU ALSO RAISED TO THE ELEVENTH CIRCUIT?

A.   IT WAS.

Q.   AND SEEK REVIEW BY THE SUPREME COURT?

A.   YES, WE DID THAT, AS WELL.

Q.   NOW, WITH REGARDS TO THE SENTENCING PHASE OF THE CASE, WAS THAT PRIMARILY MR. MENDELSOHN AND MS. KEARNS?

A.   IT WAS FOR THE LAST, I WOULD SAY, SIX WEEKS.  I MEAN, PRIOR TO THAT EVERYBODY DID EVERYTHING, BUT THEN WE HAD A MEETING IN WHICH WE CLEAVED THE CASE IN THE WAY I JUST TALKED ABOUT.

Q.   NOW, ARE YOU FAMILIAR WITH A PSYCHIATRIST, A FORENSIC

14

PSYCHIATRIST NAMED DR. HILTON?

A.    I AM.

Q.    AND HOW ARE YOU FAMILIAR WITH HIM?

A.    I'VE USED DR. HILTON IN EARLIER -- I HAD USED DR. HILTON IN EARLIER CASES.

Q.    DID DR. HILTON, WAS DR. HILTON SOMEONE THAT WAS USED ON A REGULAR BASIS BY THE FEDERAL DEFENDER PROGRAM?

A.    YEAH.  WE QUITE OFTEN USED HIM.  I, BECAUSE OF MY ROLE IN THE OFFICE AT THAT TIME, I OFTEN HAD TO APPROVE THE USE OF EXPERTS; SO I WAS WELL ACQUAINTED WITH HOW WE USED MICHAEL HILTON.

Q.    YOU WERE THE DEPUTY DIRECTOR AT THAT TIME?

A.    I GUESS THAT'S WHAT THEY CALLED ME.

Q.    THEY CALLED YOU OTHER THINGS, AS WELL?

A.    YES, THEY DID.

Q.    NOW, WAS DR. HILTON ASKED TO DO AN EVALUATION OF MR. LECROY?

A.    YES.

Q.    DO YOU RECALL WHO ACTUALLY CONTACTED DR. HILTON?

A.    I DON'T RECALL WHO CONTACTED DR. HILTON, BUT I DO THINK IT MIGHT HAVE BEEN MY SUGGESTION THAT WE CONSIDER USING DR. HILTON.

Q.    OKAY.  AND WAS DR. HILTON PROVIDED THE BACKGROUND MATERIAL THAT THE OFFICE HAD DEVELOPED REGARDING MR. LECROY, INCLUDING PRIOR PSYCHIATRIC EVALUATIONS OR PSYCHOLOGICAL EVALUATIONS

15

WHILE HE WAS IN PRISON?

A.   YOU KNOW, I DON'T KNOW FOR A FACT WHAT HE WAS PROVIDED; BUT IT WOULD HAVE BEEN EXTRAORDINARY FOR US TO NOT HAVE GIVEN HIM WHAT HE NEEDED IN ORDER TO DO HIS EVALUATION.

Q.   WOULD IT HAVE BEEN UNUSUAL FOR SUSAN MILLER AS THE INVESTIGATOR TO COLLECT THAT INFORMATION AND PROVIDE IT TO DR. HILTON?

A.   IT WOULD HAVE BEEN UNHEARD OF FOR SUSAN MILLER TO NOT COLLECT THAT INFORMATION AND PROVIDE IT TO AN EXPERT.

Q.   NOW, DID DR. HILTON ACTUALLY DO AN EVALUATION?

A.   I BELIEVE HE DID.

Q.   AND DID HE PREPARE A REPORT?

A.   I'M SURE THAT HE DID.

Q.   DID YOU ASK DR. HILTON TO DO AN EVALUATION OF MR. LECROY'S COMPETENCY TO STAND TRIAL?

A.   I THINK SO.

Q.   DID YOU ASK HIM TO DO A REPORT REGARDING HIS LEGAL RESPONSIBILITY, I.E., WHETHER OR NOT HE WAS INSANE AT THE TIME OF THE OFFENSE?

A.   I'M SURE THAT WAS ONE OF THE THINGS THAT WE ASKED HIM TO DO.

Q.   AND DID YOU ALSO ASK DR. HILTON TO DO A REPORT GENERALLY ABOUT HIS PSYCHOLOGICAL MAKEUP AND ANY MATTERS THAT MIGHT BE IN MITIGATION OF SENTENCE?

A.   YES.

16

Q.   SHOWING YOU WHAT'S BEEN PREVIOUSLY MARKED AS DEFENDANT'S EXHIBITS 1, 2 AND 3.  DO YOU RECALL DR. HILTON PREPARING A REPORT OR ACTUALLY THREE SEPARATE REPORTS?

A.   I DO.

Q.   ARE THOSE -- DO THOSE APPEAR TO BE THE REPORTS THAT DR. HILTON PREPARED?

A.   YES, THESE APPEAR TO BE THOSE THREE DOCUMENTS THAT YOU MENTIONED.

MR. MARTIN:  YOUR HONOR, I WOULD MOVE INTO EVIDENCE DEFENDANT'S 1, 2 AND 3.

THE COURT:  ANY OBJECTION?

MR. MCKINNON:  NONE, YOUR HONOR.

THE COURT:  THEY ARE ADMITTED.

MR. MARTIN:  YOUR HONOR, I HAVE AN EXTRA COPY FOR YOU.

THE COURT:  THANK YOU.

BY MR. MARTIN:

Q.   AFTER RECEIVING DR. HILTON'S REPORT, DID YOU EVER MEET WITH DR. HILTON AND GO OVER THAT REPORT WITH HIM FOR HIM TO FULLY EXPLAIN THE REPORT TO YOU AND WHAT TYPE OF TESTIMONY HE MIGHT BE ABLE TO GIVE IN THIS CASE?

A.   I DO NOT REMEMBER MEETING WITH DR. HILTON AFTER RECEIVING THESE REPORTS.

Q.   NOW, AT THE TIME OF TRIAL, YOU MENTIONED EARLIER THAT YOU AND MR. SUMMER WERE FOCUSING ON THE GUILT/INNOCENCE PHASE OF

17

THE CASE AND YOU IN PARTICULAR WERE FOCUSING ON THE JURISDICTIONAL ISSUE, NOT THAT YOU WEREN'T FOCUSING ON OTHER THINGS, BUT ON THOSE TWO ISSUES.  DID YOU EXPECT THAT PART OF THE MITIGATION CASE IN SENTENCE, SHOULD THERE BE A GUILTY VERDICT, WOULD BE THAT SEXUAL ABUSE AND MENTAL ILLNESS WAS GOING TO BE PRESENTED AS A MITIGATING FACTOR AS TO SENTENCE AT TRIAL?

A.    I HOPED THAT IT WOULD.

Q.    DID YOU EXPECT THAT IT WOULD BE?

A.    DID I EXPECT IT?  AGAIN, A LOT OF THAT DEPENDED UPON RULINGS THAT WOULD COME FROM THE TRIAL COURT; BUT WE CERTAINLY, THAT'S WHERE WE WERE HEADING.

Q.    AT THE TIME OF TRIAL, WAS ANY TYPE OF EVIDENCE PRESENTED REGARDING SEXUAL ABUSE?  BY THAT I MEAN ABUSE OF MR. LECROY AS A CHILD BY AN ADULT OR AN OLDER PERSON.

A.    I DON'T BELIEVE THAT WE ATTEMPTED TO INTRODUCE ANY SUCH EVIDENCE.

Q.    WAS SOME EVIDENCE PRESENTED FROM THE PSYCHIATRIST AND PRISON PSYCHOLOGIST REGARDING REPORTS OF THIS?

A.    THERE WERE SHARDS OF EVIDENCE OBTAINED THROUGH THE PRISON RECORDS THAT WE WERE ABLE TO GET INTO THE RECORD AND PRESENTED TO THE JURY DURING THE PENALTY PHASE, YES.

Q.    DID YOU OBSERVE ANY CONSISTENT AND COHERENT MITIGATION CASE BASED UPON SEXUAL ABUSE AND MENTAL ILLNESS?

A.    WELL, I DON'T KNOW ABOUT CONSISTENT AND COHERENT, BUT I

18

KNOW THAT THERE WAS A PLAN TO TRY TO INTRODUCE FAR MORE
EVIDENCE THAN WAS ACTUALLY PUT INTO THE RECORD.

Q.   LET ME ASK YOU A FEW QUESTIONS ABOUT OTHER ISSUES IN THE
CASE.   WERE YOU INVOLVED IN PREPARING A JURY CHALLENGE TO THE
GRAND JURY INDICTMENT -- EXCUSE ME, THE PROCEDURES FOR
SELECTING THE GRAND JURORS WHICH RETURNED THE INDICTMENT IN
THIS CASE AND THE PETIT JURORS WHICH WOULD TRY THE CASE?

A.   YES.

Q.   AND WHO DID YOU WORK WITH ON THAT?

A.   WELL, I WORKED WITH YOUR BROTHER.

Q.   WHO IS HE?

A.   JEFF.

Q.   JEFFREY MARTIN?

A.   YES, SIR.  AND AT FIRST --

Q.   IS JEFFREY MARTIN SOMEONE WHO SPECIALIZES IN THIS AREA?

A.   YES, HE DOES.

Q.   GO AHEAD.

A.   AT FIRST WHEN WE GOT THE CASE AND THERE WAS A DIVISION OF
EFFORT CONCERNING SOME OF THE PRETRIAL MOTIONS, DAN SUMMER WAS
GOING TO BE HANDLING THIS CHALLENGE.  DAN HAD SOME SUCCESS IN
THIS AREA IN SOME STATE COURT PROCEEDINGS HE HAD BEEN INVOLVED
IN, SO IT MADE GOOD SENSE FOR DAN TO DO THAT.

AS WE APPROACHED THE MOTIONS DEADLINE, IT WAS CLEAR THAT
DAN WASN'T GOING TO BE ABLE TO FINISH OR DIDN'T HAVE THE TIME
OR THERE WAS SOME REASON WHEREBY HE WASN'T PRODUCING THE

19

PRODUCT WE HAD HOPED, AND SO I TOOK THE ISSUE OVER.

Q.   DID YOU EVER PRESENT IN YOUR MOTIONS OR PLEADINGS FIGURES REGARDING THE HISPANIC POPULATION IN THE GAINESVILLE DIVISION AND ALSO IN THE NORTHERN DISTRICT OF GEORGIA?

A.   I'M SURE THAT WE DID.

Q.   IN PRESENTING THOSE FIGURES, DID YOU PRESENT GROSS CENSUS FIGURES OR DID YOU PRESENT FIGURES BASED UPON THE CITIZENSHIP OF THAT GROUP?

        MR. MCKINNON:  I REALIZE THIS IS A HEARING, BUT THERE'S A LOT OF LEADING QUESTIONS THAT ARE BEING ASKED.  I THINK A PROPER WAY TO PHRASE THAT WOULD HAVE BEEN WHAT FIGURES WERE PRESENTED TO THE COURT IN SUPPORT OF THAT MOTION RATHER THAN GIVING HIM AN EITHER/OR ABOUT WHAT HE DID.

        MR. MARTIN:  FAIR ENOUGH, FAIR ENOUGH.  I'LL REPHRASE IT.

BY MR. MARTIN:

Q.   WHAT TYPE OF FIGURES DID YOU PRESENT?

A.   I THINK, IF I RECALL, THAT WE GOT NUMBERS FROM THE CENSUS AND WE USED THOSE AS OUR STARTING POINT.

Q.   WHAT, IF ANYTHING, DID YOU CONSIDER REGARDING ADJUSTING THOSE FIGURES REGARDING THE CITIZENSHIP OF THE HISPANIC COMMUNITY?

A.   I DON'T RECALL THINKING ABOUT ANYTHING IN TERMS OF ADJUSTING THE CENSUS FIGURES IN TERMS OF CITIZENSHIP.

Q.   THAT'S SOMETHING THAT JUST DIDN'T OCCUR TO YOU.

20

A.   NO, IT DID NOT.

Q.   IN THE APPELLATE BRIEFS -- BY THE WAY, WHO WAS RESPONSIBLE FOR PREPARING THE APPELLATE BRIEFS TO THE ELEVENTH CIRCUIT?

A.   WE ALL WERE, WHICH, AS I'M SURE YOU KNOW, IT'S A DIFFICULT THING FOR FOUR LAWYERS OR THREE LAWYERS TO WORK TOGETHER.  BUT I WOULD CONSIDER MYSELF AS PROBABLY BEING THE PERSON PRIMARILY RESPONSIBLE FOR DOING THE APPELLATE BRIEFS.  I HANDLED THE FINAL STAGES OF EVERYTHING IN THAT.

Q.   IN THE APPEAL IN THE ELEVENTH CIRCUIT OPINION, THE ELEVENTH CIRCUIT MENTIONS THAT AN ISSUE REGARDING THE RETENTION OF DOCUMENTS FROM AN EARLIER SEARCH HAD NOT BEEN PROPERLY RAISED BECAUSE IT WAS ONLY RAISED DURING THE REPLY BRIEF.  WAS THERE A REASON TO DO IT THAT WAY OR --

A.   I CAN'T THINK OF A SINGLE REASON WHY --

          MR. MCKINNON:  YOUR HONOR, I'M GOING TO OBJECT.  I THINK THIS IS OUTSIDE THE SCOPE OF THE COURT'S ORDER WITH RESPECT TO THE SCOPE OF THIS EVIDENTIARY HEARING.  THIS IS NOT ONE OF THE ISSUES THAT THE COURT WAS GOING TO ALLOW EVIDENCE ON.

          MR. MARTIN:  BUT WE'VE RAISED, AS ONE OF THE ISSUES, WE'VE RAISED THE FAILURE TO PERFECT THE ISSUES ON APPEAL. THAT'S ONE OF THE ISSUES IN THE PETITION.  I ASSUMED ALL THE ISSUES OF INEFFECTIVENESS WERE BEFORE THE COURT.

          THE COURT:  I THINK I ISSUED AN ORDER THAT SET SPECIFIC MATTERS FOR EVIDENTIARY PURPOSES, AND THAT WOULD BE

21

OUTSIDE THAT SCOPE THAT WE MAY NEED TO TAKE UP AT ANOTHER POINT.  BUT I THINK IN FAIRNESS, THE NOTICE THAT WAS GIVEN TO THE PARTIES IN TERMS OF THE MATTERS THAT WOULD BE ADDRESSED FOR EVIDENTIARY PURPOSES WERE LIMITED TO THOSE SET OUT IN THE ORDER.

          MR. MARTIN:  SO ARE YOU SAYING, THEREFORE, YOU ONLY WANT US TO DEAL WITH THE QUESTIONS OF THE PRESENTATION OF MITIGATION EVIDENCE AS OPPOSED TO THE OTHER AREAS OF INEFFECTIVENESS THAT WE'VE RAISED IN OUR PETITION?  WE THINK AT SOME POINT THE LAWYERS NEED TO SAY WAS THERE A REASON WE DID THIS OR NOT.  WE CAN DO IT AT A LATER TIME.

          THE COURT:  I WILL LET YOU GO AHEAD AND ASK THOSE QUESTIONS; BUT THEY MAY HAVE TO BE SUBJECT TO RECALL BECAUSE IN FAIRNESS TO THE GOVERNMENT, I THINK MR. MCKINNON IS CORRECT IN TERMS OF WHAT THE ORDER STATED AND WHAT IT WAS INTENDED TO STATE WAS THAT IT BE LIMITED TO THOSE ISSUES.  I APPRECIATE THAT THE COURT MAY WANT TO HEAR FROM THESE ATTORNEYS ABOUT THE DECISIONS THAT WERE MADE AS RELATE TO OTHER INEFFECTIVENESS ISSUES.  IF HE IS NOT PREPARED TO PURSUE THOSE ON CROSS-EXAMINATION TODAY, I'LL AFFORD HIM THAT OPPORTUNITY AT A LATER TIME IF YOU NEED TO DO THAT.

          MR. MCKINNON:  THANK YOU, JUDGE.

          MR. MARTIN:  UNDERSTOOD.

          THE COURT:  BUT YOU MAY PROCEED.

          MR. MARTIN:  THANK YOU, YOUR HONOR.

22

BY MR. MARTIN:

Q.   MOVING ON TO ANOTHER ISSUE WITH REGARDS TO THE APPEAL.

THE COURT:  I'M SORRY, MR. MARTIN.  GO BACK TO -- I'M NOT SURE I GOT THE RESPONSE BECAUSE I WAS LISTENING TO THE OBJECTION AND I'M NOT SURE I GOT THE SUBSTANCE.

BY MR. MARTIN:

Q.   WAS THERE ANY STRATEGIC OR OTHER REASON NOT TO RAISE THAT ISSUE IN YOUR OPENING BRIEF ON APPEAL?

A.   I CAN'T THINK OF ANY REASON WHY WE DIDN'T RAISE IT IN THE OPENING BRIEF.

Q.   AND YOU DID RAISE IT IN THE REPLY BRIEF.

A.   THAT'S TRUE.

Q.   AT THE TIME OF TRIAL, THERE WAS AN ISSUE REGARDING THE COURT'S INSTRUCTIONS CONCERNING WHETHER OR NOT MR. -- THE JURY COULD CONSIDER MR. LECROY'S RISK OF ESCAPE AS AN AGGRAVATING FACTOR IN SUPPORT OF THEIR FUTURE DANGEROUSNESS AGGRAVATOR. THE ELEVENTH CIRCUIT INDICATES THAT THAT WAS -- YOU FAILED TO PERFECT THAT ISSUE AT TRIAL.  WAS THERE ANY REASON NOT TO PERFECT THAT ISSUE AT TRIAL?

A.   I CANNOT THINK OF A SINGLE REASON WHY WE WOULD NOT HAVE WANTED TO PERFECT THAT ISSUE.

Q.   THERE WAS IN THE ELEVENTH CIRCUIT APPEAL AN ISSUE REGARDING DR. LISAK'S TESTIMONY, AND THE ELEVENTH CIRCUIT RULED THAT THE FAILURE TO ACTUALLY CALL DR. LISAK MADE IT IMPOSSIBLE FOR YOU TO RAISE THAT ISSUE ON APPEAL UNDER THE *LUCE* CASE AND

23

OTHER CASES.  LUCE IS L-U-C-E.  AT THE TIME OF TRIAL, HAD IT OCCURRED TO Y'ALL THAT THE WAY TO REMEDY THAT PROBLEM WOULD BE TO PROFFER DR. LISAK'S TESTIMONY SO THERE WOULD BE A RECORD OF WHAT DR. LISAK WOULD HAVE TESTIFIED TO HAD HE BEEN PERMITTED TO BY THE COURT?

A.   I DON'T KNOW IF IT OCCURRED TO US, BUT I DON'T REMEMBER HAVING ANY CONVERSATIONS WITH ANY OTHER MEMBER OF THE DEFENSE TEAM ABOUT PRESENTING DR. LISAK VIA A PROFFER.

Q.   DID IT OCCUR TO YOU?

A.   I CAN'T SAY THAT I REMEMBER THINKING ABOUT IT.  FRANKLY, THIS WASN'T THE MAIN FOCUS OF MY WORK ON THE CASE.

Q.   I UNDERSTAND.  DURING THE CLOSING ARGUMENT BY THE PROSECUTION DURING THE SENTENCING PHASE OF THE TRIAL, THERE WAS AN ARGUMENT THAT THE DEFENDANT SHOULD BE SENTENCED TO DEATH BECAUSE OF THE INABILITY OF THE PRISON SYSTEM TO SECURE MR. LECROY UNLESS HE WAS ON DEATH ROW.  WAS THERE ANY REASON NOT TO OBJECT TO THAT ARGUMENT?

A.   THERE WAS NO REASON NOT TO OBJECT TO THAT.

Q.   THERE WAS, ON APPEAL THE ISSUE WAS RAISED ABOUT THE FAILURE OF THE INDICTMENT TO INCLUDE THE NONSTATUTORY AGGRAVATORS.  DO YOU REMEMBER THAT ISSUE BEING RAISED ON APPEAL?

A.   I DO REMEMBER RAISING IT ON APPEAL, YES.

Q.   WAS THERE ANY REASON NOT TO RAISE THE ADDITIONAL ISSUE AS TO WHETHER OR NOT THE FINAL BALANCING BETWEEN AGGRAVATORS AND

24

MITIGATORS SHOULD NOT BE INCLUDED IN THE INDICTMENT?

A.   NO, THERE WAS NO REASON.  AND ACTUALLY, I DID QUITE A BIT OF WORK ON THAT AND I REMEMBERED BECAUSE THE CASE LAW WAS VERY NEW AT THE TIME, IT WAS EVOLVING; AND FRANKLY, WE JUST NEVER THOUGHT ABOUT THAT AT THE TIME.

Q.   OKAY.

A.   BUT THE BASIC PREMISES AND THE BASIC SUPPORT FOR MAKING SUCH AN ARGUMENT WERE ALREADY IN THE OPINIONS THAT HAD BEEN ISSUED AT THE TIME WE WERE BRIEFING ALL OF THIS WITH MAGISTRATE JUDGE COLE.

Q.   DURING PRETRIAL PROCEEDINGS IT WAS DISCLOSED THAT -- LET ME BACK UP.  YOU RECOGNIZE OR RECALL, OR DO YOU RECALL THAT A FIREWALL ATTORNEY, MR. PLUMMER, WAS DESIGNATED BY THE COURT IN THIS CASE?

A.   I DO RECALL THAT.

Q.   DO YOU RECALL THAT DURING PRETRIAL PROCEEDINGS, THE FACT THAT MR. PLUMMER HAD DISCLOSED THE NAME OF THE GOVERNMENT'S EXPERT, DR. MEDLIN, HAD BEEN DISCLOSED TO THE TRIAL ATTORNEYS?

A.   I THINK I DO REMEMBER THAT, YES.

Q.   AND THAT ISSUE WAS RAISED WITH REGARDS TO THE JUDGE, AND THE COURT DENIED RELIEF.

A.   I DO REMEMBER THAT IT WAS RAISED AND I DO REMEMBER THAT THE RELIEF WE REQUESTED WAS NOT GRANTED.

Q.   WAS THERE ANY REASON NOT TO RAISE THAT ISSUE ON APPEAL?

A.   AGAIN, WE HAD TO SELECT AMONG THE ISSUES TO RAISE ON

25

APPEAL.  WE WERE AWARE OF THAT ISSUE, BUT I CANNOT THINK OF WHY WE DID NOT PUT IT AMONG OUR GROUNDS ON APPEAL.

Q.    WELL, YOU HADN'T CALLED DR. LISAK WOULD BE ONE REASON.

A.    THAT'S A DARNED GOOD REASON NOT TO RAISE IT.

Q.    ONE FINAL AREA.  AFTER TRIAL DID YOU ATTEND A WHITE-COLLAR SEMINAR THAT NOW -- WELL, THAT ACTING U.S. ATTORNEY SALLY YATES GAVE A PRESENTATION?

A.    YES.

Q.    TELL US WHAT YOU RECALL MS. YATES SAYING AT THAT SEMINAR.

A.    THIS WAS AFTER I HAD LEFT THE FEDERAL DEFENDER AND I HAD MY OWN FIRM; AND I WAS AT THIS SEMINAR, AND MS. YATES AND OTHERS WERE MAKING A PRESENTATION ABOUT THE USE OF I WANT TO SAY EXPERTS IN JURY SELECTION OR THAT WAS ONE COMPONENT OF THE PRESENTATION.  AND SHE MENTIONED IN HER PUBLIC REMARKS THAT THE U.S. ATTORNEY'S OFFICE HAD RECENTLY USED AN EXPERT IN A CARJACKING DEATH PENALTY CASE; AND THAT, OF COURSE, PEAKED MY EARS OR MY CURIOSITY BECAUSE THAT WAS WHAT MR. LECROY'S CASE WAS.  AND EITHER AS PART OF HER PUBLIC REMARKS OR LATER AFTER I WAS TALKING TO HER, IT BECAME CLEAR TO ME THAT MS. YATES AND OTHERS IN THE U.S. ATTORNEY'S OFFICE HAD HIRED THIS EXPERT AND HAD DONE SO BECAUSE THEY WANTED TO, AMONG OTHER THINGS, FIND OUT WHAT WOULD BE THE IMPACT ON A POTENTIAL JUROR IF PART OF THE DEFENSE CASE WAS TO RAISE THE ISSUE OF CHILDHOOD SEXUAL ABUSE.

Q.    AND DID YOU HAVE A SPECIFIC CONVERSATION WITH HER ABOUT

26

THAT?

A.    I HAD A VERY SPECIFIC AND EXPLICIT CONVERSATION THAT I RECALL TO THIS DAY.

Q.    IS THERE ANY DOUBT IN YOUR MIND THAT WHAT SHE WAS TALKING ABOUT WAS CHILDHOOD SEXUAL ABUSE, NOT JUST GENERAL DYSFUNCTIONAL FAMILY?

A.    NO.  THERE'S NO DOUBT IN MY MIND.  AND THE REASON THERE'S NO DOUBT IN MY MIND IS BECAUSE IT WAS SO SHOCKING TO ME BECAUSE I REALIZED THAT WHAT SHE WAS TELLING ME, IF IT WAS TRUE, WAS THAT SOME MEMBERS OF THE U.S. ATTORNEY'S OFFICE KNEW ABOUT THE POTENTIAL PLAN ON THE PART OF THE DEFENSE TO RAISE CHILDHOOD SEXUAL ABUSE WHEN, FROM MY PERCEPTION AND RECOLLECTION, THERE WAS SUPPOSED TO HAVE BEEN A WALL, THIS THING YOU CALLED A FIREWALL, TO PREVENT THAT INFORMATION FROM BEING TRANSMITTED TO THE TRIAL TEAM IN THE U.S. ATTORNEY'S OFFICE.

Q.    THIS WAS DURING JURY SELECTION THAT THEY KNEW ABOUT THIS PRIOR TO ANY DECISION BEING MADE AFTER GUILT/INNOCENCE AS TO WHETHER OR NOT THE FIREWALL SHOULD ANY LONGER STAND UP.

A.    AGAIN, BASED ON WHAT MS. YATES WAS TELLING ME, A JURY EXPERT OR SELECTION GROUP HAD BEEN PUT TOGETHER TO EVALUATE THIS QUESTION.  AND THE ONLY TIME THAT COULD HAVE HAPPENED, IN OTHER WORDS, TO DO THAT EVALUATION WOULD HAVE BEEN BEFORE TRIAL.

          MR. MARTIN:  JUST ONE SECOND.

          (DISCUSSION OFF THE RECORD.)

27

BY MR. MARTIN:

Q.   AT THE TIME WAS SALLY YATES -- WHAT POSITION DID MS. YATES HAVE AT THE U.S. ATTORNEY'S OFFICE AT THE TIME OF TRIAL, IF YOU RECALL?

A.   I BELIEVE SHE WAS THE FIRST ASSISTANT U.S. ATTORNEY.

Q.   WOULD SHE BE RESPONSIBLE FOR SUPERVISING BOTH THE TRIAL ATTORNEYS AND MR. PLUMMER, THE FIREWALL ATTORNEYS?

A.   I HAVE TO ASSUME THAT THE ANSWER TO THAT IS YES.

Q.   DO YOU RECALL THE DATE OF THE SEMINAR?

A.   I THINK IT WAS IN EARLY 2007.

Q.   I'LL SHOW YOU SOMETHING THAT MAY REFRESH YOUR RECOLLECTION.

          (PAUSE IN THE PROCEEDINGS.)

          SHOWING YOU A DOCUMENT.  DID YOU, AFTER THAT CONVERSATION, MEMORIALIZE WHAT YOU HAD HEARD WITH A MEMORANDUM TO THE FILE?

A.   I DID.

Q.   AND WHY DID YOU DO THAT?

A.   I DID THAT BECAUSE THE CONVERSATION WAS SO REAL, FRANKLY, SHOCKING TO ME.

Q.   HAVING REVIEWED THAT DOCUMENT, DOES THAT GIVE YOU MORE OF A RECOLLECTION AS TO THE EXACT DATE OF THAT SEMINAR?

A.   LET ME TAKE A QUICK LOOK HERE, BUT I SEE HERE THAT I WROTE DOWN IN THIS MEMORANDUM THAT THE SEMINAR'S DATE WHERE I HAD THIS ENCOUNTER WITH MS. YATES WAS JANUARY 25, 2007.

28

Q.   DID YOU MEMORIALIZE IN THAT DOCUMENT THAT THE SPECIFIC STATEMENT WAS THAT IT HAD TO DO WITH SEXUAL ABUSE THAT SHE -- THAT THEY WERE INTERESTED IN?

A.   YES, I DID.

          MR. MARTIN:  YOUR HONOR, I HAVE NO FURTHER QUESTIONS.

          THE COURT:  YOU MAY CROSS-EXAMINE.

                    CROSS-EXAMINATION

BY MR. MCKINNON:

Q.   GOOD MORNING.

A.   GOOD MORNING.

Q.   DO YOU HAVE DR. HILTON'S REPORTS IN FRONT OF YOU STILL?

A.   YES.

Q.   AND WOULD D1 BE THE REPORT REGARDING HIS OPINION AS TO THE COMPETENCY OF THE DEFENDANT TO STAND TRIAL?

A.   YES.

Q.   THE DATE OF THAT REPORT IS MARCH 27TH, 2003?

A.   THAT'S THE DATE OF THE EXAMINATION.

Q.   THE DATE OF THE EXAMINATION.  AND THEN THE DATE OF THE REPORT IS -- WELL, IT'S UNDATED, SO WE ASSUME IT WAS SHORTLY AFTER MARCH 27TH, 2003, THAT Y'ALL RECEIVED THIS REPORT?

A.   I'M ASSUMING THAT, YES, SIR.

Q.   AND BY THIS TIME YOU HAD GOTTEN NOTICE FROM THE GOVERNMENT THAT IT WAS SEEKING THE DEATH PENALTY IN MR. LECROY'S CASE.

A.   I'M SURE --

Q.   CERTAINLY BY MARCH OR APRIL OF 2003.

29

A.    I'M VIRTUALLY CERTAIN THAT'S TRUE, SIR.

Q.    AND WHO MADE THE DECISION TO EMPLOY DR. HILTON TO CONDUCT AN EVALUATION?

A.    WELL, WE ALL DID ON THE DEFENSE TEAM.

Q.    AND YOU DID THAT BASED ON WHAT?  WHAT WAS THE REASON WHY YOU DECIDED THAT YOU WOULD HAVE MR. LECROY EVALUATED BY A PSYCHIATRIST?

A.    WELL, THAT'S A FAIRLY STANDARD PRACTICE IN DEFENDING A CAPITAL CASE.

Q.    YOU WERE -- DID YOU HAVE SUSPICIONS YOURSELF THAT HE WAS NOT COMPETENT TO STAND TRIAL BASED ON YOUR INTERACTION WITH HIM IN PREPARING FOR TRIAL?

A.    NO.

Q.    DID YOU HAVE SUSPICIONS THAT HE WOULD BE FOUND -- THAT YOU WOULD HAVE THE AVAILABILITY OF AN AFFIRMATIVE DEFENSE OF NOT GUILTY BY REASON OF INSANITY BASED ON AN EVALUATION?

A.    THAT I WASN'T AS SURE OF.

Q.    IS THAT ONE OF THE ISSUES THAT YOU ASKED DR. HILTON TO EXPLORE?

A.    ABSOLUTELY.

Q.    OKAY.  AND BASED ON HIS EVALUATION AND THE REPORT THAT HE FILED WHICH IS MARKED D2, HE CONCLUDED THAT THAT AFFIRMATIVE DEFENSE WOULD NOT BE AVAILABLE BASED ON HIS OPINION ABOUT MR. LECROY'S MENTAL STATE AT THE TIME OF THE OFFENSE; CORRECT?

A.    THAT'S CORRECT.

30

Q.   NOW, AND THEN DR. HILTON PROVIDED YOU WITH A RATHER COMPREHENSIVE REPORT OF HIS EVALUATION OF THE DEFENDANT'S, THE DEFENDANT'S, I GUESS, MENTAL STATE, EVEN THOUGH HE WAS NOT FINDING HIM, THAT HE WAS POSSIBLY NOT GUILTY BY -- COULD POSSIBLY BE FOUND NOT GUILTY BY REASON OF INSANITY.

A.   YES.  AS IS STANDARD PRACTICE, BESIDES SIMPLY ISSUING REPORTS ABOUT HIS OPINION CONCERNING THE TWO LEGAL ISSUES FOR WHICH HE WAS HIRED, HE ALSO GAVE US A MORE THOROUGH, COMPLETE FORENSIC PSYCHIATRIC EVALUATION OF MR. LECROY.

Q.   DO YOU HAVE THAT REPORT IN FRONT OF YOU, D3?

A.   YES, I DO.

Q.   AND DR. HILTON LISTS ALL THE RECORDS THAT HE WAS PROVIDED WHICH HE USED TO EVALUATE MR. LECROY'S MENTAL COMPETENCY.  IS THAT RIGHT?

A.   THAT'S TRUE.

Q.   AND THOSE RECORDS ARE LISTED HERE IN THE REPORT.

A.   CORRECT.

Q.   DO YOU HAVE ANY RECOLLECTION THAT THERE WERE ADDITIONAL RECORDS THAT WERE PROVIDED TO DR. HILTON THAT ARE NOT LISTED IN THIS REPORT?

A.   AGAIN, BECAUSE I DIDN'T GIVE ANYTHING TO DR. HILTON, I COULDN'T SWEAR TO THAT ONE WAY OR --

Q.   WHO ACTUALLY PREPARED THE PACKET OF INFORMATION THAT WAS PROVIDED TO DR. HILTON BEFORE HE CONDUCTED HIS EVALUATION?

A.   I'M VIRTUALLY CERTAIN THAT WOULD HAVE BEEN SUSAN MILLER.

31

Q.   AND IN THE CATEGORY MARKED PRISON RECORDS, DO YOU HAVE ANY INDEPENDENT RECOLLECTION OF WHAT PRISON RECORDS WOULD HAVE BEEN TURNED OVER TO DR. HILTON?

A.   AGAIN, A LOT OF THAT WOULD DEAL WITH THE TIMING OF WHEN WE GOT CERTAIN PRISON RECORDS.  WE RAN INTO SOME PROBLEMS WITH THE BUREAU OF PRISONS WANTING TO RELEASE OR NOT RELEASE CERTAIN THINGS, SO THERE MAY HAVE BEEN PRISON RECORDS THAT ARE IN THE FILES NOW THAT WERE NOT AMONG THOSE GIVEN TO DR. HILTON.

Q.   WELL, SPECIFICALLY, DO YOU REMEMBER WHETHER YOU HAD DR. CARLSON'S NOTES OF HER INTERVIEWS AND TREATMENT WITH THE DEFENDANT IN 1999 --

A.   I DON'T REMEMBER THAT --

Q.   -- AT THE TIME THAT DR. HILTON REVIEWED THE REPORTS?

A.   I DON'T REMEMBER THAT ONE WAY OR ANOTHER.

Q.   SOME OF THE RECORDS YOU WOULD HAVE GOTTEN FROM THE UNITED STATES ATTORNEY'S OFFICE THAT YOU PROVIDED TO DR. HILTON.  IS THAT CORRECT?

A.   THE PRISON RECORDS?

Q.   YES.

A.   I DON'T AGREE WITH THAT.

Q.   YOU DON'T RECALL THAT YOU GOT RECORDS FROM BOTH THE GEORGIA DEPARTMENT OF CORRECTIONS BUT YOU ALSO GOT RECORDS FROM U.S.P. BUTNER?

A.   I DO REMEMBER GETTING RECORDS PROVIDED TO THE DEFENSE PURSUANT TO RULE 16.  I AM NOT AGREEING WITH THE PROPOSITION

32

THAT THOSE SAME RECORDS WERE AMONG THOSE DELIVERED TO DR. HILTON.  I JUST DON'T KNOW.

Q.   SO THE RECORDS FROM BUTNER YOU DON'T THINK YOU GAVE TO DR. HILTON?

A.   AGAIN, BECAUSE I WASN'T THERE TO SEE EXACTLY WHAT WAS PRESENTED IN THE PACKET, I DON'T KNOW.  BUT TO ANSWER, I THINK, WHERE YOU'RE GOING, I WOULD ASSUME, OF COURSE, WE SUBMITTED THAT TO DR. HILTON.  THAT WOULD BE NORMAL IN THE COURSE OF BUSINESS.

Q.   LET ME SHOW YOU GOVERNMENT EXHIBIT NUMBER 67.  CAN YOU IDENTIFY THAT AS A LETTER ADDRESSED TO YOU FROM RUSSELL VINEYARD THAT ADDRESSES DISCOVERY IN THE LECROY CASE?

A.   YES.

Q.   AND THE DATE OF THAT LETTER THAT A.U.S.A. VINEYARD SENT TO YOU WAS WHAT DATE?

A.   MAY 30, 2002.

Q.   SO THAT WOULD HAVE BEEN MORE THAN A YEAR OR ALMOST A YEAR BEFORE DR. HILTON'S EVALUATION.

A.   CORRECT.

Q.   AND IT SPECIFICALLY REFERENCES THAT DOCUMENTS WERE PROVIDED THAT WERE BATES STAMPED.  IS THAT CORRECT?

A.   RIGHT.

Q.   AND WHAT BAIT STAMP NUMBERS DID YOU GET IN MAY OF 2002?

A.   NUMBERS 1 THROUGH 1722.

Q.   I'M GOING TO SHOW YOU GOVERNMENT EXHIBIT NUMBER 68 ASK

YOU, FIRST OF ALL, TO LOOK AT THE BATES STAMP NUMBER.  IS THAT BATES STAMP NUMBER 1672?

A.   YES.

Q.   SO WOULD THAT BE PART OF THE BATES STAMPED SET OF RECORDS THAT YOU GOT IN MAY OF 2002?

A.   WELL, LET ME TAKE A LOOK AT THIS.  I'M ASSUMING THE ANSWER IS YES, BUT LET ME TAKE A QUICK LOOK AT THE DOCUMENT.

(REVIEWING DOCUMENT.)  AGAIN, YES, THIS LOOKS LIKE ONE OF THOSE RECORDS DONE BY DR. CARLSON WHEN MR. LECROY WAS IN CUSTODY AT THE FACILITY WHERE SHE WORKED.  I DO RECALL THAT THESE WERE AMONG THE RECORDS THAT WERE PROVIDED IN THE INITIAL DISCOVERY PACKET PROVIDED TO US BY MR. VINEYARD.

MR. MCKINNON:  YOUR HONOR, I WOULD MOVE FOR THE ADMISSION OF GOVERNMENT EXHIBIT 67 AND 68, PLEASE.

THE COURT:  ANY OBJECTION?

MR. MARTIN:  NO, SIR.

THE COURT:  THEY'RE ADMITTED.

BY MR. MCKINNON:

Q.   I WOULD ASK YOU TO LOOK, THIS IS ACTUALLY -- THE AUTHOR OF THIS DOCUMENT IS LINDA LYON AT F.C.I. EL RENO.  IS THAT CORRECT?  LOOK AT THE TOP OF GOVERNMENT EXHIBIT 68.

A.   WELL, IT'S AUTHORED BY LINDA LYON BUT SIGNED BY MARTI CARLSON.

Q.   NOW, IF YOU WOULD, LOOK AT THE SECTION MARKED TREATMENT OBJECTIVES.  DO YOU SEE WHERE MS. LYON AND DR. CARLSON SAID:

34

WHEN MR. LECROY ENTERED THE RDAP PROGRAM, HE SPECIFIED SEVERAL SIGNIFICANT EVENTS WHICH NEGATIVELY IMPACTED HIS LIFE.  THESE INCLUDE BEING SEXUALLY MOLESTED BY A BABYSITTER AT AGE EIGHT, HIS PARENTS' DIVORCE, SEVERAL SUICIDE ATTEMPTS, AN EX-FIANCÉE ABORTING HIS CHILD, AND BEGINNING HIS DRUG AND CRIMINAL LIFESTYLE WHILE IN THE ARMY.  DO YOU SEE THAT?

A.   I DO.

Q.   SO THE GOVERNMENT HAD THIS IN MAY OF 2002 AND YET THE TRIAL WASN'T UNTIL FEBRUARY OF 2004; CORRECT?

A.   I AGREE WITH THAT.

Q.   SO THE GOVERNMENT WOULD HAVE BEEN ON NOTICE, SPECIFICALLY THE TRIAL ATTORNEYS, MR. VINEYARD AND MR. BURBY, THAT THE DEFENDANT WAS RAISING WITH HIS COUNSELORS IN THE FEDERAL BUREAU OF PRISONS THE IDEA THAT THERE HAD BEEN SIGNIFICANT NEGATIVE IMPACTS ON HIS LIFE; CORRECT?

A.   I DON'T AGREE WITH YOU ABOUT THE CONCEPT OF BEING ON NOTICE THAT A SINGLE LINE IN 1722 PAGES OF DOCUMENTS TELLS THE TRIAL ATTORNEYS WHAT A CERTAIN DEFENSE WILL BE.  BUT I WILL AGREE WITH YOU THIS DOCUMENT THAT YOU'VE SHOWN ME MARKED AS GOVERNMENT EXHIBIT 68 WAS WITHIN THE POSSESSION OF THE GOVERNMENT AND THE TRIAL TEAM.

Q.   THAT WOULD BE WELL BEFORE THE FIREWALL PROCEDURE WAS SET UP BY JUDGE STORY.

A.   CORRECT.

Q.   LET ME SHOW YOU GOVERNMENT EXHIBIT NUMBER 69.  CAN YOU

35

IDENTIFY THAT AS ANOTHER LETTER FROM RUSSELL VINEYARD, IT'S

ACTUALLY SIGNED BY SOMEBODY REPRESENTING HIM, BUT IT'S FROM

RUSSELL VINEYARD; CORRECT?

A.   IT IS.  IT'S SIGNED BY MS. ISAAC, BUT IT'S A LETTER TO ME

DATED DECEMBER 23RD, 2003, CONCERNING ADDITIONAL DISCOVERY

MATERIALS WHICH ARE BATES STAMPED BETWEEN THE NUMBERS 2666

THROUGH 2918.

Q.   LET ME SHOW YOU GOVERNMENT EXHIBIT 70.  AGAIN, THAT WOULD

BE A DOCUMENT THAT'S BATES STAMPED WITHIN THE CONTEXT OF WHAT

YOU WOULD HAVE RECEIVED ON DECEMBER THE 23RD OF 2003; CORRECT?

A.   IT DOES APPEAR TO BE THAT, YES.

Q.   BECAUSE IT'S -- WHAT THE BATES STAMP NUMBER ON THIS

DOCUMENT IS 2792.

A.   CORRECT.

Q.   SO YOU WOULD HAVE GOTTEN THIS FROM RUSSELL VINEYARD ON

DECEMBER THE 23RD, APPROXIMATELY, OF 2003.  IS THAT CORRECT?

A.   YES, SIR.

          MR. MCKINNON:  YOUR HONOR, I WOULD MOVE FOR THE

ADMISSION OF GOVERNMENT EXHIBIT 69 AND 70.

          THE COURT:  ANY OBJECTION?

          MR. MARTIN:  NO OBJECTION.

          THE COURT:  THEY ARE ADMITTED.

          MR. MCKINNON:  SORRY, JUDGE, I DON'T HAVE MY COPY.

          (PAUSE IN THE PROCEEDINGS.)

BY MR. MCKINNON:

36

Q.    IF YOU LOOK AT THE BOTTOM OF THE FIRST PARAGRAPH ON THE FIRST PAGE OF GOVERNMENT EXHIBIT 70, THE LAST SENTENCE SAYS: THE INMATE REPORTS HIMSELF BEING MOLESTED AT EIGHT YEARS OF AGE BY AN 18-YEAR-OLD BABYSITTER.  DO YOU SEE THAT?

A.    I DO.

Q.    AGAIN, THAT WOULD BE INFORMATION THAT WAS PROVIDED TO YOU BY RUSSELL VINEYARD AS OPPOSED TO THE FIREWALLED ATTORNEYS; IS THAT CORRECT?

A.    THAT'S TRUE.  THIS WAS AMONG THE INFORMATION PROVIDED TO US THAT WAS CONTAINED WITHIN THE VERY VOLUMINOUS STATE COURT -- STATE PRISON RECORDS CONCERNING MR. LECROY'S PERIOD OF INCARCERATION IN STATE FACILITIES.

Q.    BUT THOSE WOULD BE TWO DOCUMENTS THAT THE GOVERNMENT HAD IN ITS POSSESSION INDEPENDENT OF THE FIREWALL THAT WOULD ESTABLISH THE FACT THAT MR. LECROY WAS MAKING REPRESENTATIONS THAT HE HAD BEEN SEXUALLY ABUSED BY A BABYSITTER WHEN HE WAS EIGHT YEARS OLD; CORRECT?

A.    I AGREE WITH YOU THAT THESE DOCUMENTS WERE WITHIN THE GOVERNMENT'S POSSESSION, YES.

Q.    NOW, IN YOUR REPRESENTATION OF MR. LECROY, WERE YOU ALSO --

MR. MARTIN:  EXCUSE ME, MR. MCKINNON.  I WANT TO MAKE THE RECORD CLEAR, THESE DOCUMENTS ARE HIGHLIGHTED, AT LEAST MINE ARE.  I ASSUME THAT WAS HIGHLIGHTED BY MR. MCKINNON, IT WASN'T HIGHLIGHTED IN THE ORIGINAL DOCUMENT.

37

THE COURT:  THEY'RE NOT HIGHLIGHTED IN MINE.

MR. MARTIN:  OKAY.  GOOD.

MR. MCKINNON:  THAT'S WHY I DON'T HAVE A HIGHLIGHTED SET, JUDGE.  I THINK I MUST HAVE GIVEN HIM THE WRONG --

MR. MARTIN:  THEN THAT ANSWERS MY QUESTION.

MR. MCKINNON:  MAYBE WE SHOULD EXCHANGE.

THE COURT:  YOU MAY WANT TO EXCHANGE WITH MR. MARTIN.

MR. MARTIN:  NO, I LIKE MINE.  FINDERS KEEPERS.  WAIT A SECOND.  LET ME -- I'LL DO THAT FOR YOU WHEN I GET THEM TOGETHER.

BY MR. MCKINNON:

Q.   NOW, MR. KISH, IN YOUR REPRESENTATION OF MR. LECROY, DID YOU HAVE CONTACT WITH HIS FAMILY MEMBERS?

A.   YES.

Q.   DID YOU KNOW THAT HIS FAMILY MEMBERS WERE SUBPOENAED TO APPEAR IN FRONT OF THE FEDERAL GRAND JURY?

A.   I KNOW THAT SOME OF HIS FAMILY MEMBERS WERE SUBPOENAED TO THE GRAND JURY, YES.

Q.   SPECIFICALLY, HIS FATHER.

A.   CORRECT.

Q.   HIS BROTHER.

A.   YES.

Q.   HIS MOTHER.

A.   I DIDN'T KNOW THAT DONNA WENT THERE, BUT OKAY.

Q.   AND HIS STEPMOTHER.

38

A.   I DIDN'T KNOW THAT EITHER.  I DON'T RECALL IT TODAY.  I PROBABLY KNEW IT AT THE TIME.

Q.   DID YOU TALK TO THEM AFTER THEY APPEARED IN FRONT OF THE GRAND JURY ABOUT WHAT THEY HAD BEEN QUESTIONED ABOUT BY THE ATTORNEYS REPRESENTING THE GOVERNMENT?

A.   I DON'T PERSONALLY REMEMBER TALKING WITH ANY OF BILL'S FAMILY MEMBERS CONCERNING WHAT QUESTIONS WERE ASKED OF THEM WHEN THEY WERE AT THE GRAND JURY, BUT I AM CERTAIN THAT SOMEONE ON THE DEFENSE TEAM WOULD HAVE DONE SO.

Q.   WHO WOULD THAT HAVE BEEN?

A.   WELL, IT PROBABLY WOULD HAVE BEEN WHICHEVER LAWYER AND/OR INVESTIGATOR WAS RESPONSIBLE FOR PREPARING THOSE PEOPLE TO BE POTENTIAL WITNESSES.

Q.   DO YOU KNOW WHO THAT WAS?  DO YOU HAVE A RECOLLECTION AS TO WHICH OF THE TRIAL TEAM, WHICH OF THE FOUR LAWYERS INVOLVED IN MR. LECROY'S DEFENSE THAT WOULD HAVE BEEN?

A.   I WENT AND SPOKE WITH CHAD A COUPLE OF TIMES, ALONG WITH MIKE HUTCHESON.  OKAY?  THAT'S THE FIRST.  WE NEVER TALKED ABOUT, IF I CAN REMEMBER, ANY CONVERSATIONS THAT LED TO A DISCUSSION OF WHAT CHAD MAY HAVE BEEN ASKED OF WHEN HE WAS IN FRONT OF THE GRAND JURY.  SO I DON'T KNOW -- THAT'S THE ONLY SPECIFIC FACTUAL RECOLLECTION I HAVE IN TERMS OF CONVERSATIONS AND -- WELL, LET ME BACK UP.

I DO REMEMBER THAT BILL'S FATHER MET WITH THE ENTIRE TEAM A COUPLE OF TIMES; AND HIS MOTHER, AS WELL, CAME TO THE OFFICE

39

AND MET WITH THE WHOLE TEAM.  BUT I DO KNOW THAT THERE WERE OTHER OCCASIONS WHEN SUSAN MILLER, POSSIBLY BRIAN AND/OR STEPHANIE MET WITH BILL LECROY'S FATHER, BILL, JR., OUR CLIENT'S FATHER, AND MOTHER SEPARATELY.  BUT THE ONLY TIME I HAVE A SPECIFIC RECOLLECTION IS WHEN MYSELF AND MICHAEL HUTCHESON SPENT THE BETTER PART OF A DAY WITH CHAD.

Q.    AND LET ME MAKE SURE I UNDERSTAND CORRECTLY.  YOUR SUSPICION THAT THE FIREWALL THAT WAS SET UP BY JUDGE STORY WAS VIOLATED BY THE TRIAL ATTORNEYS IS BASED SOLELY ON THIS CONVERSATION YOU HAD WITH SALLY YATES IN JANUARY OF 2007?

A.    I DON'T HAVE A SUSPICION OF ANYTHING.  I'M SIMPLY REPORTING WHAT SOMEONE SAID TO ME.

Q.    WELL, DID THAT NOT CREATE A SUSPICION?  ISN'T THAT WHY YOU REPORTED IT IS BECAUSE YOU BELIEVED, BASED ON THAT CONVERSATION, THAT THERE HAD BEEN A VIOLATION OF THE FIREWALL PROCEDURE?

A.    I THOUGHT THAT IT WAS VERY SUSPICIOUS.  LET'S PUT IT THAT WAY.

Q.    ISN'T THAT THE QUESTION I JUST ASKED YOU?  YOUR SUSPICION ABOUT IT --

A.    OKAY, IT'S A SUSPICION.  YOU'RE EXACTLY RIGHT.

Q.    AND IS THE ONLY BASIS FOR THAT SUSPICION YOUR CONVERSATION WITH SALLY YATES?

A.    I GUESS THAT WOULD BE TRUE, YES.

Q.    YOU DIDN'T HAVE ANY SUSPICIONS ABOUT IT DURING THE TRIAL.

40

A.   I DIDN'T THINK ABOUT IT DURING THE TRIAL.

Q.   SO THE ANSWER TO MY QUESTION WOULD BE THEN YOU DIDN'T HAVE ANY SUSPICIONS ABOUT IT.

A.   AGAIN, TRUE.

Q.   NOW, THE GRAND JURY APPEARANCE BY CHAD LECROY, DO YOU REMEMBER THAT WAS IN MARCH OF 2002?

A.   I DON'T REMEMBER IT, BUT THAT SOUNDS ABOUT RIGHT.

Q.   AND YOU DON'T RECALL TALKING TO CHAD LECROY AND HAVING HIM TELL YOU THAT HE WAS SPECIFICALLY ASKED WHETHER HIS BROTHER HAD MADE ANY ALLEGATIONS OF SEXUAL ABUSE AS A MINOR?

A.   I DO NOT RECALL HAVING THAT CONVERSATION WITH CHAD LECROY.

Q.   SO YOU DON'T KNOW THAT THAT OCCURRED THEN, IF IT, IN FACT, DID OCCUR; CORRECT?

A.   IF WHAT OCCURRED?

Q.   THAT MR. CHAD LECROY IN MARCH OF 2002 WAS ASKED SPECIFICALLY:  OKAY.  NO EPISODES OF ANY SEXUAL ABUSE BY ANYONE TOWARD HIM.

ANSWER:  I READ THAT IN ONE OF THE PRISON THINGS, TOO, THAT APPARENTLY HE HAD MENTIONED SOMETHING ABOUT A BABYSITTER. I HAVE NO KNOWLEDGE OF THAT.  I DON'T EVER RECALL THAT HAPPENING TO ME, AND I'M SURE WE HAD THE SAME BABYSITTER.

YOU DON'T RECALL THAT THE PROSECUTORS ON THE CASE IN MARCH OF 2002 WERE ALREADY ASKING QUESTIONS ABOUT POSSIBLE SEXUAL ABUSE OF THE DEFENDANT WHEN HE WAS A MINOR.

A.   SITTING HERE TODAY, NO, I DON'T RECALL THAT.

41

Q.   AND YOU DIDN'T KNOW THAT AT THE TIME WHEN YOU BECAME

SUSPICIOUS THAT THERE HAD BEEN A BREACH OF THE FIREWALL.

A.   I WASN'T THINKING ABOUT CHAD LECROY'S YEAR 2000 GRAND JURY

TESTIMONY WHEN IN 2007 I WAS AT A WHITE-COLLAR FRAUD SEMINAR.

YOU'RE RIGHT.

Q.   AND I GUESS THE FACT THAT THE GOVERNMENT USED A JURY

SELECTION EXPERT, THAT WAS NEWS TO YOU WHEN YOU HEARD

MS. YATES' COMMENTS IN JANUARY OF 2007.

A.   YES, IT WAS.

Q.   YOU DIDN'T KNOW THAT AT THE TIME.

A.   I DON'T THINK I KNEW THAT AT THE TIME, NO, SIR.

Q.   AND YOU DON'T KNOW ANYTHING ABOUT THE PROCESS THAT THE

GOVERNMENT WENT THROUGH WITH THEIR JURY SELECTION EXPERT IN

ASSISTING THEM IN PICKING A JURY IN THIS CASE, DO YOU?

A.   NO.

Q.   SO YOU DON'T KNOW THAT PRIOR TO DECEMBER --

        MR. MARTIN:  YOUR HONOR, I DON'T KNOW HOW IT'S

HELPFUL FOR THE COURT TO ASK HIM WHAT HE DOESN'T KNOW AND BY

MR. MCKINNON TESTIFYING WHAT'S ON THE DOCUMENT.  HE SAYS HE

DOESN'T KNOW ANYTHING ABOUT IT, SO THAT'S THE END OF THAT.  I

DON'T SEE HOW THAT'S HELPFUL TO ANYBODY.

        THE COURT:  I'LL SUSTAIN THE OBJECTION.

BY MR. MCKINNON:

Q.   NOW, LET ME SHOW YOU GOVERNMENT EXHIBIT NUMBER 53.

        MR. MCKINNON:  YOUR HONOR, IT WOULD ASSIST ME IF --

42

MR. MARTIN:  I WILL PUT MINE TOGETHER.  WE WERE PULLING THEM APART.  LET ME PUT THEM TOGETHER FOR YOU.

BY MR. MCKINNON:

Q.   LET ME SHOW YOU GOVERNMENT EXHIBIT 53.  DO YOU RECOGNIZE THAT AS THE NOTICE THAT YOU FILED ON BEHALF OF MR. LECROY THAT THE DEFENSE WAS GOING TO RAISE THE ISSUE OF MENTAL DISEASE OR DEFECT AT THE TRIAL?

A.   YES.

MR. MCKINNON:  YOUR HONOR, I WOULD MOVE FOR THE ADMISSION OF GOVERNMENT EXHIBIT 53.

THE COURT:  ANY OBJECTION?

MR. MARTIN:  NO OBJECTION.

THE COURT:  IT'S ADMITTED.

BY MR. MCKINNON:

Q.   AND THE DATE YOU FILED THAT NOTICE WAS WHAT DATE?

A.   OCTOBER 17, 2003.

Q.   NOW, PRIOR TO THAT TIME YOU HAD FILED NO NOTICE OF ANY INTENTION TO RELY ON ANY KIND OF PSYCHIATRIC OR MENTAL HEALTH TESTIMONY AT THE TRIAL; CORRECT?

A.   TRUE.

Q.   YOU HAD NOT PROVIDED THE GOVERNMENT WITH A COPY OF DR. HILTON'S REPORTS.

A.   CORRECT.

Q.   YOU HAD NOT PROVIDED THOSE TO THE COURT, I TAKE IT.

A.   OF COURSE NOT.

43

Q.    IN FACT, YOU NEVER PROVIDED A COPY OF DR. HILTON'S REPORT TO THE GOVERNMENT.  IS THAT CORRECT?

A.    I THINK THAT'S ALSO TRUE.

Q.    AND DID YOU EVER PROVIDE A COPY OF DR. HILTON'S REPORT TO THE COURT IN ANY OF THE EX PARTE COMMUNICATIONS THAT YOU ALL HAD WITH THE JUDGE OVER THIS ISSUE OF THE MENTAL HEALTH EVIDENCE?

A.    I DON'T REMEMBER IF WE EVER PROVIDED DR. HILTON'S REPORT TO JUDGE STORY DURING ANY OF THE EX PARTE PROCEEDINGS, BUT I WASN'T AT EACH AND EVERY ONE OF THOSE MEETINGS.

Q.    DID YOU TELL JUDGE STORY THAT YOU HAD HAD MR. LECROY EVALUATED BY DR. HILTON?

A.    I DON'T RECALL IF WE DID OR IF WE DID NOT.

Q.    NOW, YOU RECALL THAT ONCE YOU FILED THAT NOTICE IN OCTOBER OF 2003, THE GOVERNMENT FILED A MOTION TO HAVE MR. LECROY EXAMINED BY THE GOVERNMENT, AN EXPERT OF THE GOVERNMENT'S CHOOSING; CORRECT?

A.    I'M SURE THAT'S WHAT HAPPENED.

Q.    AND YOU RECALL THAT MAGISTRATE JUDGE COLE ISSUED AN ORDER THAT GRANTED THE GOVERNMENT'S MOTION AND DIRECTED THE DEFENSE TO MAKE MR. LECROY AVAILABLE FOR AN EXAMINATION BY A GOVERNMENT EXPERT; CORRECT?

A.    AGAIN, I'M SURE THAT'S WHAT HAPPENED.

Q.    AND YOU RECALL THAT YOUR TEAM FILED A MOTION BASICALLY APPEALING JUDGE COLE'S ORDER TO JUDGE STORY; CORRECT?

44

A.   I'M SURE THAT'S WHAT HAPPENED.

Q.   AND DO YOU RECALL THEN THAT SOMETIME IN DECEMBER, WELL, PERHAPS ON DECEMBER THE 16TH, 2003, THERE WAS AN EX PARTE MEETING WITH JUDGE STORY REGARDING THIS ISSUE OF AN EXAMINATION OF THE DEFENDANT?

A.   I DO RECALL THAT THERE WERE SOME EX PARTE MEETINGS WITH THE JUDGE CONCERNING THIS ISSUE, YES.

Q.   DID YOU ATTEND THIS FIRST EX PARTE MEETING WITH THE JUDGE THAT WOULD HAVE BEEN ON OR ABOUT DECEMBER THE 16TH OF 2003?

A.   SITTING HERE TODAY, I DON'T REMEMBER ATTENDING THAT.  IF SOMETHING SHOWS THAT I DID, THEN I DID; BUT I JUST DON'T REMEMBER ATTENDING THAT MEETING.

Q.   THE EX PARTE COMMUNICATIONS, THE EX PARTE MEETINGS THAT YOU HAD WITH THE COURT, WERE THOSE RECORDED ON EACH INSTANCE THAT YOU WERE PRESENT --

A.   I'M SURE THEY WERE.

Q.   -- WITH A COURT REPORTER?

A.   I'M SURE THAT THEY WOULD HAVE BEEN.

Q.   AND DO YOU RECALL HAVING DISCUSSIONS WITH THE TRIAL TEAM THEN PRIOR TO DECEMBER THE 16TH, 2003, ABOUT HOW TO DEAL WITH THE FACT OF THAT THE GOVERNMENT WANTED TO -- THAT THE GOVERNMENT ACTUALLY WAS AUTHORIZED, BASED ON THE ORDER OF THE COURT, TO CONDUCT ITS OWN EVALUATION OF THE DEFENDANT?

A.   I'M SURE WE WOULD HAVE ALL TALKED ABOUT THAT.

Q.   AND WHAT WERE YOUR DISCUSSIONS ABOUT THE POSITION YOU

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

45

WOULD TAKE WITH REGARD TO THE GOVERNMENT'S MOTION TO HAVE THE DEFENDANT EVALUATED?

A.   WELL, BY THIS POINT YOU'VE GOT TO REALIZE WE'RE ABOUT SIX WEEKS, MAYBE SEVEN, EIGHT WEEKS OFF FROM TRIAL.  WE'VE DIVIDED THE CASE INTO TWO DIFFERENT AREAS OF FOCUS, AND THIS ISSUE THAT YOU'RE ASKING ME ABOUT NOW WOULD HAVE BEEN THE AREA BEING HANDLED BY BRIAN AND STEPHANIE.  SO ALTHOUGH YOU ASKED ME A QUESTION A SECOND AGO WOULD WE HAVE HAD DISCUSSIONS, YES; BUT MY INTERACTION WITH BRIAN AND STEPHANIE ON THIS STRATEGY WAS FAIRLY MINIMAL.  I'M SURE WE TALKED ABOUT IT, BUT THEY WERE NOT IN-DEPTH CONVERSATIONS.

Q.   WHAT DO YOU RECALL ABOUT THE CONVERSATIONS ABOUT WHY YOU OPPOSED THE GOVERNMENT CONDUCTING AN EVALUATION OF MR. LECROY?

A.   BECAUSE IT WASN'T GOING TO HELP.

Q.   WELL, AFTER YOU WERE ADVISED BY THE COURT OR THROUGH THE ORDER THAT IN ORDER FOR YOU TO PURSUE YOUR EVIDENCE OF MENTAL DISEASE OR DEFECT PURSUANT TO YOUR NOTICE AT TRIAL THAT YOU WERE GOING TO HAVE TO SUBMIT MR. LECROY TO A GOVERNMENT EXPERT EXAMINATION, WHAT WERE YOUR DISCUSSIONS?

A.   AGAIN, THIS WAS MOSTLY BRIAN AND STEPHANIE'S AREA OF EXPERTISE; BUT THE WAY I RECALL IT IS THAT BRIAN'S STRATEGY, AND IT WAS MOSTLY BRIAN'S, BRIAN'S STRATEGY WAS THAT HE BELIEVED, AND I CONCURRED WITH THIS, THAT AN EVALUATION BY A GOVERNMENT EXPERT WOULD HAVE RESULTED IN VERY HARMFUL INFORMATION.  REAL FRANKLY, WE DIDN'T TRUST THE GOVERNMENT

46

EXPERTS.  AND WE FELT THAT WHEN THE GOVERNMENT WOULD HAVE SUCH INFORMATION, IT WOULD MAKE IT EXCEPTIONALLY DIFFICULT TO RAISE THE PARTS OF BILL'S BACKGROUND THAT WE THOUGHT WERE WORTHY OF PRESENTING TO THE JURY WHEN THEY HAD TO MAKE THEIR DECISION ABOUT DURING THE SENTENCING PHASE OF THE CASE.

BRIAN'S -- LET ME FINISH.  BRIAN'S STRATEGY, IN ESSENCE, WAS THAT HE HAD, I THINK HE CALLED HIM A TEACHING EXPERT.  HE WAS GOING TO USE WHAT I CALL THESE SHARDS OF INFORMATION ABOUT THE POTENTIAL FOR CHILDHOOD SEXUAL ABUSE IN BILL LECROY'S BACKGROUND, HAVE THE TEACHING EXPERT TALK WITH THE JURY ABOUT WHAT HAPPENS WHEN A PERSON HAS BEEN THE SUBJECT OF CHILDHOOD SEXUAL ABUSE, AND IN THAT FASHION AVOID HAVING TO MAKE MR. LECROY AVAILABLE FOR A GOVERNMENT EXAMINATION.

FURTHERMORE, IT'S MY UNDERSTANDING THAT BRIAN BELIEVED AND PREDICTED ACCURATELY WHAT LIKELY WOULD HAVE BEEN THE COURT'S RESPONSE TO THAT STRATEGY.  AND BRIAN THOUGHT BECAUSE THE LAW WAS QUITE NEW IN THIS AREA, THAT THE COURT'S FAIRLY PREDICTABLE RESPONSE TO OUR POSITION WOULD HAVE BEEN A GOOD ISSUE FOR APPELLATE PURPOSES.  SO THAT'S WHAT I RECALL.

Q.    WHAT RESPONSE ARE YOU REFERRING TO?  THE COURT'S RESPONSE THAT MR. LECROY WOULD HAVE TO UNDERGO A GOVERNMENT EXAMINATION OR THE COURT'S RESPONSE TO SET UP THE FIREWALL PROCEDURE?

A.    BOTH.  WE PRETTY FAIRLY ACCURATELY PREDICTED WHAT JUDGE STORY'S VARIOUS RULINGS WOULD BE, AND SO THAT'S THE ANSWER TO THAT.

47

Q.   SO YOU HAD DR. HILTON'S REPORT; CORRECT?

A.   TRUE.

Q.   SO YOU KNEW WHAT -- AND DR. HILTON IS A LICENSED PSYCHIATRIST; CORRECT?

A.   YES.

Q.   HE WAS HIRED TO DO AN EVALUATION OF MR. LECROY.

A.   RIGHT.

Q.   YOU HAD DECIDED THAT YOU WERE NOT GOING TO CALL DR. HILTON TO TESTIFY AT MR. LECROY'S TRIAL.

A.   I DON'T THINK WE COULD WITHOUT MAKING MR. LECROY AVAILABLE FOR A GOVERNMENT EVALUATION.

Q.   WELL, WERE THERE THINGS IN DR. HILTON'S REPORT THAT YOU DIDN'T WANT DISCLOSED TO THE GOVERNMENT?

A.   SITTING HERE TODAY, I CAN'T REMEMBER WHETHER THERE WERE OR THERE WERE NOT.

Q.   WELL, AT THIS STAGE MR. LECROY HAD NOT -- WHEN MR. LECROY WAS ARRESTED, HE HAD NOT CONFESSED TO THE CRIME, HAD HE?

A.   TRUE.

Q.   AND YOU KNEW IN THE FALL OF 2003 --

A.   WAIT.  HE ACTUALLY HAD CONFESSED BUT NOT TO A LAW ENFORCEMENT PERSON.

Q.   YOUR REPRESENTATION OF THE CONFESSION IS THE NOTE THAT WAS FOUND IN HIS CAR?

A.   NO.  I'M TALKING ABOUT THE MINISTER HE SPOKE WITH ON THE NIGHT OF HIS ARREST.  IT MIGHT HAVE BEEN THE MORNING AFTER HIS

48

ARREST.

Q.   DO YOU REMEMBER THAT MINISTER'S TESTIMONY WAS THAT THE DEFENDANT NEVER DISCLOSED WHAT HE WAS UPSET ABOUT?

A.   WELL, THAT WAS NOT THE WAY I REMEMBER IT.  BUT I DO BELIEVE THAT MR. LECROY MAY HAVE ADMITTED WHAT HE DID TO SOMEONE IN MINNESOTA, AND I WANT TO SAY IT WAS THAT MINISTER. BUT I HAVE A RECOLLECTION HERE TODAY THAT HE DID DIVULGE WHAT HE HAD DONE TO SOMEONE SHORTLY AFTER HIS ARREST.

Q.   IN THE SAME DETAIL THAT HE PROVIDED TO DR. HILTON?

A.   CERTAINLY NOT IN THE SAME LEVEL OF DETAIL.

Q.   SO YOU HAD DR. HILTON'S REPORT IN WHICH THE DEFENDANT HAD IN VERY, VERY MUCH DETAIL GONE INTO HIS ASSAULT, SEXUAL ASSAULT AND MURDER OF MS. TIESLER; CORRECT?

A.   WE DID HAVE DR. HILTON'S REPORT, YES.

Q.   AND YOU DID NOT WANT THAT INFORMATION DISCLOSED TO THE JURY IF DR. HILTON HAD TESTIFIED.  WOULDN'T THAT BE FAIR?

A.   NO, I DON'T AGREE WITH THAT PROPOSITION.

Q.   DO YOU RECALL --

A.   BECAUSE, BECAUSE, -- I'M SORRY TO INTERRUPT YOU -- IF WE WERE HAVING DR. HILTON TESTIFY, WE WOULD BE AT THE PENALTY PHASE.  HE WOULD ALREADY HAVE BEEN FOUND GUILTY.  SO, THEREFORE, HIS RECITATION OF WHAT HAPPENED COULD NOT HAVE HURT, BECAUSE WHEN WE'RE AT THE PENALTY PHASE, THE JURY HAS TO MAKE THAT DECISION OF WHETHER MR. LECROY SHOULD LIVE OR DIE; AND WHAT THEY'RE GOING TO HAVE TO SEE IS EVERYTHING ELSE THAT'S IN

49

THERE.

SO I DON'T AGREE WITH YOUR POINT THAT A CONFESSION IN THE REPORT WITH THE PSYCHIATRIST WAS THE REASON WHY WE DIDN'T WANT TO USE THAT EVIDENCE.

Q.   THEN WHY DIDN'T YOU CALL DR. HILTON?

A.   AGAIN, THIS WAS MOSTLY BRIAN'S AREA AND I SIMPLY CONCURRED WITH HIS STRATEGY.

Q.   SO IT WAS A STRATEGIC DECISION NOT TO CALL DR. HILTON THAT Y'ALL MADE.

A.   WELL, IT WAS A DISCUSSION.  YOU CALL IT STRATEGY, WE CAN CALL IT WHATEVER WE WANT; BUT WE DEFINITELY TALKED IT THROUGH AHEAD OF TIME.

Q.   YOU WERE FULLY AWARE WHAT DR. HILTON WOULD TESTIFY TO.

A.   YES.

Q.   AND ABOUT THE PERSONALITY DISORDERS THAT HE FOUND THAT THE DEFENDANT WAS SUFFERING FROM.

A.   TRUE.

Q.   AND YOU WERE AWARE OF WHAT THOSE PERSONALITY DISORDERS MEANT IN GENERAL TERMS.

A.   YES.

Q.   BORDERLINE ANTISOCIAL AND SCHIZOTYPICAL -- SCHIZOTYPAL. YOU UNDERSTOOD GENERALLY WHAT THOSE MEANT.

A.   I DO AND DID.

Q.   SO YOU WERE FULLY AWARE WHAT WAS IN DR. HILTON'S REPORT AND ANY CONSEQUENCES THAT WOULD IMPACT THE PRESENTATION OF YOUR

50

MITIGATION CASE AT TRIAL IF YOU HAD CALLED DR. HILTON AS A WITNESS.

A.    YES, WE WERE AWARE OF WHAT WAS IN HIS REPORT; AND YES, WE DID DISCUSS THROUGH THE POTENTIAL RAMIFICATIONS OF VARIOUS ASPECTS OF THAT REPORT BEING CONSIDERED BY THE JURY.

Q.    AND THAT INCLUDED A FULL DESCRIPTION OF THIS ALLEGED SEXUAL ABUSE THAT MR. LECROY SUFFERED AS AN EIGHT-YEAR-OLD FROM THIS BABYSITTER NAMED TINKERBELL.

A.    RIGHT.

Q.    THE TWO INSTANCES IN WHICH HE ALLEGED THAT HE WAS SEXUALLY ASSAULTED BY TINKERBELL WHEN HE WAS EIGHT; CORRECT?

A.    AGAIN, I HAVEN'T PERUSED THE REPORT AS CAREFULLY AS I PROBABLY SHOULD HAVE, BUT I THINK THAT THERE WERE TWO DESCRIPTIONS OF IT IN THERE -- OR DESCRIPTION OF TWO INCIDENTS.

Q.    TWO INCIDENTS AND IT WAS OVER.  IT HAPPENED IN A WEEK, HE WAS EIGHT, AND THEN IT WAS OVER.  THEY MOVED AND HE NEVER SAW TINKERBELL AGAIN; CORRECT?  THAT'S WHAT HE TOLD DR. HILTON.

A.    THAT'S WHAT HE TOLD EVERYBODY.

Q.    NOW, AND YOU DON'T REMEMBER WHY YOU APPROACHED JUDGE STORY ABOUT, EX PARTE ABOUT THIS ISSUE OF THE GOVERNMENT EXPERT.

A.    I DON'T.  HERE'S WHAT I REMEMBER.  I REMEMBER WE WERE IN THIS COURTROOM AND WE HANDLED SOME SUPPRESSION ISSUES, AND THEN I THINK IT WAS THE SAME AFTERNOON THAT THERE WAS AN EX PARTE PROCEEDING WITH THE JUDGE.  AND I REMEMBER BECAUSE THE SUPPRESSION ISSUES WERE KIND OF THE LAST THINGS WE HAD TO CLEAN

51

UP IN TERMS OF SOME ADMISSIBILITY OF EVIDENCE, AND I JUST REMEMBER THAT THERE WAS AN EX PARTE PROCEEDING THAT SAME AFTERNOON.

Q.   I JUST WANT TO ESTABLISH A TIME LINE.  I'M GOING TO SHOW YOU WHAT'S ALREADY IN THE RECORD BUT I'VE MARKED AS GOVERNMENT EXHIBIT NUMBER 54.  DO YOU RECOGNIZE THAT AS AN ORDER ISSUED BY JUDGE STORY ON OR ABOUT DECEMBER THE 16TH OF 2003?

A.   (REVIEWING DOCUMENT.)  I DO.

Q.   AND THAT'S THE ORDER --

        MR. MCKINNON:  YOUR HONOR, I WOULD MOVE FOR THE ADMISSION OF GOVERNMENT EXHIBIT 54, JUST SO IT'S AN EXHIBIT IN THE RECORD.  I KNOW IT'S PART OF THE --

        THE COURT:  ANY OBJECTION?

        MR. MARTIN:  NO OBJECTION.  WHAT NUMBER ARE WE TALKING ABOUT?

        MR. MCKINNON:  54.

        THE COURT:  IT'S ADMITTED.

BY MR. MCKINNON:

Q.   THAT'S THE ORDER IN WHICH JUDGE STORY FIRST SET UP A FIREWALL REGARDING THE MENTAL HEALTH EVIDENCE; IS THAT CORRECT?

A.   I THINK THAT'S TRUE.

Q.   NOW, AT THE TIME THAT YOU ALL WERE DEALING WITH JUDGE STORY ON THIS ISSUE OF THE FIREWALL ATTORNEYS, YOU KNEW THAT ROGER QUEEN WAS GOING TO BE A PART OF THE TRIAL TEAM FOR THE PROSECUTION; CORRECT?

52

A.   I COULDN'T SWEAR TO THE TIMING OF IT, BUT I KNEW THAT WE FOUND OUT THAT Y'ALL WERE -- OR THE GOVERNMENT WAS GOING TO HAVE ROGER QUEEN THERE AND POSSIBLY HAVE HIM PARTICIPATE IN THE PRESENTATION OF THE GOVERNMENT'S CASE.

Q.   AND YOU KNEW THAT ROGER QUEEN WAS THE DISTRICT ATTORNEY OF GILMER COUNTY WHERE THE MURDER OCCURRED; CORRECT?

A.   YES.

Q.   AND YOU KNEW THAT ROGER QUEEN WOULD HAVE JURISDICTION TO PROSECUTE MR. LECROY FOR MS. TIESLER'S MURDER IN THE STATE OF GEORGIA; CORRECT?

A.   I KNEW THAT BEFORE THAT.

Q.   AND YOU KNEW THAT THAT WAS A POSSIBILITY THAT IF MR. LECROY WAS NOT GIVEN THE DEATH PENALTY IN THE FEDERAL CASE, THAT HE COULD BE INDICTED AND A CAPITAL PROSECUTION BE INITIATED BY MR. QUEEN IN GILMER COUNTY; CORRECT?

A.   HE COULD HAVE BEEN INDICTED, BUT THEN YOU WOULD HAVE RUN HEADLONG INTO GEORGIA'S FAR MORE EXTENSIVE DOUBLE JEOPARDY PROTECTIONS.

Q.   WELL, YOU KNEW THAT HE COULD HAVE BEEN INDICTED AND THE GOVERNMENT -- AND MR. QUEEN COULD HAVE PROCEEDED WITH A DEATH PENALTY PROSECUTION.  YOU KNEW THAT WAS A VERY REAL POSSIBILITY.

A.   I DON'T AGREE THAT IT WAS A VERY REAL POSSIBILITY, MR. MCKINNON.  I KNEW THAT IT WAS A POTENTIAL, BUT I DON'T AGREE THAT IT WAS A REAL POSSIBILITY THE WAY YOU'RE DESCRIBING

53

IT.

Q.   AND YOU DON'T AGREE IT WAS A REAL POSSIBILITY BECAUSE OF DOUBLE JEOPARDY ISSUES?

A.   YEAH, THAT, AND THE FACT THAT IF ONE JURY UNDER THESE FACTS DECIDED THAT THE DEATH PENALTY WAS NOT APPROPRIATE, I'M SURE AN EXPERIENCED PROSECUTOR LIKE MR. QUEEN WOULD HAVE AT LEAST EVALUATED THAT AND WOULD HAVE DECIDED WHETHER IT REALLY WAS WORTH SPENDING THE CITIZENS OF GILMER COUNTY'S MONEY TO GO THROUGH THE WHOLE THING AGAIN WHEN ONE JURY HAD ALREADY DECIDED THERE WAS INSUFFICIENT EVIDENCE TO DECIDE THAT THE APPROPRIATE PENALTY OF DEATH.

SO I DON'T AGREE WITH YOU THAT IT WAS A REAL POSSIBILITY THAT MR. QUEEN WAS GOING TO INDICT AND SEEK THE DEATH PENALTY.

Q.   SO Y'ALL WEREN'T CONCERNED ABOUT THAT DOWN THE ROAD, THAT IF MR. LECROY DID NOT GET THE DEATH PENALTY OR WAS NOT CONVICTED IN FEDERAL COURT, THAT HE WOULD BE PROSECUTED IN STATE COURT?

A.   NO.

Q.   THAT NEVER ENTERED INTO YOUR DISCUSSIONS ABOUT STRATEGIC DECISIONS THAT YOU MADE ABOUT HOW YOU WOULD PRESENT THE CASE IN THE FEDERAL COURT AS TO WHAT IMPACT THAT MIGHT HAVE ON THE STATE PROSECUTION LATER ON?

A.   I DON'T THINK WE DID.

Q.   THAT WAS SOMETHING YOU NEVER CONSIDERED?

A.   WHICH -- WHAT WAS SOMETHING I NEVER CONSIDERED?

54

Q.    THE FACT THAT THERE COULD BE A STATE PROSECUTION THAT WOULD BE AFTER THE FEDERAL PROSECUTION.

A.    AGAIN, I DON'T THINK WE EVER TALKED ABOUT THAT.  I KNEW THAT WE TALKED ABOUT THE POTENTIAL FOR A STATE PROSECUTION BECAUSE IF WE HAD WON THE JURISDICTIONAL CHALLENGE, THEN THE CASE WAS DEFINITELY GOING TO BE GOING TO GILMER COUNTY.  BUT WHAT WE WERE TASKED TO DO WAS TO TRY TO WIN THE FEDERAL CASE, THE MATTER DIRECTLY IN FRONT OF US.  SO WE DIDN'T FOCUS TOO MUCH ON WHAT WOULD HAPPEN IF WE WENT THROUGH A FULL TRIAL AND A FEDERAL JURY DID NOT RETURN THE DEATH PENALTY.  NO, WE DIDN'T TALK ABOUT THAT.

Q.    WERE YOU CONCERNED ABOUT -- IF YOU HAD WON THE JURISDICTIONAL ISSUE, YOU WOULDN'T HAVE GOTTEN TO THE PENALTY PHASE; CORRECT?

A.    IF WE WON THE JURISDICTIONAL ISSUE, AS I JUST SAID, YES, WE WOULD NOT HAVE GOTTEN TO THE PENALTY PHASE; AND THEN THE QUESTION WOULD HAVE BEEN WOULD GILMER COUNTY PICK THE CASE UP.

BUT AGAIN, WHEN YOU'RE APPOINTED TO DO A CASE IN ONE COURT, YOU CAN REALLY ONLY, REAL FRANKLY, WORK ON WHAT'S DIRECTLY IN FRONT OF YOU, WHICH IS TO TRY TO AVOID THE DEATH PENALTY IN THIS CASE.

Q.    REGARDLESS OF WHAT CONSEQUENCES MIGHT ARISE AFTER THAT IN ANOTHER CASE.

A.    WELL, BECAUSE IF YOU DON'T WIN THE ONE RIGHT IN FRONT OF YOU, THE CONSEQUENCES DON'T MATTER.

55

Q.    AFTER JUDGE STORY SET UP THE FIREWALL, YOU GOT A LETTER

FROM THE GOVERNMENT, IT WAS ACTUALLY ADDRESSED TO MS. KEARNS

AND MR. MENDELSOHN, BUT DO YOU RECALL GETTING A LETTER FROM

MR. PLUMMER SAYING THAT HE WAS NOW THE FIREWALLED ATTORNEY

ALONG WITH YONETTE BUCHANAN?  DO YOU RECALL SEEING GOVERNMENT

EXHIBIT NUMBER 55?

A.    (REVIEWING DOCUMENT.)  I'M SURE I SAW THIS LETTER,

ALTHOUGH IT WAS NOT ADDRESSED TO ME.

        MR. MCKINNON:  YOUR HONOR, I WOULD MOVE FOR THE

ADMISSION OF GOVERNMENT EXHIBIT 55.

        THE COURT:  ANY OBJECTION?

        MR. MARTIN:  NO, SIR.

        THE COURT:  IT'S ADMITTED.

BY MR. MCKINNON:

Q.    NOW, DO YOU REMEMBER AT WHAT POINT THE TRIAL TEAM DECIDED

THAT YOU WERE NOT GOING TO AGREE TO ALLOW THE GOVERNMENT TO

CONDUCT ITS OWN EVALUATION OR EXAMINATION OF THE DEFENDANT AND

YOU WERE GOING TO GO WITH THIS TEACHING EXPERT WHO WAS NOT ALSO

GOING TO EVALUATE THE DEFENDANT?  DO YOU REMEMBER WHEN THAT

OCCURRED THAT YOU MADE THAT ELECTION?

A.    I CAN'T REMEMBER A SPECIFIC DAY, NO.

Q.    AND DO YOU REMEMBER WHAT WAS PRESENTED TO JUDGE STORY THAT

CAUSED HIM TO CREATE THE FIREWALL SITUATION, WHY YOU ALLEGED

THAT THAT WAS NECESSARY THAT THE TRIAL ATTORNEYS BE WALLED OFF

FROM YOUR TEACHING EXPERT'S INFORMATION?

56

A.   I DON'T RECALL THE SPECIFIC INFORMATION OR WHAT WAS PRESENTED TO JUDGE STORY THAT RESULTED IN HIS RULING CONCERNING THE FIREWALL.

Q.   OR THE RATIONALE FOR WHY IT WAS NECESSARY?

A.   FOR WHY WHAT WAS NECESSARY?

Q.   THE FIREWALL, WHY YOU THOUGHT THE FIREWALL WAS NECESSARY.

A.   WE DIDN'T SAY IT WAS NECESSARY.  WE JUST KNEW THAT IT WAS LIKELY GOING TO HAPPEN BECAUSE OF, AS JOE PLUMMER WROTE IN HIS -- IN GOVERNMENT EXHIBIT NUMBER 55, THE LAST PARAGRAPH, THERE WAS MERELY SCANT AND CONTRADICTORY INFORMATION ON THE ISSUE OF SEXUAL ABUSE IN WHAT THE GOVERNMENT HAD BEEN PROVIDED SO FAR.  AND SO WE WERE, I DO REMEMBER, WONDERING WHETHER OR NOT THE GOVERNMENT WAS AWARE OF WHAT WE WERE FOCUSING ON.

Q.   WELL, MR. PLUMMER'S LETTER WOULD BE FURTHER EVIDENCE THAT EVEN BEFORE THE FIREWALL THE GOVERNMENT KNEW SOMETHING ABOUT THE FACT THAT MR. LECROY MIGHT RAISE THE SEXUAL MITIGATION -- SEXUAL ABUSE AS A MITIGATING FACTOR IN HIS SENTENCING HEARING.

A.   WELL, HE WROTE ABOUT IT IN THIS LETTER, SO JOE WAS AWARE OF IT.  I KNOW THAT.

Q.   WELL, AT THAT POINT YOU HAD NOT PROVIDED ANY INFORMATION TO MR. PLUMMER ABOUT WHAT THE REASON FOR THE FIREWALL WAS OR WHAT YOU WERE EXPECTING TO DO WITH YOUR MITIGATION CASE, HAD YOU?

A.   NO.  HE, AS SAID IN THE LETTER HERE, HE HAD SIMPLY MET WITH BRIAN AND HAD LEARNED THAT THE EXPERT THAT WAS GOING TO BE

57

POTENTIALLY USED HAD A PH.D. IN PSYCHOLOGY, THAT THE FIELD OF EXPERTISE WAS CONCERNING ADULT MALES WHO WERE CHILDHOOD SEXUAL ABUSE VICTIMS, AND THAT THE EXPERT WAS BASING HIS OR HER OPINION ON INFORMATION CONTAINED WITHIN THE DISCOVERY MATERIALS.

Q.    ALL RIGHT, DISCOVERY MATERIALS THAT HAD BEEN PROVIDED BY THE GOVERNMENT.

A.    RIGHT.

Q.    IN FACT, THE FIRST TIME YOU PROVIDED ANY REVERSE DISCOVERY OR RECIPROCAL DISCOVERY WOULD HAVE BEEN ON DECEMBER THE 23RD WHEN YOU SENT THE PACKET OF INFORMATION THAT'S GOVERNMENT EXHIBIT NUMBER 56 TO MS. BUCHANAN AND MR. PLUMMER; CORRECT?

A.    AGAIN, WHAT YOU HAVE MARKED AS GOVERNMENT'S EXHIBIT 56 IS A LETTER FROM STEPHANIE TO YONETTE BUCHANAN CONTAINING SOME BUREAU OF PRISONS RECORDS; SO I'M ASSUMING THAT THE ANSWER TO YOUR QUESTION IS YES.  I DON'T REMEMBER SEEING THIS LETTER, BUT IT LOOKS LIKE PROBABLY WHAT WOULD HAVE GONE OUT AT THAT TIME.

Q.    AND THAT CONTAINS PRIMARILY DR. CARLSON'S NOTES OF HER THERAPY SESSIONS WITH THE DEFENDANT AT EL RENO IN 1999.  IS THAT CORRECT?

A.    THAT APPEARS TO BE TRUE, YES.

Q.    AND THOSE DOCUMENTS ARE NOT BATES STAMPED; CORRECT?

A.    ALSO TRUE.

Q.    SO THAT WOULD INDICATE THAT YOU DID NOT GET THOSE FROM THE GOVERNMENT.

58

A.   WELL, I DON'T AGREE WITH THAT AT ALL.  THERE'S A WAY TO TAKE BATES STAMPS OFF DOCUMENTS.

Q.   SO YOU'RE SAYING THAT Y'ALL TOOK THE BATES STAMPS OFF BEFORE YOU PROVIDED THE DOCUMENTS BACK TO THE GOVERNMENT?

A.   NO.  I JUST AM SAYING I DON'T KNOW FOR A FACT THAT THESE DOCUMENTS THAT ARE CONTAINED ATTACHED TO GOVERNMENT'S EXHIBIT 56 ARE DIFFERENT THAN WHAT WAS GIVEN TO US BY THE GOVERNMENT.  I JUST DON'T KNOW.

Q.   SO YOU DON'T KNOW WHETHER YOU GOT THEM FROM THE GOVERNMENT OR WHETHER YOU GOT THEM FROM SOME OTHER SOURCE.

A.   THAT'S TRUE, I DON'T KNOW.

          THE DEFENDANT:  YOUR HONOR?

          THE COURT:  YES, SIR.

          THE DEFENDANT:  IF I MAY BEG YOUR PARDON AND INTERRUPT.  I'M ON MEDICATION THAT REQUIRES ME TO URINATE QUITE FREQUENTLY FOR BLOOD PRESSURE, AND I HATE TO INTERRUPT AND I HATE TO HAVE TO EXCUSE MYSELF FOR A MINUTE AND A HALF.

          THE COURT:  THAT'S ALL RIGHT.

          THE DEFENDANT:  I APOLOGIZE.

          THE COURT:  WE WERE NEAR THE POINT WHERE WE NEEDED TO TAKE A BREAK ANYWAY.  WHY DON'T WE TAKE A 15-MINUTE RECESS AND WE'LL RETURN.  WE'LL BE IN RECESS FOR 15 MINUTES.

          (PROCEEDINGS WERE IN RECESS.)

          THE COURT:  YOU MAY PROCEED.

BY MR. MCKINNON:

59

Q.   MR. KISH, IN YOUR DIRECT EXAMINATION, YOU SAID THAT THE PLAN WAS TO PUT IN MORE EVIDENCE THAN WAS PUT INTO THE RECORD WITH RESPECT TO THE SEXUAL ABUSE ISSUE.  WHAT DISCUSSIONS DID YOU AND YOUR ATTORNEYS HAVE ABOUT WHAT THE PLAN WAS THEN FOR THE MITIGATION CASE?

A.   WELL, AGAIN, WE HAD A LOT OF DISCUSSIONS OVER THE COURSE OF MANY MONTHS.  BUT IN SUMMARY, THERE WAS A DISCUSSION OF THE ATTEMPT TO PUT INTO EVIDENCE WHAT WOULD BE INFORMATION SHOWING THAT BILL LECROY, JR., HAD BEEN SEXUALLY ABUSED, WHAT WE COULD GET FROM PRISON RECORDS AND POTENTIALLY FROM OTHER SOURCES. AND THEN AS I MENTIONED EARLIER, I THOUGHT THAT BRIAN WAS GOING TO TRY TO STITCH ALL OF THAT TOGETHER THROUGH THE EXPERT, THE TEACHING WITNESS AS THEY CALL HIM, DR. LISAK.

Q.   AND WHAT EVIDENCE DID YOU NOT PUT INTO THE RECORD THAT YOU HAD PLANNED TO PUT INTO THE RECORD?

A.   I CAN'T REMEMBER WHAT THAT IS.  AGAIN, THIS WAS NOT THE AREA OF THE TRIAL THAT I WAS FOCUSED ON.

Q.   SO ANY DECISIONS THAT WERE MADE BY MR. MENDELSOHN AND MS. KEARNS YOU CONCURRED IN?

A.   I WOULD SAY YES.

Q.   DID YOU HAVE ANY DISCUSSIONS WITH DR. LISAK YOURSELF?

A.   NO.

Q.   WHO WAS THE CONTACT WITH DR. LISAK.

A.   I THINK BRIAN --

Q.   -- OR LISAK?

60

A.   BRIAN MENDELSOHN MOSTLY WAS THE PERSON IN CONTACT WITH DR. LISAK.

Q.   LET ME SHOW YOU GOVERNMENT'S EXHIBIT NUMBER 57.  DO YOU RECOGNIZE THAT AS AN ORDER THAT JUDGE STORY ISSUED ON JANUARY THE 16TH, 2004, WITH RESPECT TO THE DEFENDANT'S APPEAL OF THE DECISION TO ALLOW THE GOVERNMENT TO -- THE MAGISTRATE'S ORDER TO ALLOW THE GOVERNMENT TO HAVE AN EXPERT EXAMINATION OF THE DEFENDANT?

A.   LET ME TAKE A QUICK LOOK.  IT LOOKS LIKE THAT'S IT, BUT LET ME TAKE A QUICK READ THROUGH HERE.

       (PAUSE IN THE PROCEEDING.)  YES, THIS DOES APPEAR TO BE THAT ORDER.

Q.   AND THAT SETS OUT, THE ORDER SETS OUT THE PARAMETERS UNDER WHICH THE EXAMINATION IS TO BE CONDUCTED; CORRECT?

A.   TRUE.

Q.   AND ON PAGE THREE OF THE ORDER IN THE PARAGRAPH THAT'S NUMBERED SIX, THE COURT SAYS:  SHOULD DEFENDANT FAIL TO PARTICIPATE IN THE MENTAL EXAMINATION ORDERED BY THIS COURT, HE MAY FORFEIT HIS RIGHT TO INTRODUCE EVIDENCE OF HIS MENTAL CONDITION AT THE SENTENCING PHASE OF THIS TRIAL.

       IS THAT -- YOU WERE AWARE OF THE COURT'S POSITION THAT THAT MAY CAUSE YOU TO FORFEIT YOUR ABILITY TO PUT UP THAT EVIDENCE AT THE SENTENCING PHASE; CORRECT?

A.   THAT'S WHAT IT SAYS; AND, OF COURSE, WE WERE AWARE OF THAT.

61

Q.   AND IS THAT THE ISSUE THAT YOU THOUGHT WOULD BE A GOOD ISSUE FOR APPEAL IF YOU DECIDED NOT TO PUT IN THE SENTENCING -- NOT TO ALLOW THE EXAMINATION THAT YOU WOULD HAVE AN ISSUE ON APPEAL THAT YOU COULD RAISE?

A.   I DIDN'T SAY I THOUGHT IT WAS A GOOD ISSUE.  IT WAS AN ISSUE THAT BRIAN BELIEVED WAS AN ISSUE WORTHY OF PRESERVING; AND BECAUSE THAT WAS MORE HIS AREA OF FOCUS DURING THE TRIAL, I CONCURRED WITH HIS EVALUATION.

Q.   SO YOU AGREED THAT IF IT CAME TO THAT, THAT STRATEGICALLY IT WOULD BE GOOD TO HAVE THIS ISSUE TO RAISE ON APPEAL IF THAT'S THE WAY Y'ALL PROCEEDED WITH THE TRIAL; CORRECT?

A.   AGAIN, THAT WAS MORE HIS AREA OF THE TRIAL, AND I AGREED -- DIDN'T DISAGREE WITH HIM, REAL FRANKLY, BECAUSE I WASN'T LOOKING AT THIS AS CLOSELY AS WAS HE.

Q.   NOW, BUT AT THIS STAGE, EVEN THOUGH THE COURT'S ORDERED THE EVALUATION, HAVE YOU CONCLUDED BY THIS TIME THAT YOU'RE NOT GOING TO ALLOW MR. LECROY TO BE EVALUATED?

A.   I CAN'T SAY THAT WE HAD.

Q.   HAD YOU CONCLUDED THAT YOU WERE GOING TO PROCEED WITH THIS TEACHING EXPERT WHERE YOUR EXPERT WOULDN'T EVALUATE MR. LECROY AND, THEREFORE, THE GOVERNMENT WOULDN'T BE ALLOWED TO EVALUATE MR. LECROY?

A.   I'M NOT SURE IF THERE HAD BEEN A FINAL DECISION MADE UNTIL WHATEVER TIME IT WAS THAT WE INFORMED THE GOVERNMENT AND THE COURT THAT WE WOULD NOT ALLOW MR. LECROY TO BE EXAMINED BY A

GOVERNMENT EXPERT.

Q.   LET ME SHOW YOU GOVERNMENT'S EXHIBIT NUMBER 58.  DO YOU REMEMBER WHEN THAT DECISION WAS MADE?

A.   I KNOW IT WAS MADE BEFORE TRIAL, BUT I DON'T INDEPENDENTLY RECALL WHEN THAT WAS.

Q.   LET ME SHOW YOU GOVERNMENT'S EXHIBIT NUMBER 58.  CAN YOU IDENTIFY GOVERNMENT EXHIBIT 58 AS A LETTER SENT BY MR. MENDELSOHN TO THE FIREWALLED ATTORNEY THAT OUTLINES THE TESTIMONY THAT DR. LISAK IS GOING TO GIVE AS THE TEACHING EXPERT, HAVING NOT DONE AN EVALUATION HIMSELF?

A.   RIGHT.  THAT'S WHAT THIS LOOKS LIKE IT IS.

Q.   AND YOU NEVER HAD DR. LISAK DO AN EVALUATION OF THE DEFENDANT; IS THAT CORRECT?

A.   NOT BEFORE TRIAL, NO.

Q.   WELL, AND THAT WAS A DECISION THAT YOU MADE, THAT YOU DIDN'T WANT DR. LISAK TO DO AN EVALUATION BECAUSE YOU KNEW THAT WOULD TRIGGER THE GOVERNMENT HAVING THE OPPORTUNITY TO DO AN EVALUATION; IS THAT CORRECT?

A.   NO, I DON'T AGREE WITH THAT.

Q.   THEN WHY DID YOU MAKE THE DECISION NOT TO HAVE DR. LISAK CONDUCT AN EVALUATION OF THE DEFENDANT PRIOR TO TRIAL?

A.   I DIDN'T MAKE ANY DECISIONS ABOUT DR. LISAK.

Q.   DID YOU HAVE ANY DISCUSSIONS WITH MR. MENDELSOHN OR MS. KEARNS OR MR. SUMNER ABOUT WHETHER YOU WOULD HAVE DR. LISAK DO AN EVALUATION?

63

A.   I'M SURE WE HAD DISCUSSIONS; BUT AGAIN, THIS WAS MORE STEPHANIE AND BRIAN'S AREA OF THE TRIAL AND I DEFERRED TO THEIR HASHING OUT WHATEVER THEY THOUGHT WAS --

Q.   WELL, WHAT DID YOU DISCUSS ABOUT WHY YOU WOULD NOT HAVE DR. LISAK DO AN EVALUATION?

A.   AGAIN, I DON'T SPECIFICALLY RECALL HAVING ANY CONVERSATIONS ABOUT WHY WE WOULD OR WOULD NOT HAVE DR. LISAK DO AN EVALUATION OF BILL LECROY, JR.

Q.   DO YOU REMEMBER THAT YOU ALL FILED A MOTION TO RECONSIDER JUDGE STORY'S JANUARY 16TH ORDER?

A.   I DIDN'T REMEMBER THAT; BUT IF THAT'S WHAT HAPPENED, THAT'S WHAT HAPPENED.

Q.   WELL, DO YOU REMEMBER THAT JUDGE STORY ISSUED AN ORDER ON YOUR MOTION FOR RECONSIDERATION?  I'LL ASK YOU TO LOOK AT GOVERNMENT'S EXHIBIT NUMBER 59.

A.   (REVIEWING DOCUMENT.)  OKAY, I'VE READ THIS NOW.  I'M SORRY, WHAT WERE YOU ASKING?

Q.   DID YOU REMEMBER THAT ON FEBRUARY 4TH JUDGE STORY ISSUED AN ORDER THAT DENIED YOUR MOTION TO RECONSIDER AND YOU'RE STILL BEING ORDERED TO SUBMIT MR. LECROY TO AN EXAMINATION; CORRECT?

A.   I DON'T REMEMBER THAT, BUT I SEE THAT'S WHAT HAPPENED.

Q.   LET ME SHOW YOU GOVERNMENT'S EXHIBIT NUMBER 60.  AND THIS IS THE ORDER THAT ARISES FROM A CONFERENCE THAT YOU HAD WHERE YOU ADVISED THE COURT THAT THE DEFENDANT WOULD INVOKE HIS FIFTH AMENDMENT PRIVILEGE AND HE WOULD NOT AGREE TO AN EXAMINATION BY

64

THE GOVERNMENT EXPERT; CORRECT?

A.   I SEE THAT THIS IS, INDEED, JUDGE STORY'S ORDER DENYING THE REQUEST FOR RECONSIDERATION.

Q.   SO BY FEBRUARY THE 6TH OF 2004, YOU HAD DECIDED THAT YOU WOULD NOT ALLOW MR. LECROY TO BE EVALUATED; CORRECT?

A.   ACCORDING TO WHAT'S WRITTEN IN THE ORDER, YES.

Q.   WELL, DO YOU HAVE A RECOLLECTION OF THAT?

A.   NO.  I WAS OUT ON MEDICAL LEAVE FOR MUCH OF THIS TIME PERIOD.

Q.   SO DURING THE -- YOU REMEMBER THAT THE TRIAL STARTED ON FEBRUARY THE 16TH, APPROXIMATELY.

A.   I REMEMBER THAT.  I WAS KIND OF WORRIED.  I HAD JUST HAD HIP REPLACEMENT SURGERY, AND THE IDEA OF SKATING AROUND IN GAINESVILLE ON THE ICE DIDN'T APPEAL TO ME.

Q.   SO YOU'RE SAYING YOU WERE NOT INVOLVED IN ANY OF THESE PROCEEDINGS LEADING UP TO THE DECISION NOT TO ALLOW MR. LECROY TO BE --

A.   I WAS INVOLVED.  THE TEAM CONSULTED WITH ME.  WE HAD REGULAR CONVERSATIONS.  I'M SURE I WAS BACK IN THE OFFICE BY SOME POINT IN MID JANUARY OR MAYBE EVEN LATE JANUARY.  BUT AGAIN, I MEAN, I WAS FOCUSING ON OTHER PARTS OF THE TRIAL.

Q.   WELL, IT'S AT THIS STAGE, FEBRUARY THE 6TH, THAT JUDGE STORY DECIDED THAT DR. MEDLIN SHOULD GO FORWARD.  LOOK AT PAGE TWO OF THE ORDER IF YOU NEED TO REFRESH YOUR RECOLLECTION.  AND ON FEBRUARY THE 6TH, JUDGE STORY DECIDED THAT IF DR. MEDLIN WAS

GOING TO BE ABLE TO TESTIFY WITHOUT CONDUCTING AN EVALUATION, SHE SHOULD STILL PREPARE A REPORT AND PRESENT THAT UNDER SEAL TO THE COURT; CORRECT?

A.   I DO SEE THAT, YES.

Q.   DO YOU REMEMBER THAT DISCUSSION?  DO YOU REMEMBER THAT BEING THE PROCEDURE THAT WAS GOING TO BE EMPLOYED?

A.   INDEPENDENTLY, SITTING HERE TODAY DO I REMEMBER THAT?  NO. BUT I SEE THAT THAT'S WHAT IT SAYS, AND THAT MAKES PERFECT SENSE.

Q.   OKAY.  AND THEN DO YOU SEE THAT THE COURT ESTABLISHED THE PROCEDURE THAT AT THE CLOSE OF THE GUILT/INNOCENCE PHASE OF THE TRIAL, DR. MEDLIN'S REPORT WOULD BE RELEASED TO THE DEFENSE?

A.   I DO SEE THAT.

Q.   AND IT WOULD BE AT THAT TIME THAT YOU WOULD ELECT AS TO WHETHER OR NOT YOU WOULD INTRODUCE HIS MENTAL HEALTH EVIDENCE.

A.   THAT'S THE WAY THE JUDGE SET IT UP IN THIS ORDER, YES.

Q.   IS THAT YOUR RECOLLECTION OF THE WAY THAT IT WAS SUPPOSED TO PROCEED?

A.   AGAIN, I DON'T HAVE AN INDEPENDENT RECOLLECTION OF THAT HERE TODAY, BUT IT MAKES PERFECT SENSE BASED ON WHAT I'M SEEING HERE.

Q.   AND YOU UNDERSTOOD THAT IF YOU ELECTED NOT TO PRESENT THE MENTAL HEALTH EVIDENCE, THAT DR. LISAK WOULD NOT TESTIFY; CORRECT?

A.   YES.

Q.   AND DR. MEDLIN WOULD NOT TESTIFY; CORRECT?

A.   AGAIN, TRUE.

Q.   AND IF YOU CALLED OTHER WITNESSES, THAT THOSE WITNESSES WOULD BE LIMITED TO FACT TESTIMONY AND WOULD NOT BE ALLOWED TO GIVE OPINION TESTIMONY ABOUT THE DEFENDANT'S MENTAL STATE; CORRECT?

A.   I THINK THAT'S EXACTLY THE WAY IT WORKED OUT.

Q.   AND YOU UNDERSTOOD THAT'S THE WAY THE PROCEDURE WOULD WORK AT THE PENALTY PHASE OF THE TRIAL.

A.   YES.

Q.   EVERYONE UNDERSTOOD THAT.

A.   I THINK EVERYBODY WHO WAS A LAWYER WHO WAS AT LEAST BEING TALKED WITH ABOUT THIS UNDERSTOOD THAT THAT WAS THE PROCEDURE.

Q.   NOW, DO YOU REMEMBER THERE BEING DISCUSSIONS AT ABOUT THE SAME TIME THAT MR. PLUMMER HAD DISCLOSED TO THE TRIAL ATTORNEYS THE IDENTITY, NAME OF THE EXPERT THAT THE GOVERNMENT HAD EMPLOYED, DR. MEDLIN?  DO YOU REMEMBER THAT BEING AN ISSUE?

A.   I DON'T.

Q.   DO YOU REMEMBER THERE BEING A MOTION TO RECUSE THE UNITED STATES ATTORNEY'S OFFICE FILED BY YOUR OFFICE BECAUSE OF THAT?

A.   AGAIN, IF THERE WAS SUCH A MOTION, I'M SURE I KNEW IT AT THE TIME; BUT I DON'T, SITTING HERE TODAY, REMEMBER THAT.

Q.   AND DO YOU REMEMBER THAT JUDGE STORY DENIED YOUR MOTION TO RECUSE THE UNITED STATES ATTORNEY'S OFFICE ON THAT BASIS?

A.   I'M PRETTY SURE IT MUST HAVE BEEN DENIED BECAUSE THE U.S.

67

ATTORNEY'S OFFICE PARTICIPATED IN THE TRIAL.

Q.   NOW, AT THE TRIAL MR. LECROY WAS FOUND GUILTY DURING THE GUILT PHASE; CORRECT?

A.   RIGHT.

Q.   AND DO YOU RECALL THAT AFTER THE CHARGE OF THE COURT ON THE GUILT PHASE, THE DEFENSE WAS GIVEN A COPY OF DR. MEDLIN'S REPORT?

A.   I DO REMEMBER THAT.

Q.   LET ME SHOW YOU GOVERNMENT'S EXHIBIT NUMBER 63.  DO YOU RECOGNIZE THAT AS BEING A COPY OF THE REPORT THAT DR. -- THAT YOU WERE PROVIDED THAT DAY?

A.   WITHOUT GOING THROUGH ALL THE PAGES OF THIS, I'M ASSUMING THIS IS THE REPORT THAT WE SAW THAT DAY, SO YES.

Q.   NOW, DO YOU ALSO RECALL THAT THE NIGHT -- THE DAY BEFORE YOU GOT THE REPORT, JUDGE STORY ADVISED YOU THAT HE HAD RECONSIDERED ALLOWING A.U.S.A. VINEYARD TO HAVE A ROLE IN CROSS-EXAMINING THE WITNESSES OR DEALING WITH THE WITNESSES THAT WOULD BE INVOLVED IN THE MENTAL HEALTH EVIDENCE?

A.   I DON'T REMEMBER THAT.

Q.   DO YOU REMEMBER THAT THE EXPECTATION WAS IS THAT THE FIREWALLED ATTORNEYS WOULD ACTUALLY DEAL WITH CROSS-EXAMINING DR. LISAK AND CONDUCTING THE DIRECT EXAMINATION OF DR. MEDLIN BASED ON THE ORIGINAL PROCEDURE THAT Y'ALL SET UP?

A.   BASED ON WHAT YOU'VE SHOWN ME HERE TODAY, THAT DOES, YOU KNOW, KINDLE SOME MEMORIES ABOUT THAT; SO, YES, I THINK THAT

68

WAS GOING TO BE THE PROCEDURE, THAT THE FIREWALLED ATTORNEYS WOULD HAVE THAT ROLE.

Q.   AND DO YOU REMEMBER THERE BEING A DISCUSSION WITH THE COURT EX PARTE AT THE END OF THE DAY ON FEBRUARY THE 27TH, 2004, IN WHICH JUDGE STORY ADVISED YOU THAT BASED ON THE WAY THE CASE HAD BEEN TRIED UP TO THIS POINT, THAT HE WAS GOING TO RECONSIDER THAT POSITION AND THAT HE WAS GOING TO ALLOW RUSSELL VINEYARD TO HAVE ACCESS TO DR. MEDLIN'S REPORT AND TO BE INVOLVED DIRECTLY IN THE DIRECT AND CROSS-EXAMINATION OF THE MENTAL HEALTH WITNESSES IF THERE WERE GOING TO BE ANY?

A.   AGAIN, I DON'T SPECIFICALLY RECALL THAT; BUT THAT DOES MAKE SENSE, CONSIDERING HOW IT ALL PLAYED OUT.

Q.   WELL, DO YOU RECALL THAT BEING AN ISSUE AS YOU DECIDED WHETHER OR NOT YOU WOULD USE DR. LISAK AND DEAL WITH CROSS-EXAMINING DR. MEDLIN?

A.   NO.

Q.   NOW, AFTER THE CLOSING -- OR AFTER THE CHARGE OF THE COURT IN THE GUILT PHASE, THE COURT GAVE YOU THE COPY OF DR. MEDLIN'S REPORT.

A.   I DON'T SPECIFICALLY REMEMBER THAT, BUT I THINK THAT'S THE WAY IT HAPPENED, THE WAY IT WAS SET UP, THE PROCEDURE; SO THAT MAKES SENSE.

Q.   WELL, DID YOU READ THE REPORT?

A.   I'M SURE I DID.

Q.   DID YOU HAVE DISCUSSIONS WITH THE REPORT WITH BRIAN

69

MENDELSOHN AND STEPHANIE KEARNS AND DAN SUMMER?

A.    I'M SURE THAT WE ALL TALKED ABOUT IT.

Q.    AND AFTER YOU READ THE REPORT, AT THE TIME THAT THE JURY WAS BROUGHT BACK INTO THE COURTROOM TO DELIBERATE ITS VERDICT ON THE GUILTY PHASE, YOU GAVE NOTICE TO JUDGE STORY THAT YOU WOULD NOT RELY ON THE MENTAL HEALTH EVIDENCE; CORRECT?

A.    THAT'S TRUE.  AS A DEFENSE, WE DID PROVIDE THE JUDGE WITH THAT NOTICE THAT WE WOULD NOT RELY ON THE MENTAL HEALTH DEFENSE.

Q.    AND YOU MADE THAT DECISION, THAT FINAL DECISION AFTER YOU HAD READ DR. MEDLIN'S REPORT.

A.    I CAN'T TELL YOU THAT WE MADE THE FINAL DECISION AFTER READING DR. MEDLIN'S REPORT, NO.

Q.    YOU HAD ALREADY DECIDED THAT YOU WERE NOT GOING TO RELY ON THE MENTAL HEALTH EVIDENCE PRIOR TO THE TIME THAT YOU GOT DISCLOSURE OF DR. MEDLIN'S REPORT?

A.    NO.  I'M JUST TELLING YOU I CAN'T SAY SITTING HERE TODAY THAT THE FINAL DECISION ON WHETHER OR NOT TO RAISE THE MENTAL HEALTH DEFENSE CAME AFTER WE WERE PROVIDED WITH THIS REPORT WHICH IS EXHIBIT 62.

Q.    WELL, WHAT DO YOU REMEMBER ABOUT DISCUSSIONS THAT YOU HAD LEADING UP TO THE TIME THAT YOU PROVIDED THE NOTICE TO JUDGE STORY THAT YOU WOULD NOT RELY ON DR. LISAK AND THE MENTAL HEALTH OPINION TESTIMONY?

A.    I'M SORRY, I REALLY DON'T UNDERSTAND YOUR QUESTION.

70

Q.   PRIOR TO THE TIME THAT YOU GAVE JUDGE STORY THE NOTICE --

A.   OKAY.

Q.   -- ABOUT NOT RELYING ON DR. LISAK AND OPINION TESTIMONY

ABOUT THE DEFENDANT'S MENTAL STATE --

A.   OKAY.

Q.   -- WHAT DISCUSSIONS DO YOU REMEMBER HAVING ABOUT THAT

STRATEGIC DECISION?

A.   WELL, AGAIN, THIS WAS MOSTLY THE FIELD THAT BRIAN AND

STEPHANIE WERE HANDLING.  I'M SURE WE ALL DISCUSSED IT.  BUT,

AGAIN, MY FOCUS MOSTLY WAS ON THE GUILT/INNOCENCE PHASE; AND UP

UNTIL THE POINT THAT YOU PROVIDED THESE THINGS, I WAS KIND OF

IN MY PART OF THE TRIAL.  SO ALTHOUGH I'M SURE WE TALKED ABOUT

IT, IT WASN'T HIGH ON MY LIST OF PRIORITIES.

     I DO KNOW, THOUGH, THAT MY FEELING, SITTING HERE TODAY, IS

THAT WE DID TRY TO, LIKE YOU ALWAYS DO, WAIT UNTIL YOU

ABSOLUTELY HAVE TO MAKE A DECISION BEFORE WE DID THAT.

Q.   BUT THAT WASN'T MY QUESTION.  MY QUESTION WAS WHAT DO YOU

RECALL ABOUT THE DISCUSSIONS THAT YOU HAD?

A.   SURE, AND I UNDERSTAND THAT.  I DON'T HAVE ANY OTHER

SPECIFIC RECOLLECTIONS OTHER THAN WHAT I'M TRYING TO TELL YOU

HERE, WHICH IS THAT I SEEM TO RECALL THAT WE WANTED TO HOLD

BACK AS LONG AS WE COULD.

Q.   WERE THERE PROVISIONS OR WERE THERE PARTS OF DR. MEDLIN'S

REPORT THAT CAUSED YOU TO BE CONCERNED THAT IF THAT EVIDENCE

WAS PRESENTED TO THE JURY, THAT IT WOULD BE DETRIMENTAL TO YOUR

MITIGATION CASE?

A.   I JUST DON'T REMEMBER THAT, I'M SORRY.

Q.   WHEN YOU DID THE -- YOU SAID YOU WERE PRIMARILY RESPONSIBLE FOR PREPARING THE APPEAL OF, THE DIRECT APPEAL OF THE CONVICTION AND SENTENCE?

A.   WELL, WE HAD INDIVIDUAL ISSUES THAT WE ALL WORKED ON; BUT I KIND OF LASHED EVERYTHING TOGETHER.  WHEN YOU'VE GOT THREE DIFFERENT WRITING STYLES, IT'S KIND OF A PAIN.  SO, YES, I WAS SORT OF THE PERSON IN CHARGE OF THE FINAL PRODUCT.

Q.   DID YOU GET TOGETHER AND DISCUSS WHAT ISSUES YOU THOUGHT WOULD BE ISSUES THAT YOU WANTED TO RAISE WITH THE ELEVENTH CIRCUIT?

A.   YES.

Q.   AND DID YOU DECIDE THE ISSUES THAT YOU THOUGHT WOULD BE THE -- WOULD HAVE THE BEST CHANCE OF GAINING A REVERSAL OF EITHER THE CONVICTION FOR THE OFFENSE OR A SETTING ASIDE OF THE DEATH PENALTY?

A.   OF COURSE.  WE TOOK WHAT WE THOUGHT WOULD BE THE MOST ADVANTAGEOUS POSITIONS FOR OUR CLIENT.  YOU TRY TO GET AS MUCH AS YOU CAN OUT OF THE CASE.  SOMETIMES YOU MISS THINGS, THOUGH.

Q.   ARE YOU SAYING THERE ARE ISSUES THAT YOU SHOULD HAVE RAISED ON APPEAL THAT YOU DIDN'T RAISE?

A.   WELL, MR. MARTIN IN HIS QUESTIONS TO ME HERE TODAY IDENTIFIED A COUPLE OF AREAS THAT, OBVIOUSLY, I NEVER THOUGHT ABOUT RAISING.

72

Q.   WERE THOSE AREAS THAT YOU WERE NOT SPECIFICALLY INVOLVED IN?

A.   NO.  I WAS INVOLVED IN ALL OF THOSE AREAS.

Q.   SO ARE YOU SAYING YOU SHOULD HAVE RAISED THOSE ISSUES ON APPEAL?

A.   WELL, I KNOW ON THE SEARCH ISSUE, I THOUGHT WE HAD A PRETTY DARNED GOOD ISSUE; AND WHEN THE ELEVENTH CIRCUIT POINTED OUT THAT WE HADN'T DONE IN THE LOWER COURT WHAT WAS NEEDED TO PRESERVE THE ISSUE, YEAH, I FELT PRETTY BAD ABOUT THAT, TO TELL YOU THE TRUTH.

Q.   ONE OF THE ISSUES THAT WAS DISCUSSED WAS THE FAILURE TO PROFFER DR. LISAK'S TESTIMONY.

A.   RIGHT.

Q.   WAS THERE ANY DISCUSSION THAT YOU SHOULD PROFFER DR. LISAK'S TESTIMONY DURING THE TRIAL?

A.   DURING THE TRIAL DID WE HAVE A DISCUSSION ABOUT THAT?  I DON'T REMEMBER.  AFTER THE FACT, YOU KNOW, YOU'VE ALWAYS DONE PROSECUTION, BILL, I MEAN, YOU ASK YOURSELF A LOT OF QUESTIONS ABOUT WHAT YOU SHOULD HAVE DONE.

Q.   NOW, LET ME ASK YOU ABOUT THE JURY SELECTION ISSUE.  WERE YOU PRIMARILY RESPONSIBLE FOR -- NOT THE JURY SELECTION ISSUE, THE JURY COMPOSITION ISSUE, THE JURY POOL ISSUE.  WERE YOU PRIMARILY RESPONSIBLE FOR THAT ISSUE AS IT TURNED OUT?

A.   YES.

Q.   AND IN YOUR MOTION THAT YOU RAISED THE ISSUE, YOU ARGUED

73

BOTH THAT MR. LECROY WAS DENIED A FAIR CROSS-SECTION OF THE COMMUNITY FOR THE GRAND JURY POOL AND WOULD BE FOR THE PETIT JURY POOL; CORRECT?

A.    YES.

Q.    AND SPECIFICALLY, YOU ARGUED THAT AFRICAN-AMERICANS AND HISPANICS WERE UNDERREPRESENTED IN THE MASTER WHEEL IN WHICH GRAND JURORS WERE SELECTED AND FROM WHICH THE PETIT JURORS WERE POOLED; CORRECT?

A.    TRUE.

Q.    AND YOU SUBMITTED STATISTICAL DATA IN SUPPORT OF YOUR MOTION; CORRECT?

A.    WE DID.

Q.    AND YOUR STATISTICAL DATA COMPARED HISPANICS IN THE -- COMPARED THE NUMBER OF HISPANICS IN THE QUALIFIED WHEEL TO HISPANICS IN THE GENERAL POPULATION; CORRECT?

A.    I BELIEVE THAT'S HOW WE DID IT.

Q.    AND YOUR STATISTICAL DATA ABOUT HISPANICS IN THE GENERAL POPULATION WOULD HAVE BEEN PULLED FROM CENSUS BUREAU DATA?

A.    I THINK THAT'S WHAT JEFFREY MARTIN USED, YES.

Q.    WERE YOU RELYING ON JEFFREY MARTIN THEN TO PROVIDE THE STATISTICAL DATA YOU NEEDED FOR YOUR APPEAL -- I MEAN FOR YOUR CHALLENGE TO THE JURY COMPOSITION?

A.    I THINK THAT'S TRUE.  I THINK WE DID RELY ON JEFF TO BASICALLY PERFORM THE ROLE OF BEING THE EXPERT WHO NOT ONLY COMPILED THE DATA BUT ANALYZED IT.

74

Q.    WHO MADE THE DECISION TO RELY ON HISPANIC POPULATION AS OPPOSED TO HISPANICS WHO WERE CITIZENS WHO WOULD BE ELIGIBLE FOR JURY SERVICE?

A.    WELL, SINCE I WAS HANDLING THE MOTION AND JEFF WAS WORKING FOR US, I WOULD BE THE PERSON MAKING THAT DECISION.

Q.    WAS THAT A CONSCIOUS DECISION YOU MADE TO ASK MR. MARTIN TO PULL THE STATISTICS FOR GENERAL POPULATION AS OPPOSED TO STATISTICS FOR CITIZENSHIP?

A.    THIS IS THE FIRST -- YES; AND THIS IS THE FIRST TIME I HAD EVER RAISED A JURY SELECTION, A JURY SELECTION ACT CHALLENGE AND/OR A SIXTH AMENDMENT CHALLENGE IN WHICH WE WERE PRESENTING EVIDENCE.  SO I MADE THE DECISION ABOUT, YES, LET'S GO WITH THAT DATA SET, SO TO SPEAK.

Q.    AND THE REASON YOU WENT WITH THAT DATA SET IS BECAUSE THE COMPARATIVE NUMBERS WOULD BE MORE FAVORABLE TO YOUR CHALLENGE IF YOU USED GENERAL POPULATION AS OPPOSED TO CITIZENSHIP STATISTICS; CORRECT?

A.    I DON'T AGREE WITH THAT.

Q.    THEN WHY DID YOU CHOOSE GENERAL POPULATION DATA RATHER THAN CITIZENSHIP DATA?

A.    I DON'T KNOW.

Q.    HAD YOU DONE THE RESEARCH?

A.    I THOUGHT I HAD.

Q.    DID YOU DISCUSS IT WITH ANYBODY?

A.    NOT REALLY, NO.  WE WERE SCRAMBLING TO CATCH UP WITH THIS,

75

REAL FRANKLY, WITH JURY SELECTION CHALLENGES.

Q.   NOW, YOU ALSO USED AN EXPERT DR. BOHON; CORRECT?
B-O-H-O-N?

A.   YES.

Q.   AND YOU PROVIDED AN AFFIDAVIT IN SUPPORT OF YOUR MOTION
FROM DR. BOHON; CORRECT?

A.   YES.

Q.   AND SHE'S A PROFESSOR OF SOCIOLOGY AT GEORGIA, AT THE
UNIVERSITY OF GEORGIA.

A.   CORRECT.

Q.   YOU KNEW SHE HAD WRITTEN EXTENSIVELY ON HISPANIC
DEMOGRAPHICS.  THAT WAS HER FIELD OF EXPERTISE.

A.   RIGHT.

Q.   AND YOU HAD HER REVIEW THE JURY SELECTION 12 REPORTS AND
THE CENSUS STATISTICS; CORRECT?  SHE DID THE ANALYSIS FOR YOU.

A.   OKAY.

Q.   REGARDING HISPANICS IN THE QUALIFIED WHEEL AND HISPANICS
IN THE GENERAL POPULATION.  YOU HAD HER DO THE STATISTICS FOR
YOU.  IS THAT RIGHT?

A.   I GUESS THAT'S TRUE, YES.

Q.   SHE FOUND IN HER ANALYSIS THAT IN THE GAINESVILLE DIVISION
THERE WAS AN ABSOLUTE DISPARITY OF 6.1 PERCENT; CORRECT?

A.   AGAIN --

Q.   DO YOU REMEMBER THE NUMBERS?

A.   I HAVEN'T LOOKED AT THESE DOCUMENTS IN A LONG TIME; BUT IF

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

76

THAT'S WHAT IT SAYS THERE, I'M GOING TO AGREE WITH THAT.

Q.   NOW, DID YOU ALSO TALK TO HER ABOUT DOING A COMPARATIVE DISPARITY ANALYSIS AS --

A.   AS OPPOSED TO ABSOLUTE?

Q.   BECAUSE, AGAIN, YOU KNEW COMPARATIVE DISPARITY WOULD BE MORE FAVORABLE TO YOUR CHALLENGE OF THE GRAND JURY ARRAY AND THE PETIT JURY ARRAY; CORRECT?

A.   YES, I DID KNOW THAT.

Q.   SO YOU HAD HER THEN DO NOT ONLY THE ABSOLUTE COMPARISON, BUT ALSO THE COMPARATIVE DISPARITY.

A.   THAT'S TRUE.

Q.   CORRECT?

A.   YES.

Q.   NOW, YOU RELIED ON PROFESSOR BOHON'S CONCLUSION THAT THE COMPARATIVE DISPARITY MEASURES ARE A MORE ACCURATE INDICATION OF THE DEGREE OF UNDERREPRESENTATION IN THE POPULATION.  DO YOU REMEMBER THAT?

A.   I DO.

Q.   MAKING THAT ARGUMENT?

A.   (NODS HEAD AFFIRMATIVELY.)

Q.   AND THAT THE COMPARATIVE DISPARITY LEVEL SEEN FOR BLACKS AND HISPANICS IN THE NORTHERN DISTRICT OF GEORGIA GENERALLY AND THE GAINESVILLE DECISION SPECIFICALLY, THAT SHE CONCLUDED THAT THAT IS ALARMINGLY HIGH.  IN FACT, YOU USED THAT AS PART OF YOUR MOTION PRACTICE IN TRYING TO GET THE INDICTMENT THROWN

77

OUT; CORRECT?

A.    RIGHT.

Q.    AND YOU KNEW AT THE TIME THAT IF YOU USED CITIZENSHIP NUMBERS AS OPPOSED TO GENERAL POPULATION NUMBERS, BOTH THE COMPARATIVE DISPARITY AND THE ABSOLUTE DISPARITY WOULD BE LOWER; CORRECT?

A.    NO.

Q.    YOU NEVER ASKED HER TO USE CITIZENSHIP NUMBERS.

A.    NO.

Q.    WHY DID YOU CHOOSE GENERAL POPULATION NUMBERS THEN?  WAS THERE ANY BASIS IN THE CASE LAW FOR IT?

A.    SITTING HERE TODAY, I DON'T KNOW WHY WE CHOSE THOSE NUMBERS.  I JUST DON'T KNOW WHY WE DIDN'T CHOOSE CITIZENSHIP NUMBERS AS OPPOSED TO GENERAL POPULATION NUMBERS.

Q.    YOU USED MR. MARTIN TO EVALUATE WHETHER BASED ON THE JURY REPORTS AND THE CENSUS DATA, YOU WERE TRYING TO FIGURE OUT WHETHER OR NOT THERE WAS UNDERREPRESENTATION OF AFRICAN-AMERICANS AND HISPANICS ON THE JURY WHEEL ITSELF; CORRECT?

A.    AGAIN, I HAVEN'T LOOKED AT THESE THINGS IN SIX YEARS.  IF THAT'S WHAT WE USED JEFF MARTIN FOR, THAT'S WHAT WE USED HIM FOR.

Q.    WELL, DO YOU REMEMBER THAT BEING AN ISSUE WHEN YOU WERE RAISING THIS WITH THE COURT?  DO YOU REMEMBER THAT BEING AN ISSUE?

78

A.   YES, ABSOLUTELY.

Q.   UNDERREPRESENTATION ON THE JURY WHEEL ITSELF AS OPPOSED TO THE COMPARISON.

A.   ABSOLUTELY.

MR. MCKINNON:  YOUR HONOR, IF I COULD HAVE JUST A SECOND.

THE COURT:  YOU MAY.

(DISCUSSION OFF THE RECORD.)

BY MR. MCKINNON:

Q.   ONE LAST QUESTION ABOUT THE JURY COMPOSITION.  DO YOU REMEMBER ARGUING IN YOUR BRIEF THAT IN ORDER TO HAVE THE COURT CONSIDER THE HIGHER COMPARATIVE DISPARITY NUMBERS THAT HAD NEVER BEEN FOUND UN -- CONSTITUTIONALLY PERMISSIBLE, YOU ARGUED THAT UNDERREPRESENTATION SHOULD BE MEASURED AGAINST THE GENERAL POPULATION, NOT THE JURY ELIGIBLE POPULATION?

A.   SITTING HERE TODAY DO I REMEMBER MAKING THAT ARGUMENT? NO.  IF IT'S WRITTEN IN THERE, THEN THAT'S WHAT I READ -- WROTE.

Q.   WELL, THE FACT THAT YOU WROTE IT, WOULDN'T THAT SUGGEST THAT -- GOING BACK TO MY ORIGINAL QUESTION WHICH WAS YOU USED THE GENERAL POPULATION NUMBERS BECAUSE YOU KNEW THOSE NUMBERS WOULD BE MORE FAVORABLE TO YOUR POSITION, AND THAT WAS A CHOICE RATHER THAN JUST I DON'T KNOW WHY WE DIDN'T USE THE JURY ELIGIBLE POPULATION NUMBERS.

A.   I DON'T AGREE WITH THAT.  I JUST DON'T EVER REMEMBER

79

THINKING ABOUT USING ANYTHING OTHER THAN THE GENERAL POPULATION NUMBERS.

Q.   THEN HOW WOULD YOU MAKE AN ARGUMENT THAT THE COURT, EVEN THOUGH THE GENERAL POPULATION NUMBERS HAD NEVER BEEN USED, THAT THE COURT SHOULD IN THIS CASE USE THE GENERAL POPULATION AS OPPOSED TO THE JURY ELIGIBLE NUMBERS?  HOW WOULD YOU MAKE THAT ARGUMENT IF IT NEVER OCCURRED TO YOU THAT THE GENERAL POPULATION NUMBERS WERE GOING TO BE BETTER THAN THE ELIGIBLE JUROR NUMBERS?

A.   SITTING HERE TODAY, I REMEMBER THE BIG ISSUE BEING TRYING TO CONVINCE THE COURT TO USE COMPARATIVE DISPARITY AS OPPOSED TO ABSOLUTE DISPARITY, NOT BASED UPON WHAT DATA SET WE BEGAN THE ANALYSIS WITH, BECAUSE WE'RE RUNNING UP AGAINST IT NO MATTER WHAT DATA SET WE USE.

Q.   RUNNING UP AGAINST WHAT?

A.   THE PROBLEM --

Q.   THE UPHILL BATTLE?

A.   THE PROBLEM THAT YOU'VE GOT TO CONVINCE A COURT TO USE SOMETHING OTHER THAN ABSOLUTE DISPARITY.

Q.   BECAUSE IF THE COURT USES ABSOLUTE DISPARITY, YOU LOSE; CORRECT?

A.   BASED ON THE NUMBERS THAT I WAS GETTING FROM THE FOLKS WE HAD HIRED, YES.

Q.   AND THE CASE LAW DIRECTED THE COURT TO USE ABSOLUTE DISPARITY; CORRECT?

A.    WELL, I DON'T AGREE WITH THAT, NO.

MR. MCKINNON:  THANK YOU.  THAT'S ALL THE QUESTIONS I HAVE.

THE COURT:  REDIRECT?

REDIRECT EXAMINATION

BY MR. MARTIN:

Q.    MR. KISH, MR. MCKINNON ASKED YOU A NUMBER OF QUESTIONS ABOUT, DISCUSSED WITH YOU WHETHER OR NOT MR. LECROY HAD EVER CONFESSED TO THIS CRIME.  DO YOU REMEMBER THOSE QUESTIONS?

A.    I DO.

Q.    AND THERE WAS A NOTE THAT WAS FOUND ON HIM AT THE TIME OF HIS ARREST IN WHICH HE STATED THAT HE WAS SORRY FOR WHAT HAD HAPPENED?

A.    RIGHT.

Q.    IT WAS NEVER CONTESTED AT THE TIME OF TRIAL THAT MR. LECROY WAS RESPONSIBLE FOR THE DEATH OF MS. TIESLER, WAS IT?

A.    NEVER.

Q.    IT WAS CONCEIVED FROM THE OUTSET THAT HE KILLED HER.

A.    ABSOLUTELY.

MR. MCKINNON:  THESE ARE ALL LEADING QUESTIONS, JUDGE.

MR. MARTIN:  FAIR ENOUGH.

THE COURT:  DON'T LEAD.

BY MR. MARTIN:

81

Q.   WITH REGARDS TO DR. HILTON, YOU SAID YOU REVIEWED THE

REPORT; CORRECT?

A.   YES.

Q.   BUT YOU -- OR DO YOU KNOW IF YOU OR ANY OTHER MEMBER OF

THE TEAM EVER SAT DOWN WITH DR. HILTON AND WENT OVER WITH HIM

WHAT HIS TESTIMONY WOULD BE BASED UPON THAT REPORT?

A.   I KNOW I NEVER DID, AND I NEVER KNEW IF ANYONE ELSE FROM

THE TEAM SAT DOWN WITH DR. HILTON IN THE MANNER YOU'VE JUST

TALKED ABOUT.

Q.   ONE FINAL THING.

     MR. MARTIN:  AND MR. MCKINNON, I DID NOT ASK THIS ON

DIRECT AND I'M TELLING YOU THAT.  SO I'M -- IT'S ONE FINAL AREA

WITH REGARDS TO POSSIBLE INEFFECTIVENESS.

BY MR. MARTIN:

Q.   PRIOR TO THIS MORNING I SHOWED YOU A COPY OF THE

TRANSCRIPT OF THE CLOSING ARGUMENT IN THE GUILT/INNOCENCE PHASE

OF THE CASE.

A.   YES, YOU DID.

Q.   AND YOU TESTIFIED THAT WAS ONE AREA THAT YOU WERE FOCUSED

ON.

A.   RIGHT.

Q.   REFERRING TO PAGE 1584 OF THE TRIAL TRANSCRIPT, AND I'LL

READ THIS, THERE WAS AN ARGUMENT MADE BY MR. BURBY:  WHAT DO

YOU HAVE TO SAY ABOUT THE EVIDENCE YOU HEARD IN THIS CASE?

YOUR VOICE, LADIES AND GENTLEMEN, WILL BE THE VERDICT YOU

82

RETURN.  IT'S THE ONLY VOICE THAT WILL BE HEARD ABOUT WHAT THIS MAN, THE TRANSCRIPT INDICATES INDICATING, WILLIAM EMMETT LECROY, JR., DID TO JOANNE TIESLER ON OCTOBER 7TH, 2001.

DO YOU REMEMBER ME SHOWING THAT TO YOU?

A.   I DO.

Q.   WAS THERE ANY REASON NOT TO OBJECT TO THAT ARGUMENT AS A COMMENT ON THE DEFENDANT'S FAILURE TO TESTIFY?

A.   NO.

MR. MARTIN:  THAT'S ALL I HAVE, YOUR HONOR.

THE COURT:  ANYTHING FURTHER?

MR. MCKINNON:  NO, YOUR HONOR.

THE COURT:  YOU MAY STEP DOWN.  THANK YOU.

MR. MARTIN:  WE WOULD CALLED MS. KEARNS.

THE COURT:  I'M ASSUMING SHE'S GOING TO BE AT IT AWHILE.  WHY DON'T WE BREAK FOR LUNCH AND THEN COME BACK.  WHY DON'T WE PLAN TO COME BACK AT ABOUT 1:15.  WE'LL RESUME AT 1:15.  WE'LL BE IN RECESS UNTIL 1:15.

(LUNCH RECESS.)

MR. MARTIN:  YOUR HONOR, JUST TO SORT OF HANDLE SOME MATTERS FOR SCHEDULING PURPOSES, MS. KEARNS IS OUR NEXT WITNESS; AND WE WERE ORIGINALLY PLANNING ON CALLING MR. MENDELSOHN AS THE NEXT WITNESS.  HE HAS TO LEAVE BY 4:45 BECAUSE HE HAS CHILD-CARE ISSUES.  AND I HAVE MY BROTHER, JEFFREY MARTIN, WHO IS THE EXPERT ON THE JURY SELECTION STUFF. I DON'T KNOW ABOUT IF WE KNOW WHETHER WE CAN JUST LET

83

MR. JEFFREY MARTIN LEAVE AND COME BACK IN THE MORNING BECAUSE I WANTED TO GO FORWARD WITH THOSE TWO WITNESSES FIRST. I DON'T KNOW WHAT MR. MCKINNON, IF HIS CROSS-EXAMINATION IS GOING TO BE AS LENGTHY, IF YOU WOULD EXPECT IT TO BE AS LENGTHY AS IT WAS THIS MORNING.

THE COURT: TOMORROW, THE ONLY THING ABOUT TOMORROW IS WE'VE GOT, I GUESS THOSE OTHER EXPERTS ARE SCHEDULED FOR TOMORROW.

MR. MARTIN: WE HAVE DR. HILTON SCHEDULED FIRST THING IN THE MORNING. I MEAN, JEFFREY MARTIN IS FLEXIBLE. HE CAN BE ANY TIME. I JUST DON'T WANT HIM TO HAVE TO WAIT AROUND HERE ALL AFTERNOON IF WE'RE NOT GOING TO GET TO HIM.

THE COURT: RIGHT. AND I KNOW YOU'VE GOT, MR. MCKINNON, RESPONSIVE WITNESSES ON THE JURY MATTER, AS WELL. SO THAT'S A BLOCK I WOULDN'T MIND TAKING FAIRLY CLOSE TO EACH OTHER.

I'M WONDERING IF, SINCE WE'VE GOT FOLKS LINED UP FOR TOMORROW, IF IT MAKES MORE SENSE TO SAY FOR MR. MARTIN TO BE EXPECTING TO GO WEDNESDAY MORNING.

MR. MARTIN: THAT WOULD BE FINE.

THE COURT: WILL THAT WORK FOR YOUR WITNESSES, AS FAR AS YOU KNOW, THE ONES YOU'VE GOT RESPONSIVE ON YOUR ISSUE?

MS. DINGLE: YES. I DON'T THINK THERE WILL BE A PROBLEM, YOUR HONOR.

THE COURT: OKAY.

MR. MARTIN:  WHY DON'T WE DO THAT.  SO I'LL TELL JEFFREY MARTIN TO LEAVE.  HE'LL COME BACK LATER.

THE COURT:  AND IN TERMS OF GETTING TO MR. MENDELSOHN, I THINK THAT'S SOMEWHAT PROBLEMATIC BECAUSE I HAD, IN COORDINATING WITH THE FOLKS AT MR. LECROY'S FACILITY IN TERMS OF THEIR SCHEDULING THE MATTERS AND SO FORTH, WE HAD INDICATED TO THEM THAT WE WOULD RECESS EACH DAY CLOSE TO 4:00 O'CLOCK AS OPPOSED TO GOING TO 5:00 O'CLOCK.  SO I THINK THE LIKELIHOOD OF GETTING TO MR. MENDELSOHN THIS AFTERNOON IS REDUCED BY THAT PERHAPS, AS WELL.

MR. MARTIN:  IF WE GET TO HIM, WE'LL START AND WE CAN FINISH UP IN THE MORNING.

THE COURT:  OKAY.  THAT WILL BE FINE.

(THE WITNESS WAS SWORN.)

THE DEPUTY CLERK:  STATE YOUR NAME, PLEASE.

THE WITNESS:  STEPHANIE KEARNS; K-E-A-R-N-S.

STEPHANIE KEARNS,

HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. MARTIN:

Q.   MS. KEARNS, WHAT IS YOUR PROFESSION?

A.   I'M A LAWYER.

Q.   AND WHAT IS YOUR POSITION AT THIS POINT?

A.   I'M THE EXECUTIVE DIRECTOR OF THE FEDERAL DEFENDER PROGRAM.

85

Q.   AND HOW LONG HAVE YOU BEEN THE EXECUTIVE DIRECTOR OF THE

FEDERAL DEFENDER PROGRAM?

A.   TWENTY-FIVE YEARS.

Q.   AND THAT'S THE PUBLIC DEFENDER FOR THIS DISTRICT; CORRECT?

A.   RIGHT.

Q.   GIVE US BRIEFLY YOUR EDUCATIONAL BACKGROUND.

A.   BACHELOR'S AND A J.D., BACHELOR FROM SKIDMORE COLLEGE IN

UPSTATE NEW YORK AND A J.D. FROM EMORY UNIVERSITY IN 1975.

Q.   AND AFTER YOU GOT YOUR LAW DEGREE, WERE YOU IN PRIVATE

PRACTICE FOR A PERIOD OF TIME?

A.   FOR NINE YEARS, YES.

Q.   AND WHAT IS YOUR AREA OF SPECIALTY?

A.   CRIMINAL DEFENSE, FEDERAL COURT.

Q.   PRIOR TO YOUR -- WERE YOU ONE OF THE LAWYERS INVOLVED IN

THE REPRESENTATION OF WILLIAM LECROY, JR.?

A.   YES, I WAS.

Q.   PRIOR TO THAT REPRESENTATION, HAD YOU BEEN INVOLVED IN A

FEDERAL DEATH PENALTY CASE?

A.   YES.

Q.   HOW MANY?  WELL, LET ME ASK IT THIS WAY.  AT A TRIAL ON A

FEDERAL DEATH PENALTY CASE.

A.   ONE.

Q.   NOW, CAN YOU DESCRIBE TO THE COURT THE MEMBERS OF THE TEAM

THAT WAS INVOLVED IN THE REPRESENTATION OF MR. LECROY.

A.   THERE WAS PAUL KISH, BRIAN MENDELSOHN AND I WERE THE THREE

LAWYERS; AND DAN SUMMER WAS APPOINTED AS SECOND LEARNED COUNSEL. AND MYSELF, MIKE HUTCHESON AND SUSAN MILLER WERE THE INVESTIGATORS WITHIN THE OFFICE; AND THEN PERIODICALLY WE USED JAN VOGELSANG AS A MITIGATION EXPERT. WE MIGHT HAVE CONSULTED, YOU KNOW, USED ANOTHER INVESTIGATOR FROM THE OUTSIDE TO DO A SPECIAL TASK OF SOME SORT.

Q. DID THE DIFFERENT LAWYERS AS THE REPRESENTATION PROGRESSED TAKE ON DIFFERENT ROLES IN THE DEFENSE?

A. YES.

Q. TELL US ABOUT THAT.

A. WELL, INITIALLY, WHEN WE WERE DOING THE JURY CHALLENGE, DAN SUMMER WAS A LARGE PART OF THAT; AND THE REST OF THE TEAM WAS PRETTY MUCH SUPPOSED TO BE INVOLVED IN EVERYTHING. AND THEN AS WE GOT CLOSER TO TRIAL, WE STARTED TO DIVIDE UP THE RESPONSIBILITIES FOR THE CASE PRIMARILY BASED ON WHO HAD INTERVIEWED WHAT WITNESSES, YOU KNOW, WHO WAS FAMILIAR WITH THAT ASPECT, MOST FAMILIAR WITH THAT ASPECT OF THE CASE.

Q. AND AS IT CAME ON TO TRIAL, WHICH ROLES DID THE DIFFERENT LAWYERS TAKE ON?

A. PAUL AND -- PRIMARILY PAUL DID GUILT/INNOCENCE. IT WAS PRIMARILY A LEGAL DEFENSE AS TO WHETHER OR NOT THIS WAS CARJACKING, AND HE HAD DONE ALL THE BRIEF WRITING ON THAT. AND BRIAN MENDELSOHN AND I DIVIDED UP MITIGATION. AND DAN SUMMER KIND OF, WE WORKED HIM IN AT DIFFERENT AREAS. BUT HE DIDN'T HAVE ANY -- ORIGINALLY HE HAD RESPONSIBILITY FOR THE JURY

SELECTION ISSUE, AND AT TRIAL HE DIDN'T REALLY HAVE ANY PARTICULAR NICHE THAT WAS HIS.

Q.    WAS HE VERY HELPFUL -- WHAT ROLE DID HE PLAY AS FAR AS BEING A LOCAL COUNSEL IN THE GAINESVILLE AREA?

A.    IN THE JURY SELECTION HE WAS ALSO VERY HELPFUL BECAUSE HE'S FROM GAINESVILLE; AND SO DURING THE, YOU KNOW, QUESTIONING OF THE JURORS, HE WAS HELPFUL IN WHAT, YOU KNOW, THE CHURCHES THAT PEOPLE WENT TO, WHAT SIGNIFICANCE THAT HAD OR WHERE THEY LIVED, THAT SORT OF THING.

Q.    YOU MENTIONED THAT MR. KISH WAS RESPONSIBLE FOR THE JURISDICTIONAL ISSUE THAT WAS RAISED IN THE CASE.  WAS THERE EVER A TIME THAT Y'ALL CONTESTED THAT MR. LECROY HAD ACTUALLY KILLED MS. TIESLER?

A.    NO.

Q.    NOW, IN REGARDS TO PREPARING AND INTERVIEWING WITNESSES, TELL US A LITTLE BIT ABOUT YOUR ROLE IN THAT.  WHICH TYPES OF WITNESSES DID YOU SORT OF FOCUS ON?

A.    ARE YOU TALKING ABOUT AT TRIAL OR LIKE DURING THE INVESTIGATION?

Q.    DURING THE INVESTIGATION -- WELL, LET ME BACK UP.  FIRST OF ALL, YOU MENTIONED MS. VOGELSANG.

A.    YES.

Q.    DID YOU WORK WITH MS. VOGELSANG?

A.    YES, I DID.

Q.    WHAT TYPE OF WORK WAS MS. VOGELSANG DOING?

88

A.    SHE WAS OUR MITIGATION EXPERT.

Q.    AND AS A MITIGATION EXPERT, WHAT TYPE OF PEOPLE WOULD SHE BE TALKING TO?

A.    SHE WOULD BE TALKING TO FAMILY, TEACHERS, PEOPLE THAT HAD HAD CONTACT WITH BILL LECROY BEFORE HE WENT TO PRISON THE FIRST TIME.

Q.    AND DID YOU WORK WITH MS. VOGELSANG IN PREPARING HER TESTIMONY?

A.    YES, I DID.

Q.    NOW, DID YOU -- WERE Y'ALL ABLE TO OBTAIN ANY TYPE OF PSYCHIATRIC RECORDS REGARDING MR. LECROY?

A.    WE OBTAINED HIS MEDICAL RECORDS FROM THE VARIOUS INSTITUTIONS HE HAD BEEN IN AND TO THE EXTENT THAT HE SOUGHT PRISON PSYCHIATRISTS OR MENTAL HEALTH WORKERS IN PRISON.

Q.    AND WHAT FACILITIES HAD HE BEEN TREATED FOR FOR MENTAL HEALTH ISSUES WHILE IN PRISON?

A.    I DON'T REMEMBER SPECIFICALLY, BUT HE WAS TREATED FOR MENTAL HEALTH ISSUES -- WELL, FIRST, WHEN HE FIRST WENT TO PRISON, HE WENT TO PRISON IN THE GEORGIA SYSTEM; AND THAT WAS PRETTY MUCH THE DECADE OF THE '90S.  WHILE HE WAS IN THE PRISON SYSTEM -- EXCUSE ME, I MISSPOKE THERE.  THE FIRST HALF OF THE DECADE OF THE '90S.  AND WHEN HE WAS IN THE GEORGIA PRISON SYSTEM, HE SAW MENTAL HEALTH PROVIDERS; AND THEN WHEN HE WAS IN THE FEDERAL SYSTEM, HE ALSO SAW MENTAL HEALTH PROVIDERS.

Q.    WITH REGARDS TO THE RECORDS FROM THE FEDERAL SYSTEM, DID

89

YOU SET UP ANY PARTICULAR PROCEDURE TO PROTECT THOSE RECORDS?

A.    YOU MEAN IN OBTAINING THEM ORIGINALLY?

Q.    YES, MA'AM.

A.    THE FIRST RECORDS THAT WE OBTAINED FROM THE FEDERAL SYSTEM WERE THE RECORDS WHEN BILL LECROY WAS IN OKLAHOMA.  AND WE CONTACTED THE LAWYER, GENERAL COUNSEL FOR B.O.P. OUT THERE AFTER WE SUBPOENAED THE RECORDS AND ARRANGED TO HAVE A FIREWALL FOR THE C.F.R. LETTER BY HAVING A LOCAL ASSISTANT UNITED STATES ATTORNEY FROM THAT OFFICE HANDLE THE C.F.R. ASPECT OF THE CASE.

Q.    WHEN YOU STAY C.F.R., EXPLAIN THAT.

A.    THE C.F.R., THE CODE OF FEDERAL REGULATIONS REQUIRES THAT IF YOU ARE OBTAINING TESTIMONY OR DOCUMENTS FROM A GOVERNMENT AGENCY, THAT YOU HAVE TO NOTIFY THE U.S. ATTORNEY, AN ASSISTANT U.S. ATTORNEY OF WHAT THE NEED FOR THE RECORDS IS.  AND SO RATHER THAN GOING THROUGH THE LOCAL U.S. ATTORNEY WHO WAS HANDLING THE CASE, BECAUSE WE WERE ENTITLED TO OBTAIN THOSE DOCUMENTS EX PARTE, WE ARRANGED WITH A MAGISTRATE JUDGE PERMISSION TO DO IT, TO DESIGNATE SOMEBODY OUT IN OKLAHOMA AND ADVISED THEM THAT THEY COULD NOT SHARE THE INFORMATION WITH THE LOCAL U.S. ATTORNEY'S OFFICE.

Q.    SO THESE WERE FEDERAL RECORDS THAT YOU OBTAINED FROM EL RENO; CORRECT?

A.    YES.

Q.    AND THAT -- YOU CALLED IT A FIREWALL ORDER.  WHAT DO YOU MEAN BY THAT?

90

A.   BECAUSE IT WAS AN EX PARTE PROCEEDING, WE ADVISED THE BUREAU OF PRISONS' LAWYER IN OKLAHOMA, AS WELL AS THE LOCAL ASSISTANT UNITED STATES ATTORNEY THAT THEY DESIGNATED OUT THERE TO SCREEN THE LETTER TO DETERMINE WHETHER WE WERE ENTITLED TO WHAT WE WERE ASKING FOR, TO NOT SHARE THAT INFORMATION WITH THE U.S. ATTORNEY'S OFFICE IN ATLANTA.

Q.   NOW, AFTER REVIEWING RECORDS, DID YOU AND THE OTHER TEAM MEMBERS BELIEVE -- WHAT, IF ANYTHING, DID Y'ALL BELIEVE WITH REGARDS TO WHETHER THERE MIGHT BE POTENTIAL MENTAL HEALTH ISSUES IN THE CASE?

A.   WE BELIEVED THERE WERE MENTAL HEALTH ISSUES.

Q.   GIVE US SORT OF THE NATURE OF THOSE.

A.   WELL, THAT BILL LECROY HAD SUFFERED EXTREME SEXUAL AND PHYSICAL ABUSE, EMOTIONAL ABUSE WHEN HE WAS GROWING UP AND THAT AS A RESULT OF THAT, HE HAD, YOU KNOW, WE HAD PSYCHIATRIC ISSUES.

I DON'T HAVE A BACKGROUND IN MENTAL HEALTH; AND, YOU KNOW, IT CERTAINLY WAS ENOUGH IN THE RECORDS, HE HAD BEEN COMPLAINING ABOUT IT THROUGHOUT HIS, YOU KNOW, HIS ADULTHOOD AND AT TIMES WHEN IT WAS NOT AT ALL RELATED TO WHAT, YOU KNOW, ANY CASE THAT WAS PENDING.  SO IT SEEMED AS THESE THINGS APPEARED, IT SEEMED TO ME TO BE FAIRLY GENUINE.  BUT I WOULD NOT HAVE BEEN IN A POSITION TO SAY, WELL, THIS MIGHT MEAN THAT HE HAS SCHIZOPHRENIA OR HE HAS BIPOLAR.  I JUST SAW ENOUGH IN THE RECORDS TO KNOW THAT HE WAS SUFFERING FROM MENTAL DISTRESS AND

91

HAD BEEN SEEKING HELP FOR THAT FOR YEARS.

Q.   WAS A DECISION MADE FOR HIM TO BE EVALUATED BY DR. HILTON
HERE IN ATLANTA?

A.   YES.

Q.   AND WHY WAS DR. HILTON PICKED?

A.   I DON'T REMEMBER IN PARTICULAR.  WE'VE USED DR. HILTON OFF
AND ON OVER THE YEARS, SO IT WAS SOMEONE THAT WE WERE ALL
FAMILIAR WITH.  BUT I DON'T REMEMBER SPECIFICALLY WHY
DR. HILTON AS OPPOSED TO LIKE JULIE RAND OR SOME OTHER
PSYCHIATRIST WAS SELECTED.

Q.   HE IS SOMEONE THAT YOUR OFFICE HAS USED FROM TIME TO TIME
IN ASSISTING YOU IN DEFENSE CASES.  IS THAT CORRECT?

A.   YES.

Q.   SHOWING YOU WHAT'S BEEN PREVIOUSLY MARKED AND ADMITTED
INTO EVIDENCE AS DEFENDANT'S EXHIBITS 1, 2 AND 3.  LET ME ASK
YOU, DID DR. HILTON GIVE YOU A REPORT OF HIS EVALUATION?

A.   HE DID.

Q.   WAS HE PROVIDED THE RECORDS THAT YOU HAD THAT WERE MAYBE
RELEVANT TO HIS EVALUATION PRIOR TO HIS EVALUATING MR. LECROY?

A.   YES.

Q.   WHO COMPILED THOSE RECORDS; DO YOU KNOW?

A.   WELL, THE RECORDS WOULD HAVE BEEN OBTAINED FROM VARIOUS
SOURCES, AND THEN WE WOULD HAVE -- I WOULD EXPECT THAT WE WOULD
HAVE HAD A MEETING, THE DEFENSE TEAM HAD A MEETING AND TALKED
ABOUT WHAT WE WERE GOING TO PROVIDE TO HIM.

92

Q.   WOULD SUSAN MILLER PLAY A ROLE IN THAT, COMPILING THOSE DOCUMENTS AND GETTING THEM TO DR. HILTON?

A.   SUSAN MILLER WOULD HAVE HAD A BIG ROLE IN OBTAINING ALL THE DOCUMENTS.  AGAIN, SOME OF THEM WOULD HAVE COME FROM THE DISCOVERY, AS WELL.

Q.   DID DR. HILTON PROVIDE YOU THREE REPORTS -- A REPORT?

A.   YES.

Q.   SHOWING YOU DEFENDANT'S EXHIBITS 1, 2 AND 3.  DO YOU RECOGNIZE THOSE?

A.   IT'S BEEN A VERY LONG TIME, BUT IT LOOKS LIKE THE REPORTS THAT WE GOT FROM DR. HILTON.

Q.   AFTER DR. HILTON PROVIDED YOU THOSE REPORTS, DID YOU EVER SIT DOWN WITH DR. HILTON AND GO OVER THEM WITH HIM AND THRASH OUT WHAT HIS CONCLUSIONS AND WHAT HIS TESTIMONY MIGHT BE?

A.   I DID NOT.

Q.   NOW, AS WE COME CLOSER TO TRIAL -- LET ME BACK UP.  WAS THERE A FIREWALL, A DIFFERENT FIREWALL FROM THE ONE YOU JUST SPOKE ABOUT INSTITUTED BY JUDGE STORY IN THIS CASE?

A.   YES.

Q.   AND HOW DID THAT FIREWALL WORK?

A.   JOE PLUMMER, WHO WAS AN ASSISTANT UNITED STATES ATTORNEY WHO WAS NOT INVOLVED IN THE PROSECUTION OF THE CASE, WAS DESIGNATED AS THE LAWYER TO WHOM WE WOULD DISCLOSE OUR MENTAL HEALTH INFORMATION; AND HE, IN TURN, WOULD SELECT AN EXPERT FOR THE GOVERNMENT TO USE TO COUNTER OUR INFORMATION, AND THAT HE

93

WAS NOT ALLOWED TO DISCUSS ANY OF THAT WITH THE DEFENSE TEAM --
I MEAN, EXCUSE ME, THE PROSECUTION TEAM.

Q.   DID THERE OCCUR -- LET ME BACK UP.  WITH RESPECT TO THAT
PROCESS, DID YOU OR YOUR STAFF OR YOUR OFFICE ALSO HAVE MR. --
DID YOU CONSULT WITH A DIFFERENT EXPERT FROM DR. HILTON, AN
EXPERT IN CHILD ABUSE?

A.   YES.

Q.   WHO WAS THAT?

A.   DR. LISAK.

Q.   WHY DR. LISAK?

A.   BECAUSE HE, IT WAS OUR UNDERSTANDING, WAS THE PREEMINENT
EXPERT ON THE EFFECT OF SEXUAL ABUSE ON YOUNG BOYS BY FEMALES.

Q.   AND DID YOU RETAIN HIM TO ASSIST YOU IN THE CASE?

A.   WE DID.

Q.   WHAT WAS YOUR UNDERSTANDING FROM THE ORDERS THAT WERE
ENTERED BY THE JUDGE AS TO WHETHER DR. LISAK -- LET ME BACK UP,
WHETHER YOUR CLIENT, MR. LECROY, WOULD HAVE TO BE EVALUATED BY
A GOVERNMENT PSYCHIATRIST IF DR. LISAK ALSO EXAMINED HIM AND
WAS CALLED AS A WITNESS?

A.   WELL, MY UNDERSTANDING OF THE READING OF THE RULES IS THAT
IF WE HAD DR. LISAK EXAMINE MR. LECROY AND THEN INTENDED TO USE
DR. LISAK AS A WITNESS, THEN WE WOULD HAVE TO MAKE BILL LECROY
AVAILABLE TO THE GOVERNMENT AND THEIR EXPERT FOR AN EVALUATION,
IF THEY CHOSE TO DO THAT.

Q.   DID THAT CAUSE YOU SOME CONCERN?

94

A.   YES, IT DID.

Q.   TELL US ABOUT THAT.

A.   WE DIDN'T WANT BILL LECROY EXAMINED BY THE GOVERNMENT PSYCHIATRIST.

Q.   YOU WERE FEARFUL OF THAT.

A.   YES, VERY FEARFUL.

Q.   SO DID YOU DEVISE -- DID YOU MAKE A DECISION NOT TO CALL DR. HILTON?

A.   YES, WE WERE NOT CALLING DR. HILTON.

Q.   DID YOU DEVISE A STRATEGY OR A PROCEDURE -- DID YOU WANT TO GIVE UP ON MENTAL HEALTH AS A DEFENSE OR A MITIGATING FACTOR AT SENTENCING?

A.   NO.  WE WANTED TO USE DR. LISAK AS A TEACHING EXPERT.

Q.   EXPLAIN THAT TO THE COURT.

A.   WHERE DR. LISAK WOULD LOOK AT THE HISTORY THAT WE COULD PROVIDE THROUGH DOCUMENTATION OF MR. LECROY AND THEN GIVE AN OPINION AS TO WHETHER OR NOT IT WOULD BE POSSIBLE FOR MR. LECROY TO BE EXHIBITING THE SYMPTOMS OF CHILDHOOD SEXUAL ABUSE BY A FEMALE, WHETHER THAT WOULD THEN EXPLAIN SOME OF THE INFORMATION THAT WE HAD.

Q.   ALL RIGHT.  HOW WAS THIS DEFENSE GOING TO BE PRESENTED TO THE JURY?

A.   THROUGH DR. LISAK AS A TEACHING EXPERT.

Q.   OKAY.  NOW, DID THERE COME A TIME WHEN THE COURT MADE IT CLEAR THAT HE WAS NOT GOING TO ALLOW DR. LISAK TO TESTIFY

95

REGARDING HOW SEXUAL ABUSE WOULD HAVE IMPACTED OR EXPLAINED HIS CONDUCT AT THE TIME OF THE OFFENSE?

MR. MCKINNON:  I OBJECT TO THE FORM OF THE QUESTION. FIRST OF ALL, THE TESTIMONY IS THAT DR. LISAK WAS GOING TO TESTIFY, AS I WROTE DOWN, WHETHER THE DEFENDANT WAS EXHIBITING SYMPTOMS OF CHILDHOOD SEXUAL ABUSE BY A FEMALE.  I HAVE NOT YET HEARD EITHER MR. KISH OR MS. KEARNS TESTIFY THAT THE PLAN WAS TO HAVE DR. LISAK TESTIFY ABOUT THE EFFECT THAT WOULD HAVE ON HIS VIOLENT --

MR. MARTIN:  I'LL REPHRASE.

THE COURT:  REPHRASE YOUR QUESTION.

MR. MARTIN:  I'LL REPHRASE.

BY MR. MARTIN:

Q.   DID YOU HAVE AN EXPERT THAT WAS AVAILABLE WHO COULD TESTIFY AS TO HOW SEXUAL ABUSE WOULD HAVE IMPACTED THE ACTUAL CRIME, OTHER THAN DR. HILTON?

A.   I'M NOT SURE I UNDERSTAND THE QUESTION.  IF YOU'RE ASKING WOULD DR. LISAK, AS A TEACHING EXPERT, HAVE EXPLAINED THE CRIME ITSELF?

Q.   YES, MA'AM.

A.   I THINK OUR HOPE WAS THAT HE WOULD BE ABLE TO DO THAT, YES.

Q.   BUT DID THAT HOPE EVER COME TO BE?

A.   NO.

Q.   WHY NOT?

96

A.    WELL, AGAIN, THE BEST OF MY RECOLLECTION IS THAT AFTER WE -- WHILE THE JURY WAS OUT AND AFTER GUILT/INNOCENCE, WE WERE GIVEN THE DR. MEDLIN REPORT WHICH WAS THE GOVERNMENT'S RESPONSE TO OUR TEACHING EXPERT, THEIR TEACHING EXPERT, AND THAT AT THAT POINT WE DECIDED THAT THE BATTLE OF THE TWO EXPERTS WAS NOT WORTH THE RISK.

Q.    AND IN THAT REGARD, DID YOU CONSULT WITH DR. LISAK WHAT HIS OPINION WAS OF DR. MEDLIN'S REPORT?

A.    I DID NOT.

Q.    OKAY.  SO HOW ARE YOU GOING TO PRESENT THIS MENTAL HEALTH, IN THAT SITUATION THIS MENTAL HEALTH DEFENSE TO THE JURY?

A.    ONLY TO THE EXTENT THAT WE COULD DO IT THROUGH THE RECORDS THAT WE HAD OF THE HISTORICAL TREATMENT.

Q.    AND WERE LIMITATIONS PLACED ON YOU BY THE COURT AS TO WHAT THE HISTORICAL WITNESSES COULD TESTIFY TO?

A.    YES, BECAUSE WE HADN'T SUBMITTED MR. LECROY FOR AN EVALUATION.

Q.    AND WHAT WERE THEY LIMITED TO IN THEIR TESTIMONY?

A.    WE WERE NOT PERMITTED TO ELICIT DIAGNOSES OR OPINIONS FROM THE EXPERTS.

Q.    WHAT COULD YOU ELICIT?

A.    WHAT WAS REPORTED BY MR. LECROY AND WHAT THEY WERE, YOU KNOW, WHAT OBJECTIVE BEHAVIOR THEY WERE OBSERVING.

Q.    WHAT DID YOU HOPE TO BE ABLE TO DO WITH THAT IN CLOSING ARGUMENT?

97

A.    YOU KNOW, DRAW THE INFERENCE THAT DR. LISAK WASN'T ABLE TO GIVE US AS AN OPINION.

Q.    WHAT INFERENCE DID YOU WANT THE JURY TO DRAW?

A.    THAT MR. LECROY WAS DAMAGED GOODS FROM BECAUSE OF WHAT HE SUFFERED IN HIS CHILDHOOD AND THAT THAT MIGHT EXPLAIN WHY HE WOULD DO SOMETHING SO AWFUL.

Q.    HAVE YOU HAD AN OPPORTUNITY TO REVIEW YOUR CLOSING ARGUMENT PRIOR TO YOUR TESTIMONY?

A.    I HAVE.

Q.    DID YOU REVIEW IT JUST RECENTLY?

A.    YES.

Q.    WAS THAT INFERENTIAL ARGUMENT EVER MADE?

A.    BARELY.

Q.    DURING THE TRIAL DID THE GOVERNMENT SEEK TO PROVE THAT PERHAPS MR. LECROY HAD NEVER BEEN ABUSED BY A BABYSITTER OR DID THEY TRY TO UNDERCUT THOSE STATEMENTS THAT HE HAD MADE?

A.    YOU KNOW, I WOULD HAVE DIFFICULTY ANSWERING THAT BECAUSE IT'S HARD FOR ME TO SEPARATE OUT THE EXTENT TO WHICH THEY WERE TRYING TO PROVE HE NEVER EVEN HAD A BABYSITTER PRETRIAL VERSUS DURING THE TRIAL.  IN OTHER WORDS, A LOT OF THE WITNESSES WE WERE INTERVIEWING SAID THAT THEY HAD BEEN QUESTIONED ABOUT THAT BY THE GOVERNMENT; BUT I DON'T RECALL THAT IT BECAME AN ISSUE, TO WHAT EXTENT IT DID IN THE TRIAL ITSELF.

Q.    WAS DR. LISAK EVER USED AS A VEHICLE TO CORROBORATE THAT, IN FACT, THIS ABUSE HAD OCCURRED?

98

A.   I MEAN, TO THE EXTENT THAT HIS OPINION WAS THAT BASED UPON WHAT WAS BEING -- WHAT WAS REFLECTED IN THE HISTORICAL TREATMENT RECORDS, THAT IT WOULD BE REASONABLE TO BELIEVE THAT HE WAS, THAT MR. LECROY WAS THE VICTIM OF CHILDHOOD SEXUAL ABUSE.

Q.   BUT HE WAS NEVER ACTUALLY EXAMINED BY DR. LISAK TO CORROBORATE THAT.

A.   NO, HE WAS NOT.

Q.   LET ME JUST ASK YOU ABOUT A FEW OTHER ISSUES.  WITH REGARDS TO THE JURY CHALLENGE ISSUES AND THE FAILURE TO PRESENT CITIZENSHIP FIGURES, WAS THAT SOMETHING THAT WAS HANDLED BY MR. SUMMER AND MR. KISH?

A.   I BELIEVE SO.

Q.   DO YOU KNOW WHETHER THERE WAS ANY STRATEGIC REASON NOT TO RAISE CITIZENSHIP FIGURES?

A.   NOT THAT I RECALL.

Q.   IN THE -- WHO WAS RESPONSIBLE FOR PREPARING THE APPELLATE BRIEF TO THE ELEVENTH CIRCUIT?

A.   IT WAS A JOINT EFFORT.

Q.   ONE OF THOSE ISSUES WAS THE FAILURE -- WAS THE SEARCH OF THE DEFENDANT'S CAR AT THE TIME OF HIS ARREST BACK IN THE '90S AND THE RETENTION OF DOCUMENTS WHICH WERE THEN PRESENTED INTO EVIDENCE, IN PARTICULAR THE TO-DO LIST.  WAS THERE ANY REASON NOT TO RAISE THAT ISSUE IN THE INITIAL BRIEF?

A.   NO.  IT WAS AN ISSUE WE HAD LITIGATED BELOW.  THERE WAS NO

REASON NOT TO RAISE IT.

Q.   DURING THE TRIAL THERE WAS GIVE-AND-TAKE ABOUT THE INSTRUCTION CONCERNING THE RISK OF ESCAPE INSTRUCTION AS TO WHETHER OR NOT THAT WOULD BE A FACTOR THAT THE JURY SHOULD CONSIDER IN DETERMINING FUTURE DANGEROUSNESS AND THE QUESTION OF WHETHER IT SHOULD MERELY BE A RISK OF ESCAPE OR A LIKELIHOOD OF ESCAPE, AND THE ELEVENTH CIRCUIT HELD THAT THAT HAD NOT BEEN PROPERLY PERFECTED AT THE TIME OF TRIAL.  WAS THERE ANY REASON NOT TO PERFECT THAT ISSUE?

A.   NO.

Q.   DURING THE CLOSING ARGUMENT, THE PROSECUTION ARGUED THAT ONE REASON THAT THE JURY SHOULD SENTENCE MR. LECROY TO DEATH WAS BECAUSE OF THE INABILITY OF THE PRISON SYSTEM TO SECURE HIM OTHER THAN HIM BEING ON DEATH ROW.  WAS THERE ANY REASON NOT TO OBJECT TO THAT ARGUMENT?

A.   NO.

Q.   ON APPEAL WAS RAISED THE ISSUE OF WHETHER OR NOT NONSTATUTORY AGGRAVATING CIRCUMSTANCES SHOULD BE ALLEGED OR REQUIRED TO BE ALLEGED IN THE INDICTMENT, BUT THE ISSUE OF WHETHER OR NOT THE FINAL BALANCING OF AGGRAVATING AND MITIGATING CIRCUMSTANCES SHOULD BE ALLEGED IN THE INDICTMENT WAS NOT RAISED.  WAS THERE ANY REASON NOT TO RAISE THAT ISSUE ON APPEAL?

A.   NOT THAT I'M AWARE OF.

Q.   ON APPEAL THE QUESTION OF WHETHER OR NOT THE COURT WAS

CORRECT IN LIMITING THE TESTIMONY OF DR. LISAK WAS HELD NOT TO BE PERFECTED ON APPEAL BECAUSE DR. LISAK HAD NEVER TESTIFIED. WAS THERE EVER ANY THOUGHT MADE TO PROFFERING DR. LISAK'S TESTIMONY DURING THE TRIAL SO THAT THERE COULD BE A RECORD OF EXACTLY WHAT HE WOULD HAVE TESTIFIED TO IF THE COURT HAD ALLOWED IT?

A.    NO.  I DON'T RECALL US EVER TALKING, EVEN AFTER IT WITH HINDSIGHT TALKING ABOUT WE SHOULD HAVE PROFFERED THE TESTIMONY. WE WERE MORE CONCERNED THAT WE SHOULD HAVE -- WELL, WHAT WE WERE CONCERNED ABOUT WAS THAT WE SHOULD HAVE GOTTEN A RULING FROM JUDGE STORY ON THAT ISSUE.

Q.    DURING THE FIREWALL DISCUSSIONS PRIOR TO TRIAL, IT WAS REVEALED THAT U.S. ATTORNEY OR ASSISTANT UNITED STATES ATTORNEY PLUMMER HAD REVEALED THE NAME OF THE EXPERT HE HAD RETAINED, DR. MEDLIN, TO THE TRIAL ATTORNEYS; AND AN EFFORT WAS MADE TO RECUSE THE TRIAL ATTORNEYS AS A RESULT OF THAT, WHICH WAS DENIED BY THE JUDGE.  WAS THERE ANY REASON NOT TO PERFECT THAT ISSUE ON APPEAL?

A.    WELL, THAT IT WAS MOOTED OUT BY US NOT HAVING CALLED DR. LISAK.

Q.    SINCE YOU HADN'T CALLED DR. LISAK, IT WOULDN'T BE A VIABLE APPEAL ISSUE?

A.    RIGHT.

        MR. MARTIN:  JUST ONE SECOND.

        (DISCUSSION OFF THE RECORD.)

101

MR. MARTIN:  YOUR HONOR, THAT'S ALL I HAVE.

THE COURT:  YOU MAY CROSS-EXAMINE.

CROSS-EXAMINATION

BY MR. MCKINNON:

Q.   MS. KEARNS, ON APPELLATE ISSUES FIRST, DID YOU AND
MR. KISH AND MR. MENDELSOHN DISCUSS WHAT ISSUES YOU THOUGHT
WOULD BE THE ISSUES YOU THOUGHT WERE MOST LIKELY TO CAUSE
EITHER A REVERSAL OF THE CONVICTION OR A REVERSAL OR SETTING
ASIDE OF THE SENTENCE?

A.   YES.

Q.   AND SO THE ISSUES YOU CHOSE WERE THE ISSUES YOU THOUGHT
WOULD HAVE THE MOST LIKELIHOOD OF SUCCESS, BASED ON YOUR HAVING
BEEN DIRECTLY INVOLVED IN THE CASE FROM BEGINNING TO END.  IS
THAT CORRECT?

A.   CORRECT.

Q.   AND YOU WOULD HAVE HAD A PAGE LIMITATION OR A WORD
LIMITATION WITH THE ELEVENTH CIRCUIT; CORRECT?

A.   YES.

Q.   SO THERE WAS A LIMIT TO HOW MUCH YOU COULD DISCUSS ABOUT
THE ISSUES YOU THOUGHT WERE MOST IMPORTANT WHEN YOU FILED YOUR
APPELLATE BRIEF.  IS THAT CORRECT?

A.   YES.

Q.   SO AT THE TIME THAT YOU ALL GOT TOGETHER AND DECIDED WHAT
ISSUES YOU WERE GOING TO RAISE ON APPEAL, THOSE WERE THE
ISSUES, BASED ON YOUR EXPERIENCE, THAT YOU THOUGHT WERE THE

102

BEST ISSUES FOR THE ELEVENTH CIRCUIT TO CONSIDER.  IS THAT CORRECT?

A.    IT IS.  BUT I WOULD ADD THAT IN THIS CASE, UNLIKE, FOR INSTANCE, THE BATTLE CASE THAT I HAD BEFORE WHICH WAS A CAPITAL CASE WHERE WE HAD TO CUT ISSUES BECAUSE WE HAD SO MANY, IN THIS CASE THERE WEREN'T -- IT WAS MORE HOW MANY PAGES DO YOU HAVE TO FLESH OUT THE ISSUE.  I DON'T RECALL US HAVING TO LEAVE OUT AN ISSUE WE THOUGHT HAD MERIT BECAUSE WE DIDN'T HAVE PAGES TO PUT IT IN.

Q.    AND IN TERMS OF A PROFFER OF -- WELL, IN TERMS OF THE ISSUE ABOUT JUDGE STORY DENYING THE GOVERNMENT -- DENYING YOUR MOTION TO RECUSE THE UNITED STATES ATTORNEY'S OFFICE BECAUSE OF THIS ALLEGED VIOLATION OF THE FIREWALL, YOU CONCLUDED THAT ISSUE WHAT MOOTED OUT BY THE FACT THAT YOU ULTIMATELY DECIDED NOT TO CALL DR. LISAK; CORRECT?

A.    RIGHT.

Q.    AND THAT WAS A CHOICE THAT YOU ALL MADE AT TRIAL BASED ON, BASED ON, WELL, AFTER YOU SAW DR. MEDLIN'S REPORT.

A.    CORRECT.

Q.    IS THAT FAIR?

A.    UH-HUH (AFFIRMATIVE).

Q.    NOW, I WANT TO KIND OF WALK THROUGH THE TIME LINE.  YOU HAVE DR. HILTON'S REPORTS IN FRONT OF YOU?

A.    I DO.

Q.    AND THEY ARE DATED ON MARCH OF 2003.  IS THAT CORRECT?

103

A.   YES.

Q.   AND THAT'S WHEN THE EXAMINATION WAS CONDUCTED?

A.   YES.

Q.   NOW, LET ME SHOW YOU -- AFTER YOU GOT DR. HILTON'S REPORT, YOU NEVER PROVIDED THAT REPORT TO THE GOVERNMENT.  IS THAT CORRECT?

A.   CORRECT.

Q.   YOU DID NOT PROVIDE THAT REPORT TO JAN VOGELSANG, YOUR MITIGATION EXPERT?

A.   I DON'T RECALL.  I DON'T RECALL WHETHER WE GAVE IT TO HER OR NOT.  WE WEREN'T GOING TO USE IT, SO I WOULD SUSPECT WE WOULDN'T GIVE IT TO HER.

Q.   YOU NEVER PROVIDED IT TO JUDGE STORY IN ANY OF THE LITIGATION OVER THE GOVERNMENT'S MOTION TO HAVE MR. LECROY EVALUATED THAT OCCURRED?

A.   I DON'T BELIEVE WE DID.

Q.   OKAY.  AND AT WHAT POINT DID YOU DECIDE THAT YOU WOULD NOT CALL DR. HILTON AS AN EXPERT WITNESS AS TO THE DEFENDANT'S MENTAL STATE?

A.   YOU KNOW, I DON'T HAVE A CLEAR RECOLLECTION OF THAT.  MY SENSE OF IT IS THAT IT WOULD HAVE BEEN FAIRLY SOON AFTER WE GOT DR. HILTON'S REPORT.

Q.   AND THE REASON WHY YOU DECIDED NOT TO CALL DR. HILTON AS YOUR EXPERT ON THE DEFENDANT'S MENTAL HEALTH WAS BECAUSE WHAT?

A.   BECAUSE WE DIDN'T CONSIDER THE DIAGNOSIS OF BORDERLINE

104

PERSONALITY DISORDER AND ANTISOCIAL PERSONALITY DISORDER PARTICULARLY HELPFUL IN A CRIMINAL CASE.

Q.   SO, IN FACT, DR. HILTON CONCLUDED THAT BASED ON HIS EVALUATION, THAT THE DEFENDANT WAS SUFFERING FROM OR WAS EXHIBITING SYMPTOMS OF SCHIZOTYPAL PERSONALITY DISORDER; CORRECT?

A.   CORRECT.

Q.   BORDERLINE PERSONALITY DISORDER AND ANTISOCIAL PERSONALITY DISORDER.

A.   RIGHT.

Q.   AND YOU BELIEVED THAT IF YOU TURNED OVER -- OR CALLED DR. HILTON AS AN EXPERT WITNESS FOR THE GOVERNMENT ON THE DEFENDANT'S MENTAL STATE AT THE TIME OF THE OFFENSE, THAT HE WOULD BE CROSS-EXAMINED ON WHAT IMPACT THOSE PERSONALITY DISORDERS WOULD HAVE ON HIS, ON THE DEFENDANT'S BEHAVIOR AND ON HIS COMMISSION OF THIS OFFENSE; CORRECT?

A.   YES.

Q.   AND YOU THOUGHT THAT INFORMATION WOULD BE DETRIMENTAL TO YOUR MITIGATION CASE THAT YOU WERE TRYING TO PUT TOGETHER ON BEHALF OF THE DEFENDANT.  IS THAT CORRECT?

A.   WELL, NOT HELPFUL.

Q.   WELL, YOU ACTUALLY THOUGHT IT -- WOULDN'T YOU THINK IT WOULD BE DETRIMENTAL?

A.   THERE WERE PARTS OF DR. HILTON'S REPORT THAT WOULD HAVE BEEN VERY HELPFUL TO EXPLAINING THIS CASE, LIKE THE MAGICAL

105

THINKING AND THE DELUSIONS.  THE PROBLEM WAS THAT THERE WAS THE RISK THAT THE ACTUAL DIAGNOSIS WOULD NOT BE HELPFUL.

Q.   THE DIAGNOSIS OF THESE PERSONALITY DISORDERS.

A.   CORRECT.

Q.   AND YOU ARE AWARE THAT DR. HILTON FOUND THAT HE WAS COMPETENT TO STAND TRIAL.

A.   RIGHT.

Q.   AND YOU WERE ALSO AWARE FROM DR. HILTON'S REPORTS THAT HE DIDN'T BELIEVE, IN HIS OPINION A NOT GUILTY BY REASON OF INSANITY DEFENSE WAS NOT VIABLE BECAUSE OF HIS MENTAL STATE; CORRECT?

A.   RIGHT.

Q.   NOW, AT WHAT POINT DID YOU CONTACT DR. LISAK?

A.   I DON'T REMEMBER SPECIFICALLY.  I BELIEVE WE CONTACTED HIM FAIRLY EARLY.

Q.   FAIRLY, WOULD IT HAVE BEEN AS EARLY AS MARCH OF 2003 WHEN YOU WERE TALKING WITH DR. HILTON?

A.   YOU KNOW, I REALLY DON'T REMEMBER SPECIFICALLY; AND THE NOTES ON THAT WOULD HAVE BEEN -- BRIAN MENDELSOHN MADE ALL THOSE CONTACTS, SO THE CHRONOLOGY OF THAT WOULD, I THINK, BE IN BRIAN'S NOTES, NOT MINE.

Q.   I TAKE IT -- WELL, LET ME SHOW YOU GOVERNMENT'S EXHIBIT 53 WHICH I THINK HAS ALREADY BEEN ADMITTED.  THIS IS THE NOTICE THAT YOU ALL FILED OF YOUR INTENTION TO RELY ON MENTAL HEALTH TESTIMONY AT THE TRIAL.  DO YOU RECOGNIZE THAT?

106

A.   UH-HUH (AFFIRMATIVE).

Q.   AND THE DATE OF THAT IS OCTOBER 2003.  WHAT'S THE SPECIFIC DATE IN OCTOBER?

A.   17TH.

Q.   OCTOBER 17TH.

A.   YES.

Q.   SO AT THE TIME THAT YOU FILED THAT NOTICE, HAD YOU ALREADY TALKED TO DR. LISAK?

A.   I DON'T RECALL.  BUT, YOU KNOW, THE TIMING OF THESE NOTICES IS DICTATED BY THE RULES AND THE EXTENSIONS YOU CAN GET.  SO IT ISN'T UNCOMMON IN OUR CASES THAT WE END UP HAVING TO FILE THIS NOTICE BEFORE WE ACTUALLY ARE CERTAIN WE'RE GOING TO PUT UP A MENTAL HEALTH DEFENSE.

Q.   BUT THAT NOTICE GIVES NOTICE THAT YOU ARE -- YOU'RE PUTTING THE GOVERNMENT ON NOTICE THAT YOU'RE GOING TO DO IT.  AT WHAT POINT -- OR WHAT MENTAL HEALTH DEFENSE WERE YOU INTENDING TO PUT UP THEN WHEN YOU FILED THAT NOTICE?

A.   AGAIN, I DON'T REMEMBER.  IT'S A CAPITAL CASE.  YOU'D CERTAINLY HAVE TO CONSIDER THAT YOU MIGHT HAVE MENTAL HEALTH TO PUT UP.  AND I'M SURE, KNOWING US, WE WAITED UNTIL THE LAST POSSIBLE MOMENT TO FILE THIS NOTICE AND THAT WHEN WE FILED IT, IT WAS THAT WE HAD TO DO IT OR WE WOULD RISK WAIVING THE ABILITY TO PUT UP THE DEFENSE IF WE DECIDED IN THE END TO DO SO.

Q.   THAT NOTICE WAS FILED APPROXIMATELY SIX MONTHS AFTER

DR. HILTON PREPARED HIS REPORT.  AND YOU TESTIFIED THAT YOU DECIDED FAIRLY QUICKLY AFTER DR. HILTON'S REPORT THAT YOU WOULD NOT USE DR. HILTON AS YOUR MENTAL HEALTH EXPERT; CORRECT?

A.    RIGHT.

Q.    SO WOULD IT BE FAIR TO SAY THAT YOU HAD ALREADY DECIDED THAT YOU WOULD NOT USE DR. HILTON BECAUSE OF HIS DIAGNOSIS OF THE DEFENDANT BY THE TIME YOU FILED THAT REPORT -- THAT NOTICE?

A.    YES.

Q.    AND YOU JUST DON'T REMEMBER WHETHER YOU HAD ALREADY TALKED TO DR. LISAK AT THIS STAGE, OR OTHER -- DID YOU TALK TO ANY OTHER?

A.    WELL, I SAID WE TALKED TO DR. LISAK, STARTED TALKING TO HIM FAIRLY EARLY.  YOU KNOW, I'M SURE BY THE TIME WE HAD, AS SOON AS WE HAD THE RECORDS AND THE INDICATION THAT MR. LECROY HAD BEEN SEXUALLY ABUSED AS A CHILD, THAT WE WERE EXPLORING WHO THE POSSIBLE EXPERTS COULD BE THAT WE COULD USE WITH THAT KIND OF HISTORY.

Q.    AND SHORTLY AFTER YOU FILED THAT NOTICE, THE GOVERNMENT FILED A MOTION TO HAVE MR. LECROY EXAMINED BY A GOVERNMENT PSYCHIATRIC EXPERT.  IS THAT CORRECT?

A.    I BELIEVE SO, YEAH.

Q.    AND YOU WERE CONCERNED ABOUT THAT.  WOULD THAT BE BASED ON YOUR EXPERIENCE IN THE BATTLE CASE?

A.    NO.  IT WOULD BE -- YOU MEAN HAVING THE CLIENT EVALUATED BY A GOVERNMENT PSYCHIATRIST?

108

Q.   YES.

A.   I WOULD SAY MY CONCERN WOULD BE BASED ON MY AT THAT POINT IN TIME 30 YEARS OF EXPERIENCE DOING CRIMINAL DEFENSE WORK.

Q.   BECAUSE THE INITIAL MOTION THAT THE GOVERNMENT FILED WAS THAT THEY WANTED TO HAVE MR. LECROY SENT TO BUTNER F.C.I. WHERE HE WOULD BE EVALUATED BY THE MENTAL HEALTH EXPERTS THERE; CORRECT?

A.   I DON'T RECALL SPECIFICALLY; BUT, YOU KNOW --

Q.   AND --

A.   -- PROBABLY THE CASE.

Q.   AND YOU WERE INVOLVED IN THE LITIGATION INVOLVING MR. BATTLE WHICH WAS IN THIS DISTRICT; CORRECT?

A.   YES.

Q.   AND YOU FILED A NOTICE SIMILAR TO THE NOTICE THAT YOU FILED IN THIS CASE IN MR. BATTLE'S CASE; CORRECT?

A.   I DID.

Q.   YOU HAD HIM EVALUATED BY YOUR EXPERTS AT THAT STAGE, AND THEY HAD FOUND THAT HE WAS BOTH INCOMPETENT TO STAND TRIAL AND THAT HE WAS INSANE AT THE TIME OF THE OFFENSE; CORRECT?

A.   CORRECT.

Q.   AND THAT WAS ANOTHER MURDER, A FEDERAL DEATH PENALTY MURDER CASE.

A.   RIGHT.

Q.   MR. BATTLE WAS SENT TO BUTNER WHERE HE WAS EVALUATED BY A PSYCHIATRIST WHO WAS ON STAFF AT BUTNER WITH THE BUREAU OF

109

PRISONS; CORRECT?

A.    (NODS HEAD AFFIRMATIVELY.)

Q.    YOU HAVE TO ANSWER YES OR NO.  I'M SORRY.

A.    I'M SORRY, YES.  I DIDN'T KNOW YOU WERE THROUGH WITH THE QUESTION.

Q.    AND A PSYCHOLOGIST WHO WAS ON STAFF.

A.    YES.

Q.    AND THIS EVALUATION TOOK PLACE OVER ABOUT 45 DAYS; IS THAT RIGHT?

A.    LONGER, YES.

Q.    AND THEY CONCLUDED THAT MR. BATTLE WAS BOTH COMPETENT TO STAND TRIAL; CORRECT?

A.    CORRECT.

Q.    AND THAT HE WAS SUFFERING FROM PERSONALITY DISORDERS BUT HE WAS NOT INSANE AT THE TIME OF THE OFFENSE; CORRECT?

A.    CORRECT.

Q.    AND THAT FORMED, BASICALLY, THE BATTLE LINES FOR THE BATTLE TRIAL THAT YOU HAD WITH THE GOVERNMENT; CORRECT?

A.    YES.  BUT THERE WAS A VERY DIFFERENT, IT WAS A VERY DIFFERENT STRATEGIC DECISION IN THE BATTLE CASE BECAUSE ANTHONY BATTLE, THE PSYCHIATRIST AT BUTNER HAD EXAMINED HIM ALMOST TEN YEARS EARLIER WHEN HE WAS AWAITING TRIAL; AND HER REPORTS, HER INITIAL REPORTS WERE VERY FAVORABLE TO THE DEVELOPMENT OF SCHIZOPHRENIA.  SO WE ANTICIPATED, WE HOPED THAT ANTHONY BATTLE GOING TO BUTNER WOULD RESULT IN THE PSYCHIATRIST HAVING THE

110

OPPORTUNITY TO SEE HOW HE HAD REGRESSED INTO FULL-BLOWN

SCHIZOPHRENIA.

Q.    BUT IT DIDN'T TURN OUT THAT WAY, DID IT?

A.    NO, IT DIDN'T.  BUT, AGAIN, I WANT TO BE CLEAR THAT IT WAS

NOT MY EXPERIENCE IN THE BATTLE CASE THAT LED TO DECISIONS THAT

WERE MADE IN THE LECROY CASE.

Q.    YOU JUST DIDN'T HAVE -- WELL, YOU DON'T REMEMBER WHETHER

OR NOT THE INITIAL MOTION FOR THE GOVERNMENT WAS TO SEND

MR. LECROY TO BUTNER TO BE EVALUATED?

A.    THE CONCERN WOULD NOT HAVE BEEN -- MY CONCERN WOULD NOT

HAVE BEEN BASED UPON WHERE HE WOULD GO FOR THE EVALUATION,

WHETHER IT WAS MINNESOTA, ROCHESTER, MIAMI OR, YOU KNOW,

BUTNER.  THAT WAS NOT THE CONCERN.

Q.    YOU JUST DIDN'T WANT TO HAVE HIM EVALUATED BY A BUREAU OF

PRISONS PSYCHIATRIST.

A.    THAT'S RIGHT.

Q.    BECAUSE YOU DIDN'T TRUST THE BUREAU OF PRISONS

PSYCHIATRISTS AND THEIR EVALUATIONS?

A.    YES, THAT'S CORRECT.  MY EXPERIENCE WITH THEM HAS NOT BEEN

GOOD.

Q.    BUT ULTIMATELY, IT EVOLVED THAT THE GOVERNMENT WOULD HAVE

MR. LECROY EVALUATED BY A PSYCHIATRIST HERE IN THE ATLANTA

AREA, NOT A PSYCHIATRIST AT BUTNER OR A PSYCHIATRIST IN THE

B.O.P. SYSTEM; CORRECT?

A.    I DON'T BELIEVE WE EVER GOT TO THAT POINT.

111

Q.   WELL, DO YOU REMEMBER THAT THERE WAS A SUBSTANTIAL AMOUNT -- THERE WAS A LITIGATION BETWEEN YOU AND THE GOVERNMENT IN FRONT OF JUDGE STORY ABOUT THE PARAMETERS OF WHAT THE EVALUATION WOULD BE?

A.   YES.

Q.   AND THE DEFENSE OPPOSED AGREEING TO A GOVERNMENT EVALUATION OF MR. LECROY THROUGHOUT; CORRECT?

A.   CORRECT.

Q.   AND DO YOU REMEMBER THAT JUDGE STORY THEN ORDERED THAT IF YOU'RE GOING TO HAVE MENTAL HEALTH TESTIMONY, THAT YOU WOULD -- AND THAT YOU WERE GOING TO HAVE HIM EVALUATED BY YOUR OWN EXPERT, THAT YOU WOULD HAVE TO SUBMIT HIM TO AN EVALUATION BY THE GOVERNMENT EXPERT BUT IT WAS GOING TO BE DR. MEDLIN WHO WAS GOING TO BE THE GOVERNMENT'S EXPERT TO DO THE EVALUATION?  DO YOU REMEMBER THAT ORDER COMING DOWN?

A.   MAYBE MY RECOLLECTION ON THIS IS INCORRECT.  I DON'T RECALL US EVER GETTING TO THE POINT WHERE THINGS WERE DECIDED THAT SPECIFICALLY.  THERE WAS A DISCUSSION, THERE WAS -- MY RECOLLECTION WAS THAT JUDGE STORY HAD NOT, HAD STILL NOT DETERMINED HE WAS GOING TO LET US USE DR. LISAK AS A TEACHING EXPERT IF WE DIDN'T ALLOW BILL LECROY TO BE EVALUATED BY THE GOVERNMENT'S EXPERT.

IF WE HAD AN EVALUATION LIKE A DR. HILTON EVALUATION, I DON'T THINK THERE WAS EVER A DISCUSSION ABOUT WHAT THE GOVERNMENT WAS GOING TO BE ABLE TO DO AS FAR AS AN EVALUATION

112

WENT, WHETHER IT WOULD HAVE TO BE LOCAL OR THEY COULD SEND HIM OFF.

Q.    LET ME SHOW YOU GOVERNMENT'S EXHIBIT NUMBER 59.

A.    OKAY.

Q.    TAKE A MINUTE AND LOOK OVER THAT.  AND FOR THE RECORD, THAT'S AN ORDER ISSUED BY JUDGE STORY ON FEBRUARY THE 4TH OF 2004; CORRECT?

A.    YES.

Q.    AND IN THAT ORDER JUDGE STORY SPECIFICALLY DIRECTS THAT IF THE DEFENSE IS GOING TO USE THIS MENTAL HEALTH EVIDENCE, THAT IT WOULD BE DR. MEDLIN WHO WOULD DO THE EVALUATION; AND HE SETS OUT PARAMETERS AS TO WHAT THE SCOPE OF THE EVALUATION WOULD BE. CORRECT?

A.    I DON'T THINK WE'RE REALLY TALKING THE SAME THING HERE. MY UNDERSTANDING IS THAT IF WE USED DR. LISAK AS A TEACHING EXPERT WITHOUT HAVING EVALUATED MR. LECROY, WE WERE RUNNING THE RISK OF STILL HAVING TO MAKE HIM AVAILABLE TO THE GOVERNMENT FOR DR. MEDLIN'S EVALUATION.  THAT'S DIFFERENT FROM THE DECISION ABOUT WHETHER WE WOULD USE -- LIKE HAVE DR. LISAK HIMSELF DO AN EVALUATION OF BILL LECROY BY MEETING WITH HIM.

Q.    SO IS WHAT YOU'RE SAYING THAT YOU NEVER INTENDED FOR DR. LISAK TO DO AN EVALUATION OF THE DEFENDANT?

A.    THAT'S CORRECT.  WE WANTED TO USE HIM AS A TEACHING EXPERT.  AND THIS ORDER PUT US IN THE WORST POSSIBLE POSITION BECAUSE THEN WE HAD BILL LECROY, OUR EXPERT NOT HAVING SEEN

113

BILL LECROY; AND IF THAT WAS COUNTERED BY DR. MEDLIN WHO HAD DONE AN EVALUATION OF BILL LECROY, THEN CLEARLY A JURY WOULD BE MORE LIKELY TO BELIEVE THE DOCTOR WHO HAD ACTUALLY EVALUATED HIM.

Q.   WHY DID YOU DECIDE THAT YOU DID NOT WANT MR. LECROY EVALUATED BY DR. LISAK?

A.   BECAUSE WE -- WELL, MY FEAR WAS WE HAD DR. HILTON'S EVALUATION, MY FEAR WAS THAT WE WOULD END UP WITH A DIAGNOSIS THAT WOULD NOT BE HELPFUL.

Q.   SO YOU HAD EVERY REASON TO BELIEVE THAT IF DR. HILTON FOUND THAT HE WAS SUFFERING FROM OR EXHIBITING SYMPTOMS OF BORDERLINE PERSONALITY DISORDER AND ANTISOCIAL PERSONALITY DISORDER AND SCHIZOTYPAL PERSONALITY DISORDER, THAT DR. LISAK WOULD FIND THE SAME THING; CORRECT?

A.   CORRECT.

Q.   AND IF YOU HAD DR. LISAK EVALUATE MR. LECROY AND YOU WANTED TO USE DR. LISAK AS A WITNESS, YOU WOULD HAVE HAD TO TURN OVER HIS EVALUATION TO THE GOVERNMENT.  THAT WAS CLEAR FROM JUDGE STORY'S ORDERS; CORRECT?

A.   CORRECT.

Q.   SO IN ORDER TO AVOID HAVING THE AWFUL INFORMATION THAT DR. HILTON FOUND ABOUT THE DEFENDANT'S PERSONALITY DISORDERS DISCLOSED TO THE GOVERNMENT, YOU CHOSE NOT TO HAVE DR. LISAK EVALUATE THE DEFENDANT IN ORDER TO -- SO YOU WOULDN'T HAVE TO DISCLOSE THAT INFORMATION TO THE GOVERNMENT; CORRECT?

114

A.    THAT'S RIGHT.

Q.    SO THAT WAS A DECISION, A STRATEGIC DECISION THAT THE THREE OR FOUR ATTORNEYS INVOLVED IN THE TRIAL TEAM MADE AS TO THE BEST POSSIBLE COURSE FOR YOUR REPRESENTATION OF THE DEFENDANT IN THIS CASE; CORRECT?

A.    RIGHT.

Q.    NOW, LET ME ASK YOU ABOUT DR. HILTON'S REPORT IN ANOTHER CONTEXT.  DR. HILTON TALKED TO THE DEFENDANT AND THE DEFENDANT GAVE HIM A VERY DETAILED CONFESSION, BASICALLY, ABOUT THE MURDER OF JOANNE TIESLER; CORRECT?

A.    CORRECT.

Q.    THERE WAS NOTHING ELSE, NOTHING THAT YOU HAD GOTTEN FROM THE GOVERNMENT WHERE ANY WITNESS HAD PROVIDED THE KIND OF DETAILED CONFESSION ABOUT JOANNE TIESLER'S LAST MINUTES OTHER THAN DR. HILTON'S REPORT; CORRECT?

A.    THAT'S CORRECT.

Q.    AND IT WAS YOUR INTENTION AT TRIAL TO PRESENT THE CASE IN SUCH A WAY THAT YOU COULD ARGUE BOTH AT CLOSING IN THE GUILT PHASE AND CLOSING IN THE SENTENCING PHASE THAT MR. LECROY WAS INVOLVED -- WAS ENGAGED IN THE BURGLARY OF MS. TIESLER'S HOME, SHE CAME IN AND SURPRISED HIM, AND THAT WITHOUT PLANNING OR THINKING OR PREMEDITATION, HE KILLED HER BECAUSE OF THAT SCENARIO; CORRECT?

A.    CORRECT.

Q.    IN FACT, THAT'S WHAT MR. SUMMER ARGUED TO THE JURY AT THE

115

END OF THE GUILT PHASE; CORRECT?

A.   CORRECT.

Q.   AND THAT'S WHAT MR. MENDELSOHN ARGUED TO THE JURY DURING THE SENTENCING PHASE WHEN HE WAS ARGUING THAT THE GOVERNMENT HADN'T PROVEN THE STATUTORY AGGRAVATING FACTOR OF THAT THE MURDER WAS COMMITTED WITH SUBSTANTIAL PLANNING AND PREMEDITATION; CORRECT?

A.   CORRECT.

Q.   BUT IF THE GOVERNMENT HAD KNOWN WHAT MR. LECROY SAID TO DR. HILTON, THEN YOU WOULD HAVE NOT BEEN ABLE TO PRESENT THAT ARGUMENT TO THE JURY; CORRECT?

A.   CORRECT.

Q.   BECAUSE THE DEFENDANT TOLD DR. HILTON THAT THERE WAS SUBSTANTIAL PLANNING AND PREMEDITATION FOR THE COMMISSION OF THIS MURDER; CORRECT?

A.   CORRECT.

Q.   IN FACT, THE DEFENDANT TOLD DR. HILTON THAT HE BROKE INTO MS. TIESLER'S HOUSE AND BASICALLY LAID IN WAIT FOR HER TO COME HOME; CORRECT?

A.   SOMETHING TO THAT EFFECT.

Q.   DO YOU NEED TO REVIEW DR. HILTON'S REPORT IN ORDER TO SAY THAT?  BUT THE DEFENDANT SAID HE BURGLARIZED MS. TIESLER'S HOME -- ACCORDING TO THE DEFENDANT, IF YOU BELIEVE WHAT THE DEFENDANT TOLD DR. HILTON, HE THOUGHT THAT MS. TIESLER WAS TINKERBELL; CORRECT?

116

A.    CORRECT.

Q.    THE WOMAN WHO HE ALLEGED HAD MOLESTED HIM.

A.    CORRECT.

Q.    AND THAT HE WAS GOING TO SEEK REVENGE ON MS. TIESLER FOR THE CHILDHOOD SEXUAL ABUSE THAT TINKERBELL HAD ALLEGEDLY IMPOSED ON HIM; CORRECT?

A.    BREAK THE SPELL.

Q.    BREAK THE SPELL.

A.    RIGHT.

Q.    THAT'S HIS MAGICAL THINKING WHICH IS THE SCHIZOTYPAL PERSONALITY DISORDER THAT DR. HILTON FOUND; CORRECT?

A.    RIGHT.

Q.    AND SO IT WAS HIS INTENTION TO ATTACK JOANNE TIESLER AS SHE CAME INTO HER HOUSE; CORRECT?

A.    AGAIN, YOU KNOW, I DON'T REMEMBER THE SPECIFIC DETAILS ABOUT DR. HILTON'S REPORT.

Q.    WELL, YOU'VE GOT IT THERE IN FRONT OF YOU.  LOOK AT GOVERNMENT EXHIBIT -- DEFENDANT'S EXHIBIT NUMBER 3.  LOOK AT PAGE TEN.

A.    (WITNESS COMPLIES.)  UH-HUH (AFFIRMATIVE).

Q.    FIRST FULL PARAGRAPH:  MR. LECROY GOT UP AND PUT ON HIS BLACK ARMY BATTLE DRESS UNIFORM, PUT HIS STEPFATHER'S POLICE BADGE ON HIS UNIFORM, FOUND HIS STEPFATHER'S HIGH-TECH POLICE BOOTS ON THE FRONT PORCH AND PUT THOSE ON.  HE STARTED HEADING OUT TO MS. TIESLER'S CABIN, BUT THEN HE REALIZED HE NEEDED

117

SOMETHING TO GAIN ACCESS INTO HER CABIN.

SO HE'S PLANNING TO BURGLARIZE, TO BREAK INTO HER CABIN; CORRECT?  THAT'S WHAT HE'S TELLING DR. HILTON.

A.   RIGHT.

Q.   AND YOU WOULD EXPECT IF HE HAD BEEN INTERVIEWED BY DR. LISAK, DR. LISAK WOULD HAVE ASKED HIM ABOUT THE DETAILS OF THE OFFENSE AS DR. HILTON HAD DONE SO.

A.   RIGHT.

Q.   SAME THING, IF HE HAD BEEN EXAMINED BY DR. MEDLIN, DR. MEDLIN WOULD HAVE ASKED HIM ABOUT THE DETAILS OF THE OFFENSE.

A.   RIGHT.

Q.   AND YOU DIDN'T WANT THE GOVERNMENT TO KNOW ABOUT WHAT THE DEFENDANT SAID ABOUT WHAT -- HOW HE COMMITTED THIS HORRIFIC CRIME, DID YOU?

A.   WELL, IT WASN'T THE GOVERNMENT KNOWING.

Q.   YOU DIDN'T WANT THE JURY TO KNOW WHAT THE DEFENDANT HAD SAID.

A.   I DIDN'T WANT THE JURY TO KNOW; RIGHT.

Q.   SO IF YOU HAD HAD THE DEFENDANT EVALUATED BY DR. LISAK THEN AND CALLED DR. LISAK AS A WITNESS, THEN THE JURY WOULD HAVE KNOWN BECAUSE YOU EXPECTED THAT HE WOULD HAVE BEEN CROSS-EXAMINED ABOUT THAT.

A.   THAT'S RIGHT.

Q.   AND IF DR. MEDLIN HAD CONDUCTED AN EVALUATION, DR. MEDLIN

118

WOULD HAVE BEEN QUESTIONED IN THE REBUTTAL CASE OF THE PENALTY
PHASE ABOUT WHAT THE DEFENDANT HAD TOLD HER.

A.   RIGHT.

Q.   AND YOU HAD EVERY REASON TO BELIEVE THAT THE DEFENDANT
WOULD TELL THEM THE SAME THING THAT HE TOLD DR. HILTON.

A.   YES.

Q.   AND YOU DIDN'T WANT THE JURY TO KNOW THE DEFENDANT'S
DESCRIPTION OF THIS HORRIFIC CRIME; CORRECT?

A.   I DIDN'T.

Q.   ONCE AGAIN, THAT'S ANOTHER REASON WHY YOU DIDN'T WANT TO
HAVE THE DEFENDANT EVALUATED BY EITHER DR. LISAK OR DR. MEDLIN;
CORRECT?

A.   CORRECT.

Q.   I'M JUST GOING TO READ ONE SENTENCE THERE:  MR. LECROY
WENT BACK TO MS. TIESLER'S HOUSE AND WENT INSIDE TO WAIT FOR
HER.

    SO IF THE JURY HAD KNOWN THAT, YOU WOULDN'T HAVE BEEN ABLE
TO ARGUE BOTH IN THE PENALTY PHASE AND IN THE GUILT PHASE THAT
THIS MURDER WAS NOT COMMITTED WITH SUBSTANTIAL PREMEDITATION
AND PLANNING; CORRECT?

A.   CORRECT.

Q.   AND BY HAVING AN EVALUATION, YOU WOULD HAVE GIVEN UP THAT
ARGUMENT BECAUSE, ACCORDING TO MR. LECROY'S OWN WORDS, HE
COMMITTED THE MURDER WITH SUBSTANTIAL PREMEDITATION AND
PLANNING.

119

A.   CORRECT.

Q.   IS THAT RIGHT?

A.   (NODS HEAD AFFIRMATIVELY.)

Q.   NOW, BEFORE THE TRIAL YOU PUT -- YOU ADVISED THE COURT THAT YOU WOULD NOT AGREE TO ALLOW MR. LECROY TO BE EXAMINED BY A GOVERNMENT EXPERT; CORRECT?

A.   RIGHT.

Q.   AND YOU ADVISED THE COURT THAT YOU HAD A SUMMARY OF DR. LISAK'S TESTIMONY THAT WOULD BE THE TEACHING TESTIMONY THAT HE WOULD GIVE, EVEN THOUGH HE HAD NOT SPECIFIC -- OR EVEN THOUGH HE HAD NOT EVALUATED THE DEFENDANT; CORRECT?

A.   YES.

Q.   AND JUDGE STORY THEN ORDERED THAT DR. MEDLIN WOULD THEN PREPARE A REPORT BASED ON THE RECORDS THAT WERE PROVIDED TO HER BY THE U.S. ATTORNEY'S OFFICE AND SHE WOULD SUBMIT THAT REPORT TO THE COURT AND IT WOULD BE UNDER SEAL; CORRECT?

A.   CORRECT.

Q.   AND NEITHER THE DEFENSE NOR THE GOVERNMENT WOULD GET A COPY OF DR. MEDLIN'S REPORT DURING THE GUILT PHASE OF THE TRIAL.

A.   CORRECT.

Q.   THEN THE PROCEDURE WAS IS THAT AFTER THE CLOSING ARGUMENTS AND CHARGE IN THE GUILT PHASE, JUDGE STORY WAS GOING TO RELEASE DR. MEDLIN'S REPORT TO THE DEFENSE.  CORRECT?

A.   CORRECT.

120

Q.    AND, IN FACT, THAT OCCURRED.

A.    YES.

Q.    AND YOU GOT DR. MEDLIN'S REPORT WHILE THE JURY WAS DELIBERATING THE GUILT PHASE.

A.    YES.

Q.    AND WHEN I SAY YOU, THAT WOULD BE COLLECTIVELY ALL FOUR OF YOU WHO WERE THE TRIAL TEAM.

A.    THAT'S RIGHT.

Q.    AND I THINK WE HAD THAT IDENTIFIED EARLIER AS GOVERNMENT'S EXHIBIT NUMBER 63.  IS THAT CORRECT?

A.    YES.

Q.    AND IS -- THAT'S THE SAME REPORT THAT YOU SAW THEN WHILE THE JURY WAS DELIBERATING ON MR. LECROY'S GUILT OR INNOCENCE; CORRECT?

A.    IT APPEARS TO BE, YES.

Q.    AND YOU READ THE REPORT, DID YOU NOT?

A.    YES.

Q.    MR. MENDELSOHN READ THE REPORT, OR DID YOU READ IT JOINTLY?  HOW DID YOU SHARE IT?

A.    I DON'T REMEMBER WHETHER WE WENT AND GOT COPIES MADE SO EVERYBODY COULD READ IT SIMULTANEOUSLY OR WHETHER WE PASSED IT AROUND.

Q.    AND YOU KNEW YOU HAD THE OPTION THAT IF YOU WERE GOING TO CALL DR. LISAK AS YOUR TEACHING EXPERT, THEN YOU KNEW JUDGE STORY WAS GOING TO ALLOW THE GOVERNMENT TO CALL DR. MEDLIN AS A

121

REBUTTAL WITNESS IN THE PENALTY PHASE IF MR. LECROY WAS
CONVICTED; CORRECT?

A.   WELL, I'M NOT EVEN SURE WE HAD -- AGAIN, I'M NOT CONFIDENT
THAT WE HAD AT THAT POINT DETERMINED WHETHER DR. LISAK WOULD
EVEN BE ABLE TO --

Q.   THAT'S FAIR.  YOU WERE GOING TO HAVE -- WEREN'T YOU GOING
TO HAVE, BASICALLY, A *DAUBERT* HEARING ON DR. LISAK'S TESTIMONY
AND JUDGE STORY WAS GOING TO MAKE A RULING ON WHETHER IT WOULD
BE ADMISSIBLE?

A.   YEAH.  I DON'T KNOW THAT IT WAS GOING TO BE UNDER *DAUBERT*;
BUT, YES, THE JUDGE HAD NOT YET RULED THAT WE WOULD BE ALLOWED
TO USE HIM AS A TEACHING EXPERT.

Q.   SO YOU WERE GOING TO HAVE A HEARING IN FRONT OF JUDGE
STORY BEFORE THE JURY HEARD DR. LISAK BECAUSE JUDGE STORY WAS
GOING TO HAVE TO RULE THAT HIS TESTIMONY WOULD BE ADMISSIBLE.

A.   YES.

Q.   BUT IN THE EVENT JUDGE STORY ADMITTED DR. LISAK, IF YOU
CHOSE TO CALL DR. LISAK AND JUDGE STORY ADMITTED HIS TESTIMONY,
THEN YOU KNEW THAT THE GOVERNMENT WAS GOING TO BE ABLE TO USE
DR. MEDLIN AS A REBUTTAL WITNESS TO DR. LISAK'S TESTIMONY ABOUT
THE CHILDHOOD SEXUAL ABUSE.

A.   YES.

Q.   AND YOU KNEW THAT IF YOU DIDN'T CALL DR. LISAK, THAT THERE
WOULD BE NOTHING FOR DR. MEDLIN TO REBUT AND DR. MEDLIN
WOULDN'T APPEAR AS A WITNESS; CORRECT?

122

A.   CORRECT.

Q.   AND YOU KNEW THAT IF YOU DIDN'T CALL DR. LISAK, THEN BOTH SIDES WOULD BE PROHIBITED FROM PRODUCING OPINION-TYPE TESTIMONY FROM MENTAL HEALTH EXPERTS WHO MAY HAVE EXAMINED MR. LECROY IN THE PAST.

A.   YES.

Q.   AND YOU INTENDED TO CALL DR. CARLSON WHO HAD SEEN MR. LECROY ON A NUMBER OF MANY OCCASIONS IN 1999 WHEN HE WAS INCARCERATED AT EL RENO; CORRECT?

A.   CORRECT.

Q.   AND THERE HAD BEEN SUBSTANTIAL DISCUSSION WITH DR. CARLSON ABOUT THE CHILDHOOD SEXUAL ABUSE THAT HE HAD SUFFERED AS A CHILD; CORRECT?

A.   YES.

Q.   AND YOU KNEW THAT YOU COULD -- IF YOU DID NOT CALL DR. LISAK, YOU COULD QUESTION DR. CARLSON ABOUT THE STATEMENTS THE DEFENDANT MADE ABOUT THE SEXUAL ABUSE AND YOU JUST COULDN'T ASK DR. CARLSON ANY QUESTIONS ABOUT HER OPINIONS ABOUT THE DEFENDANT'S MENTAL STATE WHEN SHE WAS SEEING HIM BACK IN 1999; CORRECT?

A.   RIGHT.

Q.   AND THAT WASN'T SUBJECT TO RULING BY THE COURT.  YOU KNEW THAT EVIDENCE WAS GOING TO COME OUT REGARDLESS OF WHAT YOU DID ABOUT CALLING DR. LISAK; RIGHT?

A.   RIGHT, THAT WE COULD STILL PUT UP DR. CARLSON BUT IN A

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

123

LIMITED WAY.

Q.   SHE COULD TESTIFY TO FACTS.  SHE JUST COULDN'T TESTIFY TO OPINIONS.

A.   RIGHT.  IN OTHER WORDS, YOU KNOW, AS A DOCTOR HER VALUE WOULD HAVE BEEN TO GIVE A DIAGNOSIS BASED ON HER TREATMENT OF MR. LECROY; AND WE WOULD NOT BE ABLE TO DO THAT IF WE DIDN'T CALL DR. LISAK.

Q.   ALL RIGHT.  AND YOU ALSO HAD DR. -- I DON'T KNOW HOW TO PRONOUNCE THE NAME -- GANNEL (PHONETIC)?

A.   GANAHL.

Q.   GANAHL, FROM THE DEPARTMENT OF CORRECTIONS?

A.   YES.

Q.   AND, AGAIN, HE WAS GOING TO BE ABLE TO TESTIFY AS A FACT WITNESS.  HE JUST WASN'T GOING TO BE ABLE TO GIVE OPINIONS.  YOU DID NOT CALL DR. LISAK.

A.   WELL, I WOULDN'T SAY HE JUST WASN'T GOING TO BE ABLE TO.  HIS OPINION WOULD HAVE BEEN EXTREMELY VALUABLE, BUT HE WAS NOT GOING TO BE ALLOWED TO GIVE HIS OPINION.

Q.   AND YOU READ DR. MEDLIN'S REPORT.

A.   I DID.

Q.   AND AFTER READING DR. MEDLIN'S REPORT, YOU AND MR. KISH AND MR. MENDELSOHN AND MR. SUMMER TALKED ABOUT STRATEGICALLY WHAT Y'ALL WERE GOING TO CHOOSE TO DO WITH RESPECT TO DR. LISAK AND DR. MEDLIN'S TESTIMONY; CORRECT?

A.   WE DID.

124

Q.   AND THAT DISCUSSION OCCURRED FOR HOW LONG A PERIOD OF TIME?

A.   THAT, I DON'T REMEMBER.  I DON'T REMEMBER HOW LONG THE JURY WAS OUT.  I DON'T EVEN REMEMBER, YOU KNOW, WHETHER WE TOOK A BREAK FOR A DAY BEFORE WE STARTED THE PENALTY PHASE.  THAT IS VERY MUCH A BLUR TO ME, AND I DIDN'T GO BACK AND LOOK AT MY NOTES FOR THAT PERIOD.

Q.   ALL RIGHT.  BUT YOU DID DISCUSS THE PROS AND CONS OF CALLING DR. LISAK, CROSS-EXAMINING DR. MEDLIN, NOT CALLING DR. LISAK AND GOING WITH WHAT YOU KNEW YOU HAD FACTUALLY.

A.   YES, WE DID.

Q.   AND AS A STRATEGIC DECISION, YOU DECIDED THAT THE BEST CASE YOU COULD PUT -- THE BEST MITIGATION YOU COULD PUT FORWARD FOR MR. LECROY WAS TO NOT CALL DR. LISAK AND NOT HAVE THE GOVERNMENT CALL DR. MEDLIN.  IS THAT CORRECT?

A.   THE BEST CASE WE COULD PUT FORWARD?  I GUESS IT WAS MORE WEIGHING THE HARM VERSUS THE POTENTIAL FOR MAKING IT ANY BETTER.  THERE WAS NO BEST CASE TO PUT FORWARD.

Q.   YOU DECIDED IN WEIGHING THE NEGATIVE IMPACT ON YOUR MITIGATION CASE OF THE GOVERNMENT CALLING DR. MEDLIN IN REBUTTAL, YOU CONCLUDED THAT THAT OUTWEIGHED THE POSITIVE IMPACT THAT THE OPINION TESTIMONY OF DR. LISAK AND DR. MEDLIN -- OR CARLSON AND DR. GANAHL WOULD HAVE ON YOUR MITIGATION CASE.

A.   RIGHT.  I THINK IT WAS REALLY MORE WEIGHING LISAK VERSUS

125

MEDLIN.

Q.   WELL, LISAK VERSUS MEDLIN.  YOU DECIDED THAT THIS BALANCE, IN YOUR BEST JUDGMENT, WAS THAT THE BEST MITIGATION -- THE MITIGATION CASE THAT WOULD BE THE BEST CASE TO PRESENT TO THE JURY WOULD BE WITHOUT THEIR TESTIMONY.

A.   YES.

Q.   AND THAT WAS A DECISION THAT ALL FOUR OF YOU CAME TO AGREE UPON?

A.   IN THE END, YES.

Q.   AND THE REASON THAT YOU DECIDED THIS IS BECAUSE DR. MEDLIN HAD DONE A VERY THOROUGH JOB OF GOING THROUGH AND FINDING INCONSISTENCIES IN THE DEFENDANT'S REPORT OF THIS CHILDHOOD SEXUAL ABUSE; CORRECT?

A.   NO.  I WOULDN'T SAY THAT WAS WHAT WAS SO THREATENING ABOUT DR. MEDLIN'S REPORT.  IT WAS THE COMPLETE APPARENT UNWILLINGNESS TO ACCEPT ANY IMPACT OF CHILDHOOD SEXUAL ABUSE ON AN ADULT MAN.  I MEAN, IT WAS MORE THAT SHE SEEMED -- WE SEEMED TO HAVE TWO EXPERTS THAT WERE POLAR OPPOSITES; ONE THAT SAID THIS IS A VERY DAMAGING -- THIS TRAUMA IS VERY DAMAGING AND HAS VERY SERIOUS CONSEQUENCES, AND THEN AN EXPERT WHO SEEMED TO BE UNWILLING TO ACCEPT IT.  IT WASN'T JUST BASED ON THE INCONSISTENCIES IN THE REPORTING.

Q.   BUT YOU WOULD AGREE THAT SHE DID IDENTIFY INCONSISTENCIES IN THE DEFENDANT'S REPORTING.

A.   YEAH, SHE DID.

126

Q.   FOR EXAMPLE, HE HAD GONE THROUGH ALL THESE TREATMENTS WITH DR. CARLSON AT EL RENO; BUT THEN WHEN HE GOT TRANSFERRED TO BUTNER, HE REPORTED THAT HE HAD NOT BEEN THE VICTIM OF SEXUAL ABUSE.  CORRECT?  YOU HAD THAT REPORT; CORRECT?

A.   WELL, MY RECOLLECTION WAS THAT MOST OF THE INCONSISTENCIES THAT SHE POINTED OUT COULD HAVE BEEN EXPLAINED.

Q.   EXPLAINED -- JUST AN ARGUMENT.  YOU WERE NOT PLANNING TO CALL DR. -- OR MR. LECROY AS A WITNESS DURING THE PENALTY PHASE, WERE YOU?

A.   NO.

Q.   AND YOU KNEW THAT IF YOU DID NOT CALL DR. MEDLIN, THEN THE GOVERNMENT WOULDN'T BE ABLE TO PUT IN THESE INCONSISTENT REPORTS OF HIS -- BY THE DEFENDANT OF WHETHER HE HAD SUFFERED CHILDHOOD SEXUAL ABUSE; CORRECT?

A.   WELL, MY RECOLLECTION IS MOST OF THE REPORTS WERE IN THROUGH THE WITNESSES ANYWAY.

Q.   WELL, THERE'S NO WITNESS THAT TESTIFIED FROM BUTNER WHO COULD TESTIFY TO HIS FEDERAL INTAKE SCREENING FORM AT BUTNER THAT HE PROVIDED.  WELL, LET ME SHOW YOU GOVERNMENT'S EXHIBIT NUMBER 86.  YOU WERE FAMILIAR WITH THAT?

A.   RIGHT.  BUT WHAT I'M SAYING, MR. MCKINNON, IS THAT THIS SORT OF INTAKE INTERVIEW THAT WOULD BE INCONSISTENT WITH SOMETHING THAT HE REPORTED DURING THERAPY, ONGOING THERAPY, WOULD NOT HAVE BEEN THE SORT OF THING I WOULD BE WORRIED ABOUT DAMAGING HIS CREDIBILITY.  I THINK THAT IT COULD HAVE BEEN

127

EXPLAINED.  I'M JUST SAYING -- YOU'RE TYING TO PIGEON HOLE WHY, IN MY OPINION, DR. MEDLIN'S REPORT WAS DAMAGING; AND I'M JUST SAYING WHAT YOU'RE PICKING OUT IS NOT WHY I THOUGHT IT WAS DAMAGING.  THAT'S ALL.

Q.   YOU THOUGHT IT WAS DAMAGING BECAUSE IT WOULD BE THIS BATTLE OF THE EXPERTS OVER WHETHER THERE WAS EVEN ANY IMPACT OF CHILDHOOD SEXUAL ABUSE.

A.   RIGHT.

Q.   AND YOU THOUGHT IT WOULD BE BETTER JUST TO LEAVE THE BATTLE OUT OF THE CASE AND YOU ALL WOULD JUST ARGUE TO THE JURY THAT IT WAS A MITIGATING FACTOR THEY SHOULD TAKE INTO ACCOUNT.

A.   RIGHT.

Q.   BUT YOU KNEW THAT IF DR. MEDLIN TESTIFIED, THAT THERE WOULD BE THIS REBUTTAL FROM THE GOVERNMENT THAT THE CHILDHOOD SEXUAL ABUSE HAD EVEN TAKEN PLACE IN THE FIRST PLACE; CORRECT?

A.   RIGHT.

Q.   AND AN EXAMPLE OF THAT WOULD BE GOVERNMENT'S EXHIBIT NUMBER 86 WHERE THE DEFENDANT SAYS HE'S NEVER BEEN SEXUALLY ABUSED; CORRECT?

A.   RIGHT.

Q.   ANOTHER EXAMPLE WOULD BE -- AND THE DATE OF THIS REPORT --

        MR. MCKINNON:  WELL, YOUR HONOR, I WOULD MOVE FOR THE ADMISSION OF GOVERNMENT EXHIBIT 86, PLEASE.

        THE COURT:  ANY OBJECTION?

        MR. MARTIN:  NO OBJECTION.

128

THE COURT:  IT'S ADMITTED.

BY MR. MCKINNON:

Q.    AND THE DATE OF THIS REPORT IS FEBRUARY THE 14TH OF 2000; CORRECT?

A.    CORRECT.

Q.    AND IT'S THE ONE THAT'S ENTITLED INTAKE SCREENING FORM, SO IT WAS WHEN MR. LECROY WAS TRANSFERRED FROM EL RENO TO BUTNER; IS THAT RIGHT?

A.    RIGHT.

Q.    AND THERE'S A LINE THAT SAYS, LINE 6A:  HAVE YOU EVER BEEN SEXUALLY ASSAULTED?  AND MR. LECROY CHECKED NO TO THAT QUESTION.  CORRECT?

A.    RIGHT.

Q.    AND HE WAS ALSO, ALSO ON FEBRUARY THE 14TH -- LET ME SHOW YOU GOVERNMENT'S EXHIBIT NUMBER 85.  THAT WAS ANOTHER FORM THAT WAS FILLED OUT THAT SAME DAY THAT MR. LECROY ARRIVED AT BUTNER; CORRECT?

A.    CORRECT.

Q.    AND THE HANDWRITING ON THAT FORM AT THE BOTTOM THERE WHERE IT SAYS 6, IT SAYS THAT NO REPORT OF SEXUAL --

A.    DENIES SEXUAL ABUSE.

Q.    SAYS DENIES SEXUAL ABUSE.

A.    UH-HUH (AFFIRMATIVE).  AGAIN --

Q.    NUMBER 7.

A.    BUT THESE ISOLATED DENIALS OF SEXUAL ABUSE WERE NOT

SOMETHING, FOR ME IN THE SCHEME OF ALL THE EVIDENCE THAT WE HAD, WEIGHED ON WHETHER OR NOT WE SHOULD PUT UP A MENTAL HEALTH DEFENSE.

MR. MCKINNON:  YOUR HONOR, I WOULD MOVE FOR THE ADMISSION OF GOVERNMENT'S EXHIBIT 85, AS WELL.

THE COURT:  ANY OBJECTION?

MR. MARTIN:  NO, SIR.

THE COURT:  IT'S ADMITTED.

(PAUSE IN THE PROCEEDINGS.)

BY MR. MCKINNON:

Q.    I JUST WANTED TO CLEAR UP ONE LAST THING.  ON YOUR DIRECT EXAMINATION WHEN YOU WERE TALKING ABOUT THE REASON WHY YOU DECIDED NOT TO CALL DR. LISAK AFTER READING DR. MEDLIN'S REPORT, YOU CITED THE BATTLE OF THE EXPERTS NOT WORTH THE RISK. I JUST WANT TO BE CLEAR AS TO WHAT RISK DID YOU SEE TO HAVING THIS BATTLE OF THE EXPERTS?

A.    WELL, WE STILL HADN'T PUSHED, WE STILL HADN'T PUSHED WITH JUDGE STORY TO DETERMINE WHAT DR. LISAK COULD GO INTO.  AND IN MY MIND, WE STILL HADN'T CLEARED THE HURDLE THAT IF WE LET -- IF JUDGE STORY LET LISAK TESTIFY AS A TEACHING EXPERT, THAT WE WOULDN'T HAVE TO LET DR. MEDLIN EVALUATE BILL LECROY.

Q.    SO YOU WERE ALSO CONCERNED ABOUT THAT ISSUE --

A.    YES.

Q.    -- IF YOU CALLED DR. LISAK.

A.    RIGHT.

130

Q.   LET ME SHOW YOU GOVERNMENT'S EXHIBIT NUMBER 56.  DO YOU RECOGNIZE GOVERNMENT'S EXHIBIT 56?

A.   YES.

Q.   GOVERNMENT'S EXHIBIT 56, THAT'S A LETTER WRITTEN BY YOU DECEMBER 23RD OF 2003.  IS THAT CORRECT?

A.   CORRECT.

Q.   THAT WOULD HAVE BEEN AFTER THE FIREWALL PROCEDURE HAD BEEN SET UP BY JUDGE STORY; CORRECT?

A.   CORRECT.

Q.   AND THE LETTER SAYS THAT YOU'RE ATTACHING DOCUMENTS THAT YOU HAD PROVIDED TO YOUR EXPERT.  I ASSUME YOUR EXPERT, THAT THE EXPERT YOU'RE REFERRING TO IS DR. LISAK.

A.   CORRECT.

Q.   AND THOSE ARE RECORDS THAT YOU HAD OBTAINED FROM EL RENO THROUGH THIS FIREWALL PROCEDURE THAT YOU HAD TESTIFIED TO ON DIRECT ABOUT WITH THE U.S. ATTORNEY'S OFFICE IN OKLAHOMA.

A.   YES.

Q.   AND THOSE RECORDS DON'T HAVE BATES STAMPS, SO THOSE ARE RECORDS YOU GOT FROM THE BUREAU OF PRISONS DIRECTLY, NOT THROUGH THE U.S. ATTORNEY'S OFFICE.

A.   RIGHT.

Q.   LET ME SHOW YOU GOVERNMENT'S EXHIBIT NUMBER 58.  DO YOU RECOGNIZE THAT AS A LETTER DRAFTED BY MR. MENDELSOHN TO MS. BUCHANAN WITH THE U.S. ATTORNEY'S OFFICE?  AND YOU RECALL THAT MS. BUCHANAN WAS ALSO WORKING WITH MR. PLUMMER AS ONE OF

131

THE FIREWALL ATTORNEYS; CORRECT?

A.   RIGHT.

Q.   AND THAT'S THE SUMMARY THAT YOU GAVE, THAT MR. MENDELSOHN GAVE THE FIREWALL ATTORNEYS OF WHAT DR. LISAK'S TESTIMONY WOULD BE AS A TEACHING EXPERT WITHOUT HAVING DONE THE EVALUATION; CORRECT?

A.   CORRECT.

Q.   AND THAT WAS TO COMPLY WITH AN ORDER THAT JUDGE STORY HAD GIVEN YOU ALL THAT YOU HAD TO PROVIDE THAT SUMMARY TO THE GOVERNMENT ACTUALLY ON THAT DAY, JANUARY 23RD OF 2004.

A.   RIGHT.

Q.   LET ME SHOW YOU GOVERNMENT'S EXHIBIT NUMBER 61.  DO YOU RECOGNIZE THAT AS A MOTION TO RECUSE THE UNITED STATES ATTORNEY'S OFFICE THAT WAS FILED BY THE DEFENSE TEAM?

A.   YES.

Q.   AND THE REASON YOU WERE ASKING JUDGE STORY TO RECUSE THE UNITED STATES ATTORNEY'S OFFICE IS BECAUSE YOU DISCOVERED THROUGH A CONVERSATION WITH MR. PLUMMER THAT HE HAD DISCLOSED ONLY THE NAME OF DR. MEDLIN TO THE TRIAL ATTORNEYS; CORRECT?

A.   WELL, I WOULDN'T LIMIT IT THAT WAY.  WE DISCOVERED THAT HE HAD DISCUSSED THIS WITH THE U.S. ATTORNEYS -- IT APPEARED THAT HE HAD DISCUSSED IT WITH THE TRIAL ATTORNEYS.  WHETHER HE ONLY DISCLOSED THE NAME, I DON'T KNOW.

Q.   WELL, THAT'S WHAT YOU ALLEGED IN THE MOTION, THOUGH, ISN'T IT?

132

A.   WELL, HE SAID THAT; BUT THE INFERENCE WAS THAT HE MAY HAVE DISCLOSED MORE, YOU KNOW, LIKE WHY HE SELECTED DR. MEDLIN.

Q.   BUT --

A.   THE NATURE OF HER SPECIALTY.

Q.   SO AFTER YOU FILED THAT MOTION, THERE WAS A HEARING OR A TELEPHONE CONFERENCE WITH THE JUDGE OVER THAT.

A.   I BELIEVE IT WAS A TELEPHONE CONFERENCE.

Q.   AND MR. PLUMMER SAID ON THE RECORD IN FRONT OF JUDGE STORY THAT HE HAD ONLY DISCLOSED BASICALLY THE NAME; CORRECT?

A.   (NODS HEAD AFFIRMATIVELY.)

Q.   YOU WERE CONCERNED THAT EVEN THE DISCLOSURE OF THE NAME WOULD ALLOW MR. VINEYARD TO UNDERSTAND AT LEAST THE NATURE OF THE MITIGATION KIND OF CASE THAT YOU WERE TRYING TO PUT UP.  IS THAT CORRECT?

A.   THAT'S RIGHT.

Q.   AND THAT THERE HAD BEEN A BREACH OF THE FIREWALL.

A.   RIGHT.

Q.   JUDGE STORY DENIED YOUR MOTION, CONCLUDING THAT THE DISCLOSURE OF THE NAME WASN'T CONSIDERED A VIOLATION OF THE FIREWALL.

A.   RIGHT.

Q.   AND AT THAT TIME, AS FAR AS YOU -- AS FAR AS THE RECORD ESTABLISHED, THE ONLY THING THAT THE TRIAL ATTORNEYS KNEW WAS THE NAME OF DR. MEDLIN AS THE POTENTIAL GOVERNMENT EXPERT ON THIS ISSUE.

133

A.    THAT'S WHAT THE RECORD REFLECTS, YEAH.

Q.    DO YOU HAVE --

A.    I DON'T KNOW.

Q.    DO YOU HAVE REASON TO BELIEVE THAT THE GOVERNMENT, THAT THERE HAD BEEN ADDITIONAL DISCLOSURE AND BREACH OF THE FIREWALL?

A.    THERE WAS THAT FEAR.  THE RECORD IS WHAT IT IS.

Q.    DO YOU HAVE ANY EVIDENCE?

A.    NO.  IF I HAD EVIDENCE, I WOULD HAVE PRESENTED IT TO JUDGE STORY.

Q.    AND ULTIMATELY, ANY BREACH OF THE FIREWALL WAS MOOTED OUT BY THE FACT YOU DIDN'T CALL JUDGE -- DR. LISAK ANYWAY; CORRECT?

A.    IN MY LEGAL OPINION, YES.

        THE COURT:  WHY DON'T WE TAKE ABOUT A 15-MINUTE RECESS AND THEN WE'LL RESUME.

        MR. MCKINNON:  I'M ALMOST FINISHED.

        THE COURT:  OKAY.  WE'LL TAKE A RECESS.

        (PROCEEDINGS WERE IN RECESS.)

        THE COURT:  YOU MAY PROCEED.

        MR. MCKINNON:  MS. KEARNS, I JUST WANT TO MAKE SURE ALL THE DOCUMENTS ARE IN.

        YOUR HONOR, I WOULD MOVE FOR THE ADMISSION OF GOVERNMENT'S EXHIBIT 56 WHICH IS THE LETTER FROM MS. KEARNS TO MS. BUCHANAN INCLUDING EXHIBITS FROM EL RENO.

        THE COURT:  ANY OBJECTION?

134

MR. MARTIN:  NO, SIR.

THE COURT:  THEY ARE ADMITTED.

BY MR. MCKINNON:

Q.   MS. KEARNS, I'M NOT SURE I SHOWED YOU THIS EXHIBIT, BUT I'M SHOWING YOU GOVERNMENT'S EXHIBIT 57.  THAT'S JUDGE STORY'S ORDER THAT REQUIRES THE DEFENDANT TO SUBMIT TO AN EVALUATION BY THE GOVERNMENT IF, IN FACT, YOU'RE GOING TO USE THE MENTAL HEALTH TESTIMONY, IS THAT RIGHT, MENTAL HEALTH OPINION TESTIMONY?

A.   RIGHT.

MR. MCKINNON:  YOUR HONOR, I WOULD MOVE FOR THE ADMISSION OF GOVERNMENT'S EXHIBIT 57.

THE COURT:  ANY OBJECTION?

MR. MARTIN:  NO, YOUR HONOR.

THE COURT:  IT'S ADMITTED.

BY MR. MCKINNON:

Q.   MS. KEARNS, CAN YOU IDENTIFY THIS?  GOVERNMENT'S EXHIBIT 58 IS MR. MENDELSOHN'S LETTER OUTLINING A SUMMARY OF DR. LISAK'S EXPECTED TESTIMONY.  IS THAT RIGHT?

A.   RIGHT.

Q.   AND ATTACHED TO IT IS DR. LISAK'S CV?

A.   YES.

MR. MCKINNON:  MOVE FOR THE ADMISSION OF GOVERNMENT'S EXHIBIT 58, PLEASE.

THE COURT:  ANY OBJECTION?

135

MR. MARTIN:  NO, SIR.

THE COURT:  IT'S ADMITTED.

BY MR. MCKINNON:

Q.   GOVERNMENT'S EXHIBIT NUMBER 59, CAN YOU IDENTIFY THAT AS AN ORDER FROM JUDGE STORY THAT SETS OUT ADDITIONAL PARAMETERS REGARDING THE EVALUATION?

A.   RIGHT.

MR. MCKINNON:  I WOULD MOVE FOR THE ADMISSION OF GOVERNMENT'S EXHIBIT 59.

THE COURT:  ANY OBJECTION?

MR. MARTIN:  NO, YOUR HONOR.

THE COURT:  IT'S ADMITTED.

BY MR. MCKINNON:

Q.   GOVERNMENT'S EXHIBIT NUMBER 60 IS THE ORDER WHICH ACKNOWLEDGES THE DEFENSE HAS NOW ADVISED THE COURT ON FEBRUARY THE 6TH THAT THE DEFENDANT IS NOT GOING TO SUBMIT TO A GOVERNMENT EVALUATION; CORRECT?

A.   I'M SORRY, WHAT?

Q.   THE FIRST PARAGRAPH, THE COURT ACKNOWLEDGES A HEARING OR THE COURT REFERENCES A HEARING IN WHICH THE DEFENSE NOTIFIED THE COURT --

A.   RIGHT.

Q.   -- AND FIREWALL COUNSEL THAT THERE WAS NOT GOING TO BE A GOVERNMENT EVALUATION; CORRECT?

A.   THAT MR. LECROY WOULD NOT PARTICIPATE IN AN EVALUATION.

136

Q.   CORRECT.  AND THE COURT SETS OUT ADDITIONAL PROCEDURES REGARDING DR. MEDLIN PREPARING A REPORT BASED ON THE RECORDS THAT SHE HAD RECEIVED FROM THE U.S. ATTORNEY'S OFFICE; CORRECT?

A.   CORRECT.

Q.   AND THAT REPORT WOULD THEN BE SUBMITTED TO THE COURT AND FILED UNDER SEAL; CORRECT?

A.   CORRECT.

Q.   NEITHER SIDE WOULD GET A COPY OF THE REPORT UNTIL, WELL, PRIOR TO TRIAL; CORRECT?

A.   RIGHT.

Q.   AND THEN THE PROCEDURE WAS IS THAT THE DEFENSE WOULD GET TO LOOK AT THE REPORT AFTER THE CLOSING ARGUMENTS AND CHARGE IN THE GUILT PHASE.

A.   RIGHT.

Q.   AND THAT'S EXACTLY WHAT HAPPENED IN THE CASE; CORRECT?

A.   THAT'S RIGHT.

Q.   AND I WANT TO SHOW YOU --

          MR. MCKINNON:  YOUR HONOR, I WOULD MOVE FOR THE ADMISSION OF GOVERNMENT'S EXHIBIT 60, PLEASE.

          THE COURT:  ANY OBJECTION?

          MR. MARTIN:  NO, SIR.

          THE COURT:  IT'S ADMITTED.

BY MR. MCKINNON:

Q.   AND THEN GOVERNMENT'S EXHIBIT 61 YOU IDENTIFIED PREVIOUSLY AS YOUR MOTION TO RECUSE THE U.S. ATTORNEY'S OFFICE?

137

A.    CORRECT.

Q.    AND 61 IS JUDGE STORY'S ORDER DENYING YOUR MOTION TO RECUSE; CORRECT?

A.    62; RIGHT.

Q.    62, I'M SORRY.

        MR. MCKINNON:  YOUR HONOR, I WOULD MOVE FOR THE ADMISSION OF GOVERNMENT'S EXHIBITS 61 AND 62.

        THE COURT:  ANY OBJECTION?

        MR. MARTIN:  NO, YOUR HONOR.

        THE COURT:  THEY'RE ADMITTED.

BY MR. MCKINNON:

Q.    I THINK YOU IDENTIFIED GOVERNMENT'S EXHIBIT 63 AS DR. MEDLIN'S REPORT.

A.    THAT'S CORRECT.

        MR. MCKINNON:  I WOULD MOVE FOR THE ADMISSION OF GOVERNMENT'S EXHIBIT 63, PLEASE.

        THE COURT:  ANY OBJECTION?

        MR. MARTIN:  NO, SIR.

        THE COURT:  IT'S ADMITTED.

        MR. MCKINNON:  JUDGE, JUST TO BE CLEAR, I'VE GONE BACK AND LOOKED, NOT EXTENSIVELY, AT THE DOCKET TO MAKE SURE BECAUSE SOME OF THESE ORDERS WERE FILED UNDER SEAL BECAUSE THEY WERE SUBJECT TO THE FIREWALL PROCEDURE.  IT'S NOT ENTIRELY CLEAR TO ME IF EVERYTHING HAS BEEN UNSEALED.  I KNOW AT LEAST THE FEBRUARY 6TH ORDER WAS UNSEALED BY A SPECIFIC ORDER, BUT I

138

WOULD ASK THAT THEY BE MADE A PART OF THE PUBLIC RECORD.  I DON'T THINK THERE'S ANY REASON TO KEEP ANYTHING UNDER SEAL AT THIS STAGE.

THE COURT:  I WILL SO ORDER.  AND I THINK IT WILL ALSO EASE ACCESS FOR EVERYONE BEING ABLE TO GET TO THE RECORDS FOR PURPOSES OF THE REVIEW, AS WELL; SO I WILL SO ORDER.

MR. MCKINNON:  THANK YOU.  THAT'S ALL THE QUESTIONS I HAVE FOR MS. KEARNS.  THANK YOU.

THE COURT:  REDIRECT?

MR. MARTIN:  YES, SIR.

MR. MCKINNON:  53 IS IN; CORRECT?

THE COURT:  IT IS.

REDIRECT EXAMINATION

BY MR. MARTIN:

Q.  MS. KEARNS, LET'S BEGIN WHERE MR. MCKINNON BEGAN. MR. MCKINNON ASKED YOU SOME QUESTIONS ABOUT THE INTENTION TO RAISE ON APPEAL THE BEST ISSUES THAT YOU FELT WERE SUITABLE FOR AN APPEAL AND MIGHT CAUSE A REVERSAL EITHER AS TO GUILT/INNOCENCE OR AS TO SENTENCE; IS THAT CORRECT?

A.  RIGHT.

Q.  THE ISSUE REGARDING THE CHALLENGE TO THE JURY, THAT'S NOT AN ISSUE THAT Y'ALL FELT YOU SHOULD NOT CHALLENGE OR NOT PRESENT ON APPEAL; IS THAT NOT CORRECT?

A.  RIGHT.

Q.  AND, INDEED, IT WAS PRESENTED ON APPEAL; IS THAT CORRECT?

139

A.   RIGHT.

Q.   THE ISSUE OF THE RETENTION OF THE DOCUMENTS WAS AN ISSUE THAT YOU WANTED TO PRESENT ON APPEAL; IS THAT CORRECT?

A.   CORRECT.

MR. MCKINNON:  I KNOW IT'S HARD FOR MR. MARTIN TO ASK NONLEADING QUESTIONS, BUT --

MR. MARTIN:  COME ON, WE'RE JUST GETTING --

MR. MCKINNON:  WITH EVERY QUESTION ENDS WITH "IS THAT CORRECT."

THE COURT:  I'LL ALLOW HIM A LITTLE LEADING TO AT LEAST WORK THROUGH THESE ISSUES.

BY MR. MARTIN:

Q.   WAS THAT ISSUE RAISED ON APPEAL, THE RETENTION OF DOCUMENTS?

A.   IN THE INITIAL BRIEF?

Q.   YES, MA'AM.  IT WASN'T RAISED IN THE INITIAL BRIEF, BUT IT WAS RAISED -- WHERE WAS IT RAISED?

A.   I ASSUME IT WAS IN THE REPLY BRIEF.

Q.   THE RISK OF ESCAPE ISSUE, WAS THAT AN ISSUE THAT YOU FELT (UNINTELLIGIBLE) BE RAISED ON APPEAL?

THE COURT REPORTER:  DID YOU SAY SHOULD OR SHOULDN'T?

MR. MARTIN:  LET ME SLOW DOWN.

BY MR. MARTIN:

Q.   WITH REGARDS TO THE RISK OF ESCAPE INSTRUCTION QUESTION --

A.   RIGHT.

140

Q.    -- WAS THAT AN ISSUE THAT YOU FELT NOT WORTHY OF RAISING ON APPEAL?

A.    YES.

Q.    WELL --

A.    OH, NO.  WE RAISED EVERYTHING WE THOUGHT WAS -- ASK THE QUESTION AGAIN, MR. MARTIN.

Q.    DID YOU NOT RAISE THAT ISSUE ON APPEAL?

A.    I'M SORRY, I'M NOT GOING TO REMEMBER EXACTLY.  I DIDN'T READ THE APPELLATE BRIEF BEFORE COMING HERE, SO I DON'T REMEMBER EXACTLY WHAT WE RAISED OR DIDN'T RAISE.

Q.    BUT THE ISSUES THAT WERE RAISED ON APPEAL YOU ALL FELT TO BE MERITORIOUS; IS THAT CORRECT?

A.    CORRECT.

Q.    AND THE ISSUE REGARDING THE FIREWALL AND THE MENTAL HEALTH, THE DISCLOSURE OF FIREWALL, THE EXPERT THAT THE GOVERNMENT HAD YOU DIDN'T RAISE ON APPEAL BECAUSE YOU THOUGHT IT HAD BEEN MOOTED OUT BECAUSE Y'ALL FAILED TO PRESENT DR. LISAK AS A WITNESS.

A.    CORRECT.

Q.    NOW, MR. MCKINNON ASKED YOU A BUNCH OF QUESTIONS ABOUT THE ANTHONY BATTLE CASE.  IN ANTHONY BATTLE, WE DID, IN FACT, PRESENT MENTAL HEALTH EVIDENCE, DID WE NOT?

A.    OH, WE DID, YES.

Q.    DESPITE THE UNFAVORABLE GOVERNMENT EVALUATION; CORRECT?

A.    YES.

141

Q.   YOU SAID THAT YOU WERE SCARED OF A B.O.P. EVALUATION

BECAUSE YOU JUST DON'T TRUST THE B.O.P.

A.   THAT'S RIGHT.

Q.   BUT, IN FACT, YOU DID NOT -- YOU MADE THE FINAL DECISION

NOT TO CALL DR. LISAK OR DR. HILTON IN THIS CASE WITHOUT

KNOWING EXACTLY WHAT THE B.O.P. WITNESS WOULD HAVE SAID.  IS

THAT NOT TRUE?

A.   THAT'S RIGHT.

Q.   MR. MCKINNON ASKED YOU A NUMBER OF QUESTIONS REGARDING A

DEFENSE THAT THIS WAS AN INCIDENT WHERE MR. LECROY HAD BEEN

SURPRISED BY MS. TIESLER COMING HOME.  DO YOU REMEMBER THAT,

THOSE QUESTIONS?

A.   RIGHT.

Q.   INDEED, THAT WAS A DEFENSE THAT WAS VOICED AS PART OF THE

GUILT/INNOCENCE PHASE OF THE CASE.

A.   RIGHT, TO SAY THAT IT'S NOT A CARJACKING, YES.

Q.   RIGHT.  AND THERE WOULD BE NO REASON -- WHAT, IF ANY,

REASON WOULD THERE BE NOT TO PRESENT -- WOULD THE MENTAL HEALTH

EVIDENCE HAVE ANYTHING TO DO WITH WHAT DEFENSE YOU PRESENTED AT

THE GUILT/INNOCENCE PHASE?

A.   IT COULD HAVE.

Q.   WELL, WHAT, IF ANYTHING, COULD THEY, THE GOVERNMENT HAVE

USED WITH REGARDS TO DR. HILTON'S REPORT OR ANYBODY ELSE'S

REPORT DURING THE GUILT/INNOCENCE PHASE IF THERE WAS A

FIREWALL?

142

A.   OH, NOTHING.

Q.   IT WOULDN'T HAVE BEEN AVAILABLE DURING THE

GUILT/INNOCENCE.

A.   OH, YES, YOU'RE RIGHT.

Q.   THAT'S THE SIMPLE POINT I WANTED TO MAKE.

YOU MENTIONED THAT -- MR. MCKINNON MENTIONED THAT THE

EXPLANATION THAT WAS GIVEN THAT DR. HILTON MIGHT HAVE SOME

EFFECT ON THE ARGUMENTS REGARDING PREMEDITATION.

A.   RIGHT.

Q.   HOWEVER, DID YOU NOT KNOW THAT THE AUTOPSY INDICATED THAT

MS. TIESLER'S HANDS HAD BEEN BOUND, HER FEET HAD BEEN BOUND,

THAT SHE HAD BEEN RAPED, PERHAPS SODOMIZED, REPEATEDLY STABBED

IN THE THROAT AND ALSO STABBED IN THE BACK A NUMBER OF TIMES;

CORRECT?

A.   CORRECT.

Q.   THOSE WERE FACTS YOU HAD TO DEAL WITH; CORRECT?

A.   RIGHT.

Q.   AND THOSE -- WHAT, IF ANY -- THOSE FACTS HAD SOME PROBLEMS

WITH REGARD TO A PREMEDITATION DEFENSE; IS THAT CORRECT?

A.   YEAH.

Q.   NOW, WITH REGARDS TO DR. HILTON, DID YOU EVER TALK TO HIM

AFTER YOU SAW HIS REPORT?

A.   NO.

Q.   DO YOU KNOW IF MR. KISH EVER TALKED TO HIM AFTER YOU SAW

HIS REPORT?

143

A.   I DON'T KNOW.

Q.   DO YOU KNOW IF MR. MENDELSOHN EVER TALKED TO HIM AFTER HE GAVE HIM THE REPORT?

A.   I JUST, I DON'T REMEMBER.

Q.   SO YOU DIDN'T KNOW WHAT, IF ANY, EXPLANATION DR. HILTON WOULD GIVE AS TO HOW THESE MENTAL ILLNESSES THAT HE SAW, THE PERSONALITY DISORDERS THAT HE SAW WOULD HAVE IMPACTED ON THIS CRIME, DID YOU?

MR. MCKINNON:  AGAIN, I OBJECT TO THE LEADING QUESTIONS.  THIS IS SUBSTANTIVE.  THIS IS NOT JUST --

THE COURT:  I'LL SUSTAIN THE OBJECTION.

BY MR. MARTIN:

Q.   WHAT, IF ANYTHING, DID YOU KNOW ABOUT WHAT DR. HILTON WOULD SAY AS TO WHETHER OR NOT A SCHIZOTYPAL PERSONALITY WOULD HAVE BEEN AN EXPLANATION FOR HOW THIS CRIME OCCURRED?

A.   I'M NOT SURE I UNDERSTAND THE QUESTION.  HE ATTEMPTS IN HIS REPORT, I MEAN, HE DESCRIBES THE MAGICAL THINKING AND THE DELUSIONS.

Q.   WHAT, IF ANYTHING, DID YOU KNOW ABOUT THE FACT THAT SCHIZOTYPAL PERSONALITY DISORDER INCLUDES IDEAS OF REFERENCE? DO YOU KNOW WHAT IDEAS OF REFERENCE ARE?

A.   (NODS HEAD AFFIRMATIVELY.)  YES.

Q.   WHAT ARE THEY?

A.   WHERE YOU'RE -- I MIGHT BE WRONG ABOUT THIS, BUT I THINK IT'S WHERE YOU'RE TRANSFERRING -- YOU'RE SEEING SOMETHING THAT

144

YOU'RE NOT ACTUALLY SEEING.  YOU'RE MISINTERPRETING WHAT YOU'RE SEEING FOR BEING SOMETHING ELSE.

Q.   AND WAS THAT NOT PART OF WHAT DR. HILTON HAD IN HIS REPORT?

A.   IT WAS.

Q.   WHAT, IF ANYTHING, DID YOU KNOW AS TO WHETHER OR NOT THESE PERSONALITY DISORDERS INVOLVED, CAN INVOLVE SICK PSYCHOTIC EPISODES?

A.   I DON'T.

Q.   YOU DIDN'T KNOW BECAUSE YOU DIDN'T TALK TO DR. HILTON.

A.   I DIDN'T TALK TO DR. HILTON.  I DIDN'T TALK TO HIM BEFORE OR AFTER.

Q.   WHAT, IF ANYTHING, DID YOU KNOW ABOUT WHETHER A PERSON WITH A BORDERLINE PERSONALITY DISORDER CAN DEVELOP PSYCHOTIC-LIKE SYMPTOMS, INCLUDING HALLUCINATIONS, IDEAS OF REFERENCE?  DID YOU KNOW ANYTHING ABOUT THAT?

A.   NO.

Q.   WHAT, IF ANYTHING, DID YOU KNOW AS TO WHETHER OR NOT DR. HILTON WOULD TESTIFY THAT BUT FOR THESE DISORDERS THAT HE SAW IN MR. LECROY, HE DID NOT BELIEVE THIS CRIME WOULD HAVE EVER OCCURRED?

A.   I DIDN'T TALK TO DR. HILTON ABOUT THAT.

Q.   WITH REGARD TO THE PLAN THAT WAS USED TO PRESENT THE SEXUAL ABUSE AS A CHILD AS MITIGATING EVIDENCE AT SENTENCING, YOU HAD MADE A DECISION NOT TO USE DR. LISAK OR ANY OTHER

145

EXPERT; CORRECT?

A.    RIGHT.

Q.    MADE A DECISION NOT TO USE THE DIAGNOSIS OF ANY OF THE PSYCHIATRISTS FROM THE PRISON SYSTEM; CORRECT?

A.    RIGHT.  WELL, THAT WASN'T A DECISION NOT TO USE IT.  IT WAS, YOU KNOW, A NECESSARY ASPECT OF THE OTHER DECISIONS WE MADE.

Q.    WAS THAT A SURPRISE TO YOU THAT JUDGE STORY WAS GOING TO LIMIT OUT THAT TESTIMONY SO CAREFULLY?

A.    YOU MEAN AT THE TIME HE MADE THE RULING?

Q.    YES, MA'AM.

A.    UH-HUH (AFFIRMATIVE), YES.

Q.    BUT AFTER HE MADE THE RULING, YOU KNEW WHAT THE SCORE WAS. IS THAT CORRECT?

A.    YEAH.

Q.    BETWEEN YOU AND MR. MENDELSOHN, HOW DID Y'ALL DIVIDE UP THE CLOSING ARGUMENT ON THE SENTENCING PHASE?

A.    WELL, I WAS BASICALLY REBUTTING WHAT THE GOVERNMENT ARGUED.

Q.    WHAT, IF ANY, DIFFERENCE WAS THERE BETWEEN, IF YOU RECALL, AGGRAVATING CIRCUMSTANCES AND MITIGATING CIRCUMSTANCES?  WAS ONE GOING TO DO ONE AND THE OTHER GOING TO DO THE OTHER, IF YOU RECALL?

A.    WELL, AS I RECALL, I MEAN, GENERALLY, I THINK I WAS DOING THE MITIGATION AND RESPONDING TO THE GOVERNMENT'S ARGUMENT

146

DEBUNKING THE MITIGATION.

Q.   AND IN YOUR REVIEW RECENTLY OF YOUR CLOSING ARGUMENT, DID YOU NOTE WHAT YOU SAID ABOUT SEXUAL ABUSE AND HOW THAT MIGHT HAVE IMPACTED ON THIS CRIME?

A.   YES.

Q.   AND IS THAT LIMITED TO TWO PARAGRAPHS OF YOUR CLOSING ARGUMENT?

A.   I THINK THAT'S A FAIR REPRESENTATION.

Q.   WERE YOU ABLE TO ACTUALLY ARGUE TO THE JURY, THROUGH INFERENCE OR OTHERWISE, THAT SEXUAL ABUSE PLAYED A PART, CHILDHOOD SEXUAL ABUSE PLAYED A PART IN THIS TERRIBLE CRIME?

A.   I DID NOT ARGUE TO THE JURY THAT SEXUAL ABUSE WAS WHAT -- YOU'RE SAYING WHAT PROMPTED THE CRIME OR CAUSED THE CRIME TO HAPPEN?

Q.   OR WAS AN EXPLANATION FOR THE CRIME.

A.   NO, I DIDN'T ARGUE THAT.

Q.   IS IT NOT TRUE THAT ALL YOU REALLY STATED IS, "IT'S A SIGNIFICANT EVENT BECAUSE IT ROBBED HIM OF HIS SELF-ESTEEM, THAT'S THE IMPACT IT HAD ON HIM"?  IS THAT PRETTY MUCH ALL YOU WERE ABLE TO SAY ABOUT IT, BASED ON THE EVIDENCE YOU WERE ABLE TO PRESENT?

A.   SPECIFICALLY ABOUT THE CHILDHOOD SEXUAL ABUSE?  YES.

Q.   YES, MA'AM, THAT IT ROBBED HIM OF SELF-ESTEEM.

A.   (NODS HEAD AFFIRMATIVELY.)

        (DISCUSSION OFF THE RECORD.)

147

MR. MARTIN:  YOUR HONOR, THAT'S ALL I HAVE.

THE COURT:  MS. KEARNS, LET ME ASK, WHAT IS IT THAT YOU -- IN THE DISCUSSIONS WITH MR. MENDELSOHN AND THE APPROACH TO THIS ISSUE, WHAT HAD YOU HOPED TO -- I MEAN, WHERE DID YOU HOPE THIS WAS GOING TO COME OUT?  YOU JUST SAID ONE OF THE RULINGS SURPRISED YOU.  MR. KISH SAID Y'ALL ANTICIPATED ALL OF THE RULINGS, THERE WERE NO SURPRISES.  BUT IN TERMS OF WHAT THREW YOU OFF YOUR GAME, WHAT DID YOU THINK YOU WERE GOING TO BE ABLE TO DO UNDER THE RULES OF EVIDENCE AND THE RULES OF CRIMINAL PROCEDURE THAT WAS NOT ABLE TO BE DONE?

THE WITNESS:  WELL, JUDGE, IF WE'RE TALKING ABOUT, YOU KNOW, THAT IT SURPRISED ME, MY RECOLLECTION IS YOU MADE THAT RULING BEFORE THE TRIAL STARTED.  SO I KNEW BEFORE THE TRIAL STARTED THAT WE WERE GOING TO BE LIMITED.  AT THE TIME YOU MADE IT, IT WAS, YOU KNOW, I HAD HOPED THAT WE WERE GOING TO BE ABLE TO GET IN KIND OF THROUGH THE BACK DOOR WHAT, YOU KNOW, MR. LECROY'S HISTORY HAD BEEN AND THE IMPACT THAT OTHERS WHEN HE HAD NO REASON TO BE MALINGERING ABOUT IT, WHAT OTHER MENTAL HEALTH EXPERTS HAD OBSERVED ABOUT THE EFFECT THAT THIS CHILDHOOD ABUSE HAD HAD ON HIM.  SO BY THE TIME WE GOT INTO THE TRIAL, I KNEW WHAT THE LIMITATIONS WERE.

THE COURT:  WAS THERE A RULING -- AND HELP ME RECALL BECAUSE I HONESTLY DO NOT REMEMBER.  I INTEND TO GO BACK AND LOOK AT THE TRANSCRIPT.  BUT WAS THERE NOT AT SOME POINT THE OPPORTUNITY TO OFFER MORE WITHOUT HIS HAVING TO BE SUBJECTED TO

148

AN EVALUATION?  DID I NOT RELAX THE RULING TO SOME EXTENT SO THAT THE WITNESSES COULD HAVE TESTIFIED AS TO A FACT MATTER?  I REALIZE NOT WITHOUT DR. MEDLIN RESPONDING, BUT WAS THAT THE PROBLEM EVEN WHEN THE RULING WAS PERHAPS RELAXED?

THE WITNESS:  MY RECOLLECTION IS THAT THE HOPE WAS, AS HOPE SPRINGS ETERNAL FOR LAWYERS, WAS THAT AS WE GOT INTO THE EVIDENCE AND I WAS CALLING SOMEONE LIKE DR. CARLSON OR DR. GANAHL, THAT I WOULD BE ABLE TO GET IN MORE AS HISTORICAL FACT RATHER THAN DIAGNOSIS.  BUT AS MR. VINEYARD OBJECTED TO IT, YOU SUSTAINED THE OBJECTION.

SO I THINK MY HOPE WAS THAT I WAS GOING TO GET IN MORE THAN I ACTUALLY WAS ABLE TO GET IN.

THE COURT:  WAS THERE EVER, WAS THERE EVER A RULING THAT SOME OPINION TESTIMONY COULD BE OFFERED BUT THAT THE OPINIONS OF DR. MEDLIN WOULD BE PERMISSIBLE IN RESPONSE TO THOSE?

THE WITNESS:  NOT THAT I RECALL.

THE COURT:  OKAY.  THE LIMITATION THAT YOU WERE GIVEN -- BUT FACTUAL EVIDENCE WAS PERMITTED, WAS IT NOT, IN TERMS OF WHAT HAD TRANSPIRED PREVIOUSLY THAT THESE WITNESSES COULD TESTIFY ABOUT.

THE WITNESS:  WELL, MY RECOLLECTION WAS THAT, FOR INSTANCE, DR. CARLSON WAS ALLOWED TO TALK ABOUT ANYTHING THAT BILL LECROY TOLD HER, BUT SHE WAS NOT ABLE TO GIVE THE DIAGNOSIS OR DESCRIBE HOW SHE THOUGHT THAT IMPACTED HIM.

149

THE COURT:  OKAY.

ANY OTHER QUESTIONS?  MR. MCKINNON, ANYTHING FURTHER FROM THE GOVERNMENT?

MR. MCKINNON:  LET ME HAVE A MINUTE.  I THINK I MAY KNOW WHERE IN THE TRANSCRIPT THE COURT IS REFERRING.

THE COURT:  OKAY.

(PAUSE IN THE PROCEEDINGS.)

RECROSS-EXAMINATION

BY MR. MCKINNON:

Q.   MS. KEARNS, I THINK JUDGE STORY IS ASKING YOU ABOUT THIS RULING ON PAGE 2248 OF THE TRIAL.  I WANT YOU TO READ INTO THE RECORD WHAT THE COURT SAID THERE, BEGINNING AT LINE 7.

A.   I FIND THAT WITNESS OR WITNESSES THAT WE DISCUSSED THIS MORNING WILL BE PERMITTED TO TESTIFY TO FACT MATTERS THAT OCCURRED IN THE MEETINGS WITH MR. LECROY.  THEY MAY TESTIFY TO ANY PERSONAL HISTORY THAT HE GAVE THEM.  THEY MAY TESTIFY TO THE EVENTS THAT OCCURRED AT THE TIME, INCLUDING SUCH ALLEGED SUICIDE ATTEMPTS OR WHATEVER THAT MAY HAVE OCCURRED.  IF THE DEFENSE CHOOSES TO HAVE THEM TESTIFY AS TO PSYCHOLOGICAL TESTING, RESULTS, DIAGNOSES, OPINIONS, THEN THE GOVERNMENT WILL BE PERMITTED TO REBUT THAT TESTIMONY THROUGH THE USE OF THE EXPERT THAT HAD BEEN RETAINED BY THE FIREWALLED ATTORNEYS.

THE COURT:  THAT'S WHAT I WAS RECALLING.

BY MR. MCKINNON:

Q.   SO BASED ON THAT -- AND THAT RULING IS MADE MID TRIAL, I

150

THINK DURING THE MITIGATION PART OR THE PENALTY PART OF THE

CASE.  AND YOU'D HAVE THE OPPORTUNITY TO ASK YOUR WITNESSES,

NOT DR. LISAK, BUT YOUR OTHER WITNESSES ABOUT DIAGNOSES OR

OPINIONS; BUT, AGAIN, YOU KNEW THAT WOULD OPEN THE DOOR TO THE

GOVERNMENT THEN CALLING DR. MEDLIN.

A.    RIGHT.

Q.    AND YOU DID NOT WANT THE GOVERNMENT TO CALL DR. MEDLIN IN

REBUTTAL; IS THAT RIGHT?

A.    THAT'S CORRECT.

Q.    SO YOU CHOSE, BASED EVEN ON THAT RULING, TO STICK WITH

FACTS WITH THOSE WITNESSES BUT NOT GO INTO ANY KIND OF

DIAGNOSIS OR TREATMENT OR TESTING THAT WAS DONE.

A.    THAT'S RIGHT.

Q.    AND THE REASON THAT YOU STILL DIDN'T WANT DR. MEDLIN TO

TESTIFY IS WHAT?  NOT ONLY DEALING WITH THE BATTLE OF THE

EXPERTS, YOU SAID THERE -- YOU SAID EARLIER THAT YOU WERE

CONCERNED ABOUT THE BATTLE OF THE EXPERTS BETWEEN LISAK AND

MEDLIN.  BUT HERE, EVEN IF YOU DON'T CALL DR. LISAK, YOU COULD

STILL HAVE THE TESTIMONY OF THE PEOPLE THAT ACTUALLY SAW HIM

AND TALKED TO THE DEFENDANT AND HAVE THEM TESTIFY ABOUT THEIR

OPINIONS ABOUT HIS MENTAL STATE BUT YOU STILL HAVE TO DEAL WITH

DR. MEDLIN ON REBUTTAL.

A.    BUT THESE DOCTORS WOULD NOT HAVE HAD AN OPINION SPECIFIC

TO THE SPECIAL IMPACT THAT CHILDHOOD SEXUAL ABUSE BY A FEMALE

HAS ON A YOUNG MAN, HAS ON A BOY AS AN ADULT.  THEY DIDN'T HAVE

151

THAT EXPERTISE.

AND SO HAVING DR. MEDLIN WHO WAS -- WOULD TAKE THAT ISSUE AND SAY THAT IT BASICALLY DOESN'T EXIST WOULD HAVE BEEN DEVASTATING WHEN WE DIDN'T EVEN HAVE AN EXPERT TO SAY THAT -- TO DESCRIBE HOW MR. LECROY WAS IMPACTED BY THE BABYSITTER.

Q.    SO AGAIN, YOU'RE WEIGHING THE PROS AND CONS OF THE COURSE THAT YOU WOULD TAKE DURING THE TRIAL; AND YOU DECIDED THAT YOU WOULD STICK TO THE FACTS WITH ALL YOUR MENTAL HEALTH WITNESSES AND NOT OPEN THE DOOR FOR DR. MEDLIN'S TESTIMONY.

A.    RIGHT.

Q.    THAT WAS, AGAIN, A STRATEGIC DECISION YOU MADE BASED ON THE RULINGS THAT JUDGE STORY HAD MADE BEFORE AND DURING THE TRIAL.

A.    RIGHT.

Q.    BEFORE AND DURING THE TRIAL.  OKAY.  THANK YOU.

THE COURT:  THANK YOU.  I HAD SOME RECOLLECTION OF THAT BUT COULDN'T REMEMBER THE SPECIFICS.  THANK YOU.

YOU MAY STEP DOWN, MS. KEARNS.  THANK YOU.

YOU MAY CALL YOUR NEXT WITNESS.

MR. MARTIN:  WE CALL BRIAN MENDELSOHN.

(THE WITNESS WAS SWORN.)

THE DEPUTY CLERK:  STATE YOUR NAME, PLEASE.

THE WITNESS:  BRIAN MENDELSOHN.

BRIAN MENDELSOHN,

HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

152

                        DIRECT EXAMINATION

BY MR. MARTIN:

Q.    AND MR. MENDELSOHN, WHAT IS YOUR PROFESSION?

A.    I'M AN ATTORNEY.

Q.    AND WHERE ARE YOU CURRENTLY EMPLOYED?

A.    WITH THE FEDERAL DEFENDER PROGRAM.

Q.    AND HOW LONG HAVE YOU BEEN SO EMPLOYED?

A.    SINCE 1995.

Q.    AND WHAT TYPE OF WORK DO YOU DO THERE?

A.    I'M A TRIAL ATTORNEY, REPRESENT INDIGENT CLIENTS CHARGED
WITH FEDERAL OFFENSES, AND I ALSO DO CAPITAL POST-CONVICTION
WORK.

Q.    NOW, TELL US BRIEFLY YOUR EDUCATIONAL BACKGROUND.

A.    I HAVE A B.A. DEGREE FROM THE UNIVERSITY OF SOUTH CAROLINA
AND A LAW DEGREE FROM COLUMBIA UNIVERSITY.

Q.    AND AFTER YOU GOT YOUR LAW DEGREE, DID YOU -- WHERE DID
YOU FIRST WORK?

A.    I WORKED FOR THE GEORGIA RESOURCE CENTER.  THAT WAS FROM
1990 TO 1995.

Q.    WHAT'S THE GEORGIA RESOURCE CENTER?

A.    IT IS A STATE -- WELL, AT THAT TIME IT WAS A COMMUNITY
DEFENDER ORGANIZATION JOINTLY FUNDED BY THE STATE AND FEDERAL
GOVERNMENTS TO PROVIDE POST-CONVICTION REPRESENTATION TO DEATH
ROW INMATES IN THE STATE OF GEORGIA.

Q.    AND AFTER WORKING THERE, WHERE DID YOU WORK?

153

A.    I CAME TO THE FEDERAL DEFENDER.

Q.    WERE YOU A MEMBER OF THE TEAM THAT DEFENDED WILLIAM
LECROY, JR., IN THIS CASE?

A.    YES.

Q.    PRIOR TO COMING ONTO THAT TEAM, HAD YOU EVER TRIED A DEATH
PENALTY CASE AT TRIAL?

A.    NO.

Q.    NOW, DURING -- WHO WERE THE MEMBERS OF THE TRIAL TEAM?

A.    WELL, THE ATTORNEYS WERE STEPHANIE KEARNS, PAUL KISH, DAN
SUMNER, AND THEN I WAS ON IT.

Q.    AND DID EACH MEMBER HAVE A PRIMARY ROLE IN THE TRIAL OF
THE CASE?

A.    WELL, YOU MEAN AT THE TIME OF TRIAL OR --

Q.    WELL, BOTH.

A.    YEAH.  WE WERE A LITTLE DIFFERENT THAN MANY TEAMS THAT
DIVIDED THE CASE UP BY GUILT PHASE AND SENTENCING PHASE.  WE
GENERALLY WERE ALL WORKING ON DIFFERENT PHASES OF THE CASE
MAKING BIG DECISIONS JOINTLY SORT OF IN A CONSENSUS WAY.  BUT
THEN ONCE DECISIONS WERE MADE, WE EACH TOOK OVER SEPARATE
SEGMENTS OF THE CASE AND DID CERTAIN PARTS OF IT.

Q.    WHAT WAS PAUL KISH'S ROLE?

A.    PAUL LARGELY WORKED ON THE GRAND JURY CHALLENGE.  HE
DID -- HE WAS SORT OF THE BRAIN TRUST BEHIND THE
GUILT/INNOCENCE PORTION OF THE CASE AND HE DID SOME HANDWRITING
CHALLENGES.  AND THEN HE WAS DOING SOME MITIGATION

154

INVESTIGATION WITH THE MEN IN THE LECROY FAMILY.

Q.   AND WHAT ROLE DID HE PLAY IN WHAT I WOULD CALL THE JURISDICTIONAL DEFENSE?

A.   THAT WAS HIS BABY.  THAT WAS HIS LEGAL ISSUE AND HE WAS ON THAT.

Q.   NOW, WHAT WAS DAN'S ROLE, DAN SUMMER?

A.   DAN WAS MOSTLY THERE FOR UNDERSTANDING THE GAINESVILLE AREA.  HE HAD RECENTLY DONE A GRAND JURY CHALLENGE IN THE STATE SYSTEM, AND SO HE WAS ON THE GRAND JURY CHALLENGE PART OF THE CASE.  BUT THEN LARGELY HE WAS THERE TO HELP WITH JURY SELECTION.

Q.   AND WHAT ABOUT STEPHANIE'S ROLE, STEPHANIE KEARNS'S ROLE?

A.   SHE WAS DOING A LOT OF MITIGATION INVESTIGATION, AND THAT WAS HER MAIN THING.

Q.   AND WHAT WAS YOUR ROLE THEN?

A.   I WAS DOING PRETRIAL MOTIONS AND THEN WORKING LARGELY ON THE EXPERT PORTION OF THE CASE.

Q.   WHEN YOU SAY PRETRIAL MOTIONS, WHAT PARTICULAR AREA OF PRETRIAL MOTIONS WERE YOU DEVOTED TO?

A.   A LOT OF THE CAPITAL MOTIONS, THE DISCOVERY MOTIONS, THOSE SORTS OF THINGS; AND THEN, I GUESS, AS THE LITIGATION DREW ON, THE MENTAL HEALTH LITIGATION.

Q.   NOW, YOU SAID YOU WORKED WITH THE EXPERTS.  WHAT EXPERTS DID Y'ALL RETAIN?  WELL, FIRST OF ALL, DID YOU RETAIN JAN VOGELSANG AS A FORENSIC SOCIAL WORKER?

155

A.    YES, ALTHOUGH I GUESS I SHOULD SAY STEPHANIE LARGELY

WORKED WITH JAN.

Q.    AND DID YOU RETAIN A PATHOLOGIST?

A.    YES.

Q.    A JAIL CONSTRUCTION EXPERT?

A.    YES.

Q.    A PRISON SECURITY EXPERT?

A.    YES.

Q.    DID YOU ALSO CONSULT WITH MICHAEL HILTON, THE FORENSIC

PSYCHIATRIST?

A.    WE DID CONSULT WITH HIM, ALTHOUGH I WAS NOT REALLY

INVOLVED WITH THAT EVALUATION.

Q.    DO YOU KNOW WHO CONTACTED DR. HILTON?

A.    I THINK IT WAS SUSAN MILLER IN MY OFFICE.  SHE'S AN

INVESTIGATOR.

Q.    DID HE ACTUALLY CONDUCT AN EXAMINATION OF MR. LECROY?

A.    HE DID.

Q.    AND DID YOU ALSO HAVE RECORDS, PSYCHIATRIC RECORDS, OTHER

RECORDS TO REVIEW IN CREATING HIS EVALUATION?

A.    YES, HE DID.

Q.    I THINK WHAT'S IN FRONT OF YOU IS DEFENDANT'S EXHIBITS 1,

2 AND 3.

A.    UH-HUH (AFFIRMATIVE).

Q.    DO YOU RECOGNIZE THOSE AS REPORTS THAT WERE PREPARED BY

DR. HILTON AS PART OF HIS EVALUATION?

156

A.   I DO.

Q.   DID YOU GET AN OPPORTUNITY TO SEE THOSE REPORTS AFTER HE PREPARED THEM?

A.   I DID.

Q.   THE ACCOUNT THAT DR. HILTON DESCRIBES THAT MR. LECROY GAVE HIM OF THE EVENTS SURROUNDING THE CRIME, WAS THAT CONSISTENT WITH WHAT MR. LECROY HAD TOLD YOU ABOUT THE CRIME?

A.   I NEVER ASKED HIM ABOUT THE CRIME.  I THINK HE TOLD PAUL KISH.

Q.   IT'S CONSISTENT WITH WHAT THE TEAM KNEW WAS HIS ACCOUNT OF WHAT HAD HAPPENED; CORRECT?

A.   YES.

Q.   AFTER RECEIVING THE REPORT, DID YOU EVER GO OUT AND TALK WITH DR. HILTON ABOUT HIS REPORT?

A.   NO.

Q.   DID YOU TALK TO HIM ABOUT HIS DIAGNOSES?

A.   NO.

Q.   DID YOU TALK TO HIM ABOUT WHAT THOSE, HOW THOSE DIAGNOSES MIGHT EXPLAIN MR. LECROY'S CONDUCT IN THIS CASE?

A.   NO.

Q.   NOW, DID THE DEFENSE TEAM LEARN THAT MR. -- WHAT, IF ANYTHING, DID THE DEFENSE TEAM LEARN ABOUT MR. LECROY HAVING TOLD PEOPLE IN THE PAST THAT HE HAD BEEN ABUSED BY, AS A CHILD BY A FEMALE BABYSITTER?

A.   WE HAD HEARD THAT EARLY ON IN THE CASE AND HAD SEEN IT IN

RECORDS, PRISON RECORDS IN PARTICULAR.  SO WE KNEW ABOUT THAT.

Q.   AND THIS IS SOMETHING THAT HE HAD REPORTED LONG BEFORE Y'ALL CAME ONTO THE CASE.  IS THAT CORRECT?

A.   OH, YEARS BEFORE.

Q.   DID YOU TALK WITH MR. LECROY ABOUT THAT?

A.   YES.

Q.   AND DID HE ALSO CONFIRM THAT THAT HAD HAPPENED TO HIM?

A.   YES.

Q.   WHAT, IF ANYTHING, DID YOU AS THE PERSON, ONE OF THE PEOPLE THINKING ABOUT THE MITIGATION CASE, BELIEVE WHETHER THIS COULD BE SOMETHING THAT MIGHT BE A PART OF THE MITIGATION CASE?

A.   OH, ABSOLUTELY.

Q.   DID YOU CONTACT AN EXPERT IN THIS AREA?

A.   YES, WE DID.

Q.   WHO DID YOU CONTACT?

A.   DAVID LISAK.

Q.   WHO IS DAVID LISAK?

A.   HE IS PROBABLY ONE OF THE -- HE'S PROBABLY THE FOREMOST EXPERT IN THE COUNTRY ON MEN, ADULT MEN WHO WERE SEXUALLY ABUSED AS CHILDREN.

Q.   AND DID YOU KNOW OF HIM OR HAD YOU WORKED WITH HIM IN THE PAST?

A.   I HAD RECENTLY COMPLETED A CAPITAL HABEAS CASE IN WHICH I USED DR. LISAK AS AN EXPERT.

Q.   BEFORE WE GO ON WITH DR. LISAK, I DID WANT TO ASK YOU ONE

158

OTHER THING ABOUT DR. HILTON'S REPORT.  IN DR. HILTON'S REPORT THERE IS A REFERENCE TO A THOMAS LEDFORD.  DO YOU REMEMBER THAT NAME?

A.   YES.

Q.   AS A PERSON WHO WAS INVOLVED IN WICCA AND, I DON'T KNOW HOW YOU PRONOUNCE THIS, BUT ASATRU, A-S-A-T-R-U, IT'S A RELIGION, IN JAIL?

A.   YES.

Q.   DID YOU OR ANYBODY FROM YOUR OFFICE GO TALK TO THOMAS LEDFORD TO CONFIRM WHAT WAS REPORTED BY MR. LECROY IN THE REPORT TO DR. HILTON?

A.   YES.  SUSAN MILLER AND I WENT TO INTERVIEW HIM.

Q.   WHERE DID MR. LEDFORD LIVE AT THAT TIME?

A.   AT THAT TIME HE WAS SOMEWHERE IN NORTH CAROLINA.

Q.   AND WHAT DID HE TELL YOU, GENERALLY SPEAKING, ABOUT BEING INVOLVED IN THESE RELIGIONS IN PRISON?

A.   HE WAS IN PRISON WITH MR. LECROY AND HE TOLD US THAT HE WAS SORT OF A GROUP LEADER, NOT MR. LECROY, THAT MR. LEDFORD WAS A GROUP LEADER IN THIS WICCA ASATRU PRACTICE AND THAT BILL LECROY PARTICIPATED IN VARIOUS MEETINGS AND CEREMONIES AND SERVICES AND THINGS LIKE THAT.

Q.   WHAT, IF ANYTHING, DID HE TELL YOU ABOUT WHETHER THAT PRACTICE INVOLVED MAGICAL THINGS AND MAGICAL THOUGHTS?

A.   YES, THAT THERE'S ALL SORTS OF MAGICAL PARTS OF THAT PRACTICE, YES.

159

Q.   NOW, GETTING BACK TO DR. LISAK, FIRST OF ALL, WHAT DID YOU ASK DR. LISAK TO DO?

A.   TO EVALUATE THE RECORDS ON MR. LECROY AND RENDER ANY OPINIONS THAT HE COULD, HE COULD ABOUT SEXUAL ABUSE.

Q.   DID DR. LISAK ACTUALLY EXAMINE MR. LECROY?

A.   NO, HE DIDN'T.

Q.   IF HE HAD BEEN EXAMINED, IF HE HAD EXAMINED MR. LECROY, WHAT CONSEQUENCE WOULD THAT HAVE THEN MADE WITH RESPECT TO WHETHER YOU WOULD HAVE TO SUBMIT MR. LECROY TO A GOVERNMENT EVALUATION?

A.   I THINK IF HE HAD EXAMINED MR. LECROY AND -- OR IF DR. LISAK HAD EXAMINED MR. LECROY, WE PROBABLY WOULD HAVE HAD TO SUBMIT MR. LECROY TO AN EXAMINATION BY THE GOVERNMENT.

Q.   OTHERWISE, YOU WOULDN'T BE ABLE TO USE DR. LISAK.

A.   THAT'S CORRECT.

Q.   WHAT, IF ANY, FEAR DID YOU HAVE OF THE GOVERNMENT EVALUATION?

A.   I WAS VERY SCARED OF THE GOVERNMENT EVALUATION.

Q.   SO HOW WERE YOU EXPECTING TO USE DR. LISAK IF HE WASN'T GOING TO ACTUALLY EXAMINE MR. LECROY?

A.   WE WERE PLANNING TO USE DR. LISAK AS A TEACHING EXPERT IN THE AREA OF CHILDHOOD SEXUAL ABUSE.

Q.   WHAT DID YOU MEAN BY A TEACHING EXPERT?

A.   BASICALLY, AS AN EXPERT WHO COULD EDUCATE THE JURY IN THE OVERALL FIELD OF CHILD SEXUAL ABUSE, GET AN IDEA OF WHAT

160

INDIVIDUALS WHO HAVE SUFFERED THROUGH THIS EXPERIENCE, WHAT THE LASTING EFFECTS ARE THROUGHOUT THEIR LIFE, AND THEN TIE THAT UP TO THE EXPERIENCES THAT BILL HAD.

Q.   HOW, IF AT ALL, WOULD DR. LISAK BE ABLE TO CONNECT THOSE GENERAL FEELINGS OR GENERAL OPINIONS OR GENERAL RESEARCH ABOUT CHILDHOOD ABUSE BY AN ADULT, FEMALE ADULT, CONNECT TO THE ACTUAL CRIME OR HELP EXPLAIN THE ACTUAL CRIME?

A.   WELL, I DON'T THINK THAT DR. LISAK WAS NECESSARILY GOING TO BE ABLE TO DO THAT AS A TEACHING EXPERT, BUT I WOULD HOPE THAT WE AS LAWYERS WOULD BE ABLE TO DRAW INFERENCES FROM WHAT WE GOT OUT OF DR. LISAK AND THE FACTS THAT WE PUT INTO THE RECORD TO THEN ARGUE IT TO THE JURY.

Q.   IN CLOSING ARGUMENT?

A.   THAT'S CORRECT.

Q.   NOW, DID YOU, IN FACT, GIVE A 12.2 NOTICE?

A.   YES.

Q.   AND WHY DID YOU DO THAT?

A.   BECAUSE IT'S REQUIRED BY THE RULES THAT IF WE WANTED TO PRESENT MENTAL HEALTH EVIDENCE, WE NEEDED TO SUBMIT SUCH A NOTICE.

Q.   DID THERE ALSO -- WAS THERE ALSO A FIREWALL PROCEDURE THAT WAS IMPLEMENTED AS A RESULT OF THAT 12.2 NOTICE?

A.   YES.

Q.   TELL US ABOUT THAT.

A.   THAT WAS SOMETHING THAT WE ARGUED FOR AND THAT THERE WAS

161

SOME PRETTY EXTENSIVE LITIGATION ABOUT.  BASICALLY, IN ORDER FOR US TO GIVE THE REQUIRED NOTICES, WE DIDN'T WANT THE TRIAL LAWYERS TO KNOW ABOUT THAT INFORMATION BECAUSE THEY WEREN'T ENTITLED TO KNOW ABOUT THAT INFORMATION.  SO WE ARGUED FOR A PROCEDURE TO HAVE A DIFFERENT SET OF LAWYERS APPOINTED TO REPRESENT THE GOVERNMENT IN RELATION TO THE MENTAL HEALTH LITIGATION.

Q.   AS THE EVENT CAME ON TO -- AS THE CASE MOVED UP TO TRIAL TIME, I GUESS IS A BETTER WAY OF PUTTING IT, WAS THERE EXTENSIVE LITIGATION AND MEETINGS WITH THE COURT REGARDING THE SCOPE OF THE FIREWALL AND EXACTLY WHAT YOU WERE GOING TO DO WITH REGARDS TO EXPERT TESTIMONY?

A.   YES.

Q.   GIVE JUST YOUR BASIC BRIEF SUMMARY OF HOW THAT WENT.

A.   WELL, I MEAN, THE MENTAL HEALTH EXAMINATION EVALUATION LITIGATION STARTED BACK BEFORE THANKSGIVING AND I DON'T THINK IT FINISHED UP UNTIL RIGHT AROUND THE TIME OF THE TRIAL IN FEBRUARY, MARCH OR FEBRUARY.  I MEAN, THE INITIAL PART OF THE LITIGATION -- AND STOP ME IF I'M GOING OFF ON AN AREA --

Q.   NO, GO AHEAD.

A.   -- WAS INITIALLY ABOUT THE SCOPE OF THE GOVERNMENT'S EVALUATION.  I THINK ONCE WE FILED THE 12.2 NOTICE, THE MAGISTRATE JUDGE ISSUED AN ORDER REQUIRING BILL TO GO TO BUTNER OR SOMEPLACE LIKE THAT FOR 60 DAYS OR SOMETHING.  AND SO THE FIRST PART OF THAT WAS TO STOP THAT BECAUSE WE WERE GETTING UP

162

ON TRIAL AND WE COULDN'T HAVE OUR CLIENT GONE FOR 60 DAYS.  SO WE -- THAT WAS THE INITIAL PART OF THE LITIGATION.

Q.   ALL RIGHT.  AND WHAT ABOUT HAVING AN EVALUATION DONE LOCALLY?

A.   RIGHT.  SO ULTIMATELY, I THINK THAT WAS RESOLVED AND TO THE POINT WHERE THERE WAS GOING TO BE A LOCAL EVALUATION.

Q.   THEN WHAT ABOUT THE ISSUES REGARDING THE SCOPE OF THE EVALUATION?

A.   RIGHT.  AND THEN WE WERE MAKING AN ARGUMENT THAT BECAUSE WE WERE ONLY CALLING A TEACHING EXPERT, THE GOVERNMENT SHOULD ONLY GET A TEACHING EXPERT; AND SHORT OF THAT, IF THEY WERE GOING TO GET AN EVALUATION, WE WANTED TO LIMIT THE SCOPE OF THE EVALUATION TO THE NARROW FOCUS OF THE EVIDENCE THAT WE WERE PRESENTING.

Q.   NOW, IN THE MIDST OF ALL THIS LITIGATION, WAS THERE AN OCCASION IN WHICH THE JUDGE ORDERED THAT THERE BE AN EVALUATION, ALBEIT THE SCOPE MIGHT BE LIMITED, OF MR. LECROY, THAT UNLESS -- AND UNLESS HE SUBMITTED TO THAT EVALUATION, THEN YOU WOULD BE BARRED IN PRESENTING EXPERT TESTIMONY?

A.   YEAH.  I DON'T KNOW THAT HE EVER WENT SO FAR AS TO SAY WE ABSOLUTELY WOULD BE BARRED, BUT THAT HE WAS GOING TO SIGNIFICANTLY LIMIT.

Q.   AND DID MR. LECROY ASSERT HIS FIFTH AMENDMENT RIGHT NOT TO BE EVALUATED?

A.   HE DID.

163

Q.   WAS THAT SPECIFICALLY AT YOUR ADVICE?

A.   YES, THE ADVICE OF HIS LAWYERS.  I MEAN, WE ALL --

Q.   ALL OF HIS LAWYERS WERE ADVISING HIM TO DO THAT?

A.   RIGHT.

Q.   AND HE FOLLOWED YOUR ADVICE IN THAT REGARD.

A.   YES.

Q.   WHAT, IF ANY, FEAR WAS THERE THAT IF YOU HAD AN EVALUATION EVEN WITH RESTRICTIONS, THAT IT MIGHT NOT BE CONTROLLED BY THE COURT?

A.   THAT WAS A SIGNIFICANT FEAR, AND I THINK THAT'S PROBABLY REFLECTED IN THE ARGUMENTS THAT WE MADE.

Q.   NOW, WE'RE COMING UP TO THE TIME OF TRIAL.  THE RECORD WOULD REFLECT THAT MR. LECROY HAS ASSERTED HIS RIGHT ON YOUR ADVICE NOT TO SUBMIT TO AN EVALUATION.  AND YOU HAVE PROVIDED -- I THINK IT'S UP THERE FOR YOU.  WE WON'T DUPLICATE IT.  BUT SHOWING YOU, REFERRING YOU TO GOVERNMENT'S EXHIBIT 58.  CAN YOU -- IS THAT NOT THE LETTER THAT YOU WROTE DESCRIBING THE GENERALITIES OF DR. LISAK'S TESTIMONY?

A.   RIGHT.  THAT WOULD BE A SUMMARY OF DR. LISAK'S TESTIMONY ALONG WITH HIS CV.

Q.   WAS THAT INTENDED TO SATISFY THE REQUIREMENTS OF RULE 16?

A.   IT WAS.

Q.   AND WHO WAS THAT PROVIDED TO?

A.   IT WAS ADDRESSED TO YONETTE BUCHANAN WHO WAS ONE OF THE FIREWALL COUNSEL FOR THE UNITED STATES ATTORNEY'S OFFICE.

164

Q.   AND WHAT WAS YOUR UNDERSTANDING AS TO WHETHER OR NOT THAT REPORT WOULD BE AVAILABLE TO ANY OF THE ACTUAL TRIAL COUNSEL?

A.   IT WAS MY UNDERSTANDING THAT THAT WOULD NOT BE AVAILABLE TO THE GOVERNMENT TRIAL TEAM UNTIL AFTER THE GUILT/INNOCENCE PHASE IF WE ELECTED TO PUT UP MENTAL HEALTH TESTIMONY.

Q.   NOW, PRIOR TO TRIAL DID YOU -- I'LL REFER YOU BRIEFLY NOW TO GOVERNMENT'S EXHIBIT 63 WHICH IS THE PSYCHOLOGICAL REPORT THAT WAS AUTHORED BY DR. MEDLIN.  DID YOU LEARN THAT THE FIREWALL COUNSEL HAD CONSULTED WITH DR. MEDLIN REGARDING ISSUES IN THIS CASE?

A.   YES, WE DID.

Q.   WHAT, IF ANYTHING, DID YOU LEARN AS TO WHETHER OR NOT THE FACT THAT DR. MEDLIN HAD BEEN RETAINED BY THE PROSECUTION WAS ALSO DISCLOSED TO THE TRIAL COUNSEL?

A.   WE LEARNED IN, I THINK, A PHONE CALL, THERE WAS A CONFERENCE CALL WITH FIREWALL COUNSEL, THE DEFENSE LAWYERS AND JUDGE STORY.  I THINK IN THE MIDDLE OF THAT PHONE CALL, JOE PLUMMER, WHO WAS ONE OF THE OTHER FIREWALL COUNSEL, SAID SOMETHING OFFHAND THAT HOW HE HAD TOLD THE TRIAL LAWYERS FOR THE GOVERNMENT THAT DR. MEDLIN WAS GOING TO BE THE EXPERT.

Q.   DID THAT CAUSE YOU SOME CONCERN?

A.   YES, IT DID.

Q.   WHY?

A.   WELL, DR. MEDLIN IS A SEXUAL ABUSE EXPERT; AND SO IT WAS OBVIOUS THAT BY DISCLOSING HER NAME TO THE TRIAL TEAM, THEY

165

WERE GIVING UP WHAT WE WERE UP TO.

Q.   AS A RESULT OF THAT, DID YOU MOVE TO RECUSE THE TRIAL TEAM?

A.   YES.

Q.   WAS THAT DENIED?

A.   YES, IT WAS.

Q.   WAS THAT ISSUE RAISED ON APPEAL?

A.   I DON'T THINK SO.

Q.   DO YOU KNOW WHY?

A.   I THINK WE JUST LEFT IT OUT.  I DON'T KNOW ANY PARTICULAR REASON WHY IT WASN'T.

Q.   WAS IT BECAUSE YOU DIDN'T CALL DR. LISAK AS A WITNESS?

A.   NO.  I MEAN, I DON'T RECALL ANY REASON.  I JUST DON'T REMEMBER ANY REASON WHY WE WOULDN'T HAVE PUT IT IN, BUT WE OBVIOUSLY DIDN'T.

Q.   NOW, AFTER THE GUILT/INNOCENCE PHASE OF THE TRIAL, MR. LECROY WAS CONVICTED; CORRECT?

A.   YES.

Q.   WHAT WAS THE DEFENSE THAT WAS PRESENTED IN GUILT/INNOCENCE?

A.   IT WAS A JURISDICTIONAL DEFENSE THAT THIS WASN'T A CARJACKING, THERE WASN'T A FEDERAL HOOK TO HAVE THE CASE HERE.

Q.   WAS IT EVER CONTENDED THAT MR. LECROY HAD NOT KILLED MS. TIESLER?

A.   NO.

166

Q.   NOW, AT THE CLOSE OF THE -- EXCUSE ME, AFTER THE RETURN OF THE GUILTY VERDICT IN THE GUILT/INNOCENCE PHASE OF THE TRIAL, WERE YOU PROVIDED WITH DR. MEDLIN'S REPORT?

A.   YES.

Q.   WAS THAT THE FIRST TIME YOU HAD EVER SEEN DR. MEDLIN'S REPORT?

A.   YES, IT WAS.

Q.   AND I'M SPECIFICALLY REFERRING TO I THINK IT'S GOVERNMENT'S EXHIBIT 68; IS THAT CORRECT?

A.   63.

Q.   EXCUSE ME, GOVERNMENT'S EXHIBIT 63.  DID YOU SHARE THAT REPORT WITH DR. LISAK?

A.   YES.  AS SOON AS WE GOT IT, WE FAXED IT TO DR. LISAK.

Q.   WHERE IS DR. LISAK; WHERE DOES HE TEACH?

A.   HE, I THINK BACK THEN HE WAS AT THE UNIVERSITY OF MASSACHUSETTS AT BOSTON, SO HE WAS LIVING IN BOSTON.

Q.   BOSTON AREA.  AND DID HE HAVE AN OPPORTUNITY TO REVIEW THE REPORT?

A.   YES, HE DID.

Q.   DID HE GIVE YOU AN OPINION ABOUT THE REPORT?

A.   YES, HE DID.

Q.   WHAT WAS HIS OPINION?

A.   HE THOUGHT IT WAS NONSENSE.

Q.   WHEN YOU SAY NONSENSE --

A.   I MEAN, HE THOUGHT IT WAS A HATCHET JOB BY SOMEBODY WHO

167

REALLY DIDN'T KNOW WHAT SHE WAS TALKING ABOUT.

Q.   IN THE REPORT DR. MEDLIN, FOR EXAMPLE, ATTACHES
SIGNIFICANCE TO CERTAIN ANSWERS ON THE MMPI.  DID YOU NOTICE
THAT?

A.   YES.

Q.   MMPI IS, WHAT IS IT, MINNESOTA MULTIPHASIC PERSONALITY
INVENTORY?

A.   RIGHT.

Q.   AND IS THAT GOOD PRACTICE BY A PSYCHOLOGIST?

A.   AS FAR AS IT'S MY UNDERSTANDING THAT THAT'S NOT THE WAY
THAT TEST IS TO BE USED.

Q.   DR. MEDLIN REPORTS VARIOUS DIFFERENT REFERENCES FOR HER
OPINIONS.  DID DR. LISAK -- WHAT, IF ANYTHING, DID DR. LISAK
SAY AS TO THE VALIDITY OF THAT INFORMATION?

A.   HE WAS SHOCKED AT SOME OF THE REFERENCES THAT SHE WAS
CITING.  SHE WASN'T CITING REAL STUDIES.  SHE WAS CITING
ARTICLES IN LIKE "PROSECUTOR MONTHLY" MAGAZINE OR SOMETHING
LIKE THAT, JUST HORRIBLE KINDS OF SOURCES.

Q.   WAS DR. LISAK AVAILABLE TO TESTIFY ABOUT THESE
INADEQUACIES IN DR. MEDLIN'S REPORT?

A.   YES, HE WAS.

Q.   AND WHAT TYPE OF REPUTATION DID DR. LISAK HAVE IN THIS
AREA?

A.   WELL, LIKE I SAID, HE'S THE BEST IN THE COUNTRY, WHICH IS
WHY WE WENT TO HIM.

168

Q.   A DECISION WAS MADE NOT TO USE DR. LISAK AND THAT WAS REPORTED TO THE COURT.  IS THAT NOT CORRECT?

A.   THAT'S CORRECT.

Q.   WHAT WAS THE PLAN, IF YOU WE WEREN'T GOING TO CALL DR. LISAK TO GIVE HIS TEACHING EXPERTISE AND TO RESPOND TO DR. MEDLIN IF SHE WAS BROUGHT TO TESTIFY, WHAT WAS THE PLAN TO PRESENT A CASE ABOUT SEXUAL ABUSE AS AN EXPLANATION IN MITIGATION, NOT AN EXCUSE, BUT IN MITIGATION OF SENTENCE?

A.   IF WE WERE GOING TO CALL DR. LISAK?

Q.   IF YOU WERE NOT GOING TO CALL DR. LISAK.

A.   IF WE WERE NOT GOING TO CALL DR. LISAK.  THE PLAN WAS TO GET THE FACTS OF THE SEXUAL ABUSE OUT BEFORE THE JURY THROUGH -- EXCUSE ME, I'VE GOT A BIT OF A SORE THROAT.

Q.   IF YOU NEED TO GET SOME WATER, THERE'S SOME RIGHT NEXT TO YOU THERE.

A.   I WILL.  BASICALLY, TO GET THE FACTS OF THE SEXUAL ABUSE OUT THROUGH THE PRISON RECORDS, THROUGH THE OTHER MEDICAL PROFESSIONALS WHO SAW MR. LECROY, AND THEN DESCRIBE SOME OF THE BEHAVIORS THAT HE HAD BEEN EXPERIENCING AND THAT HAD BEEN GOING ON, AND THEN BASICALLY CONNECT IT UP THROUGH INFERENCES AT CLOSING ARGUMENT.

Q.   OKAY.  WHAT TYPE OF RESTRICTIONS HAD THE JUDGE MADE CLEAR HE WOULD IMPOSE ON THE PRESENTATION OF THAT EVIDENCE FROM THESE PRISON PSYCHS OR PRISON PSYCHOLOGISTS?

A.   MY RECOLLECTION IS THAT WE WEREN'T ABLE TO GO INTO

DIAGNOSES BUT THAT WE WOULD BE ABLE TO TESTIFY ABOUT -- OR THEY WOULD BE ABLE TO TESTIFY ABOUT THE FACTS THAT MR. LECROY HAD RELATED TO THEM OR THINGS THAT THEY OBSERVED.

Q.   SO AFTER YOU WOULD GET THESE STATEMENTS IN FROM THESE MENTAL HEALTH PROFESSIONALS THAT MR. LECROY HAD DESCRIBED BEING ABUSED BY A BABYSITTER WHEN HE WAS A CHILD, HOW WAS THAT GOING TO BE TIED UP TO THE, CONNECTED TO THE ACTUAL CRIME SO AS TO GIVE AN EXPLANATION IN MITIGATION OF THE CRIME?

A.   WE WERE, LIKE I SAID, WE WERE GOING TO EXPLAIN IT IN CLOSING ARGUMENT, BASICALLY TAKING THE PLACE OF THE EXPERT AND TESTIFYING, SO TO SPEAK, IN CLOSING ARGUMENT AND CONNECTING THE DOTS BETWEEN THE OFFENSE AND THE SEXUAL ABUSE.

I DON'T KNOW IF YOU WANT TO GO INTO MY THEORY OF THE --

Q.   YEAH, GO AHEAD.

A.   THE WAY I SAW IT IS THIS WHOLE INCIDENT WAS TIED TO THE SEXUAL ABUSE AND THAT MR. LECROY SAW MS. TIESLER, HAD SOME CONNECTION WITH THE BABYSITTER, SNAPPED, HAD SOME SORT OF PSYCHOTIC BREAK AND LOST IT AND COMMITTED THE OFFENSE.  AND SO THAT'S HOW I WAS HOPING TO BE ABLE TO TIE IT UP DOWN THE ROAD.

Q.   WELL, WAS THAT INFERENTIAL ARGUMENT EVER MADE BY EITHER YOU OR MS. KEARNS?

A.   NO, IT NEVER WAS.

Q.   HOW DID Y'ALL DECIDE TO DIVIDE UP CLOSING ARGUMENT?

A.   BASICALLY, I WAS -- WE SPLIT IT UP.  I DID THE FIRST HALF AND SHE DID THE SECOND HALF.  I WAS GOING TO DEAL WITH THE

170

AGGRAVATION PART AND SHE WAS GOING TO DEAL WITH THE MITIGATION

PART.

Q.   SO YOU WERE NOT EXPECTING TO ADDRESS THIS ISSUE AT ALL IN

YOUR CLOSING ARGUMENT.

A.   NO.

Q.   DID YOU EXPECT MS. KEARNS TO ADDRESS IT THE WAY YOU JUST

DESCRIBED IT?

A.   I DID.

Q.   DID IT, IN FACT, HAPPEN?

A.   IT DIDN'T.  I'M NOT SURE WHETHER SHE HAD EXPECTED ME TO DO

IT OR I HAD EXPECTED HER TO DO IT, BUT SOMEHOW IT DIDN'T

HAPPEN.

Q.   BACKING UP A SECOND.  WHEN THE JUDGE LIMITED YOUR

WITNESSES -- LET ME BACK UP EVEN A LITTLE FURTHER.

     DO YOU REMEMBER A DR. GANAHL WHO WAS WITH THE DEPARTMENT

OF CORRECTIONS IN GEORGIA WHO HAD SEEN MR. LECROY AFTER A

SUICIDE ATTEMPT?

A.   YES.

Q.   WHAT HAD HE DONE WITH REGARDS TO SOME SORT OF TESTING?  DO

YOU REMEMBER HE HAD DONE SOME TESTING?

A.   MY RECOLLECTION IS HE HAD DONE AN MMPI.

Q.   DURING THE TRIAL THE TRANSCRIPT REFLECTS THAT YOU WERE

HOPING TO GET THOSE RESULTS IN.

A.   RIGHT.  I WAS TRYING AS HARD AS I COULD TO PUSH.  I MEAN,

I KNOW JUDGE STORY HAD LIMITED IT TO FACTS AS OPPOSED TO

171

DIAGNOSES, BUT I WAS TRYING TO PUSH THAT LINE AS CLOSE TO THE DIAGNOSIS AS WE COULD GET IT.

Q.   WAS JUDGE STORY RUNNING A TIGHT SHIP?

A.   JUDGE STORY WAS PUSHING BACK.  YES, HE WASN'T LETTING US GET THERE.

Q.   AND YOU WERE NOT ALLOWED TO DO THAT.

A.   NO.

Q.   DID YOU EVER REASSESS, IN LIGHT OF HOW CAREFUL THE JUDGE WAS BEING ABOUT THIS, DID YOU EVER REASSESS, YOU AND THE OTHER LAWYERS REASSESS THE DECISION NOT TO HAVE MR. LECROY EXAMINED BY DR. LISAK OR A GOVERNMENT EXPERT?

A.   NO.

Q.   DURING THE SENTENCING PHASE OF THE TRIAL, THE TRIAL TRANSCRIPT IN CLOSING ARGUMENT WOULD INDICATE THAT THE GOVERNMENT CONTENDED THAT AND STILL CONTENDS THAT THE STATEMENTS ABOUT CHILDHOOD ABUSE WERE MADE UP.  DO YOU REMEMBER THAT HAPPENING DURING THE TRIAL?

A.   YES.

Q.   WHAT, IF ANYTHING, DID Y'ALL DO ABOUT REASSESSING YOUR POSITION SO THAT DR. LISAK, AS A LEADING EXPERT IN HIS FIELD, COULD VERIFY FROM HIS EXPERTISE WHETHER OR NOT THESE CLAIMS OF SEXUAL ABUSE WERE, IN FACT, TRUE?

A.   IN TERMS OF REASSESSING, YOU MEAN HAVING HIM TESTIFY AGAIN?

Q.   HAVE HIM EVALUATE MR. LECROY.  THIS JUST DIDN'T OCCUR TO

172

YOU.

A.   NO.   WE HAD MADE A DECISION NOT TO HAVE HIM EVALUATED AND STUCK WITH THAT ALL THE WAY THROUGH.

Q.   SO YOU DIDN'T REASSESS.   IT'S A SIMPLE QUESTION.

A.   YES.

Q.   THE TRIAL TRANSCRIPT WOULD INDICATE THAT ON SEVERAL OCCASIONS THE JUDGE OFFERED THE POSSIBILITY OF A PROFFER OF BOTH DR. LISAK'S TESTIMONY AND DR. MEDLIN'S TESTIMONY SO THAT HE WOULD KNOW EXACTLY WHAT HE WAS DEALING WITH, NOT IN SOME SORT OF THEORETICAL BASIS, BUT THESE ARE THE WORDS THAT I WILL ALLOW.   DID YOU EVER OR THE OTHER ATTORNEYS TAKE ADVANTAGE OF THAT OFFER TO PROFFER DR. LISAK'S TESTIMONY?

A.   NO, WE DIDN'T.   I MEAN NOT HAVING HIM LIVE IN THERE TESTIFYING, NO.

Q.   RIGHT.   WAS A DECISION NOT TO HAVE MR. LECROY EVALUATED OR TO PRESENT MENTAL HEALTH EVIDENCE DURING HIS FEDERAL TRIAL MADE BECAUSE YOU WERE FEARFUL THAT THERE WOULD BE A SUBSEQUENT STATE TRIAL AND THEN THAT EVIDENCE WOULD COME IN?

A.   NO.   WE HAD NO FEAR OF STATE TRIAL.   I MEAN, LUMPKIN COUNTY, MY RECOLLECTION, IT HAD BEEN DECADES SINCE THEY HAD TRIED A CAPITAL CASE UP THERE.   AND IT'S ONE OF THE POOREST COUNTIES AROUND.   THERE WAS NO WAY THEY WERE GOING TO SPEND ANY MONEY TO TRY BILL LECROY CAPITALLY.   THAT'S WHY IT WAS HERE FEDERALLY.   THAT'S JUST, THAT'S SILLY.

Q.   WAS THERE ANY REASON FOR YOU TO LIKE HOLD BACK YOUR

173

AMMUNITION FOR SOME FEAR OF A FUTURE STATE TRIAL?

A.   WE HAD ABSOLUTELY NO FEAR OF A STATE TRIAL.

Q.   DURING YOUR CLOSING ARGUMENT, YOU ARGUED THAT THE STATE HAD NOT PROVED PREMEDITATION.  WAS THE DECISION MAKING REGARDING THE MENTAL HEALTH EXPERTS MADE SO THAT YOU COULD HAVE THAT ARGUMENT?  DO YOU UNDERSTAND WHAT I'M SAYING?  SO YOU WOULDN'T UNDERCUT THAT ARGUMENT, EXCUSE ME?

A.   NO.  I MEAN, THE PREMEDITATION PART WAS A GUILT/INNOCENCE ARGUMENT.  I'M NOT QUITE SURE I UNDERSTAND WHY --

          MR. MCKINNON:  I'M SORRY, WE'RE HAVING A HARD TIME HEARING SOME OF THE ANSWERS.

          THE WITNESS:  I'M SORRY.  THE PREMEDITATION --

BY MR. MARTIN:

Q.   AS AN AGGRAVATOR, PREMEDITATION AS A STATUTORY AGGRAVATOR.

A.   I DIDN'T -- I MEAN, WE WEREN'T -- I DON'T THINK WE HAD MUCH OF A SHOT TO DEFEAT THE STATUTORY AGGRAVATORS.  SO, I MEAN, THE DECISION WITH REGARD TO DR. LISAK REALLY WASN'T FOCUSED ON THAT PART OF THE AGGRAVATION.

Q.   LET ME ASK YOU A FEW QUESTIONS ABOUT SOME OF THE OTHER LEGAL ISSUES IN THE CASE.  FIRST OF ALL, DID YOU PLAY A ROLE IN THE BRIEFING TO THE ELEVENTH CIRCUIT?

A.   YES.

Q.   AND DID YOU HAVE ANY PARTICULAR ISSUES THAT YOU WERE RESPONSIBLE FOR?

A.   I WROTE UP THE JURY CHARGE ISSUE RELATING TO FUTURE

174

DANGEROUSNESS.

Q.   IN CONNECTION WITH THAT ISSUE, DO YOU RECALL THAT THE ELEVENTH CIRCUIT HELD THAT IT HAD NOT BEEN PERFECTED AT TRIAL AND, THEREFORE, IT WAS GOING TO BE REVIEWED ONLY ON A PLAIN ERROR STANDARD?

A.   YES.

Q.   WHY DIDN'T IT GET PERFECTED AT TRIAL?

A.   YOU KNOW, IT JUST -- I GUESS THE ONLY -- IT DIDN'T GET OBJECTED TO AT THE JURY CHARGE IS MY UNDERSTANDING.  I MEAN, WE HAD BEEN ARGUING THAT ISSUE IN MOTIONS IN LIMINE AND OBJECTIONS AND, I MEAN, DAY AFTER DAY AFTER DAY DURING THE SENTENCING PHASE.  AND SOMEHOW, I MEAN, THE ONLY THING I CAN THINK IS IT WAS A LATE AFTERNOON, HOUR-AND-A-HALF CHARGE CONFERENCE, AND WE JUST FORGOT TO SAY THE MAGIC WORDS.

Q.   DURING THE CLOSING ARGUMENT BY THE PROSECUTION IN THE SENTENCING PHASE OF THE TRIAL, AN ARGUMENT WAS MADE THAT MR. LECROY SHOULD BE SENTENCED TO DEATH BECAUSE OF THE INABILITY OF THE PRISON SYSTEM TO SECURE MR. LECROY UNLESS HE'S ON DEATH ROW.  DO YOU REMEMBER THAT ARGUMENT BEING MADE?

A.   I DO.

Q.   IT WASN'T OBJECTED TO.  WAS THERE ANY REASON NOT TO OBJECT TO IT?

A.   NO.

Q.   THERE WAS, ON THE APPEAL THERE WAS A CLAIM MADE THAT IT WAS A VIOLATION OF MR. LECROY'S FOURTH AMENDMENT RIGHTS TO

175

RETAIN CERTAIN DOCUMENTS THAT HAD BEEN SEIZED FROM HIS AUTOMOBILE AT THE TIME OF HIS ARREST IN THE EARLY '90S.  BUT THAT ISSUE HAD ONLY BEEN RAISED ON REPLY BRIEF; THEREFORE, WAS NOT SUITABLE FOR A DECISION BY THE ELEVENTH CIRCUIT.  WAS THERE ANY REASON NOT TO RAISE THAT ISSUE IN THE OPENING BRIEF?

A.    NOT THAT I KNOW OF.

Q.    THESE WERE NOT ISSUES THAT WERE BEING CULLED OUT NOT TO BE PRESENTED ON APPEAL.  IS THAT CORRECT?

A.    THIS IS A DEATH PENALTY CASE.  YOU DON'T CULL.

        MR. MCKINNON:  I'M SORRY, JUDGE, WE COULDN'T HEAR THAT LAST RESPONSE.

        THE WITNESS:  I SAID THIS IS A DEATH PENALTY CASE. YOU DON'T CULL ISSUES.  YOU RAISE ALL OF THEM.

BY MR. MARTIN:

Q.    THERE WAS RAISED ON APPEAL THE QUESTION OF WHETHER THE NONSTATUTORY AGGRAVATORS SHOULD BE ALLEGED IN THE INDICTMENT UNDER *RING VERSUS ARIZONA* AND OTHER CASES AND THE *JONES* CASE, AS WELL.  WHAT WAS NOT RAISED ON APPEAL WAS THE QUESTION WHETHER THE FINAL BALANCE BETWEEN AGGRAVATING AND MITIGATING CIRCUMSTANCES SHOULD HAVE BEEN INCLUDED IN THE INDICTMENT AND SHOULD BE A PART OF THE FINDINGS OF THE JURY -- NOT THE FINDINGS OF THE JURY, BUT THEY SHOULD BE FOUND BEYOND A REASONABLE DOUBT BY THE JURY.  WAS THERE ANY REASON NOT TO RAISE THAT ISSUE?

A.    NO.

176

Q.   I ASSUME THAT, OR I'LL ASK ANYWAY, YOU WERE NOT INVOLVED

IN THE JURY CHALLENGE ISSUES AND THE DECISIONS THAT WERE MADE

ON HOW THAT EVIDENCE WOULD BE PRESENTED.

A.   I SAT IN ON MEETINGS, BUT THAT WASN'T MY ISSUE.

Q.   THAT WAS THE AUSPICES OF MR. KISH AND MR. SUMMER; RIGHT?

A.   RIGHT.

Q.   I MAY HAVE ASKED THIS BUT I WANT TO BE CLEAR:  ON THE

APPEAL, THE ELEVENTH CIRCUIT RULES THAT YOUR CLAIMS REGARDING

THE LIMITATIONS ON DR. LISAK AND OTHERS, WELL, WOULD NOT BE

HEARD ON APPEAL BECAUSE OF THE FAILURE TO ACTUALLY CALL

DR. LISAK OR TO PRESENT THAT TESTIMONY UNDER THE *LUCE* CASE,

L-U-C-E.  WAS THERE ANY REASON, STRATEGIC REASON OTHERWISE NOT

TO PROFFER THAT TESTIMONY TO PERFECT THAT ISSUE AT THE TRIAL

LEVEL?

A.   NO, NOT THAT I CAN THINK OF.

          MR. MARTIN:  JUST ONE SECOND.

          (DISCUSSION OFF THE RECORD.)

          MR. MARTIN:  NOTHING FURTHER, YOUR HONOR.

          EXCUSE ME.  THERE MAY BE SOMETHING.

          (DISCUSSION OFF THE RECORD.)

BY MR. MARTIN:

Q.   IN YOUR CONVERSATIONS WITH DR. LISAK, DID HE EVER EXPRESS

AN OPINION TO YOU AS TO WHETHER THE MATTERS THAT HE OBSERVED IN

THE RECORDS AND OTHER MATTERS THAT WERE PRESENTED TO HIM ABOUT

MR. LECROY WERE CONSISTENT WITH SOMEBODY WHO HAD SUFFERED FROM

177

ABUSE AS A CHILD FROM AN ADULT FEMALE?

A.    YES.   HE BELIEVED THEY WERE CONSISTENT.

          MR. MARTIN:   THAT'S ALL I HAVE, YOUR HONOR.

          THE COURT:   ALL RIGHT.   WE WILL RECESS FOR TODAY AT THIS TIME CONSISTENT WITH THE REPRESENTATION WE MADE TO THE AUTHORITIES IN INDIANA.

          BUT BEFORE WE DO, I FAILED TO TAKE UP A MATTER I HAD INTENDED TO TAKE UP THIS MORNING.   I THINK I HAD INDICATED TO COUNSEL I WAS GOING TO.   AND IT WAS, MR. LECROY, WITH YOU I WANTED TO -- THROUGH YOUR COUNSEL WE HAD DISCUSSED THE SETUP THAT WE HAVE HERE PERMITTING YOU TO PARTICIPATE BY VIDEOCONFERENCE RATHER THAN BEING PRESENT HERE IN THE COURTROOM, AND COUNSEL HAD INDICATED TO ME THAT THIS WAS AGREEABLE.   BUT I WANTED TO MAKE SURE THAT YOU HAD BEEN ADVISED OF YOUR RIGHTS TO PARTICIPATE AND BE PRESENT AND CERTAINLY TO HAVE COMMUNICATIONS WITH YOUR COUNSEL, AS WELL.

          ARE YOU SATISFIED WITH PARTICIPATING IN THE PROCEEDING THROUGH VIDEOCONFERENCE AS IS BEING DONE TODAY?

          THE DEFENDANT:   YES, SIR, I AM.

          THE COURT:   AND AS I STATED TO YOU WHEN WE STARTED OUT THIS MORNING, IF AT ANY POINT THERE ARE ANY DIFFICULTIES IN YOUR BEING ABLE TO HEAR, SEE, UNDERSTAND WHAT'S TAKING PLACE HERE, IF YOU'LL STOP US AND LET ME KNOW THAT, WE'LL ADDRESS IT AT THAT TIME.

          AND I BELIEVE ARRANGEMENTS WERE MADE, IT WAS MY

178

UNDERSTANDING THEY WOULD BE MADE SO THAT YOU DO HAVE THE OPPORTUNITY FOR CONFIDENTIAL COMMUNICATIONS WITH COUNSEL OUTSIDE, OBVIOUSLY, THE HEARING AND OBSERVATION OF THOSE OF US HERE.  ARE YOU SATISFIED THAT YOU'VE HAD ADEQUATE ACCESS TO YOUR COUNSEL THROUGH THE DAY?

THE DEFENDANT:  YES, SIR, I AM.

THE COURT:  ALL RIGHT.  WE WILL THEN ADJOURN FOR THE DAY.

MR. MARTIN:  BEFORE WE ADJOURN, JUST ONE --

THE COURT:  YES.

MR. MARTIN:  WE CONTACTED DR. HILTON, AND HE HAD ARRANGED HIS APPOINTMENTS TO TESTIFY TOMORROW MORNING.  AND HE SAID NOW IT WOULD BE VERY DIFFICULT FOR HIM TO SWITCH TO THE AFTERNOON.  I DON'T KNOW IF MR. MCKINNON WOULD OBJECT, I HAVEN'T EVEN MENTIONED IT TO HIM, OF GOING AHEAD WITH DR. HILTON BEFORE MR. MCKINNON DOES HIS CROSS-EXAMINATION OF MR. MENDELSOHN.  I'M JUST THROWING THAT OUT THERE.

THE COURT:  ANY PROBLEM WITH THAT?

MR. MCKINNON:  I DON'T THINK SO, NO.

THE COURT:  THE ONLY PROBLEM WE HAVE IS WE WERE GOING TO START LATE TOMORROW.

MR. MARTIN:  I UNDERSTAND.

THE COURT:  IF Y'ALL WILL BE HERE, I MAY BE READY TO GO BY 10:30.  I HAD SAID 10:45 BECAUSE I DON'T LIKE OTHER FOLKS WAITING ON ME.  BUT IF YOU ARE HERE AT 10:30, WE'LL TRY TO

179

START AS CLOSE TO THAT AS WE CAN.  SO WHY DON'T WE TARGET 10:30 FOR A START TIME; AND AS QUICKLY AFTER THAT AS WE CAN START, WE SHOULD BE READY TO BE UP AND RUNNING.

SO WE'LL BE IN RECESS UNTIL 10:30 TOMORROW MORNING. WE'LL START OUT WITH DR. HILTON AND THEN PICK BACK UP WITH MR. MENDELSOHN.  WE'RE IN RECESS.

(PROCEEDINGS ADJOURNED.)

* * *

REPORTER'S CERTIFICATION

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
SHARON D. UPCHURCH, RPR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

DATE: _____