180

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA ) DOCKET NO. 2:02-CR-38-RWS
                         )
            V.           ) ATLANTA, GEORGIA
                         )
WILLIAM EMMETT LECROY,   ) JANUARY 12, 2010
JR.,                     )
                         )
         DEFENDANT.      )
                         )

VOLUME II
TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:                    WILLIAM L. MCKINNON, ESQ.
                                       SHANYA DINGLE, ESQ.
                                       MARY JANE STEWART, ESQ.
                                       ASSISTANT U.S. ATTORNEYS

FOR THE DEFENDANT:                     JOHN R. MARTIN, ESQ.
                                       SANDRA L. MICHAELS, ESQ.
                                       DEFENSE ATTORNEYS

COURT REPORTER:                        SHARON D. UPCHURCH
                                       2114 U. S. COURTHOUSE
                                       ATLANTA, GEORGIA 30303-3361
                                       (404) 215-1354

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
PRODUCED BY COMPUTER.

181

INDEX TO EXAMINATION

WITNESS:                                           PAGE


MICHAEL HILTON, M.D.:
DIRECT EXAMINATION                                 182
CROSS-EXAMINATION                                  217
REDIRECT EXAMINATION                               252

BRIAN MENDELSOHN:
CROSS-EXAMINATION                                  258
REDIRECT EXAMINATION                               280

MARTI CARLSON, PSY.D.:
DIRECT EXAMINATION                                 301
CROSS-EXAMINATION                                  327
REDIRECT EXAMINATION                               341

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

182

P R O C E E D I N G S

(JANUARY 12, 2010; IN OPEN COURT)

THE COURT:  MR. GOSS, YOU MAY SWEAR THE WITNESS.

(THE WITNESS WAS SWORN.)

THE DEPUTY CLERK:  PLEASE STATE YOUR FULL NAME.

THE WITNESS:  MICHAEL HILTON.

MICHAEL HILTON, M.D.,

HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. MARTIN:

Q.   DR. HILTON, WHAT IS YOUR PROFESSION?

A.   I'M A PHYSICIAN SPECIALIZING IN PSYCHIATRY.

Q.   TELL THE COURT BRIEFLY YOUR EDUCATIONAL BACKGROUND.

A.   WENT TO UNDERGRADUATE AT THE UNIVERSITY OF ALABAMA, WENT TO MEDICAL SCHOOL AT THE UNIVERSITY OF ALABAMA BIRMINGHAM.  DID AN INTERNSHIP IN GENERAL SURGERY AT CARRAWAY METHODIST MEDICAL CENTER FOLLOWED BY PSYCHIATRIC RESIDENCY AT JOHNS HOPKINS HOSPITAL IN BALTIMORE, MARYLAND; AND THEN A FELLOWSHIP IN FORENSIC PSYCHIATRY AT THE UNIVERSITY OF MARYLAND.  AND FOLLOWING THAT I MOVED TO ATLANTA AND HAVE BEEN IN PRIVATE PRACTICE FOR 20 YEARS.

Q.   WHAT IS FORENSIC PSYCHIATRY?

A.   FORENSIC PSYCHIATRY IS THE INTERFACE BETWEEN PSYCHIATRY AND THE LAW.  IT INVOLVES A VARIETY OF DIFFERENT AREAS OF THAT INTERACTION, SOME OF IT BEING CRIMINAL, SOME OF IT BEING CIVIL

183

OR WORKERS COMPENSATION, SOME OF IT BEING PROBATE, GUARDIANSHIP ISSUES, CHILD CUSTODY, COMPETENCY TO MAKE A WILL, THINGS OF THAT SORT.

Q.    AND WHAT PERCENTAGE OF YOUR PRACTICE IS FORENSIC AS OPPOSED TO OTHER TYPES OF PRACTICE?

A.    ABOUT 40 TO 50 PERCENT OF MY PRACTICE IS FORENSIC.

Q.    AND WHAT'S THE REST OF YOUR PRACTICE?

A.    GENERAL PSYCHIATRIC CARE.

Q.    OKAY.  HAVE YOU BEEN RETAINED BY PROSECUTORS' OFFICES, DEFENSE ATTORNEYS, OTHER PEOPLE TO DO FORENSIC EVALUATIONS?

A.    YES, I HAVE.

Q.    TELL US A LITTLE BIT ABOUT THAT.

A.    WELL, IN THE CIVIL AREA, MY WORK IS ABOUT 50/50 PLAINTIFF/DEFENSE.  IN WORKERS COMP. IT'S ABOUT 90 PERCENT DEFENSE BECAUSE THE CLAIMANTS' ATTORNEYS DON'T HAVE THE FUNDS TO HIRE FORENSIC EXPERTS.

IN CRIMINAL IT'S DEPENDENT.  IN STATE COURTS IT'S ALMOST ENTIRELY DEFENSE BECAUSE THE STATE USES STATE HOSPITAL EXPERTS FOR THEIR PURPOSES FOR THE MAJORITY, ALTHOUGH I HAVE HAD A FEW CASES WHERE THEY HIRED ME SPECIFICALLY FOR THE STATE.

IN FEDERAL COURT IT'S BEEN MORE VARIABLE.  WHEN I FIRST BEGAN PRACTICING, IT WAS ABOUT 75 PERCENT PROSECUTION IN THE U.S. COURTS, 25 PERCENT DEFENSE.  OVER TIME IT'S FLUCTUATED, AND I'D SAY AT THE PRESENT TIME IT'S ABOUT 75 PERCENT DEFENSE AND 25 PERCENT PROSECUTION.

184

Q.    HAVE YOU BEEN RETAINED BY THE UNITED STATES ATTORNEY'S

OFFICE HERE IN THE NORTHERN DISTRICT OF GEORGIA TO DO FORENSIC

EVALUATIONS?

A.    YES, I HAVE.

Q.    HAVE YOU BEEN RETAINED BY THE DEPARTMENT OF JUSTICE IN

OTHER STATES WITH REGARDS TO FORENSIC EVALUATIONS?

A.    YES, I HAVE.

Q.    HAVE YOU DONE WORK FOR THE FEDERAL DEFENDER'S OFFICE HERE

IN THE NORTHERN DISTRICT OF GEORGIA?

A.    YES, I HAVE.

Q.    TO DO FORENSIC EVALUATIONS.  HAVE YOU DONE WORK WITH THE

CAPITAL DEFENDER'S OFFICE FOR THE STATE OF GEORGIA?

A.    YES.

Q.    WHAT ABOUT THE GEORGIA RESOURCE CENTER DOING FORENSIC

EVALUATIONS?

A.    YES.

Q.    HAVE YOU BEEN QUALIFIED AS AN EXPERT TO TESTIFY ON THE

ISSUES OF FORENSIC PSYCHIATRY IN CRIMINAL CASES?

A.    YES.

Q.    APPROXIMATELY HOW MANY TIMES DO YOU THINK OVER THE YEARS?

A.    50 TO 75 TIMES.

Q.    AND HAVE YOU ALSO BEEN QUALIFIED AS AN EXPERT IN CIVIL

CASES --

A.    YES.

Q.    -- TO TESTIFY ON ISSUES OF FORENSIC PSYCHIATRY?

185

A.   YES.

Q.   I SHOW YOU WHAT'S BEEN PREVIOUSLY MARKED AS DEFENDANT'S EXHIBIT 4 AND WOULD ASK YOU TO IDENTIFY THAT DOCUMENT.

A.   THAT'S MY RESUMÉ.

Q.   ARE YOU CURRENTLY LICENSED TO PRACTICE PSYCHIATRY, OR A MEDICAL LICENSE IN GEORGIA?

A.   YES, I AM.

MR. MARTIN:  I WOULD MOVE IN EVIDENCE DEFENDANT'S EXHIBIT 4.

MR. MCKINNON:  NO OBJECTION.

THE COURT:  IT'S ADMITTED.

MR. MARTIN:  YOUR HONOR, HERE'S A COPY FOR YOU.

THE COURT:  THANK YOU.

BY MR. MARTIN:

Q.   APPROXIMATELY HOW MANY FORENSIC-TYPE OF EVALUATIONS DO YOU DO EACH WEEK IN YOUR PRACTICE?

A.   APPROXIMATELY THREE A WEEK.

Q.   AND WHAT IS THE GENERAL PROCESS FOR DOING A FORENSIC EVALUATION?

A.   WELL, I USUALLY ASK FOR WHATEVER PERTINENT MEDICAL INFORMATION I CAN GET OR RECORDS; AND SOMETIMES I REVIEW THOSE IN ADVANCE, SOMETIMES AFTER AN EXAMINATION.  BUT I ALWAYS LIKE TO PERSONALLY INTERVIEW THE INDIVIDUAL THAT'S IN QUESTION. THAT EXAMINATION USUALLY LASTS ANYWHERE FROM TWO HOURS TO I'VE HAD ONE THAT WENT NINE HOURS.  BUT I WOULD SAY ON AVERAGE ABOUT

186

THREE HOURS.

Q.   IS THE EXAMINATION ITSELF AN IMPORTANT PART OF THE PROCESS OF DOING A FORENSIC EVALUATION?

A.   YES.   INTERACTING WITH THE INDIVIDUAL SPECIFICALLY AND ASKING QUESTIONS AND BEING ABLE TO FOLLOW UP ON THOSE QUESTIONS IS VERY IMPORTANT.

Q.   ARE YOU TRAINED TO, IN THAT EVALUATION PROCESS TO MAKE OBSERVATIONS AS TO HOW THE PERSON IS DESCRIBING THEIR EVENTS, WHAT THEY'RE SAYING, THE NATURE OF THE EXAMINATION ON A FACE-TO-FACE BASIS?

A.   YES.   AS YOU INTERVIEW SOMEONE, ONE OF THE THINGS THAT YOU HAVE TO DO IS DETERMINE WHETHER THEY ARE OPEN OR A LITTLE CLOSED IN THEIR INTERACTION.   AND IF THEY ARE CLOSED, YOU HAVE TO DO MORE TO WORK TO GET THOSE QUESTIONS OUT; AND IF THEY ARE REALLY OPEN, THEN YOU HAVE TO DO MORE TO GUIDE THEM IN A DIRECTION THAT WOULD GIVE YOU USEFUL INFORMATION.

Q.   WERE YOU CONTACTED TO DO AN EVALUATION OF WILLIAM LECROY, JR.?

A.   YES, I WAS.

Q.   WHO CONTACTED YOU?

A.   THE U.S. PUBLIC DEFENDER'S OFFICE OR FEDERAL DEFENDER'S OFFICE.

Q.   DO YOU REMEMBER IN PARTICULAR WHAT PERSON?

A.   I HAVE IT IN HERE.

Q.   CAN I SUGGEST A NAME?

A.    I'VE GOT IT RIGHT HERE.  SUSAN MILLER.

Q.    OKAY, GOOD.  AND WERE YOU PROVIDED WITH DOCUMENTARY INFORMATION ABOUT MR. LECROY RELEVANT TO HIS CASE AND HIS BACKGROUND?

A.    YES, I WAS.

Q.    BEFORE ASKING THE NEXT QUESTION, WHAT WERE YOU ASKED TO DO IN YOUR EVALUATION?

A.    WELL, I WAS ASKED TO ADDRESS THREE ISSUES; ONE BEING COMPETENCY TO STAND TRIAL, AND THAT REFERS TO ONE'S ABILITY TO BE CAPABLE OF WORKING THROUGH THE COURTROOM PROCESS.  I WAS ASKED TO ADDRESS THE ISSUE OF CRIMINAL RESPONSIBILITY WHICH ADDRESSES THEIR PSYCHIATRIC STATE AT THE TIME OF THE OFFENSE, AND THEN ALSO TO ADDRESS ANY MITIGATING FACTORS IN HIS SITUATION THAT MIGHT HELP TO EXPLAIN THIS TERRIBLE CRIME.

Q.    CAN YOU TELL US -- WELL, FIRST OF ALL, THIS EVALUATION YOU DID WAS BACK IN 2003; CORRECT?

A.    2003, YES.

Q.    HAVE YOU HAD AN OPPORTUNITY TO REVIEW YOUR FILES AND YOUR RECORDS ABOUT THAT EVALUATION TO REFRESH YOUR RECOLLECTION OF IT?

A.    YES, I HAVE.

Q.    AND AS WELL AS THE DOCUMENTARY EVIDENCE THAT YOU WERE PROVIDED?

A.    YES.

Q.    FIRST OF ALL, TELL US WHAT INFORMATION, DOCUMENTARY

188

INFORMATION OR BACKGROUND INFORMATION YOU HAD TO BASE YOUR

EVALUATION UPON.

A.    IT WAS A CRIMINAL INDICTMENT THAT I REVIEWED, A SOCIAL

HISTORY THAT HAD BEEN PROVIDED, A POLICE INCIDENT REPORT,

SEVERAL HANDWRITTEN NOTES, COOK COUNTY SHERIFF'S DEPARTMENT

REPORT BY JANET BURKE, COOK COUNTY SHERIFF'S DEPARTMENT OFFENSE

AND INCIDENT REPORT FROM '01, MINNESOTA DEPARTMENT OF PUBLIC

SAFETY STATE PATROL FIELD RECORD, MILITARY DOCUMENTS, COBB

COUNTY PUBLIC SCHOOL RECORDS, COURT DOCUMENTS RELATIVE TO HIS

ARREST AND CONVICTION IN '91, AND HIS PRISON RECORDS INCLUDING

HIS MENTAL HEALTH PRISON RECORDS.

Q.    AND DID YOU HAVE AN OPPORTUNITY ALSO TO PERSONALLY EXAMINE

MR. LECROY?

A.    YES, I DID.

Q.    AND WHERE DID THAT OCCUR, IF YOU RECALL?

A.    IN THE LUMPKIN COUNTY JAIL.

Q.    AND WAS THAT IN A PRIVATE SETTING SO THAT YOU COULD HAVE A

SUITABLE EXAMINATION?

A.    YES.

Q.    BASED ON YOUR REVIEW OF THE RELEVANT RECORDS AND YOUR

PERSONAL EXAMINATION OF MR. LECROY, DID YOU REACH A DIAGNOSIS

ABOUT HIM?

A.    YES, I DID.

Q.    FIRST OF ALL, BEFORE WE GET INTO SPECIFICS OF THAT, I WANT

YOU TO -- THERE ARE SOME DOCUMENTS THAT ARE IN THE RECORD.

189

SHOWING YOU DEFENDANT'S EXHIBITS 1, 2 AND 3 WHICH ARE ALREADY IN EVIDENCE.  ARE THOSE THE REPORTS THAT YOU PRODUCED ON THE BASIS OF YOUR EVALUATION?

A.   YES, I DID.

Q.   AND IS IT YOUR -- WHAT IS YOUR PRACTICE WITH REGARDS TO WRITING UP A REPORT TO RECORD YOUR OBSERVATIONS, DIAGNOSIS AND INFORMATION YOU RELIED UPON?

A.   WELL, I FREQUENTLY WILL BREAK THE QUESTIONS DOWN INTO THREE REPORTS WITH ONE REPORT ADDRESSING COMPETENCY, ONE REPORT ADDRESSING CRIMINAL RESPONSIBILITY, AND ONE REPORT ADDRESSING MITIGATION, SO THAT IF THE DEFENSE OR THE PROSECUTION DECIDES TO USE OR NOT USE ONE ASPECT OF THAT, THEY'RE NOT STUCK WITH PROVIDING INFORMATION THAT'S NOT PERTINENT TO WHAT MAY BE BEING DISCUSSED.

Q.   OKAY.  BEFORE WE GET INTO THE THIRD REPORT, DID YOU REACH A CONCLUSION AS TO WHETHER OR NOT MR. LECROY WAS COMPETENT TO STAND TRIAL?

A.   YES, I DID.

Q.   WHAT WAS YOUR CONCLUSION?

A.   IT WAS MY OPINION THAT HE WAS COMPETENT TO STAND TRIAL.

Q.   DID YOU REACH A CONCLUSION AS TO WHETHER OR NOT HE WAS LEGALLY RESPONSIBLE, BY THAT WHETHER OR NOT HE WOULD BE LEGALLY INSANE UNDER THE STANDARDS IN FEDERAL COURT?

A.   YES, I DID.  IT WAS MY OPINION HE WAS NOT LEGALLY INSANE AND THAT HE WAS CRIMINALLY RESPONSIBLE.

190

Q.   AND WOULD THE DEFENDANT'S 1 AND 2 BE THE REPORTS THAT REFLECT THOSE CONCLUSIONS?

A.   YES.

Q.   NOW, DID YOU GO FURTHER AND REACH A DIAGNOSIS OF THE DEFENDANT BEYOND THE QUESTION SOLELY OF COMPETENCY AND LEGAL RESPONSIBILITY?

A.   YES, I DID.

Q.   TELL THE COURT WHAT YOUR DIAGNOSIS AND CONCLUSIONS WERE FROM ALL THE INFORMATION THAT YOU HAD AVAILABLE.

A.   WELL, SPECIFICALLY, I DIAGNOSED MR. LECROY AS SUFFERING FROM PERSONALITY DISORDERS, PRIMARILY BORDERLINE BUT ALSO ANTISOCIAL AND SCHIZOTYPAL PERSONALITY DISORDER TRAITS.  I NOTED A PREVIOUS HISTORY OF REPORTED MAJOR DEPRESSION.  AND SO THOSE WOULD HAVE BEEN THE DIAGNOSES THAT I LISTED.

NOW, IN COMING TO THOSE CONCLUSIONS AND IN OBTAINING THE INFORMATION SUPPORTIVE OF THAT, I WOULD SHARE THE FOLLOWING AND I WOULD LIST THIS IN A FASHION THAT STARTS WITH HIS FAMILY BACKGROUND, GOES THROUGH HIS PERSONAL HISTORY, AND THEN GOES ALL THE WAY UP TO THE PRESENT.  WHAT WE SEE WITH MR. LECROY IS THAT HE COMES FROM A FAMILY BACKGROUND WITH ADDICTION AND SUICIDAL BEHAVIORS IN FAMILY MEMBERS.  THERE'S A COUSIN WITH PARANOID SCHIZOPHRENIA, AND I THINK THAT'S IMPORTANT FROM THE STANDPOINT THAT IN AN INDIVIDUAL WITH A SCHIZOTYPAL PERSONALITY DISORDER, YOU OFTEN SEE THIS FAMILY LINKAGE WITH SCHIZOPHRENIA. AND SO WE ACTUALLY DO HAVE THAT LINKAGE THERE, AND I'LL COME

191

BACK AND TALK ABOUT HIS SCHIZOTYPAL PERSONAL LATER.

WE SEE AN INDIVIDUAL WHO WAS PHYSICALLY AND EMOTIONALLY ABUSED BY HIS FATHER WHILE GROWING UP.  WE'VE GOT NUMEROUS DOCUMENTATIONS OF THIS ABUSE.  WE'VE GOT HIM COMPLAINING OF ABANDONMENT BY HIS FATHER AND HIS MOTHER AS A CHILD, FEELING THEY WEREN'T THERE FOR HIM, THAT THEY DIDN'T NURTURE HIM.

LATER WE HAVE CONSISTENT DOCUMENTATION OF HIM HAVING BEEN SEXUALLY ABUSED AT THE AGE OF EIGHT BY A BABYSITTER, AND I WILL COME BACK TO THAT IN A LITTLE BIT.

WE'VE GOT THE SUBSEQUENT DEVELOPMENT OF ABNORMAL SEXUAL BEHAVIORS AS A CHILD AND AS A TEENAGER THAT FREQUENTLY DEVELOP IN INDIVIDUALS WHO HAVE BEEN PREMATURELY EXPOSED TO SEXUALITY AND SEXUAL ABUSE, AND THESE INVOLVE SOME BIZARRE MASTURBATION ENCOUNTERS WITH ANOTHER MALE COUSIN INVOLVING SOME WHIPPING OF ONE OF THEIR PENISES AND SOME OTHER THINGS.  AND THEN WE'VE GOT THE DEVELOPMENT OF SOME COMPULSIVE MASTURBATION THAT DEVELOPED AS AN OLDER CHILD AND TEENAGER INVOLVING THOUGHTS OF THIS SEXUAL ENCOUNTER HE HAD WITH THE BABYSITTER WHEN HE WAS EIGHT.

WE'VE GOT EXPOSURE TO PORNOGRAPHY AS A YOUNG TEENAGER. WE'VE GOT A SEXUAL ENCOUNTER WITH A STEPSISTER WHO WAS 13, ALMOST 14 WHEN HE WAS 19 THAT CAUSED HIM TO GO OFF TO PRISON A NUMBER OF YEARS LATER WHEN HE WAS, I THINK, ABOUT 20.  IT WAS HIS FIRST REFERRAL TO THE PRISON SYSTEM.  SO WE'VE GOT ALL OF THOSE SORTS OF BIZARRE SEXUAL BEHAVIORS THAT ARE DEVELOPING IN THIS INDIVIDUAL.

192

WE'VE GOT AN INDIVIDUAL WHO HAS DEVELOPED A VERY STRONG FANTASY LIFE THAT HAS PLAYED A VERY SIGNIFICANT ROLE IN HIS TEENAGE YEARS AND ADULT YEARS AND EVEN THE CRIME.

WE'VE GOT SOME VERY SERIOUS PROBLEMS WITH ANGER AS A TEENAGER AND ADULT.  WE'VE GOT DOCUMENTATION IN THE PRISON IN THE 1990S AND I THINK EVEN IN 2000 WHERE HE TALKS ABOUT THIS KEEPING HIS ANGRY AND HOSTILE FEELINGS LOCKED UP IN A MENTAL ATTIC IN FEAR OF WHAT WAS UP THERE; CONCERNS ABOUT THE AMOUNT OF HATRED THAT HE CARRIES AROUND AND THE ANGER AND RESENTMENT THAT HE HAD TOWARDS THIS BABYSITTER AND THESE THOUGHTS OF WANTING TO GET EVEN AND THOUGHTS OF REVENGE TOWARDS THIS BABYSITTER WITHIN THE YEAR PRIOR TO HIS RELEASE; AND HIS THOUGHTS ON ONE HAND OF REALIZING THIS SHOULDN'T BE THE SORTS OF THINGS HE SHOULD BE THINKING ABOUT, BUT ON THE OTHER HAND, A VERY STRONG FOCUS THAT IF HE CAUGHT THE BABYSITTER, HE WAS PROBABLY GOING TO EXTRACT REVENGE ON HER.

WE'VE GOT FREQUENT MENTIONS OF RESENTMENT OF AUTHORITY THAT COMES FROM, ALMOST CERTAINLY FROM THE PHYSICAL AND EMOTIONAL ABUSE THAT HE RECEIVED FROM HIS FATHER AS A CHILD. WE'VE GOT THE FACT THAT AS A LATE TEENAGER HE LEFT HOME AND BECAME HOMELESS.  HE GOT OUT OF THE HOUSE AND WAS LIVING OUT OF A CAR AT THE TIME THAT HE WAS ARRESTED AT 19 OR 20.

WE'VE GOT THIS CRIMINAL BEHAVIOR WHEN HE WAS IN HIS CAR LIVING ON THE STREETS OF REPEATED BURGLARIES TO SUPPORT HIS LIVING ON HIS OWN.  THESE BURGLARIES MOSTLY INVOLVED HIM COMING

193

INTO HOMES AND TAKING THINGS AND NOT BEING DIRECTLY CONFRONTATIONAL, BUT THERE WERE A FEW EPISODES WHERE PEOPLE WERE ACTUALLY HOME AND HE WAS CONFRONTATIONAL WITH THREATS.

WE'VE GOT THE PSYCHIATRIC ISSUES THAT DEVELOPED IN FEBRUARY OF 1992 WHEN HE HAD A SUICIDE ATTEMPT.  THIS SUICIDE ATTEMPT INVOLVED HIM OVERDOSING ON 21 INDOCIN.  INDOCIN IS AN ANTI-INFLAMMATORY MEDICATION.  AND HIS STORY IS THAT HE WAS GOING TO TAKE THIS INDOCIN TO CALM HIM ENOUGH THAT HE COULD CUT HIS WRISTS.  WELL, HE TOOK THE INDOCIN AND THEN DEVELOPED SEIZURES WHILE TOXIC UNDER THE INDOCIN AND HAD TO HAVE HIS STOMACH PUMPED AND TREATED.  DURING THIS TIME HE DESCRIBED BEING OVERWHELMED.  HIS IMPULSIVITY WAS NOTED.  THESE FEELINGS OF DEPRESSION THAT HE DESCRIBED HAD COME ON OVER A FEW DAYS AND RESULTED IN THIS SUICIDE ATTEMPT.

WE LATER HAVE SOME WRIST CUTTING TO GET RID OF PAIN A MONTH OR SO LATER.  THE WRIST CUTTING THAT HE DESCRIBED WAS NOT SUICIDAL BUT IT WAS DESIGNED TO GET RID OF PAIN, WHICH IS A CLASSIC FEATURE OF BORDERLINE PERSONALITY DISORDER.  IN FACT, WHEN YOU SEE THIS SELF-DESTRUCTIVE CUTTING TO EASE PAIN, YOU AUTOMATICALLY THINK OF BORDERLINE PERSONALITY DISORDER.

HE WENT THROUGH A LITTLE BIT OF COUNSELING IN 1992.  THEY DIAGNOSED HIM AS SUFFERING FROM A DEPRESSION, A MAJOR DEPRESSION.  WHETHER HE HAD A MAJOR DEPRESSION OR WHETHER THIS WAS A REACTION OF HIS BORDERLINE PERSONALITY DISORDER OR WHETHER THIS WAS A COMBINATION OF SOME DEPRESSIVE COMPONENTS IN

194

KEEPING WITH MAJOR DEPRESSION BUT ALSO SITUATIONAL AND KEEPING WITH HIS BORDERLINE PERSONALITY DISORDER IS REALLY HARD TO SAY. I DON'T THINK IT'S IMPORTANT. WHAT I THINK IS IMPORTANT IS THAT IT WAS AN EPISODE WHERE HE BECAME UNHAPPY WITH HIS SITUATION, HE ATTEMPTED SUICIDE AND DESCRIBED FEELING BADLY FROM AN EMOTIONAL STANDPOINT.

HE WAS THEN OUT OF COUNSELING FOR ABOUT SEVEN YEARS. HE ASKED FOR SOME COUNSELING IN '98 BUT DIDN'T GET IT. BUT THEN IN FEBRUARY OF 1999, DEPRESSIVE SYMPTOMS STARTED TO RETURN. AND, AGAIN, WHETHER IT WAS MAJOR DEPRESSION OR BORDERLINE PERSONALITY DISORDER PRIMARILY IS NOT REALLY IMPORTANT; BUT HE SOUGHT OUT COUNSELING WITH DR. CARLSON, A PSYCHOLOGIST IN THE PRISON SYSTEM. HE WAS IN THIS COUNSELING FROM FEBRUARY OF '99 UNTIL, I THINK, SEPTEMBER OF 1999.

DURING THIS TIME HE DESCRIBED A LOT OF BORDERLINE PERSONALITY TRAITS. HE DESCRIBED SOME BEHAVIORS OF SWIMMING OUT AS FAR AS HE THOUGHT HE COULD SWIM INTO THE OCEAN AND THEN SEEING IF HE COULD SWIM BACK, AGAIN, THIS IDEA OF FLIRTING WITH SUICIDE AND FLIRTING WITH DEATH. HE ACKNOWLEDGED SOME CHRONIC SUICIDAL IDEATIONS. WHEN I EXAMINED HIM HE STILL HAD THESE SUICIDAL IDEATIONS BUT SAID THAT THEY WEREN'T TO THE EXTENT OF HIM THINKING OF ACTING ON THEM, BUT IT'S JUST A CHRONIC SENSE OF AT TIMES WISHING HE WERE DEAD.

NUMEROUS EVALUATION -- SEVERAL EVALUATIONS SUGGEST, REPEATEDLY POINT TOWARDS THE DIAGNOSIS OF BORDERLINE WITH

195

DEPRESSIVE COMPONENTS.  AND THAT'S WHAT PRETTY MUCH WE FIND IN THE RECORDS BEFORE THIS CURRENT OFFENSE FOR WHICH HE'S FACING NOW.

THESE SITUATIONS, I CAN GO INTO MORE DETAIL IF WE WANT TO TALK ABOUT SOME OF HIS THOUGHTS OF REVENGE TOWARDS THE BABYSITTER, HIS RESENTMENT OF AUTHORITY, HIS ANGER PROBLEMS, HIS THOUGHTS, CONCERNS ABOUT HURTING OTHERS; BUT I WOULD JUST SAY THAT THOSE ARE IN THE RECORDS AND I CAN GO TO THOSE IF WE WISH.

NOW, I THINK THAT THOSE AREAS -- AND I ALSO MENTIONED, I THINK I FORGOT, MAYBE FORGOT TO MENTION THAT WHILE HE WAS IN PRISON, HE GOT ACTIVELY INVOLVED IN WICCA, WHICH IS A WITCHCRAFT-TYPE RELIGION, AND THIS THING THAT I MAY HAVE MISPRONOUNCED BUT HE DESCRIBED AS ASATRU, WHICH IS ALSO SORT OF A MAGICAL-TYPE MEDITATION RELIGION-TYPE BELIEF.  AND THIS WAS DOCUMENTED BY ANOTHER INMATE WHO DESCRIBES HIM AS HAVING BEEN INVOLVED IN THOSE THINGS.

NOW, WITH BORDERLINE PERSONALITY DISORDER, I GO TO SOME DOCUMENTS HERE JUST TO DESCRIBE A LITTLE BIT OF WHAT THESE CONDITIONS ARE.

Q.   ARE THERE CRITERIA UNDER THE DIAGNOSTIC AND STATISTICAL MANUAL FOR DIAGNOSING THOSE BORDERLINE DISORDERS?

A.   THERE ARE CRITERIA.  AND WHAT I WOULD START WITH, WHICH I THINK IS THE MOST SIGNIFICANT OF THE PERSONALITY DISORDERS, BORDERLINE PERSONALITY DISORDER.  NOW, THIS IS A PERVASIVE

196

PATTERN OF INSTABILITY OF INTERPERSONAL RELATIONSHIPS, SELF-IMAGE AND AFFECTS AND MARKED IMPULSIVITY.  AND WHAT WE SEE IN MR. LECROY ARE FREQUENT MENTIONS OF HIS CONCERNS FOR ABANDONMENT FROM OTHERS AND EFFORTS OF TRYING TO AVOID ABANDONMENT.

WE SEE A PATTERN OF UNSTABLE RELATIONSHIPS WITH IDEALIZING AND DEVALUING, SEEING THINGS AS BLACK AND WHITE, BECOMING ATTACHED TO HIS THERAPIST IS AN EXAMPLE OF THIS; AND THE IDEA THAT PEOPLE ARE ALL GOOD OR ALL BAD.  WE SEE IMPULSIVITY; SUICIDAL BEHAVIORS; GESTURES; THREATS; SELF-MUTILATING BEHAVIOR; THE WRIST CUTTING THAT WE DESCRIBED, THAT I DESCRIBED; AFFECT OF INSTABILITY; MARKED SHIFTS IN MOOD.  AND THIS MAY BE WHERE WE SEE SOME OF HIS DEPRESSION THAT I SAY MAY NOT BE MAJOR DEPRESSION, IT MAY BE BORDERLINE PERSONALITY DISORDER.  IF I WERE THE PSYCHIATRIST TREATING HIM, I WOULD PROBABLY STILL HAVE RECOMMENDED AT THAT TIME HE BE ON AN ANTIDEPRESSANT; BUT I THINK COUNSELING WOULD HAVE BEEN WHAT I WOULD HAVE SEEN AS THE MOST IMPORTANT FEATURE OF THAT TREATMENT.

HE DESCRIBES, WE HAVE CHRONIC FEELINGS OF EMPTINESS, INAPPROPRIATE INTENSE ANGER, DIFFICULTY CONTROLLING ANGER, TRANSIENT STRESS-RELATED PARANOIA.  AND WHAT YOU FREQUENTLY SEE WITH INDIVIDUALS WHO DEVELOP BORDERLINE PERSONALITY DISORDERS IS THIS HISTORY OF PHYSICAL AND/OR SEXUAL ABUSE AS A CHILD.

Q.   SO SEXUAL ABUSE AND PHYSICAL ABUSE IS ONE OF THOSE FACTORS

197

YOU OFTEN SEE IN PEOPLE WHO HAVE --

A.   VERY COMMON, COMMONLY FOUND IN BORDERLINE PERSONALITY DISORDERS.

NOW, ALONG WITH THAT WE SEE AN INDIVIDUAL WITH ANTISOCIAL PERSONALITY DISORDER TRAITS, AND I WILL GO OVER THAT, ANTISOCIAL.  THIS WOULD BE THE TYPE OF INDIVIDUAL THAT'S FREQUENTLY FOUND IN A CRIMINAL SETTING:  A PERVASIVE PATTERN OF DISREGARD FOR AND VIOLATION OF THE RIGHTS OF OTHERS THAT BEGINS IN CHILDHOOD OR EARLY ADULTHOOD AND CONTINUES INTO ADULTHOOD; FAILURE TO CONFORM TO SOCIAL NORMS; DECEITFULNESS; IMPULSIVITY; RECKLESS DISREGARD FOR OTHERS; LACK OF REMORSE.

AND THEN WE SEE THIS SCHIZOTYPAL PERSONALITY DISORDER. AND IN THAT PERSONALITY DISORDER WE SEE A PERVASIVE PATTERN OF SOCIAL AND INTERPERSONAL DEFICITS MARKED BY ACUTE DISCOMFORT WITH AND REDUCED CAPACITY FOR CLOSE RELATIONSHIPS AS WELL AS BY COGNITIVE OR PERCEPTUAL DISTORTIONS AND ECCENTRICITIES OF BEHAVIOR.  THIS CONDITION IS THE ONE THAT FREQUENTLY MIMICS THE EARLY STAGES OF SCHIZOPHRENIA; AND OFTENTIMES YOU'LL SEE SOMEBODY WITH THESE SCHIZOTYPAL TRAITS, AND TWO YEARS LATER THEY'RE DIAGNOSED WITH SCHIZOPHRENIA.  IN THIS CASE HE HAS A COUSIN WITH PARANOID SCHIZOPHRENIA.

OFTEN YOU'LL SEE TRANSIENT PSYCHOTIC EPISODES OR NEAR PSYCHOTIC EPISODES IN THESE TYPES OF PEOPLE.  THEY HAVE A MAGICAL PERCEPTION OF THINGS AROUND THEM, A TENDENCY TO INCORRECTLY INTERPRET CASUAL INCIDENCES, IDEAS OF REFERENCE

198

TOWARDS THEMSELVES.  AND THIS IS WHAT WE, WHAT I'M GOING TO DESCRIBE IN JUST A FEW MINUTES IN TERMS OF HIS PERCEPTION OF THE VICTIM WHEN HE, AFTER HE CAME ACROSS HER A FEW TIMES.

BUT AT ANY RATE, THOSE WOULD BE THE PERSONALITY DISORDERS I SEE AS PRESENT, AND THESE PERSONALITY DISORDERS WOULD LEAD ONE TO BE A VERY DYSFUNCTIONAL INDIVIDUAL.

Q.    ARE THESE PERSONALITY DISORDERS THAT YOU DESCRIBED A MENTAL ILLNESS?

A.    YES.

Q.    WHY DON'T YOU TALK NOW ABOUT THE ACTUAL CRIME AND HOW YOU SEE -- WHAT MR. LECROY TOLD YOU ABOUT IT AND HOW YOU SEE THESE MENTAL ILLNESSES PLAYING A PART IN THAT, IF AT ALL.

THE COURT:  PULL THE MIKE A LITTLE CLOSER.

A.    WELL, THE FIRST QUESTION YOU HAVE WHEN SOMEBODY STARTS TO DESCRIBE THESE CIRCUMSTANCES SURROUNDING THEIR CRIME, YOU WANT TO LOOK TO THE FACT THAT DOES THIS SEEM TO FIT WITH WHAT THEY HAVE TOLD YOU ABOUT THEIR PAST BEHAVIOR, DO THEY SEEM TO BE EXAGGERATING, DO THEY SEEM TO BE MINIMIZING, DO THEY SEEM TO BE PUTTING THEIR BEST FOOT FORWARD.

AND WHAT I SEE IN THIS SITUATION IS THAT HIS DESCRIPTION OF HIS CIRCUMSTANCES FOLLOWING HIS RELEASE IN AUGUST AND HIS INVOLVEMENT WITH THE CRIME DO NOT SEEM TO MINIMIZE OR MARGINALIZE HIS BEHAVIOR IN THE CRIME.  AND HE DESCRIBED A VERY BRUTAL SITUATION ON THAT DATE THAT WAS DIFFICULT FOR ME TO LISTEN TO.  I DIDN'T GET THE SENSE THAT THERE WAS ANYTHING BUT

199

TRUTHFULNESS PRESENT WHEN HE WAS DESCRIBING THIS, AND IT ALSO SEEMS VERY MUCH IN KEEPING WITH THIS STORY OF A BORDERLINE SCHIZOTYPAL ANTISOCIAL PERSONALITY THAT WE SEE FROM THE RECORDS.

AND WHAT HAPPENED IN THIS SITUATION IS HE'S RELEASED; AND WITHIN SIX WEEKS, WELL, OR EVEN BEFORE THAT, HE'S IN THE SAME NEIGHBORHOOD WITH MS. TIESLER AND HE'S GOING BY HER HOME ON SEVERAL OCCASIONS, NUMEROUS OCCASIONS TO GO TO THE WOODS.  HE'S DEVELOPED THIS SENSE OF SUSPICIOUSNESS TOWARDS AUTHORITIES AND THIS FEAR THAT THEY'RE GOING TO WANT TO PUT HIM BACK IN PRISON. AND HE'S HIDING A LITTLE STASH OF STUFF IN THIS NEAR WOODED AREA THAT IS HIS, HIS GETAWAY STASH THAT HE CAN GO TO IF HE NEEDS TO JUST ESCAPE INTO THE WILDERNESS TO GET AWAY FROM THE AUTHORITIES.

AND HE GOES UP THERE OCCASIONALLY AND BRINGS ITEMS, CLOTHING, FOOD, THIS STUFF THAT FITS, IS IN KEEPING WITH THIS FANTASY HE HAS ABOUT BEING A MILITARISTIC SURVIVALIST.  AND AS HE GOES BY MS. TIESLER'S HOUSE, HE WAVES, SHE WAVES.  AND THAT'S THE EXTENT OF THEIR ENCOUNTERS FOR THE MOST PART, UNTIL ONE DAY WHEN HE'S GOING UP TO HIS STASH, HE SAID HE WAVED, SHE DIDN'T WAVE, AND HE WENT ON TO HIS STASH SIGHT.  AND THEN AS HE'S UP THERE, SHE PULLS UP, I THINK, IN HER SUV, JUST THERE'S A LITTLE PLACE WHERE YOU CAN GET CLOSE, I THINK, ON THE ROAD TO WHERE HE WAS BACK IN THE WOODS; AND SHE LOOKED OUT THE WINDOW AND SAID, HUH.  AND I DON'T KNOW WHY SHE WAS THERE, WHETHER SHE

200

WAS WONDERING WHAT HE WAS DOING ON THIS ROUTE UP THERE FREQUENTLY; BUT IT CAUSED HIM TO HAVE SOME SUSPICION ABOUT TRYING TO INTERPRET WHAT WAS IT THAT SHE WAS DOING WHEN SHE CAME UP THERE TO SEE WHAT HE WAS DOING.

THIS SUSPICION CONTINUED FOR A COUPLE OF DAYS.  HE WAS AT THE TIME LIVING WITH HIS PARENTS, BUT HIS PARENTS WERE OUT OF TOWN AND HE WAS AT HOME.

Q.   IS THAT TYPE OF SUSPICION FROM THAT INCONSEQUENTIAL INCIDENT THE TYPE OF IDEA OF REFERENCE THAT YOU TALKED ABOUT EARLIER?

A.   YEAH, VERY MUCH IN KEEPING WITH THIS PARANOIA, IDEAS OF REFERENCE, CONNECTION WITH HIM THAT WE SEE IN THE SCHIZOTYPAL.

Q.   AND IDEA OF REFERENCE, WHAT IS THAT?

A.   WELL, THAT THERE'S SOMETHING THAT HAPPENED AND THAT IT, OBVIOUSLY, HAS SOMETHING TO DO WITH HIM AND HE HAS TO FIND OUT WHAT THAT CONNECTION IS.

Q.   GO AHEAD.

A.   AND SO AS HE'S TRYING TO THINK ABOUT THE CONNECTION, IT STARTS TO DAWN ON HIM THAT MAYBE MS. TIESLER IS THIS BABYSITTER THAT HE HAD WHEN HE WAS EIGHT YEARS OLD THAT HAD SEXUALLY ABUSED HIM.

AND I THINK THIS IS A TIME TO DESCRIBE THAT SEXUAL ENCOUNTER HE HAD WITH HIS BABYSITTER.  HE FIRST DESCRIBED THIS IN 1992 WHILE IN PRISON AND THEN AGAIN IN MORE DETAIL IN 1999, AND THEN HE DESCRIBED THE SAME SORTS OF ISSUES WITH ME.  WHEN

201

HE WAS EIGHT YEARS OLD, HE AND HIS BROTHER HAD A BABYSITTER. THEY REFERRED TO HER AS TINKERBELL. I DON'T KNOW WHAT HER NAME WAS. HE DIDN'T REMEMBER HER NAME. BUT THEY WOULD FREQUENTLY, WHEN SHE WOULD COME OVER TO SIT, GO UP AND KISS HER ON THE CHEEK AND RUN OFF.

WELL, ONE OF THE EVENINGS AFTER THEY HAD DONE THAT, SHE SENT THEM BOTH TO THEIR ROOMS AND CAME INTO MR. LECROY'S ROOM AND SAID, IF YOU'RE GOING TO KISS A GIRL, YOU NEED TO KNOW HOW TO KISS A GIRL. AND SHE PROCEEDED TO FRENCH KISS HIM AND THEN TOOK HIS CLOTHES OFF AND PERFORMED ORAL SEX ON HIM AND HE FONDLED HER BREASTS SOME. HE FOUND THE EXPERIENCE CONFUSING, EXCITING. HE THOUGHT THAT HE HAD IN PART SOME SPECIAL RELATIONSHIP WITH HER.

THERE WAS ANOTHER INCIDENT, THERE WERE TWO INCIDENCES; AND THE SECOND INCIDENT A FEW DAYS OR A WEEK OR SO, TWO WEEKS LATER INVOLVED HER HAVING TAKEN HIS CLOTHES OFF AND COMING CLOSE TO A SEXUAL ACT. HE REMEMBERS HER HAVING HIM PUT HIS PENIS BETWEEN HER LEGS. HE DOESN'T RECALL WHETHER THERE WAS INTERCOURSE OR NOT; BUT, AGAIN, IT WAS A VERY AROUSING THING THAT CAUSED HIM CONFUSION.

AND THEN AFTER THIS, SHE LIVED UPSTAIRS, AND AFTER THIS, I THINK A FEW DAYS LATER, HE WAS GOING UP THE STAIRS TO SEE HER, THINKING THEY WOULD HAVE THIS RELATIONSHIP; AND SHE HAD THIS SMILE ON HER FACE AS SHE CAME DOWN WITH HER BOYFRIEND, AND HE SAW THAT AS AN EVIL SMILE. AND SHORTLY AFTER THAT HE OR SHE

202

MOVED AWAY, AND THAT WAS HIS LAST ENCOUNTER WITH HER.  AND THIS ENCOUNTER WITH HER STARTED THE DEVELOPMENT OF FANTASIES ABOUT HER; ALSO LED TO THE OTHER SEXUALLY INAPPROPRIATE BEHAVIORS THAT WE DISCUSSED, A COMPULSIVE TYPE OF MASTURBATION AND OVER TIME, AS WELL, A RESENTMENT OVER THAT EXPERIENCE AND LATER A TREMENDOUS RESENTMENT WITH THE SENSE OF REVENGE.

WELL, AS HE STARTS TO THINK THAT MS. TIESLER MIGHT BE THAT BABYSITTER, NOW, THIS IS 12, 13 YEARS LATER -- NO, NO, 23 YEARS LATER, HE STARTS TO DEVELOP SEXUAL URGES.  HE STARTS TO THINK ABOUT HOW HIS LIFE HAS BEEN DESTROYED, AND HE PUTS THAT CONNECTION WITH HER.

THIS INVOLVEMENT HE HAD WITH WICCA IN THE PRISON STARTS TO COME FORWARD; AND HE STARTS TO THINK ABOUT HER AS BEING A WITCH, THAT THE BABYSITTER AND MS. TIESLER NOW IS THIS WITCH WHO'S PUT THIS SPELL ON HIM AND INVOLVED SEXUAL MAGIC WHICH HE SAW AS ONE OF THE STRONGEST FORMS OF MAGIC.  AND THE ONLY WAY TO UNDO SPELLS IS TO HAVE THE PERSON WHO PERFORMED THE SPELL OR SOMEONE WITH A HIGHER POWER UNDO THE SPELL.  SO HE STARTS TO THINK ABOUT MS. TIESLER IN THIS WAY AND STARTS TO GET ANGRY AND HAS THIS MIX OF ANGER AND SEXUAL DESIRES AND THIS THOUGHT OF NEEDING TO UNDO THE SPELL.

WELL, HE THEN, AFTER TWO OR THREE DAYS, GETS UP IN HIS MILITARY GEAR AS IS HIS MILITARY SURVIVALIST, PUTS ON ALL THIS VARIOUS STUFF, HIS STEPFATHER'S BOOTS AND GATHERS SOME WEAPONS THAT HE CAN FIND.  HE BREAKS INTO HER HOME TO WAIT FOR HER.

203

HE'S GOING TO FORCE HER TO UNDO THIS SPELL.

WHILE HE'S WAITING FOR HER, HE DECIDES TO GO IN, HE BREAKS INTO SOME OTHER HOUSES LOOKING FOR ITEMS, BETTER WEAPONS BECAUSE HE DOESN'T REALLY HAVE MUCH IN THE WAY OF WEAPONS.  AND SO HE STEALS A SHOTGUN, I THINK, FROM ANOTHER HOUSE AND SOME OTHER THINGS; COMES BACK, WAITS FOR HER.  AS SOON AS SHE COMES IN, HE -- LET ME GET TO THE RECORDS AND I CAN SPECIFICALLY TALK ABOUT SOME OF THESE THINGS.  HE HITS HER IN THE HEAD WITH THIS GUN HE HAS.  HE SAYS, YOU KNOW WHAT I WANT.  HE'S GOT SOME PLASTIC TIES WITH HER.  HE STARTS TO UNDO SOME OF HER CLOTHING. HE SAYS, YOU NEED TO UNDO IT.  AND SHE'S THINKING, UNDO WHAT? AND HE SAYS, I'M GETTING PISSED OFF, THESE SORTS OF THINGS.

HE THEN PROCEEDS TO RAPE HER:  YOU CAN DO IT OR I'LL DO IT, AS HE, AGAIN, TALKS -- HE'S TIED HER UP.  HE'S CHOKED HER A LITTLE BIT.  HE'S TELLING HER SHE CAN UNDO IT OR HE'LL DO IT. HE SAYS HE'S STARTING TO GET ANGRY.  SHE DOESN'T KNOW WHAT HE'S TALKING ABOUT, BUT HE'S CONVINCED THAT SHE'S JUST NOT COOPERATING.

HE PROCEEDS TO KILL HER, BRUTALLY KILLS HER, KILLS HER AND KILLS HER AGAIN, AND JUST THINKING ABOUT SHOOTING HER AND THINKING THAT SHE JUST WON'T DIE.

SHE DOES DIE.  HE LOOKS AROUND THE HOUSE FOR SOME BOOKS ON WITCHCRAFT, DOESN'T SEE ANY.  HE GRABS HER CAR KEYS TO GET AWAY.  HE TAKES OFF.  HE'S GOING TO GO UP TO NORTH CAROLINA TO HIS WITCHCRAFT MENTOR BUT REALIZES THAT THE GUY IS STILL IN

204

PRISON, A MR. LEDFORD WHO HAS ACKNOWLEDGED THAT MR. LECROY WAS INTO WITCHCRAFT.

AS HE'S HEADING UP THERE, HE CHANGES HIS MIND.  HE THINKS HE GOING TO MAYBE GO OUT AND SEE HIS PSYCHOLOGIST, DR. CARLSON, BUT CHOOSES NOT TO DO THAT AND DECIDES HE'S GOING TO GO UP INTO THE WILDERNESS AROUND MINNESOTA, CANADA, AND LIVE IN THE WOODS. WELL, AS HE'S DRIVING UP THERE, HE FINDS SOME CHRISTIAN C.D.'S AND AN ENYA C.D. AND FINDS THAT TO BE VERY INCONGRUENT WITH THE IDEA THAT THIS WAS A WITCH AND AT THAT POINT STARTS TO THINK THAT THIS DOESN'T REALLY SEEM TO MAKE SENSE.

HE COMES TO SECOND-GUESS AND REALIZES THAT THIS PROBABLY WASN'T THE BABYSITTER THAT HE HAD BEEN WANTING TO GET REVENGE ON FOR ALL THESE YEARS AND WRITES AN APOLOGY LETTER, PUTS IT IN THE CAR.  AND AS HE'S DRIVING IN TRYING TO GET INTO CANADA, HE GETS ARRESTED BY THE POLICE.  THEY FIND THIS SUICIDE -- THIS APOLOGY LETTER, AND SUBSEQUENTLY HE'S ARRESTED AND HAS BEEN INCARCERATED NOW THROUGH THE PRESENT.

Q.    WHAT IS YOUR OPINION, EXPERT OPINION AS TO WHETHER OR NOT HIS MENTAL ILLNESSES, THE BORDERLINE PERSONALITY DISORDER, THE SCHIZOTYPAL PERSONALITY DISORDERS THAT YOU DESCRIBED, PLAYED A PART IN THE MURDER OF MS. TIESLER?

A.    HIS PERSONALITY DISORDER PLAYED A DIRECT ROLE.  HIS PERSONALITY DISORDER AND HIS PREVIOUS EXPERIENCES WITH SEXUAL ABUSE PLAYED A DIRECT ROLE IN HIS OFFENSE ON THAT DATE OF THE MURDER.

205

Q.   IN YOUR EXPERT OPINION, WOULD THAT MURDER HAVE OCCURRED BUT FOR THOSE MENTAL ILLNESSES THAT YOU'VE DESCRIBED?

A.   WITHOUT HIS MENTAL ILLNESS, IT WOULD NOT HAVE OCCURRED.

Q.   WAS THE CRIME, THE MURDER OF MS. TIESLER THE PRODUCT OF HIS MENTAL ILLNESSES?

A.   YES.

Q.   WITH REGARDS TO THE SEXUAL ABUSE THAT WAS DESCRIBED IN THE RECORDS AND DESCRIBED BY MR. LECROY, DID YOU HAVE ANY DOUBT IN YOUR MIND BASED ON THAT EVIDENCE THAT HE HAD, IN FACT, BEEN SEXUALLY ABUSED?

A.   NO, I HAVE NO DOUBT.

Q.   WAS WHAT -- WAS OR WAS NOT THE SYMPTOMS AND THE HISTORY YOU SAW ABSOLUTELY CONSISTENT WITH SEXUAL ABUSE?

A.   YES.

Q.   NOW, THE REPORT -- LET ME BACK UP.  IN YOUR REPORT -- DO YOU HAVE DEFENDANT'S EXHIBIT 1 -- EXCUSE ME, DEFENDANT'S EXHIBIT 3 UP THERE IN FRONT OF YOU?

A.   WHAT IS EXHIBIT 3?

Q.   THE LONG REPORT.

A.   YES, UH-HUH (AFFIRMATIVE).

Q.   ON THE LAST PARAGRAPH OF THAT REPORT, YOU -- BY THE WAY, IN WRITING THIS REPORT BACK IN 2003, THE DATE OF THE EXAMINATION WAS MARCH 27, 2003.  THE REPORT ITSELF IS NOT DATED.  APPROXIMATELY HOW LONG AFTER THE EVALUATION WOULD IT HAVE BEEN WHEN YOU WOULD HAVE WRITTEN THIS REPORT?

206

A.    A WEEK OR TWO.

Q.    AND IN YOUR PRACTICE IN WRITING REPORTS, DO YOU TRY TO BE AS ACCURATE AS POSSIBLE AS TO WHAT THE INFORMATION YOU HAD AND THE DIAGNOSES THAT YOU REACHED?

A.    YES.

Q.    IN THE LAST PARAGRAPH OF THE REPORT, THERE IS THIS SENTENCE:  THESE THOUGHTS -- TALKING ABOUT THE THOUGHTS ABOUT MS. TIESLER PERHAPS BEING TINKERBELL AND A SPELL AND MAYBE BEING ABLE TO GET RID OF THIS SPELL BY ATTACKING HER:  THESE THOUGHTS THAT MR. LECROY DEVELOPED, WHILE NOT CLASSICALLY IN KEEPING WITH PSYCHOSIS, WERE DISTORTIONS OF REALITY BASED ON MENTAL ILLNESS, BORDERLINE PERSONALITY DISORDER AND SCHIZOTYPAL PERSONALITY DISORDER.

A.    YES.

Q.    IS THAT TYPE OF -- YOU MENTIONED EARLIER THAT FEATURES OF THOSE DISORDERS ARE TRANSIENT PSYCHOTIC EPISODES AND SO FORTH. IS THAT WHAT YOU'RE TALKING ABOUT HERE?

A.    YES.  BOTH OF THOSE CONDITIONS HAVE THIS, THIS LINKAGE WITH PROBABLY NOT NECESSARILY FULL-BLOWN PSYCHOSIS BUT THESE TRANSIENT PSYCHOTIC-LIKE OR ACTUALLY PSYCHOTIC EXPERIENCES.

Q.    DID YOU DELIVER YOUR REPORTS TO THE PUBLIC DEFENDER?

A.    YES, I DID.

Q.    AFTER YOU WROTE UP YOUR REPORTS AND SENT THEM IN TO THE PUBLIC DEFENDER, DID ANYONE FROM THE PUBLIC DEFENDER EVER COME OUT TO TALK TO YOU?

207

A.  NO.

Q.  DID YOU EVER HAVE AN OPPORTUNITY TO EXPLAIN EVERYTHING YOU JUST TOLD US HERE TODAY IN COURT TO THE PUBLIC DEFENDER?

A.  NO.

Q.  IF YOU HAD BEEN CALLED AS A WITNESS AT THE TIME OF THE DEFENDANT'S TRIAL, WOULD YOU HAVE GIVEN THE TESTIMONY THAT YOU JUST GAVE US TODAY?

A.  YES, I WOULD HAVE.

Q.  NOW, THERE IS A REPORT FROM DR. MEDLIN WHICH IS IN EVIDENCE AS GOVERNMENT'S EXHIBIT 63, AND I THINK YOU HAVE A COPY OF IT THERE THAT YOU HAD AN OPPORTUNITY TO REVIEW.

A.  YES, I DO.

Q.  HAVE YOU RECENTLY HAD AN OPPORTUNITY TO REVIEW THAT REPORT?

A.  YES, I HAVE.

Q.  COULD YOU COMMENT UPON IT.

A.  YES.  I THINK DR. MEDLIN --

Q.  WELL, BY THE WAY, DID ANYBODY FROM THE PUBLIC DEFENDER OR ANYBODY EVER GIVE YOU THAT REPORT TO COMMENT UPON ANY TIME PRIOR TO ME GIVING IT TO YOU RECENTLY?

A.  NO.

Q.  OKAY.  GO AHEAD.

A.  I THINK DR. MEDLIN DID A GOOD REPORT, DID A GOOD JOB OF DETAILING A LOT OF THE INFORMATION FROM THE MEDICAL RECORDS. IT'S A VERY LENGTHY REPORT OF 29, 28 PAGES.  FROM THAT

208

STANDPOINT, I THINK IT'S AN EXCELLENT RESOURCE.

I THINK DR. MEDLIN SEEMS TO HAVE GONE A LITTLE FAR AT TIMES IN TRYING TO FIND REASONS NOT TO ACCEPT WHAT'S IN THE MEDICAL RECORDS.

Q.   HOW WOULD YOU CHARACTERIZE -- GO AHEAD AND EXPLAIN THAT IN MORE DETAIL.

A.   WELL, I THINK THAT SHE TALKS ABOUT CRIMINALS, SOMETIMES STATING THAT THEY HAVE BEEN SEXUALLY ABUSED TO EXPLAIN SEXUAL ABUSE BEHAVIOR AS AN ADULT.  AND THERE'S ALWAYS THOSE SORTS OF THINGS TO DESCRIBE, AND IT'S VERY EASY TO SAY SOMETIMES PEOPLE LIE.  WHAT THE JOB OF A MENTAL HEALTH EXPERT IN THIS SITUATION IS TO DO IS TO LOOK TO SEE IF IT'S CONSISTENT AND IF IT FITS. AND THERE JUST SEEMS TO BE A LOT OF QUESTIONING OF A LOT OF VERY OVERWHELMING EVIDENCE OF A VERY DYSFUNCTIONAL, ABUSIVE, PHYSICALLY, EMOTIONALLY AND SEXUALLY HISTORY THAT SUGGESTS THAT THIS GUY HAS GOT SOME MAJOR PROBLEMS.

Q.   IS THERE ANYTHING IN THAT REPORT THAT WOULD CAUSE YOU TO QUESTION YOUR CONCLUSION THAT HE HAD BEEN SUBJECTED TO SEXUAL ABUSE AS A CHILD AND THAT PLAYED A PART IN THE MENTAL ILLNESSES THAT YOU DIAGNOSED?

A.   NO.  I THINK THE REPORT, IF ANYTHING, THE INFORMATION SHE PROVIDES SUPPORTS THE ISSUE OF HIS SEXUAL ABUSE AND HIS PHYSICAL AND EMOTIONAL ABUSE THAT HE'S EXPERIENCED IN THE PAST AND HIS DYSFUNCTION IN THE PRISON.

Q.   IN THE REPORT DR. MEDLIN APPARENTLY ATTACHES SIGNIFICANCE

209

TO THE ANSWERS OF PARTICULAR QUESTIONS ON THE MMPI.  DID YOU NOTE THAT IN THE REPORT?

A.    YES.

Q.    TELL US -- IF YOU WILL COMMENT UPON THAT, PLEASE.

A.    RIGHT.  ANYONE WHO'S HAD ANY EXPERIENCE WITH PSYCHOLOGICAL TESTING, PARTICULARLY MMPI, MCMI, THESE TRUE/FALSE PERSONALITY TESTS OF 567 QUESTIONS AND ABOUT 150 QUESTIONS KNOWS THAT YOU DON'T TAKE A SINGLE QUESTION ON THAT TEST AND PULL IT OUT AND USE IT FOR ANYTHING.  IT'S JUST NOT DONE.  THE REPORT, THE INFORMATION, THOSE QUESTIONS ARE TO BE TAKEN IN THEIR TOTALITY; AND YOU JUST CAN'T DO THAT.

YOU CAN'T IN THIS SORT OF SETTING ALSO REALLY PUT MUCH RELIANCE ON CHECKLISTS AND THOSE SORTS OF THINGS BECAUSE THE IMPORTANT THING IN THIS SORT OF SETTING IS THAT YOU DO AN EXAMINATION, YOU ASK SOMEBODY QUESTIONS, THAT YOU RESPOND TO THEIR QUESTIONS WITH SUBSEQUENT QUESTIONS, AND THAT YOU USE WHAT YOU KNOW ABOUT AN INDIVIDUAL TO TRY TO GET ACCURATE INFORMATION.  AND YOU GET THE LEAST ACCURATE INFORMATION FROM TAKING ONE QUESTION OUT OF A PERSONALITY TEST AND THEN TRYING TO APPLY IT TO A THEORY OR A HYPOTHESIS, THE SAME WAY WITH THESE CHECKLISTS THAT PEOPLE WILL FILL OUT.

Q.    IS IT CONTRARY TO THE INSTRUCTIONS ON THE MMPI AND ALL THE RESEARCH ON THE MMPI TO TAKE A SPECIFIC ANSWER TO A SPECIFIC QUESTION AND DRAW SOME SORT OF PSYCHOLOGICAL CONCLUSION?

A.    YES, THAT'S TRUE.

210

Q.   SHOWING YOU WHAT'S BEEN PREVIOUSLY ADMITTED INTO EVIDENCE AS GOVERNMENT'S EXHIBIT 86.  YOU MENTIONED THESE CHECKLIST-TYPE FORMS.

A.   YES.

Q.   I'LL ASK YOU TO LOOK AT THAT.  AND THAT APPEARS TO BE SOME SORT OF INTAKE FORM THAT MR. LECROY FILLED OUT WHEN HE TRANSFERRED TO BUTNER PRISON.  COMMENT UPON THAT FORM.

A.   WELL, THERE'S ONE QUESTION HERE THAT SAYS:  HAVE YOU EVER BEEN SEXUALLY ASSAULTED, YES OR NO.  AND THIS IS FROM FEBRUARY OF 2000.  HE CHECKS NO.

NOW, HE'S ALREADY DETAILED IN THE RECORDS NUMEROUS TIMES THAT HE HAD THE SEXUAL ENCOUNTER WITH HIS BABYSITTER.  AND WHEN YOU LOOK AT THE DESCRIPTION OF HOW THIS SEXUAL ABUSE WITH THE BABYSITTER OCCURRED WHEN HE WAS EIGHT YEARS OLD, IT'S VERY CLEAR TO SEE THAT HE PROBABLY WILL STILL SAY THAT HE WAS NEVER SEXUALLY ASSAULTED.  AN EXAMPLE OF THE WORDING:  IF THIS QUESTION HAD BEEN, HAVE YOU EVER BEEN -- HAD A SEXUALLY INAPPROPRIATE RELATIONSHIP AS A CHILD WITH AN ADULT OR ADULT FIGURE, HE MORE LIKELY WOULD HAVE RESPONDED YES.

BUT EVEN WITH THE QUESTION LIKE THAT, YOU FIND THAT INDIVIDUALS ARE LIKELY TO DENY OR MINIMIZE THINGS THAT ARE PSYCHIATRICALLY PAINFUL FOR THEM.  AND THAT'S WHY YOU DON'T JUST GIVE SOMEONE A CHECKLIST OVER THE INTERNET AND SAY CHECK THESE BOXES OFF AND IF YOU MEET ANY OF THESE CRITERIA, SEND THIS IN AND WE'LL SEND YOU YOUR MEDICATION.  PEOPLE DON'T

211

FREQUENTLY SHARE THIS SORT OF PERSONAL OR DIFFICULT-TO-ADDRESS INFORMATION TO A STRANGER HANDING THEM A CHECKLIST.

Q.   SHOWING YOU WHAT'S BEEN PREVIOUSLY ADMITTED INTO EVIDENCE AS GOVERNMENT'S EXHIBIT 83 WHICH IS ANOTHER TYPE OF CHECKLIST-TYPE FORM.  CAN YOU COMMENT UPON THAT FORM.

A.   THIS FORM IS FROM 2000.  IT SAYS:  HAVE YOU EVER BEEN TREATED FOR A MENTAL CONDITION.  HE'S CHECKED OFF NO.

WELL, WE KNOW FROM THE RECORDS THAT HE WAS IN COUNSELING EARLIER WITHIN THE YEAR AND THAT HE HAD BEEN PREVIOUSLY TREATED WITH AN ANTIDEPRESSANT BRIEFLY, THAT HE HAD BEEN IN PSYCHIATRIC TREATMENT IN '92.  SO HE CHECKS NO.  WELL, WHY DID HE CHECK NO? AGAIN, CHECKLISTS ARE UNRELIABLE WHEN IT COMES TO THIS SORT OF PERSONAL INFORMATION.

Q.   IN MAKING A CAREFUL EVALUATION, DOES SOMEONE PICK OUT A PARTICULAR FORM HERE AND THERE OR DO YOU LOOK AT THE TOTALITY OF THE RECORDS?

A.   NO.  I THINK YOU HAVE TO LOOK AT THE TOTALITY OF THE RECORDS AND ALSO, MORE IMPORTANTLY, LOOK AT YOUR EXAMINATION AND YOUR INTERVIEW AND WHAT INFORMATION YOU OBTAINED FROM THAT; AND AGAIN, NOT JUST THE TREATMENT RECORDS, BUT ALSO THE OTHER RECORDS THAT TEND TO CONFIRM OR DENY THE ISSUES OF CONCERN.

(DISCUSSION OFF THE RECORD.)

MR. MARTIN:  YOUR HONOR, THERE'S TWO RECORDS THAT THE GOVERNMENT IS GOING TO SUBMIT I HAVE NO OBJECTION TO.  I WOULD OFFER THEM INTO EVIDENCE, GOVERNMENT'S EXHIBIT 72 AND 73.

212

THE COURT:  THEY ARE ADMITTED.

MR. MCKINNON:  NO OBJECTION.

BY MR. MARTIN:

Q.   SHOWING YOU TWO REPORTS THAT ARE CALLED, WELL, THEODORE MILLON, PH.D., ON THEM, GOVERNMENT'S EXHIBIT 72 AND 73.  HAVE YOU HAD THE OPPORTUNITY TO LOOK AT THOSE?

A.   YES, I HAVE.

Q.   CAN YOU COMMENT UPON THOSE.

A.   YES.  THIS FIRST ONE, EXAMINATION IN AUGUST OF 2009 --

Q.   FIRST OF ALL, WHAT TYPE OF DOCUMENT OR WHAT TYPE OF TEST IS THIS?

A.   THE MCMI IS A 175-QUESTION TRUE/FALSE-TYPE QUESTION THAT'S COMPUTER SCORED.  AND IN THIS ONE, THIS FIRST --

Q.   HOW IS IT ADMINISTERED?

A.   WELL, I HAVE IT; AND I PUT PEOPLE ON A COMPUTER AND THEY ANSWER YES OR NO, AND THEN IT PRINTS THIS FORM OUT IMMEDIATELY. SOMETIMES PEOPLE, AND IT LOOKS LIKE IN THIS CASE THEY GAVE HIM, YOU KNOW, THE OLD PENCIL AND HAD HIM CIRCLE YES OR NO; AND THEN THEY EITHER RUN IT THROUGH A MACHINE OR HAND ENTER IT INTO A COMPUTER.

Q.   AND THE DESCRIPTION, THE CLINICAL SUMMARY, IS THAT PRINTED OUT BY THE COMPUTER OR IS THAT --

A.   IT'S PRINTED OUT BY THE COMPUTER.

Q.   SO NO PROFESSIONAL ANALYZES IT.  THAT'S THE COMPUTER ANALYZATION.

213

A.    RIGHT, THAT'S CORRECT.

Q.    GO AHEAD.

A.    AND THIS FIRST EXAMINATION IN AUGUST OF 1999 SUGGESTS AN OPENNESS, MAYBE EVEN BORDERING ON POTENTIALLY SOME EXAGGERATION OF HIS PATHOLOGY.  BUT THE LEVEL OF EXAGGERATION IS REALLY QUESTIONABLE.  IT MAY NOT BE WITHIN THE EXAGGERATED FRAME.  IT MAY JUST BE A VERY ACCURATE PRESENTATION OF HIS DYSFUNCTION. AND IT REALLY SUGGESTS NUMEROUS PERSONALITY DISORDER TRAITS.

AND THEN TO A LESSER EXTENT, THE HISTORY OF ALCOHOL DEPENDENCE AND ANXIETY WHICH WERE ALSO LIKELY TO BE PRESENT, I THINK THIS IS PROBABLY A REASONABLY ACCURATE DESCRIPTION OF HIS PERSONALITY AND HIS FUNCTIONING.  AND IN THIS THEY TALK ABOUT PASSIVE-AGGRESSIVE PERSONALITY WHICH IS A TYPE OF PERSONALITY DISORDER THAT WE DON'T REALLY REFER TO.  IT'S BEEN OUT OF USE FOR AWHILE, BUT IT WOULD GENERALLY SEEM TO FIT.  IT SHOWS ANTISOCIAL PERSONALITY DISORDER TRAITS, AVOIDANT TRAITS, SADISTIC TRAITS, HISTORY OF ALCOHOL ABUSE, ADJUSTMENT DISORDER WITH ANXIOUS AND DEPRESSED MOODS; AND IT ALSO SUGGESTS TO A LESSER BUT SIGNIFICANT LEVEL SOME OF THESE OTHER PERSONALITY DISORDER TRAITS LIKE BORDERLINE.

Q.    IS THERE ANYTHING IN THIS REPORT THAT CAUSES YOU TO QUESTION YOUR DIAGNOSES THAT YOU HAVE GIVEN THE JURY?

A.    NO, NOTHING IN THIS.

AND THEN THERE'S ANOTHER REPORT FROM JANUARY OF 2000.

Q.    THAT'S GOVERNMENT'S EXHIBIT 72.

214

A.   THE SAME TESTING PERFORMED FIVE MONTHS LATER.  AND THIS TESTING SUGGESTS A VERY STRONG DEGREE OF DEFENSIVENESS.  HE'S TRYING TO PUT HIS BEST FOOT FORWARD, HE'S TRYING TO MAKE HIMSELF LOOK HEALTHY.  AND I SUSPECT HE'S TRYING TO MAKE HIMSELF LOOK HEALTHY BECAUSE HE'S NOW GETTING CLOSER TO THE TIME WHEN HE'S GOING TO BE ELIGIBLE TO GET OUT.

BUT AT ANY RATE, OTHER THAN SOME COMPULSIVENESS AND A DRUG-DEPENDENCY ISSUE, THE OTHER FACTORS ARE SO LOW THAT WHAT YOU HAVE TO REALIZE IS THERE'S PROBABLY MORE PATHOLOGY HERE PRESENT THAN WHAT HE'S DESCRIBING.

Q.   THERE IS A DESIRABILITY INDEX ON THAT REPORT THAT'S VERY HIGH.  IS THAT CORRECT?

A.   RIGHT.  HE'S WANTING PEOPLE TO LIKE HIM, TO THINK THAT HE'S HEALTHY.

Q.   SO HE'S ANSWERING THE QUESTIONS IN A WAY THAT HE PERCEIVES TO MAKE PEOPLE THINK HE DOESN'T HAVE A PROBLEM.

A.   RIGHT.

Q.   ARE THOSE VALIDITY -- IS THAT CALLED A VALIDITY SCALE?

A.   YES, THOSE ARE VALIDITY SCALES.

Q.   AND ARE THOSE WAYS TO SORT OF JUDGE WHETHER OR NOT YOU'RE GETTING AN ACCURATE PICTURE?

A.   YES, YES.

Q.   IN YOUR EXPERIENCE, IS THERE ANYTHING PARTICULARLY SURPRISING ABOUT AN INMATE TRYING TO PRESENT HIMSELF BETTER THAN HE REALLY IS ON THE PSYCHOLOGICAL TESTING SOMETIMES?

215

A.    NO, I THINK THAT'S NOT.  AND, IN FACT, WITH BORDERLINE PERSONALITY DISORDERS, MANIPULATION IS A QUALITY OF THEIR PRESENTATION.  AND AT TIMES THEY ARE GOING TO TRY TO MAKE THEMSELVES LOOK HEALTHY IF IT MIGHT BE TO THEIR BENEFIT; AND THEY CAN, LIKEWISE, DO THINGS TO MAKE THEMSELVES LOOK DYSFUNCTIONAL IF THEY THINK IT'S IN THEIR BENEFIT.

Q.    GIVEN THAT MANIPULATION, DO YOU BELIEVE THAT MR. LECROY MANIPULATED YOU IN THIS?

A.    NO.  I DON'T SEE THAT HE DID IN THAT THERE'S -- I LOOK FOR CONSISTENCY IN WHAT HE'S TALKING ABOUT AND I LOOK FOR SOMEONE TRYING TO OFFER EXCUSES; AND FREQUENTLY WHEN PEOPLE TRY TO OFFER THESE EXCUSES, YOU CAN SEE THAT.  AND IN HIS CASE, HE DIDN'T SEEM TO HOLD BACK ON ANY, ANY OF THE DETAILS, ANY OF THE BRUTALITY.  AND THIS IS CONSISTENT WITH THE SORTS OF THINGS THAT HE WAS DESCRIBING OF BEING REVENGEFUL JUST BEFORE HE WAS RELEASED.

AND I CAN GIVE -- HERE'S A QUOTE:  DESIRES FOR RETRIBUTION FOR PAST MISTREATMENT MAY UNDERLIE HIS CHARACTERISTIC HOSTILITY AND ENVY AND SUSPICIOUSNESS.

GIVE ME JUST A SECOND.  SOME OF THESE, THESE STATEMENTS THAT WE SEE IN THE RECORDS JUST ALMOST PREDICT THAT SOMETHING BAD IS GOING TO HAPPEN.  DR. CARLSON NOTED IN JUNE OF '99:  IF HE DOES NOT MEET HIS WORKOUT GOALS, HIS SELF-ESTEEM SUFFERS AND HE FEARS HE WILL NOT BE PHYSICALLY FIT TO FOLLOW THROUGH ON HIS FANTASY OF GETTING REVENGE ON HIS ABUSER, EVEN THOUGH HE

216

DOESN'T KNOW HER NAME OR WHERE SHE IS.

HERE IN JULY OF '99:  HE APPEARS TO HAVE A FEAR THAT HE WILL HURT THOSE WHO HAVE HURT HIM WHEN HE IS RELEASED FROM PRISON.  HE HAS HAD REVENGEFUL THOUGHTS SINCE LATE PUBERTY.

HERE'S ANOTHER ONE.  DR. CARLSON, AUGUST OF '99: INDIVIDUALS WHO INTENTIONALLY INJURES HIMSELF (SIC) OR PEOPLE HE CARES ABOUT PHYSICALLY OR EMOTIONALLY WOULD DESERVE SEVERE BODILY INJURY.  DR. CARLSON TOLD HIM THAT HE WAS AT HIGH RISK OF RETURNING TO PRISON WITH THESE BELIEFS.

AND THE NEXT SESSION ON AUGUST 24TH, 1999, MR. LECROY EXPRESSED ANGER AT HER FOR THIS COMMENT.  SHE WROTE:  WHEN ASKED IF HE WOULD ADD DOING REVENGEFUL ACTS TO HIS IDEAL WORLD IF HE COULD BE GUARANTEED TO NOT GET CAUGHT, HE COULD NOT ANSWER THE QUESTION.  DR. CARLSON INDICATED THAT:  HE WOULD LIKE TO CHOOSE THE PATH OF NO REVENGE IN HIS LIFE.  HOWEVER, HIS REASONS FOR CHOOSING THIS PATH ARE VALID BUT NOT HEARTFELT.

SO DESIRE HERE, DESIRE FOR RETRIBUTION FOR PAST MISTREATMENT.  I'VE ALREADY SAID THAT ONE.

BUT AT ANY RATE, THESE ARE ALL DESCRIPTIONS THAT DESCRIBE THIS BURNING ANGER IN HIM WHICH IS VERY CONSISTENT WITH WHAT HE SUBSEQUENTLY DID OR DESCRIBES DOING WHEN HE WAS RELEASED.

Q.    IS THERE ANY DOUBT IN YOUR MIND FROM YOUR REVIEW OF THE RECORDS AND YOUR EXAMINATION OF MR. LECROY THAT HE WAS THE VICTIM OF SEXUAL ABUSE AND THAT THAT SEXUAL ABUSE PLAYED A SIGNIFICANT PART IN THE CRIME FOR WHICH HE WAS CONVICTED?

217

A.   THERE'S NO DOUBT IN MY MIND.

Q.   IS THERE ANY DOUBT IN YOUR MIND --

A.   WELL, I SHOULD SAY THAT THERE'S NO REASONABLE DOUBT.

Q.   I UNDERSTAND.  AND THE SAME WOULD APPLY TO THE DIAGNOSES THAT YOU DEVELOPED IN THIS CASE; CORRECT?

A.   THAT'S CORRECT.

MR. MARTIN:  YOUR HONOR, THAT'S ALL THE QUESTIONS -- EXCUSE ME.  JUST ONE SECOND.

(DISCUSSION OFF THE RECORD.)

MR. MARTIN:  YOUR HONOR, THAT'S ALL I HAVE.

THE COURT:  LET'S TAKE A TEN-MINUTE BREAK, AND THEN WE'LL PROCEED WITH CROSS-EXAMINATION.

THE COURT:  MR. MCKINNON, YOU MAY PROCEED.

CROSS-EXAMINATION

BY MR. MCKINNON:

Q.   DR. HILTON, ONE OF THE LAST THINGS YOU WERE TALKING ABOUT WAS READING THROUGH THE NOTES THAT DR. CARLSON AT F.C.I. EL RENO MADE BASED ON HER SESSIONS WITH THE DEFENDANT BACK IN JUNE AND JULY OF 1999; IS THAT RIGHT?

A.   YES.

Q.   AND YOU NOTED THAT DR. CARLSON HAD A NUMBER OF CONVERSATIONS WITH THE DEFENDANT OVER A PERIOD OF TIME ABOUT HIS DESIRE TO SEEK REVENGE AGAINST THE PERSON WHO HE BLAMED FOR SEXUALLY ABUSING HIM.  IS THAT CORRECT?

A.   YES.

218

Q.    AND HE DIDN'T GET -- I DON'T SEE ANYTHING IN THE NOTES WHERE THEY GET INTO DETAILS ABOUT WHAT THE DEFENDANT WANTS TO DO TO THE PERSON HE BLAMES FOR THIS SEXUAL ABUSE.  AT LEAST DR. CARLSON DIDN'T MAKE ANY NOTES ABOUT THE DETAILS OF WHAT FORM THE REVENGE WOULD SEEK, DID SHE?

A.    I DIDN'T SEE IT, NO.

Q.    BUT HE TALKED ABOUT IT OVER A PERIOD OF TIME, THIS IDEATION OF REVENGE AGAINST HER, AGAINST THIS TINKERBELL, AS HE DESCRIBED TO YOU.

A.    YES.

Q.    NOW, DO YOU HAVE GOVERNMENT'S EXHIBIT NUMBER 73 THERE IN FRONT OF YOU?

A.    YES.

Q.    AND THAT'S THE MCMI-III PSYCHOLOGICAL TESTING REPORT THAT WAS DONE ON THE DEFENDANT BACK IN AUGUST OF 1999.  IS THAT CORRECT?

A.    YES.

Q.    AND IF YOU WOULD LOOK AT PAGE TWO.  AND IN THE CATEGORY OR THE HEADING CLINICAL SUMMARY, IT SAYS THAT THIS REPORT, THESE REPORTS ARE NORMED ON INMATES WHO ARE IN THE EARLY PHASES OF PSYCHOLOGICAL SCREENING OR ASSESSMENT TO PREDICT HOW WELL THEY WOULD ADJUST TO PRISON.

A.    THIS IS PARAGRAPH TWO?

Q.    NO, PAGE TWO, THE TOP PARAGRAPH.

A.    YES.

219

Q.    AND I THINK YOU MENTIONED THAT IN THE POSSIBLE DIAGNOSES THAT ARE GENERATED FROM THIS TEST THAT WAS DONE BACK IN AUGUST OF 1999, IT SAYS THAT HE APPEARS TO BE -- TO FIT THE FOLLOWING AXIS-II CLASSIFICATIONS BEST:  NEGATIS -- NEGATIVISTIC PASSIVE-AGGRESSIVE PERSONALITY DISORDER, ANTISOCIAL PERSONALITY DISORDER WITH AVOIDANT PERSONALITY TRAITS AND SADISTIC PERSONALITY TRAITS?

A.    YES.

Q.    SO WOULD AVOIDANT PERSONALITY TRAITS AND SADISTIC PERSONALITY TRAITS BE SUBSETS OF THE ANTISOCIAL PERSONALITY DISORDER?

A.    NO.  LET ME EXPLAIN THIS.

Q.    EXPLAIN WHAT THAT MEANS.

A.    OKAY.  NEGATIVISTIC OR PASSIVE-AGGRESSIVE PERSONALITY DISORDER, THAT DISAPPEARED FROM THE DSM-IV IN 1980.  AND SADISTIC PERSONALITY DISORDER ALSO DISAPPEARED AND HAS NOT BEEN A PART OF DSM IN ABOUT 20 YEARS.  SO THIS IS A TEST THAT WAS COMPUTER DEVELOPED AND IT'S NOT REALLY KEPT UP WITH.

Q.    CHANGES IN THE --

A.    SO IT WAS DETERMINED THAT THOSE TRAITS, THOSE PERSONALITIES OF PASSIVE-AGGRESSIVE PERSONALITY AND SADISTIC PERSONALITY REALLY WEREN'T CONSISTENTLY MEASURABLE ENOUGH TO CONSIDER THEM DISORDERS.

     NOW, THE AVOIDANT PERSONALITY TRAITS THAT IT TALKS ABOUT, THAT'S A WHOLE SEPARATE CATEGORY FROM ANTISOCIAL PERSONALITY

220

DISORDER. WHAT THEY'RE SAYING IS THAT THIS INDIVIDUAL DOESN'T, IN THE TESTING'S OPINION, DOESN'T -- THEY PROBABLY DON'T HAVE ENOUGH TO MEET THAT CRITERIA BUT THEY'VE GOT ENOUGH THERE TO TALK ABOUT IT.

AND THE AVOIDANT PERSONALITY TRAITS ARE THE INDIVIDUALS WHO SHY AWAY FROM RELATIONSHIP FOR FEAR OF REJECTION. THEY WANT RELATIONSHIPS BUT THEY'RE SO FEARFUL OF BEING REJECTED THAT THEY WON'T STICK THEIR NECK OUT VERY FAR TO DEVELOP A RELATIONSHIP. AND SO THEY ARE OFTEN LONELY, UNHAPPY PEOPLE WHO DON'T HAVE FRIENDS.

Q.   AND DID YOU SEE EVIDENCE OF THE DEFENDANT'S SELF-REPORTING OF THOSE KIND OF TRAITS WHEN HE WAS BEING --

A.   YEAH.

Q.   -- EVALUATED BY VARIOUS MENTAL HEALTH PROFESSIONALS?

A.   YES. HE DESCRIBES THE STRONG FEAR OF REJECTION, AND YOU SEE THAT BOTH IN BORDERLINE AND IN AVOIDANT FEATURES. YES, HE HAS THAT.

Q.   NOW, IF YOU WOULD TURN OVER TO PAGE FOUR WHERE IT HAS A CORRECTIONAL SUMMARY OF THE RESULTS FROM HIS TEST.

A.   OKAY.

Q.   AND IN THE HEADING REACTION TO AUTHORITY, IT'S CONCLUDED THAT: THIS ABRASIVE AND INTIMIDATING PRISONER IS LIKELY TO BE DEFIANT AND UNTRUSTWORTHY. HE MIGHT TRY TO PLAY STAFF MEMBERS AGAINST ONE ANOTHER AS WELL AS BEING A GENERAL TROUBLEMAKER.

A.   YES.

221

Q.   THAT'S A DESCRIPTION OF WHAT THE TESTINGS RESULTS SHOW; IS THAT CORRECT?

A.   YES.

Q.   AND THEN IN THE POTENTIAL FOR VIOLENCE, IT SAYS:  THIS INMATE POSSESSES A DEFICIENT CONSCIENCE AND MAY NOT ONLY SEEK CONFLICT AND CONFRONTATIONS, BUT MAY ALSO EVIDENCE A RECKLESSLY VIOLENT DISPOSITION.

A.   YES.

Q.   THAT'S, AGAIN, BASED UPON THE ANSWERS THAT HE GAVE TO THE TEST QUESTIONS.

A.   THAT'S CORRECT.

Q.   THEN UNDER THE HEADING SEXUAL PREDATION AND VICTIMIZATION, THE TEST CONCLUDED THAT:  THE DEFENDANT IS MALICIOUS -- EXHIBITS MALICIOUS AND HOSTILE TENDENCIES WHICH MAY LEAD THIS PRISONER TO HUMILIATE AND SEXUALLY DOMINATE WEAKER INMATES.

A.   YES.

Q.   AND THEN UNDER SUICIDAL TENDENCIES, IT SAYS:  MOST INDIVIDUALS WITH THIS PROFILE ARE UNLIKELY TO TURN THEIR HOSTILITY INWARD AND ENGAGE IN SUICIDAL BEHAVIOR.  HOWEVER, THIS INDIVIDUAL'S ITEM RESPONSES INDICATE HE HAS TRIED TO COMMIT SUICIDE.

     AGAIN, THIS IS WHAT THE RESULTS OF THE ANSWERS THAT THE DEFENDANT GAVE TO THESE 175 QUESTIONS, THIS IS WHAT WHOEVER PREPARED THIS TEST CONCLUDED ABOUT WHAT IT SHOWS ABOUT THE DEFENDANT'S PERSONALITY IN AUGUST OF 1999.  IS THAT FAIR?

222

A.   YES.

Q.   AND AS I UNDERSTOOD YOUR TESTIMONY ON DIRECT, WHEN YOU REVIEWED THIS ASSESSMENT OF THE DEFENDANT'S PERSONALITY AND HIS BEHAVIOR, YOU BELIEVED THAT THIS AUGUST 1999 TEST RESULT WAS FAIRLY ACCURATE BASED ON WHAT YOU OBSERVED FROM YOUR INTERVIEW AND WHAT YOU DERIVED FROM THE --

A.   I SAW -- A LOT OF THIS SEEMS ACCURATE, YES.

Q.   NOW, WHEN YOU INTERVIEWED THE DEFENDANT, YOU ASKED HIM IF HE HAD ANY HOMICIDAL IDEATIONS DURING THE TIME THAT HE WAS INCARCERATED AT THE LUMPKIN COUNTY JAIL.  DO YOU REMEMBER --

A.   YES.

Q.   -- QUESTIONING HIM ABOUT THAT?  AND, IN FACT, THE DEFENDANT TOLD YOU THAT HE DID, IN FACT, HAVE SOME THOUGHTS OF REVENGE OR HOMICIDE AGAINST THE CELLMATES THAT HE WAS SHARING CELLS WITH.  ISN'T THAT CORRECT?

A.   LET ME GO TO THAT SPECIFIC QUESTION SO I CAN ADDRESS THAT.
     NOT CELLMATES.  IT SAYS HE'S HAD SOME THOUGHTS OF HOMICIDE IDEATIONS TOWARD A FEW OF THE OTHER INMATES.  WHEN ASKED ABOUT SPECIFICS, HE SAID HE HAD DONE NOTHING SIGNIFICANT, IT'S ALWAYS TRIVIAL THINGS -- HE SAID THEY HAD DONE NOTHING SIGNIFICANT, IT WAS ALWAYS TRIVIAL THINGS, THE REASON BEHIND HIS HOMICIDAL IDEATIONS.

Q.   AND WHAT YOU MEAN BY HOMICIDAL IDEATIONS IS THAT HE'S THOUGHT ABOUT KILLING THEM; CORRECT?

A.   THAT'S WHAT HE SAID, YES.

223

Q.   NOW, BASED ON THE DEFENDANT'S DESCRIPTION OF HIS MOTIVATION FOR MURDERING MS. TIESLER, THAT IS, THAT HE THOUGHT SHE WAS TINKERBELL, HE TOLD YOU AT THE END THAT HE REALIZED THAT SHE WAS NOT, IN FACT, TINKERBELL; CORRECT?

A.   THAT'S CORRECT.

Q.   SO IN THE DEFENDANT'S MIND, THEN TINKERBELL IS STILL OUT THERE SOMEWHERE; CORRECT?

A.   YES.

Q.   HE KNOWS THAT HE'S NOT KILLED THE RIGHT PERSON; RIGHT?

A.   CORRECT.

Q.   THE MENTAL ILLNESSES THAT YOU DESCRIBED THAT THE DEFENDANT HAD THAT LED HIM TO COMMIT THIS HORRIBLE MURDER OF MS. TIESLER, HE HAD THOSE MENTAL ILLNESSES IN OCTOBER OF 2001 WHEN HE COMMITTED THE MURDER; CORRECT?

A.   THOSE HAVE BEEN ESSENTIALLY A PERMANENT PART OF WHO HE IS SINCE HIS LATE TEENS OR EARLY 20S.

Q.   AND THEY CARRY FORWARD AS HE GROWS OLDER; CORRECT?

A.   CORRECT.

Q.   HE'S NOT CURED.

A.   THAT'S CORRECT.

Q.   CORRECT?  HE STILL HAS THESE SAME MENTAL ILLNESSES THAT YOU BELIEVED HE HAD BACK IN 2003.

A.   YES.

Q.   I THINK YOU TESTIFIED ABOUT THE -- WOULD IT BE CONSIDERED THE DEFINING FEATURE OF ANTISOCIAL PERSONALITY DISORDER THAT

224

YOU HAVE A FUNDAMENTAL LACK OF RESPECT FOR THE RIGHTS OF OTHER PEOPLE?

A.   YES.

Q.   IN THE DSM-IV-TR, TEXT REVISION, IS THAT NOW THE CURRENT DSM-IV EDITION THAT YOU USE?

A.   BOTH THE TR AND JUST THE IV ARE THE SAME DIAGNOSTIC CRITERIA.  ALL THEY DID WAS UPDATE SOME OF THE INFORMATION ABOUT SOME OF THESE CONDITIONS THAT YOU CAN READ ABOUT.

Q.   AND THE DSM-IV-TR SAYS THAT INDIVIDUALS WITH ANTISOCIAL PERSONALITY DISORDER TEND --

THE COURT:  SLOW DOWN JUST A LITTLE BIT.

MR. MCKINNON:  OH, I'M SORRY.  TEND TO BE IRRITABLE AND AGGRESSIVE AND MAY REPEATEDLY GET INTO PHYSICAL FIGHTS OR COMMIT ACTS OF PHYSICAL ASSAULT, INCLUDING SPOUSAL ABUSE OR BEATING AND CHILD BEATING.

DO YOU AGREE WITH THAT STATEMENT THAT'S IN THE DSM-IV-TR?

THE WITNESS:  YES.

BY MR. MCKINNON:

Q.   SO THAT WOULD APPLY TO THE DEFENDANT, SINCE YOU FOUND THAT HE SUFFERED FROM ANTISOCIAL PERSONALITY DISORDER.

A.   THAT'S CORRECT.

Q.   AND WHEN YOU WENT BACK AND LOOKED AT THE REPORTS OF THE CRIMES THAT THE DEFENDANT COMMITTED BACK BEFORE HE WENT TO STATE PRISON, BACK IN, I GUESS, 1988, 1987, HE COMMITTED A

225

NUMBER OF BURGLARIES; CORRECT?

A.   YES.

Q.   AND IN AT LEAST THREE INSTANCES WHEN HE WAS ENGAGED IN A BURGLARY, EITHER THE HOUSEHOLD, THE VICTIM WAS HOME OR THEY CAME HOME WHILE HE WAS IN THE HOUSE; CORRECT?

A.   YES.

Q.   AND ON ALL THOSE OCCASIONS HE WAS ARMED WITH A WEAPON; CORRECT?

A.   YES.

Q.   HE EITHER HAD A KNIFE OR HE HAD A FIREARM OF SOME SORT; CORRECT?

A.   I BELIEVE THAT'S THE CASE.

Q.   ON THOSE OCCASIONS HE DIDN'T ATTACK THE VICTIM, BUT HE LEFT; CORRECT?

A.   YES.

Q.   NOW, YOU ALSO NOW KNOW THE DETAILS OF THE DEFENDANT'S SEXUAL ASSAULT, TORTURE AND MURDER OF JOANNE TIESLER; CORRECT?

A.   YES.

Q.   THE DEFENDANT TOLD YOU THAT.

A.   YES.

Q.   SO BASED ON EVERYTHING THAT YOU KNEW AT THE TIME THAT YOU PREPARED THE REPORT BACK IN MARCH OF -- WELL, MARCH AND APRIL OF 2003, WOULD IT BE FAIR TO SAY THAT IN YOUR OPINION, THE DEFENDANT REPRESENTS OR REPRESENTED A DANGER IF HE WAS EVER TO ESCAPE FROM CUSTODY?

226

A.   YES.

Q.   A DANGER TO COMMIT NOT ONLY ASSAULTS, BUT A DANGER TO COMMIT MURDER, AS WELL?

A.   YES.

Q.   AND THAT WOULD HAVE BEEN YOUR OPINION HAD YOU TESTIFIED AND BEEN ASKED THAT QUESTION AT MR. LECROY'S DEATH PENALTY TRIAL; CORRECT?

A.   YES.

Q.   AND YOU'VE BEEN INVOLVED IN DEATH PENALTY CASES.  YOU KNOW FUTURE DANGEROUSNESS IS AN AGGRAVATING FACTOR THAT IS OFTEN ALLEGED BY THE PROSECUTION AS A BASIS FOR A JURY IMPOSING THE DEATH PENALTY; CORRECT?

A.   YES.

Q.   NOW, YOU'VE ALREADY TESTIFIED THAT THE DEFENDANT HAD HOMICIDAL IDEATIONS AGAINST PEOPLE THAT HE WAS IN PRISON OR JAIL WITH; CORRECT?

A.   YES.

Q.   SO THAT FUTURE DANGEROUSNESS COULD EXTEND TO THEM; CORRECT?

A.   POSSIBLY.

Q.   POSSIBLY.  AND YOU'VE TESTIFIED THAT HE THINKS TINKERBELL WHO'S A FEMALE IS STILL SOMEWHERE OUT THERE, AND YOU CERTAINLY WOULD CONCLUDE THAT HE REPRESENTED A DANGER TO ANYBODY THAT HE MIGHT MISTAKENLY BELIEVE IS TINKERBELL AGAIN; CORRECT?

A.   YES.

227

Q.   AND YOU KNOW FROM READING THE RECORDS THAT IN THE FEDERAL PRISON SYSTEM, IT'S NOT UNCOMMON FOR AN INMATE TO COME INTO CONTACT WITH A FEMALE WHO'S A STAFF MEMBER; CORRECT?

A.   YES.

Q.   SO MR. LECROY WOULD REPRESENT A FUTURE DANGER OR DANGER TO FEMALE STAFF MEMBERS WITHIN THE FEDERAL PRISON SYSTEM AS LONG AS HE WAS INCARCERATED THERE; CORRECT?

A.   IT'S POSSIBLE.  I THINK IT'S LESS LIKELY THAT HE WOULD REPRESENT A DANGER TO AN AUTHORITY FIGURE WHILE INCARCERATED.

Q.   BUT IT'S POSSIBLE.

A.   YES.

Q.   AND CERTAINLY -- WELL, NOW, LET ME GET YOU TO GO BACK TO GOVERNMENT'S EXHIBIT NUMBER 73 WHICH IS THE AUGUST MCMI-III REPORT.  AND IF YOU WOULD LOOK AT PAGE FOUR WHICH IS THE CORRECTIONAL SUMMARY, AND IT SAYS ESCAPE RISK:  EVEN SMALL OPPORTUNITIES WILL ENTICE THIS CONVICT TO ENGAGE IN ESCAPE BEHAVIOR.  DO YOU SEE THAT?

A.   YES.

Q.   SO BASED ON THE DEFENDANT'S ANSWERS TO THESE QUESTIONS BACK IN AUGUST OF 1999, THIS REPORT CONCLUDES THAT HE WOULD BE AN ESCAPE RISK IF HE EVER GOT THE OPPORTUNITY; CORRECT?

A.   YES.

Q.   NOW, YOU INTERVIEWED HIM AT THE LUMPKIN COUNTY JAIL; CORRECT?

A.   YES.

228

Q.    THAT'S WHERE HE WAS BEING HELD PENDING HIS DEATH PENALTY TRIAL IN FEDERAL COURT; CORRECT?

A.    YES.

Q.    DID THE DEFENDANT TELL YOU THAT HE WAS PLANNING TO ESCAPE OR THAT HE WAS THINKING ABOUT TRYING TO ESCAPE FROM THE LUMPKIN COUNTY JAIL?

A.    NO.

Q.    DID YOU KNOW AFTER YOU INTERVIEWED HIM THAT THE AUTHORITIES AT THE LUMPKIN COUNTY JAIL DISCOVERED THAT THE DEFENDANT HAD FIGURED OUT A WAY TO GET OUT OF HIS CELL AND UP INTO THE CEILING SYSTEM OF THE JAIL?

A.    IT'S MY UNDERSTANDING THAT IT WAS A CONNECTION BETWEEN HIS CELL AND THE CELL NEXT TO HIS.

Q.    RIGHT.  SO DID YOU KNOW -- YOU NOW KNOW THAT HE WAS ABLE TO GET OUT OF HIS CELL WITHIN THE JAIL.

A.    YES, AND INTO ANOTHER CELL.

Q.    AND HE WENT INTO ANOTHER CELL.  AND DO YOU KNOW NOW THAT HE HAD SEXUAL RELATIONS WITH A FEMALE PRISONER IN THE OTHER CELL?

A.    I UNDERSTAND THAT'S WHAT WAS HAPPENING.

Q.    AND WHEN DO YOU UNDERSTAND -- IS THIS SOMETHING YOU FOUND OUT JUST RECENTLY?

A.    YES.

Q.    YOU DIDN'T KNOW IT AT THE TIME.

A.    NO.

229

Q.   AND DID YOU ALSO UNDERSTAND THAT WHEN IT WAS DISCOVERED THAT HE WAS ABLE TO GET OUT OF HIS CELL AND INTO ANOTHER CELL, THAT WHEN THEY CONDUCTED AN INVESTIGATION OF WHAT HE WAS DOING, HE HAD WRITTEN A NOTE TO THE JAILERS AT THE LUMPKIN COUNTY JAIL BASICALLY SAYING HE WAS GOING TO MISS THEM WHEN HE ESCAPED?

A.   CORRECT.

Q.   SO CLEARLY, HE WAS PLANNING OR TRYING TO FIGURE OUT A WAY TO ESCAPE FROM THE LUMPKIN COUNTY JAIL.

A.   NO.

Q.   YOU DON'T AGREE THAT THERE'S AN INDICATION THAT HE WAS TRYING TO ESCAPE FROM THE LUMPKIN COUNTY JAIL?

A.   CLEARLY HE WAS TRYING TO ESCAPE.  I THINK THE NOTE, HE SAID SOMETHING TO THE EXTENT OF I'LL MISS YOU WHEN I'M GONE. AND WHAT THAT MEANS, WAS THAT HIS FANTASY, WAS IT SOME JOKE, WAS HE TRYING TO CAUSE THEM SOME CONCERN?  I DON'T KNOW.  BUT IT SOUNDS LIKE THAT THE IDEA OF GETTING OUT OF PRISON WAS ON HIS MIND.  WHETHER HE WAS ACTIVELY PURSUING THAT IDEA OR IT WAS A FANTASY, I DON'T KNOW.

Q.   WELL, IT WOULD BE CONSISTENT WITH THAT HE WAS ACTIVELY PURSUING IT, THAT HE FIGURED OUT A WAY TO AT LEAST GET OUT OF HIS CELL; CORRECT?

A.   GETTING OUT OF HIS CELL AND INTO ANOTHER CELL IS NOT.

Q.   YOU DON'T CONSIDER THAT ESCAPE.  THE EVIDENCE IS --

A.   HE'S LOCKED UP.

Q.   IT'S CONSISTENT WITH HIS ANTISOCIAL PERSONALITY DISORDER

230

THAT HE'S RESISTANT TO AUTHORITY. HE'S NOT GOING TO FOLLOW THE RULES; CORRECT?

A. WELL, NO. ACTUALLY, HE'S USUALLY A PRETTY DECENT RULE FOLLOWER. NOW, HE'S GOING TO BE REBELLIOUS IF THE OPPORTUNITY ALLOWS ITSELF; BUT HE'S FOR THE MOST PART SOMEBODY WHO DOES WELL IN A STRUCTURED SETTING. A LOT OF ANTISOCIAL PEOPLE DO WELL IN HIGHLY STRUCTURED SETTINGS.

Q. LET ME SHOW YOU, LET ME SHOW YOU GOVERNMENT'S EXHIBIT NUMBER 108, GIVE YOU A CHANCE TO READ THAT. THE QUESTION IS DO YOU RECOGNIZE THAT AS AN INDICTMENT RETURNED BY A FEDERAL GRAND JURY IN THIS DISTRICT CHARGING THE DEFENDANT WITH ATTEMPTED ESCAPE AT LUMPKIN COUNTY?

A. YES, I SEE THIS.

        MR. MCKINNON: YOUR HONOR, I WOULD MOVE FOR THE ADMISSION OF GOVERNMENT'S EXHIBIT 108, PLEASE.

        THE COURT: ANY OBJECTION?

        MR. MARTIN: I DON'T SEE HOW THAT'S RELEVANT. THERE WAS AN INDICTMENT RETURNED. THERE WAS NEVER ANY PROSECUTION. I DON'T SEE ITS RELEVANCE AT ALL. HE DIDN'T KNOW ABOUT THIS. HE'S ALREADY SAID HE DIDN'T KNOW ANYTHING ABOUT THE ESCAPE ATTEMPT. THE FACT THAT THE GRAND JURY IN A CLOSED PROCEEDING FELT THERE WAS PROBABLE CAUSE DOESN'T PROVE THERE WAS AN ESCAPE OR A REAL ESCAPE ATTEMPT, SO I OBJECT TO IT.

        MR. MCKINNON: YOUR HONOR, I THINK IT'S RELEVANT; AND ACTUALLY, I THINK THAT AT THE TRIAL THERE WAS -- THE JURY AT

231

THE TRIAL WAS AWARE OF THE FACT THAT THE DEFENDANT HAD ATTEMPTED TO ESCAPE.  IT CERTAINLY IS CONSISTENT WITH OR GOES TO THE ISSUE OF WHETHER THE DECISION NOT TO CALL DR. HILTON AS A WITNESS AT THE TRIAL WAS A REASONABLE TRIAL STRATEGIC DECISION ON THE PART OF THE TRIAL TEAM BECAUSE OF THE ISSUE OF FUTURE DANGEROUSNESS WHICH WAS ONE OF THE AGGRAVATING FACTORS IN THE TRIAL.

MR. MARTIN:  WELL, THE EVIDENCE IN THE TRIAL IS PART OF THE RECORD AND WE CAN ALL ARGUE ABOUT WHAT THAT MEANS.  THE FACT THAT A GRAND JURY RETURNED AN INDICTMENT I DON'T THINK HELPS US AT ALL.  I THINK IT'S IRRELEVANT.

THE COURT:  WHEN WAS THAT INDICTMENT RETURNED?

MR. MCKINNON:  I THINK IT'S DATED OCTOBER -- DO YOU SEE THE STAMP AT THE TOP THERE?

THE WITNESS:  OCTOBER 3RD, 2003.

THE COURT:  I WILL ADMIT IT.  THE OBJECTION IS OVERRULED.

BY MR. MCKINNON:

Q.   FOR THE RECORD, YOU RECOGNIZE THAT THE DEFENDANT WAS INDICTED FOR ATTEMPTING TO ESCAPE FROM LUMPKIN COUNTY JAIL.

A.   THAT'S WHAT IT SAYS.

Q.   AND THE DATE OF THAT OFFENSE WAS JUNE 30TH OF 2003.

A.   YES.

Q.   IT'S ON THE INDICTMENT.

A.   YES.

232

Q.   THAT WOULD HAVE BEEN ABOUT THREE MONTHS AFTER YOU TALKED TO HIM IN LATE MARCH OF 2003.

A.   YES.

Q.   THE DEFENDANT DIDN'T INDICATE TO YOU THAT HE WAS PLANNING TO ESCAPE OR THAT HE WANTED TO ESCAPE OR THAT HE WANTED TO GET OUT OF JAIL WHEN YOU TALKED TO HIM.

A.   NO.

Q.   NOW, WHEN YOU TALKED TO THE DEFENDANT, WHEN YOU DID YOUR EVALUATION OF THE DEFENDANT, IF YOU'RE DOING A FORENSIC EVALUATION IN A CRIMINAL CASE, WOULD IT BE FAIR TO SAY THAT YOU ALWAYS ARE GOING TO ASK THE DEFENDANT, THE PERSON YOU'RE EVALUATING WHO'S CHARGED WITH A CRIME, THAT YOU'RE ALWAYS GOING TO ASK THEM TO GIVE YOU DETAILS OF THE NATURE OF THE OFFENSE THAT THEY COMMITTED?

A.   USUALLY.  NOT ALWAYS.

Q.   BUT IF YOU'RE BEING ASKED TO EVALUATE MENTAL STATUS, EITHER COMPETENCY TO STAND TRIAL, YOU WOULD WANT TO KNOW WHETHER HE KNOWS ABOUT THE OFFENSE, WHETHER HE CAN HELP HIS ATTORNEYS PREPARE A DEFENSE; CORRECT?

A.   YES.

Q.   IF YOU'RE TRYING TO ESTABLISH WHETHER HE'S INSANE AT THE TIME OF THE OFFENSE, YOU'D CERTAINLY WANT TO HEAR HIS VERSION OF WHY HE COMMITTED THE OFFENSE; CORRECT?

A.   YES, USUALLY.

Q.   AND IF YOU WERE ASKED TO PREPARE A REPORT SUCH AS THE

233

REPORT YOU DID HERE WHERE YOU NOT SO MUCH ADDRESS THOSE TWO ISSUES, BUT THE THIRD ISSUE THAT YOU DID IN THIS REPORT IN THIS CASE WHERE YOU'RE EVALUATING MENTAL ILLNESS OR HIS MENTAL STATE AT THE TIME OF THE COMMISSION OF THE OFFENSE, AGAIN, YOU WOULD IN THOSE INSTANCES ASK THE DEFENDANT ABOUT THE OFFENSE; CORRECT?

A.    USUALLY.  NOT ALWAYS.

Q.    NOW, AND THE DEFENDANT GAVE YOU A VERY DETAILED RECITATION OF THE MURDER OF JOANNE TIESLER; CORRECT?

A.    HE DID.

Q.    AND IT WOULD BE FAIR TO SAY THAT THE DEFENDANT THOUGHT ABOUT COMMITTING THIS CRIME FOR, ACCORDING TO YOU, I THINK YOU SAID SEVERAL DAYS AFTER HE HAD THIS ENCOUNTER WITH MS. TIESLER AT HIS SURVIVAL, THE PLACE WHERE HE WAS HIDING HIS SURVIVAL EQUIPMENT; CORRECT?

A.    WELL, THERE'S A COUPLE OF QUESTIONS THERE.  BUT I'M NOT SURE WHEN HE DEVELOPED THE IDEA OF RAPING HER.  IT WOULD HAVE BEEN SOMEWHERE IN THAT TWO-DAY PERIOD.  AND THEN I'M NOT SURE WHEN HE DEVELOPED THE IDEA OF KILLING HER, WHETHER HE DID THAT AT THE SCENE OR WHETHER THAT WAS SOMETHING THAT HE THOUGHT ABOUT EARLIER.

Q.    DID YOU ASK HIM?

A.    I DON'T REMEMBER.

Q.    BUT YOU KNOW, BASED ON WHAT HE TOLD YOU, ASSUMING THAT WHAT HE TOLD YOU IS THE TRUTH ABOUT HOW THE OFFENSE OCCURRED,

234

THAT HE HAD PLANNED THIS OUT; CORRECT?

A.    HE TOLD ME THAT HIS PLANS WERE TO FORCE HER TO UNDO THE SPELL THAT SHE HAD PUT ON HIM.

Q.    AND HE PLANNED TO DO THAT BY ACQUIRING A SHOTGUN OR -- CORRECT?

A.    WELL, NO.  THE SHOTGUN WAS SECONDARY.  HE HAD ALREADY BROKEN INTO HER HOUSE AND WAS LOOKING FOR HER WHEN HE THEN LEFT THE HOUSE AND WENT LOOKING FOR OTHER WEAPONS THAT HE COULD HAVE.  INITIALLY WHEN HE LEFT HIS HOME, THE ONLY THING HE COULD FIND THAT WAS A WEAPON WAS A STEAK KNIFE; AND HE DIDN'T THINK THAT SEEMED IN KEEPING WITH HIS MILITARISTIC PERSONA.  SO HE WENT OVER TO THE HOME AND THEN DECIDED TO LEAVE AND LOOK FOR SOME OTHER MORE EFFICIENT WEAPONS.

SO THAT WAS -- THE IDEA OF WHAT WEAPONS HE WOULD HAVE WAS SECONDARY AND DECIDED LATE IN THE PROCESS OF THIS CRIME.

Q.    AND HE BROKE INTO, I THINK YOU SAID HE SAID --

A.    FOUR OTHER HOMES.

Q.    -- FOUR OTHER HOMES LOOKING FOR A WEAPON THAT WOULD BE MORE --

A.    SUBSTANTIAL.

Q.    -- SUBSTANTIAL THAN A STEAK KNIFE.

A.    YES.

Q.    AND HE FINALLY FOUND THIS SHOTGUN.

A.    AND I THINK A HOLDING OR HUNTING KNIFE.

Q.    THEN HE WENT BACK TO MS. TIESLER'S HOME AND HE WAITED FOR

235

HER TO COME HOME; CORRECT?

A.   YES.

Q.   AND HE HAD THESE PLASTIC TIES SO THAT HE COULD, HE COULD BIND HER OR BIND HER HANDS UP AFTER HE HAD ATTACKED HER; CORRECT?

A.   YES.

Q.   AND HE HAD PLANNED TO HAVE THOSE WITH HIM.

A.   YES.

Q.   I MEAN, THOSE WERE -- HE HAD GOTTEN THOSE BEFORE HE WENT --

A.   HE BROUGHT THOSE WITH HIM, SO THOSE WERE THINGS THAT HE BROUGHT FROM THE HOME.  SO THAT WAS PART OF THE PLANNING BEFORE HE LEFT HIS HOME.

Q.   SO HE HAD PLANNED TO TIE HER UP.  THAT'S CLEAR.

A.   YES.

Q.   ACCORDING TO WHAT HE SAID.

A.   YES.

Q.   AND HE HAD THE MEANS TO DO THAT; CORRECT?

A.   YES.

Q.   THEN HE GOT THE WEAPONS SO THAT HE COULD CONTROL HER ACTIONS WHEN SHE DID COME HOME; CORRECT?

A.   WELL, I DON'T KNOW WHAT HE PLANNED TO DO WITH THE WEAPONS. HE WAS, OBVIOUSLY, CAPABLE OF KILLING HER AND CONTROLLING HER WITHOUT THE SORTS OF WEAPONS THAT HE OBTAINED.  HE COULD HAVE FOUND THINGS AROUND THE HOUSE OR EVEN JUST HIS BEAR HANDS

236

PROBABLY, FOR THAT MATTER.

Q.   BUT THE WEAPONS GAVE HIM THAT ABILITY TO CONTROL HER AND ULTIMATELY TO KILL HER; CORRECT?

A.   WELL, I THINK HE ALREADY HAD THE ABILITY TO CONTROL HER AND KILL HER, BUT THE WEAPONS WERE ONE OF THE WAYS THAT HE WAS CHOOSING TO CONTROL HER AND KILL HER.

Q.   THAT WOULD SHOW EVIDENCE OF PLANNING, THAT HE WAS PLANNING TO KILL HER BECAUSE HE ACQUIRED THE WEAPONS THAT WOULD BE NECESSARY TO DO IT; CORRECT?

A.   WELL, I DON'T THINK SO.  WHEN YOU GET -- WHEN YOU BRING A GUN INTO AN ENVIRONMENT, IT DOESN'T MEAN THAT YOU'RE PLANNING TO KILL SOMEBODY.  IT MAY MEAN THAT YOU'RE PLANNING TO INTIMIDATE THEM.  I DON'T KNOW THAT WE KNOW FOR SURE WHAT HIS PLANS WERE IN TERMS OF KILLING HER PRIOR TO HIS KILLING HER.

Q.   BUT HE TOLD YOU THAT HE HAD SEEN HER AND SHE HAD SEEN HIM REPEATEDLY SINCE HE HAD BEEN RELEASED FROM PRISON; CORRECT?

A.   YES.

Q.   SO SHE KNEW WHO HE WAS; CORRECT?

A.   YES.

Q.   SO IF HE ASSAULTED HER, THEN SHE WOULD KNOW WHO HER ASSAILANT WAS; CORRECT?

A.   YES.

Q.   AND IF SHE LIVED TO BE ABLE TO TELL THE AUTHORITIES WHO HAD ATTACKED HER AND RAPED HER, SHE WOULD KNOW TO SAY IT'S BILL LECROY, JR.; CORRECT?

237

A.    YES.

Q.    AND YOU ELIMINATE HER ABILITY TO IDENTIFY HIM AS THE ATTACKER BY KILLING HER; RIGHT?

A.    WELL, YOU COULD; BUT THAT'S NOT HIS TYPICAL, THE WAY HE DEALS WITH THINGS.  HE WAS IN HOMES AND PEOPLE SAW HIM AND HE CHOSE NOT TO KILL THEM.

Q.    BUT IN THOSE CASES HE WAS IN STRANGERS' HOMES; CORRECT?

A.    YES.  WELL, HE WAS IN A STRANGER'S HOME WITH HER.

Q.    BUT SHE KNEW WHO HE WAS AND WHERE HE LIVED; RIGHT?

A.    WELL, THE OTHER PEOPLE IDENTIFIED HIM, AS WELL.  I DON'T THINK THAT WE CAN SAY THAT HE WENT INTO THE HOME WITH THE IDEA OF KILLING HER.  I THINK WE CAN SAY HE PROBABLY WENT IN THE HOME WITH THE IDEA OF RAPING HER AND FORCING HER TO CHANGE THE SPELL, AND WHERE IN THE PROCESS HE DECIDED HE WAS GOING TO KILL HER IS UNCERTAIN.

Q.    AND YOU DIDN'T ASK HIM WHEN HE DECIDED TO KILL HER OR WHAT HIS PLAN WAS.

A.    I DON'T RECALL, NO.

Q.    DO YOU HAVE ANY INDEPENDENT RECOLLECTION OF THIS EVALUATION OR ARE YOU RELYING TOTALLY ON REVIEWING YOUR REPORT AND THE RECORDS THAT WERE PROVIDED TO YOU?

A.    NO.  I ACTUALLY HAVE QUITE A BIT.  I WOULD SAY DOING 150 EVALUATIONS A YEAR, THAT -- AND HAVING DONE THIS FOR 20 YEARS, THAT THIS CASE STANDS OUT WITH MORE CLARITY THAN MAYBE ALL BUT HALF A DOZEN.

238

Q.   BECAUSE OF THE GRUESOME NATURE OF THE CRIME?

A.   YES.

Q.   NOW, REGARDLESS OF WHETHER WE AGREE ON WHETHER THERE WAS AN ATTEMPT TO KILL WHEN HE WENT INTO THE HOUSE, IT'S CLEAR THAT THE STORY THAT HE TOLD YOU IS INCONSISTENT WITH A THEORY THAT HE WAS COMMITTING A BURGLARY OF HER CABIN AS HE HAD DONE IN THE PAST AND THAT SHE CAME IN AND SURPRISED HIM AND HE PANICKED AND THAT'S WHAT LED TO HIM TYING HER UP AND SEXUALLY ASSAULTING HER AND THEN TORTURING AND ABUSING HER AND ULTIMATELY KILLING HER. IT'S CLEAR THAT HIS STORY IS INCONSISTENT WITH THAT THEORY; CORRECT?

A.   YES.

Q.   AND IF THE DEFENSE WANTED TO TELL THE JURY THAT THE EVIDENCE SHOWED THAT THERE WAS NO PREPLANNING HERE BECAUSE THIS BURGLARY WAS CONSISTENT WITH THE BURGLARIES THAT HE HAD COMMITTED IN THE PAST, IF THEY HAD CALLED YOU AS A WITNESS, YOUR ACCOUNTING OF WHAT THE DEFENDANT SAID ABOUT THE CRIME WOULD HAVE BEEN INCONSISTENT WITH THAT; CORRECT?

A.   YES.

Q.   AND IF THE DEFENSE AT THE TRIAL WANTED TO CONVINCE THE JURY THAT THERE WASN'T THIS SUBSTANTIAL PREPLANNING AND PREMEDITATION FOR THE COMMISSION OF THE MURDER -- AND YOU'RE AWARE THAT'S ANOTHER AGGRAVATING FACTOR THAT A JURY CAN CONSIDER IN DECIDING WHETHER TO IMPOSE A DEATH PENALTY; CORRECT?

239

A.   YES.

Q.   AND IF THE DEFENSE WANTED TO COUNTER THAT BY ARGUING THAT THE EVIDENCE DIDN'T ESTABLISH PREPLANNING AND PREMEDITATION, IF YOU HAD TESTIFIED, THEY WOULDN'T HAVE BEEN ABLE TO ARGUE THAT THIS WAS SIMPLY A BURGLARY THAT WENT BAD; CORRECT?

A.   YES.

Q.   NOW, YOU'RE ALSO AWARE THAT COMMITTING A MURDER IN AN UNUSUALLY CRUEL AND HEINOUS FASHION IS ALSO AN AGGRAVATING FACTOR THAT A JURY CAN CONSIDER IN DECIDING WHETHER TO IMPOSE THE DEATH PENALTY; CORRECT?

A.   I DIDN'T KNOW THAT.

Q.   WELL, ASSUME THAT IT IS OR ASSUME THAT IT WAS IN THIS FEDERAL DEATH PENALTY CASE.  NOW, THE DEFENDANT TOLD YOU THAT WHEN MS. TIESLER FIRST CAME INTO THE HOUSE, THAT HE WAS WAITING FOR HER.  AND YOU KNOW THAT SHE HAD NO IDEA HE WAS THERE; CORRECT?

A.   YES.

Q.   AND THAT HE CAME UP BEHIND HER AND HE HIT HER IN THE BACK OF THE HEAD WITH THE SHOTGUN; RIGHT?

A.   YES.

Q.   AND THE SHOTGUN ACCIDENTALLY DISCHARGED WHEN HE STRUCK HER IN THE BACK OF THE HEAD WITH THE SHOTGUN; CORRECT?

A.   THAT'S WHAT HE SAID, YES.

Q.   WELL, DID YOU LOOK AT THE POLICE REPORTS TO SEE THAT THERE WAS CORROBORATION THAT THE SHOTGUN HAD DISCHARGED IN THE HOUSE

240

DURING THE COMMISSION OF THE CRIME?

A.   NO.

Q.   THEN HE TOLD YOU THAT HE TIED HER HANDS BEHIND HER BACK; CORRECT?

A.   YES.

Q.   AND DID YOU LOOK AT THE CRIME SCENE PHOTOGRAPHS?  DO YOU KNOW THAT WHEN HER BODY WAS DISCOVERED, THAT HER HANDS WERE TIED BEHIND HER BACK?

A.   I DIDN'T SEE THE PHOTOGRAPHS, BUT I SAW DESCRIPTIONS OF THE PHOTOGRAPHS.

Q.   SO YOU KNOW THAT HER HANDS WERE TIED BEHIND HER BACK.

A.   YES.

Q.   AND WHEN HER HANDS ARE TIED BEHIND HER BACK, SHE'S VIRTUALLY DEFENSELESS; CORRECT?

A.   YES.

Q.   SHE CAN'T FIGHT HER ATTACKER, SHE CAN'T DO ANYTHING; CORRECT?

A.   YES.

Q.   AND THEN THE DEFENDANT TOLD YOU THAT HE SEXUALLY ASSAULTED HER; CORRECT?

A.   YES.

Q.   SHE COULDN'T FIGHT THAT OFF, COULD SHE?

A.   NO.

Q.   AND THEN THE DEFENDANT TOLD YOU THAT HE TOOK A WIRE, A CORD OF SOME SORT; CORRECT?

241

A.    YES.

Q.    HE WRAPPED THAT AROUND HER NECK; CORRECT?

A.    YES.

Q.    SHE WAS STILL CONSCIOUS AND KNOWLEDGEABLE OF WHAT'S GOING ON; CORRECT?

A.    YES.

Q.    SHE CAN'T FIGHT HIM OFF BECAUSE HER HANDS ARE TIED BEHIND HER BACK AND HE'S A SIX-FOOT-SIX ALMOST 300-POUND MAN; CORRECT?

A.    YES.

Q.    AND HE STARTED CHOKING HER; CORRECT?

A.    THAT'S CORRECT.

Q.    AND SHE WOULD BE FULLY AWARE OF THE FACT THAT SHE'S BEING STRANGLED TO DEATH, WOULDN'T SHE?

A.    YES.

Q.    BUT THAT WASN'T ENOUGH.  HE CHOKED HER TO THE POINT WHERE SHE WAS GASPING FOR AIR, ACCORDING TO HIM; CORRECT?

A.    YES.

Q.    CHOKED HER TO THE POINT WHERE SHE DEFECATED ON HERSELF; CORRECT?

A.    THAT'S CORRECT.

Q.    CHOKED HER TO THE POINT WHERE SHE URINATED ON HERSELF; CORRECT?

A.    YES.

Q.    SHE COULDN'T GET HER HANDS FROM BEHIND HER NECK TO TRY TO GET THE CORD OFF, COULD SHE?

242

A.   NO, SHE --

Q.   SHE WAS BEING STRANGLED TO DEATH; RIGHT?

A.   YES.

Q.   AND SHE WOULD HAVE KNOWN THAT; CORRECT?

A.   YES.

Q.   BUT THAT WASN'T ENOUGH FOR THE DEFENDANT IN TERMS OF KILLING HER, WAS IT?

A.   THAT WAS NOT HIS PLAN AT THAT TIME OF KILLING HER.  THAT WAS TO FORCE HER INTO UNDOING THE SPELL.

Q.   YOU CHOKE SOMEBODY TO THE POINT THAT THEY'RE GASPING FOR AIR, THAT THEY'RE LOSING CONTROL OF THEIR BODILY FUNCTIONS, BUT YOU'RE NOT TRYING TO KILL THEM?  IS THAT WHAT MR. LECROY TOLD YOU?

A.   YES.

Q.   SO SINCE SHE WASN'T DYING FROM THE CHOKING, HE DECIDED TO SLASH HER THROAT; CORRECT?

A.   WELL, HE STOPPED CHOKING HER, GAVE HER THE OPTION OF UNDOING THE SPELL; AND THEN WHEN SHE STILL -- AT THIS POINT I THINK SHE WAS UNCONSCIOUS OR NEAR UNCONSCIOUS, THAT'S WHEN HE STABBED HER IN THE BACK OR --

Q.   HE SLASHED HER THROAT FIRST, DIDN'T HE?

A.   HE SLASHED HER THROAT AND THEN --

Q.   SO IF SHE STILL WAS CONSCIOUS -- AND HE DESCRIBED HOW HE DID IT; RIGHT?

A.   YES.

243

Q.   GRABBED HER HAIR, PULLED HER NECK UP SO THE THROAT WOULD BE FULLY EXPOSED, CAME TO HER WITH A KNIFE AND JUST SLIT THE KNIFE FROM, BASICALLY FROM EAR TO EAR; RIGHT?

A.   THAT'S CORRECT.

Q.   AND YOU KNOW THAT THE CRIME SCENE INVESTIGATION CORROBORATES THAT; CORRECT?

A.   YES.

Q.   AND IF SHE WAS STILL CONSCIOUS WHEN THAT HAPPENED, THEN SHE WOULD KNOW THAT SHE WAS ABOUT TO DIE; RIGHT?

A.   YES.

Q.   BUT SHE DIDN'T DIE IMMEDIATELY, EVEN AFTER HER THROAT WAS SLASHED, ACCORDING TO THE DEFENDANT; IS THAT CORRECT?

A.   THAT'S CORRECT.

Q.   SO NOT ONLY DID HE CHOKE HER TO THE POINT THAT SHE CAN'T BREATHE, SLASHED HER THROAT, BUT THEN HE STABBED HER REPEATEDLY IN THE BACK; RIGHT?

A.   YES.

Q.   AND IF YOU HAD TESTIFIED AT THE TRIAL, YOU MIGHT HAVE BEEN SUBJECT TO EXACTLY THIS KIND OF EXAMINATION ABOUT WHAT THE DEFENDANT SAID THAT HE DID TO THIS VICTIM; CORRECT?

A.   YES.

Q.   AND YOU WOULD HAVE BEEN CROSS-EXAMINED ABOUT EXACTLY WHAT CRUEL AND HEINOUS NATURE MS. TIESLER'S DEATH AS ITS DESCRIBED BY THE DEFENDANT; CORRECT?

A.   YES.

244

MR. MARTIN:  YOUR HONOR, I OBJECT TO THAT QUESTION. I DON'T KNOW IF HE WOULD NECESSARILY HAVE BEEN ASKED TO GIVE A LEGAL OPINION AS TO WHETHER IT WAS --

THE COURT:  I'LL SUSTAIN THE OBJECTION TO THE EXTENT IT CALLS FOR A LEGAL CONCLUSION.

BY MR. MCKINNON:

Q.   IN YOUR OPINION, MR. LECROY SUFFERS FROM ANTISOCIAL PERSONALITY DISORDER?

A.   YES.

Q.   AND WE TALKED ABOUT THAT AS BEING A LACK OF RESPECT FOR THE RIGHTS OF OTHERS; CORRECT?

A.   CORRECT.

Q.   SO MR. LECROY'S HISTORY OF THE SEX THAT HE HAD AS A 19-YEAR-OLD WITH A 13-YEAR-OLD, THAT WOULD BE CONSISTENT WITH ANTISOCIAL PERSONALITY DISORDER; CORRECT?

A.   IT MIGHT OR IT MIGHT NOT, YES.

Q.   BURGLARIZING OTHER PEOPLE'S HOUSES WOULD BE CONSISTENT WITH ANTISOCIAL PERSONALITY DISORDER?

A.   YES.

Q.   A LACK OF RESPECT OF THE PROPERTY RIGHTS AND PRIVACY RIGHTS OF INDIVIDUALS?

A.   CORRECT.

Q.   AND THE MANNER IN WHICH THE DEFENDANT KILLED MS. TIESLER WOULD BE CONSISTENT WITH ANTISOCIAL PERSONALITY DISORDER; CORRECT?

245

A.   YES.

Q.   AND, IN FACT, IT CAN MANIFEST ITSELF IN A CRUEL AND SADISTIC MANNER JUST AS IT DID IN THIS PARTICULAR CASE; CORRECT?

A.   YES.

Q.   WHEN YOU TALKED TO THE DEFENDANT AND HE DESCRIBED THIS CRIME, IN YOUR REPORT YOU DESCRIBED HIS DEMEANOR.  DO YOU RECALL HOW YOU DESCRIBED HIS DEMEANOR?

A.   NO, I DON'T.

Q.   LOOK AT PAGE 12.  IT SAYS, IN YOUR MENTAL STATUS EXAMINATION SECTION, YOU SAY:  AS THE INTERVIEW PROGRESSES AND PARTICULARLY WHEN DISCUSSING THE OFFENSE, HE -- MEANING THE DEFENDANT -- IS MUCH MORE SERIOUS, LESS ANIMATED AND HIS TONE IS FLAT.

A.   THAT'S CORRECT.

Q.   SO FLAT TONE IS -- CAN YOU DESCRIBE WHAT HIS TONE IS WHEN YOU DESCRIBE IT AS FLAT.  WHAT DOES THAT MEAN?

A.   WELL, THERE WAS NOT AN INTERACTION OR A FLUCTUATING QUALITY OF HIS TONE.  THERE WAS A MUCH MORE SERIOUS NATURE TO THE WAY HE DESCRIBED IT.

Q.   FLATNESS OF TONE SHOWS SOMEWHAT OF A LACK OF EMOTION AS HE'S DESCRIBING THIS CRIME?

A.   NO, I WOULD NOT SAY THAT.  I WOULD SAY IT WAS, OVERALL IT WAS A VERY SERIOUS TIME FOR HIM.

Q.   WAS HE CRYING WHEN HE DESCRIBED IT?

246

A.    NO, I DIDN'T SAY HE WAS CRYING OR EMOTIONAL.  HE WAS JUST SERIOUS.

Q.    SERIOUS.

A.    YEAH.

Q.    NOT EMOTIONAL.

A.    NO.

Q.    NOT CRYING.  NOT SAYING HE'S SORRY HE DID IT OR THAT HE WISHES HE COULD UNDO IT.  HE DIDN'T SAY ANYTHING LIKE THAT WHILE HE WAS DESCRIBING IT, DID HE?

A.    NO.  IT WOULD BE MUCH MORE, THE WAY I DESCRIBED WHAT HE SAID, IT WAS THERE WAS NOT THE FRIENDLY INTERACTIVE QUALITY WHEN WE'RE TALKING ABOUT UPBRINGING, CHILDHOOD, SCHOOL, THOSE SORTS OF THINGS.  IT WAS, IT WAS A MUCH MORE RESERVED.

Q.    RESERVED, MATTER-OF-FACT DESCRIPTION OF THE WAY THE MURDER OCCURRED.

A.    I THINK, NO, THERE WAS NOTHING MATTER-OF-FACT ABOUT IT.

Q.    AT THE END OF THE SESSION OF YOUR MENTAL STATUS EXAMINATION SECTION, YOU SAID:  HE ACKNOWLEDGES FEELINGS OF GUILT OVER HIS BEHAVIOR.

DOES THAT MEAN THAT YOU ASKED HIM WHETHER HE FELT GUILTY ABOUT IT?

A.    I DON'T RECALL WHETHER I ASKED HIM OR WHETHER HE VOLUNTEERED.

Q.    WELL, IF HE HAD VOLUNTEERED IT, WOULDN'T YOU HAVE SAID HE VOLUNTEERED THAT HE FEELS GUILTY OR HE EXHIBITED SIGNS OF

247

REMORSE FOR HAVING COMMITTED THIS CRIME?

A.   NO.

Q.   BUT THE USE OF THE WORD ACKNOWLEDGES WOULD SUGGEST THAT HE'S SIMPLY RESPONDING TO YOUR QUESTION THAT AS TO WHETHER OR NOT HE FEELS GUILTY ABOUT COMMITTING THIS HORRIBLE CRIME.

A.   NO.

Q.   THAT'S NOT WHAT YOU INTENDED WHEN YOU WROTE THE WORD ACKNOWLEDGES THERE?

A.   NO, THAT'S NOT.

Q.   BUT IN THIS REPORT, THIS MENTAL STATUS EXAMINATION REPORT, YOU NEVER SAID THAT HE EXPRESSED REMORSE FOR HAVING COMMITTED THIS CRIME, DID YOU?

A.   I SAID HE HAD FEELINGS OF GUILT.  TO ME, THAT'S ESSENTIALLY THE SAME THING.

Q.   NEVER USED THE WORD REMORSE.

A.   NO, I USED THE WORDS FEELINGS OF GUILT.

Q.   AND YOU SAID HE ACKNOWLEDGES FEELINGS OF GUILT.

A.   RIGHT.

Q.   LET ME ASK YOU SOME OTHER FEATURES OF A PERSON WITH ANTISOCIAL PERSONALITY DISORDER.  WOULD YOU AGREE THAT PERSONS WITH ANTISOCIAL PERSONALITY DISORDER DISRE -- THAT THEY ARE FREQUENTLY DECEITFUL AND MANIPULATIVE IN ORDER TO GAIN PERSONAL PROFIT OR PLEASURE?  WOULD YOU AGREE THAT'S A FEATURE OF SOMEBODY WITH A PERSONALITY --

A.   THEY CAN SHOW THOSE FEATURES, YES.  THAT IS A FEATURE OF

248

THE DISORDER.

Q.   DO YOU AGREE THAT THEY GENERALLY FAIL TO COMPENSATE OR MAKE AMENDS FOR THEIR BEHAVIOR?

A.   YES, THAT'S A FEATURE.  THESE INDIVIDUALS WITH THESE DISORDERS DON'T HAVE TO HAVE ALL OF THESE FEATURES, BUT THESE ARE FEATURES OF THE CONDITION.

Q.   WELL, WOULD YOU AGREE THAT IT'S A FEATURE OF THE CONDITION THAT PERSONS WITH THE DISORDER MINIMIZE THE HARMFUL CONSEQUENCES OF THEIR ACTIONS OR THEY MAY SIMPLY INDICATE COMPLETE INDIFFERENCE?

A.   THEY CAN.

Q.   WOULD YOU AGREE THAT THEY EXHIBIT BEHAVIORS THAT ARE ASSOCIATED WITH MALEVOLENCE, CRUELTY AND SADISM?

A.   IT'S POSSIBLE, YES.

Q.   WOULD YOU AGREE THAT PERSONS WITH ANTISOCIAL PERSONALITY DISORDER LACK FIDELITY, LOYALTY AND HONESTY?

A.   IT'S POSSIBLE; NOT REQUIRED.

Q.   WOULD YOU AGREE THAT IT'S POSSIBLE THAT SOMEBODY WITH THIS DISORDER STATE THEIR GOOD INTENTIONS AND THEN FAIL TO DO WHAT THEY SAY THEY WILL DO?

A.   YES, IT'S POSSIBLE.

Q.   IS IT ALSO POSSIBLE THAT AT TIMES THE FAILURE TO DO THIS IS A CALCULATED WISH TO DECEIVE OR AT OTHER TIMES IT WOULD BE BECAUSE OF A CAPACITY TO SEE WHAT OTHERS WANT AND TO WISH TO PLACATE THEM?

249

A.    IT'S POSSIBLE, YES.

Q.    AND IN YOUR ASSESSMENT OF MR. LECROY, YOU FOUND THAT HIS INTELLIGENCE WAS WELL ABOVE AVERAGE; CORRECT?  I'LL ASK YOU TO LOOK AT EITHER THE BOTTOM OF PAGE 12 OR THE TOP OF PAGE 13 OF YOUR REPORT.  ACTUALLY, THE TOP OF PAGE 13:  INTELLIGENCE IS ASSESSED AS ABOVE AVERAGE?

A.    YEAH, ABOVE AVERAGE, NOT WELL ABOVE AVERAGE.

Q.    WELL, DO YOU RECALL SEEING ASSESSMENTS WHERE HIS INTELLIGENCE IS RATED AS HIGH AS A 125, HIS IQ?

A.    THAT WAS A VERY CRUDE GUESSTIMATE; BUT, YES, I SAW THAT.

Q.    WELL, YOU WOULD CONSIDER A 125 IQ TO BE WELL ABOVE AVERAGE.

A.    YES.

Q.    NOW, IN YOUR REVIEW OF THE REPORTS AND MR. LECROY'S SYMPTOM REPORTS TO THE OTHER MENTAL HEALTH PROFESSIONALS THAT YOU DID --

A.    YES.

Q.    -- DID YOU FIND ANY EVIDENCE THAT HE HAD EVER EXPRESSED THIS IDEA OF MAGICAL THINKING TO ANYBODY ELSE BEFORE YOU?

A.    I DON'T RECALL.  I DON'T THINK SO.

      YES, ACTUALLY, I THINK AT ONE POINT HE, HE DESCRIBED TO ONE OF THE THERAPISTS, I THINK DR. CARLSON, THAT, THAT THE SEXUAL ENCOUNTER IN SOME WAY MADE HIM SPECIAL.

Q.    MADE HIM FEEL SPECIAL IS WHAT HE SAID.

A.    YES.

250

Q.    AND THAT WAS HOW HE FELT AS AN EIGHT-YEAR-OLD.

A.    YES.  YOU ASKED ABOUT THE TYPES OF MAGICAL THINKING, AND I WOULD SAY THAT THAT WAS PROBABLY A VERY EARLY INSTANCE OF HIM DEVELOPING SOME SENSE THAT THERE WAS SOMETHING UNIQUE ABOUT HIS SITUATION, ABOUT HIM, BECAUSE OF HIS CIRCUMSTANCES.

Q.    WELL, OTHER THAN SAYING THAT HE'S SPECIAL, DID YOU SEE ANYTHING ELSE BETWEEN THE TIME HE WAS EIGHT AND THE TIME THAT HE WAS, HOW OLD WAS HE WHEN HE TALKED TO YOU, 31 APPROXIMATELY, EARLY 30S, WHERE HE EVER TOLD ANOTHER THERAPIST ABOUT THIS IDEA OF MAGICAL THINKING WHERE --

A.    HE DIDN'T USE THE TERM MAGICAL THINKING WITH ME.

Q.    DID HE EVER EXPRESS, YOU KNOW, HE THOUGHT THERE WAS SOME SORT OF A POWER THAT TINKERBELL HELD OVER HIM BECAUSE OF THIS ALLEGED SEXUAL ENCOUNTER?

A.    I DON'T THINK SO.  I DON'T RECALL.

Q.    AND YOU'RE AWARE THAT THERE WAS NEVER ANY KIND OF OUTCRY BY MR. LECROY WHEN HE WAS A CHILD TO HIS FAMILY MEMBERS ABOUT THIS ALLEGED SEXUAL ENCOUNTER; CORRECT?

A.    THAT'S CORRECT.

Q.    AND YOU'RE AWARE THAT NOT ONLY DID THE FAMILY MEMBERS NOT KNOW ANYTHING ABOUT IT, BUT THE FAMILY MEMBERS DIDN'T EVEN KNOW A TINKERBELL; CORRECT?

A.    CORRECT.  WELL, I DON'T KNOW, I DON'T KNOW THAT THEY DIDN'T KNOW TINKERBELL; BUT I WOULD ASSUME THEY HAD NO RECOLLECTION OF THE ABUSE OR NO KNOWLEDGE OF THE ABUSE.

251

Q.   BUT NOT ONLY THAT, BUT YOU DIDN'T READ THE REPORTS ABOUT THE FAMILY MEMBERS THAT THEY DIDN'T KNOW OF A TINKERBELL OR A BABYSITTER NAMED TINKERBELL?

A.   I DON'T THINK THAT WAS HER REAL NAME.  I THINK THAT WAS A NICKNAME THAT MR. LECROY AND HIS BROTHER USED FOR HER, SO THE PARENTS WOULDN'T PROBABLY HAVE USED THAT.

Q.   WELL, YOU KNOW THAT THE BROTHER NEVER KNEW OF A BABYSITTER NAMED TINKERBELL, THAT THEY CALLED TINKERBELL; CORRECT?

A.   I DON'T RECALL THAT, BUT I WOULD ASSUME THAT MUST BE THE CASE.

          MR. MCKINNON:  YOUR HONOR, COULD I HAVE JUST A MINUTE, PLEASE?

          THE COURT:  YOU MAY.

          (DISCUSSION OFF THE RECORD.)

BY MR. MCKINNON:

Q.   I JUST HAVE A COUPLE MORE QUESTIONS.  I JUST WANT TO BE CLEAR, THE QUESTIONS THAT I'VE BEEN ASKING YOU ABOUT WHAT THE DSM-IV-TR, THOSE WOULD APPLY TO -- YOUR ANSWERS WOULD HAVE BEEN THE SAME BACK IN 2003 OR 2004 ABOUT THE FEATURES OF THE ANTISOCIAL PERSONALITY DISORDER.

A.   YES.

Q.   AND YOUR TESTIMONY HERE TODAY, OTHER THAN, APPARENTLY, YOU KNOW SOMETHING ABOUT THE ESCAPE, HAVE YOU LEARNED ANYTHING ELSE ABOUT MR. LECROY SINCE YOU INTERVIEWED HIM BACK IN MARCH OF 2003?

252

A.   YES.  I'VE LEARNED THAT HE HASN'T GOTTEN IN MUCH IN THE WAY OF TROUBLE IN THE PAST NINE YEARS.

Q.   SINCE HE'S BEEN IN --

A.   INCARCERATED.

Q.   -- INCARCERATED IN THE FEDERAL SYSTEM.

A.   YES.

Q.   AND WHO HAVE YOU LEARNED THAT FROM?

A.   MR. MARTIN.

Q.   BUT THE QUESTIONS THAT I'VE ASKED YOU AND THE QUESTIONS THAT MR. MARTIN ASKED YOU, WOULD YOUR ANSWERS TO THOSE QUESTIONS HAVE BEEN THE SAME BACK IN FEBRUARY OR MARCH OF 2004 AS THEY ARE TODAY?

A.   YES.

        MR. MCKINNON:  THANK YOU.  THAT'S ALL THE QUESTIONS I HAVE.

        THE COURT:  REDIRECT?

        MR. MARTIN:  WRAP THIS UP QUICKLY.

                    REDIRECT EXAMINATION

BY MR. MARTIN:

Q.   DR. HILTON, THE MCMI-III, THE MILLON -- HOW DO YOU PRONOUNCE IT, MILLON?

A.   MILLON.

Q.   MILLON, GOVERNMENT'S EXHIBIT 73, WOULD ANY PSYCHIATRIST OR FORENSIC PSYCHOLOGIST RELY UPON A SINGLE DOCUMENT, A COMPUTER TEST LIKE THIS TO DIAGNOSE A DEFENDANT?

253

A.   NO.

Q.   WOULD YOU TAKE THIS ONE DOCUMENT OUT OF ALL THE OTHERS AND SAY THIS IS THE ONE, THE END ALL AND BE ALL ABOUT BILL LECROY?

A.   NO.   IT'S ONE SMALL PICTURE OF AN INDIVIDUAL.   IT'S FAR MORE COMPLICATED THAN A SIMPLE TEST.

Q.   AND THE CONCLUSIONS THAT ARE REACHED IN THIS 73, GOVERNMENT'S EXHIBIT 73, THOSE ARE COMPUTER-DRIVEN COMMENTS. IS THAT NOT CORRECT?

A.   YES.

          MR. MCKINNON:  OBJECT TO LEADING QUESTIONS.

          THE COURT:  WE'VE BEEN OVER ALL THAT.

          MR. MARTIN:  I UNDERSTAND.

BY MR. MARTIN:

Q.   YOU MENTIONED QUESTIONS ABOUT -- AND I WANT TO KEEP THIS FOCUSED ON THE HISTORY YOU WOULD HAVE HAD AT THE TIME THAT YOU WOULD HAVE TESTIFIED BACK AT THE TIME OF TRIAL YEARS AGO AND THE TIME YOU DID YOUR EVALUATION IN 2003.  YOU MENTIONED, MR. MCKINNON MENTIONED SOME QUESTIONS ABOUT THOUGHTS ABOUT HARMING OTHER INMATES.  WAS THERE ANYTHING IN THE RECORDS, THE PRISON RECORDS THAT WERE PROVIDED TO YOU, THAT INDICATE ANY TYPE OF VIOLENCE, SERIOUS VIOLENCE OVER THE TEN YEARS THAT MR. LECROY HAD BEEN IN PRISON?

A.   NOTHING ABOVE AND BEYOND WHAT YOU MIGHT USUALLY FIND AMONG PEOPLE THAT ARE LOCKED UP AMONG ONE ANOTHER.

Q.   WHAT, IF ANY -- A PERSON WITH BORDERLINE PERSONALITY

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

254

DISORDER AND SCHIZOTYPAL PERSONALITY DISORDER AND ANTISOCIAL PERSONALITY DISORDER -- BY THE WAY, WHAT PERCENTAGE OF THE PRISON POPULATION YOU THINK HAS ANTISOCIAL PERSONALITY DISORDER?

A.    PROBABLY THE MAJORITY.

Q.    DEFINED BY PEOPLE WHO BREAK THE LAW IN ONE RESPECT, ONE OF THE PRIMARY DEFINITIONS.

A.    YES.

Q.    THE FEATURES OF BORDERLINE PERSONALITY DISORDER AND SCHIZOTYPAL PERSONALITY DISORDER, HOW DO THOSE TYPE OF PEOPLE FUNCTION IN A STRUCTURED ENVIRONMENT SUCH AS A SECURED PRISON?

A.    THOSE INDIVIDUALS ARE LIKELY TO DO VERY WELL IN A STRUCTURED SETTING.  ONE OF THE THINGS THAT YOU DO IN AN INDIVIDUAL WHO HAS A BORDERLINE PERSONALITY DISORDER, WHICH IS HIS PRIMARY CONDITION AS I SEE IT, IS WORK VERY HARD TO GIVE THEM STRUCTURE IN ALL AREAS OF THEIR LIFE.

Q.    AND WHAT DO THE RECORDS INDICATE AS HOW MR. LECROY HAD PERFORMED OR HOW HE HAD GOVERNED HIMSELF IN THE STRUCTURED ENVIRONMENT OF PRISON?

A.    THE RECORDS INDICATE THAT HE'S DONE WELL IN A PRISON ENVIRONMENT, AS ONE MIGHT EXPECT FOR SOMEBODY WITH BORDERLINE PERSONALITY DISORDER.

Q.    MR. MCKINNON ASKED YOU A NUMBER OF FEATURES ABOUT THE CRIME AND OTHER THINGS THAT YOU SAID WOULD BE CONSISTENT WITH ANTISOCIAL PERSONALITY DISORDER.

255

A.    YES.

Q.    WAS THAT THE ONLY PERSONALITY DISORDER THAT EXPLAINED THE CONDUCT THAT INVOLVED ESPECIALLY THE OFFENSE IN THIS CASE?

A.    NO.  I THINK IT WAS PROBABLY THE LEAST LIKELY OF THE THREE TO EXPLAIN HIS CONDUCT AT THAT TIME.

Q.    MR. MCKINNON ASKED YOU A QUESTION ON PAGE 13 OF YOUR REPORT WHERE YOU STATE HE ACKNOWLEDGES FEELINGS OF GUILT OVER HIS BEHAVIOR.  AND MR. MCKINNON ASKED YOU WHETHER OR NOT THAT MEANT THAT HE MERELY RESPONDED TO YOUR QUESTION.  YOU SAID NO. CAN YOU EXPLAIN BETTER WHAT YOU THINK THAT SENTENCE MEANS, WHAT HAPPENED DURING YOUR INTERVIEW WITH MR. LECROY AS TO HIS FILINGS OF GUILT?

A.    WELL, DURING THE COURSE OF THE EXAMINATION, WHEN I MET WITH HIM, HE APPEARED TO BECOME APPROPRIATE IN HIS INTERACTION WITH ME AS ONE WOULD EXPECT FOR SOMEBODY DESCRIBING SOMETHING THAT WAS AS TERRIBLE AS WHAT HE HAD DONE.  THERE WAS, THERE WAS NOTHING INAPPROPRIATE IN HIS INTERACTION.  IF ANYTHING, IT WAS SUGGESTIVE OF SOMEBODY WHO WAS REMORSEFUL OF WHAT HAD HAPPENED. AND I PUT DOWN THAT HE ACKNOWLEDGED THESE FEELINGS OF GUILT.

NOW, WHETHER I SHOULD HAVE SAID HE VOLUNTEERED, I DON'T RECALL; BUT IT WASN'T SOMETHING THAT I RECALL LOOKING FOR. AND, IN FACT, I HAD SEEN IT IN THE RECORDS WHEN HE, IN THE PAST WHEN HE DESCRIBED HIS INTERACTION WITH I THINK IT WAS THE BABYSITTER AND HIS ANGER IN DESCRIBING SOME REMORSE OVER SOME OF HIS FEELINGS AT THAT TIME.  SO THIS IS SOMETHING THAT HE

256

DESCRIBED PREVIOUSLY.

Q.   AND FINALLY, MR. MCKINNON ASKED YOU SOME QUESTIONS --

A.   I'M SORRY, NOT THE BABYSITTER, THE 13-YEAR-OLD STEPSISTER.

Q.   ALSO, REFER TO THE VERY LAST LINE OF YOUR REPORT AND SPECIFICALLY IN CONNECTION WITH THE MURDER OF MS. TIESLER.  DID HE NOT STATE THAT HE HAD DEVELOPED REMORSE?

A.   RIGHT; AND, IN FACT, WROTE A LETTER APOLOGIZING.

Q.   FINALLY, WITH REGARDS TO --

A.   I WOULD ADD THAT HE WROTE A LETTER WHEN HE STILL THOUGHT THAT HE WAS IN THE PROCESS OF TRYING TO ESCAPE.  IT WASN'T AFTER HE WAS ARRESTED.  IT WAS BEFORE HE WAS ARRESTED.

Q.   RIGHT.  FINALLY, MR. MCKINNON ASKED WHETHER THE FACT THAT AN EIGHT-YEAR-OLD WOULD NOT HAVE REPORTED TO HIS PARENTS AND OTHER FAMILY MEMBERS THAT HE HAD BEEN SEXUALLY ABUSED BY THE BABYSITTER, IS THAT UNUSUAL?

A.   NO.  IT'S ACTUALLY PRETTY COMMON, PARTICULARLY WHEN YOU'VE GOT A SITUATION WHERE YOU SEE YOUR PARENTS AS NOT BEING THERE FOR YOU.

Q.   FINALLY, AND THIS IS MY LAST FINALLY, WITH REGARDS TO MAGICAL THINKING, CAN YOU GIVE US, THE COURT A LITTLE BIT BETTER UNDERSTANDING WHAT WE'RE TALKING ABOUT WHEN WE TALKED ABOUT MAGICAL THINKING.

A.   WELL, MAGICAL THINKING FREQUENTLY INVOLVES INDIVIDUALS WHO HAVE AN ACTIVE FANTASY LIFE.  IT INVOLVES THE INDIVIDUAL BEING ABLE TO PLACE THEMSELVES AT THE CENTER OF CIRCUMSTANCES THAT

257

OTHERS WOULDN'T NECESSARILY SEE THEMSELVES AS BEING AT THE CENTER OF THAT FOCUS.  IT INVOLVES TAKING A RANDOM ACTION OR AN UNEXPLAINABLE ACTION AND ATTRIBUTING SIGNIFICANCE AS IT RELATES TO YOU.

Q.    AND THAT'S A FEATURE OF SCHIZOTYPAL PERSONALITY DISORDER?

A.    YES.

Q.    THANK YOU.

        MR. MARTIN:  YOUR HONOR, THAT'S ALL I HAVE.

        THE COURT:  DOCTOR, YOU MAY STEP DOWN.  YOU'RE EXCUSED.  THANK YOU.

        WE'LL TAKE OUR LUNCH BREAK NOW.  WE'LL RESUME AT 2:00 O'CLOCK.  I ASSUME WE'LL PROCEED WITH MR. MENDELSOHN?

        MR. MARTIN:  YES.

        THE COURT:  WE'LL BE IN RECESS UNTIL 2:00 O'CLOCK.

        (LUNCH RECESS.)

        MR. MARTIN:  YOUR HONOR, I WANTED TO -- COUNSEL FOR THE GOVERNMENT ASKED ME TO MAKE THIS CLEAR ON THE RECORD.  WE'VE HAD AN OPPORTUNITY TO TALK WITH MR. LECROY OVER LUNCH, SO WE'VE BEEN IN TOUCH WITH HIM.

        THE COURT:  VERY WELL.  THANK YOU.

        MR. MENDELSOHN, YOU CAN COME TO THE STAND.  I'LL REMIND YOU YOU ARE STILL UNDER OATH.

                        BRIAN MENDELSOHN,

BEING PREVIOUSLY SWORN, WAS EXAMINED AND FURTHER TESTIFIED AS FOLLOWS:

258

CROSS-EXAMINATION

BY MR. MCKINNON:

Q.   MR. MENDELSOHN, I'M HANDING YOU DEFENDANT'S EXHIBIT
NUMBER 3.  DO YOU RECOGNIZE THAT AS THE REPORT THAT WAS
PREPARED BY DR. HILTON?

A.   YES, I DO.

Q.   AND THAT REPORT WAS PREPARED IN -- WELL, THE EXAMINATION
WAS ON MARCH THE 27TH OF 2003.  IS THAT CORRECT?

A.   THAT'S THE DATE THAT'S ON THE REPORT, YES.

Q.   AND YOU WOULD HAVE GOTTEN THE REPORT SOMETIME SHORTLY
AFTER THAT EXAMINATION; IS THAT CORRECT?

A.   I THINK WE GOT IT WITHIN A DAY OR TWO.

Q.   OKAY.  AND YOU WERE ALREADY A PART OF THE TRIAL TEAM;
CORRECT?

A.   YES.

Q.   AND YOU ALREADY HAD GOTTEN A NOTICE FROM THE GOVERNMENT
THAT THE GOVERNMENT WAS GOING TO SEEK THE DEATH PENALTY IN
MR. LECROY'S CASE; CORRECT?

A.   YES.

Q.   AND SO YOU WOULD HAVE REVIEWED DR. HILTON'S REPORT WHEN IT
WAS PROVIDED TO YOU.  IS THAT CORRECT?

A.   THAT'S CORRECT.

Q.   AND DID YOU DISCUSS IT WITH MS. KEARNS AND MR. KISH AND
MR. SUMMER, AS WELL?

A.   YES.

259

Q.    SO YOU WOULD HAVE KNOWN THAT IN DR. HILTON'S EXAMINATION OF THE DEFENDANT, THE DEFENDANT GAVE HIM A VERY DETAILED DESCRIPTION OF THE OFFENSE THAT HE COMMITTED; CORRECT?

A.    OH, ABSOLUTELY.

Q.    THE MURDER AND THE DETAILS OF HOW THE MURDER ITSELF WAS COMMITTED; CORRECT?

A.    ABSOLUTELY.

Q.    AND YOU KNEW THAT ONE OF THE STATUTORY AGGRAVATING FACTORS THAT YOU WOULD BE DEALING WITH AT TRIAL WAS THAT THE MURDER WAS COMMITTED IN AN UNUSUALLY CRUEL AND HEINOUS NATURE; CORRECT?

A.    THAT'S CORRECT.

Q.    AND YOU WERE CONCERNED THAT IF THE JURY FOUND OUT THE DEFENDANT'S ADMISSION OF THE DETAILS OF HOW HE ATTACKED MS. TIESLER, HOW HE TORTURED MS. TIESLER AND THEN HOW HE KILLED MS. TIESLER, THAT THAT MIGHT CONTRIBUTE TO THE STATUTORY AGGRAVATING FACTOR OF THE MURDER BEING UNUSUALLY CRUEL AND HEINOUS; CORRECT?

A.    YES.

Q.    YOU ALSO KNEW THAT A STATUTORY AGGRAVATING FACTOR THAT THE GOVERNMENT WAS PURSUING WAS GOING TO BE THAT THE MURDER WAS COMMITTED WITH SUBSTANTIAL PLANNING AND PREMEDITATION; CORRECT?

A.    THAT'S CORRECT.

Q.    AND, AGAIN, YOU WANTED TO REBUT THAT, THAT STATUTORY AGGRAVATING FACTOR AS BEST YOU COULD; CORRECT?

A.    THAT'S TRUE, ALTHOUGH -- AND YOU MAY -- I HAVEN'T READ THE

260

TRANSCRIPT.  MY RECOLLECTION WAS THAT THE GOVERNMENT WITHDREW THE SUBSTANTIAL PLANNING AGGRAVATOR AT SOME POINT.  I MAY BE WRONG ABOUT THAT.  I --

Q.   WELL, LET ME GIVE YOU --

A.   NO, I'M SORRY.  THERE WAS ONE AGGRAVATOR THAT GOT WITHDRAWN AND WE WERE CHALLENGING IT ON A LEGAL GROUND; BUT, I'M SORRY, I JUST DON'T REMEMBER RIGHT NOW.

Q.   BUT YOU ARGUED DURING THE ARGUMENTS FOR THE DEFENDANT DURING THE PENALTY PHASE; CORRECT?

A.   I DID.

Q.   AND, IN FACT, IT WAS YOUR ASSIGNMENT TO ADDRESS THE STATUTORY AGGRAVATING FACTORS THAT THE GOVERNMENT WAS PURSUING AS GROUNDS FOR IMPOSING THE DEATH PENALTY; CORRECT?

A.   THAT'S CORRECT.

Q.   SO THAT WAS ONE OF THE ISSUES THAT YOU WANTED TO DEAL WITH WHEN YOU TALKED TO THE JURY AT THE END OF THE PENALTY PHASE; CORRECT?

A.   THAT'S RIGHT, THAT'S RIGHT.  AND LIKE I SAY, I JUST CAN'T REMEMBER WHICH ONE GOT WITHDRAWN.  I MAY BE CONFUSING IT.

Q.   WELL, LET ME JUST SHOW YOU PAGE 2685 OF THE TRANSCRIPT JUST TO IDENTIFY THAT'S WHERE YOUR CLOSING ARGUMENT STARTS.  WOULD THAT BE FAIR?

A.   YES.

Q.   AND IF I TURN OVER TO PAGE 2691, ACTUALLY, 2690, THE OTHER STATUTORY AGGRAVATOR IS WHETHER THERE WAS SUBSTANTIAL PLANNING

261

AND PREMEDITATION.  SO YOU DID COVER THAT DURING YOUR CLOSING ARGUMENT.

A.    RIGHT.  THEN THAT MUST BE ONE THAT WAS STILL IN THE CASE.

Q.    AND EVEN BACK IN MARCH OR APRIL OF 2003, YOU KNEW THAT THAT WAS GOING TO BE, THAT CERTAINLY COULD BE A FACTOR THAT THE GOVERNMENT WOULD, WOULD PURSUE; CORRECT?

A.    OH, YEAH, SURE.

Q.    AND IT ENDED UP BEING A FACTOR; CORRECT?

A.    YES, IT WAS.

Q.    AND BASED ON DR. HILTON'S DESCRIPTION OF THE ACCOUNT OF THE CRIME THAT THE DEFENDANT GAVE, YOU BELIEVED THAT IF DR. HILTON TESTIFIED AND HE WAS CROSS-EXAMINED ABOUT THE FACTS OF THE OFFENSE, THAT DR. HILTON'S DESCRIPTION OF WHAT THE DEFENDANT TOLD HIM ABOUT HOW HE BROKE INTO MS. TIESLER'S APARTMENT AND WAITED FOR HER TO COME HOME AND THEN ATTACKED HER WOULD BE EVIDENCE OF SUBSTANTIAL PLANNING AND PREMEDITATION; CORRECT?

A.    ABSOLUTELY.

Q.    AND, IN FACT, WHAT YOU WANTED TO ARGUE TO THE JURY AND WHAT YOU DID ARGUE TO THE JURY IN THE PENALTY PHASE WAS THAT THIS WAS A BURGLARY WHERE THE DEFENDANT WAS BURGLARIZING MS. TIESLER'S HOME AND SHE CAME IN ON HIM UNEXPECTEDLY AND WHAT HE DID IN RAPING HER AND KILLING HER WAS JUST IN RESPONSE TO THE SURPRISE OF BEING SURPRISED BY BEING INTERRUPTED IN THE COURSE OF HIS BURGLARY; CORRECT?

262

A.   SOMETHING TO THAT, THAT HE SNAPPED DURING THE COURSE OF THE BURGLARY, BUT WHEN HE WAS SURPRISED, YES.

Q.   IN FACT, DO YOU REMEMBER TELLING THE JURY AT PAGE 2691: IN ANY EVENT, THE GOVERNMENT HAS TO PROVE TO YOU BEYOND A REASONABLE DOUBT THAT THERE WAS SUBSTANTIAL PLAN -- THERE WAS A SUBSTANTIAL PLAN TO KILL, AND IT'S JUST NOT HERE.  AND IF ANY OF YOU ARE CARRYING ANY RESIDUAL CONCERN OR DOUBT ABOUT THIS FROM THE LAST PHASE, YOU WOULD BE ENTITLED TO SAY NO, I DON'T FIND THIS FACTOR.

A.   I DON'T HAVE IT IN FRONT OF ME, BUT THAT SOUNDS LIKE SOMETHING I WOULD HAVE ARGUED, YES.

Q.   AND, IN FACT, DO YOU RECALL THAT MR. SUMMER TESTIFIED OR ARGUED IN HIS CLOSING DURING THE PENALTY -- OR DURING THE GUILT PHASE THAT THE DEFENSE THEORY WAS IS THAT THE EVIDENCE SHOWED THAT MS. TIESLER SURPRISED THE DEFENDANT AS HE WAS COMMITTING THE BURGLARY AND THAT WAS THE COUNTER TO THE CARJACKING?

A.   RIGHT.  I MEAN, I HAVEN'T READ THAT CLOSING ARGUMENT; BUT THAT WAS GENERALLY OUR THEORY.

Q.   CORRECT.  AND IF THE ACCOUNT OF THE MURDER THAT THE DEFENDANT GAVE DR. HILTON WAS PRESENTED TO THE JURY, THEN THAT WOULD HAVE BEEN INCONSISTENT WITH YOUR THEORY THAT THIS MURDER WAS CAUSED BY A SURPRISE OF MS. TIESLER COMING IN ON A BURGLARY; CORRECT?

A.   THAT'S CORRECT.  THE FACTS IN THAT REPORT WERE NOT PARTICULARLY HELPFUL.

263

Q.   AND YOU ALSO KNEW FROM READING DR. HILTON'S REPORT THAT HE HAD DIAGNOSED THE DEFENDANT WITH AS HAVING ANTISOCIAL PERSONALITY DISORDER; CORRECT?

A.   THAT'S RIGHT.

Q.   AND YOU ALSO KNEW THAT HE HAD DIAGNOSED THE DEFENDANT WITH BORDERLINE PERSONALITY DISORDER.

A.   THAT'S RIGHT.

Q.   AND AGAIN, YOU DIDN'T WANT THE JURY TO KNOW ABOUT THESE PERSONALITY DISORDERS THAT DR. HILTON FOUND THE DEFENDANT WAS SUFFERING FROM; CORRECT?

A.   THAT'S CORRECT.

Q.   BECAUSE YOU THOUGHT THAT WOULD BE DETRIMENTAL TO THE MITIGATION CASE YOU WERE TRYING TO BUILD ON BEHALF OF THE DEFENDANT AND THE WAY THE CASE WOULD BE PRESENTED TO THE JURY; CORRECT?

A.   THAT'S CORRECT.  THEY WEREN'T PARTICULARLY GOOD DIAGNOSES.

Q.   SO AFTER YOU GOT DR. HILTON'S REPORT -- AND IN DR. HILTON'S REPORT, WELL, ACTUALLY, HE SENT YOU THREE REPORTS, HE ALSO CONCLUDED THE DEFENDANT WAS COMPETENT TO STAND TRIAL; CORRECT?

A.   THAT'S RIGHT.

Q.   AND HE CONCLUDED THAT THE DEFENDANT WAS NOT SUFFERING FROM A MENTAL DISEASE OR DEFECT TO THE EXTENT THAT HE WAS INSANE AT THE TIME OF THE OFFENSE; CORRECT?

A.   THAT'S RIGHT.

264

Q.   SO HE HAD TOLD YOU THAT YOU WOULDN'T, AT LEAST BASED ON HIS EVALUATION, YOU WOULDN'T BE ABLE TO PURSUE A NOT GUILTY BY REASON OF INSANITY DEFENSE; CORRECT?

A.   THAT'S CORRECT.

Q.   SO DR. HILTON WASN'T GOING TO GIVE YOU AN AFFIRMATIVE DEFENSE THAT YOU COULD USE AGAINST THE CHARGES; CORRECT?

A.   YES.

Q.   AND HE WAS GOING TO GIVE YOU THE NEGATIVE ASSESSMENTS THAT THE DEFENDANT WAS SUFFERING FROM ANTISOCIAL PERSONALITY DISORDER AND BORDERLINE PERSONALITY DISORDERS; CORRECT?

A.   YES.

Q.   AND HE WAS GOING TO GIVE YOU THIS VERY DETAILED RECITATION OF THE FACTS OF THIS VERY HORRIBLE CRIME; CORRECT?

A.   THAT'S RIGHT.

Q.   AND NONE OF THAT YOU WANTED TO PRESENT TO THE JURY IN YOUR EITHER PRESENTATION OF A DEFENSE IN THE GUILT PHASE OR YOUR PRESENTATION OF A MITIGATION CASE IN THE PENALTY PHASE; CORRECT?

A.   YES.

Q.   AND THAT WAS A JUDGMENT THAT YOU, THE FOUR ATTORNEYS THAT WERE INVOLVED IN THE CASE REACHED COLLECTIVELY.  IS THAT FAIR?

A.   THAT IS FAIR.

Q.   NOW, YOU DID DECIDE, THOUGH, THAT YOU WOULD CONSULT DR. LISAK AS THE TRIAL APPROACHED.  IS THAT CORRECT?

A.   THAT'S CORRECT.  I BELIEVE WE ACTUALLY HIRED DR. LISAK

265

BEFORE WE HIRED DR. HILTON, BUT WE CERTAINLY CONTINUED WITH DR. LISAK.

Q.    RIGHT.  WELL, BUT YOU NEVER HAD DR. LISAK DO AN EVALUATION OF THE DEFENDANT.

A.    THAT'S RIGHT.

Q.    AND WHEN YOU INITIALLY HIRED DR. LISAK, WHAT DID YOU ENGAGE HIM TO DO?

A.    WELL, TO BE A PSYCHOLOGICAL EXPERT IN THE FIELD OF CHILDHOOD SEXUAL ABUSE.  NOW, WE HADN'T DECIDED WHETHER OR NOT WE WOULD SEND HIM IN FOR AN EVALUATION OR NOT, BUT WE HAD THAT AS A POSSIBILITY.

Q.    OKAY.  SO WHY DID YOU CHOSE TO HAVE DR. HILTON DO THE EVALUATION FIRST THEN?

A.    WELL, BECAUSE DR. LISAK WAS SUCH AN IMPORTANT EXPERT, WE DIDN'T WANT THE EVALUATION TO GO BAD.  WE DIDN'T WANT BILL TO SAY ANYTHING OR HAVE HIM COME UP -- WE BASICALLY WANTED A TEST RUN BEFORE WE LET DR. LISAK --

Q.    AND YOU WERE CONCERNED IF DR. LISAK DID AN EVALUATION OF THE DEFENDANT, HE WOULD COME TO SOME OF THE SAME CONCLUSIONS THAT DR. HILTON DID.

A.    NO, NO, NO, NO, IT'S NOT THAT.  DR. HILTON, THE IDEA BEHIND DR. HILTON WAS TO SEE WHAT WOULD HAPPEN, WHAT KIND OF RESULTS WE WOULD GET IN AN EVALUATION IF WE JUST DID A STRAIGHT EVALUATION.

Q.    AND THAT'S WHAT YOU GOT.

266

A.   AND THAT'S WHAT WE GOT.

Q.   SO WHEN YOU ACTUALLY EMPLOYED DR. HILTON TO DO THE EVALUATION, WAS IT YOUR INTENTION THAT YOU WOULD USE THAT AS -- AT TRIAL, USE DR. HILTON AS A WITNESS AT TRIAL?

A.   THAT WAS NEVER MY INTENTION.  MY INTENTION WAS DR. HILTON WAS A TEST RUN, WE WERE GOING TO SEE WHAT RESULTS HE CAME BACK WITH; AND THEN WITH THAT INFORMATION IN HAND, PROCEED WITH THE REST OF THE CASE.

Q.   SO WHEN YOU GOT THE REPORT BACK FROM DR. HILTON THAT WE'VE JUST GONE OVER, DEFENDANT'S EXHIBIT NUMBER 3, DID YOU EVER PROVIDE THAT REPORT TO DR. LISAK?

A.   NO.

Q.   BECAUSE YOU DIDN'T WANT DR. LISAK TO HAVE THAT REPORT BECAUSE HE MIGHT BE CROSS-EXAMINED ABOUT WHAT HE HAD, WHAT HE HAD EXAMINED AND PREPARED TO TESTIFY FROM; CORRECT?

A.   EXACTLY.

Q.   SO YOU DIDN'T WANT THE GOVERNMENT TO KNOW ABOUT DR. HILTON'S EXAMINATION OF THE DEFENDANT.

A.   I DIDN'T, NO.

Q.   SO AFTER YOU GOT DR. HILTON'S REPORT, WAS IT YOUR INTENTION THEN FROM AS EARLY AS APRIL OF 2003 THAT DR. LISAK WAS NOT GOING TO DO AN EVALUATION OF THE DEFENDANT?

A.   I DON'T KNOW THAT WE NECESSARILY MADE THAT DECISION RIGHT AWAY, BUT THAT WAS A SIGNIFICANT FACTOR IN THE DECISION.

Q.   NOW, WHEN DID YOU GET -- DID YOU GET SOME SORT OF A REPORT

267

FROM DR. LISAK, SOMETHING IN WRITING AT SOME POINT, OR ARE YOU JUST DEALING WITH DR. LISAK ORALLY AT THIS STAGE?

A.   I WAS DEALING WITH DR. LISAK ORALLY.

Q.   WHAT RECORDS DID YOU SEND TO DR. LISAK FOR HIM TO REVIEW? LET'S PUT THIS IN CONTEXT.  LET'S SAY PRIOR TO OCTOBER OF 2003 WHEN YOU FILED THE NOTICE OF YOUR INTENT TO RELY ON A MENTAL HEALTH EXPERT, WHAT, IF ANY, REPORTS DID YOU SEND TO DR. LISAK?

A.   WELL, I DID A LETTER SAYING -- AND I'M SURE IT HAD LISTED THE ITEMS.  IT WOULD HAVE BEEN MANY OF THE ITEMS THAT WE SENT TO DR. HILTON, ALTHOUGH I PROBABLY WOULDN'T HAVE SENT THE SOCIAL HISTORY DOCUMENT.  THAT WAS AN INTERNAL SOCIAL HISTORY THAT WE DID OURSELVES, AND PART OF THE REASON WITH NOT USING DR. HILTON WAS WE SENT THAT TO HILTON BUT WE WEREN'T SENDING THAT OUT.  I DON'T THINK WE SENT THAT OUT.  WE MAY HAVE.  IT WAS UNLIKELY.  POLICE REPORTS, WE WOULD HAVE SENT THE HANDWRITTEN NOTES, SHERIFF REPORTS, MILITARY DOCUMENTS, SCHOOL RECORDS, PRISON RECORDS AND PROBABLY SOME COURT RECORDS.

SO I BELIEVE THE SOURCES OF INFORMATION THAT ARE LISTED IN DR. HILTON'S REPORT ARE PRETTY SIMILAR TO WHAT WE SENT TO DR. LISAK, WITH THE MAIN EXCEPTION PROBABLY BEING THE SOCIAL HISTORY REPORT.

Q.   OKAY.  AND WHAT WAS DR. LISAK TELLING YOU ABOUT, BASED ON HIS REVIEW OF THE REPORTS, WHAT COULD HE TELL YOU, WHAT DID YOU EXPECT HIM TO TESTIFY TO AT THE TRIAL?

A.   BASICALLY, THE SUMMARY, THE RULE 16 SUMMARY THAT WE DID

268

WAS A GENERAL IDEA OF WHAT DR. LISAK WOULD BE TESTIFYING TO.

Q.   LET ME SHOW YOU GOVERNMENT'S EXHIBIT NUMBER 58.  DO YOU RECOGNIZE GOVERNMENT'S EXHIBIT NUMBER 58?

A.   YEAH.  THAT'S THE RULE 16 LETTER THAT I SENT.  I DRAFTED THIS UP AFTER DISCUSSIONS WITH DR. LISAK.

Q.   SO THAT SUMMARIZES YOUR DISCUSSIONS WITH DR. LISAK?

A.   GENERALLY.  I MEAN, DR. LISAK THOUGHT THAT THE RECORDS WERE CONSISTENT WITH CHILD SEXUAL ABUSE AND THOUGHT THAT THERE WERE INDICATIONS THERE THAT MR. LECROY WAS SEXUALLY ABUSED AS A CHILD.  BUT THAT PART WASN'T SOMETHING THAT WE WERE GOING TO BE USING DR. LISAK TO TESTIFY ABOUT, SO THAT WOULDN'T HAVE BEEN INCLUDED IN THIS SUMMARY.

Q.   AND, IN FACT, IN YOUR SUMMARY YOU DON'T SAY ANYTHING ABOUT DR. LISAK, THAT DR. LISAK IS GOING TO TESTIFY ABOUT HIS CONCLUSION THAT THE DEFENDANT HAD SUFFERED FROM CHILDHOOD SEXUAL ABUSE.

A.   RIGHT, BECAUSE BY THE TIME WE GOT TO THE POINT OF SUBMITTING DR. LISAK, WE WERE TRYING TO WALK A PRETTY FINE LINE TO KEEP MR. LECROY FROM BEING EVALUATED.  SO WE WERE NARROWLY FOCUSING DR. LISAK AS A TEACHING EXPERT.

Q.   AS A TEACHING EXPERT ON THE EFFECT OF CHILDHOOD TRAUMA IN GENERAL --

A.   RIGHT.

Q.   -- ON ADULT BEHAVIOR.

A.   THAT'S CORRECT.

269

Q.   AND IT WAS NOT YOUR INTENTION TO ASK DR. LISAK WHETHER, IN HIS OPINION, BASED ON HIS REVIEW OF THE RECORDS, THAT WHETHER THE DEFENDANT HAD BEEN SEXUALLY ABUSED AS A CHILD.

A.   THAT'S RIGHT.  I DON'T THINK WE COULD WITHOUT OPENING THE DOOR TO A GOVERNMENT EVALUATION.

Q.   AND YOUR CONCERN ABOUT OPENING THE DOOR TO A GOVERNMENT EVALUATION IS THAT THE GOVERNMENT PSYCHIATRIST WOULD REACH THE SAME CONCLUSIONS AND OBTAIN THE SAME KIND OF DETAILED DESCRIPTION OF THE CRIME THAT DR. HILTON HAD OBTAINED.

A.   RIGHT.  WELL, THE CONCLUSIONS COULD CONCEIVABLY BE WORSE; BUT THE DETAILS OF THE CRIME, CERTAINLY.

Q.   YOU DIDN'T THINK THAT -- YOU EXPECTED A GOVERNMENT PSYCHIATRIST REPORT TO BE EITHER AS BAD AS OR EVEN WORSE FOR THE DEFENDANT AS DR. HILTON'S.

A.   YES.  I DON'T HAVE A LOT OF FAITH THAT THE GOVERNMENT EXPERTS WOULD BE COMING OUT TRYING TO HELP MR. LECROY.

Q.   AND YOU KNEW THAT AS LONG AS THE GOVERNMENT EXPERT WASN'T ABLE TO EVALUATE MR. LECROY, THEN YOU WOULDN'T HAVE TO WORRY ABOUT THE THINGS THAT WERE IN THE HILTON REPORT.

A.   RIGHT, EXACTLY.

Q.   COMING OUT BEFORE THE JURY.

A.   EXACTLY.

Q.   SO IN BALANCING THE HARM TO YOUR CASE THAT A REPORT SUCH AS DR. HILTON'S WOULD HAVE AGAINST YOUR NEED TO HAVE DR. LISAK TESTIFY ABOUT THE FACT THAT THE DEFENDANT HAD BEEN A VICTIM OF

270

CHILDHOOD SEXUAL ABUSE, YOU WEIGHED THAT BALANCE IN FAVOR OF AVOIDING THE TESTIMONY FROM DR. LISAK ABOUT THE CHILDHOOD SEXUAL ABUSE SO THAT YOU WOULDN'T OPEN THE DOOR FOR A GOVERNMENT EVALUATION.

A.    THAT'S RIGHT.  IN THE LITIGATION THERE, WE TRIED TO LIMIT THE GOVERNMENT EVALUATION TO KEEP THEM FROM GOING INTO THE FACTS OF THE OFFENSE; AND ONCE WE LOST THAT, THAT PRETTY MUCH KEPT US ON THE PATH THAT WE WERE ON.

Q.    BECAUSE JUDGE STORY HAD ISSUED AN ORDER THAT SET OUT WHAT THE PARAMETERS OF THE GOVERNMENT EVALUATION WERE GOING TO BE.

A.    RIGHT.

Q.    NOW, THE WAY IT WAS LEFT PRIOR TO TRIAL, THOUGH, WAS THAT YOU GAVE JUDGE STORY NOTICE AND THE GOVERNMENT NOTICE THAT THE DEFENDANT WAS GOING TO EXERCISE HIS FIFTH AMENDMENT RIGHT TO REFUSE TO ANSWER QUESTIONS OF THE GOVERNMENT PSYCHIATRIST OR EXPERT, AND, THEREFORE, THERE WAS GOING TO BE NO GOVERNMENT EVALUATION; CORRECT?

A.    THAT'S CORRECT.  THAT'S AT THE END OF ALL THE LITIGATION.

Q.    AT THE END OF ALL THE LITIGATION.  AND THIS IS ABOUT A WEEK TO TEN DAYS BEFORE THE TRIAL IS SCHEDULED TO START WHEN THIS IS FINALLY RESOLVED IN THAT FASHION; CORRECT?

A.    SOMETHING LIKE THAT, YES.

Q.    DO YOU NEED TO SEE THE ORDER --

A.    I'VE SEEN THE ORDER IN THE LAST COUPLE OF WEEKS, SO I REMEMBER THAT.

271

Q.    BUT THE WAY IT WAS LEFT WAS THAT YOU HAD PROVIDED THE SUMMARY TO THE FIREWALLED ATTORNEYS WHO WERE WORKING IN THE U.S. ATTORNEY'S OFFICE UNDER THE FIREWALL ORDER THAT JUDGE STORY HAD ESTABLISHED; CORRECT?

A.    THAT'S RIGHT.

Q.    AND YOU HAD -- AND I BELIEVE JUDGE STORY HAD SEEN THAT SUMMARY, AS WELL; CORRECT?

A.    I BELIEVE.

Q.    OR AT LEAST YOU HAD PROFFERED TO HIM WHAT DR. LISAK WAS GOING TO TESTIFY TO.

A.    I SEEM TO RECALL THAT WE HAD COPIED JUDGE STORY WITH THIS SUMMARY, YES.

Q.    AND, IN FACT, IN JUDGE STORY'S ORDER THERE'S A SHORT SUMMARY OF WHAT IS IN GOVERNMENT'S EXHIBIT 58; RIGHT?

A.    RIGHT.

Q.    SO JUDGE STORY'S ORDER AFTER THE, AFTER GETTING NOTICE THAT THERE WAS GOING TO BE NO GOVERNMENT EVALUATION WAS IS THAT THE GOVERNMENT'S EXPERT WOULD PREPARE A REPORT BASED ON HER EVALUATION OF THE DOCUMENTS THAT THE GOVERNMENT HAD PROVIDED; CORRECT?

A.    LET ME BACK UP ONE SECOND.  GOVERNMENT'S EXHIBIT 58 HAS A C-C ON THE BOTTOM THAT SHOWS THAT WE COPIED JUDGE STORY WITH IT WHEN WE SERVED IT.

Q.    SO JUDGE STORY ACTUALLY HAD A COPY OF THAT.

A.    RIGHT.  I'M SORRY TO INTERRUPT.

272

Q.   AND SO, AND THEN JUDGE STORY ORDERED THAT THE GOVERNMENT'S EXPERT WOULD DO A REPORT BASED ON HER REVIEW OF THE DOCUMENTARY RECORDS THAT THE GOVERNMENT HAD PROVIDED TO HER.

A.   YES.

Q.   AND SHE WAS SUPPOSED TO PROVIDE THAT TO THE COURT UNDER SEAL; CORRECT?

A.   THAT'S RIGHT.

Q.   NEITHER DEFENSE TEAM NOR THE PROSECUTION TEAM, EVEN THE FIREWALLED ATTORNEYS WEREN'T GOING TO GET A COPY OF DR. MEDLIN'S REPORT; CORRECT?

A.   THAT'S CORRECT.

Q.   AND THEN AT THE END OF -- AFTER THE CLOSING ARGUMENTS AND CHARGE OF THE GUILT PHASE, THEN JUDGE STORY WAS GOING TO DISCLOSE DR. MEDLIN'S REPORT TO THE DEFENSE; CORRECT?

A.   THAT'S RIGHT.

Q.   AND YOU WOULD HAVE THE OPPORTUNITY TO ELECT AT THAT POINT WHETHER YOU WERE GOING TO PROCEED WITH ATTEMPTING TO MAKE OUT A MENTAL HEALTH CASE THROUGH DR. LISAK'S TESTIMONY OR NOT; CORRECT?

A.   THAT'S RIGHT.

Q.   AND YOU ALSO KNEW, I BELIEVE, THAT JUDGE STORY WAS GOING TO HAVE A HEARING ON, YOU KNOW, WHAT EXACTLY DR. LISAK COULD TESTIFY TO IF YOU ELECTED TO GO THAT ROUTE; CORRECT?

A.   I IMAGINE THAT WOULD HAVE HAPPENED, BUT --

Q.   YOU DON'T REMEMBER.

273

A.   -- I DON'T REMEMBER THAT.

Q.   OKAY.  NOW, AT THE TIME THAT -- THEN AFTER THE CLOSE OF THE EVIDENCE AND AFTER THE CLOSING ARGUMENTS IN THE GUILT PHASE, YOU DID GET A COPY OF DR. MEDLIN'S REPORT.

A.   WE DID.

Q.   AND THAT WOULD BE ALL FOUR OF THE TRIAL TEAM; CORRECT?

A.   RIGHT.  WE GOT ONE COPY OF IT, BUT WE WERE ALL THERE TOGETHER.

Q.   SO YOU ALL HAD A CHANCE TO LOOK OVER THE REPORT.

A.   YES.

Q.   AND THEN THE CONCLUSION WAS IS THAT YOU WOULD PROVIDE NOTICE TO JUDGE STORY THAT YOU WERE NOT GOING TO PURSUE ANY KIND OF MENTAL HEALTH EXPERT TESTIMONY DURING THE COURSE OF THE PENALTY PHASE IF IT GOT TO A PENALTY PHASE.

A.   WELL, THERE WAS A MOTION THAT -- ULTIMATELY WE DECIDED WE WERE NOT GOING TO CALL DR. LISAK.  AND I THINK, NOW WHETHER THE RAMIFICATIONS OF THAT -- WE FILED A DOCUMENT THAT SAID WE WEREN'T, THAT AT LEAST WEREN'T GOING TO CALL DR. LISAK.  HOW FAR ELSE IT WENT THAT WE WEREN'T GOING TO PERMIT ANY MENTAL HEALTH, I DON'T KNOW THAT IT WENT THAT FAR --

Q.   -- MEAN MENTAL HEALTH TESTIMONY BUT MENTAL HEALTH OPINION TESTIMONY.

A.   OH, YES, RIGHT.

Q.   SO YOU WEREN'T GOING TO RELY ON EXPERTS, YOU WERE GOING TO RELY ON JUST FACTS THAT MIGHT HAVE BEEN -- THAT COULD BE

274

PROVIDED BY SOME MENTAL HEALTH WITNESSES.

A.   WITNESSES AND REPORTS.

Q.   AND REPORTS.

A.   RIGHT.

Q.   BUT YOU WEREN'T GOING TO BE ABLE TO ASK ANY WITNESSES OPINION TESTIMONY OR EXPERT OPINION TESTIMONY BECAUSE YOU HAD NOT -- DECIDED NOT TO ALLOW THE DEFENDANT TO BE EVALUATED.

A.   THAT'S CORRECT.

Q.   AND YOU DID THAT, THAT WAS YOUR JUDGMENT AT THE TIME ABOUT WHAT THE BEST COURSE WOULD BE TO PUT UP A MITIGATION CASE IN OPPOSITION TO IMPOSING THE DEATH PENALTY IN THIS CASE; CORRECT?

A.   THAT WAS THE DECISION WE MADE AT THAT TIME, YES.

Q.   THAT WAS -- AND IT WAS THE COLLECTIVE JUDGMENT OF ALL FOUR ATTORNEYS INVOLVED IN THE TRIAL?

A.   YES.  I MEAN, WE MADE -- ANY DECISION WE MADE IN THIS CASE WAS MADE TOGETHER WITH THE FOUR OF US, ANY OF THE BIG SORT OF DECISIONS.

Q.   NOW, AT THE TIME THAT YOU GOT DR. MEDLIN'S REPORT, IN YOUR MIND WAS IT STILL A POSSIBILITY THAT YOU WOULD ATTEMPT TO INTRODUCE DR. LISAK'S TESTIMONY ABOUT THE IMPACT OF VICTIM -- CHILDHOOD ABUSE OR TRAUMA ON ADULT BEHAVIOR AND VIOLENCE?

A.   WE WERE PLANNING TO GO FORWARD WITH DR. LISAK.  HE WAS ON CALL.

Q.   IN FACT, YOU TESTIFIED THAT SOMEHOW YOU TRANSMITTED THE REPORT.  LET ME SHOW YOU GOVERNMENT'S EXHIBIT NUMBER 63.  IS

275

THAT THE REPORT THAT YOU GOT?

A.   IT IS.  I BELIEVE IT HAD A LETTERHEAD COPY ON THE TOP OF IT OR SOMETHING; BUT THIS IS THE SUBSTANCE OF WHAT WE GOT, YEAH.

Q.   OKAY.  AND DID YOU SOMEHOW TRANSMIT THAT REPORT TO DR. LISAK SO HE COULD REVIEW IT WITH YOU?

A.   YEAH, WE FAXED IT.  WE HAD AN OFFICE DOWN IN THE ATTORNEY ROOM ON THE FIRST FLOOR OF THE COURTHOUSE IN GAINESVILLE, AND WE CONVERTED THAT INTO A, THAT WAS A LECROY TEAM OFFICE; AND THERE WAS A FAX MACHINE IN THERE, SO WE FAXED IT FROM THERE.

Q.   AND WHY, AFTER READING THE DR. MEDLIN REPORT, DID YOU DECIDE THAT YOU WOULD NOT PURSUE DR. LISAK'S TESTIMONY?

A.   WELL, THERE ARE A NUMBER OF THINGS IN THERE.  THE ONE THAT STICKS WITH ME RIGHT NOW IS THERE WAS PART OF IT WHERE SHE SAID, CITED SOME STUDY THAT SAID PEOPLE IN PRISON MAKE UP SEXUAL ABUSE TO GET SYMPATHY OR TO GET SOME BENEFIT, AND THAT WAS ONE OF THE THINGS THAT WAS TROUBLESOME.  I THINK SHE ALSO WAS SORT OF ARGUING THAT HE WAS FAKING IT ALL.  SO --

Q.   I'M SORRY, SHE --

A.   SHE WAS ARGUING THAT HE WAS FAKING THIS WHOLE SEXUAL ABUSE ISSUE.

Q.   CORRECT.  AND SHE HAD ACTUALLY POINTED OUT A NUMBER OF INSTANCES WHERE THE DEFENDANT HAD MADE CONFLICTING REPORTS ABOUT CHILDHOOD SEXUAL ABUSE; CORRECT?

A.   YES.

276

Q.   AND, IN FACT, DO YOU REMEMBER THAT WHEN THE DEFENDANT --

DO YOU REMEMBER THAT THE DEFENDANT WAS INCARCERATED AT EL RENO;

CORRECT?

A.   THAT'S CORRECT.

Q.   AND THEN HE WAS TRANSFERRED TO BUTNER F.C.I.?

A.   RIGHT.

Q.   AND WHEN HE WAS, AND WHEN HE WAS AT EL RENO, HE REPORTED

THAT HE WAS A VICTIM OF CHILDHOOD SEXUAL ABUSE; CORRECT?

A.   THAT'S CORRECT.

Q.   SO WHEN HE GOT TO BUTNER F.C.I., HE WAS ASKED TO FILL OUT

A FEDERAL SCREENING, AN INTAKE SCREENING FORM; CORRECT?  IF I

SHOW YOU GOVERNMENT'S EXHIBIT 86?

A.   THAT LOOKS LIKE AN INTAKE SCREENING FORM.

Q.   RIGHT, FILLED OUT BY THE DEFENDANT.

A.   YES.

Q.   AND IT'S DATED FEBRUARY THE 14TH, 2000; CORRECT?

A.   YES.

Q.   AND IN ANSWER TO THE QUESTION HAVE YOU EVER BEEN SEXUALLY

ASSAULTED, HE CHECKED NO; CORRECT?

A.   THAT'S CORRECT.

Q.   AND HE ALSO WAS INTERVIEWED ABOUT HIS MENTAL HEALTH AND

ALLEGATIONS OF ABUSE, CORRECT, WHEN HE WAS -- WENT THROUGH THE

INTAKE PROCESS AT BUTNER?

A.   DOES LOOK LIKE THERE'S AN INTERVIEW CHECKLIST FORM.

Q.   AND YOU'RE LOOKING AT GOVERNMENT'S EXHIBIT NUMBER 85?

277

A.    THAT'S RIGHT.

Q.    AND, AGAIN, THAT'S DATED FEBRUARY 14TH, 2000.

A.    UH-HUH (AFFIRMATIVE).

Q.    AND THE INTERVIEWER WROTE A NOTE AT THE BOTTOM OF NUMBER SEVEN THAT THE DEFENDANT DENIES SEXUAL ABUSE; CORRECT?

A.    YES.

Q.    AND IT'S THE KIND OF, THAT'S THE KIND OF INCONSISTENT REPORT THAT DR. MEDLIN REPORTED OR POINTED OUT IN HER REPORT; CORRECT?

A.    SHE DID POINT THAT OUT.  I WASN'T PARTICULARLY WORRIED ABOUT INCONSISTENT STATEMENTS.  YOU KNOW, BILL IS GOING INTO A NEW PRISON.  I DON'T KNOW THAT HE'S GOING TO BE NECESSARILY WEARING -- OR OPENLY ADMITTING TO NEW PEOPLE THAT HE WAS SEXUALLY ABUSED.  THAT -- ON AN INTAKE FORM.  THAT DOESN'T REALLY BOTHER ME VERY MUCH AS AN ISSUE, BUT THAT'S SOMETHING THAT WAS IN HER REPORT.

Q.    AND THAT'S SOMETHING THAT SHE CITED SPECIFICALLY THAT LED HER TO CONCLUDE THE DEFENDANT MIGHT BE MAKING UP THIS ALLEGATION OF CHILDHOOD SEXUAL ABUSE.

A.    THAT'S TRUE.

Q.    AND YOU DIDN'T WANT TO HAVE TO DEAL WITH THAT ISSUE.  YOU WANTED THE JURY TO BELIEVE THAT HE HAD BEEN THE VICTIM OF CHILDHOOD SEXUAL ABUSE AS A MITIGATING FACTOR IN THE PENALTY PHASE; CORRECT?

A.    THAT'S CORRECT.  AND MY BOTTOM LINE ULTIMATELY ON IT WAS

278

WHILE I DIDN'T THINK VERY MUCH OF DR. MEDLIN'S REPORT, WE WEREN'T DEALING WITH EXPERTS, WE WERE DEALING WITH LAY PEOPLE; AND IN THE END IT MAY JUST BE A BATTLE OF THE EXPERTS.  NO MATTER HOW INCREDIBLE SHE MAY BE ON AN OBJECTIVE EXPERT LEVEL, YOU KNOW, SHE COULD COME OFF POLISHED ENOUGH TO A LAY JURY THAT WE WOULD END UP HAVING HER BE BELIEVABLE.

Q.    AND EVEN THOUGH YOU DECIDED NOT TO PRESENT A BATTLE OF THE EXPERTS TO THE JURY THROUGH DR. MEDLIN AND DR. LISAK, YOU KNEW YOU COULD STILL GET FACTS OUT ABOUT THE FACT THAT THE DEFENDANT HAS REPORTED IN THE PAST THAT HE WAS THE VICTIM OF CHILDHOOD SEXUAL ABUSE; CORRECT?

A.    THAT'S RIGHT.

Q.    AND, IN FACT, THAT'S WHAT HAPPENED.  YOU CALLED WITNESSES TO WHOM HE HAD MADE ADMISSIONS OR STATEMENTS ABOUT HIS CHILDHOOD SEXUAL ABUSE.

A.    THAT WE DID.

Q.    AND THEN YOU ARGUED THAT THAT WAS A MITIGATING FACTOR DURING THE PENALTY PHASE; CORRECT?

A.    WE DID.

Q.    AND, IN FACT, BECAUSE FACT WITNESSES WEREN'T CALLED, THE KINDS OF STATEMENTS LIKE GOVERNMENT'S EXHIBIT 85 AND 86 WEREN'T ACTUALLY PRESENTED TO THE JURY.

A.    I MEAN, I KNOW -- I BELIEVE THOSE -- WELL, I DON'T, I DON'T KNOW WHETHER THERE'S A CAUSE OR EFFECT THERE AND I DON'T REALLY RECALL WHETHER THOSE PARTICULAR ITEMS WERE PRESENTED TO

279

THE JURY OR NOT.  SO IF YOU TELL ME THEY WEREN'T PRESENTED TO THE JURY, I BELIEVE THAT; BUT I DON'T KNOW THE CAUSE OF WHY THEY WEREN'T.

Q.   BUT YOU BELIEVE THAT IF YOU STUCK TO FACT WITNESSES, THAT YOU COULD AVOID THE JURY HEARING SOME OF THIS TESTIMONY ABOUT INCONSISTENT REPORTS OF THE CHILDHOOD SEXUAL ABUSE; CORRECT?

A.   I WOULD ASSUME THE GOVERNMENT COULD HAVE TAKEN THESE RECORDS AND TRIED TO PUT THEM IN.

Q.   AND YOU WERE ALSO CONVINCED THAT DR. LISAK WAS NOT GOING TO -- BECAUSE YOU HAD NOT AGREED TO AN EVALUATION, DR. LISAK WAS NOT GOING TO BE ABLE TO GIVE AN OPINION ABOUT WHETHER OR NOT THE DEFENDANT HAD PROVIDED -- OR HAD BEEN THE VICTIM OF CHILDHOOD SEXUAL ABUSE; CORRECT?

A.   THAT'S CORRECT.  WE NEVER PLANNED ON CALLING HIM TO SAY THAT.

Q.   YOU DIDN'T PLAN ON CALLING HIM TO SAY THAT.  YOU WERE PLANNING ON CALLING HIM TO TALK ABOUT THE EFFECTS OF CHILDHOOD TRAUMA ON ADULT BEHAVIOR AS IT RELATES TO VIOLENCE, AS WELL.

A.   RIGHT.  AND WE WOULD THEN MATCH UP THE TRAUMA THAT, THE KINDS OF TRAUMA AND KINDS OF EFFECTS THAT DR. LISAK WOULD TESTIFY TO THE KINDS OF BEHAVIORS EXHIBITED BY MR. LECROY, AND THEN COUPLED WITH HIS STATEMENTS IN THE PRISON RECORDS ABOUT SEXUAL ABUSE, CONNECT ALL THE DOTS TOGETHER AND SAY, AH-HA, HE MUST HAVE BEEN SEXUALLY ABUSED AND THE SEXUAL ABUSE WOULD HAVE CAUSED THAT BEHAVIOR.

280

Q.   BUT YOU ALSO KNEW THAT HE HAD BEEN PHYSICALLY ABUSED BY HIS FATHER, AND THERE WAS NO ISSUE ABOUT THAT; CORRECT?

A.   I DON'T UNDERSTAND WHAT YOU MEAN BY NO ISSUE.

Q.   WELL, THE GOVERNMENT DIDN'T CHALLENGE THE FACT THAT HE WAS PHYSICALLY AND EMOTIONALLY ABUSED BY HIS FATHER AS A CHILD.

A.   I DON'T THINK THEY COULD.

Q.   RIGHT, BECAUSE THE FACT IS THAT HE WAS, IN FACT, EMOTIONALLY AND PHYSICALLY ABUSED BY HIS FATHER AS A CHILD; CORRECT?

A.   NO DOUBT ABOUT THAT.

Q.   AND MS. VOGELSANG TESTIFIED TO THAT; CORRECT?

A.   YES, SHE DID.

Q.   AND THERE WAS NO ISSUE MADE OF THAT FACT AT TRIAL BY THE GOVERNMENT; CORRECT?

A.   I DON'T RECALL THERE BEING SUCH.

          (DISCUSSION OFF THE RECORD.)

          MR. MCKINNON:  THAT'S ALL THE QUESTIONS I HAVE, JUDGE.

          THE COURT:  REDIRECT?

          MR. MARTIN:  THANK YOU, YOUR HONOR.

                    REDIRECT EXAMINATION

BY MR. MARTIN:

Q.   MR. MENDELSOHN, YOU'RE A CAREFUL LAWYER, ARE YOU NOT?

A.   I HOPE SO.

Q.   TRY TO BE.  AND YOU REVIEWED THE DISCOVERY IN THIS CASE,

281

YOU AND THE OTHER LAWYERS, DID YOU NOT?

A.   BACK AT THE TIME IT WAS PROVIDED, YES.

Q.   AND PART OF THE DISCOVERY IN THIS CASE WAS THE AUTOPSY REPORT.

A.   YES.

Q.   YOU REVIEWED THAT CAREFULLY, DID YOU NOT?

A.   I SPENT A LOT OF TIME WITH THE AUTOPSY REPORT.

Q.   YOU HIRED AN INDEPENDENT EXPERT TO ASSIST YOU IN ANALYZING THAT REPORT; CORRECT?

A.   YES.

Q.   YOU VIEWED ALL OF THE CRIME SCENE PHOTOGRAPHS.

A.   YES.

Q.   YOU REVIEWED THE CRIME SCENE MEMORANDA AND SO FORTH PROVIDED BY THE LAW ENFORCEMENT OFFICERS WHEN THEY ARRIVED AT THE CRIME SCENE.

A.   YES.

Q.   AND YOU WERE AWARE OF THE TESTIMONY OF THE INDIVIDUALS WHO FOUND MS. TIESLER'S BODY AND HOW SHE WAS FOUND.

A.   YES.

Q.   YOU AND THE OTHER LAWYERS -- WELL, LET ME ASK YOU THIS WAY.  WHAT DID YOU AND THE OTHER LAWYERS KNOW ABOUT WHETHER SHE HAD BEEN BOUND BEHIND HER BACK AND ON HER FEET WITH TIES?

A.   SHE HAD BEEN.

Q.   WHAT DID YOU KNOW AS TO WHETHER OR NOT SHE HAD STRUGGLED WITH THOSE TIES, CAUSING ABRASIONS ON HER ARMS AND LEGS?

282

A.    WE KNEW THAT THERE WERE MARKS WHICH WOULD HAVE INDICATED SOME SORT OF STRUGGLE AGAINST THE TIES.

Q.    WHAT DO YOU KNOW AS TO WHETHER OR NOT SHE HAD BEEN STRANGLED WITH A LIGATURE?

A.    IT WAS FOUND ON HER BODY AND THERE WAS BRUISING, SO WE KNEW THAT.

Q.    WHAT DID YOU KNOW WHETHER OR NOT SHE WAS STILL CONSCIOUS AND ALIVE WHEN SHE WAS BEING STRANGLED?

A.    I BELIEVE THERE WAS TESTIMONY THAT SHE STILL WOULD HAVE BEEN ALIVE.

Q.    WHAT DID YOU KNOW AS TO WHETHER OR NOT THERE WERE BRUISES ON HER BODY INDICATING THAT SHE HAD STRUGGLED THROUGHOUT THIS ORDEAL?

A.    I REMEMBER BRUISING ON THE BODY, YEAH.

Q.    WHAT DID YOU KNOW AS TO WHETHER OR NOT THERE WAS BRUISING THAT WOULD APPEAR THAT HER BODY HAD BEEN SLAMMED AGAINST THE BED DURING THIS ORDEAL?

A.    I JUST DON'T REMEMBER THAT OFF THE TOP OF MY HEAD SITTING HERE RIGHT NOW.

Q.    WHAT DID YOU KNOW AS TO WHETHER OR NOT SHE HAD BEEN CUT ACROSS THE THROAT SO DEEPLY THAT IT ALMOST CUT THROUGH HER NECK?

A.    YES, WE KNEW THAT.

Q.    YOU KNEW THAT FROM THE AUTOPSY REPORTS AND THE CRIME SCENE REPORTS AND THE PHOTOGRAPHS.

283

A.   ABSOLUTELY.

Q.   WHAT DID YOU KNOW AS TO WHETHER OR NOT SHE HAD BEEN STABBED IN THE BACK REPEATEDLY EVEN AFTER SHE HAD BEEN CUT IN THE NECK?

A.   YES, WE KNEW THAT.

Q.   AND WHAT DID YOU KNOW AS TO WHETHER OR NOT THE EXPERTS INDICATED THAT SHE WAS CONSCIOUS THROUGHOUT THIS ENTIRE ORDEAL?

A.   WELL, THERE WAS A POINT WHERE SHE, OBVIOUSLY, WAS UNCONSCIOUS; BUT I DON'T KNOW EXACTLY WHEN.

Q.   WAS IT ANY SURPRISE TO YOU THAT THE PROSECUTION WOULD USE ALL OF THESE FACTS AND CIRCUMSTANCES TO ARGUE THAT THE MURDER OF MS. TIESLER WAS HEINOUS, CRUEL, INVOLVED TORTURE?

A.   NO SURPRISE AT ALL.

Q.   AS AN EXPERIENCED LAWYER, WOULD IT BE ANY SURPRISE TO YOU THAT A JURY BASED ON THOSE FACTS ALONE WOULD FIND THAT FACT BEYOND A REASONABLE DOUBT, THAT AGGRAVATING CIRCUMSTANCE?

A.   WE EXPECTED THEY WOULD FIND THAT AGGRAVATING CIRCUMSTANCE.

Q.   DID IT SURPRISE YOU THAT IN THE CLOSING ARGUMENT IN THE SENTENCING PHASE, THAT THEN ATTORNEY, NOW MAGISTRATE JUDGE VINEYARD USED EACH AND EVERY ONE OF THOSE FACTS TO ARGUE THAT THIS HAD BEEN A TERRIBLE MURDER AND WAS CRUEL, HEINOUS, INVOLVED TORTURE AND ABUSE OF THE BODY?

A.   I WOULD HAVE BEEN SHOCKED IF HE DIDN'T.

Q.   DID IT SURPRISE YOU WHEN HE SAID:  YOU REMEMBER -- AT PAGE 2667:  YOU REMEMBER THE MANY WAYS THE DEFENDANT TORTURED JOANNE

284

TIESLER.  HE TORTURED HER BY TYING HER ANKLES TOGETHER AND HER WRISTS BEHIND HER BACK WITH PLASTIC CABLE TIES THAT HE BOUGHT TWO WEEKS EARLIER.  HE CLINCHED THOSE PLASTIC TIES SO TIGHTLY AROUND HER WRISTS THAT IT CUT INTO HER WRISTS AND LEFT THE GROOVE MARKS EVIDENT ON HER SKIN, EVIDENCE OF HER HOPELESS STRUGGLE TO FREE HERSELF FROM HIS CONTROL AND DOMINATION; CORRECT?

A.    THAT'S CORRECT.

Q.    PROSECUTION HAD THOSE FACTS WITHOUT ANY REPORT FROM DR. HILTON OR ANYBODY ELSE, CORRECT --

A.    THAT'S CORRECT.

Q.    -- TO MAKE THAT ARGUMENT?

A.    THAT'S RIGHT.

Q.    DID IT SURPRISE YOU WHEN RUSSELL VINEYARD ARGUED:  THE DEFENDANT TORTURED MS. TIESLER BY WRAPPING AN ELECTRIC CORD AROUND HER NECK AND SQUEEZING IT SO TIGHTLY AND SO LONG THAT IT LEFT A BRUISE, A LIGATURE MARK ENCIRCLING HER NECK.  THAT LIGATURE MARK TELLS YOU THAT MS. TIESLER WAS ALIVE WHEN THE DEFENDANT WAS CHOKING HER WITH THAT ELECTRICAL CORD.  THE LIGATURE BRUISE TELLS YOU THAT SHE WAS CONSCIOUS, THAT THE DEFENDANT WAS CONTROLLING HER BY SQUEEZING THAT CORD TIGHTLY AROUND HER NECK, CONTROLLING HER SO THAT HE COULD SUBDUE HER, SEXUALLY ASSAULT HER AND KILL HER.

DID THAT ARGUMENT SURPRISE YOU?

A.    NOT AT ALL.

285

Q.   WAS THAT ARGUMENT BASED ON THE EVIDENCE THAT YOU KNEW WELL IN ADVANCE OF TRIAL THAT THE PROSECUTION WOULD BE ABLE TO PRESENT AT THE TRIAL?

A.   YES.

Q.   DID IT SURPRISE YOU WHEN MR. VINEYARD ARGUED:  THE DEFENDANT ALSO TORTURED JOANNE TIESLER BY SODOMIZING HER SO SEVERELY THAT HE BRUISED HER RECTUM, HE SAVAGELY RAPED HER ON HER OWN BED, PUSHING HER BODY AGAINST THE FRAME OF HER BED SO SEVERELY THAT IT BRUISED HER HIP, POUNDING HER BODY INTO THE WOODEN FLOOR SO SEVERELY THAT HER KNEES WERE BRUISED.  AND YOU RECALL THOSE PHOTOS.  JUST REMEMBER EVERY BRUISE THAT YOU SEE UPON JOANNE TIESLER'S BODY IN THE CRIME SCENE PHOTOS AND THE AUTOPSY PHOTOS WAS INFLICTED WHILE SHE WAS ALIVE AND WHILE THE BLOOD WAS STILL FLOWING THROUGH HER BODY.

     DID THAT ARGUMENT SURPRISE YOU?

A.   NO.

Q.   WAS THAT BASED UPON EVIDENCE YOU KNEW, FULL WELL KNEW THAT THE PROSECUTION WOULD BE ABLE TO OFFER IN THIS CASE?

A.   YES.

Q.   DID IT SURPRISE YOU THAT HE WOULD ARGUE:  IT'S EVIDENT IN THE CRIME SCENE PHOTOS AND THE AUTOPSY PHOTOS YOU HAVE TO LOOK AT IN THIS CASE THAT THE DEFENDANT DIDN'T JUST KILL JOANNE TIESLER, LADIES AND GENTLEMEN, HE SLAUGHTERED HER.  HE SLAUGHTERED HER LIKE AN ANIMAL.  HE CHOSE ONE OF THE MOST BRUTAL, PAINFUL WAYS TO END HER LIFE; TO PUT A KNIFE TO HER

286

THROAT NOT ONCE, BUT TWICE, AND THE SECOND TIME HE PLUNGED IT INTO HER NECK AND RIPPED HER THROAT OPEN PENETRATING TO THE CERVICAL VERTEBRAE.

WAS THAT BASED UPON EVIDENCE THAT YOU FULL WELL KNEW THAT THE PROSECUTION COULD PRESENT IN THIS CASE?

A.   YES.

Q.   DID IT SURPRISE YOU THAT THEY MADE THAT ARGUMENT?

A.   NO.

Q.   FINALLY ON THIS POINT -- WELL, WAIT A SECOND.  DID IT SURPRISE YOU WHEN HE MADE THIS ARGUMENT:  YOU RECALL THE TESTIMONY YOU HEARD FROM THE TWO MEDICAL EXAMINERS IN THIS CASE.  THEY BOTH TOLD YOU THAT JOANNE WAS ALIVE AND CONSCIOUS WHEN THESE INJURIES WERE INFLICTED UPON HER.  DR. SPITZ -- WAS HE YOUR EXPERT?

A.   YES, HE WAS.

Q.   -- DESCRIBED FOR YOU THE TERROR THAT SHE WAS GOING THROUGH IN THIS ORDEAL, THE IMPENDING DOOM THAT SHE FELT.  HE DESCRIBED FOR YOU THAT SHE WAS ALIVE AND CONSCIOUS WHEN THE DEFENDANT PUT THAT KNIFE IN HER NECK.

WAS THAT EVIDENCE AVAILABLE TO THE PROSECUTION AND EVEN FROM YOUR WITNESS UPON WHICH MR. VINEYARD COULD MAKE THAT ARGUMENT?

A.   YES, IT WAS.

Q.   DID IT SURPRISE YOU THAT HE MADE IT?

A.   NO.

287

Q.   FINALLY IN THIS REGARD:  REMEMBER HE DESCRIBED THE BLOOD SPLATTER ON HER BEDSPREAD.

DID YOU LOOK AT THE BLOOD SPLATTERS ON THE BEDSPREAD?

A.   YES.  WELL, WE SAW THE PICTURES.

Q.   HOW WITH HER HANDS TIED BEHIND HER BACK, HELPLESS TO DO ANYTHING ABOUT IT, SHE'S MOVING UP AND DOWN ON THE BED AND THE BLOOD SPLATTERING ALL OVER HER BEDSPREAD, UPON HER STUFFED ANIMALS AT THE TOP OF HER BED.  REMEMBER WHAT THE DEFENDANT IS DOING WHILE SHE HELPLESSLY THRUSTS HER BODY.  HE JUST STANDS THERE AND WATCHES HER DIE.  AND THEN HE TAKES THIS KNIFE, THAT GERBER KNIFE RIGHT THERE, INDICATING, AND PLUNGES IT INTO HER BACK FIVE TIMES TO THE HILT, JUST GRATUITOUSLY MUTILATING HER BODY.  THEN HE CALLOUSLY TAKES THAT KNIFE AND WIPES THE BLOOD OFF ON THE BACK OF HER SHIRT, LEFT HER EXPOSED ON HER OWN BED TO BE DISCOVERED THE NEXT DAY BY HER COWORKER AND REAL ESTATE AGENT KATHY KILGORE.

DID YOU KNOW ALL OF THOSE FACTS WERE AVAILABLE TO THE PROSECUTION TO PROVE THAT ARGUMENT?

A.   YES, THE FACTS WERE THERE.  I MEAN, I THINK THERE'S SOME RHETORICAL FLOURISH IN THERE, BUT THE GENERAL FACTS WERE THERE.

Q.   THAT THERE WAS EVIDENCE THAT HE HAD WIPED THE KNIFE ON HER SHIRT; CORRECT?

A.   THAT'S CORRECT.

Q.   THAT THERE WAS BLOOD SPLATTERS INDICATING A STRUGGLE?  YOU WERE WELL AWARE OF THAT?

288

A.   YES.

Q.   AND THAT SHE WAS DISCOVERED EXPOSED WHEN HER COWORKER FOUND HER THE NEXT DAY.

A.   RIGHT, ALTHOUGH WE WERE SURPRISED AT TRIAL BY THE KNIFE BEING WIPED ON HER SHIRT.

Q.   THAT WAS ONE SURPRISE.

A.   YEAH.

Q.   BUT YOU HAD AVAILABLE THAT EVIDENCE.

     WITH REGARDS TO THE ISSUE OF PREMEDITATION, DID YOU KNOW PRIOR TO TRIAL THAT THE STATE WOULD HAVE EVIDENCE THAT MR. LECROY HAD BOUGHT THE TIES FROM THE WAL-MART BEFORE THE EVENT?

A.   WE HAD THAT EVIDENCE.

Q.   THERE WAS A RECEIPT FROM WAL-MART SHOWING HE HAD BOUGHT THESE TIES.

A.   RIGHT.

Q.   AND THAT THERE WAS EVIDENCE THAT HE HAD BROKEN INTO OTHER PLACES PRIOR TO ENTERING MS. TIESLER'S HOUSE?

A.   RIGHT.

Q.   THAT HE HAD STOLEN A SHOTGUN DURING THOSE BREAK-INS, A LOADED DOUBLE-BARREL SHOTGUN?

A.   BASICALLY, THERE WAS EVIDENCE THAT THERE WERE BREAK-INS AND THEN SOME OF THE ITEMS FROM THE BREAK-INS WERE FOUND EITHER IN TRASH CANS AT HIS HOUSE OR IN HIS POSSESSION.

Q.   AND THAT THERE WAS EVIDENCE THAT HE HAD WATCHED HER HOUSE

289

FROM AFAR WITH BINOCULARS WAITING FOR HER?  DO YOU REMEMBER THAT?

A.   I DON'T RECALL THAT.

Q.   OKAY.  DO YOU REMEMBER THERE BEING EVIDENCE THAT HE HAD SET UP A SURVEILLANCE POST IN THE HOUSE TWO DOORS DOWN FROM MS. TIESLER, WATCHING HER WITH BINOCULARS?

A.   THAT'S JUST NOT RINGING A BELL AS EVIDENCE THAT CAME OUT AT TRIAL.  I JUST DON'T --

Q.   LET ME ASK YOU THIS:  DOES THIS ARGUMENT THAT MR. VINEYARD GAVE AT THE CLOSING DURING THE SENTENCING PHASE, WOULD IT HAVE SURPRISED YOU:  RECALL THE SUBSTANTIAL PLANNING AND PREMEDITATION IN 2001, THE PREMEDITATION IN WHICH THE DEFENDANT CARRIED OUT THIS CRIME OF KILLING JOANNE TIESLER AND TAKING HER CAR.  THE DEFENDANT TRIED TO TELL YOU IT WAS AN IRRATIONAL ACT IN THE MIDDLE OF A BURGLARY.

YOU REMEMBER THAT STORY, DON'T YOU?  ACTUALLY, THAT WAS FROM THE ARGUMENT DURING THE GUILT/INNOCENCE PHASE OF THE CASE; CORRECT?

A.   OKAY.

Q.   AND AT THIS POINT HE'S ALREADY BEEN FOUND GUILTY OF THE CARJACKING AND THE MURDER OF MS. TIESLER; CORRECT?

A.   RIGHT.

Q.   YOU DIDN'T BUY THAT BOGUS BURGLARY STORY BECAUSE THE EVIDENCE SHOWED THAT THIS WAS A VERY CALCULATED PLAN AND PREMEDITATED ACT BY THE DEFENDANT TO KILL JOANNE TIESLER AND

290

TAKE HER CAR.  THE DEFENDANT WAS --

MR. MCKINNON:  I'M SORRY TO INTERRUPT; BUT, I MEAN, THE RECORD STANDS FOR ITSELF.  JUST ASKING MR. MENDELSOHN WHETHER HE REMEMBERS THIS TESTIMONY OR NOT IS REALLY NOT ADDING ANYTHING.  THE RECORD STANDS FOR ITSELF AS TO WHAT WAS SAID IN THE CLOSING ARGUMENT, WHICH IS WHAT MR. MARTIN IS READING.

MR. MARTIN:  I'M JUST TRYING TO ASK, I'M GOING TO BRING HIS ATTENTION TO A PARTICULAR PART OF THE CLOSING ARGUMENT AND ASK HIM WHETHER OR NOT IT SURPRISES HIM THAT THE GOVERNMENT COULD MAKE THIS TYPE OF ARGUMENT REGARDING PREMEDITATION BASED ON WHAT HE ALREADY KNEW ABOUT THE GOVERNMENT'S CASE.

THE COURT:  I'LL OVERRULE.  YOU MAY PROCEED.

BY MR. MARTIN:

Q.   YOU REMEMBER THAT STORY, DON'T YOU?  YOU DIDN'T BUY THAT BOGUS BURGLARY STORY -- AND I'M AT 2671 OF THE TRANSCRIPT.

THE COURT:  SLOW DOWN, MR. MARTIN.

MR. MARTIN:  YES, SIR.  I ALWAYS DO THAT.  I APOLOGIZE.

BY MR. MARTIN:

Q.   AT 2671:  YOU REMEMBER THAT STORY, DON'T YOU?  YOU DIDN'T BUY THAT BOGUS BURGLARY STORY BECAUSE THE EVIDENCE SHOWED THAT THIS WAS A VERY CALCULATED PLAN AND PREMEDITATED ACT BY THE DEFENDANT TO KILL JOANNE TIESLER AND TAKE HER CAR.  THE DEFENDANT WAS LYING IN WAIT FOR HER WHEN SHE RETURNED HOME FROM

291

HER SHOPPING TRIP.  LET'S WALK THROUGH THE EVIDENCE OF THE SUBSTANTIAL PREPARATION THAT THE DEFENDANT MADE TO CARRY OUT THE CRIME OF KILLING JOANNE TIESLER.  IT INVOLVED BUYING CABLE TIES TWO WEEKS BEFORE HE CARRIED OUT THE CRIME.  YOU SAW THE WAL-MART RECEIPT AND YOU SAW THE CABLE TIES USED ON JOANNE AND IN HIS POSSESSION WHEN HE WAS ARRESTED.  HIS PLAN INCLUDED BREAKING INTO CABINS TO GET THE EQUIPMENT, FIREARMS HE NEEDED TO CARRY OUT HIS PLAN.  IT INCLUDED SETTING UP A SURVEILLANCE POST IN THE HOUSE TWO DOORS DOWN FROM MS. TIESLER.  AND YOU SAW HOW HE POSITIONED THE CHAIR TO WATCH THE RESIDENCE, SUBSTANTIAL PLANNING AND PREMEDITATION.

DOES THAT REMIND YOU OF SOME OF THAT EVIDENCE OF THE CHAIR BEING LOCATED WHERE HE COULD WATCH THE RESIDENCE?

A.   I'M VAGUELY REMEMBERING SOMETHING ABOUT THE SITUATION IN ONE OF THE HOUSES THAT WAS BROKEN INTO, BUT --

Q.   ALL RIGHT:  YOU SAW HOW HE ENTERED MS. TIESLER'S HOME ARMED WITH A LOADED DOUBLE-BARREL SHOTGUN, THE CABLE TIES HE HAD PURCHASED AND HIS KNIFE; HOW HE PULLED HER WINDOW DOWN AND PUT THE DRAWSTRING BACK IN PLACE JUST SO HE COULD SET THE TRAP FOR HER.

DO YOU REMEMBER THAT EVIDENCE ABOUT THE WINDOW BEING DRAWN?

A.   RIGHT.

Q.   THAT WASN'T ANY SURPRISE TO YOU, WAS IT?

A.   NO.  WE HAD THE REPORTS.

292

Q.   AND THEN HE WENT INTO HER HOME AND HE WAITED, WAITING FOR HER TO RETURN FROM THAT SHOPPING TRIP, WAITING FOR HER TO WALK DOWN THE HALL AND INTO HER BEDROOM WHERE THERE WAS NO POINT OF ESCAPE, THAT SUBSTANTIAL PLANNING AND PREMEDITATION.

ANYTHING ABOUT THAT ARGUMENT AND THE FACTS AS SET OUT BY MR. VINEYARD IN HIS ARGUMENT THAT SURPRISED YOU?

A.   NO.

Q.   YOU KNEW THAT THEY COULD MAKE THOSE ARGUMENTS ABOUT PREMEDITATION IN THIS CASE; CORRECT?

A.   CORRECT.

Q.   DID YOU REALLY BELIEVE THAT YOU WERE GOING TO HAVE A REALISTIC POSSIBILITY OF GETTING THE JURY NOT TO CONCLUDE THAT, ONE, THE CRIME WAS HEINOUS, INVOLVING TORTURE AND MUTILATION AND SERIOUS ABUSE TO THE BODY?

A.   NO, NO.   THAT WAS, THAT WAS ONE THAT WE HAD TO PRETTY MUCH GIVE UP ON.

Q.   AND DID YOU HAVE ANY REALISTIC POSSIBILITY THAT THE JURY WOULD NOT BE ABLE TO FIND THAT THERE WAS A PREMEDITATION IN THIS, GIVEN ALL THIS CIRCUMSTANCES THAT MR. VINEYARD SET OUT?

A.   THEY COULD ALWAYS FIND IT.   I MEAN, WE WOULD QUIBBLE WITH SOME OF THE FACTS AND WOULD ARGUE WITH SOME OF THAT; BUT THEY, I MEAN, THEY COULD FIND -- THEY HAD THE EVIDENCE THERE TO FIND PREMEDITATION.

Q.   YOU NEVER TALKED TO DR. HILTON, DID YOU?

A.   NO.

293

Q.   DID YOU EVER TALK WITH DR. HILTON ABOUT HIS OPINION AS TO WHAT, IF ANYTHING, THERE MIGHT BE AS TO WHEN MR. -- BASED ON HIS EVALUATION OF MR. LECROY, WHEN, IF ANY, THE DECISION MAY HAVE BEEN MADE TO KILL MS. TIESLER?

A.   NO.  I DIDN'T HAVE ANY CONVERSATIONS WITH DR. HILTON.  I WAS ON TRIAL WHEN THAT EVALUATION WAS TAKING PLACE.

Q.   YOU MENTIONED THAT YOU DID NOT THINK THE DIAGNOSES OF BORDERLINE PERSONALITY DISORDER AND SCHIZOTYPAL PERSONALITY DISORDER WERE VERY HELPFUL.

A.   WELL, ACTUALLY I WAS ASKED ANTISOCIAL PERSONALITY.

Q.   THAT'S WHAT I WANTED TO CLARIFY.  FIRST OF ALL, YOU THOUGHT THAT ANTISOCIAL PERSONALITY WOULD NOT ONLY NOT BE HELPFUL, IT MIGHT EVEN BE HURTFUL.

A.   THAT'S CORRECT.

Q.   BUT THE SCHIZOTYPAL PERSONALITY DISORDER AND THE BORDERLINE PERSONALITY DISORDER, DID YOU BELIEVE THAT WOULD BE HURTFUL?

A.   THEY, THEY WEREN'T HURTFUL.

Q.   YOU JUST DIDN'T FIND THEM COMPELLING.

A.   YES.

Q.   BUT YOU NEVER TALKED TO DR. HILTON ABOUT EXACTLY HOW HE WOULD DESCRIBE HOW THOSE IMPACTED THIS CRIME.

A.   NO, I HAD NO CONVERSATIONS WITH DR. HILTON.

Q.   YOU WERE ASKED SEVERAL QUESTIONS REGARDING SOME OF THE DOCUMENTS AND THE INCONSISTENCIES, ALLEGED INCONSISTENCIES IN

294

THE REPORTS OF MR. LECROY REGARDING BEING ABUSED BY -- AS A CHILD. AND IN PARTICULAR YOU REFERRED TO, YOU WERE ASKED ABOUT GOVERNMENT'S EXHIBIT 85 AND 86. DID YOU EVER SPECIFICALLY TALK WITH DR. -- I ASSUME YOU NEVER TALKED TO DR. HILTON AS TO WHAT HIS INTERPRETATION OF THESE TWO DOCUMENTS WERE.

A.   NO, I DIDN'T.

Q.   DO YOU EVER REMEMBER SPECIFICALLY TALKING WITH DR. LISAK AS TO HIS INTERPRETATION OF THESE TWO PARTICULAR DOCUMENTS?

A.   DR. LISAK WOULD HAVE HAD THEM BECAUSE HE WOULD HAVE HAD THE PRISON RECORDS. I DON'T BELIEVE HE WAS PARTICULARLY CONCERNED ABOUT INCONSISTENCIES IN THE REPORTS.

Q.   DID DR. LISAK EVER VOICE TO YOU AN OPINION THAT HE BELIEVED THAT THIS WAS -- WELL, WHAT DID HE SAY AS TO WHETHER HE BELIEVED THIS WAS A -- THERE WAS INDICATION OF ACTUALLY BEING ABUSED AS A CHILD, MR. LECROY, EXCUSE ME?

A.   HE BELIEVED IT.

Q.   BASED ON RECORDS THAT HE HAD BEEN PROVIDED.

A.   BASED ON THE RECORDS, HE THOUGHT IT WAS VERY CONSISTENT WITH CHILDHOOD SEXUAL ABUSE.

          (DISCUSSION OFF THE RECORD.)

BY MR. MARTIN:

Q.   SHOWING YOU A DOCUMENT THAT MAY HELP REFRESH YOUR RECOLLECTION AS TO THE DOCUMENTS THAT WERE SENT TO DR. LISAK. I THINK -- WOULD IT HAVE BEEN MS. MILLER'S OBLIGATION TO COLLECT THESE DOCUMENTS AND SEND THEM TO MR. -- EXCUSE ME,

295

DR. LISAK?

A.   NO.   I COLLECTED THE DOCUMENTS AND TOLD MS. MILLER TO SEND THEM OUT.

Q.   LOOKING AT THAT DOCUMENT, DOES THAT HELP YOU IN REMEMBERING WHETHER OR NOT THERE WAS SOME SORT OF SOCIAL HISTORY THAT WAS PROVIDED TO DR. LISAK?

A.   OKAY, YEAH, THEN IT WAS OUR SOCIAL HISTORY.  WE DID PROVIDE IT.

Q.   AS WELL AS THE OTHER DOCUMENTS THAT YOU'VE ALREADY MENTIONED.

A.   RIGHT.

Q.   INCLUDING THE BUREAU OF PRISONS AND OTHER PSYCHOLOGICAL RECORDS?

A.   YES.   THOSE ARE THE KINDS OF RECORDS WE WANTED DR. LISAK TO PAY ATTENTION TO.

Q.   RIGHT.  WITH RESPECT TO THOSE RECORDS AND OTHER RECORDS THAT MIGHT BE AVAILABLE THAT DR. MEDLIN IDENTIFIED IN WHICH SHE CLAIMED THERE MIGHT BE INCONSISTENT REPORTING, WAS THERE ANY PROHIBITION FROM THE GOVERNMENT OFFERING ANY OTHER RECORDS INDICATING WHAT THEY CONTENDED TO BE OTHER DENIALS OF SEXUAL ABUSE?

A.   NOT THAT I KNOW OF.

Q.   IT WAS FAIR GAME FOR BOTH SIDES -- WHAT WAS FAIR GAME WITH BOTH SIDES AS TO WHETHER OR NOT THERE HAD BEEN A REPORT OF SEXUAL ABUSE?

296

A.   I THOUGHT -- AS I UNDERSTOOD IT, THE REPORTS OF SEXUAL ABUSE WERE PROPERLY BEFORE THE COURT AND BEFORE THE JURY.  IT WAS THE DIAGNOSES THAT WE COULDN'T GET INTO.

Q.   AND EVIDENCE CONTRARY TO THOSE REPORTS WAS ALSO FAIR GAME.

A.   I WOULD HAVE THOUGHT SO.

Q.   IF YOU RECALL, DO YOU RECALL THE GOVERNMENT TRYING TO POINT OUT THAT THERE HAD NOT BEEN ANY STATEMENT BY MR. LECROY REGARDING REPORTS OF SEXUAL ABUSE TO FAMILY MEMBERS?

A.   I KNOW THEY CROSS-EXAMINED THE DOCTORS WHO WERE THERE.  I DON'T RECALL THEM BRINGING OUT THESE REPORTS.

Q.   RIGHT.  BUT DO YOU RECALL -- WAS IT ANY SURPRISE TO YOU THAT THE GOVERNMENT WOULD TRY TO DENY THAT THERE EVER HAD BEEN ANY SEXUAL ABUSE?

A.   NO, BECAUSE EARLY ON WE KNEW THE GOVERNMENT HAD SUBPOENAED FAMILY MEMBERS TO THE GRAND JURY AND WERE TRYING TO REFUTE ALLEGATIONS OF SEXUAL ABUSE.

Q.   IN DR. MEDLIN'S REPORT -- BY THE WAY, YOU TESTIFIED YESTERDAY THAT DR. LISAK, USING YOUR WORD, FELT THAT DR. MEDLIN'S REPORT WAS NONSENSE.

A.   RIGHT.

Q.   DO YOU RECALL TESTIFYING TO THAT?

A.   I DON'T THINK HE USED THE WORD NONSENSE, BUT HE THOUGHT VERY LITTLE OF IT.

Q.   AND IN WHAT RESPECTS DID HE BELIEVE IT WAS INACCURATE OR NONSENSICAL OR NOT A VERY GOOD REPORT?

297

A.   WELL, I MEAN, MANY OF THE SOURCES SHE RELIED ON WERE NOT SOLID, PEER-REVIEWED, ACADEMIC-TYPE SOURCES; SO HE HAD A PROBLEM WITH THAT.  HE DIDN'T -- I MEAN, I'M GOING FROM MEMORY FROM THE CONVERSATION MANY YEARS AGO.  BUT HE GENERALLY THOUGHT THAT HER CONCLUSIONS WEREN'T REALLY WELL SUPPORTED; THAT SHE WAS MAKING, BASICALLY MAKING THESE STATEMENTS THAT IF YOU WENT BACK TO THE REAL SCIENTIFIC LITERATURE WOULD BE DIRECTLY REFUTED.  AND UNFORTUNATELY, I CAN'T TELL YOU SPECIFICALLY WHICH LINES OR WHICH PHRASES, BUT THAT WAS THE GENERAL FEEL THAT I RECALL FROM HIS CONVERSATION.

Q.   WAS THE DECISION MADE NOT TO CALL DR. LISAK MADE THAT DAY THAT YOU RECEIVED DR. MEDLIN'S REPORT?

A.   I BELIEVE SO.

Q.   SO YOU NEVER HAD AN OPPORTUNITY BASICALLY TO SIT DOWN WITH DR. LISAK AND GO THROUGH IT IN GREAT DETAIL?

A.   WHAT WE DID WAS WE FAXED IT TO DR. LISAK AND THEN WE DID A SPEAKER PHONE CALL WITH HIM WITH THE FOUR OF US, THE FOUR ATTORNEYS AND MAYBE SOME OF THE INVESTIGATORS, BUT THE FOUR ATTORNEYS IN THAT LITTLE ROOM AT THE COURTHOUSE IN GAINESVILLE.

Q.   IN THAT REPORT SHE PLACES SIGNIFICANCE ON SPECIFIC ANSWERS TO QUESTIONS IN THE MMPI.  DO YOU REMEMBER THAT BEING IN THE REPORT?

A.   I SEEM TO RECALL THAT.

Q.   YOUR EXPERIENCE IN DEALING WITH PSYCHOLOGISTS IN CONNECTION WITH YOUR CASES, DID YOU KNOW WHETHER OR NOT THAT

298

WAS A VALID WAY TO USE MMPI?

A.    THAT IS CERTAINLY NOT THE REGULAR PRACTICE.   THE IDEA WITH THE MMPI IS NOT SO MUCH THE ANSWERS TO THE INDIVIDUAL QUESTIONS BUT THE PATTERN OF RESPONSES AND HOW THAT COMPARES TO THE NORMED GROUPS WHO RESPOND THAT WAY.   SO PICKING OUT INDIVIDUAL QUESTIONS AND TAKING THE ANSWERS TO THAT IS NOT STANDARD PRACTICE, AS I UNDERSTAND IT.

Q.    DO YOU REMEMBER WHETHER DR. LISAK POINTED THAT OUT AS ONE FACTOR THAT MADE HIM QUESTION THE QUALIFICATIONS OF DR. MEDLIN?

A.    HE COULD VERY WELL HAVE.   I JUST DON'T RECALL, OFF THE TOP OF MY HEAD.

Q.    YOU INDICATED TOWARD THE END OF YOUR TESTIMONY OR THE END OF YOUR CROSS-EXAMINATION THAT YOU BELIEVED THAT SEXUAL ABUSE WAS A MITIGATING FACTOR IN THIS CASE.

A.    YES.

Q.    AND WAS A MITIGATING FACTOR THAT YOU AND THE ANOTHER ATTORNEYS WANTED TO PRESENT TO THE JURY AS A REASON FOR A SENTENCE OTHER THAN DEATH.

A.    YES.

Q.    AND WAS THAT A FACTOR THAT YOU FELT HAD SOME SIGNIFICANCE IN THE ACTUAL ACT THAT OCCURRED FOR WHICH HE WAS CONVICTED?

A.    MY BELIEF IT WAS DIRECTLY RELATED.

Q.    BUT WAS THAT CONNECTION EVER -- WHAT WAS THE PLAN WITH REGARDS TO TRYING TO USE THAT AS A MITIGATING FACTOR TO EXPLAIN THIS CRIME?

299

A.    WELL, BEFORE OR AFTER DR. LISAK WASN'T PART OF THE CASE?

Q.    AFTER YOU MADE THIS DECISION NOT TO CALL DR. LISAK AND AFTER THE COURT HAD INDICATED THAT IT WAS GOING TO RUN A TIGHT SHIP WITH REGARD TO THIS EVIDENCE.

A.    RIGHT.    I MEAN, MY PLAN WAS THAT WE WOULD BASICALLY TESTIFY AS EXPERTS IN CLOSING ARGUMENT.

Q.    AND WHEN YOU SAY WE, WHO'S WE?

A.    THE ATTORNEYS GIVING THE CLOSING ARGUMENT.

Q.    AND DID THAT EVER OCCUR?

A.    NO, IT DIDN'T.

          MR. MARTIN:  JUST A SECOND.

          (DISCUSSION OFF THE RECORD.)

          MR. MARTIN:  THAT'S ALL I HAVE, YOUR HONOR.

          MR. MCKINNON:  I HAVE NOTHING FURTHER.

          THE COURT:  LET ME JUST ASK THIS:  THERE'S BEEN A LOT OF FOCUS IN TERMS OF DR. HILTON'S REPORT IN TERMS OF HOW IT MAY HAVE AFFECTED PREMEDITATION, THE NATURE OF THE CRIME AND SO FORTH.  WERE THOSE THE ONLY ISSUES THAT WERE OF CONCERN TO THE DEFENSE TEAM IN TERMS OF THAT EVIDENCE AND HOW IT MIGHT GO WITH THE JURY?  I MEAN, AS I LOOK AT THAT, I'VE GOT TO ANALYZE WHY Y'ALL DID THE THINGS YOU DID, INEFFECTIVENESS IS ALLEGED HERE, AND GOING BACK AND YOU'RE MAKING THESE DECISIONS, OBVIOUSLY, AT THE TIME OF TRIAL.  BUT THE ISSUES OF THE MAGIC, THE WITCHCRAFT, THOSE KINDS OF MATTERS AS A PART OF THE REPORT TO BE PRESENTED TO A JURY IN THE GAINESVILLE DIVISION, WERE THOSE

300

EVER ISSUES THAT WERE DISCUSSED BY COUNSEL OR MATTERS THAT MIGHT PLAY INTO A DECISION ABOUT USING THIS WITNESS?

THE WITNESS: THEY WERE, THEY WERE. AND I THINK WE EACH HAD OUR OWN REASONS FOR REACHING THE CONCLUSION THAT WE DID. YEAH, THE FACTS OF THE REPORT JUST DIDN'T FEEL HELPFUL TO ME, AS WELL AS THE ANTISOCIAL PERSONALITY DIAGNOSIS. THOSE WERE THE TWO MAIN THINGS, FROM MY PERSPECTIVE.

THE COURT: AND YOU WERE PRETTY MUCH THE ONE HANDLING THE MENTAL HEALTH ASPECT OF THE CASE. YOU WERE LEAD COUNSEL. I KNOW EVERYONE PARTICIPATED; BUT THE SENSE I GOT FROM THE OTHER COUNSEL WHO HAVE TESTIFIED, YOU WERE TAKING THE LEAD ON THIS PART OF THE CASE. IS THAT CORRECT?

THE WITNESS: RIGHT. I MEAN, ULTIMATELY WE MADE THE DECISIONS THAT WE MADE AS A TEAM. BUT THEN SORT OF DOING THE WORKUP OF THE CASE OR WORKING WITH THE EXPERTS OR PUTTING IT TOGETHER, THAT WOULD BE, THAT WOULD BE MY PART OF IT.

THE COURT: YOU'RE EXCUSED. THANK YOU.

THE WITNESS: THANK YOU.

MS. MICHAELS: YOUR HONOR, WE WOULD CALL DR. CARLSON.

(THE WITNESS WAS SWORN.)

THE DEPUTY CLERK: IF YOU WOULD PULL UP TO THE MICROPHONE AND STATE YOUR FULL NAME.

THE WITNESS: DR. MARTI CARLSON.

MARTI CARLSON, PSY.D.,

HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

301

DIRECT EXAMINATION

BY MS. MICHAELS:

Q.    GOOD AFTERNOON, DR. CARLSON.  DR. CARLSON, COULD YOU TELL ME HOW YOU'RE EMPLOYED.

A.    I'M EMPLOYED FOR THE FEDERAL BUREAU OF PRISONS AS THE CHIEF PSYCHOLOGIST AT THE FEDERAL CORRECTIONAL INSTITUTION, FT. WORTH, TEXAS.

Q.    AND IT MAY JUST BE ME, BUT I'M SORT OF HAVING A HARD TIME HEARING YOU.

A.    DO YOU NEED ME TO REPEAT THAT?

Q.    YOU SAID YOU WERE THE CHIEF --

A.    CHIEF PSYCHOLOGIST AT THE FEDERAL CORRECTIONAL INSTITUTION IN FT. WORTH, TEXAS.

Q.    AND PRIOR TO FT. WORTH, TEXAS, WHERE WERE YOU EMPLOYED?

A.    AT THE FEDERAL CORRECTIONAL INSTITUTION IN EL RENO, OKLAHOMA, STILL WITH THE FEDERAL BUREAU OF PRISONS.

Q.    AND HOW LONG WERE YOU AT EL RENO?

A.    I STARTED THERE IN OCTOBER OF '96 AND I TRANSFERRED TO FT. WORTH IN NOVEMBER 2006, I THINK IT WAS.

Q.    AND CAN YOU TELL ME WHAT YOUR BACKGROUND IS EDUCATIONALLY.

A.    I HAVE A DOCTOR DEGREE, A PSYD IN CLINICAL PSYCHOLOGY FROM FOREST INSTITUTE OF PROFESSIONAL PSYCHOLOGY.  I GOT THAT IN AUGUST OF 1996.

Q.    AND DO YOU HAVE ANY SPECIALTIES?

A.    JUST CLINICAL PSYCHOLOGY.

302

Q.   OKAY.  AND IN CLINICAL PSYCHOLOGY, DO YOU HAVE ANY SPECIAL TRAINING?

A.   JUST, I MEAN, JUST THROUGH REGULAR TRAINING THAT GOES ALONG WITH ALL CLINICAL PSYCHOLOGISTS; NOTHING, NO SPECIALIZING TRAINING, NO.

Q.   OKAY.  AND WHILE YOU WERE AT F.C.I. EL RENO, BASICALLY WHAT DID YOU DO EVERY DAY?

A.   AT F.C.I. EL RENO, I WAS THE DRUG ABUSE PROGRAM COORDINATOR.

Q.   AND THAT'S CALLED DAP?

A.   DAPC.

Q.   NOW, YOU'RE ALSO CONSIDERED LAW ENFORCEMENT.  IS THAT CORRECT?

A.   CORRECT.

Q.   AND CAN YOU JUST EXPLAIN WHAT YOU MEAN BY THAT, THAT YOU'RE CONSIDERED LAW ENFORCEMENT?

A.   IN THE FEDERAL BUREAU OF PRISONS, WE HAVE THE PHILOSOPHY THAT YOU'RE A FEDERAL LAW ENFORCEMENT OFFICER FIRST AND I'M A PSYCHOLOGIST SECOND.  SO I DO A LOT OF THINGS THAT'S ALSO CUSTODIAL RELATED IN CUSTODY AND LAW ENFORCEMENT.

Q.   AND WOULD IT BE FAIR TO SAY THAT YOU'VE SPENT MOST OF YOUR PROFESSIONAL CAREER AS LAW ENFORCEMENT AND AS --

A.   BOTH; CORRECT.

Q.   NOW, AT SOME POINT, I'M NOT SURE EXACTLY WHEN, BUT AROUND ABOUT 1998 DID YOU COME TO KNOW WILLIAM LECROY?

303

A.   YES.

Q.   AND HOW DID YOU KNOW HIM?

A.   I FIRST MET MR. LECROY IN INTAKE SCREENING WHICH IS REQUIRED OF ALL INMATES WHEN THEY ARRIVE INTO A NEW FACILITY.

Q.   OKAY.  AND CUTTING AHEAD IN TIME, BASICALLY, DID YOU TREAT MR. LECROY DURING HIS TIME AT F.C.I. EL RENO?

A.   YES.

Q.   AND THAT WAS AS A PROFESSIONAL.

A.   YES.

Q.   AFTER HE LEFT EL RENO, F.C.I. EL RENO, WERE YOU EVER CONTACTED BY ATTORNEYS FOR MR. LECROY?

A.   BY THE DEFENSE COUNSEL AFTER HE HAD LEFT, YES, SEVERAL YEARS LATER.

Q.   OKAY.  DO YOU RECALL WHO CONTACTED YOU?

A.   I CANNOT REMEMBER THE SPECIFIC NAMES.  SOME NAMES MAY SOUND FAMILIAR IF I HEARD THEM.

Q.   OKAY.  AND DID THEY CONTACT YOU IN -- WAS THERE ANYTHING UNUSUAL ABOUT THE CONTACT THAT YOU RECEIVED FROM THEM?

A.   WELL, WHEN THEY CONTACTED ME, THEY TOLD ME WHY THEY WERE CONTACTING ME WAS THAT MR. LECROY HAD COMMITTED A CRIME AND THAT THEY WERE SEEKING THE DEATH PENALTY AND WANTED TO SPEAK WITH ME ABOUT MY INTERACTIONS WITH MR. LECROY AT THAT TIME.  AT THAT TIME I TOLD THEM I COULDN'T WITHOUT A RELEASE OF INFORMATION BECAUSE I DIDN'T KNOW WHO THEY WERE OR WHETHER HE HAD GIVEN CONSENT TO DO THAT.

304

Q.   OKAY.  AND DID YOU, IN FACT, RECEIVE A CONSENT TO SPEAK TO HIM --

A.   NO.

Q.   -- SPEAK TO THEM?

A.   WHAT HAPPENED IS I RECEIVED A COURT ORDER OF SOME SORT, I DON'T REMEMBER EXACTLY WHAT KIND OF COURT ORDER IT WAS, BASICALLY ORDERING THE B.O.P. NOT TO INTERFERE WITH ME TALKING WITH THE DEFENSE AND FOR ME NOT TO TALK WITH ANY OTHER FEDERAL INVESTIGATING AGENCY OR THE A.U.S.A., AND IT WAS A SEALED COURT ORDER.

Q.   AND DID YOU ABIDE BY THAT ORDER?

A.   I DON'T REMEMBER EXACTLY WHAT HAPPENED AT THAT POINT; BUT I KNOW B.O.P. ATTORNEYS GOT INVOLVED, AND AT SOME POINT I THINK THAT ORDER WAS RESCINDED OR SOMEHOW I GOT THE APPROVAL TO GO AHEAD AND TALK WITH THE DEFENSE.

Q.   NOW, WAS IT -- DO YOU RECALL IF IT WAS MALE OR FEMALE?

A.   FEMALE.

Q.   OKAY.  AND WOULD THE NAME STEPHANIE KEARNS RING A BELL?

A.   YES, THAT RINGS A BELL.

Q.   OKAY.  NOW, WERE YOU EVER EXPLAINED WHY THIS WAS DONE IN THIS MANNER BY MS. KEARNS?

A.   NO.

Q.   AND AT SOME POINT WERE YOU ADVISED THAT YOU WERE GOING TO BE A WITNESS AT MR. LECROY'S TRIAL?

A.   A WAYS AFTER, A LONG TIME AFTER THAT, ACTUALLY, THEY HAD

305

CAME AND TALKED WITH ME ABOUT THE CASE AFTER I GOT AN APPROVAL TO SPEAK WITH THEM. IT WASN'T UNTIL CLOSE TO ABOUT APPROXIMATELY A MONTH BEFORE THE TRIAL THAT I FOUND OUT THAT THEY HAD WANTED ME TO BE A WITNESS. AND THEN --

Q. LET ME STOP YOU THERE. YOU SAY THEY, WHEN YOU SAY THEY --

A. THE DEFENSE, I'M SORRY, THE DEFENSE ATTORNEYS.

Q. NOW, WAS IT -- IT WAS MS. KEARNS AND SOMEBODY ELSE?

A. WHEN THEY CAME TO VISIT ME, YES, IT WAS HER AND ANOTHER FEMALE.

Q. OKAY. AND DOES THE SAME SUSAN MILLER RING A BELL TO YOU?

A. I BELIEVE SO.

Q. OKAY. NOW, DID YOU EVER LEARN THE DETAILS OF THE CRIME THAT MR. LECROY WAS CHARGED WITH DURING YOUR CONVERSATIONS WITH MS. MILLER AND MS. KEARNS?

A. NO, JUST THAT THERE WAS A CARJACKING AND A MURDER AND RAPE. THAT'S ALL I KNEW.

Q. AND DID THEY EVER EXPLAIN TO YOU WHAT THEY NEEDED YOU AS A WITNESS FOR?

A. NO.

Q. DID THEY EVER EVEN EXPLAIN WHAT THEY NEEDED YOU AS A WITNESS FOR AT TRIAL?

A. NO.

Q. ALL RIGHT. NOW, BRINGING YOUR ATTENTION TO YOUR ACTUAL TREATMENT OF MR. LECROY, WHEN YOU SAID THERE WAS AN INITIAL INTAKE, IS THAT INITIAL INTAKE TAKEN AT EVERY INSTITUTION,

306

FEDERAL INSTITUTION AN INMATE GOES TO?

A.   AT THAT TIME, YES.

Q.   AND, FOR EXAMPLE, IF MR. LECROY ARRIVED AT F.C.I. EL RENO, THERE WOULD BE AN INTAKE FORM.

A.   YES.

Q.   AND WHEN HE WAS TRANSFERRED TO BUTNER, THERE WOULD HAVE BEEN A NEW INTAKE FORM TAKEN.

A.   YES.

Q.   SO EVERY INSTITUTION HE WENT TO, THERE WOULD BE AN INTAKE FORM.

A.   YES.

Q.   NOW, DO YOU RECALL WHETHER THE INTAKE FORM INDICATED THAT MR. LECROY NEEDED SPECIAL ATTENTION, FOR LACK OF A BETTER WORD?

A.   I DO NOT RECALL IF THERE WAS ANYTHING THAT STUCK OUT AT THAT POINT THAT HE NEEDED SPECIAL ATTENTION FOR.

Q.   DO YOU RECALL BEING CONTACTED BY SOMEONE TO MEET WITH HIM, THOUGH?

A.   YES.  ACTUALLY, I THINK THAT WAS DR. DANAHER THAT MET WITH HIM WHEN HE FIRST CAME IN BECAUSE I THINK HE HAD A HISTORY, AND I'D HAVE TO DOUBLE-CHECK THROUGH MY NOTES, BUT I THINK THERE WAS SOMETHING ABOUT A PRIOR SUICIDE AND SOME DEPRESSION FROM THE STATE SYSTEM AND THEY JUST WANTED TO CHECK TO SEE IF HE WAS OKAY.  BUT THAT WAS PRIOR TO HIM FILLING OUT AN INTAKE FORM. THAT WAS JUST THE PEOPLE IN THE RECEIVING AREA KNEW HIS HISTORY.

307

Q.    AND CAN YOU -- IS IT DR. GANAHL?

A.    DR. DANAHER.

Q.    OKAY.  D-A-N-A-H-E-R?

A.    YES.

Q.    AND HE WAS THE INTAKE DOCTOR AT EL RENO?

A.    HE WAS THE ONE THAT WAS ASSIGNED TO SEE HIM ON THAT DAY.

Q.    OKAY.  AND I'M GOING TO SHOW YOU WHAT WILL BE MARKED, I
BELIEVE, AS DEFENDANT'S EXHIBIT 13 I THINK IS WHERE WE ARE.  IS
THAT CORRECT?

          THE DEPUTY CLERK:  4 WAS THE LASTED ADMITTED.

          MS. MICHAELS:  OH, 14?

          THE COURT:  4 WAS THE LAST ONE WE HAD.

          MS. MICHAELS:  HE HAS OTHER ONES NUMBERED; SO IF IT'S
ALL RIGHT WITH THE COURT, I'LL MAKE IT 14 THEN.

          THE COURT:  THAT'S FINE.

          MS. MICHAELS:  MAY I APPROACH THE WITNESS, YOUR
HONOR?

BY MS. MICHAELS:

Q.    DR. CARLSON, I'M GOING TO SHOW YOU WHAT'S BEEN MARKED AS
DEFENDANT'S EXHIBIT 14.  IS THIS A DOCUMENT THAT YOU'RE
SOMEWHAT FAMILIAR WITH?

A.    YES, IT'S A P.S.I.

Q.    AND THAT'S A PRESENTENCE REPORT THAT WAS PREPARED FOR
MR. LECROY'S CRIME THAT HE WAS IN FEDERAL CUSTODY FOR.

A.    UH-HUH (AFFIRMATIVE).

308

Q.    IS THIS A DOCUMENT THAT YOU WOULD HAVE REVIEWED?

A.    AT SOME POINT, YES.  IT'S NOT REVIEWED ON EVERYBODY WHO JUST SHOWS UP ON INTAKE, NO.

Q.    OKAY.  BUT IF THERE'S A P.S.I., AS A GENERAL RULE, YOU WOULD EVALUATE THAT BECAUSE IT CONTAINED INFORMATION --

A.    YES.  IF I'M IN INDIVIDUAL THERAPY WITH A CLIENT AND THAT WOULD BE INFORMATION THAT WOULD BE IMPORTANT FOR THERAPY, YES.

Q.    SO IS YOUR RECOLLECTION THAT MR. LECROY REPORTED TO F.C.I. EL RENO WITH A HISTORY OF MENTAL HEALTH PROBLEMS FROM THE STATE SYSTEM?

A.    YES.  THAT'S WHAT HE REPORTED AT THE TIME THAT HE ARRIVED.

Q.    OKAY.  AND DO YOU RECALL SPECIFICALLY WHAT SOME OF THOSE PROBLEMS WERE?

A.    HE REPORTED THAT HE HAD A SUICIDE ATTEMPT IN THE STATE SYSTEM AND WAS ON ANTIDEPRESSANT MEDICATION FOR AWHILE.

Q.    AND WERE YOU AWARE THAT HE HAD REPORTED CHILD SEXUAL ABUSE?

A.    AT THAT TIME, NO.

Q.    WHEN DID YOU FIRST BECOME AWARE THAT HE HAD REPORTED CHILD SEXUAL ABUSE?

A.    WHEN I STARTED SEEING HIM INDIVIDUALLY.

Q.    OKAY.  SO LET ME BRING YOU BACK TO AT WHAT POINT OR WHO REFERRED MR. LECROY TO YOU FOR TREATMENT?

A.    WHEN HE ENTERED THE RESIDENTIAL DRUG ABUSE PROGRAM, HE WAS PLACED IN MS. NOVEY'S GROUP.  AND DURING THE COURSE OF

309

TREATMENT WITH HER, SHE HAD NOTICED HIM SHOWING SIGNS AND SYMPTOMS OF DEPRESSION; AND SHE THOUGHT THAT HE COULD BENEFIT FROM ANTIDEPRESSANT MEDICATION. AND THAT'S WHEN SHE CAME TO ME REQUESTING THAT I SEE HIM AND EVALUATE WHETHER THAT I AGREED WITH HER RECOMMENDATIONS AND WHETHER TO REFER HIM FOR PSYCHOTROPIC MEDS.

Q. JUST SO IT'S CLEAR, MS. NOVEY WORKED UNDER YOU. YOU WERE HER SUPERVISOR.

A. CORRECT.

Q. AND DID YOU, IN FACT, AGREE WITH MS. NOVEY THAT HE DID NEED TREATMENT?

A. YES.

Q. I'M GOING TO SHOW YOU WHAT I BELIEVE, I THINK YOU'VE ALREADY REVIEWED AND I HAVE A COPY OF, BUT IT WILL BE MARKED DEFENDANT'S EXHIBIT 15. NOTES WERE KEPT IN MR. LECROY'S FILE.

A. YES.

Q. AND THEY WERE KEPT NOT ONLY BY YOU, BUT BY MS. NOVEY AND DR. DANAHER.

A. YES.

Q. LET ME SHOW YOU WHAT'S MARKED AS DEFENDANT'S EXHIBIT 15. AND WOULD THIS BE THE DOCUMENTS THAT YOU WOULD HAVE OBSERVED OR WRITTEN YOURSELF IN YOUR COURSE OF TREATING MR. LECROY?

A. YES.

Q. NOW, THESE WERE NOTES THAT YOU WROTE AFTER YOU HAD MET WITH HIM OR NOTES THAT YOU HAD WRITTEN AFTER YOU REVIEWED

310

MS. NOVEY'S REPORTS?

A.    YES.

Q.    OKAY.  NOW, CAN YOU RECALL -- FIRST OF ALL, WHAT WERE THE SYMPTOMS THAT MR. LECROY REPORTED TO YOU?  WHAT DID HE --

A.    HE REPORTED SYMPTOMS CONSISTENT WITH DEPRESSION.  AS FAR AS MY RECOLLECTION, I CAN REFER HERE IN MY NOTES.  IS THAT OKAY IF I DO THAT?

Q.    PLEASE, PLEASE DO.

        MS. MICHAELS:  OH, I'M SORRY, I WOULD MOVE DEFENDANT'S EXHIBIT 14 AND 15 INTO EVIDENCE.

        THE COURT:  ANY OBJECTION?

        MR. MCKINNON:  NO.

        THE COURT:  THEY ARE ADMITTED.

        THE WITNESS:  HE WAS HAVING SYMPTOMS OF FEELING DEPRESSED, FEELING HOPELESS, INSOMNIA, SUICIDAL IDEATIONS, DECREASE IN APPETITE, DECREASE IN ENERGY, LOSS OF INTEREST IN ACTIVITIES THAT HE USED TO ENJOY.

BY MS. MICHAELS:

Q.    SO BASED ON THIS, DID YOU AGREE WITH MS. NOVEY'S INITIAL CONCERN THAT HE WAS SUFFERING FROM DEPRESSION?

A.    YES.

Q.    AND DID YOU, IN FACT, DIAGNOSE HIM WITH MAJOR DEPRESSION?

A.    YES.

Q.    BECAUSE YOU DIAGNOSED HIM WITH MAJOR DEPOSITION, WHAT DID YOU DO AFTER THAT?

311

A.   MY RECOMMENDATION AT THAT POINT WAS TO REFER HIM TO THE PSYCHIATRIST FOR POSSIBLE ANTIDEPRESSANT MEDICATION AND TO PARTICIPATE IN INDIVIDUAL THERAPY.

Q.   AND DID YOU REFER HIM TO DR. CHIOCO?

A.   CHIOCO, YES.

Q.   AND DID DR. CHIOCO PRESCRIBE ANTIDEPRESSANTS?

A.   YES, HE DID.

Q.   AND IS THAT RECORDED IN THE NOTES?

A.   YES, IT IS.

Q.   DO YOU RECALL OFFHAND WHAT KIND OF MEDICATION IT WAS?

A.    IT SAYS HERE TRAZODONE AND ZOLOFT.

Q.   NOW, IN ADDITION TO THE ANTIDEPRESSANTS THAT YOU PRESCRIBED -- OR THAT DR. CHIOCO PRESCRIBED FOR HIM, DID MR. LECROY CONTINUE WITH INDIVIDUAL THERAPY?

A.   YES.

Q.   AND I'M ASSUMING YOU'VE HAD AT THIS POINT A CHANCE TO REVIEW YOUR NOTES PRIOR TO TODAY?

A.   YES.

Q.   CAN YOU DESCRIBE WHAT WERE SOME OF THE ISSUES THAT MR. LECROY HAD.

A.    MR. LECROY HAD A LOT OF ISSUES, A LOT OF IT SURROUNDING HURT FROM PRIOR ABUSE, ABUSE FROM HIS CHILDHOOD; A LOT OF LOW SELF-ESTEEM; A LOT OF INTERPERSONAL RELATIONSHIP PROBLEMS; A LOT OF ANGER, A LOT OF INTENSE ANGER, AS WELL.

Q.   OKAY.  TALKING ABOUT THE INTENSE ANGER, WERE YOU AND/OR HE

312

ABLE TO WORK ON WHERE THE INTENSE ANGER CAME FROM?

A.   A LOT OF THE ANGER WAS A RESULT OF A LOT OF DIFFERENT THINGS.  ONE, I THINK IT WAS A WAY FOR HIM TO COVER UP DEALING WITH AND NOT HAVING TO FEEL SOME OF THE HURT; AND RELATED TO THE ISSUES THAT HAPPENED TO HIM EARLY IN HIS LIFE OR EVEN CURRENT ISSUES THAT WOULD HAPPEN TO HIM, IT WAS EASIER FOR HIM TO BE ANGRY THAN TO FEEL THE HURT.

IN ADDITION, THOUGH, HE HAD A LOT OF INTENSE RAGE AND REVENGEFUL FANTASIES TOWARDS PEOPLE WHO HAD WRONGED HIM IN HIS LIFE.

Q.   IN FACT, I BELIEVE -- AND I'M TRYING TO BE CHRONOLOGICALLY CORRECT.  ON JULY 9TH OF 1999, YOU NOTED THAT HE APPEARS TO BE RELIVING HIS ABUSE AS AN EIGHT-YEAR-OLD EACH TIME HE'S WITH A FEMALE AND APPROACHES THEM SEXUALLY.  AND YOU CONFRONT HIM ABOUT HIS FEELINGS AND HIS ANXIETY ABOUT THOSE SITUATIONS WITH FEMALES.  IS THAT A PART OF THE ANGER THAT YOU'RE TALKING ABOUT?

A.   THAT WOULD CONTRIBUTE TO HIS ANGER.

Q.   OKAY.  NOW, DURING YOUR INDIVIDUALIZED SESSIONS WITH HIM, MR. LECROY DISCUSSED HIS, ON NUMEROUS OCCASIONS DISCUSSED HIS ANGER TOWARDS THE BABYSITTER THAT ABUSED HIM WHEN HE WAS A CHILD.  IS THAT CORRECT?

A.   UH-HUH (AFFIRMATIVE).

Q.   AND PART OF THE ANGER THAT HE DISCUSSED MANIFESTED ITSELF IN REVENGEFUL THOUGHTS?

313

A.   YES.

Q.   AND I BELIEVE THAT YOU MENTIONED HIS NEED TO DEAL WITH THESE REVENGEFUL THOUGHTS.

A.   YES.

Q.   AND HOW DID YOU HANDLE THAT IN THERAPY?

A.   HE WANTED TO CLING TO HIS REVENGEFUL THOUGHTS AND ANGER. HE SEEMED TO NEED THAT AND DIDN'T WANT TO LET GO OF THAT.  AT ONE POINT HE HAD SAID THAT, YOU KNOW, LIFE WITH ALL THIS ANGER AND REVENGE WOULD BE VERY GLOOMY.  AND HE HAD HAD TO DEAL WITH A LOT OF HIS SCARS FROM HIS CHILDHOOD TO LET ALL THAT GO AND HE WANTED TO HANG ONTO, WHICH BECAME AN ISSUE AS FAR AS IN THERAPY BECAUSE IF HE WASN'T WILLING TO GO IN THAT DIRECTION, WE DIDN'T HAVE A LOT TO WORK ON.  AND SO WE SPENT SOME TIME TALKING ABOUT WHY HE HANGS ONTO THOSE AND HIS DESIRE TO MOVE ON.

Q.   I BELIEVE YOU TESTIFIED, THOUGH, AS PART OF THE ANGER, IT RESULTED IN FANTASIES OF REVENGE.

A.   YES.

Q.   AND THE FANTASIES OF REVENGE INVOLVED, I BELIEVE YOU SAID, PEOPLE THAT HAD HURT HIM CURRENTLY OR HAD HURT HIM IN THE PAST.

A.   YES.

Q.   AND THAT INCLUDED NOT ONLY THE BABYSITTER WHO HE CALLED TINKERBELL --

A.   UH-HUH (AFFIRMATIVE).

Q.   -- BUT OTHER INDIVIDUALS?

A.   YES.  WELL, WE DIDN'T GO INTO SPECIFICS ABOUT ANY OF THOSE

314

REVENGEFUL THOUGHTS.  THEY WERE JUST IN GENERAL PEOPLE WHO HAD HURT HIM.

Q.    BUT THE ONE SPECIFIC REVENGEFUL --

A.    WAS THE BABYSITTER.

Q.    -- WAS THE BABYSITTER.

A.    YES.

Q.    NOW, YOU ALSO ADDRESSED ONE OF THE ISSUES REGARDING THE BABYSITTER IN THE NOTES IN DECEMBER 1ST OF 1999 IN WHICH MR. LECROY HAD A NEED -- AND THE WORD HE USED AND I GUESS YOU ALSO USED WAS "SPECIALNESS."  THAT'S TOWARDS THE END OF THE PACKET, DECEMBER 1ST 1999.  AND A PART OF THAT SPECIALNESS WAS WHAT HE FELT FROM OTHERS AND THAT HE HAD A NEED TO FEEL SPECIAL?  FEELING SPECIAL IS THE EQUIVALENT TO FEELING LOVE FOR SOMEONE?

A.    YES.

Q.    OKAY.  NOW, DID HE EVER TALK ABOUT THIS SPECIALNESS IN THE RELATIONSHIP WITH THE BABYSITTER AND THE RELATIONSHIP HE HAD WITH HER?

A.    HE DID TALK ABOUT SOME MIXED FEELINGS WITH THE BABYSITTER.

Q.    NOW, RELATING TO THOSE MIXED FEELINGS REGARDING THE SPECIALNESS AND THE REVENGE, DID HE DISCUSS -- YOU SAID THAT HE, HE NEEDED TO FEEL FOR THE REVENGE TO KEEP GOING.

A.    YES.

Q.    AND DO YOU REMEMBER PUTTING IN YOUR NOTES THAT HE FELT THAT JUSTICE NEEDED IT TO HAPPEN, THE REVENGE?

315

A.    THAT HE WANTED JUST -- THAT IF HE LET GO OF THE REVENGE, THAT HE DIDN'T FEEL LIKE JUSTICE WOULD HAPPEN.

Q.    DID HE TALK ABOUT HOW HE WAS GOING TO GET THE JUSTICE?

A.    NO, WE DIDN'T -- OR AT LEAST NOTHING TO MY RECOLLECTION AS FAR AS ANY SPECIFICS AS FAR AS HOW HE WOULD PLAN OUT A REVENGE.

Q.    SO HE TALKED ABOUT THE NEED TO HAVE REVENGE IN PARTICULAR TO TINKERBELL.

A.    UH-HUH (AFFIRMATIVE).

Q.    BUT HE DID NOT KNOW HOW TO MAKE IT HAPPEN; CORRECT?

A.    HE DIDN'T KNOW HER NAME, JUST KNEW HER NICKNAME OF TINKERBELL, OR WHERE SHE LIVED.

Q.    SO BASICALLY HAD NO WAY TO LOCATE HER.

A.    AT THAT POINT.

Q.    OKAY.  NOW, YOU CONTINUED, I BELIEVE YOU HAD INDIVIDUAL THERAPY SESSIONS WITH HIM FOR ABOUT A YEAR; IS THAT --

A.    APPROXIMATELY.

Q.    AND AT SOME POINT YOU ADVISED HIM UNLESS HE GOT RID OF THAT ANGER, HE WAS NOT GOING TO MAKE IT.

A.    YES.

Q.    AND I'M SAYING MAKE IT, MAKE IT OUT IN THE REAL WORD.

A.    THAT HE WOULD RETURN TO PRISON.

Q.    OKAY.  NOW, WHAT WAS HIS RESPONSE TO THAT?

A.    HE WASN'T VERY HAPPY.  IN FACT, HE WAS ANGRY THAT I HAD MADE THE COMMENT THAT HE WAS AT HIGH RISK OF RETURNING BACK TO PRISON IF HE DIDN'T LET GO OF THE REVENGEFUL THOUGHTS AND DEAL

316

WITH HIS ANGER.

Q.   NOW, AT SOME POINT THERE WAS TWO THINGS CONCERNING HIM. THE FIRST ONE WAS HE DEVELOPED AN INAPPROPRIATE RELATIONSHIP NOT ONLY WITH YOU, BUT WITH MS. NOVEY WHO WAS THE DAP COUNSELOR; IS THAT RIGHT?

A.   I WOULDN'T SAY HE DEVELOPED AN INAPPROPRIATE RELATIONSHIP, BUT HE HAD --

Q.   FEELINGS.

A.   EXACTLY.

Q.   THANK YOU.  AND CAN YOU TELL ME ABOUT -- FIRST OF ALL, IT'S NOT UNUSUAL FOR THOSE IN THERAPY TO HAVE FEELINGS FOR THEIR THERAPIST.  IS THAT RIGHT?

A.   CORRECT.

Q.   AND CAN YOU EXPLAIN WHY.

A.   WHEN YOU'RE IN A THERAPEUTIC RELATIONSHIP, IT IS A RELATIONSHIP, IT IS THERAPEUTIC IN NATURE.  IT'S NOT UNCOMMON, ESPECIALLY IF YOU DON'T HAVE A HISTORY OF HAVING ANYONE CLOSE TO YOU THAT'S LISTENING TO YOU, MAYBE FOR THE FIRST TIME THEY'RE THE ONLY ONES THAT YOU'VE SHARED SOMETHING THAT'S VERY DEEP AND PERSONAL TO YOU.  AND AS YOU'RE SHARING THIS, YOU'RE GOING TO FEEL CLOSER TO THEM; AND IT'S NOT UNCOMMON FOR SOMEBODY TO MISINTERPRET THAT AS LOVE AND COMPASSION AND REALLY WANT THAT RELATIONSHIP TO CONTINUE IN THEIR LIFE.

Q.   BASED ON YOUR REVIEW OF THE RECORDS, INCLUDING DEFENDANT'S EXHIBIT 14, THE P.S.I., YOUR REPORTS FROM MS. NOVEY AND YOUR

317

OWN INDIVIDUALIZED THERAPY SESSIONS WITH MR. LECROY, HE WAS A PERSON THAT CAME FROM THAT BACKGROUND THAT DIDN'T HAVE A LOT OF STABILITY AND AFFECTION?

A.   YES.

MR. MCKINNON:  I OBJECT TO LEADING QUESTIONS.  THIS IS SUBSTANTIVE, EXACTLY WHAT --

THE COURT:  DON'T LEAD THE WITNESS.  I'LL SUSTAIN.

BY MS. MICHAELS:

Q.   WAS MR. LECROY ONE OF THOSE INDIVIDUALS WHO WAS VULNERABLE TO A SITUATION IN WHICH HE WOULD HAVE BEEN SUSCEPTIBLE TO THAT?

MR. MCKINNON:  AGAIN, I THINK THAT'S A LEADING QUESTION.  SHE CAN ASK -- SHE'S TRYING TO ELICIT AN OPINION, AND SHE SHOULD ASK WHAT'S YOUR OPINION ABOUT THE DEFENDANT'S MENTAL STATE OR SOMETHING LIKE THAT.  BUT THESE ARE ALL LEADING QUESTIONS.

THE COURT:  TECHNICALLY, IT IS LEADING.  TRY TO ASK AN OPEN-ENDED QUESTION.

BY MS. MICHAELS:

Q.   WHAT WAS MR. LECROY'S SITUATION SUCH THAT -- WHAT KIND OF PERSON WAS HE IN THIS KIND OF SITUATION THAT WOULD MAKE HIM HAVE INAPPROPRIATE FEELINGS FOR YOU AND MS. NOVEY?

A.    WELL, AS FAR AS IN A THERAPEUTIC RELATIONSHIP WHICH YOU HAD JUST ASKED, THAT THAT'S NOT UNCOMMON FOR SOMEONE TO DEVELOP THAT; AND IT'S MORE LIKELY IF THEY HAVEN'T HAD ANYBODY IN THEIR LIFE AND THAT THIS IS THE FIRST TIME THEY FELT CONNECTED WITH

318

ANYONE.

Q.   AND DID MR. LECROY HAVE THAT KIND OF BACKGROUND WHERE HE DIDN'T HAVE ANYBODY IN HIS LIFE?

A.   I WAS NOT AWARE OF HIM HAVING ANY GOOD RELATIONSHIPS.

Q.   NOW, AT SOME POINT DID MR. LECROY BECOME ELIGIBLE, SO TO SPEAK, TO LEAVE F.C.I. EL RENO TO ANOTHER INSTITUTION?

A.   YES.

Q.   AND WHY WAS THAT?

A.   HIS SECURITY POINTS DROPPED FROM A MEDIUM TO LOW SECURITY.

Q.   AND DID YOU KNOW WHERE HE WAS GOING TO BE SENT?

A.   WENT TO BUTNER.

Q.   AND DID MR. LECROY INDICATE ANY CONCERN ABOUT LEAVING F.C.I. EL RENO?

A.   YES, HE HAD A LOT OF CONCERNS.  ONE, HE HAD DEVELOPED NOT ONLY FRIENDSHIPS WITHIN THE DAP PROGRAM WITH OTHER INMATES, HE WAS CONCERNED ALSO ABOUT ENDING THERAPY AND HOW HE CAN MAKE IT; IF HE STARTED TO HAVE PROBLEMS, YOU KNOW, HE COULDN'T RUN AND FIND ME OR MS. NOVEY TO TALK TO, GOING TO A WHOLE NEW ENVIRONMENT AND RESETTING UP THAT WORRIED HIM.

Q.   NOW, IS THAT BEHAVIOR CONSISTENT WITH SOMEONE WHO SUFFERED FROM MAJOR DEPRESSION?

A.   NOT NECESSARILY.

Q.   HOW ABOUT HIS CONCERNS OF BEING ABANDONED?

A.   YES.

Q.   ALL RIGHT.  NOW, DID HE EXHIBIT CONCERNS OF BEING

319

ABANDONED?

A.   YES.

Q.   AND THAT WAS CONSISTENT WITH A MAJOR DEPRESSION DIAGNOSIS?

A.   NOT FEARS OF ABANDONMENT.  IT'S NOT NECESSARILY CONSISTENT WITH MAJOR DEPRESSION.  IT CAN BE PART OF IT.  IT'S PROBABLY MORE CONSISTENT WITH SOMEONE WITH BORDERLINE TRAITS.

Q.   ALL RIGHT.  NOW, WAS THERE ANYTHING IN YOUR INDIVIDUALIZED THERAPY SESSIONS WITH MR. LECROY OR ANYTHING REPORTED TO YOU BY MS. NOVEY RAISING A RED FLAG THAT MR. LECROY WAS NOT BEING TRUTHFUL OR OPEN WITH YOU OR MS. NOVEY ABOUT HIS BACKGROUND OR WHAT HAD HAPPENED TO HIM?

A.   NOT TO MY RECOLLECTION.

Q.   IF THERE HAD BEEN, WOULD YOU HAVE NOTED THAT IN YOUR NOTES?

A.   YES.

Q.   NOW, YOU'RE FAMILIAR WITH SOMEONE THAT'S BEEN SEXUALLY ABUSED OR THE RAMIFICATIONS OF SOMEONE THAT'S BEEN SEXUALLY ABUSED.

A.   YES.

Q.   WAS THERE ANYTHING -- OR WAS THERE A SIMILAR CONNECTION BETWEEN MR. LECROY'S MAJOR DEPRESSION AND THE CONNECTION BETWEEN BEING A SEXUALLY ABUSED CHILD?

A.   YES.

Q.   WERE YOU ABLE TO HAVE THIS TYPE OF DISCUSSION ABOUT YOUR DIAGNOSIS OF MR. LECROY AND THE RAMIFICATIONS OF YOUR DIAGNOSIS

320

WITH THE ATTORNEYS FROM THE FEDERAL DEFENDER'S OFFICE?

A.   I DON'T BELIEVE WE WENT INTO THAT GREAT DETAIL.

Q.   DID YOU EVER HAVE ANY DISCUSSION OF YOUR DIAGNOSIS WITH MR. LECROY?

A.   WE TALKED ABOUT, WE WENT OVER HIS FILE, WHAT MY THOUGHTS WERE.  I BELIEVE WE DID TALK A LITTLE BIT ABOUT THE COURSE OF TREATMENT WITH THE DEFENSE.

Q.   WHEN YOU SAY COURSE OF TREATMENT, YOU'RE TALKING ABOUT YOUR NOTES.

A.   YEAH -- WELL, AND WHEN THEY CAME TO EL RENO THE FIRST TIME TO LOOK OVER THE RECORDS, AS THEY LOOKED IN THE RECORDS, THEY HAD ASKED SOME GENERAL QUESTIONS ABOUT WHAT WERE YOU TREATING HIM FOR AND THOSE KINDS OF THINGS, YEAH.

Q.   DID THEY EVER DISCUSS WITH YOU THAT THE SYMPTOMS THAT MR. LECROY DISPLAYED WERE CONSISTENT WITH SOMEONE WHO HAD BEEN ABUSED SEXUALLY AS A CHILD?

A.   I DO NOT RECALL.

Q.   DID THEY EVER DISCUSS WITH YOU YOUR DIAGNOSIS OF MAJOR DEPRESSION MAKING HIM MORE VULNERABLE TO BEING IN FURTHER TROUBLE, CRIMINAL TROUBLE?

A.   I DON'T RECALL THAT.

Q.   DID YOU EVER DISCUSS WITH THEM THAT HIS INTENSE EMOTIONS MADE HIM MORE VULNERABLE TO DEVELOP DEPRESSION AND THE BORDERLINE PERSONALITY TRAITS YOU ALLUDED TO EARLIER?

A.   I DO NOT THINK THAT CAME UP.

321

Q.   NOW, WHEN YOU SAY THE BORDERLINE PERSONALITY TRAITS, CAN YOU DESCRIBE WHY YOU FELT THAT MR. LECROY HAD BORDERLINE PERSONALITY TRAITS?

A.   BECAUSE OF HIS INSTABILITY IN HIS MOOD, HIS INSTABILITY IN HIS RELATIONSHIPS, HIS INSTABILITY IN HIS SELF-IMAGE.

Q.   NOW, YOUR DIAGNOSIS WAS MAJOR DEPRESSION.

A.   YES.

Q.   NOT BORDERLINE PERSONALITY.

A.   YES.

Q.   COULD YOU HAVE PUT A BORDERLINE PERSONALITY TRAIT DIAGNOSIS ON YOUR REPORT?

A.   I MIGHT COULD HAVE AT THAT TIME.  I KNOW I SAW THE TRAITS. MY FOCUS AND TREATMENT AT THAT TIME WAS MAJOR DEPRESSION.

Q.   OKAY.  NOW, AT SOME POINT AFTER HE WENT TO F.C.I. EL RENO, WERE YOU EVER ABLE TO REVIEW SOME OF HIS RECORDS AT F.C.I. EL RENO, SOME OF THE NOTES?

A.   ARE YOU TALKING ABOUT BUTNER?

Q.   YOU KNOW, BUTNER, I'M SORRY, YOU'RE RIGHT, BUTNER.  THANK YOU.  I WAS WONDERING WHY YOU LOOKED SO CONFUSED.

I'M GOING TO SHOW YOU WHAT'S BEEN MARKED AS DEFENDANT'S EXHIBIT 16.  ASKING THE QUESTION PROPERLY, WERE YOU EVER ABLE TO REVIEW SOME OF THE NOTES FROM MR. LECROY AT BUTNER?

A.   THE ONES THAT WERE ON OUR ELECTRONIC PSYCHOLOGY DATABASE SYSTEM, YES.

Q.   OKAY.  AND HAVE YOU, IN FACT, REVIEWED THOSE?

322

A.   YES.

Q.   AND IF YOU LOOK AT DEFENDANT'S EXHIBIT 16, ARE THOSE THE NOTES THAT YOU WOULD BE ABLE TO SEE ON YOUR ELECTRONIC REPORTING SYSTEM?

A.   YES.

        MS. MICHAELS:  YOUR HONOR, I WOULD MOVE IN DEFENDANT'S EXHIBIT 16.

        THE COURT:  ANY OBJECTION?

        MR. MCKINNON:  NONE.

        THE COURT:  IT'S ADMITTED.

BY MS. MICHAELS:

Q.   DR. CARLSON, DID YOU REVIEW THESE, IN FACT?

A.   YES.

Q.   AND WAS THERE ANYTHING -- FIRST OF ALL, WHEN HE LEFT, MR. LECROY LEFT F.C.I. EL RENO, WHAT WAS THE STATUS OF HIS COUNSELING?

A.   WELL, WE WERE TERMINATING COUNSELING.  ONE REASON WAS BECAUSE HE WAS LEAVING; AND HE WAS DOING BETTER AS FAR AS HIS DEPRESSIVE SYMPTOMS, THAT THEY HAD DECREASED.  AND HE WAS AT LEAST HEADING IN A DIRECTION TOWARDS WORKING ON HEALING IN HIS LIFE, BUT HE STILL NEEDED FURTHER WORK BUT HE WAS HEADING IN A GOOD DIRECTION.

Q.   WHEN HE WAS AT F.C.I. EL RENO, DID HE HAVE BEHAVIOR PROBLEMS?

A.   AT EL RENO, NO.

323

Q.   DID HE HAVE VIOLENT CONFRONTATIONS WITH OTHER INMATES?

A.   NO.

Q.   IN FACT, WAS HIS GOOD BEHAVIOR ONE OF THE REASONS HE WAS ABLE TO BE MOVED TO BUTNER?

A.   YES.

Q.   NOW, AFTER REVIEWING THE NOTES IN DEFENDANT'S EXHIBIT 16, JUST SORT OF TO BE CLEAR, THESE ARE NOTES PREPARED BY OTHER MENTAL HEALTH PROFESSIONALS?

A.   YES.

Q.   WHAT DID YOU, WHAT DID YOU NOTICE?

A.   AGAIN, THEY ARE NOT MY NOTES, BUT I DID NOTICE THAT ONE OF THE THINGS AS PART OF RESIDENTIAL DRUG ABUSE PROGRAM, THE SECOND PART OF THAT IS PARTICIPATING IN AFTERCARE; SO THAT'S WHAT HE PARTICIPATED IN BUTNER WAS AFTERCARE AT LEAST ONCE A MONTH.  AND SO IT LOOKED LIKE ONCE HE GOT TO BUTNER, THAT THAT IS WHAT HE WAS DOING.

IN FACT, IT LOOKED LIKE HE HAD A LITTLE BIT OF DIFFICULTY IN THE TRANSITION AT ONE FACILITY, AT ATLANTA.

Q.   I HAVE A QUESTION.  LET ME STOP YOU RIGHT THERE, DR. CARLSON.  WHEN MR. LECROY CAME TO ATLANTA, HE HAD TO FILL OUT ANOTHER INTAKE FORM; IS THAT RIGHT?

A.   HE SHOULD HAVE, YES.

Q.   AND THEN AN ADDITIONAL ONE WHEN HE CAME TO BUTNER.

A.   YES.

Q.   AND THESE ARE JUST STANDARD FORMS THAT INMATES FILL OUT?

324

A.   YES, UH-HUH (AFFIRMATIVE).

Q.   ALL RIGHT.  AND I'M SORRY, I INTERRUPTED YOU.  YOU SAID HE HAD SOME ISSUES IN ATLANTA?

A.   YES, AS FAR AS JUST, I LOOKED AT JUST ADJUSTMENT ISSUES AND I SEE TRANSITIONING TO A NEW FACILITY.  BUT ONCE HE GOT TO BUTNER, WHAT IT LOOKS LIKE IS THAT HE GOT INVOLVED IN AFTERCARE SERVICES AND WAS DOING WELL AND PARTICIPATING, DOING OTHER THINGS OTHER THAN AFTERCARE THAT SEEMED TO BE BENEFICIAL TO HIM.

HOWEVER, THERE WAS AT SOME POINT HE STARTED GOING -- DECOMPENSATING AS FAR AS SOME OF HIS BEHAVIORAL ISSUES.  IT LOOKED LIKE HE MAY HAVE GOTTEN SOME BAD NEWS, A LOT OF CONCERNS ABOUT HIS RELEASE COMING UP.  I DON'T KNOW IF HE GOT -- AGAIN, THIS IS, A LOT OF THIS IS SPECULATION FROM WHAT I CAN TELL IN THE NOTES, THAT HE HAD GOTTEN A LOT OF BAD NEWS RELATED TO HIS RELEASE.  AND IT LOOKED LIKE HE JUST GAVE UP AND WANTED TO QUIT THERAPY AND DEFINITELY HEADING IN A DIFFERENT DIRECTION.

Q.   SO THE --

A.   A LOT MORE ANGER SHOWED BACK UP.

Q.   SO THE ANGER ISSUES DID NOT GO AWAY --

A.   NO.

Q.   -- AFTER BUTNER.  AND WERE YOU ABLE TO SEE WHETHER THE REVENGE ISSUES ALSO CAME OUT AGAIN AT BUTNER?

A.   I CANNOT RECALL WHETHER THE REVENGE.  I REMEMBER THE ANGER CAME OUT.

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

325

Q.   NOW, WERE YOU ABLE TO HAVE -- WERE YOU ABLE TO GIVE YOUR OPINION ON ANY OF THE MATTERS OF YOUR DIAGNOSIS AT TRIAL?

A.   NO.

Q.   WERE YOU EVER EXPLAINED WHY YOU COULD NOT?

A.   NO.

Q.   WERE YOU SUBPOENAED TO TRIAL?

A.   YES.

Q.   AND BY BOTH THE DEFENSE AND THE GOVERNMENT?

A.   YES.

        MS. MICHAELS:  COULD I LOOK FOR AN EXHIBIT UP THERE, YOUR HONOR?

        THE COURT:  YES.

BY MS. MICHAELS:

Q.   I'M GOING TO SHOW YOU WHAT'S BEEN MARKED PREVIOUSLY AS GOVERNMENT'S EXHIBIT 86.  I'D LIKE TO BRING YOUR ATTENTION TO QUESTION 6(B).  IS IT COMMON FOR PEOPLE WHO HAVE BEEN SEXUALLY ABUSED TO NOT SAY THEY HAVE BEEN SEXUALLY ABUSED ON EVERY INTAKE FORM?

A.   I WON'T SAY IT'S COMMON.  I WOULD SAY THAT THAT WOULDN'T SURPRISE ME THAT THEY WOULD DO THAT, YES.

Q.   ALL RIGHT.  AND BRINGING YOUR ATTENTION TO GOVERNMENT'S EXHIBIT 85, SPECIFICALLY DOWN AT QUESTION NUMBER SEVEN WHERE MR. LECROY DENIES SEXUAL ABUSE, IS THAT -- IS IT UNUSUAL FOR VICTIMS OF SEXUAL ABUSE TO DENY THEY HAVE BEEN SEXUALLY ABUSED?

A.   I'M SORRY, WHICH NUMBER?

326

Q.    I THINK IT'S 7(B) AT THE VERY BOTTOM OF THE PARAGRAPH.

MS. MICHAELS:  MAY I APPROACH, YOUR HONOR?

THE COURT:  YES.

BY MS. MICHAELS:

Q.    WHERE IT SAYS DENIES SEXUAL ABUSE.

A.    I'M SORRY, WHAT WAS YOUR QUESTION AGAIN?

Q.    THE QUESTION IS IS IT UNUSUAL FOR INMATES TO DENY THEY'VE BEEN SEXUALLY ABUSED?

A.    IT'S NOT UNUSUAL, NO.

MS. MICHAELS:  IF I COULD HAVE JUST ONE MINUTE, PLEASE, YOUR HONOR.

(DISCUSSION OFF THE RECORD.)

BY MS. MICHAELS:

Q.    IN YOUR DEALINGS WITH MR. LECROY AS HIS THERAPIST AND IN INDIVIDUAL COUNSELING SESSIONS, WERE YOU EVER FEARFUL OF MR. LECROY?

A.    NO.

Q.    AND AS A LAW ENFORCEMENT OFFICER, DID MR. LECROY DO WELL IN THE STRUCTURED ENVIRONMENT AT F.C.I. EL RENO?

A.    YES.

Q.    IF YOU HAD BEEN CALLED AS A WITNESS AT TRIAL TO TESTIFY AS TO YOUR OPINION AS AN EXPERT, WOULD YOUR TESTIMONY THEN HAVE BEEN ANY DIFFERENT THAN IT IS TODAY?

A.    NO.

Q.    AND ARE YOU FAMILIAR WITH THE ACTUAL PHYSICAL -- WHEN

327

INMATES ARE FILLING OUT THE INTAKE FORMS WHEN THEY FIRST ARRIVE, DO YOU KNOW IF IT'S IN A LARGE ROOM WITH OTHER INMATES THEY'RE FILLING THEM OUT ON A PIECE OF PAPER?

A.    IT WOULD VARY FROM INSTITUTION TO INSTITUTION.  AND FOR SOME OF THEM, IT WOULD BE DOWN IN THE PSYCHOLOGY DEPARTMENT. OTHER TIMES, IT JUST DEPENDS UPON IF THEY'RE IN HOLDOVER OR IF THEY'RE ACTUALLY GOING TO BE STAYING THERE FOR AWHILE.  IT VARIES.

Q.    SO IT'S POSSIBLE THAT THE INTAKE FORMS ARE FILLED OUT AMONG A LARGE GROUP OF PEOPLE?

A.    IT COULD BE.

Q.    OR INDIVIDUALLY.

A.    YES.

        MS. MICHAELS:  I BELIEVE THAT'S ALL I HAVE, YOUR HONOR.

        THE COURT:  LET'S TAKE ABOUT A TEN-MINUTE BREAK AND THEN WE'LL CROSS-EXAMINE.

        (PROCEEDINGS WERE IN RECESS.)

        THE COURT:  MR. MCKINNON, YOU MAY PROCEED.

                    CROSS-EXAMINATION

BY MR. MCKINNON:

Q.    DR. CARLSON, DO YOU HAVE DEFENDANT'S EXHIBIT 15 IN FRONT OF YOU?

A.    YES.

Q.    IF YOU WOULD TURN TO THE SECOND PAGE OF THAT EXHIBIT.

328

THIS WOULD BE THE PSYCHOLOGY SERVICES INTAKE SCREENING SUMMARY THAT YOU PREPARED UPON MR. LECROY'S ARRIVAL AT EL RENO; CORRECT?

A.   CORRECT.

Q.   AND THE DATE OF THIS EXAMINATION OR INTAKE REPORT IS JANUARY THE 27TH, 1988 (SIC)?

A.   CORRECT.

Q.   AND YOU ACTUALLY PREPARED THIS REPORT; IS THAT RIGHT?

A.   YES.

Q.   YOU DID A MENTAL STATUS EXAMINATION OF THE DEFENDANT WHEN HE ARRIVED AT EL RENO?

A.   YES.

Q.   AND YOUR CONCLUSION WAS THAT DURING THE SCREENING INTERVIEW, NO MENTAL STATUS ITEMS WERE NOTEWORTHY; IS THAT CORRECT?

A.   CORRECT.

Q.   WHAT DOES THAT MEAN IN LAYMEN'S TERMS?

A.   THAT MEANS I HAD NO SERIOUS CONCERNS ABOUT HIS ABILITY TO FUNCTION ON THE COMPOUND FROM A MENTAL HEALTH STANDPOINT.

Q.   AND THEN IN THE COMMENT SECTION OF YOUR REPORT, YOU NOTED THAT:  DURING THE INTERVIEW HE -- MEANING THE DEFENDANT -- WAS ALERT AND READILY RESPONSIVE.  HE RELATED IN A PLEASANT, FRIENDLY AND POLITE MANNER.  NO SIGNIFICANT MENTAL HEALTH PROBLEMS WERE NOTED OR REPORTED.

A.   CORRECT.

329

Q.   SO THOSE WOULD BE YOUR OBSERVATIONS OF HIM IN JANUARY OF 1998.

A.   CORRECT.

Q.   AND ALSO ON JANUARY THE 23RD, 1998, DR. DANAHER -- IS DR. DANAHER A PSYCHIATRIST?  THAT WOULD BE THE FIRST PAGE OF DEFENDANT'S EXHIBIT --

A.   HE'S A PSYCHOLOGIST.

Q.   A PSYCHOLOGIST, AS WELL?

A.   UH-HUH (AFFIRMATIVE).

Q.   AND HE NOTED FROM HIS INTERVIEW OF THE DEFENDANT THAT THE DEFENDANT DENIED SIGNIFICANT DEPRESSIVE SYMPTOMS.  DO YOU SEE THAT IN THE --

A.   ON THE 23RD?  ON THE 23RD?

Q.   ON THE 23RD; CORRECT.

A.   YES.

Q.   AND HE ALSO SAID:  THIS INDIVIDUAL DOES NOT PRESENTLY MEET THE CRITERIA FOR M.D.S. DUTY.  WHAT IS M.D.S. DUTY?

A.   MEDICAL DUTY STATUS.  BASICALLY, THAT'S SOMEBODY WHO IS FUNCTIONING VERY POORLY WITH A G.A.F. OF 40 BELOW.  THEY WOULD NOT -- THEY WOULD BE SIGNIFICANTLY HAVING MENTAL HEALTH SYMPTOMS SO IT WOULD BE SIGNIFICANTLY INTERFERING WITH THEIR ABILITY TO FUNCTION ON A DAY-TO-DAY LEVEL.

Q.   AND HE ALSO SAYS OR M.M.I. MONITORING.  WHAT'S M.M.I. MONITORING?

A.   MONITORING THE MENTALLY ILL, SERIOUS MENTAL ILLNESS.

330

Q.   SO BASED ON YOUR OBSERVATIONS IN JANUARY OF 1998, YOURS AND DR. DANAHER'S, YOU DIDN'T SEE ANY REASON TO SUSPECT THAT MR. LECROY PRESENTED ANY PSYCHOLOGICAL PROBLEMS.

A.   NOTHING THAT WOULD INTERFERE WITH HIS ABILITY TO FUNCTION ON A DAY-TO-DAY BASIS, CORRECT.

Q.   RIGHT.  AND IT WASN'T UNTIL A YEAR LATER, FEBRUARY OF 1999 THAT THE REFERRAL WAS MADE FROM THE RDAP COUNSELOR THAT MR. LECROY WAS EXHIBITING SOME DEPRESSIVE SYMPTOMS; IS THAT RIGHT?

A.   CORRECT.

Q.   AND IF YOU LOOK AT FEBRUARY THE 5TH, 1999, THAT WOULD BE YOUR FIRST INDIVIDUAL THERAPY SESSION WITH HIM.  IS THAT CORRECT?

A.   CORRECT.

Q.   AND IN THIS CONVERSATION -- NOW, MR. LECROY HAS BEEN INVOLVED IN THE DRUG COUNSELING --

A.   UH-HUH (AFFIRMATIVE).

Q.   -- PRIOR TO FEBRUARY OF 1999, BUT HE HAD NOT GOTTEN ANY KIND OF MENTAL HEALTH COUNSELING OR SCREENING BETWEEN JANUARY OF '98 AND FEBRUARY OF '99.

A.   WELL, DRUG ABUSE IS MENTAL HEALTH.  I'M NOT QUITE SURE --

Q.   WELL, OTHER THAN DRUG ABUSE, HE HAD NOT GOTTEN ANY COUNSELING SERVICES --

A.   RELATED TO --

Q.   -- REGARDING DEPRESSION OR PERSONALITY DISORDERS OR

331

ANYTHING LIKE THAT.

A.    NO, NOT THAT THAT DOESN'T COME UP SOMEWHAT IN DRUG ABUSE COUNSELING; BUT NOTHING OF A SERIOUS NATURE, NO.

Q.    AND AT THE BEGINNING -- AND IT'S IN FEBRUARY THAT YOU THEN BEGIN TO SEE HIM ON A REGULAR BASIS FOR BASICALLY THE REST OF 1999; CORRECT?

A.    CORRECT.

Q.    AND IT'S IN THE SUMMER OF 1999 IN PARTICULAR THAT YOU HAD A NUMBER OF CONVERSATIONS WITH MR. LECROY ABOUT HIS ANGER AND HIS REVENGEFUL THOUGHTS TOWARD PEOPLE WHO HAD ABUSED HIM IN THE PAST; CORRECT?

A.    I REMEMBER THOSE.  I'D HAVE TO LOOK AT THE SPECIFIC TIME LINES; BUT, YES, THERE WAS A POINT IN THERAPY THAT WE DID TALK ABOUT THAT, YES.

Q.    IF YOU LOOK AT JULY 27TH, YOU CLEARLY TALK ABOUT IT ON JULY THE 27TH OF 1999.  I THINK MY PACKET IS IN CHRONOLOGICAL ORDER.  THE PAGES AREN'T NUMBERED, BUT YOU SHOULD BE ABLE TO FIND IT IN CHRONOLOGICAL ORDER.

A.    I'M SORRY, JULY WHAT?

Q.    27TH.

A.    YES.

Q.    AND HE TOLD YOU THAT HE HAD REVENGEFUL THOUGHTS SINCE LATE PUBERTY, HE CONTINUES TO SEE HIS WORLD AS BEING GOOD OR EVIL; CORRECT?

A.    CORRECT.

332

Q.   AND IT WAS THIS KIND OF FACTUAL TESTIMONY THAT YOU WERE ALLOWED TO GIVE AT THE JURY TRIAL OF MR. LECROY BACK IN 2004; CORRECT?

A.   EVERY NOTE WAS GONE OVER, YES.

Q.   YOU WENT THROUGH EVERY NOTE AND YOU RECOUNTED THINGS THAT MR. LECROY HAD TOLD YOU; CORRECT?

A.   WE TALKED ABOUT SPECIFICALLY WHAT WAS IN THE NOTE.

Q.   RIGHT.

A.   BUT NOT IN ANY DETAIL.

Q.   RIGHT.  BUT WHAT WAS IN THE NOTE MEANT THINGS THAT MR. LECROY WAS TELLING YOU AT THE TIME; CORRECT?

A.   UH-HUH (AFFIRMATIVE).

Q.   AND COMMENTS THAT YOU WOULD MAKE BACK TO HIM; CORRECT?

A.   I DON'T REMEMBER SPECIFICS THAT WE DISCUSSED ABOUT, BUT I JUST KNOW THAT THIS WAS GONE THROUGH, YES.

Q.   AND, IN FACT, IF YOU LOOK OVER TO YOUR NEXT NOTE, AUGUST THE 10TH OF 1999, AND, AGAIN, YOU TALKED ABOUT HIM HAVING JUSTIFICATION FOR RETALIATION.  AND THAT'S THE CONVERSATION WHERE YOU TOLD HIM THAT HE'S AT A HIGH RISK FOR RETURNING TO PRISON.

A.   YES.

Q.   WHY DID YOU TELL HIM THAT -- WHY DID YOU BELIEVE AT THAT TIME THAT HE WAS AT A HIGH RISK FOR RETURNING TO PRISON?

A.   BECAUSE OF THE INTENSE ANGER THAT HE WAS HAVING, THE REVENGEFUL FANTASIES THAT HE WAS HAVING, AND THE DESIRE TO HANG

333

AND CLING ONTO THOSE AND NOT WANT TO GET RID OF THEM, YES.

Q.    AND YOU DIDN'T DISCUSS WITH HIM SPECIFICALLY WHAT CRIME HE MIGHT COMMIT THAT MIGHT CAUSE HIM TO END UP BACK IN PRISON. YOU JUST BELIEVED BECAUSE OF THOSE FEELINGS THAT HE HAD THAT HE WAS EXPRESSING TO YOU THAT THAT WOULD CAUSE HIM TO ACT OUT IN SOME CRIMINAL FASHION AND HE'D END UP BACK IN PRISON.

A.    WITH THAT LINE OF THINKING, THAT WOULD BE -- THAT MADE HIM AT HIGH RISK OF RETURNING BACK TO PRISON, YES.

Q.    AND THAT'S AN OPINION THAT YOU HAD BACK IN 1999.

A.    CORRECT.

Q.    NOW, IF YOU LOOK OVER TO AUGUST THE 24TH, WHICH I THINK IS THE SECOND PAGE OVER FROM AUGUST THE 10TH THAT WE JUST TALKED ABOUT, AT THE END OF THAT NOTE, YOU SAY THAT YOU DISCUSSED HOW THE DEFENDANT WAS AT A CROSSROADS IN HIS LIFE.

A.    YES.

Q.    BETWEEN A REVENGEFUL LIFE AND A PEACEFUL LIFE.

A.    CORRECT.

Q.    AND BETWEEN THIS TIME AND THE TIME THAT YOU STOPPED SEEING HIM BECAUSE HE WAS TRANSFERRED TO BUTNER, YOU FELT LIKE HE HAD -- WAS MAKING PROGRESS ON DEALING WITH HIS ANGER AND HIS REVENGEFUL THOUGHTS.

A.    YEAH.  I THINK HE HAD MADE A DECISION, BECAUSE AT THIS POINT HE HAD NOT DECIDED WHETHER HE EVEN WANTED TO GET RID OF HIS REVENGEFUL THOUGHTS AND HIS ANGER, WHICH WE COULDN'T REALLY GO FURTHER ON IN THERAPY UNTIL HE REALLY MADE THAT CHOICE.  AND

334

HE WAS GOING BACK AND FORTH, WEIGHING THE PROS AND CONS RIGHT THERE ON THE FENCE.  AND DURING THE COURSE OF THERAPY, HE HAD MADE THAT DECISION, OKAY, I WANT TO MOVE IN THE DIRECTION OF GETTING RID OF THE REVENGE AND DEALING WITH THE ANGER.

Q.   SO YOUR ADDITIONAL THERAPY SESSIONS, YOU FELT LIKE YOU WERE MAKING PROGRESS WITH THE DEFENDANT AND HIS ANGER MANAGEMENT AND REVENGEFUL FEELINGS.

A.   YES, MAKING PROGRESS, YES.

Q.   SO BY THE TIME HE LEFT EL RENO IN DECEMBER OR JANUARY, EARLY 2000, YOU FELT LIKE THERE HAD BEEN A PROGRESSION IN HIS ABILITY TO COPE WITH HIS ANGER AND REVENGEFUL THOUGHTS FROM WHEN YOU HAD THESE CONVERSATIONS IN JULY AND AUGUST OF 2000 -- OR 1999.

A.   YEAH, THERE WAS SOME PROGRESSION, YES.

Q.   NOW, YOU DIDN'T SEE HIM AGAIN AFTER HE LEFT EL RENO; CORRECT?

A.   CORRECT.

Q.   BUT YOU HAVE GONE BACK AND LOOKED AT THE NOTES FROM THE SESSIONS THAT HE HAD WITH PEOPLE SIMILAR IN YOUR POSITION AT BUTNER; CORRECT?

A.   CORRECT, THE NOTES FROM -- THAT ARE ON OUR PSYCHOLOGY DATA SYSTEM, YES.

Q.   AND SPECIFICALLY, THE REASON HE WAS TRANSFERRED TO BUTNER IS BECAUSE HIS SECURITY CLASSIFICATION WAS REDUCED --

A.   RIGHT.

335

Q.   -- AND HE WAS PROJECTED TO BE RELEASED SOMETIME IN THE NOT TOO DISTANT FUTURE; CORRECT?

A.   CORRECT.

Q.   AND JUST TO BE CLEAR, DEFENDANT'S EXHIBIT 16 ARE NOTES OF OTHER MENTAL HEALTH PROFESSIONALS AT BUTNER WHO SAW THE DEFENDANT DURING 2000.

A.   YEAH, AND ONE FROM ATLANTA.

Q.   AND ONE FROM ATLANTA.

A.   YES.

Q.   NOW, LET ME GET YOU TO TURN OVER -- AND YOU'VE READ THROUGH ALL THESE NOTES; CORRECT?

A.   YES.

Q.   AND YOU READ THROUGH THE NOTES WITH AN EYE TOWARD WHAT; WHY DID YOU READ THROUGH THE NOTES?

A.   THIS TIME OR BACK THEN?  I MEAN, IN GENERAL?

Q.   WELL, WHEN DID YOU FIRST READ THE NOTES FROM BUTNER?

A.   WHEN I WAS CONTACTED FROM THE DEFENSE ATTORNEY ABOUT HE HAD GOTTEN OUT AND COMMITTED A NEW CRIME, MY CURIOSITY WAS WHAT WENT WRONG, HOW DID HE -- YOU KNOW, HE WAS HEADING IN A DIRECTION OF WANTING TO, YOU KNOW, IMPROVE HIS LIFE AND SOMETHING, OBVIOUSLY, GOT HIM BACK ON THE OTHER PATH; AND I WAS JUST CURIOUS AS TO WHAT WAS HAPPENING AT BUTNER.  THAT WAS THE FIRST TIME I READ OVER THOSE NOTES.

Q.   OKAY.  AND THEN YOU'VE ALSO REVIEWED THEM IN ANTICIPATION OF YOUR TESTIFYING HERE TODAY; IS THAT CORRECT?

336

A.   CORRECT.

Q.   AND IN READING OVER THE NOTES FROM BUTNER, WHAT CONCLUSIONS DID YOU DRAW ABOUT THE PROGRESS OF HIS ABILITY TO DEAL WITH THE ANGER AND THE REVENGEFUL THOUGHTS THAT HE HAD INDICATED TO YOU BACK WHEN HE WAS IN EL RENO?

A.   OF COURSE, TAKING INTO CONSIDERATION I'M JUST GOING BY WHAT'S ON HERE AND I DON'T KNOW THE SPECIFICS OR IF THEY'VE INCLUDED EVERYTHING DOWN HERE, SO I'M JUST DRAWING ON WHAT'S IN HERE.

Q.   CORRECT.

A.   BUT IT LOOKS AS THOUGH AT SOME POINT HIS ANGER, WHILE HE NEVER GOT RID OF HIS ANGER, HE WAS DOING BETTER AT DEALING WITH IT, IT ALL RETURNED; AND HE WAS VERY ANGRY AGAIN, WANTING TO QUIT THERAPY, AND WAS DEFINITELY NOT HEADING IN THE DIRECTION HE WAS HEADING WHEN HE HAD LEFT EL RENO.

Q.   IN FACT, HE HAD REGRESSED BACK TO THE KIND OF ANGER AND THE KIND OF ISSUES THAT YOU HAD SEEN WHILE HE WAS AT EL RENO BEFORE HE DECIDED THAT HE WAS GOING TO TRY TO CHOOSE A PEACEFUL LIFE.

A.   IT APPEARS AS THOUGH.   I CAN'T SAY FOR SURE; BUT FROM THE NOTE, IT APPEARS AS THOUGH HE WAS SHOWING THAT, YES.

Q.   LET ME GET YOU TO LOOK SPECIFICALLY AT THE NOTE FOR NOVEMBER 14TH, 2000.   DO YOU HAVE IT?

A.   YEAH.

Q.   AND IN THE SECOND PARAGRAPH, DR. GRANT AT BUTNER WROTE:

337

THE DEFENDANT, HE HARBORS MUCH ANGER TOWARDS HIS FATHER FOR THE ABUSE DURING HIS CHILDHOOD AND BELIEVES THAT HE IS GOING TO DOMINATE HIS RELATIONSHIP WITH HIS FATHER WHEN HE IS RELEASED.

SO, AGAIN, THAT'S THE KIND OF ANGER THAT THE DEFENDANT IS NOW TALKING ABOUT THAT'S SIMILAR TO THE KIND OF ANGER THAT HE HAD WHEN YOU WERE SEEING HIM?

A.    ON THE SECOND PARAGRAPH, YOU SAID?

Q.    YES, I'M LOOKING AT NOVEMBER 14TH.

A.    I THOUGHT YOU SAID JUNE 14TH.  I'M ON THE WRONG PAGE. DECEMBER 14TH?

Q.    NOVEMBER.

A.    NOVEMBER 14TH.  I'M SORRY, CAN YOU REPEAT THE QUESTION?

Q.    I'M JUST ASKING YOU TO LOOK AT THE NOTE WHERE IT SAYS:  HE HARBORS MUCH ANGER TOWARDS HIS FATHER FOR ABUSE DURING HIS CHILDHOOD.

AGAIN, HE'S TALKING ABOUT BEING ANGRY AGAIN --

A.    YES.

Q.    -- TO PEOPLE WHO HAVE ABUSED HIM IN THE PAST.

A.    YES.

Q.    AND IT'S THE SAME KIND OF ANGER THAT HE TALKED ABOUT WHEN HE WAS TALKING ABOUT BEING REVENGEFUL TOWARD PEOPLE WHO ABUSED HIM WHEN YOU WERE DEALING WITH HIM IN JULY OF 2009.

A.    YES.

Q.    AND, IN FACT, IT'S THAT SAME KIND OF ANGER THAT HE'S EXPRESSING IN NOVEMBER 2000 THAT CAUSED YOU TO MAKE THE COMMENT

338

TO HIM THAT HE'S AT A HIGH RISK FOR RETURNING TO PRISON;
CORRECT?

A.    DRAWING THAT CONCLUSION FROM JUST WHAT IS WRITTEN HERE,
YES.

Q.    LOOKS LIKE HE'S RECYCLED BACK TO WHERE HE WAS IN THE
SUMMER OF 2000 -- OF 1999 WHEN YOU WERE TREATING HIM.

A.    YES.

Q.    AND IT LOOKS LIKE HE'S BACK IN THE SAME PLACE WHERE HE WAS
THAT CAUSED YOU WHEN YOU SAID YOU'RE AT A HIGH RISK OF
RETURNING TO PRISON; CORRECT?

A.    LOOKS LIKE A LOT OF THOSE ISSUES HAD RESURFACED, YES.

Q.    THEN IF YOU LOOK AT THE NOTE ON DECEMBER 5TH, 2000, AND AT
THIS STAGE HE'S GETTING CLOSE TO BEING RELEASED FROM BUTNER;
CORRECT?

A.    I DON'T REMEMBER EXACTLY, BUT I THINK HE IS GETTING CLOSE,
YES.

Q.    AND, IN FACT, IT'S TALKING ABOUT WHAT HIS PLANS ARE UPON
RELEASE; CORRECT?

A.    YES.

Q.    AND HE'S WORRIED, HE'S EXPERIENCING SOME ADJUSTMENT
PROBLEMS THESE PAST FEW MONTHS PRIMARILY DUE TO HIS WORRY ABOUT
RELEASE PLANS.

A.    YES.

Q.    CORRECT?

A.    UH-HUH (AFFIRMATIVE).

339

Q.   AND THEN THE NEXT SESSION, DECEMBER THE 7TH, THE NEXT NOTE IN THE SECOND PARAGRAPH, THE DEFENDANT -- THE NOTE IS THAT HE APPEARS TO BE HAVING A GREAT DEAL OF TROUBLE COPING WITH HIS UPCOMING RELEASE; CORRECT?

A.   THAT'S WHAT IT SAYS.

Q.   AND THEN ALSO IN THE TOP PARAGRAPH, AGAIN, IT'S TALKING ABOUT ANGER MANAGEMENT AND CLARIFICATION ABOUT HIS RELEASE PLANS.

A.   CORRECT.

Q.   FINALLY, THE LAST NOTE IS JANUARY THE 29TH, 2000 (SIC). AND DR. FREEMAN, WHO'S THE CHIEF PSYCHOLOGIST AT BUTNER, NOTED THAT MR. LECROY WAS IN A VERY SULLEN MOOD DURING THAT DAY'S SESSION; CORRECT?

A.   THE 29TH, 2001?

Q.   YES.

A.   YES.

Q.   THAT HE WAS FEELING NEGATIVE, MORE AND MORE NEGATIVE ABOUT HIS PROSPECTS AFTER RETURNING TO THE COMMUNITY AND THAT HE WAS GOING TO END UP GOING BACK TO WORK FOR HIS FATHER AND BE A SLAVE TO THE GRIND.

A.   CORRECT.

Q.   AND THEN THAT'S THE END OF NOTES FROM BUTNER; CORRECT?

A.   THERE'S ONE MORE ON THE 29TH.

Q.   IT JUST SAYS TERMINATION OF TREATMENT; CORRECT?

A.   YEAH.  IT'S JUST KIND OF MORE OF A SUMMARY.

340

Q.   AND THAT WOULD INDICATE, THE FACT THAT THIS NOTE IS TERMINATION OF TREATMENT, THAT WOULD INDICATE THAT AFTER JANUARY THE 29TH OF 2001, MR. LECROY WAS GETTING NO TREATMENT SERVICES AT F.C.I. BUTNER.

A.   I WOULD JUST SAY NONE THAT'S DOCUMENTED.  THAT'S ALL I CAN SAY.

Q.   AND THEN THERE'S NOTHING ELSE IN THE EXHIBIT THAT WAS GIVEN TO YOU; CORRECT?

A.   CORRECT.

Q.   SO THAT WOULD LEAD TO THE ASSUMPTION THAT HE GOT NO SERVICES FROM, AT LEAST TREATMENT SERVICES FROM THE PSYCHOLOGY STAFF AT THE BUREAU OF PRISONS BETWEEN JANUARY THE 29TH AND HIS RELEASE FROM, FINAL RELEASE FROM FEDERAL CUSTODY IN AUGUST OF 2001.

A.   NONE THAT'S DOCUMENTED.

Q.   AND YOU DON'T THEN HAVE ANY WAY TO KNOW WHAT HIS MOOD WAS, HOW HE WAS DEALING WITH ANGER, HOW HE WAS DEALING WITH HIS ANXIETY OVER BEING RELEASED BACK INTO THE COMMUNITY DURING THAT TIME FRAME, DO YOU?

A.   NO.

Q.   THANK YOU.

         MR. MCKINNON:  THAT'S ALL THE QUESTIONS I HAVE, YOUR HONOR.

         THE COURT:  REDIRECT?

         MS. MICHAELS:  YES, SIR.

341

REDIRECT EXAMINATION

BY MS. MICHAELS:

Q.   DR. CARLSON, WHEN MR. LECROY WAS FIRST RECEIVED AT F.C.I.

EL RENO AND HE INDICATED, I BELIEVE, ON THAT REPORT THAT --

JUST A MINUTE, SORRY.

        MS. MICHAELS:  MAY I APPROACH, YOUR HONOR?

        THE COURT:  YOU MAY.

        MS. MICHAELS:  AND, YOUR HONOR, I APOLOGIZE, I HAVE

COPIES FOR YOU THAT I FORGOT TO GIVE YOU.

        THE COURT:  THANK YOU.

BY MS. MICHAELS:

Q.   LOOKING AT DEFENDANT'S EXHIBIT 15, FLIPPING TO THE SECOND

FULL PAGE, THIS IS THE INITIAL REPORT.  AND IN IT DOES

MR. LECROY INDICATE HE SAW A PSYCHOLOGIST A COUPLE OF TIMES

AFTER HE HAD ATTEMPTED TO COMMIT SUICIDE BUT WAS DISCHARGED

BECAUSE THEY, QUOTE, DO NOT WORK ON PERSONALITY DISORDERS?

A.   CORRECT.

Q.   NOW, THAT'S WHAT MR. LECROY TOLD YOU.

A.   THAT IS WHAT MR. LECROY TOLD ME.

Q.   IS IT YOUR OPINION THAT HE HAD BEEN ADVISED HE HAD A

PERSONALITY DISORDER?

A.   BASED ON HIS OPINION, YES.

Q.   NOW, HE DID NOT SEE YOU FOR ALMOST A YEAR AFTER HE WAS

FIRST ADMITTED TO EL RENO, AND HE WOULD ONLY SEE YOU IF IT WAS

RECOMMENDED THAT HE WOULD SEE YOU.  IS THAT RIGHT?

342

A.   HE DID NOT SEE ME UNTIL LATER ON.  AS FAR AS IF HE WOULD HAVE NOT SEE ME UNLESS IT'S --

Q.   LET ME REPHRASE THE QUESTION.  HE WOULD NOT HAVE INDIVIDUAL COUNSELING UNLESS SOMEBODY, EITHER HE ASKED FOR IT OR SOMEBODY ADVISED THAT HE NEEDED IT.

A.   CORRECT.

Q.   HE COULDN'T JUST GO, I'M GOING TO START TAKING INDIVIDUAL COUNSELING RIGHT NOW.

A.   CORRECT.  THERE HAD TO HAVE BEEN A PROFESSIONAL, SOMEONE'S PROFESSIONAL OPINION WOULD HAVE HAD TO INDICATE THAT HE NEEDED IT.

Q.   AND WHEN HE WENT INTO THE INITIAL DAP PROGRAM WITH MS. NOVEY, THOSE -- WERE THOSE GROUP SESSIONS?

A.   YES.

Q.   AND IN THE GROUP SESSIONS, ARE THE INMATES/PARTICIPANTS ENCOURAGED TO PARTICIPATE IN SHARING THEIR FEELINGS?

A.   YES.

Q.   IN YOUR EXPERIENCE DO INMATES SOMETIMES TAKE A LONGER TIME TO OPEN UP IN THESE GROUPS?

A.   YES.

Q.   IS IT POSSIBLE THAT MR. LECROY DID NOT START SHARING HIS FEELINGS UNTIL SOMETIME HE WAS IN THAT GROUP?

A.   YES.

Q.   WHEN MS. NOVEY RECOMMENDED -- WELL, MS. NOVEY BECAME CONCERNED ABOUT WHAT HE WAS SAYING IN GROUP.  IS THAT YOUR

343

RECOLLECTION?

A.   YES.  AND THEY ALSO -- SHE COULD HAVE BEEN MEETING WITH
HIM INDIVIDUALLY, AS WELL.  THEY DID GROUP AND/OR INDIVIDUAL.

Q.   BUT IN DEFENDANT'S EXHIBIT 15 ON FEBRUARY 5TH -- WELL,
WAIT, I WENT AHEAD HERE.  MS. NOVEY RECOMMENDED MR. LECROY TO
MEET WITH YOU BECAUSE HE WAS EXPRESSING IDEATIONS OF SUICIDE
AND FEELING LIKE COMMITTING SUICIDE ON A DAILY BASIS, I BELIEVE
IS WHAT SHE REPORTED.  I'M TRYING TO FIND HER REPORT IN HERE.
YES, THE FEBRUARY 5TH BRIEF COUNSELING SESSION.

A.   UH-HUH (AFFIRMATIVE).

Q.   AND IN THE FIRST PARAGRAPH I BELIEVE YOU DESCRIBED WHY
MS. NOVEY RECOMMENDED MR. LECROY TO YOU FOR INDIVIDUAL
COUNSELING.

A.   HE HAD REPORTED A HISTORY OF DEPRESSION, SUICIDE; AND
HE -- SHE GOES INTO DETAIL ABOUT THOSE, THAT HISTORY.  AND THEN
SHE ALSO TALKS ABOUT HIS CURRENT SYMPTOMS BEING CONSISTENT WITH
MAJOR DEPRESSION AND THAT SHE GOES ON TO TALK ABOUT SHE THOUGHT
THAT HE COULD BENEFIT FROM ANTIDEPRESSANT MEDICATION.

Q.   SO IF SHE HAD NOTICED THESE SYMPTOMS EARLIER, PRESUMABLY,
SHE WOULD HAVE RECOMMENDED MR. LECROY TO YOU EARLIER.

A.   CORRECT.

Q.   NOW, IS IT YOUR OPINION THAT DRUG ABUSE IS A SYMPTOM
CONSISTENT WITH DEPRESSION?

A.   IS DRUG ABUSE CONSISTENT WITH DEPRESSION?

Q.   IF SOMEBODY SUFFERS FROM DEPRESSION -- IS DRUG ABUSE, THE

344

USE OF DRUGS, CONSISTENT WITH SOMEONE THAT SUFFERS FROM DEPRESSION?  I KNOW NOT ALWAYS, BUT --

A.   PEOPLE WHO ARE DEPRESSED, YES, CAN TURN TO DRUGS.

Q.   NOW, YOU'VE BEEN ASKED TODAY TO GIVE YOUR OPINION OR MAKE A CONNECTION OR INTERPRET CERTAIN FACTS.  DID YOU DO ANY OF THIS DURING MR. LECROY'S TRIAL?

A.   NO.

Q.   ONE OF THE THINGS YOU NOTED AND MR. MCKINNON CROSS-EXAMINED YOU ABOUT WAS WHAT APPEARED TO BE AN ESCALATION OF ANGER IN TIME WHEN MR. LECROY WAS TRANSFERRED TO BUTNER. AND IT WAS YOUR OPINION THAT HE WAS DE --

A.   COMPENSATING?

Q.   -- DECOMPENSATING.  YOU HAD ADVISED HIM EARLIER THAT ANGER WOULD CAUSE HIM TO RETURN TO PRISON.  BUT WAS IT YOUR OPINION BEFORE HE LEFT EL RENO THAT COUNSELING, CONSISTENT COUNSELING TO DEAL WITH THE ANGER WOULD HELP HIM LEAD A PEACEFUL OR LAW-ABIDING LIFE?

A.   YES.

Q.   AND WAS IT YOUR PROFESSIONAL OPINION THAT COUNSELING WAS, CONTINUAL COUNSELING WAS CRITICAL TO HIS, WHAT YOU USED, MAKING IT?

A.   HE BELIEVED THAT IT WAS CRITICAL FOR HIM MAKING IT TO HAVE CONSTANT, YOU KNOW, ACCESS TO COUNSELING SERVICES, YES.

Q.   AND WE MEAN MENTAL HEALTH COUNSELING SERVICES.

A.   YES.

345

Q.   AND DO YOU KNOW ONE WAY OR ANOTHER WHETHER AT THE TIME OF THE CRIME HE WAS RECEIVING MENTAL HEALTH COUNSELING?

A.   I DO NOT KNOW.

Q.   NOW, I ASKED YOU ABOUT THOSE TWO FORMS, GOVERNMENT'S EXHIBITS 85 AND 86.  UPON REVIEW DURING THE BREAK, ARE THESE MENTAL HEALTH FORMS?

A.   I'M NOT FAMILIAR WITH EITHER OF THESE FORMS.  THE FIRST FORM HERE LOOKS LIKE SOMETHING --

Q.   I'M SORRY, 86.

A.   I'M SORRY, 86, IS THAT THE NUMBER YOU'RE TALKING ABOUT?

Q.   YES.

A.   THE 86 FORM LOOKS LIKE SOMETHING THAT -- AND I DON'T KNOW WHO, MAYBE A UNIT TEAM OR SOMEBODY NOT PSYCH, WOULD GIVE TO SOMEONE ON ARRIVAL TO DETERMINE IF THERE'S ANY SECURITY OR SAFETY NEEDS TO BE LOOKED AT LIKE WHETHER THEY'RE SEPARATEES OR WHETHER THEY'VE, YOU KNOW, ASSISTED LAW ENFORCEMENT OFFICERS, ARE THERE ANY CONCERNS THEY NEED TO HAVE.  THAT'S WHAT IT LOOKS LIKE.  I DON'T KNOW WHO ACTUALLY GIVES THAT TO THE INMATES.

Q.   WHEN YOU SAY SEPARATEE, THAT WOULD BE A CODEFENDANT --

A.   A CODEFENDANT.

Q.   -- OR SOMEBODY WHO HAD PREVIOUS INTERACTION --

A.   SOMEBODY THAT IT WOULD NOT BE GOOD TO HAVE THEM TOGETHER, THAT THEY COULD HURT EACH OTHER.

Q.   SO THAT'S NOT A FORM THAT YOU'RE FAMILIAR WITH KEPT IN THE MENTAL HEALTH DEPARTMENT.

346

A.    CORRECT.

Q.    AND COULD YOU GIVE YOUR OPINION AS TO WHAT EXHIBIT 85, IF THAT'S THE MENTAL HEALTH FORM?

A.    I'M, AGAIN, NOT FAMILIAR WITH THIS FORM.  EITHER IT LOOKS LIKE, BECAUSE IT REFERENCES MEDICAL STAFF, THAT THIS MAY BE MEDICAL'S FORM THAT THEY USE.  IT MAY BE SOMETHING THAT THEY USE WHEN AN INMATE FIRST ARRIVES, BECAUSE MEDICAL, SOMEONE FROM MEDICAL WILL SCREEN THEM, AS WELL.  THAT MAY BE WHAT THIS IS, BUT IT IS NOT SOMETHING IN THE MENTAL HEALTH DEPARTMENT.

Q.    AND BRINGING YOUR ATTENTION BACK TO NUMBER 7 AT THE BOTTOM OF THE PAGE, UPON REFLECTION, DO YOU HAVE AN OPINION AS TO WHAT THESE LETTERS MEAN, N-O-S-I, AND THERE'S A SLASH, DENIES SEXUAL ABUSE?

A.    I WOULD ASSUME THAT HE'S SAYING NO SUICIDAL IDEATIONS BY THE N-O-S-I.  THAT'S AN ASSUMPTION BECAUSE I'M NOT THE AUTHOR. AND DENIES SEXUAL ABUSE, I DON'T KNOW IF HE'S TALKING ABOUT BEING SEXUALLY ABUSED IN PRISON OR OUT IN THE COMMUNITY.  I DON'T KNOW WHAT BECAUSE I'M NOT THE AUTHOR.

          MS. MICHAELS:  THANK YOU.  THAT'S ALL I HAVE.

          THE COURT:  YOU MAY STEP DOWN.  THANK YOU.  YOU ARE EXCUSED.

          MS. MICHAELS:  YOUR HONOR, COULD I HAVE JUST ONE SECOND, PLEASE?

          THE COURT:  YES.

          (DISCUSSION OFF THE RECORD.)

347

MS. MICHAELS:  THAT'S ALL.  THANK YOU, YOUR HONOR.

THE COURT:  WE WILL RECESS AT THIS TIME.  WE'RE GOING TO NEED TO START TOMORROW AT 10:00, SO WE WILL PROCEED -- WHO DO YOU ANTICIPATE CALLING?

MR. MARTIN:  WE WILL CALL JEFFREY MARTIN.  THAT'S THE ONLY WITNESS WE HAVE FOR TOMORROW.

THE COURT:  AND YOU WILL HAVE YOUR JURY WITNESSES TOMORROW, AS WELL, MS. DINGLE?

MS. DINGLE:  YES, YOUR HONOR.  I'LL HAVE THE JURY ADMINISTRATOR AND AN INDIVIDUAL FROM THE SECRETARY OF STATE.

THE COURT:  SO WE WILL PROCEED WITH THOSE AT 10:00.

MR. MCKINNON:  WE HAVE THREE ADDITIONAL SHORT WITNESSES.

THE COURT:  OKAY.  DO YOU WANT TO PLAN TO HAVE THEM AVAILABLE?  DO WE EXPECT THE JURY WITNESSES TO GO FOR A SUBSTANTIAL PERIOD OF TIME?  DO YOU HAVE ANY FEEL --

MR. MARTIN:  JEFFREY MARTIN IS LESS THAN 30 MINUTES.

THE COURT:  WE'VE GOT -- ACCORDING TO THE LIST I HAD WHEN WE STARTED OUT, THAT WOULD -- IF WE GET THROUGH THOSE WITNESSES, THAT WOULD GET US THROUGH ALL THE WITNESSES WE HAD TALKED ABOUT HAVING THIS WEEK.  WERE Y'ALL PLANNING THIS WEEK OR WERE YOU PLANNING ON AT OUR FEBRUARY MEETING OR DO YOU WISH TO MAKE A PROFFER ABOUT THE OTHER INSTANCE?  ARE YOU PREPARED TO MAKE THAT THIS WEEK?

MS. MICHAELS:  THREE THINGS, YOUR HONOR, ACTUALLY.

348

WE HAVE ONE WITNESS THAT WE'RE CALLING OR HOPING TO CALL JUST TO IDENTIFY DOCUMENTS RECEIVED.  SHE'S ON JURY DUTY IN DEKALB COUNTY.

MR. MARTIN:  THAT'S MS. MILLER.

MS. MICHAELS:  MS. MILLER, SUSAN MILLER.  AND IT APPEARS BY LACK OF PHONE CALL THAT SHE WAS PICKED AND THE TRIAL IS EXPECTED TO LAST THROUGHOUT THIS WEEK.

THE SECOND ISSUE THAT WE -- AND THAT MAY ELIMINATE THE NEED TO CALL ONE OTHER WITNESS WHICH WE WOULD HAVE CALLED IN FEBRUARY.  AND IT APPEARS PROFFER OF THE MITIGATION WITNESS TESTIMONY WOULD BE MORE APPROPRIATE AFTER DR. LISAK TESTIFIED BECAUSE IT'S IN CONNECTION WITH THAT.

THE COURT:  OKAY.  ALL RIGHT.  WELL, THEN, WE WILL, ASSUMING MS. MILLER CAN'T APPEAR, WE WILL PLAN TO GO FORWARD THEN WITH MR. MARTIN TOMORROW AND WITH YOUR WITNESSES AND THEN THE OTHER WITNESSES THAT YOU HAD TO PRESENT; AND WE SHOULD BE ABLE TO GET THROUGH ALL THOSE TOMORROW, I WOULD THINK.

MR. MARTIN:  WE SHOULD.

MS. MICHAELS:  WITH THE COURT'S PERMISSION, MS. MILLER WOULD HAVE BEEN A THREE-MINUTE WITNESS.  AND SINCE I'VE NOT BEEN ABLE TO CONSULT WITH HER BECAUSE OF HER JURY DUTY, IF WE'RE GOING TO CALL -- WITH THE COURT'S PERMISSION, COULD I JUST LET HER KNOW BECAUSE SHE DOESN'T (INAUDIBLE), JUST LET HER KNOW IT WOULD BE FEBRUARY.

THE COURT:  RIGHT.

349

MS. MICHAELS:  THE FEBRUARY MEETING.

THE COURT:  YOU MAY DO THAT.

MS. MICHAELS:  THANK YOU.  I APPRECIATE THAT.

THE COURT:  AND YOU MIGHT, IF IT'S POSSIBLE, IT MIGHT ALSO BE POSSIBLE, I DON'T KNOW IF YOU HAVE EXHIBITED THOSE DOCUMENTS, THAT MAYBE WE COULD STIPULATE THOSE AND MAY EVEN AVOID HER HAVING TO COME IN FEBRUARY.  I DON'T KNOW.

MS. MICHAELS:  WE MIGHT BE ABLE TO DO THAT, YOUR HONOR.

THE COURT:  YOU MIGHT CONFER WITH COUNSEL ABOUT THAT.

MR. MARTIN:  WE'LL DO THAT.

THE COURT:  ALL RIGHT.  WE WILL PLAN THEN TO PROCEED AT 10:00 O'CLOCK TOMORROW MORNING.  WE WILL BE IN RECESS AS TO THIS MATTER.  I HAVE A PLEA.  WE'LL TAKE A BRIEF BREAK.  WHEN THEY ARE READY TO PROCEED WITH THAT, WE'LL PROCEED.  YOU FOLKS ARE EXCUSED UNTIL 10:00 O'CLOCK TOMORROW MORNING.

(PROCEEDINGS ADJOURNED.)

* * *

REPORTER'S CERTIFICATION

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.


_____
SHARON D. UPCHURCH, RPR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA



DATE:  _____