350

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 2:02-CR-38-RWS |
| | ) | |
| V. | ) | ATLANTA, GEORGIA |
| | ) | |
| WILLIAM EMMETT LECROY, JR. | ) | JANUARY 13, 2010 |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |


VOLUME III
TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE RICHARD W. STORY
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:                    WILLIAM L. MCKINNON, ESQ.
                                       SHANYA DINGLE, ESQ.
                                       MARY JANE STEWART, ESQ.
                                       ASSISTANT U.S. ATTORNEYS



FOR THE DEFENDANT:                     JOHN R. MARTIN, ESQ.
                                       SANDRA L. MICHAELS, ESQ.
                                       DEFENSE ATTORNEYS




COURT REPORTER:                        SHARON D. UPCHURCH
                                       2114 U. S. COURTHOUSE
                                       ATLANTA, GEORGIA 30303-3361
                                       (404) 215-1354




PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
PRODUCED BY COMPUTER.


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

351

INDEX TO EXAMINATION

WITNESS:                                                PAGE


JEFFREY MARTIN:
DIRECT EXAMINATION                                       352
CROSS-EXAMINATION                                        381
REDIRECT EXAMINATION                                     423

WESLEY B. TAYLOR:
DIRECT EXAMINATION                                       429

RAYMOND J. BURBY, IV:
DIRECT EXAMINATION                                       438
CROSS-EXAMINATION                                        454

LUCY MOSES:
DIRECT EXAMINATION                                       462
CROSS-EXAMINATION                                        492

JOSEPH PLUMMER:
DIRECT EXAMINATION                                       511
CROSS-EXAMINATION                                        519

RUSSELL VINEYARD:
DIRECT EXAMINATION                                       525
CROSS-EXAMINATION                                        536
REDIRECT EXAMINATION                                     547

352

P R O C E E D I N G S

(JANUARY 13, 2010; IN OPEN COURT)

THE COURT:  ALL RIGHT.  I APOLOGIZE FOR OUR DELAY THIS MORNING.  NO ONE TO BLAME BUT MYSELF AND I APOLOGIZE.  I DON'T LIKE TO START LATE.  BUT WE ARE NOW READY TO PROCEED.

MR. GOSS, YOU MAY SWEAR THE WITNESS.

(THE WITNESS WAS SWORN.)

THE DEPUTY CLERK:  STATE YOUR FULL NAME, PLEASE.

THE WITNESS:  JEFFREY MARTIN.

JEFFREY MARTIN,

HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. MARTIN:

Q.   MR. MARTIN, ARE YOU RELATED TO ME?

A.   YES, I AM.

Q.   HOW ARE YOU RELATED TO ME?

A.   YOU'RE MY BROTHER.

Q.   TELL US A LITTLE BIT ABOUT YOUR EDUCATIONAL BACKGROUND.

A.   I HAVE AN UNDERGRADUATE DEGREE IN MATHEMATICS AND ECONOMICS FROM VANDERBILT AND A MASTER'S DEGREE IN ECONOMICS FROM THE UNIVERSITY OF CHICAGO.

Q.   AND TELL US A LITTLE BIT ABOUT YOUR PROFESSIONAL HISTORY, YOUR EMPLOYMENT BACKGROUND.

A.   SURE.  I'VE WORKED IN CONSULTING FIRMS, PRIMARILY EMPLOYEE BENEFITS AREA FOR A NUMBER OF YEARS.  AND THEN SINCE ABOUT THE

353

LAST TEN YEARS, I'VE WORKED INDEPENDENTLY ON ISSUES LIKE JURY ISSUES, MATHEMATICAL-TYPE ISSUES; WORKED ON POLITICAL CAMPAIGNS, MATHEMATICAL-TYPE OF ANALYSIS FOR POLITICAL CAMPAIGNS.

Q.   IN YOUR WORK, FIRST OF ALL, AS AN EMPLOYEE BENEFIT CONSULTANT, DID THAT HAVE ANYTHING TO DO WITH EXAMINING CENSUS FIGURES, DEMOGRAPHIC FIGURES, STATISTICAL FIGURES AND MAKING COMPUTATIONS ABOUT PENSION PLANS AND SO FORTH?

A.   YES.

Q.   WITH REGARDS TO YOUR WORK AS A POLITICAL CONSULTANT, HOW DOES THAT INVOLVE LOOKING AT THE COMMUNITY AND MAKING JUDGEMENTS ABOUT THE COMMUNITY AND SO FORTH?

A.   WELL, LOOKING AT VOTER REGISTRATION NUMBERS, VOTER REGISTRATION FILES, LOOKING AT CENSUS NUMBERS AND DOING STATISTICAL ANALYSIS, VOTER PROJECTIONS AND THOSE TYPE OF THINGS.

Q.   ARE POLITICAL CANDIDATES SOMETIMES INTERESTED IN THE RACIAL COMPOSITION OF THE ELECTORATE?

A.   YES.

Q.   ARE THEY INTERESTED IN THE ETHNIC COMPOSITION OF THE ELECTORATE?

A.   YES.

Q.   NOW, PARTICULARLY WITH YOUR WORK AS A CONSULTANT ON JURY POOLS AND STATISTICAL ISSUES, TELL US A LITTLE BIT ABOUT HOW YOU GOT INTO THAT AND WHAT YOU'VE BEEN DOING OVER THE YEARS.

354

A.    I'VE LOOKED AT, MATHEMATICALLY LOOKED AT THE STATISTICS INVOLVED, LOTS OF TIMES IN THE SUPERIOR COURTS IN THE STATE OF GEORGIA, SOMETIMES IN THE FEDERAL COURTS, AND LOOKED AT HOW JURY LISTS ARE PUT TOGETHER; LOOKED AT COMPUTER PROGRAMS USED FOR THOSE TYPE OF THINGS; TALKED TO CLERKS; LOOKED AT DOCUMENTS SUCH AS THE JS-12S AND THOSE TYPE OF THINGS.

Q.    AND DOES THAT WORK INVOLVE ALSO LOOKING AT CENSUS DATA AND DEMOGRAPHIC DATA ON THE COMMUNITY?

A.    THAT'S CORRECT.

Q.    AND DOES THAT WORK ALSO REQUIRE DOING STATISTICAL TESTS OF HOW THIS SYSTEM IS DOING IN REPRESENTING THE COMMUNITY?

A.    YES.

Q.    APPROXIMATELY HOW MANY TIMES DO YOU THINK YOU'VE BEEN RETAINED AS A CONSULTANT IN THESE TYPE OF ISSUES?

A.    I'VE TESTIFIED OVER THE LAST FEW YEARS ABOUT 35 TIMES. I'VE BEEN RETAINED ON MORE CASES THAN THAT.

Q.    SHOWING YOU WHAT'S BEEN PREVIOUSLY MARKED AS DEFENDANT'S EXHIBIT 13.  CAN YOU IDENTIFY THAT?

A.    THAT'S MY RESUMÉ.

        MR. MARTIN:  MOVE IN DEFENDANT'S EXHIBIT 13.

        MS. DINGLE:  NO OBJECTION.

        THE COURT:  IT'S ADMITTED.

BY MR. MARTIN:

Q.    HAVE YOU BEEN QUALIFIED TO TESTIFY AS AN EXPERT IN THE AREAS OF JURY REPRESENTATIVENESS AND HOW SUCCESSFUL THE SYSTEM

355

IS IN REPRESENTING THE COMMUNITY?

A.   YES.

Q.   AND DOES THAT WORK INVOLVE ALSO LOOKING AT THE CENSUS DATA AND WORKING WITH THAT TO TRY TO REFINE THE DATA TO FIT WHAT THE LEGAL ISSUES ARE INVOLVED?

A.   YES.

Q.   WERE YOU ASKED BY THE ATTORNEYS IN THE WILLIAM LECROY, JR., CASE TO DO AN ANALYSIS OF THE JURY SYSTEM IN THE NORTHERN DISTRICT OF GEORGIA AND IN THE GAINESVILLE DIVISION AS IT RELATED TO THAT CASE?

A.   YES, I WAS.

Q.   WHO CONTACTED YOU; DO YOU RECALL?

A.   I BELIEVE IT WAS DAN SUMMER, AND I ALSO WORKED WITH MR. KISH.

Q.   WHAT DID YOU -- WHAT WERE YOU ASKED TO DO?

A.   TO LOOK AT THE DOCUMENTS THEY HAD, THEY HAD JS-12S, AND TO LOOK -- I WENT TO A MEETING WHERE WE TALKED WITH THE SECRETARY OF STATE'S FOLKS ABOUT HOW THE VOTER REGISTRATION RECORDS ARE DELIVERED TO THE COURT.  TALKED TO MS. MOSES ABOUT HOW SHE DID THE SAMPLING AND THE NUMBERS THAT APPEARED ON THE JS-12S AND THEN LOOKED AT CENSUS MATERIALS RELATED TO THE NORTHERN DISTRICT.

Q.   OKAY.  WHEN YOU TALKED ABOUT THE JS-12, WHAT IS THE JS-12?

A.   IT'S A FORM THAT SHOWS THE DEMOGRAPHICS OF THE QUALIFIED JURY WHEEL.  IT SHOWS A NUMBER OF DIFFERENT STEPS, BUT THE END

356

RESULT IS COMPARING A SAMPLE OF THE QUALIFIED JURY WHEEL TO THE POPULATION.

Q.    AND WERE YOU ALSO FAMILIAR WITH THE JURY PLAN FOR THE SUMMONING AND SELECTION OF JURORS IN THIS DISTRICT AND DIVISION AT THAT TIME?

A.    YES.

Q.    WHEN I SAY THIS DIVISION, I MEAN THE GAINESVILLE DIVISION.

A.    YES.

Q.    HAD YOU DONE WORK IN OTHER FEDERAL JURISDICTIONS AND AS WELL AS THE NORTHERN DISTRICT OF GEORGIA TO HAVE A FAMILIARITY WITH THE GENERAL PROCEDURES FOR SELECTING JURORS?

A.    YES.

Q.    IN THAT PROCESS IS A QUESTIONNAIRE COMPLETED BY POTENTIAL JURORS?

A.    YES.

Q.    WHAT IS DONE WITH THAT QUESTIONNAIRE?

A.    FOLKS ARE QUALIFIED ACCORDING TO THAT QUESTIONNAIRE.  IN OTHER WORDS, THEY ARE DETERMINED WHETHER THEY'RE ELIGIBLE FOR JURY SERVICE.

Q.    DOES THE QUESTIONNAIRE INCLUDE INFORMATION REGARDING RACE AND ETHNICITY?

A.    YES.

Q.    AND HOW IS THAT INFORMATION USED TO CREATE THE JS-12?

A.    A SAMPLING OF THE FOLKS WHO GET QUALIFIED IS TAKEN, AND THEN THOSE NUMBERS ARE ANALYZED ACCORDING TO THEIR RACIAL AND

357

ETHNIC MAKEUP.

Q.    WHO DOES THE ACTUAL COMPUTATIONS ON THE JS-12?

A.    I BELIEVE MS. MOSES DOES.

Q.    PEOPLE WITH THE CLERK'S OFFICE.

A.    THAT'S CORRECT.

Q.    THAT'S NOT AN ANALYSIS THAT YOU YOURSELF DID.

A.    NO.

Q.    BASED UPON THE JS-12, DID YOU DO SOME ANALYSIS OF HOW WELL THE SYSTEM BOTH IN THE GAINESVILLE DIVISION AND IN THE NORTHERN DISTRICT OF GEORGIA WAS DOING IN REPRESENTING THE COMMUNITY --

A.    YES.

Q.    -- ON RACIAL FACTORS AND GENDER FACTORS AND ETHNICITY?

A.    YES.

Q.    WITH REGARD TO THAT, IS THAT SOMETHING YOU'VE DONE NUMEROUS TIMES?

A.    YES.

Q.    WERE YOU EVER ASKED BY MR. KISH OR MR. SUMMER TO REFINE THE -- WELL, BACK UP.  WHAT FIGURE DID YOU USE FOR THE FIGURE OF THE JUROR ELIGIBLE COMMUNITY TO COMPARE THE ACTUAL REPRESENTATION ON THE JURY WHEELS TO THE ACTUAL COMMUNITY?

A.    OKAY.  I USED THE CENSUS NUMBERS FOR THE NORTHERN DIVISION -- NORTHERN DISTRICT OF GEORGIA.

Q.    WHAT CENSUS?

A.    2000 CENSUS.

Q.    AND DO THOSE, THE CENSUS FIGURES GIVE US BROKEN DOWN BY

358

RACE, GENDER AND ETHNICITY?

A.    THAT'S CORRECT.

Q.    ARE THOSE CENSUS FIGURES AVAILABLE ON THE INTERNET?

A.    YES.

Q.    AND WE HAVE A LOT OF RAW DATA, BUT THERE ARE ALSO REFINED STATISTICS THAT YOU CAN GET FROM THE CENSUS BUREAU?

A.    YES.

Q.    WERE YOU EVER ASKED -- WELL, FIRST OF ALL, DO YOU USE THE GROSS FIGURES?

A.    IF BY GROSS WHAT YOU MEAN IS WHAT I CALL THE TOTAL POPULATION?

Q.    YES.

A.    THAT'S WHAT WE USE.

Q.    AND DID YOU MODIFY THAT BY AGE?

A.    THAT'S CORRECT.  WE USED AGE 18 AND OVER FOLKS.

Q.    OKAY.  WERE YOU EVER ASKED BY MR. KISH OR MR. SUMMER TO REFINE THOSE FIGURES TO CITIZENSHIP AS OPPOSED TO MERELY AGE ELIGIBLE?

A.    I DON'T BELIEVE SO.

Q.    SHOWING YOU WHAT'S BEEN PREVIOUSLY MARKED AS GOVERNMENT'S EXHIBIT 90, AND IN PARTICULAR, A DOCUMENT THAT'S ATTACHED THERETO WHICH IS AN AFFIDAVIT IN YOUR NAME.  DO YOU REMEMBER PREPARING THAT AFFIDAVIT?

A.    YES.

MR. MARTIN:  YOUR HONOR, I WOULD MOVE INTO EVIDENCE

359

GOVERNMENT'S EXHIBIT 90 WHICH IS ACTUALLY PART OF THE RECORD IN THE CASE.  IT'S THE PROFFER IN SUPPORT.

THE COURT:  ANY OBJECTION?

MS. DINGLE:  NO OBJECTION.

THE COURT:  IT'S ADMITTED.

BY MR. MARTIN:

Q.   ON PARAGRAPH 11 OF THAT AFFIDAVIT THERE'S A CHART.  DID YOU PREPARE THOSE FIGURES OR THAT CHART?

A.   YES, I DID.

Q.   WAS THAT YOUR ANALYSIS AT THAT TIME?

A.   YES.

Q.   AND YOUR ANALYSIS IS COMPARING THE HISPANIC COMMUNITY -- WELL, AND OTHER COMMUNITIES, BUT LET'S JUST FOCUS ON THE HISPANIC COMMUNITY -- THE HISPANIC COMMUNITY TO THE AGE ELIGIBLE, BY THAT I MEAN 18 AND OVER FIGURES OF THE CENSUS; CORRECT?

A.   THAT'S CORRECT.

Q.   AND WERE THOSE FIGURES EVER REFINED WITH REGARDS TO CITIZENSHIP?

A.   NO.

Q.   WERE YOU EVER ASKED TO REFINE THEM BASED ON CITIZENSHIP?

A.   I DON'T BELIEVE SO.

Q.   HAVE YOU NOW DONE AN ANALYSIS BASED UPON CITIZENSHIP FIGURES?

A.   YES, I HAVE.

360

Q.    SHOWING YOU WHAT'S BEEN PREVIOUSLY MARKED AS DEFENDANT'S EXHIBIT 17 AND ASK YOU IF YOU CAN IDENTIFY THAT?

A.    YES.   THIS IS A CHART THAT I PUT TOGETHER.

MR. MARTIN:   I WOULD MOVE INTO EVIDENCE DEFENDANT'S EXHIBIT 17.

MS. DINGLE:  NO OBJECTION.

THE COURT:  IT'S ADMITTED.

BY MR. MARTIN:

Q.    CAN YOU GO THROUGH THIS CHART WITH US AND EXPLAIN YOUR ANALYSIS TO THE COURT.

A.    SURE.  I PUT A TITLE ON IT, STATISTICAL ANALYSIS OF THE QUALIFIED JURY WHEEL FOR THE GAINESVILLE DIVISION IN THE NORTHERN DISTRICT OF GEORGIA USED IN THE 2000 CENSUS CITIZEN POPULATION AGE 18 AND OVER.

Q.    HOW CAN YOU GET, CAN YOU DETERMINE THE ACTUAL CITIZENSHIP POPULATION FROM THE CENSUS FIGURES AS OPPOSED TO JUST THE, I GUESS, THE GROSS FIGURE, FOR LACK OF A BETTER WORD?

A.    THE GROSS FIGURE, WHAT YOU'RE CALLING THE GROSS FIGURE IS, TOTAL POPULATION FIGURES INCLUDE CITIZENS AND NONCITIZENS; SO IT'S ANYBODY THAT FILLS OUT A FORM.

Q.    AND DOES THE CENSUS INTEND TO COUNT EVERYBODY WHO'S ACTUALLY HERE IN THE UNITED STATES ON A CERTAIN DATE IN 2000?

A.    THAT'S CORRECT.  CENSUS DATE IS APRIL 1ST, 2000.  SO WHAT WE HAVE ON THIS CHART IS, I GUESS, STARTING FROM THE LEFT, WE'VE GOT THE GAINESVILLE DIVISION AND WE'VE GOT IT BROKEN DOWN

361

BY WHITES, AFRICAN-AMERICANS AND HISPANIC OR LATINOS. THAT FIRST ROW THERE GIVES US THE CITIZEN POPULATION AGE 18 AND OVER IN THE GAINESVILLE DIVISION. ON THE RIGHT-HAND SIDE WE'RE GOING TO DO THE WHOLE NORTHERN DISTRICT. SO, FOR INSTANCE, WHITE PERSONS MAKE UP 93.31 PERCENT OF THE AGE 18 AND OVER CITIZENS IN THE GAINESVILLE DIVISION.

WE'VE GOT AFRICAN-AMERICAN NUMBERS AND HISPANIC OR LATINOS. DO YOU WANT ME TO CONCENTRATE ON HISPANIC AND LATINOS?

Q. YES.

A. OKAY. HISPANICS OR LATINOS ARE 1.89 PERCENT TO 1.68 PERCENT. AND THE REASON WE HAVE A RANGE HERE IS THAT THE CENSUS BUREAU REDACTS NUMBERS, SMALL NUMBERS SO THAT PEOPLE CAN'T BE IDENTIFIED FROM THEIR TABLES. SO WE HAVE FOR SOME OF THE SMALLER COUNTIES, THEY HAVE REDACTED SOME OF THE CITIZENSHIP NUMBERS FOR HISPANICS OR LATINOS.

THE BOTTOM ROW THERE I'VE LISTED OUT THE COUNTIES WITH REDACTED INFORMATION; SO IN TERMS OF HISPANIC OR LATINO NUMBERS, THE REDACTED COUNTIES ARE DAWSON, FANNING, STEPHENS, TOWNS, UNION AND WHITE. AND THAT EQUALS TO A TOTAL OF 824 FOLKS THAT WOULD -- IN THE TOTAL POPULATION OUT OF THE WHOLE DIVISION WHICH IS 396,459 FOLKS.

SO THAT'S WHY WE'VE GOT THIS LITTLE RANGE HERE. THE CENSUS BUREAU DOESN'T EVER WANT TO PUT DOWN A SMALL ENOUGH NUMBER THAT SOMEONE COULD GO TO THE CENSUS TABLES AND TRY TO

362

IDENTIFY SOMEBODY ON SOME SORT OF CHARACTERISTIC.

Q.    IS THE HISPANIC COMMUNITY IN THE GAINESVILLE DIVISION LARGELY CONFINED TO PARTICULAR COUNTIES?  IS HALL COUNTY A COUNTY THAT HAS --

A.    YES.  ABOUT 47 PERCENT OF HISPANIC OR LATINOS FOLKS IN THE GAINESVILLE DIVISION ARE IN HALL COUNTY.

Q.    GO AHEAD.

A.    THE NEXT ROW THERE WE'VE GOT THE SAMPLE OF THE QUALIFIED JURY WHEEL.  SAMPLE IS TAKEN OF THE QUALIFIED JURY WHEEL IS 325 FOLKS IN THE GAINESVILLE DIVISION, I THINK 1975 FOLKS IN THE WHOLE NORTHERN DISTRICT.  AND THOSE NUMBERS WERE ANALYZED, AND 0.62 PERCENT OF THAT SAMPLE IDENTIFIED THEMSELVES AS HISPANIC OR LATINO.

THEN THE NEXT THREE ROWS CALCULATE SORT OF THE STATISTICAL ANALYSIS THAT FOLKS USUALLY LOOK AT.  I HAVE A TITLE HERE ABSOLUTE DISPARITY.  ABSOLUTE DISPARITY IS SIMPLY JUST THE DIFFERENCE BETWEEN THE POPULATION PERCENTAGE AND THE PERCENTAGE THAT THAT GROUP IS ON THE QUALIFIED JURY WHEEL.

Q.    THERE'S SOME WATER RIGHT THERE, JEFF.

A.    THANK YOU.  THANKS.

SO FOR HISPANIC OR LATINOS, IF YOU'RE USING THE RANGE 1.89 TO 1.68 PERCENT AND YOU JUST SUBTRACT OUT 0.62 PERCENT, YOU HAVE AN ABSOLUTE DISPARITY OF 1.27 PERCENT TO 1.06 PERCENT.

Q.    NOW, WITH REGARDS TO THE ABSOLUTE DISPARITY FIGURE, ARE THERE PROBLEMS WITH USING THAT FIGURE, ESPECIALLY WHEN YOU HAVE

363

A SMALL POPULATION?

A.   YES.   THERE ARE PROBLEMS AND FOLKS LOOK AT OTHER STATISTICS.   LET ME ADD ONE THING.   I'VE PUT A NEGATIVE SIGN HERE.   ABSOLUTE DISPARITY IS USUALLY REPRESENTED AS A POSITIVE NUMBER.   THE NEGATIVE SIGN JUST SHOWS UNDERREPRESENTATION.

Q.   I GOTCHA.

A.   OKAY.   SO, YEAH, THERE ARE OTHER STATISTICS THAT STATISTICIANS LIKE TO USE.   THE GREAT BENEFIT OF THE ABSOLUTE DISPARITY STATISTIC IS IT'S JUST VERY, VERY EASY TO CALCULATE. BUT AS A STATISTICIAN, STATISTICIANS LIKE TO LOOK AT OTHER MEASURES THAT ARE MORE HELPFUL, PARTICULARLY WHEN IT COMES TO LOOKING AT SMALL GROUPS AND BIG GROUPS.

Q.   FOR EXAMPLE, IF THE GROUP YOU'RE LOOKING AT IS 50 PERCENT OF THE POPULATION AND AN ABSOLUTE DISPARITY OF ONLY 1.27 PERCENT, WHICH MEANS LIKE 48 SOME PERCENT, WOULD THAT INSTINCTIVELY INDICATE A PRETTY REPRESENTATIVE COMMUNITY?

          MS. DINGLE:   OBJECTION, YOUR HONOR.   THIS IS THE THIRD LEADING QUESTION.

          MR. MARTIN:   FAIR ENOUGH.

BY MR. MARTIN:

Q.   WHAT WOULD -- HOW WOULD YOU, AS A STATISTICIAN LOOK AT THAT?

A.   WELL, THE PROBLEM WITH ABSOLUTE DISPARITY IS THEY MEAN SOMETHING -- SOMETHING FOR A SMALL GROUP MEANS SOMETHING DIFFERENT FOR A BIG GROUP.   IT DEPENDS ON THE SIZE OF THE

364

GROUP.

SO, FOR INSTANCE, IF YOU USE AN EXAMPLE LIKE 50 PERCENT, IF WE WERE ONE PERCENT OFF IN AN ABSOLUTE DISPARITY BASIS, WE WOULD BE BETWEEN 49 AND 51 PERCENT.  WE WOULD BE REASONABLY CLOSE IN, YOU KNOW, JUST A LAY SENSE OF THE WORD.  BUT IF YOU'RE A SMALLER GROUP, LIKE HISPANICS OR LATINOS, IF YOU'RE ONE PERCENT OFF OF A GROUP THAT'S NEARLY -- IS BELOW 2 PERCENT, THEN THAT'S A BIGGER DEAL.

AND SO WHAT STATISTICIANS USUALLY LOOK AT IS OTHER MEASURES; FOR INSTANCE, THE COMPARATIVE DISPARITY.  COMPARATIVE DISPARITY AS A FORMULA IS JUST ABSOLUTE DISPARITY OVER THE POPULATION PERCENTAGE.  BUT WHAT IT REALLY MEANS IS THAT IT'S A RATE.  IN OTHER WORDS, IF WE HAD 50 PERCENT COMPARATIVE DISPARITY UNDERREPRESENTATION, WHAT IT WOULD MEAN IS WE'RE MISSING ABOUT HALF THE GROUP WE WOULD HAVE EXPECTED.

SO IT'S A RATE.  IT'S WHAT STATISTICIANS CALL A NONDIMENSIONAL THING.  IT MEANS THE SAME THING FOR A SMALL GROUP AS IT DOES FOR A BIG GROUP.  IN OTHER WORDS, IF YOU'RE MISSING HALF OF A GROUP, A BIG GROUP, YOU'RE MISSING HALF A BIG GROUP.  IF YOU'RE MISSING HALF OF A SMALL GROUP, YOU'RE MISSING HALF OF A SMALL GROUP.  IT'S A RATE.

Q.   WHAT COMPARATIVE DISPARITY DID YOU COMPUTE WITH REGARDS TO THE GAINESVILLE DIVISION IN THE HISPANIC/LATINO COMMUNITY?

A.   I CALCULATED THE COMPARATIVE DISPARITY FOR THAT DIVISION, HISPANICS OR LATINOS, AT 67.37 PERCENT TO 63.32 PERCENT

365

UNDERREPRESENTATION.

Q.   WHAT DOES THAT TELL US AS TO HOW WELL WE'RE REPRESENTING THE COMMUNITY?

A.   BASICALLY, WHAT IT'S TELLING YOU IS YOU'RE MISSING ABOUT TWO-THIRDS OF THAT GROUP YOU WOULD HAVE EXPECTED HAD THE GROUP MIRRORED THE POPULATION.

Q.   THE NEXT STATISTIC THAT YOU HAVE ON THE CHART THERE IS STANDARD DEVIATIONS FROM EXPECTED.  CAN YOU EXPLAIN THAT TO THE COURT.

A.   SURE.  ANOTHER MEASURE USED, THAT STATISTICIANS USE IS THE STANDARD DEVIATIONS FROM EXPECTED.  AND WHAT YOU'RE TRYING TO GET AT THERE IS WHAT ARE THE CHANCES THAT WE GOT A QUALIFIED JURY WHEEL THAT LOOKS LIKE IT DOES.  IN OTHER WORDS, IF WE HAVE A POPULATION THAT'S 1.89 TO 1.68 HISPANIC AND THEN WE RANDOMLY DRAW FROM THAT POPULATION, WE KNOW WE'RE NOT GOING TO GET EXACTLY THE NUMBER OF FOLKS THAT WOULD BE ON THE PERCENTAGE IN THE POPULATION.  IN OTHER WORDS, YOU GET A FEW MORE OR A FEW LESS.

WHAT STANDARD DEVIATION IS TRYING TO TELL YOU IS WHAT ARE THE CHANCES THAT THIS RESULT JUST FALLS IN A RANGE THAT IS ASSOCIATED WITH HOW LIKELY THAT RANGE IS.  WHAT STATISTICIANS GENERALLY LOOK AT IS HOW FAR -- HOW MANY STANDARD DEVIATIONS AWAY FROM WHAT WE WERE EXPECTED WE GOT.  YOU SHOULD BE WITHIN ONE STANDARD DEVIATION 68 PERCENT OF THE TIME.  YOU SHOULD BE WITHIN TWO STANDARD DEVIATIONS 95 PERCENT OF THE TIME, AND THEN

366

THREE STANDARD DEVIATIONS 95.5 PERCENT OF THE TIME.

SO WE CALCULATED THE STANDARD DEVIATIONS FROM EXPECTED HERE, AND WE'RE 1.68 TO 1.49 STANDARD DEVIATIONS TOO LOW.

Q.    IS THAT STATISTICALLY SIGNIFICANT FROM A STATISTICAL STANDPOINT?

A.    IT'S SIGNIFICANT TO THAT LEVEL OF PROBABILITY IN BETWEEN 68 PERCENT AND 95 PERCENT.

THE REASON THE BAND IS SORT OF WIDE HERE IS WE'VE GOT A PRETTY SMALL SAMPLE SIZE.  WE'VE GOT 325 FOLKS THAT WE SAMPLED OFF THE QUALIFIED JURY WHEEL.  IF YOU WERE DOING A NATIONWIDE POLL, A PRESIDENTIAL POLL OR SOMETHING LIKE THAT, ONCE YOU GET UP TO THE NUMBERS OF MAYBE LIKE 800 FOLKS, THE STANDARD DEVIATIONS AND THE MARGIN ERROR GO WAY DOWN.

SO YOU HAVE TO GET UP TO A CERTAIN NUMBER, AND IT'S NOT A VERY HIGH NUMBER, SURPRISINGLY; AND THAT'S ONE OF THE GREAT THINGS ABOUT STATISTICS WHEN YOU'RE RELATING TO POLLING.  BUT AT 325 FOLKS, WE'RE BELOW WHAT A GOOD SAMPLE WOULD BE.  SO WE'VE GOT A PRETTY WIDE RANGE.  BUT AS SUCH, WE'RE STILL ONE, ONE-AND-A-HALF STANDARD DEVIATIONS OFF OF WHAT WE WOULD HAVE EXPECTED.

Q.    AND WHAT WOULD YOU HAVE EXPECTED IF THE SYSTEM HAD BEEN DOING WHAT?

A.    IF THE SYSTEM HAD BEEN MIRRORING THE CENSUS CITIZEN POPULATION 18 AND OVER.  IN OTHER WORDS, IF WE HAD A LIST OF ALL THE CITIZENS 18 AND OVER AND RANDOMLY DREW FROM IT, WE

367

WOULD EXPECT THAT 68 PERCENT OF THE TIME WE WOULD BE WITHIN ONE STANDARD DEVIATION OF THAT PERCENTAGE AND 95 PERCENT OF THE TIME WITHIN TWO STANDARD DEVIATIONS.

Q.    WHAT DOES THAT TELL YOU, IF ANYTHING, AS TO WHETHER SOME SYSTEMATIC FACTOR IS UNDERREPRESENTING THAT COMMUNITY?

A.    WELL, IT TELLS YOU THAT THERE'S SOMETHING SYSTEMATIC GOING ON HERE AT THAT LEVEL.  SO YOU WOULD WANT TO HAVE A BIGGER SAMPLE SIZE IF YOU COULD.  BUT GIVEN THIS SAMPLE SIZE, IT'S TELLING US THAT WE'RE STILL ONE-AND-A-HALF STANDARD DEVIATIONS TOO LOW.

Q.    WHY DON'T YOU GIVE US THE SAME ANALYSIS REGARDING THE ENTIRE DISTRICT.

A.    FOR THE NORTHERN DISTRICT FOR HISPANICS OR LATINOS, THE 2000 CENSUS CITIZEN POPULATION AGE 18 AND OVER IS 2.23 PERCENT TO 2.19 PERCENT.  SO WE'VE GOT THIS RANGE AGAIN.  AND ONCE AGAIN, I LISTED THE COUNTIES WHERE WE'VE GOT SOME REDACTED INFORMATION.  SO WE'VE GOT DADE COUNTY, HARALSON COUNTY, HEARD COUNTY, MERIWETHER, PIKE.  AND THEN I PUT GAINESVILLE. GAINESVILLE IS NOT A COUNTY.  GAINESVILLE MEANS FROM THE GAINESVILLE DIVISION.

SO WE'VE GOT 824 FOLKS THAT WERE REDACTED IN THE GAINESVILLE DIVISION, PLUS FIVE MORE COUNTIES WE HAVE REDACTED INFORMATION.  THERE ARE, I BELIEVE, 30 COUNTIES IN THE WHOLE DISTRICT.  THERE ARE 16 COUNTIES IN THE GAINESVILLE DIVISION. SO WE'VE GOT 1,309 FOLKS WE DON'T KNOW THEIR CITIZENSHIP STATUS

368

OUT OF THE TOTAL DISTRICT WHICH IS 3,409,761 FOLKS.  SO WE'VE GOT THE RANGE THERE.

THE SAMPLE OF THE QUALIFIED JURY WHEEL IS 1.01 PERCENT. IF YOU CALCULATE THE ABSOLUTE DISPARITY, WE'RE 1.22 PERCENT TO 1.18 PERCENT ON AN ABSOLUTE DISPARITY BASIS UNDERREPRESENTATION.  ON A COMPARATIVE DISPARITY BASIS, WE'RE 54.6 TO 53.82 PERCENT UNDERREPRESENTATION; AND WE'RE 3.67 TO 3.58 STANDARD DEVIATIONS TOO LOW.

Q.   HOW SIGNIFICANT ARE THOSE STANDARD DEVIATIONS?

A.   ONCE YOU GET TO THREE STANDARD DEVIATIONS OFF, THAT PUTS YOU IN A RANGE THAT YOU WOULDN'T EXPECT THAT TO HAPPEN ANY MORE THAN .5 PERCENT OF THE TIME.

Q.   WHAT DOES THAT TELL YOU AS TO WHETHER OR NOT, IF ANYTHING, SOME SYSTEMATIC FACTOR IS UNDERREPRESENTING THE HISPANIC COMMUNITY?

A.   WELL, IT'S NOT A RANDOM, IT'S NOT A RANDOM DRAW FROM THE 2000 CITIZEN AGE 18 AND OVER POPULATION.

Q.   NOW, FROM YOUR REVIEW OF THE JURY PLAN AND YOUR DISCUSSIONS WITH THE JURY PERSONNEL, WHAT LIST IS USED TO OBTAIN NAMES FOR JURORS?

A.   THE VOTER REGISTRATION LIST.

Q.   IS THAT LIST SUPPLEMENTED OR MERGED WITH ANY OTHER LIST?

A.   NO.

Q.   AND IS THAT WHAT THE PLAN PROVIDES?

A.   YES.

369

Q.   HOW, IF ANYTHING, IN YOUR EXPERIENCE AND OPINION, WOULD THAT PLAY AS A SYSTEMATIC FACTOR IN THIS?

A.   WELL, IF YOU'RE LOOKING -- IF I WAS, AS A STATISTICIAN, LOOKING AT THE CITIZEN POPULATION AGE 18 AND OVER, IF I WANTED TO GET A SAMPLE OF THAT GROUP OR CROSS-SECTION OF THAT GROUP, THE BEST PRACTICE IS ALWAYS TO GET THE MOST INCLUSIVE LIST AS POSSIBLE AND THEN RANDOMLY DRAW FROM THAT.

WERE YOU'RE TALKING ABOUT THE VOTER LIST, FOR INSTANCE, IN THE SUPERIOR COURTS IN GEORGIA, THEY SUPPLEMENT THAT WITH THE DRIVER'S LICENSE AND PERSONAL IDENTIFICATION CARD LIST AND DEPENDING ON THE COUNTY, OTHER LISTS, AS WELL.  AND THAT'S A PRETTY INCLUSIVE LIST ONCE YOU START ADDING IN THE DRIVERS LIST AND THE VOTERS LIST TOGETHER.

BUT WE'VE JUST GOT THE VOTERS LIST.  SO ANYBODY THAT DOESN'T REGISTER TO VOTE IS NOT GOING TO MAKE IT ON HERE.  SO YOU'VE GOT A SYSTEMATIC SITUATION WHERE NONVOTERS ARE NOT GOING TO BE REPRESENTED.

Q.   DOES THAT -- IN YOUR EXPERIENCE, WHAT, IF ANYTHING, WOULD THAT HAVE TO DO WITH THE UNDERREPRESENTATION OF THE HISPANIC COMMUNITY?

A.   WELL, I MEAN, IT IS WHAT IT IS; AND SO WE -- IF WE'RE JUST DRAWING FROM THE VOTER REGISTRATION LIST, WE'RE JUST GOING TO GET VOTERS.  AND, YOU KNOW, YOU KNOW, USUALLY FOLKS TRY TO USE A MORE INCLUSIVE LIST.

Q.   IS THE DRIVER'S LICENSE LIST AND THE PERSONAL

370

IDENTIFICATION CARD LIST ONE OF THE MOST INCLUSIVE LISTS THAT WE HAVE WITH THE ENTIRE COMMUNITY?

A.   WELL, YOU CAN ALWAYS SUPPLEMENT.  THE MORE YOU SUPPLEMENT, THE MORE INCLUSIVE THE LIST BECOMES.  BUT IN PRACTICALLY SPEAKING, PRAGMATICALLY SPEAKING, IF YOU CAN MERGE THE VOTERS LIST AND THE DRIVERS LIST, THAT'S A PRETTY INCLUSIVE LIST.

Q.   WHEN YOU SAY MERGE, WHAT DO YOU MEAN BY THAT?

A.   MEANS IDENTIFY FOLKS WHO ARE ON BOTH LISTS AND JUST COUNT THEM ONCE AND IDENTIFY FOLKS THAT ARE ON JUST ON EITHER ONE OF THE LISTS AND MAKE SURE THEY MAKE IT ON THE LIST, AS WELL.

Q.   IN A WORLD OF COMPUTERS, IS THAT A VERY DIFFICULT THING TO DO?

A.   NO.

Q.   LET ME SHOW YOU DEFENDANT'S EXHIBIT 18 AND ASK YOU TO IDENTIFY WHAT THAT IS.

A.   THIS IS A CHART THAT I PUT TOGETHER.

Q.   BASED ON WHAT?

A.   BASED ON CENSUS INFORMATION.

Q.   AND WHAT IS IT ABOUT?

A.   I TITLED IT CHARACTERISTICS OF THE HISPANIC OR LATINO PERSONS AND NON-HISPANIC OR LATINO PERSONS IN THE GAINESVILLE DISTRICT AND THE NORTHERN DISTRICT OF GEORGIA -- GAINESVILLE DIVISION AND THE NORTHERN DISTRICT OF GEORGIA.

        MR. MARTIN:  I MOVE INTO EVIDENCE DEFENDANT'S 18.

        MS. DINGLE:  OBJECTION.  THIS CHART IS A --

371

MR. MARTIN'S ANALYSIS BASED ON SOME CENSUS DATA. AND THE GOVERNMENT HASN'T BEEN PROVIDED WITH THE RAW CENSUS TABLES, SO I WOULD JUST REQUEST THAT THE DEFENSE DO PROVIDE THOSE TABLES AND THAT WE RESERVE THE RIGHT TO RECALL MR. MARTIN IF THERE ARE QUESTIONS THAT ARISE BASED ON THAT INFORMATION.

MR. MARTIN: (INAUDIBLE).

BY MR. MARTIN:

Q. MR. MARTIN, WHERE DID YOU GET THE INFORMATION THAT'S ON THIS CHART?

A. FROM CENSUS TABLES.

Q. AND CENSUS TABLES, HOW DID YOU ACCESS THOSE?

A. THROUGH THE WEBSITE THE AMERICAN FACT FINDER, THE CENSUS BUREAU'S WEBSITE.

MR. MARTIN: I HAVE NO OBJECTION IF THEY WANT TO RECALL HIM AND ASK HIM QUESTIONS ABOUT THIS. WE'LL TENTATIVELY OFFER DEFENDANT'S EXHIBIT 18 SUBJECT TO HIM BEING RECALLED.

THE COURT: I WILL ADMIT IT.

THE WITNESS: AND I'VE GOT THE TABLES HERE, ACTUALLY.

MS. DINGLE: IF YOU COULD JUST IDENTIFY WHICH TABLES THOSE ARE, THAT WOULD BE HELPFUL.

THE WITNESS: SURE.

(PAUSE IN THE PROCEEDINGS.)

THE WITNESS: OF COURSE, THE TABLES ARE IDENTIFIED BY THEIR NAME; BUT MOST FOLKS, WHEN THEY WORK WITH THE TABLES, USE SORT OF AS A SHORTCUT THE NUMBER OF THE TABLE. SO I CAN TELL

372

YOU WHERE THE -- WHAT THE NUMBER OF THE TABLES ARE.

BY MR. MARTIN:

Q.   WE'LL DO THAT AT A BREAK.

LET ME ASK YOU, FIRST OF ALL, ABOUT SOMETHING AT THE VERY BOTTOM OF YOUR CHART WHERE IT TALKS ABOUT -- WELL, LET ME BACK UP.  THIS CHART, DEFENDANT'S EXHIBIT 18, YOU SAID THIS COMES FROM -- WHAT DO THEY COME FROM?  WHERE DO THESE FIGURES COME FROM?

A.   FROM THE 2000 CENSUS.

Q.   AND DID THE 2000 CENSUS ALSO, AS JUST GETTING INFORMATION AS WHO WAS THERE, BUT ALSO ASK QUESTIONS ABOUT VARIOUS DIFFERENT ASPECTS OF THE COMMUNITY?

A.   YES.

Q.   CHARACTERISTICS OF THE COMMUNITY.

A.   CORRECT.

Q.   LOOK AT THE VERY BOTTOM WHERE IT SAYS OWNER OCCUPIED OR RENTER OCCUPIED; EXPLAIN THOSE FIGURES TO US.

A.   THOSE COME OFF OF WHAT'S CALLED TABLE HCT2; AND IT JUST, IT'S PART OF THE CENSUS, DO YOU OWN -- DOES THE HOUSEHOLDER THAT YOU LIVE IN OWN THE HOUSE OR DO THEY RENT THE HOUSE.  SO IT'S WHAT THEY CALL TENURE.

DO YOU WANT ME TO GO THROUGH THE NUMBERS?

Q.   YEAH.

A.   AND THEN WHAT I'VE DONE IS BROKEN DOWN THOSE STATISTICS BASED ON THE GAINESVILLE DIVISION AND THE NORTHERN DISTRICT OF

373

GEORGIA AND THEN BASED ON WHETHER THE FOLKS IDENTIFIED THEMSELVES AS HISPANIC OR LATINO OR SAID THEY WEREN'T HISPANIC OR LATINO.

SO IN TERMS OF OWNER OCCUPIED, FOLKS, HOUSEHOLDER OWNS THE HOUSE THAT THEY LIVE IN, 39 PERCENT, 39.35 PERCENT OF HISPANIC OR LATINO PERSONS IN THE GAINESVILLE DIVISION SAID WE LIVE IN AN OWNER-OCCUPIED HOUSE.  NON-HISPANIC FOLKS IN THE GAINESVILLE DIVISION, 79.69 PERCENT OF THOSE FOLKS SAID THAT WE LIVE IN AN OWNER-OCCUPIED HOUSE OR CONDO.

IN THE NORTHERN DISTRICT OF GEORGIA, 36.62 PERCENT OF HISPANIC OR LATINO FOLKS LIVE IN OWNER-OCCUPIED UNITS, AND 69.01 PERCENT OF THE NON-HISPANIC OR LATINO FOLKS LIVE IN AN OWNER-OCCUPIED.

AND THEN THE NUMBERS ADD UP TO A HUNDRED.  SO RENTER OCCUPIED HISPANIC OR LATINOS IN THE GAINESVILLE DIVISION, 60.65 PERCENT LIVE IN A RENTER-OCCUPIED UNIT.  IN THE GAINESVILLE DIVISION, NON-HISPANIC OR LATINO FOLKS, 20.31 PERCENT OF NON-HISPANIC FOLKS LIVE IN A RENTER-OCCUPIED UNIT.  IN THE NORTHERN DISTRICT OF GEORGIA, 63.38 PERCENT OF HISPANIC OR LATINO FOLKS LIVE IN A RENTER-OCCUPIED UNIT, AND 30.99 PERCENT OF THE NON-HISPANIC OR LATINO FOLKS LIVE IN A RENTER-OCCUPIED IN THE NORTHERN DISTRICT.

Q.   NOW, FROM YOUR ANALYSIS OF THE SYSTEM FOR PICKING JURORS IN THIS DISTRICT AND DIVISION -- WELL, FIRST OF ALL, WHAT'S THE MASTER LIST?  HOW IS A MASTER LIST COMPOSED?

374

A.   THE MASTER LIST IS JUST THE VOTER REGISTRATION LIST.

Q.   AND FROM THAT MASTER LIST, WHAT HAPPENS NEXT?

A.   QUESTIONNAIRES ARE SENT OUT TO QUALIFY FOLKS.

Q.   HOW ARE THEY SENT OUT?

A.   THROUGH THE MAIL.

Q.   AND THEN WHAT HAPPENS?  ARE THEY ASKED TO BE RETURNED?

A.   THAT'S CORRECT.

Q.   AND WHAT HAPPENS WITH THEM THEN, THE QUESTIONNAIRES?

A.   THEN THE QUESTIONNAIRES ARE REVIEWED TO SEE IF THE PERSON QUALIFIES FOR JURY SERVICE.

Q.   IF THE QUESTIONNAIRE IS NOT DELIVERED OR NOT RETURNED BY THE PERSON, IS THAT PERSON INCLUDED IN THE NEXT PROCESS OF QUALIFYING THE JURY WHEEL?

A.   NO.

Q.   OKAY.  WOULD THE FACT THAT THE -- WHAT CONSEQUENCE WOULD THERE BE IN THAT SYSTEM IF A SIGNIFICANT PERCENTAGE OF THE NON-HISPANIC COMMUNITY IS RENTERS AS OPPOSED TO OWNER OCCUPIED?

A.   IF MOBILITY IS RELATED TO WHETHER YOU'RE RENTING OR YOU'RE OWNER OCCUPIED, THEN MORE MOBILE FOLKS, OBVIOUSLY, CHANGE THEIR ADDRESS MORE FREQUENTLY.

Q.   WAS THERE ANY EVIDENCE THAT THE SYSTEM, THAT THE PROCEDURES THAT ARE USED BY THE JURY SYSTEM FOLLOWS UP BY SENDING OUT FORWARDING OR REQUESTS FOR FORWARDING INFORMATION OR OTHER EFFORTS TO TRY TO FOLLOW UP ON THOSE NONRETURNED QUESTIONNAIRES?

375

A.   I'M TRYING TO REMEMBER.  I BELIEVE A SECOND LETTER IS SENT.

Q.   OKAY.  BUT BEYOND THAT, A SECOND LETTER, IS ANY OTHER EFFORTS MADE TO FOLLOW UP?

A.   NOT THAT I KNOW OF.

Q.   OKAY.  NOW, LET'S GO THROUGH DEFENDANT'S EXHIBIT 18 A LITTLE BIT.  WHAT DOES THIS TELL US ABOUT THE CHARACTERISTICS OF THE HISPANIC OR LATINO COMMUNITY BASED UPON CENSUS DATA?

A.   RIGHT.  AND JUST BASED UPON THE CENSUS DATA --

Q.   YES, SIR.

A.   I'M NOT AN ANTHROPOLOGIST, I'M JUST LOOKING AT THE CENSUS DATA HERE.

Q.   I UNDERSTAND.

A.   AND IF YOU LOOK AT VARIOUS CHARACTERISTICS YOU CAN PULL OUT OF THE CENSUS TABLES, THE FIRST ONE I IDENTIFIED WAS SPEAK SPANISH AT HOME.  OF COURSE, THAT'S FOR PERSONS AGE FIVE AND OVER.  AND IN HISPANIC OR LATINO FOLKS, 87.79 PERCENT IN THE GAINESVILLE DIVISION SPEAK SPANISH AT HOME.  THE NON-HISPANIC OR LATINO FOLKS IN THE GAINESVILLE DIVISION, 1.40 PERCENT SPEAK SPANISH.

Q.   THIS SAYS SPEAK SPANISH AT HOME, BUT THIS PERSON MIGHT SPEAK ENGLISH OUTSIDE THE HOME BUT THIS IS THE LANGUAGE AT THE HOME?

A.   BASICALLY, THE QUESTION IS ASKED WHAT DO YOU SPEAK AT HOME.

376

Q.    OKAY.

A.    AND THEN FOR THE NORTHERN DISTRICT OF GEORGIA, HISPANIC OR LATINO FOLKS, 85.70 PERCENT SPEAK SPANISH AT HOME AND 1.64 PERCENT OF NON-HISPANIC OR LATINO FOLKS SPEAK SPANISH AT HOME.

Q.    TELL US ABOUT THE NEXT.

A.    THEN LOOKING AT INCOME, THERE'S LOTS OF DIFFERENT WAYS YOU CAN LOOK AT INCOME.  WHEN YOU START LOOKING AT -- IT BECOMES PROBLEMATIC WHEN YOU START LOOKING AT MEDIAN INCOMES WHEN YOU'VE GOT MULTIPLE COUNTIES.  THE CENSUS BUREAU DOES IT FOR THE GENERAL PUBLIC.  IT PUTS OUT INFORMATION BASED ON COUNTIES AND SUB-COUNTIES AND THAT TYPE OF THING BUT DOESN'T SHOW THE JUDICIAL DIVISIONS.  THERE ARE TABLES THAT SHOW JUDICIAL DIVISIONS, BUT I HAVE TO WORK FROM THE COUNTY TABLES.

AND SO YOU HAVE TROUBLE WHEN YOU'RE TRYING TO AGGREGATE MANY COUNTIES ON MEDIAN INCOMES AND THAT TYPE OF THING.  BUT YOU'RE MUCH EASIER TO LOOK AT STATISTICS THAT ARE EITHER YES OR NO TYPE OF THINGS.

SO ONE THING YOU CAN LOOK AT IS INCOME IN 1999 IS BELOW POVERTY LEVEL, IS THAT YES OR NO.  AND, OF COURSE, THIS IS ONLY CALCULATED FOR THE FOLKS THAT YOU WOULD CALCULATE A POVERTY LEVEL FOR; IN OTHER WORDS, BASICALLY ADULTS.

SO IN THE GAINESVILLE DIVISION, 26.20 PERCENT OF THE HISPANIC OR LATINO PERSONS, THEIR INCOME WAS BELOW THE 1999 POVERTY LEVEL.  FOR NON-HISPANIC OR LATINO FOLKS IN THE GAINESVILLE DIVISION, THAT WOULD BE 9.31 PERCENT.

377

IN THE NORTHERN DISTRICT OF GEORGIA, 20.08 PERCENT OF THE HISPANIC OR LATINO PERSONS, THEIR INCOME WAS BELOW THE 1999 POVERTY LEVEL.  FOR NON-HISPANIC OR LATINO FOLKS, 9.30 PERCENT OF THAT GROUP WAS BELOW THE POVERTY LEVEL.  SO IT'S ABOUT TWICE THE RATE.

Q.    GO ON TO EACH CATEGORY.

A.    OKAY.  THEN BELOW, WE HAVE WHAT INDUSTRIES FOLKS WORK IN. AND THESE ARE CIVILIAN FOLKS AGE 16 AND OVER.  IT'S JUST BROKEN DOWN BY DIFFERENT INDUSTRIES.  YOU CAN GO THROUGH THEM ALL; BUT, YOU KNOW, THE ONES THAT STICK OUT IS FOR HISPANIC OR LATINO PERSONS, THE RATE OF FOLKS IN THE CONSTRUCTION AND MANUFACTURING INDUSTRIES IS ABOUT TWICE WHAT IT IS COMPARED TO NON-HISPANIC OR LATINO FOLKS IN THE GAINESVILLE DIVISION.  AND THEN IN THE NORTHERN DISTRICT, CONSTRUCTION IS 27 PERCENT IN THE HISPANIC OR LATINO FOLKS; AND IN 6.9 PERCENT IN THE NON-HISPANIC OR LATINO FOLKS, THE MANUFACTURING IS CLOSER. IT'S 19.94 PERCENT HISPANIC OR LATINOS ARE IN MANUFACTURING AND 13.64 OF THE NON-HISPANIC FOLKS.  AND THEN, OF COURSE, WE'VE GOT DIFFERENT RATES FOR THE DIFFERENT INDUSTRIES AS LISTED.

Q.    OKAY.  SHOWING YOU WHAT'S BEEN PREVIOUSLY MARKED AS DEFENDANT'S EXHIBIT 19.  ASK YOU WHAT THAT IS.

A.    NUMBER 19 IS A CHART THAT I PUT TOGETHER.  I CALLED IT ETHNIC GROUPING OF HISPANIC PERSONS IN THE GAINESVILLE DIVISION AND THE NORTHERN DISTRICT OF GEORGIA IGNORING REDACTED DATA.

MR. MARTIN:  WE MOVE INTO EVIDENCE DEFENDANT'S

378

EXHIBIT 19.

THE COURT:  ANY OBJECTION?

MS. DINGLE:  SAME OBJECTION.  WE JUST REQUEST THE ORIGINAL TABLES.

THE COURT:  VERY WELL.

BY MR. MARTIN:

Q.   WHAT IS IT YOU WERE TRYING TO SHOW US FROM THE CENSUS DATA ON THIS CHART?

A.   THE CENSUS BUREAU ASKS YOU A COUPLE OF QUESTIONS.  THEY ASK YOU YOUR RACE.  HISPANIC IS NOT A RACE.  SO YOU PUT DOWN A RACE OR A NUMBER OF RACES.  THEN IT ASKS YOU A SEPARATE QUESTION.  IT SAYS:  ARE YOU HISPANIC OR LATINO?  AND YOU BASICALLY ANSWER YES OR NO TO THAT QUESTION.  BUT IF YOU ANSWER YES, IT ALLOWS YOU TO SORT OF BREAK THAT DOWN EVEN FURTHER.

SO LOOKING AT THE 2000 CENSUS, THE FOLKS WHO SAID THAT THEY WERE HISPANIC OR LATINO IN THE GAINESVILLE DIVISION, ABOUT 78.96 PERCENT OR 78.96 PERCENT OF THOSE FOLKS SAID THAT, YES, I'M HISPANIC, I'M MEXICAN, MEXICAN-AMERICAN OR CHICANO.

Q.   WHAT DOES MEXICAN-AMERICAN MEAN?

A.   YOU KNOW, IT'S JUST WHAT THE QUESTION IS.  I MEAN, IT'S ALL SELF-REPORTED; SO IT'S WHATEVER YOU CONSIDER MEXICAN-AMERICAN IS.

Q.   OKAY.

A.   AND THEN IN THE NORTHERN DISTRICT OF GEORGIA, ABOUT 64 PERCENT OF THE HISPANIC FOLKS PUT DOWN MEXICAN,

379

MEXICAN-AMERICAN, CHICANO.

THE BIG GROUPS THAT IT BREAKS IT DOWN TO IS MEXICAN, PUERTO RICAN, CUBAN AND THEN OTHER.  SO ONCE AGAIN, WE HAVE THIS PROBLEM WHERE WHEN THE SMALLER COUNTIES, PARTICULARLY IF YOU HAVE SMALL GROUPS OF FOLKS, THEY'RE GOING TO REDACT THAT INFORMATION.  SO I DON'T HAVE INFORMATION FOR EVERYBODY WHO SAID THEY'RE HISPANIC OR LATINO.  BUT OF THE PEOPLE WE DO GET THE INFORMATION FOR THEM, 78.96 PERCENT IN THE GAINESVILLE DIVISION SAID THEY'RE MEXICAN-AMERICAN, CHICANO, OR MEXICAN.

THEY REDACTED ALL THE INFORMATION FOR PUERTO RICANS AND CUBANS IN THE GAINESVILLE DIVISION.  AND THEN THE FOLKS THAT SAID THAT, YES, I'M HISPANIC BUT --

Q.   WHY WOULD THEY BE REDACTING THAT?

A.   BECAUSE THEY DON'T EVER WANT TO PUT DOWN THE NUMBER -- THE THRESHOLD NUMBER IS EITHER 50 OR A HUNDRED.  WHERE THE CENSUS BUREAU DOESN'T WANT TO PUT OUT A TABLE WHERE SOMEONE CAN GO TO THE TABLE AND SAY, YOU KNOW, I THINK I KNOW WHO THOSE PARTICULAR GROUP OF PEOPLE ARE AND TRY TO IDENTIFY THEM FROM THE CENSUS.  THE CENSUS BUREAU KEEPS ALL INDIVIDUAL DATA SECRET FOR 72 YEARS.  AFTER 72 YEARS, THEY RELEASE IT ALL.

Q.   BUT WHAT DOES THAT TELL US AS TO HOW LARGE, IF AT ALL, THE PUERTO RICAN OR CUBAN POPULATION WOULD BE OF THE HISPANIC POPULATION IN THE GAINESVILLE DIVISION?

A.   IT WOULD BE SMALL.

Q.   OKAY.

380

A.   AND THEN OF THE OTHER GROUP WHICH IS, YES, I'M HISPANIC BUT I'M SOME OTHER GROUP BESIDES MEXICAN-AMERICAN, PUERTO RICAN, CUBAN, IN THE GAINESVILLE 15.17 PERCENT OF THE HISPANIC FOLKS SAID, YES, I'M SOME OTHER GROUP.  IN THE NORTHERN DISTRICT OF GEORGIA, 25.65 PERCENT SAID I'M SOMETHING ELSE.

AND THEN THE "SOMETHING ELSE" ARE SPLIT FURTHER AND FURTHER DOWN.  ONCE YOU GET BY MEXICAN, PUERTO RICAN, CUBAN AND OTHER, THEN YOU FILL IN WHAT IT IS YOU ARE AND THEN THEY CATEGORIZE WHAT THOSE THINGS ARE.

THE SORT OF SUBHEADINGS UNDER OTHER THAT THEY USE ARE DOMINICAN, MEANING LIKE FROM THE DOMINICAN REPUBLIC; CENTRAL AMERICAN; SOUTH AMERICAN; SPANIARD; AND, OF COURSE, ANOTHER EVERYBODY ELSE WHICH COULD BE EVEN MORE FINELY TUNED.

THE BIGGEST GROUPS ARE THE CENTRAL AMERICAN FOLKS.  IN THE GAINESVILLE DIVISION, 4.77 PERCENT OF THE HISPANIC OR LATINO FOLKS SAID I'M CENTRAL AMERICAN.  AND IN THE NORTHERN DISTRICT OF GEORGIA, 7.87 PERCENT SAID I'M CENTRAL AMERICAN.

Q.   SO FROM THESE FIGURES, WHAT DOES THIS TELL YOU AS TO WHERE THE HISPANIC LATINO COMMUNITY IS COMING FROM IN THE GAINESVILLE DIVISION?

A.   IN THE GAINESVILLE DIVISION, ABOUT 80 PERCENT COME FROM MEXICO OR THEIR TIES ARE TO MEXICO.

Q.   AND THE NEXT LARGEST GROUP IS?

A.   THE OTHER GROUP BUT WITHIN THAT GROUP, CENTRAL AMERICA.

Q.   NOW, HAD YOU BEEN ASKED BY MR. KISH OR MR. SUMMER TO

381

PRESENT THE FIGURES THAT YOU PRESENTED HERE TODAY, WOULD YOU

HAVE DONE SO?

A.   YES.

          MR. MARTIN:  JUST ONE SECOND.

          (DISCUSSION OFF THE RECORD.)

          MR. MARTIN:  THAT'S ALL I HAVE, YOUR HONOR.

          THE COURT:  YOU MAY CROSS-EXAMINE.

                    CROSS-EXAMINATION

BY MS. DINGLE:

Q.   GOOD MORNING, MR. MARTIN.

A.   GOOD MORNING.

Q.   NOW, YOU SERVED AS A STATISTICAL EXPERT IN 47 COUNTIES IN

GEORGIA AS WELL AS AT LEAST THREE FEDERAL COURTS.  IS THAT

RIGHT?

A.   THAT'S RIGHT.

Q.   AND THAT WAS LISTED IN YOUR RESUMÉ, WHICH IS DEFENDANT'S

EXHIBIT 13; CORRECT?

A.   THAT'S CORRECT.

Q.   AND WHAT PERCENTAGE OF THOSE CASES WERE YOU ASKED TO

TESTIFY ON BEHALF OF THE DEFENDANT?

A.   A HUNDRED PERCENT.

Q.   AND MOST OF THOSE CASES INVOLVE FAIR CROSS-SECTION JURY

CHALLENGES.  IS THAT RIGHT?

A.   THAT'S CORRECT.

Q.   IN FACT, YOUR BUSINESS E-MAIL ADDRESS IS

382

JURYCHALLENGE@MINDSPRING.COM?

A.   THAT'S RIGHT.  MIND-NUMBING STATICS WAS ALREADY TAKEN.

Q.   AND THAT'S INDICATED IN DEFENDANT'S EXHIBIT 13, AS WELL.

A.   THAT'S CORRECT.

Q.   NOW, YOU'RE HERE TODAY BECAUSE MR. LECROY CLAIMS THAT HE DID NOT RECEIVE A JURY OR A GRAND JURY THAT REPRESENTED A FAIR CROSS-SECTION OF HIS COMMUNITY.  IS THAT CORRECT?

A.   I'M HERE, YES, CORRECT, TO GIVE THE CENSUS NUMBERS, THAT'S CORRECT.

Q.   AND THAT'S A CONSTITUTIONAL RIGHT THAT HE HAS; RIGHT?

A.   YES.  I'M NOT A LAWYER, SO I DON'T -- YOU KNOW, I'M VERY UNCOMFORTABLE ANSWERING LEGAL QUESTIONS.

Q.   WELL, YOU ARE AN EXPERT IN JURY CHALLENGES; CORRECT?

A.   THAT'S CORRECT.

Q.   AND YOU ARE AWARE THAT THE SIXTH AMENDMENT GUARANTEES MR. LECROY THE RIGHT TO A FAIR CROSS-SECTION OF THE COMMUNITY BEING INCLUDED IN HIS JURY POOL.

A.   RIGHT.  THAT'S MY LAY UNDERSTANDING, BUT I DON'T WANT ANYBODY TO CONFUSE THAT I'M MAKING A LEGAL.

Q.   AND YOU UNDERSTAND THAT THERE ARE STANDARDS THAT HAVE BEEN SET BY THE COURTS FOR DETERMINING WHETHER A DEFENDANT HAS RECEIVED A FAIR -- A JURY THAT REPRESENTS A FAIR CROSS-SECTION OF THE COMMUNITY; CORRECT?

A.   I'M AWARE OF SEVERAL DIFFERENT STANDARDS, BUT THAT'S NOT, YOU KNOW, LOOKING AT THE LEGAL STANDARDS.  I PROVIDE THE

383

NUMBERS.

Q.    OKAY.  WELL, YOU SHOULD BE AWARE, YOU'VE STATED YOU'RE AWARE OF SEVERAL STANDARDS.  YOU MUST BE AWARE THAT IN THE ELEVENTH CIRCUIT, THE STANDARD IS WHETHER THERE'S A TEN PERCENT DIFFERENCE BETWEEN ANY GROUP IN THE JURY POOL AND THAT GROUP'S JURY ELIGIBLE POPULATION --

        MR. MARTIN:  YOUR HONOR, I WOULD OBJECT ASKING MR. MARTIN LEGAL QUESTIONS.  I DON'T THINK THAT'S A CORRECT STATEMENT OF THE LAW, AS WELL.  BUT I JUST OBJECT TO HIM BEING ASKED LEGAL QUESTIONS LIKE THAT.

        THE COURT:  I'LL SUSTAIN THE OBJECTION.  AS I UNDERSTAND IT, HE IS NOT OFFERING HIMSELF AS AN EXPERT ON THE LAW BUT RATHER ON STATISTICS; SO I'LL SUSTAIN THE OBJECTION.

        MS. DINGLE:  NO PROBLEM, YOUR HONOR.

BY MS. DINGLE:

Q.    NOW, IN THIS CASE IN ORDER TO DETERMINE MR. LECROY'S CLAIM, YOU WERE ASKED TO EVALUATE DATA RELATING TO THE QUALIFIED WHEEL FOR BOTH HIS GRAND JURY AND HIS PETIT JURY; IS THAT RIGHT?

A.    THAT'S RIGHT.

Q.    AND IN ORDER TO DO SO, YOU LOOKED AT THE STATISTICS SET OUT IN THE JS-12 REPORTS DATED DECEMBER 21, 2001?

A.    THE JS-12S, I'D HAVE TO LOOK AT THE JS-12S TO GET THE RIGHT DATE.

        MS. DINGLE:  MAY I APPROACH, YOUR HONOR?

384

THE COURT:  YOU MAY.

BY MS. DINGLE:

Q.   NOW, MR. MARTIN, I'VE HANDED YOU GOVERNMENT EXHIBITS 27 THROUGH 30.  THOSE ARE, IN FACT, JS-12 REPORTS; IS THAT CORRECT?

A.   YES.

Q.   AND THOSE JS-12 REPORTS ARE FROM 2001?

A.   THAT'S CORRECT.

Q.   AND THOSE JS-12 REPORTS ARE FOR ALL OF THE FOUR DIVISIONS OF THE NORTHERN DISTRICT OF GEORGIA; CORRECT?

A.   THAT'S CORRECT.

Q.   DID YOU RELY ON THOSE REPORTS WHEN YOU CONDUCTED YOUR ANALYSIS?

A.   YES.  I THINK I ALSO LOOKED AT, MS. MOSES HAD A SPREADSHEET, AS WELL AS I REMEMBER, THAT I LOOKED AT JUST TO VERIFY THOSE NUMBERS.

Q.   OKAY.

MS. DINGLE:  YOUR HONOR, I WOULD MOVE TO ADMIT GOVERNMENT EXHIBITS 27 THROUGH 30.

THE COURT:  ANY OBJECTION?

MR. MARTIN:  NO OBJECTION.

THE COURT:  THEY'RE ADMITTED.

BY MS. DINGLE:

Q.   NOW, THESE JS-12 REPORTS ARE CREATED SPECIFICALLY FOR EACH DIVISION WITHIN THE NORTHERN DISTRICT; CORRECT?

385

A.    THAT'S CORRECT.

Q.    SO WE'VE GOT ONE FOR ATLANTA, ONE FOR GAINESVILLE, ONE FOR NEWNAN AND ONE FOR ROME.

A.    THAT'S CORRECT.

Q.    AND BASED ON YOUR REVIEW OF THE JS-12 REPORTS, YOU CONCLUDED THAT HISPANIC CONSTITUTED .62 PERCENT OF THE QUALIFIED WHEEL IN GAINESVILLE AND 1.01 PERCENT OF THE QUALIFIED WHEEL IN THE NORTHERN DISTRICT OF GEORGIA; RIGHT?

A.    THAT'S CORRECT.

Q.    NOW, GIVEN THAT THE COURT DOES NOT ISSUE A COMPOSITE JS-12 REPORT FOR THE ENTIRE DISTRICT, CAN YOU EXPLAIN HOW YOU ARRIVED AT THAT 1.01 PERCENT NUMBER?

A.    FOR THE WHOLE DISTRICT?

Q.    YES.

A.    JUST ADDING THOSE UP.

Q.    ADDING WHAT UP?

A.    ADDING UP EACH OF THE FOUR DIVISIONS.

Q.    OKAY.  SO YOU ADDED UP THE NUMBERS IN THE SAMPLE SECTION AT THE BACK OF THE QUALIFIED WHEEL?

A.    THAT'S CORRECT.

Q.    SO LET ME JUST -- JUST TO CLARIFY WHAT YOU LOOKED AT, FOR THE GAINESVILLE DIVISION, FOR EXAMPLE, THERE IS A CHART INDICATING THE TOTAL RACIAL AND ETHNIC BREAKUP OF THE QUALIFIED WHEEL.  IS THAT RIGHT?  AND I'M LOOKING AT GOVERNMENT'S EXHIBIT 27.

386

A.   CORRECT.

Q.   AND IT HAS -- IT INDICATES THAT THEY TOOK A SAMPLE OF THE GAINESVILLE QUALIFIED WHEEL THAT WAS 325 PEOPLE.  IS THAT RIGHT?

A.   THAT'S CORRECT.

Q.   AND OUT OF THAT SAMPLE, TWO PEOPLE WERE HISPANIC; CORRECT?

A.   CORRECT.

Q.   AND SO YOU'VE GOT TWO OUT OF 325 FOR THE GAINESVILLE DIVISION.

A.   THAT'S RIGHT.

Q.   AND GAINESVILLE, THE QUALIFIED WHEEL FOR GAINESVILLE ACTUALLY HAS 4,306 PEOPLE.  IS THAT CORRECT?  IF YOU LOOK AT PAGE TWO OF GOVERNMENT'S EXHIBIT 27 AT THE TOP, THERE'S ONE, DATE SAMPLE IS TAKEN, TWO, NUMBER OF NAMES IN QUALIFIED WHEEL.

A.   RIGHT, 4,306.

Q.   NOW, IF WE GO TO THE ATLANTA DIVISION, WE'VE GOT THE SAME THING; RIGHT?  WE'VE GOT A CHART THAT SAYS 1,000 FORMS WERE SAMPLED FROM THE ATLANTA QUALIFIED WHEEL.  AND I'M LOOKING AT GOVERNMENT'S EXHIBIT 28 RIGHT NOW.

A.   CORRECT.

Q.   AND OUT OF THOSE 1,000, 15 WERE HISPANIC.  IS THAT CORRECT?

A.   THAT'S CORRECT.

Q.   AND THE TOTAL SIZE OF THE ATLANTA QUALIFIED WHEEL IS 38,302 PEOPLE?

387

A.   THAT'S CORRECT.

Q.   SO NOW IF WE GO TO THE ROME DIVISION WHICH IS GOVERNMENT'S EXHIBIT 30 -- I'M SORRY, LET ME GO BACK.  WE'RE GOING TO THE NEWNAN DIVISION WHICH IS GOVERNMENT'S EXHIBIT 29.

A.   RIGHT.

Q.   THERE WAS A SAMPLE OF 325 OUT OF WHICH THERE WAS ONE HISPANIC.  DO YOU SEE THAT?

A.   RIGHT.

Q.   AND THE TOTAL SAMPLE SIZE WAS 325 -- I'M SORRY, AND THE TOTAL NUMBER OF NAMES IN THE QUALIFIED WHEEL IS 4,041 (SIC)?

A.   CORRECT.

Q.   AT THE TOP OF THE CHART?

A.   HANG ON A SECOND.  I THINK -- YOU'RE RIGHT.  LET ME --

          THE COURT:  ARE YOU ON NEWNAN OR ROME?

          MS. DINGLE:  I'M LOOKING AT NEWNAN RIGHT NOW.

          THE WITNESS:  OKAY, NEWNAN.

          MS. DINGLE:  AND THAT'S EXHIBIT 29, GOVERNMENT 29.

          THE WITNESS:  RIGHT.

BY MS. DINGLE:

Q.   OKAY.  SO DO YOU SEE THAT THE SIZE OF THE QUALIFIED WHEEL IS FOUR FORTY ONE?

A.   RIGHT, FOUR FORTY ONE.

Q.   NOW, LAST WE'VE GOT GOVERNMENT'S EXHIBIT 30 WHICH IS THE JS-12 FOR THE ROME DIVISION.  AND THAT INDICATES THAT OUT OF A SAMPLE OF 325 PEOPLE, TWO WERE HISPANIC.

388

A.   THAT'S CORRECT.

Q.   AND THE TOTAL NUMBER OF NAMES IN THAT QUALIFIED WHEEL WAS 8,344.  DO YOU SEE THAT?

A.   YES.

Q.   NOW, IF YOU ADD UP THE TOTAL NUMBER OF HISPANIC FROM THE SAMPLE HERE ON THE LEFT COLUMN THAT I'VE DRAWN HERE -- AND, I'M SORRY, MR. LECROY, ARE YOU ABLE TO SEE THE CHART?  CAN HE HEAR ME?

THE DEFENDANT:  I DON'T KNOW.  I CAN SEE THE CHART BUT NOT THE NUMBERS WRITTEN THEREON.

MS. DINGLE:  I DON'T KNOW WHAT WE SHOULD DO.

THE COURT:  AS WE GO ALONG, IF YOU HAVE A QUESTION ABOUT WHAT IS THERE, OBVIOUSLY, YOUR COUNSEL ARE ABLE TO SEE IT HERE, IF YOU HAVE ANY QUESTION ABOUT INFORMATION HERE, LET US KNOW.  AND OBVIOUSLY, YOU'LL HAVE AN OPPORTUNITY TO TALK WITH COUNSEL, AS WELL, OUTSIDE OUR PRESENCE.  BUT IF YOU HAVE SOME CONCERN ABOUT THESE SPECIFIC NUMBERS, JUST SPEAK UP AND WE WILL MAKE SURE THAT IT'S REPEATED SO THAT YOU CAN BE AWARE.

THE DEFENDANT:  NO PROBLEM, YOUR HONOR.

THE COURT:  YOU MAY PROCEED.

BY MS. DINGLE:

Q.   SO IF WE LOOK AT THE COLUMN ON THE LEFT HERE, WE'VE GOT THE SAMPLE RESULTS.  IS THAT CORRECT?

A.   THAT'S CORRECT.

Q.   AND WHAT YOU DID WAS YOU ADDED UP WHAT I WOULD CALL THE

389

NUMERATORS HERE; RIGHT?

A.    CORRECT.

Q.    AND WHEN YOU DO THAT, YOU GET 20 HISPANICS OUT OF ALL THE SAMPLES.  AND YOU DIVIDED THAT BY THE TOTAL OF ALL THE DENOMINATORS HERE.

A.    CORRECT.

Q.    WHICH IS 1975.

A.    RIGHT.

Q.    AND YOU ENDED UP WITH 1.01 PERCENT.

A.    CORRECT.

Q.    NOW, CORRECT ME IF I'M WRONG HERE, BUT THE SAMPLE SIZES, 325 TO 1,000 TO 325 TO 325, DO NOT MIRROR THE RATIOS OF THE ACTUAL SIZES OF EACH DIVISION'S QUALIFIED WHEEL.

A.    NO.

Q.    ISN'T THAT RIGHT?

A.    THAT'S CORRECT.

Q.    AND SO IN ORDER TO ACCURATELY GAUGE THE NUMBER OF HISPANICS IN THE ENTIRE NORTHERN DISTRICT QUALIFIED WHEEL, SHOULDN'T YOU TAKE THOSE RATIOS AND APPLY THEM TO EACH DIVISION AND THEN ADD THEM TOGETHER?

A.    THERE'S A LOTS OF DIFFERENT WAYS TO DO THAT.  YOU KNOW, IF THAT'S THE SAMPLE SIZE, THAT'S THE SAMPLE SIZE.  I MEAN, YOU KNOW, YOU CAN PRORATE THE NUMBER -- IS WHAT YOU'RE TALKING ABOUT IS PRORATE THOSE NUMBERS?  YOU COULD, YEAH.

Q.    NOW, I WOULDN'T CHARACTERIZE THAT AS PRORATING, WOULD I,

390

BECAUSE, FOR INSTANCE, LET'S SAY WE ACCEPT YOUR NUMBERS FOR THE GAINESVILLE DIVISION.  THOSE ARE AT THE TOP HERE ON THE CHART; RIGHT?  ROW ONE WOULD BE THE GAINESVILLE DIVISION.  THREE OUT OF 25 IN THE SAMPLE ARE HISPANIC FOR GAINESVILLE; RIGHT?

A.    325; RIGHT.

Q.    AND THAT'S, AS YOU TOLD US, YOU GOT .62 PERCENT OF GAINESVILLE IS HISPANIC.  AND SO IF I WANTED TO FIND OUT HOW MANY HISPANIC JURORS THERE ARE IN GAINESVILLE, WHAT I WOULD HAVE TO DO IS MULTIPLY .62 BY 4306.  ISN'T THAT RIGHT?

A.    IF I WANTED -- IN THE WHOLE QUALIFIED JURY WHEEL?

Q.    THAT'S CORRECT.

A.    WELL, I MEAN, THAT WOULD BE AN ESTIMATE.

Q.    IT WOULD BE AN ESTIMATE; BUT THAT'S THE NUMBER YOU CAME UP WITH, CORRECT, USING THE JS-12?

A.    I CAME UP WITH .62; RIGHT.

Q.    RIGHT.  AND SO THAT'S THE ESTIMATED PERCENTAGE OF HISPANICS IN THE QUALIFIED WHEEL EVEN ACCORDING TO YOU, ISN'T IT?

A.    IT'S ACTUALLY, TECHNICALLY, IT'S THE ACTUAL NUMBER IN THE SAMPLE, AND WHAT YOU'RE SAYING IS THE SAMPLE IS AN ESTIMATE OF THE ENTIRE QUALIFIED JURY WHEEL; RIGHT.

Q.    DO YOU HAVE ANY REASON TO BELIEVE THAT THE SAMPLE IS NOT RANDOM?

A.    NO.

Q.    AND SO YOU WOULD SAY THAT THE ESTIMATE YOU GOT FOR THE

391

SAMPLE WOULD BE ACCURATE FOR THE ENTIRE QUALIFIED WHEEL FOR

GAINESVILLE; RIGHT?

A.   I WOULD LIKE TO HAVE A LARGER SAMPLE SIZE; BUT, I MEAN,

IT'S A SAMPLE.

Q.   WELL, YOU'RE ADMITTING THAT THIS IS THE ACCURATE

PERCENTAGE FOR THE SAMPLE.

A.   IT'S THE ACCURATE PERCENTAGE FOR THE SAMPLE, ABSOLUTELY.

Q.   BUT YOU'RE SAYING THAT THAT PERCENTAGE FOR THE SAMPLE IS

NOT SUFFICIENT FOR US TO DETERMINE THE PERCENTAGE OF HISPANICS

IN THE GAINESVILLE QUALIFIED WHEEL?

A.   IT DEPENDS ON WHAT LEVEL YOU WANT TO LOOK AT.  IT WOULD BE

BETTER IF WE KNEW WHAT THE HISPANIC CONTENT WAS OF THE WHOLE

LIST.

Q.   SO BASICALLY, WHAT YOU'RE SAYING IS THAT THE DEFENDANT

SHOULD NOT BE RELYING ON YOUR STATISTICS IN ORDER TO EVALUATE

HIS FAIR CROSS-SECTION CLAIM.

A.   NO, I'M NOT SAYING THAT AT ALL.  I'M SAYING, YOU KNOW, WE

HAVE WHAT WE HAVE.  WE HAVE A SAMPLE HERE.  AND IF YOU WANT TO

RUN A BIGGER SAMPLE, THAT WOULD BE GREAT.  BUT GIVEN WHAT WE'VE

GOT, WE'VE GOT TO USE WHAT WE GOT.

Q.   OKAY.

A.   AND THAT'S WHAT WE'RE USING.

Q.   SO LET'S USE WHAT WE'VE GOT.  LET'S FIGURE OUT HOW MANY

HISPANICS THERE ARE IN GAINESVILLE.  WHAT STEP WOULD YOU TAKE

TO FIGURE THAT OUT?

392

A.   IF YOU WANTED AN -- IN TERMS OF THE GAINESVILLE QUALIFIED
JURY WHEEL?

Q.   THAT'S CORRECT.

A.   IF YOU WANTED AN ESTIMATE, AND, YOU KNOW, OF COURSE,
THAT'S ONLY AN ESTIMATE, YOU'RE MAKING SOME ASSUMPTIONS HERE,
YOU WOULD MULTIPLY .62 TIMES THE 4300.

Q.   OKAY.  SO LET'S DO THAT.  AND YOU'RE GOING TO GET 26.6
HISPANIC JURORS FOR THE GAINESVILLE DIVISION.  DO YOU TRUST MY
CALCULATION?

A.   YES.

Q.   OKAY.

A.   CLOSE ENOUGH.  TO A ROUND IT'S CLOSE ENOUGH.

Q.   ALL RIGHT.  NOW, IF YOU CONDUCT THIS EXERCISE FOR EACH OF
THE DIVISIONS, IF YOU CONDUCT THIS EXERCISE FOR EACH OF THE
DIVISIONS, ASSUMING YOU TRUST MY CALCULATOR, I'M GOING TO SHOW
YOU WHAT WE COME UP WITH FOR EACH ONE.

     SO APPLYING THE METHOD THAT YOU JUST DESCRIBED, YOU WOULD
GET 26.6 JURORS IN GAINESVILLE, 575 IN ATLANTA, 14 IN NEWNAN
AND 51 IN ROME.  DOES THAT MAKE SENSE?

A.   THAT MAKES SENSE.

Q.   AND IF YOU ADD THOSE NUMBERS TOGETHER, YOU'RE GOING TO GET
666.6 HISPANIC JURORS IN THE NORTHERN DISTRICT OF GEORGIA IN
THE QUALIFIED WHEEL; CORRECT?

A.   USING THAT PROCEDURE, YEP.

Q.   AND AS YOU SAID, THIS IS JUST AN ESTIMATE.

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

393

A.    ABSOLUTELY.

Q.    BUT THIS WOULD BE THE CORRECT ESTIMATE OF THE NUMBER OF HISPANIC JURORS IN THE NORTHERN DISTRICT.

A.    YOU KNOW, CORRECT, IS IT ACCURATELY DONE ACCORDING TO THE PROCEDURE, THAT'S RIGHT.

Q.    AND THE TOTAL NUMBER OF JURORS IN THE QUALIFIED WHEEL YOU COME UP WITH BY ADDING THESE; CORRECT?

A.    CORRECT.

Q.    AND THAT NUMBER IS 55,433; RIGHT?

A.    CORRECT.

Q.    AND IF YOU PUT 666 OVER 55,433, YOU GET THE PERCENTAGE OF HISPANICS IN THE NORTHERN DISTRICT OF GEORGIA, DON'T YOU?

A.    HANG ON A SECOND.  LET ME -- I WAS GETTING SOMETHING A LITTLE DIFFERENT WITH THAT TOTAL THERE.

      (PAUSE IN THE PROCEEDINGS.)

      OKAY.  I'M SORRY.  WHAT WAS THE QUESTION?

Q.    THE QUESTION WAS IF 666 IS THE NUMBER OF HISPANIC JURORS IN THE NORTHERN DISTRICT AND 55,433 IS THE TOTAL NUMBER OF JURORS IN THE QUALIFIED WHEEL, THEN WE CAN TAKE 666 DIVIDED OVER 55,433 AND WE'LL GET THE PERCENTAGE OF HISPANICS IN THE QUALIFIED WHEEL FOR THE DISTRICT.

A.    YOU KNOW, I HAVE TO BE CAREFUL HOW I USE MY LANGUAGE JUST LIKE LAWYERS DO, TOO.  YOU GET THE CORRECT, ACCORDING TO YOUR PROCEDURE.  BUT WHAT YOU'VE GOT TO UNDERSTAND IS WE'VE MADE SOME ASSUMPTIONS HERE.  IT'S HYPOTHETICALLY CORRECT.  YOU'VE

394

DONE THE NUMBERS CORRECTLY HYPOTHETICAL, GIVEN THE PROCEDURE YOU'RE TAKING.

Q.   WELL, EVEN YOU YOURSELF ADMITTED THAT BY YOUR NUMBERS FOR THE GAINESVILLE DIVISION, IF WE APPLY THOSE TO THE GAINESVILLE QUALIFIED WHEEL, THE CORRECT ESTIMATE OF HISPANICS IS 26. THAT'S WHERE WE STARTED; RIGHT, MR. MARTIN?

A.   RIGHT.  AND WHAT -- I THINK WHAT YOU'RE CON -- I HAVE TO BE CAREFUL WHEN I SAY CORRECT ESTIMATE BECAUSE THAT MEANS SOMETHING VERY SPECIFIC TO ME.  AND YOU'RE RIGHT, IT'S AN ESTIMATE, ABSOLUTELY.  AND TAKING WHAT YOU'VE DONE HERE, 666 DIVIDED BY 55,433 WOULD BE AN ESTIMATE OF THE JURY WHEEL. ABSOLUTELY.

Q.   AND --

A.   THERE ARE OTHER WAYS TO ESTIMATE IT, TOO; BUT THAT WOULD BE AN ESTIMATE, THAT'S RIGHT.

Q.   WELL, THE ESTIMATE THAT I CAME UP WAS BASED ON THE ACTUAL NUMBERS OF THE QUALIFIED WHEEL; RIGHT?

A.   CORRECT.

Q.   AND THE NUMBERS THAT YOU CAME UP WERE BASED JUST ON THE SAMPLE; RIGHT?

A.   THAT'S CORRECT.  NOW, THE NUMBERS, TO BE CLEAR, THE NUMBERS YOU CAME UP WITH FOR THE HISPANIC FOLKS ARE NOT BASED ON THE ACTUAL NUMBERS.  THEY ARE BASED ON THE ESTIMATES.

Q.   THEY ARE ESTIMATES; RIGHT.  BUT THEY ARE ESTIMATES BASED ON THE ACTUAL SIZES OF THE QUALIFIED WHEEL.  THAT'S WHAT I'M

395

GETTING AT.

A.    RIGHT.

Q.    AS OPPOSED TO JUST A SAMPLE.

A.    THAT'S CORRECT, THAT'S ABSOLUTELY CORRECT.

Q.    OKAY.  AND IF YOU DO IT BY MY METHOD, YOU COME UP WITH 666 OVER 55,433 AND THAT EQUALS 1.2 PERCENT; RIGHT?

A.    THAT'S CORRECT.

Q.    1.2 PERCENT IS HIGHER THAN THE ESTIMATE FOR HISPANICS THAT YOU CAME UP WITH USING THE SAMPLE, ISN'T IT?

A.    I THINK SO.  LET ME LOOK.  YEAH.  I CAME UP WITH 1.01.

Q.    SO THAT WAS A DIFFERENCE OF .19 PERCENT.

A.    RIGHT.

Q.    NOW, YOU'RE AWARE THAT THE DEFENDANT'S BRIEF IN THIS MOTION STATES THAT HISPANIC CITIZENS 18 AND OLDER MAKE UP BETWEEN 2.19 AND 2.23 PERCENT OF THE DISTRICT.

A.    CORRECT.

Q.    AND, IN FACT, I THINK THAT'S ON --

A.    IT'S ON.

Q.    -- DEFENDANT'S EXHIBIT --

A.    17.

Q.    -- 17 YOU'VE GOT THE SAME NUMBERS.  SO USING YOUR 1.01 NUMBER, JUST FOLLOWING YOUR CHART HERE, YOU CAME UP WITH 1.22 TO 1.18 PERCENT FOR THE ABSOLUTE DISPARITY.

A.    CORRECT.

Q.    AND BASED ON THOSE NUMBERS, THE COMPARATIVE DISPARITY THAT

396

YOU CAME UP WITH WAS 54.62 TO 53.82.

A.    CORRECT.

Q.    BUT IF WE USE THE NUMBER THAT I JUST CAME UP WITH NOW, 1.2 PERCENT, THE ABSOLUTE DISPARITY GOES DOWN TO .99 PERCENT TO 1.03 PERCENT.

A.    YOU HAVE TO BE CAREFUL HERE BECAUSE I DON'T WANT TO USE -- I'M CONSTRAINED IN SOME RESPECTS.

Q.    HOW ARE YOU CONSTRAINED?

A.    CONSTRAINED BECAUSE IF I CAME UP HERE AND DID A LOT OF HYPOTHETICALS AND ESTIMATES AND THAT TYPE OF THING, I THINK YOU WOULD RIGHTLY SAY, WELL, YOU'RE SPECULATING HERE.  AND SO I'M SORT OF CONSTRAINED BY USING THE NUMBERS THAT ARE ON THE JS-12 AND IN THE SAMPLE THAT WAS TAKEN.

Q.    WELL, MR. MARTIN --

A.    IF YOU WANT TO USE THE 1.20, YOU KNOW, I CAN WORK THROUGH THE CALCULATIONS.

Q.    OKAY.  LET'S DO IT.  YOU'VE CONCEDED THAT THE 1.2 PERCENT IS AN ACCURATE PERCENTAGE FOR HISPANICS BASED ON THE ACTUAL NUMBERS IN THE QUALIFIED WHEEL; CORRECT?

A.    IT'S NOT AN ACCURATE NUMBER.  IT'S AN ESTIMATE NUMBER.

Q.    IT'S AN ESTIMATE THAT'S BASED ON USING THE NUMBERS IN THE QUALIFIED WHEEL AS WELL AS THE PERCENTAGES IN THE JS-12S.

A.    I HAVE NO ARGUMENT WITH THAT.  IT'S DEFINITELY AN ESTIMATE.  I AGREE WITH YOU.  WHAT MY PROBLEM IS IS MY EXHIBITS, I TRY TO STICK TO THE NUMBERS I CAN POINT MY FINGERS

397

TO AND SAY THESE ARE THE NUMBERS SO THAT NOBODY IS ACCUSING ME OF BEING HYPOTHETICAL OR SPECULATIVE.

Q.   WELL, YOU'RE A STATISTICAL EXPERT.

A.   AND I'M A STATISTICAL EXPERT; AND IF YOU WANT ME TO CALCULATE IT USING THE 1.2, I HAVE NO PROBLEM DOING THAT.  I JUST WANT TO TELL YOU THAT THAT'S YOUR NUMBER, NOT MY NUMBER.

Q.   OKAY.  I'M AWARE OF THAT.  SO LET'S USE MY NUMBER AND LET'S CALCULATE THE ABSOLUTE DISPARITY.

A.   ALL RIGHT.  YOU HAD 1.20.  SO YOU'RE GOING TO GET A RANGE OF 1.03 TO .99.  IS THAT WHAT YOU HAD?

Q.   I GOT THE SAME THING.  SO THAT'S A DECREASE IN THE ABSOLUTE DISPARITY --

A.   THAT'S CORRECT.

Q.   -- FROM WHAT YOU GOT.  NOW, CAN YOU CALCULATE THE COMPARATIVE DISPARITY FOR ME USING MY NUMBERS?

A.   SURE.  (PAUSE IN THE PROCEEDINGS.)  AND IT'S SUBJECT TO DOING STUFF ON THE FLY, YOU KNOW.  THIS IS WHAT I'VE GOT.  I'VE GOT THE COMPARATIVE DISPARITY TO BE A RANGE OF 45 PERCENT TO 46 PERCENT.

Q.   OKAY.  SO 45 TO 46 PERCENT IS 10 PERCENT LOWER THAN WHAT YOU CAME UP WITH USING 1.01 PERCENT.

A.   RIGHT.  10 PERCENT, AND BE CAREFUL HERE, IT'S 10 PERCENT LOWER IN TERMS OF JUST SUBTRACTING THE TWO NUMBERS; THAT'S CORRECT.

Q.   AND SO WITH JUST A .19 PERCENT CHANGE IN THE NUMBER OF

398

HISPANICS BETWEEN YOUR ESTIMATE AND MY ESTIMATE, THERE WAS A 10 PERCENT DIFFERENCE IN THE COMPARATIVE DISPARITY.  ISN'T THAT RIGHT?

A.    THAT'S CORRECT.

Q.    AND YOU CLAIM THAT COMPARATIVE DISPARITY ANALYSIS IS THE BEST METHOD TO USE WHERE A GROUP CONSTITUTES LESS THAN 10 PERCENT OF THE POPULATION?

A.    THAT'S CORRECT.  OF COURSE, YOU WANT TO LOOK AT ALL THE OTHER STATISTICAL MEASURES, AS WELL; BUT YES.

Q.    AND THE WAY THAT COMPARATIVE DISPARITY WORKS IS BASICALLY THAT YOU TAKE THE ABSOLUTE DISPARITY AND YOU DIVIDE THAT BY THE JUROR ELIGIBLE MEMBERS IN THE POPULATION.

A.    THAT'S CORRECT, THE PERCENTAGE OF THE JURY.

Q.    RIGHT.  SO KEEPING THE ABSOLUTE DISPARITY CONSTANT, AS THE GROUP SIZE DECREASES, THE COMPARATIVE DISPARITY GETS LARGER.

A.    KEEPING THE -- RUN THAT ONE BY ME AGAIN.

Q.    IF WE KEEP THE ABSOLUTE DISPARITY CONSTANT, FOR INSTANCE, IF THE ABSOLUTE DISPARITY IS 10 PERCENT, IF A GROUP MAKES UP 70 PERCENT OF THE POPULATION, THE COMPARATIVE DISPARITY WILL BE A LOT LOWER THAN IF THAT GROUP MAKES UP 20 PERCENT OF THE POPULATION.

A.    CORRECT.  AND THAT'S PRECISELY THE POINT WE'RE MAKING IS THAT IT MEANS SOMETHING DIFFERENT FOR A SMALLER GROUP THAN IT DOES FOR A BIG GROUP.  ABSOLUTELY.

Q.    AND SO IF YOU HAVE A GROUP SIZE, A GROUP THAT MAKES UP

399

ONLY 1.1 PERCENT OF THE POPULATION AND THERE'S AN ABSOLUTE

DISPARITY OF ONE, THEN YOU GET A 91 PERCENT COMPARATIVE

DISPARITY.

A.   IF YOU MAKE UP -- RUN THAT ONE BY ME AGAIN.

Q.   IF YOU HAVE A GROUP THAT'S 1.1 PERCENT OF THE POPULATION

AND THERE'S AN ABSOLUTE DISPARITY OF ONE, YOU DO ONE OVER 1.1.

A.   RIGHT.

Q.   AND YOU GET 91 PERCENT COMPARATIVE DISPARITY.

A.   RIGHT.

Q.   AND IF THERE'S ONLY ONE MEMBER OF A GROUP IN AN ENTIRE

COMMUNITY, LET'S SAY WE HAD A GROUP, A 10,000-PERSON TOWN AND

THERE'S ONLY ONE NATIVE AMERICAN IN THAT TOWN, IF THAT NATIVE

AMERICAN PERSON DOESN'T GET INTO THE QUALIFIED JURY WHEEL,

YOU'VE GOT A 100 PERCENT COMPARATIVE DISPARITY; RIGHT?

A.   CORRECT.

Q.   AND, FOR INSTANCE, IF YOU HAD FOUR NATIVE AMERICANS IN

THAT TOWN AND ONLY ONE GOT INTO THE QUALIFIED JURY WHEEL, YOU

WOULD HAVE A 75 PERCENT COMPARATIVE DISPARITY; RIGHT?

A.   I THINK YOU'RE RIGHT.

Q.   SO WITH EXTREMELY SMALL COMMUNITIES, DISTORTIONS CAN OCCUR

THAT MAKE THE COMPARATIVE DISPARITY FIGURES LESS MEANINGFUL.

A.   THERE ARE DISTORTIONS -- OF COURSE, THERE ARE DISTORTIONS

WITH ANY NUMBERS; CORRECT.  AND THAT'S WHY YOU RELY ON ALL

THESE NUMBERS HERE.

Q.   AND AS WE SHOWED WITH THE EXAMPLE OF YOUR PERCENTAGE AND

400

MY PERCENTAGE, IF THERE ARE EVEN SMALL CHANGES OR ERRORS OR OMISSIONS FROM THE DATA, THAT CAN HAVE A MASSIVE EFFECT ON THE COMPARATIVE DISPARITY.  ISN'T THAT RIGHT?

A.   YOU KNOW, YOU HAVE TO -- YOU KNOW, LIKE YOU USE YOUR WORDS CAREFULLY, I HAVE TO USE MY WORDS CAREFULLY.  MASSIVE IS A, YOU KNOW, IS A LAYPERSON TERM.  YOU HAVE TO LOOK AT THE STATISTICS, AND THAT'S WHAT WE'RE LOOKING AT.  AND IF YOU TALKING SIGNIFICANT AND NONSIGNIFICANT, THEN YOU'RE TALKING STANDARD DEVIATIONS.

Q.   LET'S STICK WITH --

A.   IF IT'S BIGGER -- IF YOU SAID AS A LAYPERSON IT'S BIGGER, IT'S BIGGER.

Q.   SO EVEN SMALL CHANGES IN THE NUMBER OF INDIVIDUALS IN THE GROUP CAN HAVE LARGE EFFECTS ON THE COMPARATIVE DISPARITY; RIGHT?

A.   THEY HAVE AN EFFECT; RIGHT.  AND YOU JUST HAVE TO RUN THE NUMBERS AND SEE WHAT THEY ARE.  I AGREE.

Q.   AND SO BECAUSE OF THIS DISTORTION, SO TO SPEAK, OR -- I'M SORRY, LET ME CORRECT MY WORDS HERE.  BECAUSE OF THE LARGE EFFECT IN COMPARATIVE DISPARITY THAT CAN HAPPEN BASED ON SMALL CHANGES, THE HIGHER THE COMPARATIVE DISPARITY THAT SHOULD BE TOLERATED.  DOES THAT MAKE SENSE?

A.   IN TERMS OF WHEN YOU SAY TOLERATED, IT'S TOLERATED BY WHO? IF YOU WANT TO LOOK AT THE STATISTICAL ANALYSIS -- I THINK WHERE YOU'RE GOING IS YOU'RE TALKING ABOUT STATISTICALLY WHAT

401

MATTERS.  AND WHAT YOU WANT TO DO IS A COUPLE OF THINGS.  YOU WANT TO LOOK AT THE STANDARD DEVIATIONS TO SEE IF THIS IS A SYSTEMATIC OR A RANDOM TYPE OF THING.  AND THEN ALSO YOU WANT TO LOOK AT IMPACT, AND IMPACT DEPENDS ON HOW MANY FOLKS YOU'RE GOING TO DRAW OUT OF EACH OF THOSE GROUPS.

Q.   OKAY.  AND THAT ACTUALLY BRINGS ME TO MY NEXT POINT WHICH IS YOU'VE EXPRESSED CONCERNS ABOUT THE ABSOLUTE DISPARITY METHOD OF CALCULATING UNDERREPRESENTATION; RIGHT?

A.   CORRECT.

Q.   AND SPECIFICALLY, YOUR CONCERN IS THAT, FOR INSTANCE, IF COURTS HAVE A BENCHMARK OF 10 PERCENT FOR ABSOLUTE DISPARITY, THEN SOME GROUPS THAT ARE LESS THAN 10 PERCENT OF THE POPULATION COULD BE COMPLETELY EXCLUDED FROM THE JURY POOL.

A.   CORRECT.

Q.   BUT THAT ISN'T THE CASE HERE; RIGHT?  IN THIS PARTICULAR CASE --

A.   IN WHAT --

Q.   IN THIS PARTICULAR CASE WERE 100 PERCENT OF HISPANICS EXCLUDED FROM MR. LECROY'S JURY POOL?

A.   NO.

Q.   IN FACT, AS WE DISCUSSED USING THIS ESTIMATE, THIS NUMBER, THERE WERE 26 HISPANICS IN THE GAINESVILLE QUALIFIED WHEEL.

A.   AN ESTIMATE; CORRECT.

Q.   AND APPROXIMATELY -- WELL, BY YOUR OWN ESTIMATES, USING 1.01 PERCENT, THERE WOULD BE 560 HISPANICS IN THE NORTHERN

402

DISTRICT WHEEL; RIGHT?  BY YOUR ESTIMATE, I'M SORRY, NOT LOOKING AT THAT CHART.  BUT YOU GAVE US 1.01 PERCENT OF THE QUALIFIED WHEEL.

A.   THE 1.01?

Q.   RIGHT.

A.   YEAH.  IF YOU USED THAT AS AN ESTIMATE FOR THE WHOLE WHEEL AND YOU MULTIPLIED IT OUT, IT WOULD BE 560.

Q.   RIGHT.  SO YOU'D HAVE 560 HISPANICS IN THE WHEEL, EVEN BY YOUR OWN NUMBERS.

A.   AS AN ESTIMATE.  THE ONLY ONES I REALLY KNOW ARE THE 20 THAT WE'VE GOT THE DATA ON.

Q.   AND USING THE 1.2 PERCENT HISPANICS FOR THE ENTIRE NORTHERN DISTRICT OF GEORGIA, WE'D HAVE 666 HISPANICS IN THE QUALIFIED WHEEL, APPROXIMATELY.

A.   AS AN ESTIMATE; RIGHT.

Q.   NOW, THE NUMBERS WE'VE BEEN USING WERE BASED ON JS-12 REPORTS CREATED IN 2001; RIGHT?

A.   CORRECT.

Q.   AND YOU USED THOSE REPORTS TO COME UP WITH YOUR NUMBERS FOR MR. LECROY'S GRAND JURY AND HIS PETIT JURY?

A.   CORRECT, IN THE SENSE THAT I CAN'T REMEMBER IF THE GRAND JURIES ARE POOLED DISTRICT-WIDE AND THE PETIT JURIES ARE POOLED JUST FROM THE DIVISION, IS THAT CORRECT?  OR ARE THEY BOTH POOLED DISTRICT-WIDE?  OR WHAT ARE YOU ASKING MAYBE?

Q.   WELL, MY QUESTION IS JUST WHETHER YOUR ANALYSIS WAS

403

LIMITED TO THE 2001 JS-12 REPORTS.

A.   YES, IT WAS.

Q.   AND ARE YOU AWARE THAT MR. LECROY WAS INDICTED BY A GRAND JURY THAT WAS DRAWN FROM THE 1997 MASTER WHEEL?

A.   I HAVE NO REASON TO DOUBT YOU IF THAT'S TRUE.

Q.   AND YOU JUST EXPRESSED SOME CONFUSION, BUT ARE YOU AWARE THAT GRAND JURIES IN THIS DISTRICT ARE COMPOSED OF JURORS FROM ALL FOUR DIVISIONS IN THE NORTHERN DISTRICT OF GEORGIA?

A.   I HAVE NO REASON TO DOUBT THAT THAT'S TRUE.

Q.   NOW, HAVE YOU HAD THE OPPORTUNITY AT ALL TO CALCULATE THE ABSOLUTE AND COMPARATIVE DISPARITIES FOR THE NORTHERN DISTRICT OF GEORGIA USING THE 1997 JURY STATISTICS, NOT NECESSARILY IN THIS CASE?

A.   I DON'T KNOW.  MAYBE I HAVE, BUT I DON'T RECALL.

Q.   IF YOU WERE TO -- WELL, LET ME SHOW YOU, I HAVE JUST HANDED YOU DOCUMENTS THAT HAVE BEEN MARKED FOR IDENTIFICATION AS GOVERNMENT EXHIBITS 10, 11, 12 AND 13.

A.   RIGHT.

Q.   AND THESE ARE THE JS-12 REPORTS FROM 1997 FOR ALL FOUR DIVISIONS; IS THAT RIGHT?

A.   YES; CORRECT.  THEY ARE DATED 12/17/1997.

        MS. DINGLE:  YOUR HONOR, I WOULD MOVE TO ADMIT THAT PROVISIONALLY SUBJECT TO TESTIMONY FROM THE JURY ADMINISTRATOR.

        THE COURT:  ANY OBJECTION?

        MR. MARTIN:  LET ME FIND THEM.  I HAVE NO OBJECTION

404

TO THEM BEING ADMITTED.

THE COURT:  THEY ARE ADMITTED.

MR. MARTIN:  CONTINGENT UPON THAT.

THE COURT:  YES, THEY ARE ADMITTED.

BY MS. DINGLE:

Q.    NOW, IF YOU WERE TO PERFORM AN ANALYSIS OF HISPANIC REPRESENTATION IN THE NORTHERN DISTRICT OF GEORGIA FOR 1997, WOULD YOU FIND IT MORE APPROPRIATE -- WELL, IT WOULD BE APPROPRIATE TO USE THE 2000 CENSUS NUMBERS TO CONDUCT THAT ANALYSIS.  IS THAT RIGHT?

A.    THE 1997 ONE?

Q.    RIGHT.

A.    IT DEPENDS ON WHAT YOU HAVE.  YOU KNOW, YOU'D WANT TO USE 1997 NUMBERS IF -- I GUESS, YOU KNOW, YOU WANT TO SAY IT'S REPRESENTATIVE AS OF WHAT PERIOD AND SO --

Q.    RIGHT.  YOU UNDERSTAND THAT THE CENSUS IS ONLY TAKEN EVERY TEN YEARS; RIGHT?

A.    WELL, THE DECENNIAL CENSUS, OBVIOUSLY, IS ONLY TAKEN EVERY TEN YEARS.  THE CENSUS BUREAU RELEASES CENSUS NUMBERS EVERY YEAR.

Q.    WELL, THE NUMBERS THAT WE'VE BEEN TALKING ABOUT WITH REGARD TO YOUR CHARTS WERE BASED ON THE DECENNIAL CENSUS; RIGHT?

A.    WERE BASED ON THE 2000 DECENNIAL CENSUS; CORRECT.

Q.    SO IF WE WERE RELYING ON THE DECENNIAL CENSUS, THEN WE'D

405

WANT THE ONE CLOSEST TO 1997.  ISN'T THAT RIGHT?

A.   WELL, IT DEPENDS ON WHAT YOU'RE USING IT FOR.  ANY TIME THAT YOU'RE VERY FAR OFF OF THE DECENNIAL CENSUS DATE, ESSENTIALLY, THOSE CENSUS NUMBERS BECOME ESTIMATES.  IF YOU WANT TO USE YEARLY NUMBERS, YOU CAN USE YEARLY NUMBERS.

Q.   WELL, ASSUMING THAT OUR CHOICE IS LIMITED TO THE 1990 CENSUS AND THE 2000 CENSUS, FOR 1997 IT WOULD MAKE MORE SENSE TO USE 2000, WOULDN'T IT?

A.   IF YOU HAD THE NUMBERS AT THE TIME.

Q.   NOW --

A.   YOU KNOW, YOU'D HAVE TO BE CLEAR.  YOU'D WANT TO LOOK AT THE CHANGES IN DEMOGRAPHICS.  IF THE 1990 CENSUS AND THE 2000 CENSUS WERE ENTIRELY CONSISTENT, YOU WOULD HAVE SOME BETTER FEELING THAT THE NUMBERS ARE THE SAME, YOU KNOW, SUBJECT TO SOME CRAZY, YOU KNOW, FLOOD, YOU KNOW, SOME SORT OF CIRCUMSTANCES WHERE PEOPLE ARE MOVING IN AND OUT.

Q.   SO BARRING ANY EXTRAORDINARY CIRCUMSTANCES, THOUGH, YOU WOULD AGREE THAT THE CENSUS TAKEN CLOSEST TO THE PERIOD WOULD BE THE BEST CENSUS TO USE.

A.   WELL, YES, YOU WOULD WANT TO USE THE CLOSEST.

Q.   YOU'VE ANSWERED MY QUESTION.  NOW, IF WE'RE GOING TO PERFORM THE SAME ANALYSIS USING THE 1997 NUMBERS, THOSE NUMBERS COMBINING THE NORTHERN DISTRICT OF GEORGIA -- SORRY, I'M SORRY, COMBINING THE JS-12 NUMBERS FOR EACH DIVISION FOR THE ENTIRE NORTHERN DISTRICT OF GEORGIA, YOU GET .87 PERCENT OF THE

406

QUALIFIED WHEEL AS HISPANIC.  DO YOU TRUST MY MATH ON THAT OR WOULD YOU LIKE TO GO THROUGH 1997 --

A.   I DON'T HAVE ANY REASON TO DOUBT YOU.  WHAT DID YOU DO? DID YOU -- HOW DID YOU COME UP WITH THAT NUMBER?

Q.   I FOLLOWED THE SAME PROCEDURE THAT WE -- FOLLOWING THE SAME PROCEDURE THAT WE DISCUSSED EARLIER.  WE DID --

A.   THE PROCEDURE THAT YOU CAME UP WITH?

Q.   EXACTLY.  SO YOU TAKE THE PERCENTAGE OF HISPANICS IN EACH SAMPLE.  YOU APPLY THAT PERCENTAGE TO THE TOTAL NUMBER IN THE QUALIFIED WHEEL.  YOU GET THE NUMBER OF HISPANICS IN THE QUALIFIED WHEEL FOR THAT DIVISION.  YOU DO IT FOR ALL FOUR DIVISIONS.  ADD THE NUMBER TOGETHER.  THEN YOU GET THE TOTAL NUMBER OF HISPANICS IN THE QUALIFIED WHEEL AND DIVIDE THAT BY THE TOTAL NUMBER OF JURORS.  IS THAT THE PROCEDURE THAT WE FOLLOWED BEFORE?

A.   THAT'S THE PROCEDURE YOU FOLLOWED.  AND, OF COURSE, I WANT TO MAKE SURE THAT WHEN YOU SAY THE TOTAL NUMBER OF HISPANICS, THAT'S JUST -- YOU'RE GUESSING AT WHAT THE NUMBER IS.

Q.   RIGHT.  SO IF YOU TRUST MY MATH AND MY CALCULATOR, BY FOLLOWING THAT PROCEDURE, WE WOULD COME UP WITH .87 PERCENT OF THE QUALIFIED WHEEL AS HISPANIC IN 1997.

A.   I HAVE NO REASON TO DOUBT THAT THAT'S WHAT YOU'D COME UP WITH.

Q.   AND IF YOU USE THAT NUMBER, YOU GET IN -- COMPARED WITH THE 2000 CENSUS STATISTICS THAT YOU YOURSELF USED, YOU'D GET AN

407

ABSOLUTE DISPARITY OF 1.32 TO 1.36 PERCENT.  DO YOU WANT TO DO THOSE CALCULATIONS?

A.    THAT SOUNDS ABOUT RIGHT.

Q.    AND THAT WOULD RESULT IN A 60.1 PERCENT COMPARATIVE DISPARITY.

A.    THAT SOUNDS ABOUT RIGHT.

Q.    SO BASED ON THAT, WE ALREADY WENT OVER THIS, BUT USING THE 1997 NUMBERS, HISPANICS WERE NOT COMPLETELY EXCLUDED FROM THAT QUALIFIED JURY WHEEL EITHER, WERE THEY?

A.    NO, THEY WEREN'T COMPLETELY EXCLUDED, THAT'S CORRECT.

Q.    AND I JUST WANT TO TURN TO, YOU KNOW, NOW THAT WE'VE ESTABLISHED THE CORRECT COMPARATIVE DISPARITY NUMBERS FOR THE NORTHERN DISTRICT OF GEORGIA FOR THE JURY WHEEL USED IN MR. LECROY'S CASE, I WANT TO TALK ABOUT THE NUMBERS THAT YOU PROVIDED IN SUPPORT OF DEFENDANT'S MOTION IN THE TRIAL IN THIS CASE.  AND THAT WAS BACK IN 2003.  IS THAT RIGHT?

A.    YOU HAD A LOT OF STUFF IN THAT QUESTION.  2003 SOUNDS ABOUT THE RIGHT TIME PERIOD.

Q.    WELL, DO YOU HAVE GOVERNMENT'S EXHIBIT 90 IN FRONT OF YOU?

A.    YES.

Q.    WHAT'S THE DATE ON THAT EXHIBIT?

A.    AUGUST 23RD, 2002, IS WHAT THE FILE STAMP IS.

Q.    OKAY.  SO YOUR ANALYSIS AT THAT TIME WAS CONDUCTED IN 2002.

A.    THAT'S WHAT IT LOOKS LIKE, AUGUST 2002.

408

Q.    OKAY.  AND YOU PROVIDED AN AFFIDAVIT IN SUPPORT OF

DEFENDANT'S MOTION AT THAT TIME.

A.    THAT'S CORRECT.

Q.    AND TAKING INTO ACCOUNT THAT THERE WAS -- MAY HAVE BEEN

SOME DEGREE OF METHODICAL ERROR, YOU CAME UP WITH COMPARATIVE

DISPARITIES OF 84.07 PERCENT FOR THE NORTHERN DISTRICT OF

GEORGIA AND 90.75 PERCENT FOR THE GAINESVILLE DIVISION;

CORRECT?

A.    THAT'S CORRECT.

Q.    AND THOSE COMPARATIVE DISPARITY NUMBERS ARE SIGNIFICANTLY

HIGHER THAN THE ONES THAT YOU AND I CAME UP WITH JUST NOW.

A.    THEY ARE HIGHER, YES.

Q.    AND THAT'S BECAUSE YOU USED GENERAL POPULATION STATISTICS

FROM THE CENSUS, NOT CITIZENSHIP STATISTICS; RIGHT?

A.    WHAT I WOULD CALL TOTAL POPULATION WHICH INCLUDES CITIZENS

AND NONCITIZENS.

Q.    SO, I MEAN, AS MR. JACK MARTIN ASKED YOU BEFORE, YOU DID

NOT REFINE YOUR ANALYSIS TO LIMIT IT TO HISPANIC CITIZENS.

A.    THAT'S CORRECT.

Q.    AND SO WHERE YOU STATED IN PARAGRAPH 13 OF YOUR AFFIDAVIT

THAT THERE WAS VIRTUALLY A COMPLETE EXCLUSION OF HISPANICS FROM

JURIES, DO YOU SEE THAT?

A.    IN PARAGRAPH -- I GOT --

Q.    PARAGRAPH 13 OF YOUR AFFIDAVIT.

A.    UNFORTUNATELY, I'VE GOT TWO PARAGRAPH 13S HERE.  ALL

409

RIGHT.  OKAY, SORRY.  WHAT'S THE QUESTION?

Q.   I JUST WANT TO CONFIRM YOU MENTIONED THERE WERE TWO --

A.   YEAH, I'VE GOT TWO PARAGRAPH 13S HERE OR AT LEAST TWO. YEAH, I'VE GOT TWO PARAGRAPH 13S.  I BELIEVE YOU'RE TALKING ABOUT THE SECOND PARAGRAPH 13.

Q.   SO THE SECOND PARAGRAPH 13 WHERE YOU STATE:  THERE'S VIRTUALLY A COMPLETE EXCLUSION OF THIS CLASS FROM JURIES IN THIS DIVISION.  NOW, THAT STATEMENT THAT YOU MADE WAS BASED ON THE NUMBERS YOU CAME UP WITH USING THE GENERAL POPULATION. ISN'T THAT RIGHT?

A.   CORRECT.

Q.   NOW, I WANT TO JUST TURN TO STANDARD DEVIATION WHICH YOU TALKED ABOUT A LITTLE BIT.  NOW, EVEN ON DIRECT YOU ADMITTED THAT AT 325 IN A SAMPLE, WE'RE BELOW WHAT A GOOD SAMPLE WOULD BE.

A.   THAT'S CORRECT.

Q.   IS THAT RIGHT?

A.   THAT'S CORRECT.  WELL, A GOOD SAMPLE IN TERMS OF GETTING THE MARGINS OF ERROR.

Q.   AND THAT'S FOR PURPOSES OF STANDARD DEVIATION ANALYSIS.

A.   CORRECT.

Q.   OKAY.  AND WHAT STANDARD DEVIATION ANALYSIS REALLY TELLS US IS HOW LIKELY YOU ARE TO PULL A JURY WITH THOSE CHARACTERISTICS.

A.   THAT'S CORRECT.

410

Q.    AND SO THAT NUMBER BECOMES LESS AND LESS ACCURATE AS THE SAMPLE SIZE GETS SMALLER.  ISN'T THAT RIGHT?

A.    THAT'S CORRECT.  NOT LESS AND LESS ACCURATE.  IT STAYS AS ACCURATE AS IT ALWAYS IS.  IT BECOMES WIDER.  THE MARGIN OF ERROR BECOMES LARGER.

Q.    WELL, WOULDN'T YOU SAY THAT IF THERE'S A LARGER CHANCE FOR ERROR, THEN SOMETHING IS LESS ACCURATE?

A.    WE'RE NOT TALKING ABOUT ERROR HERE.  WE'RE TALKING ABOUT THE LARGER CHANCE OF SOMETHING HAPPENING.

Q.    WELL, YOU JUST DESCRIBED THAT AS A MARGIN OF ERROR, DIDN'T YOU?

A.    YEAH, THAT'S THE TERM THAT YOU USE FOR IT.  THAT'S THE STATISTICAL TERM.

Q.    OKAY.  WELL, THE GREATER THE MARGIN OF ERROR, THE LESS ACCURATE THE SAMPLE; RIGHT?

A.    THAT'S NOT REALLY HOW THE NUMBERS ARE PUT TOGETHER.  YOU HAVE A MARGIN OF ERROR ASSOCIATED WITH A SAMPLE AND IT IS WHAT IT IS.  I MEAN --

Q.    WELL --

A.    YOU'RE RIGHT.  IF YOU CALCULATED IT WRONG, IT WOULDN'T BE ACCURATE, IT WOULD BE WRONG.  BUT --

Q.    ASSUMING THAT YOU CORRECTLY CALCULATE THE STANDARD DEVIATION, THE SMALLER THE SAMPLE SIZE IS, THE LESS ACCURATE THAT STANDARD DEVIATION ANALYSIS IS.

A.    NO.  THE STANDARD DEVIATION ANALYSIS IS STILL AS ACCURATE.

411

IT'S JUST YOU GET A WIDER RANGE.

Q.   WELL, YOU ADMITTED YOURSELF THAT YOU WISHED YOU HAD HAD A LARGER SAMPLE.

A.   RIGHT.  YOU WANT A SMALLER RANGE BECAUSE THAT WOULD, THAT TELLS YOU MORE ABOUT THE SAMPLE.  RIGHT.  ABSOLUTELY, CORRECT. A LARGER SAMPLE WOULD BE BETTER.

Q.   AND GIVEN THAT A LARGER SAMPLE WOULD BE BETTER, THERE'S NO REASON TO RELY ON STANDARD DEVIATION AS OPPOSED TO THE OTHER METHODS THAT WE TALKED ABOUT.

A.   NO, I WOULDN'T SAY THAT.  YOU WOULD STILL WANT TO LOOK AT STANDARD DEVIATIONS.

Q.   I WANT TO JUST --

A.   BUT YOU'VE GOT TO KNOW WHAT THE STANDARD DEVIATIONS ARE.

Q.   WELL, IN THIS CASE, AS YOU YOURSELF NOTED, THE STANDARD DEVIATION WAS LESS THAN 2 PERCENT IN THE GAINESVILLE DIVISION. ISN'T THAT RIGHT?

A.   LESS THAN TWO STANDARD DEVIATIONS.

Q.   I'M SORRY, LESS THAN TWO STANDARD DEVIATIONS.

A.   IN THE GAINESVILLE DIVISION, THAT'S CORRECT.

Q.   NOW, I WANT TO TURN TO THE SPECIFIC JURY POOL THAT WAS SUMMONED IN MR. LECROY'S CASE.  NOW, YOU HAVEN'T CONDUCTED ANY ANALYSIS OF THE JURY QUESTIONNAIRES FOR MR. LECROY'S GRAND JURY VENEER OR HIS PETIT JURY VENEER, HAVE YOU?

A.   FOR THE ACTUAL GRAND JURY?

Q.   NOT THE ACTUAL GRAND JURORS BUT THE VENEER, THE POOL OF

412

PEOPLE WHO CAME TO THE COURTROOM THAT DAY TO BE SELECTED FOR THE GRAND JURY.

A.    I DON'T BELIEVE SO.

Q.    IN FACT, YOU'VE NEVER LOOKED AT ANY QUESTIONNAIRES RELATED TO THIS CASE, HAVE YOU?

A.    I'M TRYING TO REMEMBER.  WHEN I TALKED TO MS. MOSES ABOUT IT, SHE SHOWED ME -- DRAWING ON MEMORY HERE -- SHE SHOWED ME A SPREADSHEET THAT, YOU KNOW, IS HOW SHE CONDUCTED THE SAMPLE. AND I DON'T KNOW IF SHE SHOWED ME QUESTIONNAIRES AT THAT TIME OR NOT.  I CAN LOOK BACK THROUGH MY NOTES AND SEE.

        (DISCUSSION OFF THE RECORD.)

BY MS. DINGLE:

Q.    I'VE JUST HANDED YOU GOVERNMENT'S EXHIBIT 39.

A.    OKAY.

Q.    AND GOVERNMENT'S EXHIBIT 39 IS, BASICALLY, THE QUESTIONNAIRES FOR THE PETIT JURY VENEER IN MR. LECROY'S CASE.

A.    OKAY.

        MS. DINGLE:  YOUR HONOR, I WOULD JUST MOVE TO ADMIT THESE PROVISIONALLY UNTIL MS. MOSES CAN TESTIFY.

        THE COURT:  VERY WELL.  I'LL GIVE YOU A CHANCE TO OBJECT.

        MR. MARTIN:  I UNDERSTAND.  BUT I DON'T REALLY OBJECT TO THEIR AUTHENTICITY, IF THAT'S THE QUESTION.  BUT I DO BELIEVE THEY'RE IRRELEVANT.  THE CASE LAW IS QUITE CLEAR THAT WHAT THE COMPOSITION OF ANY PARTICULAR JURY PANEL IS

413

IRRELEVANT.  IT'S WHAT THE COMPOSITION OF THE JURY WHEEL THAT MATTERS.  IF THERE WAS NO REPRESENTATION OF HISPANICS, THAT DOESN'T MAKE ANY DIFFERENCE.  IF THERE WAS 50 PERCENT HISPANICS, IT DOESN'T MAKE ANY DIFFERENCE.

BUT FOR WHAT IT'S WORTH, I DON'T MIND THEM GETTING IN.  WE CAN ARGUE THE LEGAL POINTS LATER.

MS. DINGLE:  I APPRECIATE DEFENSE COUNSEL.  AND JUST FOR -- I'D LIKE TO NOTE THAT, YOU KNOW, IT'S CERTAINLY RELEVANT TO WHETHER MR. LECROY WAS PREJUDICED BY HIS TRIAL COUNSEL WHAT THE ACTUAL COMPOSITION WAS OF HIS PETIT JURY VENEER.

MR. MARTIN:  THAT'S JUST NOT THE CASE LAW.

THE COURT:  LET'S MOVE THROUGH IT FAIRLY QUICKLY.

BY MS. DINGLE:

Q.   SO IF YOU LOOK AT THESE PETIT JURY QUESTIONNAIRES, YOU HAVEN'T HAD A CHANCE TO REVIEW THEM.

A.   I DON'T BELIEVE SO.

Q.   AND ASSUMING THAT I DID AN OKAY JOB WHEN I REVIEWED THEM, YOU WOULD GET ONE HISPANIC OUT OF 91 QUESTIONNAIRES.

A.   THERE'S ONE HISPANIC PERSON ON THE VERY TOP HERE; AND DOING THE OLD-TIME MOVIE TECHNIQUE, I DON'T SEE ANYBODY ELSE UNDER THE RACE -- WELL, NO, WAIT A SECOND.  IT'S GOT A QUESTION, DOESN'T IT?  OKAY, SORRY.

ONCE AGAIN, USING THE MOVIE TECHNIQUE, I DON'T SEE ANYBODY ELSE.  SO I DON'T HAVE ANY REASON TO DOUBT YOU THAT THERE'S ONE HISPANIC.

414

Q.   AND ONE OUT OF 91 HISPANICS WOULD BE 1.10 PERCENT; CORRECT?

A.   SOMETHING LIKE THAT; RIGHT.

Q.   AND THAT'S NEARLY DOUBLE THE PERCENTAGE OF HISPANICS IN GAINESVILLE THAT WE CAME UP WITH EARLIER AND THAT YOU CAME UP WITH PERSONALLY; RIGHT?

A.   NO, I'M SORRY.

Q.   WELL, YOU CAME UP WITH .6 PERCENT HISPANICS IN THE GAINESVILLE DIVISION.  ISN'T THAT RIGHT?

A.   OFF THE -- WELL, I DIDN'T COME UP WITH.  THE JS-12 HAS .62 PERCENT, RIGHT, CORRECT.

Q.   AND THE NUMBER THAT WE HAVE FOR THIS SET OF QUESTIONNAIRES IS 1.10 PERCENT HISPANICS.  ISN'T THAT RIGHT?

A.   YEAH, SOMETHING LIKE THAT.  THAT'S CORRECT.

Q.   NOW, IF YOU LOOK AT THE JS-12S, IN THE ETHNICITY SECTION, THAT'S DIVIDED INTO HISPANIC, NON-HISPANIC AND UNKNOWN; ISN'T THAT RIGHT?

A.   THAT'S RIGHT.

Q.   THERE ARE NO OTHER CATEGORIES LISTED FOR ETHNICITY IN THE JS-12S.

A.   I DON'T BELIEVE SO.

Q.   AND SO THOSE UNKNOWNS MUST BE EITHER HISPANIC OR NON-HISPANIC.

A.   THAT'S CORRECT.

Q.   AND YOU HAVE NO REASON TO BELIEVE THAT ALL OF THOSE

415

UNKNOWNS ARE NON-HISPANIC.

A.   I HAVE NO REASON TO BELIEVE -- I HAVE NO REASON TO BELIEVE TO KNOW WHAT THEY ARE.

Q.   AND IF WE LOOK AT, FOR EXAMPLE, GOVERNMENT'S EXHIBIT 27, IN THE CASE OF THE 2001 GAINESVILLE WHEEL, THIS UNKNOWN GROUP WAS 1.5 PERCENT OR FIVE PEOPLE; RIGHT?

A.   I'M SORRY, WHICH ONE?  THE GAINESVILLE?

Q.   YES, THAT WOULD BE GOVERNMENT'S EXHIBIT 27.

A.   OKAY.

Q.   SO DO YOU SEE --

A.   YES, THERE ARE FIVE UNKNOWNS; CORRECT.

Q.   THERE ARE FIVE UNKNOWNS.  AND SO RELYING ON THE SAMPLE HERE, IF EVEN TWO OF THOSE FIVE WERE ACTUALLY HISPANIC, THAT WOULD DOUBLE THE NUMBER OF HISPANICS IN THE QUALIFIED WHEEL FOR GAINESVILLE, WOULDN'T IT?

A.   YOU KNOW, I'VE TESTIFIED A LOT OF TIMES AND I'VE GOT TO TELL YOU I REALLY STAY AWAY FROM THE HYPOTHETICAL, BECAUSE RIGHTLY, SOMEONE CALLS YOU.  THERE'S FIVE PEOPLE UNKNOWN.  THEY COULD BE HISPANIC, THEY COULD NOT BE HISPANIC.  PARTICULARLY WHEN YOU START SAYING "EVEN IF," YOU KNOW, YOU'VE GOT TO UNDERSTAND WHAT I DO IS TO GIVE SOMEONE SOME --

Q.   MR. MARTIN, I UNDERSTAND WHAT YOU DO, AND I'M GOING TO ASK THE QUESTION AGAIN.  IF THERE ARE FIVE UNKNOWNS AND TWO OF THOSE UNKNOWNS HAPPEN TO BE HISPANIC, WOULDN'T THAT DOUBLE THE NUMBER -- THE PERCENTAGE OF HISPANICS IN THE GAINESVILLE WHEEL?

416

A.   IF YOU'RE ASKING ME MATHEMATICALLY, YES, IT WOULD.  IF THOSE TWO PERSONS WERE THE KING AND QUEEN OF ENGLAND, IT WOULD CHANGE THINGS.  YOU KNOW, IT'S HYPOTHETICAL.

Q.   AND IF, IN FACT, WE DID DO THAT, IT WOULD REDUCE THE COMPARATIVE DISPARITY BY HALF, WOULDN'T IT?

A.   I'M REAL UNCOMFORTABLE ANSWERING REAL HYPOTHETICAL QUESTIONS.  I UNDERSTAND WHAT YOU'RE --

Q.   MR. MARTIN, YOU'VE EXPRESSED YOUR DISCOMFORT WITH HYPOTHETICALS.

A.   RIGHT.

Q.   AND NOW WE'RE GOING TO MOVE ON WITH THE HYPOTHETICALS. AND I'M ASKING YOU THE QUESTION, IF WE DOUBLE THAT NUMBER OF HISPANICS IN THE GAINESVILLE DIVISION -- I'M SORRY, IF WE DOUBLE THE PERCENTAGE OF HISPANICS IN THE GAINESVILLE DIVISION, HOW WOULD THAT AFFECT THE COMPARATIVE DISPARITY?

A.   IF WE DID THAT HYPOTHETICALLY, IT WOULD DOUBLE, IT WOULD DOUBLE -- IF WE DOUBLED THE PERCENTAGE, IT WOULD AFFECT THE ABSOLUTE DISPARITY.  WE CAN CALCULATE THAT OUT.  IT WOULD --

Q.   IT WOULD CUT IT IN HALF, WOULDN'T IT?  IT WOULD CUT IT IN HALF.  THAT WOULD BE THE --

A.   PROBABLY BE ABOUT RIGHT.

Q.   NOW, YOU'RE FAMILIAR WITH THE JUROR ELIGIBILITY REQUIREMENTS IN THIS DISTRICT?

A.   YES, SOMEWHAT, YES.

Q.   AND THOSE REQUIREMENTS INCLUDE U.S. CITIZENSHIP.

417

A.   CORRECT.

Q.   RESIDENCE IN THE DISTRICT FOR ONE YEAR.

A.   I BELIEVE THAT'S IN THE PLAN.  I DON'T KNOW OFF THE TOP OF MY HEAD.  I'D HAVE TO LOOK.  I HAVE NO REASON TO DOUBT THAT YOU HAVE TO BE A RESIDENT FOR A YEAR.

Q.   THE ABILITY TO READ, WRITE, UNDERSTAND AND SPEAK ENGLISH?

A.   IF YOU TELL ME SO.

Q.   NO MENTAL OR PHYSICAL INFIRMITY THAT PREVENTS YOU FROM RENDERING SATISFACTORY JURY SERVICE?

A.   SOUNDS REASONABLE.

Q.   AND YOU'VE NEVER BEEN CONVICTED OF A FELONY OR HAVE A PENDING FELONY CHARGE WHERE YOUR RIGHTS HAVE NOT BEEN RESTORED.

A.   ARE YOU ASKING ME PERSONALLY?

Q.   I'M SORRY, THAT IS A REQUIREMENT FOR JURY SERVICE; ISN'T THAT RIGHT?

A.   BOTH OF THOSE IS, YES, THAT'S A REQUIREMENT; AND, NO, I'VE NOT BEEN.

Q.   AND IN THIS CASE YOU WERE NOT ABLE TO DETERMINE THE NUMBER OF HISPANICS IN THE POPULATION WHO COULD SATISFY ALL OF THOSE REQUIREMENTS.

A.   I'M SORRY, WHAT?  YOU'VE NOT BEEN ABLE -- WHAT?

Q.   YOU'RE NOT ABLE TO IDENTIFY THE PERCENTAGE OF HISPANICS IN THE NORTHERN DISTRICT WHO CAN SATISFY ALL OF THOSE JURY SERVICE REQUIREMENTS, CAN YOU?

A.   NO.

418

Q.   SO INSTEAD, YOU RELIED ON CITIZENSHIP STATISTICS; ISN'T THAT RIGHT?

A.   THAT'S CORRECT.

Q.   AND THE ACTUAL NUMBER OF JUROR-ELIGIBLE HISPANICS IS GOING TO BE SMALLER THAN THOSE NUMBERS BECAUSE NOT ALL HISPANIC CITIZENS MEET THE JUROR SERVICE REQUIREMENTS.

A.   THAT'S CORRECT.  THAT'S TRUE OF ALL GROUPS; CORRECT.

Q.   NOW, ARE YOU AWARE OF A -- ARE YOU FAMILIAR WITH THE PEW HISPANIC CENTER?

A.   THE -- PARDON?

Q.   THE PEW HISPANIC CENTER; P-E-W?

A.   I'M NOT PARTICULARLY FAMILIAR WITH THEM, NO.

Q.   WELL, THE PEW HISPANIC CENTER IS A THINK TANK DEDICATED TO REVIEWING DEMOGRAPHICS ABOUT THE HISPANIC COMMUNITY IN THE UNITED STATES.  AND A STUDY BY THE PEW CENTER CONCLUDED THAT 46 PERCENT --

     MR. MARTIN:  YOUR HONOR, IS THIS A -- I MEAN, IF WE'RE GOING TO PUT IN SOME STUDY, WE NEED TO HAVE SOME WITNESS TO VERIFY IT AND SO FORTH.  HE SAYS HE'S NOT FAMILIAR WITH IT. I THINK THAT'S THE END OF THE MATTER.

     MS. DINGLE:  YOUR HONOR, I THINK IT'S RELEVANT WHAT MR. MARTIN'S KNOWLEDGE IS OF, YOU KNOW, WHETHER THIS COMMUNITY CAN SATISFY THE JURY ELIGIBILITY REQUIREMENTS.  AND GIVEN HIS POSITION, THAT INCLUDES MORE THAN JUST LOOKING AT THE JS-12S. IT INVOLVES BEING AWARE OF DIFFERENT STATISTICS OUT THERE.

419

THE COURT:  I HAVE NO IDEA WHO THE PEW GROUP IS AND HE DOESN'T EITHER; SO UNTIL YOU CAN LAY SOME FOUNDATION FOR IT, I DON'T KNOW THIS IS GOING TO CARRY MUCH WEIGHT.  I'LL SUSTAIN THE OBJECTION.

MS. DINGLE:  OKAY.

BY MS. DINGLE:

Q.   NOW, IF WE LOOK AT THE 2000 CENSUS STATISTICS, HAVE YOU TAKEN A LOOK AT THOSE?

A.   YES.

Q.   AND ARE YOU AWARE IN THE STATE OF GEORGIA, THE CENSUS FOUND THAT 57.79 PERCENT OF THOSE WHO SPEAK SPANISH AT HOME ALSO SPEAK ENGLISH LESS THAN VERY WELL?

A.   IF YOU TELL ME THAT'S THE NUMBER, I DON'T HAVE ANY REASON TO DOUBT YOU.

Q.   SO YOUR NUMBERS DO NOT ACCOUNT FOR THE FACT THAT MANY HISPANIC CITIZENS CANNOT SPEAK ENGLISH WELL ENOUGH TO SERVE ON A JURY.

MR. MARTIN:  YOUR HONOR, I DON'T THINK THAT'S AN INCORRECT STATEMENT, WHATEVER THE CENSUS INFORMATION THERE WAS THERE.  IT DOESN'T MEAN THAT THEY'RE UNABLE TO SIT ON A JURY JUST BECAUSE THERE MIGHT BE A SECOND LANGUAGE.  I DON'T UNDERSTAND THE -- I OBJECT TO THE QUESTION AS IRRELEVANT.

MS. DINGLE:  THE QUESTION IS CLEARLY RELEVANT BECAUSE THE ISSUE IS WHETHER HISPANICS CAN SPEAK -- WHAT PERCENTAGE OF HISPANICS CANNOT SPEAK ENGLISH WELL ENOUGH TO SERVE ON A JURY.

420

MR. MARTIN:  EXCUSE ME, I'M SORRY.  DID YOU FINISH, COUNSEL?

MS. DINGLE:  AND IN ADDITION, THE POINT IS THAT MR. MARTIN WASN'T ABLE TO EVALUATE, AS HE ADMITTED, THE JUROR ELIGIBLE POPULATION.  HE MERELY USED CITIZENS AS A PROXY FOR THAT AND --

THE COURT:  AND I THINK HE'S ANSWERED THAT QUESTION. HE SAID HE DIDN'T MAKE ANY -- HE TOOK CITIZENS AND MADE NO REDUCTIONS BASED ON JUROR ELIGIBILITY.  AND SO I THINK HE HAS -- YOU'RE CORRECT, HE HAS CONCEDED THAT, I BELIEVE.

BY MS. DINGLE:

Q.   NOW, MR. MARTIN, YOU'RE AWARE THAT ADMINISTRATION OF FEDERAL JURIES IS GOVERNED BY THE JURY SERVICE AND SELECTION ACT?

A.   I BELIEVE THAT'S CORRECT.

Q.   AND YOU'RE AWARE THAT THAT ACT PROVIDES FOR JURIES TO BE COMPOSED FROM VOTER REGISTRATION LISTS?

A.   NOT OFF THE TOP -- DOES IT RESTRICT YOU JUST TO THE VOTER REGISTRATION LIST?  I DON'T KNOW.  I DON'T KNOW, I DON'T -- OFF THE TOP OF MY HEAD, I DON'T KNOW EXACTLY WHAT IT SAYS.

Q.   WELL, IN ANY CASE, YOU BELIEVE THAT A MORE COMPREHENSIVE LIST WOULD BE CREATED BY SUPPLEMENTING VOTER REGISTRATION LISTS WITH DRIVER'S LICENSES AND PERSONAL I.D.'S.

A.   THAT'S CORRECT.

Q.   FIRST, HAVE YOU CONDUCTED ANY ANALYSIS OF VOTER

421

REGISTRATION RATES AMONG HISPANICS OR NON-HISPANICS IN THE

NORTHERN DISTRICT?

A.   NO.

Q.   AND DO YOU HAVE ANY DATA INDICATING THAT HISPANICS ARE

DISCRIMINATED AGAINST IN THE VOTER REGISTRATION PROCESS?

A.   FIRSTHAND ACCOUNTS?  YOU KNOW -- NO.  SYSTEMATICALLY IN

GEORGIA, THE VOTER REGISTRATION RECORDS HAVE -- I'M NOT SURE

THIS IS EXACTLY WHAT YOU'RE GETTING AT.  BUT THERE'S AN EFFECT

OF BEING HISPANIC AND THE EFFECT IS THIS:  BEFORE A CERTAIN

TIME PERIOD, YOU WEREN'T ALLOWED TO IDENTIFY YOURSELF AS

HISPANIC.  RECENTLY YOU'VE BEEN ALLOWED TO IDENTIFY YOURSELF AS

HISPANIC.  AND IT GETS MORE COMPLICATED AFTER THAT.

     THERE ARE VARIOUS VOTER REGISTRATION FORMS THROUGHOUT THE

STATE.  THEY'RE REFERRED TO BY THE SECRETARY OF STATE, BY THE

SECRETARY OF STATE AT THE TIME.  IN OTHER WORDS, THERE'S A

MASSEY ONE AND FORTSON ONE AND ALL THIS TYPE OF STUFF.  AND

THEY HAD VARIOUS WAYS THAT YOU COULD IDENTIFY YOURSELF AS

HISPANIC OR MULTIRACIAL OR ANY OF THAT TYPE STUFF.

     SO THERE HASN'T BEEN A -- THERE CERTAINLY HASN'T BEEN A

CONSISTENT WAY FOR YOU TO IDENTIFY YOURSELF AS HISPANIC ON THE

VOTER REGISTRATION.

Q.   BUT THE ISSUE YOU'RE SPEAKING TO IS SELF-IDENTIFICATION,

NOT WHETHER YOU'RE ACTUALLY ABLE TO REGISTER TO VOTE.  ISN'T

THAT RIGHT?

A.   I HAVE NOT STUDIED WHETHER PEOPLE HAVE BEEN BARRED FROM

422

REGISTERING.

Q.   AND YOU'RE AWARE THAT THE QUALIFICATIONS TO VOTE ARE MORE RESTRICTIVE THAN THOSE REQUIRED TO GET A DRIVER'S LICENSE IN GEORGIA; RIGHT?

A.   I'M NOT, I'M NOT A -- I DON'T KNOW ALL THE TECHNICAL INS AND OUTS OF THAT.  YOU CAN, CERTAINLY YOU CAN GET A DRIVER'S LICENSE AT, YOU KNOW, LEARNER'S AT 15 AND A REGULAR LICENSE AT 16.  YOU CAN GET -- OR A YEAR AFTER YOUR LEARNER'S. AND THEN YOU CAN REGISTER EVEN AT 17-AND-A-HALF AS LONG AS THE NEXT REGULARLY SCHEDULED ELECTION OCCURS BEFORE -- AFTER YOU TURN 18.

Q.   NOW, YOU'VE TESTIFIED IN MULTIPLE COUNTIES AND AT LEAST THREE FEDERAL COURTS EVALUATING JURY SELECTION PROCEDURES.  IS THAT RIGHT?

A.   THAT'S CORRECT.

Q.   AND YOU'VE HANDLED SOME CASES WHERE THE JURY PLAN REQUIRED THAT ALL JURORS BE DRAWN ONLY FROM VOTER REGISTRATION LISTS.

A.   YEAH, SOME OF THE PLANS READ THAT WAY, RIGHT, CORRECT.

Q.   AND IN SOME CASES THE JURORS WERE DRAWN FROM DRIVER'S LICENSE AND PERSONAL IDENTIFICATION LISTS.

A.   THE MERGER OF THE TWO, YEAH.

Q.   AND SO YOU'VE HANDLED CASES IN DISTRICTS THAT HAVE HAD VARIOUS SOURCES OF -- VARIOUS SOURCE LISTS FOR THEIR JURY POOLS.  ISN'T THAT RIGHT?

A.   WELL, I MEAN, EACH DISTRICT HAS THEIR OWN SOURCE LIST.  IF

423

YOU'RE TALKING ABOUT OVERLAPPING GEOGRAPHY, SURE.

Q.   WELL, VARIOUS SOURCE LISTS MEANING D.M.V., VOTER REGISTRATION, PERSONAL IDENTIFICATION CARDS, THOSE BEING DIFFERENT SOURCE LISTS.

A.   YEAH, CORRECT.

Q.   AND IN MULTIPLE CASES YOU FOUND THAT THOSE SOURCE LISTS RESULTED IN UNDERREPRESENTATION OF DISTINCT GROUPS.

A.   IT DEPENDS ON THE PROCEDURE; CORRECT.

Q.   BUT UNDERREPRESENTATION WAS NOT LIMITED TO VOTER REGISTRATION LISTS; IS THAT CORRECT?

A.   CORRECT.  YOU CAN UNDERREPRESENT FOLKS IN OTHER WAYS, TOO; CORRECT.

THE COURT:  HOW MUCH LONGER WILL YOU BE?  WE NEED TO TAKE A BREAK.

MS. DINGLE:  I THINK WE'RE DONE.

NOTHING FURTHER, YOUR HONOR.

THE COURT:  ARE YOU GOING TO NEED HIM FOR A FEW MINUTES, MR. MARTIN?  WE'LL TAKE A BRIEF BREAK IF WE DO.

MR. MARTIN:  LET'S TAKE A BRIEF BREAK.

THE COURT:  LET'S TAKE A TEN-MINUTE RECESS.

(PROCEEDINGS WERE IN RECESS.)

THE COURT:  YOU MAY PROCEED.

REDIRECT EXAMINATION

BY MR. MARTIN:

Q.   MR. MARTIN, DO YOU HAVE IN FRONT OF YOU THE JS-12S WHICH

424

ARE GOVERNMENT EXHIBITS 27 THROUGH 30?

A.    YES, I DO.

Q.    AND AT THE TOP LEFT-HAND CORNER OF THAT, THAT DOCUMENT IS CALLED JS-12 BECAUSE THAT'S THE NUMBER OF THE FORM THAT IT'S ON, IS THE NAME OF THE DOCUMENT THE REPORT ON OPERATION OF THE JURY SELECTION PLAN?

A.    THAT'S CORRECT.

Q.    AND IT ALSO SAYS UNDER THERE COMPLETED PURSUANT TO 28 U.S.C., SECTION 1863(A)?

A.    THAT'S CORRECT.

Q.    ARE YOU FAMILIAR WITH THAT REQUIREMENT OF THE LAW THAT THESE REPORTS BE FILED?  IF YOU'RE NOT, YOU'RE NOT.

A.    NOT PARTICULARLY, BUT YOU ALWAYS SEE THESE JS-12S.

Q.    WHENEVER YOU LOOK AT A FEDERAL JURY SYSTEM, THIS IS THE FIRST FORM YOU LOOK AT.

A.    THAT'S CORRECT.

Q.    WHO PICKS THE SAMPLE SIZE?

A.    MS. MOSES, I GUESS, BECAUSE SHE'S THE ONE THAT PICKED THE SAMPLE.

Q.    WELL, NOT IN PARTICULAR.  WAS IT PERSONNEL WITH -- DID YOU PICK THE SAMPLE SIZE OR DID THE PERSONNEL FOR THE FEDERAL COURTS PICK THE SAMPLE SIZE?

A.    I DIDN'T PICK THE SAMPLE SIZE.

Q.    SO SOMEONE FROM THE FEDERAL COURT SYSTEM PICKED THESE SAMPLE SIZES; CORRECT?

425

A.    THAT'S CORRECT.

Q.    AND YOU MENTIONED THAT A LARGER SAMPLE IS ALWAYS BETTER.
IS IT ALWAYS BETTER, A LARGER SAMPLE?

A.    BETTER IN THAT YOU GET MORE INFORMATION FROM A LARGER
SAMPLE.

Q.    THESE SAMPLE SIZES THAT WERE USED BY THE CLERK'S OFFICE IN
COMPILING THIS REPORT, ARE THESE SAMPLE SIZES THAT YOU AS A
STATISTICIAN COULD RELY UPON IN MAKING CONCLUSIONS?

A.    YES.

Q.    IN DEFENDANT'S EXHIBIT 17, DO YOU HAVE THAT IN FRONT OF
YOU?

A.    YES.

Q.    YOU TESTIFIED EARLIER THAT STANDARD DEVIATION DOES TAKE
INTO ACCOUNT SAMPLE SIZE?

A.    THAT'S CORRECT.

Q.    AND THAT THE STANDARD DEVIATIONS REGARDING THE GAINESVILLE
DIVISION ARE SMALLER OR DIFFERENT FROM THE ENTIRE DISTRICT?

A.    I'M SORRY, THE --

Q.    WELL, EXPLAIN, EXPLAIN HOW THE STANDARD DEVIATION TAKES
INTO ACCOUNT THE SAMPLE SIZE IN COMING UP WITH THE STATISTICAL
SIGNIFICANCE THAT THEY ARE INTENDED TO SHOW.

A.    RIGHT.  THE LARGER THE SAMPLE SIZE, THE MORE PRECISE THE
STANDARD DEVIATIONS ARE, THE NARROWER THE MARGIN OF ERRORS IS.
IN OTHER WORDS, IF YOU FLIP A COIN TEN TIMES, YOU MIGHT GET,
YOU KNOW, FOUR HEADS AND SIX TAILS OR THREE HEADS AND SEVEN

426

TAILS.  IF YOU FLIP IT 10,000 TIMES, IF YOU'RE ANYWHERE VERY FAR OFF OF 50 PERCENT, THEN SOMETHING IS WRONG.

Q.   WERE THE STANDARD DEVIATIONS THAT YOU COMPUTED BASED ON THE SAMPLE SIZES THAT WERE USED IN THIS CASE SIGNIFICANT, STATISTICALLY SIGNIFICANT, IN YOUR EXPERTISE?

A.   YES.

Q.   FINALLY, DO YOU HAVE GOVERNMENT'S EXHIBIT 39 IN FRONT OF YOU?

A.   YES, I DO.

Q.   COUNSEL ASKED YOU SOME QUESTIONS ABOUT UNKNOWN ETHNICITY. LOOK AT THE VERY TOP ONE ON THERE.  THIS PERSON, QUESTION NUMBER SIX IS A QUESTION ABOUT RACE.  DO YOU SEE THAT?

A.   THAT'S CORRECT.

Q.   NOW, ETHNICITY IS NOT CONSIDERED A RACIAL CATEGORY UNDER THE CENSUS; IS THAT CORRECT?

A.   THAT'S CORRECT.

Q.   OR UNDER THE JURY'S FORM; CORRECT?

A.   THAT'S CORRECT.

Q.   BUT ANYWAY, THIS INDIVIDUAL TYPED IN OR HANDWROTE IN HISPANIC UNDER RACE; CORRECT?

A.   THAT'S CORRECT.

Q.   YOU SEE THAT SOMETIMES.

A.   YES.

Q.   HOWEVER, IS THERE A SEPARATE QUESTION WITH REGARDS TO HISPANIC AND NON-HISPANIC?

427

A.   RIGHT.  QUESTION SEVEN SAYS ARE YOU HISPANIC, AND YOU EITHER ANSWER YES OR NO.

Q.   SO THIS PERSON PUT IT IN TWICE, ONCE AS A RACE AND ONCE AS ETHNICITY; CORRECT?

A.   THAT'S CORRECT.

Q.   AND THE UNKNOWNS THAT WOULD HAVE BEEN SHOWN ON THE JS-12 WOULD HAVE BEEN SOMEONE WHO NEVER ANSWERED QUESTION NUMBER SEVEN?

A.   THAT'S CORRECT.

Q.   SO IF SOMEONE --

A.   THEY WOULD HAVE RETURNED THE FORM BECAUSE THEY GOT QUALIFIED, BUT THEY WOULD HAVE NOT PUT AN ANSWER FOR QUESTION NUMBER SEVEN.

Q.   SO THEY MAY HAVE PUT IN SOME FORM FOR BLACK, WHITE, ASIAN, SO FORTH AND INDICATED THERE; AND THEN WHEN THE QUESTION OF HISPANIC, THEY JUST DIDN'T ANSWER IT ONE WAY OR THE OTHER.

A.   THAT'S CORRECT.

Q.   SO IS IT FAIR TO CONCLUDE THAT THOSE OTHERS ARE LIKELY HISPANICS, THE ONES WHO DIDN'T ANSWER ONE WAY OR THE OTHER THAT SPECIFIC QUESTION?

A.   IT DOESN'T TELL YOU WHETHER YOU ARE OR YOU AREN'T.  I MEAN, WE JUST DON'T KNOW.

Q.   BUT THERE WAS A SPECIFIC QUESTION THAT THEY WERE ASKED TO ANSWER.

A.   THAT'S CORRECT.

428

Q.   JUST DIDN'T ANSWER IT.  FINALLY, COUNSEL ASKED YOU WHETHER YOU TESTIFIED ALMOST EXCLUSIVELY FOR THE DEFENSE.  HAVE YOU BEEN ASKED BY JUDGES TO ACTUALLY ANALYZE THEIR SYSTEMS AND GIVE THEM YOUR OPINIONS ON -- IN THE STATE SYSTEM?

A.   YES.

MR. MARTIN:  YOUR HONOR, THAT'S ALL I HAVE.

MS. DINGLE:  YOUR HONOR, I DON'T HAVE ANY REDIRECT -- RECROSS, I'M SORRY.

THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

WHY DON'T WE TAKE OUR LUNCH BREAK AT THIS TIME.  WE'LL COME BACK.  AND YOU HAVE A COUPLE OF FOLKS, RIGHT, ON THIS, MS. DINGLE, ON THIS ISSUE, AS WELL?

MS. DINGLE:  WE DO.  THERE'S ONE WITNESS WHO'S QUITE SHORT.  I DON'T KNOW IF YOU WOULD WANT TO DO HIM NOW, YOUR HONOR; AND THEN WE CAN SAVE MS. MOSES FOR THE AFTERNOON.

THE COURT:  ARE THEY HERE READY?

MS. DINGLE:  YES, THE WITNESS IS HERE.

THE COURT:  WHO IS IT?

MS. DINGLE:  HIS NAME IS WES TAYLOR.  HE'S THE HEAD OF THE ELECTIONS DIVISION OF THE GEORGIA SECRETARY OF STATE.

THE COURT:  IF IT'S GOING TO BE BRIEF SO WE CAN GET HIM OUT OF HERE, WE CAN DO THAT.  DO YOU HAVE ANY IDEA, MR. MARTIN, HOW LONG YOU'RE GOING TO NEED HIM?

MR. MARTIN:  I DON'T KNOW.

THE COURT:  WHY DON'T WE -- WE'LL TRY.  WE'LL DO THE

429

DIRECT, AND IF WE DON'T THINK WE CAN GET THROUGH HIM IN 15 MINUTES OR SO --

MR. MARTIN:  YOUR HONOR, GIVEN THE TECHNICAL NATURE OF THIS STUFF, I WOULD ASK FOR THE COURT TO PERMIT MR. JEFFREY MARTIN TO STAY IN THE COURTROOM TO HELP ME IN THIS REGARD.

THE COURT:  I WILL PERMIT HIM TO.

(THE WITNESS WAS SWORN.)

THE DEPUTY CLERK:  STATE YOUR NAME.

THE WITNESS:  MY FULL NAME IS WESLEY B. TAYLOR.

WESLEY B. TAYLOR,

HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MS. DINGLE:

Q.   GOOD MORNING, MR. TAYLOR.  NOW, BEFORE WE BEGIN, DO YOU HAVE A PERSONAL CONNECTION TO ANYONE IN THE COURTROOM?

A.   YES.  I DO KNOW JUDGE STORY.

Q.   AND HOW DO YOU KNOW HIM?

A.   MY WIFE WAS HIS LAW CLERK ABOUT EIGHT YEARS AGO NOW, AND I KNOW HIM IN MEETING HIM THROUGH HER.

Q.   MR. TAYLOR, WHAT IS YOUR OCCUPATION?

A.   I AM THE ASSISTANT SECRETARY OF STATE FOR THE STATE OF GEORGIA.

Q.   AND HOW LONG HAVE YOU BEEN SO EMPLOYED?

A.   I'VE BEEN THE ASSISTANT SECRETARY OF STATE SINCE PROBABLY FOR ABOUT FOUR MONTHS NOW.  BEFORE THAT -- I'VE BEEN WITH THE

430

SECRETARY OF STATE'S OFFICE, THOUGH, SINCE MARCH OF 2007.  I CAME IN AS GENERAL COUNSEL TO SECRETARY HANDEL; AND THEN IN APRIL OF 2008, I WAS ASKED TO TAKE OVER AS THE ELECTIONS DIVISION DIRECTOR AND I'VE BEEN DOING THAT EVER SINCE.

Q.   AND WHAT ARE YOUR RESPONSIBILITIES?

A.   MY RESPONSIBILITIES ARE TO MANAGE THE ELECTIONS DIVISION. WE HAVE 20 EMPLOYEES.  THE ELECTIONS DIVISION OVERSEES ELECTIONS AND VOTER REGISTRATION FOR THE STATE OF GEORGIA, AND THOSE ARE MY DAY-TO-DAY DUTIES.

Q.   DO YOU PROVIDE VOTER INFORMATION TO THE FEDERAL COURTS IN THE STATE OF GEORGIA?

A.   WE DO, YES.

Q.   AND HOW IS THAT INFORMATION SOLICITED FROM YOU?

A.   TYPICALLY, WE'LL GET A LETTER OR A REQUEST FOR VOTER REGISTRATION INFORMATION FROM THE COURT, FROM THE NORTHERN DISTRICT OR FROM WHATEVER DISTRICT COURT, AND WE'LL PROVIDE THAT.

          MS. DINGLE:  MAY I APPROACH, YOUR HONOR?

          THE COURT:  YOU MAY.

BY MS. DINGLE:

Q.   MR. TAYLOR, DO YOU RECOGNIZE THOSE DOCUMENTS?

          MR. MARTIN:  WHAT ARE YOU REFERRING TO?

          MS. DINGLE:  I'M SORRY, GOVERNMENT EXHIBIT 2 AND GOVERNMENT EXHIBIT 15 WHICH HAVE BEEN MARKED FOR IDENTIFICATION.

431

THE WITNESS:  I PERSONALLY HAVE NOT SEEN THESE TWO SPECIFIC DOCUMENTS BEFORE, BUT THEY DO LOOK CONSISTENT WITH LETTERS THAT I HAVE SEEN.

BY MS. DINGLE:

Q.   AND WHAT ARE THOSE DOCUMENTS?

A.   THEY ARE REQUESTS FOR THE VOTER REGISTRATION INFORMATION.

MS. DINGLE:  YOUR HONOR, I WOULD MOVE TO ADMIT THESE DOCUMENTS PROVISIONALLY SUBJECT TO MS. MOSES'S TESTIMONY.

MR. MARTIN:  NO PROBLEM.

THE COURT:  THEY ARE ADMITTED.

BY MS. DINGLE:

Q.   AND HOW DO YOU RESPOND ONCE YOU RECEIVE A REQUEST FROM THE FEDERAL COURTS?

A.   WELL, WE'LL PROVIDE THEM WITH THE VOTER REGISTRATION INFORMATION REQUESTED, AND THAT'S BEEN PROVIDED ON A C.D. FOR A NUMBER OF YEARS.

Q.   AND THAT'S BEEN THE CASE SINCE 1996 AT LEAST.

A.   YES.

Q.   NOW, WHAT ARE THE REQUIREMENTS TO REGISTER TO VOTE IN THE STATE OF GEORGIA?

A.   WELL, THERE ARE A NUMBER OF REQUIREMENTS.  YOU HAVE TO BE AT LEAST 17-AND-A-HALF YEARS OF AGE TO REGISTER TO VOTE.  YOU HAVE TO BE A UNITED STATES CITIZEN.  YOU HAVE TO BE A RESIDENT OF THE STATE OF GEORGIA; AND YOU HAVE TO NOT HAVE BEEN OR BE DISENFRANCHISED BY ONE OF THE STATE CONSTITUTIONAL PROVISIONS,

432

WHICH YOU CAN'T BE A CURRENT FELON SERVING A FELONY SENTENCE OR YOU CAN'T HAVE BEEN ADJUDICATED MENTALLY INCOMPETENT.

Q.    AND OTHER THAN THE REQUIREMENTS THAT YOU'VE LISTED, ARE THERE ANY OTHER REASONS WHY SOMEONE MIGHT BE DENIED THE RIGHT TO REGISTER TO VOTE IN THE STATE OF GEORGIA?

A.    NOT THAT I'M AWARE OF.

Q.    WHERE CAN INDIVIDUALS REGISTER TO VOTE IN THIS STATE?

A.    MANY, MANY PLACES.  DO YOU WANT ME TO NAME ALL OF --

Q.    SURE.  GIVE US SOME EXAMPLES.

A.    OKAY.  WE HAVE VOTER REGISTRATION APPLICATIONS AVAILABLE IN THE ELECTIONS DIVISION.  VOTER REGISTRATION APPLICATIONS ARE AVAILABLE ON LINE ON THE SECRETARY OF STATE'S WEBSITE.  FOLKS CAN REGISTER AT THE DEPARTMENT OF DRIVER SERVICES WHEN THEY EITHER RENEW OR GET THEIR DRIVER'S LICENSE OR A STATE I.D. CARD, THEY CAN REGISTER TO VOTE THERE.  FOLKS CAN REGISTER TO VOTE AT THE LIBRARY WHEN THEY GO TO CHECK OUT A BOOK OR DO WHATEVER THEY ARE GOING TO DO AT THE LIBRARY.

DEPARTMENT OF HUMAN RESOURCES, D.F.A.C.S. OFFICES, THOSE PUBLIC ASSISTANCE OFFICES ARE REQUIRED TO REGISTER FOLKS TO VOTE IF THEY WANT TO REGISTER TO VOTE.  PUBLIC AND PRIVATE HIGH SCHOOLS AND UNIVERSITIES IN THE STATE OF GEORGIA ARE DEPUTY REGISTRARS AND REGISTER THEIR STUDENTS AND EMPLOYEES TO REGISTER TO VOTE.

THERE ARE THIRD PARTIES, POLITICAL PARTIES THAT GO OUT AND ABOUT IN THE STATE AND ATTEMPT TO GET PEOPLE TO REGISTER TO

433

VOTE IF THEY ARE NOT ALREADY REGISTERED.  THERE'S A LOT OF

PLACES.

Q.    AND WERE THESE VOTER REGISTRATION OPTIONS AVAILABLE IN

1996 AND 2000?

A.    I KNOW THEY WERE IN 2000.  IN THE 1996 TIME FRAME, I

BELIEVE THAT, YES, I BELIEVE THEY WERE.

Q.    AND WHAT LANGUAGE ARE VOTER REGISTRATION FORMS IN?

A.    IN ENGLISH.

Q.    CAN YOU FILL OUT THE FORM IN ANY OTHER LANGUAGE?

A.    WELL, NO.  BUT THE FORM REALLY ONLY REQUIRES YOUR NAME AND

YOUR IDENTIFYING INFORMATION LIKE YOUR DRIVER'S LICENSE NUMBER,

COUNTY AND ADDRESS.  SO THERE'S -- THERE WOULD, I GUESS, ONLY

BE ONE LANGUAGE THAT YOU WOULD FILL IT OUT IN.

Q.    AND THE FORMS HAVE BEEN PRINTED ONLY IN ENGLISH SINCE

1996.

A.    CORRECT.

Q.    WHAT RACE OR ETHNICITY STATISTICS, IF ANY, ARE KEPT ON

VOTER REGISTRATION?

A.    CURRENTLY?

Q.    I'M SORRY, IN 1996 AND 2000.

A.    BACK IN 1996 AND 2000, I BELIEVE THE ONLY ETHNICITY

INFORMATION WE HAD WERE WHETHER SOMEBODY WAS EITHER WHITE OR

BLACK OR OTHER, I BELIEVE.

Q.    I'VE HANDED YOU A DOCUMENT THAT'S BEEN MARKED FOR

IDENTIFICATION AS GOVERNMENT'S EXHIBIT 33.  DO YOU RECOGNIZE

434

THAT DOCUMENT?

A.    I DO.

Q.    WHAT IS IT?

A.    THIS IS THE VOTER REGISTRATION STATISTICS ACTIVE VOTERS BY RACE AND GENDER, AND THIS IS BACK FROM NOVEMBER 7 OF 2000.

Q.    AND WAS THIS DOCUMENT KEPT IN THE ORDINARY COURSE BY THE SECRETARY OF STATE'S OFFICE?

A.    YES.

Q.    AND HAS IT BEEN CERTIFIED BY YOUR OFFICE AS A TRUE COPY?

A.    IT HAS, YES.

        MS. DINGLE:  YOUR HONOR, I'D MOVE TO ADMIT GOVERNMENT'S EXHIBIT 33.

        MR. MARTIN:  NO OBJECTION.

        THE COURT:  IT'S ADMITTED.

BY MS. DINGLE:

Q.    NOW, GOVERNMENT'S EXHIBIT 33, DOES THAT INDICATE THE VOTING REGISTRATION RATES FOR HISPANICS?

A.    NOT SPECIFICALLY, NO.

Q.    AND WAS A SIMILAR -- WAS A DOCUMENT SIMILAR TO EXHIBIT 33 PRODUCED IN 1996?

A.    YOU KNOW, WE HAD -- AND I HAVE TO GO BACK.  I HAVEN'T SEEN ONE FROM 1996.  I HAVEN'T LOOKED AT IT SPECIFICALLY, SO I CAN'T ANSWER THAT.

Q.    TO YOUR KNOWLEDGE, WERE VOTER REGISTRATION STATISTICS ON HISPANICS KEPT IN 1996?

435

A.    OH, NO, NO.

Q.    NOW, WHY DOES THE STATE KEEP RACE AND ETHNICITY STATISTICS ON VOTERS -- I'M SORRY, ON THOSE WHO REGISTER TO VOTE?

A.    WELL, ACTUALLY, IT'S OPTIONAL ON THE VOTER REGISTRATION APPLICATION.  SO PEOPLE DON'T HAVE TO DESIGNATE WHAT THEIR RACE OR ETHNICITY OR GENDER IS.  BUT THE STATE KEEPS THAT FOR A NUMBER OF REASONS; THE NATIONAL VOTER REGISTRATION ACT WHICH IS FEDERAL STATUTE, SECTION -- THE VOTING RIGHTS ACT WHICH THE FEDERAL GOVERNMENT HAS WANTED TO SEE WHAT VOTER REGISTRATION STATISTICS ARE WITH RESPECT TO RACE AND GENDER OVER THE YEARS. AND SO THAT'S WHY WE'VE KEPT THAT INFORMATION.

Q.    AND WHAT AUTHORITY GOVERNS THE STATE'S VOTER REGISTRATION PRACTICES?

A.    THERE ARE A NUMBER OF STATUTES THAT WOULD APPLY.  BUT THERE IS THE GEORGIA ELECTION CODE, WHICH IS TITLE 21, CHAPTER 2 OF THE OFFICIAL CODE OF GEORGIA ANNOTATED.  THERE'S THE STATE ELECTION BOARD RULES FOR THE STATE OF GEORGIA. THERE'S, AS I SAID, THE NATIONAL VOTER REGISTRATION ACT; HAVA, THE HELP AMERICA VOTE ACT; THE VOTING RIGHTS ACT; AND ALSO THE UNIFORM AND OVERSEAS CITIZEN ABSENTEE VOTING ACT.  IT'S UOCAVA, AND I HAVE TROUBLE WITH THE ACRONYM SOMETIMES.

Q.    AND WHAT AGENCY OR ENFORCEMENT BODIES ARE THERE THAT ENSURE THAT VOTER REGISTRATION TAKES PLACE CONSISTENT WITH THOSE LEGAL OBLIGATIONS?

A.    THERE ARE A NUMBER.  THERE'S THE SECRETARY OF STATE.

436

THERE'S THE STATE ELECTION BOARD, WHICH IS A FIVE-MEMBER BODY IN THE STATE OF GEORGIA.  THERE'S THE ATTORNEY GENERAL'S OFFICE IN THE STATE OF GEORGIA.  THERE'S ALSO THE UNITED STATES ATTORNEY GENERAL THROUGH THE DEPARTMENT OF JUSTICE AND THROUGH THE VOTING RIGHTS ACT, AND NVRA HAS ENFORCEMENT OF FEDERAL LAW WITH RESPECT TO VOTING, VOTER REGISTRATION.

Q.   AND SINCE 1996 HAVE ANY OF THOSE AUTHORITIES EXPRESSED CONCERN ON THE BASIS OF RACE OR ETHNICITY RELATED TO VOTING REGISTRATION IN GEORGIA?

A.   NOT SPECIFICALLY, NOT WITH RESPECT TO STATEWIDE.  THERE WAS A NUMBER OF YEARS AGO IN ONE SPECIFIC COUNTY IN SOUTH GEORGIA WHERE A VOTER REGISTRATION ISSUE CAME UP; AND THAT WAS DEALT WITH ACTUALLY BY THE SECRETARY OF STATE, STATE ELECTION BOARD AND THE U.S. ATTORNEY GENERAL.  AND NOTHING ACTUALLY -- IT WAS DEALT WITH BEFORE IT BECAME AN ISSUE.

Q.   AND THAT TOOK PLACE IN SOUTH GEORGIA, YOU SAID.

A.   YES, MA'AM.

Q.   NOW, SINCE 1996 ARE THERE ANY VOTING REGISTRATION PRACTICES IN THIS STATE THAT HAVE BEEN FOUND BY ANY COURT OR TRIBUNAL TO BE DISCRIMINATORY ON THE BASIS OF RACE OR ETHNICITY?

A.   NO, NOT THAT I'M AWARE OF.

Q.   AND AS THE HEAD OF THE ELECTIONS DIVISION OF THE SECRETARY OF STATE, ARE YOU AWARE OF ANY VOTING REGISTRATION PRACTICES THAT COULD BE CONSIDERED DISCRIMINATORY ON THE BASIS OF RACE OR

437

ETHNICITY SINCE 1996?

A.    NO, MA'AM.

Q.    AND BASED ON YOUR KNOWLEDGE, DOES THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA HAVE ANY REASON TO BELIEVE THAT IT SHOULD NOT RELY ON THE VOTER REGISTRATION LISTS THAT YOU PROVIDE TO THEM BECAUSE OF DISCRIMINATORY VOTER REGISTRATION PRACTICES?

            MR. MARTIN:  I DON'T KNOW IF HE CAN SPEAK TO WHETHER ANYBODY ELSE HAS ANY REASON TO RELY UPON IT OR NOT.  HE CAN TESTIFY WHAT HE KNOWS ABOUT IT; BUT WHETHER SOMEBODY ELSE HAS ANY REASON TO DOUBT, IT SEEMS TO BE BEYOND WHAT HE CAN TESTIFY TO.

            MS. DINGLE:  WELL, PRESUMABLY, AS HEAD OF THE ELECTIONS DIVISION, IF THERE WERE DISCRIMINATORY VOTING PRACTICES, HE WOULD BE REQUIRED TO ALERT THE COURT PRIOR TO OFFERING A VOTER REGISTRATION LIST TO COMPOSE THE JURY POOL.

            MR. MARTIN:  WELL, I GUESS SHE COULD ASK HIM HAS HE EVER DONE THAT; BUT TO SAY WHETHER SOMEBODY ELSE HAS ANY SUSPICIONS OR NOT, I DON'T THINK HE COULD SAY.

            THE COURT:  IT'S MY UNDERSTANDING YOU'RE ASKING AS TO THE SECRETARY OF STATE'S OFFICE.  I MAY HAVE MISSED -- RESTATE YOUR QUESTION.

BY MS. DINGLE:

Q.    HAVE YOU EVER HAD ANY CONCERNS ABOUT DISCRIMINATORY VOTER REGISTRATION PRACTICES WITH REGARD TO THE VOTER REGISTRATION

438

LISTS THAT YOU'VE PROVIDED TO THE GEORGIA FEDERAL COURTS SINCE 1996?

A.   NO, MA'AM.

MS. DINGLE:  NOTHING FURTHER.

MR. MARTIN:  JUST ONE SECOND.

(DISCUSSION OFF THE RECORD.)

MR. MARTIN:  YOUR HONOR, NO QUESTIONS.

THE COURT:  MR. TAYLOR, YOU'RE EXCUSED.  THANK YOU.

WE'LL TAKE OUR LUNCH RECESS.  WE'LL RECONVENE AT 1:45.  WE WILL BE IN RECESS UNTIL 1:45.

(LUNCH RECESS.)

(THE WITNESS WAS SWORN.)

THE DEPUTY CLERK:  STATE YOUR FULL NAME, PLEASE.

THE WITNESS:  RAYMOND J. BURBY, IV.

RAYMOND J. BURBY, IV,

HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. MCKINNON:

Q.   MR. BURBY, HOW ARE YOU PRESENTLY EMPLOYED?

A.   I'M A PARTNER AT THE LAW FIRM OF BRYAN CAVE POWELL GOLDSTEIN HERE IN ATLANTA.

Q.   SO YOU'RE AN ATTORNEY?

A.   I AM.

Q.   HOW LONG HAVE YOU BEEN WITH BRYAN CAVE POWELL GOLDSTEIN?

A.   JUST OVER THREE YEARS.

439

Q.   PRIOR TO YOUR JOINING THAT LAW FIRM, HOW WERE YOU EMPLOYED?

A.   I WAS AN ASSISTANT UNITED STATES ATTORNEY WITH THE U.S. ATTORNEY'S OFFICE HERE IN ATLANTA.

Q.   WHEN DID YOU GO TO WORK IN THE UNITED STATES ATTORNEY'S OFFICE?

A.   THE SPRING OF 2002, TO THE BEST OF MY RECOLLECTION.

Q.   AND WHILE YOU WERE AT THE UNITED STATES ATTORNEY'S OFFICE, WERE YOU INVOLVED IN THE PROSECUTION OF WILLIAM LECROY, JR.?

A.   I WAS.

Q.   WHAT ROLE DID YOU PLAY IN THAT PROSECUTION?

A.   I WAS ONE OF TWO PROSECUTORS ASSIGNED TO THE CASE, HELPED TO TRY THE CASE.  I WOULD DESCRIBE MYSELF AS THE MAYBE SECOND CHAIR.  RUSSELL VINEYARD WAS THE LEAD PROSECUTOR.

Q.   DO YOU REMEMBER APPROXIMATELY WHEN YOU JOINED THE PROSECUTION TEAM ON THE LECROY CASE?

A.   I DON'T RECALL SPECIFICALLY.  I BELIEVE IT WAS IN 2002 AT SOME POINT; BUT I'M SORRY, I CAN'T BE SPECIFIC.

Q.   AND IF YOU TRIED THE CASE IN FEBRUARY OF 2004, WOULD YOU HAVE BEEN INVOLVED IN THE CASE AT LEAST BY OCTOBER OF 2003?

A.   YES.

Q.   LET ME SHOW YOU WHAT'S BEEN MARKED AS GOVERNMENT'S EXHIBIT NUMBER 53 AND ASK YOU IF YOU RECOGNIZE WHAT THAT DOCUMENT IS?

A.   I DO RECOGNIZE THE DOCUMENT.  IT'S ENTITLED NOTICE OF EXPERT EVIDENCE OF A MENTAL CONDITION.

440

Q.   AND WHO FILED THAT?

A.   IT WAS FILED BY COUNSEL FOR MR. LECROY.

Q.   WOULD YOU HAVE BEEN AWARE OF THE FACT THAT THAT NOTICE WAS BEING PROVIDED TO THE GOVERNMENT AT OR ABOUT THE TIME THAT THE NOTICE WAS FILED?

A.   YES.

Q.   IT'S ALREADY ADMITTED INTO EVIDENCE.  WHAT DATE WAS THAT NOTICE FILED?

A.   IT INDICATES OCTOBER 17TH, 2003.

Q.   NOW, AT THE TIME THAT NOTICE WAS FILED, WERE YOU ALREADY FAMILIAR WITH THE CASE?

A.   YES.

Q.   HAD YOU BEEN THROUGH THE DOCUMENTARY EXHIBITS OR THE DOCUMENTS THAT THE GOVERNMENT HAD COLLECTED IN THE COURSE OF CONDUCTING ITS INVESTIGATION INTO MS. TIESLER'S MURDER?

A.   I HAD.

Q.   HAD YOU LOOKED AT OR WERE AWARE OF RECORDS THAT YOU HAD GOTTEN FROM THE BUREAU OF PRISONS WITH RESPECT TO MR. LECROY'S PRIOR INCARCERATION?

A.   I WAS FAMILIAR WITH THOSE RECORDS.

Q.   NOW, AT SOME POINT DID THE PROSECUTION TEAM DECIDE TO EMPLOY A JURY CONSULTANT TO ASSIST YOU WITH THE CASE?

A.   WE DID.

Q.   AND WAS ONE OF THE THINGS THAT THE JURY CONSULTANT WAS GOING TO DO WAS TO DO FOCUS GROUPS IN ANTICIPATION OF THE

441

TRIAL?

A.    YES.

Q.    WHAT WAS THE PURPOSE OF EMPLOYING THE JURY CONSULTANT TO DO FOCUS GROUPS FOR YOU?

A.    I THINK HELP US MAKE SOME DECISIONS ON HOW BEST TO PRESENT OUR CASE TO THE JURY, WHAT TO ANTICIPATE IN TERMS OF THE JURY'S REACTION TO POSSIBLE DEFENSES THE DEFENSE MIGHT PRESENT; AND, OF COURSE, TO HELP US SELECT A JURY THAT WE THOUGHT, YOU KNOW, WOULD BE FAIR AND IMPARTIAL AND RECEPTIVE TO OUR SIDE OF THE CASE.

Q.    ONCE YOU SELECTED THE FOCUS GROUP, WERE YOU INVOLVED IN PREPARING ANYTHING IN ORDER FOR THE FOCUS -- THE ORGANIZATION OF THE GROUP THAT YOU WERE USING, WERE YOU PREPARED -- LET ME REPHRASE THAT.

A.    I CAN ANSWER IT.  I THINK I KNOW WHERE YOU'RE HEADED.

Q.    GO AHEAD.  THANK YOU.

A.    AS I RECALL, WE PREPARED ESSENTIALLY A SUMMARY OF THE PROSECUTION CASE, THE CASE THAT WE WERE AT LEAST AT THAT TIME ANTICIPATING PRESENTING, AND THEN A SUMMARY OF THE DEFENSE CASE.  OBVIOUSLY, WE DIDN'T KNOW EXACTLY WHAT CASE THE DEFENSE WAS GOING TO PRESENT, BUT WE CAME UP WITH A SUMMARY THAT WE THOUGHT WAS A POSSIBILITY, A STRONG POSSIBILITY.  AND AS I RECALL, THOSE TWO SUMMARIES WERE BOTH READ TO THE FOCUS GROUPS, AND THEN THEY DELIBERATED ON THE CASE AFTER THAT.

Q.    WERE YOU INVOLVED IN PREPARING THE PRESENTATION OF THE

442

SUMMARY OF THE DEFENSE CASE THAT WAS GOING TO BE PRESENTED TO THE FOCUS GROUPS?

A.   YES.  AS I RECALL, RUSSELL PREPARED THE GOVERNMENT'S SUMMARY AND I PREPARED THE DEFENSE SUMMARY.

Q.   LET ME SHOW YOU GOVERNMENT EXHIBITS 109 AND 110.  FIRST OF ALL, LOOK AT GOVERNMENT EXHIBIT 110.  DO YOU RECOGNIZE WHAT GOVERNMENT EXHIBIT 110 IS?

A.   YES.  THIS APPEARS TO BE A COPY OF THE PRESENTATION OF THE DEFENSE CASE, THE SUMMARY OF THE DEFENSE CASE THAT I WROTE.

Q.   AND WHEN YOU WROTE THAT, WERE YOU USING YOUR GOVERNMENT COMPUTER?

A.   YES.

Q.   DID YOU SAVE IT ON YOUR GOVERNMENT COMPUTER?

A.   I DID.

Q.   LOOK AT GOVERNMENT'S EXHIBIT 109.  DO YOU RECOGNIZE WHAT GOVERNMENT'S EXHIBIT 109 IS?

A.   YES.

Q.   WHAT IS GOVERNMENT'S EXHIBIT 109?

A.   IT IS A LISTING, TO MY KNOWLEDGE, IT IS A LISTING OF MY FILES, MY ELECTRONIC FILES, I BELIEVE WORD PERFECT FILES, ON THE COMPUTER SYSTEM OF THE U.S. ATTORNEY'S OFFICE RELATED TO THIS CASE.

Q.   AND DOES IT LIST THE DOCUMENT THAT YOU'VE GOT IN FRONT OF YOU AS GOVERNMENT'S EXHIBIT 110?  IF I CALL YOUR ATTENTION TO ABOUT HALFWAY DOWN THE PAGE WHERE IT SAYS FOCUS DEFENSE.

443

A.   YES.

Q.   IS THAT HOW YOU SAVED THAT DOCUMENT THEN WHEN YOU SAVED IT
IN YOUR WORD PERFECT FILE BACK AT THE TIME YOU PREPARED IT?

A.   YES.

Q.   AND IF YOU LOOK --

         MR. MCKINNON:  YOUR HONOR, I WOULD MOVE FOR THE
ADMISSION OF GOVERNMENT EXHIBIT 109, PLEASE.

         THE COURT:  ANY OBJECTION?

         MS. MICHAELS:  NO, YOUR HONOR.

         THE COURT:  IT'S ADMITTED.

BY MR. MCKINNON:

Q.   IF YOU LOOK OUT TO THE FAR LEFT -- THE FAR RIGHT COLUMN ON
GOVERNMENT EXHIBIT 109, WELL, FIRST OF ALL, WHAT IS THAT COLUMN
HEADED?

A.   ITS HEADING READS LAST MODIFIED.

Q.   WHAT WOULD THAT INDICATE TO YOU?

A.   THE LAST TIME I SAVED IT, I BELIEVE.

Q.   WOULD THAT BE THE LAST TIME YOU WOULD HAVE WORKED ON IT?

A.   TO THE BEST OF MY KNOWLEDGE.

Q.   AND WHAT DATE WAS THE LAST TIME YOU WOULD HAVE SAVED OR
MODIFIED THE GOVERNMENT EXHIBIT 110 THAT YOU HAVE IN FRONT OF
YOU?

A.   THE EXHIBIT INDICATES DECEMBER 11TH, 2003, AT 3:53 P.M.

Q.   NOW, ONCE YOU FINALIZED GOVERNMENT'S EXHIBIT 110, WHAT DID
YOU DO WITH IT?

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

444

A.   I DON'T RECALL SPECIFICALLY, BUT I ASSUME WE WOULD HAVE, I WOULD HAVE PRINTED IT OR E-MAILED IT TO OUR JURY CONSULTANT; AND THEN IT WOULD HAVE BEEN, AGAIN, READ TO THE FOCUS GROUPS AT THE FOCUS GROUP SESSION THAT WAS HELD.

Q.   OKAY.

A.   I MAY HAVE BROUGHT IT WITH ME TO THE FOCUS GROUPS.  I CAN'T RECALL EXACTLY.

MR. MCKINNON:  YOUR HONOR, I WOULD MOVE FOR THE ADMISSION OF GOVERNMENT EXHIBIT 110, PLEASE.

THE COURT:  ANY OBJECTION?

MS. MICHAELS:  YES, YOUR HONOR, I WOULD OBJECT.  THE ONLY RELEVANCE FOR 110 IS NOT NECESSARILY WHAT HE PRESENTED BUT WAS WHAT HE HAD NOTICE OF WHAT THE DEFENSE'S PRESUMED DEFENSE WAS GOING TO BE REGARDING SEXUAL ABUSE OF MR. LECROY.

MR. MCKINNON:  I AGREE.  THAT'S WHY THE GOVERNMENT IS TENDERING IT IS BECAUSE IT DEMONSTRATES WHAT MR. BURBY KNEW OR WHAT THE GOVERNMENT PROSECUTION TEAM BELIEVED THAT THE DEFENSE WOULD BE PRIOR TO THE TIME THAT THE COURT ESTABLISHED THE FIREWALL PROCEDURE.

THE COURT:  I'LL OVERRULE THE OBJECTION.

BY MR. MCKINNON:

Q.   MR. BURBY, ACTUALLY, THE PAGES AREN'T NUMBERED, SO IF I COULD GET YOU TO TURN TO I BELIEVE IT'S THE TENTH PAGE.

A.   OKAY.

Q.   AND, AGAIN, THE PURPOSE OF GOVERNMENT EXHIBIT 110 WAS FOR

445

THE JURY FOCUS -- THE JURY CONSULTANT TO PRESENT THIS MITIGATION OR WHAT THE PROSECUTION BELIEVED WOULD BE THE DEFENSE CASE TO THE FOCUS GROUP THAT WAS SERVING AS THE PSEUDO JURY HERE. IS THAT CORRECT?

A. THAT'S RIGHT. I MEAN, THERE WERE TWO PARTS TO THIS SUMMARY. ONE WAS FOCUSED ON THE GUILT/INNOCENCE PHASE OF THE CASE, AND THEN ONE PART OF THE SUMMARY WAS FOCUSED ON THE MITIGATION OR THE PENALTY PHASE.

Q. LOOK AT THE LAST PART OF WHAT IS THE PARAGRAPH THAT CARRIES OVER FROM PAGE NINE, AND READ WHAT YOU WROTE ABOUT BILL'S GREATEST SECRET, BILL, JR.'S, GREATEST SECRET.

A. SURE. WELL, DO YOU WANT ME TO START AT THE SENTENCE BEFORE OR JUST -- WELL: BILL, JR.'S, GREATEST SECRET OF ALL, HOWEVER, WAS THE FACT THAT A BABYSITTER HAD MOLESTED HIM. HE CARRIED THE SHAME OF THAT ABUSE AROUND WITH HIM FOR MOST OF HIS LIFE, NEVER TELLING HIS PARENTS OR BROTHER. IT WAS NOT UNTIL HE WENT TO FEDERAL PRISON AND BEGAN TO RECEIVE COUNSELING THAT HE EVEN TALKED ABOUT IT -- OR EVER TALKED ABOUT IT.

Q. SO AS OF DECEMBER THE 11TH OF 2003, WAS THE TRIAL TEAM FOR THE GOVERNMENT IN THE LECROY CASE ALREADY CONCERNED THAT THERE WOULD BE EVIDENCE OF THIS ALLEGED SEXUAL INCIDENT INVOLVING A BABYSITTER?

A. YES.

Q. AND WHERE HAD YOU GOTTEN THE INFORMATION ABOUT THAT?

A. TO THE BEST OF MY RECOLLECTION, WE HAD SOME RECORD FROM

446

HIS B.O.P. FILE WHERE THAT WAS REFERENCED, WHERE HE HAD TOLD A COUNSELOR OR SOMEBODY ABOUT THAT INCIDENT.

Q.   AND TURN OVER TO THE NEXT PAGE THEN.  AND IF YOU WOULD, LOOK AT THE LAST PARAGRAPH ON THE NEXT PAGE THAT STARTS: THERE'S ANOTHER FACTOR THAT MITIGATES AGAINST THE POSITION OF THE DEATH PENALTY HERE.

A.   SURE.

Q.   AND READ -- WELL, LET ME ASK YOU THIS:  AT THE TIME YOU'RE PREPARING THIS IN DECEMBER, YOU HAD ALREADY GOTTEN A NOTICE ABOUT THE DEFENSE WAS GOING TO CALL A MENTAL HEALTH EXPERT.

A.   WE HAD.

Q.   HAD YOU GOTTEN ANY INFORMATION AT THIS STAGE, TO YOUR RECOLLECTION, ABOUT WHAT EXACTLY THE MENTAL HEALTH EXPERT WAS GOING TO TESTIFY ABOUT?

A.   NOT TO MY RECOLLECTION.

Q.   SO, BUT DID YOU --

A.   OTHER THAN WHAT HAD BEEN IN THE NOTICES.  I MEAN, IF THIS WAS THE ONLY NOTICE -- I KNOW THERE WAS LITIGATION OVER THIS ISSUE.  I JUST CAN'T REMEMBER WHAT WAS FILED BY THE OTHER SIDE. BUT IT WOULD HAVE BEEN ONLY WHAT THEY INCLUDED IN THEIR FILING.

Q.   WHAT DID YOU SUSPECT, WHAT DID YOU SAY THAT YOU SUSPECTED THE DEFENSE WOULD PRODUCE THEN IN TERMS OF A MENTAL HEALTH MITIGATION DEFENSE?

A.   JUST WHAT WE WROTE HERE WAS OUR --

Q.   WHAT DID YOU WRITE IN GOVERNMENT'S EXHIBIT 110?

447

A.    THERE'S ANOTHER FACTOR --

MS. MICHAELS:  I'M SORRY, I KNOW YOU SAID THE PAGES WEREN'T NUMBERED; BUT I'M NOT WITH YOU.  WHERE ARE YOU?

THE COURT:  WHAT'S AT THE TOP OF THE PAGE?  HOW DOES THE PAGE START?

THE WITNESS:  BURGLARIES REVEALED THAT HE HAD SOME SERIOUS MENTAL HEALTH PROBLEMS, WHICH I THINK IS THREE OR FOUR PAGES, IT'S FOUR PAGES FROM THE BACK --

MR. MCKINNON:  PAGE 11 FROM THE FRONT.

MR. BURBY:  OR FOUR FROM THE BACK, IF THAT'S EASIER. AND THEN WE'RE DOWN AT THE BOTTOM PARAGRAPH.

MS. MICHAELS:  THERE'S ANOTHER FACTOR THAT MITIGATES? AM I RIGHT?

THE WITNESS:  YES.

MS. MICHAELS:  OKAY.  PERFECT.  THANK YOU.

BY MR. MCKINNON:

Q.    SO READ WHAT YOU WROTE FOR THE FOCUS GROUP TO PRESENT TO THE FOCUS JURY.

A.    THERE'S ANOTHER FACTOR THAT MITIGATES AGAINST IMPOSITION OF A DEATH PENALTY HERE.  AT THE TIME BILL, JR., RAPED AND MURDERED MS. TIESLER, HIS CAPACITY TO APPRECIATE THE WRONGFULNESS OF HIS CONDUCT OR TO CONFORM HIS CONDUCT TO THE REQUIREMENTS OF THE LAW MAY HAVE BEEN SIGNIFICANTLY IMPAIRED. A PSYCHIATRIST WHO HAS REVIEWED BILL, JR.'S, CASE BELIEVES THAT THE SEXUAL ABUSE HE SUFFERED AS A CHILD AT THE HANDS OF A

448

BABYSITTER, THE ABUSE OF HIS MOTHER THAT HE WITNESSED AS AN ADOLESCENT, AND HIS RAPE IN PRISON AS AN ADULT COULD ALL HAVE CONTRIBUTED TO CAUSE HIM TO, QUOTE, UNQUOTE, SNAP AND LITERALLY LOSE CONTROL OF HIMSELF, ET CETERA, ET CETERA.

Q.   SO THIS IS WHAT YOU BELIEVED THE DEFENSE WOULD PRESENT AS MITIGATING EVIDENCE AT THE DEATH PENALTY TRIAL.

A.   WE CERTAINLY THOUGHT IT WAS A POSSIBILITY.

Q.   LET ME SHOW YOU -- FIRST OF ALL, I'LL SHOW YOU GOVERNMENT'S EXHIBIT 71 AND A PACKET.  AFTER YOU MET WITH THE FOCUS GROUP, DID YOU GET A REPORT BACK FROM THE FOCUS GROUP?

A.   WE DID.

Q.   AND YOU HAVE THE FULL REPORT IN FRONT OF YOU.

A.   I DO.

Q.   IT'S NOT MARKED AS AN EXHIBIT.  BUT IF YOU LOOK AT GOVERNMENT'S EXHIBIT 71, DOES THAT APPEAR TO BE A SELECTED PORTION OF THE FOCUS GROUP REPORT?

A.   YES.  IT'S THE COVER PAGE AND THEN SOME PORTION OF THE CONTENT.

Q.   WHO PREPARED THAT REPORT?

A.   R AND D STRATEGIC SOLUTIONS, LLC.  THAT WAS OUR JURY CONSULTANT.

        MR. MCKINNON:  YOUR HONOR, I ONLY WANT TO TENDER A SELECTED PORTION OF THE REPORT WHICH HAS BEEN MARKED AS DEFENDANT'S EXHIBIT NUMBER 71; AND I WOULD MOVE FOR THE ADMISSION OF GOVERNMENT'S EXHIBIT 71, PLEASE.

449

MS. MICHAELS:  YOUR HONOR, I WOULD OBJECT BECAUSE THE ONLY ISSUE THAT'S BEEN RAISED IS WHAT THEY HAD NOTICE AND HOW THEY GOT THE NOTICE OF WHAT THE DEFENSE'S MENTAL HEALTH DEFENSE WAS GOING TO BE.  AND WHAT THE FOCUS GROUP FOCUSED ON IS IRRELEVANT TO THAT ISSUE.

MR. MCKINNON:  WELL, YOUR HONOR, AGAIN, IT SHOWS THAT THE TRIAL TEAM WAS PROVIDING INFORMATION TO THE FOCUS GROUP WHICH MADE IT INTO THE REPORT CONSISTENT WITH MR. BURBY'S STATEMENTS ABOUT THE DEFENSE PRESENTATION THAT THEY PROVIDED TO THE FOCUS GROUPS, JUST TO FURTHER ESTABLISH THAT WHAT THEY SUSPECTED THE DEFENSE WOULD BE PRIOR TO THE TIME THE COURT SET UP THE FIREWALL.

MS. MICHAELS:  THE FACT THAT HE MAY HAVE BEEN RIGHT ABOUT SUSPICION DOESN'T MAKE IT RELEVANT.  THE ONLY ISSUE IS WHEN WAS THE NOTICE AND HOW DID THEY KNOW IT IN LIGHT OF THE FIREWALL.

MR. MARTIN:  YOUR HONOR, WOULD YOU PERMIT ME JUST TO ELABORATE ON THAT?  WHAT OUR CONCERN IS IS THAT THE -- WE HAVE NO CONCERN WITH REGARDS TO THE DATE PROBLEM.  IT IS INDICATED IN HERE THAT THE FOCUS JURY DIDN'T MAKE MUCH OF SEXUAL ABUSE. THAT'S -- WE DON'T WANT THAT TO BE CONSIDERED BY THE COURT IN ANY RESPECT OF WHAT THE POWER OF THAT EVIDENCE WOULD BE. THAT'S THE BASIS OF OUR OBJECTION.

THE COURT:  I UNDERSTAND.  AND I WILL OVERRULE THE OBJECTION.  I WILL ADMIT THE TESTIMONY, BUT IT IS -- IF I'M

450

GOING TO CONSIDER FOR ANYTHING BEYOND THE ISSUE FOR WHICH I BELIEVE IT'S BEING SUBMITTED, I WOULD MAKE COUNSEL AWARE OF THAT AND GIVE YOU AN OPPORTUNITY TO BE HEARD ON THAT.

MS. MICHAELS:  THANK YOU, YOUR HONOR.

MR. MCKINNON:  I ASSUME WE WOULD JUST BRIEF THAT AS PART OF THE BRIEFING.

THE COURT:  THAT'S FINE.

MR. MCKINNON:  I WOULD LIKE TO BE HEARD ON BEHALF OF THE GOVERNMENT, THAT THE COURT MIGHT CONSIDER IT AS TO THE ISSUE OF PREJUDICE UNDER THE *STRICKLAND* STANDARD.

MR. MARTIN:  WELL --

MR. MCKINNON:  THAT'S WHAT THEY'RE CONCERNED ABOUT IS BECAUSE THE FOCUS GROUP GENERALLY DIDN'T PLACE ANY WEIGHT ON THE SEXUAL ASSAULT EVIDENCE AS IN MITIGATION OF PUNISHMENT.  I THINK THAT GOES TO THE QUESTION OF PREJUDICE.

MR. MARTIN:  WE (INAUDIBLE) ONLY SAY THAT PREJUDICE CAN BE DETERMINED BY A COURT BASED ON FOCUS GROUPS, A PROCEEDING THAT THE DEFENSE HAD NO PARTICIPATION IN.  I DON'T THINK THAT'S -- WE CAN ALWAYS ADDRESS THAT.

THE COURT:  I THINK THAT'S SOMETHING THAT CAN BE ARGUED IN THE BRIEFS.  AND IT'S THERE NOW IN THE RECORD; SO IF YOU WANT TO ARGUE THAT IN THE BRIEFS, I'LL LET YOU RESERVE THAT ISSUE TO ARGUE IN THE BRIEF.

BY MR. MCKINNON:

Q.   SO LOOKING AT GOVERNMENT'S EXHIBIT 71, I UNDERSTAND IT'S

451

NOW BEEN ADMITTED, IF YOU WOULD LOOK AT THE SECOND PAGE. AND THEN AT THE BOTTOM DOES THE -- FIRST OF ALL, WHAT IS THE SECOND PAGE?

A.    IT'S ENTITLED RESEARCH METHODOLOGY.

Q.    AND IS THERE A SECTION OF THAT RESEARCH METHODOLOGY PAGE WHERE IT SUMMARIZES WHAT YOUR FOCUS, YOUR JURY CONSULTANT IS GOING TO PROVIDE TO THE JURY IN REGARD TO THE DEFENSE CASE?

A.    YES.

Q.    AND READ WHAT THAT SECTION SAYS.

A.    IT SAYS:  THE DEFENSE RESPONDS BY ADMITTING TO THE THEFT OF THE VEHICLE AS WELL AS THE RAPE AND MURDER OF MS. TIESLER, BUT POINTS OUT THAT BOTH THE MURDER AND THEFT OF THE VEHICLE WERE NOT PREMEDITATED AND AS SUCH DOES NOT MEET THE ELEMENTS OF CARJACKING UNDER THE FEDERAL STATUTE.  THE DEFENSE ALSO RESPONDS THAT DESPITE THE DEFENDANT'S GUILT, THE DEATH PENALTY SHOULD NOT BE IMPOSED DUE TO THE IMPACT OF A CHILDHOOD TRAUMA, IN PARENTHESES, I.E., MOLESTATION BY A BABYSITTER, OVERLY STRICT FATHER, PARENTS' MARRIAGE WAS DYSFUNCTIONAL, CLOSE PAREN, ON MR. LECROY'S MENTAL HEALTH.  THE DEFENSE REQUESTS THAT THE DEFENDANT INSTEAD BE SENTENCED TO LIFE IN PRISON WITHOUT THE POSSIBILITY OF PAROLE.

Q.    SO AGAIN, THE PURPOSE OF THE FOCUS GROUP WAS TO PRESENT THE CASE AS YOU THOUGHT IT WOULD BE PRESENTED TO THE TRIAL JURY AND GET FEEDBACK FROM THE FOCUS GROUP ABOUT WHAT THEY THOUGHT ABOUT THE ISSUES.

452

A.    THAT'S RIGHT.

Q.    AND THAT WAS PRESENTED, THAT WAS DONE BY YOU AND RUSSELL VINEYARD WITHOUT ANY INVOLVEMENT OF THE ATTORNEYS THAT WERE SERVING AS THE FIREWALL ATTORNEYS IN THE CASE.

A.    THAT'S RIGHT.  I THINK IT WAS DONE BEFORE THE FIREWALL WAS ESTABLISHED.

Q.    THEN LOOK OVER AT THE LAST PAGE OF GOVERNMENT'S EXHIBIT 71, PLEASE.  AND WHAT IS THE LAST PAGE?

A.    I BELIEVE THE FOCUS GROUP MEMBERS FILLED OUT A QUESTIONNAIRE AND ANSWERED QUESTIONS, AND THIS LOOKS LIKE IT'S GIVING THE PERCENTAGE, PERCENTAGES OF THEIR RESPONSES TO DIFFERENT --

Q.    WHAT IS THE FIRST QUESTION THAT'S ON THE THIRD PAGE OF GOVERNMENT EXHIBIT 71?

A.    IT SAYS:  Q48.  MR. LECROY SAYS HE WAS MOLESTED AS A CHILD.  IS THIS FACT RELEVANT OR IRRELEVANT TO WHETHER HE SHOULD RECEIVE THE DEATH PENALTY OR LIFE IMPRISONMENT?  THEN IT HAS A SERIES OF RESPONSES.

Q.    WHAT ARE THE RESPONSES, FOR THE RECORD?

A.    COMPLETELY RELEVANT, 4 PERCENT; SOMEWHAT RELEVANT, 12 PERCENT; SOMEWHAT IRRELEVANT, 16 PERCENT; COMPLETELY IRRELEVANT, 68 PERCENT.

Q.    AND WHAT'S THE NEXT QUESTION THAT'S ON THE THIRD PAGE?

A.    Q49.  MR. LECROY SAYS HE WAS MOLESTED AS A CHILD.  DOES THIS FACT MAKE YOU -- AND THEN, AGAIN, IT HAS A SERIES OF

453

POSSIBLE ANSWERS -- MUCH MORE LIKELY TO IMPOSE THE DEATH PENALTY, ZERO PERCENT; SOMEWHAT MORE LIKELY TO IMPOSE THE DEATH PENALTY, 4 PERCENT; SOMEWHAT MORE LIKELY TO SENTENCE HIM TO LIFE IMPRISONMENT, ZERO PERCENT; MUCH MORE LIKELY TO SENTENCE HIM TO LIFE IMPRISONMENT, ZERO PERCENT; IT HAS NO EFFECT ON MY DECISION TO INVOKE THE DEATH PENALTY, 88 PERCENT; I WOULD NOT IMPOSE THE DEATH PENALTY IN THIS CASE, 8 PERCENT.

Q.   FINALLY, LET ME SHOW YOU GOVERNMENT'S EXHIBIT 54 WHICH IS ALREADY IN EVIDENCE.  DO YOU RECOGNIZE THAT AS BEING THE ORDER ESTABLISHED BY JUDGE -- OR ENTERED BY JUDGE STORY THAT SET UP THE FIREWALL PROCEDURE?

A.   YES.

Q.   WHAT'S THE DATE OF THAT ORDER?

A.   IT INDICATES IT WAS FILED IN CHAMBERS ON DECEMBER 16TH, 2003.

Q.   SO THAT WOULD BE -- SO THE FIREWALL PROCEDURE WAS SET UP AFTER YOU WOULD HAVE SENT THE DEFENSE FOCUS GROUP SUMMARY TO YOUR JURY CONSULTANT.

A.   THAT'S CORRECT.  WELL, LET ME -- AFTER I LAST EDITED THAT DOCUMENT AND PRESUMABLY SHARED IT WITH OUR JURY CONSULTANT OR BROUGHT IT TO THE FOCUS GROUP.

Q.   IT WAS ENTERED AFTER YOU LAST WORKED ON THE DOCUMENT.

A.   THAT'S CORRECT.  YEAH.  IT MAY BE ALSO AFTER WE ACTUALLY DID THE FOCUS GROUPS.  I JUST DON'T REMEMBER THE EXACT DAY WE DID THE FOCUS GROUPS.

454

Q.    AFTER THE FIREWALL WAS SET UP, DID EITHER JOE PLUMMER OR YONETTE BUCHANAN PROVIDE YOU WITH ANY DISCOVERY THAT THEY HAD RECEIVED FROM THE DEFENSE REGARDING THE MATTERS THAT WERE SUBJECT TO THE FIREWALL ORDER?

A.    THEY DID NOT.

Q.    AND DID YOU LEARN ANYTHING ABOUT WHAT, FROM EITHER JOE PLUMMER OR YONETTE BUCHANAN, ABOUT WHAT THE MATTERS WERE THAT WERE SUBJECT TO THE FIREWALL ORDER?

A.    NO.

          MR. MCKINNON:  THANK YOU.  THAT'S ALL THE QUESTIONS I HAVE.

          THE COURT:  MS. MICHAELS?

          MS. MICHAELS:  IF I COULD HAVE JUST A MOMENT, PLEASE, YOUR HONOR.

          THE COURT:  YES.

                    CROSS-EXAMINATION

BY MS. MICHAELS:

Q.    MR. BURBY, YOU WERE PART OF THE GROUP OF THE U.S. ATTORNEYS THAT SENT OUT THE DISCOVERY.  IS THAT CORRECT?

A.    YES, GENERALLY.  THERE MAY HAVE BEEN SOME DISCOVERY SERVED BY MR. VINEYARD BEFORE I -- HE WAS INVOLVED IN THE CASE LONGER THAN I WAS, SO I CAN'T SAY I WAS INVOLVED IN ALL OF THE DISCOVERY PRODUCTIONS.  SOME MAY HAVE OCCURRED BEFORE I GOT INVOLVED.  IN FACT, I SUSPECT IT DID OCCUR.

Q.    YOU'RE AWARE THAT DISCOVERY WAS SENT OUT --

455

MS. MICHAELS:  MAY I APPROACH, YOUR HONOR?

THE COURT:  YOU MAY.

BY MS. MICHAELS:

Q.    LET ME SHOW YOU GOVERNMENT'S EXHIBIT 67 WHICH IS ON THE FRONT OF 68.  IS THAT A LETTER NORMALLY SENT OUT WHEN YOU'RE GIVING NOTICE TO THE DEFENSE ABOUT DISCOVERY?

A.    YES.

Q.    AND IT SHOWS THAT IT'S BATES STAMPED SO BOTH SIDES KNOW EXACTLY WHO GOT WHAT?  FOR EXAMPLE, THE BATES STAMP NUMBER ONE, YOU'LL KNOW THAT YOU SENT THOSE DOCUMENTS AND THERE'S A RECORD OF WHAT THOSE DOCUMENTS ARE.

A.    YES.  I WAS JUST LOOKING TO SEE IF THIS INDICATED THERE WAS A BATES RANGE PROVIDED.  WE WOULD ORDINARILY BATES LABEL. I WAS JUST LOOKING AT THE COVER LETTER.  OH, IT DOES SAY 1 THROUGH 1722, YES.

Q.    AND THE SAME THING WITH GOVERNMENT'S EXHIBIT 69 WHICH HAS PREVIOUSLY BEEN ADMITTED?

A.    YES.

Q.    AND BEHIND GOVERNMENT'S 67 IS GOVERNMENT'S 68 WHICH IS A DRUG TREATMENT SUMMARY REFERRAL LETTER?  AND DO YOU RECALL LOOKING AT THAT?

A.    YES.

Q.    HOW DID YOU GET THAT MENTAL HEALTH DOCUMENT?

A.    I DO NOT RECALL.

Q.    YOU DON'T KNOW HOW YOU GOT THE MENTAL HEALTH RECORDS OF

456

MR. LECROY?

A.    I DON'T HAVE A SPECIFIC RECOLLECTION.  I WOULD ASSUME WE WOULD HAVE OBTAINED THEM FROM THE B.O.P., BUT I DON'T THINK I WAS INVOLVED IN GETTING THEM.

Q.    BUT IT WOULD BE FAIR TO SAY THAT YOU HAD THAT DOCUMENT ON MAY 30TH OF 2002 SINCE IT'S CONTAINED IN THE --

A.    YES, AND THE ONLY --

Q.    -- RELEVANT BRACKETS OF THE BATES STAMP.

A.    ABSOLUTELY.  I DON'T KNOW THAT I WAS INVOLVED IN THE CASE IN MAY OF 2002.  I HAD ONLY JUST STARTED AT THE OFFICE.  BUT CERTAINLY IT APPEARS THE GOVERNMENT WAS PRODUCING THIS DOCUMENT IN DISCOVERY THAT IT HAD OBTAINED IN SOME MANNER.

Q.    AND YOU SAID THE SAME THING FOR THIS DECEMBER 23RD, 2003, LETTER.

A.    CAN I SEE THAT?

Q.    YES.

A.    I WOULD SAY THAT THIS WAS A DOCUMENT THAT THE GOVERNMENT HAD OBTAINED IN ITS INVESTIGATION SOMEHOW AND WAS PRODUCING IN DISCOVERY.  I DON'T RECOGNIZE THIS DOCUMENT THE WAY I RECOGNIZE THE OTHER ONE, BUT I'M SURE I SAW IT IF WE HAD IT.

Q.    NOW, ACCORDING TO GOVERNMENT'S EXHIBIT 54, THE FIREWALL PROCEDURE WAS ENTERED INTO AN ORDER AS OF DECEMBER 16TH OF 2003?

A.    THAT'S WHAT'S INDICATED ON THE EXHIBIT.

Q.    AND AT THAT POINT YONETTE BUCHANAN AND JOE PLUMMER WERE

457

APPOINTED AS THE FIREWALL ATTORNEYS AND YOU WERE NOT TO DISCUSS ANY OF THE MENTAL HEALTH ISSUES WITH THEM?

A.   THAT'S CORRECT.

Q.   NOW, WHEN DID YOU -- FIRST OF ALL, WHO PICKED THE FOCUS GROUP?

A.   YOU MEAN THE PEOPLE THAT ACTUALLY CAME TO THE FOCUS GROUP?

Q.   YEAH.

A.   R AND D SOLUTIONS.  I ASSUME THEY DID UNLESS THEY SUBCONTRACTED TO SOMEBODY ELSE.  BUT THEY HANDLED IT.  WE WEREN'T INVOLVED IN THAT.

Q.   SO R AND D -- WHAT ARE THEY CALLED AGAIN?

A.   R AND D SOLUTIONS.

Q.   R AND D STRATEGIC SOLUTIONS WERE THE ONES INVOLVED IN PICKING THE FOCUS GROUP INDIVIDUALS.

A.   TO THE BEST OF MY KNOWLEDGE.

Q.   AND YOU HAVE NO IDEA HOW THEY WERE PICKED.

A.   NO.

Q.   YOU DID NOT PARTICIPATE IN THAT SELECTION PROCESS.

A.   I DID NOT.

Q.   DO YOU HAVE ANY IDEA WHETHER ANY OF THOSE INDIVIDUALS THAT WERE INVOLVED IN THE FOCUS GROUP WERE DEATH QUALIFIED?

A.   AGAIN, I DON'T KNOW HOW THEY WERE CHOSEN.

Q.   AND THEY DIDN'T HEAR ANY LIVE TESTIMONY, THOSE FOCUS GROUP INDIVIDUALS.  THEY JUST HEARD A PRESENTATION.

A.   THAT'S RIGHT.

458

Q.    AND YOU WERE THE ONE THAT GAVE THAT PRESENTATION.

A.    NO.  TO THE BEST OF MY MEMORY, WE HAD SOMEBODY WITH R AND D THAT JUST READ THE TWO SUMMARIES.  I DON'T BELIEVE -- I'M 99 PERCENT CERTAIN THAT MR. VINEYARD AND I SIMPLY OBSERVED, DID NOT PARTICIPATE ACTUALLY.

Q.    WERE YOU IN THE SAME ROOM OBSERVING OR WERE YOU LIKE BEHIND A TWO-WAY MIRROR?

A.    IN ANOTHER ROOM.  I FORGET IF IT WAS CLOSED CIRCUIT TV OR A MIRROR OR WHAT.

Q.    OKAY.  AND THE ONLY TWO THINGS THEY HEARD, JUST SO I'M CLEAR, IS THE PRESENTATION OF THE PROSECUTION CASE READ BY SOME ACTOR, SO TO SPEAK, AND THE PRESENTATION OF THE DEFENSE CASE READ BY SOME ACTOR.

A.    TO THE BEST --

Q.    NO ONE FROM YOUR OFFICE.

A.    TO THE BEST OF MY MEMORY, THAT IS ALL -- THAT IS THE ONLY INFORMATION THEY WERE PROVIDED.  BUT I ASSUME THE REPORT LISTS EVERYTHING THEY WERE TOLD, IF THERE WAS MORE.

Q.    OKAY.  NOW, WHAT DOCUMENTS DID YOU HAVE REGARDING MR. LECROY'S MENTAL HEALTH WHEN YOU PREPARED GOVERNMENT'S EXHIBIT 110?

A.    I DON'T RECALL SPECIFICALLY.  I BELIEVE I HAD THE DOCUMENT THAT WAS ON ONE OF THE EXHIBITS YOU SHOWED ME WHICH REFERENCED AN ALLEGATION OF BEING SEXUALLY MOLESTED BY A BABYSITTER.

Q.    WHAT OTHER DOCUMENTS?

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

459

A.    THAT'S -- I DON'T RECALL SPECIFICALLY.  I DO SEEM TO RECALL THAT DOCUMENT.

Q.    WELL, WHAT OTHER MENTAL HEALTH ISSUES -- DIDN'T MR. LECROY HAVE OTHER ISSUES OTHER THAN THE BABYSITTER MOLESTATION?

A.    I DON'T REMEMBER.

Q.    SO THE ONLY MENTAL HEALTH ISSUE THAT YOU CAN RECALL THAT YOU WENT ON TO EXPLAIN IN THE PRESENTATION OF THE DEFENSE CASE IN GOVERNMENT'S EXHIBIT 110 WAS THE MOLESTATION BY THE BABYSITTER.

A.    WELL, WE HAD WHATEVER HAD BEEN FILED BY THE DEFENSE WITH RESPECT TO THE NOTICE OF THEIR INTENT TO PRESENT.  AND I DON'T RECALL THOSE FILINGS, BUT WE HAD THAT INFORMATION IN TERMS OF WHAT THEY WERE PLANNING.  AND THEN WE --

Q.    LET ME STOP YOU THERE.  WHAT WAS THAT?

A.    I DON'T REMEMBER.  I MEAN, ONE OF THE EXHIBITS WAS THE NOTICE OF EXPERT EVIDENCE, FOR EXAMPLE.  I RECALL THERE BEING LITIGATION OVER OUR ABILITY TO HAVE HIM EXAMINED OR -- AND WHETHER THERE WAS INFORMATION DISCLOSED DURING THAT PROCESS WHICH, PRESUMABLY, PREDATED THE FIREWALL AND THE FOCUS GROUPS, I ASSUME WE WOULD HAVE HAD THOSE PLEADINGS.

BUT IN TERMS OF INDEPENDENT INFORMATION WE HAD THROUGH OUR INVESTIGATION, I DON'T RECALL SPECIFICALLY WHAT WE HAD, ALTHOUGH, AGAIN, THAT DOCUMENT, THAT EXHIBIT YOU HAD DOES, I DO REMEMBER THAT.

Q.    SO WOULD IT BE FAIR TO SAY THAT GOVERNMENT EXHIBIT 110 IS

460

THE MENTAL HEALTH DISEASE OR DEFECT OR CONDITION THAT WAS REFERENCED IN GOVERNMENT'S EXHIBIT 53 WHICH YOU HAVE THERE?

A.   IT WAS CERTAINLY A PART OF IT.  I CAN'T SWEAR IT WAS THE ONLY DOCUMENT THAT REFERENCED THE ALLEGATION OF THE CHILDHOOD MOLESTATION, BUT IT WAS CERTAINLY ONE ITEM.  IT MAY HAVE BEEN THE ONLY ITEM.  I JUST DON'T REMEMBER.

(DISCUSSION OFF THE RECORD.)

BY MS. MICHAELS:

Q.   WERE YOU NOT AWARE THAT THERE WAS A FIREWALL FOR THE BUREAU OF PRISONS' MENTAL HEALTH RECORDS?

A.   I DON'T RECALL THAT.

Q.   NO ONE ADVISED YOU THAT YOU WERE NOT ALLOWED TO REVIEW HIS MENTAL HEALTH RECORDS FROM B.O.P.?

A.   I HAVE NO RECOLLECTION OF THAT.

MR. MCKINNON:  YOUR HONOR, I'M SORRY, I THINK THAT MISREPRESENTS THE ONLY TESTIMONY WE HAD ABOUT WHAT THAT FIREWALL WAS.  IT SEEMS TO ME THAT FIREWALL WAS DIRECTED TOWARD THE B.O.P.  WE DON'T KNOW THE DATE.  I WOULD ASK THAT THEY PRODUCE SOME ORDER FROM OKLAHOMA THAT SETS A TIME FRAME HERE BECAUSE WE DON'T KNOW WHEN THAT ORDER WAS ENTERED BY THE COURT IN OKLAHOMA.

THE COURT:  SHE'S GOT HIM ON CROSS.  I'LL ALLOW HER TO ASK ABOUT IT.  OBVIOUSLY, WITHOUT EVIDENCE OF IT, THE COURT CAN'T RELY ON IT.  BUT I'LL ALLOW YOU TO CROSS-EXAMINE HIM ABOUT ANY KNOWLEDGE HE HAS OF IT.

461

BY MS. MICHAELS:

Q.    DO YOU HAVE ANY KNOWLEDGE OF A FIREWALL THAT HAD BEEN ERECTED AT THE BUREAU OF PRISONS AT EL RENO REGARDING MR. LECROY'S MENTAL HEALTH FILE?

A.    I DON'T REMEMBER ANY SUCH FIREWALL OR KNOW OF ANY SUCH FIREWALL.

MS. MICHAELS:  IF I COULD HAVE JUST A MOMENT, YOUR HONOR.

(DISCUSSION OFF THE RECORD.)

MS. MICHAELS:  THAT'S ALL I HAVE, YOUR HONOR.

THE COURT:  ANY REDIRECT?  I'M SORRY, WERE YOU FINISHED?

MS. MICHAELS:  IF I COULD HAVE JUST ONE MINUTE, YOUR HONOR.  I'M SORRY.

THE COURT:  YES, MA'AM.

MS. MICHAELS:  IF I COULD APPROACH HIM, YOUR HONOR.

THE COURT:  YOU MAY.

(DISCUSSION OFF THE RECORD.)

MS. MICHAELS:  NO, SCRATCH IT.  THAT'S IT.  I'M NOT GOING TO ASK HIM ANYTHING ELSE.  THANK YOU.

THE COURT:  ANY REDIRECT?

MR. MCKINNON:  NO, YOUR HONOR.

THE COURT:  YOU MAY STEP DOWN.  YOU'RE EXCUSED.  THANK YOU.

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

462

MS. DINGLE:  YOUR HONOR, THE GOVERNMENT CALLS MS. LUCY MOSES.  BEFORE WE BEGIN, I'D LIKE TO MOVE TO ADMIT WHAT'S BEEN MARKED AS GOVERNMENT'S EXHIBIT 37.  THIS IS A CENSUS TABLE THAT I REFERRED TO IN MY CROSS-EXAMINATION OF MR. MARTIN, AND I UNDERSTAND THE DEFENSE HAS NO OBJECTION.

MR. MARTIN:  EXCUSE ME, I WAS IN A CONVERSATION WITH OTHER COUNSEL.  I HAVE NO OBJECTION TO THAT.

THE COURT:  IT'S ADMITTED.

(THE WITNESS WAS SWORN.)

THE DEPUTY CLERK:  STATE YOUR FULL NAME.

THE WITNESS:  LUCY MOSES.

LUCY MOSES,

HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MS. DINGLE:

Q.   GOOD AFTERNOON, MS. MOSES.

A.   GOOD AFTERNOON.

Q.   WHAT IS YOUR OCCUPATION?

A.   I'M THE JURY ADMINISTRATOR HERE AT THE U.S. DISTRICT COURT.

Q.   AND HOW LONG HAVE YOU HELD THAT POSITION?

A.   THIS MAY WILL BE 13 YEARS THAT I'VE BEEN IN THIS POSITION.

Q.   WHAT ARE YOUR RESPONSIBILITIES?

A.   I OVERSEE THE JURY PROCESS FOR THE DISTRICT; AND THAT INCLUDES REBUILDING OUR JURY MASTER WHEEL, MAILING OUT THE

463

QUESTIONNAIRES, QUALIFYING THE QUESTIONNAIRES ONCE THEY COME BACK, MAILING OUT THE SUMMONSES, HANDLING ANY EXCUSES TO BE POSTPONED OR EXCUSED, PROVIDING JURY ORIENTATION TO THE JURORS WHEN THEY HAVE TO REPORT, AND PAYING THE JURORS.

Q.   AND WHAT GUIDANCE HAVE YOU BEEN GIVEN BY THE COURT IN CARRYING OUT THOSE DUTIES?

A.   WELL, THE GUIDANCE IS FOUND IN OUR JURY PLAN APPENDIX A OF OUR LOCAL RULES.

Q.   AND UNDER THAT PLAN WHO HAS FINAL AUTHORITY FOR HOW JURIES ARE ADMINISTERED IN THE DISTRICT?

A.   THE CLERK HAS THE AUTHORITY UNDER THE SUPERVISION OF THE CHIEF JUDGE; AND THE CLERK CAN CHOOSE A DESIGNEE, AND I AM THE DESIGNEE.

Q.   SO YOU REPORT TO THE CLERK OF COURT?

A.   YES, I DO.

Q.   NOW, HAS THAT BEEN THE CASE DURING YOUR ENTIRE TENURE AS A JURY ADMINISTRATOR FOR THIS DISTRICT?

A.   YES, IT HAS.

Q.   WHO DRAFTS AND APPROVES THE JURY PLAN?

A.   THE JURY PLAN IS DRAFTED BASED ON THE -- IT'S ACTUALLY DRAFTED BY THE COURT AND APPROVED BY THE ELEVENTH CIRCUIT.

Q.   AND IS THE SELECTION OF JURORS CONDUCTED STRICTLY IN ACCORDANCE WITH THAT PLAN?

A.   YES, IT IS.

Q.   AND HAS THAT BEEN THE CASE SINCE YOU BECAME A JURY

464

ADMINISTRATOR 13 YEARS AGO?

A.   YES, IT HAS.

Q.   HOW MANY JURY PLANS HAVE BEEN IN EFFECT SINCE YOU BECAME A JURY ADMINISTRATOR?

A.   I WOULD SAY THERE HAVE BEEN FOUR.

Q.   AND WHAT YEARS WERE THOSE ISSUED?

A.    '97, '99, 2002, AND 2008.

Q.   AND WHICH DIVISIONS ARE GOVERNED BY THE PLAN?

A.   THE FOUR DIVISIONS THAT MAKE UP OUR DISTRICT, WHICH ARE ATLANTA, GAINESVILLE, NEWNAN AND ROME.

Q.   AND HOW ARE GRAND JURIES AND PETIT JURIES COMPOSED WITH RESPECT TO THOSE DECISIONS?

A.   GRAND JURIES ARE COMPOSED OF JURORS FROM ALL FOUR DIVISIONS, WHEREAS PETIT JURIES ARE COMPOSED OF JURORS FROM EACH RESPECTIVE DIVISION, SO INDIVIDUAL DIVISIONS.

Q.   NOW, WHAT IS A MASTER JURY WHEEL?

A.   MASTER JURY WHEEL IS REALLY HOW -- SOMETHING WE REBUILD EVERY FOUR YEARS, AND IT PROVIDES US THE NAMES OF REGISTERED VOTERS THAT WILL LAST US FOR -- FROM WHICH WE GET OUR PROSPECTIVE JURORS, AND THAT LASTS US FOR THE FOUR YEARS.

Q.   AND WHEN YOU SAY YOU CREATE A WHEEL THAT LASTS FOR FOUR YEARS, WOULD YOU SAY ALL OF THE GRAND AND PETIT JURIES DURING THAT PERIOD ARE DRAWN FROM THE SAME MASTER JURY WHEEL?

A.   THAT IS CORRECT.

Q.   SO IN THE CASE OF MR. LECROY, DO YOU HAPPEN TO KNOW WHEN

465

HIS GRAND JURY WAS IMPANELED?

A.   HIS GRAND JURY WAS IMPANELED ON SEPTEMBER 11TH, 2001.

Q.   AND HOW DO YOU KNOW THAT?

A.   IN REVIEWING FOR MY TESTIMONY TODAY, I CAME ACROSS A LIST OF THE GRAND JURORS WHO WERE IMPANELED; AND ON THE LIST IT DID INDICATE SEPTEMBER 11TH, 2001.

Q.   NOW, IF THE GRAND JURY FOR MR. LECROY WAS IMPANELED ON SEPTEMBER 11, 2001, WHEN WAS THE MASTER JURY WHEEL CREATED FROM WHICH THAT GRAND JURY WAS DRAWN?

A.   THAT WOULD HAVE BEEN CREATED IN 1997.

Q.   AND WHICH JURY PLAN WAS IN EFFECT AT THE TIME THAT THE 1997 MASTER JURY WHEEL WAS CREATED?

A.   THAT WOULD HAVE BEEN THE 1997 JURY PLAN.

Q.   AND IN THE CASE OF MR. LECROY'S PETIT JURY, DO YOU KNOW WHEN THAT WAS IMPANELED?

A.   I BELIEVE THAT WAS FEBRUARY 17TH, 2004.

Q.   AND WHEN WAS THE MASTER JURY WHEEL CREATED FROM WHICH THAT PETIT JURY WAS DRAWN?

A.   THAT WOULD HAVE BEEN FROM OUR 2001 MASTER JURY WHEEL.

Q.   I'VE JUST HANDED YOU TWO DOCUMENTS THAT HAVE BEEN MARKED FOR IDENTIFICATION AS GOVERNMENT EXHIBITS 38 AND 14.  CAN YOU IDENTIFY THOSE DOCUMENTS?

A.   THE EXHIBIT 38 IS OUR JURY PLAN IN 1997 AND EXHIBIT 14 IS OUR JURY PLAN IN 1999.

Q.   AND WERE BOTH OF THOSE KEPT IN THE ORDINARY COURSE OF

466

OPERATIONS OF THE JURY OFFICE?

A.   YES, THEY WERE.

Q.   AND HAVE THOSE DOCUMENTS BEEN CERTIFIED AS TRUE COPIES BY YOUR OFFICE?

A.   YES, THEY HAVE.

Q.   NOW, WERE THE PROCEDURES USED TO CREATE THE 1997 AND THE 2001 MASTER WHEELS THE SAME?

A.   YES, THEY WERE.

Q.   AND WHERE DID YOU GET THE NAMES USED TO CREATE THOSE MASTER WHEELS?

A.   WE GOT THOSE FROM THE GEORGIA SECRETARY OF STATE'S OFFICE OF VOTER REGISTRATION.

Q.   IS THAT THE ONLY SOURCE THAT YOU USED FOR CREATING THE MASTER JURY WHEELS?

A.   YES, IT IS.

Q.   WHY DON'T YOU USE ANY OTHER SOURCE, FOR EXAMPLE, THE DRIVER'S LICENSE LISTS?

A.   WE FEEL THAT THE VOTER REGISTRATION SOURCE MOST ACCURATELY REFLECTS WHAT WE NEED AS FAR AS FOR JURORS.  IF WE USE ANY OTHER SOURCE, WE WOULD RUN INTO ISSUES SUCH AS PROSPECTIVE JURORS THAT WOULD BE UNDER 18, PROSPECTIVE JURORS THAT WOULD BE FELONS, AND PROSPECTIVE JURORS THAT WOULD BE NONCITIZENS.

Q.   HOW DOES THE COURT GO ABOUT GETTING THE VOTER REGISTRATION LISTS?

A.   ALL THREE DISTRICTS REBUILD THEIR JURY WHEELS AT THE SAME

467

TIME. ALL THREE DISTRICTS REQUEST THE NAMES OF THE VOTERS FROM THE SECRETARY OF STATE'S OFFICE TOGETHER.

Q. I'M SHOWING YOU WHAT HAS BEEN MARKED FOR IDENTIFICATION AS GOVERNMENT EXHIBITS 2 AND 15. THESE WERE PROVISIONALLY ADMITTED PRIOR WITH A PREVIOUS WITNESS, BUT I'D LIKE TO GO OVER THEM WITH YOU, AS WELL. WHAT ARE THOSE DOCUMENTS?

A. EXHIBIT NUMBER 2 IS THE LETTER THAT WAS WRITTEN TO THE SECRETARY OF STATE'S OFFICE PRIOR TO OUR REBUILD OF THE 1997 WHEEL, AND EXHIBIT NUMBER 15 WAS THE LETTER WRITTEN BY ALL THREE DISTRICTS PRIOR TO THE 2000 WHEEL REQUESTING THE NAMES OF THE VOTERS IN OUR STATE.

Q. AND WERE BOTH OF THESE LETTERS KEPT IN THE ORDINARY COURSE OF THE JURY OFFICE?

A. YES, THEY WERE.

Q. AND HAVE THEY BOTH BEEN CERTIFIED AS TRUE COPIES BY YOUR OFFICE?

A. YES, THEY HAVE.

MS. DINGLE: MOVE TO ADMIT GOVERNMENT EXHIBITS 2 AND 15.

THE COURT: ANY OBJECTION?

MR. MARTIN: NO, SIR.

THE COURT: THEY ARE ADMITTED.

BY MS. DINGLE:

Q. NOW, IF YOU LOOK AT EXHIBIT 2 AS AN EXAMPLE, THE DATE ON THAT LETTER, CAN YOU READ THE DATE ON THAT LETTER?

468

A.    OCTOBER 4TH, 1996.

Q.    AND WHY WAS THE LETTER MAILED ON THAT DATE?

A.    WE MAIL THE LETTER PRIOR TO THE CUTOFF OF THE GENERAL ELECTION.  IN THIS CASE, IT'S MY UNDERSTANDING THE GENERAL ELECTION CUTOFF DATE IS USUALLY A MONTH PRIOR TO THE ACTUAL ELECTION.  SO WE MAIL THE LETTER TO LET THE SECRETARY OF STATE'S OFFICE KNOW THAT WE WILL BE NEEDING THE NAMES OF VOTERS ONCE THE CUTOFF DATE HAS PASSED.

Q.    AND WHAT HAPPENS AFTER YOU SEND THAT LETTER REQUESTING THE VOTER REGISTRATION LISTS?

A.    THEN THE SECRETARY OF STATE'S OFFICE PROVIDES US THE NAMES OF ALL THE VOTERS IN THE STATE.

Q.    NOW, WHAT DOCUMENTARY EVIDENCE DO YOU RECEIVE CONFIRMING THAT THE SECRETARY OF STATE SENDS THAT INFORMATION TO THE VENDOR?

A.    WE GET A CERTIFICATION FROM THE SECRETARY OF STATE'S OFFICE.

Q.    I'VE HANDED YOU THREE DOCUMENTS THAT HAVE BEEN MARKED FOR IDENTIFICATION AS GOVERNMENT'S EXHIBIT 3, 16 AND 17.  CAN YOU IDENTIFY THESE DOCUMENTS?

A.    YES.  EXHIBIT NUMBER 3 IS THE CERTIFICATION FROM THE SECRETARY OF STATE'S OFFICE FOR OUR 1997 JURY WHEEL REBUILD. EXHIBIT NUMBER 16 IS THE CERTIFICATION FROM THE SECRETARY OF STATE'S OFFICE FOR OUR 2001 REBUILD.  AND EXHIBIT NUMBER 17 IS A CERTIFICATION FROM THE VENDOR WHO REBUILT THE JURY WHEELS FOR

469

ALL THREE DISTRICTS INDICATING THAT HE RECEIVED THE DISK

CONTAINING ALL OF THE NAMES FROM THE SECRETARY OF STATE'S

OFFICE.

Q.    ARE THOSE DOCUMENTS KEPT IN THE ORDINARY COURSE OF THE

JURY OFFICE?

A.    YES, THEY ARE.

Q.    AND HAVE THEY BEEN CERTIFIED BY YOUR OFFICE AS TRUE

COPIES?

A.    YES.

        MS. DINGLE:  MOVE TO ADMIT 3, 16 AND 17.

        THE COURT:  ANY OBJECTION?

        MR. MARTIN:  NO, SIR.

        THE COURT:  THEY ARE ADMITTED.

BY MS. DINGLE:

Q.    NOW, WHAT GUIDANCE DID YOU PROVIDE TO THE VENDOR FOR

PROCESSING THE VRL DATA?  AND I'M SORRY, BY VRL, I MEAN VOTER

REGISTRATION LIST.

A.    WE, BASED ON -- WE PROVIDE HIM WITH A COPY OF OUR JURY

PLAN AS WELL AS A QUOTIENT AND A STARTING NUMBER SO THAT THEY

CAN PICK THE FOLKS, THE JURORS THAT MAKE UP OUR JURY WHEEL.

Q.    I'M HANDING YOU WHAT'S BEEN MARKED FOR IDENTIFICATION AS

GOVERNMENT'S EXHIBIT 4.  CAN YOU IDENTIFY THAT DOCUMENT?

A.    YES.  IT WAS A LETTER THAT WAS SENT TO OUR VENDOR PRIOR TO

THE 1997 WHEEL WHICH GIVES HIM INSTRUCTIONS ON FOLLOWING OUR

JURY PLAN WHEN IT COMES TO REBUILDING OUR MASTER WHEEL AS WELL

470

AS AUTHORIZATION TO ALLOW HIM TO REBUILD OUR MASTER WHEEL AND THE RECORD LAYOUT THAT WAS INVOLVED AS FAR AS REBUILDING OUR MASTER WHEEL GOES.

Q.   AND IS THAT LETTER KEPT IN THE ORDINARY COURSE?

A.   YES, IT IS.

Q.   AND HAS IT BEEN CERTIFIED AS A TRUE COPY BY YOUR OFFICE?

A.   YES, IT HAS.

MS. DINGLE:  MOVE TO ADMIT GOVERNMENT EXHIBIT 4.

THE COURT:  ANY OBJECTION?

MR. MARTIN:  WHAT NUMBER IS THAT AGAIN?

THE COURT:  4.

MR. MARTIN:  NO OBJECTION.

THE COURT:  IT'S ADMITTED.

BY MS. DINGLE:

Q.   NOW, THAT LETTER, WHAT'S THE DATE ON THAT PARTICULAR LETTER?

A.   NOVEMBER 26TH, 1996.

Q.   AND WAS A SIMILAR LETTER MAILED WITH RESPECT TO THE 2001 JURY WHEEL?

A.   YES, IT WAS.

Q.   AND WOULD THAT 2001 LETTER HAVE ATTACHED A COPY OF THE MOST RECENT JURY PLAN, AS WELL?

A.   YES, IT WOULD HAVE.

Q.   NOW, WHAT CONFIRMATION DOES THE JURY OFFICE KEEP THAT THE VENDOR WILL CARRY OUT HIS DUTIES ACCORDING TO THE PLAN?

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

471

A.   WE KEEP AN AUTHORIZATION FROM OUR VENDOR.

Q.   I'M SHOWING YOU WHAT'S BEEN MARKED FOR IDENTIFICATION AS GOVERNMENT EXHIBITS 5 AND 18.   WHAT ARE THOSE DOCUMENTS?

A.   EXHIBIT NUMBER 5 IS THE COURT AUTHORIZATION THAT WAS SIGNED BY THE CLERK AT THE TIME, LUTHER D. THOMAS, AS WELL AS AN AFFIDAVIT FROM OUR VENDOR, BILL BENNETT, SAYING THAT HE WILL CARRY OUT OUR PRACTICES ACCORDING TO OUR JURY PLAN.   AND EXHIBIT 18 -- EXCUSE ME, THAT WAS FOR THE 1997 JURY WHEEL. EXHIBIT 18 IS THE SAME EXACT THING THAT WAS SIGNED BY BOTH MR. THOMAS AND MR. BENNETT PRIOR TO OUR 2001 JURY WHEEL.

Q.   ARE THOSE FORMS KEPT IN THE ORDINARY COURSE OF BUSINESS AT THE JURY OFFICE?

A.   YES, THEY ARE.

Q.   AND HAVE THEY BOTH BEEN CERTIFIED BY YOUR OFFICE AS TRUE COPIES?

A.   YES, THEY HAVE.

         MS. DINGLE:  MOVE TO ADMIT GOVERNMENT EXHIBITS 5 AND 18.

         MR. MARTIN:  NO OBJECTION.

         THE COURT:  THEY ARE ADMITTED.

BY MS. DINGLE:

Q.   SO NOW, ONCE THE VENDOR HAS THE DISK CONTAINING THE VOTER REGISTRATION LISTS, WHAT STEPS ARE TAKEN TO CREATE THE MASTER WHEEL?

A.   UNDER OUR JURY PLAN WE HAVE TO MAKE SURE THAT OUR JURY

472

WHEEL HAS A MINIMUM NUMBER OF JURORS IN EACH OF THE DIVISIONS; AND BASED ON THE MINIMUM NUMBER OF JURORS OR ACTUALLY THE NUMBER THAT WE WANT IN OUR MASTER WHEEL, WE CHOOSE -- OR WE HAVE A QUOTIENT AS WELL AS WE PICK A STARTING NUMBER THAT WE WILL GIVE OUR VENDOR IN ORDER FOR HIM TO BUILD THE MASTER WHEEL.

Q.   SO HOW IS THE -- FIRST, HOW DO YOU FIGURE OUT HOW MANY JURORS YOU'RE GOING TO NEED IN EACH DIVISION FOR THAT FOUR-YEAR PERIOD?

A.   WE WANT TO ENSURE THAT WE DO HAVE ENOUGH JURORS.  AT A MINIMUM, WE HAVE TO GO BY WHAT IS IN OUR JURY PLAN.  FOR EXAMPLE, WE HAVE A MINIMUM OF 60,000 THAT ARE REQUIRED IN THE ATLANTA DIVISION.  WE WILL ALWAYS MAKE SURE THAT WE HAVE MORE THAN 60,000 TO ENSURE THAT ENOUGH ARE IN OUR WHEEL TO LAST FOR THE FOUR YEARS.

Q.   AND DO YOU SOMETIMES EXCEED THAT MINIMUM?

A.   YES, WE DO.

Q.   AND ONCE YOU'VE FIGURED OUT HOW MANY JURORS YOU NEED FOR EACH DIVISION, HOW DO YOU CREATE THE QUOTIENT?

A.   THE QUOTIENT IS BASED ON THE TOTAL NUMBER OF REGISTERED VOTERS FOR THAT DIVISION.  AND WE DIVIDE THE NUMBER THAT WE NEED, THE MINIMUM NUMBER THAT WE HAVE DETERMINED IN ADVANCE -- OR I SHOULD TAKE THAT BACK.  THE MINIMUM NUMBER IS DIVIDED INTO THE TOTAL NUMBER OF REGISTERED VOTERS FOR THE DIVISION, AND THAT IS HOW WE GET OUR QUOTIENT.

473

Q.   SO, FOR EXAMPLE, IF THERE WERE 100,000 VOTERS IN THE GAINESVILLE DIVISION AND YOU NEEDED 10,000 JURORS FOR THE NEXT FOUR YEARS, WHAT WOULD YOU DO?

A.   WE WOULD DIVIDE 10,000 INTO A HUNDRED THOUSAND.

Q.   AND YOUR QUOTIENT WOULD BE?

A.   WOULD BE TEN.

Q.   AND WHAT DO YOU DO ONCE YOU HAVE THAT QUOTIENT?

A.   ONCE WE HAVE THE QUOTIENT, WE DO A RANDOM DRAW TO DETERMINE WHAT OUR STARTING NUMBER WOULD BE.  AND OUR STARTING NUMBER NEEDS TO BE BETWEEN ONE AND OUR QUOTIENT.

Q.   AND WHEN YOU SAY THE STARTING NUMBER, ARE YOU REFERRING TO WHERE YOU BEGIN APPLYING THE QUOTIENT ON THE LIST?

A.   THAT IS CORRECT.

Q.   NOW, WHAT GUIDANCE IS THERE ON -- WELL, WITHDRAW.

I'M SHOWING YOU A DOCUMENT THAT'S BEEN MARKED FOR IDENTIFICATION AS GOVERNMENT EXHIBIT 21.  WHAT IS THAT DOCUMENT?

A.   THIS IS A DOCUMENT THAT OUR CLERK, LUTHER D. THOMAS, IT'S ACTUALLY A MEMO THAT HE SUBMITTED TO CHIEF JUDGE ORINDA EVANS ASKING FOR HER RECOMMENDATION REGARDING HOW TO CHOOSE A STARTING NUMBER, EITHER AS AN AUTOMATED WAY OR AS A MANUAL, IN A MANUAL METHOD, USING A MANUAL METHOD.

Q.   IS THAT MEMORANDUM KEPT IN THE ORDINARY COURSE AT THE JURY OFFICE?

A.   YES, IT IS.

474

Q.   AND HAS IT BEEN CERTIFIED BY YOUR OFFICE AS A TRUE COPY?

A.   YES, IT HAS.

MS. DINGLE:  MOVE TO ADMIT GOVERNMENT EXHIBIT 21.

MR. MARTIN:  NO OBJECTION.

THE COURT:  IT'S ADMITTED.

BY MS. DINGLE:

Q.   NOW, WHAT PROCEDURE WAS RECOMMENDED IN THAT MEMO FOR CHOOSING THE STARTING NUMBER?

A.   IT WAS RECOMMENDED THAT WE USE A MANUAL METHOD.

Q.   AND WHAT IS THE MANUAL METHOD?

A.   THE MANUAL METHOD IS PUTTING NUMBERS ON DISKS, PUTTING THEM IN A HOPPER AND MANUALLY PICKING OUT THE NUMBER.

Q.   SO WOULD THAT BE LIKE THE LOTTO, BASICALLY?

A.   YES.

Q.   AND HOW DID YOU ACTUALLY COME UP WITH THE STARTING NUMBER IN 1997 AND 2001?  WHAT WAS THE PROCEDURE THAT YOU FOLLOWED?

A.   WELL, TO COME UP WITH THE STARTING NUMBER, WE KNOW IT HAD TO BE BETWEEN ONE AND OUR QUOTIENT.  AND IN BOTH INSTANCES WE POSTED A NOTICE THAT WE WERE GOING TO DO A PUBLIC DRAW TO GET OUR STARTING NUMBER.

Q.   I'VE HANDED YOU WHAT'S BEEN MARKED FOR IDENTIFICATION AS GOVERNMENT EXHIBITS 6 AND 19.  WHAT ARE THOSE DOCUMENTS?

A.   EXHIBIT NUMBER 6 IS THE PUBLIC NOTICE THAT WE POSTED PRIOR TO THE STARTING NUMBER DRAW FOR OUR 1997 WHEEL, AND EXHIBIT 19 IS THE PUBLIC NOTICE THAT WE POSTED PRIOR TO THE STARTING

475

NUMBER DRAW FOR OUR 2001 WHEEL.

Q.   AND ARE THOSE NOTICES KEPT IN THE ORDINARY COURSE OF THE JURY OFFICE?

A.   YES, THEY ARE.

Q.   AND HAVE THEY BEEN CERTIFIED BY YOUR OFFICE AS TRUE COPIES?

A.   YES.

         MS. DINGLE:  MOVE TO ADMIT GOVERNMENT EXHIBIT 6 AND 19.

         MR. MARTIN:  NO PROBLEM.

         THE COURT:  THEY ARE ADMITTED.

BY MS. DINGLE:

Q.   I'M HANDING YOU WHAT'S BEEN MARKED FOR IDENTIFICATION AS GOVERNMENT EXHIBIT 7 AND 20.  CAN YOU IDENTIFY THOSE DOCUMENTS?

A.   YES.  THESE ARE THE WITNESSES WHO OBSERVED THE STARTING NUMBER DRAW.  EXHIBIT NUMBER 7 IS FOR THE 1997 WHEEL.  EXHIBIT NUMBER 20 IS FOR THE 2000 WHEEL.  AND WE HAD ONE PERSON WHO DID THE ACTUAL DRAW; AND IN THE '97 WHEEL WE HAD FOUR WITNESSES, AND IN THE 2001 WHEEL DRAW WE HAD FIVE WITNESSES.

Q.   AND ARE THOSE RECORDS OF THE STARTING NUMBERS DRAWN KEPT IN THE ORDINARY COURSE IN THE JURY OFFICE?

A.   YES, THEY ARE.

Q.   AND HAVE THEY BEEN CERTIFIED BY YOUR OFFICE AS TRUE COPIES?

A.   YES, THEY HAVE.

476

MS. DINGLE:  MOVE TO ADMIT GOVERNMENT EXHIBIT 7 AND 20.

THE COURT:  ANY OBJECTION?

MR. MARTIN:  NO, SIR.

THE COURT:  THEY ARE ADMITTED.

BY MS. DINGLE:

Q.   DO GOVERNMENT EXHIBIT 7 AND 20 ALSO INDICATE THE STARTING NUMBERS THAT WERE USED FOR THE JURY WHEELS --

A.   YES, THEY DO.

Q.   NOW, ONCE YOU'VE CALCULATED THE QUOTIENT AND THE STARTING NUMBER, WHAT STEPS DO YOU TAKE?

A.   THEN WE GIVE THE QUOTIENT AND THE STARTING NUMBER FOR EACH DIVISION TO OUR VENDOR, AND THAT WILL HELP HIM IN CREATING OUR MASTER WHEEL.

Q.   SO THE RESULTING NAMES AFTER THE QUOTIENT AND STARTING NUMBER ARE APPLIED BY THE VENDOR, IS THAT THE ACTUAL LIST OF NAMES FOR THE MASTER JURY WHEEL?

A.   THAT IS CORRECT.

Q.   WHAT DISCRETION DID YOU OR ANYONE ELSE IN THE CLERK'S OFFICE HAVE TO CHOOSE OR TO EXCLUDE JURORS DURING THE PROCESS THAT YOU'VE JUST DESCRIBED?

A.   I HAVE NO DISCRETION.

Q.   AND HOW COULD YOU OR ANYONE ELSE IN THE CLERK'S OFFICE ALTER THE COMPOSITION OF THE MASTER WHEEL BASED ON THE RACE OR ETHNICITY OF THE JURORS?

477

A.   WE ABSOLUTELY CANNOT.

Q.   NOW, LET'S TALK ABOUT THE QUALIFIED WHEEL.  WHAT ARE THE QUALIFICATIONS TO BE A JUROR?

A.   YOU MUST BE A CITIZEN, YOU MUST NOT BE AN ELECTED OFFICIAL OR ONE WHO IS APPOINTED BY AN ELECTED OFFICIAL.  YOU HAVE TO BE OVER THE AGE OF 18.  YOU MUST NOT BE A FELON WHOSE RIGHTS HAVE NOT YET BEEN RESTORED, CIVIL RIGHTS HAVE NOT BEEN RESTORED. YOU MUST NOT BE IN THE ARMED SERVICES AND -- WELL, THOSE ARE THE BASICS.

Q.   IS THERE ANY LANGUAGE REQUIREMENT TO BE A JUROR?

A.   YOU MUST READ, SPEAK AND UNDERSTAND ENGLISH.

Q.   AND IS THERE ANY MENTAL OR PHYSICAL REQUIREMENT IN ORDER TO BE A JUROR?

A.   IF YOU CAN PROVIDE PROOF THROUGH YOUR DOCTOR THAT YOU SHOULD BE EXCUSED BECAUSE OF A PHYSICAL OR MENTAL INFIRMITY, THEN WE DO REQUIRE A DOCTOR'S CERTIFICATION.

Q.   NOW, WHERE ARE THE REQUIREMENTS FOR BEING JURY QUALIFIED SET OUT?

A.   THEY ARE IN OUR JURY PLAN.

Q.   AND ONCE YOU HAVE THE MASTER WHEELS FOR ALL THE DIVISIONS, HOW DO YOU IDENTIFY QUALIFIED JURORS?

A.   WE MAIL OUT JURY QUALIFICATION QUESTIONNAIRES BASED ON THE NAMES IN OUR MASTER WHEEL; AND ONCE THEY COME BACK, THEN WE DETERMINE WHETHER OR NOT THEY ARE QUALIFIED TO SERVE AS JURORS.

Q.   I'VE HANDED YOU A DOCUMENT THAT WAS MARKED FOR

478

IDENTIFICATION AS GOVERNMENT EXHIBIT 22.  WHAT IS THAT DOCUMENT?

A.   THIS IS A JURY QUALIFICATION QUESTIONNAIRE.

Q.   AND ARE YOU ABLE TO DETERMINE WHEN THAT QUESTIONNAIRE WAS USED?

A.   IT WAS USED FOR THE '97 WHEEL AS WELL AS THE 2001 WHEEL.

Q.   NOW, DO THE QUESTIONS IN THAT QUESTIONNAIRE CORRESPOND TO THE REQUIREMENTS FOR JURY SERVICE?

A.   YES, THEY DO.

Q.   AND WAS THAT QUESTIONNAIRE KEPT IN THE ORDINARY COURSE OF BUSINESS OF THE JURY OFFICE?

A.   YES, IT WAS.

Q.   HAS IT BEEN CERTIFIED BY YOUR OFFICE AS A TRUE COPY?

A.   YES.

          MS. DINGLE:  MOVE TO ADMIT GOVERNMENT EXHIBIT 22.

          MR. MARTIN:  NO OBJECTION.

          THE COURT:  IT'S ADMITTED.

BY MS. DINGLE:

Q.   NOW, WHEN YOU MAIL OUT THE QUESTIONNAIRES TO THE NAMES IN THE MASTER WHEEL, WHERE DO YOU GET THE ADDRESSES FOR THOSE POTENTIAL JURORS?

A.   THE ADDRESSES ARE FROM THE VOTER REGISTRATION LISTS THAT WERE GIVEN TO US BY THE SECRETARY OF STATE'S OFFICE.

Q.   AND DO YOU DO ANYTHING -- OR I SHOULD CLARIFY.  IN 1997 AND 2001, DID YOU DO ANYTHING TO VERIFY THOSE ADDRESSES?

479

A.   PRIOR TO THE MAILING OF THE QUESTIONNAIRES, OUR VENDOR RAN OUR DATABASE AGAINST THE NATIONAL CHANGE OF ADDRESS DATABASE TO ENSURE THAT WE HAVE THE MOST ACCURATE ADDRESSES FOR OUR JURORS.

Q.   WHERE DOES THE NATIONAL CHANGE OF ADDRESS DATABASE COME FROM?

A.   THAT, I DO NOT KNOW.

Q.   IS THAT A GOVERNMENT PROVIDED DATABASE?  DO YOU HAPPEN TO KNOW THAT?

A.   I HONESTLY DON'T KNOW.  THAT'S HANDLED BY OUR VENDOR.  BUT IT IS, I BELIEVE IT'S A NATIONALLY RECOGNIZED PROGRAM; BUT I DON'T KNOW WHERE IT COMES FROM.

Q.   SO THAT PROGRAM IS APPLIED TO DETERMINE WHETHER THE MOST RECENT ADDRESS IS BEING USED TO MAIL THE QUESTIONNAIRE.

A.   YES, THAT'S CORRECT.

Q.   AND DOES THE U.S. POSTAL SERVICE FORWARD QUESTIONNAIRES IF A JUROR HAS PUT A FORWARDING ADDRESS ON FILE WITH THEM?

A.   YES, THEY DO.

Q.   HOW DO YOU KNOW THAT?

A.   WE HAVE GOTTEN CALLS FROM JURORS IN THE PAST THAT HAVE INDICATED THEY HAVE RECEIVED A FORWARDED QUESTIONNAIRE FROM OUR OFFICE.

Q.   AND IF YOU SENT OUT QUESTIONNAIRES, HOW WOULD YOU FIND OUT IF AN INDIVIDUAL IS DECEASED WHO WAS MAILED A QUESTIONNAIRE?

A.   IF SOMEBODY IS DECEASED, OFTENTIMES FAMILY MEMBERS OR AN EXECUTOR OF THE ESTATE WILL RETURN THE QUESTIONNAIRE TO US AND

480

MARK ON THERE THAT THE JUROR IS DECEASED.

Q.   AND HOW DO YOU FIND OUT IF AN INDIVIDUAL HAS MOVED OUTSIDE OF THE NORTHERN DISTRICT OF GEORGIA?

A.   EITHER THE JUROR WILL RESPOND BACK TO US OR THE PERSON PRESENTLY LIVING AT THE ADDRESS WILL RESPOND BACK TO US THAT THE JUROR HAS MOVED OUT OF THE DISTRICT.

Q.   NOW, IN 1996 AND 2001, WHAT DID YOU DO WITH QUESTIONNAIRES THAT WERE RETURNED UNDELIVERABLE?

A.   THOSE QUESTIONNAIRES THAT WERE RETURNED UNDELIVERABLE WE ATTEMPTED TO GET THE BEST ADDRESS FOR THE -- TO MAIL THE JUROR A NEW QUESTIONNAIRE THROUGH THE WHITE PAGES.

Q.   AND WHAT HAPPENED WITH QUESTIONNAIRES THAT WERE NOT RETURNED?

A.   WITH THE QUESTIONNAIRES THAT WERE NOT RETURNED, WE DID MAIL A SECOND NOTICE.

Q.   I'VE HANDED YOU WHAT'S BEEN MARKED FOR IDENTIFICATION AS GOVERNMENT'S EXHIBIT 24.  WHAT IS THAT DOCUMENT?

A.   EXHIBIT 24 IS A LETTER THAT IS SIGNED BY CLERK OF COURT DAN THOMAS, LUTHER D. THOMAS, FOR OUR 2001 WHEEL THAT WAS SENT TO ALL JURORS WHO DID NOT RESPOND TO OUR FIRST MAILING ASKING THAT THEY FILL OUT THE ENCLOSED QUESTIONNAIRE AND RETURN TO OUR OFFICE.

Q.   AND WHAT'S THE DATE ON THAT LETTER?

A.   JULY 16TH, 2001.

Q.   WAS IT SENT -- WELL, FIRST, WAS THAT LETTER KEPT IN THE

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

481

ORDINARY COURSE OF BUSINESS AT THE JURY OFFICE?

A.    YES, IT WAS.

Q.    AND HAS IT BEEN CERTIFIED BY YOUR OFFICE AS A TRUE COPY?

A.    YES, IT HAS.

          MS. DINGLE:  MOVE TO ADMIT GOVERNMENT EXHIBIT 24.

          MR. MARTIN:  JUST A SECOND, PLEASE.

          (DISCUSSION OFF THE RECORD.)

          MR. MARTIN:  I HAVE NO OBJECTION.

          THE COURT:  IT'S ADMITTED.

BY MS. DINGLE:

Q.    NOW, WAS A SIMILAR LETTER SENT IN 1997?

A.    YES, IT WAS.

Q.    AND DO THOSE FOLLOW-UP LETTERS ATTACH THE SECOND COPY OF
THE QUESTIONNAIRE?

A.    YES, THEY DO.

Q.    HOW EFFECTIVE IS THE FOLLOW-UP LETTER AT GETTING FOLKS TO
SEND IN THEIR QUESTIONNAIRES?

A.    HISTORICALLY, WE SEND QUESTIONNAIRES OUT TO 25 PERCENT OF
OUR ENTIRE WHEEL.  OF THE 25 -- OF THE QUESTIONNAIRES THAT ARE
ACTUALLY MAILED, WE GET A RESPONSE RATE BACK OF USUALLY 50
PERCENT.

Q.    SO YOU'RE SAYING, JUST TO CLARIFY, 25 PERCENT OF THOSE WHO
RECEIVE QUESTIONNAIRES DON'T SEND THEM BACK INITIALLY?

A.    THAT IS CORRECT.

Q.    AND THEN YOU SEND OUT THE FOLLOW-UP LETTER TO THAT GROUP.

482

A.   YES.

Q.   AND 50 PERCENT OF THE ONES WHO GOT THE FOLLOW-UP LETTER THEN SEND THEIR QUESTIONNAIRES IN.

A.   THAT IS CORRECT.

Q.   NOW, WITH RESPECT TO QUESTIONNAIRES THAT ARE RETURNED UNDELIVERABLE OR NOT RETURNED AT ALL, DO YOU HAVE ANY WAY OF DETERMINING THE RACE OR ETHNICITY OF THOSE INDIVIDUALS?

A.   NO, WE DO NOT.

Q.   AND WHAT DO YOU DO WITH ALL OF THE QUESTIONNAIRES THAT ARE ULTIMATELY RETURNED TO YOU?

A.   WE STORE THEM IN OUR OFFICE.

Q.   AND HOW DO YOU EVALUATE, BASED ON THOSE QUESTIONNAIRES, WHICH JURORS ARE QUALIFIED?

A.   BASED ON OUR JURY PLAN, WE REVIEW THE QUESTIONS THAT WERE FILLED IN BY THE JURORS; AND BASED ON THE ANSWERS, WE DETERMINE WHETHER OR NOT THE JUROR IS QUALIFIED TO SERVE.

Q.   AND ONCE YOU'VE IDENTIFIED THE QUALIFIED JURORS, DO YOU PUT THOSE NAMES INTO A WHEEL?

A.   YES, WE DO.

Q.   NOW, WHAT REPORTS, IF ANYTHING, ARE COMPLETED CONCERNING THE RESULTS OF MAILING OUT THE QUALIFICATION QUESTIONNAIRES?

A.   WE SUBMIT A REPORT CALLED THE JS-12.

Q.   I'VE JUST HANDED YOU GOVERNMENT EXHIBITS 27 THROUGH 30 WHICH HAVE BEEN MARKED FOR IDENTIFICATION.  CAN YOU IDENTIFY THOSE DOCUMENTS?

483

A.   YES.  GOVERNMENT 27 IS THE JS-12 FOR THE GAINESVILLE DIVISION, GOVERNMENT 28 IS THE JS-12 FOR THE ATLANTA DIVISION, GOVERNMENT EXHIBIT 29 IS THE JS-12 FOR THE NEWNAN DIVISION, AND GOVERNMENT EXHIBIT 30 IS THE JS-12 FOR THE ROME DIVISION.

Q.   AND WHAT YEAR WERE THOSE JS-12S COMPLETED?

A.   IN 2001.

Q.   I'M HANDING YOU WHAT'S BEEN MARKED AS GOVERNMENT EXHIBITS FOR IDENTIFICATION 10 THROUGH 13.  WHAT ARE THOSE DOCUMENTS?

A.   GOVERNMENT EXHIBIT NUMBER 10 IS THE JS-12 FOR GAINESVILLE FOR OUR 1997 WHEEL, GOVERNMENT EXHIBIT 11 IS THE JS-12 FOR ATLANTA FOR OUR 1997 WHEEL, GOVERNMENT EXHIBIT 12 IS THE JS-12 FOR NEWNAN FOR OUR 1997 WHEEL, AND GOVERNMENT EXHIBIT 13 IS THE JS-12 FOR ROME FOR OUR 1997 WHEEL.

Q.   ARE ALL OF THOSE JS-12 REPORTS KEPT IN THE ORDINARY COURSE OF THE JURY OFFICE?

A.   YES, THEY ARE.

Q.   AND HAVE THEY BEEN CERTIFIED AS TRUE COPIES BY YOUR OFFICE?

A.   YES.

        MS. DINGLE:  YOUR HONOR, I'D MOVE TO ADMIT GOVERNMENT EXHIBITS 10 THROUGH 13.  I BELIEVE 27 THROUGH 30 WERE ALREADY ADMITTED.

        THE COURT:  THEY WERE.  ANY OBJECTION?

        MR. MARTIN:  NO, SIR.

        THE COURT:  THEY'RE ADMITTED.

484

BY MS. DINGLE:

Q.   I'VE JUST SHOWN YOU WHAT'S BEEN MARKED FOR IDENTIFICATION AS GOVERNMENT EXHIBITS 9 AND 25.  WHAT ARE THOSE DOCUMENTS?

A.   THIS IS A REPORT THAT WE SUBMITTED TO THE CHIEF JUDGE. GOVERNMENT EXHIBIT NUMBER 9 WAS SUBMITTED TO CHIEF JUDGE VINING OR I SHOULD SAY SENIOR JUDGE VINING FOR THE 1997 WHEEL IN WHICH HE ACCEPTED OUR RECOMMENDATIONS FOR THE MASTER WHEEL FOR 1997.

GOVERNMENT EXHIBIT NUMBER 25 IS THE REPORT THAT WE SUBMITTED TO CHIEF JUDGE EVANS IN WHICH SHE CONCLUDED WITH OUR RECOMMENDATION AS TO THE MAKEUP OF THE MASTER WHEEL FOR THE 2001 WHEEL.

Q.   AND ARE THOSE REPORTS KEPT IN THE ORDINARY COURSE OF THE JURY OFFICE?

A.   YES, THEY ARE.

Q.   AND HAVE THEY BEEN CERTIFIED BY YOUR OFFICE AS TRUE COPIES?

A.   YES, THEY HAVE.

MS. DINGLE:  MOVE TO ADMIT GOVERNMENT EXHIBITS 9 -- I'M SORRY, 9 AND 25.

MR. MARTIN:  NO OBJECTION.

THE COURT:  THEY ARE ADMITTED.

BY MS. DINGLE:

Q.   NOW, LET'S TALK ABOUT THE JS-12 REPORTS, I'M SORRY, ON THE STATISTICAL DATA KEPT BY THE JURY OFFICE.  WHAT RACIAL AND/OR ETHNIC DATA IS REQUESTED IN THE JURY QUESTIONNAIRES?  IT'S ON

485

GOVERNMENT EXHIBIT 22, BY THE WAY, IF YOU WOULD LIKE TO REFER TO THE DOCUMENT.

A.    AS FAR AS RACIAL MAKEUP, IT DOES INDICATE FOR THE JUROR TO NOTE WHETHER THEY ARE ASIAN, NATIVE HAWAIIAN/PACIFIC ISLANDER, NATIVE AMERICAN INDIAN, BLACK, WHITE, OR OTHER.

Q.    AND WITH REGARD TO ETHNICITY?

A.    AND WITH REGARD TO ETHNICITY, IT ASKS WHETHER OR NOT YOU -- ARE YOU HISPANIC, YES OR NO.

Q.    NOW, WHAT ANALYSIS DO YOU DO OF THAT RACIAL AND ETHNIC DATA WHEN YOU RECEIVE THE QUESTIONNAIRES?

A.    WELL, THE ANALYSIS ACTUALLY GOES INTO OUR JS-12 THAT WE PREPARE.

Q.    AND WHY DO YOU DO ANALYSIS OF THE RACIAL AND ETHNIC MAKEUP OF THE QUALIFIED JURY WHEEL?

A.    BECAUSE IT'S IMPORTANT TO MAKE SURE THAT OUR STATISTICS ARE IN COMPLIANCE WITH THE CENSUS BUREAU'S STATISTICS.

Q.    AND WHAT DO YOU MEAN BY THAT?

A.    WE WANT TO MAKE SURE THAT NOT ONE GROUP IS OVERREPRESENTED OR UNDERREPRESENTED AS FAR AS OUR JURY WHEEL GOES.

Q.    AND WHAT BENCHMARK DO YOU USE FOR DETERMINING OVER- OR UNDERREPRESENTATION?

A.    WE USE A BENCHMARK OF TEN PLUS OR MINUS OVER OR UNDER.

Q.    NOW, WHEN YOU TALK ABOUT A 10 PERCENT BENCHMARK, DO YOU COMPARE THE QUALIFIED WHEEL TO ANY STATISTICS FOR THE POPULATION?

486

A.   YES.  WE DO COMPARE IT TO THE CENSUS POPULATION TABLES.

Q.   AND THOSE CENSUS POPULATION TABLES, ARE THEY FOR THE GENERAL POPULATION OR ARE THEY LIMITED IN ANY WAY?

A.   THEY ARE FOR THE DISTRICT, FOR OUR DISTRICT AS A WHOLE.

Q.   AND THEY'RE JUST FOR -- FOR EXAMPLE, THE CENSUS TABLES THAT YOU USE DON'T BREAK DOWN CITIZENS IN THE DISTRICT AS OPPOSED TO JUST ANYONE ELSE, CITIZEN, NONCITIZEN, DO THEY?

A.   IT IS JUST THE GENERAL POPULATION.

Q.   NOW, HOW DO YOU GET THE CENSUS DATA THAT'S USED FOR CALCULATING OVER- OR UNDERREPRESENTATION?

A.   WE GET THAT CENSUS DATA THROUGH THE ADMINISTRATIVE OFFICE OF THE U.S. COURTS.

Q.   I'M HANDING YOU WHAT'S BEEN MARKED FOR IDENTIFICATION AS GOVERNMENT EXHIBITS 31 AND 32.  CAN YOU IDENTIFY THOSE DOCUMENTS?

A.   YES.  EXHIBIT NUMBER 31 IS THE CENSUS DATA FOR THE CITIZEN POPULATION, AND EXHIBIT NUMBER 32 IS THE CENSUS DATA FOR GENERAL POPULATION.

Q.   AND ARE THOSE CENSUS STATISTICS THAT ARE KEPT IN THE ORDINARY COURSE OF THE JURY OFFICE?

A.   YES, THEY ARE.

        MS. DINGLE:  YOUR HONOR, THESE HAVE NOT BEEN CERTIFIED BY THE U.S. CENSUS BUREAU.  BUT BARRING ANY OBJECTION FROM THE DEFENSE, I WOULD MOVE TO ADMIT THEM.

        THE COURT:  ANY OBJECTION?

487

MR. MARTIN:  NO.

THE COURT:  THEY ARE ADMITTED.  I'M SORRY, WHAT WERE THE NUMBERS?

MS. DINGLE:  31 AND 32.

THE COURT:  THEY ARE ADMITTED.

BY MS. DINGLE:

Q.   NOW, LET'S TALK ABOUT THE CREATION OF THE GRAND JURY.  HOW DO YOU ACTUALLY GO ABOUT CREATING A GRAND JURY OR HOW DID YOU GO ABOUT THAT IN 2001 WHEN MR. LECROY'S GRAND JURY WAS IMPANELED?

A.   WE, UNDER OUR JURY PLAN, OUR GRAND JURIES ARE MADE UP OF THE PROPORTIONAL NUMBERS OF JURORS THAT ARE IN THE DISTRICT AT THE TIME.  SO PRIOR TO, PRIOR TO PULLING A GROUP OF GRAND JURORS, WE TOTAL UP THE NUMBER OF JURORS THAT TOTAL FOR ALL FOUR DIVISIONS.  AND THEN I, BASED ON THE NUMBER OF QUALIFIED JURORS I HAVE FOR EACH DIVISION, I GET A PERCENTAGE OF MAKEUP FOR EACH DIVISION; FOR EXAMPLE, 50 PERCENT ATLANTA, 12 PERCENT GAINESVILLE, 13 PERCENT NEWNAN, ET CETERA.  AND THAT'S BASED ON THE PROPORTIONAL NUMBERS THAT ARE IN THE TOTAL, THE TOTAL QUALIFIED WHEEL AT THAT TIME.  AND THAT TELLS ME WHAT PERCENTAGE OF JURORS HAVE TO BE FROM EACH DIVISION.

Q.   SO ONCE YOU'VE CREATED A GROUP THAT'S PROPORTIONAL TO THE DIVISIONS, WHAT DO YOU DO WITH THAT LIST OF NAMES?

A.   THOSE JURORS THEN RECEIVE JURY SUMMONSES FOR GRAND JURY SERVICE.

488

Q.   AND WHAT DO THE SUMMONSES INSTRUCT THE JURORS TO DO?

A.   THEY INSTRUCTED THEM TO RETURN THE SUMMONSES TO OUR OFFICE AND THEN TO -- THEY PROVIDE A DATE IN WHICH THEY NEED TO APPEAR.

Q.   NOW, IF YOU WANTED TO -- ATTENDANCE IS KEPT OF THE GRAND JURORS WHO APPEAR AS A RESULT OF THE SUMMONSES; IS THAT RIGHT?

A.   THAT'S CORRECT.

Q.   AND IF YOU WANTED TO IDENTIFY THE RACIAL MAKEUP OF THOSE INDIVIDUALS, COULD YOU GO BACK AND LOOK AT THEIR QUESTIONNAIRES?

A.   YES, YOU COULD.

Q.   AND IS THAT THE CASE WITH REGARD TO THE 1997 MASTER WHEEL? I'M SORRY, IS THAT THE CASE WITH REGARD TO MR. LECROY'S GRAND JURY WHICH WAS PULLED FROM THE 1997 MASTER WHEEL?

A.   AT THIS POINT WE DO NOT HAVE THE QUESTIONNAIRES FOR THE 1997 MASTER WHEEL.

Q.   AND WHY IS THAT?

A.   THAT'S BECAUSE THEY WERE -- WE WERE ABLE TO DESTROY OR I SHOULD SAY SHRED THOSE RECORDS AFTER THE WHEEL IS FINISHED.

Q.   I'VE HANDED YOU GOVERNMENT EXHIBIT, WHAT'S BEEN MARKED FOR IDENTIFICATION AS GOVERNMENT EXHIBIT 41.  WHAT IS THAT DOCUMENT?

A.   THIS IS A MEMO FROM LUTHER D. THOMAS, CLERK OF COURT AT THE TIME, TO CHIEF JUDGE EVANS ASKING PERMISSION TO DISPOSE OF THE 1997 MASTER JURY WHEEL.

489

Q.   IS THAT KEPT IN THE ORDINARY COURSE OF THE JURY OFFICE?

A.   YES, IT IS.

Q.   AND HAS IT BEEN CERTIFIED BY YOUR OFFICE AS A TRUE COPY?

A.   YES, IT HAS.

          MS. DINGLE:  MOVE TO ADMIT GOVERNMENT EXHIBIT 41.

          THE COURT:  ANY OBJECTION?

          MR. MARTIN:  NO, SIR.

          THE COURT:  IT'S ADMITTED.

BY MS. DINGLE:

Q.   NOW, AFTER THE SUMMONSEES FOR THE GRAND JURY APPEAR AT THE
COURTHOUSE, WHAT HAPPENS THEN?

A.   THEN THEY HEAR THE COURSE OF BUSINESS THAT IS BEFORE THEM.

Q.   AND THOSE PROCEDURES WITH REGARD TO THE GRAND JURY
IMPANELED ON 9/11, WERE THEY CONDUCTED IN ACCORDANCE WITH THE
1999 JURY PLAN?

A.   YES, THEY WERE.

Q.   NOW, HOW WAS MR. LECROY'S PETIT JURY CREATED FROM THE
QUALIFIED WHEEL, THE 2001 QUALIFIED WHEEL?

A.   WE DREW SUMMONSES FROM THE GAINESVILLE QUALIFIED WHEEL.

Q.   AND WHAT HAPPENED AFTER THE SUMMONSES WERE SENT OUT?

A.   THEY WERE SENT OUT AND WERE MAILED BACK TO OUR GAINESVILLE
OFFICE.

Q.   AND DID THE SUMMONSEES ULTIMATELY APPEAR AT THE
GAINESVILLE DIVISION COURTHOUSE?

A.   YES, THEY DID.

490

Q.   AND WAS A RECORD KEPT OF THE INDIVIDUALS WHO APPEARED AT THAT TIME?

A.   YES, THERE WAS.

Q.   AND TO IDENTIFY THE RACE OR ETHNICITY OF THOSE JURORS, COULD WE LOOK BACK AT THE QUESTIONNAIRES?

A.   YES, WE CAN.

Q.   I'VE HANDED YOU WHAT'S BEEN MARKED FOR IDENTIFICATION AS GOVERNMENT'S EXHIBIT 39.  WHAT IS THAT SET OF DOCUMENTS?

A.   THESE ARE THE QUESTIONNAIRES, GOVERNMENT'S EXHIBIT 39 IS THE GROUP OF QUESTIONNAIRES OF THOSE JURORS THAT WERE SUMMONED FOR JURY SERVICE FOR MR. LECROY'S CASE.

Q.   AND ARE THOSE DOCUMENTS KEPT IN THE ORDINARY COURSE OF THE JURY OFFICE?

A.   YES, THEY ARE.

Q.   AND HAVE THEY BEEN CERTIFIED AS TRUE COPIES BY YOUR OFFICE?

A.   I DON'T RECALL THAT THEY ARE.

MS. DINGLE:  YOUR HONOR, I WOULD MOVE TO ADMIT THESE. AND IF THE DEFENSE HAS NO OBJECTION, WE COULD ASK THAT THESE COPIES BE CERTIFIED FOLLOWING THE HEARING.

MR. MARTIN:  I HAVE NO OBJECTION REGARDING AUTHENTICITY.  I WOULD OBJECT, AS I DID BEFORE, THAT THIS IS IRRELEVANT TO THE ISSUE.

THE COURT:  VERY WELL.  IT'S ADMITTED.

BY MS. DINGLE:

491

Q.    FINALLY, YOU MENTIONED BEFORE THAT MR. LECROY STOOD TRIAL IN 2004.   WHICH JURY PLAN WAS IN PLACE AT THAT TIME?

A.    THAT WAS THE 2002 JURY PLAN.

Q.    I'M HANDING YOU WHAT'S BEEN MARKED FOR IDENTIFICATION AS GOVERNMENT EXHIBIT 26.   WHAT IS THAT DOCUMENT?

A.    THIS IS THE APPENDIX A, THE JURY PLAN, I SHOULD SAY APPENDIX A TO OUR LOCAL RULES, THE JURY PLAN FROM JUNE 1ST, 2002.

Q.    AND IS THAT JURY PLAN KEPT IN THE ORDINARY COURSE OF THE JURY OFFICE?

A.    YES, IT IS.

Q.    HAS IT BEEN CERTIFIED BY YOUR OFFICE AS A TRUE COPY?

A.    YES, IT HAS.

Q.    AND WERE THE PETIT JURY PROCEDURES THAT WERE FOLLOWED IN MR. LECROY'S CASE CONSISTENT WITH THE 2002 JURY PLAN?

A.    YES, THEY WERE.

Q.    ONE FINAL DOCUMENT.   I'M HANDING YOU WHAT'S BEEN MARKED FOR IDENTIFICATION AS GOVERNMENT'S EXHIBIT 8.   CAN YOU IDENTIFY THAT DOCUMENT?

A.    THIS IS THE LETTER THAT WE SENT TO OUR VENDOR, MR. BILL BENNETT, BACK FOR THE 1997 WHEEL IN WHICH WE INDICATED TO HIM WHAT THE STARTING NUMBER AND QUOTIENT SHOULD BE FOR EACH OF OUR DIVISIONS.

Q.    IS THAT DOCUMENT KEPT IN THE ORDINARY COURSE OF THE JURY OFFICE?

492

A.   YES, IT IS.

Q.   AND HAS IT BEEN CERTIFIED BY YOUR OFFICE AS A TRUE COPY?

A.   YES.

Q.   AND WAS A SIMILAR LETTER SENT WITH REGARD TO THE 1997 JURY WHEEL?

A.   FOR THE 2001.

Q.   I'M SORRY, FOR THE 2001 JURY WHEEL.

A.   YES, IT WAS.

Q.   AND TO YOUR KNOWLEDGE, ARE THERE ANY PROCEDURES THAT THE JURY OFFICE CONDUCTS THAT COULD BE CONSIDERED DISCRIMINATORY ON THE BASIS OF RACE OR ETHNICITY?

A.   ABSOLUTELY NOT.

          MS. DINGLE:  NO FURTHER QUESTIONS.

          THE COURT:  YOU MAY CROSS-EXAMINE.

                    CROSS-EXAMINATION

BY MR. MARTIN:

Q.   MS. MOSES, YOU ARE CONSTRAINED, AS ALL MEMBERS OF THE JURY MANAGEMENT TEAM THERE, BY THE PROVISIONS OF THE JURY PLAN IN THIS DISTRICT, ARE YOU NOT?

A.   YES, I AM.

Q.   AND YOU'RE ALSO REQUIRED TO FOLLOW THE STATUTORY REQUIREMENTS UNDER THE JURY SELECTION SERVICE ACT, I THINK, OF 1976, BUT THE STATUTORY PROVISIONS UNDER 28 U.S.C. 1861 AND FOLLOWING PROVISIONS.

A.   YES.

493

Q.   AND YOU'RE FAMILIAR WITH BOTH OF THOSE, THE PLANS AND THE

STATUTORY REQUIREMENTS.

A.   YES.

Q.   WITH REGARDS TO THE VARIOUS PLANS THAT YOU'VE IDENTIFIED

WHICH ARE, I THINK THEY'RE IN FRONT OF YOU, DEFENDANT'S

EXHIBITS 14, 26 AND 38, FIRST OF ALL, DEFENDANT'S EXHIBIT --

EXCUSE ME, GOVERNMENT EXHIBITS 14 AND 26 WERE THE AMENDED PLANS

AS OF 1999 AND 2002.  THOSE PLANS HAVE BEEN ESTABLISHED IN THIS

DISTRICT FOR A LONG TIME, HAVE THEY NOT?

A.   YES.

Q.   INDEED, THEY WERE FIRST ESTABLISHED BACK IN 1982 AND

SUBMITTED BY THEN CHIEF JUDGE, JUDGE MOYE, AND SUBMITTED TO THE

ELEVENTH CIRCUIT AT THAT TIME.  IS THAT CORRECT?

A.   THAT'S CORRECT.

Q.   AND THEN THE PLAN WAS TWEAKED A LITTLE BIT OR MODIFIED A

LITTLE BIT MORE RECENTLY IN GOVERNMENT'S EXHIBIT 38.  IS THAT

CORRECT?  EXCUSE ME, THAT'S NOT 38, THAT'S 26.

A.   26, YES.

Q.   26.  AND THAT WAS AS OF MAY 2002.  ALL THREE OF THE PLANS,

HOWEVER, PROVIDE FOR THE VOTER REGISTRATION LIST TO BE THE SOLE

SOURCE OF NAMES FOR JURORS.  IS THAT NOT CORRECT?

A.   YES, THEY DO.

Q.   AND ALL THREE PLANS REQUIRE THE QUALIFICATION, EXCUSAL OR

EXEMPTION OF JURORS PURSUANT TO STATUTORY REQUIREMENTS.  IS

THAT CORRECT?

494

A.    THAT IS CORRECT.

Q.    I JUST WANT TO CLARIFY THOSE WORDS.  THERE ARE CERTAIN QUALIFICATIONS FOR A JUROR TO SERVE, SUCH AS CITIZENSHIP AND BEING OVER 18 YEARS OLD; AND YOU LISTED A FEW OF THOSE ALREADY. THEN THERE ARE CERTAIN EXEMPTIONS FROM JURY SERVICE, SUCH AS BEING A PUBLIC OFFICIAL; I THINK ONE YOU DIDN'T MENTION, BEING A LAW ENFORCEMENT OFFICER IS AN EXEMPTION; AND ALSO BEING A FIREFIGHTER IS AN EXEMPTION UNDER THE STATUTE AND ALSO UNDER THE PLAN.  IS THAT CORRECT?

A.    THAT IS CORRECT.

Q.    AND THEN THERE ARE EXCUSALS.  AND EXCUSALS INVOLVE SITUATIONS SUCH AS BEING A FULL-TIME CAREGIVER OF A SMALL CHILD, AND EXCUSALS CAN ONLY OCCUR AFTER A JUROR HAS BEEN SUMMONED AND ONLY BY A DISTRICT COURT JUDGE.

A.    THAT IS CORRECT.

Q.    NOW, YOU MENTIONED THAT ONE OF THE -- YOU'RE FAMILIAR WITH THE REQUIREMENTS OF THE STATUTE, AND I'M PARTICULARLY REFERRING YOU TO TITLE 28, UNITED STATES CODE, 1863, WHICH SPECIFICALLY PROVIDES THAT IF THE VOTER REGISTRATION LIST -- WELL, LET ME BACK UP.  IT PROVIDES THAT YOU SHOULD USE THE VOTER REGISTRATION LIST AS THE SOURCE OF NAMES; BUT ALSO PROVIDES THAT THAT LIST SHOULD BE SUPPLEMENTED, THE PLAN SHOULD SUPPLEMENT THAT LIST IF THE GOALS OF THE PLAN, WHICH IS A REPRESENTATIVE JURY AND NONDISCRIMINATION, ARE NOT BEING ACHIEVED.  IS THAT NOT CORRECT?

495

A.    THAT IS WHAT THE STATUTE SAYS.

Q.    AND THERE ARE CERTAIN DISTRICTS AROUND THE COUNTRY WHO ACTUALLY DO THAT.  ARE YOU FAMILIAR WITH THAT?

A.    I DO BELIEVE THERE ARE A FEW, YES.

Q.    DISTRICT OF COLORADO, FOR EXAMPLE, DOES THAT, DOES IT NOT?

A.    THAT, I DON'T KNOW.

Q.    OKAY.  BUT IT'S AUTHORIZED BY THE ACT AND, INDEED, REQUIRED BY THE ACT IF THE SYSTEM IS NOT FAIRLY REPRESENTING THE COMMUNITY.  IS THAT CORRECT?

A.    THAT IS CORRECT.

Q.    NOW, YOU MENTIONED THAT ONE OF THE -- THE REASON THAT YOU HAVE DECIDED -- OR PEOPLE RESPONSIBLE, NOT YOU, YOU'RE NOT THE ULTIMATE DECISION-MAKER, ARE YOU?

A.    NO, I'M NOT.

Q.    THE COURT HAS DECIDED NOT TO SUPPLEMENT, FOR EXAMPLE, THE DRIVER'S LICENSE LIST OR THE PERSONAL IDENTIFICATION LIST IS BECAUSE YOU WOULD GET POSSIBLY JURORS WHO WERE NOT QUALIFIED; CORRECT?

A.    THAT'S CORRECT.

Q.    PEOPLE, YOU MENTIONED PEOPLE UNDER 18, BECAUSE YOU CAN GET A DRIVER'S LICENSE AT 16.

A.    YES.

Q.    PEOPLE WHO ARE NONCITIZENS; CORRECT?

A.    THAT'S CORRECT.

Q.    PEOPLE WHO ARE FELONS; CORRECT?

496

A.    THAT'S CORRECT.

Q.    THOSE ARE THE THREE THAT YOU MENTIONED.

A.    RIGHT.

Q.    NOW, THERE ARE PROCEDURES, HOWEVER, THAT ARE ALREADY IN PLACE IN THE PLAN TO ELIMINATE EACH AND EVERY ONE OF THOSE CATEGORIES DURING THE QUALIFICATION PROCESS.  IS THAT NOT TRUE?

A.    THAT IS CORRECT.

Q.    REFERRING YOU, I THINK YOU -- I THINK ONE OF THE EXAMPLES IS GOVERNMENT EXHIBIT 22 WHICH IS A QUALIFICATION QUESTIONNAIRE.

A.    YES.

Q.    DO YOU HAVE THAT IN FRONT OF YOU?

A.    UH-HUH (AFFIRMATIVE).

Q.    INDEED, THE VERY FIRST QUESTION ON THE QUALIFICATION QUESTIONNAIRE -- WELL, LET ME BACK UP SO EVERYBODY CAN UNDERSTAND.  AFTER YOU GET A LIST OF NAMES FROM THE MASTER WHEEL THAT YOU SELECTED RANDOMLY USING THAT STARTING NUMBER THAT YOU TALKED ABOUT, YOU THEN WOULD SEND OUT TO THOSE NAMES FROM THE VOTER REGISTRATION LIST THAT HAVE BEEN LISTED A QUALIFICATION QUESTIONNAIRE TO MAKE SURE THAT EVERYBODY THAT'S GOING TO BE ON THE QUALIFIED WHEEL ARE QUALIFIED TO BE JURORS.

A.    RIGHT.

Q.    OR WHETHER OR NOT THEY MIGHT BE EXEMPT, WHICH I KNOW IS A TECHNICAL TERM.  BUT THOSE ARE THE TWO THINGS YOU'RE LOOKING FOR; CORRECT?

497

A.   YES.

Q.   AND AT THAT LEVEL EXCUSALS DON'T APPLY BECAUSE EXCUSALS ONLY APPLY AT THE SUMMONING PROCESS; IS THAT CORRECT?

A.   THAT IS CORRECT.

Q.   NOW, THE VERY FIRST QUESTION HERE, ARE ANY CHARGES NOW PENDING AGAINST YOU FOR A VIOLATION OF STATE OR FEDERAL LAW, THAT'S A DISQUALIFICATION; CORRECT?

A.   YES.

Q.   SO SOMEONE COULD BE ON THE VOTER REGISTRATION LIST AND HAVE A PENDING CHARGE AGAINST THEM, COULD THEY NOT?

A.   YES, THEY COULD.

Q.   AND SOMEBODY COULD BE ON THE VOTER REGISTRATION LIST AND ACTUALLY HAVE A FELONY CONVICTION BUT NEVER HAVE BEEN DELETED FROM THE VOTER REGISTRATION LIST.

A.   THAT IS CORRECT.

Q.   SO YOU HAVE ANOTHER QUESTION WHETHER YOU'VE BEEN CONVICTED, QUESTION NUMBER TWO, THAT WOULD BE A DISQUALIFICATION.

     YOU MENTIONED MENTAL DISABILITIES.  THAT'S ANOTHER DISQUALIFICATION.  SOMEBODY MIGHT BE ON THE VOTER REGISTRATION LIST AND NOT MEET THE MENTAL DISABILITY REQUIREMENTS FOR JURY SERVICE; IS THAT CORRECT?

A.   YES.

Q.   THE QUESTION NUMBER TEN:  ARE YOU A CITIZEN OF THE UNITED STATES?  DO YOU SOMETIMES GET PEOPLE WHO COME BACK AND SAY

498

THEY'RE NOT A CITIZEN, THAT HAPPENED TO BE ON THE VOTER

REGISTRATION LIST?

A.    EVERY SO OFTEN WE DO.

Q.    SO THOSE PEOPLE CAN BE ELIMINATED AT THIS STAGE OF THE

PROCESS; CORRECT?

A.    YES.

Q.    AND WHAT COUNTY DO YOU RESIDE IN?  IF THEY'VE MOVED OUT OF

THE DISTRICT OR DIVISION, THAT WOULD BE A WAY TO PUT THEM --

YOU MIGHT CHANGE THEM TO A DIFFERENT DIVISION OR YOU MIGHT

ELIMINATE THEM FROM THE SYSTEM ALL TOGETHER IF THEY'RE OUT OF

THE STATE; CORRECT?

A.    THAT IS CORRECT.

Q.    YOU GET THAT, PEOPLE ON THE VOTER REGISTRATION LIST WHO

HAVE MOVED; CORRECT?

A.    YES.

Q.    INDEED, THE VOTER REGISTRATION LIST IS NOT ALWAYS PURGED

TIMELY.  PEOPLE MOVE A LOT, SO YOU GET A LOT OF PEOPLE WHO ARE

NO LONGER CITIZENS OF GEORGIA IN THE QUALIFICATION PROCESS.  IS

THAT CORRECT?

A.    YES.

Q.    OR WHO NO LONGER ARE IN THE DISTRICT OR DIVISION, FOR

EXAMPLE.  DO YOU READ, WRITE AND SPEAK THE ENGLISH LANGUAGE?

YOU COULD BE ON THE VOTER REGISTRATION LIST AND NOT MEET THAT

QUALIFICATION.  IS THAT CORRECT?

A.    YES.

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

499

Q.   YOU'RE NOT BANNED FROM BEING A VOTER IN GEORGIA BECAUSE YOU CAN'T READ AND WRITE ENGLISH, ARE YOU?

A.   RIGHT, NO, YOU'RE NOT.

Q.   ARE YOU A FULL-TIME PUBLIC OFFICIAL?  I BET EVERY FULL-TIME PUBLIC OFFICIAL IS ON THE VOTER REGISTRATION LIST. BUT THAT'S AN EXEMPTION.  ACTUALLY, THAT'S AN EXCUSAL, IS IT NOT?

A.   THAT'S AN EXEMPTION.

Q.   AN EXEMPTION, YOU'RE RIGHT.  YOU GOT ME ON THAT.  SO THEY WOULD BE ELIMINATED DURING THAT PROCESS.

A.   RIGHT.

Q.   FULL-TIME MEMBER OF ANY GOVERNMENT, POLICE OR REGULAR FIRE DEPARTMENT; CORRECT?

A.   EXEMPTION.

Q.   NOW, VOLUNTEERS ARE NOT -- VOLUNTEER FIRE DEPARTMENTS ARE NOT EXCUSED AT THIS LEVEL, BUT THEY CAN BE EXCUSED AT THE EXCUSAL LEVEL.

A.   THAT IS CORRECT.

Q.   ANY TIME IT'S A FULL-TIME MEMBER IN THE ACTIVE SERVICE OR THE ARMED SERVICES, THOSE PEOPLE ARE CLEARLY ON THE VOTER REGISTRATION LIST.  WE HAVE ABSENTEE BALLOTS FROM PEOPLE OVERSEAS ALL THE TIME, BUT THEY WOULD BE DISQUALIFIED DURING THIS PROCESS.

A.   YES.

Q.   SO ISN'T IT FAIR TO SAY THAT EACH OF THOSE TYPES OF PEOPLE

500

THAT WOULD BE ON THE DRIVER'S LICENSE LIST THAT ARE NOT QUALIFIED OR WOULD BE OTHERWISE EXEMPT FROM JURY SERVICE CAN BE ELIMINATED THROUGH THE QUALIFICATION PROCESS?

A.    YOU CAN SAY THAT.

Q.    DO YOU HAVE -- INDEED, WHEN YOU -- LET ME ASK.

(DISCUSSION OFF THE RECORD.)

BY MR. MARTIN:

Q.    YOU HAVE 21 IN FRONT OF YOU?

A.    COULD YOU TELL ME WHAT EXHIBIT 21 IS?

Q.    WHEN YOU REVISED THE QUALIFICATION AND SUMMONING THING YOU SENT TO JUDGE EVANS.  THE VERY LAST YOU WERE -- LET ME BACK UP. GOVERNMENT EXHIBIT 21 WAS YOU SENDING IN TO JUDGE EVANS YOUR PROPOSAL FOR THE JUROR QUALIFICATION FORM AND THE -- ACTUALLY ALSO THE JURY SUMMONING FORM.  IS THAT NOT CORRECT?

A.    THE JUROR QUALIFICATION QUESTIONNAIRE, YES.

Q.    NOW, THE LAST PAGE IS A FORM, DO YOU SEE THAT -- THIS IS A DIFFERENT TYPE OF FORM.  IT'S LIKE A -- DO YOU SEE WHAT I'M TALKING ABOUT?

A.    YES, UH-HUH (AFFIRMATIVE).

Q.    WHAT'S THE DIFFERENCE BETWEEN THAT AND THE OTHER QUALIFICATION FORM?

A.    THIS JURY QUALIFICATION QUESTIONNAIRE, THE LAST PAGE OF THIS DOCUMENT WAS USED FOR THE 1993 JURY WHEEL REBUILD.

Q.    SO THIS IS WHAT YOU'RE COMPARING WHAT YOU'VE DONE BEFORE.

A.    THAT'S RIGHT, YES.

501

Q.   AT THE SUMMONING STAGE, IS THERE ANOTHER FORM THAT'S SENT OUT AT THE SUMMONING STAGE WHERE YOU'RE SUMMONING SOMEBODY FOR A PETIT JURY OR FOR THE GRAND JURY IN WHICH YOU AGAIN ASK THESE QUALIFICATION QUESTIONS, I MEAN EXEMPTION QUESTIONS?

A.   WE DO NOT ASK ALL OF THEM, BUT THERE ARE SOME QUESTIONS THAT WE DO ASK ON THE SUMMONS.

Q.   SO THERE'S AT LEAST ONE MORE LEVEL THAT'S AVAILABLE TO REMOVE PEOPLE WHO ARE NOT QUALIFIED OR OTHERWISE EXEMPT FROM JURY SERVICE.

A.   IT'S NOT AS THOROUGH OF A LEVEL, BUT YES.

Q.   AND ALSO, THAT'S AN OPPORTUNITY FOR THEM TO REQUEST EXCUSALS?

A.   YES, IT IS.

Q.   AN EXAMPLE OF AN EXCUSAL WOULD BE IF YOU'RE OVER 70.

A.   YES.

Q.   YOU'RE NOT ELIMINATED, YOU'RE NOT REMOVED FROM THE QUALIFIED WHEEL, BUT IF YOU'RE OVER 70 AND YOU CHOOSE TO, YOU CAN EXCUSE YOURSELF AT THAT TIME.

A.   YES, YOU CAN.

Q.   LET ME ASK YOU A LITTLE BIT ABOUT THE JS-12S, IF I MAY. WE'RE TALKING ABOUT 27, 28, 29 AND 30.  AGAIN, THE REQUIREMENT -- LET ME BACK UP.  YOU REFILL UNDER THE PLAN, I THINK MAYBE UNDER THE ACT AS WELL, BUT AT LEAST UNDER THE PLAN, THE JURY WHEELS ARE REFILLED AFTER EVERY GENERAL ELECTION.  IS THAT CORRECT?

502

A.   YES, THEY ARE.

Q.   AND SO AFTER THE GENERAL ELECTION IN '96, THEY WERE REFILLED; AND THE GENERAL ELECTION IN 2000, THEY WERE REFILLED.

A.   YES.

Q.   AFTER YOU -- REFILLING OF THE WHEEL TAKES A LITTLE WHILE, DOES IT NOT?

A.   YES, IT DOES.

Q.   YOU'VE GOT TO GO THROUGH THIS ENTIRE PROCESS OF GETTING THE INFORMATION FROM THE SECRETARY OF STATE, THEN QUALIFICATION, SENDING OUT QUALIFICATION QUESTIONNAIRES, FOLLOWING UP THOSE THAT DON'T GET BACK, GOING THROUGH ALL THOSE, THERE'S A NUMBER OF QUALIFICATION QUESTIONNAIRES SOMEBODY HAS TO GO THROUGH BY HAND TO SEE WHETHER OR NOT THERE'S A REASON TO EXCLUDE SOMEBODY FOR WHATEVER REASON, AND THEN COMPOSING THAT AND USING YOUR VENDOR THROUGHOUT THIS ENTIRE PROCESS.  SO IT TAKES SOME MONTHS TO DO.

A.   YES, IT DOES.

Q.   AND GOVERNMENT'S EXHIBIT 27 WOULD INDICATE THAT THESE JS-12S WERE COMPLETED AROUND DECEMBER 21 OF '01.  SO IT TAKES ABOUT A YEAR PROCESS TO GET THE WHEEL REFILLED, THE NEW QUALIFIED WHEEL.

A.   YES, IT DOES.

Q.   AND THIS FORM IS SOMETHING THAT'S REQUIRED BY THE STATUTE TO BE FILED AND COMPLETED BY YOU.  IS THAT NOT CORRECT?

A.    IT'S ACTUALLY BY THE JUDICIAL CONFERENCE.

503

Q.    WELL, YOU SEE AT THE VERY TOP OF THE FORM, IT SAYS REPORT ON OPERATION OF THE JURY SELECTION PLAN COMPLETED PURSUANT TO 28 U.S.C. 1863(A)?

A.    YES.

Q.    AND 1863(A) SAYS THAT EACH DISTRICT COURT SHALL SUBMIT A REPORT ON THE JURY SELECTION PROCESS WITHIN ITS JURISDICTION TO THE ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS IN SUCH FORM AND AT SUCH TIMES AS THE JUDICIAL CONFERENCE OF THE UNITED STATES MAY SPECIFY.

A.    YES.

Q.    SO THERE ARE CERTAIN RULES AND REGULATIONS THAT THEY PROMOTE AS TO HOW TO COMPLETE THIS FORM; CORRECT?

A.    THAT IS CORRECT.

Q.    INDEED, I THINK THE STATUTE SAYS THE JUDICIAL CONFERENCE OF THE UNITED STATES MAY FROM TIME TO TIME ADOPT RULES AND REGULATIONS GOVERNING THE PROVISIONS AND OPERATIONS OF THE PLANS FORMULATED UNDER THIS TITLE.

      NOW, AND THE PURPOSE OF THIS FORM IS TO ENSURE THAT THE PROCESS THAT YOU'VE GONE THROUGH, THIS LENGTHY PROCESS, THIS YEAR-LONG PROCESS, HAS RESULTED IN A QUALIFIED JURY WHEEL THAT FAIRLY REPRESENTS THE COMMUNITY.  IS THAT CORRECT?

A.    YES, IT IS.

Q.    AND, INDEED, YOU'RE GIVEN CERTAIN RULES AND REGULATIONS ABOUT HOW TO GO ABOUT DOING THIS; CORRECT?

A.    YES.

504

Q.    AND ONE OF THE THINGS YOU DO IS YOU SELECT A SAMPLE; CORRECT?

A.    UH-HUH (AFFIRMATIVE), YES.

Q.    YOU COULD ACTUALLY, IF YOU GO THROUGH EVERY SINGLE QUESTIONNAIRE AND DO AN ENTIRE ANALYSIS OF EVERY SINGLE JUROR ON THE QUALIFIED WHEEL, BUT THE OFFICE OF ADMINISTRATIVE COURTS RECOMMENDS DOING A SAMPLING; IS THAT CORRECT?

A.    YES.

Q.    AND YOU PICK THE SAMPLING NUMBER THAT'S INCLUDED ON THIS FORM, OR YOU AND THE PEOPLE IN YOUR STAFF DID THAT; CORRECT?

A.    THAT IS CORRECT.  IT WASN'T PICKED BY ME.

Q.    WERE THOSE -- WAS IT THE COMPUTER COMPANY THAT YOU WERE WORKING WITH OR WAS IT PURSUANT TO WHAT WAS PROPOSED BY THE ADMINISTRATIVE OFFICE?  HOW DID YOU COME UP WITH THE SAMPLING NUMBER, IS WHAT I'M ASKING?  DO YOU KNOW?

A.    HISTORICALLY, THAT'S WHAT WE'VE USED.

Q.    THIS IS THE SAMPLING SIZE THAT HAS BEEN USED HISTORICALLY IN THIS DISTRICT AND DIVISION.

A.    YES.

Q.    AND YOU HAD NO REASON TO BELIEVE THAT THAT SAMPLING SIZE WOULD NOT PROVIDE YOU AN ACCURATE PICTURE OF WHETHER OR NOT THE SYSTEM WAS ACCURATELY REPRESENTING THE COMMUNITY, DID YOU?

A.    NO, I DID NOT.

Q.    INDEED, THIS IS A VERY IMPORTANT REPORT BECAUSE IF IT TURNS OUT THAT YOU DON'T HAVE A FAIR REPRESENTATION, YOU KNOW

505

SOMETHING IS WRONG AND SOMETHING MIGHT NEED TO BE FIXED; IS

THAT CORRECT?

A.    YES.

Q.    AND BOTH YOU AND JUDGE EVANS AND THE COURT RELY UPON THIS

FORM IN DETERMINING WHETHER OR NOT THE SYSTEM THAT THEY'VE SET

UP IS ACCURATELY AND FAIRLY REPRESENTING THE COMMUNITY; IS THAT

CORRECT?

A.    YES.

Q.    ONE FINAL AREA I WANTED TO ASK YOU ABOUT.  WITH REGARDS

TO -- ALL RIGHT.  YOU GET A NAME AND ADDRESS FROM THE VOTER

REGISTRATION LIST; IS THAT CORRECT?

A.    YES.

Q.    AND THAT'S THE PRIMARY ADDRESS THAT YOU SEND THE

QUALIFICATION QUESTIONNAIRES OUT; CORRECT?

A.    THAT IS CORRECT.

Q.    AN DO YOU SEND THEM OUT FIRST CLASS MAIL?

A.    YES, WE DO.

Q.    DO YOU SEND THEM OUT CERTIFIED MAIL OR ANY OTHER TYPE OF

SPECIAL TYPE OF MAILING?

A.    NO, WE DO NOT.

Q.    AND YOU SAID THAT YOUR -- WHAT DO YOU CALL HIM, YOUR

CONSULTANT?

A.    VENDOR.

Q.    YOUR VENDOR ALSO, IS YOUR UNDERSTANDING, USED SOME SORT OF

PROGRAM THEY HAVE FOR UPDATING ADDRESSES; CORRECT?

506

A.   YES.

Q.   SOMEBODY COULD BE REGISTERED TO VOTE YEARS AGO AND NEVER HAVE CHANGED THEIR ADDRESS IN THE VOTER REGISTRATION; IS THAT CORRECT?

A.   YES, IT IS.

Q.   SO THERE ARE TIMES WHEN AN ADDRESS IN THE VOTER REGISTRATION IS NOT UP-TO-DATE; CORRECT?

A.   YES.

Q.   ARE YOU FAMILIAR WITH HOW OFTEN YOU'RE REQUIRED TO RENEW YOUR DRIVER'S LICENSE?

A.   IS IT EVERY FIVE YEARS?

Q.   EVERY FIVE YEARS ON YOUR BIRTHDAY.

A.   YES.

Q.   AND YOU HAVE TO GIVE THEM A NEW UPDATED ADDRESS; CORRECT?

A.   YES.

Q.   ARE YOU FAMILIAR WITH INFORMATION, IF YOU ARE, THAT THE DRIVER'S LICENSE ADDRESSES TEND TO BE MORE UPDATED THAN THE VOTER REGISTRATION ADDRESSES?

A.   YES.

Q.   THE SAME WOULD APPLY TO A PERSONAL IDENTIFICATION CARD.

A.   YES.

Q.   ALL RIGHT.  YOU SEND OUT THE QUESTIONNAIRE AND YOU SAID -- AND I GOT REAL CONFUSED WITH YOUR FIGURES BUT I WANT TO MAKE SURE.  WHAT PERCENTAGE OF THOSE QUESTIONNAIRES ARE EITHER NON-RETURNED OR UNDELIVERABLE?

507

A.   I CAN ONLY GIVE YOU THE PERCENTAGE OF THOSE THAT ARE NOT RETURNED, AND IT'S 25 PERCENT USUALLY ARE NOT RETURNED BY THE PROSPECTIVE JUROR.

Q.   AND THESE QUESTIONNAIRES TELL PEOPLE THAT THIS IS A FEDERAL REQUIREMENT THAT YOU ARE TO FILL THESE FORMS IN AND RETURN THEM TO US.

A.   YES, IT IS.

Q.   SO ON THE FIRST MAILING, 25 PERCENT COME BACK UNRETURNED -- EXCUSE ME, 25 PERCENT ARE NOT RETURNED.

A.   THAT'S CORRECT.

Q.   I MISSPOKE.  YOU DON'T KNOW HOW MUCH WERE UNDELIVERABLE?

A.   I DON'T RECALL OFFHAND WHAT THAT NUMBER IS ON A NORMAL BASIS, NO.

Q.   BUT WHEN YOU DON'T GET ONE BACK -- LET ME BACK UP.  IF IT'S NONDELIVERABLE, DO YOU SEND A SECOND NOTICE, OR WHAT DO YOU DO WITH NONDELIVERABLES?

A.   ARE YOU REFERRING TO THOSE THAT ARE RETURNED TO THIS OFFICE AS UNDELIVERABLE?

Q.   YES.  YOU MAIL OUT A LETTER AND -- LET ME MAKE SURE WE'RE BOTH SPEAKING ABOUT THE SAME THING.  YOU MAIL IT OUT AND YOU GET A NOTICE BACK FROM THE POSTAL SERVICE THAT SAYS THIS WAS NONDELIVERABLE.  SOMETIMES THAT LITTLE FORM SAYS NO LONGER AT THIS ADDRESS, NO FORWARDING ADDRESS, THOSE LITTLE CHECKS ON THOSE LITTLE FORMS COME BACK.

A.   CORRECT, YES.

508

Q.   AND WHAT DO YOU DO IN THAT SITUATION?

A.   WHEN MAKE EVERY ATTEMPT POSSIBLE TO TRY AND FIND A BETTER ADDRESS FOR THAT PROSPECTIVE JUROR.  BACK IN 1997 AND 2001, THAT INVOLVED USING THE WHITE PAGES.

Q.   SO YOU WOULD TURN TO THE WHITE PAGES AND SEE IF YOU COULD FIND AN ADDRESS FOR THAT NAME IN THE WHITE PAGES.

A.   THAT'S CORRECT.

Q.   IF THE PERSON DIDN'T HAVE A TELEPHONE, THEY'RE NOT GOING TO BE IN THE WHITE PAGES.

A.   YES.

Q.   OTHER THAN THAT, DID YOU DO ANYTHING?

A.   NO, WE DID NOT.

Q.   NOW, AFTER -- NOW, THAT'S ONE GROUP.  THE UNDELIVERABLES -- EXCUSE ME, THE NON-RETURNED, YOU DON'T GET ANYTHING BACK FROM THE POST OFFICE SAYING THIS PERSON IS NO LONGER HERE.  YOU JUST DON'T GET ANY RESPONSE FROM THE PERSON. AS I UNDERSTAND IT, YOU THEN MAIL THEM ANOTHER LETTER WHICH IS GOVERNMENT'S EXHIBIT 24.

A.   YES.

Q.   AND THAT LETTER IS SENT TO THE PRIOR ADDRESS, I ASSUME.

A.   THAT IS CORRECT.

Q.   IS IT SENT CERTIFIED MAIL, REGISTERED MAIL, ANY OTHER SPECIALTY OR JUST FIRST CLASS MAIL?

A.   FIRST CLASS MAIL.

Q.   AND YOU GET, YOU SAY FROM THOSE LETTERS YOU GET ABOUT 50

509

PERCENT RESPONSE.

A.    YES, WE DO.

Q.    AND WHEN YOU GET THEM, THEY GO RIGHT INTO THE PROCESS.  SO YOU'RE STILL MISSING 50 PERCENT OF THE 25 PERCENT.

A.    THAT IS EXACTLY CORRECT.

Q.    IF YOU DON'T GET ANYTHING BACK FROM THAT FIRST LETTER, DO YOU DO ANYTHING ELSE?

A.    FROM THE FIRST LETTER?  NO.

        MR. MARTIN:  JUST ONE SECOND.

        (DISCUSSION OFF THE RECORD.)

BY MR. MARTIN:

Q.    THANK YOU FOR YOUR PATIENCE IN ALL THIS.  I WANT TO UNDERSTAND EXACTLY.  THE MASTER JURY WHEEL -- ALL RIGHT.  YOU HAVE TO DIVIDE THIS STUFF UP BY DIVISIONS BECAUSE YOU HAVE DIFFERENT JURIES BEING SELECTED FROM DIFFERENT DIVISIONS.

A.    YES.

Q.    AND WHEN YOU'RE PICKING THE MASTER JURY WHEEL, DO YOU -- HOW DO YOU DETERMINE HOW MANY PEOPLE TO ASK THE SECRETARY OF STATE TO GIVE YOU FROM EACH PARTICULAR COUNTY IN EACH PARTICULAR DIVISION?  DO YOU UNDERSTAND MY QUESTION?  HOW DO YOU DETERMINE -- LET ME BACK UP.  YOU WANT A -- YOU'RE LOOKING FOR A TOTAL NUMBER TO BEGIN WITH, CORRECT, A GROSS --

A.    OF REGISTERED VOTERS?

Q.    YES, MA'AM.

A.    YES, WE ARE.

510

Q.   HOW DO YOU DETERMINE HOW MANY TO PICK FROM EACH PARTICULAR COUNTY SO THAT IT FAIRLY REPRESENTS THE ENTIRE DISTRICT?

A.   OUR VENDOR PICKS FROM THE TOTAL NUMBER OF REGISTERED VOTERS IN EACH COUNTY THAT MAKE UP THAT DIVISION.

Q.   OKAY.  SO IT IS NOT BASED UPON CENSUS FIGURES FOR EACH COUNTY, IT'S BASED UPON VOTER REGISTRATION FIGURES.

A.   THAT'S CORRECT.

Q.   AGAIN, WITH REGARDS TO A GRAND JURY, GRAND JURY IS SELECTED FROM THE ENTIRE DISTRICT, NOT FROM ANY PARTICULAR DIVISION; CORRECT?

A.   RIGHT.

Q.   HOW DO YOU PROPORTION THE NUMBER OF GRAND JURORS YOU'RE GOING TO SUMMON FROM EACH PARTICULAR DIVISION?

A.   WELL, LIKE I WAS TRYING TO EXPLAIN BEFORE, WHAT I DO IS I COUNT UP -- WELL, THE COMPUTER CAN TELL ME HOW MANY QUALIFIED MEMBERS I HAVE FROM EACH -- FOR THE WHOLE DISTRICT, FOR THE DISTRICT AS A WHOLE.  THEN IT CAN TELL ME HOW MUCH QUALIFIED JURORS I HAVE IN EACH DIVISION.  AND I DIVIDE THAT NUMBER INTO THE ENTIRE NUMBER FOR THE WHOLE DISTRICT AND GET MY PERCENTAGES.

Q.   SO, AGAIN, IT'S NOT, THE PROPORTION IS NOT BASED EITHER ON VOTER REGISTRATION OR ON CENSUS AT THIS TIME; IT'S BASED ON THE NUMBER OF PEOPLE IN THE QUALIFIED WHEEL FROM EACH PARTICULAR DIVISION.

A.   YES, THAT'S CORRECT.

511

(DISCUSSION OFF THE RECORD.)

MR. MARTIN:  THAT'S ALL I HAVE.  THANK YOU.

THE COURT:  ANY MORE QUESTIONS?

MS. DINGLE:  NOTHING FURTHER.

THE COURT:  YOU ARE EXCUSED, MS. MOSES.  THANK YOU.

WE WILL TAKE A TEN-MINUTE RECESS.

(PROCEEDINGS WERE IN RECESS.)

(THE WITNESS WAS SWORN.)

THE DEPUTY CLERK:  STATE YOUR FULL NAME, PLEASE.

THE WITNESS:  JOSEPH PLUMMER; P-L-U-M-M-E-R.

JOSEPH PLUMMER,

HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. MCKINNON:

Q.   MR. PLUMMER, HOW ARE YOU EMPLOYED?

A.   I WORK AS AN ASSISTANT U.S. ATTORNEY IN THE NORTHERN DISTRICT OF GEORGIA.

Q.   HOW LONG HAVE YOU BEEN EMPLOYED AS AN ASSISTANT U.S. ATTORNEY IN THE NORTHERN DISTRICT OF GEORGIA?

A.   OVER 20 YEARS.

Q.   SO YOU WERE AN A.U.S.A. IN THIS DISTRICT BACK IN DECEMBER OF 2004?

A.   YES.

Q.   2003?

A.   YES.

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

512

Q.   AND LET ME SHOW YOU GOVERNMENT'S EXHIBIT NUMBER 54 AND ASK YOU DO YOU RECOGNIZE GOVERNMENT'S EXHIBIT NUMBER 54?

A.   YES, I RECOGNIZE GOVERNMENT'S EXHIBIT NUMBER 54.

Q.   WHAT IS GOVERNMENT'S EXHIBIT NUMBER 54?

A.   IN THIS CASE, THE LECROY CASE, DEFENSE COUNSEL INDICATED THAT THEY WANTED TO USE SOME SORT OF A MENTAL HEALTH DEFENSE BUT THEY DIDN'T WANT TO DISCLOSE IT TO THE LEAD COUNSEL.  AND SO THEY DEVISED, ALONG WITH THE COURT, A SYSTEM IN WHICH FIREWALL ATTORNEYS, MYSELF AND YONETTE BUCHANAN, WOULD BE SET UP AND INFORMATION WOULD BE DISCLOSED TO US FOR THE PURPOSES OF ALLOWING US TO SEE WHETHER OR NOT WE WANTED TO TRY TO HIRE A PSYCHIATRIST OR PSYCHOLOGIST TO POSSIBLY PREPARE A REBUTTAL DEFENSE.

Q.   AND THE ORDER THAT YOU HAVE, GOVERNMENT'S EXHIBIT 54, THAT'S DATED DECEMBER THE 16TH.  IS THAT CORRECT?

A.   THAT'S CORRECT.

Q.   NOW, DID YOU GET, THEN GET INVOLVED IN THE LECROY CASE AS ONE OF THE FIREWALL ATTORNEYS SHORTLY AFTER DECEMBER THE 16TH, 2003?

A.   THAT'S CORRECT.

Q.   LET ME SHOW YOU GOVERNMENT'S EXHIBIT NUMBER 55.  DO YOU RECOGNIZE GOVERNMENT'S EXHIBIT NUMBER 55?

A.   YES.  THIS IS A LETTER WHICH IS DATED DECEMBER THE 19TH WHICH REFERENCES THE EARLIER DECEMBER THE 16TH ORDER.  AND THE LETTER IS A CONFIRMATION OF A CONVERSATION THAT YONETTE

513

BUCHANAN AND MYSELF HAD WITH DEFENSE COUNSEL, STEPHANIE KEARNS AND BRIAN MENDELSOHN, WITH RESPECT TO CARRYING OUT THE TERMS OF THE ORDER REFLECTED IN GOVERNMENT'S EXHIBIT 54.

Q.    LET ME STOP YOU REAL QUICK.  IN GOVERNMENT'S EXHIBIT 55 YOU REFERENCE IN THE SECOND PARAGRAPH ON THE FIRST PAGE A MEETING THAT YOU AND A.U.S.A. BUCHANAN HAD WITH BRIAN MENDELSOHN ON DECEMBER 17TH, 2003.  IS THAT CORRECT?

A.    THAT'S CORRECT.

Q.    AND AT THE END OF THE LETTER, AT THE END OF THAT PARAGRAPH, YOU STATE IN GOVERNMENT'S EXHIBIT 55: MR. MENDELSOHN FURTHER INDICATED THAT THE DEFENSE EXPERT WAS A TEACHING EXPERT AT THE UNIVERSITY OF MASSACHUSETTS --

THE COURT:  SLOW DOWN.

BY MR. MCKINNON:

Q.    SORRY.  THAT HE HAD A PH.D. IN PSYCHOLOGY AND THAT HIS FIELD OF EXPERTISE WAS ADULT MALES WHO WERE VICTIMS OF SEXUAL ABUSE WHEN THEY WERE CHILDREN.  THEN YOU MEMORIALIZED THAT CONVERSATION IN THIS LETTER; IS THAT CORRECT?

A.    YES, I MEMORIALIZED THAT BECAUSE AT THAT POINT IN TIME, IT WAS OUR UNDERSTANDING THAT THEY WERE GOING TO SUPPLY US WITH A CURRICULUM VITAE, BUT THEY DIDN'T; AND HE JUST ORALLY GAVE US HIS EXPERT'S CREDENTIALS.

Q.    AFTER YOU GOT THAT INFORMATION FROM MR. MENDELSOHN, DID YOU PROVIDE THAT INFORMATION TO EITHER A.U.S.A. VINEYARD OR A.U.S.A. PLUMMER -- OR A.U.S.A. BURBY?

514

A.   NO, I DID NOT.

Q.   AND THEN ALSO IT SAYS:  MR. MENDELSOHN ALSO INDICATED THE DEFENDANT WAS SEXUALLY ABUSED WHILE IN PRISON.  DID YOU MAKE ANY MENTION OF THAT TO EITHER A.U.S.A. VINEYARD OR A.U.S.A. BURBY?

A.   NO, I DID NOT.

Q.   THEN YOU ALSO REFERENCED A DECEMBER 18TH, 2003, MEETING THAT YOU AND A.U.S.A. BUCHANAN HAD WITH MS. KEARNS AND MR. MENDELSOHN.  DID YOU PROVIDE ANY INFORMATION THAT YOU GOT FROM THAT DECEMBER 18TH MEETING TO EITHER A.U.S.A. VINEYARD OR A.U.S.A. BURBY?

A.   NO, I DID NOT.

Q.   NOW, LET ME SHOW YOU GOVERNMENT EXHIBIT NUMBER 56.  DO YOU RECOGNIZE WHAT GOVERNMENT EXHIBIT 56 IS?

A.   SUBSEQUENT TO, I GUESS, SENDING THE LETTER THAT'S REFLECTED IN GOVERNMENT'S EXHIBIT 55 WHICH WAS CC'D TO THE COURT, WE THEN TO SOME EXTENT GOT SOME SORT OF DISCOVERY MATERIALS REGARDING THE BASIS OF THEIR EXPERT'S OPINION.

Q.   WAS THAT SERVED ON YOU AND MS. BUCHANAN, GOVERNMENT EXHIBIT NUMBER 55?

A.   YES.  IT WAS MAILED TO YONETTE BUCHANAN, AND I HAD ACCESS TO IT.

Q.   AT ANY TIME DID YOU PROVIDE THESE RECORDS TO EITHER JOEY BURBY OR RUSSELL VINEYARD IN VIOLATION OF THE FIREWALL ORDER?

A.   NO, WE DID NOT PROVIDE THESE B.O.P. MATERIALS TO THE OTHER

515

ATTORNEYS.

Q.   LET ME SHOW YOU GOVERNMENT EXHIBIT NUMBER 57.  DO YOU RECOGNIZE THAT, GOVERNMENT EXHIBIT NUMBER 57?

A.   YES, I RECOGNIZE GOVERNMENT'S EXHIBIT NUMBER 57.

Q.   AND THAT'S AN ORDER THAT JUDGE STORY ISSUED ON OR ABOUT JANUARY THE 16TH, 2004.  IS THAT RIGHT?

A.   THAT'S CORRECT.

Q.   AND IF YOU LOOK AT PAGE TWO OF GOVERNMENT EXHIBIT 57 --

A.   YES, I'M THERE.

Q.   -- AND IS THE DEFENDANT DIRECTED TO DO SOMETHING BY THE COURT ON OR BEFORE JANUARY 23RD, 2004?

A.   HE WAS DIRECTED TO PROVIDE US WITH THE IDENTITIES AND QUALIFICATIONS OF ANY EXPERTS THAT WOULD TESTIFY IN THE CASE, BECAUSE I THINK AT THAT TIME WE STILL HADN'T EVEN RECEIVED THE CURRICULUM VITAE OR ANYTHING LIKE THAT.  AND THE COURT ALSO WANTED US -- OKAY, WELL, BY THE 23RD WE WERE GOING TO GET THE IDENTITIES AND QUALIFICATIONS.

Q.   LET ME SHOW YOU GOVERNMENT EXHIBIT NUMBER 58.  DO YOU RECOGNIZE GOVERNMENT EXHIBIT NUMBER 58?

A.   YES, I DO.  THIS IS A LETTER THAT'S ADDRESSED, AGAIN, TO YONETTE BUCHANAN WHICH I HAD ACCESS TO.  AND IN IT, IT'S SIGNED BY BRIAN MENDELSOHN AND HE INDICATES THAT HE'S COMPLYING WITH JUDGE STORY'S ORDER OF JANUARY THE 16TH WHICH WAS REFLECTED IN GOVERNMENT'S EXHIBIT 57.

Q.   DID YOU PROVIDE THAT LETTER AND THE CURRICULUM VITAE FOR

516

THE DEFENSE EXPERT TO EITHER RUSSELL VINEYARD OR JOEY BURBY IN VIOLATION OF THE FIREWALL?

A.    NO, WE DID NOT.

Q.    DID YOU DISCLOSE ANY INFORMATION ABOUT WHAT YOU NOW KNEW THAT THE DEFENSE EXPERT WAS GOING TO TESTIFY ABOUT TO EITHER A.U.S.A. VINEYARD OR A.U.S.A. BURBY?

A.    NO, WE DID NOT.

Q.    NOW, WERE YOU ALSO INVOLVED IN ENGAGING AN EXPERT FOR THE GOVERNMENT TO ADDRESS MENTAL HEALTH ISSUES THAT MIGHT ARISE AT THE TRIAL?

A.    RIGHT.  BASED ON THE INFORMATION THAT HAD BEEN PROVIDED TO US BY DEFENSE COUNSEL, THE OTHER PURPOSE FOR US AS THE FIREWALL ATTORNEYS WAS FOR US TO SEE WHETHER OR NOT IT WAS POSSIBLE TO RETAIN AN EXPERT TO EVALUATE THEIR EXPERT'S ANALYSIS AND DETERMINE WHETHER OR NOT WE WERE GOING TO POSSIBLY EVALUATE THE DEFENDANT.

Q.    NOW, DID AN EVALUATION BY A GOVERNMENT EXPERT EVER OCCUR?

A.    IT NEVER TOOK PLACE.  WHEN THE TIME CAME, THE DEFENDANT, THROUGH HIS COUNSEL, INDICATED THAT HE WAS GOING TO INVOKE HIS FIFTH AMENDMENT PRIVILEGE.

Q.    NOW, OTHER THAN DISCLOSING THE NAME OF THE GOVERNMENT EXPERT TO A.U.S.A. VINEYARD AND A.U.S.A. BURBY, DID YOU DISCLOSE ANY INFORMATION ABOUT THE GOVERNMENT EXPERT TO EITHER ONE OF THE TRIAL ATTORNEYS FOR THE GOVERNMENT?

A.    NO.

517

Q.    DID YOU EVER GET A COPY OF DR. MEDLIN'S REPORT?

A.    I'M NOT REALLY SURE OF THAT.  I DO KNOW THAT WE SUBSEQUENTLY APPEARED IN FRONT OF JUDGE STORY SOMETIME IN EARLY FEBRUARY JUST SHORTLY BEFORE TRIAL WAS SUPPOSED TO TAKE PLACE, AND I THINK THAT'S WHEN DEFENSE COUNSEL WENT ON THE RECORD AND ADVISED THE COURT THAT THEIR CLIENT WAS GOING TO INVOKE THE FIFTH AMENDMENT.  AND AT THAT POINT IN TIME, I THINK OUR POSITION WAS THAT UNDER RULE 12.2, THAT WE WERE ENTITLED TO CONDUCT AN EXAMINATION.  AND THE JUDGE, I BELIEVE, WAS GOING TO DECIDE WHETHER OR NOT THEY WOULD BE ABLE TO PUT FORWARD ANY MENTAL HEALTH EVIDENCE LATER ON IN THE CASE IN THE PENALTY PHASE; AND THAT SORT OF WAS THE END OF MY INVOLVEMENT.  AND SO AT THAT POINT IN TIME, I HAD NOT RECEIVED THE REPORT AS OF FEBRUARY THE 6TH.  IT PROBABLY WAS SUBSEQUENTLY MAILED TO OUR OFFICE.  ACCORDING TO THE --

Q.    DON'T SPECULATE.  DID YOU EVER SEE IT?  DID YOU EVER RECEIVE IT IN THE U.S. ATTORNEY'S OFFICE?

A.    I MIGHT HAVE.  WHAT I WAS GOING TO EXPLAIN, ACCORDING TO THE COURT ORDER, IT WAS SUPPOSED TO BE FILED UNDER SEAL WITH THE COURT.  I JUST DON'T RECALL SEEING IT.

Q.    DO YOU HAVE ANY RECOLLECTION OF EVER SEEING IT?

A.    NO.  I MEAN, IF IT CAME IN, IT WAS SOMETIME PROBABLY WHILE THE TRIAL WAS IN PROGRESS.

Q.    LET ME SHOW YOU GOVERNMENT'S EXHIBIT 60.  AND LOOK AT THE -- DOES THAT HAVE ORDERS ABOUT HOW DR. MEDLIN'S REPORT WAS

518

SUPPOSED -- IS THIS AN ORDER REGARDING HOW DR. MEDLIN'S REPORT WAS TO BE DISCLOSED TO THE COURT?

A.   RIGHT.   THIS WAS -- WE HAD A TELEPHONE CONFERENCE WITH THE JUDGE; AND AT THAT POINT IN TIME, BECAUSE WE WERE AWARE THAT WE COULDN'T COMMUNICATE WITH OUR COLLEAGUES, WE ASKED FOR PERMISSION TO AT LEAST ADVISE THEM THAT THE DEFENDANT WAS GOING TO INVOKE THE FIFTH AMENDMENT AT THAT POINT IN TIME.

AND THEN THE JUDGE ESSENTIALLY DIRECTED US THAT SINCE HE WAS GOING TO STILL DETERMINE WHETHER OR NOT THE DEFENSE EXPERT COULD TESTIFY, THAT IF WE WANTED TO, WE COULD GO AHEAD AND HAVE OUR EXPERT PREPARE A REPORT BASED ON THE MATERIALS THAT THE DEFENSE HAD PROVIDED US, THAT SHE SHOULD PREPARE A WRITTEN REPORT IF SHE DID SO AND THEN FILE IT UNDER SEAL WITH THE COURT.

Q.   AND IN REGARD TO YONETTE BUCHANAN'S INVOLVEMENT IN THIS, DID YOU HAVE ANY DISCUSSIONS, HAVE ANY REASON TO BELIEVE THAT YONETTE BUCHANAN WOULD HAVE PROVIDED ANYTHING TO THE TRIAL ATTORNEYS THAT WOULD HAVE BEEN IN BREACH OF THE FIREWALL ORDER?

A.   NO.   I DON'T HAVE ANY REASON TO BELIEVE THAT SHE WOULD HAVE.   AND I THINK WHEN WE WERE HAVING THE LAST FEW MATTERS, THE TELEPHONE CONFERENCE AND THE MEETING THAT TOOK PLACE AT THE DAY OR THE HEARING THAT TOOK PLACE A DAY OR TWO BEFORE THIS, I'M NOT EVEN SURE IF SHE WAS EVEN PRESENT.   SHE WAS TIED UP ON SOMETHING ELSE.

MR. MCKINNON:   THANK YOU.   THAT'S ALL THE QUESTIONS I

519

HAVE.

THE COURT:  YOU MAY CROSS-EXAMINE.

CROSS-EXAMINATION

BY MS. MICHAELS:

Q.   GOOD AFTERNOON, MR. PLUMMER.

A.   GOOD AFTERNOON.

Q.   MR. PLUMMER, WHAT DID YOU KNOW ABOUT THE DEFENSE, MENTAL
HEALTH DEFENSE OF MR. LECROY PRIOR TO THE DATE YOU WERE ASKED
TO BE THE FIREWALL ATTORNEY?

A.   I REALLY DIDN'T KNOW ANYTHING.  I MEAN, ALL I KNEW IS THAT
IT WAS A CARJACKING THAT INVOLVED A WOMAN THAT WAS ASSAULTED
AND RAPED AND KILLED AND THAT IT WAS BEING PROSECUTED AS A
DEATH PENALTY CASE.

Q.   AT SOME POINT YOU MADE THE DECISION TO AT LEAST CONSULT OR
RETAIN DR. MEDLIN IN THIS CASE; RIGHT?

A.   YES.

Q.   AND THAT WAS BASED ON YOUR UNDERSTANDING FROM
MR. MENDELSOHN AND MS. KEARNS THAT CHILD ABUSE OR CHILD ABUSE
OF MR. LECROY WAS GOING TO BE AN ISSUE IN THE DEFENSE.

A.   THAT'S CORRECT.

Q.   BECAUSE, OF COURSE, DR. MEDLIN'S EXPERTISE IS ALLEGEDLY
CHILD ABUSE; CORRECT?

A.   I THINK THAT'S ONE OF THE AREAS THAT SHE PRACTICES IN IS
DEALING WITH SEX OFFENDERS.

Q.   CERTAINLY SHE TALKS ABOUT THAT ON HER WEBSITE AND IN HER

520

DOCUMENTATION; CORRECT?

A.    I BELIEVE -- I'M NOT EXACTLY SURE ABOUT THE WEBSITE, BUT I THINK IN THE CURRICULUM VITAE THAT SHE FURNISHED THAT WAS ONE OF THE AREAS OF EXPERTISE THAT SHE LISTED.  I CAN'T SAY THAT THAT'S THE SOLE EXPERTISE THAT SHE HAD.

Q.    BUT YOU WOULD AGREE THAT IS THE REASON YOU DECIDED TO RETAIN AND CONSULT DR. MEDLIN AS OPPOSED TO SOME OTHER PROFESSIONAL.

A.    BECAUSE SHE HAD THAT EXPERTISE, YES.

Q.    RIGHT.  SO, AND YOU WOULD AGREE WITH ME THAT AT SOME POINT, YOU GAVE THE NAME OF DR. MEDLIN TO MR. VINEYARD.

A.    I THINK THAT I DID.  I MEAN, I'M NOT A HUNDRED PERCENT CERTAIN.  IF I CAN EXPLAIN.

AT THE POINT IN TIME WHEN THIS ORDER WHICH IS GOVERNMENT'S EXHIBIT 60 WAS ENTERED, THIS IS FEBRUARY THE 6TH, 2004, THE TRIAL WAS COMING UP WITHIN A COUPLE OF WEEKS.  WE KNEW THAT THE EXPERT WAS GOING TO HAVE TO BE SUBPOENAED AT SOME POINT IN TIME.  AND SO I CANNOT REMEMBER WHETHER YONETTE OR I DRAFTED THE SUBPOENA OR WHETHER WE DIRECTED MR. BURBY OR MR. VINEYARD'S LEGAL ASSISTANT TO DRAFT THE SUBPOENA; OR WHETHER AT SOME POINT IN TIME WHILE THEY WERE IN THE MIDDLE OF TRIAL, PERHAPS APPROACHING THE END OF THE TRIAL, THAT WE SAID, WELL, WE STILL DON'T HAVE A RULING IN TERMS OF WHETHER OR NOT THE DEFENSE IS GOING TO GO FORWARD, YOU CAN'T, YOU KNOW, YOU CAN'T WAIT UNTIL THE LAST MINUTE, YOU'VE GOT TO HAVE SOMEBODY SUBPOENAED.

521

Q.   WELL, FEBRUARY 6TH IS WHEN THE JUDGE ISSUED HIS ORDER.

A.   THAT'S CORRECT.

Q.   THE ONE YOU'RE REFERRING ABOUT.  AND DO YOU RECALL TELLING THE JUDGE ON FEBRUARY 6TH THAT THE TRIAL TEAM, THE PROSECUTION TRIAL TEAM KNEW THE NAME OF DR. MEDLIN?

A.   I MIGHT HAVE.  I'M NOT SURE.  IF YOU COULD SHOW ME SOMETHING THAT WOULD INDICATE IT.

          MS. MICHAELS:  MAY I APPROACH THE WITNESS, YOUR HONOR?

          THE COURT:  YOU MAY.

BY MS. MICHAELS:

Q.   I'M GOING TO SHOW YOU WHAT, I GUESS, IS ALREADY IN EVIDENCE, BUT THE TRANSCRIPT OF FEBRUARY 6TH.  I BRING YOUR ATTENTION TO LINE 1 THROUGH 12, PLEASE.

A.   (REVIEWING DOCUMENT.)  JUST READING THIS, IT'S NOT CLEAR THAT I KNEW.  I TESTIFIED THAT, QUOTE, I THINK THAT HE DOES KNOW THE NAME OF THE EXPERT.  AND I EXPLAINED THAT, BECAUSE OF THE PROCESS OF US BASICALLY HAVING TO FILL OUT PAPERWORK TO HIRE DR. MEDLIN, AND I'D HAVE TO GET IN CONTACT WITH YONETTE TO BASICALLY GIVE YOU THE WHOLE ANSWER, BUT IT'S MY UNDERSTANDING THAT HE DOES KNOW THE NAME OF OUR DOCTOR, DR. MEDLIN.

     AND THEN I WAS ASKED:  HAS HE HAD ANY CONTACT WITH HER? AND I SAID:  HE'S HAD NO CONTACT.  I'VE BEEN THE ONLY SOURCE OF CONTACT WITH DR. MEDLIN.

Q.   BUT IT'S FAIR TO SAY FROM THIS, YOU HAD GOOD REASON TO

522

BELIEVE THAT MR. VINEYARD KNEW THE NAME OF THE EXPERT,

DR. MEDLIN, AT THAT POINT.

A.    THAT'S WHAT I THOUGHT POSSIBLY.

Q.    AND WHY DID RUSSELL VINEYARD NEED TO KNOW DR. MEDLIN'S

NAME TO FILL OUT PAPERWORK TO GET A SUBPOENA?

          MR. MCKINNON:  YOUR HONOR, I OBJECT.  THIS IS NOT

RELEVANT.  THE ALLEGATION IS THAT THE TRIAL ATTORNEYS

DISCOVERED FROM THE FIREWALLED ATTORNEYS THE THEORY THAT THE

DEFENSE WAS GOING TO PRESENT IN THEIR MITIGATION CASE.  THE

IDENTITY -- THE COURT HAS ALREADY DEALT WITH THIS ISSUE

INVOLVING THE NAME OF DR. MEDLIN BECAUSE THERE'S AN ORDER THE

COURT ENTERED SAYING IT WAS OKAY FOR THE TRIAL ATTORNEYS TO

KNOW THE NAME.  IT'S IN THE RECORD ALREADY.

          SO I DON'T SEE HOW THIS IS RELEVANT TO THE ALLEGATION

THAT'S IN THE PETITION WHICH IS THAT THERE WAS A DISCLOSURE OF

THE THEORY THAT THE DEFENSE WAS GOING TO PURSUE IN THE

MITIGATION CASE.

          THE COURT:  I WILL -- I REALIZE THERE NEEDS TO BE

SOME DEGREE OF BACKGROUND, BUT LET'S TRY TO MOVE TOWARD WHAT I

THINK IS MORE APPROPRIATELY THE ISSUE AND THAT IS THOSE

DISCLOSURES.  YOU MAY PROCEED.

BY MS. MICHAELS:

Q.   WELL, MR. PLUMMER --

          MS. MICHAELS:  MAY I APPROACH AGAIN?

          THE COURT:  YES.

523

BY MS. MICHAELS:

Q.    DO YOU RECALL TELLING JUDGE STORY THAT YOUR UNDERSTANDING WAS THAT THE DEFENSE -- OR THE PROSECUTION TEAM, MR. VINEYARD AND MR. BURBY, WANTED TO CHECK THE REFERENCES OF DR. MEDLIN, TOP OF PAGE 20 OF THE TRANSCRIPT?

A.    RIGHT.  THEY WANTED TO DETERMINE WHETHER OR NOT SHE HAD TESTIFIED IN OTHER PROCEEDINGS, YES.

Q.    SO, IN FACT, MR. VINEYARD AND MR. BURBY DID KNOW ABOUT DR. MEDLIN SO THEY COULD CHECK HER REFERENCES AND SEE WHETHER SHE HAD TESTIFIED IN ANY OTHER PROCEEDINGS OR NOT.

A.    THAT'S CORRECT.

Q.    AND IF SHE TESTIFIED IN OTHER PROCEEDINGS REGARDING HER EXPERTISE IN CHILD ABUSE, THAT WOULD ALLOW MR. VINEYARD AND MR. BURBY TO KNOW THAT IT WAS CHILD ABUSE WAS THE ISSUE.

          MR. MCKINNON:  OBJECTION, JUDGE.  THE RECORD IS THAT THEY ALREADY KNEW THAT THAT WAS -- BELIEVED THAT WOULD BE AN ISSUE.  THAT DOESN'T NECESSARILY ESTABLISH THAT THERE WAS SOME SORT OF BREACH OF THE FIREWALL.

          THE COURT:  I'LL OVERRULE.  YOU MAY ANSWER THE QUESTION IF YOU CAN.

          THE WITNESS:  NO, BECAUSE I THINK, JUST LIKE WHEN YOU CALL A CHEMIST OR ANY OTHER EXPERT, THEY WANTED TO KNOW WHETHER OR NOT THE PERSON HAD BEEN QUALIFIED AS AN EXPERT IN STATE AND/OR FEDERAL COURTS.  IT WAS GENERAL IN TERMS OF THAT NATURE. THAT WAS MY UNDERSTANDING.

524

BY MS. MICHAELS:

Q.    MR. PLUMMER, DID YOU RECEIVE ANY DOCUMENTS REGARDING MENTAL HEALTH, OTHER THAN WHAT YOU'VE ALREADY STATED IN THIS ONE EXHIBIT THAT YOU RECEIVED FROM MR. MENDELSOHN VIA LETTER, DID YOU RECEIVE ANY OTHER MENTAL HEALTH DOCUMENTS REGARDING MR. LECROY, HIS B.O.P. FILE, HIS DEPARTMENT OF CORRECTIONS FILE?

A.    I KNOW THAT WE WERE IN CONTACT WITH DR. SALLY JOHNSON WHEN WE INITIALLY BECAME INVOLVED AS THE FIREWALL ATTORNEYS, AND WE HAD TRIED TO ARRANGE FOR THE DEFENDANT TO GO BACK TO -- OR TO GO TO F.C.M. BUTNER TO BE EVALUATED.  IN THE COURSE OF THAT, WE MAY HAVE EITHER OBTAINED INFORMATION FROM HER OR GOTTEN INFORMATION FROM OUR FILES, BUT I'M NOT SURE.

Q.    INFORMATION REGARDING MR. LECROY'S MENTAL RECORDS, MENTAL HEALTH RECORDS?

A.    WE MAY HAVE.  I JUST DON'T, I DON'T RECALL.

Q.    AND JUST SO IT'S CLEAR, SALLY JOHNSON, WHAT WAS HER ROLE AT THAT POINT?

A.    WE WERE SEEKING TO RETAIN HER OR UTILIZE HER TO EVALUATE THE DEFENDANT.  BUT DEFENSE COUNSEL OBJECTED, I GUESS, TO HIM BEING EVALUATED AT BUTNER BECAUSE ULTIMATELY THE JUDGE DETERMINED THAT HE WOULD BE EVALUATED LOCALLY HERE AT THE U.S. PENITENTIARY ATLANTA.

            MS. MICHAELS:  IF I COULD HAVE JUST A MOMENT.

            I HAVE NOTHING ELSE.  THANK YOU, YOUR HONOR.

525

THE COURT:  ANY REDIRECT?

MR. MCKINNON:  NO, YOUR HONOR.

THE COURT:  YOU MAY STEP DOWN, SIR.

YOU MAY CALL YOUR NEXT WITNESS.

MR. MCKINNON:  CALL RUSSELL VINEYARD.

(THE WITNESS WAS SWORN.)

THE DEPUTY CLERK:  STATE YOUR FULL NAME.

THE WITNESS:  RUSSELL VINEYARD.

RUSSELL VINEYARD,

HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. MCKINNON:

Q.   AND HOW ARE YOU PRESENTLY EMPLOYED, SIR?

A.   UNITED STATES MAGISTRATE JUDGE.

Q.   HOW LONG HAVE YOU BEEN A UNITED STATES MAGISTRATE JUDGE?

A.   A LITTLE OVER THREE YEARS.

Q.   PRIOR TO THE TIME THAT YOU WERE APPOINTED TO THE BENCH, WHAT WAS YOUR POSITION?

A.   I WAS ASSISTANT UNITED STATES ATTORNEY FOR THE NORTHERN DISTRICT OF GEORGIA.

Q.   HOW LONG DID YOU SERVE IN THAT CAPACITY, PLEASE?

A.   SINCE SEPTEMBER OF '91, SO APPROXIMATELY 15 YEARS.

Q.   WERE YOU ASSIGNED AS THE LEAD TRIAL ATTORNEY FOR THE PROSECUTION OF WILLIAM LECROY, JR.?

A.   YES.

526

Q.   WHEN DID YOU FIRST BECOME INVOLVED IN THE LECROY CASE?

A.   SHORTLY AFTER THE MURDER OF JOANNE TIESLER, I WAS CONTACTED BY, I BELIEVE, THE SUPERVISING PROBATION OFFICER, KURT WARREN, AND NOTIFIED OF THE MURDER; AND I BECAME INVOLVED SHORTLY THEREAFTER.

Q.   WERE YOU INVOLVED IN IT IN THE GRAND JURY INVESTIGATION THAT WAS CONDUCTED PRIOR TO THE RETURN OF AN INDICTMENT AGAINST MR. LECROY?

A.   I WAS.

Q.   I'M GOING TO SHOW YOU GOVERNMENT EXHIBIT NUMBER 64.  FIRST OF ALL, I'LL ASK YOU IF YOU WOULD IDENTIFY WHAT GOVERNMENT EXHIBIT 64 IS, PLEASE.

A.   IT'S A COPY OF A TRANSCRIPT OF GRAND JURY TESTIMONY PROVIDED BY CHADWICK LECROY.

Q.   WHO WAS CHADWICK LECROY?

A.   THAT IS WILLIAM EMMETT LECROY, JR.'S, BROTHER.

Q.   AND DOES THIS TRANSCRIPT INDICATE THAT YOU PLAYED A ROLE IN THE APPEARANCE OF MR. LECROY'S BROTHER BEFORE THE FEDERAL GRAND JURY?

A.   IT DOES.

Q.   WHAT ROLE DID YOU PLAY?

A.   I WAS THE PROSECUTOR WHO WAS QUESTIONING CHADWICK LECROY.

Q.   WHAT DATE WAS MR. LECROY CALLED TO APPEAR AND TESTIFY IN FRONT OF THE FEDERAL GRAND JURY?

A.   ACCORDING TO THE TRANSCRIPT, IT WAS MARCH 12TH, 2002.

527

Q.   NOW, I'LL ASK YOU TO TURN OVER TO THE, ACTUALLY THE THIRD PAGE OF THE EXHIBIT.

        MR. MCKINNON:  AND AGAIN, JUDGE, I HAVE ONLY COPIED THE RELEVANT PORTIONS OF THIS GRAND JURY TRANSCRIPT RATHER THAN THE ENTIRE TRANSCRIPT.  I HAVE THE ENTIRE TRANSCRIPT AVAILABLE IF DEFENSE COUNSEL WANTS TO SEE IT.

BY MR. MCKINNON:

Q.   AND IT'S PAGE NUMBER 52 OF THE TRANSCRIPT.  AND I WOULD ASK YOU IF YOU ASKED THIS QUESTION OF MR. LECROY:  THERE'S NOTHING OTHER THAN CORPORAL PUNISHMENT YOU CAN POINT TO FROM YOUR CHILDHOOD THAT MIGHT -- AND THEN HE INTERRUPTED AND SAID: I WOULDN'T HAVE KNOWN ANYTHING.  AND YOU ASKED:  OKAY.  NO EPISODES OF ANY SEXUAL ABUSE BY ANYONE TOWARD HIM.

        DID YOU ASK THAT QUESTION OF MR. LECROY?

A.   YES, I DID.

Q.   AND WHAT ANSWER DID HE GIVE YOU BACK IN MARCH OF 2002?

A.   HE SAID:  I READ THAT IN ONE OF THE PRISON THINGS, TOO, THAT APPARENTLY HE HAD MENTIONED SOMETHING ABOUT A BABYSITTER. I HAVE NO KNOWLEDGE OF THAT, AND I DON'T EVER RECALL THAT HAPPENING TO ME.  AND I'M SURE WE HAD THE SAME BABYSITTER.

Q.   AND WHY WERE YOU ASKING MR. LECROY QUESTIONS ABOUT WHETHER THERE HAD BEEN ANY SEXUAL ABUSE IN HIS BROTHER'S BACKGROUND OR DURING HIS BROTHER'S CHILDHOOD?

A.   DURING THE INVESTIGATION WE OBTAINED RECORDS FROM MR. LECROY'S IMPRISONMENT, BOTH IN FEDERAL COURT -- IN FEDERAL

528

PRISON AND IN STATE PRISONS.  AND I RECALL THAT IN ONE OF THE RECORDS, THERE WAS A REFERENCE THAT MR. LECROY HAD TOLD SOMEONE WITHIN THE PRISON SYSTEM THAT HE HAD BEEN ABUSED AS A CHILD.  I WANTED TO QUESTION HIS BROTHER ABOUT THAT TO TRY TO DETERMINE THE VERACITY OF THAT ALLEGATION AND TO FIND OUT WHAT, IF ANYTHING, HE COULD TELL ME ABOUT IT.

Q.    AND WHY WOULD YOU BE CONCERNED ABOUT THAT IN A MURDER INVESTIGATION?

A.    WELL, WE BELIEVED THAT THIS CASE COULD POSSIBLY BE A DEATH PENALTY CASE AND THAT WE MIGHT BE PROCEEDING TO TRIAL, AND IF WE WERE SUCCESSFUL IN CONVICTING MR. LECROY, PROCEEDING TO A DEATH PENALTY PORTION IN WHICH AGGRAVATING AND MITIGATING EVIDENCE WOULD BE PRESENTED.  I WANTED TO KNOW FOR MY OWN INVESTIGATION THE TRUTHFULNESS OF THIS ALLEGATION; AND THEN SECONDARILY, WITH REGARD TO TESTIMONY THAT MIGHT COME OUT IN THE MITIGATION, TO SEE IF MR. CHADWICK LECROY WOULD HAVE ANY INFORMATION THAT MIGHT SHED LIGHT ON THAT ALLEGATION.

Q.    LET ME SHOW YOU GOVERNMENT EXHIBIT 67 AND 68 WHICH HAVE ALREADY BEEN ADMITTED.  DO YOU RECOGNIZE GOVERNMENT EXHIBIT 67 FIRST?

A.    YES.

Q.    WHAT IS GOVERNMENT EXHIBIT 67?

A.    IT'S A LETTER DATED MAY 30TH, 2002, THAT INDICATES THAT IT'S A COVER LETTER FOR DISCOVERY THAT'S BEING PROVIDED IN CONNECTION WITH THE INDICTMENT OF MR. LECROY IN CASE NUMBER

529

2:02-CR-38.

Q.   AND WHAT PAGES OF DISCOVERY WOULD HAVE BEEN PROVIDED IN

THAT TIME FRAME OF MAY OF 2002?

A.   IT SAYS THAT ENCLOSED ARE PAGES CONSECUTIVELY NUMBERED 1

THROUGH 1722.

Q.   LOOK AT EXHIBIT NUMBER 68 WHICH I'VE ALSO HANDED UP THERE.

FIRST OF ALL, DO YOU SEE THE BATES STAMP AT THE BOTTOM OF

GOVERNMENT EXHIBIT 68?

A.   I DO.

Q.   AND WOULD THAT BATES STAMP INDICATE THAT THAT DOCUMENT WAS

A PART OF THE DISCOVERY THAT WAS PROVIDED IN MAY OF 2002?

A.   YES, IT DOES.

Q.   AND WOULD YOU HAVE HAD THAT DISCOVERY THEN PRIOR TO THE

MARCH TIME FRAME WHEN YOU WERE CONDUCTING THE INVESTIGATION?

A.   YES.

Q.   AND IF YOU WOULD LOOK TOWARD THE BOTTOM OF GOVERNMENT

EXHIBIT 68 AND SEE IF THERE'S A REFERENCE IN THAT DOCUMENT

WHERE MR. LECROY MADE A REPORT OF SEXUAL ABUSE BY A BABYSITTER

WHILE HE WAS A JUVENILE AND, FRANKLY, OTHER FACTORS THAT MIGHT

BE MITIGATING -- MIGHT BE RELEVANT TO A MITIGATION CASE IN A

DEATH PENALTY PROSECUTION.

A.   IT DOES.  IT MENTIONS THAT HE REPORTED BEING SEXUALLY

MOLESTED BY A BABYSITTER AT AGE EIGHT.  HE REFERENCED ALSO HIS

PARENTS' DIVORCE, SEVERAL SUICIDE ATTEMPTS, AN EX-FIANCÉE

ABORTING HIS CHILD, AND BEGINNING A DRUG AND CRIMINAL LIFESTYLE

530

WHILE IN THE ARMY.

Q.   DO YOU HAVE A RECOLLECTION TODAY SPECIFICALLY OF WHERE THAT DOCUMENT WOULD HAVE COME FROM, GOVERNMENT EXHIBIT 68?

A.   IT CAME FROM EITHER HIS BUREAU OF PRISONS FILE OR HIS STATE PRISON FILE.

Q.   NOW, WERE YOU AWARE AT ANY TIME OF SOME SORT OF A FIREWALL ORDER THAT WAS ISSUED BY A JUDGE IN OKLAHOMA REGARDING THE PRODUCTION OF MENTAL HEALTH RECORDS BY THE BUREAU OF PRISONS TO THE UNITED STATES ATTORNEY'S OFFICE?

A.   NO.

Q.   DID YOU HAVE ANY KNOWLEDGE OF ANY KIND OF A FIREWALL ORDER FROM A JUDGE OTHER THAN JUDGE STORY?

A.   NOT OTHER THAN JUDGE STORY'S ORDER THAT I RECALL, NO, SIR.

Q.   I'LL SHOW YOU GOVERNMENT EXHIBIT 66 AND ASK YOU IF YOU CAN IDENTIFY GOVERNMENT EXHIBIT 66?

A.   YES, SIR.

Q.   WHAT IS GOVERNMENT EXHIBIT 66?

A.   IT'S A COPY OF A PORTION OF THE TRANSCRIPT OF THE TESTIMONY OF WILLIAM LECROY, SR., BEFORE THE FEDERAL GRAND JURY.

Q.   WHAT DAY DID HE -- AND WHO WAS WILLIAM LECROY, SR.?

A.   THAT IS THE DEFENDANT'S FATHER.

Q.   WHAT DAY DID THE DEFENDANT'S FATHER TESTIFY BEFORE THE FEDERAL GRAND JURY?

A.   MARCH 12TH, 2002.

531

Q.    SAME DAY AS THE BROTHER?

A.    I BELIEVE THAT'S CORRECT.  YES, SIR.

Q.    NOW, IF YOU WOULD TURN OVER TO THE SECOND PAGE OF THE EXHIBIT WHICH IS ACTUALLY PAGE 47 OF THE TRANSCRIPT OF MR. LECROY --

        MR. MCKINNON:  WELL, FIRST OF ALL, JUDGE, I WOULD MOVE FOR THE ADMISSION OF GOVERNMENT EXHIBIT 66, PLEASE.

        MS. MICHAELS:  JUDGE, MY ONLY OBJECTION IS I HAVE THE COMPLETE TRANSCRIPTS AND I WOULD PREFER THE COMPLETE TRANSCRIPTS BE PUT INTO EVIDENCE.  I HAVE COPIES AND I'M WILLING TO DO THAT.

        THE COURT:  ANY OBJECTION?

        MR. MCKINNON:  WELL, JUDGE, I DO OBJECT.  GRAND JURY TRANSCRIPTS ARE FILED UNDER SEAL.  RULE 6(E) GOVERNS THE DISCLOSURE.  I DON'T KNOW THE RELEVANCE OF ANYTHING OTHER THAN THE QUESTIONS ABOUT THE SEXUAL ABUSE BECAUSE THAT'S THE ONLY ISSUE THAT I DEEM RELEVANT FROM WHAT THESE TRANSCRIPTS REVEAL.

        THE COURT:  LET ME DO THIS:  I WILL ADMIT THE EXHIBIT AS IT IS TENDERED.  I WILL AFFORD COUNSEL AN OPPORTUNITY TO SUPPLEMENT FURTHER IF YOU NEED TO DO THAT, BUT AT THIS POINT I'LL ADMIT THE EXHIBIT AS TENDERED.

BY MR. MCKINNON:

Q.    IF YOU WOULD LOOK DOWN AT, THIS WOULD BE PAGE 47 OF THE TRANSCRIPT.  LOOK AT LINE 20.  YOU ASKED THIS QUESTION:  DO YOU KNOW ANY REASON WHY BILL, JR., WOULD NOT WANT TO DISCUSS HIS

532

FAMILY HISTORY WITH AN EVALUATOR OR A PSYCHOLOGIST IN A

SEXUAL -- PSYCHOSEXUAL EVALUATION?  AND THE ANSWER WAS:  NO,

SIR.

LET ME ASK YOU, WHY WERE YOU ASKING THAT QUESTION TO THE

DEFENDANT'S FATHER?

A.  WELL, IN INVESTIGATING THE CASE, IT SEEMED THAT

MR. LECROY, AS I RECALL, HAD REFUSED TO COMPLY WITH A

PSYCHOSEXUAL EVALUATION THAT HAD BEEN ORDERED AS A CONDITION OF

HIS SUPERVISED RELEASE.  I WAS EXPLORING WHETHER THAT

CONTRIBUTED TO HIS WANTING TO FLEE THE JURISDICTION AND LED HIM

TO COMMITTING THE CRIME AGAINST MS. TIESLER.

Q.  AND THEN YOUR NEXT QUESTION WAS:  NOTHING ABOUT HIS

UPBRINGING, ANY EPISODE THAT HE WOULD BE EMBARRASSED TO DISCUSS

OR TALK ABOUT?  AND THE ANSWER WAS:  NOT THAT I'M AWARE OF, NO,

SIR.  THEN YOU ASKED:  YOU'RE NOT AWARE OF ANY EPISODE IN HIS

LIFE WHERE HE WAS EVER SEXUALLY ABUSED OR ANYTHING LIKE THAT?

AGAIN, YOU'RE ASKING THE QUESTION TO THE DEFENDANT'S

FATHER ABOUT SEXUAL ABUSE FOR THE SAME REASON THAT YOU

TESTIFIED YOU WERE ASKING OF THE BROTHER, AS WELL?

A.  YES, SIR.

Q.  AND THEN FINALLY, LET ME SHOW YOU GOVERNMENT EXHIBIT

NUMBER 65.  CAN YOU IDENTIFY GOVERNMENT EXHIBIT NUMBER 65,

PLEASE.

A.  YES, SIR.

Q.  WHAT IS GOVERNMENT EXHIBIT NUMBER 65?

533

A.   IT'S A COPY OF A PORTION OF THE TRANSCRIPT OF THE GRAND JURY TESTIMONY OF TANYA LECROY.

Q.   WHO WAS TANYA LECROY?  WHO IS TONYA LECROY?

A.   WILLIAM LECROY, SR.'S, WIFE, I BELIEVE, NOT THE MOTHER OF WILLIAM EMMETT LECROY, JR., THOUGH.

Q.   AND DID MS. LECROY TESTIFY IN FRONT OF THE FEDERAL GRAND JURY ON THE SAME DATE AS HER HUSBAND AND HER STEPSON?

A.   SHE DID.

Q.   MARCH THE --

A.   MARCH 12TH, 2002.

Q.   MARCH 12TH OF 2002.

        MR. MCKINNON:  YOUR HONOR, I WOULD MOVE FOR THE ADMISSION OF GOVERNMENT EXHIBIT 65, PLEASE.

        MS. MICHAELS:  AGAIN, WITH THE SAME OBJECTIONS FOR THE FULL TRANSCRIPT.

        THE COURT:  VERY WELL, THE EXHIBIT IS ADMITTED.

BY MR. MCKINNON:

Q.   JUDGE VINEYARD, WOULD YOU LOOK AT PAGE 23, BEGINNING AT LINE 17, OR ACTUALLY THE SECOND PAGE OF THE EXHIBIT BUT 23 OF THE TRANSCRIPT.  AND WHAT QUESTIONS DID YOU ASK TANYA LECROY ALONG THE LINES OF THE TESTIMONY THAT YOU HAD BEEN GIVEN ABOUT YOUR EXAMINATION OF WILLIAM LECROY, SR., AND CHAD LECROY?

A.   I ASKED HER:  ARE YOU AWARE OF ANYTHING FROM HIS CHILDHOOD THAT HE WOULD BE RELUCTANT TO SHARE IN THE COURSE OF A PSYCHOSEXUAL EVALUATION?

534

Q.    AND HER ANSWER WAS?

A.    NO -- I'M SORRY:  NOT THAT I'M AWARE OF, NO.

Q.    DID YOU ALSO ASK ABOUT ANY KIND OF MENTAL OR EMOTIONAL CONDITIONS THAT SHE WAS AWARE OF, AS WELL?

A.    I DID.

Q.    AND WHAT DID SHE SAY IN RESPONSE TO THAT?

A.    SHE SAID NO.

Q.    AND WHETHER HE HAD BEEN TREATED FOR ANYTHING?

A.    SHE ALSO SAID NO.

Q.    AT THIS POINT HAD YOU ALREADY GOTTEN RECORDS THAT WOULD HAVE ALERTED YOU TO THE FACT THAT HE HAD RECEIVED SOME MENTAL HEALTH EVALUATION AND TREATMENT WHILE HE WAS IN PRISON?

A.    THE RECORDS THAT YOU SHOWED ME EARLIER FROM THE DISCOVERY DOCKET, I'M SORRY, GOVERNMENT EXHIBIT 68 WERE AMONG THE RECORDS WE HAD OBTAINED.

Q.    NOW, LET ME SHOW YOU GOVERNMENT EXHIBIT 54 AND ASK YOU IF YOU ARE FAMILIAR WITH GOVERNMENT EXHIBIT 54?

A.    YES, SIR.

Q.    WHAT IS GOVERNMENT EXHIBIT 54?

A.    IT'S THE ORDER ENTERED BY JUDGE STORY ON DECEMBER 16TH, 2003, DIRECTING THAT A FIREWALL BE ESTABLISHED WITHIN THE U.S. ATTORNEY'S OFFICE.

Q.    IF YOU LOOK AT PAGE TWO OF THE ORDER -- WELL, FIRST OF ALL, WHAT DID YOU UNDERSTAND WAS THE FIREWALL PROCESS THAT WAS BEING SET UP BY THE COURT IN REGARD TO THAT DECEMBER 16TH

535

ORDER?

A.   THAT ANOTHER ATTORNEY OTHER THAN MYSELF OR JOEY BURBY, WE WERE THE PROSECUTORS ON THE CASE, WOULD BE APPOINTED TO INTERACT WITH THE DEFENSE TEAM, THAT IS, MR. LECROY'S ATTORNEYS, WITH REGARD TO THE GOVERNMENT HAD MOVED TO HAVE MR. LECROY EXAMINED, HAVE A PSYCHIATRIC EXAMINATION, AND THAT ANY CONTACT BETWEEN OUR OFFICE AND MR. LECROY'S COUNSEL WOULD BE THROUGH THE FIREWALLED ATTORNEY WHO WOULD HAVE THAT INTERACTION AND COMMUNICATION ON THE ISSUE OF MENTAL HEALTH OF MR. LECROY AND SPECIFICALLY THE PSYCHIATRIC EVALUATION OF MR. LECROY.

Q.   AND ONCE THIS FIREWALL WAS SET UP, WHAT DID YOU UNDERSTAND YOUR ABILITY TO FIND OUT INFORMATION ABOUT WHAT THE DEFENDANT INTENDED TO DO WITH RESPECT TO MENTAL HEALTH EVIDENCE AT THE TRIAL, EITHER DURING THE PENALTY PHASE OR THE -- EITHER THE GUILT/INNOCENCE PHASE OR THE PENALTY PHASE IF THERE WAS A PENALTY PHASE?

A.   I THINK THE ORDER PROVIDES THAT ANYTHING COMMUNICATED TO THE FIREWALLED ATTORNEY CANNOT BE SHARED WITH MYSELF OR MR. BURBY OR PEOPLE ASSISTING US IN THE PROSECUTION OF MR. LECROY.

Q.   AND DID YOU LEARN ANYTHING FROM EITHER A.U.S.A. PLUMMER OR A.U.S.A. BUCHANAN, THE FIREWALLED ATTORNEYS, THAT WOULD BE IN VIOLATION OF THIS ORDER?

A.   NO, SIR.

536

Q.   DID THEY DISCLOSE ANYTHING THAT THEY LEARNED FROM THE DEFENSE ABOUT THE DEFENSE'S INTENTIONS WITH RESPECT TO MENTAL HEALTH OR SEXUAL ABUSE EVIDENCE, DID THEY DISCLOSE ANY OF THAT EVIDENCE TO YOU DURING THE -- WELL, IN VIOLATION OF THIS ORDER?

A.   NO, SIR.

MR. MCKINNON:  THANK YOU.  THAT'S ALL THE QUESTIONS I HAVE.

THE COURT:  YOU MAY CROSS-EXAMINE.

MS. MICHAELS:  YES, YOUR HONOR.  COULD I HAVE JUST A MOMENT, PLEASE?

THE COURT:  YES.

(DISCUSSION OFF THE RECORD.)

MS. MICHAELS:  SORRY, WE'RE MISSING A DOCUMENT.

                    CROSS-EXAMINATION

BY MS. MICHAELS:

Q.   JUDGE VINEYARD, YOU DID LEARN THAT THE EXPERT RETAINED BY MS. BUCHANAN AND MR. PLUMMER WAS A DR. MEDLIN.

A.   THAT'S CORRECT.

Q.   AND WHEN DID YOU LEARN THE NAME OF THAT EXPERT?

MR. MCKINNON:  AGAIN, I OBJECT ON RELEVANCE GROUNDS. THIS IS NOT THE ALLEGATION THAT'S MADE IN THE PETITION.  THE COURT ACTUALLY ENTERED AN ORDER THAT AUTHORIZED THE TRIAL TEAM TO KNOW THE NAME OF THE GOVERNMENT'S EXPERT, AND THE ALLEGATION IS THAT THE GOVERNMENT LEARNED THROUGH A BREACH OF THE FIREWALL ABOUT THE THEORY THAT WAS BEING PRESENTED BY THE DEFENSE.  THIS

537

DOES NOT GO TO THAT ISSUE.

THE COURT:  AGAIN, I WILL OVERRULE THE OBJECTION AND ALLOW LIMITED QUESTIONING TO PURSUE WHAT IS THE ISSUE IN THE CASE.  BUT CERTAINLY THIS REGARDS COMMUNICATIONS BETWEEN COUNSEL, AND SO I'LL ALLOW LIMITED QUESTIONING.

YOU MAY PROCEED.

THE WITNESS:  IF I RECALL YOUR QUESTION, I DON'T RECALL PRECISELY WHEN WE LEARNED THE IDENTITY OF DR. MEDLIN; BUT IT WAS SOMETIME BEFORE SHE WAS RETAINED.

BY MS. MICHAELS:

Q.   AND WHEN YOU LEARNED HER NAME, YOU WERE ABLE TO AND DID CHECK ON HER CREDENTIALS AND SEE WHEN SHE HAD TESTIFIED IN OTHER HEARINGS?

A.   IF I DIDN'T, I BELIEVE MR. BURBY DID.  BUT SOMEONE ON THE PROSECUTION TEAM, I'M SURE, WOULD HAVE LOOKED AT HER CURRICULUM VITAE, AND I BELIEVE I MAY HAVE SEEN THAT, AS WELL.

Q.   AND YOU WOULD HAVE BEEN ABLE BY THAT TO DETERMINE WHATEVER OTHER HEARINGS OR TRIALS SHE HAD TESTIFIED IN; CORRECT?

A.   PROBABLY SO.  THAT'S OFTEN REFLECTED ON THE CURRICULUM VITAE.  I DON'T RECALL IN HER PARTICULAR CASE IF IT WAS.

Q.   DO YOU RECALL REVIEWING ANY TESTIMONY OF TRANSCRIPTS THAT SHE HAD PROVIDED IN PREVIOUS HEARINGS?

A.   I DID NOT.

Q.   OKAY.  NOW, AS PART OF YOUR PRACTICE WHEN YOU WERE ASSISTANT UNITED STATES ATTORNEY, YOU WOULD PROVIDE --

538

MS. MICHAELS:  IF I MAY APPROACH THE WITNESS, YOUR HONOR?

THE COURT:  YOU MAY.

BY MS. MICHAELS:

Q.   JUDGE VINEYARD, YOU WOULD HAVE PROVIDED DISCOVERY TO THE DEFENSE; CORRECT?

A.   YES.

Q.   AND I THINK YOU'VE ALREADY BEEN SHOWN PREVIOUSLY WHAT'S GOVERNMENT'S EXHIBIT 67 AND 69 AND, IN FACT, UNDERNEATH THAT ATTACHED THE ACTUAL DOCUMENT.

A.   YOU SHOWED ME TWO DIFFERENT DOCUMENTS.

Q.   YES, THESE -- FIRST OF ALL, 67 AND 69 WOULD BE THE LETTERS YOU WOULD SEND TO DEFENSE COUNSEL REGARDING DISCOVERY; CORRECT?

A.   CORRECT.

Q.   AND LETTERS YOU WOULD SEND REGARDING DISCOVERY WOULD BE TO MEMORIALIZE WHAT YOU HAD SENT THEM SORT OF AS PROOF TO SHOW THAT YOU ACTUALLY SENT THEM THE DISCOVERY; CORRECT?

A.   THAT'S CORRECT.

Q.   AND ALSO TO HAVE NUMBERS ON THE DISCOVERY THAT CORRESPONDED SO IF SOMEBODY CALLED YOU UP AN SAID PLEASE LOOK AT DOCUMENT 245, YOU KNOW EXACTLY WHAT THEY'RE TALKING ABOUT.

A.   AMONG OTHER REASONS, YES.

Q.   OKAY.  SO IN THOSE TWO LETTERS YOU ARE GIVING DISCOVERY BATES STAMPED WHATEVER TO THE DEFENSE; IS THAT CORRECT?

A.   THAT'S CORRECT.

539

(PAUSE IN THE PROCEEDINGS.)

MS. MICHAELS:  SORRY, YOUR HONOR.

IF I COULD APPROACH, YOUR HONOR?

THE COURT:  YOU MAY.

BY MS. MICHAELS:

Q.   IF YOU HAD RECEIVED THE PSYCHOLOGICAL RECORDS FROM F.C.I. BUTNER WHICH WOULD HAVE BEEN BATES STAMPED 1607 TO 1695, YOU WOULD NOT HAVE LEFT OUT ANY DOCUMENTS FROM THE PSYCHOLOGICAL RECORDS OF F.C.I. BUTNER, WOULD YOU?

A.   NO, I WOULDN'T THINK I WOULD HAVE ANY REASON TO.  WE PROVIDED WHATEVER WE HAD.

Q.   YOU WOULD HAVE PROVIDED THE WHOLE FILE TO THE DEFENSE.

A.   THAT'S CORRECT.

Q.   YOU WOULDN'T HOLD BACK A DOCUMENT.

A.   THAT'S CORRECT.

Q.   OKAY.  AND THE SAME THING FOR, I THINK YOU -- IN QUESTIONING BY MR. MCKINNON, YOU MAY HAVE OBTAINED, I THINK YOU SAID ONE OF THESE DOCUMENTS LOOKED LIKE THE FILE, ONE OF THESE OTHER FILES.  IF YOU HAD RECEIVED THE INMATE PSYCHOLOGICAL FILE OF MR. LECROY FROM THE GEORGIA DEPARTMENT OF CORRECTIONS, YOU WOULD HAVE TURNED OVER THE ENTIRE FILE TO THE DEFENSE.  YOU WOULD NOT HAVE LEFT ANYTHING OUT.

A.   THAT'S CORRECT.

Q.   OKAY.  NOW, DO YOU RECALL RETAINING OR USING A SERVICE AS A JURY CONSULTANT?

540

A.   YES.

Q.   AND THAT WAS THE FOCUS GROUP RAND -- TO PREPARE A FOCUS GROUP RAND, OR R AND D STRATEGIC SOLUTIONS?

A.   R AND D STRATEGIC SOLUTIONS IS THE JURY CONSULTANT WE RETAINED.

Q.   OKAY.  YOU WORKED WITH MR. BURBY ON THAT.

A.   I DID.

Q.   DO YOU RECALL THAT MR. BURBY PREPARED WHAT HE CALLED THE PRESENTATION OF THE DEFENSE CASE?

A.   THAT'S CORRECT.

Q.   AND I'M GOING TO SHOW YOU WHAT'S PREVIOUSLY MARKED AND ADMITTED AS GOVERNMENT'S EXHIBIT 110.  DOES THAT LOOK FAMILIAR TO YOU?

A.   IT DOES.

Q.   AND WOULD YOU HAVE ASSISTED MR. BURBY IN PREPARING WHAT YOU THOUGHT WAS MITIGATION FACTS TO THE FOCUS GROUP?

A.   I'M SURE WE WOULD HAVE DISCUSSED IT.  HE ACTUALLY PREPARED THE DEFENSE SIDE AND I PREPARED THE PROSECUTION SIDE.

Q.   AND DO YOU RECALL IN THIS PRESENTATION OF THE DEFENSE CASE, YOU OFFERED OUT THAT HE HAD BEEN SEXUALLY ASSAULTED BY OTHER INMATES ON NUMEROUS OCCASIONS?

A.   I DON'T RECALL THAT SPECIFICALLY.

Q.   ALL RIGHT.  OKAY.  IT'S AT THE BOTTOM OF THE FIRST PAGE.

A.   I SEE THAT.

Q.   DO YOU RECALL WHERE YOU WOULD HAVE LEARNED THAT

541

INFORMATION?

A.    IT WOULD HAVE BEEN IN THE RECORDS, I SUPPOSE, IF IT WERE SOMETHING IN THERE.  I DON'T RECALL THAT INFORMATION.

Q.    WHAT INFORMATION DO YOU RECALL REGARDING MR. LECROY AS MITIGATION?

A.    ABOUT WHAT SUBJECT?

Q.    WHAT YOU WOULD HAVE DEEMED MITIGATION REGARDING MR. LECROY THAT YOU WOULD HAVE HELPED MR. BURBY PREPARE DOCUMENT 110.

A.    I SUPPOSE THE CHILD ABUSE ALLEGATION, THE DIFFICULTY WITH HIS PARENTS.  WE PROBABLY PUT IN THERE SOMETHING ABOUT CORPORAL PUNISHMENT.  I DON'T RECALL.  I HAVEN'T REVIEWED THAT DOCUMENT.

Q.    AND THIS WOULD HAVE BEEN INFORMATION YOU LEARNED FROM THE FILES.

A.    OR FROM OUR INVESTIGATION, FROM INTERVIEWS WITH INDIVIDUALS.  IT WASN'T LIMITED TO SIMPLY REVIEWING THE FILES.

Q.    AND WHAT INDIVIDUALS DID YOU INTERVIEW THAT KNEW MR. LECROY?

A.    WELL, HIS FATHER, HIS BROTHER, HIS STEPMOTHER, AMONG OTHER FAMILY MEMBERS.

Q.    OKAY.  DO YOU RECALL WHETHER YOU ASKED MR. LECROY, SR., WHETHER MR. LECROY, JR., HAD EVER BEEN SEXUALLY ABUSED BY INMATES?

A.    I DON'T REMEMBER THAT.

Q.    YOU DON'T REMEMBER ASKING HIM THAT?

A.    I DON'T REMEMBER EITHER WAY.

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

542

MS. MICHAELS:  YOUR HONOR, IF I COULD APPROACH?

THE COURT:  YOU MAY.

MS. MICHAELS:  I GUESS THIS WOULD BE MARKED AS DEFENDANT'S EXHIBIT 18, I THINK, MAYBE?

THE COURT:  I'VE GOT YOU THROUGH 19.  IT WOULD BE 20. I SHOW YOU --

MS. MICHAELS:  OKAY.  IT WOULD BE DEFENDANT'S EXHIBIT 20.

(DISCUSSION OFF THE RECORD.)

BY MS. MICHAELS:

Q.   JUDGE VINEYARD, CAN YOU FIND ANYWHERE IN THERE WHERE YOU ASKED MR. LECROY, SR., ABOUT MR. LECROY, JR., BEING SEXUALLY ABUSED AS AN INMATE?

THE COURT:  IF IT'S IN THERE, IF YOU CAN POINT HIM TO IT.  I'M ASSUMING YOU'VE LOOKED AT IT.  IF YOU THINK IT'S IN THERE, IF YOU'LL POINT HIM TO IT, I THINK THAT WILL HELP US.

MS. MICHAELS:  OKAY.  IT'S NOT IN THERE.  I CAN CUT TO THE CHASE.

THE COURT:  OKAY.

MS. MICHAELS:  YOUR HONOR, I HAVE A COPY FOR THE COURT.

THE COURT:  ALL RIGHT.

MS. MICHAELS:  AND I OBTAINED THESE RECENTLY FROM THE GOVERNMENT.

BY MS. MICHAELS:

543

Q.   SAME QUESTION FOR CHADWICK LECROY, DO YOU RECALL ASKING HIM OR RECEIVING INFORMATION ABOUT MR. LECROY, JR., BEING SEXUALLY ABUSED AS AN INMATE OR SEXUALLY ASSAULTED BY OTHER INMATES?

A.   WITHOUT REVIEWING THE TRANSCRIPT, I DON'T RECALL.  I DON'T RECALL THE TESTIMONY.

MS. MICHAELS:  YOUR HONOR, I MOVE DEFENDANT'S EXHIBIT 20 IN.

THE COURT:  I WILL ADMIT IT UNDER SEAL.  I WOULD ORDER THAT IT BE FILED UNDER SEAL.

MS. MICHAELS:  THANK YOU, YOUR HONOR.

MR. MCKINNON:  I DON'T SEE THE RELEVANCE OF THIS. THE PETITION SAYS SEXUAL ABUSE, NOT WHETHER HE WAS ABUSED BY AN INMATE.  IT'S SEXUAL ABUSE AS A CHILD, NOT WHETHER HE WAS ABUSED BY INMATES WHILE HE WAS SERVING TIME.  I DON'T KNOW THE RELEVANCE OF THIS, AND IT'S OUTSIDE THE SCOPE OF WHAT WAS ALLEGED IN THE PETITION.

MS. MICHAELS:  YOUR HONOR, I COULD EX PARTE AT THE BENCH EXPLAIN TO YOU WHERE I'M GOING WITH THIS.

THE COURT:  I'LL LET YOU PROCEED FOR NOW.

MS. MICHAELS:  THANK YOU.

THE WITNESS:  IS THERE A QUESTION PENDING?

BY MS. MICHAELS:

Q.   YES, SIR.  DO YOU RECALL ASKING CHAD LECROY, MR. LECROY'S BROTHER, ABOUT WHETHER MR. LECROY, JR., HAD BEEN SEXUALLY

544

ASSAULTED BY OTHER INMATES ON NUMEROUS OCCASIONS?

A.   I THOUGHT I SAID WITHOUT READING THE TRANSCRIPT, I DON'T RECALL WHETHER I DID OR NOT ASK HIM THAT.

        MS. MICHAELS:  AND YOUR HONOR, IT WOULD BE THE SAME RESPONSE, IT'S NOT IN THERE.  THIS IS THE COURT'S COPY.

        THE COURT:  OKAY.

BY MS. MICHAELS:

Q.   AND THE SAME QUESTION WITH MR. LECROY, JR.'S, STEPMOTHER, TANYA LECROY, I'M GOING TO SHOW YOU WHAT'S MARKED AS DEFENDANT'S EXHIBIT 22.  IT'S THE SAME QUESTION.

A.   MY ANSWER WOULD BE THE SAME; WITHOUT REVIEWING IT, I DON'T RECALL WHETHER I ASKED HER OR NOT.  I THINK IT'S MORE DOUBTFUL WITH REGARD TO HER.

        MS. MICHAELS:  SAME THING, YOUR HONOR.  I WOULD MOVE INTO EVIDENCE DEFENDANT'S EXHIBIT 21 AND 22.

        THE COURT:  THE SAME PROVISIONS STATED PREVIOUSLY, UNDER SEAL.

        MS. MICHAELS:  YES, SIR, I UNDERSTAND.

        MR. MCKINNON:  YOUR HONOR, FOR THE RECORD, I HAVE THE SAME OBJECTION.  I DON'T SEE THE RELEVANCE.

        THE COURT:  AND THE COURT MAY WELL DETERMINE IT HAS NONE; BUT AT THIS POINT, I'M GOING TO ALLOW IT IN THE RECORD UNDER SEAL.

BY MS. MICHAELS:

Q.   NOW, IN THE PRESENTATION OF THE DEFENSE CASE YOU ASSISTED

545

MR. BURBY IN PREPARING, THERE'S A DISCUSSION OF A PSYCHIATRIST WHO REVIEWED THE CASE. AND HERE IT SAYS -- I THINK, IS THE GOVERNMENT'S 110 STILL UP THERE?

MR. MCKINNON: I THINK IT'S IN FRONT OF MR. GOSS.

BY MS. MICHAELS:

Q. BRINGING YOUR ATTENTION TO THE FOURTH PAGE FROM THE BACK.

(DISCUSSION OFF THE RECORD.)

YES, THE THIRD LINE FROM THE BOTTOM WHERE IT SAYS: A PSYCHIATRIST HAS REVIEWED BILL, JR.'S, CASE, BELIEVES THAT THE SEXUAL ABUSE HE SUFFERED AS A CHILD AT THE HANDS OF THE BABYSITTER. WHAT PSYCHIATRIST ARE YOU REFERENCING THAT REVIEWED BILL, JR.'S, CASE?

A. I DON'T KNOW THAT HE IS REFERENCING AN ACTUAL PSYCHIATRIST. THIS IS PRESENTED, WAS PREPARED TO BE PRESENTED TO A FOCUS GROUP IN ANTICIPATION OF WHAT EVIDENCE MIGHT BE PRESENTED. I DON'T BELIEVE IT'S REFERRING TO AN ACTUAL PSYCHIATRIST. MR. BURBY COULD BETTER ANSWER THAT QUESTION SINCE HE PREPARED THIS DOCUMENT, THOUGH.

Q. NOW, WHEN YOU WERE ASKING THE GRAND JURORS QUESTIONS, YOU WERE ASKING WITNESSES BEFORE THE GRAND JURY ABOUT MITIGATING CIRCUMSTANCES?

A. IN PART, YES.

Q. SO THE GRAND JURY HAD BEFORE IT MITIGATING CIRCUMSTANCES WHICH THEY COULD BALANCE AGAINST THE AGGRAVATING CIRCUMSTANCES IN DETERMINING WHETHER TO RETURN SPECIAL FINDINGS AS TO THE

546

DEATH PENALTY?

A.   THEY HAD WHATEVER EVIDENCE WAS BEFORE THEM TO CONSIDER IN REGARD TO THAT.

Q.   PRIOR TO THE JUDGE ISSUING THE FIREWALL ON DECEMBER 16TH OF 2003 WHICH WAS GOVERNMENT'S EXHIBIT 54, WHAT DID YOU KNOW ABOUT THE DEFENSE'S MENTAL HEALTH EXPERT?

A.   NOTHING.

Q.   DID YOU KNOW ANYTHING ABOUT THEIR MENTAL HEALTH DEFENSE?

A.   UNLESS THEY DISCLOSED IT TO ME IN DISCUSSIONS, I DON'T, I DON'T RECALL KNOWING ANYTHING ABOUT THEIR MENTAL HEALTH EXPERT OR THE DEFENSE.  THEY PROVIDED SOME SORT OF NOTICE TO US THAT WOULD HAVE PROMPTED US TO FILE THE MOTION TO SEEK A PSYCHIATRIC EVALUATION, SO WE WOULD HAVE KNOWN WHATEVER WAS IN THAT NOTICE. THEY PROVIDED A NOTICE OR BY LETTER.

        MS. MICHAELS:  COULD I HAVE JUST ONE MOMENT, PLEASE, YOUR HONOR?

        (PAUSE IN THE PROCEEDINGS.)

        MS. MICHAELS:  THAT'S ALL I HAVE.  THANK YOU.

        THANK YOU, JUDGE VINEYARD.

        THE COURT:  ANY REDIRECT?

        MR. MCKINNON:  NO, YOUR HONOR.

        THE COURT:  THANK YOU, SIR.  YOU MAY STEP DOWN.

        ANYTHING --

        MR. MCKINNON:  JUST A MINUTE, JUDGE.

        (DISCUSSION OFF THE RECORD.)

547

REDIRECT EXAMINATION

BY MR. MCKINNON:

Q.   I JUST HAVE ONE QUESTION ON REDIRECT, JUDGE VINEYARD.  YOU WERE ASKED ABOUT WHAT YOU TURNED OVER TO THE DEFENSE.  AND WHAT IS IT THAT YOU TURNED OVER TO THE DEFENSE AS DISCOVERY IN THIS CASE?  BASICALLY, DID YOU HAVE AN OPEN FILE DISCOVERY POLICY?

A.   YES, YES, I'M SORRY.  YES, WE HAD AN OPEN FILE DISCOVERY POLICY.  WE DID NOT WITHHOLD THINGS.  AND AS A MATTER OF FACT, I THINK WE TURNED OVER DOCUMENTS EVEN BEFORE THE CASE WAS INDICTED.  I HAVE SOME RECOLLECTION OF THAT.

Q.   SO IF YOU GOT IT FROM WHATEVER SOURCE, YOU PROVIDED A COPY TO THE DEFENSE.

A.   THAT'S CORRECT.

Q.   AND OBVIOUSLY, IF YOU DIDN'T HAVE IT, YOU COULDN'T PRODUCE IT TO THE DEFENSE.

A.   THAT'S RIGHT.

          MR. MCKINNON:  THANK YOU.  THAT'S ALL.

          THE COURT:  YOU ARE EXCUSED.  THANK YOU.

          ANY OTHER WITNESSES FROM THE GOVERNMENT?

          MR. MCKINNON:  THAT'S ALL WE HAVE, JUDGE.  THANK YOU.

          MR. MARTIN:  WE HAVE NO OTHER WITNESSES AT THIS TIME. BUT WE WOULD LIKE TO TENDER DEFENDANT'S EXHIBIT 7 WHICH IS A CERTIFIED COPY OF THE DEPARTMENT OF CORRECTIONS RECORDS REGARDING MR. LECROY THAT I'VE, ACTUALLY I'VE SHOWN THEM TO MR. MCKINNON.

548

THE COURT:  ANY OBJECTION?

MR. MCKINNON:  NO.

THE COURT:  IT'S ADMITTED.

MR. MARTIN:  I HAVE A COPY FOR THE COURT.

THE COURT:  THANK YOU.

MR. MARTIN:  JUST ONE SECOND.

(DISCUSSION OFF THE RECORD.)

MS. MICHAELS:  YOUR HONOR, THERE IS ONE ISSUE.
MR. MCKINNON HAS INDICATED TO ME (INAUDIBLE).

THE COURT REPORTER:  COULD YOU PLEASE COME TO THE
PODIUM?

MS. MICHAELS:  I'M SORRY.  MR. MCKINNON BROUGHT UP TO
ME THAT HE OBJECTED TO ANY DISCUSSION ABOUT A FIREWALL ISSUE
REGARDING THE BUREAU OF PRISONS RECORDS THAT MS. KEARNS
REFERENCED.  I WILL SAY THAT MY UNDERSTANDING IN THE FIREWALL
THAT WE REFERENCED IN THE PETITION WE BELIEVE WAS ALL IN ONE
THE SAME FIREWALL INVOLVED IN YOUR HONOR'S ORDER REGARDING THE
FIREWALL.  IT WASN'T UNTIL MS. KEARNS TESTIFIED THAT WE NOW
UNDERSTOOD THAT SHE WAS TALKING ABOUT TWO SEPARATE FIREWALLS.
AND WE WOULD EITHER ASK THAT WE BE ALLOWED TO AMEND THE
PETITION AND INCLUDE THE FIRST FIREWALL OR JUST ALLOW IT TO
CONTINUE AND ARGUE ABOUT THE FIRST FIREWALL VIOLATION IN
CONJUNCTION WITH THE SECOND FIREWALL VIOLATION.

AND WE ARE GOING TO BE OFFERING EVIDENCE ON THE FIRST
FIREWALL.  THAT WAS IN REFERENCE TO THE SEALED RECORDS I WASN'T

549

AWARE OF.

THE COURT:  RIGHT.  I WAS NOT AWARE OF THAT EITHER. I DON'T RECALL -- THAT WAS THE FIRST -- I MEAN, MAYBE IT HAPPENED BACK THEN AND I'VE FORGOTTEN ABOUT IT, BUT THIS WAS ALL NEWS TO ME ABOUT A FIREWALL IN OKLAHOMA OR COLORADO OR WHEREVER IT WAS.

MR. MCKINNON:  AND MY ONLY POINT IS THAT WE DON'T HAVE NOTICE OF THIS BEING AN ALLEGATION THAT THERE WAS SOME SORT OF VIOLATION, BECAUSE THE PETITION IS SPECIFIC TO THIS COURT'S FIREWALL ORDER AND THERE'S NO MENTION OF ANOTHER.

SO I THINK THEY HAVE TO AMEND THE PETITION, PUT THE GOVERNMENT ON NOTICE, AND THEN PROVIDE US WITH WHATEVER DISCOVERY.  BUT THAT WAS MY POINT WITH MS. MICHAELS IS WE DON'T KNOW WHAT WE'RE REBUTTING AND WE DON'T EVEN KNOW WHAT THE ORDER SAYS, THE DATE OF THE ORDER, AND WHAT RECORDS THEY ALLEGE WERE OBTAINED IN VIOLATION OF THE ORDER.

SO OUR WITNESSES ARE BEING ASKED, WHERE DID YOU GET THIS EVIDENCE OR THESE RECORDS FROM; BUT WE DIDN'T KNOW TO PREPARE THEM ABOUT GOING THROUGH THE DISCOVERY FILE AND SAYING, OKAY, WE GOT THIS FROM BUTNER, WE GOT THIS FROM EL RENO. REALLY, WE WERE BLINDSIDED BY THIS ISSUE, AND I THINK WE ARE ENTITLED TO NOTICE AS TO WHAT TO BE PREPARED FOR.

MS. MICHAELS:  THAT'S FINE, YOUR HONOR.  I MEAN, WE'RE IN THE SAME POSITION.  I MEAN, WE'RE NOT AWARE THERE WAS A SEPARATE ORDER.  AND THEN I WAS IN A DOUBLE BLIND POSITION OF

550

THE ENTIRE DOCKET, ALL THOSE ORDERS ARE UNDER SEAL AND WE'VE NOT BEEN ABLE TO REVIEW THEM. I ASSUMED THAT THAT FIREWALL ORDER WAS THERE, BUT I'M HEARING FROM THE COURT AND MR. MCKINNON NO.

THE COURT: NO, IT'S NOT. I WILL LET YOU -- I'LL ALLOW YOU TO -- WELL, I THINK WHAT YOU NEED TO DO IS MOVE TO AMEND THE 2255 TO ADD THIS COUNT.

MS. MICHAELS: YES, SIR. THANK YOU.

THE COURT: AND IT SEEMS THAT THE EVIDENCE AT LEAST ON THE ISSUES OF THE JURY AND THE -- WELL, AT LEAST -- WELL, THE FIREWALL I THOUGHT; BUT IF WE'VE GOT THIS OTHER POTENTIAL FIREWALL ISSUE, PERHAPS MAYBE THAT NEEDS TO BE FURTHER CLARIFIED AND THERE MAY BE ADDITIONAL EVIDENCE ABOUT THAT, BUT -- IF THE PETITION IS AMENDED.

BUT WHAT IS YOUR WISH -- IT SEEMS TO ME THE ONE ISSUE THAT IS RIPE FOR FURTHER BRIEFING BASED UPON THE EVIDENCE THAT'S BEEN RECEIVED WOULD BE THE JURY CHALLENGE ISSUE. DO YOU WANT TO GO AHEAD AND BRIEF, YOU KNOW, SUPPLEMENT THE BRIEF ON THAT OR DO YOU WANT TO WAIT AND DO IT ALL AT ONCE? I DON'T HAVE A STRONG FEELING --

MR. MARTIN: I WOULD ACTUALLY PREFER TO WAIT AND DO IT ALL AT ONCE, AFTER WE GOT THE TRANSCRIPTS AND EVERYTHING TOGETHER.

THE COURT: I'M ONLY GOING TO ISSUE ONE ORDER, SO I'M NOT GOING TO DECIDE IT UNTIL WE GET IT ALL IN.

551

MR. MARTIN:  I WOULD PREFER WE DO IT ALL AT ONE TIME.

THE COURT:  THAT'S FINE.  I WILL SET A BRIEFING SCHEDULE FOR THAT AFTER THE FEBRUARY HEARING.  I'LL HAVE MR. GOSS CONFER WITH COUNSEL.  I KNOW THERE WAS SOME DISCUSSION ABOUT WHETHER WE MIGHT COULD ADJUST THE DATE OF THAT HEARING. MR. GOSS WILL CONFER WITH COUNSEL TO SET THE DATE FOR THE FINAL HEARING AND TO TAKE UP, I GUESS, DR. LISAK AND DR. MEDLIN, TO TAKE THE EVIDENCE ON THEM; AND IF THERE IS EVIDENCE ON THIS OTHER FIREWALL, TO TAKE THAT UP, AS WELL.

MS. MICHAELS:  YOUR HONOR, THERE IS ALSO, AS I'VE ADVISED MR. MCKINNON, IT APPEARS MS. MILLER WAS CALLED AS A JUROR OR PICKED AS A JUROR, AND I BELIEVE WE WOULD BE CALLING HER IN FEBRUARY ALSO.  THAT'S THE INFORMATION I GAVE HER THIS MORNING.

THE COURT:  ALSO, WE WOULD THEN RECEIVE THE PROFFER FROM COUNSEL CONCERNING THE OTHER MITIGATING FACTORS.

MS. MICHAELS:  YES, SIR.

THE COURT:  ALL RIGHT.  IF THERE'S NOTHING ELSE THEN, WE WILL BE -- LET ME, BEFORE WE BREAK, LET ME JUST CONFIRM, MR. LECROY, HAVE YOU BEEN ABLE TO FOLLOW EVERYTHING VIA VIDEOCONFERENCE UP TO THIS POINT?

THE DEFENDANT:  YES, YOUR HONOR, I HAVE.

THE COURT:  AND HAVE YOU HAD YOUR -- BEEN ABLE TO HAVE YOUR CONSULTATIONS WITH COUNSEL AS YOU WOULD DESIRE?

THE DEFENDANT:  YES, YOUR HONOR, I HAVE.

552

THE COURT:  ALL RIGHT.  DO YOU HAVE ANY OBJECTIONS YOU WANT TO VOICE TO THE MANNER IN WHICH THE MATTER HAS BEEN CONDUCTED TO THIS POINT?

THE DEFENDANT:  NOT AT THIS TIME, YOUR HONOR.

THE COURT:  ALL RIGHT.  WE WILL THEN RECESS THIS HEARING UNTIL IT IS SCHEDULED FOR CONTINUATION AT SUCH TIME AS MR. GOSS MAY ESTABLISH WITH CONSULTATION.

(DISCUSSION OFF THE RECORD.)

THE COURT:  OKAY.  FEBRUARY 8TH AT 10:00 O'CLOCK. APPARENTLY HE'S ALREADY TALKED WITH YOU.

MR. MARTIN:  I THINK WE'LL BE READY THEN.  OUR WITNESS IS READY THEN.  MR. MCKINNON SAID HE MIGHT HAVE A POTENTIAL PROBLEM, BUT WE WON'T KNOW UNTIL LATER.

THE COURT:  ALL RIGHT.  WELL, BE IN TOUCH WITH MR. GOSS IF THERE ARE ISSUES THAT NEED TO BE RESOLVED.  I WILL ASSUME IT'S FEBRUARY 8TH AT 10:00 UNLESS THERE'S CONSULTATION AND WE NEED TO MOVE IT.

ALL RIGHT.  WE ARE IN RECESS.  THANK YOU.

(PROCEEDINGS ADJOURNED.)

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

* * *

REPORTER'S CERTIFICATION

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
SHARON D. UPCHURCH, RPR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

DATE: _____