553

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION


UNITED STATES OF AMERICA,      )
                               )
                               )
    -VS-                        ) DOCKET NO. 2:02-CR-038-RWS
                               ) VOLUME IV
WILLIAM EMMETT LECROY, JR.,     )
                               )
    DEFENDANT.                  )


TRANSCRIPT OF CONTINUATION OF EVIDENTIARY PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. STORY
UNITED STATES DISTRICT COURT JUDGE
MONDAY, FEBRUARY 8, 2010


APPEARANCES:

ON BEHALF OF THE GOVERNMENT:

    WILLIAM L MCKINNON, JR., ESQ.
    MARY JANE STEWART, ESQ.
    ASSISTANT UNITED STATES ATTORNEYS

ON BEHALF OF THE DEFENDANT:

    JOHN R. MARTIN, ESQ.
    SANDRA L MICHAELS, ESQ.


ELISE SMITH EVANS, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
ATLANTA, GEORGIA

554

INDEX

WITNESS ON BEHALF OF THE DEFENDANT:

DAVID LISAK, PH.D.
  Direct Examination by Mr. Martin              556
  Cross Examination by Mr. McKinnon             607
  Redirect Examination by Mr. Martin            653


WITNESS ON BEHALF OF THE GOVERNMENT:

JULIE C. MEDLIN, PH.D.
  Direct Examination by Mr. McKinnon            665
  Cross Examination by Mr. Martin               696
  Redirect Examination by Mr. McKinnon          723

555

(Monday, February 8, 2010; Atlanta, Georgia.)

THE COURT:  Be seated.

All right.  I believe we are ready to proceed.  Before we proceed with the first witness, Mr. Lecroy, let me just make sure you are able to hear us satisfactorily; is that correct?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And you are still in agreement that we proceed in this fashion whereby you participate by videoconference, but will have the opportunity for contact with your counsel?  You are satisfied and all right with this process?

THE DEFENDANT:  Yes, Your Honor, I am.

THE COURT:  All right.  You want to swear the witness?

DAVID LISAK, PH.D.,

having been duly sworn, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK:  If you would state your name, please.

THE WITNESS:  My name is David Lisak.

THE COURTROOM DEPUTY CLERK:  Thank you.

MR. MARTIN:  Dr. Lisak, pull that mic right in front of you so you can speak right into.

Your Honor, for the Court's information, Mr. McKinnon and I have agreed that Dr. Medlin, who's in the courtroom, will be able to sit during Dr. Lisak's testimony.  And when she testifies, vice versa.

THE COURT:  Very well.  Thank you.

ELISE SMITH EVANS, RMR, CRR

556

DIRECT EXAMINATION

BY MR. MARTIN:

Q.   Dr. Lisak, please tell the Court and the court reporter your full name.

A.   My name is David Lisak.  That's spelled L-i-s-a-k.

Q.   And what is your profession, sir?

A.   I'm a clinical psychologist, Associate Professor of Psychology at the University of Massachusetts in Boston.

Q.   And how long have you been a Professor of Psychology at the University of Massachusetts in Boston?

A.   For 20 years.

Q.   Tell the Court briefly your educational background.

A.   I got a Bachelor's degree from the University of Virginia, and a Master's and Ph.D. in clinical psychology from Duke University.

Q.   Okay.  And after you got your Ph.D. from Duke University, tell us a little bit about your teaching career and your professional career.

A.   Well, I taught for a year at Duke immediately after I got my Ph.D., and then I went to UMASS Boston in 1990 and have been teaching there since.

Q.   And do you have any particular area of specialty in your studies and research?

A.   I've been researching both the causes and the consequences of violence.  I've been studying men who perpetrate violence, rape,

557

and murder and also studying the victims of violence, mostly men who were abused as kids, as children.

Q.   And has child sexual abuse been the primary focus of your --

A.   It's been one of the primary focuses, yes.

Q.   Have you written any key publications in this area?

A.   I've written about two to three dozen.  I don't remember how many, but -- in the area of violence and trauma --

Q.   Okay.

A.   -- and child abuse.

Q.   And has -- have you done, conducted independent research in this area?

A.   Yes, I have.

Q.   Have you also in your clinical practice and also in your research talked to numbers of people who are victims of sexual abuse?

A.   Yes.  Over the years in research and clinical and forensic context, I've evaluated and interviewed hundreds of men who were abused as children, whether sexually, physically, both, psychologically, neglected.

Q.   Okay.  In -- in your professional career -- well, first of all, do you teach at the University of Massachusetts at Boston?

A.   Yes, I teach.  And primarily I teach courses on psychological trauma to graduate and undergraduate students.

Q.   Okay.  And do you also do consulting work with law enforcement, defense lawyers, and so forth in this area of child

abuse or violence, so forth?

A.   Yes.  I do -- I'm on the faculty of the National Judicial Education Program.  We do educational programs for judges around the country on -- they're primarily on non-stranger sexual violence.  I've been on the faculty of American Prosecutor Research Institute and do a lot of trainings with prosecutors around the country and also with law enforcement.  And that's in the area usually of non-stranger violence, non-stranger rape.  And, then, I also consult on specific cases, as I am here today, and also consult with law enforcement and prosecutors, and that would be primarily in rape cases.

Q.   And in your practice as consulting with lawyers in cases like this, have you been consulted with regards to doing evaluations of individuals who have been sex offenders or who have been subject to childhood sex abuse?

A.   Yes, frequently.

Q.   How many times have you -- do you believe you've been qualified to testify as an expert in those areas?

A.   Well, I've -- I've testified in sort of live testimony more than 20 times and then given written testimony more than 50 times.

Q.   Okay.  Showing you what's been previously marked or admitted in evidence as Government's Exhibit 58, attached to which is a CV, is that your CV as of the date of the report, which is January of 2004?

A.  Yes, this looks like it.  Yeah.

Q.  And does that have a list of a number of the publications and so forth that you authored or co-authored in this area and other areas?

A.  Yes.  It has publications, conference presentations, and so forth.

Q.  And that would have been a CV that would have been your applicable CV at the time if you had testified in this case in 2004, sir?

A.  That's right.

Q.  Dr. Lisak, were you contacted by lawyers for Mr. William Lecroy, Jr., in connection with this case to consult?

A.  Yes, I was.

Q.  Do you remember who contacted you?

A.  I'm pretty sure it was Brian Mendelsohn.  I know I spoke with at least one other attorney in the office, but I'm pretty sure it was Brian Mendelsohn who contacted me initially.

Q.  And what did Mr. Mendelsohn ask you to do for them?

A.  Well, initially it was a phone conference.  And I frankly can't remember, you know, the specifics or the details of the phone conversation, other than I know he gave me a -- an overview of the case or at least the aspects of the case that he wanted my -- my input on.  And there was a -- a presumption or whatever that I would evaluate Mr. Lecroy, because I -- and, actually, I don't remember that specifically.  But I know he sent me a letter

following up on this phone call in which he mentioned that --
that he would be requesting me to evaluate Mr. Lecroy.

Q.   Did you expect at that time that you would actually
personally examine Mr. Lecroy?

A.   Yes, because that's the typical -- when I'm asked to -- to
provide input on a case like this, it's almost always to review
records, to evaluate the defendant, and then to explain to the
attorneys what I've discovered.

Q.   Is the personal examination of the individual a critical part
of the evaluation process?

A.   Yes.

Q.   Okay.  First of all, you said you were also asked to review
documents.  Do you remember what, if any, documents you were
provided?

A.   Well, I can remember the general categories.  There were --
there was a very kind of rough chronology or social history
chronology.  There were police reports.  There were prison
records.  There was some records of treatment records from the --
the Federal Bureau of Prisons.  I believe there was some school
records and I believe some medical records and Georgia Department
of Correction records.

Q.   Did those records -- what, if anything, did those records
indicate with regards to whether or not Mr. Lecroy had been the
victim of childhood sexual abuse?

A.   Well, there were two mentions in the records.  There was a --

ELISE SMITH EVANS, RMR, CRR

let's see.  It was 1992 from one of the treatment records.  There was just -- it was just a reference to the fact that he had told like -- and I can't remember the name of the clinician -- that he had been sexually abused.  And I think in that case he may have mentioned that he was 8 years old and it was by a babysitter.  I don't remember if that was -- those specifics were in there.

And then in 1999, there was a somewhat more extensive reference in the records in his treatment -- actually, two different clinicians, Dr. Carlson who treated him individually for a while, and I think it was a substance abuse clinician who also had referenced in her records that he'd been sexually abused.

Q.  Are those types of documentary evidence of statements about sexual abuse something that you rely upon in your profession?

A.  It's one of the -- one of the factors that I would -- I would weigh and also look for additional information on the -- if there's that level of detail on the specifics of the abuse.

Q.  All right.  Would you also want to go ahead and talk to the defendant himself about these subjects?

A.  Yes, of course.

Q.  What -- what does that add to the -- to the -- to the examination or the evaluation, the actual personal contact with the defendant and his discussions with you about it?

A.  Well, I mean, in this case what the records indicated is that he had disclosed that he'd been sexually abused on two occasions.

And that's good.  It's interesting.  It confirms that he has made this disclosure previously, but it provides in this case virtually no details about the nature of the abuse, the extent of the abuse, the impact of the abuse, what it meant to him. There's virtually nothing there, other than simply that he was. So the evaluation of the defendant is where I would hope to get all those details, all that information.

Q.  Would the evaluation offer you any insights into whether or not it was a truthful claim of sexual abuse?

A.  It can.  Certainly -- I'm not a mind reader, and nobody is, but after doing these kinds of evaluations for about 25 years, you know, there are certain things that would certainly be red flags if they appeared that might make me wonder whether this was truthful.  And on the other side, there are certain things that you hear that would make it very, very unlikely that somebody was fabricating if you heard it.

Q.  Okay.  Now, after you reviewed the documents, were you ever allowed to actually personally examine Mr. Lecroy --

A.  No --

Q.  -- back then?

A.  -- I never did.

Q.  When I say back then, back in 2003 and 2004.

A.  Right.

Q.  Now, did you further consult with Mr. Mendelsohn about what you might be able to add as a witness if you were called as a

ELISE SMITH EVANS, RMR, CRR

witness in the prosecution of the case?

A.   Well, again, I don't have any sort of detailed recollections of the sequence of the conversation or discussion or when it happened, really, other than I do recall that at some point they let me know that they decided that I would not evaluate Mr. Lecroy.  And then there was either discussion or they asked me could I provide sort of in -- a general educational testimony about the impact of -- you know, what the research says about the impact of childhood sexual abuse.  And I told them that I could.

         And he asked me to sort of write up something, which I did, sort of a -- it was an outline.

Q.   Showing you again Government's Exhibit 58.  Have you had an opportunity recently to review this document, which is a letter from Mr. Mendelsohn describing your possible testimony?

A.   Yes.

Q.   Is that an accurate summary of the types of testimony that you would have been able to provide at the time of trial?

A.   Yes.

Q.   Does the language in that look familiar to you?

A.   Yes.  I think he -- you know, as I said, I provided him with an outline, and I think he just incorporated that into this letter.

Q.   Can you tell the Court generally what it was you could have said back then as a witness in the case?

A.   Well, that the -- generally -- I mean, I teach about this

fairly frequently, so I have a kind of a way of categorizing the -- the possible impact.  And I say possible because, you know, everybody who's sexually abused does not have the same -- doesn't have the same impact.

So, I would have described the psychological impact, and that involves the emotional states that many sexually abused children have to contend with and what those very intense emotions like helplessness and -- you know, states of helplessness and powerlessness and rage and fear and so forth, what those kinds of emotions feel like and how they can evolve over time.

And, then, especially in the case of men, the -- there is very, very commonly a lot of confusion about the sexual abuse and what it means about their -- their identity both as men and also their sexual identity.  And, then -- all this is -- by the way, this is all based on research.  There's a fair amount of research that has been done, even specifically on male survivors of sexual abuse.

And, then, also I would have talked about the -- the sort of gamut of the most common psychiatric legacies that we have noted in the research.  And generally those that -- the two main ones there are symptoms of depression that let go -- you know, extend all the way to major depressive episodes, and then symptoms in the sort of spectrum of anxiety disorders that may sometimes be PTSD, but could as likely be other forms of

ELISE SMITH EVANS, RMR, CRR

anxiety -- symptoms or anxiety disorders.

And, then, there are functional consequences of childhood abuse and childhood sexual abuse that affect a person's -- oftentimes, their ability to function in school academically, that radiate out from there into their ability to function in work environments. And so there's been research -- I've done a little research on this myself -- on the long-term impact on their relationship histories, their school performance and job histories. And you see the effects of the sexual abuse, along with other forms of abuse, on those areas of functioning.

And, then, I think I also talked with Mr. Mendelsohn about the -- the neurobiological effects of trauma. And there is an -- increasing in 2003 and 2004, there was already a lot of research and a lot more advanced understanding than we'd ever had about the impact of child abuse on the developing brain. And, so, I was prepared to sort of talk generally about that.

Q.  Now, and you say impact on the developing brain. What -- what type of damage or consequences can there be to the -- neurologically from childhood abuse?

A.  Well, there are two -- there are many different areas. The two main areas, I think, certainly back then that I would have focused on are children who grow up in environments where they're surrounded by a threat. And this would be primarily -- it could be sexual abuse, could be physical abuse, and also domestic violence in the home. So, children -- the human brain is

designed to -- it's a survival instrument, and it is designed to alert a person to cues of danger.

And, so, if a child is growing up in a home where, for example, there's a violent adult and that child is going to learn what are the very, very subtle signs of changes in facial expression, changes in vocal tone that indicate that this violent individual is about to become violent. And what's actually happening is that the child's brain is adapting to this -- excuse me, to this circumstance.

And over time, when the danger is chronic, the child's brain really becomes hypervigilant. And what it means is it becomes hyperreactive to these very subtle cues and hyperalert to them. And this has physiological consequences, because what's happening is that the brain alerts the body and the body then becomes -- as that adrenalin response to these cues. And when that happens repeatedly, there's the secondary area that there's been -- and there was a fair amount of research back then already -- that the neurochemicals and hormones that are released in these extreme stress situations, these adrenalin reactions, can be quite damaging to specific parts of the brain.

And there was already in 2003 and '4 a lot of attention being paid particularly to the hippocampus, which is the part of the brain that is integrally involved in memory, memory formation. And we had had many years already of clinical studies that have showed that people with extensive trauma histories have

ELISE SMITH EVANS, RMR, CRR

567

a whole sort of gamut of memory problems, just memory deficits. And so there was a convergence already of biological research which was beginning to show us the possible mechanism for these clinical findings that we've been finding.

So that's sort of the -- the particular areas that I was prepared to talk about.

Q.   Among the psychological consequences are shame -- can you -- expand a little bit on that.

A.   Yes.   Shame and humiliation and especially -- I don't know if I can say especially.   There's -- for men in particular, the experience of sexual abuse is very often one of the most intensely humiliating and shameful experiences that can be experienced.   And it's one of the reasons that it's widely understood that male victims of sexual abuse are much less likely to disclose the abuse, both as children and also later on as either adolescents or adults.

And it's also why the -- the abuse experiences tend to -- it's almost like -- they fester in this kind of whirlpool of shame and humiliation.   And because there's no disclosure, the child or the adolescent now, or even the adult, never talks to anybody, never gets any kind of external input.   And very often men go through their entire lives with very, very distorted understanding of what happened to them or what the meaning of it was.

A very common one, as I mentioned, is a -- a kind of a

panic that this -- it means that they're homosexuals because -- and this is true for men who were abused both by men and women. And so the shame and humiliation is -- is -- and how it ties into the -- their -- their sense of themselves as men is one of the most difficult legacies that male victims have to contend with.

Q.   If there was evidence in this case of physical abuse, parental abuse, by the defendant's father, how does that play in with sexual abuse?  Do you understand my question?

A.   Well, there's -- again, there's very solid research that children who are exposed to multiple forms of abuse are at higher risk for just a whole variety of bad outcomes then children who are exposed to only a single form of abuse.  And the -- so, to the extent that in Mr. Lecroy's case there is both sexual abuse and physical abuse, or -- and I would add in there exposure to violence in the home, so usually domestic violence, that, you know, the combination of these different forms of abuse really create an additive effect.

        And we see this in outcomes that -- and I've done this myself in my own research that when you look at children exposed to only a single form of the abuse, you see a certain -- a certain risk for negative outcomes, and whether that's violence or psychiatric outcomes or psychological outcomes.  And when you add in a second or a third abuse experience or factor, you get substantially elevated risks.

Q.   And among the risks that you're talking about, what type of

risk is there for violent behavior as an adult to someone who has suffered from sexual abuse in combination with these other types of abuse that you talked about?

A.   Well, it's -- again, it is -- I can only express it in the form of risk factor or sort of how it impacts their risk of perpetrating some kind of violence.  So if -- men who are abused, whether sexually or physically, most men who are abused do not commit any kind of act of violence.  But men who are abused are substantially more likely to commit an act of violence than men who are not abused.  So there is a risk factor that is introduced when you're abused.

When you're multiply abused, that risk factor goes up substantially.  So, off the top of my head, I can remember one study that I did in which the -- the risk of some form of violence -- and we assessed a number of different forms of interpersonal violence -- was somewhere in the neighborhood of 30 something percent for men who are either -- I think it was either physically or sexually abused.  The men who were both physically and sexually abused, that went up to about 48 or 49 percent who committed some act of violence later in their life.

Q.   With regard to the homosexual confusion that you talked about, if there was evidence in this case that the father was homophobic, made homophobic remarks all the time, and an uncle would -- they would make jokes and disparage another uncle who was gay, how would that play into the impact of that sexual

abuse?

A.   Well, I can answer that in a hypothetical or I can answer it specifically, because I did --

Q.   Okay.  Why don't you answer hypothetically --

A.   Okay.

Q.   -- and then we'll go to specifics later.

A.   Okay.  Well, certainly, it would increase the likelihood that the individual who was the -- the child that was abused, if they are exposed in their family environment to those kinds of attitudes, remarks and so forth, that it could very much intensify their sort of anxiety about -- you know, if the abuse has introduced in them this confusion in the sense that this -- maybe this means I'm homosexual, and at the same time they're hearing these kind of remarks about homosexuality, then that would certainly intensify this conflict.

Q.   Okay.  I'm talking about, now, just evidence that would have not come from Mr. Lecroy.  If at the time of trial you were aware that there was evidence of Mr. Lecroy inappropriately dealing as an adolescent with sexuality after the sexual abuse, groping other young females, inappropriate sexual behavior, how would that have played in your assessment of whether or not he'd been sexually abused?

A.   That's difficult to say.  I'd have to --

Q.   Okay.

A.   You know, I'd have to really see the specifics of what was in

the record, so --

Q.   Okay.  We'll come back to that later.

I'm trying to sort of divert from what you would testify after seeing him and what you would have testified before seeing him.

A.   Okay.

Q.   And maybe we'll clarify that later.

The testimony that you've just given about the impact of sexual abuse and combined especially with physical abuse, would you have been available to give that testimony at the time of Mr. Lecroy's trial back in 2004?

A.   Yes.

Q.   And would your testimony have been supported by all the research you've just described?

A.   Yes.

Q.   Were you ever called to testify?

A.   No, I wasn't.

Q.   Do you know why?

A.   No.  I don't -- I may have had a -- I don't remember whether I had a phone call before the trial.  I must have.  But I don't recall the specifics of what -- you know, other than, you know, they'd decided that they were not going to need me, because at that point it was clear that I wasn't going to evaluate Mr. Lecroy.  The only thing that was still possible, my recollection, was that I might be called to testify in the sort of general

ELISE SMITH EVANS, RMR, CRR

572

educational way.  And, then, at some point they told me that they wouldn't be needing that.

Q.  Okay.  Now, have you -- were you later contacted by me regarding this case?

A.  Yes.

Q.  Okay.  And do you recall approximately when that was?

A.  In 2008, I think, maybe.

Q.  And did I -- what did I ask you to do?

A.  Well, you -- I think it was our first phone call that you said that you would like me to evaluate Mr. Lecroy.

Q.  Okay.  Did you have an opportunity, actually, to personally examine Mr. Lecroy?

A.  Yes, I did.

Q.  Where did that occur?

A.  At the -- the Federal Correctional Institute at Terre Haute.

Q.  Was the surroundings suitable for a private, confidential interview?

A.  Yes, it was.

Q.  Did it appear to be a room --

A.  I think it was that same room, yes.

Q.  Similar to the room that Mr. Lecroy is sitting in right now, a private room with a desk between you?

A.  That's correct.

Q.  Was that a suitable location to do a professional evaluation?

A.  Yes.

ELISE SMITH EVANS, RMR, CRR

573

Q.   Did they give you any time constraints that kept you from completing your evaluation?

A.   No.   They were very accommodating, actually.

Q.   Okay.   And were you able to bring in any materials, anything else you needed to do the evaluation?

A.   Yes.

Q.   And did -- how many days were you there?

A.   I was there for two days, January 13th and 14th, 2009.

Q.   All right.   Tell us about your evaluation, your examination of Mr. Lecroy those two days.

A.   Well, I asked Mr. Lecroy to -- focusing on this -- the issue of sexual abuse --

Q.   And by the way, this was just the two of you together in the room; there wasn't people watching and so forth?

A.   That's correct.   No, we were alone.

Q.   Go ahead.

A.   I asked him, I think, initially some general questions -- actually, when I evaluate sexual abuse, I don't ask a question like were you ever sexually abused.   What I do is take a very, very complete sexual history.   And what I essentially introduce this as is that I want to know everything that has really ever happened to them of a sexual nature as far back as they can remember.   And I -- and I mention and I say that, you know, and this could be -- mean, you know, particular kinds of sex acts.   I mean, any kind of sexual experience that you've had.

ELISE SMITH EVANS, RMR, CRR

And, you know, it's typically fairly overwhelming for somebody initially to hear that.  So, you know, we start, and we go chronologically.  And the reason for that is it's -- people who do evaluations of really any survivor of sexual abuse, and it's particularly important for men, we're very much aware that it's actually quite typical for men not to perceive a sexual abuse experience as being sexual abuse.

So to ask somebody were you ever sexually abused, very often you'll get a no.  And that may be because they're not simply prepared to talk about it to you because of that shame and humiliation and those factors.  But it also can be because that's not how they have it encoded.  They don't have -- they don't think of it as abuse.  And it's often the case, especially when the abuser was female.  So many men think of this as simply a first sexual experience, and they can be quite unaware of the kind of impact that an experience like that can have.

So you have to be very careful never to ask about, you know, experiences of being sexually assaulted or sexually abused or molested, any of those kinds of key words that, you know, refer to sort of that kind of situation.  And so I just ask for any kind of sexual experience.

And it usually takes several follow-up questions to get them to really understand that I mean anything.  And then we start going through it chronologically.  And then I'll ask all kinds of follow-up questions about every episode or incident that

ELISE SMITH EVANS, RMR, CRR

575

they -- that they recall until I feel like I have all the details that they can recall and remember about each incident. So that's what I did with Mr. Lecroy.

Q. What do you recall Mr. Lecroy telling you?

A. Well, the -- he -- if I remember correctly, there were -- no, I think the first sexual experience that he could recall was the incident when he was 8 years old. There were two incidents with this babysitter that he nicknamed Tinkerbell. I don't know whether that was the name that they called her then or this is subsequently. But -- and he -- he remembered this -- these two episodes as occurring quite close together. In fact, he thought that this babysitter came and baby-sat for him and his brother because it was right around the time of his parents' anniversary, one of their anniversaries, and that they were going out to celebrate. And they went out twice to celebrate this anniversary. And whether it was a couple days apart or -- he didn't remember it, but that was how he remembered it.

And he described the first incident, his parents left and the babysitter was sitting on -- I believe it was a sofa, and she was talking on the phone. And he and his brother were kind of excited about it was the first time she'd ever baby-sat for them. This was a woman who he remembered as being 18 or 19, lived upstairs in this apartment complex, and they were kind of excited about it. And they started sort of playing these games while she was talking on the phone, essentially kind of bothering

ELISE SMITH EVANS, RMR, CRR

her.  And he would -- Mr. Lecroy would kind of lean over, sort of steal a kiss, like kiss her on the cheek or try to kiss her on the cheek, things like that.  Sort of two boys kind of playing these kind of antics.

She -- he then remembered her -- getting off the phone, you know, sort of ending the phone call, and either being irritated with him or just playing like she was irritated with him.  But he remembers her telling them that it was time for bed and that they had to go to their bedrooms.

And then he remembers her coming into his bedroom and saying something to the effect of, well, if you're going to kiss a girl, you have to know -- you have to learn how to do it, something to that effect, and proceeding then to -- he described it as teaching him how to French kiss, meaning -- I asked him what does that mean -- with open mouths and tongues.  And she then proceeded -- she did this for a while, and -- I don't remember the exact sequence, but she then removed his shirt and started caressing him on his chest, removed her blouse, and took his hand and basically guided him, put his hand on her breasts and essentially was -- I think he used the word teaching, teaching him what to do and how to do this.

And this went on for some amount of time.  She then started to pull down his -- his pants.  I don't remember whether he specified whether he was wearing pajamas or not.  And he remembers trying to stop her because he felt weird, felt

ELISE SMITH EVANS, RMR, CRR

uncomfortable about that.  But she kind of persisted.  And then he either let her or she just pulled his pants down.  And -- I can't recall whether he said he -- she fondled him, but shortly thereafter she performed fellatio on him.  I believe -- I don't have my notes with me.  I believe that was the -- essentially the extent of the abuse that occurred on this first incident.

This went on for some period of time.  She then pulled his pants back up, I think, and then put him in bed.  He remembers she left the room and he was so -- sort of combination of worked up, to some extent aroused, but also very, very confused.  He used the word "weird" a number of times as he was remembering how it felt.  And he remembers staring up at the ceiling for a long time after she left the room.

The second incident occurred, again, some short number of days afterwards.  And if I remember correctly, this time she brought a girlfriend over.  She came into his bedroom and -- in this incident, and I -- I can't remember, again, the exact sequence.  But the sexual activity extended this time to -- I might be getting the two incidents confused here.  But he -- she -- again, there was a lot of fondling of her breasts.  This time -- I think it was this time, she also had him suck on her nipples.  She then inserted a finger into his anus and took his finger and inserted it into her vagina.

That's -- that's -- those are the salient aspect of the second incident that I remember.  He also then remembers that

ELISE SMITH EVANS, RMR, CRR

578

when this incident was over, she took him into the bathroom to wash him up, clean him up afterwards.

Q.   Do you have your summary report that you recently wrote?

A.   Yes.  Thank you.

Q.   Why don't -- if that would help you refer to -- refresh your recollection as to any specific details --

A.   Yeah.

Q.   -- of that second incident.

A.   (Witness reviewing document.)

Oh.  The other thing that occurred in this incident is that she -- what he remembers is -- what he described to me was she kind of had her -- pushed his genitals into her genitals. And he doesn't -- you know, I think I asked him was there actual penetration, and my recollection is he didn't know -- he didn't remember.  He couldn't remember.  Just remembers that there was this contact.

The other thing is that he -- she then at one point during the second incident took his head in her hands and pushed his head into her genital area and essentially moved his head around like this to get him to essentially stimulate her.

Q.   Aside from all the specific little details of this, but the general nature of the two events of a 8 year old by a older babysitter, would that be childhood sexual abuse?

A.   Oh, yes.

Q.   Okay.  The -- after he has told you that, did you have

further discussions with him about -- about this incident and its impact on him?

A.   Yes.  I -- I simply asked him -- I think I might have asked him questions about, you know, subsequent days, what -- if he had any further contact with this babysitter.  And he actually -- he did, or at least -- I think it was the next day after the second incident, he was -- he was all stirred up by what had happened, and he recalled he was -- he went up the stairs towards where her apartment was.  And as he was going up the stairs, the babysitter was coming down the stairs arm-in-arm with what he said he now guesses must have been her boyfriend.  And he sees them suddenly, and she looks at him and sort of smiled at him and then just walked past him.

And he described how he was -- well, I don't want to say devastated.  I mean, he was very confused by this, but felt betrayed, felt -- because clearly what he was trying to describe to me was he felt like this incident that had occurred was some, you know -- for him it was this major thing, and he felt there must be some significant now attachment or relationship with this babysitter.  And it was like she was just blowing him off, just, you know, walking past him dismissively.

And that was a very -- it's a very telling and it was very consistent with how a child will be very, very confused by a sexual abuse experience is one of the reasons, of course, why we -- it's against the law.  Children aren't prepared to engage

in adult sexual behavior, and this is one of the reasons why. They are overwhelmed by the experience, and it is -- it leaves them completely unable to understand what happened and confused by it.  And that little incident was sort of a little microcosm of that.

There were then other incidents that -- in the -- in the days and maybe weeks following which were similar.  He described -- there was a -- I think it was a girl in the neighborhood that he frequently played with, maybe from -- they may have gone to the same school, and he went up to this girl and just on impulse kissed her and tried to do what Tinkerbell had done with him, meaning tried to French kiss her.  And he said that, you know, he thought, well, the girl would just really like this and -- you know, because it had been, you know, what Tinkerbell had taught him to do.  But the girl screamed and ran and told her mother, and the mother told his father.  And he got beaten by his father because of it.

And there were -- I think I put this in my report. There were one or two other incidents like that where he was exhibiting what I think clinicians and, actually, teachers who are trained in this would recognize as either called precocious sexual behavior or reactive sexual aggression or sexual behavior, acting out with other kids his age some of the things that the babysitter had done to him and gotten in a fair amount of trouble because of it.

581

Q.   So that pattern that you saw, as he described, was consistent with what the research tells us about sexual abuse?

A.   Yes.   Not just the research, but a pretty vast -- well, literature, knowledge base, a clinical knowledge base about the impact of sexual abuse on children.

Q.   As you continued to talk to Mr. Lecroy, did you talk about any long-term symptoms or consequences of this sexual abuse?

A.   Yes.   There were a couple in particular.   And this now gets to the specifics of the sort of more hypothetical question you were asking about homosexuality earlier.

Q.   Right.

A.   As he -- you know, he recalled that as he got older, and he couldn't remember specific ages, but as he got older and started learning more about sexuality and mainly in his recollection from his, you know, remarks and things he heard from his father and his uncles, one of the things he heard from them were disparaging remarks about homosexuals.   And in particular -- I may have put this in my report, there was a particular phrase that -- referring to homosexuals as men who take it in the butt.

            And he remembered that when he heard that, it immediately triggered this recollection of what Tinkerbell had done to him, putting her finger in his anus.   And he interpreted that as meaning that this might have been a homosexual act and that might mean that he was homosexual.   And together, then, with all the kinds of really disparaging remarks that he was hearing,

ELISE SMITH EVANS, RMR, CRR

and not just from his uncles, but he was in an environment where this was pretty common, it made him feel quite panicky about, you know, whether or not he was homosexual. And if he was homosexual, how terrifying that was to be, you know, one of the people who was looked at this way.

And this is -- this is sort of his particular experience of something that many men who are sexually abused go through, a real confusion and sometimes real fear that the abuse means that they are homosexual when they may not be anything of the sort.

Q. From the way that Mr. Lecroy -- well, first of all, you had the documentary evidence from the prior statements about being sexually abused while he was in prison to psychiatrist -- by the way, while I'm on this, would you expect someone as an adult who had been sexually abused as a child to freely and openly talk all the time about being sexually abused?

A. No, of course not.

Q. Would you expect them to blurt that out just through a screening to a -- some physician's assistant taking a report, a ten-minute report as to the psychological state of someone?

A. No. It would be -- as I said, there's a -- actually, a literature on the -- the fact that men in particular are typically quite reluctant to disclose. And even when they do disclose, oftentimes it's a very partial disclosure, and oftentimes they may disclose in one circumstance or context, but

not in another.  So it would be -- it would not be at all surprising if he didn't.

Q.  In your personal experience dealing with hundreds -- well, people who you've interviewed or evaluated, examined, and this is -- are people always open quickly with this or do you have trouble getting it out of people?  Just give us your general experience.

A.  It's -- in general, this is a very difficult thing for men to disclose.  I'll give you a sort of an anecdotal example that I think portrays this.  I'm from the Boston area, and back in 2002, 2003, we had -- we were sort of the what, the ground zero of the clergy, the Catholic church sexual abuse scandal.  As somebody who's known in the community as a clinician working with male survivors, over the course of those two or three years, I got countless numbers of phone calls and e-mails from the wives of men who were in their forties, fifties, and sixties who had been sexually abused by a priest who had never disclosed anything to anybody until there was -- the intensity of the scandal was such that the *Boston Globe* had stories every morning in the newspaper, it was on the television.  And there was so much pressure, that they finally -- their husbands essentially were decompensating and finally disclosed to their wives.

But 90 percent of these men, first of all, refused to go public, refused to join in the lawsuit against the Church, refused to have their names in any way publicized, refused to go

584

see a therapist in any way.  The only thing -- the only help they got was their wives seeking out advice from people like myself to then go back to their husbands and try to help them.  That's how -- and that's typical.  That's fairly typical.

Q.   Would you discount this claim of sexual abuse because Mr. Lecroy had not told his mother or his father about it?

A.   No.

Q.   Does that surprise you?

A.   No, it doesn't.

Q.   The -- from your evaluation of Mr. Lecroy, in particular your -- your personal examination of him, did you draw any conclusions as a clinician as to whether or not Mr. Lecroy had in fact been sexually abused?

A.   Yes, I believe he was.

Q.   And what do you base that upon?

A.   I base it on the -- the disclosure that he made to me that -- the details of it, the -- the details of the subsequent -- the impact of the abuse -- well, he didn't see it as impact, but the things that he told me about that happened after the abuse that were also very consistent with this and consistent with what we know about the impact of these kinds of sexual abuse experiences on a child's behavior.

     Some of the other things he talked about about the impact; his -- his panic about homosexuality and so forth.  And also, then, the fact that this disclosure -- it wasn't the first

585

time.  That there were -- the first disclosure at that point was -- let's see, I interviewed him in 2009.  So it was 17 years earlier he had disclosed the sexual abuse and then again in 1999, so ten years earlier.  So there was -- there were other instances of this.

So taken altogether, but certainly my evaluation of him left me with little doubt that he'd been sexually abused.

Q.  Was the way he described not only the incident or his confusion and the other factors you've described and the subsequent conduct that he described and the subsequent consequences totally consistent with what the -- you know in your experience and the research tells us about sexual abuse?

A.  Yes.

Q.  Would that be something that a lay person would be easily -- to concoct, not -- if they hadn't been sexually abused?  Do you understand my question?

A.  You mean would he be able to sort of figure out how to portray himself?

Q.  Yes, sir.

A.  He would have -- if he -- if this was fabricated, he would have had to study a pretty esoteric literature, and actually a lot of it.  I'm not even sure where you'd read it.  But -- you know, because some of the details about sort of the reactive behavior subsequently, I mean, it's out there.  But he would have -- this would have had to have been a -- a real substantial

586

effort to -- and, you know, one other thing I'd add to this is his -- he's -- the description of this, to me, it's not like he portrayed this as, you know, here's what I think, you know, was the most damaging thing that ever happened to me.  And I'm not even sure -- you know, when he was describing some of these other sexual incidents afterwards, he was doing so because I had asked him, again, for this complete sexual history.  So -- you know, we were going sort of incident to incident, so it wasn't like he was telling me and then I did this and then I did this.  He told me about these things because I was sort of methodically trying to get every incident that he could recall.

So, it would be extraordinary for him to have fabricated all that.

Q.   You mentioned other abuse, parental abuse, violence in the home.  Would the fact that Mr. Lecroy had stated as an adult in letters and otherwise that he loves his mother and loves his dad discount that those things actually ever occurred?

A.   No, not at all.

Q.   Why not?

A.   It's -- again, it's very, very common for children who are abused to -- first of all, to cling to a view of their childhood or a view of their parents that is really completely distorted. In fact, that's quite common.  And one of the ways of understanding that is all children have -- you know, arguably the -- the most crucial need of childhood is secure attachment.

And when a child is abused by a parent or parents, that doesn't lessen their need for attachment.  In fact, it increases the desperation of their need for secure attachment.

And so what that generates is this, what for some people is a paradoxical, sort of reaction where they need to discount the abuse or to deny the abuse or -- you know, despite the fact of the abuse, still portray their parents as wonderful, loving parents because they need to cling to that sense that they have parents that they can be attached to.

And in the case -- you know, when you're evaluating somebody many years later, there's another sort of factor involved, which is in my experience, many men who I evaluate, you know, as adults in their twenties, thirties, forties, even when we have tremendous evidence -- you know, we have Social Service records, you know, we have DSS involvement, descriptions of the abuse, sometimes hospital records of the effects of the abuse, and still get this kind of portrayal of, you know, rosy home, wonderful parents and so forth.  And it is -- at that point they need -- there's a psychological need to paint over all of that and to feel like they had a decent childhood, decent parents.

It actually takes a lot to simply accept that -- who your parents were and what they did to you was -- had this kind of impact on you or was so far from what we would all want.  So it's a very, very typical dynamic.

Q.  The -- if there was independent evidence aside from what Mr.

ELISE SMITH EVANS, RMR, CRR

Lecroy said of the type of inappropriate sexual behavior as a young person, like you said the French kissing the little girl on the playground or wherever it was, would that further support your conclusion that he was sexually abused as a child?

A.   Sure.  Yes.

Q.   If there had been evidence that there was -- what, if any, impact would there have been if there was evidence that as he grew up as a teenager, his mother would deal with him in an inappropriate way, such as having him sit on her lap when he was a teenager and treating him as her boyfriend and those types of overly romantic types of expressions between a mother and a son, not typical from the usual type of nurturing relationship?

A.   Well, that might be -- you know, depending on the -- sort of the nature and the strength of the evidence, that might be evidence that there were sort of inappropriate sexual boundaries in the home.  It -- it's -- if it was not behavior initiated by him, then it -- you know, I may not consider it to be, you know, evidence of -- or, you know, sexual abuse that he had experienced.

Q.   Right.

A.   So it would depend on the nature of -- the specific nature of the --

Q.   Fair enough.

     Let me turn to Dr. Medlin's report, which is Government's Exhibit 63.  Do you have a copy of her new one?

A.   I do.

Q.   Okay.  First of all, have you had an opportunity to review that report?

A.   Yes, I have.

Q.   Would you give the Court your general observations about the report?

A.   Well, it's -- first of all, it's a report based solely on the review of the records in the case, so Dr. Medlin did not evaluate Mr. Lecroy.  So that -- and I think, actually, Dr. Medlin acknowledges that it's a serious limitation not to be able to do that.  So there's that sort of kind of overall caveat.

I actually think the report is -- there are a number of things in the report that I think are very tenuous readings of the record.

Q.   Okay.  Let me ask you a couple of things.  Let's turn to page 5 of the report.  And at the end of the very first paragraph there, a number of times in the report she states and cites to an article that's referred to as the Hindman article (1988).  And her quote is, "It should be noted that there is research suggesting that a significant number of sex offenders fabricate a childhood history of sexual abuse, presumably in order to explain their own sexual offending."

Comment about that.

A.   Well, first of all, I had a hard time finding -- I didn't initially have in my copy of the report the list of references,

and I couldn't find the Hindman.  But I since have seen the references.  And this is apparently a reference to a piece published in a -- I guess it was a -- it was a prosecutors newsletter.

Q.   The *National District Attorney's Association Bulletin* is what the exhibit says.

A.   Bulletin.  Okay.

So my -- my -- I don't -- I'm not familiar with the bulletin, but bulletins generally are not peer-reviewed journals. So my -- my assumption is that this is not a peer-reviewed piece of research, which -- so just on that basis I would -- I would not weight the research very heavily.

There is a -- there's no question that, you know, in certain circumstances, there is a -- a certain percentage of individuals who will make up things.  But the experience of -- in my experience, and also there's a vast literature now on the cycle of violence that deals with the relationship between childhood abuse, both sexual abuse, physical abuse, neglect, and later violence, sexual violence, non-sexual violence.  And this is a very serious research literature and also clinical literature for many good reasons.  It's a -- an enormous problem. And it's very clear that there is a -- a very significant relationship between child abuse and various forms of adult violence and adolescent violence.

It's also clear from many, many different sources that

ELISE SMITH EVANS, RMR, CRR

the -- the greatest, what, hindrance to the accuracy of reports about -- especially sexual abuse when it comes to men is not fabrication and overstating, but the opposite.  It's men who are sexually abused not being willing to disclose it.  And there's some excellent studies that have documented that fact.

So, I guess going back to that one sentence, I think -- I haven't seen the Hindman article, but as I said, it sounds like it was published in a newsletter that is not a peer-reviewed journal.  And what this sentence does not reference is a vast literature that describes a very, very significant relationship between childhood sexual abuse and physical abuse and later violence.

Q.   Turning to page 7, right before the section that says Criminal History, there is a -- a paragraph that reads: According to B.O.P. intake screening form dated February 14, 2000, a certain number, Mr. Lecroy denied having ever been sexually assaulted according to a medical history form completed on 12-14 of 2000 at FCI Butner.  The medical examiner wrote:  No SI -- suicidal ideation, I assume that's what that would mean. Denies sexual abuse.

There are similar references throughout Dr. Medlin's report to the fact that he on a number of occasions when seen for a screening or an intake -- an intake form is when you go from one facility to another facility --

A.   Yes.

592

Q.   -- he would not -- he made some statement or didn't check off a box saying he'd been sexually abused.

What would you make of that?

A.   Not a lot.  I wouldn't make a lot of it.

Q.   Why not?

A.   Well, for one thing, you know, one of these -- the question was --

Q.   Well, let me actually show you the two forms.  This is Government's Exhibit 86, the first form.  And the second form is Government's Exhibit 85.  I'll note at the very bottom that note.

A.   Right.  So the -- the -- first of all, the questions about have you ever been sexually assaulted, that's -- again goes back to the point I was making earlier that asking a -- especially a man about whether or not they'd ever been sexually assaulted, even if that individual was prepared to answer yes, it's quite possible, quite likely actually, that they would not think of what had happened to them as an assault.

And, actually, to this day I'm not sure that Mr. Lecroy would describe -- in fact, I doubt very much that he would describe or even think about what happened to him by the babysitter as an assault.  I'm not even sure that -- you know, I guess at some point he started to think about it as abuse, but initially he certainly didn't.

So, you know, those kinds of questions are certainly not going to get very many disclosures.  But then the other

ELISE SMITH EVANS, RMR, CRR

factor is that it's just widely understood that disclosures, especially by men, about childhood histories of sexual abuse are -- are very -- they can be either very difficult to get or they can be -- they might disclose under one circumstance, either because they happen to be very upset at the time, or if the disclosure might happen in a particular context where they are -- you know, have extended encounter with somebody and feel more trusting.

But it's -- there's all kinds of evidence, as well as years and years and years of clinical sort of knowledge in this area, that disclosures are -- can be very intermittent.

Q.   Would the fact that on those two forms -- and there may be a few others, but those are the two that the Government have identified -- in those checklist type forms, denied being sexually assaulted cause you to doubt your opinion based on everything that you had, including the examination of Mr. Lecroy and the history that he presented?

A.   No.

Q.   Turn to page 11 of Mr. -- of Dr. Medlin's report, the paragraph that's toward the middle of the page.  It says Mr. Lecroy wrote a letter to Mr. Dempster.

Do you see that paragraph?

A.   Yeah.

Q.   In that letter he stated:  I don't have a major problem anyway -- talking about psychological problems.  He had been in a

psychological unit at Georgia -- in the Georgia -- in the Georgia prison system. Could you call the parole board and tell them that my problem is just a behavioral disorder and not very serious as mental health problems go?

Would that cause you to discount your conclusions?

A. No.

Q. Would somebody who's been sexually abused necessarily see themselves with a mental health problem or --

A. No. And furthermore, there could be 150 other reasons why he might write that sentence. It just -- I see it as wholly irrelevant to whether or not he was sexually abused.

Q. Would one reason be that he wanted the parole board to parole him?

A. Could very well.

Q. He also wrote, and Dr. Medlin apparently emphasized this, he has a loving, supportive family all waiting for me to get out.

Would that cause you to believe that the family life had been perfect?

A. No, it wouldn't.

Q. Would someone wanting to be paroled want to represent that where they're being paroled to is going to be a good place to be paroled?

A. That might be a reason for writing it, certainly.

Q. Throughout the report -- you've reviewed the report in detail recently?

ELISE SMITH EVANS, RMR, CRR

A.   Yes.

Q.   Dr. Medlin makes assumptions about the relationship between Mr. Lecroy and Dr. Carlson, a prison psychiatrist -- or psychologist, who had a therapeutic relationship with him for some period of time.  Can you comment about the way Dr. Medlin appears to see them, how you saw the notes?

A.   Well, let me refer specifically.  Do you have the page number where the --

Q.   Well, you might start --

A.   Okay.

Q.   -- I'm on page 13 -- well, let me just -- let me -- she expresses the opinion several times that she believed that Dr. -- excuse me, that Mr. Lecroy was portraying his sexual abuse as a way to curry favor with her or to get her ultimately to -- to like him.

A.   Yeah.

Q.   Do you remember that?

A.   Yes.  Well, and I read the original notes --

Q.   Yeah.

A.   -- Dr. Carlson's notes.

Q.   And, actually, why don't you look at the top of page 6 is one place that he -- that she says that.  And she says it in several other places in the report.  We don't want to just burden the proceedings, but it's in the report.

A.   Yes.

Well, all I can say is I read those notes, Dr. Carlson's notes.  And that's not -- I mean, there's limited amount that you can deduce reading somebody's -- you know, one paragraph or so notes.  But it certainly looked to me like he had -- Mr. Lecroy had, I guess -- I think it was put on a history form that he had been sexually abused.  And that Dr. Carlson had, as would be appropriate as a treating psychologist, had raised the issue with him.  And Mr. Lecroy had clearly talked about it to some extent.  And that it was Dr. Carlson who had then made some interpretations about how that abuse in her eyes, in her view, seemed to have affected him in terms of his relationships with women.

But I didn't see any evidence at all that Mr. Lecroy was somehow sort of using this as -- as a mechanism for -- you know, trying to get her to like him or love him.  I'm not saying that that wasn't happening.  He clearly was having a very strong transference reaction.

Q.   And transference is something that happens in therapy; is that correct?

A.   It happens fairly frequently.  And he may have been having a fairly intense version of it.  But the specific notes that we're talking about here read very much like a -- a treating psychologist raising what could be a very important issue with a client that they are treating, and then making some interpretations based on what the client tells them.

597

Q.   Would you -- as a therapist, whatever, would Dr. Carlson be the person who would best know how that therapy relationship was going -- ongoing; not us trying to discern from her notes here --

A.   Well, certainly, if you have the opportunity to talk with Dr. Carlson, I would imagine she could tell you.

Q.   All right.  Why don't you turn to page 19?  There are some comments about some personality testing, the Millon -- is that how you pronounce that, Milan?

A.   The Millon?  Uh-huh.

Q.   I'm showing you Defendant's -- Government's 72 and 73 which are in evidence.  You've had an opportunity to look at them?

A.   Yeah.

Q.   Can you comment about what Dr. Medlin says about that and specific answers to questions and so forth?

A.   Well, in -- in general --

Q.   First of all --

A.   I'm sorry.

Q.   -- tell -- just sort of just give the Court just a little bit of background on what that personality test is and so forth.

A.   It's a fairly widely used sort of personality inventory used as -- as you can see also in a forensic concept -- context that -- and much like the MMPI, the Minnesota Multiphasic Personality Inventory, it provides -- I think, in fact, it will have the profile here.  It's -- it provides profiles based on -- here it is.  Based on the answers that the patient or client

ELISE SMITH EVANS, RMR, CRR

responds, true-false answers.  And like the MMPI, it is -- it's a normed test, meaning it's considered a valid test to the degree that you can demonstrate through research that people who respond with a certain pattern of responses are more likely to have certain kinds of behaviors, certain kinds of personality characteristics.

And what's important about tests like this is that their validity is -- is founded on that.  Actually, it's a statistical principle that what this says about this particular individual may have validity because of the research that's been done that shows that those patterns of responses have been correlated with -- significantly with certain kinds of behaviors and so forth.

What the -- what the tests like this can't do is -- you know, individual responses, there's no research that shows that an individual response of true or false on question 162 is systematically correlated with anything.  So it's really not -- it's not valid to look at individual responses and draw conclusions from them.

Q.  At the bottom of page 19, Dr. Medlin apparently attached significance to Mr. Lecroy answering false to the question, "The memory of a very upsetting experience in my past keeps coming back to haunt my thoughts."  Would that response cause you to doubt your conclusions of sexual abuse based on a totality of your evaluation?

599

A.   No, it wouldn't.  And apart from what I just described a moment ago about the -- you know, the validity of these tests and how they can be used and how they can't be used, you know, one of the reasons for that is we have no idea what Mr. Lecroy was thinking when he read that question.  We don't know whether he read that question accurately.  We don't know whether -- I mean, there's a million things that we don't know.  And that's one of the reasons that there's nothing that you can extrapolate from an answer to a single question like that.

Q.   Would you or any reputable psychologist or mental health expert diagnose somebody based upon answers to particular questions on any type of personality test?

A.   No.

Q.   Turning to page 23, toward the bottom of the page, where Dr. Medlin talks about PTSD.  First of all, why don't you describe how PTSD plays with sexual abuse and so forth as a general matter.

A.   Well, Post-Traumatic Stress Disorder is -- it's one of the anxiety disorders, and it is the -- the anxiety disorder that is certainly amongst the public most associated with traumatic experiences.  And there's a lot of research that indicates that some individuals who have been sexually abused experience -- certainly experience trauma symptoms and some of them some of the time might have enough symptoms that they would meet the criteria to be diagnosed with PTSD.  But it is -- it's certainly a

ELISE SMITH EVANS, RMR, CRR

600

minority of men or woman who've been sexually abused who would meet the criteria for PTSD.

And even those who do, they will only meet those criteria in certain times, certain phases of their life.  Nobody goes through an entire lifetime suffering from PTSD symptoms on an ongoing basis.  So, for example, a person might actually have PTSD for a period of time, and most commonly they will kind of shift into the avoidance symptoms of PTSD, which will over time begin to look a lot like depression.  In fact, it becomes very, very difficult to differentiate between the sort of long-term avoidant response to trauma and depression.

Q.  Would that -- that she didn't see PTSD in the records or a diagnosis of PTSD -- discount your conclusion that he was sexually abused as a child?

A.  No, not at all.

Q.  And on that same page, toward the top, end of the first paragraph, 23, it talks about a study from Kolko.  Is that a study that you're familiar with?

A.  This is I think -- I'm familiar with the reference -- I'm familiar with Kolko's research.

Q.  Right.

A.  So I'm not sure of this particular study.

Q.  For example, one study found that a supportive parent figure, high intellectual functioning, and higher SES -- that's socioeconomic status, I assume -- helps to compensate for an

early adverse parenting experience.  In Mr. Lecroy's case, it appears he had high intellectual functioning, a supportive mother, and average socioeconomic status.

Comment about that.

A.  Well, I think what she's referring to here is the research on risk and resiliency.  So it's a way of trying to understand -- you know, we know we have -- we get very -- variable outcomes from people who have faced things like childhood abuse, various kinds of abuse.  And so there's a great deal of research that has gone on to try to understand what other factors that determine why one person might turn out with fewer symptoms, fewer problems, another person more symptoms, more problems.  And people have looked at both the risk side and the resiliency side.

And the resiliency side or the protective factors include -- these are some of them.  Certainly SES, a person who has -- their family has more resources, more likely they can get help for the child, there are things that can buffer the impact of abuse.  And certainly a supportive parent or even just a supportive family member can certainly be an important resiliency factor.

And, yes, intellectual functioning, again, it's -- you know, the child's own ability to use their own resources.  So that's -- you know, there's a great deal of literature on that.

Whether Mr. Lecroy -- I think the -- the two -- two of three here, actually -- I'm not sure that I would interpret it

the same way.  Certainly I don't see his mother as being all that supportive.  And, in fact, from what I've read and also what he described to me, his mother was a very, very timid woman who was completely dominated by his father.  And I think Mr. Lecroy actually experienced a fair amount of abandonment by her and the fact that she didn't protect him from his father.

And, then, the socioeconomic status is a kind of a difficult one to -- is one of the reasons why sort of research is so difficult to do.  My understanding of Mr. Lecroy's sort of childhood is that the family went through just enormous swings of sort of income level and moved some incredible number of times, and apparently mostly because the father was a gambler.  And there were times in which there was a lot of money and then there were times in which the family, you know, had to move and had debts and so forth.

So I -- I don't know how I would interpret that, but I don't think I would consider that a resiliency factor.

Q.  And the results of sexual abuse can be variable.  Some people can get through it, others not; there's just no way to know for certain?

A.  Yes.  And the other thing I would add to this, though, is this sentence really deals with the -- these resiliency or protective factors.  The thing -- there is that other side of the equation, the risk factors.  And in Mr. Lecroy's case, if you were kind of looking at his case from a research perspective, you

would have to note that he not only was sexually abused, but also was physically abused and exposed to domestic violence.  And so the -- you'd have to weight the equation with those additional risk factors.

Q.  I did want to ask you something else on an earlier page, page 18, where Ms. -- Dr. Medlin mentions that Dr. -- excuse me, that Mr. Lecroy had a history of substance abuse.  Is substance abuse something you see in sexual -- sexually abused and physically abused children?

A.  Well, all abused kids are at substantially greater risk of abusing substances, and there can be a variety of pathways into it.  But it's a very, very well known pathway.

Q.  Turning to page 26, the middle paragraph there where he -- where Dr. Medlin attaches significance to the fact that Mr. Lecroy, since the time of his arrest on these charges, had not requested psychological services.  Does that cause you to discount your conclusions?

A.  No.  I'm not sure I see what -- how that would be relevant to whether or not he was sexually abused.

Q.  Finally, toward the last pages of the -- her report, Ms. -- Dr. Medlin again attaches terrific significance -- or I'll leave out the word "terrific."  Attaches some significance to the inconsistent reporting.  Does that bother you, that he didn't tell some people, but told other people?

A.  No.  It's -- again, it's -- it's essentially what we would

ELISE SMITH EVANS, RMR, CRR

expect, that it -- it is very commonly the case that men who've been sexually abused who do disclose will disclose in certain contexts, in certain times and not in others, and that's exactly what we see all the time.

Q. She also mentions later in that paragraph, I'll quote her: However, the research -- no. No. Let me start the sentence before.

If Mr. Lecroy had been sexually abused, any emotional and behavioral problems could be related to that history of abuse. So, she does concede that if in fact there had been abuse, these could have caused problems for him; correct?

A. Yeah. I can't see where that sentence is, but --

Q. Look toward the middle of that last -- on page 27.

A. Okay. If this -- okay. Sure. Yes.

Q. But then she goes on to say: However, the research shows that individuals who were sexually abused as children are not at any higher risk for committing a sex crime than individuals who are victims of other types of childhood abuse and neglect, citing a study by Mr. Widom or Ms. Widom?

A. Cathy Widom, yeah.

Q. Do you know her?

A. Uh-huh.

Q. Comment about that.

A. Oh, I agree totally. That -- that's true in my research as well, that -- it's not that sexual abuse is a uniquely powerful

risk factor for future violence.  The impact of neglect and physical abuse are -- are just as serious.  And, you know, the only thing I would add is that it is -- what we do know also is that the combination of multiple forms of abuse increases that, you know, element of risk.

Q.  So when you have two of them, you've got a higher risk?

A.  Yes.

Q.  And the final sentence she quotes a U. S. General Accounting Office study:  Overall, there is -- retrospective studies, prospective studies, and research reviews indicated that the experience of childhood sexual victimization is quite likely neither a necessary nor a sufficient cause of adult sexual offending.

           Comment about that.

A.  I think that's an accurate statement.  I think the research is very clear that sexual abuse by itself does not cause later violence.  It is a significant risk factor that when other things accumulate, usually downstream, downstream in the lifespan of the individual, the risk of violence occurs.  So it's not sufficient by itself and it is not necessary.  Yes, there are people who commit acts of violence who've never been sexually abused or never been physically abused, so it's not --

Q.  And vice versa, there have been people sexually abused who never commit violence?

A.  Absolutely.

ELISE SMITH EVANS, RMR, CRR

Q.  But does that mean that sexual abuse and the other abuse you saw did not have any impact on Mr. Lecroy as an adult in his violent behavior?

A.  No, it doesn't mean that.  And that's the point of this research is that sexual abuse and physical abuse, all these forms of abuse and neglect, by themselves, do not mean that the person who has suffered them is going to become violent.  It does mean that the person who's suffered them is at greater risk.

Q.  Now, if you had been allowed to evaluate Mr. Lecroy back in 2003 and 2004, would you have -- and we have to ask an assumption -- and your evaluation would have been what you had when you saw him recently in Terre Haute -- well, a couple of years ago, Terre Haute -- would you have been able to give the testimony that you just gave to the Court today?

A.  Yes.

Q.  Would you have also had the same comments and conclusions, opinions about Dr. Medlin's report?

A.  Yes.

        MR. MARTIN:  Just one second.

        (A pause in the proceeding was had.)

        MR. MARTIN:  Your Honor, that's all I have.

        THE COURT:  Why don't we take a break?  Were we going to -- did y'all want to take a -- did you want to take a break and have time to meet with your expert before you did the Cross; is that -- or are you ready?

ELISE SMITH EVANS, RMR, CRR

MR. MCKINNON:  If we could just take a normal morning break, and then over lunch we can talk further about it.

THE COURT:  Okay.  All right.  Why don't we take a 10 minute break, and we'll come back and begin.  And then we'll probably break for lunch close to 12:30 and then -- or if you hit a breaking point in your Cross, before then, let me know.  But at sometime after noon, we'll take the lunch break.  I'm happy to work with you on that.  But let's take a 10 minute break now, we'll come back, proceed with Cross then.

(A recess was had.)

THE COURT:  Be seated.

CROSS EXAMINATION

BY MR. MCKINNON:

Q.  Dr. Lisak, in your Direct Examination, you mentioned a letter that you received from Brian Mendelsohn.  Do you have a copy of that letter with you?

A.  I'd have to check my files.  I might have it.

Q.  Okay.

A.  I can go check now or later.

THE COURT:  Why don't you just do it at lunch?

Q.  (BY MR. MCKINNON):  Why don't you just do it at lunch?

A.  Okay.  Sure.

Q.  And do you remember approximately when you were first contacted?

A.  By?

608

Q.   By Brian Mendelsohn.

A.   That would have been either -- well, the letter that we were just talking about was dated in January of 2003.  And my -- I'm assuming that the phone call would have been some weeks before that, so it might have been in late 2008.  But I don't -- so I don't remember -- obviously it was before the letter, my initial phone call with him.

Q.   I want to make sure we're right on the date.  The trial that you were going to -- where you would have testified was in February and March of 2004?

A.   Right.  Well, did I just say --

Q.   Do you know how long --

A.   I meant 2002.  Okay?  Did I just say 2008 before?  Okay. Sorry.

Let me -- the letter that I received from him was in January of 2003.  And we had had the phone call before that.  I don't remember how much earlier before that, how much before that.  So it may have been in January of '03 or it could have been in December, even November of '02.

Q.   And then it was a year later -- if the trial was in February and March of 2004, then it would have been a year later when you would have had the conversation when they told you you would not need to be a witness?

A.   Well, I -- it would have been sometime later.  I don't remember -- I've no memory of, you know, sort of when the timing

ELISE SMITH EVANS, RMR, CRR

of that was, other than obviously it was before the trial.

Q.  And I take it you were in contact with Brian Mendelsohn or a representative of Mr. Lecroy throughout that time frame of 2003, and there were discussions about doing an evaluation, then you were not going to do an evaluation, all of this would have been periodic --

MR. MARTIN:  I'm -- I mean, I think when he was referring to that letter, I think Dr. Lisak's confused about the year.  The letter was the letter that he identified earlier, which was January of 2004.  I think we just got -- I don't want to mislead Mr. McKinnon.  I don't think the evidence would be he was -- maybe -- I just don't want us getting down the road that we're all confused about --

THE COURT:  Go ahead and get the letter.

(A pause in the proceeding was had.)

MR. MARTIN:  I was wrong.  Sandy likes to hear that.

MR. MCKINNON:  Okay.  I think probably I should mark this as an exhibit.

THE COURT:  We can make a copy of that if you need the original.

THE WITNESS:  Yeah, that would be great.

Q.  (BY MR. MCKINNON):  I marked this as Government's Exhibit 110.  And for the record, can you identify what Government Exhibit 110 is, please?

A.  This is a -- a letter from -- well, signed by Brian

Mendelsohn, addressed to me, dated January 10th, 2003. And it's basically a -- a -- it -- thanking me for agreeing to work on Mr. Lecroy's case and confirming that their office will retain me to conduct a psychological evaluation of Mr. Lecroy, and it goes on from there.

Q. Okay. Now, when the -- when the letter says that the office is going to retain you to conduct a psychological evaluation, what did you understand they were asking you to do initially?

A. Well, you know, I want to preface all my answers to these questions about the specifics about what -- you know, what the -- the conversations we had are. I don't remember, like, the -- certainly not verbatim, but I don't even remember the specifics of one conversation versus another.

My recollection is that they -- the initial contact was they gave me a kind of a run-down of the -- some of the facts of the case. They -- they had some information -- I don't know whether they gave me the details of where they got the information that they believed he'd been sexually abused. And that they were asking me if I would be willing to evaluate him. And so my -- my understanding or my recollection that the evaluation was -- would be pertaining to the sexual abuse, to I know -- if they had questions about whether it was a credible disclosure of abuse and also the details of it and the possible impact of the abuse.

Q. Okay. And when you were -- when you get that kind of request

generally, what information do you want to get from the client or the attorney representing the client that will help you make an assessment and prepare to do this evaluation?

A.   Generally, any -- any information they have that might be relevant is information that I would like to review, so that would -- I will typically ask them or they will tell me that they have, for example, medical records, psychological records, school records, any kind of counseling or psychiatric records, if they have -- virtually anything that might be helpful in understanding the background and especially if there's specific references in those records to the abuse or the impact of the abuse.

Q.   Okay.  And they did send you records --

A.   Yes, they did.

Q.   -- at some point?

So let me show you some exhibits that have already been admitted.  I show you Defendant's Exhibit 7, ask you if you recognize Defendant's Exhibit 7 as records that you would have received prior to your -- well, back in 2003.

A.   Well, you know, the -- it looks like it, because I remember there were records from the Georgia State Department of Corrections.  Whether these were -- you know, I can't say right here that I remember these specific pages, but it certainly would be consistent.

Q.   But you did get records from the Georgia Department of Corrections?

612

A.   Yes.   Yes.

Q.   And for the record, Defendant's Exhibit No. 7 has a cover page that says those records are from the Georgia Department of Corrections?

A.   From the Georgia Department of Corrections, that's correct.

Q.   Did you see a presentence report that was prepared upon Mr. Lecroy in his previous federal conviction back in 1995?

A.   I believe I did, yes.

Q.   And you testified you saw records from the Federal Bureau of Prisons regarding counseling sessions, interviews, that sort of thing?

A.   Yes.   From about 1998 through till 2000 or 2001 even, yes.

Q.   So that would be Defendant's Exhibit 15?

A.   15, yes.

Q.   And does it look like you also saw Defendant's Exhibit 16?

A.   Yes.

Q.   Now, do you have any experience as -- doing forensic evaluations in criminal cases for, say, competency or mental state at the time of the -- of an offense?

A.   That's not what I do, no.

Q.   Okay.  If a forensic examination had been done of Mr. Lecroy prior to the time that you were asked to look into his background and evaluate this sexual offense, would that have been something that would have been important for you to have and evaluate?

A.   It would be certainly something I would want to see,

613

certainly.

Q.   So let me show you Defendant's Exhibits 1, 2, and 3 and ask you if you have ever seen Defendant's Exhibits 1, 2, and 3.

A.   (Witness reviewing exhibits.)

Well, yes, I certainly saw this report by Dr. Hilton. What I can't remember is when.

Q.   Well, would you have seen it prior to the trial, March and -- February and March of 2004?

A.   I'm quite certain of that.

Q.   Okay.

A.   I'm quite certain that I actually had a copy of that report in my old file from the -- from 2003.

Q.   Okay.  So you would have been aware that Dr. Hilton did a forensic examination of the defendant in March of 2003?

A.   Yes.

Q.   And you would have been aware, then, that Dr. Hilton concluded that the defendant exhibited schizotypal personality disorder?

A.   Yes.  I remember the report.  I have reread the report since, so I'm familiar with it.

Q.   Well, let me show you Defendant's Exhibit No. 1 and ask you to look at page 16.  Do you see it was Dr. Hilton's conclusion that the defendant had schizotypal personality disorder?

A.   Yes, that's part of his conclusion.

Q.   Antisocial personality disorder?

614

A.   Yes.

Q.   And borderline personality disorder?

A.   Correct.

Q.   Now, did you do any assessment of your own to conclude or make any conclusions about the accuracy of Dr. Hilton's conclusions about the defendant's personality disorders or mental state?

A.   No, I did not.

Q.   Did you do any assessment when you initially saw -- well, you never saw the defendant prior to 2004; correct?

A.   Correct.

Q.   So you wouldn't have been able to do an assessment as to his sanity at the time of the offense, for example, or competency to stand trial?

A.   That's correct.

Q.   Did the fact that the defendant was -- and Dr. Hilton's conclusion had personality disorders, did that play a role in your evaluation of the defendant and -- back in 2004 in terms of the report of his -- his sexual abuse?

A.   Well, the thing that -- I never -- I never did an evaluation. So I can -- I remember seeing Dr. Hilton's report.

        What -- you know, my recollection is after that initial contact and initial request that I would evaluate Mr. Lecroy, it never materialized.  And then at some point -- and, again, I don't remember when, but at some point it shifted into would I

provide background educational testimony. And at that point, then, it was -- I was no longer going to be talking about -- or examining Mr. Lecroy or even talking about him specifically. It was simply going to be describing the research on the impact of child abuse.

So I'm not sure that -- you know, I remember reading Dr. Hilton's report, but I don't think I -- I went further into -- trying to, you know, determine whether -- what kind of meaning this had, because I wasn't evaluating Mr. Lecroy and I wasn't going to be testifying about him.

Q. All right. Would you agree that people who have antisocial personality disorder may repeatedly lie, use an alias, con others, or malinger?

A. It's part of the descriptive features, yeah.

Q. So you would have known that malingering or conning or lying would have been a part of Mr. Lecroy's personality?

A. Possibly. Possibly.

Q. Based on how you reviewed it?

A. Possibly, yes.

Q. Would that have played a role in your assessment of whether or not -- well, before you evaluated Mr. Lecroy in 2009, did you review Dr. Hilton's report?

A. Yes.

Q. And were you evaluating or trying to make an assessment of whether Mr. Lecroy was malingering or falsely reporting this

sexual abuse?

A.  Of course, yes.

Q.  And you would have known, then, that somebody with antisocial personality disorder could possibly use false reports of a -- some sort of false reports or conning in order to gain something for themselves; correct?

A.  Certainly.

Q.  And you were aware that the defendant had falsely reported certain psychological consequences or certain mental status in the past; correct?

A.  I had read through all his records, so I was aware that there were times when he reported certain symptoms and other times when he didn't, times when -- actually we talked about on the Direct times when he said that he had no mental issues, so forth.  So, yes, I was pretty familiar with the entire record.

Q.  In fact, you had read Dr. Dempster's or reviewed Dr. Dempster's reports of his interaction with the defendant back in 1992; correct?

A.  Yes.

Q.  Also, the defendant's letters to Dr. Dempster in which he had admitted that -- in which he admitted that he did not have to try to commit suicide in 1992?

A.  Yes.

Q.  Let me show you Government Exhibit No. 111.

          MR. MARTIN:  Bill, let me look at it and see what

you're talking about.

MR. MCKINNON:  It's Bates stamped 2804.

(A pause in the proceeding was had.)

MR. MARTIN:  Okay.  I got that.  It's already in evidence.  I'm sorry.

MR. MCKINNON:  It's part of Defendant's Exhibit --

MR. MARTIN:  Yeah.

Q.  (BY MR. MCKINNON):  This is already in evidence, so --

A.  Okay.

Q.   -- so we'll use it so we won't --

A.  I think it's in the -- can I just look at that one?

Q.  Let me show you Government Exhibit 111, 112, and 113, and ask you if you recognize those exhibits.

A.  (Witness reviewing exhibits.)

Yeah, I remember reading these.

MR. MCKINNON:  Your Honor, I would move for the admission of Government Exhibits 111, 112, and 113, please.

THE COURT:  Any objection?

MR. MARTIN:  No, but I think they're already in evidence.

THE COURT:  That's fine.  They're admitted.

MR. MCKINNON:  Let me make sure I get straight which was which.

Q.  (BY MR. MCKINNON):  So 111 is a letter from Mr. Lecroy --

MR. MARTIN:  Just one second.  Just so I make sure I

have the right one.

MR. MCKINNON:  111 is a letter dated 24 March '92.

(A pause in the proceeding was had.)

Q.  (BY MR. MCKINNON):  So Government's Exhibit 111 is a letter from Mr. Lecroy to Mr. Dempster; correct?

A.  Yeah, a note.

Q.  A note?

A.  Correct.

Q.  And in the note -- and it references an attempt that he had made while he was in state prison to cut his wrists; correct?

A.  Well, I'll just read.  I stayed up thinking last -- this is part of it.  I stayed up thinking last night about everything and I feel like talking.  I couldn't get the thoughts out of my mind last Thursday, and the only way I could find to shut -- shut them back up was to cut on myself.  I -- it wasn't an attempted suicide, but just to get rid of the pain.

Q.  So it wasn't an attempted suicide?

A.  Right.

Q.  Cutting his wrists?

A.  Right.  It's a fairly common -- in fact, as you noted that Dr. Hilton diagnosed him with borderline personality disorder, in these kinds of self mutilation or cutting, self-injurious behaviors are part of the diagnostic spectrum.

Q.  Let me show you Government Exhibit 112.  Do you recall seeing that letter from Mr. Lecroy to Mr. Dempster dated March the 31st

of 1992?

A.  Yes, I do.

Q.  And do you remember that you were referencing quotations that Dr. Medlin included from that letter in her report; correct?

A.  I don't remember.  I have to see the specific quotation.

Oh, yes, here, the -- I think this was the -- could you call the parole board and tell them that my problem is just a behavioral disorder and not very serious as mental health problems go?  I think that was one of the things that was quoted in Dr. Medlin's report.

Q.  Correct.  And in that letter, there's no mention of the childhood sexual abuse; correct?

A.  That's -- I don't think so, no.

Q.  And so when Mr. Lecroy is talking about problem, he's not -- he's not disclosing to Mr. Dempster that he's been abused sexually as a child; correct?

A.  Correct.

Q.  And do you remember seeing anything in Dr. Dempster's notes, Mr. Dempster's notes, about any self reporting about the incident with Tinkerbell?

A.  I don't think so, no.

Q.  So when Dr. Medlin referenced that, she's not talking about the defendant saying anything about his childhood sexual abuse; correct, because it's not in the -- in the letter?  Correct?

A.  Right.  But I'm not sure what the -- you want to go back to

Dr. Medlin's report about --

Q.  Do you have that in front of you?

A.  Yeah, I do.

Q.  Can you find the page that -- that you're -- that you were referencing in your testimony about Dr. Medlin's report?  I'm sorry.  I would direct you to it, but I can't find my note about it.  I'm sorry.

A.  (Witness reviewing document.)

Q.  Look at page 11.  I'm sorry.

A.  Yes.  Okay.  Got it.

Q.  But you agree that there's nothing in Government Exhibit No. 112 that has anything to do with the childhood sexual abuse; correct?

A.  There's a sort of a implication in the last sentence where it says -- he also wrote that he had a "loving, supportive family all waiting for me to get out."  I guess what I was asked was would I view that as sort of evidence that Mr. Lecroy had not experienced any abuse either in his family or otherwise.  And I certainly wouldn't, so that's -- I think that's all I was asked at that point.

Q.  Well, I think on Direct you testified experienced any sexual abuse.  So now it's just abuse?

A.  Well, I don't -- we can look -- I won't remember whether I was asked specifically about sexual abuse or general abuse.  But the -- I remember -- at some point I was describing the -- the

fact that men who are abused very often actually quite commonly think about their childhood in sort of much more glowing terms than it actually was and describe their parents as, you know, more than adequate parents. And it comes out of a need to view themselves as a product of a normal home and a normal household. So this would be a sort of a very typical response and not indicative at all that he hadn't been abused.

Q. And then look at -- let me show you Government Exhibit 113. And that's -- do you remember seeing that where Mr. Dempster concluded that the defendant had not tried to commit suicide by taking an overdose of medicine, but that it had been accidental; correct?

A. (Witness reviewing exhibit.)

Well, it -- and I'm not clear -- I wasn't clear from what I read. In fact, I think what he was concluding here was that it was, again, just like cutting is -- is viewed not as a -- necessarily a -- a serious suicide attempt, but rather as a -- as a kind of a gesture, that he was viewing it, this overdose, in the same light, which would be consistent with, again, Dr. Hilton and possibly other people have seen in Mr. Lecroy many symptoms and many behaviors consistent with borderline personality disorder. And those kinds of -- they're usually referred to as self-injurious behaviors are part of that spectrum, part of the borderline spectrum. And so I -- that was how I interpreted this -- this statement.

Q.  And you're aware from reading the later records that the defendant repeatedly reported that he had attempted to commit suicide on prior occasions; correct?

A.  I've seen in the record, yes.

Q.  All right.  So when the defendant was reporting that he had tried to commit suicide back in 1992 by either this overdose of medicine or cutting his wrists, that according to the experts who saw him at the time, it hadn't really been a suicide attempt; correct?

A.  I -- well, I'm not sure if each occasion, whether the clinician who was getting this report, how they were interpreting it.  But certainly --

Q.  Well --

A.  -- some of them were interpreting it as suicidal gestures and not as serious suicide attempts.

Q.  No, I'm not asking for how they interpreted.  I'm asking what the defendant told them.  And you're aware from the records that the defendant on a number of occasions later said that these incidents in 1992 were suicide attempts; correct?

A.  I don't remember specifically what -- what words he used, but -- so I can't -- I know -- I seem to remember him referring to suicide attempts, but I don't remember the exact words that we would have used or how they were recorded in the documents.

Q.  But if they're recorded in the documents as suicide attempts as the defendant described them, then you would agree that that

would be inconsistent with what he said back in 1992 about these incidents where he's saying that they're accidental and that he didn't intend to commit suicide; correct?

A.   Well, no, I wouldn't draw that conclusion, just from those facts, because, you know, when -- what he's, you know, referencing here are, you know, self-injurious behaviors that most people refer to as suicide attempts.  So whether he was using that language in order to give the impression that he had actually tried to commit suicide or whether he was just simply using that language because that's the term that most people use for taking an overdose or cutting your wrists, I don't know.  And I'm not prepared to, you know, sort of draw that conclusion based on just a reference like that in a record.

I'm not trying to be oppositional with you, but I'm just trying -- we have to understand, people do use this all the time.  They say -- you know, even clinicians refer to these things as suicide gestures, suicide attempts.  And then if you ask them more detailed questions, they'll say, well, these were part of the whole pattern of self-injurious behaviors and so forth.  So I just want to be very careful about not making interpretations that I can't really know about.

Q.   But --

(A pause in the proceeding was had.)

Q.   (BY MR. MCKINNON):  Dr. "Lee-zack" or "Lie-zack"?

A.   "Lee-sack".

Q.   Sorry.  I show you Government Exhibit No. 114, and this would have been a note from the staff from the Georgia Department of Corrections in May of 1992; correct?

A.   Yes.

Q.   You would have seen that; correct?

A.   Yes.

Q.   And do you see where in the second --

MR. MCKINNON:  Your Honor, I would move for the admission of Government Exhibit 114, please.

THE COURT:  Any objection?

MR. MARTIN:  No objection.

THE COURT:  It's admitted.

Q.   (BY MR. MCKINNON):  And that's signed by Bryan J. Dempster, who was a counselor; correct?

A.   That's what it says, yes.

Q.   And a Jackie Simmons who was a mental health -- or director; correct?

A.   Correct.

Q.   And then a clinical psychologist, Gary Ganahl; correct?

A.   That's right.

Q.   And do you see in the second paragraph at the end where they report that the -- he, referring to the defendant, reports that a recent wrist cut was a manipulative attempt, and the initial concern of his overdosing on Indocin was actually an attempt on his part to disinhibit himself so that he could cut his wrists

and be removed from the work camp there at Rogers; correct?

A.   That's right.

Q.   So they concluded that his apparent suicide attempts were manipulative attempts to get some sort of other treatment in the prison system?

A.   That's what they -- they seem to be concluding, yes.

Q.   And you're aware that the defendant continued to report these later on as -- I've asked you that question.  I'll withdraw that question.

But -- so there would be a reason why the defendant might want to make it look like he had attempted to commit suicide if he was trying to get some sort of special treatment within the prison system; correct?

A.   It's possible.

Q.   And that wouldn't be related to borderline personality disorder, that would be related to his antisocial trying to manipulate and con his way into getting what he might not otherwise be entitled to; correct?

A.   Possible.  I think most -- most clinicians would view that kind of self injurious and the -- the manipulative stuff as part of the borderline spectrum, but doesn't --

Q.   And you're aware that he took -- Mr. Martin showed you the Millon test in your Direct Examination.

A.   Yes.

Q.   All right.  Let me show you Government Exhibit 72 and 73.

ELISE SMITH EVANS, RMR, CRR

626

Let me show you 73 first.  That would be the Millon report from August of 1999; correct?

A.   Correct.

Q.   And you would also have reviewed the Government Exhibit 72, which would have been a report on the results of the Millon test that was taken in January of 2000; correct?

A.   Correct.

Q.   And you're aware that by January 2000, Mr. Lecroy was hoping to be released from federal custody on the sentence that he was serving at the time; correct?

A.   I'm going to take your word for it.  I don't remember the sequence of --

Q.   But you remember that he was at El Reno where he saw Dr. Carlson through -- for 1998 and 1999?

A.   '99.

Q.   And do you remember that he --

A.   Yes.

Q.   -- that he was transferred from El Reno to Butner FCI in December of 2000 -- of 1999; correct?

A.   I'll take your word for it on the date.  I remember he was transferred, so I don't remember the date.  That's all.

Q.   And the reason for the transfer is is that he was becoming eligible for early release from his -- or release to a halfway house from his federal sentence that he was serving during that time?

627

A.   Again, I'll just accept that you're -- you're -- I don't remember the -- those specifics, so.

Q.   So the Millon -- the first time he took the Millon would have been when he was actually being seen by Dr. Carlson on a regular basis through 1999; correct?

A.   Yes.

Q.   If you accept my dates.

A.   I accept your dates.

Q.   All right.  And when he took the Millon in January 2000, it's when he would have been transferred to Butner and he was hoping to be released on -- into a halfway house as the first step to being released back out into the community, if you accept my dates?

A.   Yes.

Q.   And you know from reviewing the two Millon reports that the results are substantially different?

A.   I'd have to look again --

Q.   Well, look at --

A.   -- profiles --

Q.   -- 73 first since that's the first one.

A.   Yeah.  Yes.

Q.   And, in fact, he reports himself to be much better in January of 2000 when he's hoping to be released; correct?

A.   Correct.

Q.   And he reports himself to be -- have significantly more

ELISE SMITH EVANS, RMR, CRR

issues in August of 1999 when he was being seen by Dr. Carlson;
correct?

A.   Correct.

Q.   And you -- you remember that Dr. Carlson reported that the
defendant had expressed some romantic feelings toward her;
correct?

A.   Yes.

Q.   So he would have a reason to want to continue to see Dr.
Carlson in 1999 while he was at El Reno; correct?  If he had
these romantic feelings toward her, that might be a reason why
he'd want to continue to be --

A.   It might be.  I just don't want to --

Q.   -- to want to see her?

A.   I don't want to make an interpretation about something I
really have no idea.  So if you're asking if it's a plausible --
or a possible motivation, then it's a possible motivation.

Q.   It's a possible motivation that he would try to make himself
look worse than he really was so that he could continue to see
Dr. Carlson in El Reno; correct?

A.   Or that he -- he might also be simply more disclosing about
actual problems that he was having in that context.  That's
another possible explanation for it.

Q.   But my question was:  It's possible that he was trying to
make himself appear to be worse or have issues so Dr. Carlson
would continue to have her regular sessions with him.  Correct?

A.   Right.  I just -- I just want to -- that's not the only possible explanation.  I think it's equally possible that he was disclosing more truthfully and accurately because he wanted to continue in treatment with her.

Q.   Right.  Well, then, if that's the case then, by the time he got to Butner and took the Millon in January of 2000 when he was hoping to get out, then he's going to disclose him -- or make it appear that he's much better than he was just four months earlier so that people who were evaluating his file might conclude that he would -- should be released early.  Correct?

A.   That's certainly possible.

Q.   And that would be an example of manipulative behavior on his part to try to manipulate the prison authorities into assessing him in a way that might be different than the way he really was?

A.   Yes.

Q.   One or the other --

A.   Yes.

Q.   -- would be true?

A.   Yes.

Q.   And Mr. Martin showed you the -- the two reports that he made when he arrived at Butner -- or shortly after he arrived at Butner, where he denied that he was the victim of sexual abuse. Do you remember that?

A.   Well, there was one where he said no to being sexually assaulted, and then there was one where there was a notation

ELISE SMITH EVANS, RMR, CRR

about sexual abuse.

Q.   I show you Government Exhibits 85 and 86.

A.   (Witness reviewing exhibits.)

So, yes.  So 86 is where he says no to questions about sexual assault.  And then 85 --

Q.   If you'll look at the handwritten part at the bottom.

A.   Right.  No -- again, S -- so maybe suicidal ideation/denies sexual abuse.

Q.   Okay.  And you were asked about those by Mr. Martin on Direct; correct?

A.   Yes.

Q.   And your conclusion was is that he was -- well, let me rephrase.

You're aware that the defendant had just spent an entire year, from February -- almost a year, from February to December, meeting with Dr. Carlson in regular counseling sessions at El Reno; correct?

A.   Yes.

Q.   In which he had disclosed this alleged sexual abuse; correct?

A.   Correct.

Q.   And had talked about it repeatedly with her over a period of time; correct?

A.   Well, repeatedly for -- there were a number of sessions clearly, yes.

Q.   A number of sessions over a number of months in which he had

631

disclosed this; correct?

A.   Yes.  Again, I don't remember how -- whether it was months or weeks, but it was a period of time.

Q.   Well, and he also had disclosed it to Dr. Novey; correct?  I think that's what you testified to on Direct.

A.   Is that --

Q.   The drug treatment counselor.

A.   The drug -- okay.  I just don't remember her name.  But yeah.  Uh-huh.  Yes.  Yes.

Q.   And you remember that he had expressed some romantic feelings toward her as well?

A.   Yes.

Q.   While he was at El Reno?

A.   Yes.

Q.   So conduct that would be consistent with a manipulative inmate would be somebody who's reporting events that might not have occurred in order to get these women or female counselors to continue to see him; correct?

A.   That -- that's -- I guess that's your interpretation, but that's just not mine.  That's all.

Q.   Well, I understand it's not yours, but it's a possibility that that occurred; correct?

A.   Sure.  Anything's possible.

Q.   And it's also a possibility that when he got to Butner and he's hoping to be released soon and he doesn't want to -- he

ELISE SMITH EVANS, RMR, CRR

doesn't have this need to disclose to the female counselors, that he tells the person who interviewed him the truth, which is he had not been sexually abused?  That's a possibility, too?

A.  That's a possibility.  But an alternative possibility is one that I encounter quite frequently, actually.  Inmates in -- in prisons are oftentimes very, very concerned about information about sexual abuse being -- getting out into the inmate population and what that can mean for their well-being and their status in the prison.  And I've actually encountered in my work on these cases a number of cases where we actually have had very detailed information about sexual abuse that the -- the inmate or the defendant has experienced or experienced as a child where they would simply not agree to talk about it for fear that the information would get out and they would be targeted because of it.

So another -- it doesn't surprise me that -- either that Mr. Lecroy would not disclose the abuse consistently for all the reasons that I talked about this morning.  But the fact that this was also occurring in an intake into a new institution, also another interpretation that I would consider is that he's -- he's concerned about this information being out there.

Q.  All right.  But you are aware that he disclosed initially -- the first time he ever disclosed it that we have a record of was at an intake into a new facility when he was taken into the Georgia Department of Corrections?

ELISE SMITH EVANS, RMR, CRR

633

A.  Yes.  Yes, I'm aware of that.

Q.  And you're also aware of the fact that none of the family members were -- had any knowledge of this alleged sexual abuse; correct?

A.  Correct.

Q.  In fact, not only that, but they didn't have any knowledge of a babysitter named Tinkerbell; correct?

A.  Well, I don't remember -- I don't know, you know -- I'm not privy to the -- what investigation was done and who was asked. And so I don't know anything about --

Q.  Well, so you don't know that his brother was asked whether he remembered there -- whether there was a babysitter named Tinkerbell?

A.  Not specifically his brother, no.  I know -- I was told that family members were asked and that nobody could remember a Tinkerbell.  That's what I was told.

Q.  Well, and his brother was at the apartment at the time the sexual abuse occurred; correct?

A.  Yes.

Q.  And his brother didn't -- and you don't know that his brother didn't remember a Tinkerbell, a babysitter named Tinkerbell?

A.  Well, I was -- I think I was told that his -- that they asked Chad, and I think his -- I know that his mother was asked.  I don't remember -- or whether his father was asked.

Q.  And you're also aware Tinkerbell is a fictional character

634

from --

A.  Yes.

Q.  -- the story *Peter Pan* --

A.  Yes.

Q.  -- correct?

Not only is the story *Peter Pan* fictional, but Tinkerbell is a fairy, a fictional character in a fictional story; correct?

A.  Yes.

Q.  Now, I think you testified you're not familiar with Dr. Hindman.  Are you aware of studies that Dr. Hindman has done in which she has polygraphed individuals who reported sexual abuse as children who have been charged with crimes afterwards?

A.  Well, I -- I've certainly read studies about the use of polygraph and so forth.  I don't remember whether those studies that I read were his or not, so I'd have to see the article.

Q.  Actually, you don't know Dr. Hindman, so you don't know if Dr. Hindman is a female?

A.  Well, I don't -- oh, okay.

Q.  You don't know who she is?

A.  I don't know whether the -- I may have read her studies or one of her studies, but I don't associate the name of it, so.

Q.  Well, are you aware, then, that they gave -- people who were sexual offenders who claimed to have been abused prior to their own sexual offense, sexually abused prior to their own sexual

635

offense, immunity for them to take a polygraph examination?

A.   I --

Q.   Are you aware of the study where that was done?

A.   I would have to know.  Not from memory.  I'd have to see the study.

Q.   Are you aware that --

THE COURT:  If he's not familiar with the study, I don't know that we're accomplishing anything, any further questions along that line.

Q.   (BY MR. MCKINNON):  You don't know what the results of the study were?

A.   No, not at all.

Q.   Now, let me ask you about your -- your background.  After you -- after you finished your -- your education, where did you go initially after graduating from -- after getting your Ph.D.?

A.   I spent a year at Duke University teaching and doing research, and then -- I guess that was the 1989-90.  And then in the fall of '90, I started teaching at UMASS Boston.

Q.   And you've taught there full time since?

A.   Yes.

Q.   And done research there as part of your teaching duties?

A.   Yes.

Q.   And you're a member of the faculty, then, of University of Massachusetts at Boston?

A.   That's correct.

636

Q.  All right.  And I assume that means you teach psychology courses as a part of your duties?

A.  Yes.

Q.  What percentage of your time is devoted to teaching, of your -- you know, your professional work is devoted to your teaching responsibilities?

A.  About a third.

Q.  And does that mean, then, that the two-thirds that is left is devoted to research?

A.  No.  No.  For many years now I've spent a -- the largest percentage of my time in applied work.  So some of that would be research, and really depending on the year, or working directly with either law enforcement or prosecutors specifically on cases or in trainings.  In the last, oh, four or five years I've been spending a lot of time with the U. S. Military, the different services, on sexual assault prevention and sexual -- on working with the JAG Corps and the investigative corp on their -- increasing their effectiveness in prosecuting sexual assault cases.

Q.  Okay.  And another, I guess, area that somebody in your field might be engaged in would be clinical work; is that correct?  Would be seeing patients, either sexual -- people who have been sexual abuse victims or people who had been sexual abusers themselves; correct?

A.  Well, could -- certainly clinical psychologists could do --

ELISE SMITH EVANS, RMR, CRR

637

Q.   Right.

A.   -- that.  I'm not sure what your --

Q.   And -- well, that's what -- I guess my question is:  Do you do any clinical work?

A.   I don't -- I stopped doing individual clinical work about six years ago, something -- six or seven years ago.

Q.   All right.  So back when you did clinical work, what percentage of your time was devoted to actually seeing patients and counseling patients?

A.   Well, for a number of years, probably for the first decade, I was probably -- at least a third of my time was doing direct clinical work.

Q.   All right.  But since -- in the last six years, you've done no direct clinical work?

A.   Not therapy.  I've done clinical work in the sense I've done a lot of evaluations and assessments.

Q.   All right.  On Direct Examination you mentioned that -- I think you gave us some statistics, 48 to 49 percent of offenders who -- people who've been abused as -- sexually abused as children risk some form of violence or multiple --

A.   Yeah.  That figure was -- in that study, those were men who had been both sexually and physically abused.  Of those men, 48 percent had committed some form of violence later in their life.

Q.   Okay.  What study was that?

A.   I believe that is -- I think it was 19 -- was it 1994 or '96,

ELISE SMITH EVANS, RMR, CRR

638

factors -- factors associated with -- I can't remember the title, but it was --

Q.   Do you know who did it?

A.   I did.

Q.   That was your -- your research?

A.   Yeah.  Yeah.

Q.   All right.  And the time frame was what year?

A.   I don't have my CV up here anymore.  I think it was -- I think that was '96.

Q.   And you mentioned on Direct Examination that boys who are abused by males, boys are often afraid that they're gay because of the sexual abuse.  Is that based on research, is it based on your observations from your -- your research?  Do you know what that --

A.   Well --

Q.   -- is based on?

A.   -- it certainly -- based on my clinical work with male survivors, my research, and -- I've done a lot of interviews in the research context with male survivors.  And, also, forensic -- in the forensic domain of evaluating men who were abused as kids.  But there's -- that's widely described in the literature.

Q.   Okay.

A.   So that would be clinical -- which I'm trying to think about -- and the research literature as a -- a very common issue that --

ELISE SMITH EVANS, RMR, CRR

Q.  Well, how about in this case, where the sexual abuse is allegedly committed on a boy by a female?

A.  Uh-huh.

Q.  Do you see the same incidents of -- the reporting that they -- they're afraid they're gay because of the sexual abuse by a female?

A.  What is -- I don't know that -- I don't think there's research that would tell us whether men who are abused by women are as likely or equally likely to have those kinds of fears and confusions, specific ones.  What is salient to those of us who've done a lot of work with men who are abused is that -- again, I think most of us initially expected that this would be an issue that would really only pertain to men who were abused by men, for obvious reasons.  And it has been surprising that it is not the case that it is only men who are abused by men, that it is quite common also -- I mean, also found in men who are abused by women.

And over time -- you know, I certainly and many others like me who've done a lot of work with male survivors have come to understand why that is.  Initially it was a sort of -- it was paradoxical to us to discover that.

Q.  Are there reports that you're relying on or is that based on your personal experience?

A.  Well, it's not -- just my personal experience.  I think these are things that are probably mostly published in books that have been written about, for instance, by Richard Gartner wrote a

book -- a good book about work with -- with male survivors, Mike Lu. There's a number of books that have been written that are based on many, many years of clinical work and treatment of male survivors, and it probably is the kind of thing that is in those kinds of publications rather than in research studies.

Q. When you -- when you talked to Mr. -- I want to go back to the 2004 time frame. You believe you saw Dr. Hilton's report prior to 2000 -- prior to the trial, which would have been in February and March of 2004?

A. Yes, certainly. It was -- all I can say is it was -- somewhere in that time frame I must have seen the report. So whether it was -- you know, whether they sent me the report in the spring of '03 or whether it was the summer, I -- I have no way of remembering that.

Q. So you would have been at least familiar with the rather specific detailing that Dr. Hilton put into his report about the -- the interaction with Tinkerbell, that the defendant reported to Dr. Hilton?

A. Yes. Whatever was in his report, yes.

Q. All right. And you would have known that in -- if you had testified in March of 2004 at the trial; correct?

A. If -- yes. If I'd been asked to testify in 2004, I would have had --

Q. Because the details that are in Dr. Hilton's report are much more specific than any of the details that are reported by Dr.

Carlson in her interview notes; correct?

A.   That's correct.

Q.   Or in any of the other records that were available to you independent of Dr. Hilton's report; correct?

A.   Correct.

Q.   So there was no -- no specifics given in any of the other psychological reports that you reviewed?

A.   That's right.

Q.   So when you testify -- when you were discussing with Mr. Mendelsohn about testifying as a teaching expert, were you being told, then, just to ignore the fact that the defendant had given this detailed report to Dr. Hilton that you were aware of?

A.   I don't remember -- you know, all I remember is -- a quite clear memory of being asked to think about and sort of sketch out an outline of what I would testify about in terms of what does the research say about the impact of childhood abuse or childhood sexual abuse.  I don't -- I don't recall -- I don't think -- my recollection is that at that point it was, I mean, purely educational testimony with no reference specifically to Mr. Lecroy.

Q.   If -- if you had been asked, then -- if you had testified in 2004 at the trial and you had been asked a series of questions about what -- what reports, what have you reviewed in anticipation of your testimony, you would have had to disclose that -- at the trial that you had reviewed Dr. Hilton's report;

correct?

A. Sure. Yes.

Q. And you might have been asked to provide that report back to the prosecutor at the time as a basis of -- as a source document that you had -- had reviewed in anticipation of testifying; correct?

MR. MARTIN: Your Honor, I object. He's asking --

THE COURT: I'll sustain. I'll sustain the objection, whether he would have had to disclose that or not. That's a legal matter that the Court would have had to decide what disclosure would have been required.

MR. MCKINNON: Okay. I understand the Court's ruling.

THE COURT: I mean, he doesn't know whether you would have asked for it or not. You asked him if he would have been asked for it. I'm pretty confident if you'd known about it, you'd have asked for it.

MR. MCKINNON: Well, but my question was if you had been asked, you would have had to disclose it.

MR. MARTIN: That's -- that's a legal conclusion.

MR. MCKINNON: No, that's not a legal conclusion, if he had been asked. I'm not asking him to decide whether or not the Court would have allowed the question. Just if the question had been allowed, wouldn't he have had to disclose the fact that he had reviewed Dr. Hilton's report.

MR. MARTIN: I guess that's -- that's a possibility, if

the Court had allowed -- it's a little speculative, but I don't know if it makes any difference.

THE COURT:  Yeah.  You may answer.

A.  Well, if your question is if I was asked, I would have answered truthfully.  So my recollection is that I had seen Hilton's report, and if I was asked if I'd seen it, then I would certainly have answered yes.

MR. MCKINNON:  I didn't realize how late it was getting.  I'm close to finishing, but not quite.

THE COURT:  Okay.  How much -- do you want to break now or do you think you're going to be --

MR. MCKINNON:  Actually, we could break now.  I might could organize it a little better and be faster after lunch.

THE COURT:  Okay.  All right.  Why don't we come back at 1 -- is 1:45, is that enough time for everyone if we come back at 1:45?  Okay.  Why don't we take a break until 1:45?

(A luncheon recess was had.)

THE COURT:  Be seated.

You may proceed.

MR. MCKINNON:  Thank you.

Q.  (BY MR. MCKINNON):  Dr. Lisak, Dr. Medlin's report that you have there in front of you, that's your copy?

A.  Yes.  I don't know if it's come up here yet.

Q.  Government Exhibit 63.  That copy just doesn't have the heading on it.

A.   Okay.

Q.   Do you recall when you first saw Dr. Medlin's report?

A.   I actually -- I don't recall -- I don't independently recall seeing it until I was -- after I was contacted by Mr. Martin.  It doesn't mean I -- you know, I didn't have a copy of it in my file.  And I don't recall seeing it prior to when it was sent to me in, probably, 2000 -- well, either 2008 or 2009.

Q.   Okay.  And it's your recollection -- well, what is your recollection about when you were advised that you would not be a witness at the trial?

A.   I'm sorry.  You know, literally all I can -- you know, I can bracket it with, you know, when they initially contacted me and sent me the documents and when the trial was.  And -- but I have no other means of sort of pinpointing when it was that we had the phone conversations where, you know, they told me that the -- when they first asked me, you know, to testify as an educational witness and then ultimately told me that I would not be testifying at all.

Q.   Right.  But in terms of, I guess, before, during, after the trial, do you have any idea what -- where it fit in the context of the trial itself?

A.   I don't, because I have no memory of being aware, really, that the trial was going on, because at that point -- at some point I was told that I would not be testifying.  So it was kind of -- it was literally just off my radar screen.

ELISE SMITH EVANS, RMR, CRR

Q.  And do you recall ever seeing a faxed copy of Dr. Medlin's report?

A.  I don't.  I -- I was told, you know, in conversation just the other day that -- I think it was Brian Mendelsohn recalls faxing it to me.  And I'm not saying that that didn't happen.  I just -- I can't -- I don't remember.

Q.  You don't have any recall of --

A.  I don't.  I don't.

Q.  -- seeing it then and talking with the defense trial team --

A.  Right.

Q.  -- during the trial?

A.  It's certainly possible.  And that's the find of thing that, you know, things like that have happened.  But I just -- I just don't remember that happening specifically.

Q.  And in your -- if we go back to the 2003-2004 time frame, when you initially reviewed the records that you did -- let me rephrase -- let me back up.  Let me ask a question.

     If somebody had suffered from sexual abuse and it had been significant, what would you expect to see in terms of -- what would you look for in terms of adult behavior or reporting of symptoms resulting from the abuse?

A.  There's -- there's nothing specific other than -- I can say there's some general domains that I would evaluate.  And they would correspond to the things I was talking about this morning, looking certainly at their -- their sexual history to see what,

if any, impact the sexual abuse might have had on their sexual development, their sexual identity, their sexual experiences, their -- have them describe to me their -- their experiences of sexual activity of various kinds throughout their life span. So I'd like at that domain.

Q. Okay. Can I stop you and ask one question about that?

A. Sure.

Q. So -- but because you hadn't talked to the defendant in the 2003-2004 time frame, you couldn't evaluate that domain back before the trial?

A. That's correct. I mean, that would be only information that you would get from doing a in-person, face-to-face evaluation.

Q. Okay. I'm sorry. And then the next thing you might look for would be what?

A. Well, all the domains, so all the different areas of psychological impact that you might see. How does -- you know, is there -- are there anger issues, are there fear issues, are their shame and humiliation issues, and how have they played out in this person's life? I would evaluate and listen for some of the more what are referred to as psychiatric symptoms, you know, symptoms of anxiety, depression, symptoms like that.

It's -- you know, depending on the nature of the abuse, it is also associated with a higher risk for suicidal impulses and ideations, evaluate that. And obviously in the context of a forensic setting, I would be also listening for and evaluating

ELISE SMITH EVANS, RMR, CRR

647

for acts of perpetration of different kinds of violence.

Q.   Okay.  But you weren't able to do any of that in Mr. Lecroy's case, specifically because you didn't actually interview him or do an evaluation back in the 2003-2004 time frame?

A.   Correct.

Q.   And that was at the direction of the trial team?

A.   Yes.  That wasn't my choice.

Q.   That wasn't your choice, that was their choice; correct?

A.   That's correct.

Q.   Okay.  When you looked through the records that you were provided when you were -- when it was anticipated that you would in fact talk to Mr. Lecroy directly, did you see any -- any reference where he had ever been diagnosed with symptoms related to or consistent with Post-Traumatic Stress Disorder?

A.   You know, I could only really respond to that in the context of having reviewed the records more recently.  I don't remember, you know, what I was concluding or what I had made note of when I reviewed what I had back in 2003.  I, you know, simply just don't remember.

Q.   Okay.  Well, in your most recent review, did you see any reports of symptoms that would be consistent with PTSD?

A.   I don't recall any, no.

Q.   And that would be something that you might expect to see a victim of abuse exhibit would be symptoms consistent with Post-Traumatic Stress Disorder?

ELISE SMITH EVANS, RMR, CRR

A.   Actually, only rarely.  Only rarely, you know, when you're evaluating adults who are abused as children.

Q.   Now, I'm going to ask you, when you did talk to him January 2009, first of all, what did you tell him about why you were there and what your purpose was?

A.   I probably told him that I -- well, actually, I probably asked him if he understood why I was there and made sure that he was aware that his -- his attorneys had asked me to come and speak with him.  And then I told him probably in some terms that -- that I was there to evaluate his -- his sexual history -- or I don't know exactly how I put it, but it would have been something like that.

Q.   Okay.  How long did you spend with him?

A.   I don't remember how many hours, but it was -- some number of hours on each day.  I don't remember -- you know, by the time I got in there, and it would have been four to five hours.  I don't remember.

Q.   Four to five hours total or four to five hours each day?

A.   Well, no.  We -- it was more than that.  It was more than four to five hours total.  So -- somewhere in the neighborhood of four hours each day, I would think.

Q.   And you had him provide you with a very detailed history of his sexual experiences?

A.   Yes.

Q.   Both as a -- as a minor and as an adult?

649

A.   Correct.

Q.   And did he understand that it was important that he tell you everything that -- that was -- that was part of his sexual experience as both a minor and an adult?

A.   Well --

Q.   Did he appear to understand that?

A.   He appeared to -- well, he seemed to be fairly cooperative. Whether he was disclosing of everything, I can't really tell. But he -- he certainly provided a lot of detail about a lot of the experiences that he'd had.

Q.   And you asked him for a lot of detail?

A.   Yes.

Q.   And you asked him for -- to tell you about all the experiences that he had had as -- in terms of his sexual history?

A.   Yes.

Q.   And he told you about two times with Tinkerbell?

A.   The two incidents.

Q.   Two incidents with Tinkerbell.

         Did he tell you about any other instances that you would consider to be as a minor that involved more than -- more than the kissing the girl and then being beaten for it after she told her father -- after she told her mother?

A.   I'm sorry.  Any other instance?

Q.   Any other --

A.   Experiences did you say?

ELISE SMITH EVANS, RMR, CRR

Q.   -- experiences as a child, other than the two instances with Tinkerbell and the one incident involving kissing the girl shortly after that?

A.   Yes.   There were some other -- I think there were two other incidents that he described similar to that incident where he kissed the girl.  So they were, I think, fairly close in time to when the abuse occurred and they were -- they were similar.  I don't think they involved kissing again.  I think it was some other kind of sort of sexual act or quasi sexual act.  But I think there were two others that he talked about.

Q.   Okay.  And, I mean, some sexual interaction or contact on the part of minors is considered normal, isn't it?

A.   Yes.

Q.   And kissing would be -- even among fairly young children, 8 or 9 years old, that wouldn't be considered abnormal, would it, in terms of sexual development?

A.   No.  Obviously it depends on the type of kissing.

Q.   All right.  And in your report that you prepared, you didn't mention that it was French kissing, but you testified it was French kissing this morning?

A.   Oh, yes.  That was quite specific -- he was very specific about what he did and how he then understood why this girl reacted so strongly to his --

Q.   And the other two instances involved -- do you remember any details of what those would be that would -- were they abnormal,

651

normal, were they --

A.  No.  They -- they were quite clearly sort of examples of precocious -- what is sometimes referred to as precocious sexual or, you know, sort of quasi adult-like sexual behavior.  Let me see if I put enough in here to cue me.

The -- let's see if I can -- one of them -- one of them involved -- if I remember correctly, one of them involved more sort of fondling.  He was fondling with -- and I don't remember the -- I think he -- he described who this child was, but I don't remember who the child was in the neighborhood.  But it was not -- I remembered it was not kissing, but it was some other kind of sexual contact that, you know, he was having with this child.

Q.  Okay.  And that would have been close in time to the incidents with Tinkerbell when he was 8?

A.  Yes.

Q.  So between the time he was 8 and 18, any other -- anything else that he told you about between -- in that ten year time frame?

A.  Other sexual experiences?

Q.  Yes.

A.  Yes.  Yes.

Q.  What did he tell you about?

A.  He told me about -- there was a -- a experience he had with a cousin, I believe it was Russ, who had him -- asked him to do

ELISE SMITH EVANS, RMR, CRR

various things to him while he was masturbating.  There was -- he described an experience -- let's see, try to get this chronologically.  He described I think it was a couple of sexual experiences with prostitutes when he was --

Q.   That was while he was in the Army?

A.   Yes, when he was in the service.

Q.   And after he would have been at least on his own?

A.   Yes.

Q.   But in terms of being a minor, did he describe anything else besides three incidents with girls and one with --

A.   What he said is that at a certain point, I'm trying to remember -- my memory is that somewhere around the age of between 12 and 14 -- and actually I think -- after the experience with his cousin Russ where they were discovered by either an aunt or a grandmother, and that was a -- a very -- he was, you know, shamed and frightened by this, by being discovered and by what it might mean.  It was all the -- the sort of overtones that this was like almost homosexual activity between the two of them.  That he from that point on until he was in his teens, later teens, simply resorted to masturbation and started using pornography.

Q.   While he was a teenager, you mean, during his teen years?

A.   Yes.

Q.   But, again, in and of itself, I mean, it's not uncommon for teenage boys to masturbate?

A.   Nope.

653

Q.   Not uncommon for teenage boys to look at pornography?

A.   No.

MR. MCKINNON:  That's all the questions I have.

THE COURT:  Any Redirect?

MR. MCKINNON:  Your Honor, for the record, I did make a copy of the letter that was marked as 110, so I'll return the original and substitute a copy of the letter.

THE COURT:  That's fine.

MR. MCKINNON:  For the record.

THE COURT:  Thank you.

Mr. Martin, you may Redirect.

REDIRECT EXAMINATION

BY MR. MARTIN:

Q.   Dr. Lisak, Mr. McKinnon asked you a number of questions in relationship to the diagnosis of Dr. Hilton of antisocial personality?

A.   Yes.

Q.   Do you remember that?

And he referred you to the DSM which states that one of the features of that personality disorder is a tendency to lie, to manipulate?

A.   Yes.

Q.   To falsify?

A.   Yes, sir.

Q.   That's a characteristic?

ELISE SMITH EVANS, RMR, CRR

Does that mean that you can never trust anything that anybody says who's been diagnosed as antisocial personality?

A.  No, obviously not.

Q.  All right.  Does that mean they always lie about everything?

A.  No.

Q.  In your doing a diagnosis of Mr. Lecroy and listening to him describe his history to you, are you merely looking -- listening to the words or are you looking to the content of it as it fits into the total diagnosis?

A.  Well, just to be clear, I was not diagnosing.

Q.  I mean, diagnosing.

A.  Evaluating.

Q.  Evaluating.  Excuse me.

A.  Okay.  Yes.  Obviously when you evaluate somebody, in this case their sexual history, you listen for the context they provide, the details they provide, the -- you know, sometimes, you know, again depending on the context, the fact that somebody describes things and can remember certain things and not others is actually more of a -- it's more consistent with how people recall childhood events than would be an account that seemed pristine and, you know, sort of A to Z, nothing missing, everything accounted for and so forth.

So those are the kinds of things that you would obviously listen for.  And in addition in this case, the -- the psychological reaction to the abuse that I've talked about, those

are the kinds of things that would be very unlikely that somebody would be able to fabricate if they were just making something up.

Q.  If you couldn't trust anything that someone who's been diagnosed as antisocial personality, you would never be able to evaluate them; is that right?

A.  Well, you wouldn't -- there'd be no purpose in evaluating them if you couldn't listen to what they were saying and evaluate it with your various other means.

Q.  With your experience?

Let me ask you a few questions about Defendant's Exhibit 7, which Mr. McKinnon's pulled out a few pages.

MR. MARTIN:  Your Honor, may I stand with the witness?

THE COURT:  Yes.

Q.  (BY MR. MARTIN):  Turning to -- turning to the notes on the third page of the document, right there.

A.  All right.

Q.  Do you see those notes where it says that -- this is by the -- Mr. -- Dr. Ganahl, it is unclear whether Mr. Lecroy attempted suicide, but Thursday morning approximately 7 a.m., he said he was faced with a "big problem" and bad feelings Wednesday night and Thursday morning.  However, is unwilling or unable to articulate what the problem feelings were.  He said that on Thursday morning, he felt as if it was just easier to end his life.

Did anything make you suspicious of that -- that

656

account that was given by Mr. Lecroy to Dr. Ganahl?

A.   There's no -- there's no way for me to evaluate.  This is -- this is a progress note, so this is the clinician writing his or her sort of account of this session.  And, so I can only rely on sort of -- the -- sort of the face validity of the language.  And what they are -- what this clinician is -- is doing is reporting what Mr. Lecroy told him or her.

Q.   This note is dated February 10, '92, a few days after the suicide or the attempt, whatever --

A.   Right.

Q.   The -- in this note or elsewhere, does he attribute this suicide to sexual abuse?

A.   No.  There's -- there's no mention here of sexual abuse. This refers to -- I don't know if -- I don't remember whether he specifies what the big problem was that's in quotes here, but there -- I remember reading this and I don't remember seeing anything about sexual abuse.

Q.   Now, turning to the document that's dated February 21, it's a typewritten document or a summary by Dr. -- it's actually not Doctor, Mr. Dempster?

A.   Yes, sir.

Q.   The counselor.  The -- looking at the very end of that first paragraph, does he at that point reveal this problem with possible molestation by an 8 year old?

A.   Well, it says:  He is currently serving time for revoking

ELISE SMITH EVANS, RMR, CRR

657

probation with the child molest -- molestation charges.
Apparently when he was 19 years old, he had sex with a 13 year
old girl.  The inmate reports himself being molested at age -- at
8 years of age by an 18 year old babysitter.

Q.   Does he attribute that incident as he's describing it through
this summary as the reason for the suicide, is he trying to use
that as an excuse for the suicide that you see in those reports?

A.   Oh, I don't see any -- I don't see him making any connection.

Q.   Okay.

A.   This looks like just background information that he's
including here.

Q.   Now, looking -- this page here, the note that -- progress
note of 2-25-92, and the middle of that where he -- is there
discussion about him being -- his father being very violent and
verbally abusive?

A.   Yes.  He -- I guess the -- is this -- this is still Dempster?
Well, I'm just trying --

Q.   This is, yeah, Dempster.

A.   Well, anyway, the clinician is referring to a phone call that
they had with the -- with Mr. Lecroy's mother.  And so he's
reporting some family history that he gleaned from that phone
call.  Says she gave me some history pertaining to his family
dynamics.  Apparently he had a very violent and verbally abusive
father.

Q.   Turning back to the summary report, page 2 of it, does that

also indicate that Mr. Dempster had confirmed this with the mother, Donna Houston?

A.   Yes.   It says I discussed Mr. Lecroy's history with his mother, Donna Houston, gives the phone number.   Yeah.   She validated the reports that he had not received any mental health treatment prior to his suicide attempt.

Q.   Mr. McKinnon asked you some questions about whether they were really concerned about suicide.   Turning to the note of April 2 of '92, it again appears to be Mr. Dempster's note, this page that looks like this --

A.   Yes.

Q.   -- does it appear to be that that's the point he had -- several months after the suicide attempt that they're still monitoring him for possibly self injury and suicide ideation?

A.   Apparently has a lot of frustration concerning when he is to get out and not knowing what is required --

Q.   Yeah.

A.   -- of him prior to his consideration for parole.   He reports his behavior at Rogers CI as -- I can hardly read this writing.

Q.   Let me back -- back up about the parole.   Mr. McKinnon asked you about a document which I think is separately identified as a long letter of -- at the very end of this as item number Government Exhibit 112, which is a letter to Mr. Dempster -- Dumpster -- or Dempster, excuse me, by Mr. Lecroy.

A.   March 3rd?

659

Q.   Yes.

A.   Or the -- okay.  Yeah.

Q.   Does -- not -- have you recently looked over that letter again?

A.   Just this morning when we were --

Q.   Yeah.  And he says in there they're waiting to see what a psychiatrist thinks before granting or denying my parole?

A.   Yes.  I see it.

Q.   Does the letter express his concern that if he continues to be psychiatrically -- in the psychiatric center and psychiatrically treated, that it's going to cause a problem for him being paroled?

A.   I'm going to have to read the letter before --

Q.   Okay.  Do it again.  I want to --

A.   Okay.

          (Witness reviewing exhibit.)

          Well, these two sentences -- look -- I'll read them and --

Q.   Okay.

A.   -- I guess we can all make our judgment.  He says:  Because of an overdose of medication at Rogers CI, the parole board has not made a decision.

          So he's clearly attributing their not making a decision to this overdose.

          Next sentence is:  They are waiting to see what a

ELISE SMITH EVANS, RMR, CRR

psychiatrist thinks before granting or denying my parole.

So he -- that would suggest fairly strongly that he sees a link between whether or not he's going to be granted parole and the termination of a psychiatrist and this issue of the -- the overdose.

Q.   And in this letter, does he not say on the second page: Could you call the parole board and tell them that my problem's just a behavioral disorder and not very serious as mental health problems go?

A.   Yes.

Q.   Okay.  And Mr. McKinnon asked you was it possible that he really didn't have a suicide attempt, it was all a manipulation to avoid work detail, and you said that's possible?

A.   Yes.

Q.   Is it just also an explanation from these records that what was --

MR. MCKINNON:  Objection.  Leading.

MR. MARTIN:  Well, maybe it was.

Q.   (BY MR. MARTIN):  But what is the conclusion -- another conclusion you can draw is whether or not he had something else to do, specifically his parole?

A.   Well, certainly.  And I just -- I don't want to be in the position of trying to sort of figure out retrospectively what was going on in his head.  It's -- it's -- this letter certainly would give one grounds to interpret this as he's concerned about

661

whether or not he's going to be paroled and he's concerned about whether or not his psychiatric problem, psychiatric history, whether that is going to be an impediment to getting parole. That's probably as far as I'd be willing to --

Q.   Okay.  And that letter is dated March 31, '92, if you look at the top?

A.   Yeah.

Q.   And the progress note, which is April 2, '92, a day or two later -- why don't you go back?

A.   All right.

Q.   And Mr. McKinnon earlier asked you whether or not they decided he was no suicide risk at all.

A.   Yeah.

Q.   References the letter and the statement that it really wasn't a suicide at the very beginning, does it not?  Discussed letter inmate wrote on 3-31-92?

A.   Correct.

Q.   And that -- it goes on, see as not him being suicidal as he is on the March 23, '92.  Does it not say:  I will monitor his behavior a while longer to see if any additional self injury or depression emerges?  Correct?

A.   Yes.  Yes.

Q.   So does that tell you that those clinicians looking at him in that case were still worried as to whether or not he was potentially suicidal?

A.   Well, again, I will be very --

Q.   Precise.

A.   I'll stick exactly with the words.  They are monitoring him for self injury -- self injury is behavior -- and depression.

Q.   Mr. McKinnon asked you a few questions about whether or not Mr. Lecroy's representation of his -- of his problems over the years may have been a way to manipulate prison people, in particular with regards to whether or not he could be moved into a halfway house.

A.   Yes.

Q.   Do you remember those questions?

A.   I remember the question, yeah.

Q.   That would all depend on whether or not he really was eligible for a halfway house, would it not?

A.   Yes.  I don't have any independent knowledge about whether there was a halfway house or whether that was part of what was being considered.  I don't know that.

Q.   As a sex offender, you don't have knowledge whether he was available even for a halfway house?

A.   No, I don't.

         MR. MARTIN:  Just one second.

         (A pause in the proceeding was had.)

Q.   (BY MR. MARTIN):  Referring to Government's Exhibit 110, which appears to have some notes at the bottom, do you recognize that handwriting?

A.   Yes.   That's mine.

Q.   And this says a note of -- it says S. Kearns.

Do you remember the name Stephanie Kearns?

A.   Vaguely.

Q.   All right.   Just looking at that note, does it -- to yourself in which it's listed on there.   I'll read it to you.   It says: Need testimony?

A.   Yes.

Q.   Report 30 days prior to trial, basic conclusions -- that appears to be what it says.   Mitigation only.

Do you understand that you were being considered as a witness only with regards to sentencing?

A.   Yes.   Correct.

Q.   Then it says:   Hall County jail, Gainesville, Georgia, 45 minutes north of Atlanta.

Does that ring a bell as to whether or not at that time it was contemplated that you would actually personally see Mr. Lecroy in jail?

A.   Oh, yes.   That was the -- he was telling me where -- where he was being held at the time, I guess.   I'm assuming that's where.

Q.   Okay.   And what does that say there?

A.   Will change to 175.   I think that was my hourly fee.

Q.   They would negotiate your fee?

A.   Yes.

MR. MARTIN:   That's all I have, Your Honor.

ELISE SMITH EVANS, RMR, CRR

MR. MCKINNON:  I have nothing further.

THE COURT:  You may step down, sir.  Thank you.

MR. MARTIN:  Well, excuse me.  Excuse me just one second, Your Honor.

(A pause in the proceeding was had.)

Q.  (BY MR. MARTIN):  Do you know -- well, you and I talked several times before you testified today; is that not correct?

A.  Yes.

Q.  And we went over an outline of your testimony, did we not?

A.  That's correct.

Q.  And a question and answer format?

A.  Right.

Q.  Did you ever do that with Mr. Mendelsohn or any of the attorneys for Mr. Lecroy prior to trial to get a specific outline of what your testimony would be?

A.  No.

MR. MARTIN:  That's all I have.

THE COURT:  You may step down, sir.

Any other witnesses from the --

MR. MARTIN:  No, sir.

THE COURT:  You may call.

MR. MCKINNON:  Call Dr. Julie Medlin.

JULIE C. MEDLIN, PH.D.,

having been duly sworn, was examined and testified as follows:

THE COURTROOM DEPUTY CLERK:  If you will state your

name, please.

THE WITNESS:  Julie Christine Medlin.

DIRECT EXAMINATION

BY MR. MCKINNON:

Q.  How are you employed presently?

A.  I'm employed as a licensed psychologist.  And I'm Director of the Medlin Treatment Center, which is a private outpatient counseling center that has four offices in metro Atlanta.

Q.  All right.  And how long have you been engaged in the -- as the Director of the Medlin Treatment Center?

A.  Since it was founded in 1997.

Q.  Do you have people that work for you, under you, at your treatment center?

A.  Yes, I do.  We have approximately 20 clinicians on staff, most of whom are licensed psychologists.

Q.  All right.  Is there a specialty that -- that your staff and you personally are engaged in?

A.  Yes.  We specialize in the evaluation of sexual abuse and sexual deviancy, which means that we conduct psychosexual evaluations and sexual trauma evaluations of alleged sexual abuse victims and confirm sexual abuse victims, as well as of alleged and confirmed sexual abusers.

Q.  All right.  And who do you do those evaluations for?

A.  For a very diverse referral base.  We do them sometimes for defense attorneys.  Sometimes they're referred by other mental

666

health professionals.  Sometimes they're referred by Department of Family and Childrens Services.  Could be adult probation, juvenile probation.  We do a lot of court-ordered evaluations for juvenile and Superior Courts.  So we do them all the way from the clinical realm to the forensic realm and a lot of different steps in between.

Q.  All right.  And what is -- what are your specific duties, then, in the Medlin Treatment Centers?

A.  Well, I serve as the Director of the organization, which means I oversee the clinical work of the 20 other mental health professionals.  I also directly supervise several psychological evaluators, meaning that I participate in the evaluation with them and then I review the reports and co-sign them.

I myself conduct psychotherapy or counseling with children, adolescents, and adult, victims and perpetrators.  I also conduct evaluations of the same.

Q.  Can you tell us your educational background?  Where did you get your college degree?

A.  I earned my Bachelor's in Psychology from Harvard University in 1989.  Then I earned my Master's of Science in clinical psychology from the University of Florida in 1991.  And then my -- or, I'm sorry, 1993.  And then in 1995 I got my Ph.D. in clinical psychology from the University of Florida.

Q.  All right.  And what was your dissertation on when you got your Ph.D.?

667

A. My dissertation was on child molesters and various psychological characteristics of child molesters. So I conducted research in several prisons and conducted interviews with convicted child molesters, as well as a control sample that was in the community.

Q. All right. And then after -- after obtaining your Ph.D., what did you do initially in terms of your professional experience?

A. Well, I also completed a -- my internship. After University of Florida, I went to the joint program at the Federal Correctional Institution in Butner, North Carolina. And it was a joint program with the University of North Carolina, Department of Psychiatry. So I completed my residency or internship there. And as part of that, I worked in the adult sex offender treatment program at the Federal Correctional Institution.

Q. What were your duties when you worked in the adult sex offender program?

A. I conducted -- I conducted individual and group therapy, and I also conducted forensic assessments.

Q. Okay. What time frame did you do your internship at Butner?

A. That was in 1994 to '95.

Q. Okay. Then after you -- and in 1995 is when you got your Ph.D.?

A. Yes.

Q. Okay. So what -- what was the next thing in your

ELISE SMITH EVANS, RMR, CRR

professional experience after that?

A.   Okay.   After that I moved to the Atlanta area, and I joined an outpatient counseling center or private practice, where I started an outpatient adult sex offender treatment program and also a juvenile sex offender treatment program.   And I conducted psychosexual evaluations of juveniles -- children, juveniles and adults, as well as general psychological evaluations and sexual trauma evaluations.

Q.   How long did you do that then?

A.   I was there for about a year and a half.   And then I started Medlin Treatment Center.

Q.   Have you published in the field?

A.   Yes, I have.   I published a 918 page sex offender treatment manual that was written for other mental health professionals to start up and run a sex offender treatment program.

I've also published an article on sexual behaviors in children.   And also wrote, I guess would be the word, or produced a CD-ROM for mental health professionals on clinical techniques for breaking through denial in adult sex offenders.

Q.   Okay.   I show you Government Exhibit 115.   Can you identify what Government Exhibit 115 is?

A.   Yes.   This is a copy of my resume.

Q.   And is that a -- that's a current copy as opposed to a copy that would have been provided back in 2004; is that --

A.   Yes, that's correct.

669

MR. MCKINNON:  Your Honor, I move for the admission of Government Exhibit 115.

THE COURT:  Any objection?

MR. MARTIN:  No, sir.

THE COURT:  It's admitted.

Q.  (BY MR. MCKINNON):  Have you had occasion to testify in either court or juvenile proceedings?

A.  Yes, I have.

Q.  And on how many occasions?

A.  On about 150 occasions, and that includes in juvenile and Superior Courts in about 27 different counties in Georgia.

Q.  Okay.  And have you been qualified as an expert witness on all of those occasions?

A.  Yes.

Q.  And what's been the nature of the testimony that you've given, just generally?  Not going into every 150 occasions, but generally what have you testified as an expert about?

A.  Typically, about sexual abuse, either in regards to my evaluation of the alleged victim or the alleged perpetrator.

Q.  Okay.  And if we would go back to the 2004 time frame, do you have any way to kind of assess how many times you would have been qualified as an expert as of, say, March of 2004?

A.  I would guess that it -- at least a hundred times, because I testified a lot very early on in my career because I was doing a lot more evaluations.  I still conduct a lot of evaluations, but

not nearly as many as I used to.

So a lot of my court experience was, you know, like say in the first 10 years of my being in private practice or -- so that would be my guess.  I could give you a more accurate number, but I don't have that material in front of me.

Q.   That's fine.

When you -- back when you were conducting evaluations on a more regular basis, what were you evaluating, what were you typically evaluating or being asked to evaluate?

A.   Well, it really depended on the case.  It depended on, you know, where they were in the clinical or potentially legal process.  So, for example, I conduct forensic videotaped evaluations of children in cases of alleged sexual abuse and --

Q.   What are you trying to determine in those forensic videotaped evaluations of children?

A.   I'm trying to assess the validity of the allegations.  So, basically, does it appear that the child is telling the truth.

Q.   Have you been asked to do that with respect to adults who are alleging sexual abuse?

A.   Yes.

Q.   And when you are asked to evaluate an adult who alleges sexual abuse, what are you looking for or what -- what does your evaluation entail, typically?

A.   Well, typically it involves an interview or multiple interviews with the client.  It involves reviewing all of the

671

relevant records in the case.  So, for example, any medical records, school records, job records, criminal records, things of that nature, mental health records.

And then it involves -- typically involves psychological testing.  And so in the psychological testing, I look to see if the person has a tendency to exaggerate their symptoms or fake symptoms or, you know, I look to see how they are scoring on the validity scales, which means do they have a tendency to overreport or a tendency to underreport their symptoms.

Then I look to see do they have symptoms that would be consistent with a history of sexual abuse.  I look to see do they have problems that would be consistent with what's in the literature and the research in regards to types of problems that sexual abuse victims often have.

In the interview I look to see, you know, how much detail they give about the allegations, their body language when they're talking about it, their consistency over time with -- if they've reported it to other people.  I look at possible motivations for why they may make false allegations.  And then I sort of try to assess their overall psychological functioning in regards to diagnosis and mental health as well.

Q.   Now, back in 2000 -- late 2003, December of 2003, were you contacted by an Assistant United States Attorney about doing an evaluation in a case involving William Lecroy, Jr.?

ELISE SMITH EVANS, RMR, CRR

A.   Yes.

Q.   And what were you specifically asked to do initially when you were contacted by the United States Attorney's Office?

A.   I was asked to conduct a psychosexual evaluation on him.

Q.   And what would that have -- what did you anticipate you would be doing then when you were asked to conduct that kind of evaluation?

A.   I anticipated conducting a clinical interview, one or possibly more interviews with Mr. Lecroy himself, and then also administering a battery of psychological tests to assess what kind of mental health issues he may have and to see if that might be consistent with a history of sexual abuse.

Q.   And what kind of tests or what are some of the tests that you would have anticipated having Mr. Lecroy perform while you were conducting your evaluation?

A.   I -- I believe that I -- back at that time I had recommended the MMPI-2, which is the Minnesota Multiphasic Personality Inventory, Second Edition.  The MCMI-III, which is the Millon Multiaxial Clinical Inventory, which is the one that he'd already been given in the past in the prison.

Also an IQ test.  I don't recall specifically which one, but it's probably the Kaufman Brief Intelligence Test, Second Edition, which is just to sort of get a general idea of his intellectual functioning.  And that's the standard part of any psychological evaluation.

Also the Trauma Symptom Inventory, which is a measure to assess for symptoms of post-traumatic stress related to a trauma.  A test to assess for malingering, the TOMM, T-O-M-M, test of malingering.  And I don't recall if there were any other specific tests that I had mentioned at that time, but it was decided that I would not be allowed to evaluate him as he would be invoking his Fifth Amendment rights.

Q.   So did you get to do any testing back in 2003 and 2004?

A.   No.

Q.   And, in fact, you've been present in court today to hear Dr. Lisak's testimony?

A.   Yes.

Q.   And you've -- and what records have you evaluated, then, both back in the 2003-2004 time frame, as well as in preparing for you're testimony today, what have you looked at?

A.   Okay.  I have -- I've reviewed Mr. Lecroy's U. S. Army records, Georgia Department of Corrections records including his probation records, City of Smyrna Police Department records, Cobb County Superior Court records, Bureau of Prisons medical records, current indictment and related police reports, Federal Defender's letter dated 12-23-03.  And I have also reviewed Dr. Lisak's report that was prepared for today, and then I've reviewed part of Dr. Hilton's report.

Q.   And -- but let me make clear, Dr. Lisak's report, was that made available to you back in the 2003-2004 time frame?

674

A.   No.   So the last two documents that I mentioned I just reviewed for today.  So I had not reviewed them back in 2004.

Q.   Okay.  And in your review of the records that were provided to you -- let's talk about the 2004 time frame first.  Other than two administrations of the Millon test when the defendant was in state custody in -- in the 1990s, did any of the psychological testing that you would have done, do you see any of that having been done back in the 2003-2004 time frame?

A.   No.   Only the Millon.

Q.   And coming forward to today, have you -- again, in terms of hearing Dr. Lisak's testimony this morning and early this afternoon and reviewing the records, have -- other than the Millon, have you seen any evidence of any psychological testing having been done with respect to the defendant?

A.   No.

Q.   So the record's clear, I'll show you Government Exhibit 116, ask you to identify Government Exhibit 116.

A.   Yes.  This is the summary report on William Lecroy, Jr., written by Dr. Lisak.

Q.   Is that the -- the report that you -- you reviewed in anticipation of testimony today?

A.   Yes.

        MR. MCKINNON:  Your Honor, I would move for the admission of Government Exhibit 116, please.

        MR. MARTIN:  No objection.

ELISE SMITH EVANS, RMR, CRR

675

THE COURT: It's admitted.

Q. (BY MR. MCKINNON): Now, I think you mentioned that you didn't do the evaluation that you intended to do or expected to do. Were you asked to do something else with respect to Mr. Lecroy back in early 2004?

A. Yes, I was. I was asked to go ahead and just review his records and render an opinion in regards to -- in the court order, it was should be limited to the defendant's proposed use of abuse and trauma as a mitigating factor during the death penalty phase of the trial.

Q. All right. So what did you do, then, with respect to the Court -- the direction that you got from the Court in that order with preparing a report of some sort?

A. I reviewed all of the records and tried to render opinion regarding that very specific issue.

Q. Okay. And just for the record, then, did you prepare a report that was submitted?

A. Yes, I did.

Q. And would that be Government Exhibit No. 63?

A. Yes. I believe it was actually -- I have -- I have one that's on letterhead and signed, but that is --

Q. Your copy is --

A. Right. But that is the report.

Q. Okay. And you submitted that under seal to the Court; is that correct?

ELISE SMITH EVANS, RMR, CRR

A.  Yes.

Q.  Didn't provide a copy -- did you provide a copy at the time to the United States Attorney's Office?

A.  I believe I sent it directly to the Judge.

Q.  Now, from your -- from your review of the records, did you make a determination about at least what was reported as to Mr. Lecroy's IQ?

A.  Yes.  I had seen that in the records he had obtained a culture fair IQ of 125.

Q.  And what would that mean in terms of his IQ in relation to the general population?

A.  That means that he's above average in his intellectual functioning compared to the average -- to the general population.

Q.  Now, did you also review the records to see if there were inconsistencies in his reporting of sexual abuse as a child?

A.  Yes.

Q.  And what did you find from your review of the records regarding Mr. Lecroy's reporting of his -- of sexual abuse as a child?

A.  Okay.  I'm going to turn to that section in the -- in my report.

Q.  Now --

A.  In general I found that he was inconsistent in his reporting of this.  That based on my review of the records, that he first reported the sexual abuse to Bryan Dempster on February 21st,

677

1992, but -- and reported it to Dr. Marti Carlson when he saw her for therapy in 1999.  But then in -- later on in 2000, February -- on February 14th, 2000, at Federal Correctional Institution at Butner, denied having been sexually abused.

Q.  All right.  And was that significant to you, then, in your evaluation of whether or not there had been sexual abuse -- whether the defendant was a victim of sexual abuse?

A.  Yes.  He had also denied it on a few other occasions as well. Yes.  It calls into question whether or not he was actually sexually abused, because he's reporting it sometimes in some circumstances, most notably to female therapists for whom he has expressed a romantic interest, but then not -- typically not to male mental health professionals and typically not on forms when asked about it, like in a routine mental health assessment.

Q.  All right.  Is it significant to you that he was reporting it to female mental health professionals while he was incarcerated?

A.  Yes.

Q.  Or the gender of the person to whom the report was made?

A.  Yes.  Especially when it's to two females who he -- female therapists whom he had expressed a romantic interest in.  And the reason I say that is that there is research, the research we've talked about by Jan Hindman, that shows that approximately -- when sex offenders are asked have they ever been sexually abused, 60 percent of them said that they had, but when they were polygraphed, that number went down to 30 percent.

So there is research that demonstrates that sex offenders, if they're not polygraphed, you know, often inflate the rates at which they've been sexually abused. And it is thought that part of the rationale for that is that they would prefer to be seen as sort of a victim of their experience rather than just as someone who's committed a sex offense. And it's also thought that it may be a way for them to justify their offending if they can say, well, it also happened to me, I was sexually abused.

And I can tell you that in working with adult sex offenders myself, I have found that to be the case. I have had adult sex offenders tell me in therapy that they were sexually abused, and then when they took a sexual history polygraph, which is the standard requirement of our sex offender treatment program, it has come out that in fact they were not actually sexually abused. So, I've seen it clinically in my own experience and it's also well documented in the research.

And Jan Hindman replicated that study on a different data set and got almost the exact same findings the second time around.

So all of that -- to come back to your question, I think it's possible that -- that Mr. Lecroy may have talked about having a history of sexual abuse to female therapists in part because it might make him -- it might help the therapist better relate to him or see him as maybe not such a bad guy.

Q.   Let me kind of break this up and ask you specifically about Jan Hindman and her studies.

A.   Yes.

Q.   Are you familiar with who Jan Hindman is?

A.   Yes.  She is well known in the sex offender treatment world, and this study is well known among people who do sex offender evaluations and treatment.

Q.   All right.  And do you make that statement based on your own experience in the sex offender treatment world?

A.   Yes.  I'm a member of the Association for the Treatment of Sexual Abusers.  And Jan Hindman is a frequent speaker there and her research is often discussed at those conferences.

Q.   All right.  And is her research published in some recognized publication of your field?

A.   Yes, it is.  Yes, it is.  And this particular article was in -- was in *Federal Probation*.  And she reviewed two different studies that had been conducted with -- yielding the same results.

Q.   All right.  Now, let me ask you about the studies.  You mentioned some statistics.  The first statistic is 60 percent. What does 60 percent refer to?

A.   Actually, it is 65 percent.  65 percent of adult sex offenders reported being sexually abused as a child, and then when they were polygraphed --

Q.   All right.  And what are the circumstances under which

they're polygraphed?

A.   Well, they were given immunity.  They were offered immunity, so that whatever they disclose could not be used against them in a legal proceeding or criminal proceeding.

Q.   All right, sir.  So the 65 percent -- so talking about 65 percent of the offenders who are sexual -- sexual offenders reported being victims of sexual abuse?

A.   Yes.

Q.   And, then, when they were polygraphed where they asked specifically about whether or not they were a victim of sexual abuse?

A.   Then only 32 percent reported having been sexually abused.

Q.   So approximately half admitted to malingering or making up the report of being a sexual abuse victim themselves?

A.   Yes.

Q.   All right.  When was that first study done, approximately?

A.   That was comparing the histories of polygraphed and non-polygraphed offenders, 1988 to 1994.

Q.   So that study would have been available to you to testify about back in 2004?

A.   Yes.

Q.   Now, when was the second study done?

A.   The second study was comparing histories of adult offenders before and after polygraph, 1994 to 1999.

Q.   So, again, that would have been available, then, in 2004?

ELISE SMITH EVANS, RMR, CRR

681

A.  Yes.

Q.  And when you say the study was replicated, what do you mean by that?

A.  Well, it means that they repeated the study to see if they would get the same results with a different set of subjects or individuals.

Q.  All right.  And so the same study was done, just with different subjects?

A.  Yes.

Q.  And what were the -- what was the results of the second study that was done?

A.  The second study found that 61 percent of adult sex offenders when they were not polygraphed reported having been sexually abused as a child, and that when they were polygraphed, they reported only 30 -- only 30 percent of them reported having been sexually abused as a child.

Q.  So the numbers were approximately the same as the previous study?

A.  Yes.

Q.  In terms of the percentage, approximately half admitted that they had not actually been sexually abused as a child?

A.  Yes.

Q.  All right.  And back when you were doing your evaluation, did you know that Mr. Lecroy was a convicted sex offender in the early 1990s?

ELISE SMITH EVANS, RMR, CRR

A.   Yes.

Q.   And do you know what offense he was convicted of?

A.   Yes.

Q.   What was that?

A.   Molesting his 13 year old stepsister and I believe it was statutory rape or aggravated child molestation.  I don't know what he eventually was convicted of or pled to, but --

Q.   And is Dr. Hindman's studies, are those well known in the -- in the sexual offender field?

A.   Yes.

Q.   Such as yours?

A.   Yes.  And, in fact, it's standard practice in sex offender treatment programs to polygraph the offenders for very reasons such as this, is that they're often dishonest about their history of sexual abuse.  So it's a standard part of our program.  And it's actually a requirement -- requirement of the sex offender -- of the sex offender treatment providers who are on the approved provider list for the Georgia Department of Corrections, Probation Division, they're required to have all of their probationers be polygraphed every six months while they're in treatment.

Q.   Now, were there other instances that you discerned from the reports that you reviewed back in 2003 and 2004 where you saw instances of Mr. Lecroy being inconsistent in his report of his mental health symptoms or mental health state -- status to

professionals?

A.   Yes.   There were --

Q.   Can you give us another example, then, of what you found?

A.   Yes.   There were several instances of Mr. Lecroy giving inconsistent reports of his history of depression and of suicide attempts.   For example, after he had overdosed on the Indocin, he told Mr. Dempster that he had wanted to commit suicide.   But then he later told him that, in fact, he had not tried to kill himself, that he had taken the Indocin in order to numb himself enough that he could cut his wrists so that then he could be moved from the work camp.

So that -- looking at the timeline, it's clear that based on Mr. Lecroy's own report, that he lied to Bryan Dempster when he -- when Mr. Dempster initially asked him about overdosing on the Indocin.

Q.   Okay.   Let's see if I can walk you through the timeline.   Let me show you Defendant Exhibit No. 7, and we'll use the exhibit numbers.   Is this -- first of all, is Defendant Exhibit 7 something you would have reviewed?

A.   Yes, it is.

Q.   All right.   And what's the date -- I handed you -- I don't think this is numbered, but page 1 of a -- what is the date when Mr. Lecroy initially reported that he'd attempted to commit suicide at Rogers CI?   Do you have that in your records?

A.   Yes.   The overdose on the tablets of Indocin occurred on

February 6th, 1992.  And, then, this issue was discussed during his mental status exam with Bryan Dempster on February 21st, 1992.

Q.   So if I show you the report that -- show you a report dated February the 21st, 1992, which is part of Defendant's Exhibit No. 7, is this the report that you're referring to?

A.   Yes.

Q.   And can you find in there just -- and read into the record what Mr. Dempster reported the defendant said on February the 21st, 1992?

A.   His intentions, he said, were to kill himself.

Q.   Let me show you Government Exhibit 114 and ask you if you would have reviewed Government Exhibit 114 while you were -- in your review in 2003 and -- in 2004?

A.   Yes.

Q.   And does that then -- what's the date of the Government Exhibit 114?

A.   This is May 14th, 1992.

Q.   And who prepared that?

A.   This was signed by Bryan Dempster, Jackie Simmons who was the mental health, Mental MR Director, and then Gary Ganahl, the clinical psychologist.

Q.   And do they then report what the defendant said to them more recently in May about the overdose?

A.   Yes.  It says:  During our discussions he reports that a

ELISE SMITH EVANS, RMR, CRR

685

recent wrist cut was a manipulative attempt and the initial concern of his overdosing on Indocin was actually an attempt on his part to disinhibit himself so that he could cut his wrists and be removed from the work camp there at Rogers.

Q.   All right.   So is the May 14th report consistent with the February the 21st report?

A.   No.   It suggests that what he told Mr. Dempster originally was not true.

Q.   Let me show you one other --

(A pause in the proceeding was had.)

Q.   (BY MR. MCKINNON):   Let me just show you one other note that is included in Defendant's Exhibit No. 7, which is dated April the 2nd, 1992.   And would you read what Mr. -- and that was prepared by Mr. Dempster again -- about what he said the defendant told him on April the 2nd, 1992, about the alleged suicide attempt?

A.   It says:   Discussed letter inmate wrote 3-31-92.   Apparently he has a lot of frustration concerning when he is to get out (not knowing) and what is required of him prior to his consideration for parole.   He reports his behavior at Rogers CI as not being suicidal as he did on 3-23-92.   I will monitor his behavior a while longer to see if any additional self injury or depression emerges.

He agrees with Dr. Ganahl's eval, which Dr. Ganahl's eval indicated that he was -- he did not diagnose him with

clinical depression.

Q.   Now, let me ask you, even though these -- even though this report has nothing to do with sexual abuse as a child, is it relevant to your trying to determine whether or not the defendant's report of sexual abuse as a child would be credible?

A.   Yes, it is relevant, because it suggests that the defendant has a history of lying about his symptoms.  And if he were to lie about his symptoms or mental status, he might lie about other things, such as his history of abuse.

Q.   Now, you mentioned depression.  At some point did he -- did he report that he was suffering from depression while he was in prison?

A.   Yes.  He initially denied to evaluators or mental health professionals in prison that he had a history of depression.  And he even told Dr. Carlson when he first met her that he did not have a history of depression.  But, then, a year later he told her that he did have a history of depression and tried to commit suicide by overdosing in 1991, which we just talked about where he had later admitted that he had not been trying to kill himself, he had been trying to numb himself enough to cut his wrists so then he could be removed from the work camp.

Q.   Okay.  So -- and did you see that, then, through the records where at times he would claim to be depressed, at other times he would deny that he even had a history of depression?

A.   Yes.  And also that sometimes he would say he had no history

of suicide attempts, and other times he would say he had three suicide attempts and would include this incident with the medication as one of the suicide attempts.

Q. All right. And that -- again, that inconsistency in his reporting of suicide attempts and depression or depressive symptoms, would that be relevant to your determination as to whether or not his self report of victim -- of sexual abuse would be credible?

A. Yes, because it suggests that he says what he thinks -- he says whatever he thinks at the time is going to benefit him the most in terms of being moved out of a work camp or being paroled or getting a therapist to like him or feeling sorry for him or things of that nature. So, it appears that he's not a reliable reporter.

Q. All right. Would that also include perhaps creating a sexual abuse as a -- as a child as a mitigating factor in a death penalty criminal case?

A. Quite possibly.

Q. There's one other area I want to ask you about. Was there an instance in the reports when the -- an evaluator concluded the defendant was faking a seizure in front of him?

A. Yes. Yes. It -- on 4-19-93, the medical records indicate that it appears he faked a seizure in order to avoid being sent become to his correctional unit from the hospital. And that was the documentation of the medical professional there at the time.

Q.   Okay.  And that, again, would be consistent with what you've been testifying about in terms of depression or suicide attempts, inconsistent reporting, and apparent -- and with the apparent intention of trying to get something and manipulate something in the system?

A.   Yes.  It would definitely be consistent with manipulation.

Q.   Now, in the -- in your review of the records, did you review therapy notes by Dr. Carlson when the defendant was seeing her at El Reno?

A.   Yes.

Q.   Did you reach any opinion about whether Dr. Carlson was conducting some sort of an examination of the defendant in terms of whether he was being truthful in his reporting to her?

A.   It appeared to me that she was taking what he said at face value.  For example, he -- you know, he told her I guess in '98 that he did not have a history of depression or suicide attempts, but then in '99, he told her he did have a history of depression and suicide attempts.  And instead of looking through the records to verify that, she simply just wrote it in her notes that he had a history of depression and suicide attempts.

Q.   Okay.  And, again, I think you've testified to this, but did it appear that the defendant might be trying to manipulate Dr. Carlson into allowing him to continue to see her because of his interest in her?

A.   Yes.  It's interesting to note that when he had seen her in

'98, he had expressed an interest in getting therapy, but for whatever reason was not given therapy.  So, you know, it's suspected that a year later he may have exaggerated his symptoms of depression in the hopes that he would be offered therapy at that time, and in fact he was.

Q.  Now, let me ask you -- another thing about the suicide attempts.  Was there a suicide attempt that the defendant claimed was the result of a gunshot?

A.  Yes.

Q.  And did you see anything in the records you reviewed that would suggest that the gunshot wound was accidental as opposed to being intentional or an attempt to commit suicide?

A.  Yes.

Q.  What was that?

A.  In the presentence -- in the presentence investigation, it states that the gunshot wound to his leg was accidental.  But in later treatment records, Mr. Lecroy reported that it was a suicide attempt.

Q.  Now, let me ask you a couple of questions about Dr. Lisak's testimony.  In your experience as a clinician, do men who report sexual or -- let me rephrase this.

You heard Dr. Lisak testify about the fact that the defendant was allegedly sexually abused by a female, but that caused him to have some concern about being a -- homophobic or gay.  Is that your experience in your clinical experience?

690

A.   No.   No.   I have seen many adult men who are sexually abused by a female in childhood, and none of them have told me that that resulted in them having feelings or fear that they were gay. Now, I have seen men who are sexually abused by a male report a fear that they were gay or the others might think they were gay, but I've never seen that in the case where the abuser was a female.

And I've also -- when I conducted the prison research on child molesters, did see -- did interview men there who reported a history of sexual abuse by a female, and many of them did not really perceive it as sexual abuse.  And, in fact, thought of it as a positive experience, that they were being initiated into the sexual world by this older woman.

Q.   In your experience as a clinician and your studies, then, I mean, would you view two incidents of this sexual contact, even if it happened with a -- with a female by an 8 year old boy, did it appear to be traumatic to the defendant in his reporting of it from the records you reviewed?

A.   It does not -- I think it's unclear whether or not that experience, if it happened, was traumatic for him.  There are indications in the records that the sexual contact made him feel special, that he later masturbated to thoughts of it, that there were some positive feelings surrounding it.  But it's unclear to me if there really was -- if he really experienced significant -- if it was -- if he experienced it as traumatic.

ELISE SMITH EVANS, RMR, CRR

Q.  I mean, did you see reports where he was reporting it as being a traumatic -- when you reviewed the records back in 2003 and 2004, when he would actually talk about it with Dr. Carlson, did you see reports that he had reported it as being a traumatic experience?

A.  Well, I believe he did talk about being very angry at some point and having -- you know, having themes of revenge or thoughts of revenge against various individuals, and I believe that she may have been one of them.  So I do think that there -- he may have had mixed feelings about it.  But it's unclear to me how much of that would account for later actions in behaviors by him.

Q.  Let me ask one last question.  I know I'm kind of skipping around at times.  But on March 19th, 1999, there was a note that Dr. Carlson wrote that the defendant had forgiven himself for his -- well, he reported that he'd forgiven himself.  Can you comment on your analysis of that note, what it means?

A.  Yes.  I think it's noteworthy that in the prior session, he had reportedly told Dr. Carlson that he was feeling guilty for having molested a 13 year old girl.  Now, it doesn't appear that he told her that this girl was his stepsister, but that he apparently said that he wanted to write a letter apologizing.  But instead, in the next session, wrote a letter where he forgave himself.

And I find that noteworthy because it suggests that the

remorse -- his remorse for his sexual offending was not genuine, and that he was redirecting it back to feeling like he's a victim, forgiving himself, instead of writing a letter apologizing to his victim as he said that he would.  And that's very common among sex offenders to shift the focus to themselves, present themselves as a victim, and to avoid really talking about their offending and taking responsibility for it.

Q.   Not sex victims, sexual --

A.   Sex offenders.

Q.   Sex offenders, which is what Mr. Lecroy clearly is, because he's been convicted of a sexual offense?

A.   Yes.

Q.   Dr. Lisak was asked about your -- on page 7 of your report -- can you turn to page 7?  About the fact that you noted that the defendant, when he was interviewed at Butner in February of 2000, denied that he was the victim of sexual abuse, and you had made a note of that.  Why did you make a note of that or why would you think that would be significant?

A.   Well, I made a note of that and I thought it was significant because he had just received months, if not a year, of treatment with Dr. Carlson where apparently he was discussing the sexual abuse and processing it.  And to then -- for them to -- for him to then deny a history of sexual abuse, you know, a year later or shortly thereafter suggests that he may not have been sexually abused.

Q.   Dr. Lisak commented on the fact that in your report, you noted a specific response on the Millon examination and the defendant's response on the specific -- to a specific question. Why would you have put that in your report and why would that have been important?

A.   I noted that because the specific issue I was asked to address was not his diagnosis, but about whether or not he had experienced some sexual abuse that was a mitigating factor in his case.  So I thought that anything in the records that related to a history of trauma or abuse was relevant.

     Now, what Dr. Lisak testified to about that you don't typically interpret a single item, that's true, you don't typically, you know, interpret a single item when you're making a diagnosis.  So you would never use that one item to formulate a diagnostic impression.  But I believe it is relevant because it's just another piece of information to be considered from the records in this case.

Q.   On page 23, Dr. Lisak was questioned about the Kolko study of 2002.  Why did you include a reference to the Kolko study in 2002 of your report at page 23?

A.   I included that because it appears that while Mr. Lecroy did have a difficult childhood in some respects, that there appeared to be some positive aspects.  And the research does show that there are protective factors, or they're sometimes called moderating variables, that will affect how much an individual is

694

affected by their history of abuse or neglect.  So -- I mean, because we know that not everyone who's been sexually abused commits a sex offense.  In fact, the research shows most people who are sexually abused don't commit a sex offense.  So there's research geared towards trying to understand why some do and some don't.  And that's true for any form of abuse, that there's research looking at protective factors.

And there was one study that showed that the following factors, you know, helped compensate for early abuse or negative childhood experiences, and those factors are supportive parent figure, high intellectual functioning, and a higher socioeconomic status.

Q.  And based on your review of the records, did Mr. Lecroy have high intellectual functioning?

A.  Yes, he did, based on the IQ test -- IQ score that was reported in his records of being 125, which is above average.  So, yes, he would have on the higher intellectual functioning.

Q.  And did you view the relationship with his mother to be a positive or negative influence on his childhood?

A.  Well, I have to say I had limited information about his relationship with his mother.  But there was some information in the records to suggest that they had some positive interaction.  I believe she had said that they were very close.  Now, his perception may be different.

He did also report in his letter -- when he was asking

about seeing a psychiatrist so he could go before the parole board, he did, you know, refer to having a loving family that was waiting for him outside of prison.  So there were some suggestions in the records that he did have, you know, some positive family experience and a supportive mother.

Q.  Okay.  I think it was also mentioned on page 23 about the reference to Post-Traumatic Stress Disorder and the fact that you didn't see any -- any indication of symptoms of that in the -- in the report.  Why would that be significant?

A.  Well, it's significant because sometimes sexual abuse victims will have PTSD.  And his test results didn't show any evidence of that.  Now, that doesn't necessarily mean -- lack of PTSD doesn't mean that he was not sexually abused, but it's still worth noting that he wasn't scoring high on that.

And I believe he was reporting some symptoms of that to Dr. Carlson, and then also he had reported symptoms of PTSD earlier back when he was attempting to get a nurse to write him a prescription for Elavil.  So I think it's noteworthy for both of those reasons in reference to that, because when I read the note about the Elavil, it seemed somewhat suspicious to me.  He was telling a nurse in the letter exactly what dosage he wanted of Elavil, and it seemed rather presumptuous and a little manipulative.

So at any rate, I think it's relevant for both of those reasons.

Q.   And for the record, what is Elavil, then, for a lay person?

A.   It's an antidepressant.

          MR. MCKINNON:  Just one second.

          (A pause in the proceeding was had.)

Q.   (BY MR. MCKINNON):  The testimony that you've given today, all the records that you've reviewed in -- and testified about, were those available to you back in 2004?

A.   Yes, all of them were, with the exception of Dr. Lisak's report and Dr. Hilton's report.  But my testimony has not really focused on those two documents.

Q.   I don't think I've asked you any questions about either report because I want to make it clear that your testimony you're giving today would have been available to the trial jury back in 2004?

A.   Yes.

          MR. MCKINNON:  Thank you.  That's all the questions I have.

          THE COURT:  Let's take about a 10 minute break.  Then we'll have Cross Examination.

          MR. MARTIN:  Fair enough.

          (A recess was had.)

                    CROSS EXAMINATION

BY MR. MARTIN:

Q.   Let's start where we left off.  As I understand it, your testimony is that if you had been called as a witness back in

2004 for the trial of William Lecroy as an expert in child sexual abuse, that you would have testified that it's possible that a child of only 8 years old who was molested by his 18 month old -- 18 year old, excuse me, babysitter who told him that unless -- let me show you how to kiss and started to French kiss, who then took him into a bedroom and undressed him, who then told her -- removed his shirt, caressed his chest, and then asked him to caress her breasts.  Then he pulled down -- she pulled down his pants, he tried to stop her, but she then went ahead and performed fellatio on him.  And, then, on a second occasion -- oh, and asked him to suck her nipples.  And then on a second occasion that she had a separate incident in which she would begin kissing him, removed her clothes and his own, initialed -- initiated genital-to-genital contact, pushed his face down into her genitals and rubbed his face back and forth on her genitals, then inserted her finger into his anus, and then had him insert his finger in her vagina, that quite possibly that would not have been a traumatic experience for him, but may have been something that he would have enjoyed and would have told his buddies about. Right?

A.   He himself reported to Dr. Carlson that the sexual activity made him feel special and that he had mixed feelings about it. And it's actually quite common for children who've been sexually abused to have mixed feelings about it, including some positive physical sensations.  For example, when she, you know -- when she

allegedly performed fellatio on him, he may have experienced some sexual arousal, and that would help explain why he indicated later that he masturbated to thoughts of the sexual interaction with her.

Q.  So this would have been -- you would have told this jury that all this could have been a very pleasurable experience to Mr. Lecroy and actually would have been a positive influence on him? You would have testified to that?

A.  No.

MR. MCKINNON:  Judge, I object to the question because there's no foundation laid that Dr. Medlin knew back in 2003 any of these details about the alleged sexual --

Q.  (BY MR. MARTIN):  Assume for the sake of my questions that those details had come out during the trial, and you were called as a witness, you would have given the same testimony you just gave in answer to Mr. McKinnon earlier that that experience -- you've used the words "could have," "possibly suggests," "might have" throughout all your testimony.  I'm not saying it was necessarily pleasurable, necessarily a good thing, but your testimony as you just told Mr. McKinnon was all of this might have or possibly could have been very pleasurable to Mr. Lecroy and would not have caused him any trauma whatsoever.  Is that not what you testified to?

A.  No, that is not what I testified to.  And I feel like you're misrepresenting what I'm saying.

Q.   Well, what is it?

A.   What I'm -- well, first of all, let me be clear that sexual abuse is never a good thing.  Regardless of how the victim perceives it, it's never a good thing.  And it can certainly have negative effects on the victim.  But having said that, children who've been sexually abused often perceive it in very different ways.

So there are some people who have been sexually abused, particularly men, sexually abused by older females, who don't seem to view it as sexual abuse and do sometimes view it as being a positive experience.  That is what I was referring to when I testified that he may have had mixed feelings about it.  He himself told his psychologist at the Bureau of Prisons that -- that this sexual activity made him feel special.

Q.   And confused?

A.   Yes.

Q.   You're an expert in this area?

A.   And he had mixed feelings about it.

Q.   And that's very common --

A.   Yes.

Q.   -- for sexually abused children --

A.   Yes.

Q.   -- to be confused, to have all sorts of mixed feelings about them, and to carry that for the rest of their lives?

A.   Well, not necessarily to carry it for the rest of their

lives.  It depends on the individual.

Q.  Depends on the individual?

A.  It also depends on a number of other factors that have been found in the research to predict which child sexual abuse victims experience more emotional distress.  And those are things such as use of force during the abuse, multiple perpetrators, the abuse extending over a long period of time, and the abuse being perpetrated by a biological relative.  And I'd like to point out that in this case, none of those factors apply to Mr. Lecroy's experience of alleged sexual abuse.

Q.  But let's be clear.  You don't dispute, do you, as an expert in the field, that this incident as I just described and it was testified to by Dr. Lisak, using your words, could have, possibly have caused severe trauma to Mr. Lecroy?  You don't dispute that, do you?

A.  I believe that it could have caused him problems, yes.

Q.  And --

A.  But I'm not necessarily in agreement that it would cause him significant lifelong trauma that would then result in violent behavior.

Q.  Well, you have limitations on your ability to give an opinion about Mr. Lecroy; is that not correct?

A.  Yes.

Q.  You never evaluated him; correct?

A.  Yes.

Q.   You never talked to Dr. Carlson, did you?

A.   No.

Q.   You've had a lot of opinions about Dr. Carlson's notes and what they might mean and might not mean about their relationship, but you never talked to Dr. Carlson, did you?

A.   No.

Q.   You never talked to the mother, did you?

A.   No.

Q.   You never talked to the probation officer who reported in her report that the -- the gunshot wound was an accident, did you?

A.   No, but I read the report.

Q.   The report says simply in the physical condition that on one of his legs there was a gunshot wound which was from an accidental gunshot wound; correct?

A.   Yeah.

Q.   You don't know the context and how that discussion occurred, did you?

A.   No.  But that sounds -- accidental does not imply suicide attempt.

Q.   Listen to my question, listen to my question.  The question is did you not know the context in which this information was obtained and put into this presentence report, do you?

A.   I do not know any more information about that gunshot wound beyond what was reported in that presentence investigation report.

Q.   And you don't know whether or not that was a statement made concerning the physical condition of the defendant during a -- an interview that had nothing to do with his mental condition or any types of things like that, do you?

A.   I do not -- I don't know any more information.  But accidental does imply that it was accidental.

Q.   With regard to the culture fair IQ score, are you familiar with that test?

A.   No.

Q.   Do you know what population it's normed against?

A.   No.

Q.   If it was normed against the prison population, would that be a different score than it would be a WAIS-II, a WAIS-III, which is normed against the general population?

A.   Yes.  I would expect it would probably be -- that a 125, if the -- if it's the -- based on the -- normed on the prison population would probably -- that person would probably score a little bit lower than on the WAIS if they're compared to the normal.

Q.   But you relied upon this culture fair, but you don't even know how it's normed?

A.   Well, I did also notice in Dr. Carlson's notes that she referred to Mr. Lecroy as having high intelligence.

Q.   I asked a simple question.  You don't know how the culture fair was normed, do you?

A.   No.   But most IQ tests are a mean of 100, standard deviation to 15.

Q.   Right.   And they're normed against different populations; correct?

A.   I've never heard of an IQ test that was only normed on a prison population, but, I mean, I guess it's possible.

Q.   You don't know?

You don't know whether -- if you don't know anything about it, you don't know anything.

The study of Jan Hindman, in your report, you repeatedly cite to that study and you say -- I'll refer -- do you have your report there in front of you?

A.   Yes.

Q.   On page 5:   It should be noted that there is research suggesting that a significant number of sex offenders fabricate a childhood history of sexual abuse, presumably in order to explain their own sexual offending?

A.   Yes.

Q.   And you -- you put (Hindman 1988).   And when I turned to the bibliography of your report, it says:   Hindman (1988).   Research disputes assumptions about child molesters.   And then it indicates that that was published in the *National District Attorney's Association Bulletin*.

Is that where that report is -- was published?

A.   Yes.   It's my understanding that the -- the same information

was reported in both places.

Q.   It is --

A.   Both in the *National District Attorney's Association Bulletin* and in *Federal Probation*.

Q.   *Federal Probation* in 2001?

A.   Yes.

Q.   Do you know whether those tests were peer reviewed, that research was peer reviewed in articles?

A.   I believe they were.

Q.   Do you know?  You said you believe.  Do you know?

A.   I don't know for a fact, but I can tell you that they're well accepted in the field, in the sex offender treatment field.

Q.   Are any of your articles peer reviewed?

A.   No.  I'm not a researcher and I don't spend my time writing academic research articles for journals.

Q.   Okay.  One of your reports, one of your -- reading your CV, it indicates a number of different presentations that you've made to various different groups?

A.   Yes.

Q.   Sometimes just community groups, sometimes hospitals, prosecutors; different groups, all sorts of different groups. And there was one group called Devereux, D-e-v-e-r-e-u-x.  Do you see that?

A.   Yes.

Q.   In May of 2007.  The title of that presentation is Care for

Children With Sexually Reactive or Offending Behaviors.

Do you understand what those terms mean?

A.   Yes.

Q.   What does sexually reactive mean?

A.   Sexually reactive is a term used in the field to refer to a child who has been sexually abused who is then showing inappropriate sexual behaviors.

Q.   Is that not evidence of sexual abuse if someone is -- let me finish my questions.  If someone is sexually reactive, offending behaviors is another word you use, is that not some evidence of sexual abuse?

A.   Not necessarily.  The -- the research shows that 35 percent of sexually aggressive children, meaning children who actually molest other children, 35 percent of them were -- were sexually abused.  That means the majority were not.

Q.   35 percent were?

A.   Right.  And we're not talking about just sexually reactive behavior.  Sexually reactive behaviors refers to low-level sexual behaviors, such as frequent masturbation, humping the sofa, things like that that don't actually involve hands-on offending, molesting other children.  So I'm saying even of the hands-on, the sexually aggressive, there only 35 percent were sexually abused.

So what that says is that children who are showing sexually aggressive behaviors can have developed that behavior

from other ways.

Q.  Well, let me ask you this question.  You interview a child and a child is claiming to be sexually abused.  Now, you will concede that children sometimes do not immediately outcry sexual abuse?  You agree with that, don't you?

A.  Yes.

Q.  Often they don't tell their parents; is that correct?

A.  Yes.

Q.  And sometimes they give conflicting reports; sometimes they say it happened, sometimes they take it back?

A.  Yes.

Q.  And when you're interviewing them, you look for those indications as an expert, somebody trained in the field, that the report sounds credible?  That's one thing you look at; correct?

A.  Yes.

Q.  And sexually reactive behavior, even though it's not necessarily an indication of sexual abuse, that would be one factor you would look at, as you have before in other cases, to say, yes, this is another indication that there was sexual abuse.  Correct?

A.  It's something -- it's a piece of information that I would consider in looking at all of the information in the case.  So a child showing an inappropriate sexual behavior in and of itself does not mean the child was sexually abused.

Q.  So --

A.   So -- but it's one piece of information I would consider.

Q.   Right.  Any good scientist in this field is going to look at more -- as much information as they possibly can to make a judgment; correct, that's relevant?

A.   Yes.

Q.   You want to talk to the defendant or the individual that you're evaluating to find out what they have to say about it, how credible their story account is?

A.   Yes.

Q.   You want to look at things like sexually reactive behavior; not necessarily, but that's one thing you want to look at. Correct?

A.   Yes.

Q.   You want to talk to people who -- family members, if you can, who are willing to talk about it; correct?

A.   Yes.

Q.   You want to look at a medical history; correct?

A.   Yes.

Q.   You want to look at other types of acting out behaviors that may have occurred over the -- over the time that might be an indication of sexual abuse, such as bed-wetting and things like that; correct?

A.   Yes.

Q.   I mean, there are other objective things outside the mere report that can give you some evidence, not necessarily all

bed-wetters having been sexually abused; correct?

A.   That's correct.

Q.   But that's one thing that you would look at; correct?

A.   Yes.

Q.   So in diagnosing any person as to whether or not they're sexually abused, you want to talk to them, you want to look at the sexually reactive behavior, you want to see how it's affected their life, you want to see what type of reports they may have made to clinical position -- medical mental health people over the years, all of which may be a piece of information to have a total picture of whether there's been sexual abuse; correct?

A.   Yes.

Q.   And if someone has been seen like Dr. -- like Dr. Carlson saw Mr. Lecroy over some period of time, that had extended discussions about this, you'd want to look to something more than just their notes, wouldn't you?

A.   Well, their notes really should summarize anything that's relevant in the case, so I guess that would depend on how good their notes are.

Q.   Well, and if you are in your words going to suggest that the notes indicate that this was something that Mr. Lecroy was doing to try to curry favor with Dr. Carlson, because the notes in your words suggest that, you would want to talk to Dr. Carlson and say, well, what was your observation?  You were there.  I'm seeing this suggestion here.  Did that actually happen?  Was that

what happened?

A.   Not necessarily.  I feel that I have her -- I had her documentation of her perception of -- of their interaction.  I mean, she should have put anything relevant in the progress notes, and --

Q.   So doctor --

A.   -- so that should -- you know, that should give me enough information to, you know, render some opinion about their therapy sessions.

Q.   But if Dr. Carlson had called you on the phone and said let me tell you about my interchange with Mr. Lecroy, you would have just hung up, I don't need to talk to you, the notes say it all; right?

A.   No.  Certainly I would have talked to her.

Q.   And you didn't?

A.   I didn't receive a phone call from her.

Q.   No.

A.   That was also -- I was not asked to call all the people involved in the case and conduct my own investigation.  That wasn't my role.

Q.   I understand.  Same thing with Mr. Dempsey and Dr. Ganahl, never talked to them; correct?

A.   No.

Q.   Do you have D-7 there in front of you, the notes of Dr. Dempsey and -- not Dr. Dempsey; Mr. Dempsey and Dr. Ganahl?

ELISE SMITH EVANS, RMR, CRR

A.   I'm not sure I know what you're referring to, D --

Q.   The Department of Corrections record, Georgia Department of Corrections.  Let me see if I can -- here.

A.   Okay.

Q.   It is your testimony that Mr. Lecroy must have lied about the suicide because he later said that the reason he hurt himself was to get off of work detail?

A.   Yes.

Q.   Did you give any -- did you look at the very last page of those notes, which is a letter that Mr. Lecroy wrote to Mr. Dempster regarding his parole prospects?

A.   Yes.

Q.   And in that letter, he expresses exasperation that unless he gets cleared by the psychiatric unit, that's going to diminish his possibilities for parole?

A.   Yes.

Q.   Indeed he says:  Could you call the parole board and tell them that my problem is just a behavioral disorder and not very serious as the mental health problems go?

        Do you remember him saying that?

A.   Yes.

Q.   And he also says I have a loving family, they'll take care of me, or something like that and somewhere in here.

        You would agree with me that Mr. Lecroy at that point had a motivation to get out of the psych unit in order to -- as

he expresses, in order to make a parole?

A.  Well, I don't know if he's motivated to get out of the psych unit, but it appears to me that he was motivated to influence Mr. Dempster to write a letter so that he could potentially be paroled.

Q.  And, again, you've talked a lot about possibilities and might haves.  Is it just as possible that Mr. Lecroy's statements to Mr. Dempster that, well, it really wasn't a suicide after all, it was just a instant I wanted to get off work detail was just as likely his attempt to try to persuade the parole board to remove him -- to allow him to be paroled as opposed to the fact that the suicide was never a real suicide?

A.  Well, I suppose that's possible, although I would think that he might not want to do that because it certainly makes him look more antisocial to have intentionally tried to manipulate to get out of work camp.  But I suppose it's possible.

Q.  Well, that's all you've been able to talk about is possibilities, so let's talk about the possibilities.  The possibility on February 21, 1992, in -- that's a report -- and you mentioned that Mr. Lecroy made these statements about sexual abuse to the female therapist because he wanted to impress them or curry favor or get their love.  Mr. Dempster is not a female; right?

A.  That's correct.

Q.  And on February 21, 1992, as reflected in the report, after

ELISE SMITH EVANS, RMR, CRR

describing -- or in the context of where he said his intentions were to kill himself, but not as a cause for that, he says he reported himself being molested at 8 years of age by an 18 year old babysitter.  Correct?

A.   Yes.

Q.   There's no purpose in saying that in order to get the love from Mr. Dempster, is there?

A.   No.  But it is possible that he mentioned that right after mentioning his offending, his own sexual offending.  And as I've testified before, that's often a reason that sex offenders will report having a history of sexual abuse is so that the other party or the evaluator or mental health professional will kind of feel sorry for them and sort of see -- you know, think, oh, well, I see why they did it, then; they were a victim so then they committed this offense.

Q.   Well --

A.   So I -- you know, I mean, it's possible that it was raised in that context.  I don't know.  I wasn't there, so I can't really say for sure.

But I was not testifying previously that he brought -- that he initially disclosed to Dr. Carlson.  You know, I was aware he initially disclosed to Mr. Dempster.  But I think it's possible that it got processed so much in the therapy sessions with Dr. Carlson because that was an interpretation that she made, and he may have just sort of gone with it, you know, to

sort of please her.

Q.   And it's also possible that she was drawing out from him a very embarrassing, shameful, distressing event in his life which had shaped him?  That's also possible?

A.   Yes, that's possible.

Q.   Because as you would well know, in this area this type of abuse is something that causes people to be shameful about it, they're not open, they don't broadcast it to the world, and sometimes they only reveal it in the most intimate of situations, and sometimes only after building a relationship with someone. Is that correct?

A.   Yes.  It depends on the person.

Q.   Right.  So it's equally or not -- let's don't get the words equally.  It is possible that that was an accurate statement made to Mr. Dempster back in February of 1992?

A.   That he'd been sexually abused?

Q.   Yes, ma'am.

A.   Yes, it's possible.

Q.   The -- as I understand Dr. Hindman's report as you -- or whatever it was, the investigation or study, was that 60 percent -- these may be gross figures -- 59 percent, something like that, reported sexual abuse, and after being confronted with polygraph, that went down to 30 percent.  That's my basic recollection of your figures.

A.   Yes.  That 65 percent of sex offenders reported being

sexually abused, and then when polygraphed, only 32 percent.

Q.   32.   About half?

A.   Yes.

Q.   So -- but those 32 obviously had been sexually abused; correct?

A.   Well, based on the polygraph.

Q.   Yeah.

A.   And based on their disclosure.

Q.   Are you familiar with a publication called *Child Abuse and Neglect*, a journal?

A.   Yes.

Q.   That's a reputable journal in the area of your subject; right?

A.   Yes.

Q.   Relied upon by experts; correct?

A.   Yes.

Q.   Some that -- peer-reviewed articles that are put out there and reviewed by other people; correct?

A.   Yes.

Q.   Are you familiar with a study that was done where 59 percent of inmates in this survey reported experiencing some form of sexual abuse?

A.   59 percent of just general inmates?

Q.   No.   Of 100 inmates who participated in the study, 59 percent reported experiencing some form of sexual abuse before puberty?

A.   No, I'm not aware of that specific study.

Q.   You would agree that this is something that's been studied a lot; correct?

A.   Yes.

Q.   And there's some studies that indicate maybe a higher percentage than Dr. Hindman's study?

A.   Well, to -- Dr. Hindman's study --

Q.   Or, Hindman.  Excuse me.  I'm sorry.

A.   -- is different in that it actually involves the polygraph. So part -- there is a huge methodological problem with a lot of the studies in this field about whether or not sexual abuse results in people committing a sex offense and how much of a risk factor that is, because most of the studies in the metanalyses that have been conducted have not used the polygraph.

Q.   But if it --

A.   So if it's based on self report, which it almost always is based on self report of a history of sexual abuse, and we have two studies here that demonstrate that sex offenders report it, you know, twice as frequently as has actually occurred, then that alone could account for the difference that some studies show between sex offenders and non-sex offenders in the research about their history of sexual abuse.

Q.   But as I understand it, the notion of Dr. Hindman's study is that people, as you expressed several times in your report and your testimony, sex offenders will use that as an excuse for

716

their own sexual offending; therefore, they say I've been sexually abused as an excuse for their own sex offending; correct?

A.   Not all of them, but a significant percentage do.

Q.   32 percent or whatever the number was had actually been sexually abused?

A.   Yes, it appears that way.

Q.   But if in this study this was a blind study, it was an anonymous form, it wasn't like anybody was, you know, going to get any benefit from reporting the sexual abuse.  In other words, you take out that subjective criteria where somebody's trying to present themselves better than they are because no one's going to know who's reporting it.  And in this study that was published in *Child Abuse and Neglect* indicated that 59 percent indicated they'd been sexually abused, that's something that -- as a good scientist, you would take account of, would you not?

A.   Well, I think it's -- yeah.  I mean, I think it's important information.  I think, you know, I would need to know more information about exactly where the survey's anonymous, did the inmates believe they were anonymous, did they think there was any chance that, you know, that they could get any benefit for saying they had a history of abuse.  But really it's beside the point, because the study that you're talking about apparently is not about sex offenders, so it's about general, just general inmates. And I would agree that, you know, general inmates do have higher

rates of abuse and neglect.

Q.   And you do also agree that people who have been sexually abused and people who have -- in combination with physical abuse from the family and domestic violence, that when you combine those factors, there's a higher risk of violent behavior as an adult?  You would agree with -- all the studies indicate that, don't they?

A.   I would agree that, yes, there's research to suggest that.

Q.   Significant body of research to suggest that?

A.   I don't know the number of studies, but I do know that the research suggests that multiple traumas increases a person's risk for multiple problems.

Q.   And you yourself noted in the materials that you saw that there had been physical abuse from the father and physical abuse of the father toward the mother in their relationship?

A.   Yes.

Q.   You noted in your testimony that Mr. Lecroy on a couple of occasions mentioned that he has a loving family, positive support at home.  In your experience in this area of interviewing people, is it not uncommon for people who have been abused by their mothers or their fathers or their parents to still cling to them and to express that they were loving parents and would do anything for them?

A.   Yes.  But I tend to see that more in cases of people who just deny the abuse ever occurred, but they're sort of consistent and

sort of having this naive approach.

What really doesn't make sense in this case to me is that -- is the inconsistency, that Mr. Lecroy reports a history of physical abuse and domestic violence, but then later writes something that says I have a loving, supportive family.  Those two things are not really consistent, especially after he had already talked about the abuse, you know, to different mental health professionals, to then say he has a loving, supportive family just sounds deceptive to me.

Q.  But you just -- you believe he did not have a loving and supportive family, do you?  There was terror in his family, there was abuse in the family, both of him and of -- between the husband and the wife; correct?

A.  Yes, that appears to be the case.

Q.  And for him to say, for example, in the context of trying to get paroled, I have a loving family, that's where I'm going to go live with, that's not something that would be totally unexpected; correct?

A.  It seems to me to be manipulative.

Q.  All right.  Seems to be --

A.  And misrepresented -- is misrepresenting the case, because he's already said -- given information quite to the contrary.

What I was saying before is that, yes, you do see denial in people who've been abused, but they tend to be consistent in their denial.  In other words, they tend to say,

719

oh, you know, it's just a spanking.  It really wasn't physical abuse.  You don't have them one minute saying they're physically abused and then, you know, shortly thereafter saying I had a loving, supportive family.

Q.  Well, you don't have that here, anybody doing that minute-to-minute either, do you?

A.  Well, it's pretty -- I mean, short period of time.  May not be like, you know, within the same month.  But I'm saying, you know, having already reported that there's abuse and then to say, you know, I have this loving, supportive family, it's not consistent.

Q.  These reports we're talking about, psychiatric reports, cover a ten year period, do they not, that you reviewed?

A.  Yes.

Q.  Okay.  Showing you what has been previously marked as Defendant's Exhibit 85 and 86, these are two that you have singled out of inconsistent reports by Mr. Lecroy of sexual abuse; correct?

A.  (Witness reviewing exhibits.)

Yes.

MR. MARTIN:  Your Honor, if I can stay with the witness a second.

Q.  (BY MR. MARTIN):  85 it says to be a Federal Bureau of Prisons intake screening form.  Do you know anything about how those forms are filled out?

A.   No.

Q.   Okay.  Does it appear to be a form that's just checked by the inmate and signed?

A.   No.  It appears to me that it's based on an interview, because it says at the top here inmate interview.  And the interview time was 4:30.  So it appears to me that this is based on an interview.

Q.   Well, let me ask it this way.  Do you know --

A.   And, actually, it lists the interviewer's name and has their signature.

Q.   Yeah.  But do you know what happens when someone's intaked from one facility to another in the federal prison system?

A.   No.

Q.   Do you know whether this process takes five minutes or five hours?

A.   No, I don't.

Q.   And the word "sexually assault," have you ever been sexually assaulted or sexually -- have you recently been sexually assaulted, the words "assault" and "abuse" can have different meanings to different people; correct?

A.   Yes.

Q.   Let me ask you about the others.  The other one is also a type of form that's used by the prison system in which it says at the bottom of the form:  Denies sexual abuse.  And there's several boxes that are checked on Government's Exhibit 85.  Do

721

you know the context of that interview or anything about it?

A.   No.   But it does appear that this is the -- he was interviewed for this and that the interviewer signed it at the bottom.   And that the interviewer asked about sexual abuse and wrote denies sexual abuse.

Q.   All right.   And you don't know how that question was asked, do you?

A.   No.

Q.   All right.   And you would concede as you had earlier that people, especially adults, can sometimes be reluctant to reveal just to somebody they first met, perhaps in the context of other people, something like sexual abuse?

A.   Yes, that's possible.

Q.   Would you not credit the reports of mental health therapists such as Dr. Carlson, Mr. Dempster, Dr. Ganahl who are in therapy with someone over a checklist form that was done in some process that you don't even know how it was conducted?

A.   Yes.   I would -- I would give more weight to the mental health professional who had spent more time or conducted psychological evaluation with the client.

        MR. MARTIN:   Just one second.

        (A pause in the proceeding was had.)

Q.   (BY MR. MARTIN):   Dr. Medlin, one of the things that you've done over the years here in the state of Georgia is testify in a number of cases; is that correct?

722

A.   Yes.

Q.   And those cases have resulted in reported decisions?

A.   In what?

Q.   Reported decisions by the Court of Appeals or the Supreme Court of Georgia.

A.   Reported decisions?

Q.   Do you know what that means?

A.   Yes.  I guess you're saying records of the case.

Q.   The court issues an opinion.

A.   Yes.

Q.   And you've repeatedly testified over the years that sexually abused people can give inconsistent reports of their sexual abuse?

A.   Yes.  Particularly children who are still in contact with the abuser or are at risk of being returned to the abuser, such as a child in foster care who is continuing to have visits with the abuser or could be sent back to the abuser's home at any point in time.  I do not see that same level of inconsistency in adults.

Q.   But the circumstances of an adult can affect that inconsistency of report?  For example, a prisoner, a person in prison where he's subject of being sexually attacked may be much more confidential about a history of sexual abuse than someone else; correct?

A.   Well, I don't think so much about their own history of sexual abuse.  It's usually about their sexual offending, about -- you

know, for example, when I was at Federal Correctional Institution at Butner, the inmates did not want to reveal that they had committed a sex offense.  But I did not see any examples of inmates not wanting to tell someone that they had been sexually abused by an older female.  It's usually the shame was related to their own offending.

Q.  All right.

THE COURT:  Any Redirect?

MR. MCKINNON:  Just briefly.

REDIRECT EXAMINATION

BY MR. MCKINNON:

Q.  Do you have Dr. Lisak's report there in front of you?

A.  Oh, okay.

Q.  In Dr. Lisak's report, Government Exhibit 116, is there a detailed description given to Dr. Lisak by the defendant of the alleged incidents with Tinkerbell?

A.  Yes.

Q.  And in the reports that -- and just make clear, you did not have Dr. Lisak's report back in 2004 when you were preparing your own report?

A.  That's correct.

Q.  And in the records that you reviewed in preparing your own report, is there anything that -- where the level of detail that's provided in Dr. Lisak's report was written down in any of the reports that you reviewed?

ELISE SMITH EVANS, RMR, CRR

A.   The -- this information about the details of the sexual abuse was not anywhere in any of the records that I had been given in 2004.  So the first time I've ever read any information about the actual details of the sexual abuse was in -- was very recently in Dr. Lisak's report.

MR. MCKINNON:  Thank you.  That's all the questions I have.

THE COURT:  You may step down.

I'm going to suggest that counsel confer in an effort -- and offer up a -- a briefing schedule, if you will. And if you -- I don't know if you're wanting to wait for the transcript to do the briefs or if you want otherwise.

MR. MARTIN:  Your Honor, there is one other thing.  You made a mention in your order, you know, that we would have an opportunity to suggest to you some few additional witnesses that you'd --

THE COURT:  Yes.

MR. MARTIN:  -- wanted to hear from us about.  And I mean, sure, I'm happy to consult -- I would want to have a transcript so we can brief based on the transcript.  And I will surely talk with Bill and we can work something out.  But when do you want to hear this other business?

THE COURT:  I don't know how long it's going to take you to do it.  I'm prepared to hear your proffer today.  What we had contemplated was simply a proffer of the nature of the

ELISE SMITH EVANS, RMR, CRR

725

evidence that you expected to produce.  And if you want to offer that now, I -- it's fine.  I'm happy to hear it if we can do it in about ten minutes or less.

MR. MARTIN:  Well, would you prefer us to do it in writing?

THE COURT:  I'm fine to hear if it's not that --

MR. MARTIN:  Okay.

MS. MICHAEL:  I don't know if I can do it in ten minutes or less, Your Honor.

THE COURT:  Okay.  All right.  Well, then we either need to do it in writing or we can set it down to do it another time.  I have to be done by 4:30.

MS. MICHAEL:  I understand, Judge.  I'm 99 percent I cannot do it that fast.

THE COURT:  Okay.  Then we need to reschedule for that, then.  And if you want to submit it in writing, that's fine, or -- why don't you do that rather than everyone else -- everyone having to come back?  If you will just -- if you will go ahead and submit that to me within the next five days so I can make a decision about whether there's going to be any more evidence taken or not.  I'll give you an opportunity to respond to it, if you wish, in terms of whether -- and this will only be as to whether we need to take more evidence on it.  Okay.  All right.

And then I'll let counsel confer.  I would like for you to set a briefing, to try to agree on a briefing schedule to have

726

it -- I don't want to spread this out too long.  For one thing, just the -- while the evidence is fresh, it's just a lot easier to decide.  So better than even going back and reading the transcript.  But I'll let you confer and propose a briefing schedule, and then we'll proceed in that way.

Anything else today?

MR. MARTIN:  No, sir.

THE COURT:  All right.  Thank you.  We're adjourned.

(End of proceedings.)

*****

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

CERTIFICATE OF REPORTER

I do hereby certify that the foregoing pages are a true and correct transcript of the proceedings taken down by me in the case aforesaid.

This the 12th day of March, 2010.

_____
ELISE SMITH EVANS, RMR, CRR
OFFICIAL COURT REPORTER

ELISE SMITH EVANS, RMR, CRR