UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA,     )
                                    )
      v.                          )      CASE NO.
                                    )      2:02-CR-038-RWS-SSC-1
WILLIAM EMMETT LECROY, JR. )
                                    )
        Defendant.         )

## POST HEARING BRIEF WITH RESPECT TO DEFENDANT'S MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY PURSUANT TO 28 U.S.C. § 2255

**I.**      **INTRODUCTION**

On April 22, 2008, Defendant William Emmett LeCroy, Jr. (hereinafter referred to as the "Defendant" or "Mr. LeCroy") filed his Motion to Vacate, Set Aside or Correct Sentence By a Person in Federal Custody Pursuant to 28 U.S.C. §2255 (Doc. 493)(hereinafter the "Motion to Vacate"). On January 9, 2009, the Government responded in the Government's Response to Defendant's Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody Pursuant to 28 U.S.C. §2255 (hereinafter the "Government's Response")(Doc. 508). On February 11, 2009, the Defendant filed his Traverse to Government's Response to Defendant's Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody Pursuant to 28 U.S.C. §2255 (Doc. 511)(hereinafter the "Defendant's Traverse"). On the same date the Defendant filed his Motion for

1

Evidentiary Hearing and Discovery (Doc. 510). On March 13, 2009, the Court entered an Order (Doc. 512) granting the Defendant's request for an evidentiary hearing regarding three issues raised in the Motion to Vacate, but required the Defendant to provide more specific information regarding other issues.

On March 27, 2009, the Defendant filed his Defendant's Response to Court's Order Regarding Evidentiary Hearing (Doc. 513), listing the witnesses that the Defendant requested that the Court hear from at an evidentiary hearing, as well as the testimony he expected those witnesses to provide. On April 9, 2009, the Court entered another Order (Doc. 518), denying the request of the Defendant with respect to certain witnesses, but deferring to oral argument at the evidentiary hearing with respect to other witnesses.

With respect to issues about which the Court allowed the presentation of evidence, an evidentiary hearing was held on January 11, 12 and 13, 2010 and concluded on February 8, 2010. (Docs. 534, 535, 536, 537). At the conclusion of the hearing the Court instructed counsel for Mr. LeCroy to make a proffer with regard to mitigation witness testimony they had requested that the Court hear. (Evidentiary Hearing Transcript (hereinafter "EHT")-724-725). On February 18, 2010, the defense filed its Defendant's Proffer of Mitigation Witness Testimony (Doc. 527). The Government responded on June 1, 2010 with the Government's Response to Defendant's Proffer of Mitigation Witness Testimony (Doc. 528). On

June 25, 2010, Defendant responded with Defendant's Reply to Government's Response to Defendant's Proffer of Mitigation Witness Testimony (Doc. 539). On December 7, 2010, the Court entered an Order denying the Defendant's request that the Court receive additional evidence regarding mitigation witness testimony. (Doc. 540).

The parties have now agreed to a briefing schedule regarding the issues raised in the Motion to Vacate, including those issues about which evidence was received. Counsel for the Defendant now files his brief with respect to the issues currently before the Court. To the extent it is efficient and to avoid unnecessary repetition, counsel where appropriate may adopt the often extensive legal arguments and citation of authority in support of various claims made in the Defendant's Traverse.

## II.     THE GUILT/INNOCENCE CASE

The Eleventh Circuit opinion, <u>United States v. LeCroy</u>, 441 F.3d 914, 918-920 (11th Cir. 2006), as well as the Government's Response, pp. 2-10 (Doc. 508), detail from a sufficiency of evidence and prosecution point of view the evidence supporting the Defendant's guilt. Suffice it to say inferences could be drawn from this evidence to support the Government's contentions made at trial, both as to guilt/innocence and as to sentencing, that the brutal murder of Ms. Joann Tiesler was an unnecessary attack by a repeat offender desperate to obtain a vehicle to

escape from the consequences of his then probation. The defense never contended that Mr. LeCroy did not abuse and murder Ms. Tiesler. They could not given the physical evidence found at the crime scene and at the time of Mr. LeCroy's arrest, as well as Mr. LeCroy's admission of his crime shortly after his arrest to a minister in Minnesota. (EHT-80) (Trial Transcript, (hereinafter "TT")-2618-2622). Instead, the sole guilt/innocence defense was a "jurisdictional" argument that the murder of Ms. Tiesler was not sufficiently connected to the "carjacking" of her vehicle to constitute a federal death penalty offense. United States v. LeCroy, 441 F.3d at 923-925. According to this defense, Mr. LeCroy was simply burglarizing Ms. Tiesler's house when he was interrupted by her unexpectedly arriving home, resulting in an impulsive and spontaneous attack on her, followed by his escaping in her car, although this was not his original intent. (EHT-114-115, 261-262).

While given the facts with which the defense was confronted, this guilt/innocence defense may well have been the only reasonable alternative. But once Mr. LeCroy was convicted the defense needed to shift focus in order to offer the jury some reason why the ultimate penalty of death should not be imposed. After all, the physical evidence from the autopsy and the crime scene photographs supporting a lengthy and brutal assault belied an impulsive attack by Mr. LeCroy upon being surprised by Ms. Tiesler. The jury was left waiting for some explanation from the defense, although not an excuse or justification, for the

assault that the physical evidence clearly proved had occurred other than the Government's claim that it was a gratuitous and savage attack by a criminal needing a vehicle. That explanation, mental illness borne of sexual, physical and emotional abuse, was available to the defense, but never presented due to a failure to investigate the alternatives available to the defense with respect to this evidence and the unreasonable miscalculations, miscommunications and misunderstandings of trial counsel in preparing and presenting a mitigation case, as detailed in Section III below.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING WITH RESPECT TO MENTAL HEALTH EVIDENCE

### A. Relevant Facts

Mr. LeCroy was represented at trial by a team of four lawyers, Stephanie Kearns, Paul Kish and Brian Mendelsohn with the Federal Defender Program, Inc., and Dan Summer, a private attorney in Gainesville, Georgia, where the trial was held. (EHT-12, 85-86, 153-154). The fact investigators in the case were Susan Miller and Mike Hutcheson, also with the Federal Defender Program. (EHT-12, 86). In the early days of the representation the four attorneys worked together and consulted on the various issues in the case. (EHT-12-13, 86). But as the trial date approached, the attorneys took on various roles in defending the case. (EHT-12-13, 86-87, 153). Mr. Kish and Mr. Summer were to handle the guilt/innocence defense.

(EHT-13, 86, 153-154). Although there was never a contention that Mr. LeCroy did not rape and murder Ms. Tiesler, the guilt/innocence defense focused on the jurisdictional argument that the murder was unconnected with the carjacking of Ms. Tiesler's vehicle. (EHT-13, 86, 165). Mr. Summer's primary role was as a "local counsel," because of his familiarity with the Gainesville area. (EHT-86-87, 154). He did the preliminary work on the jury challenge issues, although Mr. Kish had to finish the job, and was available to assist in selecting the jury. (EHT-13, 86, 154). Ms. Kearns and Mr. Mendelsohn were to handle the penalty phase of the trial. (EHT-18-19, 86-87, 89, 154).

Ms. Kearns worked primarily with Jan Vogelsang, the defense mitigation expert, in developing a family history, which included substantial evidence of physical and emotional abuse, as well as other family dysfunctions. (EHT-87, 154-155). (Trial Transcript (hereinafter "TT")-2514-2590). Mr. Mendelsohn's focus was with respect to the expert witnesses. (EHT-154). Ms. Kearns and Mr. Mendelsohn were to present this evidence to the jury and handle the penalty phase closing argument.

The pretrial mitigation investigation revealed not only a substantial history of physical and emotional abuse by the family, but also incidents of bizarre sexual behavior and sexual abuse. (EHT-190-191). The most important incident of sexual abuse with respect to the actual murder of Ms. Tiesler was an incident when Mr.

LeCroy was only 8 years old and was sexually abused by a babysitter, who he knew only as "Tinkerbell." (EHT-191). Records from Mr. LeCroy's prior incarcerations indicated that he had reported this sexual abuse and had discussed it with at least two mental health professionals, including a Dr. Marti Carlson, who was a prison psychiatrist where the Defendant was housed at the El Reno Federal Correctional Institution, in Fort Worth, Texas. (EHT-88-90, 303, 312-314).

Dr. Carlson was contacted by the defense and confirmed Mr. LeCroy's report of childhood sexual abuse. (EHT-303-304). Although, as Ms. Kearns conceded, she did not have "a background in mental health" (EHT-90), it was nevertheless believed by the defense that sexual abuse, combined with the other abuses that the Defendant had suffered as a child, could constitute a mental health mitigation defense at sentencing. (EHT-17, 90-91, 157).

Indeed, Mr. LeCroy had reported to the defense that his attack on Ms. Tiesler was directly related to the sexual abuse he had suffered as a child. While residing with his parents in the Cherry Log Mountain Community in North Georgia, he had encountered Ms. Tiesler, a nearby neighbor, on a couple of occasions and became convinced that she was in fact the "Tinkerbell" who had abused him as a child. He believed that he had been cursed by this abuse and that "Tinkerbell" was responsible for the troubles he had encountered throughout his life and would continue in the future. He became obsessed with Ms. Tiesler, who

he believed to be "Tinkerbell", and believed somehow that he could force her to remove the spell that she had over him if he confronted her and made her lift this curse. As a consequence, he broke into her house, laid in wait for her and confronted her about the sexual abuse. When she refused to acknowledge that she was in fact "Tinkerbell" and refused to lift the spell he believed that she had cast upon him, he attacked and abused her, thinking that this would cause her to lift the spell. He then panicked and fled the scene in Ms. Tiesler's car, taking some of her clothing in hopes that they could be used in lifting the spell. He only realized later that Ms. Tiesler was not "Tinkerbell", when he learned she had Christian CD's in her car. Ashamed about what he had done he wrote a note asking to be forgiven for her murder, which was found in the car after his arrest. (EHT-156, 198-204)(EHT Defense Exhibit 3, pp. 9-12)(TT-752, Gov. Ex. 41A).

Having heard this explanation for what had happened and having reviewed the records of Mr. LeCroy's reports while he was incarcerated of sexual abuse as a child the defense obviously realized the attack on Ms. Tiesler was the result of mental illness, especially as it related to childhood sexual abuse, not the burglary gone bad that the defense contended in the guilt/innocence case. (EHT-17, 90-91, 156-157, 298). As a consequence, they arranged for Mr. LeCroy to be evaluated by Dr. Michael Hilton, a well-respected forensic psychiatrist in Atlanta, who the Federal Defender Program had often used to evaluate clients. (EHT-13-15, 91,

182-185; Defendant's Exhibit 4). Dr. Hilton was provided the prison records that had previously been amassed with respect to Mr. LeCroy's reports of sexual abuse, as well as other records regarding his family history, including information regarding physical and emotional abuse as a child. (EHT-15, 30-33, 35-36, 92, 188; Defendant's Exhibit 3). Dr. Hilton also interviewed Mr. LeCroy personally. (EHT-188).

Dr. Hilton reached a diagnosis which attributed the attack on Ms. Tiesler to various mental disorders of the Defendant, including "borderline personality disorder" and "schizotypal personality disorder", which often leads to "paranoid schizophrenia" and may include "transient psychotic episodes or near psychotic episodes." (EHT-195-198, 206; Defendant's Exhibit 3, p. 16). Dr. Hilton provided the defense with reports of his conclusions, but none of the defense attorneys, including Mr. Mendelsohn, who was handling the expert witnesses, ever met with Dr. Hilton to discuss with him his findings. (EHT-16, 80, 91, 142, 156, 292; Defendant's Exhibits 1, 2, 3). While Dr. Hilton was clear that Mr. LeCroy was competent and legally responsible for his actions (EHT, Defendant's Exhibits 1 and 2), he also concluded that "but for the mental illnesses" that he diagnosed, Mr. LeCroy would never have committed the attack on Ms. Tiesler, important mitigation evidence. In short, the murder of Ms. Tiesler was "the product of (Mr. LeCroy's) mental illnesses." (EHT-205, 216-217). Defense counsel never knew of

this explanation that the attack on Ms. Tiesler was the result of mental illness, not simple cruelty, as the Government contended, because they never talked to Dr. Hilton. (EHT-143-144, 293).

Instead, counsel opted for a different tact. Since they did not believe that Dr. Hilton's diagnoses would be all that "compelling" (EHT-103-104, 263, 293), although they reached this conclusion from merely reading his report and never spoke with him to determine exactly how persuasive his testimony could have been, they decided instead to present a mitigation case based upon the prison records, perhaps augmented by the testimony of the mental health providers Mr. LeCroy saw in prison. They would then present expert testimony from Dr. David Lisak, known to be one of the leading experts in the country concerning the effects on an adult of childhood sexual abuse. (EHT-93, 156-157, 167). However, Dr. Lisak would not actually evaluate Mr. LeCroy, but would simply testify as a "teaching expert" with respect to what is generally known about how childhood sexual abuse can affect adults. (EHT-46, 59, 94-95, 159-160). The defense decided not to have Dr. Lisak actually evaluate the Defendant because they knew that this would trigger the government's right to its own independent evaluation of Mr. LeCroy and they did not trust the types of experts that the Government typically retained for an independent Government evaluation. The same unreasonable fear

would have prevented them from offering the testimony of Dr. Hilton. (EHT-45-47, 60, 94, 107-110, 129, 159, 268-269).

The upshot of these decisions was that, despite the fact that Dr. Hilton was prepared to present substantial evidence with respect to mental illness, including his opinion that the crime never would have occurred but for the mental disorders with which the Defendant suffered, he was never called as a witness. Instead, the defense intended to present a "documentary" case of sexual abuse from prison records and Dr. Lisak would provide a general gloss regarding how childhood sexual abuse might affect an adult. No expert testimony would be presented directly tying the sexual abuse, or any mental illness condition suffered by the Defendant, to the specific crime for which he was certainly to be convicted. Instead, Dr. Lisak would be "an expert who could educate the jury in the overall field of child sexual abuse" who could testify to the "lasting effects" to "individuals who have suffered from this experience." Although as a "teaching expert" Dr. Lisak would not be able to "connect" his expert opinions "to the actual crime or help explain the actual crime," the "hope" was that the "lawyers would be able to draw inferences from what we got out of Dr. Lisak and the facts that we put into the record to then argue it to the jury." (EHT-159-160).

Even this questionable plan fell apart when the defense was required to give Rule 12.2 notice of the expert testimony of Dr. Lisak and the defense was then

presented with the contrary testimony of Dr. Julie Medlin, raising questions about the validity of the report by Mr. LeCroy of childhood sexual abuse. (EHT-95-96, 102, 124-125, 273, 278). Counsel then made the decision not to call Dr. Lisak, or even to proffer his testimony to determine the extent to which the Court would allow him to testify, so that all the defense was left with was what attorney Kish described as "shards" of evidence of childhood abuse based solely upon the brief reports of sexual abuse in prison records, without any of the prison mental health providers being allowed to testify to any diagnoses or opinions they may have had. (EHT-17, 96-97, 123, 149, 274). No expert would testify as to the impact on an adult of childhood sexual abuse, much less how this sexual abuse played a part in the Defendant's crime. Instead, Ms. Kearns and Mr. Mendelsohn expected to be able to tie together the sexual abuse as a mitigation factor in closing argument. They would in Mr. Mendelsohn's words, take "the place of the expert in testifying, so to speak, in closing argument, in connecting the dots between the offense and the sexual abuse." (EHT-96-97, 168-169, 299).

Yet even this even more questionable fall back plan also fell apart when apparently due to miscommunication between Mr. Mendelsohn and Ms. Kearns, no consistent and coherent argument by counsel was made in closing argument at sentencing based upon the "shards" of evidence of sexual abuse actually received into evidence. (EHT-97, 169). Mr. Mendelsohn believed that he was supposed to

speak in his closing argument at sentencing only with respect to the Government's case in aggravation, while Ms. Kearns was going to handle all of the mitigation arguments. (EHT-145-146, 169, 260). But only four short paragraphs of her closing argument even touched on the issue of sexual abuse and all that Ms. Kearns actually said is that sexual abuse may have deprived Mr. LeCroy of his "self esteem." (TT-2715-2716)(EHT-146). This was hardly a compelling argument "connecting the dots" between the sexual abuse and the actual crime committed by Mr. LeCroy. As Mr. Mendelsohn testified, "I'm not sure whether she had expected me to do it or I had expected her to do it, but somehow it didn't happen." (EHT-170).[1]

---

[1]The entire closing argument concerning sexual abuse is as follows:

> "And, again, I think if you look at his history, what you see and what – the family history, what Jan Vogelsang and what Dr. Carlson, I think, more importantly shows to you is that you have someone who has a basic moral fiber. His entire childhood through that divorce he was a good kid. He was doing well in school. He sought out ROTC, it's in the writings, he seeks out ROTC because it gives him something that he is missing, those boundaries that Jan Vogelsang described there were a lack of. He seeks it out on his own. He knows that ROTC is healthy for him, it has discipline, it builds his self-esteem, the self-esteem that is in the pits. And you know he has virtually no self-esteem.
>
> And what does he attribute that to? The baby-sitter, to the sexual abuse he suffered as a child. And the Government may - - Mr. Burby made a big deal yesterday of one of the witnesses about he never described the child molestation to anybody. He didn't tell anybody. His family didn't know about it.

Had the defense allowed Mr. LeCroy to have been evaluated by Dr. Lisak, not only would he have provided his expert testimony that the Defendant had actually been sexually abused, something that the Government contested, but would have further offered expert testimony, from one of the leading experts in the country on the subject, as to how this sexual abuse, especially when combined with physical and emotional abuse otherwise proven in the case, would have offered an explanation, although not an excuse or a justification, for the attack on Ms. Tiesler. (EHT-573-588, 604-605). Dr. Hilton would have provided an even clearer connection between the crimes and mental illness, based upon his expertise as a forensic psychiatrist. (EHT-205, 216-217).

---

Come on, this is 2004. You know, we all watch TV. If we haven't read books about it, why do we have all these priests that are now being accused of sexual abuse for things they did 20 years ago? Because children don't talk about it. For whatever reasons, whatever happens. That doesn't mean it didn't happen.

Why would he be talking about sexual abuse by a teenager when he's in therapy with Dr. Carlson? He's not in therapy to get out of jail. He's not in therapy to cut his sentence short. He has no benefit to gain from the therapy or the D.A.P. program that he was involved in El Reno except self-improvement or to relieve himself, learn how to deal with his anger and get beyond his anger so that his life will be better emotionally. There's no motive to lie about the baby-sitter. And he's talking about the baby-sitter in '92 and he's talking about the baby-sitter in '99. But it's a significant event because it robbed him of his self-esteem. That's the impact it had on him. We know that from what he's written."(TT-2715-2716).

Moreover, because of the decision by the defense to advise the Defendant not to agree to an independent Government evaluation, the defense was denied the opportunity to present any mental health evidence. (EHT-161-163). While the results of a Government evaluation may have been troublesome and may have been sufficient to justify a decision not to present mental health evidence, we will never know because the decision was made not to present that evidence without even knowing what a Government evaluation would have revealed (EHT-141), much less what Dr. Hilton would have provided or what Dr. Lisak could have testified to if he had evaluated the Defendant. It may well have been a mistake not to present mental health evidence under any circumstance, because this essentially left Mr. LeCroy defenseless at sentencing. But it was clearly unreasonable for a decision to be made not to present mental health evidence without even knowing what the consequences of that decision would be, that is what Dr. Hilton and Dr. Lisak could have actually testified to and what the danger and extent of a Government evaluation actually would have been.

In addition, while the account of Mr. LeCroy of his attack on Ms. Tiesler is graphic and gruesome, and Dr. Hilton and Dr. Lisak would have been required to recount what the Defendant had told them as part of their evaluation, the Government's case, based upon the autopsy and the crime scene evidence and photographs, left no doubt that the attack on Ms. Tiesler was brutal and savage,

much, if not all, of it occurring while Ms. Tiesler was still conscious. (EHT-118, 142, 280-283). Moreover, its duration and brutality belie any argument that the attack on her was merely a spontaneous response after the Defendant had been interrupted by her while burglarizing her house. (EHT-114, 261-262). As Mr. Mendelsohn conceded, there was no reasonable argument that the aggravating factors alleged by the Government had not been proven by the physical evidence itself and the fact that an evaluation would require experts to talk about the details of the events would have added no more gruesome detail than what the jury had already learned from the physical evidence. (EHT-283-292). Indeed, the physical evidence left the jury to speculate about the details of the cruelty of the attack, allowing them to imagine the worst possible scenarios, while the testimony of the experts would have at least offered a context or explanation for the attack, albeit one that was driven by delusions and obsessions borne of mental illness.

### B. Argument and Authority

Claims A, B and L in the Motion to Vacate relate to the effectiveness of trial counsel with respect to potential mental health evidence at sentencing. Claims of ineffective assistance of counsel are governed by the familiar two-pronged test of Strickland v. Washington, 466 U.S. 668 (1984). In order to obtain relief for ineffective assistance of counsel a defendant must establish (1) "that counsel's performance was deficient" in that it "fell below the objective standards of

reasonableness," under "prevailing professional norms," 466 U.S. at 687-688, and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. 466 U.S. at 694. It is not necessary for a defendant to show "that counsel's deficient conduct more likely did not alter the outcome of the case." 466 U.S. at 694. Instead, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. In determining prejudice the Court should not look at each claimed error individually, but should consider the cumulative effect of counsel's errors. Strickland, 466 U.S. at 687 ("A defendant must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable")(emphasis added).

In determining whether counsel's performance fell below professional norms, a strategic decision made with full knowledge of the consequences of the decision which is then actually implemented by counsel, is often unchallengeable. But an uninformed strategic decision is not due deference, especially if the supposed strategy was not even implemented. Strickland v. Washington, 466 U.S. 668, 690-691 (1984)("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment support the limitations on

investigation."); <u>Baxter v. Thomas</u>, 45 F.3d 1501, 1514 (1995)("[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.") (<u>citing</u> and <u>quoting</u> <u>Horton v. Zant</u>, 941 F.2d 1449, 1462 (11th Cir. 1991)). Moreover, a strategic choice must itself be reasonable in the particular circumstance of the case. <u>Cave v. Singletary</u>, 971 F.2d 1513, 1518 (11th Cir. 1992)("Further, we wish to emphasize the district court's observation that the mere incantation of the word 'strategy' does not insulate attorney behavior from review. The attorney's choice of tactic must be reasonable under the circumstances.").

Trial counsel here were faced with a case where there was no viable defense to the rape and murder of Ms. Tiesler. Mr. LeCroy's DNA was found in Ms. Tiesler's body. He was arrested intending to cross the border into Canada in her stolen vehicle. Blood matching Ms. Tiesler was found on his shirt in the car. Also found in his car was a note expressing remorse for her murder. The Defendant confessed to a minister in Minnesota shortly after his arrest. This was only the most damning of the evidence against him. Faced with these circumstances, it was more than reasonable to pursue a jurisdictional defense with respect to guilt/innocence, based upon an argument that the theft of Ms. Tiesler's vehicle was not sufficiently connected with the attack upon her.

There were problems with this defense, most notably the compelling circumstantial evidence that the Defendant was resisting the conditions of his probation requiring him to undergo sex offender evaluation, the fact that the only transportation he had available was a motorcycle which could not sustain a long trip, and the fact that the family car was not available to him because his mother and step father had not left the keys in the house. But given the circumstances, pursuing a jurisdictional defense was at least a possible, perhaps the only possible, guilt/innocence defense.

But the same did not apply to the mitigation case at sentencing. Trial counsel had done their job in conducting an extensive investigation of the Defendant's background. They had uncovered evidence of Mr. LeCroy's chaotic, dysfunctional and abusive, both physically and emotionally, childhood, as well as evidence of sexual abuse as a child, including Mr. LeCroy's reports to mental health professionals while he was incarcerated that he had been sexually abused by a female babysitter. Counsel also understood that this type of evidence could form a compelling case which could convince at least one juror, all that was necessary, that a sentence of life without parole, rather than a sentence of death, would be an appropriate sentence. Where counsels' actions broke down, falling beneath professional norms, was in failing to implement a strategy of a defense based upon mental illness, fueled by physical, emotional and sexual abuse.

Counsel caused the Defendant to be evaluated by a well-respected forensic local psychiatrist, Dr. Michael Hilton, who found Mr. LeCroy to be competent and not insane at the time of the event. But he also provided an extensive report describing mental illnesses, including borderline personality disorder and schizotypal personality disorder, which in Dr. Hilton's opinion offered an explanation as to how Mr. LeCroy could have come to commit the crime for which he was obviously guilty. These disorders include "magical" thinking, "transient psychotic episodes", and features similar to "paranoid schizophrenia" (EHT-197-198), which might cause Mr. LeCroy to conclude in his confused and deluded state that Ms. Tiesler was in fact the babysitter that had molested him as a child and who had cast a spell upon him which was the cause of all of his troubles as an adult, which only she could remove.

However, counsel never met with Dr. Hilton and explored with him the full ramifications of the diagnoses he found, as well as the reasons for his conclusions, and the possible mitigation testimony he could have provided, such as his conclusions that mental illness played a "direct role" in the crime and that the murder would not have "occurred but for" the mental illnesses he had diagnosed. (EHT-204-205). Instead, counsel, who admittedly were not mental health experts themselves (EHT-90), dismissed the report as offering diagnoses which were not sufficiently "compelling," based solely on the written reports themselves. (EHT-

293). They did this in the face of the fact that the account that Mr. LeCroy provided Dr. Hilton was the exact same account of the events which he had described to counsel. (EHT-156). <u>Holsomback v. J. D. White</u>, 133 F.3d 1382, 1386-1389 (11th Cir. 1998)(Counsel ineffective for failing to contact examining physicians in an aggravated sodomy case who had reported no physical evidence of the crime. A claimed strategic reason not to follow up on the written reports was rejected.).

Instead of working with Dr. Hilton to appreciate the full context of his conclusions, counsel merely jettisoned his report, as well as the possibility of presenting any expert testimony regarding mental health issues. Their alternative plan was merely to present the evidence regarding Mr. LeCroy's dysfunctional upbringing, including the reports of sexual abuse made to mental health professionals while the Defendant was in prison, and hopefully provide a gloss with respect to this information from a "teaching expert", who would testify only generally about what is known about how childhood sexual abuse can affect adults, without that expert testimony being specifically tied to the Defendant or his crime. (EHT-159-160).

The plan not even to talk with Dr. Hilton about his conclusions was not reasonable and an inadequate investigation and this unreasonableness was compounded when the alternative replacement plan was not even carried out. This

alternative plan broke down when the defense was required to provide a Rule 12.2 notice of the nature of Dr. Lisak's testimony and the Government then provided them, at the close of the guilt/innocence phase, with a report from Dr. Julie Medlin raising questions about the validity of Mr. LeCroy's report of sexual abuse. (EHT-Government's Exhibit 68). At this point, the defense completely abandoned any expert testimony regarding mental health issues, the only realistic mitigation case available to respond to what was clearly a difficult murder/rape case. Without any expert testimony to explain the impact of the abuse that Mr. LeCroy had suffered as a child, counsel was left only with an option of somehow trying to "connect the dots" in closing argument, with the attorneys "taking the place of the expert." (EHT-96-97-169).

This strategy was itself questionable and unreasonable under the circumstances, because without any expert testimony as to Mr. LeCroy's mental illness there were no "dots" to connect. But even if it could somehow be excused as marginally sufficient under prevailing professional norms, something the Defendant strongly contests, it was never in fact implemented, apparently due to miscommunication between Ms. Kearns and Mr. Mendelsohn. Mr. Mendelsohn believed that Ms. Kearns would drive the point home regarding the effect of sexual and other abuse suffered by the Defendant, as apparently Mr. Kish also believed would happen, but the actual closing argument on this subject includes only four

short paragraphs and all that Ms. Kearns argued was that somehow the sexual abuse might have affected the Defendant's "self-esteem." (TT-2715-2716). This was hardly a compelling case for a sentence other than death, even though the defense had significant evidence of mental illness directly related to the crime which could have given at least one juror reasons to reach a verdict other than death.

In the questioning of trial counsel during the evidentiary hearing, the Government appeared to be pressing two primary points as justifications for the decisions made by trial counsel. First, they brought out evidence that Mr. Mendelsohn and Ms. Kearns were fearful from their experience that a Government evaluation would not have been helpful and perhaps even more damaging than the evidence that they could present, even though they did not even know the extent of Dr. Hilton's testimony, because they never talked to him, nor was Dr. Lisak ever allowed to interview the Defendant. A Government evaluation may or may not have been harmful, but there was no way for any of the trial counsel to know until an evaluation actually occurred. If the evaluation by a Government mental health expert had been so persuasive and damning that it trumped any expert testimony by defense experts, then an informed decision might reasonably be made not to pursue mental health evidence through an expert. The Defendant would have been no worse off than he was ultimately in this case. But to make this decision in a

vacuum without even knowing what the results of a Government evaluation would be, or even what specifically Dr. Hilton or Dr. Lisak, if he had personally evaluated Mr. LeCroy, would have opined, is just the type of uninformed strategic decision to which the Court should give no deference. Jackson v. Herring, 42 F.3d 1368 ("[A] legal decision to forego a mitigation presentation cannot be reasonable if it is unsupported by sufficient investigation."); Bond v. Beard, 539 F.3d 256, 289 (3rd Cir. 2008)("Strategy is the result of planning informed by investigation, not guesswork.").

The second excuse that appears in the Government's line of questioning is that it was reasonable not to call as a witness, Dr. Hilton, who actually evaluated the Defendant, or Dr. Lisak, if he had evaluated him, because they would have then been required to describe the details of the Defendant's account of his attack on Ms. Tiesler. But, here again, calling Dr. Hilton or Dr. Lisak and having them recount the details provided by the Defendant would have not made the factual situation counsel faced any worse than it already was. The autopsy and the crime scene photographs were sufficient to prove an extended and brutal attack on Ms. Tiesler while she was conscious, and in some sense were worse than the precise details of the Defendant's description of the event, because the jurors would inevitably speculate as to the worst scenarios possible. The jury already knew that it was a brutal rape/murder and Dr. Hilton's or Dr. Lisak's testimony would not

have made that situation any more difficult than it already was. On the other hand, their expert testimony would have provided an explanation of mental illness, which, although not a justification or excuse for the attack, could have persuaded at least one juror to impose a sentence other than death.

But even if you accept as one possible reasonable trial strategy of having trial counsel make the mental health case in closing argument based upon the few reports of sexual abuse by the Defendant, without any type of expert testimony to explain the relationship between the abuse and the crime, the strategy at least has to be actually implemented by counsel. Here, not only had counsel abandoned any expert mental health evidence or any other evidence tying the defendant's sexual and other abuse as a child to the actual crime for which he had been convicted, but they even failed to organize what little evidence they had into any type of cogent mitigation argument at sentencing. <u>Gray v. Branker</u>, 529 F.3d 220, 235 (4th Cir. 2008)("Counsel did not present a cohesive case for the mental or emotional disturbances-indeed it was barely mentioned in closing argument at sentencing.").

The Defendant believes he was denied the effective assistance of counsel (1) when counsel failed to discuss Dr. Hilton's evaluation with him, (2) when they failed to have Dr. Lisak personally evaluate the Defendant, (3) when they unreasonably abandoned expert testimony based upon the fear of a Government evaluation which they could only speculate as to its results, and (4) when they

devised a strategy of trying to "testify" as experts in closing. But even this questionable strategy was never implemented, due to miscommunication among the attorneys depriving the Defendant of any type of mental health defense at the sentencing phase. This was in and of itself deficient performance below objective standards of reasonableness sufficient to satisfy the first prong of the Strickland test. Jackson v. Herring, 42 F.3d at 1364-1368 (Counsel ineffective for failing to conduct an adequate mitigation investigation due to a "misunderstanding" between the defendant's two counsel as to who was responsible for this investigation); Harris v. Dugger, 874 F.2d 642 (11th Cir. 1988)("Here, counsel's failure to present or investigate mitigation evidence resulted not from an informed judgment, but from neglect. Each lawyer testified that he believed that the other was responsible for preparing the penalty phase of this case."); State v. Terry, 280 Ga. 341, 344 (2006)(Counsel found to be ineffective due to the failure to conduct an adequate investigation because counsel "miscommunicated about the role each was to play" in the defendant's defense.).

With respect to the question of prejudice, the mental health evidence that was readily available to the defense but never presented due to the ill informed and objectively unreasonable decisions of defense counsel would have provided the jury with some explanation for what was otherwise an inexplicable attack upon Ms. Tiesler. The evidence would not have only explained why the attack occurred

but would have offered an explanation as to the brutality of the attack. In short, the jury would have learned that the assault on Ms. Tiesler was not a gratuitous and unprovoked act of evil, as the Government contended, but was the "product" of mental illness and would have never occurred but for the sexual and other abuse which the Defendant had suffered and which had caused him to develop mental disorders, the symptoms of which included "magical" thinking and "transient psychotic episodes." As Justice O'Connor observed in <u>California v. Brown</u>, 479 U.S. 538, 545 (1987), such mitigation evidence is relevant "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, <u>or to emotional or mental problems</u>, may be less culpable than those who have no such excuse." (Emphasis added).

The question is not whether at least one juror would certainly have returned a verdict other than death if he or she had heard this evidence, or even whether it is likely or probable that at least one juror would have returned a verdict other than death. The question is whether there is "a reasonable probability" that at least one juror would have returned a different verdict had the juror heard relevant mental health evidence which was never presented by counsel, that is a "probability sufficient to undermine confidence in the outcome" of the case. <u>Strickland v. Washington</u>, 466 U.S. at 694. At bottom, the issue is whether during the sentencing phase of the trial the prosecution's case for death was met with the type

of "adversarial testing" necessary for us confidently to conclude that the Defendant received a "fair trial" with respect to sentencing. Id. at 685.

Here, the prosecution's case for death was unrebutted because no cohesive, coherent and compelling case was made to explain how the Defendant's individual background and character, including the mental illnesses from which he suffered, related, at least in mitigation and in extenuation, to the attack on Ms. Tiesler. Counsel failed to investigate all reasonable alternatives before making critical strategic decisions about the presentation of expert testimony. There was a misunderstanding between counsel as to how what evidence they did have could be used to persuade the jury. As a consequence, counsel failed in their constitutional duty to provide the jury with the complete and individualized picture of the Defendant's mental illnesses, perhaps, the one and only reason which could persuade at least one juror under the circumstances of this case to render a verdict other than death.

The Defendant did not receive a "fair trial" consistent with constitutional standards and at which the jury had a full and individualized picture of Mr. LeCroy, both aggravating and compelling mitigating circumstances, such as mental illness, in determining sentence. The Government's case for death was not subjected to the "adversarial testing process" which our system relies upon "to produce a just result." Strickland, 466 U. S. at 685-687. Mr. LeCroy was denied

constitutionally effective assistance of counsel at sentencing and a new sentencing should be ordered. <u>Cunningham v. Zant</u>, 928 F.2d 1006, 1019 (11th Cir. 1991)(Failure to develop evidence of mild retardation and brain injury "prejudiced Cunningham's ability to receive an individualized sentencing," which is the "primary purpose of the penalty phase."); <u>Stephens v. Kemp</u>, 848 F2d 642, 652 (11th Cir. 1988) ("Our reading of the record convinces us that, under the circumstances of this case, trial counsel's failure to investigate, present and argue to the jury at sentencing any evidence of appellant's mental history and condition constituted error 'so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment'"); <u>Middleton v. Dugger</u>, 849 F2d 491, 494-495 (11th Cir. 1988) (Failure to develop evidence of "schizoid personality" diagnosis and evidence that the defendant was "sexually assaulted while at a school for boys" found to be constitutionally ineffective assistance of counsel. The Court concluded, "This kind of psychiatric evidence, it has been held, has the potential for altering the causal relationship that can exist between mental illness and homicidal behavior."); <u>Gray v. Branker</u>, 529 F.3d at 235 ("Evidence of mental disturbance of the type omitted at Gray's sentencing (paranoid personality disorder) can be persuasive mitigating evidence for jurors considering the death penalty, and this evidence can determine the outcome."); <u>Ben-Shalom v. Ayers</u>, 566 F.Supp.2d 1053, 1120 (E.D.Cal. 2008)("It is manifest that to counter the effect

of the aggravating circumstances of the crime [counsel] was obligated to show something mitigating about Ben-Shalom's mental state during his homicidal actions. This required that he fulfill his 'sacrosanct duty to conduct a full and complete mitigation investigation before making tactical decisions'....What was missing was evidence explaining why Ben-Shalom committed his awful crime and an effort on [counsel's] part to develop that evidence.")(citation omitted).

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL WITH RESPECT TO THE JURY CHALLENGE

### A. Relevant Facts

In its Opinion affirming the Defendant's convictions and sentences, the Eleventh Circuit rejected the Defendant's claim that Hispanics were underrepresented in the jury wheels from which the petit and grand juries were drawn in his case, "because he failed to proffer any evidence of the relevant population—the percentage of the Hispanic population that is eligible for jury service." United States v. LeCroy, 441 F.3d at 918, fn. 1. In Ground F of the Grounds for Relief alleged in the Motion to Vacate, the Defendant has asserted that this failure to present juror eligible evidence with respect to the Hispanic community in the Northern District of Georgia and the Gainesville Division was ineffective assistance of counsel.

Of the four lawyers who composed the defense trial team, attorneys Paul Kish and Dan Summer were the ones who handled the jury challenge issues.

(EHT-72, 98, 154). They worked with Jeffrey Martin, an expert in examining the representativeness of jury systems, who had consulted and/or testified in numerous cases challenging jury selection procedures, to assist them in examining the representativeness of the grand and petit jury selection procedures in the Northern District of Georgia and the Gainesville Division. (EHT-73, 352-355).At first it was believed that Mr. Summer was going to be the primary attorney handling this matter, but as the motion's deadline approached it became clear that Mr. Summer would not be able to finish the project, so Mr. Kish took over and was the primary attorney handling this issue. (EHT-18-19).

Mr. Martin used figures from the JS-12 forms used by the jury clerk to survey the representativeness of the jury wheels, a document that he had used numerous times before, and compared those figures with the 2000 Census for the Northern District of Georgia based upon race, gender and ethnicity. The JS-12 showed the percentage of each group in the Qualified Wheels, based upon a sampling from these wheels. Mr. Martin compared percentages of the relevant communities reflected on the JS-12 with 2000 Census figures, adjusted for age, considering only the 18 and over juror eligible population. However, he was never asked to refine those figures with respect to citizenship data, even though only United States citizens can serve on federal juries. 28 U.S.C. §1861, 1865(b)(1). (EHT-357-358).

Mr. Kish testified that it did not occur to him that the figures should be adjusted for citizenship. (EHT-19-20). As Mr. Kish testified, he was "scrambling to catch up" with the jury challenge issues after taking over from Mr. Summer and did not know exactly why he elected to use general population figures as opposed to citizenship figures. (EHT-74-77). There was no strategic reason not to use citizenship figures and the use of general population figures had nothing to do with the fact that those figures might be more favorable because they would show larger disparities. (EHT-74, 78-79, 90). Indeed, he believed that the primary issue was not with respect to citizenship, as opposed to general population figures, but was whether comparative disparity analysis can be used with respect to a relatively small population, such as the Hispanic population in the Northern District of Georgia and the Gainesville Division. (EHT-79, 98).

At the evidentiary hearing Mr. Martin testified as to the figures that he would have computed had he been asked to compare the juror eligible Hispanic population, taking into account citizenship, with their representation on the jury wheels, again using the JS-12 analysis computed by the Clerk's office. Using 2000 Census data, between 1.8% to 1.68% of the Gainesville Division were Hispanics over 18 years of age and citizens. On the other hand, only 0.62% of the Qualified Wheel in the Gainesville Division, from which petit jurors would be selected, based upon the JS-12 analysis, were Hispanic. This resulted in an absolute

disparity of minus 1.27% to minus 1.06% and a comparative disparity of minus 67.37% to minus 63.22%. Approximately 2/3 of the age and citizenship eligible population of the Hispanic community in the Gainesville Division was missing from the Qualified Wheel. Using standard deviation analysis, Mr. Martin concluded from a mathematical standpoint that something systematic was causing a significant underrepresentation of the Hispanic community in the Qualified Wheel. (EHT-360-366; Defendant's Exhibit 17).

Mr. Martin also testified with respect to an analysis of the entire District, from which the grand jury would have been selected. For the entire District 2.3% to 2.19% of the age and citizenship eligible population was Hispanic while only 1.01% of the Qualified Wheel was Hispanic, resulting in an absolute disparity of minus 1.22% to 1.18% and a comparative disparity of minus 54.46% to 52.82%. In other words, approximately half of the Hispanic population was not being represented. Again, the standard deviations analysis indicated that something systematic was going on for the entire District in underrepresenting the Hispanic community. (EHT-367-368; Defendant's Exhibit 17).

With respect to possible systematic factors resulting in this underrepresentation, Mr. Martin testified that the sole use of the Voter Registration list may be part of the problem. This deficiency could be corrected by supplementing the Voter Registration list with the list of the driver's license and

personal identification cards and then merging the lists. The lists could be merged, something that is not difficult to do in the age of computers, and you would have a much more inclusive list from which to draw jurors. If you drew randomly from this more inclusive group you would reduce the underrepresentation seen in the system. (EHT-368-370). Indeed, such merging may be required by the Juror Selection and Service Act of 1968 (the "Jury Act"). 28 U.S.C. §1863(b)(2).

Mr. Martin also testified, based on Census data, regarding some of the unique characteristics of the Hispanic community in the Northern District of Georgia and the Gainesville Division. (EHT-370-377, Defendant's Exhibit 18). For example, approximately 39% of the Hispanic population lives in owner occupied housing while 76.69% of the non-Hispanic population in the Gainesville Division lives in owner occupied housing. For the entire District, 36.62% of the Hispanic population lives in owner occupied units while 69.01% of the non-Hispanic population lives in owner occupied units. (EHT-373; Defendant's Exhibit 18). In the Gainesville Division, 60.65% of the Hispanic population lives in renter occupied units while only 20.31% of the non-Hispanics live in renter occupied units. (EHT-373; Defendant's Exhibit 18). For the Northern District of Georgia, 63.38% of the Hispanic population lives in renter occupied units while only 30.99% of non-Hispanics live in renter occupied units. (EHT-373; Defendant's Exhibit 18).

These figures may reflect an additional systematic factor that may be causing the underrepresentation of the Hispanic population. Questionnaires are sent out to people on the Master List (composed solely from the Voter Registration lists) and from those returned the Qualified List is composed. However, if questionnaires are not delivered or not returned there are no follow-up procedures other than sending a second letter to the same address. Thus, the mobility of the members of the Hispanic community, who live primarily in rental units, may play a large part in the non-return rate of questionnaires, resulting in the underrepresentation of the Hispanic community. They are more likely to have questionnaires not delivered or not returned than the more stable non-Hispanic population. (EHT-374-375).

Other significant factors represented by the Census indicate that 87.79% of the Gainesville Division Hispanics speak Spanish at home while only 1.4% of the non-Hispanic population speak Spanish at home. (EHT-375, Defendant's Exhibit 18). Similarly, for the Northern District of Georgia, 85.7% of the Hispanic population speaks Spanish at home while only 1.64% of the non-Hispanic population speaks Spanish at home. (EHT-376, Defendant's Exhibit 18).

Poverty rates also indicate a distinction between the Hispanic population and non-Hispanic population. 26.2% of the Hispanic population in the Gainesville Division lived below the 1999 poverty level, while only 9.31% of the non-Hispanic

population of the Gainesville Division lived below this poverty level. (EHT-376; Defendant's Exhibit 18). For the Northern District of Georgia, 20.08% of the Hispanic population lived below the 1999 poverty level, while only 9.03% of the non-Hispanic population lived below the poverty level. (EHT-377; Defendant's Exhibit18).

Census figures also show that the Hispanic population is twice as likely as the non-Hispanic population in the Gainesville Division or the Northern District of Georgia to be involved in the manufacturing or construction business. (EHT-377; Defendant's Exhibit 18).

Census figures also show that the Hispanic population in the Gainesville Division and the Northern District of Georgia is primarily Mexican, Mexican-American or Chicano. (EHT-378-379; Defendant's Exhibit 19). The Puerto Rican and Cuban populations, as well as the Central American population, are relatively small. Approximately 80% of the Gainesville Hispanic population comes from Mexico or has ties to Mexico, with the next largest group being Central Americans, with only 4.7% of the population. (EHT-378-380; Defendant's Exhibit 19).

If asked by Mr. Kish or Mr. Summer, Mr. Martin would have testified with respect to all of the information that he testified to at the evidentiary hearing, including the citizenship eligible population, the systematic factors leading to the

underrepresentation of the Hispanic community, and the Census figures regarding the nature of the Hispanic population and their ancestry. (EHT-380-381).

### B.  <u>Argument and Authority</u>

Counsel addressed the general law in support of the Defendant's position in the Section V of Defendant's Traverse, which is adopted by reference herein. (Doc. 511)(pp. 16-22). The Government's Response was filed on January 9, 2009 and the Defendant's Traverse was filed on February 11, 2009. Subsequent to the filing of these pleadings the United States Supreme Court decided <u>Berghuis v. Smith</u>, 130 S.Ct. 1382 (2010), which involved the review of the decision of the Sixth Circuit in <u>Smith v. Berghuis</u>, 543 F.3d 326 (6th Cir. 2009). The Supreme Court's holding in <u>Berghuis</u> is not binding on this Court, because it involved the review of a state court decision under 28 U.S.C. §2254(d)(1) of the Antiterrorism and Effective Death Penalty Act of 1986 (the "AEDPA"), where relief cannot be granted unless the state decision under review "is contrary to or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," In the context of a §2255 proceeding, as here, no such deference is required. But, the decision in <u>Berghuis</u> is at least instructive on several points.

First and most important, the Court in <u>Berghuis</u> makes clear that "neither <u>Duren</u> nor any other decision of this Court specifies the method or tests courts

must use to measure the representation of distinctive groups in jury pools." 130 S.Ct. at 1393. As the Defendant has previously argued, the minus ten percent absolute disparity threshold, which is sometimes said to apply in the Eleventh Circuit, has never been adopted by the Supreme Court. Instead, as the Supreme Court in <u>Berghuis</u> noted, "[t]he courts below and the parties noted three methods employed or identified in lower federal court decisions; absolute disparity, comparative disparity and standard deviation." While recognizing that "[e]ach test is imperfect", and that no test would in and of itself be dispositive, the Court specifically refused to hold that absolute disparity is the only test, much less a minus 10% absolute disparity threshold, as the Government claims is the law. (Government's Response, p. 45). <u>Id</u>. at 1393-1394 & fn. 4.

In sum, the Supreme Court in <u>Berghuis</u> continued to leave open the appropriate statistical test, although, in observing that each test is "imperfect", appeared to signal that a flexible reference to all three recognized tests, absolute disparity, comparative disparity and statistical significance, using a case by case analysis, should be the method of analysis of the representation issue, similar to what is recommended by the former Fifth Circuit in the Appendix to <u>Foster v. Sparks</u>, 506 F.2d 805, 834-835 (5th Cir. 1975). <u>See</u>, <u>also</u>, <u>Alexander v. Louisiana</u>, 405 U.S. 625, 630 (1972)("This Court has never announced mathematical standards for the demonstration of 'systematic exclusion', but has rather,

emphasized that a factual inquiry is necessary in each case that takes into account all explanatory factors."); Kairys, Kadane and Lehosczky, "Jury Representativeness: A Mandate for Multiple Sources." 65 Cal.L.Rev. 776, 793-799 (1977).

Here, although the age and citizenship eligible Hispanic population in the Gainesville Division and the Northern District of Georgia is relatively small, the comparative disparity figures indicate that no less than half and up to almost two thirds of the age eligible and citizenship eligible population is not being represented in the jury wheels. Standard deviation analysis indicates that this underrepresentation is statistically significant and that it is mathematically extremely unlikely that this would be occurring if jurors were being selecting randomly from the community with no disparate impact upon the Hispanic community. In short, based on a statistical analysis, something must be causing as much as a half to two thirds of the Hispanic community not being represented on the Qualified Wheels.

The distinctive nature of the Hispanic community is well recognized in the case law, especially considering the fact that the Hispanic community involved here comes from Mexico or has significant ties to Mexico. Castaneda v. Partida, 430 U.S. 482, 495 (1997)("In this case, it is no longer open to dispute that Mexican-Americans are a clearly identifiable class."); Hernandez v. Texas, 347

U.S. 475, 478 (1954); <u>United States v. Torres-Hernandez</u>, 447 F.3d 699, 703, fn. 6 (9th Cir. 2006); <u>Smith v. State</u>, 275 Ga. 715, 718 (2002). (Noting the unique characteristics of the Hispanic community in Hall County, including "the speaking of Spanish, professing the Roman Catholic faith, a strong work ethic, and strong family traditions," as well as citing to the "[m]any courts" that have "determined that Hispanics are a distinctive group for Sixth Amendment purposes."). Moreover, as testified by Mr. Martin, the 2000 Census confirms the unique characteristics of the Hispanic community, not the least of which is the primary use of the Spanish language at home, as well as significant social and economic distinctions.

Among the factors identified for the significant underrepresentation of the Hispanics in the Qualified Wheels is the reliance on the Voter Registration lists alone as the sole source for names of potential jurors and the mobility of the Hispanic community, compared to the community at large, so that there is a significant difference between the return rates on questionnaires when there is minimal follow up for non-delivered or non-returned questionnaires.

In sum, had counsel merely perfected this issue by causing citizenship eligible figures to be presented, as opposed to merely general population figures, they would have presented a meritorious jury challenge case, which would have required the dismissal of the Indictment and/or the staying of any proceedings in the case until the deficiencies had been corrected. 28 U.S.C. §1867(a). As a

consequence, the Defendant's rights under the Sixth Amendment to the United States Constitution and under the Jury Act, were denied. Obviously, there is a reasonable probability that but for the deficient performance of counsel there would have been a different result in the case, i.e. dismissal of the Indictment and/or staying the proceedings until the constitutional and statutory deficiencies had been corrected, or if relief had not been granted at the district court level, reversal of his convictions and sentences upon appeal.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO RAISE ON APPEAL THE RETENTION OF DOCUMENT ISSUE

The Eleventh Circuit in its opinion declined to address the Defendant's claims regarding the retention of documents found in his car as a result of a 1991 law enforcement search, because this issue was raised only in "one paragraph of his reply brief" and therefore "was not fairly presented" by counsel during the appeal. <u>United States v. LeCroy</u>, 441 F.3d at 925, fn. 8. Attorneys Kish, Kearns and Mendelsohn testified during the evidentiary hearing that there was no reason not to perfect properly the retention of documents issue on appeal (EHT-71-72, 98-99, 174-175). As attorney Kish admitted, "sometimes you miss things" and he regretted that they had not adequately handled this issue on appeal. (EHT-71-72).

The documents involved were important evidence not only with regard to guilt/innocence, but certainly with respect to sentencing. The Government described these documents in the Government's Response as follows:

"Following defendant's arrest on burglary charges in 1991, law enforcement officers found inside his vehicle a written plan to "armed rob cars and kill people driving so the car can be used 2 or 3 days." (Doc. 430-1233, 1243-46). On the same piece of paper defendant also wrote: "Kill J? No! Maybe later for car." (Doc. 430-1246). Defendant's written plan included burglarizing homes to steal food, guns and ammunition. (Doc. 430-1246). On a separate piece of paper found in his car in 1991, defendant compiled a hit list and a plan in the event he was "being chased" which included robbing or stealing cars, switching cars every other day, and burglarizing houses to get food and drink. (Doc. 430-1247). In addition to carrying out the hit list, defendant had written plans to "rape, rob, and pillage" and to be "ruthless and famous." (Doc. 430-1247)." (Government's Response, p. 8)(Doc. 508).

The failure to perfect a valid constitutional issue can constitute ineffective assistance of counsel. Kimmelman v. Morrison, 477 U.S. 365, 385-387 (1986) (Counsel ineffective for failing to conduct pretrial discovery and file a timely

suppression motion.). Here, as counsel testified, there was no strategic reason not to raise this issue on appeal. Indeed, it was raised, albeit ineffectively, in the Defendant's Reply Brief on appeal.

With respect to the merits of the issue, counsel cites to the Court the cases, also referred to by the Government at footnote 6 to the Government's Response, indicating that the retention of seized property, here for over ten years, constituted a violation of the Defendant's Fourth Amendment rights sufficient to require suppression. Fox v. Van Oostereun, 987 F.Supp. 597, 608 (W.D.Mich. 1997)(citing Hudson v Palmer, 468 U.S. 517, 538 (1984)(O'Connor, J. concurring) for the proposition that "a seizure originally conducted lawfully can nevertheless become unlawful if the duration or manner of the seizure is deemed unreasonable in light of competing interests.")(Emphasis added); Roderick v. City of Gulf Port, Mississippi, 144 F.Supp.2d 622, 629, fn. 9 (S.D.Miss. 2000)("It would appear that the continued retention of property falls within the ambit of this broad definition of 'seizure'").

With respect to the prejudice prong, given the other significant evidence with regard to guilt/innocence, the seized documents may not have created a reasonable probability of a different result as to guilt/innocence. But, given their provocative language, especially the so-called "hit list" in which the Defendant claimed to have planned to "rape, rob and pillage" in order to be "ruthless and

famous", the Court cannot be confident that but for the failure to suppress the evidence, there was not at least a reasonable probability of a different result as to sentencing, especially when this failure is considered cumulatively with the other errors of counsel described herein and in the Defendant's previous pleadings.

**VI.** **INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO RAISE THE ISSUE OF WHETHER THE INDICTMENT MUST INCLUDE THE FINAL BALANCING BEFORE IMPOSING A SENTENCE OF DEATH AND IN FAILING TO REQUEST AN INSTRUCTION REQUIRING THE JURY TO FIND BEYOND A REASONABLE DOUBT THAT THE DEFENDANT CAN BE SENTENCED TO DEATH ONLY IF EACH JUROR FOUND BEYOND A REASONABLE DOUBT THAT ALL AGGRAVATING FACTORS, BOTH STATUTORY AND NON-STATUTORY OUTWEIGH THE MITIGATING FACTORS PRESENTED BY THE DEFENSE**

In Section H of the Motion to Vacate and in Section VII of the Defendant's Traverse, the Defendant raised the question of ineffective assistance of counsel for failing to raise the issue of whether the Indictment must allege the final balancing before imposing a sentence of death and in failing to request an instruction telling the jury that it must find that aggravating circumstances outweigh the mitigating factors presented by the defense beyond a reasonable doubt before they can sentence the Defendant to death. Counsel for the Defendant addressed the legal argument in support of this issue in detail in the Defendant's Traverse and will not repeat it here, instead adopting herein that argument. (Doc. 511)(pp. 24-37). Although there have been some lower court decisions regarding this issue, the

Supreme Court has never directly addressed it, nor, to counsel's knowledge, is there any binding authority in this Circuit.[2]

During the evidentiary hearing the trial attorneys testified that there was no strategic reason not to raise this at the trial or on appeal. (EHT-23-24, 99, 175). The Defendant relies upon his detailed argument set out in the Defendant's Traverse as to why the final balancing must be alleged in the Indictment and found by the jury beyond a reasonable doubt. Had this issue been properly perfected, the Indictment would have been dismissed and/or there is a reasonable probability that at least one juror would have returned a different sentencing verdict. The Defendant was denied effective assistance of counsel and his death sentence should be set aside.

## VII. INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO OBJECT TO IMPROPER GOVERNMENT ARGUMENT REGARDING THE CLAIMED INABILITY TO SECURE THE DEFENDANT WHILE IN PRISON

### A. Relevant Facts

In both its opening and concluding sentencing arguments, counsel for the Government contended to the jury that a death sentence should be imposed because of the claimed inability of the Bureau of Prisons not to secure the

---

[2]Although the issue was raised in <u>United States v. Natson</u>, 444 F.Supp.2d 1269, 1303-1304 (M.D.Ga.), where Judge Land believed the claim was meritorious but curiously predicted the Eleventh Circuit would disagree, the Eleventh Circuit had no occasion to weigh in because the defendant avoided a death sentence.

Defendant unless he was placed on death row at the United States Penitentiary in Terre Haute, Indiana. They claimed that he might be transported to a local jail, similar to what happened with some prison witnesses in the case (TT-2679, 2718), and that the only way to be certain that he will not be an escape risk would be for him to be "sentenced to death", where he will held in a "single cell" and "in the most secure facility he can be held in among some twenty some odd inmates who are all known" and not "be one of the 154,000 roaming around federal prisons within this country." (TT-2723-2724). This demonstrably unfair argument by the Government, urging the jury to sentence the Defendant to death because of a claim that the Government itself would be unable properly to secure the Defendant without his being placed on death row, was not objected to by defense counsel nor raised as an issue on appeal. All three counsel testified that there was no strategic reason not to object to this argument. (EHT-23, 99, 174).

### B.   Argument and Authority

Future dangerousness may be a proper non-statutory aggravating factor at sentencing. But, as here, where the defense was arguing for a life without parole sentence, the issue of future dangerousness is limited to the possibility of dangerousness solely with respect to the Defendant's conduct behind bars. United States v. Allen, 247 F.3d 741, 788 (8th Cir. 2001); United States v. O'Reilly, 545 F.Supp.2d 630, 638 (E.D.Mich. 2008). Moreover, while a substantial likelihood of

escape might be a factor to consider, <u>Allen</u>, 247 F.3d at 788, it is one thing for the Government to point to the actions of the Defendant to support such an argument, quite another for the Government to simply throw up its hands and claim that there is no way they could ever secure the Defendant unless he is placed on death row.

In making such an argument, the Government played on the unfounded fears of the jurors while at the same time realizing that the Government itself, through the Bureau of Prisons, has plenty of ways through its classification process to guarantee that the Defendant would never be able to engineer any type of successful escape, other than placing him on death row. In short, the Government cannot <u>itself</u> create the justification for sentencing someone to death by claiming that they are unable adequately to secure the Defendant, especially when such a claim is patently false.

This extreme and disingenuous argument by the Government apparently caught the defense off guard and as a consequence timely objections were not made so that the improper argument could have been corrected by the Court through sustaining an objection and a correcting instruction. Similarly, the issue was not properly perfected so that it could be raised on appeal.

But for counsel's failure to object to this improper argument there is a reasonable probability of a different result as to sentence, when this error is combined with the other failures of counsel with respect to sentencing, including

the failure to present compelling mental health evidence that was available, to suppress damaging documents that should have never been considered by the jury at sentencing, and to except to the Court's "risk" of escape instruction.

## VIII. INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO OBJECT TO THE COURT'S INSTRUCTION REGARDING DEFENDANT'S CLAIMED FUTURE DANGEROUSNESS BECAUSE OF THE "RISK" OF ESCAPE

### A. Relevant Facts

Ground E of the Motion to Vacate raises the Defendant's claim of ineffective assistance of counsel because his trial counsel failed to object to the Court's instruction that the jury in deciding sentence should consider whether the Defendant was a potential danger to the general public, even though he would be incarcerated for life, if they found that he was an escape "risk." Trial counsel raised this issue at trial, but failed to make a timely exception to the Court's instruction. (TT-2760). As a consequence, the Eleventh Circuit Court of Appeals failed to consider the Defendant's argument in this regard on any standard of review other than a plain error standard. United States v. LeCroy, 441 F.3d at 930-931. During the evidentiary hearing, Ms. Kearns and Mr. Mendelsohn testified that there was no reason not to perfect this issue with an exception at trial. (EHT-99, 173-174). As Mr. Mendelsohn testified, counsel just "forgot to say the magic words." (EHT-174).

## B.      Argument and Authority

Counsel can, of course, be ineffective when they fail to perfect a meritorious legal issue, absent some strategic reason not to. Kimmelman v. Morrison, 477 U.S. 365 (1986). Here, no timely exception was made to the Court's instruction regarding the Defendant's claimed escape "risk" and as a consequence the Eleventh Circuit refused to consider this claim under any standard other than a plain error standard.

The problem with the Court's instruction is that although it may be proper for the jury to consider the Defendant's possible future dangerousness to the public if there was a substantial danger that the Defendant might escape, e.g. United States v. Allen, 247 F.3d at 788, the instruction given by the Court left the jury without any guidance as to the degree of evidence that the jury should have in determining the substantiality of such "risk." The word "risk" is so elastic and ill-defined, that it could include the mere possibility of an escape, no matter how fanciful, as opposed to what the defense counsel requested which was an instruction that the jury must find beyond a reasonable doubt that there was a "likelihood" of escape.  But due to counsel's inattention, they failed adequately to perfect this issue.

With respect to prejudice, the Court should consider the several errors of counsel cumulatively. Here, the Government not only made an improper argument,

not objected to by counsel, that the Defendant could only be securely incarcerated while on death row, but this error was then exacerbated by the Court's "risk" instruction, as well as the other errors of counsel set out herein, in the Motion to Vacate and in the Defendant's Traverse. After all, much of the Government's sentencing argument was directed at the claimed future dangerousness of the Defendant to the public should he escape, which the Government was allowed to exploit not only with its improper argument but with an instruction from the Court, not excepted to by counsel, allowing for the mere "risk" of escape to be considered by the jury in determining future dangerousness to the public. (TT-2677-2680, 2718-2719, 2726). Had this issue been properly perfected on appeal, there is at least a reasonable probability of a different result, requiring the Court, when combined with all of the other ineffective assistance of counsel errors set out herein, to order a new sentencing.

## IX.    REMAINING GROUNDS FOR RELIEF

The Defendant relies upon the factual and legal arguments set out previously in his Motion to Vacate and in the Defendant's Traverse with respect to the remaining Grounds for Relief alleged in the Motion to Vacate or about which evidence was received during the evidentiary hearing. Some of those Grounds for Relief relate to issues that were raised and decided on direct appeal and are alleged again merely to perfect the issue should the United States Supreme Court decide

ultimately to consider and resolve these issues. (See, e.g., Grounds for Relief I and J). Ground for Relief K relates to the Justice Department protocols for implementing a death sentence, which both the Government and the Defendant agree is premature for the Court to consider, because it may not be necessary to address this claim should relief be granted on other grounds and given the fact that there is litigation pending in the United States District Court for the District of Columbia on this very issue which will likely find its way to the United States Supreme Court.

## X.   <u>CONCLUSION</u>

The Defendant asserts each and every Ground for Relief raised in the Motion to Vacate, as further explained in the Defendant's Traverse and herein, or raised by the evidence received by the Court. The Defendant respectfully requests that the Court grant the Defendant relief, either setting aside his convictions or, at a minimum, vacating his death sentence and ordering a resentencing.

[signatures on next page]

This 1st day of March, 2011.

Respectfully submitted,

s/John R. Martin
John R. Martin
Georgia Bar No. 473325

44 Broad Street, N.W.
Suite 202 The Grant Building
Atlanta, Georgia  30303
404.522.0400
jack@martinbroslaw.com

s/Sandra Michaels
Sandra Michaels
Georgia Bar No. 504014

44 Broad Street, N.W.
Suite 202 The Grant Building
Atlanta, Georgia  30303
404.522.0400
slmichaels@mindspring.com

Counsel for William LeCroy

# CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2011 I electronically filed the foregoing **POST-HEARING BRIEF WITH RESPECT TO MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY PURSUANT TO 28 U.S.C. §2255** with the Clerk of Court using the CM/ECF system which will send notification of such filing to William McKinnon, Assistant United States Attorney.

s/John R. Martin               
JOHN R. MARTIN
