IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| | : | NO. 2:02-CR-038-RWS |
| v. | : | |
| | : | |
| | : | |
| WILLIAM EMMETT LECROY, JR. | : | |

**GOVERNMENT'S POST-HEARING RESPONSE TO DEFENDANT'S MOTION
TO VACATE, SET ASIDE, OR CORRECT SENTENCE
BY A PERSON IN FEDERAL CUSTODY PURSUANT TO 28 U.S.C. § 2255**

Comes now the United States of America, by and through counsel, Sally Quillian Yates, United States Attorney, and William L. McKinnon, Jr. and Shanya J. Dingle, Assistant United States Attorneys, for the Northern District of Georgia, and submits its post-evidentiary hearing response to defendant's Motion to Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody Pursuant to 28 U.S.C. § 2255 (hereinafter Section 2255 motion). [Doc. 493].

I.   **INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING WITH RESPECT TO MENTAL HEALTH EVIDENCE**

A.   <u>Statement of Facts</u>

Four lawyers made up the trial team which represented defendant at the death penalty trial--Paul Kish, Stephanie Kearns and Brian Mendelsohn from the Federal Defender Program, Inc. and

1

Dan Sumner who was in private practice in Gainesville, Georgia. (Evidentiary Hearing Transcript (T.)-12). Any major decisions made about trial strategy were made collectively by all four attorneys. (T-274).

The trial team investigated defendant's background in anticipation of presenting mitigating evidence to the jury during the sentencing phase, if there was one. The team determined that defendant had suffered childhood sexual abuse by a babysitter. Once that determination was made, the team engaged Dr. David Lisak as an expert in the field of childhood sexual abuse. (T-265). However, the team was initially uncertain about whether to have Dr. Lisak conduct a psychiatric examination of defendant for fear that the examination would go poorly or that defendant would say something that would be problematic. (Id.). Therefore, the defense team employed Dr. Michael Hilton to conduct a psychiatric evaluation of defendant. (T-13-14, 29, 265). The purpose for using Dr. Hilton to do the examination was so that he could do a test run with defendant and give the trial team an assessment of what a psychiatrist would conclude from a forensic examination. (T-266). The trial team never intended to use Dr. Hilton as a witness at trial, but rather Dr. Hilton's report was intended to guide the trial team in future decisions about how to proceed. (Id.).

2

Dr. Hilton conducted his examination on March 27, 2003, then prepared a report regarding his opinions about defendant's mental state.  (Def. Ex. 3-p. 1).  During Dr. Hilton's examination, defendant provided a detailed and graphic description of his rape, torture and murder of Joanne Tiesler.  (Def. Ex. 3, pp. 10-11).  In his report, Dr. Hilton summarized defendant's depiction of his commission of the crime as follows:

> Mr. LeCroy got up and put on his black Army battle dress uniform. He put his stepfather's police badge on his uniform. He found his stepfather's high tech police boots on the front porch and put those on. He started heading out to Ms. Tiesler's cabin, but then he realized he needed something to gain access into her cabin. He went back to the house and got a pry bar. He started out again and then realized he needed other supplies. He went back home and got his fanny pack and started putting all sorts of stuff in it. He also realized he needed combat protection. He got plastic ties, duct tape, Gatorade and Power bars. He looked around for a weapon, but all he could find were steak knives, and they did not seem adequate: His Leatherman also did not seem adequate. He left out again for her cabin, one of five cabins in a row. He got to her cabin and broke in through the use of a tall ladder he found under her crawl space. Climbing up the back and getting onto her porch, he used a pry bar to get the screen off and then open the window. As he was getting into her cabin, he saw two cats inside and realized that he was in the right place. He said, "Cats and witches go together." Once in her cabin, which was empty, he again decided that he needed a more adequate weapon. He left her cabin and went to the cabin next door, which was also empty. He broke in, but found nothing of use. He left that cabin and went to the next cabin. He broke in and found some soup and a Coke. He had lunch and then left. He went to the next cabin. While on the porch, he found a sheathed knife with a lock blade. He took it and put it in his fanny pack. He decided it would be a good back-up weapon, but he also needed a gun. He broke into the last cabin, where he found an antique shotgun over the mantle. He looked around and found some associated 16-gauge shotgun shells and took them. He

3

realized that one of the cabins he had been in earlier had a hacksaw in it. He took the shotgun and the shells and went back to the cabin to get the hacksaw. He sawed off the barrel of the shotgun. At that point, he decided he was ready.

Mr. LeCroy went back to Ms. Tiesler's house and went inside to wait for her. He then heard a car drive up. He became nervous. He looked out the window and saw that it was home of Ms. Tiesler's neighbors arriving at the cabin next door. He continued to wait and was quite nervous. He used her restroom. He urinated and defecated in the toilet. As he was coming out of the bathroom, he heard another vehicle coming. He went into her bedroom and could hear her approaching the cabin. As she came in, he saw her and struck her in the back of the head with the gun. The shotgun accidentally discharged, shooting into the wall. She fell to the floor. He told her not to look at him. He also, however, had the collar of his combat uniform pulled up over the bottom part of his face and the back of his collar pulled up around the back of his head and over the top of his head, so that only his eyes were exposed. He said the conversation was minimal. He told her several times, "You know what I want." She questioned him about the possibility of wanting money, and he told her he did not want her money. He used the plastic ties that he brought with him to tie her hands together. He then tied her legs together. As he started undoing her belt, she asked him, 'Is that what this is?' He did not say anything. She cooperated with him as he took her pants down. She stated only, Not on the floor.' Mr. LeCroy picked her up and put her on the side of the bed. He said his penis was too soft to penetrate her. He asked for some Vaseline. She told him where it was. He put some Vaseline on his penis and on her vagina. He was then able to penetrate her and immediately developed an erection. During the act, they were both silent. After he climaxed, he told her it was her turn to "undo it." She questioned him about what he meant. He told her she knew. They argued a little bit. He told her, "I'm getting pissed off" She was trying to appease him, but was not complying with his demands. He did not know what she had done the first time (when he was a child). He put a new shotgun shell in his shotgun and threatened her, yet she still did not comply. He then found a cord from a carbon monoxide monitor and looped it around her neck. He told her to "do it or else," but she did not know what to do. He started choking her to the point that she could not

breathe. She started gasping. She grabbed at his pants legs. He heard her start to urinate and defecate on herself. He then let go of the cord and said, "That's it." He told her, "You can do it or I'll do it." At that time, she was only making mumbling sounds. He pulled his knife out of its sheath, grabbed her head by her hair from behind, pulled her head back and cut her throat as hard as he could. She went limp immediately, but he could still hear breathing sounds. He stabbed her in the back a few times, and yet she was still making breathing sounds. He became frustrated that she would not die. He started to think, "I can't kill this woman." He walked out of the bedroom and looked out the window to see if anyone was around. He was planning to go back into the bedroom and shoot her in the back of the head with both barrels of the shotgun, but when he went back into the bedroom, she was not making any sounds. She was dead.

(Def. Ex. 3, pp. 10-11).

Based upon Dr. Hilton's examination of defendant, Dr. Hilton concluded that defendant was suffering from Schizotypal Personality Disorder, Antisocial Personality Disorder, and Borderline Personality Disorder. (Id. at p. 16). At the conclusion of his report Dr. Hilton explained the relationship between defendant's personality disorders and his commission of the rape, torture and murder of Joanne Tiesler as follows:

Upon Mr. LeCroy's release from prison, he had an unusual and unexplainable encounter with Ms. Tiesler (the victim) after she followed him down a dirt road, looked at him, said `huh' and then drove off. That experience inflamed some of his unresolved issues relative to his sexual abuse experience by his babysitter (Tinkerbell) when he was 8 years old. His schizotypal tendencies of magical thinking and his previous experiences in witchcraft led him to believe that Ms. Tiesler was indeed his former babysitter (Tinkerbell), that witchcraft was involved and that a spell needed to be broken. Mr. LeCroy had no one with whom to discuss these thoughts. These ideas gradually coalesced through rumination to an obsessional level of ideation. A plan of reversing the roles and

5

undoing what had been done developed. These thoughts that Mr. LeCroy developed, while not classically in keeping with psychosis, were distortions of reality based on mental illness (Borderline Personality Disorder' and Schizotypal Personality Disorder). Mr. LeCroy subsequently fell into his military operative/survivalist mode. He broke into the victim's home, as well as four other homes, in 'pursuit of his plan. Ultimately, he raped the victim and then following the rape and when there was no undoing of the spell, he became angry, frustrated and then acting as a military operative he killed the victim then seen as the aggressor in a violent, military-style fashion. After Ms. Tiesler's death, Mr. LeCroy began looking for other possible options to have the "spell" broken. He subsequently took Ms. Tiesler's car and some of her belongings, and then headed off in a poorly planned fashion, looking for a more powerful "spell breaker." Then after a period of time on the road in his victim's vehicle, he began to realize that, indeed, Ms. Tiesler was not his former babysitter. He developed remorse and wrote a letter to Ms. Tiesler, apologizing and acknowledging that he was "doomed to hell."

(Def. Ex. 3, p. 17).

The trial team received and reviewed Dr. Hilton's report. (T-258-59, 264). The trial team recognized that the detailed and graphic description of the rape, torture and murder of Joanne Tiesler given to Dr. Hilton would support the statutory aggravating factors that the murder was unusually cruel and heinous and that the murder was carried out with substantial premeditation and planning. (T-259-261). The trial team intended to argue to the jury that the facts and circumstances established that defendant snapped when Joanne Tiesler caught him the act of burglarizing her residence, and that he formed the intent to steal her vehicle only

after he raped, tortured and murdered her.[1]  (T-261-62).  The trial team believed that this defense would provide a defense to the federal offense of carjacking, and if successful, would avoid the imposition of the death penalty on defendant.  (T-262).  Upon reading Dr. Hilton's report, the trial team readily recognized that defendant's description of the offense was not consistent with the botched burglary defense that the team intended to employ as a defense to the carjacking charge and in rebuttal to the statutory aggravating factor that the murder was committed with substantial planning and premeditation.  (T-261-62).  The trial team also concluded that Dr. Hilton's diagnosis that defendant was possessed antisocial and borderline personality disorders would not be helpful.  (T-263).

Dr. Hilton's report was not disclosed to Dr. Lisak because the trial team did not want Dr. Lisak to be cross-examined about the matters that were disclosed in the report.[2]  (T. 266).  The report was not disclosed to the government for the same reason.  (Id.).

Dr. Hilton reviewed the MCMI report of psychological testing that was done on defendant in 1999.  (T-218).  The conclusions in the report were based upon answers defendant gave during the test.

---

[1]This defense will hereinafter be referred to as the "botched burglary defense."

[2]Dr. Lisak testified that he was quite certain that he was provided a copy of Dr. Hilton's report before the trial.  (T-613).

(T.221).   The purpose of the report was to predict how well defendant would adjust to prison.  (T-218-19).   The report concluded that defendant was abrasive and intimidating, that he was likely to be defiant and untrustworthy, that he would play staff members against one another, that he would be a general troublemaker, that defendant possessed a potential for violence, that defendant possessed a deficient conscience, that defendant may evidence a recklessly violent disposition, that defendant exhibited malicious and hostile tendencies that may lead him to humiliate and sexually dominate other prisoners.  (T-220-21).   Dr. Hilton concluded that based upon his personal examination of defendant, the assessment of defendant's personality as set forth in the report was accurate.  (T-222).

Dr. Hilton also conceded that because defendant suffered from antisocial personality disorder, defendant would tend to be irritable and aggressive, that he would repeatedly get into physical fights or commit acts of physical assault, that he would demonstrate a lack of respect for others and their rights, and that defendant would engage in cruel and sadistic behavior.  (T.224, 244-45).

During Dr. Hilton's examination of defendant, defendant told him that he had thought about killing other prisoners with whom he was incarcerated at the time.  (Id.).  Based upon his examination, Dr. Hilton concluded that defendant represented a danger to commit

additional assaults and murders in the future against persons in the community if he was in the community and against other inmates and staff within the prison system.  (T-226-27).  Dr. Hilton conceded that defendant's version of the commission of the rape, torture and murder of Joanne Tiesler would have foreclosed the defense team from arguing that the crime started as a botched burglary.  (T-237-39).  Dr. Hilton also conceded that defendant's version of the commission of the crime supported the statutory aggravating factors that the murder was committed after substantial planning and premeditation and that the murder was committed in an unusually cruel and heinous manner.  (Id.).

On October 20, 2003, defendant gave notice of his "intent to introduce expert evidence relating to a mental disease or defect or any mental condition of the defendant bearing on the issue of punishment."  (Doc. 183).  Defendant did not specify the mental condition, disease or defect about which he intended to present evidence or identify his expert(s); rather, his one sentence notice simply tracked the language of Rule 12.  In response, the government moved pursuant to Rule 12.2(c)(1)(B) for an order requiring defendant to submit to a mental examination. (Doc. 189). In response, defendant initially stated that the expert evidence he planned to introduce "could conceivably" not be based on an examination of him.  (Doc. 195-2).  The magistrate judge nevertheless ordered that defendant be examined.  (Doc. 210).  In

9

a motion to reconsider, defendant finally confirmed that the expert evidence he planned to present would "not be based on an evaluation of [him]." (Doc. 219-3). The magistrate judge denied the motion to reconsider, (Doc. 234), and defendant appealed the order to this Court. (Doc. 245).

During subsequent proceedings, the defense disclosed that it intended to call Dr. Lisak as a teaching expert to educate the jury about sexual abuse of boys and the ramifications that such abuse can have on grown men. (Govt. Ex. 58). Defendant's notice did not include an opinion by Dr. Lisak about whether defendant had actually been the victim of childhood sexual abuse, as defendant alleged. (Id.). The defense proposed to connect this evidence to the defendant by presenting fact testimony from mental health witnesses who had treated him while he was incarcerated. (Doc. 453-4). The Court nevertheless affirmed the magistrate judge's order requiring defendant to be examined, although it limited the scope of the examination. (Doc. 306; Doc. 453-30). The Court explained that "the Government should be given the opportunity to respond to that connection [to defendant]; and the most obvious way to do that is to have someone examine the defendant to determine if the connection is appropriate." (Doc. 453-3). Defendant subsequently invoked his Fifth and Sixth Amendment rights and refused to submit to the court-ordered evaluation. (Doc. 454-7).

At that point, the Court was authorized to exclude defendant's

expert altogether.  See Rule 12.2(d).  However, the Court instead reserved ruling on whether defendant could call Dr. Lisak.  (Doc. 454-8).  The court permitted the government to retain an expert to prepare a report regarding defendant's mental condition based solely on certain records she had been provided.  The Court required the government's expert's report to be filed under seal and remain under seal until the close of the guilt/innocence phase of the trial.  (Doc. 346).  At that time, the report would be released to the defense to assist them in deciding whether to call Dr. Lisak as a witness.  (Doc. 346; Doc. 431-1570-74; Doc. 455-15-16).  The report would simultaneously be released to fire-walled Assistant United States Attorneys but not to the government's trial attorneys.  (Id.).  If the defense elected to still call Dr. Lisak, the court would then hold a hearing on the admissibility of Dr. Lisak's proposed testimony.  (Doc. 431-1571-72; Doc. 455-11-12).  If the court decided to admit his testimony, it would finally take up the issue of whether the government's expert would be allowed to testify in rebuttal and, if so, the scope of her testimony.  (Doc. Doc. 431-1571-73; Doc. 455-17).

        After the jury began its deliberations on the guilt of defendant, the trial team was provided with a copy of the report prepared by the government expert, Dr. Julie Medlin. (T-272-73).  The trial team was directed to review the report and advise the Court whether it would seek to present Dr. Lisak's testimony as a

teaching expert subject to rebuttal by the government's expert witness. (Id.). After reviewing Dr. Medlin's report, the trial team advised the Court that it would not proceed with the testimony of Dr. Lisak. (T. 273).

The trial team discovered upon reading Dr. Medlin's report that Dr. Medlin had conducted an extensive and thorough review of defendant's medical and psychological records, and that she was prepared to testify to a number of matters that would damaging to defendant's mitigation case. (Govt. Ex. 63). First, Dr. Medlin was prepared to note that on a BOP Intake Screening form and a medical history form both dated February 14, 2000, defendant denied that he had ever been sexually assaulted. (Govt. Ex. 63, p. 7). Dr. Medlin's report also notes that defendant first reported childhood sexual abuse on February 21, 1992, while defendant was serving a prison term for child molestation. Dr. Medlin's report notes that research indicates that a significant number of sexual offenders falsely report being sexually abused as children. (Id. at 5). Dr. Medlin was also prepared to demonstrate that defendant had been inconsistent in reporting depression and other mental health issues while he was in prison and that there was reason to believe that defendant had made false reports of depressive symptoms in an effort to manipulate prison staff. (Id. at 10-22).

In summary, Dr. Medlin was prepared to testify that

> [i]n regards to the issue of sexual abuse, it is unclear
> if Mr. LeCroy was sexually abused by a female babysitter

as alleged, and if so, to what extent. There is some question regarding this, given that he was apparently inconsistent in reporting a history of sexual abuse. In addition, there appear to be some potential motivations for him to fabricate such a history. Research suggests that a significant percentage of sex offenders fabricated a history of childhood sexual abuse, presumably to explain and justify their sexual offending. It should be noted that Mr. LeCroy appears to have exaggerated and possibly fabricated other problems, such as his suicide attempts and seizures. If Mr. LeCroy had been sexually abused, any emotional and behavioral problems could be related to that history of abuse. However, the research shows that individuals who were sexually abused as children are not at any higher risk for committing a sex crime than individuals who were victims of other types of childhood abuse and neglect (Widom, 1995). The research also shows that the vast majority of childhood sexual abuse victims are not arrested for sex crimes or any other crimes as adults (Widom, 1995). A comprehensive review of 25 research studies concluded, "Nevertheless, overall retrospective studies, prospective studies and research reviews indicated that the experience of childhood sexual victimization is quite likely neither a necessary of sufficient cause of adult sexual offending (U.S. General Accounting Office, 1996).

(Id. at 27-28).

The trial team recognized that Dr. Medlin was prepared to testify to inconsistencies in defendant's self-report of childhood sexual abuse. (T-275). The trial team also recognized that in order to avoid a government evaluation of defendant, Dr. Lisak was not going to give an opinion regarding the credibility of defendant's report of childhood sexual abuse. (T. 279). On the other hand, the trial team knew from reviewing Dr. Medlin's report that she was prepared to call into question the veracity of defendant's report of childhood sexual abuse. (T-276). The team also learned from reviewing Dr. Medlin's report that she was also

13

prepared to cite studies that concluded that sexual offenders often make up a history of being victims of sexual abuse. (T-275). The trial team concluded that if defendant called Dr. Lisak, then the government would call Dr. Medlin, and the penalty phase would devolve into a battle of experts over defendant's report of sexual abuse as a child. (T. 278). After reviewing Dr. Medlin's report, the trial team concluded that it would be more effective in presenting defendant's mitigation case not to call Dr. Lisak, and thereby keep Dr. Medlin from testifying in rebuttal. (Id.). Therefore, the team decided to call fact witnesses to whom defendant had stated that he was sexually molested, then argue the fact that he was the victim of childhood sexual abuse as a mitigating factor at sentencing. (Id.).

      B.    <u>Argument and Citation of Authority</u>

          1.    Legal Standard

Defendant contends that trial counsel rendered ineffective assistance of counsel with respect to the investigation and presentation of mitigating evidence of mental health evidence in four ways--the failure to interview Dr. Hilton, the failure to have Dr. Lisak conduct a personal evaluation of defendant, the abandonment of expert testimony for fear of a government evaluation, and for devising a strategy of addressing the mental health issues in closing. (Doc. 541-26). However, defendant has failed to carry his burden to demonstrating that trial counsel's

strategic decisions fell below the standard of what a reasonably competent attorney would do or that defendant was prejudiced thereby.

It is uncontradicted that a defendant has a constitutional right to effective assistance of counsel at all stages of his criminal proceedings.  See Wilson v. United States, 962 F.2d 996, 997 (11th Cir. 1992); Middleton v. Dugger, 849 F.2d 491, 493 (11th Cir. 1988).  In Strickland v. Washington, 466 U.S. 668, 687 (1984), the Supreme Court set forth the test under which the Court reviews a claim of ineffective assistance.  This standard applies equally to both the guilt and sentencing phases of the trial.  King v. Strickland, 748 F.2d 1462, 1463 (11th Cir. 1984).  To prevail on a claim of ineffective assistance of counsel, defendant bears the burden of establishing by a preponderance of the evidence that (1) his attorney's performance was deficient; and (2) he was prejudiced by the inadequate performance.  Mills v. Singletary, 63 F.3d 999, 1020 (11th Cir. 1995).  The inquiry is two-pronged: defendant must show both ineffective assistance (the performance prong) and resulting prejudice (the prejudice prong).   See  Smith v. Wainwright, 741 F.2d 1248, 1254 (11th Cir. 1984) (emphasis added).

To satisfy the performance prong, the defendant must prove that his counsel's representation was unreasonable under prevailing professional norms.  Strickland, 466 U.S. at 690.  The defendant must overcome a strong presumption of competence on the part of his

trial counsel, and the court must give significant deference to the attorney's decisions.  Hagins v. United States, 267 F.3d 1202, 1204-05 (11th Cir. 2001).  The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error during the trial in light of all the circumstances.  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986).

In Chandler, the defendant contended that his attorneys were ineffective during the sentencing phase of his federal death penalty trial for failing to present character evidence in mitigation of punishment.  Prior to addressing the merits of Chandler's ineffectiveness claim, the Eleventh Circuit conducted a lengthy review of the law on the performance prong of the Strickland standard.  The court held that "the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.' (footnote omitted)."  218 F.3d at 1313, citing, Burger v. Kemp, 483 U.S. 776 (1987).  The court held that in judging the performance of trial counsel the court must indulge in the strong presumption that counsel's performance was reasonable, and in cases such as the instant case where the court is reviewing the performance of trial counsel that are experienced, the presumption in favor of the reasonableness is even stronger. 218 F.3d 1316.  As stated above, the inquiry of reasonableness is an objective one.  In addition, the reviewing court will not conduct its inquiry through the distortion of hindsight, but must

16

review the reasonableness of counsel's performance in the light of circumstances facing counsel at the time of the trial.  (Id.).

Finally, the court held that counsel is under no duty to investigate every possible matter that might be raised in mitigation in a death penalty trial.  Nor is trial counsel required to present all evidence that might arguably mitigate a death sentence.

> Counsel is not required to present every nonfrivolous defense; nor is counsel required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy. See Waters, 46 F.3d at 1511 (en banc) (noting that no absolute duty exists to present all possible mitigating evidence available: "Our decisions are inconsistent with any notion that counsel must present all available mitigating circumstance evidence."). Considering the realities of the courtroom, more is not always better. Stacking defenses can hurt a case. Good advocacy requires "winnowing out" some arguments, witnesses, evidence, and so on, to stress others. See Rogers, 13 F.3d at 388 (citing Jones v. Barnes, 463 U.S. 745, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983)); see also Waters, 46 F.3d at 1512 (en banc) ("There is much wisdom for trial lawyers in the adage about leaving well enough alone.").
>
> No absolute duty exists to introduce mitigating or character evidence. [footnote omitted] See Tarver v. Hopper, 169 F.3d 710, 715 (11th Cir.1999) (noting that counsel is not "required to investigate and present all available mitigating evidence to be reasonable") (citing Burger, 107 S.Ct. at 3126); Stanley v. Zant, 697 F.2d 955, 961 (11th Cir.1983) (no duty to present general character evidence); see also Waters, 46 F.3d at 1511 (en banc) (noting this court and Supreme Court have held counsel's performance to be constitutionally sufficient when no mitigation evidence was produced even though it was available). See, e.g., Burger, 107 S.Ct. at 3126 (finding counsel effective even though counsel presented no mitigation evidence at all); Darden, 106 S.Ct. at 2474 (same).

218 F.3d at 1319.

In Reed v. Secretary, Florida Department of Corrections, 593 F.3d 1217, 1244 (11th Cir. 2010), the Eleventh Circuit recently decided another death penalty habeas proceeding in which the issue was whether trial counsel was ineffective for failing to present mitigation evidence during the penalty phase. In Reed, the court noted the "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91.

Further, reasonably competent trial counsel will not be deemed to have been ineffective for failing to do a more extensive investigation to uncover mitigating evidence where extensive mitigating evidence was discovered. Reed, 593 F.3d at 1242. As the Supreme Court noted in Bobby v. Van Hook, 558 U.S. ___, 130 S. Ct. 13, (2009),

> This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained. It is instead a case, like Strickland itself, in which defense counsel's decision not to seek more mitigating evidence from the defendant's background than was already in hand fell well within the range of professionally reasonable judgments.

130 S.Ct. at 19.

18

In order to satisfy the prejudice prong, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. The Supreme Court held that the prejudice prong of Strickland requires more than a mere showing that the outcome of the proceeding would have been different but for counsel's errors. Lockhart v. Fretwell, 506 U.S. 364, 369-370 (1993).  The analysis must include whether the outcome was fundamentally unfair or unreliable.  (Id.).

Where as here, trial counsel's failure to investigate and present additional mitigating evidence during the penalty phase of a death penalty case is alleged to the basis for a ineffective assistance claim, the question "is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Reed, 593 F.3d at 1241, quoting, Strickland, 466 U.S. at 695.

    2.    Performance Prong

Defendant has not carried his burden of demonstrating that trial counsel's trial strategy was one that no other reasonable counsel would have pursued.

The first three allegations of deficient performance made by defendant, i.e., the failure to interview Dr. Hilton, the failure to have Dr. Lisak conduct a personal evaluation of defendant, and the abandonment of expert testimony for fear of a government evaluation, are all pre-trial decisions that are interrelated and will be addressed jointly.  The fourth allegation, i.e., not calling Dr. Lisak and devising a strategy of addressing the mental health issues in closing argument, was a mid-trial strategic decision that will be addressed separately.

As the Court is aware, the trial team consisted of four experienced attorneys--Stephanie Kearns, the director of the Federal Defender Program, Paul Kish and Brian Mendelsohn, both experienced and senior attorneys with the Federal Defender Program, and Daniel Sumner from Gainesville, Georgia.  The trial team performed as a team in making strategic decision about how to proceed with all phases in defending this death penalty prosecution.  Given the trial team's collective experience and the fact that the four attorneys made decisions jointly, this Court must give defendant's trial team's strategic decisions the strongest presumption of reasonableness.  <u>Chandler</u>, 218 F.3d 1316; <u>Reed</u>, 593 F.3d at 1244.

The trial team decided not to pursue a sentencing mitigation presentation based upon a mental health professional's conclusion that defendant was mentally ill, that the mental, physical, and

sexual abuse that defendant experienced as a child and young man exacerbated his mental illness, and that the torture and murder of Joanne Tiesler was the product of defendant's mental illness. This decision was reasonable, because in order to present that testimony the mental health expert would have had to testify to the version of the rape, torture and murder that defendant told to him or her. That version was substantially different from the botched burglary defense that the trial team intended to pursue, and the trial team knew that it could not credibility present both the botched burglary defense and defendant's version of the crime. The trial team, therefore, decided to call Dr. Lisak as a teaching expert on the effect of sexual abuse as a child on the behavior of adult men, as opposed to having Dr. Lisak personally evaluate defendant's mental state and testify as to his opinions about defendant's mental state. The defense chose this strategy, because under the Court's rulings, if the defense intended to present a mental health defense based upon an examination by a defense expert, the government would have been entitled to have defendant evaluated by an expert of its choosing. The trial team concluded that it did not want to submit defendant to an evaluation by a government expert for two reasons, first, the team was concerned that a government expert would not reach the same opinion about defendant's mental state as did Dr. Hilton, and secondly, the team knew that a government expert would ask defendant to provide his

version of the events leading up to his rape, torture and murder of Joanne Tiesler. Based upon the account of the crime defendant gave to Dr. Hilton, the defense team knew that defendant's version was not consistent with the botched burglary theory that the trial team believed was in defendant's best interest to pursue. Therefore, the strategic reason not to have Dr. Lisak or a government expert evaluate defendant was made, because, to do so would have caused the defense team to have to give up the botched burglary defense during the guilt/innocence phase.

The trial team decided to have defendant evaluated by Dr. Hilton as a test run to determine what evidence would result from a mental health evaluation. Dr. Hilton saw defendant on March 27, 2003, and submitted his report to the trial team shortly thereafter. After reading the report, the trial team did not follow up with an interview of Dr. Hilton, because it was not intended that Dr. Hilton would be a witness at trial. Rather, the trial team intended to use Dr. Hilton's findings in determining how to proceed with expert testimony regarding defendant's mental state.

Simply put, the trial team's failure to speak directly with Dr. Hilton about his conclusions was not deficient performance because Dr. Hilton's report set out the fact that defendant was mentally ill and that defendant's mental illness contributed to defendant's rape, torture and murder of Joanne Tiesler.

Accordingly, the trial team already knew what Dr. Hilton would say about defendant's mental illness and the relationship of his mental illness to the crime. There was nothing to be gained by talking to Dr. Hilton directly.

Defendant also contends that the trial team performed deficiently by failing to have Dr. Lisak personally examine defendant and for pursuing a strategy designed to avoid having a government psychiatrist examine defendant. Defendant contends that the trial team's performance was deficient therefor because the trial team never determined what Dr. Lisak or a government expert would conclude about defendant's mental state, therefore, the trial team made strategic decisions about how to proceed without knowledge of what it was avoiding.

However, the trial team already knew what a mental health professional would say if the professional personally evaluated defendant, because the team already had Dr. Hilton's report. The whole point for having Dr. Hilton evaluate defendant in the first place was to test what a psychiatrist would conclude about defendant's mental state. The trial team had no reason to believe, nor does habeas counsel proffer a reason for the trial team to have believed, that Dr. Lisak or a government expert would reach any different conclusions or hear a different version of the commission of the offense from defendant than did Dr. Hilton did.

Moreover, the trial team did not need to speak directly with Dr. Hilton or have Dr. Lisak or a government expert evaluate defendant to understand the implications that a personal evaluation of defendant's mental state by a mental health expert would have on the team's strategic decisions about how to proceed with defending defendant in both stages of the upcoming trial. The trial team readily understood from reading Dr. Hilton's report, particularly the last paragraph set out above, that in Dr. Hilton's opinion defendant was mentally ill, defendant was suffering from antisocial, borderline, and schizotypal personality disorders, and defendant's mental illness contributed to defendant's commission of the rape, torture, and murder of Joanne Tiesler. However, upon reading Dr. Hilton's report, the trial team immediately recognized that the description of the offense given to Dr. Hilton by the defendant was incompatible with the trial strategy the trial team intended to pursue, that is, that defendant was not guilty of carjacking, because the circumstantial evidence established that the murder was committed when Joanne Tiesler surprised the defendant while he was burglarizing her residence, defendant panicked when she caught him, and defendant formed the intent to steal her vehicle after he raped, tortured and murdered her. As the Court is aware, had the jury believed this botched burglary scenario, or if the jury had a reasonable doubt about the carjacking charge because of this theory of the defense, then

24

defendant would have been acquitted of the carjacking offense and there would have been no penalty phase.  Given the horrific nature of the offense defendant cannot demonstrate that this was not an unreasonable strategy given the fact that the evidence that defendant committed the offense was overwhelming.  Clearly, the goal of the defense team was not to prove that defendant did not commit the crime,[3] but to avoid the imposition of a death sentence in this especially gruesome and horrific rape, torture, and murder.

The trial team concluded that it could not credibly present the botched burglary defense during the guilt/innocence phase of the trial, then during the penalty phase of the trial have Dr. Hilton, Dr. Lisak or a government expert testify to the completely different version that defendant provided Dr. Hilton and would have provided Dr. Lisak or a government expert.  To have done so would have caused the trial team to lose all credibility with the jury at precisely the time when the trial team's credibility would have been most important to defendant.  Given the horrific nature of the rape, torture and murder of Joanne Tiesler, it was a reasonable decision to pursue the botched burglary defense in an effort to win acquittal on the federal carjacking charge.

In addition, the trial team would know that it had four different forums in which to win an acquittal on the carjacking

---

[3]Indeed, habeas counsel concedes that there was no issue that the evidence established that defendant committed the rape, torture, and murder of Joanne Tiesler.

25

charge by presenting the botched burglary defense, i.e., this Court on a Rule 29 motion for judgement of acquittal, the jury during the guilt/innocence phase, the Eleventh Circuit on direct appeal, and the Supreme Court on writ of certiorari.  Success with any one of those forums would have led to defendant's acquittal on the carjacking charge.  In juxtaposition, the defense would know that it had one forum in which it could win the death penalty argument and that would be the jury.  At the same time they would have to deal with the truly horrific nature of Joanne Tiesler's rape, torture and murder.

Based upon the Court's pre-trial rulings set out above, the trial team knew that if Dr. Lisak personally evaluated defendant, then a government expert would also be allowed to evaluate defendant.  While the trial team arguably could have controlled the scope of Dr. Lisak's evaluation, that is, direct Dr. Lisak not to ask defendant to tell him about his commission of the offense, the trial team understood that it could not control the scope of the government expert's evaluation.  Therefore, the team would have reasonably believed that defendant would tell the government expert the same version of the facts that defendant told to Dr. Hilton. As noted above, that version was inconsistent with the botched burglary defense and the team recognized that it could not credibility pursue the botched burglary defense, if the jury was

going to hear defendant's inconsistent version of the facts later during the sentencing phase.

Accordingly, had Dr. Lisak personally evaluated defendant, then the trial team would have been faced with the choice of giving up the botched burglary defense or giving up Dr. Lisak as a witness.  Therefore, the trial team embarked upon a strategy of having both the botched burglary defense and Dr. Lisak as a witness.  Dr. Lisak would not personally evaluate defendant.  The trial team would not allow a government expert to evaluate defendant.  The trial team would establish through fact witnesses that defendant said that he was sexually molested as a boy.  Then Dr. Lisak would testify as a teaching expert about the relationship between childhood sexual abuse and adult behavior.

The Eleventh Circuit directs that this Court "must not second-guess counsel's strategy," and "reliance on [one] line of defense to [the] exclusion of others is [a] matter of strategy." Chandler, 218 F.3d at 1314 (n.14).  If the chosen course was reasonable, then counsel was not ineffective.  Id.

A district judge in the Southern District of Alabama concluded in a similar case that it was reasonable for the defendant to defend a carjacking charge on the theory that the car theft occurred after a botched robbery attempt resulted in the shooting death of the victim.  Bohannon v. United States, 2010 WL 749329, p. 3 (11th Cir. February 26, 2010).  In Bohannon, the court found that

27

"promising" evidence was presented at trial that supported this theory. Id. Because there was evidence to support this theory, the court found that "[d]efense counsel's strategic decision to focus on showing that the killing took place during a robbery rather than a carjacking was eminently reasonable, because it was supported by many available facts and would negate an element of the prosecution's case." Further, the Court found that even if the alternative defense put forward by habeas counsel, a mental retardation defense,[4] was reasonable, "under Chandler this would not show deficient performance because counsel's selected strategy was also reasonable." Id. at p. 4.

Similarly, the Eleventh Circuit recognizes that proceeding with a sentencing strategy that focuses on the lack of certainty as to the guilt of the defendant may be sound trial strategy, particularly in a case as the instant case where the nature of the offense is horrific. See Reed, 593 F.3d at 1244, citing, Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 787-88 (11th Cir. 2003) and Stewart v Dugger, 877 F.2d 851, 856 (11th Cir. 1989).

In conclusion, as was true in Bohannon, the botched burglary defense was a reasonable strategy to pursue because there was evidence to support it. Because presentation of a botched burglary

---

[4]The Court's primary holding in Bohannon was that the mental retardation defense would not have been admissible at trial had it been presented, so trial counsel could not have been ineffective for failing to pursue it at trial. Id. at 3.

28

defense during the guilt/innocence phase was reasonable, and because by calling one of the potential mental health professionals the jury would have learned that defendant's version of the rape, torture, and murder of Joanne Tiesler was inconsistent with the botched burglary defense, the defense team made a reasonable strategic decision not to call Dr. Hilton as a witness during the penalty phase and not to have Dr. Lisak conduct a personal examination of defendant.

Defendant has failed to carry his burden of establishing that trial counsel was constitutionally ineffective for failing to speak with Dr. Hilton, for failing to have Dr. Lisak personally examine defendant, or for failing to have a government expert personally examine defendant.

Defendant also contends that the trial team was guilty of deficient performance for failing to call Dr. Lisak to testify as a teaching expert about the effect of childhood sexual abuse on adults during the penalty phase of the trial, then failing to more persuasively argue that the sexual abuse defendant claimed to have suffered as a child was a mitigating factor.

As the Court is aware, at the commencement of the trial neither Dr. Lisak nor Dr. Julie Medlin, the government's expert had personally examined defendant.  However, the trial team had provided the government with notice that Dr. Lisak would testify to the effects of childhood trauma on adult behavior.  (Govt. Ex. 58).

29

Notably, defendant's notice did not include an opinion by Dr. Lisak about whether defendant had actually been the victim of childhood sexual abuse, as defendant alleged. (Id.). At the Court's direction, Dr. Medlin had prepared a report and submitted it under seal to the Court. After the jury began its deliberations on the guilt of defendant, the trial team was provided with a copy of the Dr. Medlin's report. The trial team was directed to review the report and advise the Court whether it would seek to present Dr. Lisak's testimony as a teaching expert subject to rebuttal by the government's expert witness. After reviewing Dr. Medlin's report, the trial team decided not to call Dr. Lisak, because the team recognized that Dr. Medlin was prepared to testify to all the inconsistencies in defendant's self-report of childhood sexual abuse. The trial team concluded that if defendant called Dr. Lisak, then the government would call Dr. Medlin, and the penalty phase would devolve into a battle of experts over whether defendant was credible in his report of abuse by Tinkerbell. The team concluded that it would be more effective to call witnesses to whom defendant had stated that he was sexually molested, then argue that fact as a mitigating factor at sentencing.

The trial team's strategic decision to rely on fact testimony about defendant's report of childhood sexual abuse was reasonable. First, the Court must evaluate the reasonableness of counsel's performance from counsel's perspective at the time of the alleged

error in light of all the circumstances.  <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 381 (1986).  Although Dr. Lisak evaluated defendant after the trial and concluded that defendant had been sexually assaulted as a child based upon that evaluation, Dr. Lisak did not evaluate defendant before the trial and was not prepared to give an opinion about the credibility of defendant's report of childhood sexual abuse.  (T-563-71).  To the contrary, Dr. Lisak admitted that because of the lack of details that were provided by defendant to the witnesses to whom defendant claimed he had been sexually abused, Dr. Lisak would need to conduct an evaluation of defendant in order to get the details about the sexual abuse and its impact on defendant in order to make an assessment about the credibility of defendant's report of childhood sexual abuse.  (T-562).  It is clear from the record that because Dr. Lisak was going to testify as a teaching expert on the effect of childhood sexual abuse, and because Dr. Lisak had not evaluated defendant, Dr. Lisak was not prepared to render an opinion on whether the sexual abuse actually occurred.

On the other hand, the trial team discovered after reading Dr. Medlin's report that Dr. Medlin had conducted an extensive and thorough review of defendant's medical and psychological records, and that she was prepared to testify to a number of matters that would be damaging to defendant's mitigation case.  (Govt. Ex. 63). First, Dr. Medlin was prepared to note that on a BOP Intake

Screening form and a medical history form both dated February 14, 2000, defendant denied that he had ever been sexually assaulted. (Govt. Ex. 63, p. 7).  Dr. Medlin's report also notes that defendant first reported childhood sexual abuse on February 21, 1992, while defendant was serving a prison term for child molestation.  Dr. Medlin's report notes that research indicates that a significant number of sexual offenders falsely report being sexually abused as children.  (Id. at 5).  Dr. Medlin was also prepared to demonstrate that defendant had been inconsistent in reporting depression and other mental health issues while he was in prison and that there was reason to believe that defendant had made false reports of depressive symptoms in an effort to manipulate prison staff.  (Id. at 10-22).

In summary, Dr. Medlin was prepared to testify that

> [i]n regards to the issue of sexual abuse, it is unclear if Mr. LeCroy was sexually abused by a female babysitter as alleged, and if so, to what extent.  There is some question regarding this, given that he was apparently inconsistent in reporting a history of sexual abuse.  In addition, there appear to be some potential motivations for him to fabricate such a history.  Research suggests that a significant percentage of sex offenders fabricated a history of childhood sexual abuse, presumably to explain and justify their sexual offending.  It should be noted that Mr. LeCroy appears to have exaggerated and possibly fabricated other problems, such as his suicide attempts and seizures.  If Mr. LeCroy had been sexually abused, any emotional and behavioral problems could be related to that history of abuse.  However, the research shows that individuals who were sexually abused as children are not at any higher risk for committing a sex crime than individuals who were victims of other types of childhood abuse and neglect (Widom, 1995).  The research also shows that the vast majority of childhood sexual

> abuse victims are not arrested for sex crimes or any other crimes as adults (Widom, 1995).  A comprehensive review of 25 research studies concluded, "Nevertheless, overall retrospective studies, prospective studies and research reviews indicated that the experience of childhood sexual victimization is quite likely neither a necessary of sufficient cause of adult sexual offending (U.S. General Accounting Office, 1996).

(Id. at 27-28).

Thus, the trial team was aware that Dr. Medlin was prepared to call into question the veracity of defendant's self-report of childhood sexual abuse based upon defendant's inconsistent self-report that he was the victim of sexual abuse, the records which revealed a history of defendant being manipulative of prison staff with respect to his alleged mental health issues in order to achieve gain for himself, and studies that concluded that sexual offenders often falsely report a history of sexual abuse as a child.  In addition, Dr. Medlin was prepared to cite studies that showed that the experience of childhood sexual abuse was likely not a cause of adult sexual offending.  Dr. Lisak would have agreed with this conclusion.  (T-605).

Therefore, the trial team made a strategic decision not to cast doubt on their client's credibility regarding his claim of childhood sexual abuse.  Rather, the trial team concluded that it would be more effective to rely on the factual testimony of the witnesses to whom defendant had reported the childhood sexual abuse and then address that as a mitigating factor in closing.  The trial team's strategic decision to do so was clearly reasonable.

Defendant also contends that he was denied the effective assistance of counsel because trial counsel in closing argument did not adequately address the correlation between defendant's alleged childhood sexual abuse and the rape, torture and murder of Joanne Tiesler.

Deficient performance in closing argument may be the basis of a finding that trial counsel rendered ineffective assistance of counsel.  See Lawhorn v. Allen, 519 F.3d 1272 (11th Cir. 2008) (death sentence vacated where trial counsel chose not to give a closing argument during the penalty phase).  In Lawhorn, the Eleventh Circuit explained that through closing argument during the penalty phase, "counsel has one "last clear chance" or final opportunity to marshal all of the mitigating evidence before the jury and explain or minimize the prosecution's evidence."  519 F.3d at 1296, citing Herring v. New York, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555 (1975).  The court also stated that "[d]eficient performance is demonstrated by an attorney's failure to use the closing argument to focus the jury's attention on his client's character or any mitigating factors of the offender's circumstances, and by his failure to ask the jury to spare his client's life."  519 F.3d at 1295, citing Dobbs v. Turpin, 142 F.3d 1383, 1389 (11th Cir. 1998).

Closing arguments during the penalty phase will be found to be deficient where the argument "would have been likely misunderstood

34

by the jurors as meaning that their judgment call on the appropriateness of a death sentence did not really matter." Mann v. Dugger, 844 F.2d 1446, 1457 (11th Cir. 1988); and where the argument failed to focus the sentencing jury's attention on "the character and record of the individualized offender and the circumstances of the particular offense...." Penry v. Lynaugh, 492 U.S. 302, 316 (1989), citing Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991 (1976).

In the instant case, the trial team divided up the closing argument during the penalty phase.  Mr. Mendelsohn gave the first half.  He told the jury that the decision to impose the death penalty was uniquely in each juror's hands because the decision to sentence defendant to death must be unanimous, and that if only one juror believed that a life sentence was appropriate, then the sentence would be life imprisonment.  (Doc. 237-2687).  He also told the jury that their decision was final because the judge could not overturn it.  (Id.).  Mr. Mendelsohn then attacked the aggravating circumstances. (Doc. 237-2688-96).  He concluded his argument by telling the jury that defendant would spend the rest of his life in prison and that defendant would think about the victim impact testimony of the victim's family and friends every day for the rest of his life. (Doc. 237-2296-98).  Finally, Mr. Mendelsohn asked the jury to grant mercy.  (Doc. 237-2298).

Ms. Kearns then addressed the jury about the mitigating factors. She first defined the mitigating factors as mercy and explained that the jurors must look at defendant as a human being. (Doc. 237-2702-04). Ms. Kearns argued that the evidence of defendant's conduct immediately after the murder established that defendant was immediately remorseful for killing Joanne Tiesler, and that life imprisonment for a defendant who feels remorseful for his crime would be just punishment. (Doc. 237-2705-08). Ms. Kearns also argued that defendant's writings and defendant's contacts with psychologists while he was in prison before the murder demonstrate that he felt bad about and was remorseful for his other actions that hurt people. (Doc. 237-2708-11). Secondly, Ms. Kearns argued that life imprisonment was an appropriate punishment because a death sentence would make victims of defendant's family who still supported him. (Doc. 237-2711-14). Finally, Ms. Kearns argued that defendant's childhood and family history and the lack of evidence of violence while he was incarcerated demonstrated that defendant has basic moral fiber because he was a good kid and did well in school, and that defendant was the victim of childhood sexual abuse. (Doc. 237-2715-16). As to the childhood sexual abuse, Mr. Kearns specifically argued that defendant talked about the childhood sexual abuse when he was in therapy in prison in order to "learn how to deal with his anger and get beyond his anger so that his

36

life will be better emotionally." (Doc. 237-2716). Ms. Kearns argued further that the incident with the babysitter was a significant event in defendant's life because as he said in his writings, "it robbed him of his self-esteem. That's the impact it had on him." (Id.). Ms. Kearns concluded her argument by suggesting that based on the way Joanne Tiesler lived her life, she would consider defendant worthy of mercy. (Doc. 237-2717).

Defendant contends that trial counsel should have given a closing argument that better focused the jury's attention on relationship between the alleged childhood sexual abuse and the crime. However, as noted previously, in reviewing the performance of trial counsel in a death penalty case, the task of the court is not to look in hindsight at what counsel could have done, but to evaluate what counsel did do. It is from this perspective that the court determines whether the closing argument was within the sphere of what a reasonably competent trial attorney would do. In the instant case, trial counsel told the jury that defendant was a victim of childhood sexual abuse, that it caused him to be angry and robbed him of his self-esteem and that he sought counseling for being a victim. Counsel did meet her constitutionally mandated duty to draw the jury's attention to this individualized factor in defendant's background that would mitigate against the imposition of the death penalty. In addition, trial counsel told the jury that the decision to execute defendant was an individual one that

37

would not be overturned by the judge, asked the jury to show mercy on defendant, argued that defendant was remorseful for his crime, argued that life imprisonment for a remorseful defendant was sufficient punishment, discussed defendant's lack of violence in prison, discussed other mitigating factors such as defendant's upbringing, his parent's divorce and the impact that those issues had on his behavior, and concluded by arguing to the jury that the victim would have mercy for defendant.

None of the deficiencies that the Eleventh Circuit has noted in mitigation phase closing arguments in other death penalty cases were present in the instant case. The closing argument that defense counsel gave was well within the sphere of what a reasonably competent attorney would give.

For the foregoing reasons, defendant has failed to carry his burden of persuasion on the performance prong as to whether the trial team rendered ineffective assistance of counsel in the investigation, presentation or argument regarding defendant's mental state.

C.   <u>Prejudice Prong</u>

Nor can defendant satisfy the prejudice prong--defendant cannot show a reasonable probability that but for the alleged unprofessional errors of the trial team the outcome of the sentencing hearing would have been different.

First, the Eleventh Circuit recognizes that there are "some [death penalty] cases [that] almost certainly cannot be won by defendants" because "sometimes the best lawyering, not just reasonable lawyering, cannot convince the sentencer to overlook the facts of a brutal murder-or, even a less brutal murder[-]for which there is strong evidence of guilt in fact." <u>Clisby v. State of Alabama</u>, 26 F.3d 1054, 1057 (11th Cir. 1994)." <u>Lawhorn v. Allen</u>, 519 F.3d at 1296.  The instant case is just such a case.  Defendant attacked Joanne Tiesler in her own home.  Defendant struck her in the back of the head with a shotgun.  Defendant bound her and brutally raped her.  Then, using a knife, defendant slit Joanne Tiesler's throat with such savagery that he nearly decapitated her. Finally, defendant stabbed Joanne Tiesler in the back multiple times.  The last minutes of Joanne Tiesler's life were filled with terror, pain, apprehension, horror, and fear caused by defendant. In addition, the jury was aware that defendant served 10 years in federal and state prisons for offenses that included a sexual offense and that defendant committed this offense within four months of his release.  The trial team could not change or overcome these facts.  Nor can habeas counsel.  This is simply one of those cases in which the facts of the crime are so aggravating that no amount of mitigating evidence or even the most effective lawyering can overcome them.  Because of the facts of the crime, habeas counsel simply cannot demonstrate that the outcome of the

sentencing phase of the trial would have been different. Therefore, defendant cannot satisfy the <u>Strickland</u> prejudice prong.

In addition to the horrific nature of the offense, habeas counsel must also overcome the fact that along with the alleged mitigating evidence that defendant contends was not presented would have come significant aggravating evidence, most significantly the diagnosis of defendant's antisocial personality disorder.  The Eleventh Circuit has held in a number of cases that testimony regarding a diagnosis that the defendant had an antisocial personality disorder "is not mitigating, but damaging." <u>See</u> <u>Reed</u>, 593 F.3d at 1246, quoting <u>Cummings v. Sec'y Dep't of Corr.</u>, 588 F.3d 1331, 1368 (11th Cir. 2009)(collecting cases).  Moreover, the Eleventh Circuit has also repeatedly held that a defendant could not satisfy the prejudice prong where proposed mitigation evidence would have led to the introduction of damaging evidence in aggravation of sentence.  <u>See</u> <u>Reed</u> 593 F.3d at 1245, citing <u>Windom v. Sec'y Dep't of Corr.</u>, 578 F.3d 1227, 1251 (11th Cir. 2009); <u>Gaskin v. Sec'y Dep't of Corr.</u>, 494 F.3d 997, 1004 (11th Cir. 2007); <u>Robinson v. Moore</u>, 300 F.3d 1320, 1350-51 (11th Cir. 2002).

In <u>Reed</u>, the court noted that

> The probability of proposed mitigating evidence opening the door to strong aggravating evidence is an important factor to consider in assessing the reasonable probability of a different sentencing result. <u>Belmontes</u>, 130 S.Ct. at 389-90; <u>see</u> <u>Windom</u>, 578 F.3d at 1251; <u>Gaskin</u>, 494 F.3d at 1004; <u>Robinson</u>, 300 F.3d at 1350-51.

593 F.3d at 1246.

Notably, defendant does not allege that the failure to call Dr. Hilton as a witness during the sentencing phase was deficient performance.  However, had Dr. Hilton testified or had Dr. Lisak or a government expert done an evaluation of defendant's mental state and testified, anyone of them would have testified that defendant had been diagnosed with antisocial personality disorder, and therefore, defendant would tend to be irritable and aggressive, that he would repeatedly get into physical fights or commit acts of physical assault, that he would demonstrate a lack of respect for others and their rights, and that defendant would engage in cruel and sadistic behavior.

Moreover, had Dr. Hilton, Dr. Lisak and/or a government expert witness testified it would likely have come to light that defendant had thoughts about killing other prisoners with whom he was incarcerated, as he told Dr. Hilton, and it is likely that it would have been brought to light that the mental health expert considered defendant to represent a danger to commit assaults and murders in the future against persons in the community if he was in the community and against other inmates and staff within the prison system.  Thus, a mental health expert's testimony would have supported the non-statutory aggravating factor that defendant represented a future danger to others.

In addition, had Dr. Hilton, Dr. Lisak and/or a government expert witness testified, defendant's version of his commission of

41

the rape, torture and murder of Joanne Tiesler would been presented to the jury, and the mental health expert would have conceded, as Dr. Hilton did, that defendant's version of the commission of the rape, torture and murder of Joanne Tiesler would support the statutory aggravating factors that the murder was committed after substantial planning and premeditation and that the murder was committed in an unusually cruel and heinous manner.

Dr. Hilton, Dr. Lisak, and/or a government expert would agree, again as Dr. Hilton did, that the MCMI report of psychological testing that was done on defendant in 1999 was accurate. That report concluded that defendant was abrasive and intimidating, that he was likely to be defiant and untrustworthy, that he would play staff members against one another, that he would be a general troublemaker, that defendant possessed a potential for violence, that defendant possessed a deficient conscience, that defendant may evidence a recklessly violent disposition, that defendant exhibited malicious and hostile tendencies that may lead him to humiliate and sexually dominate other prisoners. This testimony would have been damaging to trial team's contention that the Bureau of Prisons could house defendant without creating an undue risk to staff and other inmates if the jury imposed a life sentence rather than the death penalty. Finally, Dr. Lisak or another mental health expert would have to concede that most men who are abused, whether

42

sexually or physically as children, do not commit an act of violence as adults.

In considering the prejudice prong in a habeas proceeding in a death penalty case where habeas counsel alleges that trial counsel was ineffective for failing to present additional mitigating evidence, this Court must weigh the mitigation evidence presented at trial along with the mitigation evidence brought to light by habeas counsel against the evidence in aggravation. Reed, 593 F.3d at 1246-47, citing Porter v. McCollum, 558 U.S. ___, 130 S.Ct. 447, 453 (2009).[5]  "This includes aggravating evidence to which the proposed mitigating evidence would have opened the door." Reed, 593 F.3d at 1247, citing Wong v. Belmontes, 558 U.S. ___, 130 S.Ct. 383, 387 (2009).

As in Reed and Lawhorn, in the instant case the aggravating nature of the crime itself places an insurmountable burden on habeas counsel to demonstrate that there was additional mitigating

---

[5]In Porter v. McCollum, the Supreme Court found that trial counsel rendered ineffective assistance of counsel where inexperienced counsel only had one short meeting with the defendant about the penalty phase, never interviewed any witnesses, and failed to uncover mitigating evidence of defendant's mental health, family background and military service.  130 S.Ct at 453.  The Eleventh Circuit distinguished its holding in Reed from the holding in Porter by noting that the crux of the Court's ruling in Porter was centered around counsel's failure to investigate and present evidence of Porter's military service, and that military service was not at issue in Reed.  593 F.3d at 1243 (n.16).  In the instant case defendant's military service was presented to the jury through the testimony of mitigation expert, Jan Vogelsang.  (Doc. 436-2563-67).

evidence of such compelling nature available to trial counsel but not presented to the jury that there is a reasonable probability that the outcome of the sentencing proceeding would have been different had the mitigating evidence been presented. Coupled with the aggravating nature of the crime itself, the Court must also consider that defendant had already been convicted of sexual assault, that defendant committed the offense only four months after serving ten years in prison, that mental health experts concluded that defendant represented a future danger to assault and murder others, that defendant was manipulative, that defendant was disrespectful of the rights of others, and that mental health experts would concede that the crime was unusually cruel and heinous and that it was committed with premeditation and planning. Weighed against that was the evidence that in addition to defendant's self-report that he was sexually victimized as a boy, Dr. Lisak concluded that defendant was telling the truth about this fact, and that in a mental health expert's opinion defendant was mentally ill, but at the same time still understood right from wrong at the time of the commission of the offense, and that defendant's mental illness contributed to the brutal rape, torture, and murder of Joanne Tiesler.

The Court must conclude that the aggravating factors outweigh the mitigating factors to such a degree that there is no reasonable probability that if the additional aggravating and mitigating

44

evidence was presented to the jury that the outcome would have been different.

C.    Conclusion

For all of the above and foregoing reasons, defendant has failed to carry his burden on either the performance prong or the prejudice prong on the issue of whether trial counsel was ineffective for failing to present additional mitigating evidence on defendant's mental health.  This issue provides no basis for Section 2255 relief.

## II.    INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING WITH TRIAL COUNSEL'S FAILURE TO PRESENT A JURY CHALLENGE USING STATISTICS

Defendant's claim that his trial counsel were ineffective for failing to present a jury challenge using citizenship statistics is without merit.  As set forth herein and in the Government's prior response brief, it is apparent that, had the Defendant's trial counsel presented the analysis offered at the evidentiary hearing, the Defendant still would not have been able to satisfy the Constitutional or statutory requirements of a fair cross-section claim.  Defendant is unable to show that Hispanics were unfairly or unreasonably represented in the relevant jury pools, or that they were systematically excluded from them, as required under Duren v. Missouri, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979) and the Jury Service and Selection Act ("JSSA"), 28 U.S.C. §§ 1861-1878.

A.    Statement of Facts

    1.    Procedural History

Defendant sought the opportunity to present evidence in response to the Eleventh Circuit's holding with respect to his direct appeal, in which the Court of Appeals stated that:

> LeCroy's [jury challenge] claim fails because he failed to proffer any evidence of the relevant population – the percentage of the Hispanic population that is eligible for jury service.  Our cases have held that the relevant comparison is the difference between the percentage of the distinctive group among the population eligible for jury service and the percentage of the distinctive group on the jury wheel.

United States v. LeCroy, 441 F.3d 914, 918 n.1 (11th Cir. 2006) (citations omitted).

Upon the Court's grant of an evidentiary hearing, the Defendant offered the testimony of statistical expert Jeffrey Martin, who opined on the percentage of Hispanics in the jury wheel as compared with the number of Hispanic citizens over eighteen years of age in the Northern District of Georgia.  In addition, the Government offered testimony from the jury clerk for the Northern District of Georgia and from a representative of the Georgia Secretary of State.

    2.    Jury Selection Process

The jury selection process in the Northern District of Georgia is governed by District's Jury Plan, which is drafted in accordance with the JSSA and approved by the Eleventh Circuit Court of

Appeals.   (T-463-65; Ex. 14 (1999 Jury Plan); Ex. 38 (1997 Jury Plan)).

a.   Master Jury Wheel

Pursuant to the Jury Plan, a new Master Jury Wheel is created every four years, in order to ensure that the District has a sufficient number of jurors to last for a four-year period.  (Ex. 14, at 4).  Accordingly, the Jury Plan prescribes a minimum number of names needed in the Master Jury Wheel to meet this need for each of the four Divisions that make up the District.

In order to create the Master Jury Wheel, the court requests the voter registration lists for the counties composing the District from the Georgia Secretary of State.  (Ex. 14, at 3; T-430-31, 466).  A third-party vendor then divides the total number of registered voters for each Division by the number of jurors needed in that Division, thereby establishing the "quotient."  (T-472-73).  For instance, if there are 600,000 registered voters in the Atlanta Division and 60,000 jurors are needed for the Master Jury Wheel, the quotient is ten.  (Id.)  A public drawing is then held, whereby the Clerk of Court pulls a number between one and ten, the quotient, in order to determine the starting number for selecting names from the voter registration list.  (T-473-76).  The vendor then selects the name on the voter registration list at the starting number, along with every tenth name thereafter, for the wheel.   (T-476).   This process is repeated for each of the

47

Divisions, with the combined result constituting the "Master Jury Wheel" for the District. The purpose of constructing the Master Jury Wheel in this manner is to ensure random selection of registered voters as potential jurors.

Neither the vendor nor the clerk's office has the capacity to choose or to exclude jurors from the Master Jury Wheel during this process, and the clerk's office "absolutely cannot" alter the composition of the Master Jury Wheel based upon the race or ethnicity of prospective jurors. (T-476-77).

> b.    Qualified Jury Wheel

Qualified Jury Wheels are maintained for each Division in the District, and are composed of those members of the Master Jury Wheel who qualify to serve as jurors, as identified by juror questionnaires. (T-477-78, 482). Under the Jury Plan and the JSSA, an individual may not serve on grand juries or petit juries if he or she:

> (1)  is not a citizen of the United States eighteen years old who has resided for a period of one year within the judicial district;
>
> (2)  is unable to read, write and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;
>
> (3)  is unable to speak the English language;

> (4)   is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or
>
> (5)   has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year, and his civil rights have not been restored."

(Ex. 14, at 6 (quoting 28 U.S.C. § 1865(b))).

The Jury Plan also exempts the following groups from jury service: "(1) members in active service of the armed forces of the United States; (2) members of the Fire or Police Department . . . (3) public officers in the executive, legislative, or judicial branches of government of the United States or any state, district, territory, or possession or subdivision thereof who are actively engaged in the performance of official duties."  (Ex. 14, at 5).

In addition to using juror questionnaires to identify qualified jurors, the Court also reviews a sampling of the questionnaires in order to determine the approximate racial and ethnic makeup of the Qualified Jury Wheel.  This data is recorded in publicly-available JS-12 reports, which are issued with respect to each Division.  (Exs. 10-13, Exs. 27-30).  The court maintains such records in order to ensure that the jury pools are generally "in compliance with the census bureau's statistics," meaning that no single racial or ethnic group is over- or under-represented in

49

the Qualified Jury Wheel by more than ten percent when compared with its census numbers. (T-485).

### c.   Mailing of Juror Questionnaires

During the relevant period, the Court took several steps to ensure the successful delivery and return of juror questionnaires. Prior to sending out the questionnaires, the Court's vendor compares the potential jurors' voter registration addresses against a national change of address database, in order to use the most accurate mailing addresses. (T-478-79). Approximately seventy-five percent of juror questionnaires are returned. (T-506-07).

Where questionnaires were returned as undeliverable, the jury clerk used the White Pages to search manually for updated addresses. (T-480). In addition, the Court relied upon the U.S. Postal Service to redeliver juror questionnaires to jurors where a forwarding address existed for them. (T-479). The jury clerk was unable to quantify the number of undeliverable juror questionnaires. (T-506-08).

In the case of the (approximately) twenty-five percent of juror questionnaires that were not returned at all (and presumably were delivered), the jury clerk would send the prospective juror a letter attaching the questionnaire a second time and asking the prospective juror to respond. (T- 480-81, 508). About half of the prospective jurors who received this letter returned their questionnaires. (T-506-09).

50

With respect to both the undeliverable and the unreturned juror questionnaires, the Court had no way of determining the race or ethnicity of the prospective jurors.  (T-482).

### d.    Formation of Jury Panels

When a need arises for grand or petit jurors, names are selected at random from the Qualified Jury Wheel, and summonses are mailed to the people selected.  (Ex. 14, at 6, 9).  Grand jurors are pulled from all four Divisions of the District, in numbers proportional to each Division's representation in the Qualified Jury Wheel.  Petit jurors are drawn solely from the Qualified Jury Wheel for the Division where the trial is scheduled to take place.

### 3.    Statistical Data

The Defendant's grand jury was impaneled on September 11, 2001, and was drawn from the 1997 Qualified Jury Wheel for the District.  (T-464-65).  The Defendant's petit jury was impaneled on February 17, 2004, and was drawn from the 2001 Qualified Jury Wheel for the Gainesville Division.  (T-465).

### a.    1997 Qualified Jury Wheel

The 1997 Qualified Jury Wheel for the District was composed of .87 percent Hispanics.  (T-405-06; Exs. 10, 11, 12, 13).  The 2000 Census indicates that Hispanic citizens over eighteen years of age made up 2.19 to 2.23 percent of the District.  (Def. Ex. 17). Accordingly, there was an absolute disparity of 1.32 to 1.36

percent, and a comparative disparity of 60.1 percent with regard to Hispanics in the jury pool.  (T-406-07).

###### b.   2001 Qualified Jury Wheel

The 2001 Qualified Jury Wheel for the Gainesville Division, from which the Defendant's petit jury was drawn, was composed of .62 percent Hispanics.  (Ex. 27).  The 2000 Census figures indicate that the Gainesville Division was composed of between 1.68 to 1.89 percent Hispanic citizens over eighteen years of age.  (T-361; Def. Ex. 17).  Accordingly, there was an absolute disparity of 1.06 to 1.27 percent, and a comparative disparity of 63.32 to 67.37 percent with respect to Hispanic representation in the Gainesville Qualified Jury Wheel.[6]  (T-362, 364).

### B.   Argument and Citation of Authority

The evidence presented at the evidentiary hearing fails to support defendant's claim of a fair cross-section violation.  To establish a *prima facie* violation of the fair cross-section requirement under the Sixth Amendment or the JSSA, a defendant must prove that: "(1) a group qualifying as 'distinctive' (2) is not

---

[6] While not relevant for purposes of evaluating the Defendant's fair cross-section claim under the Sixth Amendment and the JSSA, it is notable that the questionnaires for the Defendant's actual petit jury venire indicate that at least one Hispanic juror was present out of the ninety-one jurors who appeared.  (Ex. 39).  This represents 1.10% of the jury venire (double the estimated percentage of Hispanics in the entire Gainesville Qualified Jury Wheel), for an absolute disparity of only .58 to .79 percent. and a comparative disparity of 34.5 to 41.8 percent.

fairly and reasonably represented in jury venires, and (3) 'systematic exclusion' in the jury-selection process accounts for the underrepresentation." Berghuis v. Smith, 130 S. Ct. 1382, 1392, 176 L. Ed. 2d 249, 260 (2010) (citing Duren, 439 U.S. at 364); Carmichael, 560 F.3d at 1278 (holding that "[t]he fair cross-section principle [of the JSSA] is identical to that required by the Sixth Amendment" and citing United States v. Rodriquez, 776 F.2d 1509, 1510 n.1 (11th Cir. 1985) ("The standard for determining a violation of the statutory fair cross-section requirement is the same as that applied in assessing a sixth amendment fair cross-section violation.")) Accordingly, the Government will address the Defendant's constitutional and statutory claim together. As set forth below, the defendant cannot meet the second or third prong of the fair cross-section jury challenge test.

1.   Distinctive Group

In the instant case, the Court need not decide whether Hispanics are a distinctive group under Duren because, even assuming *arguendo* that they are, the Defendant has not shown "unfair underrepresentation" or "systematic exclusion" and thus cannot prevail on his Sixth Amendment claim.

2.   Fair and Reasonable Representation

The Defendant cannot show that Hispanics are unfairly or unreasonably represented, because the absolute disparities between the percentage of Hispanics in the Defendant's Qualified Jury

Wheels and the percentage of citizenship- and age-eligible Hispanics in the corresponding population, are less than ten percent.  In the Eleventh Circuit, courts must apply a ten-percent threshold using absolute disparity analysis:[7]  "Under black-letter Eleventh Circuit precedent, 'if the absolute disparity . . . is ten percent or less, the second element is not satisfied.'" Carmichael, 560 F.3d at 1280 (quoting United States v. Grisham, 63 F.3d 1074, 1078-79 (11th Cir. 1995)); United States v. Pepe, 747 F.2d 632, 649 (11th Cir. 1984) ("Because the disparity found by the district court was well within the absolute disparity limits set by this court, appellants failed to establish the second element of a prima facie *sixth amendment* fair cross-section violation . . . .") (italics in original); United States v. Maskeny, 609 F.2d 183, 190 (5th Cir. 1980) (rejecting comparative disparity and standard deviation analysis).  This Circuit's precedent in Carmichael, Grisham and Pepe remains undisturbed by the Supreme Court's recent decision in Berghuis v. Smith, which considered a fair cross-

---

[7] The asserted underrepresentation of Hispanics in the relevant jury pools may be even less significant than suggested by the Defendant's statistics.  Defendant's jury expert acknowledged that, in conducting his analysis, he relied upon statistics for the citizenship- and age-eligible percentage of the Hispanic population.  (T-417-18).  This group does not represent the jury-service eligible Hispanic population, given that some proportion of citizens over eighteen years of age would not be able to meet the other service requirements, including: language-ability, residence in the District for more than one year, and lack of a pending felony charge or felony conviction (where one's civil rights have not been restored).

section jury challenge in the context of a state habeas case. 130 S. Ct. 1382 (2010). Despite extensive briefing by the parties and third-party amici regarding the relative merits of the absolute disparity, comparative disparity and standard deviation methods of determining underrepresentation, the Supreme Court acknowledged that "neither Duren nor any other decision of this Court specifies the method or test courts must use to measure the representation of disinctive groups in jury pools," and unanimously declined "to take sides today on the method or methods by which underrepresentation is appropriately measured." Smith, 130 S. Ct. at 1393-94; see also United States v. Pritt, No. 6:09-CR-110-Orl-28KRS, 2010 U.S. Dist. LEXIS 63470, at *28 (M.D.Fl. June 8, 2010) ("[N]othing in the Smith decision provides any support for a wholesale departure from the well-established law in the Eleventh Circuit regarding the requirements for a fair cross-section claim.").

Moreover, even if this Court were to apply comparative disparity analysis, as urged by the Defendant, the disparities of approximately 60.1 percent (1997 District Qualified Jury Wheel) and 63.32 to 67.37 percent (2001 Gainesville Division Qualified Jury Wheel) are less than or equal to those that have been found permissible under the Sixth Amendment. In Pepe, for instance, the Eleventh Circuit rejected the defendant's jury challenge where the comparative disparity was 67.3 percent. Pepe, 747 F.2d at 649

n.18; see also United States v. Weaver, 267 F.3d 231, 243 (3d Cir. 2001) ("Looking first at the comparative disparity figures, we find that they are quite high --  40.01% and 72.98% -- but that because African-Americans and Hispanics comprise such a small percentage of the population, the results of this analysis are of questionable probative value.").  Not only has the comparative disparity test not been accepted by the Eleventh Circuit, but given the small size of the Hispanic population in question, the comparative disparity method is not an appropriate analysis because it distorts and overstates the extent to which Hispanics were underrepresented in the Defendant's jury pools.  See Gov. Br. (filed 1/9/09), at 45-49; (T-397-401).

To the extent that the Defendant urges this court to consider the standard deviation method, there is no basis for this Court to do so.  As the Supreme Court noted in Smith, "to our knowledge, 'no court has accepted a standard deviation analysis alone as determinative in Sixth Amendment challenges to jury selection systems.'" 130 S. Ct. at 1393 (quoting United States v. Rioux, 97 F.3d 648, 655 (2d Cir. 1996)); Maskeny, 609 F.2d at 190 ("[W]e decline appellant's invitation to focus on comparative or standard deviation disparity . . . .").  Standard deviation analysis does not measure underrepresentation; it measures the probability of a jury pool looking as it does, when compared with the population. (T-365-67, 409).  Likewise, the standard deviation method offers no

insight into whether systematic exclusion has occurred. Thus it has no bearing in this case. Moreover, as the Defendant's own jury expert acknowledged, there was a high margin of error related to the standard deviation analysis performed in this case, because of the small sample size involved. (T- 366, 409-10). Ultimately, no evidence was presented at the evidentiary hearing concerning the reliability or relevance of the Defendant's standard deviation analysis that warrants this Court departing from the Eleventh Circuit precedent prescribing use of the absolute disparity method.

### 3.   Systematic Exclusion

The Defendant's arguments that Hispanics are systematically excluded from the jury pool due to (1) the exclusive use of voter registration lists as the source for jury names and (2) insufficient follow-up by the Court on unreturned questionnaires have both been rejected by federal courts as a basis for supporting a fair cross-section jury challenge.

### a.   Voter Registration Lists

The JSSA provides for voter registration lists to serve as the presumptive source of jury pools. 28 U.S.C. § 1863(b)(2). Defendant's assertion that the Court's reliance on voter registration lists violates the law must fail on the basis that (1) he has made no showing that, during the relevant period, Hispanics registered to vote in disproportionately low numbers, causing their percentages in the Qualified Jury Wheels to be lower and (2) even

if the Defendant were able to make such a showing, it would be insufficient to make a fair cross-section claim where, as here, there is no evidence that Hispanics were discriminated against in the voter registration process.

First, with regard to voter registration rates among Hispanics, Wesley B. Tailor, a representative of the Georgia Secretary of State, testified at the evidentiary hearing that statistics regarding Hispanic ethnicity were not kept at the time that the 1997 and 2001 Master Jury Wheels were created.  (T-433). Accordingly, the Defendant cannot prove any link between Hispanic voter registration rates and the representation of Hispanics in the Qualified Jury Wheels.  Second, Mr. Tailor testified that there were no findings of discriminatory practices relating to voter registration in the Northern District of Georgia during the relevant period.  (T-436-38).

Nevertheless, assuming *arguendo* that Hispanics were less likely to register to vote, in the absence of a showing of discrimination, the Eleventh Circuit has affirmed that "the circuits are 'in complete agreement that neither the [Jury Service and Selection] Act nor the Constitution require that a supplemental source of names be added to voter lists simply because an identifiable group votes in a proportion lower than the rest of the population.'" Carmichael, 560 F.3d at 1279 (quoting United States v. Orange, 447 F.3d 792, 800 (10th Cir. 2006)); see also United

States v. Ireland, 62 F.3d 227, 231-32 (8th Cir. 1995) ("[T]he mere fact that one identifiable group of individuals votes in a lower proportion than the rest of the population does not make a jury selection system illegal or unconstitutional. Likewise, numerical disparities resulting from the use of voter-registration lists do not violate a defendant's Sixth Amendment rights.") (internal citations omitted); United States v. Cecil, 836 F.2d 1431, 1448 (4th Cir. 1988) ("[T]here is no violation of the jury cross-section requirement where there is merely underrepresentation of a cognizable class by reason of failure to register, when that right is fully open."); United States v. Neighbors, 590 F.3d 485, 491-92 (7th Cir. 2009) (denying Sixth Amendment claim where Defendant argued that selection of venires from voter registration lists created systemic inequities); cf. United States v. Rodriquez-Lara, 421 F.3d 932, 945 (9th Cir. 2005) (considering possibility that exclusive use of voter registration lists for jury selection could violate the Sixth Amendment under some circumstances, but holding that, where defendant was not able to provide evidence linking reliance on voter registration lists to current systematic exclusion, he had failed to set forth a *prima facie* case under Duren).

     b. Mobility of Hispanic Population and Questionnaire Follow-up

Defendant's speculation that Hispanics are less likely to return juror questionnaires is insufficient to establish a fair cross-section claim.  First, in the face of the jury clerk's testimony that there is no way to determine the race or ethnicity of prospective jurors whose questionnaires are undeliverable or unreturned (T- 482), Defendants cannot prove that Hispanics have disproportionately low questionnaire return rates.  See, e.g., Randolph v. California, 380 F.3d 1133, 1141-42 (9th Cir. 2004) (rejecting jury challenge based on assertion that the clerk's office did not follow up on unreturned questionnaires and noting that, while the defendant "suggest[ed] in his brief that Hispanics return questionnaires at a lower rate than the general population, he has presented no evidence to support this suggestion").

Second, even if the Court accepts the Defendant's proposition that Hispanics were less likely to return their questionnaires for the 1997 and 2001 Qualified Jury Wheels, federal courts have held that insufficient follow-up on unreturned questionnaires does not constitute systematic exclusion under Duren or violate the JSSA. Smith, 130 S. Ct. at 1395-96 (rejecting the notion that the County's "reliance on mail notices, [and] its failure to follow up on nonresponses," among other things, could give rise to a fair-cross-section claim);  Smith v. Berghuis, 543 F.3d 326, 342 n.5 (6th Cir. 2008) ("Courts . . . have been relatively uniform in finding that the failure to send additional letters to individuals

who did not to respond to questionnaires was not 'systematic exclusion' within the meaning of Duren."), reversed on other grounds by Smith, 130 S. Ct. 1382 (2010).  In sum, such courts have held that disproportionately low return rates are external factors that are not inherent in the jury selection plans themselves.  For instance, the Tenth Circuit has explained that "[d]iscrepancies resulting from the private choices of potential jurors do not represent the kind of constitutional infirmity contemplated by Duren."  Orange, 447 F.3d at 800.  Other federal courts have applied similar reasoning where, as here, questionnaire response rates depended upon the conduct of the potential jurors themselves. See Rioux, 97 F.3d at 658 ("There is systematic exclusion when the underrepresentation is due to the system of jury selection itself, rather than external forces.  The inability to serve juror questionnaires because they were returned as undeliverable is not due to the system itself, but to outside forces, such as demographic changes."); United States v. Murphy, No. 94-CR-794, 1996 U.S. Dist. LEXIS 8488, at *12 (N.D. Ill. June 18, 1996) (finding that higher rates of nonresponsiveness to jury questionnaires by African-Americans "does not create a constitutional violation by the government"); Carmichael, 560 F.3d at 1279 (declining to find a violation of the JSSA where the Jury Administrator did not have a routine practice for following up on questionnaires returned as undeliverable); United States v. Ortiz,

897 F. Supp. 199, 205 (E.D. Pa. 1995) (declining to find systematic exclusion where "it was the unfortunate failure of Hispanics either to register to vote or to return the jury questionnaires, through no fault or encouragement of the court's jury selection procedures, which may have produced any underrepresentation of Hispanics on grand juries.").

C.    Conclusion

For the foregoing reasons, defendant's claim that his trial counsel were ineffective for failing to present a jury challenge using citizenship statistics is without merit, and provides no basis for Section 2255 relief.

III. GOVERNMENT COUNSEL'S ALLEGED BREACH OF THE FIREWALL.

The Court permitted the presentation of evidence on this issue at the evidentiary hearing, however, defendant failed to brief the issue in his post-hearing brief.  (Doc. 541).  Accordingly, the Government deems this issue to have been abandoned and will not address it herein.

IV.    REMAINING ISSUES

As to the remaining issues briefed in defendant's post-hearing brief, (Doc. 541), the government contends that no significant facts were brought to light on these issues at the evidentiary hearing.  Accordingly, the government relies upon the arguments

presented in the government's January 9, 2009, response to defendant's Section 2255 motion (Doc. 508) as argument and citation of authority upon which the Court should rely in order to deny Section 2255 relief on those issues.

## V. CONCLUSION

For the reasons set forth herein and in the government's January 9, 2009, response, (Doc. 508), defendant's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody Pursuant to 28 U.S.C. § 2255 (Doc. 493) should be denied.

Respectfully submitted,

SALLY QUILLIAN YATES
UNITED STATES ATTORNEY

/s/ *William L. McKinnon, Jr.*
WILLIAM L. McKINNON, JR.
ASSISTANT UNITED STATES ATTORNEY
Georgia Bar No. 495812

/s/ *Shanya J. Dingle*
SHANYA J. DINGLE
Provisionally Admitted Pursuant to
Local Rule 83.1

600 Richard B. Russell Federal Bldg.
75 Spring Street, S. W.
Atlanta, Georgia   30303
404/581-6046
404/581-6181 (Fax)

CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the persons listed below a copy of the foregoing document by electronically filing with the Clerk of Court using the CM/ECF system which will automatically send notification via email said copy to:

            Sandra Michaels
            Jack Martin

This 31st day of March, 2011.

                              /s/
                              WILLIAM L. MCKINNON, JR.
                              ASSISTANT UNITED STATES ATTORNEY

64