UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CASE NO. |
| | ) | 2:02-CR-038-RWS-SSC-1 |
| WILLIAM EMMETT LECROY, JR. | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO GOVERNMENT'S POST-HEARING RESPONSE
TO DEFENDANT'S MOTION TO VACATE, SET ASIDE OR CORRECT
SENTENCE BY A PERSON IN FEDERAL CUSTODY PURSUANT TO 28
U.S.C. § 2255

## I.   INTRODUCTION

The Defendant William Emmett LeCroy, Jr. (hereinafter referred to as the "Defendant" or "Mr. LeCroy"), hereby responds to the Government's Post-Hearing Response to Defendant's Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody Pursuant to 28 U.S.C. §2255 (Doc. 542)(hereinafter the "Government's Post-Hearing Response"). The Defendant continues to rely primarily upon the detailed factual and legal argument presented in his Post-Hearing Brief With Respect to Defendant's Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody Pursuant to 28 U.S.C. § 2255 (Doc. 541) (hereinafter the "Defendant's Post-Hearing Brief"), which adopts and incorporates additional legal and factual arguments presented by the Defendant in his Traverse

1

to Government's Response to Defendant's Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody Pursuant to 28 U.S.C. §2255 (Doc. 511)(hereinafter the "Defendant's Traverse"). Defendant herein will merely respond to certain specific legal and factual contentions presented by the Government in the Government's Post-Hearing Response.

## II.    BOTCHED BURGLARY DEFENSE

The Government's essential argument, its bottom line with respect to the performance prong of Strickland, is that the Defendant's ineffective assistance of counsel claims fail because trial counsel were justified in abandoning a mental health defense in favor of a so-called "botched burglary defense." According to the Government, it was at least a reasonable strategic choice to forego any attempt to connect the crime with the Defendant's mental illnesses and childhood sexual abuse through expert testimony in favor of a "botched burglary defense," because the mental health mitigation case would have been inconsistent with the guilt/innocence "botched burglary defense" and would have caused counsel to have lost credibility with the jury during the penalty phase, a time when credibility with the jury was all too important. (Government's Post-Hearing Response, pp. 20-27).

If what the Government claims happened had in fact happened, there might, but only might, be some merit to this argument. But what the Government claims

happened simply did not happen. First, contrary to the Government's argument, the defense recognized that even with the claimed "botched burglary defense," there was no way they could overcome the Government's proof of the aggravating circumstances necessary for the imposition of the death penalty. With respect to the aggravating circumstance that the crime was "heinous, involving torture and mutilation and serious abuse of the body," Mr. Mendelsohn conceded "that was one we had to pretty much give up on." (EHT-283, 292). [1] With respect to the premeditation aggravator, again as Mr. Mendelsohn conceded, "we would quibble with some of the facts and would argue with some of that; but they, I mean, they could find--they had the evidence to find premeditation." (EHT-292).

Indeed, in closing argument, Government counsel with respect to the premeditation aggravator ridiculed what he referred to as the "bogus burglary story," pointing to among other things the evidence of the Defendant's bringing to the crime cable ties he obtained from Walmart, his surveillance of the Tiesler house and how the Defendant "pulled her window down and put the drawstrings back in place so he could trap her." (TT-2671). None of this was a surprise to the defense. (EHT-291-292). This simply was not a case such as <u>Bohannon v. United States</u>, 2010 WL 749329*3 (S.D. of Ala.), relied upon by the Government

---

[1] The Government itself recounted these facts in the Government's Post-Hearing Response, conceding that the trial lawyers "could not change or overcome these facts." (Government Post-Hearing Response, p. 39).

(Government's Response, pp. 27-28), where there was "promising evidence" to support a "botched robbery" defense to a carjacking.

Second, this is not a case where counsel made a reasoned and informed strategic decision to pursue one defense over another, as in Bohannon or Chandler v. United States, 218 F.3d 1305 (11th Cir. 2000)(en banc). Quite to the contrary, counsel wanted to and attempted to present a mental health defense at sentencing, based upon childhood sexual and other abuse. (EHT-17, 90-91). After all, one of their plans was to present Dr. Lisak, a nationally known expert on childhood sexual abuse, as a "teaching expert" with respect to the effects of childhood sexual abuse on adults. (EHT-93, 156-157, 167). However, even though they had readily available compelling expert testimony to support this mitigation case, due to uninformed decisions not to present this evidence, their ultimate plan was to make a mental health case based upon sexual abuse by simply presenting what attorney Kish described as "shards" of evidence of childhood abuse. These "shards" would be based solely upon the reports by Mr. LeCroy of the sexual abuse made to mental health providers while he was in prison, without any of the prison mental health providers being allowed to explain the mental health consequences of this sexual abuse, or any expert testimony regarding the effects of childhood sexual abuse. Counsel would then take "the place of the expert in testifying, so to speak,

4

in closing argument, connecting the dots between the offense and the sexual abuse." (EHT-96-97, 168-169, 299).

And even this questionable plan failed when due to miscommunication between Mr. Mendelsohn and Ms. Kearns no argument connecting the sexual abuse and the crime was ever made. According to Mr. Mendelsohn, "The way I saw it is this whole incident was tied to the sexual abuse and that Mr. LeCroy saw Ms. Tiesler, had some connection with the babysitter, snapped, and had some sort of psychotic break and lost it and committed the offense. And so that's how I was hoping to be able to tie it up down the road." (EHT-169). Although it is hard to imagine how any, much less a compelling, "inferential" argument tying a "psychotic break" based on sexual abuse to the actual crime, as Mr. Mendelsohn hoped, could be presented without any evidence to support the argument, Mr. Mendelsohn conceded that even this doubtful plan was never in fact implemented. (EHT-169). As Mr. Mendelsohn explained, "I'm not sure whether she (Ms. Kearns) had expected me to do it or I had expected her to do it, but somehow it didn't happen." (EHT-170) (TT-2715-2716). What the Government claims to have been a reasoned and orderly decisionmaking process, whereby a reasoned and deliberate choice was made to forego mental health evidence in favor of a "botched burglary defense," is simply contradicted by the record.

Moreover, the Defendant's ineffectiveness claim regarding the sentencing argument is not a stand alone claim, as the Government attempts to frame the Defendant's contention. (Government's Response, pp. 34-38). Instead, it is one part of the overall ineffectiveness claim. After all, if the Government's argument is that the decision to abandon expert mental health evidence in favor of a plan to connect the Defendant's childhood sexual abuse to his crime through argument by counsel was a reasonable strategic decision to which deference should be given, then at least that plan must have been actually implemented. But here, Ms. Kearns and Mr. Mendelsohn agree that this never happened. (EHT-97, 169-170).

Contrary to the argument made by the Government and the cases cited by it, this is not a case where one defense was chosen over another and the defense chosen actually implemented. This is a case where due to ill-informed and unreasonable decisions the defense failed to present the credible mitigation case they wanted to present, even under the questionable plan they ultimately concocted. Indeed, in this respect the failure to make any argument connecting the Defendant's crime to the sexual abuse he had suffered, even though this was what trial counsel claims they intended to do, is tantamount to a failure to give any closing argument, at least one focusing on the one mitigating factor directly connected with the Defendant and his crime. Under Lawhorn v. Allen, 519 F.3d

6

1272, 1294-1298 (11th Cir. 2008), cited by the Government (Government's Response, pp. 34-35), this alone was ineffective assistance of counsel.

### III.   THE DETAILS OF THE RAPE AND MURDER OF MS. TIESLER

The Government makes much of the fact that in presenting mental health evidence a detailed explanation of how the Defendant raped and murdered Ms. Tiesler would have been presented to the jury and this was reason enough to forego a mental health defense, although this was the only mitigating explanation the defense had for what was obviously a brutal murder. (Government's Post-Hearing Response, pp. 3-6). But, again, as Mr. Mendelsohn conceded, the description by Mr. LeCroy of what happened added little to what the uncontradicted physical evidence proved as to the attack. (EHT-280-284). As summarized by the Government itself in the Government's Post-Hearing Response, "Defendant attacked Joanne Tiesler in her own home. Defendant struck her in the back of the head with a shotgun. Defendant bound her and brutally raped her. Then, using a knife, Defendant slit Joanne Tiesler's throat with such savagery that he nearly decapitated her. Finally, Defendant stabbed Joanne Tiesler in the back multiple times. The last minutes of Joanne Tiesler's life were filled with terror, pain, apprehension, horror and fear caused by defendant." (Government's Post-Hearing Response, p. 39). The defense well knew it would have to meet this evidence

7

(EHT-280-292), which was graphically summarized by Government counsel in his sentencing closing argument. (TT-2667-2670).

Yet despite the Government's own disturbing evidence, the Government nevertheless claims that fear of the details provided by Mr. LeCroy to Dr. Hilton, and that he would have also described to a Government psychiatrist and Dr. Lisak if they had personally evaluated Mr. LeCroy, placing the evidence of the attack on Ms. Tiesler in the context of mental illness, was enough to reject the only opportunity to provide a mitigating explanation for the brutal rape/murder that the Government's physical evidence proved beyond a reasonable doubt and which the defense was forced to concede. This simply makes no sense and hardly relieved trial counsel from their duty not to foreclose a mental health defense supported by expert testimony—they presented a half hearted mental health defense, and then ineffectively—without knowing the full ramifications of that decision.

## IV.    DR. HILTON'S REPORT

The Government argues that it was in no way ineffective for counsel not even to speak with Dr. Hilton, because they would have learned from Dr. Hilton's report <u>alone</u> that he was available to testify that the Defendant's crime was the result of mental illness. Moreover, the sole purpose of having the Defendant evaluated by Dr. Hilton was to find out what a psychiatrist would say about the

role mental illness played in the Defendant's crime. (Government's Post-Hearing Response, pp. 2, 23).

While it is true that Dr. Hilton's report is detailed and attributes the Defendant's crime to "schizotypal tendencies of magical thinking" and that the Defendant's "thoughts" at the time of his crime, "while not classically in keeping with psychosis, were distortions of reality based on mental illness" (Defendant's Exhibit 3, p. 17), reviewing a written report is no substitute for sitting down with an expert and discussing the full ramifications of his diagnoses and the full extent of the testimony he could provide. For example, while Mr. Mendelsohn testified that he did not find Dr. Hilton's diagnoses of schizotypal personality disorder and borderline personality disorder to be "compelling", he never discussed with Dr. Hilton how these conditions explained the Defendant's crime. (EHT-156, 293). If he, or the other attorneys, had only spoken with Dr. Hilton, he would have learned the personality disorders diagnosed by Dr. Hilton are mental illnesses and that schizotypal personality disorder mimics the early stages of schizophrenia and often leads to paranoid schizophrenia. (EHT-197-198). He would have also learned that individuals with this mental illness often experience "transient psychotic episodes or near psychotic episodes and have a magical perception of things around them" and "a tendency to incorrectly interpret casual incidents, ideas of reference toward themselves," such as Mr. LeCroy's misinterpreting the incident prior to the crime

9

where Ms. Tiesler looked at him curiously and said "Huh." This is typical of the type of suspicion that people who have a schizotypal personality disorder might attach to an inconsequential incident. (EHT-197-200).

If trial counsel had only spoken with Dr. Hilton, they would have also learned Dr. Hilton's opinion, about which he would have testified at trial if only called, that based on the records he had reviewed and the descriptions of the sexual abuse provided by Mr. LeCroy in his personal interview of Mr. LeCroy he had no doubt that Mr. LeCroy had been sexually abused as a child and that his symptoms and history are absolutely consistent with sexual abuse. (EHT-205).  And, perhaps most important of all, he would have learned of Dr. Hilton's strong opinion that the mental illnesses he diagnosed played a "direct role" in the crime, that the murder of Ms. Tiesler was "the product of his mental illnesses" and that had the Defendant not been suffering from these mental illnesses, the crimes would not have occurred. (EHT-204-205).  Finally, counsel would have learned of Dr. Hilton's opinion that there was no reasonable doubt in his mind that Mr. LeCroy was a victim of sexual abuse, that the sexual abuse played a significant part in the crime for which he was convicted, and that he was similarly certain of the impact of the Defendant's mental illness. (EHT-216-217). While some of this might have been gleaned from the written report, there was no way to know the full compelling nature of Dr. Hilton's testimony without actually meeting with him.

10

Even more confounding, however, is the Government's argument that fear of a Government evaluation was not the reason not to pursue a mental health defense at sentencing, because the defense knew that a Government psychiatrist would have reached the same conclusions as Dr. Hilton, namely that the Defendant's crime was the product of mental illness and would not have occurred but for his mental illness. (Government's Post-Hearing Response, pp. 22-23). As the Government contends, "The whole point for having Dr. Hilton evaluate defendant in the first place was to test what a psychiatrist would conclude about the defendant's mental state. The trial team had no reason to believe, nor does habeas counsel proffer a reason for the trial team to have believed, that Dr. Lisak or a Government expert would reach any different conclusion or hear a different version of the commission of the offense from defendant than Dr. Hilton did." (Government's Post-Hearing Response, p. 23). According to the Government, even in this circumstance it was still a reasonable decision by trial counsel not to present mental health expert evidence at sentencing because (1) it would have been inconsistent with the "botched burglary defense," (2) it would have presented to the jury the details of the Defendant's account of the offense and (3) it would have also allowed the jury to know about the diagnosis of anti-social personality disorder. (Government Post-Hearing Response, pp. 24-27, 41-42).

This is an extraordinary claim and it is worth noting the full implication of the Government's position. The Government's position is that it would have been constitutionally effective assistance of counsel, such that the adversary system worked to create a fair verdict in which we can have confidence, Strickland v. Washington, 466 U.S. 668, 689 (1984), to forego what the defense had every reason to believe would be unrebutted expert mental health evidence from both defense and Government psychiatric experts who personally evaluated the Defendant that the Defendant's crime was the product of mental illnesses, would not have occurred but for those mental illnesses, and was in part the consequence of the Defendant's childhood sexual abuse, simply because (1) this testimony would have revealed graphic details, already proven by the physical evidence, (2) would have been inconsistent with a "botched burglary defense," which itself had been contradicted by compelling Government evidence, or (3) would have also included a diagnosis of antisocial personality, something that was also obvious from the Government's evidence.

First, as we know, the defense never opted for a "botched burglary defense" over a mental health defense and wanted to present, and even attempted to present, a mental health explanation for the crime, albeit ineffectively. Further, it is worth noting that to the extent that the "botched burglary defense" was a way to create a jurisdictional argument based upon the fact that the Defendant did not commit the

murder with the intention to steal Ms. Tiesler's car, the same applies to a mental health defense, because, as explained by the Defendant to Dr. Hilton and to trial counsel, his attack on Ms. Tiesler had nothing to do with a desire to steal her car. Second, as explained in detail above, the description of the offense by Mr. LeCroy, although graphic, was no worse than the evidence that the defense was already facing, which the Government itself argues the "trial team could not change or overcome." (Government's Post-Hearing Response, p. 39). Finally, the defense already knew that the Government would present evidence of the Defendant's prior criminal acts, including his prior convictions and the fact that he had committed this crime only shortly after his release from custody (Government's Post-Hearing Brief, p. 39), evidence in and of itself of an anti-social personality, which would have hardly been exacerbated by this unremarkable conclusion by the mental health experts.

According to the Government, it was reasonable to abandon the one and only mitigating explanation of the Defendant's crime, which would have been powerfully supported by unrebutted testimony by <u>both</u> Government and defense experts, even though this evidence would have been consistent with what the jury already knew about the Defendant, and even though the defense attempted, albeit in a woefully ineffective manner, to offer mental illness borne of sexual abuse as an explanation for the Defendant's crime. How can this possibly be a reasoned and

informed decision so that we can be confident that the adversary system properly functioned in this case?[2]

## VI.   DR. LISAK

With respect to Dr. Lisak's testimony, according to the Government the decision not to call Dr. Lisak, even as only a "teaching expert," was based upon Dr. Medlin's report which indicated that she would dispute the Defendant's claims of sexual abuse, based solely upon a review of the records of the Defendant regarding his reports of sexual abuse and claimed research about the false reports of sexual abuse by individuals convicted of sex related crimes. (Government's Post-Hearing Response, pp. 31-33). But, as Mr. Mendelsohn conceded, the defense knew that the Government would attempt to dispute the Defendant's claims of sexual abuse (EHT-279), upon the flimsy basis that the Defendant had not always admitted the sexual abuse in filling out bureaucratic intake forms while in prisons, despite the clear record of his reporting such abuse in the context of private and confidential sessions with mental health experts. The defense never worried about

---

[2]The Government curiously claims that the Defendant does not contend that it was ineffective not to call Dr. Hilton as a witness. (Government's Response, p. 41). Quite to the contrary, the failure to call Dr. Hilton is at the core of the Defendant's claim, because the decision not to call him was made without full knowledge of the consequences of this decision, that is without knowledge of the full extent of Dr. Hilton's testimony, without knowledge of what a Government evaluation would have revealed and without knowledge of what Dr. Lisak's evaluation would have been.

the failure of Mr. LeCroy while in prison to report the sensitive issue of sexual abuse on bureaucratic forms. (EHT-125-126, 277).

Moreover, Dr. Lisak, one of the leading experts in childhood sexual abuse in the country, was prepared to dispute the claims of Dr. Medlin. He described her report to trial counsel as "nonsense" and a "hatchet job by somebody who really didn't know what she was talking about." He further explained that he was "shocked at some of the references that she was citing," because they are not "real studies." (EHT-166-167). Moreover, had Dr. Lisak only evaluated the Defendant, he would have been able to testify as an expert that the Defendant's report of the effect that sexual abuse had on him was absolutely consistent with what the professional and scientific community and his personal training and experience would expect, confirming the validity of the report. (EHT-584-586). As Dr. Lisak testified, "my evaluation of him left me with little doubt that he'd been sexually abused" and "it would be extraordinary for him to have fabricated that." (EHT-585, 586).

However, the defense did not know how Dr. Lisak could refute the Government's claims of false reports of sexual abuse, as well as the testimony of Dr. Medlin based upon her simple review of the records, because the defense never allowed Dr. Lisak personally to evaluate the Defendant. Even Dr. Medlin conceded that a personal evaluation of the Defendant would be critical in determining

whether a report of sexual abuse was valid. (EHT-700, 708). Moreover, because defense counsel had never spoken with Dr. Hilton about this topic, they were not even aware that Dr. Hilton was prepared to provide his expert testimony that there was no doubt from his review of the records and his own personal evaluation of Mr. LeCroy that he had been sexually abused as a child. (EHT-205, 216-217). Indeed, Dr. Hilton was of the mind that Dr. Medlin's report was obviously biased but, paradoxically, her summary of the records actually supported his conclusion that Mr. LeCroy was the subject of sexual, physical and emotional abuse. (EHT-207-208). Nor did Dr. Medlin contact Dr. Carlson who had had an extensive period of contact and treatment of Mr. LeCroy. (EHT-708-709). And she had no idea of the context in which prison intake forms were completed, although she attached significance to them. (EHT, 719-726). Yet despite these concessions by Dr. Medlin, trial counsel made the uninformed decisions regarding Dr. Lisak and Dr. Medlin, as well as Dr. Hilton, which deprived the Defendant of any expert testimony with respect to the consequences of childhood sexual abuse and left the Defendant with the questionable strategy of the lawyers somehow testifying "as experts" in closing with respect to this critical issue, and even that plan failed because of miscommunication between Mr. Mendelsohn and Ms. Kearns.

It must be remembered what was lost to the Defendant by these uninformed and unreasonable decisions. Dr. Lisak, who has now personally evaluated the

16

Defendant, would have testified that in his expert opinion, based upon years of training and research, as well as his professional experience, that the Defendant's claims of childhood sexual abuse were valid and that based upon that sexual abuse there is a solid body of scientific evidence that the Defendant is at a much higher risk of violent behavior as an adult, especially when sexual abuse is, as here, combined with other forms of physical and emotional abuse. (EHT-567-571). Had this evidence been combined with testimony from Dr. Hilton, a forensic psychiatrist, that the Defendant had been sexually abused as a child and that in his opinion this played a significant role in his crimes, and that it was his opinion that the Defendant's crimes were the product of his mental illness and would not have occurred but for his mental illness, there is at least the reasonable probability that at least one juror, all that is necessary (18 U.S.C. §3593), would have reached a different result as to sentencing.

## VI.    WHAT REALLY HAPPENED

The Government's Post-Hearing Response attempts a justification for counsel's actions based upon claimed decisions never made and after the fact justifications not supported by the evidence. For example, the Government claims that the decision not to use Dr. Hilton and not to have Dr. Lisak evaluate the Defendant personally was not prompted by a recognition that to present their testimony would require Mr. LeCroy to be evaluated by a Government psychiatrist,

17

whose conclusions might be unfavorable to the defense, as Ms. Kearns and Mr. Mendelsohn testified (EHT-93-94, 107-108, 159), but because they recognized that the evaluation of Dr. Lisak and of a Government expert would likely be the same as Dr. Hilton. If this were true, why did Ms. Kearns testify that she was "very fearful" of a government evaluation and this is why she "didn't want Bill LeCroy examined by the Government psychiatrist." (EHT-94). And, why would Mr. Mendelsohn have testified that he also did not want Mr. LeCroy evaluated by a Government psychiatrist because he was "very scared" of a Government evaluation. (EHT-159). The Government's claim is simply not true. Moreover, it is a rather incredible conclusion to draw from the evidence, since no attorney worth his or her salt would fail to present at a death penalty sentencing a mental health mitigation case that the defendant's crime was the product of his mental illness and would not have occurred but for his mental illness when this circumstance would have been not only unrebutted but in fact supported by both Government and defense experts, as the Government claims was the thinking of defense counsel.

The Government is attempting to avoid the fact that the defense made a decision to forego mental health evidence because they feared that a Government evaluation would be unhelpful and in doing so they made an important strategic decision without full knowledge of the ramifications of that decision. Had a Government evaluation been unfavorable then a reasonable decision might have

18

been made not to present expert mental health evidence and the Defendant would have been no worse off than he ultimately was. But if a Government evaluation had supported and confirmed the defense's evaluation by Dr. Hilton, and the supposed conclusions of Dr. Lisak, as the Government speculates would have occurred, then no reasonable attorney would have failed to present that evidence, evidence that the defense indeed even tried to present, albeit ineffectively.

## VII.  PREJUDICE

The Government appears to argue that whatever you might think of counsel's failure to offer the compelling mental health evidence case that was available to the defense, it would not have mattered anyway because the circumstances of the death of Ms. Tiesler were so inflammatory that no matter how persuasive a mental health mitigation case might have been, it would not have made any difference. (Government's Post-Hearing Brief, pp. 38-45).  Indeed, since it is the Government's position that a Government psychiatrist would have reached the same conclusions as Dr. Hilton with respect to the fact that the Defendant's crime was the product of his mental illness and would not have occurred but for his mental illness, it is apparently also its position that even this mitigation case supported by both defense and Government psychiatrists would have made no difference. According to the Government, there was no reason even to present a mitigation case, because once the Defendant was convicted a death sentence was

inevitable. As the Government boldly asserts, "This is simply one of those cases in which the facts of the crime are so aggravating that no amount of mitigating evidence or even the most effective lawyering can overcome them." (Government's Response, p. 39).[3]

The Government's position ignores the importance that jurors can attach to a causal relationship between mental illness and a defendant's crime. As reflected in the cases cited on page 29 of the Defendant's Post-Hearing Brief,[4] and as recognized by Justice O'Connor in California v. Brown, 479 U.S. 538, 545 (1987), it is a "long held" belief by our society that a defendant whose criminal acts are

_____

[3]The Government cites Clisby v. State of Alabama, 26 F.3d 1054, 1057 (11th Cir. 1994) and Lawhorn v. Allen, 519 F.3d at 1296, which cites to Clisby, for this proposition. It is worth noting that despite the egregious facts in Lawhorn, the Court nevertheless found the failure to give a closing argument about the defendant's domination by his girlfriend at the time of the offense, his age and his "troubled family background" to be sufficient prejudice to require relief. 519 F.3d at 1296-1297. Moreover, Clisby itself involved a brutal axe murder "by a person who had killed before," 26 F.3d at 1035, and one of the examples cited in Clisby, Daugherty v. Dugger, 839 F.2d 1426 (11th Cir. 1988), involved a defendant who had committed four separate murders. Mr. LeCroy was convicted of a single, albeit brutal, murder, and a prior murder is probably the most aggravating circumstance in a death case. The other case cited in Clisby, Thompson v. Wainwright, 787 F.2d 1447, 1454 (11th Cir. 1986), involved the failure to present mitigating evidence of a mental condition even though this evidence failed to show that the defendant was "suffering any specific disturbance at the time of the crime." This is obviously different from this case where the expert mental health evidence would have specifically connected the Defendant's mental illness with the crime.

[4]The Defendant's Post Hearing Brief incorrectly cites Stephens v. Kemp, as 848 F.2d 642, 652 (11th Cir. 1988). The correct cite is 846 F.2d 642, 652 (11th Cir. 1988).

attributable "to emotional and mental problems" are "less culpable than those who have no such excuse." See, also, Penry v. Lynaugh, 492 U.S. 302, 319 (1989).

Here, it cannot be safely concluded that if the defense had presented a coherent mental health mitigation case, based on the evidence that would have been available to it, there is not at least a reasonable probability that at least one juror would have concluded that the aggravating facts of this case did not sufficiently outweigh the mitigating circumstance that the Defendant would never have committed the crime but for mental illness and childhood sexual abuse for which he was not responsible. 18 U.S.C. §3593(d). Although the Government's Post-Hearing Brief repeatedly uses language with respect to prejudice which appears to place a burden on the Defendant to prove that the evidence not offered would have likely or certainly resulted in a different verdict (Government's Post-Hearing Brief, pp. 39-40), that is simply not, nor has it ever been, the test. All the Defendant must show is a "reasonable probability" of a different verdict as to at least one juror, understood as a reason to lack confidence in the fairness of the jury's verdict.[5]

---

[5]The Government claims that a defendant must also show that "the outcome was fundamentally unfair or unreliable," citing to Lockhart v. Fretwell, 506 U.S. 364, 369-370 (1993) (Government's Post-Hearing Response, p. 19). In Williams v. Taylor, 529 U.S. 362, 391-394 (2000), the Supreme Court specifically rejected the notion that Lockhart added an additional hurdle to a defendant's ineffectiveness claim based upon the deprivation of a "substantive or procedural right," such as the

Here, when there was available to the defense evidence which would have established a causal link between his crime and mental illnesses borne in part from sexual abuse, there was at least a reasonable probability of a different verdict such that we cannot be confident in the verdict of the jury. After all, we are not talking about inconsequential evidence which "would barely have altered the sentencing profile presented to the sentencing (jury)." Strickland at 700. Due to counsel's deficient performance the sentencing jury was deprived of the only available mitigating evidence directly related to the offense so that the jury could "accurately gauge his moral culpability." Porter v. McCollum, 130 S.Ct. 447, 454 (2009). The failure of juries to reach a unanimous verdict of death in numerous cases with facts much worse than the facts in this case, often involving numerous victims, makes clear that there is no such thing as a death penalty case where there is no possibility of a sentence other than death, especially when there was available evidence that the Defendant's crime was the product of mental illness and childhood sexual abuse, although that appears to be the Governments contention.

## VIII. CONCLUSION AS TO INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING

The Defendant recognizes that he was represented by experienced and dedicated counsel who rightly deserve the respect of the Court. But in the cauldron

---

constitutionally protected right "to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer."

22

of a death penalty defense even the best and most committed counsel can make what are literally fatal mistakes. Counsel for the Defendant recognizes that the law requires deference to strategic decisions made by experienced counsel and warns against the benefit of hindsight. But these concerns do not eliminate the Court's responsibility to determine whether fateful decisions made by counsel were adequately informed and were reasonable under the circumstances of the case. While "[e]xperience is due some respect," the law accepts "that even the very best lawyer could have a bad day," that no attorney's "conduct is above the reasonableness inquiry" and that "an experienced lawyer may, on occasion, act incompetently." Chandler v. United States, 218 F.3d at 316 & n. 18.

Unfortunately here, as detailed in the Defendant's Post-Hearing Brief, critical strategic decisions were made without full knowledge of the consequences of those decisions. The decision was made not to pursue calling Dr. Hilton as a witness without discussing his testimony with him to know the full power of his diagnoses and opinions and because of the fear of a Government evaluation which counsel suspected would be unfavorable, but did not know for sure. A similar decision was made with respect to Dr. Lisak's not personally evaluating the Defendant because of concern about a Government evaluation, the results of which were still unknown. In either situation, if the Government evaluation had been so powerful as to convince counsel not to present an expert mental health defense, the

Defendant would have been no worse off than he already was and turned out to be. Having made these uninformed strategic decisions, which resulted in depriving the Defendant of any expert testimony to connect his crimes to mental illness, even though testimony was readily available, the defense devised a questionable plan to try to present the mental health case through the attorneys themselves, itself an unreasonable strategy, which nevertheless was not even implemented because of miscommunication between counsel.

The question is not whether another hypothetical attorney with full knowledge of the consequences of the decisions made by counsel, such as the knowledge as to the scope of Dr. Lisak's and Dr. Hilton's testimony and what a Government evaluation would have revealed, could have nevertheless made a decision not to present mental health evidence. The Defendant's right to effective assistance of counsel is not to be judged in the abstract. Instead, the question is whether Defendant's <u>actual</u> counsel performed reasonably in making the <u>actual</u> decisions that they in fact made, i.e. whether the adversary system in this case <u>actually</u> functioned adequately. <u>Sears v. Upton</u>, 130 S.Ct. 3259, 3265 (2010)("That a theory might be reasonable, in the abstract, does not obviate the need to analyze whether counsel's failure to conduct an adequate investigation before arriving at this particular theory prejudiced Sears.").

We do not contend that trial counsel deliberately failed in their duties to their client, nor could we. Instead we claim that critical and strategic decisions were made without sufficient information, which deprived the Defendant of the one and only hope he had for a sentence other than death, that is that at least one juror would conclude that a sentence other than death would be justified, because the Defendant's crime was the product of mental illness borne in part by childhood sexual abuse and would not have occurred but for his mental illness, a circumstance that is widely recognized as a reason to impose a sentence other than death. This was deficient performance under the standards of Strickland v. Washington, which but for counsel's mistakes create a reasonable probability of a different result at sentencing. The death verdict in this case is simply "unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." Strickland, 466 U.S. at 696. The Defendant's death sentence should be vacated and a new sentencing hearing ordered.

## IX.   JURY CHALLENGE ISSUE

### A.   Statistical Analysis

The Government is wrong when it claims that there is a hard and fast rule in the Eleventh Circuit that a Defendant must show that a cognizable group is underrepresented by a more than a 10% absolute disparity before any relief can be granted. (Government's Post-Hearing Response, p. 54). After all, such a rule

would allow for the complete exclusion of a cognizable group that represented 10% or less of the population, such as the Hispanic/Latino population of the Division and District in this case. Does the Government seriously claim that a showing that no Hispanics were represented on the relevant Qualified Wheels would nevertheless be an insufficient showing of a substantial underrepresentation, because there would still be a less than 10% absolute disparity?

While it may be true that the former Fifth Circuit and the Eleventh Circuit have insisted on a more than 10% absolute disparity for larger populations, the former Fifth Circuit also made clear in United States v. Butler, 615 F.2d 685, 686 (5th Cir. 1980), that it was never intended that "the absolute disparity method is the sole means of establishing unlawful discrimination," especially when a "less-than-10% minority" is at issue. See also, United States v. Maskeny, 609 F.2d 183, 190 (5th Cir. 1980).[6] Moreover, as far back as 1972, the Supreme Court held in Alexander v. Louisiana, 405 U.S. 625, 630 (1972), and more recently in Berghius v. Smith, 130 S.Ct. 1382, 1393-1394 & fn. 4 (2010), that juror representation is not to be examined based upon one statistical test for all circumstances, especially when an artificial threshold is assigned to such a test, as the Government contends.

---

[6]Of course, as the Court well knows, decisions of the former Fifth Circuit handed down prior to September 30, 1981, are binding precedent in the Eleventh Circuit unless overruled or modified by the Eleventh Circuit en banc. Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc).

26

As the Supreme Court held in <u>Berghius</u>, each of the statistical tests most often used, "absolute disparity, comparative disparity and standard deviation," is "imperfect" and has its own problems. <u>Berghius</u> at 1393-1394 & fn. 4. The following chart shows the problems with absolute disparity, especially when you impose a 10% threshold.

| Jurisdiction | % Population | % Jury Wheel | Absolute Disparity |
|---|---|---|---|
| A | 60% | 50% | 10% |
| B | 20% | 10% | 10% |
| C | 12% | 2% | 10% |
| D | 10% | 0% | 10% |

Obviously, each of the above sample jurisdictions represents vastly different successes in representing the cognizable group at issue. They range from a jury wheel with regard to jurisdiction A that substantially represents the community, to jurisdiction D which totally excludes the cognizable class at issue. But each has the exact same absolute disparity. In jurisdiction B more than half of the group at issue is being excluded, but the absolute disparity is still only 10%. With respect to jurisdiction C, more than 83% of the group is not represented, but still the absolute disparity is the same. In short, absolute disparity is probably the worst statistic to use in determining whether a jury system is successfully representing the community, especially when you impose an arbitrary threshold, such as 10%. It is

27

a statistic that no serious statistician would ever use to examine the question of representativeness.

We recognize that comparative disparity can have its own problems. When you are examining a relatively small group in the community, as here, based upon a sampling of the jury wheel, a relatively small change in the relevant numbers can have a significant impact on the comparative disparity percentage. Appendix to Foster v. Sparks, 506 F.2d 805, 834-835 (5th Cir. 1975). This is why it has been suggested that in using comparative disparity, a statistic which at least takes into account the percentage of the group examined in the community, relief should not be required unless there is a relatively large disparity. Some have suggested a comparative disparity of more than 25%. See, Kairys, Kadane and Lehoczky, Jury Representativeness: A Mandate for Multiple Source Lists, 65 Cal.L.Rev. 776, 796 & fn. 112 (1977). Here, however, the comparative disparities reflected in the statistics are well over 50%, well beyond what anyone would expect as a threshold for a comparative disparity to prove a significant underrepresentation.

Moreover, with respect to possible sample size problems (Government's Post-Hearing Response, p. 57), standard deviation analysis is helpful. As Mr. Jeffrey Martin testified, standard deviation takes into account sample size, which in this case was relatively small. However, it was the sample size chosen by the Jury Clerk in compiling the JS-12 to determine whether the Qualified Wheels fairly

represented the community. Moreover, despite the relatively small sample size here, the standard deviations computed by Mr. Martin are well above what would be expected if the system was effectively representing all portions of the community. (EHT-365-366, 368, 400-401, 409-411). In short, the combination of the significant comparative disparity and standard deviation statistics here are more than sufficient to prove that for some reason the system is not effectively representing the Hispanic/Latino community. If there was not some systematic factor or factors reducing their representation and the system was operating randomly as it should, you would not see these types of statistics.

## B.   Systematic Factors

Counsel for the Defendant recognizes that in <u>United States v. Carmichael</u>, 560 F.3d 1270, 1279 (11th Cir. 2009), the Eleventh Circuit stated, in what is arguably <u>dicta</u>, because the Court found that the defendant's fair cross-section claim failed because it did not satisfy the questionable 10% absolute disparity rule, that the failure to supplement the voter registration list or to implement necessary follow-up procedures to insure the fair representation of all portions of the community would not constitute a sufficient violation of the Jury Selection and Service Act of 1968 ("JSSA"), 28 U.S.C. §§ 1861 <u>et</u>. <u>seq</u>., to merit relief under the JSSA. The Court made no similar holding with respect to a constitutional claim under the Sixth Amendment. The Supreme Court, of course, has never weighed in

29

on this issue. Moreover, the former Fifth Circuit in <u>Broadway v. Culpepper</u>, 439 F.2d 1253, 1257 (5th Cir. 1971), noted that the JSSA "almost in constitutional terms, calls for a fair cross-section of the community and requires the use of supplemental sources if the use of the voter lists does not reflect that cross-section." (citation omitted). After all, as the Court in <u>Broadway</u> held, "the use of the voter list is not the end sought. Rather, that is a principal source. If the source is deficient or infected its use alone will not suffice." <u>Id</u>.

Although <u>Carmichael</u> describes the language of 28 U.S.C. §1863(b)(2) as "vague," 560 F.3d at 1279, it is hard to imagine how the command of the statute could be more unambiguous than the statement that the "plan <u>shall</u> prescribe some other source or sources of names <u>in addition to</u> voter lists when <u>necessary</u> to foster the policy and <u>protect</u> the rights secured by Sections 1861 and 1862 of this Title," which specifically provide that the policy of the JSSA is to insure "the right to grand and petit juries selected at random from a <u>fair</u> cross-section of the community in the district or division wherein the convenes." (Emphasis added). There is nothing "vague" about this language. The JSSA explicitly requires supplementing voter registration lists when using the voter registration list alone does not create wheels that reflect "a fair cross-section of the community."

The Court's justification in <u>Carmichael</u> for ignoring the requirement of 28 U.S.C. §1863(b)(2) of the JSSA for supplementing the voter registration list when

30

necessary to achieve jury wheels that reflect a fair cross-section of the community, is that the sole use of the voter registration list is not systematic exclusion because the minority individuals not represented have in effect chosen not to be represented by not registering to vote. Carmichael also rejects the failure to follow up on returned and non-returned questionnaires as not a systematic factor of constitutional or statutory significance, because the individuals not included in the wheels have again somehow chosen not to be represented. Id. at 1279. Both conclusions are illogical and contrary to Supreme Court precedent.

The systematic factor that resulted in a violation of the defendant's Sixth Amendment rights in Duren v. Missouri, 439 U.S. 357 (1979), was women choosing to request an automatic exemption from jury service simply because of their gender. Therefore, the question is not whether any particular group chooses or does not choose to be involved. The question is whether there exists some structural problem in the system for creating the jury wheels which systematically excludes a cognizable portion of the population. Simply put, the system cannot be designed to use a source of names that is known to underrepresent a cognizable portion of the population, simply because those individuals choose not to register to vote, nor fail to implement procedures that insure that all portions of the population are represented, because due to social and cultural factors they are more likely not to be delivered mail or to return questionnaires.

## X.   CONCLUSION

The Defendant has addressed herein specific points raised by the Government's Post-Hearing Brief and, of course, continues to rely primarily upon the comprehensive statement of his legal and factual positions set out in the Defendant's Post-Hearing Brief and in the Defendant's Traverse. With respect to the issues of ineffective assistance of counsel, the Court should consider the cumulative impact of the mistakes of counsel. Here, Defendant was denied a potentially meritorious jury challenge, because of the failure of counsel to present citizenship figures. Counsel failed to perfect challenges to the burden of proof required in the jury's ultimate decision in weighing aggravating circumstances against mitigating circumstances. Inflammatory evidence was admitted, which should have been suppressed and this issue was not perfected for appeal. Without challenge from the defense, the Government made improper arguments, falsely and improperly claiming that the Defendant should be sentenced to death because the Government itself would not be able to secure him while incarcerated. And most important of all, the Defendant was deprived of a mental health mitigation case at sentencing, the most, and probably only, compelling case for a sentence other than death, because decisions were made without sufficient knowledge of their consequences due to the miscalculations of counsel and miscommunications among counsel.

For all of the reasons detailed in the Defendant's Post-Hearing Brief, the Defendant's Traverse, and herein, the "adversary process that our system counts on to produce just results" did not function in the case as it should have. <u>Strickland</u>, 466 U.S. at 696. The Court cannot safely conclude that but for counsel's mistakes, especially when considered cumulatively, there is not at least a "reasonable probability that the results of the proceedings would have been different," understood as "a probability sufficient to undermine confidence" in the jury's verdict. <u>Strickland</u>, 466 U.S. at 693-694; <u>Porter v. McCollum</u>, 130 S.Ct. at 455-456 (2009).  As a consequence, the Court should grant the Defendant relief and order that a new sentencing be held.

This 2nd day of May, 2011.

Respectfully submitted,

<u>s/John R. Martin</u>
John R. Martin
Georgia Bar No. 473325

44 Broad Street, N.W.
Suite 202 The Grant Building
Atlanta, Georgia  30303
404.522.0400
jack@martinbroslaw.com

<u>s/Sandra Michaels</u>
Sandra Michaels
44 Broad Street, N.W.            Georgia Bar No. 504014
Suite 202 The Grant Building
Atlanta, Georgia  30303
404.522.0400
slmichaels@mindspring.com        Counsel for William LeCroy, Jr.

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 2, 2011, I electronically filed the foregoing **REPLY TO GOVERNMENT'S POST-HEARING RESPONSE TO DEFENDANT'S MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY PURSUANT TO 28 U.S.C. §2255** with the Clerk of Court using the CM/ECF system which will send notification of such filing to William McKinnon, Assistant United States Attorney.

s/John R. Martin
JOHN R. MARTIN