**Declaration of Carol A. Wright**

Pursuant to 28 U.S.C. § 1746 I declare under penalty of perjury that the following is true and correct:

1)      I am an attorney licensed to practice law in Ohio, Pennsylvania, and the federal courts. I have concentrated my practice on representing death-sentenced individuals in all phases of litigation from trial through clemency proceedings since 1999. In 2008, I became the Supervisor of the newly formed Capital Habeas Unit ("CHU") in the Federal Public Defender's Office for Southern Ohio. In that position I hired, trained and supervised attorneys, investigators and paralegals in representing death-sentenced clients in federal habeas corpus and clemency proceedings. I have presented on clemency representation in capital conferences. In 2018, I accepted a job as the Chief of the Capital Habeas Unit for the Middle District of Florida to open a new CHU in Florida.

2)      I have been asked by members of Mr. Lecroy's defense team to execute a Declaration speaking to my experience representing death-sentenced prisoners in clemency and describing the basic tasks that go into clemency representation in capital defender offices. Mr. Lecroy's attorneys have told me a bit about his case and the circumstances they are facing seeking to advocate for clemency during the COVID-19 pandemic.

3)      Representation during a pending execution date is governed by Guidelines designed to provide equal representation for all clients. Those Guidelines include the American Bar Association ("ABA") *Standards for Criminal Justice*, the ABA *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, ("ABA Guidelines")[1], the ABA Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases ("Supplementary Guidelines"), the National Legal Aid & Defender Association ("NLADA") *Performance Guidelines for Criminal Defense Representation*, and the NLADA *Standards for the Appointment and Performance of Counsel in Death Penalty Cases.*

4)      The Supplementary Guidelines extend to all stages of a case and make clear: "The skills, abilities, and functions outlined in the[] Supplementary Guidelines must be present throughout the defense team, and the responsibility for the development and presentation of mitigation evidence must be incorporated into the defense case at all stages of the proceedings from the moment the client is taken into custody, and extending to all stages of every case in which the jurisdiction may be entitled to seek the death

---

[1] 31 HOFSTRA L. REV. 913 (2003), available at http://ambar.org/2003guidelines.

penalty, including initial and ongoing investigation, pretrial proceedings, trial, appeal, post-conviction review, clemency proceedings and any connected litigation. The duty to investigate, develop and pursue avenues relevant to mitigation of the offense or penalty, and to effectively communicate the fruits of those efforts to the decision-makers, rests upon defense counsel."[2] Further, the Guidelines direct: "At no stage of a capital representation may counsel limit the scope of services to be provided without risking violation of Model Rule 1.2."[3]

5)      Specific Guidelines related to counsel's duties during the execution-date stage of the case include:

> **ABA GUIDELINE 10.15.1—DUTIES OF POST-CONVICTION COUNSEL**
>
> A.      Counsel representing a capital client at any point after conviction should be familiar with the jurisdiction's procedures for setting execution dates and providing notice of them. Post-conviction counsel should also be thoroughly familiar with all available procedures for seeking a stay of execution.
>
> B.      If an execution date is set, post-conviction counsel should immediately take all appropriate steps to secure a stay of execution and pursue those efforts through all available fora.
>
> C.      Post-conviction counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules. Counsel should make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review.
>
> D.      The duties of the counsel representing the client on direct appeal should include filing a petition for certiorari in the Supreme Court of the United States. If appellate counsel does not intend to file such a petition, he or she should immediately notify successor counsel if known and the Responsible Agency.
>
> E.      Post-conviction counsel should fully discharge the ongoing obligations imposed by these Guidelines, including the obligations to:
>
>> 1.      maintain close contact with the client regarding litigation developments; and

---

[2] ABA Supplemental Guidelines, 36 Hofstra L. Rev. 677, 678-79 (2008).

[3] Lawrence J. Fox, *Capital Guidelines and Ethical Duties: Mutually Reinforcing Responsibilities*, 36 Hofstra L. Rev. 775, 792 & n.89 (2008) (discussing how the ABA Guidelines "can be seen as simply the very specific implementation of the ethical rules" set forth in the *Model Rules of Professional Conduct*).

Wright Declaration                          2

2.      continually monitor the client's mental, physical and emotional condition for effects on the client's legal position;

3.      keep under continuing review the desirability of modifying prior counsel's theory of the case in light of subsequent developments; and

4.      continue an aggressive investigation of all aspects of the case.

**NLADA Standard 11.9.5 Duties Common to All Postjudgment Counsel**

(a) Counsel representing a capital client at any point after imposition of the death sentence should be familiar with the procedures by which execution dates are set and how notification of that date is made. Counsel should also be familiar with the procedures for seeking a stay of execution from all courts in which the case may be lodged when an execution date is set.

(b) Counsel should take immediate steps to seek a stay of execution, and to appeal from any denial of a stay, in any and all available courts when an execution date is set.

(c) Counsel should continually monitor the client's mental, physical and emotional condition to determine whether any deterioration in the client's condition warrants legal action.

6)      The Guidelines related to the duties of clemency counsel include:

**ABA GUIDELINE 10.15.2—DUTIES OF CLEMENCY COUNSEL**

A. Clemency counsel should be familiar with the procedures for and permissible substantive content of a request for clemency.

B. Clemency counsel should conduct an investigation in accordance with Guideline 10.7.

C. Clemency counsel should ensure that clemency is sought in as timely and persuasive a manner as possible, tailoring the presentation to the characteristics of the particular client, case and jurisdiction.

D. Clemency counsel should ensure that the process governing consideration of the client's application is substantively and procedurally just, and, if it is not, should seek appropriate redress.

**NLADA Standard 11.9.4 Duties of Clemency Counsel**

(a) Clemency counsel should be familiar with the procedures for and permissible substantive content of a request for clemency.

Wright Declaration                          3

(b) Clemency counsel should interview the client and any prior attorneys if possible, and conduct an investigation to discover information relevant to the clemency procedure applicable in the jurisdiction.

(c) Clemency counsel should take appropriate steps to ensure that clemency is sought in as timely and persuasive a manner as possible.

7)     For more than a decade, the topic of clemency representation has been discussed at capital defense conferences and trainings, and attorneys are largely in agreement over what the best practices governing this representation is. Although the courts as of yet may not have developed as robust an understanding of counsel's obligations in clemency as the federal public defenders' offices have, we consider the work described herein foundational to the ethical representation of clients represented by our offices and by other appointed counsel.

8)     Over the last several years, institutional defender offices (like FDSET) as well as appointed counsel working with defender offices, have become increasingly committed to ensuring that the representation each client receives is consistent with the relevant guidelines governing our professional responsibilities as capital defense attorneys. Not only does this ensure that we are always providing our clients representation at the level contemplated by Congress in ensuring the provision of attorneys to death-sentenced prisoners in federal court under 18 U.S.C. § 3599 and for related state-court advocacy once an execution date has been set (18 U.S.C. § 3599(e)); but adhering to these professional standards is essential for ensuring that our clients' cases are properly adjudicated and move efficiently through the judicial system.[4]

9)     The bulk of my now more-than 20-years of experience representing death-sentenced clients in clemency has been in Ohio, an active death penalty state in the Sixth Circuit. Ohio has executed 56 people since 1999. The work we have done representing clients in clemency in Ohio has been guided by national standards of practice.

10)    Ohio has a formal clemency process that includes an interview with the inmate prior to a clemency hearing before the Ohio Parole Board ("Board"). The Board then makes a recommendation to the Governor, and the Governor makes the final decision as to whether a prisoner is granted a reprieve, a commutation, or is denied clemency, thereby clearing the way to proceed with

---

[4] ABA Guidelines, Guideline 1.1, Commentary, at 929-30. The Guidelines "recognize[] the simple truth that any other course has weighty costs-to be paid in money and delay if cases are reversed at later stages or in injustice if they are not." *Id.* at 930.

Wright Declaration                             4

an execution. Although the clemency process in Ohio is different than the process set up for federally death sentenced inmates, the lessons we have learned from representing death-sentenced prisoners in clemency in Ohio are applicable and communicated to capital defenders in all jurisdictions.

11)   As the Supervisor in the Southern District Ohio CHU, I directly participated in ten clemency proceedings and indirectly participated in at least twenty additional proceedings. I attended the majority of all clemency hearings during my time as Supervisor of the SD Ohio CHU. I also advised Criminal Justice Act panel attorneys and other external teams about clemency proceedings. I de-briefed teams after hearings and executions.

12)   Each of the three governors that served during my tenure as the Supervisor of the CHU were willing, under certain circumstances, to grant commutations or reprieves. We were successful in obtaining clemency from both Democratic and Republican governors for several clients. This success was possible because of intense planning and execution of a clemency campaign for each of our clients.

13)   Clemency is a remedy of last resort. Although concepts and ideas for a possible clemency campaign are conceived throughout the federal habeas representation, there are so many variables that the most important work on the clemency case typically happens in the last six months to a year before the execution date. Any sooner than that, and you are determining a clemency strategy without consideration for the most recent legal and factual developments in the case. Also, a premature campaign argues for clemency before the public or the president has had an opportunity to turn his focus to the case.

14)   If you are newly appointed and an execution date is set, the initial work in preparing for clemency involves getting to know your client and his case as thoroughly as possible. Even if you have been working on the case for some time, a careful re-examination of the file from the unique viewpoint of clemency is also essential.  This requires reviewing everything in the file and meeting often with your client. It requires time because the files are large and by the time the client has reached this stage, they may have little trust in attorneys or interest in the clemency process. Oftentimes, advocating for a client for clemency involves a lot of time spent convincing the client to pursue clemency in the first place.

Wright Declaration                              5

15) In addition to the review of the file, you must complete a thorough independent investigation into the client, including his social psychological background and history reaching back several generations. *See* ABA Guidelines 10.15.2(b). This is essential because there may be facts about your client or his case that could never have been part of the judicial proceedings but which may be very pertinent to any consideration of executive clemency. You also must complete a thorough independent investigation into the crime and all facets of the trial, sentencing, appeal, post-conviction and federal habeas stages. You must obtain all records relating to the client and his family. These records may include educational, employment, military, criminal history, prison, medical, mental health, social security, children's services', religious, etc. They will also involve your investigation into facts that have occurred after your client was sentenced to death. Every person involved in the client's life that can be interviewed should be interviewed. This thorough independent investigation may alert a team to additional litigation that is necessary to vindicate the client's rights. For example, if a client's intellectual disability claim was not previously litigated, but evidence of intellectual disability begins to emerge during the clemency investigation, the team may need to work up that claim and litigate it. The team needs to determine if there are valid grounds for a challenge to the lethal injection method. Additionally, the team needs to determine if the client is competent to be executed. In federal defender offices and among capital defenders this work is not considered optional.

16) All of this work requires time and team effort. Early in the process—in my experience in Ohio, typically meaning more than a year in advance of the scheduled execution date—the client should be visited at least monthly, if not bi-monthly, to keep him/her appraised of the team's efforts, to learn more about the client, and to build a trusting relationship. This is also true of the client's family or friends identified by the client. The clemency process should be explained to the client and to any potential witnesses. In states that set execution dates with less lead time, this work would presumably have to start in earnest as soon as an execution date is announced.

17) All team members involved in the clemency process should visit and be able to visit the client. Although one or two team members may develop a close relationship with the client and may visit more often depending on their role, the client needs to know that an entire team is working on his behalf. Moreover, things happen during the lead-up to a clemency petition being submitted or a clemency meeting with the decision makers that may require a different member of the team to visit. The client should be at least

Wright Declaration                    6

somewhat comfortable with each team member so the work can continue, and so that one team member is not overly burdened by the required visitation.

18)    All interviews with the client and potential witnesses in support of clemency must be in person, face-to-face, one-on-one interviews. This is necessary for two reasons. First, in order to receive accurate information in an interview, the interviewer must build a rapport with the witness. *See* Supplementary Guidelines 5.1.C & 10.11.C. Many of the topics that must be explored are highly sensitive, and witnesses must be given the appropriate space and support in order for them to feel comfortable enough to discuss those sensitive topics. In Mr. Lecroy's' case, I have been made aware that a significant component of his mitigation history relates to child sexual abuse, and ensuing mental illness. There is no way to develop this type of information, which is undoubtedly relevant to clemency consideration, without being able to speak face-to-face and spend time with witnesses. Developing this sort of information requires a significant amount of time spent with the witness and the client. Often, several visits with witnesses are required before the rapport and trust has built to the point where sensitive information will be provided.

19)    The second reason for requiring in person, face-to-face interviews with all witnesses is that the team must gauge how best to present information to the relevant decision maker—in this case, the Pardons Attorney and the President. Members of the defense team involved in clemency representation must ask themselves, is this witness a good historian? Are there documents or other tangible evidence that will support what this witness is saying? What is the best way to present this witness's information? These are questions that can only be answered by meeting with the witness and building a rapport and an understanding of what the clemency process entails and what the goal of the presentation is. One meeting is never sufficient, because rapport and trust is not gained in one meeting.

20)    Even if the witness stands solidly in support of your client, her ability to communicate what she knows about the client's background, character, and history may be limited. I recall a brother of a client who was interviewed in person by our mitigation investigator on several occasions. Both he and his brothers had been subjected to extreme physical abuse, often tied to their beds at night, left without food and physically beaten by foster parents. It was only after several meetings that he was able to disclose the sexual abuse he suffered at the hands of the foster father—abuse that was undoubtedly relevant to the client's case for clemency. It was clear from the repeated visits

Wright Declaration                                        7

that the brother could never have spoken of this abuse in front of the decision maker, however—even though his recounting of the abuse would be the best way to transmit this information. A decision was made to videotape his testimony. That decision also required preparation, practice, mastering the video equipment and working with the brother to get through the video session.  It was a compelling video but took several months of preparation, work, editing and teamwork to complete.

21)    As the team begins to focus on the theme and theories of the clemency process, people need to be identified that can speak to the theme and theories. These people may be family members, friends, former teachers or coaches, co-defendants, witnesses, jurors, former attorneys and experts. After all these people are interviewed, decisions are made as to who can best convey the theme and theories developed. There may be just one theory that fits into the theme, i.e. a juror who was unaware of mitigation evidence that was not presented, or it may be many. For example, the crime may not be the worst of the worst, the forensic testimony may have been junk science, and the client may suffer from brain damage. Once identified, each of the narrators need to be prepared for their presentation on that theme, whether that is through live presentation, video, or affidavit. This takes practice and time. It cannot be done over email, phone, or Zoom. It should also not be done during an exceptionally difficult time for the potential witness, like during the stress caused by a global pandemic.

22)    While the work with witnesses in support of clemency is ongoing, other team members are continuing to meet with the client to keep him apprised of the developing presentation. Experts may be needed to meet the client for evaluation. It is roundly accepted that expert visits have to take place in-person, face-to-face.

23)    This work in gathering evidence for clemency is necessarily very broad. Clemency may be the only opportunity to present evidence that could not be considered by a court due to procedural default or other evidentiary rulings. Some evidence, such as your client's adjustment to incarceration, may never have been previously available for any judicial tribunal to consider. Clemency is a unique opportunity to present a complete and holistic view of the case so that the decision makers can arrive at a conclusion about the fairness of executing the death sentence.

24)    As the clemency decision and execution date nears, the client's anxiety increases, requiring more visits and more time from the team. In addition,

Wright Declaration                           8

the client's family and friends may need additional attention and time from the legal team to go over the plans for clemency, the plans for the execution, etc. There are times when the clemency process brings family members who have lost contact with the client back into the client's life. These rekindled relationships contribute to the strength of a clemency campaign: they can be powerful examples of forgiveness and redemption; they can lead to the revelation of new information that supports an existing clemency theme or establishes a new theme relevant to the clemency decision maker; they also broaden the base of support for the clemency effort.

25) Even in Ohio where clemency is sometimes granted, it is an exceptional event, and our clients know this. They come to realize that they are most likely to be executed. Although some clients have thought about this potential outcome, many have not. As a clemency decision nears, the team oftentimes finds themselves exploring difficult topics with their clients – remorse, the meaning of life, beliefs about god and the afterlife. These are not conversations that can occur over the phone. They have to occur face-to-face and one-on-one. Nor are these conversations usually complete in one meeting. However, it is my sincere belief that these conversations are an integral, foundational part of the representation we are appointed to provide clients facing execution. I cannot imagine a client preparing for execution without regular access to his attorneys, his family, or his spiritual adviser. There are of course clients who "volunteer" for execution, or who stop trusting their attorneys and begin refusing visits, or whose attorneys abandon them even as they approach their execution date. But I am not aware of any other circumstances in which the Government has sought to proceed with an execution date while at the same time adopting policies that serve to increasingly limit the client's ability to interact with counsel, spiritual advisors, or the outside world prior to death.

26) These in-person interactions are all the more necessary and poignant in Mr. Lecroy's case. I have been made aware of the fact that Mr. Lecroy will name his longtime lead counsel, John R. Martin, as the witness to his execution. In my experience, this is a near-sacred duty of appointed counsel, particularly appointed counsel who has a long-standing relationship of confidence and trust with the client. Clients need someone they can trust to talk to in the last days and hours of their lives. Though these sessions are very difficult for appointed counsel, it is an essential duty they have been appointed to carry out. And, when all else fails, it is appointed counsel's duty to be a witness the actual execution, to make sure it is conducted in conformance with the laws and protocols set forth and to note any irregularities or problems. Finally, it

is counsel's duty to be present so that his client may see a friendly face in the crowd of witnesses so that he knows someone is there on his side.

27) In this case, it is my understanding that Mr. Martin will not be able to fulfill these last duties of appointed counsel due to the COVID-19 pandemic. Because he suffers from chronic leukemia, he must avoid visiting penal institutions where the danger of contagion is extremely high and his own health could be easily compromised.  The Government's insistence of going forward with the execution of Mr. Lecroy in the middle of this pandemic will prevent Mr. Martin from being there for his client.

28) Many clients suffer from mental illness. These clients often become more anxious, agitated or even psychotic as clemency proceedings progress. Some shut down and require patience and repeated daily visits to get through the time. Others can become suicidal or act out, resulting in disciplinary action. In my experience, even clients who have been mostly stable for years may change and become mentally unstable due to the stress of an upcoming execution. Regardless, this has happened with sufficient regularity in my experience that it is always our practice that someone from the team is visiting the client at least two times weekly for at least a month or two before the execution date.

29) As the execution date nears, the media is beginning to inquire about the case for clemency and may be reporting about the past crime. Journalists may be reaching out to victims, witnesses and former prosecutors to get updated quotes on feelings about the upcoming execution. A well-planned clemency campaign has anticipated media attention and will have planned their own media campaign. This requires a spokesperson, bullet points, and people available to do interviews and provide quotes from the defense team. It may require writing opinion pieces and reaching out to stakeholders for their support. It may entail petitions and requests to call the governor or the President. All this needs to be done months prior to the clemency proceedings so that the media campaign is ready to launch its message and is not scrambling to react. Media interviews are generally done in-person, so members of the team need to be prepped and ready to handle the media side of the campaign.

30) Media attention can bring out jurors or victims. Ideally, the team has already reached out to all jurors and victims as part of the initial investigation for clemency. Interviewing jurors is an art. It requires patience and tenacity. Many jurors are not willing to discuss their service over the phone. I would

Wright Declaration                              10

never permit my investigators or attorneys to cold call jurors. It is critically important to attempt to interview jurors face-to face, meeting them at their home. People are much more reluctant to close the door in your face then to hang up a phone. Oftentimes, people are curious about the case and the client once you explain who you are and why you are there. Many jurors are very interested in new information or evidence that was not presented at trial. Many jurors also remember things about the trial or deliberations that no one else knew occurred. Those memories can provide a basis for litigating or a reason for granting clemency. In one of our Ohio cases, a juror saw information about the client's horrendous upbringing online following his clemency hearing. He had not been interviewed by the attorneys previously. He reached out to the Governor through an email stating that this information would have made a difference and he would not have recommended a death sentence had it been presented to him at the time of the trial. The Governor subsequently granted a reprieve and asked the Ohio Parole Board to reopen the hearing to hear from the juror. Following a second hearing, the Governor granted Raymond Tibbetts a commutation to a life sentence. https://www.bbc.com/news/world-us-canada-44908026. If the clemency team had been unable to investigate and present this information during the clemency hearing, this juror would never have known of it, and clemency almost certainly would not have been granted.

31)    The team must also attempt to interview the surviving victims of the offense. This may be done by someone outside the team or it may be done by one of the team members. Generally, the team attempts to find some connection to the victims, such as a spiritual advisor or religious figure that is willing to set up a meeting. Some victims are very interested in meeting with representatives of the client, while others want nothing to do with the process. If a meeting is set up, it is imperative that such a meeting be face-to-face. As supervisor of the CHU, I would require my teams to reach out to a victim through an intermediary in order to be respectful of their feelings. I know of cases where the surviving victims did not want a client executed and were willing to become witnesses for the client in the clemency hearing. *See, In Re: Jeffrey D. Hill* accessible at: ttps://drc.ohio.gov/Portals/0/Clemency/Clemency_JeffreyHill.pdf?ver=2016-11-04-085157-033. Victim outreach is another type of outreach that is essential to clemency work and preparation and that absolutely cannot and should not be done over the phone or in any other way than face-to-face. Doing it any other way is much more likely to be upsetting and offensive to the victim.

32)   A clemency campaign requires extraordinary teamwork. Preparing for the actual hearing or meeting with the decision maker involves many months of work from all of the team members, including the lawyers, the mitigation investigator, the fact investigator and the paralegal. Additional team members may include experts or a person trained in Defense Initiated Victim Outreach. There are times when the team needs to meet, brainstorm, delegate tasks and review what they have learned. In-person team meetings are the most effective and help to manage the stress and anxiety of the team members whose client is nearing execution. There are so many different things that have to be happening all at the same time, it is critical to keep up and to make sure all team members are fulfilling their assigned tasks. It is also critical that the client's concerns are being shared so everyone on the team knows what to expect when they talk with the client.

### Worldwide Pandemic

33)   The United States is currently in the midst of the worst global public health crisis in over 100 years. The United States Secretary of Health and Human Services declared COVID-19 a public health emergency on January 31, 2020.[5] On March 13, 2020, the President of the United States declared a National Emergency.[6]

34)   Scientists at The Center for Infectious Disease Research and Policy at the University of Minnesota report that "we must be prepared for at least another 18-24 months of significant COVID-19 activity."[7] Dr. Zeke Emanuel, a special advisor to the director general of the World Health Organization (WHO) has also confirmed what the majority of epidemiologists warn: we cannot anticipate a return to normal for at least 18 months, "The kind of normal where we go traveling, we go to restaurants, we go to concerts, we go to religious services, we go on cruises, until we have a vaccine that protects everyone, that's 18 months. It's not going to be sooner."[8]

---

[5] *See* U.S. Dept. of Health and Human Serv., Determination that a Public Health Emergency Exists, Jan. 31, 2020.

[6] *See* Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, WHITEHOUSE.GOV, available at: https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/?utm_source=link.

[7] *See* This Is the Future of the Pandemic, N.Y. TIMES, May 8, 2020, available at: https://www.nytimes.com/2020/05/08/health/coronavirus-pandemic-curve-scenarios.html.

[8] Meg Cunningham, *Federal Government Need 18-Month Plan for Life to Return to Normal: Dr. Zeke Emanuel*, ABC NEWS, April 8, 2020, https://abcnews.go.com/Politics/federal-government-18-month-plan-life-return-normal/story?id=70046439.

35) The measures taken to respond to the pandemic and to slow its course are completely antithetical to competently preparing for a clemency proceeding. Social distancing, working from home, wearing masks, interacting with anyone other than members of your immediate household only by phone or Zoom completely defeats the purpose of careful preparation for a clemency campaign. The inability to meet with your client on a regular and increasing basis as you near the clemency date, the inability to meet with witnesses, including experts, and the inability to have in-person team meetings frustrates the purpose of the clemency process because it decreases the likelihood that the team will be able to assemble the most important information to the decision maker for review. Even if a team started early in the case developing the theme of the clemency proceeding, much of the actual work cannot be done until the last several months before the hearing.

36) Perhaps the most important problem caused by the pandemic is the inability to meet regularly and on an increasing basis with your client. As noted above, a rapport must be maintained with the client to ensure his mental health leading up to the execution and to coordinate the clemency efforts. This requires frequent in person one-on-one visits. Phone calls are not sufficient to build this rapport. Moreover, prison phone calls are often limited in time and not the best quality. Little sensitive information, if any, will be divulged over the phone while talking with your client—even though sensitive information is often key to the case for clemency. Emails are not confidential and are impersonal. Team members must meet with the client.

37) Even when the prison allows in-person visits, individual team members may not be able to go to the prisons due to their own health situations. If an attorney or other team member is suddenly unable to visit with the client, particularly if this attorney has a longstanding relationship with the client, the ability of the entire team to carry out its essential functions is greatly compromised.

38) The same problem exists with witnesses – family members, teachers, coaches, employers, former attorneys, jurors, spiritual advisors, etc. These people may be reluctant to talk over the phone and reluctant to get involved without team members spending significant time building a rapport with these individuals. This is particularly important with family members. Even if these individuals are located in a place where numbers of infections are not soaring, opening the door to a masked stranger is unlikely. Additionally, many of our clients come from more vulnerable populations, and their family

Wright Declaration                        13

members are likely to come from those same vulnerable populations and being even less willing to open the door to a stranger. The idea of meeting in an open space with sufficient social distancing also presents problems. Although this approach might work with someone the team has been working with on an ongoing basis, those individuals that have not yet been contacted are unlikely to agree to meet a masked stranger in the middle of a pandemic. Given the number of infected prisoners in prisons throughout the country, experts of any sort may be reluctant to meet with our clients at this time.

39)     In addition, many federal defender offices and other legal societies have imposed quarantines following any out-of-state travel by team members. Following a prison visit, an attorney or investigator may be unable to go into his or her office and access resources that may be unavailable at home.  All "work arounds" require time and effort that would be better spent investigating or preparing the actual clemency presentation.

40)     Finally, the inability to have in-person team meetings, which are crucial to adequate representation, is frustrated during the pandemic. Many of the Federal Public Defenders have discouraged or banned employees from working in the office and required all persons to telework. There is no end in sight in certain areas and no real end until a vaccine is developed. As noted above, these in-person meetings are critical to the preparation of clemency. Teams need to brainstorm and manage client's, family members' and witnesses' expectations. Tasks need to be delegated and followed up on. The client's increasing anxiety needs to be addressed. Teams need to process their own anxiety. All of this is frustrated by the inability to gather together in person and will significantly undermine any case for clemency being made during this time.

_____

Carol A. Wright

Wright Declaration                              14