IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION


UNITED STATES OF AMERICA,        )
          Plaintiff,             )   Indictment
                                 )   No. 2:02-CR-038-RWS
-vs-                             )
                                 )   and
WILLIAM EMMETT LECROY, JR.,      )
          Defendant.             )   No. 2:08-CV-083-RWS



Transcript of the Proceedings
Before the Honorable Richard W. Story,
United States District Court Senior Judge
September 2, 2020
Gainesville, Georgia



APPEARANCES OF COUNSEL:

On behalf of
the Government:          Scott Meisler,
                         Carolyn Cain Burch,
                         Assistant United States Attorneys


On behalf of
the Defendant:           John Richard Martin, Esq.
                         Sandra Louise Michaels, Esq.
                         Stephen Allen Ferrell, Esq.



Reported stenographically by:
Amanda Lohnaas, Official Court Reporter
United States District Court
Atlanta, Georgia
(404) 215-1546

(Wednesday, September 2, 2020, 2:30 p.m.; Gainesville, Georgia; attorneys appearing via Zoom.)

THE COURT:  Be seated.

THE COURTROOM DEPUTY:  The court now calls for a motion hearing in Criminal Action 2:02-CR-38, United States of America versus William Emmett LeCroy.

Counsel, please state your name for the record.

THE COURT:  Counsel, if you will just announce your appearances.

MR. MARTIN:  Jack Martin on behalf of Mr. LeCroy.

MS. MICHAELS:  Sandra Michaels on behalf of Mr. LeCroy.

MR. FERRELL:  And Stephen Ferrell on behalf of Mr. LeCroy.  Good afternoon.

THE COURT:  Mr. Meisler, you are muted.  I think you are muted.

MR. MEISLER:  You are correct, Your Honor, I apologize. This is Scott Meisler from the DOJ Criminal Division for the government.  Also on the Zoom is Tippi Burch from the U.S. Attorney's Office in Atlanta and two of our colleagues, who are muted, I believe.

THE COURT:  Very well.  Good afternoon.

MR. MEISLER:  Good afternoon.

THE COURT:  Thank you all for being available so that we could give this matter expedited consideration.

I have received and reviewed the submissions that have

been made already, which puts us in a posture that actually I think lends itself to proceeding at this time by letting me hear from the defendants as the movants here now that you have seen a response from the government to your position.

So let me hear from the defendants and then I'll give the government a chance to respond to that.

MR. MARTIN:  Thank you, Your Honor.

I'm going to begin with maybe some more personal remarks about what it's like to appear with, be present in an execution and the last days before someone is executed.

Mr. Ferrell, who has been very helpful to us in recent days since he was appointed, with legal issues, he will address some of the legal issues involved.

Just a little bit of a background.  As you well know, I was appointed, along with Ms. Michaels, back 13 years ago and I think in part because both of us have had experience in federal death penalty cases and experience in state death penalty cases and we represented Mr. LeCroy ever since that day.

Approximately five years ago the Supreme Court denied our petition for certiorari, which made this case -- there weren't any more legal issues or legal proceedings to go forward with and all was left was for the state -- excuse me, for the government to set an execution date and go forward with whatever they wanted to do.

Unfortunately, five years has passed, and now in the midst of a pandemic and on the eve of an election, the government has decided it's best to go forward now with an execution.  This creates for me personally a very serious problem.

The government has said that this is an extraordinary motion, and it is, and it's an extraordinary situation.  I've never -- I've been involved in many death penalty cases over the years, never had a situation where an execution was scheduled right in the middle of a pandemic so that counsel would be unable, for health reasons, to be present during that execution or to be able to consult with and comfort the client in the days leading up to the execution.

We have done -- we have been scrambling since this date was set approximately a month ago.  We had a deadline for a commutation petition, which we filed within that deadline last week.  We had filed a commutation petition years ago in the waning days of the Obama Administration, thinking that President Obama might take some interest in it, but unfortunately he did not.  He took an interest in another case but not in ours.  And so we had to withdraw that petition because you only have one petition allowed under the regulations.  So we had to file a petition again once an execution date was set; we did that last week.

But with regard to this situation, we were scrambling to

do research and prepare for this.  And, as I said before, the motion being filed with the court is extraordinary, we're asking the court to, we believe the court has the power to do it, it is an extraordinary motion in asking, and I don't think is unprecedented in one sense, while other people may have tried, but not in the sense that we had to not stay the execution, not prohibit the execution, but to reset it to a date in which I could be present to comfort my client, and to be present during his execution.

Your Honor, when you appointed me to represent, me and Sandy, Sandra -- Ms. Michaels, excuse me -- represent Mr. LeCroy years ago I know you expected us to do our best. We've known you; you knew us.  You knew we would do everything that we thought was legally and ethically possible to try to help Mr. LeCroy, and we did that.

Over the years both of us have developed a very close relationship with Mr. LeCroy.  I know you saw us in court through a number of days in court struggling over issues of mental health and Mr. LeCroy came to know us and trust us. That is important.

One of the things about death penalty cases, it's important in any case, what's important about death penalty case is that you not only help the defendant with all of his legal issues, but that you develop a close relationship with him so that he can help you and so that you can help him.

Mr. LeCroy was specifically asked who he wanted to be present during his execution.  That was a procedure that the Bureau of Prisons has.  And he put my name down.

We have talked to him by telephone since that date and he again reaffirmed, Mr. Martin, or Jack, I want you there, please be there.  And he has expressed that several times to us.

So I have the situation where I think I have a legal and ethical obligation to be present at his execution or to be there present during the days leading up to his execution, which is impossible because of the extraordinary situation we're facing with the pandemic.

I submitted a brief letter from my doctor which is attached to the motion, and as explained in there, I contacted -- contracted a type of leukemia which was first diagnosed probably ten years ago.  The ironic part about it is they believe it was probably because I was exposed to the defoliant Agent Orange while I was in Vietnam.

Fortunately, that condition is manageable.  I've had chemo and now I'm on medication and I'm fully healthy to do whatever I need to do legally and otherwise, except I've got to be very careful about exposing myself to some sort of -- to expose myself, let's be specific, to the virus that's now spreading around the country.

Not only I'm 74, just turned 74 last week, but I have

this condition which makes me susceptible to that virus, and not only susceptible to it but susceptible to having very unfortunate consequences if I contract the disease.

So that puts us in an awkward situation.  Here Mr. LeCroy wants me to be present at his execution.  Due to circumstances, extraordinary circumstances dealing with my health, which is otherwise manageable, I can't go.  I can't travel, I can't enter the prison, I will be exposed.

You know, I'm sure the prison will try to do everything they can to prevent exposure.  But I've been through one execution before and I know, and I've talked to other people who have been involved in other executions recently, federal executions, and, you know, what happens is you go into the facility, you're put in a holding room, there will be other people there, they will probably be wearing masks, who knows, who knows who's been in that room before.

You're then put into a van with others to go to the execution chamber.  In a van, closed in, and you're driven there and then you're in a crowded room during the execution procedure with others.  And there's just no way they can guarantee my safety.

Plus, in addition, there's no guarantee for my safety traveling to Terre Haute.

So we say a solution to this problem, we have a client desperately wanting me to be present, I have an ethical duty

to be present as part of my appointment by you, Your Honor, and I can't do it because of the pandemic, which we believe will end sometime later this year or the first part of next year.

And we waited five years for this execution since the Supreme Court denied certiorari and why are we going to rush it now in this situation where I can't do what I need to do.

Judge, you know, the legal reasons for me being present are obvious. It's normal in a death execution for counsel to be present. Georgia statute, which is -- the federal statute says you should follow the procedures of the state statute. The Georgia statute specifically provides it. The federal regulations provide it.

Mr. LeCroy was asked what lawyer did he want present. The normal situation would be that the lawyer would be present and also available to him in the hours leading up to the execution. And but because of the pandemic, can't do that. But we can do it after the pandemic has subsided, after we get a vaccine, whatever other procedures are necessary to make, to ensure the safety.

You know, I don't know if you've ever, Judge, ever attended an execution in your career but I attended one once before. I represented Carl Isaacs, who you probably know from the Albany murder, represented him on his post-conviction proceedings, and all was lost and an

execution was going forward.

I talked to other lawyers about that.  There was this dispute among death penalty lawyers.  Some said don't go, it will just traumatize you so you won't be able to do this work again.  But others said, no, it's your duty to be present, there are reasons for you to be present, that is the last proceeding in his case.

So I mulled it over and thought about it, and I'd known Carl for a long time and had developed a relationship with him, despite his terrible crimes, and I opted to go.  And I'm so glad that I did go because not only was I able to talk with him right before the execution to assure him that we had done everything possible to avoid this, to listen to his comments about it, for him to tell me things he wanted me to tell other people about his regrets, just things he wanted me to tell other people, that he was okay, that he was strong, he was going to be okay.  That was a comfort to him.

You know, I attended a funeral years ago for Ed Garland's father.  And Ed said something I've always held close.  He said somebody asked him what does a criminal defense lawyer do.  A criminal defense lawyer provides strength to his client.

So what you do in this situation is you are there to give him the strength, go through with an awful, awful situation, he's going to be killed by the state or the

government and you're there to offer him some strength, get through that, to comfort him, and even to have some gallows humor about it.  Sometimes that's helpful just to get through that terrible situation.

Can you imagine sitting in a room, knowing you're about to be killed a few hours later?  It's terrible.

And then to be present during the execution.  As I said before, I was loaded into a van with others.  It's amazing to me who, all sides that go to this execution, there were politicians, police officers, victim's family.  There was a room full of people and I was the only friendly face in the audience.

And I had told Carl beforehand, Carl, look out for me, look for me in the room if you can, make sure I'm there, and I'm there to comfort you.

And I remember him tied up to a gurney.  What they do, at least they do in Georgia, I don't know what they do with the feds, they turn the gurney towards you so the defendant can look out in the crowd, and I was the only friendly face for him.

And he looked at me, he recognized me, and I could see him recognizing me even though he was strapped to this gurney.  And I did like this, be strong, and he'd shake his head.

That's important, somebody to be there in that moment.

Excuse me, Your Honor.

So when you appointed me and Sandy years ago I knew you expected us to do everything we could for him and I knew you expected us to provide him the strength that he needed to get through this process.

And I think it's important -- you know, the government says, well, Mr. Ferrell can do that.  Mr. Ferrell's a great lawyer, very bright lawyer, very sympathetic lawyer, but he's not somebody who's been with him for 13 years, Mr. LeCroy.  He's never seen his face, doesn't know, he doesn't know, you know, doesn't have that history.

You know, one of the things your job is to do at this time is to gauge the competency of the client, to see whether or not he has deteriorated.  As you know from the hearing, Mr. LeCroy has a history of psychotic episodes.  And if he's in a psychotic episode, that needs to be reported.  And, you know, maybe stress will bring that upon him, who knows.  But you need somebody who has a baseline with him for a number of years, somebody who's seen him all those years and knows what's normal and what isn't normal for him.  That is one thing you do in this situation.

You also are there to ensure that during the execution it gets handled properly.  For instance, where people don't respond well to the drugs, they're gasping for air and you've got to be there to recognize that, to witness it, and to, if

you can, to do something about it, to raise an emergency motion or at least be a witness to what happened.

Those are all critical moments for reasons why it is normal, it is normal for the lawyer to be there.

And in this extraordinary situation the state is asking for something that is not normal because I can't be there because of my health and Sandy can't be there because she's my wife and we live together.

You know, this is not, as the state -- as the government seems to try to characterize it, as a last minute maneuver. This is a serious motion raising an extraordinary issue where the one lawyer who's been with him for a number of years, who knows him, who can comfort him in this time of day, that terrible hour, you know, it's not unlike a family member being present during a family member dying in the hospital. Somebody needs to be present during those last moments. Somebody who can comfort him, somebody who can give him the strength to go forward, somebody who can assure him we've done everything we can, somebody who he trusts and knows, that's seen me operate in court, seen me try hard for him in court, seen me present his case as effectively as I can, all those reasons he can trust me.

And this government is saying, okay, I know that's normal but we're not going to allow it this time because, well, it's a pandemic and Mr. Martin may be sick, I'm sorry

about that, we need to go forward.

What's the rush?  They can put this off.  There's other people on death row.  They don't need to be rushing this forward at this time.  You know, they could have done it years ago but they didn't and now it has come to pass that they are going to try to execute a man without his lead lawyer, his longtime lawyer being present.

You know, this is not a trick motion.  This is a serious motion.  When you appointed us years ago I know you expected us to do everything we could, everything we're ethically required to do, and everything a good lawyer would do to represent Mr. LeCroy.

Now because of the epidemic and my unfortunate health situation that's impossible.  We believe that the law gives the court the power, and Mr. Ferrell will deal with this, to do something about that, to say I'm going to make my appointment order meaningful, my appointment order asks Mr. Martin to do this all the way to the end and Mr. Martin should be able to do it all the way to the end and I have the power to make sure that happens.

And so I urgently ask the court to consider that request very personally and very professionally, of course.  But for me it's very important and it would be awful for me to know that he goes to an execution without my being present to help him get through that, to give him the strength to do it, to

be that friendly face, someone to give him:  It's okay, you can do it.

Everybody else in that room are all, the warden reading the execution, the nurses, everybody else, they're just unfriendly bureaucratic faces and that's pretty much all the audience too, and no one should be put through that.

So I urgently ask the court to consider this.  I'll turn it over to Mr. Ferrell, unless you have some questions of me, and he can address some of the legal issues.

THE COURT:  Mr. Ferrell, I'll hear from you.

MR. FERRELL:  Thank you, Your Honor.  Thank you for giving us the opportunity to present our arguments to you and especially Mr. Martin's compelling reasons for why he wants to be and should be at the execution.

I won't go over that again but I want to make sure that the court is aware that it has the power to do exactly what we're asking, and what we're asking is for neither an injunction nor a stay.

By this motion we have not challenged the Executive Branch's ability to set an execution date.  They've cited to authority that upheld that and we could have challenged that, but really we recognize that they set this date, but that this court also has authority.

And one of the things they say in their motion is this court and the Executive Branch have concurrent authority.

And while both have the authority, I'm not sure if concurrent, which implies equal basis, is exactly accurate because everything giving this -- giving them the authority to set a date is preceded by the clause "except to the extent a court orders otherwise."

Thus, while both parties may have authority, this court's authority is superior to the government's.  The government is subjugated to this court's authority to set a date.  Even if they both have that authority, this court's authority is superior.

And I think that's as it should be because this court is not a party in this action but rather an impartial arbiter who can judge the nature of Mr. Martin's situation, of our request of the fact that these years have gone by with no date and that suddenly we get 50-some days' notice in the middle of a pandemic and the court is in the best position to weigh those factors out.  And that's why I think it's only right that the court has superior authority to set a different date than the one asked for or the one set by the Executive Branch.

This court must oversee all judicial proceedings having to do with setting a date and has the position to enforce all of its orders, one of which was 13 years ago appointing Mr. Martin and Ms. Michaels to take this case, as Mr. Martin said, all the way to the end.

Secondly, even though the case law cited by the government -- even through the case law cited by the government, I think it's obvious that what we're asking for is neither an injunction or a stay.  In the *Nken* case, I'm not sure how you pronounce that, but from the Supreme Court where Chief Justice Roberts gives a very concise definition of what's an injunction and what's a stay, Justice Roberts points out that an injunction is basically a court telling a party to do something or not to do something.

And while courts always do that and not everything's an injunction, what we're talking about here is an injunction would be either execute or don't execute.

We're not asking for either of those.  We are, consistent with this court's authority, merely asking that the court set a date, and considering all of the circumstances, including Mr. Martin's health situation and the compelling need of having lead counsel present for all the reasons Mr. Martin said, that that would be -- it's not saying don't execute; it's saying execute in April once, given all the information available to the court, we think it seems very likely that a vaccine will be available by then.

So it's not saying don't execute, it's not saying execute; it's saying I'm setting the date.  That's why it is not an injunction.

And this is consistent with the *Schiavo* case from the

Eleventh Circuit that was cited by the government in which there they were seeking to preserve the status quo.

The purpose of this motion is not to preserve the status quo so that, you know, once a ruling is achieved or handed down that things haven't been altered in a way they can't be put back.

What we're asking for is merely to do it at a date that is reasonable under all of the circumstances.  So it is not -- it's very different from the *Schiavo* case.

Also, this, what we're asking for, is not a stay.  As Chief Justice Roberts points out, a stay is an operation kind of staying judicial proceedings.  Generally where the court has ordered something, such as an execution, and there's another procedure to determine whether that court was right or wrong within its discretion (indiscernible).  A stay stops that judicial proceeding.

We're not asking that this judicial proceeding be stopped, we're not asking that some other (indiscernible) appropriate through this proceeding, at least; we're asking that this court merely put it at a date so that its other orders, particularly the important order appointing counsel, be given its full effect.

And looking at balancing the other interests, saying that it has been indeed five years that all (indiscernible) litigation, at least in this case and what difference is a

few months.  The government may well have a compelling interest in carrying out their execution, but in this court's ability to balance all of the factors, not going to be that much less compelling if it happens in April, or their interest is not that much more hurt if this happens in April.

In a lot of ways I think that what we're asking for, like when the court has discretion -- and that's important to also mention, we are not saying this court has absolute unfettered discretion, as they say in their answer.  This court is exercising its discretion but it's got to be within the bounds of reason and (indiscernible) compelling differing interests and balancing those interests because that's why this court is the impartial arbiter, it has the ability to exercise that discretion.

What I was going to say a second ago is I would compare what we're asking for as almost like an order to reset a trial date.  If counsel -- if a date has been set and the court even presses that it's very important to start on a date certain, if counsel comes forward and says -- and that can be counsel for the government or counsel for the defendant -- comes forward and says here are compelling reasons, Your Honor, why this date ought to be changed, that's neither a stay nor an injunction.  It's merely, I think, the event happening going forward, merely changing the date because of the various reasons within a court's

discretion it has to move something like a trial date.

And again this is why I think the C.F.R.s give superior authority to a court, because the court can exercise its discretion and balance those interests and can take them into account and do what it thinks is right, what Your Honor thinks is correct.

And finally, as Mr. Martin points out, there are many facts that make this situation extraordinary, and the fact that we're doing this here by computer I think illustrates it eloquently. And the fact that Your Honor is wearing a mask and all of these things show that we are in a very unique time that none of us would have anticipated six months to a year ago.

And that all of the evidence that we have heard from the government, from the medical expert, is that a vaccine will be available, maybe by the end of this year, if not, early next year. And certainly we, Mr. Martin, Ms. Michaels, will prevail ourselves of our first opportunity to obtain those vaccines so that we can carry out our job. So that is at least our extraordinary time.

One thing I do want to point out, that Mr. Martin said that I had never met Mr. LeCroy. That is incorrect, I have gone to see him. Beginning of the representation I saw him twice, so I just want to make sure that that's clear.

Finally, in conclusion, the deliberate taking of a human

life, as eloquently explained by Mr. Martin, is an extraordinary moment and the government is exercising awesome power when it does that.  But the inmate's statutory right to counsel that is afforded by this court's order is part of that awesome moment.  It's what ensures that the defendant's rights are protected.  It's what ensures the dignity of the process, which the courts have said many times is extremely important in capital punishment.  And it's part of the protections and procedures that make that awesome event something that's not torture or uncivilized.

And I think that Your Honor has the ability to grant the relief we're requesting, to move the execution date.

And if you have any questions I'd be happy to answer them, otherwise I ask you to grant our motion.

THE COURT:  I may have some questions for you but let me first hear from the government.

Mr. Meisler, I'll hear from you at this time.

MR. MEISLER:  Thank you, Your Honor.  Good afternoon. Can you hear me?

THE COURT:  I can, yes.

MR. MEISLER:  Excellent.

May it please the court, my name is Scott Meisler, I'm with the Department of Justice Criminal Division in Washington.

We acknowledge in our response, Your Honor, and we

reiterate today, that the travel limitations that Mr. Martin is suffering are very unfortunate.

But at this juncture those limitations on his ability to meet with Mr. LeCroy in person have not prevented defense counsel from submitting an application which is being processed right now by the Office of Pardon Attorney in Washington.  And we submit Mr. LeCroy has not otherwise established any legal basis for this court to reset or modify the existing execution date, which he concedes was lawfully set, until some unknown date in 2021 or afterwards, when the pandemic is sufficiently under control to allow Mr. Martin's health concerns to be addressed.

Unless the court has opening questions for the government I'll try to organize my remarks essentially as we structured our response to the court, so I'll first explain why we don't think the court has authority to postpone the execution unless Mr. LeCroy meets the standard for an injunction or a stay of execution, and also try to explain why neither of the two sources that are cited by Mr. LeCroy in his motion or mentioned by Mr. Ferrell today, the DOJ regulation and the All Writs Act, confer such authority on the court.

But critically I want to make clear that we don't think the court needs to decide definitively the question of whether it has this authority as an abstract matter.

Like the two other district court decisions we've cited in our brief, *Lee* case from Arkansas and the *Honken* case from Iowa, we think the court can assume it has the authority to reset the date but it can decline to exercise that authority as a discretionary matter.

The court can follow that course, in our view, because Mr. LeCroy has not shown a denial of his access to counsel or access to the courts which would justify extraordinary relief that really does come at the last minute, it would be coming less than three weeks before the execution date and more than a month after Mr. LeCroy was notified of that date by the Bureau of Prisons.

As I mentioned, his counsel have already submitted a clemency petition.  They requested an oral hearing on that petition.  He has access to his lawyers, even if it's less than ideal access:  by telephone, video conferencing.  And the lawyer appointed by this court more than 18 months ago, Mr. Ferrell, who has met with him twice, would be able to witness the execution in person and remain in contact with lead counsel, with Mr. Martin and Ms. Michaels, if needed. If something did go wrong, you would need multiple attorneys anyway, one at the prison site and one to make any kind of contact or submission to a court outside.

We believe Mr. Ferrell is perfectly capable of fulfilling that role even if it is not the preference of

Mr. LeCroy at this time.

So, Your Honor, I'll turn to the initial point, and I think we respectfully disagree with Mr. Ferrell that the defendant, the prisoner here is not seeking an injunction.

The way that Mr. Ferrell described the relief that he is seeking from the court makes it clear that he is asking the court to do exactly what Chief Justice Roberts described in the *Nken* decision.  He's asking the court to tell the Executive Branch what to do or not to do, not to do the execution on September 22nd, which is what it's currently scheduled for, but instead to do it at a date set by this court in the spring of 2021.

That, to our mind, sounds like it's asking for an injunction.  And even if not in name, in effect.

Likewise, to the extent that the definition of a stay in *Nken* is described as temporarily rendering inoperative an order, it's not just a court order.  In the regular stay of execution contacts Eleventh Circuit has addressed numerous times, mostly from state cases, to be candid, but if you have an execution warrant or a death warrant signed by the Executive Branch of a state, a governor, for example, and a court halts the execution, it is rendering that executive order from a state executive official temporarily inoperative while court proceedings play out.  And that in effect is, I think, what Mr. LeCroy is also seeking from this court.

The distinction between stay and injunction isn't always clear, as *Nken* recognizes, and in some cases they can kind of overlap conceptually.  But however you phrase it, we do think that Mr. LeCroy is seeking a kind of equitable relief that is subject to the traditional four-factor test that the Eleventh Circuit and the Supreme Court have applied in these kind of scenarios that require both likelihood of success on the merits, irreparable harm to the party seeking relief, and, of course, the balancing of interests at the third and fourth step of that test.

So we do think that this is a request for an injunction or for a stay and that Mr. LeCroy has not attempted to meet that standard because he's disclaimed any attempt to obtain those kind of remedies from the court.

THE COURT:  Let me ask you a question, and I hate to interrupt but while we're at this point and it's fresh and that's what you're talking about, it may be helpful to address it now.

And I appreciate what you're saying about it being a stay or an injunction, but it seems to me that in those instances there's typically some other piece to the process that's not present here.  It's stayed so that this appeal can be completed or it's enjoined to allow these tests to be run or something like that, whereas this feels more like, I think the suggestion was perhaps made by Mr. Ferrell, of almost

like a continuance, not that this not occur, not that this process be set aside in any way, but rather that it not occur on this date but on a later date because of some circumstances.

We'll talk in a moment about what, even assuming that were the case, what is the burden that should be borne to cause such a continuance to occur and that's a separate issue.

But what is your response to this being in those ways perhaps somewhat different because it doesn't take off the table the fact that the execution is to proceed with no further action from any entity, no court will have to act, nothing has to happen other than let's assume the court directed that the Justice Department or the Bureau of Prisons would set the new date. So that a new date would be set but that would be it, there would be no adversarial or judicial proceeding. What are your thoughts on that?

MR. MEISLER: I guess two things, Your Honor. One is I still think that's halting a date that exists right now and I think Mr. Ferrell conceded was lawful, the Executive Branch and the Bureau of Prisons in particular has the lawful legal authority to set the date. So it is still setting aside an otherwise lawful date, which feels to me like, in the posture of this case, like an injunction.

I agree with Your Honor that it is different and it is

different in just the way you described.  But I actually think that makes the defense request here more extraordinary and more difficult to justify because usually in those cases the court can evaluate a defendant's likelihood of success on the merits of the other proceedings Your Honor mentioned: likelihood of succeeding on appeal, likelihood of succeeding on a separate civil lawsuit challenging, for example, method of execution as unconstitutional.

Here Mr. LeCroy is not doing any of those things and so if it's very, very hard for a defendant, which it is, to get a stay or an injunction, even when he has a separate lawsuit lodging in good faith a challenge to other aspects of his execution, we think it should be even harder when he's not asking for that, when he's simply saying, Court, in your discretion please just set this for reasons that I believe in good faith Mr. Martin is advancing, reasons that concern the humaneness of the execution process or a keenly felt belief on his part that he's not fully realizing his duties to the court or to his client.

But still we think those are an even weaker position for a defendant to be in than someone who has a separate legal case pending.  And again, even in those circumstances courts are extremely demanding in what they would not or would do.

And, indeed, Your Honor, and we put this in our brief as well, but we think it's why the Bureau of Prisons regulation,

which we will now address, really can't be read to just give the court to recognize any kind of unfettered or even very broad judicial authority to just reset execution dates because in those instances I think a defendant would just come to the court and repackage things, right, would say, Your Honor, I'm not asking to permanently halt this or even take it off the books, you can put a date down the road, but I kind of feel like I want some more time to maybe investigate possible further, second or third round of habeas proceedings, don't stay things, don't enjoin the Bureau of Prisons, just give me a little bit more time (indiscernible). You do that, Your Honor --

THE COURT:  I lost you.

MR. MEISLER:  (Indiscernible).

THE COURT:  I lost you at the end of what you just said, you faded out on me.  Just right at the end of what you were saying.

MR. MEISLER:  I apologize.  I was trying to say, Your Honor, I think that if defendants could obtain even delays of their execution for a time certain, four, five, six months, without having to meet the stay or injunction standards, they would often be coming to judges just like yourself, sentencing judges who imposed the capital punishment and asking them just to exercise discretion, just to push it off a bit further because they want to investigate further

potential clemency applications, extraordinary relief via habeas corpus or other statutory mechanisms.

So I think it would really eviscerate and allow defendants to circumvent the standards that the Supreme Court and the Eleventh Circuit have announced for stays of executions or injunctions that the defendants could repackage, so it's a very similar request as an exercise of the court's discretion.

THE COURT:  Let me ask you this.  Would a better analogy, perhaps, be something that a defendant couldn't control?  An example might be let's say that on September 22nd, Indiana was placed under a significant tornado warning and there was concern, people were told to shelter in, don't anyone leave your home, or whatever, there's a likelihood of a tornado, tornados have actually touched down, there's a warning.  Who would have the authority then, if anyone, to say we're going to continue this, we're going to put it off because it's not safe right now to do it?

MR. MEISLER:  Right.  You know, I don't know the answer to that question, Your Honor, in the sense that I'm not sure if that would be something that should be brought to the attention of the sentencing court back in Georgia or if that would be something that would be brought to a habeas court in Indiana.

We've put a footnote in our brief mentioning to Your

Honor that in some ways the challenge here does seem like it's the kind of challenge, the implementation of a sentence is often brought under habeas corpus law under Section 2241 in the district of confinement. And so I'm not sure, Your Honor, if it would go to you as the sentencing judge or to the habeas court there.

But if that kind of scenario troubles Your Honor, that would be all the more reason to take the second path that I mentioned and follow the lead of the courts in *Lee* and *Honken* and assume the authority exists outside of habeas, outside of the stay or injunction factors, but to decline to exercise your discretion.

I'll turn to that if I can in just a moment but before I do I just want to say a couple words briefly in response to Mr. Ferrell on the Bureau of Prisons Regulation 26.3 and as well the All Writs Act that he mentioned.

And so the "extent to the otherwise," the proviso in the Bureau of Prisons regulations, we do not read that as acknowledging -- certainly it would not be a provision that affirmatively confers on the court any authority because it's just a regulation issued by the attorney general to govern the affairs of the Executive Branch. It's not purporting to confer on the court any authority like a congressional statute would, the Executive Branch regulation. We don't think that when it says "except to the extent"

(indiscernible).

THE COURT:  Your words ran together.  Talk a little slower.

MR. MEISLER:  Sure, sure.  I apologize.  And if you're having trouble hearing me, Your Honor, I do have headphones I can try but those have their own issues as well.

Sorry, I was just saying that we don't think that the Bureau of Prisons regulation, which is 28 C.F.R. 26.3, we don't think it does either of two things.

First of all, it's an Executive Branch regulation that governs the affairs of the Executive Branch so it doesn't purport to affirmatively confer authority upon the court.  But we also don't understand it as recognizing any kind of preexisting judicial authority to intervene at any time in any way when it concerns the implementation of the capital sentence.

Instead, we think it really reaffirms the concurrent authority of the court and the -- the court and the executive to set an execution date in the first instance.

But -- and this is I think an important point to distinguish the trial continuance analogy that Mr. Ferrell made earlier -- obviously in the trial continuance scenario, the court has a pending proceeding before it.  The court is supervising its own affairs and the affairs of the parties.

This is quite different.  We think that both the statute

3596 and the regulations and, in fact, the judgment of this court on the docket in this case contemplate a two-step process in capital cases, where while the appeals are exhausted the defendant's first step is committed to the custody of the attorney general, and the second step is when the attorney general eventually is going to turn over, is going to plan the execution and turn over the defendant to the U.S. marshals and the warden for the implementation of the sentence.  That's in the statute in 3596, in the court's judgment, and in the regulations.

And so unlike just a continuance scenario in a court, we think that where things stand right now, we're well into step two.  The appeals have been exhausted, defendant was committed to the attorney general, the attorney general has now started step two by setting an execution date and preparing, making preparations eventually to hand Mr. LeCroy to the marshals to complete the process.

To my mind, Your Honor, it's much more akin to a situation where a court is being asked at year three of a five-year sentence to say that the Bureau of Prisons isn't calculating good time authority credit correctly, is otherwise misapplying or mismanaging the sentence.  The defendant can't just come back to the sentencing court and say, Judge, this is your order, this is your judgment, fix it.

The defendant has to find some other basis, some other statutory authorities to upset an otherwise final order and give the court authority to tell the Bureau of Prisons and the Executive Branch how to go about implementing or carrying out the sentence.

So that's where I think we think we are right here, we're at step two, where custody is -- the defendant has exhausted his appeals, he exhausted his collateral review under Section 2255, and we're now at the phase where we're moving towards completion of the sentence when the attorney general transfers custody to the marshal to complete the capital punishment process.

Now, that's 26.3, Your Honor, I don't think the proviso there, "to the extent the court orders otherwise," is recognizing any kind of broad authority that Mr. Ferrell says.

He also mentioned 28 U.S.C. 1651(a), which is the All Writs Act, and the *Schiavo* case. And we've noted there, Your Honor, that in the context of clemency proceedings, certainly where a defendant, capital defendant has court-appointed counsel appointed under Section 3599(e), courts have recognized and have held that that's not unfettered authority. It doesn't give the court that appointed the lawyer the authority essentially to oversee the clemency process or to give commands to executive officials to be more

cooperative and to facilitate that process.

It is true that those cases are decided in the context of state proceedings so they have an element of federalism baked into them.  We think the same principles, very similar principles still apply even though this is a federal execution, the court doesn't have a power under 3599 itself to oversee the clemency process or to draw that out by rescheduling the execution date.

And if that's so, the All Writs Act, which is really principally by its text designed to aid the court in protecting or exercising jurisdiction conferred by other provisions, it also doesn't give the court that authority. And it is an extraordinary authority that the Supreme Court and the Eleventh Circuit have carefully policed in execution cases and have been, I think, especially vigilant when lower courts attempt to use the All Writs Act to enjoin or delay executions without requiring defendants to satisfy the usual criteria for obtaining a stay or an injunction.

Now, both Mr. Martin and Mr. Ferrell have mentioned the timing in this case and I do want to discuss that briefly, especially as it relates to any decision the court makes, assuming it has authority, in declining to exercise its discretion.

So we don't view this case as a rush.  Yes, the case, cert was denied five years ago by the Supreme Court.  But the

attorney general did not begin to resume federal executions amidst the pandemic.  I think, as the court may know, the attorney general announced the resumption of federal executions in mid 2019 and planned for federal executions to begin later that year.  That was after a careful administrative process that culminated in the administrative records cited by Mr. LeCroy in his motion here.  And executions did not resume at that time because of a preliminary injunction entered by a court in D.C.

The Justice Department took that to the Supreme Court, tried to get the injunction dissolved.  The court declined to do so immediately but it ordered the D.C. circuit to proceed with quote, "appropriate dispatch," and three justices in a separate opinion by Justice Alito that we cited in our brief thought that the government's likely to prevail and that the lower court could actually decide the case within two months.  That was his recommendation.

That didn't happen, Your Honor.  It took a little bit longer than that and by the time the Supreme Court denied certiorari review it was June and the pandemic was upon us.  This was not a planned action, Your Honor, where the Executive Branch decided it was going to move immediately during a pandemic.  It was something that was long in the works and, because of litigation and other proceedings, it couldn't start before the pandemic.

But I think the important point, one important point is the one that both Judge Rudofsky, in the lead litigation that we cited for you, and the judge in Iowa as well recognized, and they both were facing allegations that are quite similar, not directly analogous but quite similar to the ones that Mr. LeCroy has made here concerning access to counsel, difficulties in traveling, and other restrictions that are imposed by the COVID-19 pandemic.

And both those courts said that they were going to defer it to the elected branches of government because Congress has not halted federal executions, the Executive Branch has deemed it important to go forward, and that the kind of delay that defendants like Mr. LeCroy are seeking, while in theory are short, are indefinite because none of us know, unfortunately, just how long the effects of the pandemic will be felt, the availability of vaccines, and how those would interact with medical conditions like those that, unfortunately, Mr. Martin is facing at this time.

So in the face of those three factors those courts have stayed their hand and said that we're not going to intervene, we're not exercise any residual authority that we have here because we're not the branch of government best suited to make those decisions.

And in that regard, Your Honor, I'll point out that while Mr. Martin has made a very poignant case this morning

about the need to be present for his client, I don't think that he's made out any kind of legal violation.  Again, if the court is thinking about exercising its discretion here we think it should be looking at whether Mr. LeCroy has stated any kind of statutory constitutional violation or whether he established a violation of a court order.

And we don't think he's established any of those things.  He's not alleged that there's a right to counsel under the Constitution up to the moment of execution.  And Eleventh Circuit authority, Supreme Court authority make clear that he doesn't have that right.

By statute, I mentioned already 3599 has been construed by the courts as a rather modest funding provision, not one that confers a right to (indiscernible) provision designed to level the playing field for indigent defendants -- excuse me, Your Honor, it's not a provision designed to provide a right, an enforceable right to effective assistance of counsel, or counsel of choice, and that to me is what I think that Mr. Martin's and Mr. LeCroy's complaints boil down to here.

He has excellent, experienced counsel in Mr. Ferrell, who can travel.  He has met with him in person.  And according to the Bureau of Prisons declaration from Warden Watson that we submitted, Your Honor, Mr. Ferrell has been intimately involved with Mr. LeCroy by setting up the ten phone calls since March that the Bureau of Prisons has

reported in the declaration.

So we think Mr. Ferrell has been an active part of this team since the court appointed him in early 2019.  He has met Mr. LeCroy in person.  He's able to be on site.  And as unfortunate as it is that Mr. LeCroy might not have his preferred counsel present with him in the days or weeks or moments leading up to his execution, he does have a very capable, experienced lawyer with whom he has at least a year and a half's worth of a working relationship.

And, of course, Mr. Martin and Ms. Michaels are available by telephone and video conference, as imperfect as those methods may be.  Available as well, I would think, to be part of a legal team that was involved in any last minute litigation should any arise because of things that happen at the prison.

So while we are very sympathetic to the concerns that Mr. Martin has raised, we don't think that they've established any kind of legal constitutional violation.  We don't think they've established a statutory violation.  We don't think this court's rather generic, I think, orders under 3599 appointing Mr. Martin provide any kind of specificity that he has to be there in a certain capacity in person up to the very last minute.

And the last two sources of law that I think have been mentioned in the briefs and the hearing today are the Bureau

of Prisons Regulation at 28 C.F.R. 26.4 and the Georgia statute, so I'll mention those, I'll address those briefly if I can.

26.4, we do not believe confers an enforceable right on Mr. LeCroy or any defendant.  It too has the proviso language, the "except to the extent a court orders otherwise," but what it does, though, is that it is placing numerical caps on the categories of people that can come, not more than the following number of persons selected by the warden, not more than the following numbers of people selected by the prisoner.

And the Seventh Circuit in *Peterson versus Barr* cited in our response, Your Honor, addressed subparagraph 4, not the paragraph that addresses the attorneys but the one that addresses visitors from the public and the media, and it held, in essence, I think, that the regulation did not confer an enforceable right on Mr. Lee there -- sorry, Mr. Lee's relatives there for purposes of the Administrative Procedure Act.

We think the same logic applies here because the wording is very similar to in subparagraph 3 right above it and again I think it would lead to an anomalous result if it were to be read as Mr. LeCroy reads it, which is to say that it would allow a defendant, who maybe wasn't operating with the same good faith as Mr. Martin is demonstrating here, it would

allow a defendant to pick three adult friends or relatives, allege scheduling conflicts for them and put off an execution.

We don't think that that's the kind of discretion that, or right that the regulation is meant to memorialize in any way, nor do we think that by putting the "except if the court orders otherwise" that the regulation meant to confer on the court authority to put off an execution as a remedy for someone's inability to attend on the date that's been lawfully set by the Executive Branch.

So that leaves Your Honor the Georgia statute.  And I'll say two things about that.

The first is that we don't think it's relevant because Section 3596 of the Federal Death Penalty Act does not actually incorporate that.  When the 3596 refers to the manner of implementation, it's referring to state laws and state rules governing the effectuation of death.  That is what the Seventh and Ninth circuits have held.

To be clear, Your Honor, the government's position is it doesn't even do that.  Our position is the one that Judge Katsas sets forth in his opinion in the D.C. Execution Protocol cases.  But again, no circuit has gone so far as to say that state statute governing witness attendance are among those incorporated by the Death Penalty Act.

And two very recent published decisions with the Seventh

Circuit and the Ninth Circuit have held to the contrary, only provisions that effectuate death that excludes provisions about witness attendance, and the Supreme Court denied relief, Your Honor, in both of those cases.

And secondly, I guess I would say that if Your Honor disagreed with that understanding and the Georgia statute were relevant, we still don't think that on its face it provides an enforceable right, not just to make the request or to have a court order the warden to honor a request for a particular lawyer, but also for a court to put off or postpone an execution as a remedy for a prison's inability to accommodate a lawyer or for a lawyer's scheduling conflicts.

And in that regard, Your Honor, it is worth just thinking about how this would play out in a more mundane case. We are dealing, I recognize, with much different circumstances, Your Honor, than this, but you can imagine a scenario where a defendant's, a condemned inmate's preferred counsel who worked with him for many years is a prominent lawyer, there's another case going to trial, multidefendant case that just can't be moved. It's been put off and has speedy trial restrictions on it, it can't be moved, and the inmate really wants that lawyer there.

He just can't attend. It's jury selection, it's the second day of trial, it's closing arguments, he just can't be there. That's a terrible thing, it's unfortunate. But we

don't think it provides a federal court that entered the judgment of conviction in a capital sentence authority to reset the date just as an equitable matter or to make the execution more humane absent satisfaction of the usual criteria, the usual standards for a stay or an injunction.

I will try to wrap up here, Your Honor.  Last thing I'll say, this is in our motion as well, Mr. LeCroy has brought to the court's attention here some factors that may kind of pull at the heartstrings, and they are unfortunate, as I said. But I want to mention the other side of the balance here, which is that this crime was heinous, the case has been sitting for quite a while, and the Eleventh Circuit in the *Bowles versus Desantis* case cited in our brief, Your Honor, has said every time an execution is put off in a case like this, it does have a cost in terms of the victims, the family, and the government and every delay basically converts, at least temporarily, a sentence of death into a sentence of life imprisonment.

And that's where we are right now.  We're at a phase where another delay, more delay would cause the kind of harms that the courts have been concerned about and they would do so quite close to the set execution date.  And so it may not be the eve of execution, but we do think we are in the zone of last minute intervention that the Supreme Court has emphasized, repeatedly recently, in vacating other

injunctions, should be an extreme exception.  The court said an extreme exception, not the norm by any means.

So we think that to meet, to fall within that exception the defendant has to come forward with much more in terms of a legal, a statutory, constitutional rule-based violation than what Mr. LeCroy has brought to the court, which consists of unfortunate circumstances, perhaps sympathetic ones, but not ones that we think make out a legal violation or that would support the court's exercise of its discretion even if it had the authority to act in this scenario.

THE COURT:  Thank you.

MR. MEISLER:  Thank you.

THE COURT:  Mr. Ferrell, let me ask you, why is this not a motion that in reality relates to the execution of the sentence?  And it's a sentence that the court directly authorized the attorney general and then the marshal to do the things that have been done here.  I gave them that authority in my order to do that and they have acted pursuant to that and your concern here is in that acting how they're executing the sentence.

Why shouldn't this have to clear the hurdles of a 2241 and be gauged on that standard as opposed to whatever the standard is we would be applying here?

MR. FERRELL:  Well, Your Honor, I think that's because of the inherent authority this court has to exercise its

discretion.  And this court did delegate some authority, but I disagree that that preamble in the regulations, it doesn't confer authority, I would say more it recognizes the court's superior authority.  And the court has authority to say, okay, you're better suited to figure out dates and things like that.

But then when things are brought to the court's attention and the court, in its discretion -- and I will disagree with, or not disagree, but Mr. Meisler may be right that if this court acts as we ask the court, that other defendants may bring similar claims, but those courts will have to weigh those interests in their discretion, and if those are real game playing or if it is really a small minute detail that someone's trying to pick up on, courts are well-versed in figuring those things out.

I've been practicing for a while and I know this court has been presiding for a while and most judges know when that happens and have their proper gatekeeping authority.

And in this case it's exactly as Your Honor said, there's not some other proceeding that is causing the stay. The court isn't say, well, let's see what the Eleventh Circuit says about it, let's see how certain conditions play out, you know, what the tests show, I think is what the court said.

That's why this is different and I think that the courts

retain jurisdiction over the matter until the end because this is the court that ordered that sentence and this is the court that has authority to see that it's carried out, carried out pursuant to its other orders, such as the statutory right to counsel, which is not a minimal right in a death penalty case even at the end.

I think especially, as Mr. Martin eloquently illustrated, it's a very important function and a survey of execution protocols all over this country and in the federal system, I would challenge anyone to find one that doesn't have some provision for the presence of counsel.

And the reason for that unanimity is because there's a general recognition of just how important counsel's role is at the very end.

And so by us asking that another date be set, we are not asking that it (indiscernible) and Chief Justice Roberts, in his discussion of an injunction, that any time a court issues an order telling a party to do or not do, that doesn't make it an injunction. And it doesn't make it a stay when the court says I'm going to move it to a different date that accommodates the interests I think are compelling and that flow from my jurisdiction over this case and the sentence that I imposed.

THE COURT: I'm also a little concerned, and Mr. Meisler alluded to some of the cases that talk about the -- and I

think it was perhaps in a clemency case talking about the relief being sought, whether it really accomplishes what the true remedy you're seeking is.  Basically this is about my seeing that my order appointing counsel is carried out and if -- and I can order that that be carried out but that does not necessarily mean that the execution does not go forward and I don't get to get down into the specifics.

There are cases that suggest it's inappropriate for the court to go out and jiggle the system out there.  I've given the charge to counsel, they're to carry out that function as best they can, and I don't think I'm necessarily the person to go out and change the system when other means are available.

And I think it gets to the concern that Mr. Meisler had about whether there's a constitutional or a statutory violation.  Is it possible for there still to be adequate assistance of counsel and is it appropriate for me to evaluate that on a personal relationship level as opposed to a legal level?  That is, can competent counsel be there who could satisfy the constitutional or statutory requirements for Mr. LeCroy to be adequately represented in those final days, final hours, final minutes, rather than, while it may not be the person he most would like to have there, is that not meeting the obligation of the order and seeing that my order is carried out?

And on top of that, and I don't mean to -- if one of the lawyers objected to this question I'd sustain it because it's duplicitous, I'm asking too many questions, but while I'm on a roll I want to finish this.

But it also raises that concern and I don't -- let me hasten to say this is not my concern in this case, but the ability to game the system, and while I wish I had the ability to discern when someone's gaming me, I'm not always adept at that.  I've been gamed before, I will be gamed again, I am sure.

But to give that power over something as important as this so freely, that is, to read these regulations as saying if someone who is on the list can't make it, we can't do it, and how good of an excuse is a good excuse?  Who makes the call?  Is it the Executive Branch or is it the Judicial Branch?

Those, it seems to me we're opening up a real Pandora's box when I think many people would say what I should be looking at is are this man's constitutional rights being protected, is he being adequately represented by lawyers for his legal rights and legal protections, are they being taken care of.

MR. FERRELL:  I'll go ahead and answer that.  And I think that there are potentially issues here on the adequacy of counsel and one of them being, as Mr. Martin pointed out,

the mental health of the defendant at the time of execution and their knowledge of his baseline.

Certainly I have met him and I have talked to Mr. LeCroy on the phone.  It's very different than knowing your counsel and being able to recognize when your client is decompensating in ways that you hadn't seen before, you hadn't seen in other stressful situations.

Also, as for other -- this court's ability to discern other instances of game playing, I'm sure there are times when judges have thought something was game playing and it really wasn't, it was sincere.  So I think there's always -- it's human to possibly err.

But at the same time this is really an extraordinary situation.  We've compared this, and certainly the government compared this to *Lee* and *Honken,* and I would join *Lee* and *Honken* in saying those are very compelling reasons to move their executions, because of this pandemic.  But in our case we have that pandemic and those exact same reasons that I think make for a compelling case that those judges disagreed with.

But in addition we've got learned, experienced counsel who's been working this case for 15 years or 13 years who's unable to carry out his function, his appointed function.  That's another weighty element for this court to decide.  And I think given the court's discretion it's something that

courts, unfortunately for you, many times I think I'm glad I'm not the judge, at least this argument, I don't have to decide, but the judges, that's what your role is and when you ask in your question is it not better to let the executive decide that, no, because I don't think the executive is going to give those factors of counsel appropriate weight.

And as for any statutory right being violated, I would say the statutory right to (indiscernible) in order to have that counsel.  It may not be what Mr. Meisler I think was referring to at one time is you can't argue in habeas that ineffective assistance of counsel in habeas is grounds for (indiscernible).

But you can argue, and I would cite to the *McFarland* decision, which we cited to in our motion, that having counsel appointed must be meaningful, therefore if there are practical considerations that the court must take into account in order to make that appointment meaningful the court has discretion to do that.  I certainly wouldn't say unfettered discretion.  I'm sure most judges would agree with me that they don't have unfettered discretion in almost anything.  They've got to (indiscernible) the factors, make a reasonable balance of all the (indiscernible) and arrive at a decision.

And I think that in this case, given the factors that we presented to you, given the fact that this is a short

duration for a resetting and it is not a stay because we're not waiting on something else, that the court has that discretion and that there won't be a whole lot of plaintiffs or defendants or inmates going forward but (indiscernible) factors and evidence that are (indiscernible).

THE COURT:  Mr. Meisler, let me close it out with a question to you if I could.

I appreciate the argument that you've made in terms of basing a decision on a constitutional violation or some statutory violation, and because I think certainty is important in cases of this type and that there needs to be an understanding of folks that are dealing with these cases what the expectations are, but -- and I think you've already answered this but I just want to roll it out there one more time if there's anything else you want to say about it.

There's no question we are in an unbelievable time in terms of the COVID-19 pandemic, and when I look at our system of justice and how it's operating right now, the allusion was made earlier to the fact that you guys are participating by video conference, I'm sitting here wearing a mask with my staff in the courtroom who are also wearing masks.  We are not having jury trials.  People are sitting in prison or in jails, holding facilities, awaiting trials because we are unwilling to call jurors to the courthouse.

Our system is at a totally different place right now and

it's because we've halted things in the face of the pandemic, and we've done that because of a strong desire by me and my colleagues on this court to protect everyone.  We would not ask Mr. Martin to come to court for a hearing.  We would not ask him to and we sure as heck wouldn't require him to.  Nor would we you, hasten to say.  We will not require any lawyer to appear in court at this time because of the uncertainty of this virus and our desire not to put people at risk.

And so we're that way for a discovery dispute in a civil case, for a plea in a criminal case.  And we're talking about an execution of a human being here.  And I don't want to get -- I'm not headed down the road it sounds like I'm headed down.

What I'm wanting to say here is that you've expressed a concern that the government has an interest in seeing that its sentences are carried out and that every day there's a continuance it's a life sentence for that period of time, which to me calls to mind the perception of justice and what is the perception of justice.  And I have just a little tug inside that says we won't make you come here for a discovery dispute but we will make a lawyer go to Terre Haute to witness an execution because, by golly, we're going to have our executions.  We may not have our trials but we will have our executions.

There's a spin you can put on that that's counter to

let's see to it that justice is done, let's get these matters taken care of.  But to me -- I've tried three death penalty cases.  I have had a defendant who was tried before me who has been executed.  I am not new to this, so I've been down this road.

But I say to judges that have not tried one of these cases, it's an experience that is unlike any other, it's a responsibility that is unlike any other and so I take it that way.  For me -- and I know you do too, I'm preaching to the choir here, I know every one of you takes this extremely seriously and you've been very respectful in your approach here.

But that is a concern I have, the perception of justice here is also important to me.  While it's important, I don't know that that is the basis for making a decision, and you can tell me that it's not, and it may well not be.  But a part of the argument here is that the court has a function, it has a duty, it has a responsibility, as does the Executive Branch, and part of my duty and responsibility is to see that there are just results and that there's a perception of the public that what happens here is just and it's fair and that it is human, that it is humane.

So, again, what this takes me to is this is not about stopping an execution as I see it; it's about when it's going to occur.  And the things I'm struggling with are, on the one

hand, there needs to be a finality to judgments.  I'm a firm believer, there needs to be a finality to judgments.  There needs to be clarity in the law so people know what the law is.  And I recognize other judges have been affirmed on the basis that COVID-19 is not a reason to change the way we're doing this and so I recognize that law is out there and I've got to -- that may carry the day for me, quite honestly.

I have not decided this case, folks, I am still struggling with it, and I guess you can tell that by the way I'm talking to you.

But that's the one concern that's out there that you both have touched on.  I think that's a big part of what Mr. Martin's comments went to.  And you alluded to it earlier in terms of, I think, the government's perspective on it, and that is -- and I think it's a very legitimate position, the government needs to see the sentences carried out.  That's what your responsibility is, that's what you're charged to do by law.

But how do you react to a concern that -- and this isn't one of those where every delay tactic has been used.  This isn't one of those where the guy's been marched over to the death chamber four times and every time the warden runs in with a letter from whoever he gets it from and stops it. This is the first time an execution date has been set.  It was set only a month ago.  Yes, it's a short time but there's

only like a two-month window to do all this.  So this is not one of those kinds of cases.

Let me get you to just react to that, seriously, and I'm asking you because I really want to hear your thoughts on it.

MR. MEISLER:  I appreciate the court's concern.  And it is a difficult moment, it's a difficult situation.  These cases are extremely weighty and I want to assure the court, as I think per your comments, that all the government lawyers take this very seriously and we appreciate the professionalism and the keen interest Mr. Martin and Mr. Ferrell and Ms. Michaels have in exercising and fulfilling their legal duties, their ethical duties and their duties under the court's appointment order.  So we're not accusing them of bad faith or gamesmanship.

But as Your Honor mentioned earlier, I think courts do have to worry about precedent and worry about announcing rules or writing decisions that invite gamesmanship that's difficult to police in future cases.

But going directly to the court's concern about the perception of justice.  The first thing I would say I think goes to what Your Honor just mentioned.  One thing I would say is one big piece of the justice system is that like cases be treated alike and of course Your Honor has (indiscernible) decision in *Lee* and *Honken* but I think one important piece of perception of justice here would be if COVID-19 was not

enough to halt the executions in those cases, why is it here?

And yes, you can draw pretty what I think is a thin distinction and say, well, those defendants didn't have lawyers who were medically inhibited from attending in person. But, again, given the other kind of alternative channels of communication -- this goes to my second point about how society has adapted to COVID, given alternative ways for Mr. Martin and Ms. Michaels to communicate with Mr. LeCroy, via video conferencing unmonitored, via telephone and whatnot, we think society has adapted in a way.

It's notable, Your Honor, that the Supreme Court of the United States, Congress, the Supreme Court, I'm thinking in particular of the cases where it's heard oral arguments telephonically for the first time ever, in cases involving the President's Article II powers, very sensitive cases involving congressional subpoenas and issued written decisions, extended its term into July, those are I think illustrative of the effects of COVID but they're also I think illustrative of how our system has handled its most important matters through other means.

And so if we -- undoubtedly put execution and implementation of death sentence up there with Supreme Court cases, I'm not going to try to draw on a diagram but the point is it's up there, we recognize that. But if our system can handle congressional hearings with Dr. Fauci on the

pandemic and its effects on our lives, the Supreme Court decisions on presidential power, this very proceeding before the court remotely today, we think that the defense counsel can avail themselves of these mechanisms, these remote communications and means that aren't perfect but do satisfy not just the Constitution, not just the statute, but certainly the letter and spirit of the court's appointment orders, even if they put some strain on defense counsel's ability to satisfy their ethical obligations to the fullest extent they believe them binding.

I would just note, Your Honor, that in Ms. Carol Wright's declaration, which is very eloquent by its own right, I think she acknowledged that a lot of these standards she's discussing are well established among the capital defense bar, but they're not statutory standards, they're not constitutional standards that bind this court and failure to reach the very laudable heights that are set forth in her declaration I don't think make out a legal violation.

And the last thing I think I'll say is that the court is constrained here a bit, right.  As much as the court, even if the court has some kind of discretion in this matter, and again we dispute that for the reasons that I said earlier, when a case reaches this point in its history, even though Mr. LeCroy has not been the most litigious capital defendant ever, he has reached the end of the line on the usual

remedies under appeal and 2255 and cert petition to the Supreme Court, when you reach the end of the line in that way and finality is attached, the system does put restrictions on a court's authority.  That's what I think those last minute intervention cases in the Supreme Court are really about. This may have been good enough but it's not the kind of concern that right at the very end of the day is enough to justify a court's exercising authority.

And the *McFarland* case that Mr. Ferrell cited is a case that recognizes the authority of a federal habeas court to enter a stay so that counsel can be appointed and a habeas petition can be filed.

But again, Your Honor, going back to our earlier dialogue, that's a situation where a court is entering a stay, not just entering an unnamed, kind of unprecedented order in its discretion, it's entering a stay so that further proceedings before it can take place and Congress's statutory expectation that defense counsel would be appointed to assist in the one full and fair opportunity on habeas can be fulfilled.

It's not, I think, an open invitation to say whenever we think it's convenient in a capital case to put off an execution date, a court can intervene, exercise its authority, countermand a concededly lawful date set by the Executive Branch, even when there are definitely certainly

some heartstrings being pulled by the current -- the current dilemma that Mr. Martin faces.

So that's what I would say to the court, that the perception of justice here has a number of sides and I think that justice will be well served here by treating this case alike with *Lee* and *Honken* and by recognizing that we are at the finality stages, the government's interests also come into play, and the unfortunate circumstances caused by the pandemic shouldn't be used as a justification for what I think would be an unprecedented form of relief.

THE COURT:  Thank you all for being available.  I will take the matter under advisement.  It is my intention to issue a written order as soon as I possibly can and will, of course, get that out to you so that you can take whatever action you deem appropriate in response to that order.

But your presentations today have been most helpful and I appreciate the approach each of you has taken and I wish I could say it has made everything crystal clear for me now but I will go now and struggle with this and I will do the best with it that I can.  Thank you, have a good day.

(Proceedings concluded, 4:00 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT:

NORTHERN DISTRICT OF GEORGIA:

           I hereby certify that the foregoing pages, 1 through 57, are a true and correct copy of the proceedings in the case aforesaid.

           This the 9th day of September, 2020.

*/s/ Amanda Lohnaas*
_____

Amanda Lohnaas,
Official Court Reporter
United States District Court